IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

ELLEN ZECHMAN,              )
                           )
        Plaintiff,          )        C.A. NO. _____
                           )
            v.              )        JURY TRIAL DEMANDED
                           )
CHRISTIANA CARE HEALTH      )
SYSTEMS,                    )
                           )
        Defendant.          )

## COMPLAINT

### INTRODUCTION

1.  This is a Complaint brought pursuant to the *Americans with Disabilities Act of 1990*, codified as 42 U.S.C. §12101 et seq. and the *Age Discrimination in Employment Act of 1967*, codified as 29 U.S.C. §621 et seq.

### PARTIES

2.  Plaintiff, Ellen Zechman (hereinafter "Plaintiff"), was at all times relevant to this Complaint, a resident of the State of Delaware, residing at Newtown Place, Newark, Delaware 19702.  Plaintiff is currently a resident of the State of North Carolina, residing at 1608 Tryon Road, New Bern, North Carolina 28560.  Plaintiff is a forty-six (46) year old female who suffers from Mixed Connective Tissue Disease.

3.  Defendant, Christiana Care Health Systems (hereinafter "Defendant"), is and was at all times relevant to this Complaint, a Delaware corporation whose registered agent for the service of process is Christiana Care Corporation, 501 West 14th Street, Wilmington, Delaware 19801.

## JURISDICTION AND NATURE OF ACTION

4.    Jurisdiction is founded on the existence of a question arising under federal statutes.  This action arises under the *Americans with Disabilities Act of 1990*, 42 U.S.C. §12101 et seq. and 28 U.S.C. §§1331 and 1343(4) (the "ADA"). The jurisdiction of this Court is invoked to secure protection and redress deprivation of rights secured by federal law, which prohibits discrimination against employees because of their disability.

5.    The jurisdiction of this Court is also invoked to secure protection and redress deprivation of rights secured by federal laws which prohibit discrimination against employees on the basis of age, in the terms, conditions and privileges of employment, and which prohibit retaliation against an employee for exercising such rights under Title VII of the *Civil Rights Act of 1962*, as amended, 42 U.S.C. §2000(e) et seq. (hereinafter "Title VII"), the *Age Discrimination in Employment Act of 1967*, as amended, 29 U.S.C. §621 et seq., and to secure protection and redress deprivation of similar rights secured by 19 Del. C. §711.

6.    In addition, diversity jurisdiction exists under 28 U.S.C. §1332, in that the parties are based in different states and the amount in controversy is in excess of $75,000.00.  An additional jurisdictional basis for Plaintiff's state law claim exists under the principles of pendant and supplemental jurisdiction and 28 U.S.C. §1367.

7.    The state law claim regarding the breach of the implied covenant of good faith and fair dealing is brought pursuant to the pendant jurisdiction of this Court.

8.    Injunctive and declaratory relief, damages and other appropriate legal and equitable relief are sought pursuant to 42 U.S.C. §2000(e), (f), and (g).

9.    Plaintiff exhausted all administrative remedies before bringing this action, and received a Right to Sue letter from the U.S. Equal Employment Opportunity Commission (hereinafter "EEOC") dated December 13, 2004.

### FACTUAL BACKGROUND

10.    Plaintiff began working for Defendant on a full-time basis on or about June 23, 2002 as a second-year resident physician ("PGY-2") in the Department of Obstetrics and Gynecology through the Department of Graduate Medical Education.

11.    Plaintiff was hired to replace another resident who had left the program, becoming the fourth (4th) resident in a group of three (3) other PGY-2 physicians-in-training which was comprised of Dr. Rachel Heinle, Dr. Kirsh, and Dr. Kirfides, who all began working together in or around June 2001.

12.    Prior to beginning her full-time residency employment with Defendant, in or around March 2002, Plaintiff signed her residency contract and was asked by Ms. Sandi Kardos, Defendant's Residency Coordinator, to provide a copy of her driver's license and her Social Security card for their employment file. Plaintiff complied with this request and upon reviewing the documentation, Ms. Kardos had a look of surprise on her face and commented to Plaintiff, "you certainly don't look your age."

