## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ELLEN ZECHMAN,                              :
                                            :
              Plaintiff,                     :
                                            :
       v.                                   :        C.A. No. 05-159-JJF
                                            :
CHRISTIANA CARE HEALTH SYSTEMS,             :
                                            :
              Defendant.                     :

---

## BRIEF IN SUPPORT OF DEFENDANT CHRISTIANA CARE HEALTH SYSTEMS' MOTION FOR SUMMARY JUDGMENT

---

David H. Williams (#616)
MORRIS, JAMES, HITCHENS &
WILLIAMS LLP
222 Delaware Ave., 10th Floor
P.O. Box 2306
Wilmington, DE 19899
(302) 888-6900
dwilliams@morrisjames.com

Michael J. Ossip (admitted pro hac vice)
Thomas S. Bloom (admitted pro hac vice)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
215.963.5543

Attorneys for Defendant Christiana Care
Health Systems

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

I.    NATURE AND STAGE OF THE PROCEEDINGS ....................................... 1

II.   SUMMARY OF ARGUMENT ......................................................................... 1

III.  STATEMENT OF UNDISPUTED FACTS ...................................................... 3

      A.    Plaintiff's Academic History And Application To Join Christiana
            Care As A Second-Year OB/GYN Resident ......................................... 3

      B.    Plaintiff's Poor Performance And Christiana Care's Efforts To
            Help Her Improve ................................................................................. 5

      C.    On September 29, 2003, The RRC Terminates Plaintiff's
            Residency For Academic Reasons ....................................................... 10

      D.    Plaintiff's Alleged Disability And Request For Accommodation ....... 12

IV.   ARGUMENT ................................................................................................. 14

      A.    Standard Of Review .............................................................................. 14

      B.    The Court Should Dismiss Plaintiff's Age Discrimination Claims
            Because Plaintiff Cannot Establish That Christiana Care's
            Legitimate, Nondiscriminatory Reasons For Her Termination Are
            Pretext For Age Discrimination. ......................................................... 15

            1.    Christiana Care Has Articulated Legitimate
                  Nondiscriminatory Reasons For Plaintiff's Termination ......... 16

            2.    Plaintiff Has Adduced No Evidence That Christiana Care's
                  Legitimate Nondiscriminatory Reasons For Her
                  Termination Are Pretextual ...................................................... 18

      C.    Christiana Care Is Entitled To Summary Judgment With Respect
            To Plaintiff's Disability Claims. ......................................................... 22

            1.    Plaintiff Does Not Have A "Disability" Under The ADA ......... 23

            2.    Plaintiff's Accommodation Claim Fails ................................... 26

            3.    Plaintiff's Discriminatory Termination Claim Fails ............... 29

V.    CONCLUSION .............................................................................................. 39

i

## TABLE OF AUTHORITIES

### CASES

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) .................................................15

Anderson v. McIntosh Inn, 295 F. Supp. 2d 412 (D. Del. 2003)...................................16

Barber v. CSX Distrib. Servs., 68 F.3d 694 (3d Cir. 1995)............................................33

Bruton v. Diamond State Tel. Co., 623 F. Supp. 939 (D. Del. 1985)............................15

Carter v. St. Louis Univ., 167 F.3d 398 (8th Cir. 1999) ...........................................19, 30

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ..............................................................14

Clark County Sch. Dist. v. Breeden, 532 U.S. 268 (2001) .............................................33

Cox v. Carrier Sales & Distrib., No. 3:04-CV-527, 2006 WL 2038565 (E.D.
　　Tenn. July 20, 2006) ............................................................................................ 32-33

E.E.O.C. v. Avecia, Inc., 151 F. App'x 162, 165 (3d Cir. 2005).....................................37

E.E.O.C. v. Sara Lee Corp., 237 F.3d 349 (4th Cir. 2001)............................................24

Ferguson v. E.I. Du Pont de Nemours & Co., 560 F. Supp. 1172 (D. Del. 1983)........31

Fitzpatrick v. Nat'l Mobile Television, 364 F. Supp. 2d 483 (M.D. Pa. 2005).............22

Fuentes v. Perskie, 32 F.3d 759 (3d Cir. 1994) ........................................................18, 30

Gile v. United Airlines, Inc., 95 F.3d 492 (7th Cir. 1996)........................................ 27-28

Hartsfield v. Miami-Dade County, 90 F. Supp. 2d 1363 (S.D. Fla. 2000) ....................28

Healy v. New York Life Ins. Co., 860 F.2d 1209 (3d Cir. 1988)........................... 16-17

Kysor Indus. Corp. v. Margaux, Inc., 674 A.2d 889 (Del. Super. Ct. 1996).................37

Marinelli v. City of Erie, 216 F.3d 354 (3d Cir. 2000)...................................................23

Massaro v. Chester Hous. Auth., No. CIV. A. 98-245, 1999 WL 624485 (E.D. Pa.
　　Aug. 5, 1999) .............................................................................................................21

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) ...................................... 15-16

Moon v. Delaware River & Bay Auth., No. Civ. A. 05-261-JJF, 2006 WL 462551
    (D. Del. Feb. 24, 2006) .......................................................................................36

Naghiu v. Inter-Continental Hotels Grp., Inc., 165 F.R.D. 413 (D. Del. 1996) ............................14

Nelson v. Upsala College, 51 F.3d 383 (3d Cir. 1995)......................................................31

Petrocelli v. DaimlerChrysler Corp., No. Civ. A. 04-943-KAJ, 2006 WL 733567
    (D. Del. Mar. 22, 2006)........................................................................................16

Riner v. Nat'l Cash Register, 434 A.2d 375 (Del. 1981) ..................................................16

Rizzo v. PPL Serv. Corp., Nos. CIV.A. 03-5779, CIV.A. 03-5780, CIV.A. 03-
    5781, 2005 WL 913091 (E.D. Pa. Apr. 19, 2005) ..............................................................21

Schoch v. First Fid. Bancorporation, 912 F.2d 654 (3d Cir. 1990) ..................................................15

Schofield v. Met. Life Ins. Co., No. 3:CV-03-0357, 2006 WL 2660704, (M.D. Pa.
    Sept. 15, 2006)......................................................................................................34

Shah v. Consol. Edison Corp., No. 04 Civ. 2880, 2005 WL 612713 (S.D.N.Y.
    Mar. 15, 2005)........................................................................................................33

Shaw v. Chamberlain Mfg. Corp., No. 3:05cv1344, 2006 WL 2382284 (M.D. Pa.
    Aug. 17, 2006) ......................................................................................................31

Siefken v. Village of Arlington Heights, 65 F.3d 664 (7th Cir. 1995) ..........................................27

Soileau v. Guilford of Maine, Inc., 105 F.3d 12 (1st Cir. 1997) ...........................................24-25

St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993)......................................................16

Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278 (11th Cir.
    1997) .............................................................................................................26-27

Synesiou v. DesignToMarket, Inc., No. 01-5358, 2002 WL 501494 (E.D. Pa. Apr.
    3, 2002) ..............................................................................................................37

Testerman v. Chrysler Corp., No.CIV.A. 95-240-MMS, 1997 WL 820934 (D.
    Del. Dec. 30, 1997)..............................................................................................22

Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981) ....................................................16

Tice v. Centre Area Transp. Auth., 247 F.3d 506 (3d Cir. 2001).....................................................23

Tojzan v. New York Presbyterian Hosp., No. 00-CIV-6105 (WHP), 2003 WL
    1738993 (S.D.N.Y. Mar. 31, 2003) ............................................................................24, 25

Toyota Motor Mfg. v. Williams, 534 U.S. 184 (2002)....................................................24

Weiss v. Northwest Broad., Inc., 140 F. Supp. 2d 336 (D. Del. 2001) .........................37

Wilcoxon v. Red Clay Consol. Sch. Dist. Bd. of Educ., 437 F. Supp. 2d 235 (D.
    Del. 2006) ................................................................................................................37

Williams v. Phila. Hous. Auth. Police Dep't, 380 F.3d 751 (3d Cir. 2004)...................34

Ziegler v. Del. County Daily Times, 128 F. Supp. 2d 790 (E.D. Pa. 2001) ..................21

## STATUTES

Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, et seq .....................1

Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, et seq..............................1

42 U.S.C. § 12102(2)(A)................................................................................................23

Del. Code Ann. tit. 19, § 711 (2006) ...............................................................................1

Del. Code Ann. tit. 19, § 711(a) (2006)..........................................................................16

Del. Code Ann. tit. 19, §§ 723, 724 and 726 (2006).........................................................1

## REGULATIONS

29 C.F.R. § 1630.2(g)(1) (2006).....................................................................................23

29 C.F.R. § 1630.2(o)(1)(ii) (2006) ...............................................................................27

29 C.F.R. Part 1630 app. §1630.2(j) (2006) ...........................................................23-24

## MISCELLANEOUS

Federal Rule of Civil Procedure 56 ................................................................................14

S.B. 154, 142nd Gen. Assemb. (Del. 2004)...................................................................37

## I.    NATURE AND STAGE OF THE PROCEEDINGS

On April 21, 2004, Plaintiff Ellen Zechman ("Plaintiff") filed the instant

Complaint against Defendant Christiana Care Health Systems ("Christiana Care"),

asserting claims of age discrimination under the Age Discrimination in Employment Act

of 1967, 29 U.S.C. § 621, et seq. ("ADEA") and Del. Code Ann. tit. 19, § 711 (2006),

disability discrimination under the Americans with Disabilities Act of 1990, 42 U.S.C. §

12101, et seq. ("ADA") and Del. Code Ann. tit. 19, §§ 723, 724, and 726 (2006),

retaliation, breach of the covenant of good faith and fair dealing, and detrimental reliance,

arising out of the termination of her employment.  Discovery is now closed and

Christiana Care now moves for summary judgment because there are no genuine issues

of material fact and Christiana Care is entitled to judgment as a matter of law.

