## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ELLEN ZECHMAN,                          :
                                        :
              Plaintiff,                :
                                        :
       v.                               :        C.A. No. 05-159-JJF
                                        :
CHRISTIANA CARE HEALTH SYSTEMS,         :
                                        :
              Defendant.                :

---

## SPECIAL APPENDIX OF UNPUBLISHED OPINIONS
## CITED IN BRIEF IN SUPPORT OF DEFENDANT
## CHRISTIANA CARE HEALTH SYSTEMS'
## MOTION FOR SUMMARY JUDGMENT

---

David H. Williams (#616)
MORRIS, JAMES, HITCHENS & WILLIAMS LLP
222 Delaware Ave., 10th Floor
P.O. Box 2306
Wilmington, DE  19899
(302) 888-6900
dwilliams@morrisjames.com

Michael J. Ossip (admitted pro hac vice)
Thomas S. Bloom (admitted pro hac vice)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA  19103
215.963.5543

Counsel for Defendant Christiana Care
Health Systems

Dated:  October 23, 2006

# TABLE OF CONTENTS

| TAB NO. | DESCRIPTION |
|---------|-------------|
| SA-1 | Cox v. Carrier Sales & Distrib., <br> No. 3:04-CV-527, 2006 WL 2038565 (E.D. Tenn. July 20, 2006) |
| SA-2 | E.E.O.C. v. Avecia, Inc., <br> 151 F. App'x 162 (3d Cir. 2005) |
| SA-3 | Massaro v. The Chester Housing Auth., <br> No Civ. A. 98-245, 1999 WL 624485 (E.D. Pa. Aug. 5, 1999) |
| SA-4 | Moon v. The Delaware River & Bay Auth., <br> No. Civ. A. 05-261-JJF, 2006 WL 462551 (D. Del. Feb. 24, 2006) |
| SA-5 | Petrocelli v. DaimlerChrysler Corp., <br> No. Civ.A. 04-943-KAJ, 2006 WL 733567 (D. Del. Mar. 22, 2006) |
| SA-6 | Rizzo v. PPL Serv. Corp., Nos. CIV.A.03-5779, CIV.A.03-5780, CIV.A.03-5781, 2005 WL 913091 (E.D. Pa. Apr. 19, 2005) |
| SA-7 | Schofield v. Met. Life Ins. Co., <br> No. 3:CV-03-0357, 2006 WL 2660704 (M.D. Pa. Sept. 15, 2006) |
| SA-8 | Shah v. Consol. Edison Corp., <br> No. 04 Civ. 2880, 2005 WL 612713 (S.D.N.Y. Mar. 15, 2005) |
| SA-9 | Shaw v. Chamberlain Mfg. Corp., <br> No. 3:05cv1344, 2006 WL 2382284 (M.D. Pa. Aug. 17, 2006) |
| SA-10 | Synesiou v. DesignToMarket, Inc., <br> No. 01-5358, 2002 WL 501494 (E.D. Pa. Apr. 3, 2002) |
| SA-11 | Testerman v. Chrysler Corp., <br> No. CIV.A. 95-240-MMS, 1997 WL 820934 (D. Del. Dec. 30, 1997) |
| SA-12 | Tojzan v. N.Y. Presbyterian Hosp., <br> No. 00-Civ.-6105 (WHP), 2003 WL 1738993 (S.D.N.Y. Mar. 31, 2003) |

# SA-1

Westlaw.

Slip Copy

Slip Copy, 2006 WL 2038565 (E.D.Tenn.)

(Cite as: 2006 WL 2038565 (E.D.Tenn.))

Page 1

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, E.D. Tennessee.
Carol Dee COX and Sammie Rogers Cox, Plaintiffs,
v.
CARRIER SALES & DISTRIBUTION, Defendant.
No. 3:04-CV-527.

July 20, 2006.
Ursula Bailey, Stacy, Whitt & Cooper, Knoxville, TN, for Plaintiffs.

Jonathan O. Harris, Keith D. Frazier, Ogletree, Deakins, Nash, Smoak & Stewart, L.L.P., Nashville, TN, for Defendant.

### *REPORT AND RECOMMENDATION*

H. BRUCE GUYTON, Magistrate Judge.

*1 This matter is before the undersigned pursuant to 28 U.S.C. § 636(b), the Rules of this Court, and by Order [Doc. 24] of the Honorable Thomas A. Varlan, United States District Judge, for a report and recommendation on the defendant's Motion for Summary Judgment [Doc. 11].

### I. *Introduction*

This is a discrimination and retaliation action brought by the plaintiff Carol Cox ("Cox") against her former employer, Carrier Sales & Distribution ("Carrier"). [FN1] Specifically, the plaintiff asserts causes of action under the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et seq.* ("ADEA"); the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, et seq. ("ADA"); the Equal Pay Act, 29 U.S.C. § 206(d); Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"); the Tennessee Human Rights Act, Tenn.Code Ann. § 4-21-101, et seq. ("THRA"); and the Tennessee Handicap Act, Tenn.Code Ann. § 8-50-103 ("THA"). Additionally, the plaintiff asserts a claim of intentional infliction of emotional distress under Tennessee state law. Cox's husband, Sammie Cox, also asserts a claim for loss of consortium. [Doc. 1].

> FN1. The plaintiff originally identified her employer as Carrier Mid-South Knoxville. The defendant Carrier Sales & Distribution filed an answer, asserting that Carrier Mid-South Knoxville was not the plaintiff's employer and thus not a proper party defendant. The parties agree that the proper party defendant is Carrier Sales & Distribution.

It is admitted that Carrier is an "employer" within the meaning of the various state and federal statutes under which the plaintiff brings this action; that Cox filed a charge with the EEOC; and further, that the EEOC issued the plaintiff a Notice of Right to Sue on July 8, 2004. [Doc. 3]. The subject matter jurisdiction of the Court is not in dispute. [Doc. 2].

After carefully considering the entire record, the Court concludes that summary judgment in favor of Carrier is proper as to all of the plaintiff's claims. Accordingly, for the reasons set forth herein, it is **RECOMMENDED** that the defendant's Motion for Summary Judgment [Doc. 11] be granted and that this case be dismissed.

### II. *Relevant Facts*

As required by Rule 56 of the Federal Rules of Civil Procedure, the Court will recite and consider the relevant facts in the light most favorable to the plaintiff. In doing so, the Court relies on the depositions of the plaintiff Carol Cox and several

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                    Page 2

Slip Copy, 2006 WL 2038565 (E.D.Tenn.)

(Cite as: 2006 WL 2038565 (E.D.Tenn.))

Carrier employees, and other testimony and exhibits filed with the Court.

The plaintiff was initially hired by Andrews Distributing on December 27, 1999 as an administrative assistant in the Knoxville office. She was 47 years old at the time. In 2001, Andrews Distributing was bought out by Carrier. [Cox Dep. at 17-19]. The office in which the plaintiff worked was part of a region which included offices in Knoxville, Chattanooga, and the TriCities area. Glenn Loper ("Loper") is the Market Manager for this region, and all 35 employees in this region ultimately report to him. Loper works in the Chattanooga office. Scott Henry ("Henry") is the Residential Sales Manager in the Knoxville office and was the plaintiff's immediate supervisor. Henry reports directly to Loper. [Loper Dep. at 13].

*2 As an administrative assistant, the plaintiff was responsible for the "general running of the office," including assisting Henry and the other salespeople, and "making sure that everything that needed to be done was done." [Cox Dep. at 58]. Several duties were added to the plaintiff's job responsibilities over the years, including ordering literature, covering the phones on a more frequent basis, managing accounts payable, handling questions about insurance, and keeping up with program changes. [Id. at 170-71]. The plaintiff admitted that she "had a pretty full plate." [Id. at 173].

A. Bridgett Johnson

In May, 2003, Carrier hired 37-year-old Bridgett Johnson ("Johnson"). Johnson testified that she was hired as an administrative assistant in the Knoxville office. [Johnson Dep. at 9]. The plaintiff, on the other hand, claims that Johnson was hired as a receptionist, whose duties were to answer the phones and handle the mail. [Cox Dep. at 59, 65]. Johnson's starting salary was higher than the plaintiff's. [Id. at 67]. Christa Carsello ("Carsello"), the Human Resources Manager, explained that this was because Johnson had more education, experience, and computer skills. [Carsello Dep. at 94-95].

The plaintiff claims that soon after Johnson was hired, Johnson began performing some of the plaintiff's job duties. For example, the plaintiff discovered an email on Johnson's desk indicating that Johnson was working on updating the office's antiquated phone system, a project on which the plaintiff had been working. [Cox Dep. at 77-78]. The plaintiff did not talk to management about this incident, reasoning that if "they had given it to [Johnson] to do, then I was going to let her go ahead and do it." [Cox Dep. at 82].

Another one of plaintiff's job duties was to keep up with new dealer accounts. In July, 2003, the plaintiff discovered an email on Johnson's desk from Shirley Cronkite, a temporary administrative assistant in the Chattanooga office, regarding a spreadsheet that was to be kept on new dealers. The email stated that the plaintiff was to help Johnson fill out this information. The plaintiff contacted Cronkite to ask why she needed the information, and Cronkite told her that Johnson would be keeping this information up to date from now on. [Doc. 12 Ex. 6].

In August, 2003, the plaintiff learned that Johnson was ordering food for a Lunch & Learn program put on by Carrier for one of its clients in Oak Ridge. Previously, the plaintiff had prepared the lunches herself for these programs through her catering business, but that ceased when Henry decided that it was a conflict of interest. [Doc. 12 Ex. 8; Cox Dep. at 95].

In September, 2003, the plaintiff learned that Johnson was going for training on the administration of HVAC Partners, a website program for Carrier dealers. Previously, the plaintiff had been the program's administrator. [Cox Dep. at 111-12]. The plaintiff called Carsello in Human Resources and asked why Johnson was being sent for training instead of her. Carsello told her that Henry would come talk to her about it. Henry told the plaintiff that he wanted Johnson to be brought up to speed on the program because Johnson would be doing the online warranties. [Id. at 115]. The plaintiff stated that Henry was very angry with the plaintiff for raising the issue with Carsello first.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                          Page 3

Slip Copy, 2006 WL 2038565 (E.D.Tenn.)

**(Cite as: 2006 WL 2038565 (E.D.Tenn.))**

During this discussion, Henry told her that she was doing a good job and asked her why she could "not just be satisfied with that." [*Id.* at 119].

**B. Job Performance Issues**

*3 Prior to January, 2004, the plaintiff had never been disciplined. [Cox Aff. ¶ 18]. In January, 2004, the plaintiff received a Performance Alert [Doc. 12 Ex. 10] from Scott Henry regarding the plaintiff's absence from work. The Performance Alert states that the plaintiff had been "absent during critical times" on several recent occasions, and the plaintiff was admonished to call in and speak with Henry directly when she called in sick and not to have any one call in for her. The plaintiff wrote on the form that she was not aware that she had to speak with Henry personally. [*Id.;* Cox Dep. at 151]. The plaintiff testified that other employees had called in requesting sick leave without speaking to Henry directly. [Cox Dep. at 152]. Henry also noted in the Performance Alert that the plaintiff's "attitude and teamwork requires improvement as well so that you are not the source of frustration, or controversy for others." The Performance Alert further states: "Immediate improvement is required, or further action, up to and including termination will be taken." [Doc. 12 Ex. 10].

During the meeting on this Performance Alert, Henry told the plaintiff that she had a negative attitude, and that other employees viewed her as inaccessible because she kept her office door closed. The plaintiff explained that she was often cold at work and had a space heater under her desk, so she would close her door to keep the heat in. [Cox. Dep. at 155]. Henry also told her that she had become a source of frustration for other employees in the office, and that some employees had complained to him that they did not want to use the plaintiff for tasks because of her attitude. [*Id.* at 156, 157].

Glenn Loper performed a Performance Evaluation on the plaintiff in January, 2004. [Doc. 12 Ex. 11]. In this review, Loper noted that the plaintiff was "out of the office too much" due to illness and taking too long to run business errands. [Loper Dep.

at 24, 27]. He also noted that the plaintiff did a "[g]ood job when available," but that she was "[o]ut of [the] office wa[y] too much to depend on for important meetings." Loper testified that this latter comment was in reference to a January, 2004 strategy meeting that had been scheduled in Knoxville for all of Carrier's sales people in the East Tennessee region. Loper sent the plaintiff quota information to put in a particular format, but the plaintiff did not complete the project in time for the meeting because she was out sick. [Loper Dep. at 40-41]. Loper testified that he "had to improvise, and go in there and get it done myself." [*Id.* at 41]. He did not give her a written reprimand for this. [*Id.* ].

Loper also described an incident where the plaintiff did not get the price books out on time, which cost Carrier some money because dealers could not be charged the new, higher prices until the price books were sent out. [*Id.* at 42, 84]. The plaintiff was supposed to prepare the price books, but did not finish them before going on vacation. [Henry Dep. at 18]. Before returning to work from vacation, the plaintiff also took some sick time. [*Id.* at 81]. However, she did not communicate to anyone that the price books still needed to be done. [*Id.* at 81-82]. Henry talked to the plaintiff about this issue, but no formal action was taken against the plaintiff. [Loper Dep. at 42].

*4 In the overall objective rating of the Performance Evaluation, Loper noted that "[w]ith a better attitude and a proactive approach to helping all other employees her performance could improve." [Doc. 12 Ex. 11]. Loper explained in his deposition that this comment was in reference to the fact that sometimes the plaintiff would respond to requests for help from salespeople by stating that she did not have time, and he felt that she needed to be more proactive in helping all salespeople in the office. [Loper Dep. at 49-50]. Loper testified that every salesperson in the office had complained to him about the plaintiff's unwillingness to help. [*Id* . at 51]. He felt that the plaintiff had a "bad attitude towards the salespeople" and that the salespeople "couldn't depend on her to help, so they went somewhere else" because it was easier to ask

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 2038565 (E.D.Tenn.)

(Cite as: 2006 WL 2038565 (E.D.Tenn.))

another employee for assistance than it was to ask the plaintiff. [*Id.* at 66]. It was Loper's impression that the plaintiff did not seem to care if the company succeeded. [*Id.*].

Henry received complaints from salespeople about the plaintiff's lack of timeliness and accuracy. [Henry Dep. at 69]. Henry felt that the plaintiff was not proactive in seeking work or showing initiative. [ *Id.* at 80].