13.    Plaintiff immediately began working in the required capacity of the former resident and it was made clear to Plaintiff by everyone who interviewed her for the position that her previous experience as a first (1st) year resident was much different from that of a first (1st) year resident who had gone through Defendant's Ob/Gyn program.  Defendant fully understood that Plaintiff had a minimal chance to participate as a primary surgeon during her first (1st) year of training in her former program, which is customary in many other programs of this nature.

14.    Plaintiff was informed by Dr. Anthony Sciscione, Defendant's Residency Director, that she would be provided with ample opportunity to increase her surgical skills.

15.    In or around August 2002, Dr. Sciscione informed Plaintiff that various teaching physicians "did not like" Plaintiff because she was "different."  Dr. Sciscione also told Plaintiff that the Residency Review Committee was giving him as much "grief" over hiring Plaintiff as it did when he hired Dr. Rita Vinod, a foreign medical school graduate.  Dr. Sciscione encouraged Plaintiff to work hard, be pleasant, and hopefully the Residency Review Committee would be won over by Plaintiff's "determination and endearing personality."

16.    When Plaintiff asked Dr. Sciscione what he meant by "different," he did not respond.  When Plaintiff specifically asked if it was her southern accent or her age, Dr. Sciscione just shrugged his shoulders and walked away.

17.    In or around August 2002, Plaintiff was asked to complete an EEO survey.

18.    On or about September 17, 2002, Plaintiff was called to Ms. Sandi Kardos'
office and asked to submit her EEO survey. Plaintiff did not have the
completed survey with her, so Ms. Kardos required Plaintiff to remain in her
[Kardos'] office until another survey could be sent to her office via facsimile,
and Ms. Kardos then required Plaintiff to complete the EEO survey before
Plaintiff was permitted to return to work.

19.    In or around October 2002, Plaintiff was notified that the Residency Review
Committee was not satisfied with her surgical skills, so Plaintiff was assigned
a mentor, Dr. Joseph Patruno, who was supposed to conduct periodic meetings
with Plaintiff to act as an instructor as well as someone with whom she could
talk.

20.    During their initial meeting, Dr. Patruno told Plaintiff that various members of
the Residency Review Committee disapproved of her. Patruno also told
Plaintiff that she would have to work exceptionally hard to win the
Committee's approval and he also told Plaintiff that the upcoming annual
CREOG Exam would be pivotal for its approval. Patruno told Plaintiff, "these
are not kind and loving people here," and warned Plaintiff, "if you do not do
well on this exam, those knives in your back will be knives in your head."

21.    Plaintiff was routinely questioned by various teaching physicians and Ob/Gyn
resident colleagues as to why she wanted to "do this at this stage in [her] life."
Plaintiff also noticed that Dr. Rachel Heinle was becoming increasingly rude
toward Plaintiff, even turning her back towards Plaintiff when they were
required to sit next to each other at their daily morning conferences.

22.    Also, in or around October 2002, Plaintiff mentioned to Dr. Sciscione that she
       was experiencing increasingly rude behavior toward her from Dr. Rachel
       Heinle. Dr. Sciscione agreed with Plaintiff and told her, "if anyone ever had it
       out for you, it's Rachel Heinle."

23.    Also, in or around October 2002, Nurse Practitioner Jackie Cook informed
       Plaintiff that she [Cook] heard Dr. Rachel Heinle accuse Plaintiff of failing to
       document a medical procedure that was performed on a triage patient on a day
       when Plaintiff was not even on duty.

24.    On or about November 5, 2002, Plaintiff was assisting Dr. Russell White
       when he began to discuss with Plaintiff the physical demands of their
       specialty. Plaintiff responded that many of the teaching physicians were well
       into the sixties (60s) and were still carrying a full schedule. Dr. White told
       Plaintiff there is "a certain serviceability expected" of a trainee, and also told
       her that because the program desires a certain number of years of service from
       its trainees that it was "a young person's specialty."