## II.    SUMMARY OF ARGUMENT

1.    Plaintiff is a former resident in Christiana Care's Department of Obstetrics

and Gynecology ("OB/GYN").  As part of their training and service to the hospital,

OB/GYN residents are required to diagnose, treat and perform surgery on pregnant

women.  Needless to say, the duties of an OB/GYN resident implicate significant

concerns for patient safety and liability that require hospitals to closely scrutinize each

resident's performance and competence.

2.    Plaintiff came to Christiana Care as a second-year transfer resident in July

2002 at the age of 45.  Shortly after she arrived, the Resident Review Committee[1]

---

[1]    The RRC is comprised of senior OB/GYN physicians, including both Christiana Care faculty members and outside attending physicians who are not employed by Christiana Care. (Kaminski Dep. 14:4 – 15:2 at A-212.)  One of the RRC's primary functions is to monitor the residents' educational progress and performance and to make decisions regarding their

("RRC" or "Committee"), which is comprised of both Christiana Care faculty and outside physicians, determined that Plaintiff's medical knowledge, skills and judgment were below the level expected of a second-year resident. The Committee appointed a mentor for Plaintiff and devised a remedial education program to help her catch up. After Plaintiff failed to show significant improvement, the Committee intensified her remediation program and provided her with additional one-on-one instruction. Over the course of subsequent months, Plaintiff continued to perform at a sub-standard level and exhibited resistance to constructive criticism and efforts to teach her.

3.     During the Spring and Summer of 2003, the Committee actively discussed terminating Plaintiff's residency, but ultimately decided to permit her to repeat her second year on probation, subject to frequent reviews of her performance and status as a resident. By September 2003, Plaintiff was still not performing at the level expected of a second-year resident and, making matters worse, she was becoming increasingly hostile to constructive criticism and hence more difficult to teach. Thus, on September 29, 2003, the Committee voted to terminate Plaintiff's residency because of her numerous performance deficiencies and her resistance to the faculty's efforts to teach her. Dr. Moses Hochman, who described himself as "probably [Plaintiff's] biggest supporter," noted in his final evaluation that "I can't say I've se[e]n very much improvement. . . . [She] needs to realize that she has a problem . . . [and] still needs a special curriculum. I'm doubting if she will ever catch up."  (A-74 – A-77.)[2]

---

educational program and residency status. (Kaminski Dep. 12:18 – 13:3 at A-211; Ekbladh Dep. 15:19 – 21 at A-255.)

[2]     The Appendix, referred to as "A-__," is being filed under seal with this brief.

4.      This lawsuit, in which Plaintiff asserts a raft of federal and state law claims alleging discrimination and retaliation based on her age and alleged disability, reflects nothing more than Plaintiff's continued inability or unwillingness to acknowledge that the Committee had legitimate concerns about her competence and her resistance to education. Instead of accepting any personal responsibility, Plaintiff projects blame onto others and makes unsupported allegations of discrimination and retaliation. As shown below, Plaintiff's claims are entirely without merit and Christiana Care is entitled to summary judgment.

## III.    STATEMENT OF UNDISPUTED FACTS

### A.    Plaintiff's Academic History And Application To Join Christiana Care As A Second-Year OB/GYN Resident.

Plaintiff received a bachelor's degree in 1990 from East Carolina University ("ECU") and an MD degree, also from ECU, in 1994. (A-2 – A-3.) Upon graduation from medical school, Plaintiff started a four-year residency program in the Pathology Department at ECU. (Zechman Dep. 15:18 – 24 at A-103.) Plaintiff testified that she quit this residency program during her second year in order to devote her time to having and raising a family. (Id. at 16:1 – 13 at A-103, 18:7 – 10 at A-104.)[3] Thereafter, she worked part-time and without compensation at her husband's allergy clinic and at a women's clinic in New Bern, North Carolina. (Id. at 18:20 – 23:13 at A-104.)

In 2001, Plaintiff decided to pursue an OB/GYN specialty. (A-2 – A6.) A traditional OB/GYN residency, such as Christiana Care's program, requires four years of resident training, and is considered "more demanding and time-consuming" than other

---

[3]    Plaintiff has four children who, at the time she began her residency at Christiana Care, were 2, 4, 7, and 16 years old and living at home with her husband in New Bern, North Carolina. (A-19.)

3

types of residencies. (Fraser Dep. 21:21 – 22:2 at A-230 – A-231.) Plaintiff failed to obtain a full-time position in a traditional OB/GYN residency program. Shortly thereafter, Plaintiff began a one-year OB/GYN preliminary residency at Riverside Regional Medical Center, in Newport News, Virginia. (Zechman Dep. 25:11 – 14 at A-105.) Because the position was limited to only one-year, she soon began re-applying to traditional four-year OB/GYN residency programs for the 2002 term. (Zechman Dep. 26:15 – 21 at A-106.) Plaintiff thereafter applied to four OB/GYN residency programs, including ECU, which was her first choice and closest to her home. (A-95 – A-96; A-10 – A-11.) None of these programs offered Plaintiff a position, and she was "devastated" that she was not selected by ECU.[4] (A-12.)

After the disappointment of failing to match with programs close to her home in North Carolina, Plaintiff applied for a second-year OB/GYN residency position at Christiana Care, which had a vacancy due to an unanticipated departure. (A-13.) Plaintiff's application included a standard residency application form, letters of recommendation, transcripts, and information from the Newport News program. Her age and family status were certainly not hidden, as her medical school transcript included her birth date (showing her age as 45), and her letters of recommendation mentioned that she was "somewhat older" and that she had "left the Pathology residency to complete her family." (A-7 – A-9; A-1.)

---

[4]   Plaintiff sued ECU in January 2003 asserting claims that are strikingly similar to the claims she now asserts against Christiana Care, namely that ECU's decision not to offer her a residency position was discriminatory based on her age and alleged disability. (A-26 – A-32.)

Plaintiff traveled to Delaware for in-person interviews at Christiana Care.

(Zechman Dep. 32:7-19 at A-107.) Dr. Lamar Ekbladh, Dr. Paul Kaminski, and Dr.

Anthony Sciscione each interviewed Plaintiff. (Eklbadh Dep. 8:16 – 20 at A-253;

Kaminski Dep. 7:23 – 24 at A-210; Sciscione Dep. 7:17 – 18 at A-279.) Plaintiff

testified that it would have been apparent during the interviews that she was an older,

non-traditional, resident. (Zechman Dep. 46:14 – 20 at A-111.) Thus, with full

knowledge that Plaintiff was 45 years old, Christiana Care selected Plaintiff to fill out the

four-person class of second-year OB/GYN residents. Plaintiff's one-year contract was

effective from July 1, 2002 through June 30, 2003 and stated that she would not be

employed beyond that period except upon "recommendation of the Department

Education Committee and Program Director, fulfillment of all licensure and regulatory

requirements, and approval of the Graduate Medicine Education Committee." (A-14 –

A-18.)

### B.    Plaintiff's Poor Performance And Christiana Care's Efforts To Help Her Improve.

Soon after Plaintiff began her residency at Christiana Care, it became apparent to

the hospital's teaching physicians, members of the RRC, as well as outside physicians,

that Plaintiff had serious academic deficiencies, including a poor medical knowledge

base, poor medical judgment, poor surgical skills, and poor prioritization skills. On

October 28, 2002, nine members of the Committee met to evaluate the residents'

performance. (A-20 – A-22.) The Committee's contemporaneous meeting minutes

contain the following assessment of Plaintiff's progress:

> She was behind and still is behind. Should be watched
> closely by the chief residents. She has received several
> complaints about her H&P's [histories and physicals],

5

> jumping to conclusions. Her surgical skills, medical
> judgment and medical knowledge are all below average.

(A-22.)[5]  In order to help Plaintiff improve, the Committee voted unanimously to appoint

a faculty mentor, who thereafter met with Plaintiff frequently and designed a

personalized education program for her, including reading assignments, weekly quizzes,

and reviewing procedures and operative reports with her.  (A-22; A-23.)

In December 2002, Dr. Anthony Sciscione, then the OB/GYN Residency Program

Director, met with Plaintiff to review her progress.  (A-24.)  Dr. Sciscione advised

Plaintiff that, due to her lack of improvement, he was going to intensify her remediation

program to help her catch up, including extra one-on-one instruction from all faculty

attending physicians.  (Id.)  Dr. Sciscione emphasized to Plaintiff that this extra attention

was "an effort to teach and review with [her] the critical thinking process that occurs in a

seasoned faculty member."  (Id.)  The next day, Dr. Sciscione issued a memorandum

instructing each faculty attending physician in the OB/GYN Department to schedule

extra one-on-one instruction with Plaintiff.  (A-25.)  Dr. Sciscione testified that not only

did the attending physicians follow his directive, but that "it was enthusiastically

accepted."  (Sciscione Dep. 39:6 – 40:2 at A-287.)

Despite receiving help from her mentor and intensive remedial education from

numerous faculty members, Plaintiff's performance did not significantly improve.