## C. Hostile Work Environment

The plaintiff alleges that she was subjected to a hostile work environment. For example, during a business meeting in Gatlinburg, an intoxicated Scott Henry said to the plaintiff, "hey big momma, what are you doing up this late ... old ladies like you should be in bed right now." Henry made this comment in front of several other Carrier employees, as well as the plaintiff's husband. [Cox Dep. at 36-37]. Cox did not report this incident to any management at Carrier. [*Id.* at 39, 40].

The plaintiff also recalled that Henry would make lewd remarks and use foul language in speaking to other employees, and that he had on occasion said things to her that she considered to be "obscene." [ *Id.* at 39]. The plaintiff could not recall specific comments Henry made, only that he used curse words in speaking with other employees and in Monday morning meetings. [*Id* . at 41]. She testified that after the Performance Alert in January, 2004, Henry "deliberately said things and did things knowing that I would overhear or that I was in the room to purposefully intimidate me or to make me feel uncomfortable." [*Id.* at 275].

The plaintiff also testified that Henry's attitude toward her contributed to a hostile work environment. She recalled that if she went in to ask him a question, Henry would give a "very agitated, irritated type response," and that he was sometimes gruff or short-tempered with her. [*Id.* at 42]. The plaintiff testified that Henry "made it very difficult to ask questions to him" by not giving complete answers or directions for what he wanted. [*Id.* at 43]. She also recalled that he would make

comments showing a negative attitude towards women, including sexually explicit jokes. The plaintiff could not recall any specific statements or jokes that were made. [*Id.* at 50]. She estimated that she had overheard Henry make inappropriate jokes approximately five to ten times in the past year. [*Id.* at 51]. She did not report these incidents to Human Resources because she "didn't feel they would listen." Instead, she would just leave the room when the jokes were made. [*Id.* at 52].

**\*5** The plaintiff claims that Johnson also contributed to the hostile work environment by taking over some of the plaintiff's job duties. The plaintiff stated that she was not sure that Johnson was doing this because Henry instructed her to do these tasks or whether Johnson herself had asked to do them. [*Id.* at 55]. The plaintiff also stated that on some days, Johnson would not speak to her at all. [ *Id.*].

The plaintiff also claims that Henry's supervisor, Glenn Loper, contributed to the hostile work environment. The plaintiff claims that Loper would occasionally use four-letter words in the office. She also claims that Loper's performance evaluation of her also contributed to the hostile work environment. [*Id.* at 56].

## D. Plaintiff's Medical Conditions

The plaintiff has diabetes and high blood pressure. [ *Id.* at 231]. The plaintiff testified that she is "pretty much" able to live a normal life by controlling her diet and taking insulin. [*Id.* at 233-34]. She does have to go to the bathroom about once an hour because of her diabetes, but she stated that this does not affect her job one way or the other. [*Id.* at 235]. The plaintiff's high blood pressure sometimes gives her headaches and makes her feet and legs swell. The plaintiff takes medication to help alleviate these symptoms. Medication keeps her blood pressure within an acceptable range on most days. [*Id.* at 235]. When the plaintiff's feet are swollen, it is sometimes hard for her to walk or stand for long periods of time. [*Id.* at 237].

The plaintiff is also morbidly obese. [Cox Aff. at ¶

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 2038565 (E.D.Tenn.)

**(Cite as: 2006 WL 2038565 (E.D.Tenn.))**

Page 5

42-43]. The plaintiff states that being overweight affects all areas of her life and prevents her from doing a lot of things that other people can do, such as walking for a long distance, bending a lot, sitting in small chairs or chairs with arms, and wearing certain clothes and shoes. [Cox Dep. at 240]. The plaintiff testified she is able to bend and could, for example, pick her purse off the floor. The plaintiff stated that she requested and received a new office chair with adjustable arms as an accommodation for her weight. [Cox Dep. at 240-41].

The plaintiff stated that she believes that she was laid off due to a disability because she "wasn't able to do some of the things around the office that ... other people might be able to do more easily," such as dressing more modern. She also feels that, based upon the type of small, petite people he hired, Henry "would prefer someone that was smaller." [*Id.* at 242-43]. The plaintiff also believes that Henry discriminated against her because she had to go to the bathroom a lot. [*Id.* at 243].

**E. The March 18, 2004 Letter**

On March 18, 2004, the plaintiff sent a three-page letter to Carrier's ombudsman, Brian Nugent, listing several complaints or concerns that she had about issues in the office, including allegations of ethical violations and other improper behavior by Scott Henry. The plaintiff sent the letter anonymously. Included in her complaints was that "[o]lder employees or employees who are 'different' are treated differently than younger employees and employees who do not 'party' after hours" and that

*6 [o]lder employees are definitely discriminated against, as every employee that has been terminated by Carrier since their take over has been over the age of fifty with the exception of one and all of these employees were chosen for termination by Scott Henry. Younger employees have been hired for positions that older employees hold making 33% more a year than the older employee. The older employee then has to teach them the job they were hired to do making the higher salary.
[Doc. 12 Ex. 13].

After receiving the letter, the ombudsman contacted Loper. Management spent two days investigating the allegations in the letter by contacting dealers and employees and eventually determined that the allegations did not have merit. [Loper Dep. at 72-73]. The plaintiff was asked by both management and other employees if she sent the letter. In the plaintiff's opinion, "everyone knew [she] had sent the letter." [Cox Aff. at ¶¶ 32-35].

On May 6, 2004, the plaintiff was terminated. She was told that she was being terminated due to a position restructure. [Cox Dep. at 217]. When asked why she was selected for termination and not Johnson, the plaintiff was told that she was selected because of her attitude. [*Id.;* Cox Aff. at ¶ 37]. Loper testified that Cox was terminated because Carrier had a new phone system, thus requiring only one administrative assistant in Knoxville, and because an administrative assistant was needed in Chattanooga to assist him. [Loper Dep. at 78]. Loper testified that the position in Knoxville had to be eliminated because Carrier permitted the region to have only a certain number of employees. [Loper Dep. at 79]. The plaintiff was not offered the administrative position in Chattanooga. [Carsello Dep. at 105]. Carrier subsequently hired 55-year-old Donna Coulter to fill the Chattanooga position. [Henry Dep. at 13]. After the plaintiff's termination, Johnson's duties as the Knoxville administrative assistant did not change. Most of the duties that were previously performed by the plaintiff were transferred to the Chattanooga position. [Johnson Dep. at 31].

The plaintiff states in her affidavit that at the time that she was terminated in May 2004, the Knoxville office of Carrier did not have a new phone system. [Cox Aff. at ¶ 39]. Loper testified that the new phone system was installed around April, 2004; that it took a long time to get installed; and that he was not sure when the installation was completed. [Loper Dep. at 79].

The plaintiff also states in her affidavit that at the time of her termination and for as long as she had worked for Andrews and Carrier, there was a full-time administrative assistant in Chattanooga.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 2038565 (E.D.Tenn.)

(Cite as: 2006 WL 2038565 (E.D.Tenn.))

Page 6

[Cox Aff. ¶ 40]. In her deposition, however, the plaintiff had testified that Chattanooga had only a temporary administrative assistant for approximately a year in 2003, and that at the time of her termination, there was not an administrative assistant in Chattanooga. [Cox Dep. at 254-55]. Loper also testified that he did not have an administrative assistant in Chattanooga to assist him. [Loper Dep. at 48].

*7 The plaintiff currently provides day care services out of her home, runs a clothing and jewelry business out of her home, and continues to have a catering business. [Cox Dep. at 143, 279, 282].

### III. *The Summary Judgment Standard*

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The burden of establishing that there is no genuine issue of material fact lies upon the moving party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

In considering a motion for summary judgment, the Court must take all of the evidence submitted by the non-moving party as true, and must draw all reasonable inference in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable jury could find in its favor. *Id.* at 248. The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

Once the moving party presents evidence sufficient to carry its burden under Rule 56, the non-moving party may not rest upon its pleadings, but must affirmatively set forth, by affidavits or otherwise, "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). An entry of summary judgment is mandated if, "after adequate time for discovery and upon motion, [the non-moving party] fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ." *Celotex,* 477 U.S. at 322. In reviewing the evidence, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251-52; *see also Gaines v. Runyon,* 107 F.3d 1171, 1174-75 (6th Cir.1997) (requiring non-moving party "to present some significant probative evidence that makes it necessary to resolve the parties' differing versions of the dispute at trial" in order to defeat summary judgment).

### IV. *Analysis and Ruling*

#### A. Age Discrimination

The Court will first address the plaintiff's claim of age discrimination brought pursuant to the ADEA and the THRA. The plaintiff alleges that she was terminated because of her age and that she was replaced by Bridgett Johnson, a younger employee. [FN2]

> FN2. The plaintiff also alleges in the Complaint that Carrier had a pattern and practice of terminating employees over the age of forty and replacing them with people under the age of 40. [Doc. 1]. However, the plaintiff may not prove her discrimination claim with pattern-or-practice evidence. "[T]he pattern-or-practice method of proving discrimination is not available to individual plaintiffs." *Bacon v. Honda of America Mfg., Inc.,* 370 F.3d 565, 575 (6th Cir .2004), *cert. denied,* 543 U.S. 1151 (2005).

The ADEA makes it unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions or privileges of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 7

Slip Copy, 2006 WL 2038565 (E.D.Tenn.)

(Cite as: 2006 WL 2038565 (E.D.Tenn.))

employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Claims brought under the THRA are governed by the same evidentiary framework that applies to ADEA claims. *See Bruce v. Western Auto Supply Co.,* 669 S.W.2d 95, 97 (Tenn.Ct.App.1984). Accordingly, the Court's analysis with respect to the ADEA will apply with equal force to the plaintiff's claim under the THRA.

*8 A plaintiff may meet her evidentiary burden under the ADEA in one of two ways. *Mitchell v. Vanderbilt University,* 389 F.3d 177, 181 (6th Cir.2004). On the one hand, a plaintiff may offer direct evidence of the employer's discriminatory motive by producing "evidence, which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Wexler v. White's Fine Furniture, Inc.,* 317 F.3d 564, 570 (6th Cir.2003) (en banc) (quoting *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.,* 176 F.3d 921, 926 (6th Cir.1999)). If, on the other hand, a plaintiff is unable to provide direct evidence of an improper motive, she may offer indirect and circumstantial evidence of such a motive pursuant to the burden-shifting approach established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).

In order to establish a *prima facie* case of age discrimination using circumstantial evidence under the *McDonnell Douglas* framework, a plaintiff must show that: (1) she is a member of the protected class, that is, she is at least forty years of age; (2) she was subjected to an adverse employment action; (3) she was otherwise qualified for the position; and (4) she was replaced by a younger person. *Rowan v. Lockheed Martin Energy Systems, Inc.,* 360 F.3d 544, 547 (6th Cir.2004). A person is not "replaced," however, "when another employee is assigned to perform the plaintiff's duties in addition to other duties or when the work is redistributed among other existing employees already performing related work." *Barnes v. GenCorp., Inc.,* 896 F.2d 1457, 1465 (6th Cir.1990).

Once the plaintiff has made out a *prima facie* case, the burden shifts to the defendant to give a legitimate, non-discriminatory reason for the

termination. *Rowan,* 360 F.3d at 547. If the defendant satisfies this burden, the burden shifts back to the plaintiff to show that the legitimate reasons offered were merely pretext for a decision "actually motivated by an unlawful bias against age." *Id.* A plaintiff may satisfy this burden "by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Wexler,* 317 F.3d at 576 (quoting *Dews v. A.B. Dick Co.,* 231 F.3d 1016, 1021 (6th Cir.2000)).

The plaintiff has not presented any direct evidence of an improper motive based upon age; accordingly, the Court must examine the plaintiff's age discrimination claim according to the *McDonnell-Douglas* burden-shifting framework. The parties do not dispute that the plaintiff was a member of a protected class, that she was qualified for her position, or that she was subjected to an adverse employment action. The parties dispute, however, whether the plaintiff was replaced by a younger employee. The defendant argues that the plaintiff cannot establish that she was replaced by a younger employee because the employee who replaced her, Donna Coulter, is actually older than the plaintiff. The plaintiff counters that she was replaced not by Coulter, but by Bridgett Johnson. At the very least, the plaintiff contends, that a genuine issue of material fact exists as to whether she was replaced by Coulter or Johnson.

*9 The plaintiff bases her contention that she was replaced by Johnson on the fact that Johnson was hired as a receptionist in 2003 but subsequently became the administrative assistant for the Knoxville office after the plaintiff's termination. Carrier disputes this, arguing that Johnson was hired as an administrative assistant and thus did not "replace" the plaintiff.

Even accepting as true the plaintiff's contention that Johnson was hired as a receptionist, the Court concludes that the plaintiff was not replaced by Johnson. Even if Johnson's job title was technically that of a receptionist, it is clear from the testimony of Johnson and of the plaintiff herself that Johnson

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2038565 (E.D.Tenn.)

**(Cite as: 2006 WL 2038565 (E.D.Tenn.))**

was performing substantially similar duties to the plaintiff prior to her termination. "A 'person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties.' " *Grosjean v. First Energy Corp.,* 349 F.3d 332, 336 (6th Cir.2003), *cert. denied,* 541 U.S. 1010 (2004) (quoting *Barnes,* 896 F.2d at 1465). Johnson was neither hired nor reassigned to perform the plaintiff's duties; she was already assigned administrative assistant duties in the Knoxville office at the time of the plaintiff's termination. Accordingly, the Court concludes that the plaintiff was not replaced by Johnson.

If the plaintiff was replaced at all, the undisputed facts demonstrate that Carrier eliminated the plaintiff's position in Knoxville in order to create an administrative position in Chattanooga and that this position was filed by Donna Coulter, who is in fact older than the plaintiff. Accordingly, the plaintiff cannot show that she was replaced by a younger employee, and her *prima face* case of discrimination fails.

Even if the plaintiff could make a *prima facie* case, she has failed to demonstrate that the legitimate, non-discriminatory reasons for her termination given by the defendant were pretextual. Carrier proffered two primary reasons for eliminating the plaintiff's position: (1) the updating of the antiquated phone system, which eliminated the need for two administrative assistants in Knoxville and (2) the need for a permanent administrative assistant position in Chattanooga to assist Loper. The plaintiff contends that these proffered reasons have no basis in fact. First, the plaintiff argues that at the time of her termination, the new phone system had not yet been installed. Second, the plaintiff argues that there was no need to create an administrative assistant position in Chattanooga because, according to her affidavit, there was a full-time administrative assistant position in Chattanooga for as long as the plaintiff had worked for Andrews and Carrier. [Cox Aff. at ¶ 40].