25.    On or about February 24, 2003, Plaintiff reported to Defendant's emergency
       room with a severe headache, stiff neck, and photophobia. Plaintiff informed
       Dr. Sciscione, Defendant's Residency Director, that she suffered from Mixed
       Connective Tissue Disease.

26.    The very next day, on or about February 25, 2003, Planitiff returned to the
       emergency room with worsening symptoms, including nausea. Plaintiff was
       admitted to Christiana Hospital that day and knowledge of Plaintiff's
       disability became widespread and public among the staff and other resident

physicians. Plaintiff remained hospitalized from February 25, 2003 through February 28, 2003.

27.    In or around March 2003, Plaintiff developed a red, spotted rash, reported to Defendant's Employee Health Department for evaluation, and was given a work release excuse. However, Dr. Sciscione did not allow Plaintiff to go home, despite the fact that she may have been contagious and potentially hazardous to pregnant women. Instead, Dr. Sciscione instructed Plaintiff to report to the resident library to read chapters in her textbook and take exams based on the reading material. Initially, Plaintiff was feeling only slightly sick. However, by mid-day of her first day with the rash, Plaintiff was feeling ill and lethargic.

28.    Despite how she was feeling, Plaintiff was required to sit in the resident library and take exams for a full week. Plaintiff was not permitted to go home or take sick leave, and was informed by Ms. Sandi Kardos, Residency Coordinator, that if Plaintiff went home sick, the time missed would be counted against her vacation time, which was in direct contrast to Defendant's employee manual which stated that every resident was entitled to six (6) weeks of sick time in addition to their accrued vacation time.

29.    Also in March 2003, on Easter weekend, Plaintiff filed a complaint with her supervisor about an incident involving Plaintiff being forced to examine a pregnant patient who was late in her third (3rd) trimester with no fetal heart rate without a supervising physician. Plaintiff felt this incident was in violation of the Accreditation Council on Graduate Medical Education

("ACGME") guidelines and that it was also just bad medicine to allow

residents to continue seeing patients unsupervised, which had been ongoing

for a significant period of time, causing Plaintiff to express her complaint to

her supervisor.

30.    In or around April 2003, Dr. Moses Hochman advised Plaintiff that she should

start looking for another residency program because there was "great

animosity toward [her]" for filing her complaint about the deceased baby

incident over Easter weekend.  Plaintiff requested that Dr. Hochman write her

a letter of recommendation.

31.    On or about April 4, 2003, Dr. Hochman provided Plaintiff with a letter of

recommendation for the residency program at Eastern Virginia Medical

School in Norfolk, Virginia.  In this letter, Dr. Hochman stated, "Dr. Zechman

is much older than her coresidents, but by my observation is the most

dedicated physician, I have seen, desiring to complete her OB/GYN

residency."

32.    On or about May 13, 2003, Plaintiff sent an e-mail to Dr. Sciscione, Dr.

Lamar Ekbladh, and Dr. Patruno, her mentor, stating that she was routinely

being re-assigned from her current rotation in Gynecology Surgery to the

Labor and Delivery and Ob/Gyn Triage Department, which Plaintiff found

strange considering she was being criticized for her surgical skills, yet she was

not being allotted time in the OR to improve her surgical skills.  Plaintiff

believed her re-assignments were in retaliation for her complaint about the

deceased baby over Easter weekend.

33.    On or about May 19, 2003, Plaintiff was left behind when Defendant's
residents were required to attend a meeting in Philadelphia, Pennsylvania,
despite the fact that Plaintiff had made it known to everyone during their
morning check-in meetings for a period of two (2) weeks prior to this meeting
that she had never driven in Philadelphia and would need to go with someone
or, at minimum, follow another car to the meeting. Instead, Plaintiff was left
behind and was forced to attempt to drive herself to this meeting, which
resulted in Plaintiff getting lost and missing the meeting. As a result of
getting lost and missing the meeting, Plaintiff's Residency Director threatened
to take away her upcoming vacation time. Plaintiff believes she was
intentionally left behind in retaliation for her complaint about the deceased
baby incident over Easter weekend.