---

[5]    The RRC members present at the meeting were:  Anthony Sciscione, D.O., Paul Kaminski,
M.D., Garrett Colmorgen, M.D., Philip Schlossman, M.D., Christine Maynard, M.D.,
Gregory Demeo, D.O., Estelle Whitney, M.D., Faith Brosch, M.D., and Anthony Bell, M.D.
(A-20.)  Colleen Bratsch, D.O., the chief resident, also attended the meeting.  (Id.)
However, chief residents do not take part in final deliberations or votes involving decisions
regarding individual residents' special curriculum.  (A-97 – A98.)

Plaintiff's evaluations continued to express concern about her superficial medical knowledge and poor medical judgment. (A-33.) Making matters worse, Plaintiff resented and resisted the faculty's efforts to give her extra help. (See A-68; A-70 – A-73; A-74 – A-77.) The evaluations also expressed doubts about Plaintiff's ability to progress in the program. As one physician reported at the time:

> I am particularly concerned about her ability to make quick judgments on a busy service (a skill critical to being a successful third year resident) with her knowledge base, personal management skills, and attention to detail are not currently consistent with what I would expect from a second year resident. **To advance her to a third year position in my judgment would create issues of patient safety as well as place [Plaintiff] in a position in which she is not ready, personally or intellectually.**

(A-33) (emphasis added). On March 17, 2003, the RRC voted to extend Plaintiff's remediation program and to re-review her progress at a June 16, 2003 meeting, when the Committee would decide whether to "offer her a [Third-Year] contract, a [Third-Year] contract with remediation ongoing, a [Second-Year] contract with remediation ongoing, *or no contract.*" (A-34) (emphasis added).[6]

Plaintiff's performance did not significantly improve during the three months leading up to her next review at the June 16, 2003 RRC meeting. For example, in a June 2, 2003 evaluation, an ***outside attending physician*** who was also a member of the RRC rated Plaintiff's performance as "unsatisfactory" in virtually every category and noted:

> [Plaintiff] skips steps in evaluating a patient, makes quick decisions without all the information and often minimizes the patient's complaints of pain. She is unorganized and

---

[6]    The RRC members present at the March 17, 2003 meeting were Anthony Sciscione, D.O., Estelle Whitney, M.D., Lamar Ekbladh, M.D., Gregory Demeo, D.O., Moses Hochman, M.D., Philip Schlossman, M.D., and Faith Brosch, M.D. (A-34.)

> rarely presents a patient in a satisfactory or cohesive way,
> presentations are scattered and follow no logical sequence. .
> . . [Plaintiff's] attitude is at times awful; she gives the
> appearance of working hard but seems to accomplish little.

(A-35 – A-38.) The foregoing evaluation, which is representative of many of Plaintiff's

evaluations, also noted that Plaintiff had insufficient medical knowledge to be a third year

resident and questioned "if she ever will." (A-38.)

At the next RRC meeting on June 16, 2003, which was attended by ten members,

the Committee reviewed the evaluations and overall progress of all OB/GYN residents.

(A-39 – A-41.)[7] The Committee determined that Plaintiff was still "working below her

expected level," "agreed that she is not capable of handling the duties of a PGY3," and

expressed "concerns about her ability to complete the program." (A-40.) The Committee

considered a motion to terminate Plaintiff's residency, but ultimately decided to offer her

the opportunity to repeat her second year with continued remediation, subject to frequent

reviews of her performance and residency status. (Id.) Shortly thereafter, Plaintiff signed

a residency contract to repeat her second year. (A-42 – A-47.) Importantly, Plaintiff does

not and cannot contend that the decision to not promote her to the third year of the

program was discriminatory.[8] Indeed, the fact that the Committee gave her this second

chance – even after it had already provided her with extensive remedial education –

---

[7] The RRC members at the June 16, 2003 meeting were: Anthony Sciscione, D.O., Paul
Kaminski, M.D., Garrett Colmorgen, M.D., Gregory Demeo, D.O., Moses Hochman, M.D.,
Lamar Ekbladh, M.D., Janice Tildon-Burton, M.D., Jeffrey Russell, M.D., Faith Brosch,
M.D., and Anthony Bell, D.O. (A-39.) Plaintiff's co-resident, Dr. Robyn Gray, also
attended the meeting as a resident representative, but she was not present during the RRC's
final deliberations or during any votes regarding individual residents' special curriculum.
(A-97 – A98.)

[8] The decision to offer Zechman another second-year residency contract occurred more than
300 days prior to her EEOC charge and her charge does not even refer to that event.

refutes Plaintiff's assertion that the Committee members were biased against her because of her age or alleged disability. The decision to give her a second chance also highlights the cautious approach taken with respect to Plaintiff and demonstrates that the Committee did not act precipitously when it eventually voted to terminate her residency for academic reasons. At the June 16, 2003 meeting, the Committee stated that its next meeting would be on August 18, and that it would also have a special meeting in September to "review Dr. Zechman's progress." (A-39 – A-40.)

On July 30, 2003, Plaintiff signed an acknowledgement that the RRC would re-review her progress on August 18, 2003, "[a]t which time the committee will determine one of the following: [1] Proceed with the remediation/special PGY2 rotation, [2] Mainstream into a PGY2 position, [3] *Termination*, [or 4] Progress into a PGY3 position." (A-57) (emphasis added). Nine members of the RRC attended the August 18, 2003 meeting, which was devoted almost entirely to assessing Plaintiff's progress. (A-64 – A-65.)[9] The meeting minutes indicate that, in addition to reviewing Plaintiff's evaluations, the Committee also invited three faculty members who had worked closely with Plaintiff (including her mentor) to attend the meeting and report on her progress. (Id.) The Committee members expressed numerous concerns regarding Plaintiff's performance, including:

> [1] learning ability; [2] adaptability; [3] poor clinical judgment; [4] very abrupt moves; [5] attitude/behavioral; [6] wanted to be spoon fed; [7] relationship with peers is not good; [8] separated herself from other residents; [9]

---

[9]    The RRC members present at the August 18, 2003 meeting were: Lamar Ekbladh, M.D., Paul Kaminski, M.D., Garret Colmorgen, M.D., Gregory Demeo, D.O., Moses Hochman, M.D., Janice Tildon-Burton, M.D., Anthony Bell, D.O., Christine Maynard, M.D., and Estelle Whitney, M.D. (A-64.)

> very immature about how she deals with things; [10] other
> residents are avoiding her; [11] stressed/depressed; [12]
> playing residents against residents; [13] had a perfect case
> and refused to do it; [14] threatened residents; [15]
> unteachable; and [16] uses people/thinks people are out to
> get her.

(A-64.)  The August 18 meeting minutes also indicate that Plaintiff had confided to a

Committee member that she felt "stressed" and "depressed" and that she was crying at

night and "waking with her pillow soaked every morning." (A-65.)  The Committee had a

lengthy discussion about the best course forward and ultimately suggested that, for the

time being, Plaintiff would continue as a probationary second year resident on the

condition, among others, that Plaintiff seek psychological counseling. (Id.)  Dr. Ekbladh

informed Plaintiff of the Committee's recommendations on August 20, 2003. (A-66 – A-

67.)  The Committee determined that they would re-review Plaintiff at their next meeting.

(A-64.)

### C.    On September 29, 2003, The RRC Terminates Plaintiff's Residency For Academic Reasons.

The RRC's next review of Plaintiff's progress occurred at a September 29, 2003

meeting.[10]  (A-80 – A-82.)  The majority of Plaintiff's recent evaluations reflected a lack

of meaningful improvement and expressed continued concerns about her resistance to

efforts to teach her:

> • "[Plaintiff] remains a difficult resident to educate.  She
>   continues to try and extrapolate from the knowledge that
>   she has onto all patients even when not appropriate.  Her
>   surgical skills have begun to improve but clearly remain

---

[10]  The RRC members present at the meeting were:  Paul Kaminski, M.D., Garrett Colmorgen,
M.D., Lamar Eklbadh, M.D., Faith Brosch, M.D., Anthony Bell, D.O., Christine Maynard,
M.D., and Waleed Shalaby, M.D.  (A-80.)  Robyn Gray, D.O., and chief resident also
attended but did not participate in the final deliberations or vote regarding Plaintiff.  (A-97 –
A-98.)

10

below that of her 2nd year peers. . . . She continues to
display inappropriate emotionalism. For example, she
asked a question about assignments, to which I referred her
to Dr. Ekbladh. She then proceeded to tell me about her
abusive childhood in a tearful way. This particular scenario
has occurred multiple times. When in confrontation, she
tends to either discuss her up bringing or shift blame onto
others. She will require a great deal of structure to learn. I
remain concerned about her ability to finish this program."
(A-70.)

- "I am however concerned with her inability to be flexible
  when problems arise, with her inability to think ahead in
  the case. . . . Throughout the case she failed to be able to
  make simple decisions, to take responsibility, to think
  ahead. Her surgical skills are well below her peers but her
  lack of critical thinking concerns me more." (A-68.)

- She "can't take criticism and make improvements."
  (A-78.)

- "She needs to be more acceptable of constructive criticism,
  needs to be able to multi-task. She is unable to keep more
  than 1 point straight." (A-79.)

Even Dr. Moses Hochman – who described himself as "probably [Plaintiff's] biggest

supporter" – reported in his evaluation that "I can't say I've se[e]n very much

improvement. . . . [She] needs to realize that she has a problem . . . [and] still needs a

special curriculum. I'm doubting if she will ever catch up." (A-74 – A-77.)

Plaintiff's resistance to remediation is also reflected in some of her own e-mails.

For example, in July 2003 one of the chief residents suggested that Plaintiff attend the

morning OB/GYN rounds because it was a good opportunity to review a variety of cases

with experienced physicians. (A-58.) Rather than viewing this suggestion as part of the

program's efforts to teach her and help her succeed, Plaintiff felt offended and sent an

e-mail to the Department Chair demanding to know why she was being "singled out"

when other residents were not required to attend rounds. (Id.)