With respect to the updating of the phone system, the defendant argues that regardless of whether the phone system was updated shortly before or shortly after the plaintiff's termination, there is no dispute that the system has been updated, thereby eliminating the need for the second administrative assistant position in Knoxville. The plaintiff acknowledged in her deposition that she knew that the new phone system was coming. [Cox Dep. at 180-81]. Indeed, purchasing an upgraded phone system was one of the duties that the plaintiff claims was taken away from her by Johnson. Thus, there does not appear to be any real dispute that Carrier planned on upgrading its phone system and that, while the installation of the new phone system may not have been completed on the day of the plaintiff's termination, the installation was completed shortly thereafter. There also does not appear to be any dispute that the upgraded phone system eliminated the need for two administrative assistant positions in Knoxville. Accordingly, the Court cannot say that the defendant's first proffered reason for eliminating the plaintiff's position in Knoxville had no basis in fact.

**\*10** With respect to the need for a permanent administrative assistant position in Chattanooga, the plaintiff states in her affidavit that there had always been a "full-time" administrative assistant in Chattanooga, and thus, the defendant's proffered reason for her termination was pretext. The plaintiff's affidavit, however, is in direct contradiction with her earlier deposition testimony in which she acknowledged that the administrative assistant who worked in Chattanooga was only a temporary worker who had worked for approximately a year in 2003, and further, that at the time of her termination, there was no administrative assistant in Chattanooga. [Cox Dep. at 254-55]. "[A] party cannot create a factual issue by filing an affidavit which contradicts earlier deposition testimony after a motion for summary judgment has been made. If an affidavit is untimely and inconsistent with prior discovery responses, it is inadmissible and should not be considered." *Graham v. American Cyanamid Co.,* 350 F.3d 496, 509 (6th Cir.2003), *cert. denied,* 541 U.S. 990 (2004).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                      Page 9

Slip Copy, 2006 WL 2038565 (E.D.Tenn.)

**(Cite as: 2006 WL 2038565 (E.D.Tenn.))**

In summary, the Court concludes that the plaintiff has failed to make a *prima facie* case of age discrimination because she cannot show that she was replaced by a younger worker. Even if a *prima facie* case could be made, the plaintiff has failed to show that the reasons given for her termination were pretext. Accordingly, it is **RECOMMENDED** that the plaintiff's claims of age discrimination under the ADEA and the THRA be dismissed.

**B. Age Discrimination—Retaliation**

Next, the plaintiff alleges that she was terminated in retaliation for reporting the discrimination against older employees. [Doc. 1]. The defendant argues that the plaintiff cannot establish a *prima facie* case of retaliation because she cannot show the element of causation.

To establish a *prima facie* case of retaliation, a plaintiff must show "(1) that the plaintiff engaged in a protected activity; (2) that the defendant had knowledge of the plaintiff's protected conduct; (3) that the defendant took an adverse employment action towards the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action." *Weigel v. Baptist Hosp.,* 302 F.3d 367, 381 (6th Cir.2002). In order to demonstrate a causal connection, " 'a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken' in the absence of the protected conduct." *Id.* (quoting *Nguyen v. City of Cleveland,* 229 F.3d 559, 563 (6th Cir.2000)).

The defendant argues that even if the plaintiff satisfied the first three elements of a *prima facie* case, she cannot show that there was a causal connection between the protected activity and her termination. The Court agrees. The Sixth Circuit has held that "[a] causal link may be shown through knowledge combined with closeness in time." *Weigel,* 302 F.3d at 381 (quoting *Johnson v. University of Cincinnati,* 215 F.3d 561, 582 (6th Cir.2000)). In the present case, the plaintiff testified that in her opinion, "everyone knew" that she had written the anonymous letter. Beyond the plaintiff's sheer speculation, however, there is no evidence

that any decision makers knew that the letter originated from her. Moreover, the decision to terminate the plaintiff came approximately six weeks after the anonymous letter was sent. *Compare Weigel,* 302 F.3d at 381 (finding decision to reject plaintiff's application was made "shortly" after decision makers became aware of plaintiff's complaints of age discrimination). In short, the plaintiff has not produced any evidence to suggest a causal connection between her sending the anonymous letter and her termination.

**\*11** Even if the plaintiff could establish a *prima facie* case, however, the Court would find, for the reasons set forth *supra,* that the defendant is nevertheless entitled to summary judgment on the plaintiff's retaliation claim because the plaintiff has failed to carry her burden of showing that the defendant's legitimate, nondiscriminatory reasons for her termination were pretext.

For these reasons, it is therefore **RECOMMENDED** that the plaintiff's retaliation claim be dismissed.

**C. Disability Discrimination**

In her complaint, the plaintiff alleges that she suffers from diabetes and hypertension; that frequent urination is a symptom of her conditions; that as a result of these conditions, she is required to eat within a certain time period each day; and that she was reprimanded and eventually terminated because of her disability in violation of the ADA and the THA. [Doc. 1]. In her deposition, the plaintiff further asserted that her obesity constituted a disability for which she was terminated. The plaintiff contends that these medical conditions substantially affected the major life activity of working, as she was required to go to the bathroom frequently and was frequently absent from work for medical reasons, two reasons the plaintiff contends that were used to justify her selection for termination.

The defendant counters that neither the plaintiff's diabetes nor high blood pressure substantially limits her in any major life activity. The defendant further

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                Page 10

Slip Copy, 2006 WL 2038565 (E.D.Tenn.)

**(Cite as: 2006 WL 2038565 (E.D.Tenn.))**

argues that the plaintiff's weight does not constitute an impairment under the ADA because the plaintiff has not shown that her weight is the result of any physiological disorder, and further, that the plaintiff has not shown that her weight substantially limits her in any major life activity. Finally, the defendant argues, the plaintiff cannot show that her job was eliminated solely because of a disability.

To establish a claim of disability discrimination under the ADA or THA, a plaintiff must show: (1) that she has a disability; (2) that she was qualified to perform the requirements of her job, with or without reasonable accommodation; and (3) that she was discriminated against solely because of her disability. *Mahon v. Crowell*, 295 F.3d 585, 589 (6th Cir.2002); *see also Barnes v. Goodyear Tire & Rubber Co.*, 48 S.W.3d 698, 705 (Tenn.2000) (stating that THA claim is analyzed under same principles as those used for the ADA). Where, as in this case, the plaintiff seeks to prove her case indirectly, without direct proof of discrimination, the plaintiff may show a *prima facie* case of disability discrimination by showing that:(1) she is disabled; (2) she is otherwise qualified for the position, with or without a reasonable accommodation; (3) she suffered an adverse employment action; (4) the employer knew or had reason to know of her disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced. *Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir.1996). Once the plaintiff sets out a *prima facie* case, the burden shifts to the defendant employer to offer a legitimate, non-discriminatory reason for its action. *Id.* If the defendant satisfies this burden, the plaintiff must then show that the proffered reason is pretext. *Id.*

**\*12** The ADA defines a "disability" as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of the individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). In the present case, the plaintiff claims that she is disabled because she has several physical impairments--specifically, diabetes, hypertension, and morbid obesity--that substantially

limit one or more major life activities. The plaintiff has not alleged that she had a record of an impairment or was regarded by the defendant as having such an impairment. Accordingly, the Court will limit its analysis to the first definition of disability, that is, having a physical or mental impairment that substantially limits one or more major life activities.

"[W]hether a person has a disability under the ADA is an individualized inquiry." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483 (1999); 29 C.F.R. pt. 1630, App. § 1630.2(j) (2005) ("The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual").

The parties do not dispute that diabetes and hypertension constitute physical "impairments." The defendant argues, however, that the plaintiff's obesity cannot be considered an impairment unless she suffers from morbid obesity which results from some type of physiological disorder. In support of this argument, the defendant relies upon the federal regulations, which define "physical or mental impairment" as follows:
(1) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or
(2) Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.
29 C.F.R. § 1630.2(h) (2005). The appendix to this regulation goes on to explain as follows:
It is important to distinguish between conditions that are impairments and physical, psychological, environmental, cultural and economic characteristics that are not impairments. The definition of the term "impairment" does not include physical characteristics such as eye color,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 2038565 (E.D.Tenn.)

(Cite as: 2006 WL 2038565 (E.D.Tenn.))

Page 11

hair color, left-handedness, or height, weight or muscle tone that are within "normal" range and are not the result of a physiological disorder. 29 C.F.R. § 1630.2(h) (App.2005). Thus, "physical characteristics that are 'not the result of a physiological disorder' are not considered 'impairments' for the purposes of determining either actual or perceived disability." *Andrews v. State of Ohio,* 104 F.3d 803, 808 (6th Cir.1997).

**\*13** In the present case, the plaintiff states in her affidavit that she is morbidly obese, and the defendant has not presented any proof to the contrary. Moreover, morbid obesity has been found to constitute a physical impairment within the meaning of the ADA. *See Cook v. State of Rhode Island Dep't of Mental Health, Retardation, and Hospitals,* 10 F.3d 17, 25 (1st Cir.1993). Accordingly, the Court finds that the plaintiff has made a *prima facie* showing that the plaintiff's obesity is a physical impairment within the meaning of the ADA.

Merely having an impairment, however, "does not make one disabled for purposes of the ADA." *Toyota Motor Mfg., Ky., Inc. v.. Williams,* 534 U.S. 184, 195 (2002). "Claimants also need to demonstrate that the impairment limits a major life activity." *Id.* While there is not an exhaustive list of major life activities, the Supreme Court has recognized that "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working" constitute major life activities. *Sutton,* 527 U.S. at 480 (quoting 29 C.F.R. § 1630.2(i)).

The plaintiff claims that she is substantially limited by her impairments in several major life activities, including walking, bending, sitting, and working. The defendant correctly points out that both the Supreme Court and the Sixth Circuit have noted the "conceptual difficulties" involved in defining "working" as a major life activity. *See Sutton,* 527 U.S. at 492; *Mahon,* 295 F.3d at 590. Nevertheless, the Sixth Circuit has repeatedly recognized, post-*Sutton,* that working does constitute a major life activity under the ADA. *See Mahon,* 295 F.3d at 590; *Henderson v. Ardco, Inc.,* 247 F.3d 645, 652

(6th Cir.2001); *Ross v. Campbell Soup Co.,* 237 F.3d 701, 709 (6th Cir.2001). Because of the problems surrounding this particular category of life activities, however, the Sixth Circuit treats "working" as more of a "residual category resorted to only when a complainant cannot show she or he is substantially impaired in any other, more concrete major life activity." *Mahon,* 295 F.3d at 590. The Court will therefore first address whether the plaintiff is substantially limited in life activities other than working.

Although the plaintiff has diabetes and high blood pressure, she testified that she is "pretty much" able to live a normal life by controlling her diet and taking insulin. When the plaintiff's feet are swollen, it is sometimes hard for her to walk or stand for long periods of time. However, she also admitted that she could walk for up to a half-mile at a time. The plaintiff further testified that she is not able to bend a lot. She admitted, however, that she is able to bend and could, for example, pick her purse off the floor. The plaintiff also stated that she has trouble sitting in small chairs or chairs with arms. However, this evidence does not show that the plaintiff is substantially limited in her ability to actually engage in the activity of sitting, rather that she is merely limited in the type of chairs that she may sit.

**\*14** Based upon the plaintiff's testimony, the Court cannot say that the plaintiff has produced evidence demonstrating that she is substantially limited in her ability to sit, bend or walk. An "impairment that only moderately or intermittently prevents an individual from performing major life activities is not a substantial limitation under the [ADA]." *Mahon,* 295 F.3d at 590-91. While the evidence shows that the plaintiff's obesity and other medical conditions somewhat limit her in the performance of bending, sitting, and walking, the Court does not find that there is evidence present in the record from which a reasonable juror could conclude that the plaintiff is "severely" restricted in any of these activities. *See id.* at 591.

The plaintiff also claims that she is substantially limited in the major life activity of working.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2038565 (E.D.Tenn.)

(Cite as: 2006 WL 2038565 (E.D.Tenn.))

Specifically, she contends that her medical conditions required her to take frequent trips to the bathroom and also required her to have frequent absences from work. To be considered substantially limited in the major life activity of working, the Supreme Court has stated that a plaintiff

> must be precluded from more than one type of job, a specialized job, or a particular job of choice. If jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs. Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs.

*Sutton,* 527 U.S. at 492.

The Court finds that the plaintiff has failed to make a *prima facie* case that she is precluded from a broad range of jobs as a result of her need to take frequent trips to the bathroom or even to take frequent absences from work. In fact, the plaintiff testified that she is currently engaged in a broad range of work activities, including a child care business, a catering business, and the sale of clothes and jewelry out of her home. Accordingly, the Court finds that the plaintiff has failed to produce evidence to show that she is substantially limited in the major life activity of working as a result of her medical conditions.

Assuming that the plaintiff could make a *prima facie* case of disability discrimination, the burden would then shift to the defendant to articulate a legitimate, non-discriminatory reason for the plaintiff's termination. *Williams v. London Util. Comm'n,* 375 F.3d 424, 428 (6th Cir.2004). As discussed earlier in this opinion, the Court finds that the defendant has proffered legitimate, nondiscriminatory reasons for the elimination of the plaintiff's position, and further, that the plaintiff has failed to meet her burden of demonstrating that these legitimate reasons are pretext. Accordingly, it is **RECOMMENDED** that the plaintiff's disability discrimination claims also be dismissed.

**D. Equal Pay Act**

The plaintiff withdraws her Equal Pay Act claim.

[Doc. 19]. Accordingly, it is **RECOMMENDED** that the defendant's Motion for Summary Judgment be granted with respect to the plaintiff's Equal Pay Act claim.

**E. Hostile Work Environment**

**\*15** In her complaint, the plaintiff alleges that she was subjected to a sexually charged hostile work environment. [Doc. 1]. The defendant argues that the plaintiff's hostile work environment claim fails because the vast majority of the conduct of which the plaintiff complains is not actionable harassment; that she was not subjected to an environment that was severe and pervasive; and that she failed to report this harassment to Carrier.

The plaintiff responds that viewing the facts in the light most favorable to the plaintiff, the workplace and environment were sufficiently hostile, and summary judgment is therefore not appropriate.

Title VII of the Civil Rights Act of 1964 provides, in pertinent part, that "[i]t shall be an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). [FN3] The Supreme Court has held that this provision "not only covers 'terms' and 'conditions' in the narrow contractual sense, but 'evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment.' " *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 78 (1998) (quoting *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 64 (1986). "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993) (citations and internal quotation marks omitted).