34.    On or about June 19, 2003, Plaintiff sent a formal complaint via e-mail to Dr.
O'Connor at the Accreditation Council on Graduate Medical Education
("ACGME") alleging residency abuse and discriminatory practices at
Christiana Care, and also citing to the ACGME the deceased baby incident
from Easter weekend as an example of the procedural violations that were
occurring at Christiana Care.

35.    On or about June 24, 2003, less than a week after filing her complaint with the
ACGME, Plaintiff was informed that she would not be offered a third (3rd)
year residency contract. Plaintiff was told she might be given an opportunity
to advance in the fall if her surgical skills improved. Plaintiff concurrently
noticed that her position had already been posted on the national website for

OB/GYN residency positions. Plaintiff strongly believes she was not offered this position in retaliation for her complaint to the ACGME.

36. On or about June 25, 2003, Plaintiff was informed by Residency Coordinator Sandi Kardos that she [Plaintiff] was no longer permitted to use the third (3rd) year call room since it had been decided that Plaintiff would not be promoted to third (3rd) year status. When Plaintiff asked Dr. Ekbladh what area she could use, she was told to use the second (2nd) year call room. When Plaintiff reported to the second (2nd) year call room, she noticed that there was only one single bed in the room and that there was another second (2nd) year resident assigned to that room on call at the exact same time she would have needed the room. Therefore, Plaintiff became the only resident out of the sixteen (16) resident physicians without a bed or an area for personal items when she was on call.

37. On or about July 1, 2003, Plaintiff was assigned an individual training schedule under the direction of Dr. Matthew Hoffman. Plaintiff, however, was routinely re-assigned from this schedule throughout the months of July, August, and September 2003, thus not receiving most of the surgical cases with her assigned teaching physicians that she was supposed to have.

38. Resident Physician Robyn Gray would re-assign Plaintiff from her surgical assignments, allowing other residents to step in and participate in the surgical cases that had originally been assigned to Plaintiff. At one point, Dr. Kaminski informed Plaintiff that he was going to include in his written evaluation report to Dr. Ekbladh that he did not understand why Plaintiff was

being taken off all of her surgical assignments and replaced with other residents. Dr. Kaminski read this statement in his report to Plaintiff when it was completed, but told her he could not give her a copy of the document.

39.   On or about July 23, 2003, Plaintiff began to suffer from fatigue due to an increasingly demanding workload and she requested a reasonable accommodation from Defendant due to her disability. Plaintiff requested a seventy-two (72)-hour break (three (3) days) in every fourteen (14)-day period, which did not necessarily need to be on the weekends.

40.   On or about July 23, 2003, Plaintiff was given a Request for Disability Accommodation Form to complete by the Assistant to the Director of the Graduate Medical Education Department. Plaintiff completed her portion of the request form on or about July 24, 2003 and returned it to Sandi Kardos on or about July 25, 2003. The physician's portion of the request form was completed by Dr. David Fraser and sent via facsimile ("fax") to Defendant's Employee Health Services Department on or about August 11, 2003.

41.   On or about July 25, 2003, Plaintiff was assigned to assist Dr. Kaminski in the operating room, but was once again denied the opportunity to improve her surgical skills because Dr. Naqui took the case over and would not allow Plaintiff to even assist in the operating room. Plaintiff was instead re-assigned to Triage.

42.   On or about July 26, 2003, Plaintiff was on a scheduled twenty-four (24)-hour call night when supervising resident physician Dr. Robyn Gray told Plaintiff she should just "quit or at least go to another program."

43.     On or about July 29, 2003, Dr. Robyn Gray, supervising resident physician, informed Plaintiff that she was required to attend the 6:30 a.m. morning rounds in the High Risk Obstetrics Unit, even though Plaintiff was not currently assigned to that unit.

44.     Plaintiff was scheduled to have weekly skill improvement sessions with Kirk Roberts using the operating room training equipment in order to improve her surgical skills. However, Dr. Robyn Gray would routinely assign Plaintiff to morning duties to prevent her from participating in these sessions, which were always scheduled for mornings, thus disallowing Plaintiff the opportunity to improve her surgical skills.