11

At the conclusion of the September 29 meeting, after having provided Plaintiff with many months of remediation and extra one-on-one instruction, the Committee members voted to terminate Plaintiff's residency because, among other reasons: (1) "overall evaluation scores very low;" (2) "not performing at appropriate level;" (3) "surgical skills are that of a PGY1;" (4) "had a special rotation and mainstreamed and still below level;" (5) "no significant improvement with surgical skills;" (6) "very poor clinical judgment which leads to significant concerns about patient care;" and (7) "unreceptive to educational interaction, therefore very hard to work with and teach." (A-80 – A-82; A-83.) The vote to terminate Plaintiff's residency was unanimous with two abstentions. (A-81.) Dr. Kaminski, one of two members who abstained from the vote, testified that notwithstanding his abstention, he believes the decision to terminate Plaintiff's residency was "justified" and "reasonable." (Kaminski Dep. 49:18 – 50:5 at A-220 – A221, 59:12 – 16 at A-223.) [11]

### D.    Plaintiff's Alleged Disability And Request For Accommodation.

On July 23, 2003, Plaintiff sent a letter to Dr. Lamar Ekbladh, Chief of the OB/GYN Department and Acting Residency Director, requesting an accommodation for a mixed connective tissue disorder which allegedly caused occasional flares of fatigue and joint pain.[12] (A-51 – A-52.) Both Plaintiff and her treating physician testified that Plaintiff's symptoms are intermittent and unpredictable and that she can go months and even years without any symptoms. (Fraser Dep. 17:18 – 18:3 at A-229 – A-230, 74:17 –

---

[11]    The identity of the second person who abstained is not reflected in the record.

[12]    Dr. David Fraser, Plaintiff's treating physician, testified that Plaintiff had an "unspecified diffuse connective tissue disorder," not "mixed connective tissue disorder," which is a "totally different diagnosis with other auto antibodies being present. She does not have that." (Fraser Dep. 11:7 – 12 at A-228.)

18 at A-244; Zechman Dep. 142:12 – 19 at A-135.)  Plaintiff's requested accommodation was a permanent modification to her work schedule that would have essentially given her two guaranteed 3-day vacations per month.  (A-51 – A-52.)

In response to Plaintiff's request, Dr. Ekbladh directed her to fill out a request for accommodation and to provide supporting medical information.  (Zechman Dep. 294:7 – 11 at A-173; A-59.)  Dr. Eklbadh also spoke with Plaintiff's treating physician, who told Dr. Eklbadh and reiterated in his deposition that the "optimal" accommodation would be to allow Plaintiff to take intermittent leave when flares of the disorder occurred.  (Eklbadh Dep. 69:12 – 16 at A-268; Fraser Dep. at 87:16 – 88:17 at A-247; A-60; A-61.)  Based on this information, Dr. Ekbladh told Plaintiff that she should apply for intermittent leave pursuant to the Family and Medical Leave Act ("FMLA"), and he gave her the appropriate FMLA forms.  (A-69.)  Plaintiff did not return the required Certificate of Health Care Provider until October 3, 2003 – four days after the RRC had already voted to terminate her residency.[13]  (A-84 – A-90; A-91) (stating that Plaintiff applied for leave pursuant to the FMLA on October 3, 2003).

Given that Plaintiff's requested accommodation (two guaranteed 3-day vacations per month) was contrary to her own doctor's recommendation, Christiana Care suspects that the true reason for Plaintiff's request was to enable her to spend more long weekends with her family in North Carolina.  Indeed, on July 22, 2003, the day before Plaintiff requested an "accommodation" in the form of 3-day vacations, she wrote the following entry in her diary:

---

[13]    Plaintiff's Complaint does not assert any claims under the FMLA.

> Told that I was on call this Saturday, 7/26, then again
> Sunday next week August 3rd meaning I don't see the
> children for 3 weeks. Jim is unable to come up . . . I really
> lost it when Sandi told me this, I'm physically exhausted
> and now I don't see my children for 3 weeks . . . it was
> supposed to get 'better' call-wise after July – nothing has
> changed, it has gotten worse – less weekends free to see my
> family – this is worse than I imagined it could be. I don't
> know if I can hold out.

(A-50.)

## IV.    ARGUMENT

### A.    Standard Of Review.

Federal Rule of Civil Procedure 56 mandates the entry of judgment against a

party who fails to offer admissible evidence sufficient to establish the existence of every

element essential to that party's case and on which that party bears the burden of proof.

Celotex Corp. v. Catrett, 477 U.S. 317, 322, 327 (1986) (noting also that summary

judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an

integral part of the Federal Rules as a whole, which are designed 'to secure the just,

speedy and inexpensive determination of every action.'").  Although the defendant bears

the initial responsibility of asserting the basis for its motion, the defendant is not required

to negate the plaintiff's claim.  Rather, the defendant must only point out that there is an

absence of evidence to support the plaintiff's case or, alternatively, offer affirmative

evidence which demonstrates that the plaintiff cannot prove his case.  Naghiu v. Inter-

Continental Hotels Grp., Inc., 165 F.R.D. 413, 418 (D. Del. 1996).

After the defendant demonstrates a lack of evidence to support the non-moving

party's claims, the plaintiff must present competent evidence designating "specific facts

showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324 (citation

omitted).  Although the court is to view all evidence in a light favorable to the plaintiff,

14

the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an

otherwise properly supported motion for summary judgment.  <u>Anderson v. Liberty</u>

<u>Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).  Rather, a dispute must exist over a <u>material</u>

fact.  <u>Id.</u>  To survive a motion for summary judgment, therefore, the plaintiff must come

forward with specific, admissible and credible evidence supporting each element

essential to her case; mere conclusory allegations or denials are not enough.  <u>Schoch v.</u>

<u>First Fid. Bancorporation</u>, 912 F.2d 654, 657 (3d Cir. 1990).  Speculation, without proof,

is likewise insufficient.  <u>Bruton v. Diamond State Tel. Co.</u>, 623 F. Supp. 939, 943 (D.

Del. 1985).  Applying this standard, the undisputed facts establish that Plaintiff's claims

fail as a matter of law.

> **B.    The Court Should Dismiss Plaintiff's Age Discrimination Claims Because Plaintiff Cannot Establish That Christiana Care's Legitimate, Nondiscriminatory Reasons For Her Termination Are Pretext For Age Discrimination.**

Christiana Care terminated Plaintiff's residency because of her poor performance

and failure to significantly improve despite extensive efforts to help her improve over a

prolonged period.  Plaintiff's age discrimination claim fails as a matter of law because

there is no evidence that any of the relevant decision-makers (the RRC members) were

motivated by age discrimination, or that the RRC's stated reasons for its decision were

pretextual.

Plaintiff's age discrimination claim is governed by the familiar burden-shifting

framework set forth by the Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411

U.S. 792 (1973), and clarified in <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502 (1993).[14]

Under that framework, the plaintiff has the initial burden of establishing a *prima facie*

case of discrimination by a preponderance of the evidence.  See <u>Texas Dep't of Cmty.</u>

<u>Affairs v. Burdine</u>, 450 U.S. 248, 252-53 (1981).  If the plaintiff succeeds in establishing

a *prima facie* case, the burden then shifts to the employer, who must merely articulate (as

opposed to prove) a legitimate, non-discriminatory reason for the employee's discharge.

<u>Burdine</u>, 450 U.S. at 254; <u>Anderson v. McIntosh Inn</u>, 295 F. Supp. 2d 412, 418 (D. Del.

2003).  Once the defendant meets this minimal burden of production, the burden shifts

back to Plaintiff to prove by a "preponderance of evidence" that Christiana Care's stated

reasons "were not true, but were a pretext for discrimination.'"  <u>Id.</u>

### 1.    Christiana Care Has Articulated Legitimate Nondiscriminatory Reasons For Plaintiff's Termination.

Christiana Care legitimately terminated Plaintiff's employment because she was

not performing at the level expected of a second-year (much less a third-year) OB/GYN

resident.  Christiana Care has articulated numerous legitimate reasons for terminating

Plaintiff's residency, including the fact that all members of the RRC agreed at various

RRC meetings over a period of many months that Plaintiff's academic performance was

substandard, that her performance had not adequately improved despite a prolonged

period of intensive one-on-one remedial education, and that she refused to acknowledge

that she had a problem and resisted all efforts to help her.  See  <u>Healy v. New York Life</u>

---

[14]    Plaintiff's age discrimination claims under the ADEA and state law are governed by the same legal standards.  <u>Petrocelli v. DaimlerChrysler Corp.</u>, No. Civ. A. 04-943-KAJ, 2006 WL 733567, at *4, 6 (D. Del. Mar. 22, 2006); <u>Riner v. Nat'l Cash Register</u>, 434 A.2d 375, 376-377 (Del. 1981) (applying federal analysis to review of age discrimination decision under Del. Code Ann. tit. 19, § 711(a) (2006)).  All unpublished court opinions are in the Special Appendix being filed with this brief.

Ins. Co., 860 F.2d 1209, 1214 (3d Cir. 1988) (holding that poor performance is a legitimate business reason for termination). Although Christiana Care does not have the burden to support its decisions with affirmative evidence, the record contains such evidence in spades, including contemporaneous notes from the RRC meetings in which the decisions were made and numerous evaluations by both faculty and outside physicians. (See, e.g., A-20 – A-22; A-35 – A38; A-34; A-39 – A-41; A-64 – A-65; A-80 – A-82.)