> FN3. The Tennessee Supreme Court has noted that the THRA is "coextensive with

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

federal law." *Parker v. Warren County Util. Dist.*, 2 S.W.3d 170, 172 (Tenn.1999).

In order to prove a hostile work environment claim, the plaintiff must demonstrate the following:
1) the employee is a member of a protected class, 2) the employee was subject to unwelcomed sexual harassment, 3) the harassment was based on the employee's sex, 4) the harassment created a hostile work environment, and 5) the employer failed to take reasonable care to prevent and correct any sexually harassing behavior.
*Bowman v. Shawnee State Univ.*, 220 F.3d 456, 462-63 (6th Cir.2000). To show a hostile work environment, the plaintiff must meet both an objective and a subjective test: "the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard that environment as abusive." *Id.* at 463.

In determining whether the alleged harassment is sufficiently severe or pervasive, the Court must consider the totality of the circumstances. *Williams v. General Motors Corp.*, 187 F.3d 553, 562 (6th Cir.1999). Among the appropriate factors the Court may consider is "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. "[T]he issue is not whether each incident of harassment *standing alone* is sufficient to sustain the cause of action in a hostile environment case, but whether--taken together--the reported incidents make out such a case." *Williams*, 187 F.3d at 562. Mere isolated incidents, "unless extremely serious, will not amount to discriminatory changes in the terms or conditions of employment." *Bowman*, 220 F.3d at 463.

*16 'Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at 'discriminat[ion] ... because of ... sex." *Oncale*, 523 U.S. at 80. Thus, conduct that is not sexual in nature may be illegally sex-based and thus considered in the hostile environment analysis only if the employee can show that but for her gender,

she would not been subjected to the harassment. *Bowman*, 220 F.3d at 463.

The standards for determining the existence of a hostile work environment "are sufficiently demanding to ensure that Title VII does not become a 'general civility code.' " *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Accordingly, "the ordinary tribulations of the workplace, the sporadic use of abusive language, gender-related jokes, and occasional teasing" do not rise to the level of severe and pervasive conduct creating a hostile environment. *Id.*

In the present case, the plaintiff contends that she was subjected to cursing and sexually explicit jokes. She also contends that she was further humiliated when her intoxicated supervisor said to her at a business function, and in the presence of her husband and other employees, "hey big momma, what are you doing up this late ... old ladies like you should be in bed right now." Additionally, in her deposition, the plaintiff recounted several instances that she claims contributed to the hostile environment, including Johnson taking over some of the plaintiff's job duties and that on some days, Johnson would not speak to her at all. The plaintiff also claims that Loper's performance evaluation of her also contributed to the hostile work environment. The plaintiff also testified that Henry's attitude toward her contributed to a hostile work environment. She recalled that if she went in to ask him a question, Henry would give a "very agitated, irritated type response," and that he was sometimes gruff or short-tempered with her. She also recalled that he would make comments showing a negative attitude towards women, including sexually explicit jokes. She estimated that she had overheard Henry make inappropriate jokes approximately five to ten times in the past year. In light of all of these incidents, the plaintiff argues, the work environment was sufficiently hostile.

The Court disagrees. The plaintiff estimated that there were five to ten incidents in the last year when she overheard sexually explicit jokes. However, she does not remember the specifics of any of these incidents, nor is there any evidence to suggest that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                              Page 14

Slip Copy, 2006 WL 2038565 (E.D.Tenn.)

**(Cite as: 2006 WL 2038565 (E.D.Tenn.))**

these jokes were directed to her at all. As for the use of foul language by Henry, Loper, and others, there is no evidence that the plaintiff was subjected to this language because of her gender. *See Williams,* 187 F.3d at 565 (holding that non-sexual conduct may contribute to hostile work environment where employee is subjected to conduct because of her gender). Nor is there any evidence that Johnson's behavior or Loper's review of the plaintiff's performance were offensive acts related in any way to the plaintiff's gender. These actions simply cannot support a hostile environment claim. While Henry's drunken comment to the plaintiff was inappropriate, and the language used and the jokes told by her fellow employees may have been crude and distasteful, these relatively isolated incidents are merely offensive remarks that fall far short of being sufficiently pervasive, hostile or abusive to support a claim of a hostile work environment. *See, e.g., Clark v. United Parcel Serv.,* 400 F.3d 341, 351 (6th Cir.2005) (finding three isolated incidents of vulgar jokes and inappropriate physical contact over two years did not constitute hostile work environment); *Burnett v. Tyco Corp.,* 203 F.3d 980, 985 (6th Cir.2000), (holding that single battery, along with two offensive remarks over six-month period did not create hostile work environment); *Morris v. Oldham County Fiscal Court,* 201 F.3d 784, 790 (6th Cir.2000) (finding that teasing, offhand comments and isolated sexual advance did not create hostile work environment).

\*17     For the foregoing reasons, it is **RECOMMENDED** that the plaintiff's hostile work environment claims under Title VII and the THRA be dismissed.

**F. Intentional Infliction of Emotional Distress**

The plaintiff claims that the defendant's termination of her for a pretextual reason and the "big mamma" comment made by Scott Henry constitute outrageous conduct which resulted in mental distress to the plaintiff.

"To state a claim for intentional infliction of emotional distress, a plaintiff must establish that: (1) the defendant's conduct was intentional or

reckless; (2) the defendant's conduct was so outrageous that it cannot be tolerated by civilized society; and (3) the defendant's conduct resulted in serious mental injury to the plaintiff." *Lourcey v. Estate of Scarlett,* 146 S.W.3d 48, 51 (Tenn.2004). It is not enough to show that the defendant acted with tortious or criminal intent; the plaintiff must "show that the defendant's conduct was 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Id.* (quoting *Miller v. Willbanks,* 8 S.W.3d 607, 614 (Tenn.1999)).

Even taking all of the plaintiff's allegations as true, the Court does not find that the plaintiff's termination or the comment made by Henry rise to the level of "atrocious" or "utterly intolerable" conduct so as to give rise to a claim for intentional infliction of emotional distress. Accordingly, it is **RECOMMENDED** that the plaintiff's claim for intentional infliction of emotional distress be dismissed.

**G. Loss of Consortium**

The plaintiff's husband, Sammie Cox, asserts a claim for loss of consortium under Tennessee law. Loss of consortium is a derivative claim. *See Tuggle v. Allright Parking Sys., Inc.,* 922 S.W.2d 105, 108 (Tenn.1996). Accordingly, because the Court has recommended that the plaintiff's claims be dismissed, it is further **RECOMMENDED** that Sammie Cox's loss of consortium claim be dismissed as well. [FN4]

> FN4. In the memorandum in support of its motion, the defendant notes that it "appears" that the plaintiff is asserting a claim of religious discrimination, as she references in her complaint that she was "ridiculed about being a Christian." The complaint, however, does not specifically set forth a claim for religious discrimination, nor does the plaintiff address such a claim in her response to the defendant's motion for summary judgment. Accordingly, the Court finds that the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 15

Slip Copy, 2006 WL 2038565 (E.D.Tenn.)

**(Cite as: 2006 WL 2038565 (E.D.Tenn.))**

plaintiff is not pursuing a claim of
religious discrimination in this case.

**V. Conclusion**

For the reasons set forth above, and based upon the
entire record in this case, it is **RECOMMENDED**
that the defendant's Motion for Summary Judgment
[Doc. 11] be **GRANTED.** [FN5]

> FN5. Any objections to this Report and
> Recommendation must be served and filed
> within ten (10) days after service of a copy
> of this recommended disposition on the
> objecting party. Such objections must
> conform to the requirements of Rule 72(b),
> Federal Rules of Civil Procedure. Failure
> to file objections within the time specified
> waives the right to appeal the District
> Court's order. *Thomas v. Arn,* 474 U.S.
> 140, 106 S.Ct. 466 (1985). The district
> court need not provide *de novo* review
> where objections to this report and
> recommendation are frivolous, conclusive
> or general. *Mira v. Marshall,* 806 F.2d 636
> (6th Cir.1986). Only specific objections
> are reserved for appellate review. *Smith v.
> Detroit Federation of Teachers,* 829 F.2d
> 1370 (6th Cir.1987).

Slip Copy, 2006 WL 2038565 (E.D.Tenn.)

**Motions, Pleadings and Filings (Back to top)**

• 2006 WL 1203331 (Trial Motion, Memorandum
and Affidavit) Reply Brief in Support of
Defendant's Summary Judgment Motion (Mar. 8,
2006)Original Image of this Document (PDF)

• 2006 WL 807899 (Trial Motion, Memorandum
and Affidavit) Plaintiff's Response to Defendant
Motion for Summary Judgemnt (Feb. 23,
2006)Original Image of this Document (PDF)

• 2005 WL 2890508 (Trial Motion, Memorandum
and Affidavit) Brief in Support of Defendant's
Motion for Summary Judgment (Sep. 26,
2005)Original Image of this Document (PDF)

• 2004 WL 3041698 (Trial Pleading) Answer
(Nov. 16, 2004)Original Image of this Document
(PDF)

• 3:04cv00527 (Docket) (Nov. 9, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# SA-2

Westlaw.

151 Fed.Appx. 162                                                            Page 1

151 Fed.Appx. 162, 2005 WL 2562617 (C.A.3 (Del.))
**(Cite as: 151 Fed.Appx. 162)**

**H**
Briefs and Other Related Documents
E.E.O.C. v. Avecia, Inc.C.A.3 (Del.),2005.This case was not selected for publication in the Federal Reporter.NOT PRECEDENTIAL Please use FIND to look at the applicable circuit court rule before citing this opinion. Third Circuit Local Appellate Rule 28.3(a) and Internal Operating Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3 IOP APP I 5.3.)
United States Court of Appeals,Third Circuit.
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; Lisa Stepler
v.
AVECIA, INC. Lisa Stepler, Appellant.
**No. 04-3396.**

Argued July 12, 2005.
Decided Oct. 13, 2005.

**Background:** Discharged employee brought action against former employer, alleging Title VII retaliation, wrongful termination in violation of Delaware law, and intentional infliction of emotional distress under Delaware law. The United States District Court for the District of Delaware, Susan L. Robinson, J., granted summary judgment in favor of employer on the retaliation and wrongful termination claims, and dismissed the emotional distress claim. Employee appealed.

**Holdings:** The Court of Appeals held that:

(1) genuine issue of material fact precluded summary judgment in employee's Title VII retaliation claim, and

(2) discharge did not violate public policy and did not involve a falsification of employment records, for purpose of employee's wrongful termination claim.

Affirmed in part; reversed and remanded in part.
West Headnotes
**[1] Federal Civil Procedure 170A ☞2497.1**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)2 Particular Cases
            170Ak2497 Employees and Employment Discrimination, Actions Involving
               170Ak2497.1 k. In General. Most Cited Cases
Genuine issue of material fact as to whether employee's discharge was related to her complaints about hostile work environment precluded summary judgment in employee's Title VII retaliation claim. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[2] Labor and Employment 231H ☞759**

231H Labor and Employment
   231HVIII Adverse Employment Action
      231HVIII(A) In General
         231Hk759 k. Public Policy Considerations in General. Most Cited Cases
Under Delaware law, discharge of at-will employee did not violate public policy and did not involve a falsification of employment records, for purpose of employee's wrongful termination claim, absent showing of employer's violation of a recognized public interest, or actual manipulation of employment records.

***163** On Appeal from the United States District Court for the District of Delaware. Dist. Court Civil Action No. 03-CV-00320. District Judge: The Honorable Susan L. Robinson.

Phillip B. Bartoshesky (Argued), Biggs and Battaglia, Wilmington, Del., for Appellant.
Ginger D. Schroder (Argued), Schroder, Joseph & Associates LLP, Buffalo, N.Y., Jennifer C. Jauffret,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

151 Fed.Appx. 162                                                                                          Page 2

151 Fed.Appx. 162, 2005 WL 2562617 (C.A.3 (Del.))
**(Cite as: 151 Fed.Appx. 162)**

Richards, Layton & Finger, Wilmington, DE, for
Appellee.

Before ALITO, BECKER, and GREENBERG,
Circuit Judges.

### OPINION OF THE COURT
PER CURIAM.
**\*\*1** Lisa Stepler, a former laboratory technician for
Avecia, Inc. ("Avecia") sued Avecia for retaliation
under Title VII of the Civil Rights Act of 1964,
wrongful termination under Delaware law, and
intentional infliction of emotional distress under
Delaware law. The District Court dismissed
Stepler's claim for intentional infliction of
emotional distress and granted summary judgment
in favor of Avecia on Stepler's retaliation and
wrongful termination claims. We affirm the
dismissal of the claim for the intentional affliction
of emotional distress and the entry of summary
judgment in favor of Avecia on the wrongful
termination claim. However, we reverse the entry
of summary judgment in favor of Avecia on the
retaliation claim and remand for further proceedings.

#### I.

Stepler asserts that this case should have been
analyzed under the framework of *Price Waterhouse
v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104
L.Ed.2d 268 (1989).[FN1] Under that framework,
the "burden of production and the risk of
non-persuasion are shifted to the defendant," and
the defendant must show "that even if
discrimination was a motivating factor in the
adverse employment decision, it would have made
the same employment decision regardless of its
discriminatory animus." *Armbuster v. Unisys Corp.,*
32 F.3d 768, 778 (3d Cir.1994). This framework
only applies, however, where the employee can
show *"direct evidence* that an illegitimate criterion
was a substantial factor in the decision." *Price
Waterhouse,* 490 U.S. at 276 109 S.Ct. 1775
(O'Connor, J., concurring in the judgment)
(emphasis added); *see also Walden v.
Georgia-Pacific Corp.,* 126 F.3d 506, 513 (3d
Cir.1997). We have carefully considered the
evidence on which Stepler relies in this case, and

while the question is close we conclude that she did
not meet the "direct evidence" standard.

> FN1. 42 U.S.C. § 2000e-2(m) does not
> reach retaliation claims. *Woodson v. Scott
> Paper Co.,* 109 F.3d 913, 934 (3d Cir.),
> *cert. denied,* 522 U.S. 914, 118 S.Ct. 299,
> 139 L.Ed.2d 230 (1997).