45.     On or about July 30, 2003, only seven (7) days following Plaintiff's request for accommodation, Dr. Ekbladh called Plaintiff into his office and threatened her with termination. When Plaintiff asked Dr. Ekbladh how termination could be an option, Ekbladh laughed and replied, "well, we certainly would have to come up with a good reason, wouldn't we?"

46.     On or about August 11, 2003, Plaintiff performed two (2) medical procedures with Dr. Ghassem Vakili. Dr. Vakili asked Plaintiff, "why are they holding you back" and "who is mad at you" while they were completing these procedures.

47.     On or about August 12, 2003, Dr. Gray assigned Dr. Rachel Heinle to take Plaintiff's place in an operating room case, despite the fact that Heinle was assigned to another area, thus denying Plaintiff yet another opportunity for any surgery cases that day.

48.    In or around August and September 2003, Plaintiff was denied the opportunity to attend weekly half-day clinics at Wilmington Hospital; these clinics are a requirement of all Ob/Gyn training programs. When Plaintiff asked Dr. Hoffman why she was excluded from this opportunity, he shrugged his shoulders and told her to ask Dr. Ekbladh. When Plaintiff asked her assigned mentor, Dr. Patruno, why she was excluded from this opportunity, Patruno stated, "Can't you see? They kicked you out of the call room, now they're pushing you out the door."

49.    On or about August 20, 2003, Plaintiff met with her mentor, Dr. Patruno, who encouraged Plaintiff to quit and go home to be with her family. Patruno told Plaintiff, "you are not wanted here; they are all but ignoring you – it's not getting better, it's worse."

50.    On or about August 20, 2003, Plaintiff inquired as to why she had not yet received a response to her request for accommodation, to which Dr. Ekbladh replied that he was "awaiting the final report from Dr. Fraser." Ekbladh demanded to speak with Dr. Fraser personally and ordered Plaintiff to see a staff psychiatrist, Dr. Judith Martin.

51.    While awaiting a response to her request for accommodation, Plaintiff was required to work 85.25 hours from August 17, 2003 to August 23, 2003 and she was denied any time off for the months of July and August 2003.

52.    On August 20, 2003, Plaintiff received a letter from Dr. Lamar Ekbladh which stated, *"The committee noted that you seem to be exceedingly stressed and you have many signs of depression...There was also concern expressed that*

*your emotional status is preventing you from learning appropriately or that*
*there might be an underlying learning disability but that these could not be*
*clearly separated."*

53. On or about September 3, 2003, Plaintiff requested time off for September 5
    or September 8, 2003, in line with her request for accommodation, stating that
    she had "worked 18 consecutive days without a full twenty-four (24) hour
    break." Plaintiff also stated that all of her joints ached and she was feeling
    worn out. Sandi Kardos informed Plaintiff that she would have to request
    time off through the proper channels.

54. Plaintiff requested to use a sick day on September 5, 2003 but was required to
    use one of her vacation days instead.

55. On or about September 4, 2003, Plaintiff received a schedule for the weeks of
    September 8, 2003 through November 17, 2003. Plaintiff was informed by
    Ms. Sandi Kardos that she would be part of "the regular team" in those
    rotations and that they would not be able to afford Plaintiff the
    accommodation she requested because the residency program could not
    tolerate having anyone out for that long a period of time.

56. On or about September 16, 2004, Plaintiff received a letter from Dr. Ekbladh
    informing her that she should apply for Family Medical Leave ("FMLA") and
    that she would have to have her FMLA forms returned to Employee Health
    within 15 days from the date of Dr. Ekbladh's letter.

57. On or about September 20, 2003, Plaintiff suffered a pinched nerve in her left
    leg, resulting in her left leg going numb. Plaintiff requested a medical leave

through her mentor, Dr. Patruno, who assisted Plaintiff with providing her request for medical leave to Employee Health and Sandi Kardos.

58. On or about September 22, 2003, Plaintiff provided her FMLA request forms to Employee Health and Sandi Kardos, only six (6) days after Dr. Ekbladh's September 16, 2003 letter.