The record shows that all of the Committee members – as well as additional faculty members, outside physicians, nurses and residents – consistently and repeatedly expressed concerns about Plaintiff's performance since at least October 2002. (Id.) In October 2002, the Committee unanimously agreed that Plaintiff "was behind and still is behind" and voted to appoint a mentor. (A-20 – A-22.) In December 2002, Dr. Sciscione – whom Plaintiff viewed as an ally who would not discriminate against her (Zechman Dep. 117:1 – 14 at A-128) – advised Plaintiff that her performance was still far below the program's minimum expectations, and that he planned to intensify her remediation with extra one-on-one instruction. (A-24; A-25.) When Plaintiff's overall performance failed to substantially improve even after at least six months of intensive remediation, the RRC considered terminating her residency at the June 16, 2003 meeting, but ultimately decided to extend her remedial educational program rather than dismiss her. (A-39 – A-41.)

Eventually, after months of intensive remediation, the Committee voted to terminate Plaintiff's residency because, according to evaluations prepared by both faculty and outside physicians, her performance had not improved significantly and she remained resistant to efforts to help her catch up. (A-80 – A-82.) The termination decision was

17

based on a long and consistent history of poor performance. Indeed, Christiana Care

believes it gave Plaintiff far more time to improve than she could reasonably have

expected to receive, particularly given the importance of ensuring that residents in an

active OB/GYN hospital practice – who treat, diagnose, and perform surgery on patients

– meet minimum standards of competence. After 15 months of substandard performance

and at least nine months of intensive but ultimately unsuccessful remediation, the

Committee terminated Plaintiff's residency. As Dr. Kaminski testified, "we can't carry

her on probation forever." (Kaminski Dep. 59:10-11 at A-223.)

> ## 2.    Plaintiff Has Adduced No Evidence That Christiana Care's Legitimate Nondiscriminatory Reasons For Her Termination Are Pretextual.

To survive summary judgment, Plaintiff must point to evidence that would allow

a fact finder reasonably to infer that Christiana Care's reasons were either a post-hoc

fabrication or otherwise did not actually motivate the employment action. Fuentes v.

Perskie, 32 F.3d 759, 764 (3d Cir. 1994). Plaintiff cannot satisfy this burden merely by

attempting to show that "the employer's decision was wrong or mistaken," because the

issue is "whether discriminatory animus motivated the employer, not whether the

employer is wise, shrewd, prudent, or competent." Id. at 765 (citations omitted). As the

Fuentes further explained:

> [T]he nonmoving plaintiff must demonstrate such
> weaknesses, implausibilities, inconsistencies,
> incoherencies, or contradictions in the employer's proffered
> legitimate reasons for its action that a reasonable factfinder
> could rationally find them 'unworthy of credence,' and
> hence infer 'that the employer did not act for [the asserted]
> nondiscriminatory reasons.'

Id. (internal citations omitted).

18

Applying this standard, there is <u>no</u> evidence that Christiana Care's legitimate, non-discriminatory reasons for terminating Plaintiff's employment are pretextual. Nor has Plaintiff adduced any evidence that any of the relevant decision-makers (*i.e.*, the RRC members) were motivated by age discrimination. Although there may be individual physicians who had positive experiences with Plaintiff and who viewed her performance as satisfactory, that is legally insufficient to create a triable issue as to whether the RRC's decision, which was based on *all* of Plaintiff's evaluations and the totality of circumstances, was a pretext for disability discrimination. <u>See</u> <u>Carter v. St. Louis Univ.</u>, 167 F.3d 398, 401-02 (8th Cir. 1999) (affirming grant of summary judgment because evidence that plaintiff received some positive evaluations during surgical residency was insufficient to create issue of fact as to whether decision to terminate his residency for poor performance was pretextual). Indeed Dr. Hochman, who described himself as "probably [Plaintiff's] biggest supporter," stated in his final evaluation that "I can't say I've se[e]n very much improvement. . . . [She] needs to realize that she has a problem . . . [and] still needs a special curriculum. I'm doubting if she will ever catch up." (A-74 – A-77.) Dr. Kaminski, who was similarly supportive of Plaintiff and abstained from voting to terminate her residency, testified that the RRC's termination decision was both "reasonable" and "justified." (Kaminski Dep. 58:23 – 59:16 at A-223.)

Nevertheless, Plaintiff appears to believe that she can prove pretext by attempting to show that she was denied sufficient opportunities to improve her surgical skills because the chief residents allegedly denied her various surgical cases. (Zechman Dep. 79:11-12 at A-119.) Even putting aside the overwhelming evidence that Plaintiff received *more* educational opportunities than her co-residents received, this argument

still misses the mark in several respects. First, the Committee terminated Plaintiff's

residency because she exhibited a constellation of serious deficiencies, only two of which

related to surgical skills. (A-81; A-83) (Kaminski Dep. 57:7 – 61:12 at A-222 – A-223)

(listing knowledge deficit, clinical judgment, inappropriate reactions to criticism, and

poor relationships with other residents who felt they could not trust her decision-making).

Dr. Sciscione, who was the OB/GYN Residency Director until June 2003, testified that:

> I was concerned about Dr. Zechman on many levels. I
> mean, not just surgically. I mean, the way she processed
> information, the way she came to conclusions, the
> conclusions she came to, and if I remember right, she had a
> spotty interaction with some patients.

(Sciscione Dep. 47:16 – 48:6 at A-289.)

Second, there is no evidence that Plaintiff was pulled from surgical assignments

more frequently than any of her co-residents. (Eklbadh Dep. 57:10 – 16 at A-265) ("We

could not identify that she was being changed any more than anybody else was in the

daily changing of the schedule."). Indeed, Dr. Sciscione, who Plaintiff concedes was one

of her allies and not someone who would discriminate against her (Zechman Dep. 117:1

– 14 at A-128), testified that Plaintiff "was afforded the opportunities. . . . There are some

folks that are just not good – they don't have good dexterity, for whatever reason. . . . .

Unfortunately, I can't change that. All I can do is give them the opportunity to operate,

and she was given the opportunity to operate." (Sciscione Dep. 48:7 – 49:2 at A-289.)

Third, even if it were true that Plaintiff was pulled from surgery more than her

classmates or that people did not want to work with her, there is absolutely no evidence

that the various persons who made those decisions were motivated by age discrimination.

In light of Plaintiff's well-documented deficiencies and Christiana Care's obvious need to

balance Plaintiff's desire for more surgery opportunities against the needs of the hospital and the safety of its patients, Plaintiff must, at a minimum, come forward with competent evidence that the decisions regarding her surgical opportunities were based on her age. There is no such evidence. Moreover, it is undisputed that none of the residents or outside physicians who allegedly pulled Plaintiff from surgeries were members of the RRC or participated in the decision to terminate Plaintiff's residency.

Finally, in addition to the utter lack of evidence of pretext or age discrimination, there is affirmative evidence in the record that refutes any inference of age discrimination. For example, more than half of the members of the RRC who were involved in the decision to terminate Plaintiff were older than she was at the time of the termination decision, which undercuts any possible inference of discrimination. (A-80; A-94.) See Rizzo v. PPL Serv. Corp., Nos. CIV.A. 03-5779, CIV.A. 03-5780, CIV.A. 03-5781, 2005 WL 913091, at *11 (E.D. Pa. Apr. 19, 2005) (finding that plaintiffs did not produce evidence that age was a factor in termination decisions where "the relevant decisionmakers were themselves in the protected age group"); Ziegler v. Del. County Daily Times, 128 F. Supp. 2d 790, 812 n.47 (E.D. Pa. 2001) (noting that because the decision-maker was 53 years old when he terminated the-then-60 year old plaintiff' s employment, "the inference of discrimination is therefore less since the decision maker was a member of the same protected class as the plaintiff."). Moreover, the fact that Christiana Care hired Plaintiff when she was 46 and terminated her residency only 16 months later further refutes any inference of age discrimination. See Massaro v. Chester Hous. Auth., No. CIV. A. 98-245, 1999 WL 624485, at *2 (E.D. Pa. Aug. 5, 1999) (holding that plaintiff did not establish that age discrimination was a factor in his

termination, reasoning that "since Plaintiff was age 59 at the time of hiring, it is difficult to argue that he was terminated, at age 59 as a result of his age"); Fitzpatrick v. Nat'l Mobile Television, 364 F. Supp. 2d 483, 501 (M.D. Pa. 2005) (granting summary judgment in part because of fact that the employer "hired [plaintiff] when he was 50, and then after he worked for eight and one half months, fired him at age 51," precludes any inference of age discrimination).

In short, the RRC voted to terminate Plaintiff's residency because she failed to correct her numerous performance deficiencies despite extensive remedial education over a prolonged period of time. Plaintiff is obviously displeased with the RRC's decision, but there is no competent evidence that the RRC's reasons were a pretext for age discrimination.