Stepler's Title VII claims must be analyzed under
the burden-shifting framework established by
*McDonnell Douglas Corp. v. Green,* 411 U.S. 792,
93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its
progeny. Under**\*164** this framework, Stepler was
first required to make out a prima facie case of
retaliation by establishing (1) that she engaged in a
protected activity, (2) that she suffered an adverse
employment action, and (3) that there was a causal
link between her protected activity and the adverse
employment action. *Farrell v. Planters Lifesavers
Co.,* 206 F.3d 271, 279 (3d Cir.2000). If Stepler
successfully made out a prima facie case, Avecia
had to point to evidence in the summary judgment
record that was sufficient, if believed, to support a
finding that Stepler was not discharged because of
her protected activity. *See St. Mary's Honor Ctr. v.
Hicks,* 509 U.S. 502, 506-507, 113 S.Ct. 2742, 125
L.Ed.2d 407 (1993). If Avecia met this burden,
Stepler was required to prove that unlawful
retaliation was a determinative cause of her firing.
*See McDonnell Douglas,* 411 U.S. at 802-803, 93
S.Ct. 1817.

[1] Stepler clearly satisfied the first two prongs of
the prima facie case standard. Her complaints
about a hostile work environment and retaliation
were protected activities, and her firing by Avecia
obviously was an adverse employment action.
Whether she proffered sufficient evidence to meet
the third prong of the prima facie case standard is
less clear due to the gap of almost one year between
her initial complaint and her termination, but a gap
of this magnitude is not conclusive and can be
outweighed by a "pattern of harassment" or a "
pattern of antagonism" in the intervening period.
*See Woodson v. Scott Paper Co.,* 109 F.3d 913, 920
(3d Cir.1997); *see also Robinson v. Southeastern
Pennsylvania Transp. Auth.,* 982 F.2d 892, 894-95

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

151 Fed.Appx. 162                                                          Page 3

151 Fed.Appx. 162, 2005 WL 2562617 (C.A.3 (Del.))
**(Cite as: 151 Fed.Appx. 162)**

(3d Cir.1993). A reasonable jury considering the evidence in the light most favorable to Stepler-including Stepler's performance reviews, management's increased scrutiny of her, the tension with her co-workers, the memorandum of April 23, 2001, and the termination letter-could conclude that there was a causal link between Stepler's protected activities and Avecia's decision to fire her. We thus conclude that Stepler made out a prima facie case.

**\*\*2** Avecia's proffered reasons for Stepler's termination were poor work performance and disruptive behavior, but a reasonable jury considering the evidence in the light most favorable to Stepler, and drawing all inferences in Stepler's favor, could conclude otherwise. Particularly noteworthy are the references in both the April 23 memo and the May 4, 2001, termination letter to Stepler's "intense focus upon alleged harassment [and] retaliation." App. 264, 371.

III.

Conversely, there are no issues of fact precluding summary judgment in favor of Avecia on Stepler's state law claim for breach of the covenant of good faith and fair dealing.

[2] The general rule in Delaware is that employees are employed "at will" and may be dismissed at any time without cause. *See Merrill v. Crothall-American, Inc.,* 606 A.2d 96, 103 (Del.1992). The general rule does not apply, however, in the following four situations:
(i) where the termination violated public policy;
(ii) where the employer misrepresented an important fact and the employee relied "thereon either to accept a new position or remain in a present one";
(iii) where the employer used its superior bargaining power to deprive an employee of clearly identifiable compensation related to the employee's past service; and
**\*165** (iv) where the employer falsified or manipulated employment records to create fictitious grounds for termination.

*Lord v. Souder,* 748 A.2d 393, 400 (Del.2000) (citing *E.I. DuPont de Nemours and Co. v. Pressman,* 679 A.2d 436, 442-44 (Del.1996)). Stepler claims that Avecia's actions fit into either the first or fourth category. She contends that the first category fits because being fired for opposition to sexual harassment and retaliation violates public policy, and she argues that the fourth category fits because she was subjected to false criticisms of her work in her performance evaluation, false claims that she was using work time to study, and false claims that she was fired for behavioral and performance issues.

In order to make out a claim of a public policy violation, a plaintiff must satisfy a two-part test: " (i) the employee must assert a public interest recognized by some legislative, administrative or judicial authority and (ii) the employee must occupy a position with responsibility for advancing or sustaining that particular interest." *Lord,* 748 A.2d at 401 (citing *Pressman,* 679 A.2d at 441-42). To satisfy the first part, Stepler relies on the Delaware Supreme Court's decision in *Schuster v. Derocili,* 775 A.2d 1029 (Del.2001), which recognized a cause of action for breach of the covenant of good faith and fair dealing where the employee alleged that she was terminated following sexual harassment in the workplace. But in 2004 the Delaware legislature amended 19 Del. C. § 710 *et seq.,* which prohibits discrimination in employment practices, in order to clarify that this statute was the "sole remedy" for an aggrieved employee "to the exclusion of all other remedies." 19 Del. C. § 712(b) (2005). In fact, the synopsis of the Senate Bill expressly states disagreement with the Delaware Supreme Court's decision in *Schuster:*
**\*\*3** This bill confirms that Chapter 7 is the exclusive and sole remedy for employment discrimination claims, requiring initial processing of all such claims with the Department of Labor for review and action. This bill effectively re-establishes the exclusive remedy put in question by the decision in *Schuster v. Derocili,* 775 A.2d 1029 (2001).

Delaware Bill Summary, 2004 Reg. Sess. S.B. 154. Moreover, when the bill is read in light of the sponsor statement, which "confirms" and "

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

151 Fed.Appx. 162                                                                                      Page 4

151 Fed.Appx. 162, 2005 WL 2562617 (C.A.3 (Del.))
**(Cite as: 151 Fed.Appx. 162)**

re-establishes" the pre-existing rule "put in question by" *Schuster,* it is clear that the 2004 Amendment is meant to be retroactive. Thus Stepler has not asserted a recognized public interest, and Avecia's actions do not fit into the first category.

Nor do they fit into the fourth category: falsification or manipulation of employment records to create fictitious grounds for termination. Even if we assume that Stepler was subjected to false criticisms of her work performance and false claims that she was using work time to study, there is no evidence that these particular criticisms and claims were the grounds for Stapler's termination. And even if we assume that Avecia falsely claimed that Stepler was fired for behavioral and performance issues, this is not the kind of falsehood specified in the fourth category, which provides that an employer violates the covenant of good faith and fair dealing when it "falsifie[s] or manipulate[s] employment records to create fictitious grounds for termination." *Lord,* 748 A.2d at 400. If the employer did not actually falsify or manipulate employment records, then it does not matter if the employer gave a false rationale for termination. *See Williams v. Caruso,* 966 F.Supp. 287, 291 (D.Del.1997) ("Nothing in *Pressman* suggests an employer who gives an employee a false reason for termination*166 is subject to liability under the implied covenant of good faith and fair dealing. *Pressman* only held culpable the *manufacture* of grounds for dismissal, not the *statement* of a false reason for dismissal.") (emphasis in original); *see also Geddis v. University of Delaware,* 40 Fed. Appx. 650, 654 (3d Cir.2002) (unpublished) (noting that the employee did not claim his supervisor " intentionally created 'fictitious negative information ' about him in order to get him fired" and thus the conduct at issue did not fit the fourth *Pressman* category) (quoting *Schuster,* 775 A.2d at 1040).

### IV.

Under Delaware law, the general rule is that the worker's compensation administrative process is the exclusive remedy for an employee who suffers a work-related accident causing personal injury or death. *See* 19 Del.Code Ann. § 2304 (2005).

However, the Delaware Supreme Court has held that "claims that involve a *true intent* by the employer to injure the employee fall outside of the Workers' Compensation Act and remain separately actionable as common law tort claims." *Rafferty v. Hartman Walsh Painting Co.,* 760 A.2d 157, 159 (Del.2000) (emphasis added); *see also Showell v. Langston,* No. Civ. A. 02C-01-016, 2003 WL 1387142, at *3 (Del.Super. March 5, 2003) (citing *Rafferty*). Thus, "for a complaint to survive a motion to dismiss, there must be more than a mere allegation that there was an intentional injury; there must be facts alleged which, if true, show deliberate intent to bring about an injury." *Rafferty,* 760 A.2d at 160. In other words, an employee must allege facts that, if true, would show that the employer intended to injure her. It would not be enough to allege facts showing that the employer intended to do an action and that the worker was injured as a result of that action. Specific intent is required.

**\*\*4** Stepler cites *Rafferty* and argues that her claim for intentional infliction of emotional distress is not barred. In a Memorandum Order of April 28, 2004, the District Court rejected Stepler's argument. We agree with the District Court's analysis.

We therefore affirm the District Court's order of summary judgment in favor of Avecia on Stepler's claims under Delaware law, but we reverse the District Court's order granting summary judgment in favor of Avecia on Stepler's retaliation claim, and we remand the case for further proceedings.

C.A.3 (Del.),2005.
E.E.O.C. v. Avecia, Inc.
151 Fed.Appx. 162, 2005 WL 2562617 (C.A.3 (Del.))

Briefs and Other Related Documents (Back to top)

• 04-3396 (Docket) (Aug. 23, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

SA-3

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 1999 WL 624485 (E.D.Pa.)

**(Cite as: 1999 WL 624485 (E.D.Pa.))**

C

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
Mr. John D. MASSARO, Plaintiff
v.
THE CHESTER HOUSING AUTHORITY,
Defendant
**No. Civ.A. 98-245.**

Aug. 5, 1999.
A. Martin Herring, A. Martin Herring & Assoc.,
Philadelphia, PA, for John D. Massaro, Plaintiff.

Scott F. Cooper, Blank Rome Comisky &
McCauley LLP, Philadelphia, PA, for the Chester
Housing Authority, Defendant.

*MEMORANDUM AND ORDER*

ANGELL, Magistrate J.

*1 Plaintiff, John D. Massaro, brought suit against
his former employer, Chester Housing Authority,
alleging he was unlawfully terminated in violation
of the federal Age Discrimination in Employment
Act, ADEA, 29 U.S.C. § 626 (Supp.1999) and in
retaliation for filing a claim with the Equal
Employment Opportunity Committee, EEOC.

I. *FINDINGS OF FACT*
1. The Chester Housing Authority, CHA, is
responsible for 1400 public housing units in the
City of Chester. Due to mismanagement and fiscal
irresponsibilities, the Honorable Judge Norma
Shapiro placed CHA under a federal receivership
on or about June 4, 1994.

2. In accordance with Judge Shapiro's August 31,

1994 Court Order, Robert Rosenberg, Esquire, was
appointed to serve as the Receiver of CHA. The
federal Receiver was granted power to effect
personnel decisions.

3. CHA hired Mr. Massaro on August 12, 1996 as
"Acting Director of Technical Services."

4. Mr. Massaro's employment status was temporary
and subject to a ninety day probationary period.

5. At the time of hiring, Plaintiff was 59 years old.

6. At the conclusion of the probationary period,
Mr. Massaro requested, but was denied, permanent
status and benefits.

7. On or about February 5, 1997, Executive
Director of CHA, Michael Lundy, met with staff
members of the Receiver and discussed with them
the termination of Mr. Massaro's employment from
CHA as Mr. Massaro had not performed his duties
to the satisfaction of CHA.

8. Pursuant to Judge Shapiro's order, the Receiver
met with Judge Shapiro during the week of
February 10, 1997 to request permission to separate
Massaro from his employment. The court did not
object, and Mr. Lundy was informed on or about
February 18, 1997, that the Receiver and the Court
approved the decision to terminate Mr. Massaro.
Mr. Lundy drafted a termination letter and
presented it to Mr. Massaro on February 21, 1997.

9. On February 17, 1997, Plaintiff initiated a
charge of discrimination with the EEOC. In a
memorandum dated February 18, 1997, Plaintiff
informed CHA of his action against them with the
EEOC.

10. On February 21, 1997, Plaintiff was presented
with a letter of termination. The first paragraph
stated that Plaintiff was terminated due to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 2

Not Reported in F.Supp.2d, 1999 WL 624485 (E.D.Pa.)

**(Cite as: 1999 WL 624485 (E.D.Pa.))**

reorganization, which eliminated his position. The second paragraph stated that CHA would not retain Plaintiff's services in a different position due to poor work performance.

11. CHA has not filled Mr. Massaro's position. The position has been eliminated due to implementation of CHA's reorganization plans.

## II. *DISCUSSION*

"When evaluating ADEA discrimination claims based on indirect evidence, we apply a slightly modified version of the three step *McDonnell-Douglas* shifting burden analysis developed by the Supreme Court for use in Title VII discrimination cases." *Connors v. Chrysler* 160 F.3d 971, 973 (3d Cir.1998) citing *Keller v. Orix Credit Alliance, Inc.* 130 F.3d 1101, 1108 (3d Cir.1997) (en banc).

*2 Plaintiff establishes a prima facie case by satisfying four prongs; 1) that he was a member of a protected class, i.e., that he was over forty, 2.) he was qualified for the position at issue, 3.) he suffered an adverse employment action and 4.) that he was replaced by, or the position was filled with, a younger individual. *Connors v. Chrysler* 160 F.3d 971, 973 (3d Cir.1998). The evidence must be sufficient to convince a reasonable fact finder to find all the elements of the prima facie case.

In the instant case, clearly, Mr. Massaro meets the first prong, as a 59 year old individual he is a member of the protected class. Having been hired for the position at issue, "Acting Director of Technical Services", he has shown that he was qualified for the position thereby meeting the second prong. As evidenced by the termination letter, Mr. Massaro satisfies the third prong, that he suffered an adverse employment action.

It is at step four that I do not find a prima facie case. The evidence presented at trial does not sufficiently establish that the position of "Acting Director of Technical Services" was filled by a younger individual. Rather Defense Exhibits D-3 and D-15 establish that the position was eliminated, thereby precluding plaintiff from establishing the

fourth prong.

"As an alternative to making out a prima facie case with indirect evidence, plaintiff may shift the evidence burden by producing direct evidence of discrimination." *Connors v. Chrysler* 160 F.3d 191 (1998). There is no direct evidence, either in Plaintiff's testimony or exhibits submitted at trial, to show that Plaintiff's termination was based on illegal criteria. Again, Defense Exhibits D-3 and D-15 establish that Plaintiff was terminated due to a reorganization which included the elimination of his position.

In addition, since Plaintiff was age 59 at the time of hiring, it is difficult to argue that he was terminated, at age 59 as a result of his age. Clearly, age was not of concern to CHA at the time of initial hiring. Plaintiff has not met his burden of establishing that age was a factor in his termination six months later.

Plaintiff's second claim alleges his termination was in retaliation for filing a claim of discrimination with the EEOC. To establish retaliation, Mr. Massaro must show 1.) that he suffered a materially adverse employment action and 2.) a causal link existed between the protected activity and the adverse employment action. *Robinson v. City of Pittsburgh* 120 F.3d 1286, 1292 (3d Cir.1997), *Mondzelewski v. Pathmark Stores, Inc.* 162 F.3d 778, 782 (3d Cir.1998).