59. On or about October 3, 2003, Plaintiff contacted Ms. Sandi Kardos to inform her that Plaintiff had a medical release to return to work and would be faxing same to Employee Health and Kardos. Plaintiff also informed Kardos that Plaintiff would have "lifting restrictions" upon her return. Kardos told Plaintiff "if you can't lift, you might as well not come back." When Plaintiff responded that lifting was not a requirement of a physician, Kardos replied, "you are a resident; you do whatever you are told to do."

60. Shortly after her conversation with Kardos, Plaintiff received a telephone call from Dr. Kaminski informing her that Dr. Ekbladh had "dismissed" her.

61. On or about October 4, 2003, Plaintiff sent a letter to Brian Little, Director of Academic Affairs, indicating that she wished to challenge Dr. Ekbladh's actions.

62. On or about October 8, 2003, Plaintiff received a letter dated September 29, 2003 stating that the Residency Review Committee voted unanimously to dismiss Plaintiff for academic reasons.

63. Plaintiff met with her assigned mentor, Dr. Patruno, for advice and information about Defendant's "fair hearing procedure." Patruno questioned Plaintiff, asking her what she thought she would accomplish by challenging

Dr. Ekbladh, stating "don't you see they do not want you here." Patruno told Plaintiff, "if you win by challenging the decision, you will just be ignored; you can't learn if they won't teach you."

64.    On or about October 22, 2003, Plaintiff met with Dr. Charles Whitney for advice. Whitney told Plaintiff, "they sure have pushed people through this program who were much worse than you." Whitney also informed Plaintiff that he had a prior incident with Dr. Ekbladh and told her "no one will stand up for you because they saw what he [Ekbladh] did to me and they are all scared."

65.    After her visit with Dr. Whitney, Plaintiff decided to visit Dr. Ekbladh in his office. Dr. Ekbladh told Plaintiff that it was "no use" to challenge his decision because "even if you win, I will still be your Residency Director and you will still be under my supervision and I will just find another reason to get rid of you." Ekbladh further threatened Plaintiff by stating that if she challenged him and lost, then he would "report [Plaintiff] to the National Practitioners' database and give [Plaintiff] unfavorable recommendations."

66.    Plaintiff, fearful that her future in Ob/Gyn was in jeopardy, felt she had no choice but to resign from her position, and was constructively discharged by forcing her resignation under duress, on October 28, 2003.

67.    After Plaintiff submitted her resignation on October 28, 2003, she received an e-mail from Brian Little indicating that Plaintiff would have to "back-date" her resignation letter to September 28, 2003. Plaintiff informed Dr. Little of the abuse she had endured and asked to meet with him to discuss her situation

further. However, once Plaintiff submitted her back-dated letter of resignation, no further communication was received from Dr. Little.

68. In an effort to move forward, Plaintiff applied to the Family Practice program in Greenville, North Carolina, but was declined a position due to "poor recommendations from the Christiana Residency Program" according to Dr. Dean Patton who informed Plaintiff of her rejection via telephone.

69. Plaintiff then applied for various positions in eastern North Carolina, but due to the fact that Plaintiff was not Board-certified in an ACGME approved specialty, Plaintiff was not eligible for most of the positions in that region.

70. Plaintiff filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") on or about June 9, 2004, alleging age discrimination, disability discrimination and retaliation. A copy of Plaintiff's Charge of Discrimination is attached hereto as Exhibit "A."

71. Plaintiff was issued a Right to Sue letter from the EEOC dated December 13, 2004 for the Charge of Discrimination filed on June 9, 2004. A copy of this Right to Sue letter is attached hereto as Exhibit "B."

## COUNT I
### *Violation of the Age Discrimination in Employment Act*

72. Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 71 by reference as if specifically set forth herein.

73. Plaintiff was over the age of forty (40) at the time she entered Defendant's Residency Program.

74.    The practices of Defendant, as complained of above, had the effect of depriving Plaintiff of equal employment opportunities and otherwise affected her employment because of her age.