**C.    Christiana Care Is Entitled To Summary Judgment With Respect To Plaintiff's Disability Claims.[15]**

Plaintiff contends that Christiana Care discriminated against her based on her alleged disability – an unspecified connective tissue disorder – by: (1) failing to provide her with a reasonable accommodation; and (2) terminating her residency. As shown below, these claims fail as a matter of law for several reasons. First, Plaintiff's connective tissue disorder does not constitute a disability under the ADA because, according to Plaintiff and her doctor, she can go years without any symptoms and, even when her symptoms are present, Plaintiff is not substantially limited in any of her major life activities. Second, even if Plaintiff had a disability, her accommodation claim fails because Christiana Care engaged in the interactive process and offered her an alternative

---

[15]    Plaintiff's disability claims under the ADA and Delaware state law are governed by the same legal standards. Testerman v. Chrysler Corp., No.CIV.A. 95-240-MMS, 1997 WL 820934, at *11 (D. Del. Dec. 30, 1997).

accommodation. Plaintiff's own doctor testified that the accommodation offered by

Christiana Care was the "optimal" accommodation for Plaintiff's condition. Third,

Plaintiff's termination claim fails because there is no evidence that the RRC's stated

reasons for terminating Plaintiff's residency were a pretext for disability discrimination

or retaliation

### 1.    Plaintiff Does Not Have A "Disability" Under The ADA.

Plaintiff's connective tissue disorder is not a disability under the ADA because,

according to Plaintiff and her own doctor, her symptoms are extremely intermittent, and

she can go months or years without any symptoms. (Zechman Dep. 142:12 – 19 at A-

135; Fraser Dep. 74:9 – 23 at A-244.)  Even when she is symptomatic, Plaintiff's

condition does not substantially limit any of her major life activities. (Zechman Dep.

281:4 – 19 at A-170.)

To establish a *prima facie* case of discrimination under the ADA, a plaintiff must

show, among other things, that she has a disability, which the statute defines as "a

physical or mental impairment that substantially limits one or more of the major life

activities of such individual." 42 U.S.C. § 12102(2)(A); 29 C.F.R. § 1630.2(g)(1) (2006).

The plaintiff "bears the burden of establishing that [she] is disabled within the meaning of

the ADA," and must point to specific evidence in the record that establishes that she is

substantially limited in a major life activity in order to survive a motion for summary

judgment. Marinelli v. City of Erie, 216 F.3d 354, 363 (3d Cir. 2000).  There is no such

thing as a *per se* disability, no matter how serious the impairment may seem. See Tice v.

Centre Area Transp. Auth., 247 F.3d 506, 513 n.5 (3d Cir. 2001) ("it is well-established

that a particular diagnosis, no matter how severe (or severe-sounding to the layperson),

standing alone, is not sufficient to establish 'disability'"); 29 C.F.R. Part 1630 app.

1630.2(j) (2006) (stating "[t]he determination of whether an individual has a disability is
not necessarily based on the name or diagnosis of the impairment the person has, but
rather on the effect of that impairment on the life of the individual." ). Rather, courts
must determine in a case-by-case manner whether the plaintiff has presented "evidence
that the extent of the limitation [caused by their impairment] in terms of their own
experience . . . is substantial." Toyota Motor Mfg. v. Williams, 534 U.S. 184, 198
(2002).

       In Toyota, the Supreme Court held that in order to be substantially limited in a
major life activity, an individual must have an impairment that "prevents or severely
restricts the individual from doing activities that are of central importance to most
people's daily lives." Id. To be substantially limiting, an impairment must have a
"permanent or long-term impact." Id. at 196. As a matter of law, medical conditions
with intermittent or unpredictable symptoms are not disabilities under the ADA:

                   Even accepting [plaintiff's] argument that when his back
                   pain is acute it limits his ability to walk, dress himself,
                   bend and lift, such limitations are only intermittent in
                   nature. . . . Since [plaintiff's] physical impairments are
                   episodic and are not consistently severe, they do not
                   substantially limit a major life activity.

Tojzan v. New York Presbyterian Hosp., No. 00-CIV-6105 (WHP), 2003 WL 1738993,
at *7-8 (S.D.N.Y. Mar. 31, 2003). Indeed, "[t]o hold that a person is disabled whenever
that individual suffers from an occasional manifestation of an illness would expand the
contours of the ADA beyond all bounds." E.E.O.C. v. Sara Lee Corp., 237 F.3d 349, 352
(4th Cir. 2001) (finding that plaintiff who experienced seizures once to twice a week was
not disabled under the ADA); Soileau v. Guilford of Maine, Inc., 105 F.3d 12, 16 (1st

24

Cir. 1997) (acute episodic depression not substantially limiting with respect to ability to interact with others even if underlying condition is lifelong).

The testimony of Plaintiff and her doctor conclusively establish that, as a matter of law, Plaintiff's connective tissue disorder is not a disabling impairment under the ADA because it is an intermittent, episodic disorder; even when Plaintiff is symptomatic, she is not substantially limited in any of her major life activities. Tojzan, 2003 WL 1738993, at *7-8. Plaintiff admitted in her deposition that her tissue disorder "is very unpredictable and kind of a day-to-day basis, *but you can go years and weeks, you know, and be asymptomatic*." (Zechman Dep. 142:12 – 19 at A-135) (emphasis added). The duration of any "flare-up" of the disorder is also unpredictable, as Plaintiff stated that sometimes they last for "a week," "sometimes its two weeks[,] sometimes it's the next day. This is very hit and miss." (Id. at 195: 19 – 21 at A-148.) Plaintiff's treating physician, Dr. Fraser, stated in his medical certification that Plaintiff's condition is a "disease characterized by *intermittent* episodes of fatigue, joint pain, rash, fever pleurisy. *Occasional* problems walking, working, concentrating." (A-62 – A-63; Fraser Dep. 73:13 – 23 at A-243) (emphasis added). Dr. Fraser identified the duration of the disorder as "intermittent," and testified that he put a question-mark next to the question regarding the disorder's permanency because Plaintiff "*can go for months or years and not be bothered by it*, but then you can have severe flares and have to go to the doctor and be on multiple medication for six months . . . so I had a question in my mind about whether I should really, truly put down whether this was a permanent limitation." (A-62 – A-63; Fraser Dep. 74:5 – 23 at A-244) (emphasis added).

When Plaintiff is not having a flare-up, she still "can go full-blast." (Zechman Dep. 281:20 – 23 at A-170.) During flare-ups of Plaintiff's tissue disorder, which are rare, Plaintiff sometimes (but not always) experiences symptoms including fatigue, joint pain, canker sores, and diarrhea. (Id. at 281:4 – 11 at A-170.) However, Plaintiff testified that she "physically can keep going" even during a flare-up. (Id.) Indeed, Plaintiff testified that the only limitation on her daily activities during flare-ups are that "there are times when, say, there's a cub scout meeting that evening, I tell my husband, Honey, I'm tired. I need to lay down on a sofa. You cook supper tonight. You take the kids. I'm tired. I just need to lay down. And I do." (Id. at 280:6 – 15 at A-170.)

In short, the Court should grant summary judgment as to Plaintiff's disability claims because, as a matter of law, her connective tissue disorder does not qualify as a disability. Plaintiff's symptoms are extremely intermittent and, even when present, they do not substantially limit any of her major life activities.

### 2.    Plaintiff's Accommodation Claim Fails.

Plaintiff's accommodation claim fails because she did not need any accommodation in order to perform the essential functions of her position. Even if Plaintiff was entitled to an accommodation, Christiana Care offered her an alternative reasonable accommodation, which her treating doctor described as the "optimal" accommodation for Plaintiff's condition.

The ADA does not require an employer to provide a reasonable accommodation unless an employee is unable to perform the essential functions of her job because of a disability. Plaintiff has the burden to prove that she requested an accommodation that was both reasonable and necessary for the performance of the essential functions of her position. Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1286 (11th

Cir. 1997). "Reasonable accommodation" includes "modifications or adjustments to

work environment, or to the manner or circumstances under which the position held or

desired is customarily performed, *that enable a qualified individual with a disability to*

*perform the essential functions of that position*." 29 C.F.R. § 1630.2(o)(1)(ii) (2006)

(emphasis added). If Plaintiff could perform the essential functions of her position as an

OB/GYN resident without an accommodation, then she is not entitled to an

accommodation. Siefken v. Village of Arlington Heights, 65 F.3d 664, 666 (7th Cir.

1995) (employer need only provide accommodation that will "enable a disabled

individual to work").

There is no evidence that Plaintiff's connective tissue disorder prevented her from

performing any of the essential functions of her position. Indeed, Plaintiff admits in her

Complaint that she was fully capable of performing the essential functions of her position

as an OB/GYN resident. (Compl., D.I. 1, ¶ 90.)    Therefore, as a matter of law,

Christiana Care was not required to provide any accommodation.

Furthermore, after Dr. Ekbladh received Plaintiff's July 23, 2003 letter asking him

to "accommodate" her connective tissue disorder by permanently modifying her schedule

to give her two 3-day breaks per month, he immediately engaged in the interactive

process by requesting medical information and by speaking with Plaintiff's treating

physician. (Zechman Dep. 294:7 – 11 at A-173; A-59; A-60; A-61.) Plaintiff's

physician told Dr. Eklbadh that Plaintiff's symptoms were intermittent and unpredictable,

and that he had "no specific recommendation" as to how any extra time off should be

arranged. (Fraser Dep. 78:13 – 79:1 at A-245; A-60; A-61.) Therefore, Christiana Care

offered Plaintiff an alternative accommodation, which it is entitled to do under the ADA.

Gile v. United Airlines, Inc., 95 F.3d 492, 499 (7th Cir. 1996) ("An employer is not obligated to provide an employee the accommodation he requests or prefers."); Hartsfield v. Miami-Dade County, 90 F. Supp. 2d 1363, 1372 (S.D. Fla. 2000) ("ADA requires only a reasonable accommodation, not necessarily the preferred accommodation, or the maximum accommodation, or every accommodation.")