The decision to separate Mr. Massaro from his employment with CHA was made on or about February 5, 1997, by Mr. Lundy. Pursuant to a Court Order, Mr. Lundy was required to consult with the Receiver, who in turn consulted the Court, resulting in a two week delay in carrying out Mr. Massaro's termination.

The evidence submitted at trial established that the decision to terminate Mr. Massaro occurred approximately two weeks prior to his initiation of a claim with the EEOC. Therefore his termination could not have been a retaliatory act because the causal connection between the protected activity and termination is not present. Mr. Massaro's retaliation claim fails to satisfy the causation

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                              Page 3

Not Reported in F.Supp.2d, 1999 WL 624485 (E.D.Pa.)

**(Cite as: 1999 WL 624485 (E.D.Pa.))**

element.

### III. *CONCLUSIONS OF LAW*

**\*3** 1. Plaintiff has not established, by either direct or indirect evidence that age discrimination was a factor in separating him from his employment with CHA.

2. Plaintiff has not established a causal connection between the termination of his employment and his filing of a claim with the EEOC, therefore, he has not made a showing sufficient to support a retaliation claim.

### *ORDER*

AND NOW, this day of August, 1999, after a trial without a jury, and based upon the foregoing findings of fact and conclusions of law under Fed.R.Civ.P.52(a), JUDGMENT IS ENTERED in favor of the Defendant and against the Plaintiff on both the age discrimination and retaliation claims. The clerk is directed to mark this action closed.

Not Reported in F.Supp.2d, 1999 WL 624485 (E.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

• 2:98cv00245 (Docket) (Jan. 16, 1998)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# SA-4

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 462551 (D.Del.)

(Cite as: 2006 WL 462551 (D.Del.))

Page 1

c

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
Howard L. MOON, Jr., Plaintiff,
v.
THE DELAWARE RIVER AND BAY
AUTHORITY, Defendant.
No. Civ.A. 05-261JJF.

Feb. 24, 2006.

Jeffrey K. Martin, and Lori A. Brewington, of Margolis Edelstein, Wilmington, Delaware, for Plaintiff.

William W. Bowser, and Adria B. Martinelli, of Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware, for Defendant.

*MEMORANDUM OPINION*

FARNAN, J.

*1 Pending before the Court is Defendant's Motion For Partial Judgment On The Pleadings (D.I.4). Because both parties submitted matters outside the pleadings with their briefing, the Court, pursuant to Fed.R.Civ.P. 12(c), will treat the Motion as one for summary judgment under Rule 56. The Court concludes that Plaintiff has had reasonable opportunity to present all material pertinent to such a motion because Plaintiff's Answering Brief treats Defendant's Motion as one for summary judgment. ( *see* D.I. 8 at 8.) For the reasons discussed, the Court will grant the Motion in part and deny it in part.

BACKGROUND

At all relevant times, and at least up to the time of filing his Complaint, Plaintiff was employed by Defendant, The Delaware River and Bay Authority ("DRBA"). Plaintiff brings this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.,* alleging four causes of action: (1) retaliation for filing complaints with the EEOC, (2) racial discrimination resulting in deprivation of equal employment opportunities, (3) racial discrimination resulting in failure to promote, and (4) breach of the implied covenant of good faith and fair dealing. As part of his first cause of action, Plaintiff alleges that DRBA "denied Plaintiff the opportunity for promotions despite his qualifications," (D.I. 1 at ¶ 48(a)), and "forced Plaintiff to work in a hostile work environment," (*Id.* at ¶ 48(b)). As part of his third cause of action, Plaintiff again alleges that DRBA "denied Plaintiff numerous opportunities for career advancement despite his qualifications." (*Id.* at ¶ 57.) Plaintiff alleges multiple instances in which DRBA unfairly failed to promote him, including failure to promote him to Chief Operating Officer ("COO") in November, 2002.

By its Motion, DRBA requests the Court to dismiss Plaintiff's claims with regard to hostile work environment and DRBA's failure to promote him to COO, because those claims were not raised in the charges Plaintiff filed with the EEOC. In addition, DRBA contends that Plaintiff's claim with regard to DRBA's failure to promote him to COO is time barred. DRBA further contends that Plaintiff's fourth cause of action, breach of the implied covenant of good faith and fair dealing, is barred by Delaware statute and that the covenant is inapplicable because Plaintiff's employment was not terminated.

DISCUSSION

I. Standard of Review

Federal Rule of Civil Procedure 56(c) provides that a party is entitled to summary judgment where "the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 2

Not Reported in F.Supp.2d, 2006 WL 462551 (D.Del.)

**(Cite as: 2006 WL 462551 (D.Del.))**

pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

In determining whether there is a triable dispute of material fact, a court must review all of the evidence and construe all inferences in the light most favorable to the non-moving party. *Valhal Corp. v. Sullivan Assocs., Inc.,* 44 F.3d 195, 200 (3d Cir.1995). However, a court should not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000). To properly consider all of the evidence without making credibility determinations or weighing the evidence, a "court should give credence to the evidence favoring the [non-moving party] as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." ' *Id.* at 151.

*2 To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts.... In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial." ' *Matsushita Elec, Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586- 87 (1986). However, the mere existence of some evidence in support of the non-moving party will not be sufficient to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the non-moving party on that issue. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). Thus, if the evidence is "merely colorable, or is not significantly probative," summary judgment may be granted. *Id.*

II.    Whether    Plaintiff    Failed    To    Exhaust Administrative Remedies With Respect To Certain Claims

DRBA contends that the Court should dismiss Plaintiff's claims of hostile work environment and

failure to promote him to COO because Plaintiff did not specifically raise those claims in the charges he filed with the EEOC. (D.I. 5 at 9.) In response, Plaintiff contends that those claims should not be dismissed because they are within the scope of the EEOC charges and a reasonable investigation of the charges would have revealed them. (D.I. 8 at 11.) Plaintiff further contends that he provided information relating to those claims to the EEOC, ( *Id.* at 3, 14), that the EEOC investigator neglected to include that information in the charges, (*Id.*), and that Plaintiff should not be penalized because of the EEOC's negligent omission, (*Id.* at 12).

Before initiating a lawsuit under Title VII, a plaintiff must first file charges of discrimination with the EEOC and be granted a right-to-sue letter. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 798 (1973). The purpose of this requirement is to provide the EEOC the chance to "investigate, mediate and take remedial action with respect to a charge of discrimination." *Tillman v. The Pepsi Bottling Group, Inc.,* 2005 U.S. Dist. LEXIS 18891, 17 (D.Del.2005) (citing *Ostapowicz v. Johnson Bronze Co.,* 541 F.2d 394, 398 (3d Cir.1976)). A court should construe these formalities in a general fashion, because "[s]uch technicalities are particularly inappropriate in a statutory scheme in which laymen, unassisted by trained lawyers, initiate the process." *Love v. Pullman,* 404 U.S. 522, 526-27 (1972). Therefore, the ambit of a civil complaint, once a right-to-sue letter is issued by the EEOC, is " 'defined by the scope of the EEOC investigation which can reasonably be expected to grow out of a charge of discrimination,' regardless of the actual scope of the EEOC investigation." *Ebert v. Office of Information Systems,* 1998 U.S. Dist. LEXIS 9100, 12, (D.Del.1998) (citing *Hicks v. ABT Assoc., Inc.,* 572 F.2d 960, 966 (3d Cir.1978) (quoting *Ostapowicz v. Johnston Bronze Co.,* 541 F.2d 394, 398-99 (3d Cir.1976), cert. denied, 429 U.S. 1041 (1977))).

*3 More specifically, "the relevant test for determining whether plaintiff must exhaust her administrative remedies, therefore, is 'whether the acts alleged in the subsequent Title VII suit are fairly within the scope of the prior EEOC

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                Page 3

Not Reported in F.Supp.2d, 2006 WL 462551 (D.Del.)

**(Cite as: 2006 WL 462551 (D.Del.))**

complaint, or the investigation arising therefrom." ' *Tillman v. The Pepsi Bottling Group, Inc.,* 2005 U.S. Dist. LEXIS 18891, 17-18 (D.Del.2005) (citing *Waiters v. Parsons,* 729 F.2d 233 (3d Cir.1984); *Ostapowicz,* 541 F.2d at 398-99; *Flesch v. E. Pa. Psychiatric Inst.,* 434 F.Supp. 963, 970 (E.D.Pa.1977); *Howze v. Jones & Laughlin Steel Corp.,* 750 F.2d 1208, 1212 (3d Cir.1984)). In addition, courts have allowed claims not specifically mentioned in the prior EEOC charge "where there was a close nexus between the facts supporting the claims raised in the charge and those in the complaint." *Ebert v. Office Of Information Systems,* 1998 U.S. Dist. LEXIS 9100 (D.Del.1998) (citing *Howze,* 750 F.2d at 1212; *Ostapowicz,* 541 F.2d at 398-99).

With respect to Plaintiff's claim that DRBA unlawfully discriminated in failing to promote him to COO, the Court concludes that there is a close nexus between that claim and the six incidents of failure to promote specified in Plaintiff's initial EEOC charge. (*see* D.I. 6 at A1.) The Court further concludes that a reasonable investigation of that charge would have encompassed that claim within its scope. Therefore, the Court will deny DRBA's Motion with respect to Plaintiff's claim that DRBA unlawfully discriminated in failing to promote him to COO.

With respect to Plaintiff's claim of hostile work environment, the Court concludes that there is not a close nexus between that claim and the facts specified in Plaintiff's EEOC charges. Neither of the charges alleges any fact related to claims of a hostile work environment. Nor do they allege any fact from which a hostile work environment could reasonably be inferred. Thus, the Court further concludes that a reasonable investigation of the charges would not have encompassed that claim within its scope. Therefore, the Court will grant DRBA's Motion with respect to Plaintiff's claim of hostile work environment.

III. Whether Plaintiff's Claim That DRBA Unlawfully Discriminated In Failing To Promote Him To COO Is Time Barred

DRBA contends that Plaintiff's claim that DRBA unfairly failed to promote him to COO is barred by 42 U.S.C. § 2000e-5(e)(1), which provides that, where, as here, the person filing a Title VII employment discrimination charge has initiated proceedings with a state agency, the charge must be filed with the EEOC within 300 days after the alleged unlawful employment practice occurred. Plaintiff claims that he was unlawfully denied promotion to COO in November, 2002. His initial EEOC charge was filed on April 6, 2004. Plaintiff's Answering Brief (D.I.8) does not respond to this contention.

Because DRBA's failure to promote Plaintiff to COO occurred more than 300 days before Plaintiff filed his initial EEOC charge, Plaintiff's claim with respect to that incident is time barred unless Plaintiff can demonstrate that DRBA's failure to promote him is part of a continuing violation. *Rush v Scott Specialty Gasses, Inc.,* 113 F.3d 476, 481 (3d Cir.1997). "The continuing violation theory allows a 'plaintiff [to] pursue a Title VII claim for discriminatory conduct that began prior to the filing period if he can demonstrate that the act is part of an ongoing practice or pattern of discrimination of the defendant." ' *Id.* (quoting *West v. Philadelphia Elec. Co.,* 45 F.3d 744, 754 (3d Cir.1995)). To do this, Plaintiff must first show that DRBA committed at least one discriminatory act within the 300 day period. *Id.* at 481 (citing *West,* 45 F.3d at 754). Plaintiff must also show that the prior discriminatory act was not an isolated incident, but part of a continuing pattern of discrimination. *Id.* "A plaintiff satisfying these requirements may present evidence and recover damages for the entire continuing violation, and the 300-day filing period will not act as a bar." *Id.*

\*4 Reviewing the evidence and construing all inferences in the light most favorable to Plaintiff, the Court concludes that Plaintiff has adequately alleged that DRBA's failure to promote him to COO was part of a continuing violation. Plaintiff alleges at least five other incidents of failure to promote, four of which are clearly within the 300 day period. (D.I. 8 at 2-3.) Moreover, the high degree of similarity between the alleged incidents, and their

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 462551 (D.Del.)

**(Cite as: 2006 WL 462551 (D.Del.))**

Page 4

recurring nature demonstrate that DRBA's failure to promote Plaintiff to COO was part of a continuing pattern of discrimination. Therefore, the Court concludes that Plaintiff's claim that DRBA unlawfully failed to promote him to COO is not time barred.

IV. Whether Plaintiff States A Claim Under The Implied Covenant of Good Faith and Fair Dealing

DRBA contends that Plaintiff's fourth cause of action, that DRBA breached the implied covenant of good faith and fair dealing, should be dismissed because DRBA never terminated Plaintiff's employment. Plaintiff's Answering Brief (D.I.8) does not respond to this contention.

Under Delaware law, the covenant of good faith and fair dealing is recognized as a very narrow exception to the presumption of at-will employment. *E.I. DuPont de Nemours and Co. v. Pressman,* 679 A.2d 436, 441 (Del.1996). In order to bring a valid cause of action under the covenant of good faith and fair dealing, a plaintiff must show that his claim falls into one of four exclusive categories:

"(i) where the termination violated public policy; (ii) where the employer misrepresented an important fact and the employee relied 'thereon either to accept a new position or remain in a present one;' (iii) where the employer used its superior bargaining power to deprive an employee of clearly identifiable compensation related to the employee's past service; and (iv) where the employer falsified or manipulated employment records to create fictitious grounds for termination."

*Lord v. Souder,* 748 A.2d 393, 400 (Del.2000) (quoting *Pressman,* 679 A.2d at 442-44).

Here, Plaintiff cannot contend that his claim falls within category i or iv because DRBA did not terminate Plaintiff's employment. Plaintiff does not contend that his claim falls within category ii or iv. Therefore, the Court concludes that Plaintiff's fourth cause of action, breach of the implied covenant of good faith and fair dealing, fails to state a claim

upon which relief can be granted.

In addition, the Delaware Discrimination in Employment Act, 19 Del. C. Chapter 7, precludes Plaintiff from bringing his fourth cause of action. In July, 2004, the Act was amended to provide that "[t]his subchapter shall afford the sole remedy for claims alleging a violation of this chapter to the exclusion of all other remedies." 19 Del. C. § 712(b) . Moreover, the General Assembly's synopsis of the amendments to the Act states that:

This bill confirms that Chapter 7 is the exclusive and sole remedy for employment discrimination claims, requiring initial processing of all such claims with the Department of Labor for review and action. This bill effectively re-establishes the exclusive remedy put in question by the decision in *Schuster v. Derocili,* 775 A.2d 1029 (2001).