75.    The practices employed by Defendant violate Plaintiff's rights under the *Age Discrimination in Employment Act* ("ADEA") were intentional and were done with malice and/or reckless indifference to the federally-protected rights of Plaintiff and were designed to further injure Plaintiff.

76.    The practices of Defendant, as complained of above, caused Plaintiff to experience conscious pain and suffering and other emotional harm.

77.    As a direct and proximate result of said acts, Plaintiff has suffered and continues to suffer, loss of employment, loss of income, loss of other employment benefits, and has suffered, and continues to suffer, distress, humiliation, great expense, embarrassment, and damages to her reputation.

## COUNT II
### *Violation of 19 Del. C. §711*

78.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 77 by reference as if specifically set forth herein.

79.    Defendant's aforesaid actions constituted discrimination against Plaintiff on the basis of age in violation of 19 Del. C. §711.

80.    Defendant's violation of Plaintiff's rights under 19 Del. C. §711 was intentional and therefore were done with malice and reckless indifference to the federally-protected and state-protected rights of Plaintiff and were designed to further injure Plaintiff.

81.    As a direct and  proximate result of said acts, Plaintiff has suffered and
continues to suffer, loss of employment, loss of income, loss of other
employment benefits, and has suffered, and continues to suffer, distress,
humiliation, great expense, embarrassment, and damages to her reputation.

## COUNT III
### *Violation of 19 Del. C. §723, §724, §726*

82.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1
through 81 by reference as if specifically set forth herein.

83.    Defendant's aforesaid actions constituted discrimination against Plaintiff on
the basis of an actual and/or perceived disability in violation of 19 Del. C.
§723, §724, §726.

84.    Defendant's violation of Plaintiff's rights under 19 Del. C. §723, §724, §726
was intentional and therefore was done with malice and reckless indifference
to the federally-protected and state-protected rights of Plaintiff and was
designed to further injure Plaintiff.

85.    As a direct and proximate result of said acts, Plaintiff has suffered and
continues to suffer, loss of employment, loss of income, loss of other
employment benefits, and has suffered, and continues to suffer, distress,
humiliation, great expense, embarrassment, and damages to her reputation.

## COUNT IV
### *Violation of the Americans with Disabilities Act (the "ADA")*

86.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1
through 85 by reference as if specifically set forth herein.

87.   Defendant violated Plaintiff's rights under the ADA by constructively discharging her as a result of a disability.

88.   Defendant violated Plaintiff's rights under the ADA by constructively discharging her as a result of a perceived disability.

89.   Defendant violated Plaintiff's rights under the ADA by denying her request for a reasonable accommodation due to her disability.

90.   At all relevant times, Plaintiff was able to perform the essential functions of her position as a resident physician.

91.   Defendant's violations of Plaintiff's rights under the ADA were intentional and therefore were done with malice and reckless indifference to the federally-protected rights of Plaintiff and were designed to further injure Plaintiff.

92.   As a direct and proximate result of said acts, Plaintiff has suffered and continues to suffer, loss of employment, loss of income, loss of other employment benefits, and has suffered, and continues to suffer, distress, humiliation, great expense, embarrassment, and damages to her reputation.

### COUNT V
### *Disability Discrimination*

93.   Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 92 by reference as if specifically set forth herein.

94.   The practices of Defendant, as complained of above, had the effect of depriving Plaintiff of equal employment opportunity and otherwise adversely affected her employment because of an actual and/or perceived disability. The practices of Defendant were intentional and therefore were done with

malice and reckless indifference to the federally-protected and state-protected rights of Plaintiff and were designed to further injure Plaintiff.

95.    Defendant failed to provide reasonable accommodations to Plaintiff based upon Plaintiff's disability.

96.    The practices of Defendant, as complained of above, caused Plaintiff to experience conscious pain and suffering and other emotional harm.

97.    As a direct and proximate result of said acts, Plaintiff has suffered and continues to suffer, loss of employment, loss of income, loss of other employment benefits, and has suffered, and continues to suffer, distress, humiliation, great expense, embarrassment, and damages to her reputation.