Specifically, Dr. Eklbadh suggested that Plaintiff apply for intermittent FMLA leave, which would enable her to take time off on an as-needed basis. (A-69.) Plaintiff's physician testified that this was the "optimal" response to Plaintiff's condition. (Fraser Dep. 87:16 – 88:3 at A-247.) Christiana Care provided Plaintiff with the necessary FMLA forms on September 16, 2003 (A-69), but Christiana Care did not receive the required Certificate of Health Care Provider until October 3, 2003, four days after the Committee voted to terminate Plaintiff's residency for academic reasons. (Zechman Dep. 310:4 – 9 at A-177; A-84 – A-90, A-91.)

The record evidence is unequivocal that Plaintiff was capable of performing the essential functions of her OB/GYN residency position without an accommodation. Therefore, Christiana Care was not required to provide any accommodation, let alone provide Plaintiff with her requested accommodation of 3-day vacations. Moreover, Christiana Care did in fact offer an alternative accommodation that her own physician thought was "optimal," which was to encourage her to apply for intermittent FMLA leave so that she could take time off as-needed. Accordingly, there are no genuine issues of material fact and Christiana Care is entitled to summary judgment on Plaintiff's failure to accommodate claim.

### 3.    Plaintiff's Discriminatory Termination Claim Fails.

To the extent Plaintiff contends that the termination of her residency was motivated by anti-disability bias based on her connective tissue disorder (it is not clear that she so contends), any such claim fails as a matter of law for two reasons.

First, as set forth more fully above, Plaintiff is not a "qualified individual with a disability" under the ADA because the symptoms of her connective tissue disorder are intermittent – she "can go months or years and not be bothered by it." (Fraser Dep. 74:9 – 23 at A-244; Zechman Dep. 142:12 – 19 at A-135.) Plaintiff also concedes that, even when her symptoms are present, she "physically can keep going."[16] (Zechman Dep. 281:4 – 6 at A-170.)

Second, even assuming Plaintiff could establish a *prima facie* case (she cannot), Christiana Care has articulated legitimate non-discriminatory reasons for the decision to terminate her residency. Specifically, the RRC voted to terminate Plaintiff's residency because, despite many months of warnings and extensive efforts to help her improve, Plaintiff failed to significantly improve (or acknowledge) her deficiencies, including: (1) "overall evaluation scores very low;" (2) "not performing at appropriate level;" (3) "surgical skills are that of a PGY1;" (4) "had a special rotation and mainstreamed and still below level;" (5) "no significant improvement with surgical skills;" (6) "very poor clinical judgment which leads to significant concerns about patient care;" and (7) "unreceptive to educational interaction, therefore very hard to work with and teach." (A-80 – A-82.)

---

[16]    Plaintiff described the symptoms of a flare-up to sometimes include fatigue, canker sores, joint pain, and diarrhea. (Zechman Dep. 281:6 – 19 at A-170.)

Plaintiff must adduce admissible and credible evidence that Christiana Care's stated reasons suffer from sufficient "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" that a fact finder could rationally conclude that they did not actually motivate the decision and that the real reason was disability discrimination. Fuentes, 32 F.3d at 765. There is no such evidence in this case. See Carter, 167 F.3d at 401-02 (affirming grant of summary judgment because evidence that plaintiff received some positive evaluations during surgical residency was insufficient to create issue of fact as to whether decision to terminate his residency for poor performance was pretext for discrimination).

Accordingly, the Court should grant summary judgment as to any claim by Plaintiff that Christiana Care terminated her residency based on disability discrimination.

### D. Plaintiff's Retaliatory Termination Claims Fail.

Plaintiff's retaliation claims appear to be predicated on: (1) an e-mail complaint that Plaintiff sent to the Accreditation Council for Graduate Medical Education ("ACGME");[17] and (2) her July 23, 2003 request for a modified work schedule as an accommodation for her connective tissue disorder. There is no evidence that could permit either of these claims to survive summary judgment.

To establish a *prima facie* case of retaliation under the ADA or ADEA, Plaintiff must show: (1) that she engaged in protected activity by complaining about or opposing employment practices that are prohibited by the ADA or ADEA; (2) that she suffered an adverse employment action; and (3) that there was a causal connection between the

---

[17]    The ACGME is a private council that evaluates and accredits medical residency programs in the United States, *available at* http://www.acgme.org (last visited Oct. 15, 2006).

protected activity and the adverse employment action.  Nelson v. Upsala College, 51 F.3d 383, 386 (3d Cir. 1995).  Once a plaintiff establishes a *prima facie* case, the employer may rebut the claim by proffering a legitimate, non-discriminatory reason for the adverse action.  Shaw v. Chamberlain Mfg. Corp., No. 3:05cv1344, 2006 WL 2382284, at *10 (M.D. Pa. Aug. 17, 2006).  The burden then shifts back to the plaintiff to show that the proffered reason is pretextual.  Id.

As shown briefly below, Plaintiff cannot make out a *prima facie* case of retaliation.  Even if she could establish a *prima facie* case, Plaintiff's retaliation claims still fail because there is no evidence that Christiana Care's stated reasons for terminating her residency were pretextual.

### 1.    Plaintiff Cannot Establish *Prima Facie* Case Because There Is No Evidence Of A Causal Link Between The Alleged Protected Activities And Her Termination.

To show the "causal link" required for a *prima facie* case of retaliation, "the plaintiff must present evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action.  Essential to a causal link is evidence that the employer was aware that the plaintiff had engaged in the protected activity."  Ferguson v. E.I. Du Pont de Nemours & Co., 560 F. Supp. 1172, 1200 (D. Del. 1983).  Here, Plaintiff cannot establish a *prima facie* case of retaliation, either based on her complaint to the ACGME or her request for an accommodation, because there is no evidence suggesting that either of those events had any impact at all on the decision to terminate Plaintiff's residency.

Plaintiff's complaint to the ACGME, which alleged that Christiana Care violated various guidelines regarding the utilization and supervision of residents, cannot serve as a predicate for a retaliation claim under the ADA or ADEA.  Plaintiff lodged her complaint

31

to the ACGME in an e-mail in which she specifically requested anonymity. (A-48 – A-49.) Plaintiff testified that she never told anyone at Christiana Care that she had filed any complaint with the ACGME. (Zechman Dep. 375:20 – 376:7 at A-193 – A-194.) Every RRC member who has testified on this subject testified that the Committee was unaware of the identity of the person who filed the anonymous ACGME complaint. (Tilden-Burton Dep. 37:2 – 16 at A-299; Ekbladh Dep. 50:9 – 51:16 at A-264; Kaminski Dep. 44:24 – 47:2 at A-219) (Q: Were there discussions in the committee meetings about who may have sent the complaint? A: No."). Moreover, although Plaintiff's lengthy email to the ACGME contained one sentence vaguely referring to discrimination, it is undisputed that the ACGME never disclosed that fact to Christiana Care. (A-48 – A-49.) Rather, the ACGME informed Christiana Care on July 28, 2003, that it had received a confidential complaint regarding alleged noncompliance with the ACGME's substantive residency program guidelines. (A-54 – A-56.) ACGME's correspondence to Christiana Care did not disclose that the anonymous complainant also made allegations of discrimination. (Id.)

Thus, Plaintiff's purported reliance on her ACGME complaint is misplaced for two reasons. First, there no evidence that any of the RRC members who voted to terminate her residency had any knowledge that Plaintiff was the source of the anonymous complaint. See, e.g., Cox v. Carrier Sales & Distrib., No. 3:04-CV-527, 2006 WL 2038565, at *10 (E.D. Tenn. July 20, 2006) ("Beyond the plaintiff's sheer speculation . . . there is no evidence that any decision makers knew that the letter originated from her. Moreover, the decision to terminate the plaintiff came approximately six weeks after the anonymous letter was sent. . . . In short, plaintiff has

32

not produced any evidence to suggest a causal connection between her sending the anonymous letter and her termination."); Shah v. Consol. Edison Corp., No. 04 Civ. 2880, 2005 WL 612713, at *2 (S.D.N.Y. Mar. 15, 2005) ("There is no suggestion that anyone knew who had filed the anonymous complaint . . . [a]ccordingly, the filing of the anonymous complaint could not possibly have provoked the . . . adverse actions.").

Second, even if the RRC members knew that Plaintiff was the source of the complaint (they did not), allegations of inadequate resident supervision and other regulatory issues are not protected activity under the ADA or ADEA. Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 269 (2001) (holding that "protected activity" means "oppos[ing] any practice made an unlawful employment practice" under the ADA or ADEA).[18] It is undisputed that the ACGME never disclosed to Christiana Care that the complaint also contained a reference to employment discrimination. Nor is there any evidence that anyone at Christiana Care ever learned that the complaint referred to discrimination or any other employment practice prohibited by the ADA or ADEA. Therefore, there is no evidentiary basis from which to infer that Plaintiff's e-mail to the ACGME was causally linked in any way to the RRC's decision to terminate her residency.