**\*5** S.B. 154, 142d Gen. Ass. (Del.2004). Accordingly, The Court will grant DRBA's Motion with respect to Plaintiff's fourth cause of action.

CONCLUSION
In sum, for the reasons discussed, the Court will grant DRBA's Motion with respect to Plaintiff's claim of hostile work environment and Plaintiff's fourth cause of action, breach of the implied covenant of good faith and fair dealing. The Court will deny DRBA's Motion with respect to Plaintiff's claim that DRBA unlawfully failed to promote him to COO in November, 2002.

An appropriate order will be entered.

*ORDER*
At Wilmington, this *24* day of February, 2006, for the reasons set forth in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that:

1. Defendant's Motion For Partial Judgment On The Pleadings (D.I.4) is *GRANTED* with respect to Plaintiff's claim of hostile work environment and Plaintiff's fourth cause of action, breach of the implied covenant of good faith and fair dealing;

2. Defendant's Motion For Partial Judgment On

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 5

Not Reported in F.Supp.2d, 2006 WL 462551 (D.Del.)

**(Cite as: 2006 WL 462551 (D.Del.))**

The Pleadings (D.I.4) is *DENIED* with respect to Plaintiff's claim that Defendant unlawfully failed to promote him to COO in November, 2002.

Not Reported in F.Supp.2d, 2006 WL 462551 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

• 2006 WL 1199928 (Trial Motion, Memorandum and Affidavit) Reply to Defendant's Answer to Plaintiff's Motion for Reargument (Mar. 24, 2006)Original Image of this Document (PDF)

• 2005 WL 2868112 (Trial Motion, Memorandum and Affidavit) Defendant's Reply Brief in Support of its Motion for Judgment on the Pleadings (Sep. 15, 2005)Original Image of this Document (PDF)

• 2005 WL 2603682 (Trial Motion, Memorandum and Affidavit) Plaintiff's Answering Brief in Opposition to Defendant's Motion for Judgment on the Pleadings (Aug. 29, 2005)Original Image of this Document (PDF)

• 2005 WL 2385534 (Trial Motion, Memorandum and Affidavit) Defendant's Opening Brief in Support of Its Motion for Judgment on the Pleadings (Aug. 3, 2005)Original Image of this Document (PDF)

• 1:05cv00261 (Docket) (May. 03, 2005)

• 2005 WL 1307844 (Trial Pleading) Complaint (May 2, 2005)Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# SA-5

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 733567 (D.Del.)

(Cite as: 2006 WL 733567 (D.Del.))

Page 1

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
Dino G. PETROCELLI, Plaintiff,
v.
DAIMLERCHRYSLER CORPORATION,
Defendant.
No. Civ.A. 04-943-KAJ.

March 22, 2006.
Dino G. Petrocelli, Plaintiff, pro se.

Jennifer Gimler Brady, Sarah E. DiLuzio, Potter Anderson & Corroon LLP, Wilmington, Delaware, for Defendant.

William C. Martucci, Kristen Aggeler Page, Shook Hardy & Bacon LLP, Kansas City, Missouri, of counsel.

MEMORANDUM OPINION

JORDAN, J.

I. INTRODUCTION

*1 This is an employment discrimination case brought by Dino G. Petrocelli ("Petrocelli"), who is proceeding pro se, against his former employer, DaimlerChrysler Corporation ("DaimlerChrysler" or the "Company"). Petrocelli, a Hispanic American, claims that while he was working for DaimlerChrysler he was the target of discrimination based on his national origin, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e et seq., and of the Delaware Discrimination in Employment Act (the "Delaware

Act"), 19 *Del.Code* § 711. He also alleges that, in violation of Title VII, DaimlerChrysler retaliated against him for filing the first of two charges of discrimination and that the Company defamed him by accusing him of theft and by making derogatory statements about his work habits. Before me now is DaimlerChrysler's Motion for Summary Judgment. (Docket Item ["D.I."] 56; the "Motion".) This court has subject matter jurisdiction over the case pursuant to 28 U.S.C. §§ 1331, 1343, and 1367. For the reasons that follow, the Motion will be granted in part and denied in part.

II. BACKGROUND [FN1]

> FN1. The following background information is taken from the parties' submissions and does not constitute findings of fact.

A. *Perceived Harassment During Petrocelli's Employment at DaimlerChrysler*

Petrocelli applied for employment with DaimlerChrysler on March 15, 1997 (D.I. 58 at A1-2), after being referred to the Company through the Latin American Community Center (*id.* at A8, 66:21-67:14). On his application, Petrocelli listed "Spanish" as one of his skills (*id.* at A1), and during his interview with DaimlerChrysler, he was asked to "say a few things in Spanish," because he "didn't look Hispanic" (*id.* at A9-10, 73:24-74:8, 74:23-75:3). In May 1997, Petrocelli began working at DaimlerChrysler's Parts Distribution Center in Newark, Delaware ("Newark PDC"). (*Id.* at A11, 81:2-4.) Petrocelli worked on the night shift at Newark PDC, initially on the dock and later in the warehouse as a picker/packer. (*Id.* at A10-11, 77:12-78:10.)

Petrocelli testified at his deposition about several incidents at Newark PDC that he perceived to be harassment based on his national origin. First, he

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 2

Not Reported in F.Supp.2d, 2006 WL 733567 (D.Del.)

**(Cite as: 2006 WL 733567 (D.Del.))**

testified that his coworkers drew pictures of his "face with a beard ... and [his] name under there and saying, 'Me no speak English' ... [with] a sombrero ... [o]r a jail cell with a sombrero with [his] name." ( *Id.* at A23, 140:7-11.) Those pictures were drawn with markers "[i]n the bathrooms, on the work equipment, [and] out in the work area on boxes." ( *Id.* at A23, 140:12- 18.) One particular picture, drawn in the bathroom in October 2001, depicted "a snake with a sombrero, [Petrocelli's] name underneath of it, ... bars of a jail cell around it, ... [and] references to ... [him] not speaking English." ( *Id.* at A25, 169:21-24.) He further testified that "on several occasions," starting in January 2000, pictures and notes were left in work areas "referring to burritos and tacos ... and references to [him] wearing a bandanna ... being in gangs and calling [him] 'Esse'." (*Id.* at A26, 185:17-186:3.)

*2 Petrocelli also testified that he was called "Spic" by coworkers on "numerous" occasions, including once in December 2001 in front of the control center at Newark PDC. (*Id.* at A26, 186:12-23.) Petrocelli testified that he was called "a lazy Latino," a "mushroom picker," and a "Spic" on other occasions in 1998 and 2000. (*Id.* at A34-35, 218:18-20, 220:16-221:1.) During some of those incidents, the speaker using those terms acted "like he was going to run [Petrocelli] over with his forklift." (*Id.* at A34-35, 220:23-221:1.)

According to Petrocelli, one of his supervisors saw him wearing a cross, asked if he was Catholic, and when Petrocelli said that he was, the supervisor "looked surprised ... [and] said, 'Well, I thought you people practiced "Santaria" or Voodoo or something like that,' and laughed." (*Id.* at A31, 206:12-207:1; *see also id.* at A20, 121:4-17.)

Finally, Petrocelli testified that, starting in September 2001, coworkers made references about his relationship with a non-Hispanic white female coworker. (*Id.* at A26, 187:24-188:5.) Those references included sexually explicit drawings posted on billboards (*id.* at A26, 188:15-22), as well as a particular occasion where a coworker said to Petrocelli and the female coworker, "Are you down with the brown tour?" (*id.* at A26-27,

188:9-15, 189:7-14).

B. *Events Leading Up to Petrocelli's Firing*

During his tenure at Newark PDC, which lasted from 1997 until January 2002, Petrocelli was disciplined many times for violating DaimlerChrysler's Standards of Conduct. Petrocelli's disciplinary record (*id.* at A99-119) includes, inter alia, violations for (1) leaving work during working hours without permission, or failing to return to work after lunch or relief without permission; (2) failing to exert normal work effort on the job, wasting time, loitering, loafing, or sleeping on the job; (3) failing to follow instructions from supervisors; (4) negligent or deliberate damage to DaimlerChrysler's property; and (5) threatening, intimidating, coercing, harassing, retaliating, or using abusive language to others. (*See also id.* at A96-97 (DaimlerChrysler Standards of Conduct).) Between April 14, 1999 and June 14, 2001, Petrocelli received four disciplinary layoffs, each lasting between five and thirty days. (*Id.* at A100-10.) On September 19, 2001, Petrocelli was suspended for attempting to steal DaimlerChrysler property. (*Id.* at A111- 14.) Finally, on January 9, 2002, Petrocelli was suspended indefinitely for violating DaimlerChrysler's standards of conduct. ( *Id.* at A115-17.) That suspension was modified to a discharge effective January 11, 2002. (*Id.* at A118.)

Petrocelli testified that twelve of his coworkers committed similar violations but were not punished as severely as he was. (*Id.* at A21-23, 130:9-138:9.) Those violations included sleeping, loafing, and playing board games (*id.* at A22-23, 136:10-138:9), as well as the more severe issue of working under the influence of drugs (*id.* at A21-22, 133:11-134:23). According to Petrocelli, some coworkers received no discipline for those violations (*id.* at A22, 136:10-137:2), while others received too little discipline (*id.* at A22-23, 134:17-23, 138:1-9). Petrocelli also admitted, however, that he did not know precisely what discipline those coworkers received, although he perceived it to be less severe than what he received. (*Id.* at A22-23, 134:20-136:4, 138:1- 9.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                        Page 3

Not Reported in F.Supp.2d, 2006 WL 733567 (D.Del.)

**(Cite as: 2006 WL 733567 (D.Del.))**

\*3 After he was discharged in January 2002, Petrocelli filed a union grievance to appeal that decision. (*Id.* at A152-53.) That grievance addressed whether discharge was an appropriate response to Petrocelli's violations, but it did not include any allegations of discrimination based on national origin. (*Id.*) On April 11, 2002, the Appeal Board, which included representatives of DaimlerChrysler and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"), directed that Petrocelli be offered reinstatement, and that offer was extended in a letter to Petrocelli dated May 22, 2002. (*Id.* at A154-56.) The reinstatement offer required Petrocelli to report to Newark PDC on May 28, 2002. (*Id.* at A156.)

However, Petrocelli did not report as directed because, in March 2002, while his grievance was being considered, he had been arrested for possession of cocaine and he remained in custody. (*Id.* at A4, 33:2-5; *id.* at A157.) He was convicted of possession of a controlled substance and violation of probation, which had been imposed after an earlier conviction for offensive touching. (*Id.* at A5, 34:4-20, 35:24-36:15.) He was incarcerated for approximately eight months, beginning in March 2002. (*Id.* at A33, 213:22- 214:3 .) After failing to report by June 6, 2002, and failing to substantiate the reason for his failure, Petrocelli's seniority was terminated. (*Id.* at A158-59.)

C. *Procedural History*

On January 22, 2002, while his grievance was pending, Petrocelli filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Delaware Department of Labor against DaimlerChrysler, alleging that he was subjected to discrimination and a hostile work environment in violation of Title VII and the Delaware Act. (*Id.* at A160.) On November 26, 2003, the Delaware Department of Labor issued a Reasonable Cause Finding that concluded there was evidence to support a finding of a hostile work environment but not a finding that the disciplinary actions and discharge resulted from discrimination. (*Id.* at A167-68.) The EEOC adopted those findings

in a Notice of Right to Sue dated May 18, 2004. (*Id.* at A169.) The EEOC also issued a Notice of Right to Sue on January 6, 2005, stating that the EEOC found reasonable cause to believe that a violation had occurred, but that it had not obtained a settlement with DaimlerChrysler and would not bring suit. (*Id.* at A161.) That notice concluded the EEOC's processing of Petrocelli's first charge of discrimination against the Company. (*Id.*)

On April 3, 2003, Petrocelli filed with the EEOC a second Charge of Discrimination, alleging that DaimlerChrysler had retaliated against him for filing his first charge by offering him reinstatement when the Company knew that he was incarcerated and unable to report. (*Id.* at A162.) The EEOC issued a Dismissal and Notice of Right to Sue on September 10, 2003, stating that the retaliation charge could not be investigated because it was not filed within the statutory time limit. (*Id.*) That notice informed Petrocelli that he had ninety days to file a claim based on that second charge, or the right to sue would be lost. (*Id.*)

\*4 Based on the May 18, 2004 Notice of Right to Sue on the first charge of discrimination, Petrocelli filed this suit against DaimlerChrysler on August 16, 2004, alleging that he was fired, disciplined, and subjected to a hostile work environment in violation of Title VII and the Delaware Act. (*Id.* at A164-70.) On September 28, 2005, Petrocelli was granted leave to amend his complaint. (D.I.53.) That amended complaint provided more explanation in support of Petrocelli's allegations of discrimination, as well as articulating his claims for retaliation and defamation. (D.I. 58 at A171-75.) Petrocelli seeks reinstatement, back pay, front pay, and compensatory and punitive damages. (*Id.* at A174.)

III. STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(c), a party is entitled to summary judgment if a court determines from its examination of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact and that the moving party is entitled to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 733567 (D.Del.)

**(Cite as: 2006 WL 733567 (D.Del.))**

Page 4

judgment as a matter of law. In determining whether there is a triable dispute of material fact, a court must review the evidence and construe all inferences in the light most favorable to the non-moving party. *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir.1976). However, a court should not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000). To defeat a motion for summary judgment, Rule 56(c) requires that the non-moving party "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986) (internal citation omitted). The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(c). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita,* 475 U.S. at 587 (internal citation omitted). Accordingly, a mere scintilla of evidence in support of the non-moving party is insufficient for a court to deny summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986).

IV. DISCUSSION

In his complaint, Petrocelli asserts that DaimlerChrysler violated both Title VII and the Delaware Act. (D.I. 58 at A164-70.) Since claims of employment discrimination under the Delaware Act are analyzed in the same way as claims under Title VII, *Giles v. Family Court,* 411 A.2d 599, 601-02 (Del.1980), the following analysis uses the Title VII framework, and the conclusions apply equally to the claims of hostile work environment and disparate treatment under the Delaware Act.