### COUNT VI
### *Detrimental Reliance*

98.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 97 by reference as if specifically set forth herein.

99.    Based upon the foregoing facts, Plaintiff relied to her detriment upon the representations of Defendant that she would be afforded the opportunity to improve upon her surgical skills, and that Defendant would accommodate her disability.

100.   The practices of Defendant, as complained of above, caused Plaintiff to experience conscious pain and suffering and other emotional harm.

101.   As a direct and proximate result of said acts, Plaintiff has suffered and continues to suffer, loss of employment, loss of income, loss of other employment benefits, and has suffered, and continues to suffer, distress, humiliation, great expense, embarrassment, and damages to her reputation.

## COUNT VII
### *Retaliation*

102.  Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 101 by reference as if specifically set forth herein.

103.  The practices of Defendant, as complained of above, had the effect of depriving Plaintiff of equal employment opportunities or otherwise adversely affected her employment through repeated acts of retaliation directed toward Plaintiff, for her repeated complaints about the way she was being treated by her colleagues, supervisors and/or instructors, and for filing a complaint with the ACGME, and for requesting a reasonable accommodation for her disability and for complaining repeatedly when she was not receiving the training she was supposed to receive by Defendant.

104.  The practices employed by Defendant to retaliate against Plaintiff were intentional and were done with malice and/or reckless indifference to the federally-protected rights of Plaintiff and were designed to further injure Plaintiff.

105.  The practices of Defendant, as complained of above, caused Plaintiff to experience conscious pain and suffering and other emotional harm.

106.  As a direct and proximate result of said acts, Plaintiff has suffered and continues to suffer, loss of employment, loss of income, loss of other employment benefits, and has suffered, and continues to suffer, distress, humiliation, great expense, embarrassment, and damages to her reputation.

## COUNT VIII
### *Breach of the Covenant of Good Faith and Fair Dealing*

107.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1
through 106 by reference as if specifically set forth herein.

108.    The actions of Defendant constitute a violation of the Covenant of Good Faith
and Fair Dealing implicit in every employment agreement.

109.    Defendant breached the Covenant of Good Faith and Fair Dealing to Plaintiff
by terminating her based upon an actual and/or perceived disability and/or
based upon her limitations due to her disability and/or based upon retaliatory
motives, and by discriminating against her based upon her age.

110.    Defendant's discrimination was willful, wanton, and malicious. As a result,
Plaintiff is entitled to an award of compensatory and punitive damages.

111.    The above-stated damages were not the result of any act or omission on the
part of the Plaintiff.


**WHEREFORE**, Plaintiff Ellen Zechman, respectfully requests that this Court
enter judgment in her favor and against Defendant, Christiana Care Health
Systems:

(a)    Declaring that the conduct engaged in by the Defendant to be in
violation of Plaintiff's rights;

(b)    Issuing a judgment in Plaintiff's favor ordering Defendant to provide
appropriate back pay with pre- and post-judgment interest, in amounts
to be determined at trial, and other affirmative relief necessary to
eradicate the effects of Defendant's unlawful employment practices;

(c)    Issuing a judgment in Plaintiff's favor ordering Defendant to provide compensation for non-pecuniary losses, including, but not limited to, pain, suffering, and humiliation, in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of Defendant's unlawful employment practices;

(d)    Issuing a judgment in Plaintiff's favor ordering Defendant to provide compensation for past and future pecuniary losses, in amounts to be determined at trial;

(e)    Issuing a judgment in Plaintiff's favor ordering Defendant to pay punitive damages for its malicious and/or reckless conduct in amounts to be determined at trial;

(f)    Issuing a judgment in Plaintiff's favor ordering the Defendant to pay the costs of reasonable attorneys' fees and expenses and the costs of this litigation; and

(g)    Granting such other further relief as this Court deems just and proper.


MARGOLIS EDELSTEIN


Jeffrey K. Martin, Esquire (#2407)
1509 Gilpin Avenue
Wilmington, Delaware 19806
302-777-4680 phone
302-777-4682 facsimile
Attorney for Plaintiff Ellen Zechman


Dated:  March 14, 2005