The record evidence is also insufficient to establish a *prima facie* case of retaliation based on Plaintiff's July 23, 2003 request for an accommodation. First, more

---

[18]    Similarly, to the extent that Plaintiff contends that she complained to her supervisors about malfunctioning beds, eating lunch at the nurses' station, lack of supervision, or that her class-mates were rude to her, such complaints are not "protected activity" because the do not oppose violations of the ADA or ADA. Breeden, 532 U.S. at 271. Moreover, even if Plaintiff believed that people were being unfair or rude to her, "a general complaint of unfair treatment does not translate into a charge of illegal . . . discrimination." Barber v. CSX Distrib. Servs., 68 F.3d 694, 702 (3d Cir. 1995).

than two months elapsed between the date of Plaintiff's request and the termination of her residency on September 29, 2003, which is not sufficiently close in time to establish the causal link required for a *prima facie* case. Williams v. Phila. Hous. Auth. Police Dep't, 380 F.3d 751,760 (3d Cir. 2004) (citation omitted) (holding that a two month and one week time lapse between a request for accommodation and a termination is not "so close as to be unduly suggestive" of retaliation and is insufficient to infer a causal link); Schofield v. Met. Life Ins. Co., No. 3:CV-03-0357, 2006 WL 2660704, at *6–7 (M.D. Pa. Sept. 15, 2006) (granting summary judgment on retaliation claim because "over a month elapsed between the time [plaintiff] returned from his medical leave and the alleged retaliatory action," and noting that an inference of retaliation based on temporal proximity "typically requires that the alleged retaliatory action occurred within days of the protected activity"). Moreover, it is undisputed that as early as March 17 and June 16, 2003, the RRC was actively discussing the possibility of terminating Plaintiff's residency, which negates any inference that its September 29, 2003 termination decision was influenced by Plaintiff's July 2003 request for an accommodation. (A-34; A-39 – A-41.)

Second, there is no evidence that Dr. Ekbladh or anyone else reacted negatively to Plaintiff's request for an accommodation. To the contrary, Dr. Ekbladh's actions in response to Plaintiff's request support the exact opposite conclusion, as he engaged in the interactive process and then suggested the alternative accommodation (intermittent FMLA leave) that Plaintiff's physician indicated was medically appropriate. (Zechman Dep. 294:7 – 15 at A-173; A-60; A-61, A-69.)

34

In short, Plaintiff cannot establish a *prima facie* case of retaliation because there is no basis to infer that either her complaint to the ACGME or her request for an accommodation was causally linked to her termination.

### 2.    Plaintiff Cannot Establish Pretext.

Even if Plaintiff could establish a *prima facie* case of retaliation, she cannot show that the RRC's stated reasons for terminating her residency were a pretext for retaliation. As explained more fully above, the RRC determined as early as October 2002 that Plaintiff's performance was sub-standard.  (A-20 – A-22.)  Over the next eleven months, the RRC gave Plaintiff more than ample opportunity to improve and provided her with extensive remediation and one-on-one instruction in order to help her succeed.  It is undisputed that *before* Plaintiff ever requested an accommodation or sent her anonymous complaint to the ACGME, the RRC had already placed Plaintiff on probation; had held her back a year and refused to promote her to the next year of her residency; and had actively discussed the possible need to terminate Plaintiff's residency on several occasions.  (A-34; A-39 – A-41.)  The termination of Plaintiff's residency was not precipitous, but rather it was the natural culmination of a prolonged but unfortunately unsuccessful effort to help Plaintiff meet the minimum expectations of an OB/GYN resident.  Plaintiff failed to achieve an acceptable level of performance despite many months of extra educational opportunities and attention.  Dr. Kaminski, who was one of the two RRC members who abstained from voting on the termination decision, testified as follows:

> Q:    When the committee ultimately voted to terminate
> [Plaintiff]'s residency, when it came up at that meeting in
> September 2003, did that come as a surprise to you that the
> committee was going to consider her termination?

A:    No.

Q:    You could see it coming?

A:    Yes.

Q:    Was that based on [Plaintiff]'s performance over the course of the time she was at the program?

A:    And previous timeline that was given for her to improve or be – we can't carry her on probation forever.

Q:    In your judgment, was the decision to terminate [Plaintiff]'s residency in 2003 a reasonable decision?

A:    I think it was reasonable.

Q:    Do you think the decision was justified?

A:    Yes, I do.

(Kaminski Dep. 58:23 – 59:16 at A-223.)

In short, there is no evidence from which a fact finder could infer that the RRC terminated Plaintiff's residency based on retaliation for her ACGME complaint or her request for an accommodation. The Court should grant summary judgment on Plaintiff's retaliation claims.

### E.    Plaintiff's Claim For Breach Of Good Faith And Fair Dealing Is Not Viable Under Delaware Law.

Plaintiff purports to bring a claim for "breach of the covenant of good faith and fair dealing." However, the Court should grant summary judgment on this claim because the "Delaware Discrimination in Employment Act ["the Act"] . . . precludes" such a claim. Moon v. Delaware River & Bay Auth., No. Civ. A. 05-261-JJF, 2006 WL 462551, at *4 (D. Del. Feb. 24, 2006). Indeed, the Delaware Legislature has expressly "confirm[ed]" and "reestablish[ed]" that the Act is the "exclusive and sole remedy for

36

employment discrimination claims." S.B. 154, 142nd Gen. Assemb. (Del. 2004). See
also E.E.O.C. v. Avecia, Inc., 151 F. App'x 162, 165 (3d Cir. 2005) (stating that "it is
clear that the 2004 Amendment is meant to be retroactive"); Wilcoxon v. Red Clay
Consol. Sch. Dist. Bd. of Educ., 437 F. Supp. 2d 235, 247 (D. Del. 2006) (holding that
the employee cannot assert a claim for breach of covenant of good faith and fair dealing
"where the Delaware state statute provides the exclusive remedy" for employment
discrimination claims). Thus, Plaintiff's good faith and fair dealing claim fails as a matter
of law.

    **F.**    **Plaintiff's "Detrimental Reliance" Claim Fails As A Matter Of Law.**

    Plaintiff purports to assert a claim entitled "Detrimental Reliance," alleging that
she relied on Christiana Care's alleged promises to "afford" her the "opportunity to
improve upon her surgical skills" and to "accommodate her disability." (Compl., D.I. 1,
¶ 99.) However, "detrimental reliance" is not a recognized cause of action under
Delaware law, and any purported claim for promissory estoppel (of which detrimental
reliance is an element) fails because the parties' relationship is governed by two
undisputedly valid employment contracts. Weiss v. Northwest Broad., Inc., 140 F. Supp.
2d 336, 344 (D. Del. 2001) (stating that because there was a valid contract, the Plaintiff
"cannot recover under a theory of promissory estoppel"); Kysor Indus. Corp. v. Margaux,
Inc., 674 A.2d 889, 896 (Del. Super. Ct. 1996) (finding it unnecessary to address issue of
promissory estoppel because the parties' relationship was governed by an enforceable
contract); Synesiou v. DesignToMarket, Inc., No. 01-5358, 2002 WL 501494, at *5 (E.D.
Pa. Apr. 3, 2002) (holding that promissory estoppel claim was invalid because
employer's purported post-hire promises concerned matters within the four-corners of the
employment agreement).

Here, there are two undisputedly valid contracts that governed the parties'

relationship. Both the 2002 and 2003 employment agreements state that "[t]his

Agreement constitutes the entire Agreement between the parties and supersedes all

previous agreements. Any amendments to the Agreement must be in writing and

executed by the parties hereto."  (A-14 – A-18; A-42 – A-47.)  The employment

agreements provide that both parties:

> mutually agree to 1) fulfill the educational requirements as
> set forth by the accrediting body of the graduate training
> program to which the resident has been admitted; 2) fulfill
> the established program of each individual residency
> program to which the Resident is accepted; and 3) abide by
> the applicable portions of the Medical-Dental Staff Rules
> and Christiana Care rules, regulations, policies, and
> procedures that may be changed or amended from time to
> time.

(A-14; A-42.)  The agreements also contain an anti-discrimination provision.  (A-17; A-

45.)  Accordingly, there can be no question that any promises relating to Plaintiff's

instruction, coursework, or Christiana Care's obligations not to discriminate against her

are encompassed within the "four-corners" of the employment agreement.  Thus,

Plaintiff's claim for "detrimental reliance" fails as a matter of law.

## V.    CONCLUSION

For the reasons set forth above, there are no genuine disputes of material fact and

the Court should grant Christiana Care's motion for summary judgment as to all of

Plaintiff's claims.

Respectfully submitted,

David H. Williams (DE 616)
MORRIS, JAMES, HITCHENS & WILLIAMS
LLP
222 Delaware Ave., 10th Floor
P.O. Box 2306
Wilmington, DE  19899
(302) 888-6900
dwilliams@morrisjames.com

Michael J. Ossip (admitted pro hac vice)
Thomas S. Bloom (admitted pro hac vice)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA  19103
215.963.5543

Dated:  October 23, 2006        Attorneys for Defendant Christiana Care
Health Systems

39

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

ELLEN ZECHMAN,                        :
                                      :    C.A. No. 05-159 (JJF)
                        Plaintiff,    :
                                      :
            v.                        :
                                      :
CHRISTIANA CARE HEALTH SYSTEMS,       :
                                      :
                        Defendant.    :

**CERTIFICATE OF ELECTRONIC SERVICE**

I hereby certify that on October 23, 2006, I electronically filed the attached

**BRIEF IN SUPPORT OF DEFENDANT CHRISTIANA CARE HEALTH SYSTEMS'**

**MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using CM/ECF which will

send notification of such filing(s) to the following:

> Jeffrey K. Martin, Esquire
> Margolis Edelstein
> 1509 Gilpin Avenue
> Wilmington, DE 19806


> David H. Williams (#616) (dwilliams@morrisjames.com)
> MORRIS, JAMES, HITCHENS & WILLIAMS, LLP
> 222 Delaware Avenue
> P.O. Box 2306
> Wilmington, DE 19899
> (302) 888-6900

> Michael J. Ossip (mossip@morganlewis.com)
> Thomas S. Bloom (tbloom@morganlewis.com)
> MORGAN, LEWIS & BOCKIUS LLP
> 1701 Market Street
> Philadelphia, PA 19103
> (215) 963-5543

> Attorneys for Defendant
Dated: October 23, 2006    Christiana Care Health Services, Inc.

1473986/1