A. *Hostile Work Environment*

A hostile work environment may form the basis of a Title VII discrimination claim against an employer. *Cardenas v. Massey,* 269 F.3d 251, 260 (3d Cir.2001) (citing *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65-68 (1986)). The inquiry into whether an environment is hostile requires a look into "all the circumstances ... [including] the

frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23 (1993). That analysis "must concentrate not on individual incidents, but on the overall scenario." *Durham Life Ins. Co. v. Evans,* 166 F.3d 139, 149 (3d Cir.1999). To establish a Title VII claim based upon a hostile work environment, Petrocelli must show that "(1) he suffered intentional discrimination because of his national origin; (2) the discrimination was pervasive and regular; (3) it detrimentally affected him; (4) it would have detrimentally affected a reasonable person of the same protected class in his position; and (5) there is a basis for vicarious liability." *Cardenas,* 269 F.3d at 260.

**\*5** For purposes of this Motion, DaimlerChrysler concedes four of those five elements, arguing only that the discrimination faced by Petrocelli was not pervasive and regular. (D.I. 57 at 28-32.) DaimlerChrysler first argues that the harassment discussed in Petrocelli's deposition is a series of isolated incidents. In particular, according to DaimlerChrysler, the name-calling, including epithets like "spic," "mushroom picker," "lazy Latino," and references to "you people" practicing Santaria or voodoo, were sporadic, and, in any event, constituted mere offensive utterances. (*Id.* at 29.) Also, according to DaimlerChrysler, the picture of the snake with the sombrero in a jail cell with Petrocelli's name was a one-time occurrence, and that a "single item of graffiti" is not pervasive and regular discrimination. (*Id.* at 30.)

DaimlerChrysler's argument misses the mark, because it focuses on individual incidents in isolation and, unsurprisingly, finds that each is a one-time occurrence. To the contrary, the analysis must consider the circumstances as a whole and not focus on each event individually. *Durham Life,* 166 F.3d at 149. According to Petrocelli's unrebutted testimony, he was called a "spic" on "numerous" occasions during his time at Newark PDC. (D.I. 58 at A26, 186:12- 23.) Other derogatory terms, such as "lazy Latino," and "mushroom picker," were

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 733567 (D.Del.)

**(Cite as: 2006 WL 733567 (D.Del.))**

Page 5

allegedly directed at him. (*Id.* at A34-35, 218:18-20, 220:16-221:1.) The reference to the religion practiced by "you people" was also clearly addressed to Petrocelli's Hispanic origin. (*Id.* at A31, 206:12-207:1.) Those statements, taken as a group and according to Petrocelli's testimony, were not sporadic, and they constitute more than offensive utterances. *See Smith v. Leggett Wire Co.,* 220 F.3d 752, 767 (6th Cir.2000) (holding that the commonplace use of the word "nigger" constituted more than mere offensive utterances). Finally, according to Petrocelli, pictures directed at his national origin were drawn in the bathrooms, on the work equipment, and out in the work area on boxes. (D.I. 58 at A23, 140:7-18; *id.* at A25, 169:21-24.) DaimlerChrysler points to one such picture and calls it an isolated occurrence. (D.I. 57 at 30.) Again, by isolating individual events, DaimlerChrysler ignores the totality of Petrocelli's allegations.

DaimlerChrysler also argues that many events that were perceived by Petrocelli to constitute harassment, including the statements and drawings referring to Petrocelli's romantic relationship with a non-Hispanic white coworker, the request that he speak Spanish at his interview, and the discipline he received for violating the standards of conduct, were not actually directed at his national origin. (D.I. 57 at 28-31.) While I agree that each of those events, viewed in isolation, might not be obviously directed at Petrocelli's Hispanic origin, [FN2] when they are considered along with the epithets and offensive graffiti, a reasonable jury might conclude that those acts were motivated by a discriminatory purpose. *See Aman v. Cort Furniture Rental Corp.,* 85 F.3d 1074, 1083 (3d Cir.1996) (interpreting less obvious incidents in light of other racially-motivated events). Therefore, the less overt incidents reported by Petrocelli are properly included in the totality of circumstances examined by the factfinder.

> FN2. The "brown tour" comment does seem so directed, however. (*See* D.I. 58 at A26-27, 188:9-15, 189:7-14.)

*6 DaimlerChrysler has failed to show that,

viewing the evidence in the light most favorable to Petrocelli, the incidents of hostility were not "pervasive and regular" as required under Title VII. Petrocelli's unrebutted testimony raises a genuine issue of material fact concerning the frequency and severity of the hostility he experienced. Therefore, because that is the only issue raised by DaimlerChrysler, I will deny the Motion as to the hostile work environment claim.

*B. Disparate Treatment*

Petrocelli alleges that when DaimlerChrysler disciplined him for violating the standards of conduct and eventually fired him, it discriminated against him based on his national origin. (D.I. 58 at A165.) Those disparate treatment claims are analyzed under the *McDonnell Douglas* burden shifting framework. *Jones v. Sch. Dist. Of Philadelphia,* 198 F.3d 403, 410 (3d Cir.1999) (referring to *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973)). Under that framework, Petrocelli must establish a prima facie case of discrimination based on national origin by showing: (1) that he is a member of a protected class; (2) that he suffered an adverse employment action; and (3) that that action occurred under circumstances that give rise to an inference of unlawful discrimination, such as might occur when a similarly situated person not of the protected class is treated differently. *Jones,* 198 F.3d at 410- 11; *Boykins v. Lucent Techs., Inc.,* 78 F.Supp.2d 402, 409 (E.D.Pa.2000). If Petrocelli succeeds in establishing a prima facie case, then DaimlerChrysler must "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *Jones,* 198 F.3d at 410. If DaimlerChrysler meets that burden, then Petrocelli must show by a preponderance of the evidence that those legitimate reasons were a pretext for discrimination. *Id.* If DaimlerChrylser raises a legitimate nondiscriminatory reason for its actions, Petrocelli may overcome a summary judgment motion with evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 6

Not Reported in F.Supp.2d, 2006 WL 733567 (D.Del.)

**(Cite as: 2006 WL 733567 (D.Del.))**

action." *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir.1994).

Here, for both the claim based on disciplinary action and the claim based on discharge, DaimlerChrysler concedes, for purposes of this Motion, the first two elements of Petrocelli's prima facie case, but argues that he has not established the third element: that the circumstances give rise to an inference of unlawful discrimination. (D.I. 57 at 21-23, 25.) Furthermore, DaimlerChrysler argues that it had legitimate nondiscriminatory reasons for disciplining and firing Petrocelli, and Petrocelli has failed to establish that those reasons were pretextual. (*Id.* at 23-25, 26-27.) The arguments concerning the inference of unlawful discrimination and the showing of pretext both focus on Petrocelli's failure to show that similarly situated coworkers were treated differently than he was. (*Id.* at 22-25, 27.)

\*7 If Petrocelli's assertions about the discipline received by his coworkers were the only relevant evidence, I would agree that Petrocelli had failed to establish an Inference that his discipline and firing were based on unlawful discrimination. Petrocelli admitted that he did not know precisely what discipline other employees received (D.I. 58 at A22-23, 134:20-136:4, 138:1-9), and his unsubstantiated belief that he was punished more severely is insufficient to support his prima facie case. *See Seabrook v. Gadow,* No. Civ.A.01-802, 2003 WL 21383719, at \*7 (D. Del. June 10, 2003). Also, considering that DaimlerChrysler has articulated legitimate nondiscriminatory reasons for its actions by presenting the details of Petrocelli's disciplinary record (D.I. 58 at A99-119), Petrocelli's belief about the discipline given to other employees is insufficient to raise a genuine issue of material fact as to pretext. *See Seabrook,* 2003 WL 21383719, at \*7.

However, for the claim based on disciplinary actions, Petrocelli has presented other relevant evidence. "Evidence of ... a hostile work environment is relevant to whether one of the principal non-discriminatory reasons asserted by an employer for its actions was in fact a pretext for

discrimination." *Aman,* 85 F.3d at 1086. As discussed above, *supra* Section IV.A, Petrocelli has presented sufficient evidence to overcome DaimlerChrysler's summary judgment motion as to his hostile work environment claim. That general evidence of a hostile environment, viewed in the light most favorable to Petrocelli, raises genuine issues of material fact both as to open hostility at Newark PDC and as to the reasons underlying the disciplinary actions taken against Petrocelli by his supervisors. That evidence is relevant not only for Petrocelli's prima facie case of discrimination, but could also support a reasonable factfinder's belief that an invidious discriminatory reason was a motivating or determinative cause of those actions. *Fuentes,* 32 F.3d at 764 Therefore, Petrocelli has presented sufficient evidence of pretext to survive a motion for summary judgment, and I will deny the Motion as to the disparate treatment claim based on the disciplinary actions taken against Petrocelli.

The evidence of a hostile work environment is not sufficient, however, to support Petrocelli's disparate treatment claim based on his discharge. DaimlerChrysler has articulated a legitimate nondiscriminatory reason for that action: Petrocelli failed to report to work after he was reinstated because he was incarcerated for possession of cocaine and violation of his probation. (D.I. 58 at A5, 34:4-20, 35:24-36:15; *id.* at A33, 213:22-214:3; *id.* at A157-59; *see also* D.I. 57 at 26.) While the evidence about the environment at Newark PDC raises a factual issue as to the motivation behind the discipline given to Petrocelli by his supervisors, a reasonable factfinder could not infer that the decision to discharge Petrocelli after he failed to report was motivated by discrimination. His failure to report was caused by his own actions in March 2002 and his subsequent arrest, conviction, and incarceration. Therefore, I will grant the Motion as to the disparate treatment claim based on Petrocelli's discharge. [FN3]

> FN3. In his claim that DaimlerChrysler retaliated against him for filing a discrimination charge, Petrocelli alleged that the Company knew that he was incarcerated and that the timing of his

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 7

Not Reported in F.Supp.2d, 2006 WL 733567 (D.Del.)

**(Cite as: 2006 WL 733567 (D.Del.))**

reinstatement was manipulated so that he would be unable to report. (D.I. 58 at A162.) As discussed below, *infra* Section IV.C, that retaliation claim is time-barred, and the allegations concerning the timing of his reinstatement were not raised in the EEOC charge which provides the basis for this suit (*id.* at A160). Thus, those allegations may not be used to support the disparate treatment claim based on his discharge. In addition, as noted below, *infra* Section IV.C, Petrocelli has adduced no evidence to support his allegation that the timing of his reinstatement was actually manipulated.

*C. Retaliation*

**\*8** In his amended complaint, Petrocelli alleges that DaimlerChrysler discharged him in retaliation for filing his first Charge of Discrimination on January 22, 2002. (*Id.* at A172, (1)(c).) That allegation, made pursuant to Title VII, was first raised in a Charge of Discrimination filed by Petrocelli with the EEOC on April 3, 2003. (*Id.* at A162.) The EEOC issued a dismissal on September 10, 2003, giving Petrocelli notice that his right to sue on that charge would be lost after ninety days. ( *Id.* at A163.)

DaimlerChrysler correctly points out (D.I. 57 at 33) that Petrocelli did not file his compliant until August 16, 2004 (D.I. 58 at A164-66), and so his claim of retaliation under Title VII was filed outside the ninety-day window and is therefore time-barred. *See* 42 U.S.C. § 2000e-5(f)(1). That time bar is subject to equitable tolling if the filing was untimely "due to sufficiently inequitable circumstances." *Grice v. U.S. Postal Serv.*, No. Civ .A.05-2404, 2005 WL 1528880, at \*4 (D.N.J. June 29, 2005). No such circumstances have been presented here. Even though Petrocelli is proceeding pro se, he filed his complaint in a timely manner after the EEOC dismissed his disparate treatment and hostile work environment charges, and there is no apparent excuse for his failure to do so for his retaliation charge. (D.I. 58 at A164-66, A169.) Thus, I conclude that Petrocelli's retaliation claim is

time-barred.

Even if that claim were not time-barred, Petrocelli has failed to demonstrate a causal link between his charge of discrimination and his discharge. *See Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 286 (3d Cir.2001) (requiring such a demonstration to support a prima facie claim of retaliation). As already noted, *supra* Section IV.B, Petrocelli was discharged after failing to report to work because he was incarcerated. Petrocelli has produced no evidence to support the allegation that that decision was caused by a retaliatory motive. Therefore, in addition to being time-barred, Petrocelli has failed to establish a prima facie case of retaliation.

*D. Defamation*

Finally, in addition to his claims under Title VII and the Delaware Act, Petrocelli makes a defamation claim, apparently pursuant to Delaware common law. (D.I. 58 at A173.) In support of its Motion, DaimlerChrysler does not dispute whether Petrocelli has established a prima facie claim of defamation, but asserts that it is protected by the qualified privilege between employer and employee. (D.I. 57 at 35-36.)

DaimlerChrysler is correct that, under Delaware law, statements made in furtherance of the common interest of management and labor in operating a successful business are privileged. *Gonzales v. Avon Prods., Inc.*, 609 F.Supp. 1555, 1559 (D.Del.1985) (citing *Battista v. Chrysler Corp.*, 454 A.2d 286, 291 (Del.Super.Ct.1982)). The statements made about Petrocelli, including allegations of theft and loafing (D.I. 58 at A173), appear to fall within that common interest. However, the qualified privilege will be lost if the speaker knows the statement is false, or if the speaker acts with express malice, a desire to cause harm, or bad faith. *Gonzales*, 609 F.Supp. at 1559. The evidence raised by Petrocelli in support of his hostile work environment claim, when viewed in the light most favorable to him, also raises a genuine issue as to the motives behind the allegedly defamatory statements. Therefore, I will deny the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 733567 (D.Del.)

**(Cite as: 2006 WL 733567 (D.Del.))**

Motion as to the defamation claim.

V. CONCLUSION

**\*9** Accordingly, I will grant the Motion for Summary Judgment as to the disparate treatment claim based on Petrocelli's discharge and as to the retaliation claim. I will deny the Motion in all other respects. An appropriate order will follow.

Not Reported in F.Supp.2d, 2006 WL 733567 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

• 2006 WL 809107 (Trial Motion, Memorandum and Affidavit) Defendant Daimlerchrysler Corporation's Reply in Support of its Motion for Summary Judgment (Feb. 27, 2006)Original Image of this Document (PDF)

• 2005 WL 3666810 (Trial Motion, Memorandum and Affidavit) Opening Brief in Support of Defendant Daimlerchrysler Corporation's Motion for Summary Judgment (Nov. 1, 2005)Original Image of this Document (PDF)

• 2005 WL 3666809 (Trial Pleading) Answer of Daimlerchrysler Corporation to Plaintiff's Amended Complaint (Oct. 12, 2005)Original Image of this Document (PDF)

• 1:04cv00943 (Docket) (Aug. 16, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.