SA-6

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 913091 (E.D.Pa.)

**(Cite as: 2005 WL 913091 (E.D.Pa.))**

Page 1

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
John S. RIZZO, Plaintiff
v.
PPL SERVICE CORPORATION, Defendant
Gregory GORSKY, Plaintiff
v.
PPL SERVICE CORPORATION, Defendant
Kim GORSKY, Plaintiff
v.
PPL SERVICE CORPORATION, Defendant
**No. Civ.A. 03-5779, Civ.A. 03-5780, Civ.A.
03-5781.**

April 19, 2005.
Donald P. Russo, Bethlehem, PA, for Plaintiff.

Malcolm J. Gross, Allentown, PA, Daniel R. Halem
, Peter Rahbar, New York, NY, for Defendant.

*MEMORANDUM*

PRATTER, J.

**\*1** Before the Court is Defendant PPL Service
Corporation's ("PPL") Motion for Summary
Judgment filed on December 17, 2004. This Motion
applies to all of the above captioned matters
inasmuch as all three of the cases arise from the
same basic facts. Plaintiffs John S. Rizzo, Gregory
Gorsky, and Kim Gorsky (collectively "Plaintiffs")
filed separate complaints in the Court of Common
Pleas Lehigh County on or about September 24,
2003. PPL removed these matters to this Court on
October 17, 2003. In their complaints, Plaintiffs
allege that they were discriminated against by their

employer, PPL, based on their respective ages.

PPL asserts in its Motion for Summary Judgment
that Ms. Gorsky's counts fail as a matter of law
because there is no evidence that Ms. Gorsky
suffered an adverse employment action, which is
required in order for a plaintiff to establish a prima
facie case. PPL further argues that all of the
Plaintiffs' claims fail as a matter of law because
there is no record evidence demonstrating that
PPL's disciplinary actions against each of the
Plaintiffs gives rise to an inference of
discrimination, another requirement to establish a
prima facie case. Finally, even if Plaintiffs could
establish prima facie cases, PPL contends that it has
articulated legitimate, non-discriminatory reasons
for terminating Mr. Rizzo and Mr. Gorsky and for
issuing a written warning to Ms. Gorsky and
Plaintiffs have failed to produce any evidence that
PPL's reasons for the discipline of the Plaintiffs
were pretexts for unlawful age discrimination.

The Court finds that Ms. Gorsky has failed to
produce record evidence of an adverse employment
action. The Court also finds that Mr. Rizzo and Mr.
Gorsky have failed to show that the
non-discriminatory reasons articulated by PPL were
a pretext for unlawful age discrimination.
Therefore, the Court grants summary judgment for
PPL in all of the listed matters and these cases are
dismissed.

*I. BACKGROUND*

On or about September 24, 2003, Plaintiffs filed
individual complaints in the Court of Common
Pleas of Lehigh County naming PPL Susquehanna,
LLC ("PPL") as Defendant. Count I of each of these
Complaints alleges violations of the Age
Discrimination in Employment Act of 1967
("ADEA"), 29 U.S.C. §§ 621, *et seq.;* Count II of
each of these Complaints alleges violations of the
Pennsylvania Human Relations Act ("PHRA"), 43

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                           Page 2

Not Reported in F.Supp.2d, 2005 WL 913091 (E.D.Pa.)

**(Cite as: 2005 WL 913091 (E.D.Pa.))**

PA. CONS.STAT. §§ 950, *et seq.* These matters were removed by PPL to this Court, which has jurisdiction pursuant to 28 U.S.C. § 1331, because the matters involve a claim arising from federal law. The Court has jurisdiction of the state law claim in each case pursuant to 28 U.S.C. § 1367, because the state law claims arise from the same occurrence and events as the federal law claims.

Gregory Gorsky was employed by PPL from 1973 to 2001. In 2001, he was employed as a designer-drafter at PPL's nuclear facility in Berwick, Pennsylvania. (GG Tr. 10-13). [FN1] Kim Gorsky was employed by PPL from 1984 to 2003, and, in 2001, was employed as a senior drafter at PPL's nuclear facility in Berwick, Pennsylvania. (KG Tr. 14-15). John Rizzo was employed by PPL from 1979 to 2001, and, when terminated, was employed as a senior engineer at PPL's nuclear facility in Berwick, Pennsylvania. (JR Tr. 25-26).

> FN1. Following the lead of the parties in their filings, the Court will use the following abbreviations: (GG Tr.) for Gregory Gorsky's deposition transcript; (JR Tr.) for John Rizzo's deposition transcript; (KG Tr.) for Kim Gorsky's deposition transcript; (GJ Tr.) for George Jones's deposition transcript; (DR Tr.) for Douglas Rehrer's depositions transcript. Additionally, PPL filed a series of declarations in support of its Motion for Summary Judgment. These declarations are of Douglas Rehrer (Rehrer Decl.), George Jones (Jones Decl.), Andrew K. Williams, Esq. (Williams Decl.), and Daniel R. Halem, Esq. (Halem Decl.).

**\*2** During the time period of the events in question, PPL had in place an e-mail and internet policy that restricted use of company e-mail or internet for only business purposes. Specifically, Corporate Policy 405, dated April 11, 2001, states "E-mail is Company property and intended strictly for Company business. When using e-mail ... [the user] must adhere to established policies including the Standards of Conduct and Integrity and Diversity in the Workplace." (Corp. Policy 405, at p. 5). The

Standards of Conduct and Integrity (presented to employees in a power point presentation) in the section headed "Company Funds, Property" states:

> Use of Company resources, including computers, e-mail or the Internet for other than Company business functions is a violation of Company policy. This applies at any time (working hours and non-working hours, including lunch). Inappropriate use of Company time and resources (including ... E-mail ... ) can result in disciplinary action up to and including termination.... Use of Company computers, E-Mail, and the Internet is monitored to ensure proper use.

(Standards of Conduct and Integrity Policy, at D/Gen 000092). Additionally, PPL has a Policy on Sexual Harassment which prohibits sexual harassment and defines sexual harassment to include "the display of sexually suggestive objects or pictures, or telling jokes of a sexual nature." (Policy on Sexual Harassment, at p. 1).

Plaintiffs admit to knowing that the Company e-mail system was intended for Company business use only. (GG Tr. 37-38, 56-58, 61-62, 70-71; KG Tr. 58-59, 62-64; JR Tr. 32-33, 35, 48-49, 51). Additionally, Plaintiffs were aware that the Company could monitor their e-mails and Internet usage. (GG. Tr. 37; KG Tr. 57-58; JR Tr. 49). Further, Plaintiffs concede that they understood it was a violation of Company's policy to distribute sexually explicit e-mails or e-mails that were derogatory to any groups. (GG Tr. 16, 62; JR Tr. 39-40; KG Tr. 62-64). Plaintiffs also admitted to receiving the various policies discussed above and attended a training provided by PPL on these policies. (GG Tr. 34-35, 75; KG Tr. 48-49, 70-72; JR Tr. 40-41, 169). Plaintiffs claimed that the Standards of Conduct and Integrity Policy was distributed years prior to the investigation. However, the deposition testimony of Mr. and Ms. Gorsky show that Mr. Gorsky received the training two years prior to the investigation (not 6 to 8 as asserted by the Plaintiffs in their Reply to the Motion for Summary Judgment), (GG Tr. 34-35) and Ms. Gorsky received the training in 1999 (not 1989 as asserted by the Plaintiffs in their Reply to the Motion for Summary Judgment) (KG Tr. 70). Further, Plaintiff also stated that Mr. Rizzo "never

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 3

Not Reported in F.Supp.2d, 2005 WL 913091 (E.D.Pa.)

**(Cite as: 2005 WL 913091 (E.D.Pa.))**

received training" in the EEO policy, but Mr. Rizzo himself testified that he received this training on May 5, 1999. (JR Tr. 169).

According to Douglas Rehrer, PPL's Manager of Health and Security at the time at issue, PPL followed the Responsible Behavior Program, which provides for five degrees of employee discipline: 1) casual reminder; 2) oral reminder; 3) written reminder; 4) decision making leave; and 5) termination. (Rehrer Decl. ¶ 7). The final decision on what type of punishment to administer is for an employee's manager. (Rehrer Decl. ¶ 7).

*3 In September 2000, Mr. Rehrer was asked to begin an investigation of theft of time at a subsidiary corporation of PPL. (DR Tr. 9-11). This investigation revealed violations of e-mail policy by employees using their company e-mail for personal reasons. (DR Tr. 12). Mr. Rehrer requested and received the authority to investigate the e-mail folders of the 15 employees identified as the violators. (DR Tr. 12-14). Of the fifteen people, seven employees of the subsidiary were determined to have been sending non-business related e-mails. (DR Tr. 14-16, 27-28). This investigation also revealed Mr. Gorsky as one of the abusers of the e-mail system. (DR Tr. 15). The subsidiary, after this investigation was concluded, disciplined the seven employees determined to be violators. (DR Tr. 20).

Mr. Rehrer then requested the right to investigate Mr. Gorsky more fully, along with the other employees of PPL who either sent emails to or received e-mails from Mr. Gorsky. (DR Tr. 28-29). After assembling the complete list of employees who Mr. Gorsky had non-business contact with via e-mail (which totals over 100 employees), the twelve people with the highest number of e-mail activity were investigated further. (DR Tr. 30, 33). This investigation, called Phase One, was later reduced to focusing on 10 employees. (Two of the twelve individuals were no longer employed at PPL). (Rehrer Decl. ¶ 13). All of the Plaintiffs were part of this Phase One investigation. (Rehrer Decl. ¶ 14).

The investigation reviewed the e-mail account of the 10 employees, including the "inbox," "sent" folder, and "delete" folder. (DR Tr. 30). Since there had never been a prior e-mail investigation, no official standards governing how to approach the investigation existed. (DR Tr. 23). Mr. Rehrer then decided to divide all e-mails were then divided into two categories: 1) "sexual, ethnic, or racial" and 2) "other improper." (DR Tr. 24-25). George Jones, the PPL Vice President responsible for the Nuclear Department, testified that no official standard as to what was "improper" existed, so it was a "judgment call" as to what fit into each category. (GJ Tr. 31).

This was further divided in a matrix into three sub-categories: 1) those sent by the employee; 2) those received by the employee; and 3) those stored by the employee. (DR Tr. 25). After assembling this information, several factors were considered in determining the severity of discipline to be recommended to the Vice Presidents: First, "sexual, ethnic, or racial" e-mails were viewed as a the most serious violation; second, storing the "sexual, ethnic, or racial" e-mails on a Company computer was the next most serious offense; third, the number of "sexual, ethnic, or racial" e-mails received was viewed as evidence that the employee did not tell the sender to stop; and, finally, the volume of the other e-mails was considered. (DR Tr. 25-26). However, the volume of e-mails "was not a determining factor." (GJ Tr. 31-32).

*4 It was then determined that Mr. Gorsky and Mr. Rizzo were the two most egregious violators of PPL policies (the matrix showing the Phase One investigation findings is attached), and therefore should be terminated. (Rehrer Decl. ¶ 21). It was further recommended that five employees be given suspensions and three employees (including Ms. Gorsky) be given written warnings. (Rehrer Decl. ¶ 21).

Mr. Gorsky concedes that his use of e-mail for sexually explicit material was inappropriate and against Company policy. (GG Tr. 16, 120). However, Mr. Gorsky, while conceding that some punishment was deserved, alleges that termination was an excessive punishment for his actions. (GG

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 913091 (E.D.Pa.)

**(Cite as: 2005 WL 913091 (E.D.Pa.))**

Page 4

Tr. 131). Both Mr. Rehrer and Mr. Jones stated that they believed Mr. Gorsky's role as the prime offender made the decision to terminate him the only appropriate discipline. (Rehrer Decl. ¶ 24; Jones Decl. ¶ 7-8).

Mr. Rizzo admitted that he was aware of PPL's policies concerning use of e-mail and sexual harassment, and also conceded that his behavior was inappropriate. (JR Tr. 181-82, 185). Mr. Rizzo also admitted to being personally offended by some of the e-mails being sent by Mr. Gorsky, and feared that he would get in trouble for receiving these e-mails. (JR Tr. 91, 95, 123- 24, 133-34, 143-44). Furthermore, Mr. Rizzo concedes that the e-mails he stored on his company computer were "very inappropriate" to store at work. (JR Tr. 104). Since Mr. Rizzo was viewed as the second most egregious violator involving "sexual, ethnic" e-mails, behind Mr. Gorsky, Mr. Rehrer and Mr. Jones concluded that termination was the appropriate punishment. (Rehrer Decl. ¶ 25; Jones Decl. ¶ 7).

Ms. Gorsky was aware that there were e-mail and Internet policies at the Company (KG Tr. 119), but was not aware that there were restrictions on the e-mails that an employee could send and receive. (KG Tr. 40). Since Ms. Gorksy had significantly fewer e-mails then the other employees investigated, it was decided by her superiors at PPL that a written warning would suffice. (Rehrer Decl. ¶ 29; Jones Decl. ¶ 7). Ms. Gorksy claims she was told the disciplinary letter would be removed from her file after one year. (KG Tr. 131). However, Ms. Gorsky requested and received a copy of the letter more than a year later. (KG Tr. 132).

The final decision on discipline was made by George Jones, with the support of PPL's other Vice Presidents. (Jones Decl. ¶ 1). Mr. Jones was 53 years old when he made the decisions. (Jones Decl. ¶ 10). Mr. Rehrer was 57 years old when he recommended the discipline that was eventually adopted. (Rehrer Decl. ¶ 32).

After the Phase One investigation was completed, a Phase Two investigation was conducted regarding

the misuse of e-mails. (Rehrer Decl. ¶ 34). This investigation resulted in 19 employees receiving discipline. (Rehrer Decl. ¶ 35). Another 17 employees were investigated, but not found to have violated the applicable PPL policies. (Rehrer Decl. ¶ 35).

**\*5** After his termination, Mr. Gorsky filed a grievance pursuant to the collective bargaining agreement. (GG Tr. 128). An arbitrator made a ruling on this matter and found that his actions were "inappropriate and deserving of a serious penalty." (Arbitrator's Decision at 11). However, the arbitrator went on to note that, given Mr. Gorsky's exemplary work history, he should be reinstated without back pay but with full seniority. (*Id.*).

Mr. Rizzo also filed a complaint regarding his termination with the Department of Labor, alleging that he was terminated for reporting alleged safety violations to PPL. (JR Tr. 18-20). Mr. Rizzo's filing was dismissed by an administrative law judge. (JR Tr. 20, 22).

Mr. Gorsky was replaced on March 31, 2003 by Roy Fisher, who was born June 18, 1952 (Mr. Gorsky was born April 3, 1954 (GG Tr. 5)). (Jones Decl. ¶ 11). Prior to that time, Mr. Gorsky's duties were absorbed by existing members of his work group. (Jones Decl. ¶ 11). Mr. Rizzo's position was not filled; his duties were absorbed by existing members of his work group. (Jones Decl. ¶ 11).

Ms. Gorsky filed a grievance regarding her written warning, but the union did not pursue her grievance. (KG Tr. 139, 140-41). Ms. Gorsky applied for an accounting position within PPL after the investigation had begun, but was denied the position. (KG Tr. 29). She had applied for this same position prior to the discipline, with the same result. (KG Tr. 186). During oral arguments, counsel for Ms. Gorsky argued that Ms. Gorsky had received a suspension following this investigation, (Transcripts from Oral Argument on March 7, 2005, at 24 ll. 10-11), but there is absolutely no evidence to support such a statement of fact. Ms. Gorsky also alleged in the Memorandum of Law accompanying the Reply to the Motion for Summary Judgment that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 5

Not Reported in F.Supp.2d, 2005 WL 913091 (E.D.Pa.)

**(Cite as: 2005 WL 913091 (E.D.Pa.))**

her performance reviews went down after the e-mail investigation from "excellent" to "okay." (Pl.'s Mem., at 7, citing KG Tr. 158 (stating that Ms. Gorsky felt the later performance evaluations "just ... were [not] written with as much zest as before")). In actuality, Ms. Gorsky conceded in her deposition when confronted with her performance evaluations from 2001 and 2002 that she received the highest possible rating and was pleased with her performance evaluations during this time. (KG Tr. 159-162). In her deposition, Ms. Gorsky states that she "must have been mistaken" about receiving only satisfactory performance evaluations, and explains that this error was caused by her "mood or feeling of being left out." (KG Tr. 162).

Further, PPL asserts that Plaintiffs have misled the Court by claiming that the Standards of Conduct and Integrity Policy were distributed years prior to the investigation. The deposition testimony of Mr. and Ms. Gorsky show that Mr. Gorsky received the training two years prior to the investigation (not 6 to 8 as stated in the Plaintiffs' Reply) (GG Tr. 34-35) and Ms. Gorsky received the training in 1999 (not 1989 as stated in the Plaintiffs' Reply) (KG Tr. 70). Further, it was also argued on behalf of Plaintiffs that Mr. Rizzo "never received training" in the EEO policy, but Mr. Rizzo himself testified that he received this training on May 5, 1999 (JR Tr. 169). [FN2]

FN2. Counsel has previously been urged to take care with the manner in which he presents facts of cases to the Court. For example, in *Helfrich v. Lehigh Valley Hosp.,* 2005 WL 670299 (E.D.Pa. Mar.18, 2005), Plaintiffs' counsel in this matter also represented Mr. Helfrich. The Court noted in footnote 2 of that opinion the importance of not "taking liberty with undisputed facts and objectively reasonable inferences that exist within the record." In light of counsel again tending to, on the one hand, exaggerate some facts and, on the other hand, obfuscate other facts, the Court will once again refer counsel to cases that clarify the importance of candor to the Court.

*See, e.g., LaSalle Nat'l Bank v. First Connecticut Holding Group, LLC,* 287 F.3d 279, 293 (3d Cir.2002) ("As an officer of the court, an attorney must comport himself/herself with integrity and honesty when making representations regarding a matter in litigation. 'An attorney's obligation to the court is one that is unique and must be discharged with candor and with great care. The court and all parties before the court rely upon representations made by counsel. We believe without qualification that an attorney's word is his bond." ') (quoting *Baker Indus., Inc. v. Cerberus Ltd.,* 764 F.2d 204, 212 (3d Cir.1985)); *In re Universal Minerals Inc.,* 755 F.2d 309, 312-13 (3d Cir.1985) ("Above and beyond the dictates of courtesy, counsel have 'a continuing duty to inform the Court of any development which may conceivably affect an outcome' of the litigation. This is so, even where the new developments, new facts, or recently announced law may be unfavorable to the interests of the litigant") (quoting *Fusari v. Steinberg,* 419 U.S. 379, 391, 95 S.Ct. 533, 42 L.Ed.2d 521 (1975) (Burger, C.J., concurring); *cf.* PA. RULES OF PROF'L CONDUCT, R. 3.3 (candor toward tribunal); *Pinkham v. Sara Lee Corp.,* 983 F.2d 824, 833 (8th Cir.1992) ("Attorneys, as officers of the court, have the responsibility to present the record with accuracy and candor").

**\*6** All the Plaintiffs filed complaints with the EEOC regarding the alleged age discrimination. The EEOC issued determinations in all of these matters that found that probable cause existed that violations occurred.

The EEOC determination for all of the Plaintiffs is substantially the same. The EEOC noted that the e-mail investigation was quite narrow, including only ten people, eight of whom were in the protected age group and the other two were 38 and 39. (Kim Gorsky's EEOC Determination ("KGED"), at 2; Gregory Gorsky's EEOC

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 913091 (E.D.Pa.)

**(Cite as: 2005 WL 913091 (E.D.Pa.))**

Determination ("GGED"), at 2; John Rizzo's EEOC Determination ("JRED"), at 2). The EEOC further noted that PPL had at least five thousand employees and that PPL did not do a random investigation of all these employees nor did it actually investigate every employee who was found to have inappropriate e-mails. (KGED, at 2; GGED at 2; JRED at 2). The EEOC also disputed PPL's assertion of the number of inappropriate e-mails sent, received, or stored by each of the Plaintiffs' and that the Plaintiffs violated the Sexual Harassment Policy, Equal Employment Opportunity and Harassment Policy, Electronic Information Security Policy, or the Standards of Conduct and Integrity Policy. (KGED, at 2-3; GGED at 2; JRED at 2). From these determinations, the EEOC concluded that PPL's decisions "to concentrate its investigation on and discipline only the individuals within or close to the protected age group" was a violation of the ADEA. (KGED, at 3; GGED at 3; JRED, at 3).

II. *STANDARD OF REVIEW*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c) . Reviewing the record, the Court is obliged to "resolve all reasonable inferences in [the non-moving party's] favor." *Jones v. Sch. Dist. of Phila.,* 198 F.3d 403, 409 (3d Cir.1999). The moving party, here PPL, bear the burden of showing that the record reveals no genuine issue as to any material fact and that they are entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). Once the moving party has met its burden, the non-moving parties, here Mr. and Ms. Gorsky and Mr. Rizzo, must go beyond the pleadings to set forth specific facts showing that there is a genuine issue for trial. *Id.* However, the parties opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts," but must produce *competent evidence* supporting their opposition. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106

S.Ct. 1348, 89 L.Ed.2d 538 (1986).

To defeat a motion for summary judgment, factual disputes must be both material and genuine. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is material if it is predicated upon facts that are relevant and necessary and that may affect the outcome of the matter pursuant to the underlying law. *Id.* An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving parties. *Id.* at 248-49. Summary judgment is mandated against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, because such a failure as to an essential element necessarily renders all other facts immaterial. *Celetox Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Thus, if there is only one reasonable conclusion from the record regarding the potential verdict under the governing law, judgment must be awarded to the moving party. *Anderson,* 477 U.S. at 250.

III. *DISCUSSION*

*7 The burden-shifting analysis established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), is the appropriate analysis for summary judgment motions in cases alleging age discrimination where there is no direct evidence of discrimination. *Torre v. Casio, Inc.* 42 F.3d 825, 829 (3d Cir.1994). In order to establish a *prima facie* case of age discrimination, a plaintiff must demonstrate by a preponderance of the evidence that he or she: (1) is at least 40 years of age; (2) was qualified for the position; (c) suffered an adverse employment action; and (d) there is an inference of age discrimination. *Ryder v. Westinghouse Electric Corp.,* 128 F.3d 128, 136 (3d Cir.1997). These elements are not to be construed too strictly, but depend on the facts of the particular case. *Jones,* 198 F.3d at 411. To show an inference of age discrimination the plaintiff must show that he "lost out because of his age." *O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. 308, 312, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996) (holding that the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 913091 (E.D.Pa.)

(Cite as: 2005 WL 913091 (E.D.Pa.))

Page 7

relevant issue is whether the evidence could support a reasonable factfinder's conclusion that a discriminatory animus served as the basis for the employer's decision); *Pivirotto v. Innovative Systems, Inc.,* 191 F.3d 344, 355 (3d Cir.1999).

If the Plaintiffs have established *prima facie* cases, PPL must "articulate a legitimate nondiscriminatory reason for the adverse employment action at issue." *Id.* at 412 (*citing Keller v. Orix Credit Alliance, Inc.,* 130 F.3d 1101, 1108 (3d Cir.1997)). The Plaintiffs then must point "to some evidence, direct or circumstantial, from which a factfinder would reasonably either (1) disbelieve the employer's articulated legitimate reasons or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir.1994). [FN3]

> FN3. The Court does take note and wishes to commend Plaintiffs' counsel for bringing to the Court's attention the recent United States Supreme Court case *Smith v. City of Jackson, Miss.,* --- U.S. ----, 125 S.Ct. 1536, --- L.Ed.2d ----, 2005 WL 711605 (U.S. March 30, 2005), in which the Supreme Court recognized that "disparate impact" claims are recognized under the ADEA. Disparate impact refers to actions by an employer which are "facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another." *Teamsters v. United States,* 431 U.S. 324, 335-336 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). However, the Court must note that Plaintiffs have not explained in their submission how a disparate impact claim would apply to this case or if Plaintiffs are arguing that PPL's actions disparately impacted employees over 40 years of age. Because Plaintiffs have not made any motion or request of the Court to take certain action, the Court will not address the merits of any potential "disparate impact" claim.

A. *Adverse Employment Action*

PPL argues that Ms. Gorsky does not demonstrate that she suffered from an "adverse employment action." Adverse employment action is defined as one that "alters the employee's compensation, terms, conditions, or privileges of employment, deprives her of employment opportunities, or adversely affects her status as an employee." *Robinson v. Pittsburgh,* 120 F.3d 1286, 1299 (3d Cir.1997). In other words, the alleged adverse employment action must result in a "significant change in employment status, such as hiring, firing, failing to promote, reassignment, or a decision causing a significant change in benefits." *Burlington Indus. v. Ellerth,* 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). Therefore, a written warning does not constitute an adverse employment action absent a material change in the employee's terms and conditions of employment. *Weston v. Pennsylvania,* 251 F.3d 420, 431 (3d Cir.2001).

PPL notes that in *Hay v. GMAC Mortgage Corp.,* 2003 U.S. Dist. LEXIS 16550 (E.D.Pa. Sept. 11, 2003), Judge Gardner concluded that a written warning that was a permanent part of the plaintiff's personnel file was not evidence of an adverse employment action, because the plaintiff failed "to identify any material change in his employment after defendant reprimanded him." *Id.* at * 18-19. Judge Gardner cited to the *Weston* opinion which had concluded that a written reprimand that remained in the plaintiff's file for six months did not result in a material change in the terms or conditions of employment. *Id.* (citing *Weston,* 251 F.3d at 430-31). Similarly, in a non-precedential opinion, the Court of Appeals for the Third Circuit found that verbal and written warnings did not amount to an adverse employment action, where there was no evidence that the plaintiff suffered a material change in her employment. *Urey v. Grove City College,* 94 Fed. Appx. 79, 81 n. 2 (3d Cir.2004).

*8 PPL further notes that there is no evidence that Ms. Gorsky suffered any change to her employment after receiving the written reprimand. In fact, Ms. Gorsky has conceded that she received positive

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 8

Not Reported in F.Supp.2d, 2005 WL 913091 (E.D.Pa.)

**(Cite as: 2005 WL 913091 (E.D.Pa.))**

evaluations in the years following the reprimand. Ms. Gorsky's argument that the reprimand kept her from being offered the accounting position, according to PPL, is specious, since Ms. Gorsky was not qualified (she has no accounting degree), she has provided no evidence that the decision makers charged with responsibility for filling that position were even aware of her reprimand, and she was first rejected for that position prior to the issuance of her written reprimand.

Ms. Gorsky argues that the written reprimand is a "permanent blemish" on her record that prevented her from getting the accounting position. Although Ms. Gorsky concedes that no evidence directly links the written reprimand to the decision not to hire her for the accounting position, Ms. Gorsky speculates that the existence of the reprimand was a factor in her not being offered that position.

Ms. Gorsky also argues that two other employees, John Knorr (age 39) and Jeffrey Palmer (age 38), also received written reprimands, but these writings were removed from their files after one year. Ms. Gorsky argues that this disparate treatment raises an inference that she suffered an adverse employment action and the action was motivated by discrimination. *See Pittman v. Continental Airlines, Inc.,* 35 F.Supp.2d 434, 443 (E.D.Pa.1999) (finding "a female sexual discrimination plaintiff must show that male employees did not suffer similar adverse employment actions, despite displaying the same problem which provoked and supported the adverse action suffered by the plaintiff" to demonstrate a prima facie case).

The Court finds that Ms. Gorsky has not produced any credible evidence that she suffered an adverse employment action. A written reprimand is, in and of itself, clearly not enough to rise to the level of an "adverse employment action." While Ms. Gorsky makes some speculations that would imply an adverse employment action, these speculations have no factual basis in the record and cannot be viewed as reasonable inferences from the record. Therefore, summary judgment is granted in favor of PPL as to Ms. Gorsky's claims for failure to establish a *prima facie* case.

*B. Inference of Age Discrimination*

PPL argues that the Plaintiffs cannot establish that their discipline occurred under circumstances giving rise to an inference of discrimination. PPL notes that 25 employees who were the same age or older that Mr. Rizzo and Mr. Gorsky either received lesser discipline than they did or no discipline at all after investigation. Additionally, there is no evidence that age was ever discussed in any of the decisions to discipline. In fact, the decision makers claim that they did not know the Plaintiffs personally or know their ages when making the decisions. (Rehrer Decl. ¶ 32; Jones Decl. ¶ 4). Finally, neither Mr. Rizzo nor Mr. Gorsky were replaced with younger employees.

**\*9** Plaintiffs argue that terminating older employees with seniority gives rise to an inference of discrimination. Plaintiffs note that "a court should look at the Plaintiff's entire work history, and not just the limited circumstances involving her termination." *Chisholm v. National Corporation For Housing Partnerships,* 2001 WL 115406, at \*2 (E.D.Pa. Jan.31, 2001). As such, an employer's refusal to consider past good behavior in disciplining or other employment actions may be considered as evidence of discrimination. *See Gunby v. Pennsylvania Electric Company,* 840 F.2d 1108, 1117 (3d Cir.1988) (holding an individuals' past excellent performance and regular promotions is evidence that refusal to further promote a black man was evidence of discrimination). Plaintiffs also reiterate the point discussed in the adverse employment action that disparate treatment of similarly situated individuals gives an inference of discrimination.

PPL notes that an employee's prior job performance has no relevance when the employee was terminated for behavior tangential to his work. *Pierce v. New Process Co.,* 580 F.Supp. 1543, 1546 (W.D.Pa.1984), *aff'd without opinion,* 749 F.2d 27 (3d Cir.1984). As such, PPL argues that Plaintiffs reliance on the *Gunby* case is entirely misplaced. Finally, past work history was not a factor in any of the individuals disciplined, and companies have the right to make their own determination as to what

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 9

Not Reported in F.Supp.2d, 2005 WL 913091 (E.D.Pa.)

**(Cite as: 2005 WL 913091 (E.D.Pa.))**

factors are relevant to discipline. *See Kelly v. Drexel University,* 94 F.3d 102, 109 (3d Cir.1996) (holding the "second-guessing" of companies management decisions is unfair without evidence of discriminatory motivations); *Thakur v. R.W. Johnson Pharmaceutical Research Institute,* 268 F.Supp.2d 521, 531 (E.D.Pa.2003) (holding that a court "may not question an employer's basis for terminating an employee unless that basis is rooted in illegal discrimination or otherwise contravenes the law"). Since the Plaintiffs cannot identify for this Court any actually similarly situated employees [FN4] who were younger and treated more leniently, there is no evidence that shows a discriminatory intent.

> FN4. PPL notes that Mr. Gorsky and Mr. Rizzo were determined to be the most egregious violators of the e-mail policy, so no other employee is similarly situated.

The investigation that led to the termination of Mr. Gorsky and Mr. Rizzo was limited to a small group of individuals (around 50 employees out of 4,600) of whom a significant majority were over 40 years old (nearly 80% of the people investigated). PPL has raised several points explaining why this investigation affected predominantly employees in the protected age group, including the demonstrable fact that the average age of PPL employees is 46 years old, (Transcript from Oral Argument on March 7, 2005, at p. 5, l. 4) and the investigation centered around e-mails sent and received by Mr. Gorsky who, naturally, has friends who are of a similar age as Mr. Gorsky. Despite these legitimate explanations, the Court's role is to determine if the plaintiff has raised a genuine issue of material fact that he "lost out because of his age." *O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. 308, 312, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996). Therefore, the question is whether a reasonable factfinder could find that discriminatory animus was the motivation for Mr. Gorsky's and Mr. Rizzo's termination.

*10 The record evidence does raise a genuine issue that Mr. Gorsky and Mr. Rizzo were terminated because of their age. The investigation of 47

employees at PPL included 37 employees in the protected age group. Of the ten employees outside the protected age group, five were not disciplined, including the only employees investigated below the age of thirty. Further, the most severe discipline, termination, was only administered to three individuals, all in the protected age group. These numbers could certainly be inferred by a reasonable factfinder to show that the investigation and the discipline that followed was motivated by discriminatory animus. Therefore, the Court finds that there is sufficient evidence to infer age discrimination and Mr. Gorsky and Mr. Rizzo have established a *prima facie* case of age discrimination. Thus, under the burden shifting analysis of *McDonnell Douglas,* the inquiry must proceed to the analysis of wether PPL has articulated legitimate, non-discriminatory reasons for the termination of Mr. Gorsky and Mr. Rizzo and, if such reasons exist, whether Mr. Gorsky and Mr. Rizzo can produce sufficient evidence to show these reasons are pretextual.

*C. Legitimate, Non-Discriminatory Reasons*

According to PPL, it has provided legitimate, non-discriminatory reasons for the termination of Mr. Gorsky and Mr. Rizzo. The reasons provided by PPL are that the Plaintiffs misused the Company's e-mail system in violation of known procedures, and this misuse was a drain on the computer system, was evidence of lack of productivity by the employees, and the e-mails contained highly inappropriate material for the workplace that could have exposed PPL to sexual harassment litigation. Mr. Gorsky and Mr. Rizzo do not dispute that the reasons given are legitimate and non-discriminatory, but argue that the reasons are pretextual. Therefore, the burden shifts to Mr. Gorsky and Mr. Rizzo to produce sufficient evidence to raise a genuine issue of material fact that the reasons expressed are pretextual.

In order to show the reasons given were pretextual, a plaintiff must produce evidence from which a factfinder could reasonably either: (1) disbelieve the articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 10

Not Reported in F.Supp.2d, 2005 WL 913091 (E.D.Pa.)

**(Cite as: 2005 WL 913091 (E.D.Pa.))**

than not a motivating or determinative cause of the employer's actions. *Reeves v. Sanderson Plumbing Products,* 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Stanziale v. Jargowsky,* 200 F.3d 101, 105 (3d Cir.2000). A plaintiff cannot discredit an employer's reasons merely by showing that the "employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir.1994). Instead, a plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions ... that a reasonable factfinder could rationally find them 'unworthy of credence.' " *Id.*

*\*11* In this case, Mr. Gorsky and Mr. Rizzo have failed to produce any evidence that could cause a reasonable factfinder to either disbelieve PPL's articulated reasons for the terminations or believe that a discriminatory reason was more likely than not a motivating or determinative cause of PPL's termination of Mr. Gorsky and Mr. Rizzo. Both Mr. Gorsky and Mr. Rizzo have conceded that they received, sent, and/or stored e-mails that were inappropriate for the workplace, that this use of the e-mail system was prohibited under PPL policy, and that they were informed that PPL had the right to discipline employees for misuse of the e-mail. Further, both Mr. Gorsky and Mr. Rizzo conceded that many of the e-mails were of a sexual or otherwise potentially offensive nature and that it was possible for other employees would have been offended if they saw the e-mails.

Further, neither Mr. Gorsky nor Mr. Rizzo have produced evidence that age was a factor in any manner in PPL's decisions to terminate their employment. First, they cannot cite to any specific instance where they were told by any member of management that their age was a factor in the decisions. Second, the decisionmakers in this matter have asserted that they did not even know the ages of any of the people investigated when making their decisions. Third, the only basis for alleged age discrimination is the Plaintiffs' own unsubstantiated, subjective beliefs that "no other explanation" is

plausible. Fourth, the relevant decisionmakers were themselves in the protected age group. Finally, the evidence shows that 25 employees who were the same age or older than Mr. Gorsky and Mr. Rizzo received lesser or no discipline.

Mr. Gorsky and Mr. Rizzo seem to rely solely on the argument that the methodology of the investigation was too arbitrary and narrow and, therefore, the underlying reason for the terminations must have been discriminatory animus. Specifically, Mr. Gorsky and Mr. Rizzo argue that PPL's failure to use progressive discipline is evidence of pretext. [FN5] These arguments seem to be nothing more than an attempt to second guess the PPL's decision. At no point has Mr. Gorsky or Mr. Rizzo actually referred to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in PPL's reasons that would give a reasonable factfinder a basis to find PPL's articulated reasons were "unworthy of credence." *Fuentes,* 32 F.3d at 764.

> FN5. The cases cited to by Plaintiffs actually state that a failure to follow the procedures of the company, which may include "progressive discipline," is evidence of discrimination. *Craig v. Y & Y Snacks, Inc.,* 721 F.2d 77, 80 (3d Cir.1983) ; *Sylvester v. Callon Energy Services, Inc.,* 781 F.2d 520, 525-26 (5th Cir.1986). However, in this case, there is no evidence presented that PPL had a procedure for progressive discipline at the time of the termination, or that PPL violated any of its procedures in the investigation at issue.

Because Mr. Gorsky and Mr. Rizzo have failed to produce evidence that would cause a reasonable factfinder to disbelieve the reasons stated by PPL or believe that a underlying motive was discrimination, the Court finds that summary judgment is appropriate as to the claims of Mr. Gorsky and Mr. Rizzo.

*D. EEOC Determination*

The Court also wishes to address the issue of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 11

Not Reported in F.Supp.2d, 2005 WL 913091 (E.D.Pa.)

**(Cite as: 2005 WL 913091 (E.D.Pa.))**

EEOC Determinations in the matters of Ms. Gorsky, Mr. Gorsky, and Mr. Rizzo. In all of these cases, the EEOC determined that probable cause existed for an age discrimination claim. If these determinations were found by the Court to be competent evidence, they would raise a genuine issue of material fact and summary judgment would be inappropriate. On the other hand, if the Court finds the EEOC determinations to not be competent evidence for any reason, they would not be part of the summary judgment analysis. The admissibility of EEOC determinations is up to the sound discretion of the trial court, *Starceski v. Westinghouse Elec. Corp.,* 54 F.3d 1089, 1100 (3d Cir.1995), and the Court here finds in the context of these cases that the EEOC determinations are not competent evidence.

**\*12** As Plaintiffs conceded during oral argument, if the Court finds the EEOC determination is not supported by the record, it is not competent evidence. *See Coleman v. Home Depot, Inc.,* 306 F.3d 1333, 1341-42 (holding that an agency determination that is not "trustworthy" is inadmissible). In this case, the EEOC determinations are filled with findings inconsistent with the actual record. The EEOC significantly understated the quantity of inappropriate e-mails involved by ignoring the e-mails received and stored by the Plaintiffs. The EEOC also misstated the policies of PPL, which clearly prohibited all non-work use of the e-mail system, by claiming PPL's policy only prohibited e-mails that violated "state or federal law." Finally, the EEOC focused heavily on the so-called narrow nature of the investigation, but this fact alone cannot be the basis of a finding of discriminatory motive.

The Court finds that the EEOC Determinations in these matters to be too untrustworthy to be considered as competent evidence. Besides the concerns expressed above about the accuracy of the findings of the EEOC, the Court also takes note of the undisputed contentions of PPL's counsel, Andrew K. Williams, that the EEOC investigator admittedly refused to do a thorough investigation, but simply required that PPL take part in a settlement conference at the risk she would produce

a determination favorable to the Plaintiffs if no settlement conference was conducted. Because the Court finds the EEOC Determinations to be untrustworthy on their face, the Court will not further address this alleged behavior of the EEOC investigator.

IV. *CONCLUSION*

For the foregoing reasons, the Court grants the Defendant's Motion for Summary Judgment. An appropriate Order to be entered in each of the captioned cases consistent with this Memorandum follows.

*ORDER*

AND NOW, this 19th day of April, 2005, upon consideration of Defendant PPL Service Corporation's ("PPL") Motion for Summary Judgment (Docket No. 15) and the accompanying Exhibits and Declarations, the Plaintiffs' Memorandum in Opposition to the Motion (Docket No. 23) and the accompanying material, PPL's Reply Memorandum of Law (Docket No. 26), the Plaintiffs' Supplemental Memorandum of Law to cite New Authority (Docket No. 31), the letter sent by PPL's counsel on April 11, 2005, and the representations of counsel at oral argument on March 7, 2005, it is hereby ORDERED that the Motion for Summary Judgment (Docket No. 15) is GRANTED.

It is further ORDERED that the Clerk of the Court is directed that this matter is CLOSED for statistical purposes.

Not Reported in F.Supp.2d, 2005 WL 913091 (E.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

• 2:03cv05781 (Docket) (Oct. 17, 2003)

• 2:03cv05779 (Docket) (Oct. 17, 2003)

• 2:03cv05780 (Docket) (Oct. 17, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

SA-7

Westlaw.

Slip Copy                                                                    Page 1

Slip Copy, 2006 WL 2660704 (M.D.Pa.)

**(Cite as: 2006 WL 2660704 (M.D.Pa.))**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
M.D. Pennsylvania.
Robert SCHOFIELD, Plaintiff
v.
METROPOLITAN LIFE INSURANCE
COMPANY, Robert Pidich, Defendants.
**No. 3:CV-03-0357.**

Sept. 15, 2006.
Peter G. Loftus, Loftus Law Firm, P.C., Waverly,
PA, for Plaintiff.

Mark A. Saloman, Proskauer Rose LLP, Newark,
NJ, Thomas B. Helbig, Scanlon, Howley &
Doherty, Scranton, PA, for Defendants.

*MEMORANDUM*

THOMAS I. VANASKIE, District Judge.

**\*1** Plaintiff Robert Schofield initiated this action
against his former employer, Metropolitan Life
Insurance Company ("MetLife"), and three of
MetLife's employees--Robert Pidich, Rose C.
Johnston, and Kellee Tinsley-- complaining of
improper handling of his leave of absence during
the winter of 2001 and his ensuing separation from
employment in May of 2002. This Court previously
dismissed Plaintiff's claims against Ms. Johnston
and Ms. Tinsley, as well as claims of intentional
infliction of emotional distress, wrongful discharge,
and violation of the Employee Retirement Income
Security Act ("ERISA"), *29 U.S.C. § 1001, et seq.*
*Schofield v. Metropolitan Life Ins. Co.,* No.
3:CV-03-0357 (Dkt. Entry 45) (M.D.Pa. Dec. 16,
2003).

Remaining Defendants MetLife and Mr. Pidich
have moved for summary judgment on Mr.
Schofield's claims under the Age Discrimination in
Employment Act ("ADEA"), *29 U.S.C. § 621, et
seq.* (Count I); the Americans with Disabilities Act
("ADA"), *42 U.S.C. § 12101, et seq.* (Count II); the
Pennsylvania Human Relations Act ("PHRA"), *43
Pa.C.S.A. § 951,* et *seq.* (Count III); and the Family
Medical Leave Act ("FMLA"), *29 U.S.C. § 2601, et
seq.* (Count IV). [FN1] Because Mr. Schofield does
not present sufficient evidence from which a
fact-finder could conclude that his position changed
following his return from FMLA leave or that his
leave was a factor behind MetLife's actions that led
to his voluntary resignation, his FMLA claim must
fail. Likewise, Mr. Schofield has failed to present
sufficient evidence that his voluntary resignation
constituted an adverse employment action by
MetLife or that MetLife acted with discriminatory
animus in order to prevail on his discrimination
claims. Consequently, MetLife's motion for
summary judgment will be granted.

> FN1. For purposes of convenience, the
> remaining Defendants, MetLife and Mr.
> Pidich, will be collectively referred to as
> MetLife in this opinion, as they moved
> together for summary judgment.

*I. BACKGROUND*

MetLife operates an information technology center
in Clarks Summit, Pennsylvania. (Defs.' Statement
of Material Facts ("S.M.F.") (Dkt. Entry 71-2) ¶
1.) The facility employs about forty project
managers to manage various software projects. (*Id.*
¶ 2.)

In 1997, Mr. Schofield became a project manager
at the facility. (*Id.*) In this position, he was
responsible for hiring, managing, evaluating, and
terminating a team of programmers, system
consultants, and other information technology

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Page 2

Slip Copy, 2006 WL 2660704 (M.D.Pa.)

**(Cite as: 2006 WL 2660704 (M.D.Pa.))**

professionals. (*Id.* ¶ 3.) Kellee Tinsley was a highly regarded member of his team. (*Id.* ¶¶ 5-6.) Mr. Schofield reported directly to MetLife Director Robert Pidich. (*Id.* ¶ 4.)

Mr. Schofield began experiencing severe anxiety and depression in 2001. (Pl.'s Counter Statement of Material Facts ("C.S.M.F.") (Dkt. Entry 71-2) ¶ 17.) Due to his illness, he missed work for most of the month of December 2001. (Mr. Schofield's Dep., Pl.'s Br. Opp. Ex. A (Dkt. Entry 72-2) at 149-150.) Mr. Schofield was eventually placed on disability leave effective January 2, 2002. (Defs.' S.M.F. ¶ 17.) On January 18, 2002, Mr. Schofield attempted suicide. (Pl.'s C.S.M.F. ¶ 20.)

**\*2** On April 1, 2002, Mr. Schofield returned to his project manager position. (Defs.' S.M.F. ¶¶ 25-26.) Ms. Tinsley and Mr. Pidich agreed to cover for Mr. Schofield if he needed to leave work temporarily due to his illness. (*Id.* ¶ 28.) During April and May, Mr. Schofield occasionally missed work due to his illness. (*Id.* ¶¶ 31-37.) Mr. Pidich continued to consider Mr. Schofield one of the best managers at the facility. (*Id.* ¶ 38 .)

Mr. Schofield and Ms. Tinsley had a friendly relationship. (*Id.* ¶ 39.) Mr. Schofield, however, felt that Ms. Tinsley became temperamental after she was promoted to a project manager position in 2001. (*Id.* ¶ 40.) According to Mr. Schofield, she subsequently became upset over trivial matters and often snapped at him, only to later apologize. (*Id.* ¶ 43; Pl.'s C.S.M.F. ¶¶ 40, 43.)

During a conversation between Mr. Schofield and Ms. Tinsley on April 15, 2002, Mr. Schofield noted that he had seen her smoking cigarettes at a colleague's wedding. (Defs.' S.M.F. ¶ 41.) Ms. Tinsley became upset and told Mr. Schofield to "mind his own business." (*Id.* ¶ 42.)

On April 26, 2002, Ms. Tinsley sent an email to Mr. Schofield stating that she "did not mean to snap" at him and may have been "a little harsh" with him. (Ms. Tinsley's April 26, 2002 email, Saloman Cert. Ex. 13 (Dkt. Entry 57-5).) Mr. Schofield wrote a lengthy response to Ms. Tinsley's email in

which he attempted to explain how her reaction made him feel and why he mentioned her smoking. (Mr. Schofield's April 26, 2002 email, Defs.' Br. Ex. 13 (Dkt. Entry 57-5).) In the email, he stated that he had "a very strong attachment and affection" for Ms. Tinsley and that she came "second only to [his] wife." (*Id.*)

During a conversation on April 29, 2002, Ms. Tinsley informed Mr. Schofield that she did not want to be treated differently based on his personal affection for her. (Defs.' S.M.F. ¶ 49.) Mr. Schofield continued to send Ms. Tinsley emails unrelated to work. (*Id.* ¶¶ 51, 54.)

On May 2, 2002, Mr. Schofield sent Ms. Tinsley another email titled, "All or nothing." (Mr. Schofield's April 26, 2002 email, Defs.' Br. Ex. 17 (Dkt. Entry 57-6).) It began with the following prefatory statements in bold print:

Don't read this if you are involved in something important. Wait till you have some free time to deal with it.

(*Id.*) Mr. Schofield expressed confusion as to why she had declined his offers to come with her husband to his house for a social visit. (*Id.*) He also expressed gratitude for her "help, patience and consideration" with his illness, but cautioned that his recovery was not complete and cryptically stated that "Option 'B' is still a serious consideration." [FN2] (*Id.*) Mr. Schofield further wrote:

> FN2. According to Mr. Schofield and his wife, "Option 'B' " meant he would take time off from MetLife or retire. (Defs.' S.M.F. ¶¶ 57-58.) Ms. Tinsley and Mr. Pidich, however, believed "Option 'B' " meant Mr. Schofield might attempt suicide again. (*Id.* ¶ 59.)

I have been very open about how I have come to regard you. I would like to know how you see me. Sorry to put this on you but I'm sure you can understand I can't stand not knowing the whole picture and being able to make sense out of it. That usually gets me in trouble but that's the way it is.
**\*3** (*Id.*)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 3

Slip Copy, 2006 WL 2660704 (M.D.Pa.)

**(Cite as: 2006 WL 2660704 (M.D.Pa.))**

After reading Mr. Schofield's email, Ms. Tinsley became upset and left work. (Defs.' S.M.F. ¶ 62.) She feared that Mr. Schofield was a threat to her safety. (*Id.*) She contacted MetLife's Human Resources Generalist, Rose Johnston, and complained about Mr. Schofield's actions. (*Id.* ¶¶ 64-66.) Mr. Pidich also reported Ms. Tinsley's concerns to Human Resources and Mark Davis, a MetLife Vice President, (*Id.* ¶ 67.) Ms. Johnston accepted Ms. Tinsley's complaint of harassment and hostile work environment, and undertook to investigate the complaint. (*Id.* ¶ 68.)

Mr. Schofield inquired of Mr. Pidich about Ms. Tinsley's absence from work on Friday, May 3rd. (*Id.* ¶ 70.) When Mr. Schofield pressed Mr. Pidich as to whether Ms. Tinsley was ill, Mr. Pidich told him to "just let it go...." (*Id.* ¶ 71.) Mr. Schofield, rather than accepting this advice, sent Ms. Tinsley an email to her home. (Defs.' Br. Ex. 19 (Dkt. Entry 57-6).) He sent her another email on May 6, 2002, entitled "Please read this!" (Defs.' Br. Ex. 20 (Dkt. Entry 57-6).) In this email, Mr. Schofield said:

> If you want *I'll resign so you don't have to work*
> *with me anymore.* No matter what, you don't
> deserve to be upset because of me. Talk to me,
> please!

(*Id.* (emphasis added).)

On May 7, 2002, Ms. Johnston met with Mr. Schofield and Mark Davis to discuss the complaint. (Defs.' S.M.F. ¶ 77.) Mr. Schofield admits that Ms. Johnston made clear that the discussion had nothing to do with the possible termination of his employment. (*Id.*) Mr. Schofield, however, interrupted the meeting shortly after it was commenced, saying "Let me save you some time. I cannot deal with this right now. I'm out of here." (Mr. Schofield's Dep., Pl.'s Br. Opp. Ex. A (Dkt. Entry 72-3) at 200.) He put his security pass down on the table in the conference room and went home. (*Id.* at 200-01.) Mr. Davis believed that Mr. Schofield had just quit. (Davis Aff., Dkt. Entry 76-1, at ¶ 9.)

Ms. Johnston also interpreted Mr. Schofield's actions as indicating that that he had resigned. (Ms. Johnston's Dep., Defs.' Br. Ex. 12 (Dkt. Entry 57-5)

at 33.) She began processing Mr. Schofield's resignation that same day. (*Id.* at 36; Letter dated May 7, 2002, Defs.' Br. Ex. 21 (Dkt. Entry 57-6).)

Mr. Schofield contacted Ms. Johnston the next day and wished to discuss the situation further. (Mr. Schofield's Dep., Pl.'s Br. Opp. Ex. A (Dkt. Entry 72- 3) at 215.) On May 9, 2002, Mr. Schofield met with Ms. Johnston and Mr. Pidich. (Defs.' S.M.F. ¶ 88.) The three of them explored options for reinstating Mr. Schofield. (*Id.* ¶ 93.) Ms. Johnston and Mr. Pidich informed Mr. Schofield that he could be reinstated only if he limited his interaction with Ms. Tinsley, which would likely have required Mr. Schofield to be transferred to another team. (*Id.* ) Mr. Schofield left the meeting without reaching an agreement for reinstatement. [FN3] (Mr. Schofield's Dep., Pl.'s Br. Opp. Ex. A (Dkt. Entry 72-3) at 223-26.)

> FN3. Mr. Schofield says he left the
> meeting after Ms. Johnston asked him to
> sign a paper saying the emails he sent were
> inappropriate. (Mr. Schofield's Dep., Pl.'s
> Br. Opp. Ex. A (Dkt. Entry 72-3) at
> 223-26.) Ms. Johnston denies she made
> this request. (Ms. Johnston's Dep., Defs.'
> Br. Ex. 12 (Dkt. Entry 57-5) at 59-60.)

*4 Later that day, Mr. Schofield, Ms. Johnston, and Mr. Pidich had a telephone conference during which Mr. Schofield requested unconditional reinstatement until Ms. Tinsley decided whether to return to MetLife, and if she did return, that Ms. Tinsley be placed on "special assignment" while Mr. Schofield and MetLife explored a retirement package. (Defs.' S.M.F. ¶ 99.) This was the last meeting between MetLife and Mr. Schofield concerning the possibility of his reinstatement.

On February 26, 2003, Mr. Schofield filed a complaint in this Court, asserting employment discrimination (Counts I, II, and II), violation of the FMLA (Count IV), violation of ERISA (Count V), intentional infliction of emotional distress (also labeled as Count V), and wrongful discharge (Count VI). (Compl. (Dkt. Entry 1).) This Court previously dismissed Mr. Schofield's ERISA, intentional

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                 Page 4

Slip Copy, 2006 WL 2660704 (M.D.Pa.)

**(Cite as: 2006 WL 2660704 (M.D.Pa.))**

infliction of emotional distress, and wrongful discharge claims. *Schofield v. Metropolitan Life Ins. Co.,* No. 3:CV-03-0357 (Dkt. Entry 45) (M.D.Pa. Dec. 16, 2003). Defendants have moved for summary judgment on all remaining claims. (Dkt. Entry 53.) The Motion has been fully briefed and is now ripe for decision.

## II. DISCUSSION

MetLife argues it is entitled to summary judgment on Mr. Schofield's FMLA claim because he has failed to show a violation of the Act as he was returned to his project manager position following his leave of absence. MetLife also claims that Mr. Schofield did not suffer an adverse employment decision because he voluntarily resigned and that, in any event, he has failed to demonstrate that age or disability discrimination played a role in his separation from employment.

### A. Summary Judgment Standard

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed.R.Civ.P. 56(C).* A fact is "material" if proof of its existence or nonexistence might affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).* An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to nonmoving party. *Cont'l Ins. Co. v. Bodie, 682 F.2d 436, 438 (3d Cir.1982).* The moving party has the burden of showing the absence of a genuine issue of material fact, but the nonmoving party must present affirmative evidence from which a jury might return a verdict in the nonmoving party's favor. *Anderson, 477 U.S. at 256-57.* Merely conclusory allegations taken from

the pleadings are insufficient to withstand a motion for summary judgment. *Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir.1990).* Summary judgment is to be entered "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).*

### B. The FMLA Claim

**\*5** The FMLA grants eligible employees 12 weeks of leave in a 1-year period for certain events, including a disabling health problem. *29 U.S.C. § 2612(a)(1).* Upon return from such leave, "the employer must reinstate the employee to his or her former position or an equivalent." *Ragsdale v. Wolverine World Wide, Inc., 535 U .S. 81, 86 (2002)* (citing *29 U.S.C. § 2614(a)(1)).*

Mr. Schofield claims that MetLife violated the FMLA by not returning him to his previous position or an equivalent position when he returned from his medical leave on April 1, 2002. (Compl. (Dkt. Entry 1) ¶ 89.) MetLife has moved for summary judgment on this claim, asserting that Mr. Schofield was returned to his previous position of project manager. (Defs.' Br. (Dkt. Entry 54) at 3- 4.) The evidence does indeed establish that Mr. Schofield was returned to his previous position upon his return from his FMLA leave. (Mr. Schofield's Dep., Pl.'s Br. Opp. Ex. A (Dkt. Entry 72-3) at 266-67.) [FN4]

> FN4. MetLife submitted the following deposition testimony by Mr. Schofield:
> Q: Now, when you returned from the conclusion of your FMLA leave, you were returned to the same project manager position that you held prior to you leaving in December or January, right?
> A: Yes.
> Q: And the duties and responsibilities were the same as when you left as when you returned?
> A: Yes.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 2660704 (M.D.Pa.)

**(Cite as: 2006 WL 2660704 (M.D.Pa.))**

*(Id.)*

Mr. Schofield nonetheless maintains that MetLife violated the FMLA. He bases his argument on a conversation he had with Mr. Pidich in March 2002, in which Mr. Pidich told him that he "probably won't be coming back [to his] project manager position .... because of [his] illness." (Mr. Schofield's Dep., Pl.'s Br. Opp. Ex. A (Dkt. Entry 72-3) at 271.) Instead, Mr. Schofield would be retained as a consultant and another person would take over his project manager position. [FN5]

> FN5. It is likely that Mr. Pidich was offering Mr. Schofield the consultant position as a less stressful alternative to the project manager position to accommodate Mr. Schofield's severe anxiety.

Regardless of what was said, Mr. Schofield was returned to his project manager position following his medical leave of absence. A request, offer, or threat to change positions is not an adverse employment action to warrant recovery under the FMLA. *See Ajayi v. Aramark Business Services, Inc., 336 F.3d 520, 531 (7th Cir.2003)* ("An unfulfilled threat, which results in no material harm, is not [a] materially adverse [employment action]"). This argument, consequently, has no merit.

Mr. Schofield alternatively argues that "there was a definite plan, scheme and design to release him or assign him to another job and replace him" after he was returned to his project manager position. (Pl.'s Br. Opp. (Dkt. Entry 71-1) at 9.) Specifically, Mr. Schofield alleges that MetLife's handling of Ms. Tinsley's harassment complaint was connected to his medical leave. Consequently, Mr. Schofield appears to be pursuing a retaliation claim under the FMLA.

An employer may not use the taking of FMLA leave as a negative factor in employment decisions. *Conoshenti v. Public Service Elec. & Gas Co., 364 F.3d 135, 146 (3d Cir.2004).* In order to succeed on a retaliation claim under the FMLA, a plaintiff must show that (1) he took leave under the Act, (2) he suffered an adverse employment decision, and (3)

the adverse decision was causally related to his leave. *Id.* MetLife argues that Mr. Schofield has failed to present sufficient evidence from which a fact-finder could determine that MetLife's handling of Ms. Tinsley's complaint was causally connected to his leave. [FN6] (Defs.' Reply Br. (Dkt. Entry 76-1) at 3-4.)

> FN6. MetLife also challenges whether Mr. Schofield suffered an adverse employment action, arguing that he voluntarily resigned. Indeed, an employee cannot claim that he suffered an adverse employment decision under the FMLA when he voluntarily resigns. *See Hammon v. DHL Airways, Inc., 165 F.3d 441, 447 (6th Cir.1999).* Because this Court finds it clear that Mr. Schofield's asserted adverse employment action was not connected to his leave, this Court will deny his claim under the FMLA without determining whether he suffered a sufficiently adverse retaliatory act. It should be noted that actionable retaliatory conduct is *not* synonymous with an adverse employment action for purposes of a discrimination claim. *See Moore v. City of Philadelphia, --- F.3d ----, 2006 WL 2492256, at \*7-8 (3d Cir.2006).*

\*6 Mr. Schofield asserts that a causal connection was established based on the short duration of time (a little more than one month) between his return from leave and MetLife's handling of Ms. Tinsley's harassment claim, which led to his departure from MetLife. Courts are hesitant to infer a causal connection between an alleged retaliatory action and the taking of FMLA leave based on temporal proximity alone. See *Weston v. Pennsylvania, 251 F.3d 420, 431 (3d Cir.2001)* ("With one exception, we have never held that timing alone can be sufficient to establish causation.") Consequently, most Courts require that the timing of the alleged retaliatory action to be "unusually suggestive of retaliatory motive before a causal link will be inferred." *Williams v. Philadelphia Housing Authority Police Dept., 380 F.3d 751, 760 (3d Cir.2004)* (citing *Shellenberger v. Summit Bancorp,*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                Page 6

Slip Copy, 2006 WL 2660704 (M.D.Pa.)

**(Cite as: 2006 WL 2660704 (M.D.Pa.))**

*Inc., 318 F.3d 183, 189 n. 9 (3d Cir.2003); see also Washco v. Federal Express Corp., 402 F.Supp.2d 547, 559 (E.D.Pa.2005).*

This typically requires that the alleged retaliatory action occurred within days of the protected activity. For instance, in *Jalil v. Avdel Corp.,* two days between the protected activity and the alleged retaliation was found to be sufficient to support an inference of a causal connection. *873 F.2d 701, 708 (3d Cir.1989); but see Weston, 251 F.3d at 431 n. 5* (distinguishing Jalil as being "limited to the unusually suggestive facts of the case"). In contrast, a ten day separation between the protected activity and the alleged retaliation was not sufficient to support an inference of a causal connection in *Newman v. Dollar Bank, No. Civ.A. 04-1163, 2006 WL 895089, at *6 (W.D.Pa. March 31, 2006).*

In this case, over a month elapsed between the time Mr. Schofield returned from his medical leave and the alleged retaliatory action. In *Williams,* the Court advised that "where 'the temporal proximity is not so close as to be unduly suggestive,' ... 'timing plus other evidence may be an appropriate test.' " *380 F .3d at 760* (quoting *Thomas v. Town of Hammonton, 351 F.3d 108, 114 (3d Cir.2003)).* *Williams* involved a two month separation between the alleged retaliatory action and the protected conduct. *Id.* The *Williams* Court ultimately determined that the plaintiff did not establish a causal connection because he did not put forth any other evidence suggesting a retaliatory animus, and the defendant's alternative explanation for plaintiff's termination was "quite compelling." *Id..*

Similarly, Mr. Schofield has failed to put forth any other evidence suggesting a connection between MetLife's handling of Ms. Tinsley's harassment claim and his medical leave. In fact, MetLife was accommodating to Mr. Schofield's request for medical leave, as Mr. Pidich and Ms. Tinsley offered to cover for him if he felt he needed additional time off after he returned from his FMLA leave. (Defs.' S.M.F. ¶ 28.)

*7 Moreover, Mr. Schofield has presented no evidence to challenge MetLife's articulated

non-retaliatory reason for investigating Ms. Tinsley's harassment complaint. There is no dispute that Mr. Schofield engaged in a series of communications that resulted in Ms. Tinsley asserting a harassment complaint. [FN7] MetLife had an obligation to investigate Ms. Tinsley's complaint against Mr. Schofield. MetLife also had a legitimate basis for requesting that Mr. Schofield limit his interaction with Ms. Tinsley during the investigation. [FN8] Other than his own conclusory allegations, Mr. Schofield has presented no evidence from which a fact-finder could conclude that MetLife's articulated reasons for its actions were tied to his FMLA leave. MetLife's motion for summary judgment, therefore, will be granted on this claim.

> FN7. Mr. Schofield does argue that Ms. Tinsley's reaction was unjustified. Regardless of whether Ms. Tinsley's reaction was appropriate or not, MetLife had a reasonable basis to investigate the complaint. See *Andy v. United Parcel Service, Inc., 111 Fed. Appx. 670 (3d Cir.2004)* (It is "the perception of the decision maker, which is 'what matters.' ").

> FN8. MetLife asked Mr. Schofield to switch teams rather than Ms. Tinsley because it was MetLife's policy that an accuser's position cannot be altered while resolving a harassment claim. (Mr. Pidich's Dep., Pl.'s Br. Opp. Ex. D (Dkt. Entry 73-2) at 57.)

**C. The Discrimination Claims**

MetLife has also moved for summary judgment on Mr. Schofield's claims that MetLife unlawfully terminated his employment based on his age or disability. In employment discrimination cases, the Third Circuit has applied a slightly modified version of the *McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973),* burden shifting framework. *See, e.g., Taylor v. Phoenixville School Dist ., 184 F.3d 296, 306 (3d Cir.1999)* (analyzing an ADA claim); *Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir.1997) (en banc)* (analyzing

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                   Page 7

Slip Copy, 2006 WL 2660704 (M.D.Pa.)

**(Cite as: 2006 WL 2660704 (M.D.Pa.))**

an ADEA claim); *Sempier v. Johnson & Higgins,* *45 F.3d 724, 728 (3d Cir.1995)* (analyzing an ADEA claim). Under this scheme, the plaintiff must first present sufficient evidence to establish a *prima facie* case of discrimination. A plaintiff establishes a *prima facie* case of discrimination by showing that: (1) he was a member of a protected class (i.e., was over forty years old under the ADEA or was disabled under the ADA); (2) he was qualified for the position in question; (3) he suffered an adverse employment decision, such as discharge; and (4) the adverse decision occurred under circumstances giving rise to an inference of discrimination. *See Sarullo v. U.S. Postal Service, 352 F.3d 789, 797 (3d Cir.2003); Taylor, 184 F.3d at 306; Sempier, 45 F.3d at 728.*

If the plaintiff is able to show a *prima facie* case of discrimination, "the burden of production (but not the burden of persuasion) shifts to the defendant." *Keller, 130 F.3d at 1108.* The defendant must then offer evidence that is sufficient to support a finding that it had a legitimate, non-discriminatory reason for the discharge. *Id.* If the defendant fails to do so, judgment must be entered for the plaintiff.

If the defendant offers evidence of a legitimate, non-discriminatory reason for the adverse employment decision, the burden shifts back to the plaintiff. To survive summary judgment, the plaintiff must produce evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir.1994).*

**\*8** MetLife argues that Mr. Schofield did not suffer an adverse employment decision because he voluntarily resigned. (Defs.' Br. (Dkt. Entry 54) at 5-10 (citing, *inter alia, Acosta v. Catholic Health Initiatives, Inc., No. CIV.A. 02-1750, 2003 WL 176978, at \*15 (E.D.Pa. Jan. 24, 2003)* (holding that an employee's voluntary resignation after an evaluation did not constitute an adverse employment action).) Mr. Schofield denies that he resigned. According to him, he left the meeting

because he was upset, confused, and embarrassed by Ms. Tinsley's harassment allegations and the manner in which MetLife confronted him with the allegations. He could not handle discussing the issue at that time. He asserts that he intended to come back to work when the problems got straightened out. (Pl.'s Br. Opp. (Dkt. Entry 71-1) at 10-11.)

As MetLife observes, Plaintiff's undisclosed intention that he was not quitting his job or his belief as to how his actions should have been perceived by others attending the meeting of May 7, 2002, is not controlling. It is the perception of the employer that matters. *See Andy v. United Parcel Service, Inc., 111 Fed. Appx. 670, 671 (3d Cir.2004).* In this case, Mr. Schofield's statement--"Let me save you some time. I cannot deal with this right now. I'm out of here." (Mr. Schofield's Dep., Pl.'s Br. Opp. Ex. A (Dkt. Entry 72-3) at 200)--coupled with his action of turning in his identification card, certainly indicated that he had indeed resigned. Clearly, it was not unreasonable for either Ms. Johnston or Mr. Davis to have regarded Mr. Schofield's statement and action as indicating that he had quit. Both his words, "I'll save you some time.... I'm out of here," and his action, turning in his identification card, manifested an intent to resign. *See Hammon v. DHL Airways, Inc., 165 F.3d 441, 448 (6th Cir.1999)* (noting that an employee resigns when he "express[es] an intention to resign" and "take[s] some action to demonstrate that he is relinquishing his position"); *Gauden v. Borough of Roscoe, 470 A.2d 191, 193 (Pa.Commw.Ct.1984)* (same, based on Pennsylvania law). His undisclosed intention to return to employment when the matter was somehow resolved does not alter the perception of the MetLife decision maker, "which is 'what matters. [FN9]' " *Andy, 111 Fed. Appx. at 671.*

> FN9. Significantly, Ms. Johnston immediately began processing Mr. Schofield's resignation after the meeting, indicating that her perception was that Mr. Schofield had resigned. Moreover, it was Mr. Schofield--not MetLife--which initiated reinstatement talks, further

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 2660704 (M.D.Pa.)

**(Cite as: 2006 WL 2660704 (M.D.Pa.))**

signifying that MetLife believed Mr. Schofield had resigned.

An employee who voluntarily resigns cannot show that he or she has suffered an adverse employment decision at the hands of the employer. *See, e.g., Hammon,* 165 F.3d at 448; *Iadanza v. Bell Atlantic Network Services, Inc., No. CIV. A. 96-2789, 1998 WL 122249, at *4-5 (E.D.Pa. March 10, 1998), aff'd, 191 F.3d 445 (3d Cir.1999); Sherrod v. Philadelphia Gas Works, 209 F.Supp.2d 443, 449-50 (E.D.Pa.2002); Acosta v. Catholic Health Initiatives, Inc., No. CIV.A. 02-1750, 2003 WL 176978, at *15 (E.D.Pa. Jan. 24, 2003).* Because Mr. Schofield has failed to present evidence sufficient to cast doubt on the assertion of the MetLife decision makers (Johnston and Davis) that they regarded his action as signifying an intention to resign, MetLife is entitled to judgment in its favor.

**\*9** MetLife did not act improperly either, when it did not accept Mr. Schofield's decision to rescind his resignation. Failure to accept a previous employee's rescission of his voluntary resignation is not an adverse employment action for the simple reason that the employment relationship has ended *See MacLean v. City of St. Petersburg, 194 F.Supp.2d 1290, 1300 (M.D.Fla.2002).* Mr. Schofield has failed to show a genuine dispute of fact material to the question of whether MetLife subjected him to an adverse employment action, and, on this ground alone, MetLife is entitled to judgment in its favor.

Even if there was a genuine dispute material to the question of whether Plaintiff had been discharged, as opposed to voluntarily quitting, he has failed to produce evidence from which a fact-finder could reasonably disbelieve MetLife's proffered reasons for its actions, or believe that an invidious discriminatory reason was more likely than not a motivating cause of MetLife's actions.

Plaintiff claims that he suffered adverse employment actions when MetLife: (1) mistakenly processed his resignation, which had the effect of terminating his employment, and (2) conditioned his reinstatement on limiting his contact with Ms.

Tinsley, perhaps requiring him to transfer to another team. MetLife asserts that it had legitimate, non-discriminatory reasons for its actions. Specifically, it was attempting to respond to Ms. Tinsley's complaint against him.

MetLife has presented sufficient evidence to support its assertion. After receiving a complaint from Ms. Tinsley about Mr. Schofield's behavior, MetLife's Human Resources Generalist, Rose Johnston, initiated an investigation. (Defs.' S.M.F. ¶ 68.) Ms. Johnston met with Mr. Schofield and MetLife Vice President, Mark Davis, to discuss the complaint on May 7, 2002. (Defs.' S.M.F. ¶ 77.) Shortly after the meeting began, Mr. Schofield interrupted, "I'll save you some time. I cannot deal with this right now. I'm out of here." (Mr. Schofield's Dep., Pl.'s Br. Opp. Ex. A (Dkt. Entry 72-3) at 200.) He put his security pass down and went home. (*Id.* at 200-01.)

Ms. Johnston thought Mr. Schofield intended to resign by his actions. (Ms. Johnston's Dep., Defs.' Br. Ex. 12 (Dkt. Entry 57-5) at 33.) She therefore initiated MetLife's resignation procedures. (*Id.* at 36; Letter dated May 7, 2002, Defs.' Br. Ex. 21 (Dkt. Entry 57-6).)

Mr. Schofield contacted Ms. Johnston the next day and wished to discuss the situation further. On May 9, 2002, Mr. Schofield met with Ms. Johnston and Mr. Pidich and explored options for reinstatement. (Defs.' S.M.F. ¶ 88.) Ms. Johnston and Mr. Pidich felt it would be necessary to limit Mr. Schofield's interaction with Ms. Tinsley given her ongoing complaint. An agreement could not be reached for reinstating Mr. Schofield.

Mr. Schofield fails to present any evidence that casts serious doubt on MetLife's proffered reasons for its actions. He attempts to undermine MetLife's rationale by arguing that Ms. Tinsley's reaction was unreasonable. (Pl.'s Br. Opp. (Dkt. Entry 71-1) at 15-16.) But regardless of whether Ms. Tinsley had a reasonable basis for her complaint or not, MetLife had an obligation to investigate the claims. [FN10] Indeed, MetLife had a basis for taking the complaint seriously, as Ms. Tinsley was missing

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 2660704 (M.D.Pa.)

**(Cite as: 2006 WL 2660704 (M.D.Pa.))**

work out of fear of Mr. Schofield. (Ms. Johnston's Dep., Defs.' Br. Ex. 13 (Dkt. Entry 57-5) at 18-27; Ms. Tinsley's Dep., Defs.' Br. Ex. 15 (Dkt. Entry 57-6) at 41-50).) Mr. Schofield has not presented sufficient evidence from which a fact-finder could reasonably infer that MetLife's proffered reasons "was either a *post hoc* fabrication or otherwise did not actually motivate the employment action." *Fuentes v. Perskie, 32 F.3d 759, 764-65 (3d Cir.1994)* (setting forth the evidentiary standard for a plaintiff to survive summary judgment).

> FN10. Even if MetLife's decision to investigate Ms. Tinsley's complaint was mistaken, it does not demonstrate that MetLife discriminated against Mr. Schofield. *See Fuentes v. Perskie, 32 F .3d 759, 765 (3d Cir.1994)* ("To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.").

**\*10** Support for this conclusion is found in *Andy v. United Parcel Service,* where the plaintiff also attempted to attack the validity of the defendant's proffered legitimate, non-discriminatory reason for terminating him--namely, the plaintiff engaged in an inappropriate relationship at work. *2003 WL 22697194.* The Court cautioned that "the issue of whether or not Defendants held a mistaken belief regarding Plaintiff's relationship with Alison plays no role in the decision of this Court." *Id. at \*9* (citing *Fuentes, 32 F.3d at 765).* Instead, the Court focused on whether the perceptions of the defendant's managers indicated a discriminatory animus. *Id.* The plaintiff, though, failed to cast "doubt on his supervisors' contention that they acted only pursuant to the perceived existence of an inappropriate relationship ." *Id.* Consequently, the Court concluded that the defendant had a legitimate reason to be concerned about the relationship and granted summary judgment in its favor. *Id. at \*13-14.*

An identical conclusion is compelled here. Regardless of Mr. Schofield's undisclosed intentions with respect to his communications with Ms. Tinsley, she certainly had grounds to complain to MetLife and it had a legitimate basis for addressing her complaint. Moreover, the fact that it suggested conditions for his reinstatement by limiting his access to Ms. Tinsley belies any assertion that age or disability bias animated some convoluted scheme to remove Mr. Schofield from MetLife's payroll.

Significantly, Plaintiff has not pointed to any evidence of a similarly situated younger or non-disabled person who was treated more favorably. The mere fact that his employment relationship ended and he is in a protected class is not sufficient to raise an inference of discrimination where, as here, the employment relationship was terminated as an incident to an inquiry concerning emails that seriously disturbed a co-worker, and Plaintiff can point to no evidence that some other person who had engaged in similar behavior was Plaintiff was treated more favorably. *Id. at \*12.*

Mr. Schofield nonetheless argues that age or disability discrimination was more likely than not a motivating factor in MetLife's actions due to remarks he attributes to MetLife employees. In support of his age discrimination argument, Mr. Schofield states that Mr. Pidich told him that MetLife "was targeting employees over 50 for termination like other large corporations." (Mr. Schofield's Dep., Pl.'s Br. Opp. Ex. A (Dkt. Entry 72-3) at 261-64; Pl.'s Br. Opp. (Dkt. Entry 71-1) at 12.) Mr. Schofield also asserts his own perception that MetLife was disproportionately terminating employees over fifty. (Mr. Schofield's Dep., Pl.'s Br. Opp. Ex. A (Dkt. Entry 72-3) at 262-64.) Mr. Pidich, who no longer works for MetLife, did not "remember specifically saying" that MetLife was targeting employees over fifty, though he did not believe the evidence pointed to such a conclusion. (Mr. Pidich's Dep., Defs.' Br. Ex. 5 (Dkt. Entry 57-4) at 69.) Mr. Schofield did not point to any other relevant evidence of age discrimination in his brief. [FN11]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 10

Slip Copy, 2006 WL 2660704 (M.D.Pa.)

**(Cite as: 2006 WL 2660704 (M.D.Pa.))**

FN11. Mr. Schofield also cited an affidavit of a MetLife employee from a different state for the conclusion that MetLife "had a program to reduce ratings of older employees to justify their termination." (Pl.'s Br. Opp. (Dkt. Entry 71-1) at 13.) Mr. Schofield fails to show how these conclusory allegations of a scheme to reduce the ratings of older employees in New Jersey are relevant to his case. Mr. Schofield was not terminated for a low rating, he was investigated for harassing a co-worker. This other employee's affidavit fails to show that age was a motivating factor in the decision to investigate Ms. Tinsley's complaint against Mr. Schofield.

**\*11** This is insufficient evidence to support a finding of age discrimination. "Stray remarks by non-decision makers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision." *Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 545 (3d Cir.1992); see also Bullock v. Children's Hosp. of Philadelphia, 71 F.Supp.2d 482, 486 (E.D.Pa.1999)* ("As a general matter, comments, even by a decision-maker, will not constitute direct evidence of discrimination, unless they are related to the decisional process itself.") Mr. Pidich's statement is not connected to Mr. Schofield's abrupt departure from the MetLife office.

While Mr. Pidich was involved in the discussions to reinstate Mr. Schofield, Mr. Pidich's alleged statement fails to establish that age was a motivating factor in the discussion. Significantly, Mr. Schofield's statement does not even indicate that Mr. Pidich had a bias against older workers. Instead, the statement appears to be complaining about such conduct. Indeed, Mr. Pidich was over fifty (50) years of age at the time.

Mr. Pidich and Ms. Johnston required that Mr. Schofield limit his contact with Ms. Tinsley to conform to MetLife's policy to separate employees involved in a harassment complaint. (Mr. Pidich's

Dep., Pl.'s Br. Opp. Ex. D (Dkt. Entry 73- 2) at 57; Johnston Aff. (Dkt. Entry 56) ¶ 2.) Mr. Schofield fails to present sufficient evidence from which a fact-finder could conclude that age was more likely than not a motivating factor behind MetLife's actions. Consequently, summary judgment is appropriate against Mr. Schofield for his age discrimination claim.

Similarly, Mr. Schofield attempts to support his disability discrimination argument by pointing to an alleged statement by Mr. Pidich that everything was Mr. Schofield's fault "because [he] was sick." (Mr. Schofield's Dep., Pl.'s Br. Opp. Ex. A (Dkt. Entry 72-3) at 283-84, Pl.'s Br. Opp. (Dkt. Entry 71-1) at 13- 14.) Again, Mr. Pidich was not involved in the decision to process Mr. Schofield's resignation, so this statement does not constitute evidence of disability discrimination in that decision.

Moreover, the evidence actually indicates that Mr. Pidich was supportive of Mr. Schofield's disability. Mr. Pidich offered to cover for Mr. Schofield if he needed time off after coming back from his medical leave. (Mr. Schofield's Dep., Pl.'s Br. Opp. Ex. A (Dkt. Entry 72-2) at 195.) He also continuously praised Mr. Schofield's work product.

Mr. Schofield again fails to present sufficient evidence from which a fact-finder could conclude that discrimination played a role in MetLife's actions. Rather, the evidence supports MetLife's articulated reasons for its actions--it was simply investigating Ms. Tinsley's complaint against Mr. Schofield. Consequently, Mr. Schofield's discrimination claims will be dismissed. [FN12]

FN12. Mr. Schofield also asserted a claim for disability discrimination under the PHRA. The analytical framework of an action under the PHRA is essentially identical to that of a claim under the ADA. *See Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 382 (3d Cir.2002); Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir.1996).* Accordingly, the analysis of Mr. Schofield's ADA claim is equally applicable to his claim of disability

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 11

Slip Copy, 2006 WL 2660704 (M.D.Pa.)

**(Cite as: 2006 WL 2660704 (M.D.Pa.))**

discrimination under the PHRA.

### III. CONCLUSION

**\*12** For the reasons set forth above, Defendant's motion for summary judgment (Dkt. Entry 53) will be granted. An appropriate Order follows.

### ORDER
**NOW, THIS 15th DAY OF SEPTEMBER, 2006,** for the reasons set forth in the foregoing Memorandum, **IT IS HEREBY ORDERED THAT:**

1. Defendants' motion for summary judgment (Dkt. Entry 53) is **GRANTED.**

2. The Clerk of Court is directed to enter judgment in favor of the remaining Defendants, and to mark this matter **CLOSED.**

Slip Copy, 2006 WL 2660704 (M.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

• 2004 WL 2151387 (Trial Motion, Memorandum and Affidavit) Legal Brief of Defendants Metropolitan Life Insurance Company and Robert Pidich in Support of Their Motion for Summary Judgment (Jul. 23, 2004)Original Image of this Document (PDF)

• 2003 WL 23788432 (Trial Pleading) Answer and Affirmative Defenses of Metropolitan Life Insurance Company, Robert Pidich and Rose C. Johnston (May 20, 2003)Original Image of this Document (PDF)

• 2003 WL 23788428 (Trial Motion, Memorandum and Affidavit) Brief of Defendants Metropolitan Life Insurance Company, Robert Pidich and Rose Johnston in Support of Their Motion for Sanctions Pursuant to Fed.R.Civ.P. 11 (May 5, 2003)Original Image of this Document (PDF)

• 2003 WL 23788429 (Trial Motion, Memorandum and Affidavit) Brief of Defendants Metropolitan Life Insurance Company, Robert Pidich and Rose

Johnston in Support of Their Motion for Partial Dismissal of Plaintiff's Complaint (May 5, 2003)Original Image of this Document (PDF)

• 3:03cv00357 (Docket) (Feb. 26, 2003)

• 2003 WL 23787910 (Trial Motion, Memorandum and Affidavit) Reply Brief of Defendant Kellee Tinsley in Support of Her Motion to Dismiss Plaintiff's Complaint (2003)Original Image of this Document (PDF)

• 2003 WL 23788424 (Trial Motion, Memorandum and Affidavit) Brief of Defendant Kellee Tinsley in Support of Her Motion to Dismiss Plaintiff's Complaint (2003)Original Image of this Document (PDF)

• 2003 WL 23788442 (Trial Motion, Memorandum and Affidavit) Reply Brief of Defendants Metropolitan Life Insurance Company, Robert Pidich and Rose Johnston in Further Support of Their Motion for Partial Dismissal of Plaintiff's Complaint (2003)Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

SA-8

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 612713 (S.D.N.Y.)

**(Cite as: 2005 WL 612713 (S.D.N.Y.))**

Page 1

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Dan SHAH, Plaintiff,
v.
CONSOLIDATED EDISON CORPORATION OF
NEW YORK, Defendant.
**No. 04 Civ. 2880(JSR).**

March 15, 2005.

*MEMORANDUM ORDER*

RAKOFF, J.

**\*1** By Order dated January 12, 2005, the Court denied plaintiff's motion to amend his Complaint. By Order dated February 4, 2005, the Court granted summary judgment to defendant. By Order dated February 13, 2005, the Court denied plaintiff's motion under Rule 56(f), Fed.R.Civ.P., seeking additional discovery in connection with the summary judgment motion. This Memorandum Order will briefly set forth the reasons for these determinations, dispose of plaintiff's motion for reconsideration of the Order of February 13, 2005, and direct the entry of final judgment.

1. *The Motion to Amend.* Plaintiff's original Complaint was filed on April 14, 2004, and alleged two counts of unlawful retaliation and one count of hostile work environment. *See* Complaint at ¶¶ 4-31. [FN1] Although the Court denied plaintiff's separate application for injunctive relief, *see* Order dated July 29, 2004, it acceded to plaintiff's request that the matter be moved rapidly to trial. *See* transcript, July 29, 2004. As a result, after discovery

was completed, the Court set a trial date of February 14, 2005, subject only to resolution of defendant's putative motion for summary judgment. *See* transcript, November 22, 2004.

> FN1. It now appears that plaintiff's counsel may have filed the Complaint before receiving a "Right to Sue" letter from the EEOC, a fact made known to the Court only when, having belatedly received the Right to Sue Letter on December 14, 2004, plaintiff's counsel annexed it to his motion to amend the Complaint filed on December 20, 2004. In similar disregard of jurisdictional prerequisites, plaintiff's counsel, even while moving for reconsideration of the Court's Order of February 13, 2005, has already filed with the Court of Appeals a purported notice of appeal from that Order, from the Orders of January 12, 2005 and February 4, 2005, and from various, earlier orders in this case, even though final judgment has not yet been entered in the case. *See* Notice of Appeal, February 28, 2005.

Nonetheless, after defendant's motion papers for summary judgment had been served, plaintiff moved, on December 20, 2004, to amend his Complaint to add a second hostile work environment claim and a claim of wrongful termination. Plaintiff himself recognized that these new claims would entail still further discovery, for he labeled his motion "Plaintiff's Motion to Amend and for Discovery." To have permitted plaintiff to so proceed after discovery had been closed, summary judgment motion practice was proceeding, and trial was imminent would have been highly prejudicial to defendant, totally disruptive to the Court's calendar, and contrary even to plaintiff's own prior request for a speedy trial. Accordingly, by Order dated January 12, 2005, the Court denied plaintiff's motion to amend. *See, e.g., Krumme v.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 2

Not Reported in F.Supp.2d, 2005 WL 612713 (S.D.N.Y.)

**(Cite as: 2005 WL 612713 (S.D.N.Y.))**

*WestPoint Stevens, Inc.,* 143 F.3d 71, 88 (2d Cir.1998).

2. *The Motion for Summary Judgment.* In the first two counts of his Complaint, as fleshed out by discovery, plaintiff asserts that he suffered, by way of retaliation, seven adverse employment actions: (1) in 2002 and 2003, he was denied a technical training course, *see* Deposition of Dan Shah, September 29, 2004 ("Shah Dep.") at 69-72, 120; (2) in August, 2002, he was denied a mentor, *see id.* at 93-95; (3) in April, 2003, he did not receive a pay raise, *see* Affidavit of George Christ ("Christ Aff.") at ¶¶ 6, 7, 16; (4) in May, 2003, he was demoted from a "band 3L" position to a "band 2H" position, though his salary did not decrease as a result, *see* Deposition of Loretta Vanacore, date not indicated ("Vanacore Dep.") at 64; (5) in May or June 2003, he was denied a EH & S manager's position at the 74th Street Generating Station, *see* Shah Dep. at 46-47; (6) in April, 2004, he received a Performance Improvement Notification, ("P.I.N."), *see* 2004 Performance Review of Dan Shah attached to Certification of Stephen T. Mitchell, January 7, 2005, as Exhibit M, at 2; and (7) in April, 2004, as a result of being placed on P.I.N. status, he once again did not receive a pay raise, *see* Deposition of Walter Stepien, date not indicated ("Stepien Dep.") at 41, 45

**\*2** In its moving papers on summary judgment, defendant adduced substantial admissible evidence that these actions were the product of lawful conduct. *See* (by way of summary), defendant's Rule 56.1 statement at ¶¶ 27, 29-38, 50-54, 60-70. The burden therefore was upon plaintiff to adduce admissible evidence from which a reasonable juror could infer that at least one real reason for these actions was retaliation. *See generally Fisher v. Vassar College,* 114 F.3d 332, 345 (2d Cir.1998) (en banc); *see also Tongalson v. Dreyfus Service Corp.,* 04 Civ. 2308, 2005 U.S. Dist. LEXIS 2141, at \*19-\*20 (S.D.N.Y. Feb. 14, 2005). In his answering papers, however, plaintiff wholly failed to carry this burden. His Rule 56.1 statement effectively ignored many of defendant's assertions by offering in response either non-responsive citations to the record or wholesale

references to entire depositions without any particularization of the paragraphs he regarded as responsive. On the basis of a comparison of the parties' Rule 56.1 statements alone, the Court would be justified in granting summary judgment to defendant on the retaliation counts.

Instead, however, the Court has undertaken to search the record, at least to the extent it has been provided by the parties in the exhibits to their summary judgment papers. But, having done so, the Court is unable to discern any basis on which a reasonable juror could infer that plaintiff was the victim of retaliation in any respect.

The most obvious flaw is plaintiff's failure to show causality, an essential element of any retaliation claim. *See DeCinto v. Westchester County Medical Center,* 821 F.2d 111, 115 (2d Cir.1987). The first protected activity that plaintiff claims provoked retaliation was his reporting to defendant's internal "EEO" officer in June, 2000 his witnessing of alleged racially discriminatory conduct against a fellow employee, David Perez. But it is undisputed that the reporting was made by means of an anonymous complaint. *See* Shah Dep. at 28, 53-59. There is no suggestion that anyone knew who had filed the anonymous complaint until Shah himself revealed his authorship shortly before or while testifying at a deposition in late September, 2003. Accordingly, the filing of the anonymous complaint could not possibly have provoked the first five of the seven adverse actions listed above, all five of which occurred before September, 2003.

The other protected action that Shah contends provoked retaliation was the aforementioned deposition testimony itself, which he gave in connection with a legal action brought by Perez against defendant. Since, as noted, this deposition occurred in September, 2003, the only adverse actions it could possibly have provoked were Shah's being placed on P.I.N. status in April, 2004 and the concomitant denial of a pay raise (i.e., the last two of the seven adverse actions listed above).

As to the former, simply being notified that your performance must improve does not of itself

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 3

Not Reported in F.Supp.2d, 2005 WL 612713 (S.D.N.Y.)

**(Cite as: 2005 WL 612713 (S.D.N.Y.))**

constitute an adverse employment action cognizable under the federal anti-discrimination laws. *See Weeks v. N.Y.S. (Div. of Parole),* 273 F.3d 76, 83 (2d Cir.2001). It is true that being on P.I.N. status also meant that Shah would once again not get a pay raise. But both actions were simply the continuation of assessments of Shah's works that indisputably trace back to long before his deposition. Thus, a year earlier, Shah's supervisors had already expressed doubts about his performance and decided not to give him a pay raise. *See* Christ Aff. at 6, 7, 16; 2003 Performance Review of Dan Shah attached to Certification of Jeanmarie Schieler, December 21, 2005, as Exhibit B. The review in 2004 simply reiterated Shah's 2003 problems.

**\*3** Against this, Shah offers no more than the argument that because he testified adversely to his employer in the deposition in late September, 2003, a reasonable juror could infer that part of the reason he was denied a pay raise in April, 2004 was retaliation. But given that, based on a similar assessment of his performance deficiencies, his employer had previously denied him a raise before the deposition was given, such an inference would rest on nothing more than the grossest speculation. Moreover, the gap of more than six months between when Shah gave his deposition and when the decision was made not to give him a pay increase in 2004, *see* Shah Dep. at 73, 126; Christ Aff. ¶¶ 6, 7, 22, is far too long to support in itself an inference of discrimination. *See, e.g., Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273 (2001) (temporal proximity must be "very close"); *Hussein v. Hotel Employees & Restaurant Union, Local 6,* 108 F.Supp.2d 360, 367 (S.D.N.Y.2000) ( "the passage of more than two months defeats any retaliatory nexus"); *Ponticelli v. Zurich American Ins. Group,* 16 F.Supp.2d 414, 436 (S.D.N.Y.1998) (two-and-a-half months between protected activity and discipline "is hardly the close proximity of time" necessary to establish a causal link). The two retaliation claims here alleged must therefore be dismissed.

As to his other cause of action, alleging a hostile work environment, plaintiff claims in the Complaint that "he has been forced to work in a racially hostile

work environment on a continuous basis since at least January 2000." Complaint ¶ 26. But on the instant motion, plaintiff has wholly failed to adduce admissible evidence of this claim. Indeed, the only competent and relevant evidence he now presents regarding this claim consists of his testimony that he witnessed three occasions when Mr. Perez was referred to, respectively, as a "cockroach," "boy," and "ponytail," *see* Shah Dep. at 24, 25, 41, and his overhearing a lower level executive say something to the effect that "hey, look white man owns the world" or "white man rules the world," *see id.* at 24. This falls woefully short of the level of evidence that would warrant any reasonable juror in inferring the kind of hostile climate necessary to support plaintiff's legal claim. *See Alfano v. Costello,* 294 F.3d 365, 373 (2d Cir.2002); *Torres v. Pisano,* 116 F.3d 625, 630-31 (2d Cir.1997), *cert. denied,* 522 U.S. 997 (1998). Accordingly, plaintiff's hostile work environment claim, like his retaliation claims, must be dismissed.

3. *The Rule 56(f) Motion and the Motion for Reconsideration.* The official docket sheet of this case reveals that on February 8, 2005, plaintiff filed a motion under Rule 56(f), Fed.R.Civ.P., seeking additional discovery on his summary judgment motion. Well before February 8, 2005, the Court had already issued, and faxed to counsel, its Order dated February 4, 2005, granting defendant's motion for summary judgment. Accordingly, the Court, by Order dated February 13, 2004, denied plaintiff's Rule 56(f) motion as both untimely and moot.

**\*4** Plaintiff now moves for reconsideration of that ruling, alleging, in an affidavit from one of plaintiff's counsel's associates, that she attempted to file the motion on January 25, 2005, and believed she had done so. Rather than resolve this discrepancy, the Court has now undertaken to reconsider the Rule 56(f) motion *de novo* and on the merits. But, having done so, the Court is still obliged to deny the motion, as the discovery sought in the Rule 56(f) motion is entirely irrelevant to the issues before the Court on defendant's summary judgment motion. Accordingly, both the Rule 56(f) motion and the motion for reconsideration are denied.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 4

Not Reported in F.Supp.2d, 2005 WL 612713 (S.D.N.Y.)

**(Cite as: 2005 WL 612713 (S.D.N.Y.))**


In sum, since the Court has granted summary judgment to defendant and disposed of all other pending motions, the Clerk of the Court is hereby directed to enter final judgment dismissing the Complaint with prejudice.

SO ORDERED.

Not Reported in F.Supp.2d, 2005 WL 612713 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

• 1:04cv02880 (Docket) (Apr. 14, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

SA-9

Westlaw.

Slip Copy

Page 1

Slip Copy, 2006 WL 2382284 (M.D.Pa.), 33 NDLR P 92

**(Cite as: 2006 WL 2382284 (M.D.Pa.))**

**Motions, Pleadings and Filings**

United States District Court,
M.D. Pennsylvania.
Arlen SHAW, Plaintiff
v.
CHAMBERLAIN MANUFACTURING CORP.,
d/b/a Chamberlain, Jim Nayavich, James
Flaherty, and Daurice Holly-Febbo, Defendants.
**No. 3:05cv1344.**

Aug. 17, 2006.
Cynthia L. Pollick, The Employment Law Firm,
Pittston, PA, for Plaintiff.

Alissa Gilfand, Frank A. Bear, Seyfarth Shaw LLP,
Joseph S. Turner, Seyfarth, Shaw, Fairweather &
Geraldson, Chicago, IL, Brian J. Lenahan, Lenahan
& Dempsey, Scranton, PA, for Defendants.

*MEMORANDUM*

JAMES M. MUNLEY, District Judge.

*1 Before the Court for disposition is the
Defendants' Joint Motion for Summary Judgment.
This matter has been fully briefed and is ripe for
disposition. For the following reasons, Defendants'
motion for summary judgment is granted.

**I. Background**

Plaintiff Arlen Shaw is currently an employee at
Defendant Chamberlain Manufacturing Corp's
manufacturing facility in Scranton, Pennsylvania.
Chamberlain manufactures mortar shells for the
military. At all relevant times, Defendant Jim
Nayavich was the Human Resource Manager,
Defendant James Flaherty was the company's
President, and Defendant Daurice Holly-Febbo was
a Supervisor and Nurse.

Shaw began working for Chamberlain in March
1998 under the job classification "laborer." (Doc.
22-8, Pl.Ex., Shaw Dep. Tr. ("Shaw Dep") 9, 14)
This job classification was determined by a
collective bargaining agreement. (*Id.* at 10) Shaw
was a laborer until July 1998, when he became a
skilled operator. (*Id.* at 10-11). In September or
November of 1999, based on negotiations between
his union and Chamberlain, he returned to the
laborer job classification. (*Id.* at 11) Under the
current collective bargaining agreement, laborer is
the only classification available for the Scranton
facility, and it encompasses jobs in three primary
manufacturing areas: the forge facility, the heat treat
area, and the production area. (Def. Ex. V,
Nayavich Decl. ¶ 7) Chamberlain does not
guarantee employees work in a specific area or
specific job because production needs are sporadic
and change regularly. (*Id.* ¶ 8) Although there are
tasks in the facility that would qualify as "light
duty" [FN1] work, Chamberlain does not provide
permanent "light duty" positions, but only assigns
temporary light duty work to employees with
injuries who anticipate returning to their pre-injury
jobs. (*Id.* ¶ 9)

> FN1. Under Chamberlain's definition, as
> well as the definition of Plaintiff's treating
> physician, light duty work involves lifting
> anywhere from ten to twenty-five pounds.
> (*See* Def. Ex. F, Dr. Mogerman Return to
> Work Evaluation, Sept. 10, 2003).

Shaw injured his shoulder in October of 1998.
(Shaw Dep. 33; Doc. 22-7, Chamberlain Dep. [FN2]
33) At the time, he was working in a position that
required him to remove a heavy mortar shell from
the assembly line, place it in a machine, and place it
back on the conveyor line after the machine
completed it function. (Shaw Dep. 34-35) After two
or three weeks of this repetitive motion, his
shoulder became sore. (*Id.*) Then, Chamberlain
placed him in a position requiring that he handle a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                                       Page 2

Slip Copy, 2006 WL 2382284 (M.D.Pa.), 33 NDLR P 92

**(Cite as: 2006 WL 2382284 (M.D.Pa.))**

lighter, 30 pound shell. (*Id.* at 35-36) While performing this task, he reached for a shell and felt a shooting pain from his right shoulder to his fingertips, followed by a few moments of numbness. *(Id.)* He reported the injury to the on-site nurse, who gave him some pills and released him to finish his shift. (*Id.* at 36) Although he did not initially miss work, he visited the doctor for Chamberlain, Dr. Joseph Greco, who restricted him to lifting twenty to twenty-five pounds for a week until he returned for a follow-up appointment. (*Id.* at 37) Dr. Greco then referred Shaw to Dr. Jack Henzes, who examined him three times. (*Id.* at 38)

> FN2. Chamberlin's deposition consists of the testimony its corporate designees pursuant to Federal Rule of Civil Procedure 30(b)(6).

*2 Shaw continued to work with restrictions until Dr. Jeffrey Mogerman performed surgery on his shoulder in May 1999. (*Id.* at 37) After his surgery, Shaw was on leave until October 25, 1999. (*Id.* at 38) When he returned to work following the surgery, he was placed in the skilled operator classification for several months. (*Id.* at 39)

Within three months of the surgery, Shaw was terminated because he had trouble performing as a result of his shoulder. (*Id.* at 11-12, 49) Shaw arbitrated his termination, and the arbitrator reinstated him. (*Id.* at 49) Shaw was out of work for six months as a result of the termination. (*Id.* at 50) When he returned, he was under no restrictions and he worked as a skilled operator with "adaptors." (*Id.* ) This job required that he take a five to eight pound piece of metal and place it in a machine to cut it, then take it out of the machine and place it in another machine to cut the opposite side. (*Id.* at 46-47) After two months, a problem arose with Shaw's performance, and he agreed to accept a demotion from skilled operator to laborer. (*Id.* at 51)

In December of 2001, Shaw re-injured his shoulder while working as a maintenance laborer. (*Id.* at 59-60) In this position, he cleaned the machines to keep them in proper working condition. (*Id.* at 60) On the date he was injured, there was a flood, and

he cleaned up the water using a 55 gallon drum with a vacuum system. (*Id.* at 61) After drawing in the water, he disposed of it in a chemical disposal holding tank. (*Id.*) During the course of his eight hour shift, he made approximately a dozen trips from the flood to the chemical disposal tank. (*Id.* at 61-62) When he woke up the next morning, he could not move his arm. (*Id.* at 62) Prior to the re-injury, he was under no work restriction. (*Id.*)

The next day, he reported his injury to his supervisor, who advised him to see the nurse. (*Id.* at 63) The nurse advised him to see Dr. Greco. *(Id.)* Dr. Greco placed restrictions in his lifting and prohibited him from using his arm over his head. *(Id.)* Dr. Greco additionally wanted him to see Dr. Mogerman within a week because Dr. Mogerman had previously performed Shaw's surgery. (*Id.* at 64)

Dr. Mogerman examined him and ordered that he continue working with modified duties until he had the opportunity to reexamine him in March of 2002. (*Id.* at 68) At that time, Shaw was placed on painting duty. (*Id.* at 68) Dr. Mogerman again examined Shaw on April 8, 2002, and ordered that he continue in "sedentary" work. (*Id.* at 70) Dr. Mogerman explained that Shaw suffered from impingement syndrome in his shoulder, and could lift between zero and ten pounds. (Def. Ex. F., Mogerman Return to Work Evaluation, Apr. 8, 2002) Thus, Shaw continued painting. (Shaw Dep. 70) While Shaw worked with restrictions, he continued working eight hours a day, five days a week, at the same rate of pay he received when he worked without restrictions. *(Id.)*

*3 On May 20, 2002, Dr. Mogerman advised that Shaw had improved and could lift no more than fifteen pounds, and was able to perform the "felt pack" job. (*Id.* at 75-76) This job required that Shaw fill a 120 millimeter shell with sponges. (*Id.* at 76-77) Despite Dr. Mogerman's advice, Shaw felt packing the sponges aggravated his shoulder because it required that he use a hammer. (*Id.* at 77-78) After reporting the aggravation, Shaw continued packing the sponges but Chamberlain assigned another employee to perform the hammering. (*Id.* at 78)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2382284 (M.D.Pa.), 33 NDLR P 92

**(Cite as: 2006 WL 2382284 (M.D.Pa.))**

On July 8, 2002, Dr. Mogerman completely restricted Shaw from working until he had the opportunity for another observation on July 22, 2002. (*Id.*) On July 22, 2002, Dr. Mogerman continued Shaw's leave until yet another examination on August 12, 2002. (*Id.* at 79). On August 12, Dr. Mogerman counseled that Shaw should remain off work until September 5, 2002, at which time he could return to light duty work as a floor scrubber pending further examination on September 25, 2002. (*Id.* at 80) Floor scrubbing required that Shaw sit in and drive a machine that swept and scrubbed the floors. (*Id.* at 80-81)

On September 25, Dr. Mogerman reexamined him and advised that he remain off work completely until October 9, at which time he again advised that he stay off work until October 30. (*Id.* at 83) On October 30, he allowed Shaw to return to work on November 18, 2002 on light duty work with no use of his right arm. (*Id.* at 87-88) On December 4, 2002, Dr. Mogerman advised that Shaw should again cease working until January 9, 2003, to allow him time for physical therapy. (*Id.* at 88)

Shaw, however, did not return to work on January 9, 2003, and from the time he stopped working as a floor scrubber on September 24, 2002, he remained away from work until June of 2004. (*Id.* at 88-89, 149) During this time, he periodically visited Dr. Mogerman and discussed the possibility of working. (*Id.* at 89-91)

In early June 2003, Dr. Mogerman wrote to Chamberlain to inform it that he did not believe that Shaw would ever be able to resume his former position and he required a permanent light duty position. (*Id.* at 110, 112, 114) On June 24, 2003, Defendant Daurice Holly-Febbo wrote a letter to Shaw stating, "Your medical provider, Dr. Mogerman, states you are unable to return to your pre-injury job and will have permanent restrictions. Chamberlain does not have provisions in the light duty program to offer permanent light duty job classification." (*Id.* at 112) Since Chamberlain did not have permanent light duty positions, it requested the assistance of Karen Kane of P.A. Advocates to assist Shaw with his re-entry into the work force. (*Id.*

at 113) Shaw met with Kane and she arranged four interviews for him with other employers. (*Id.* at 115-116)

On September 10, 2003, Dr. Mogerman sent a letter to Chamberlain releasing Shaw to return to work with restrictions. (*Id.* at 118-119) He stated that Shaw could lift in the ten to twenty-five pound range, but could push or pull zero to five pounds with his right arm and ten to twenty-five pounds with his left. (*Id.* at 180) He concluded that these restrictions would be in place indefinitely. (Def. Ex. F, Mogerman Return to Work Eval., Sept. 10, 2003).

*4 On October 17, 2003, Chamberlain responded by informing Dr. Mogerman that it had no permanent light duty positions, and thus could not rehire Shaw because Dr. Mogerman's prognosis was for a permanent injury and restriction. (Shaw Dep. 120-121; Def. Ex. F. Chamberlain Letter to Dr. Mogerman, Oct. 17, 2003) Shaw believes this was not true because in the past employees performed light duty tasks. (Shaw Dep. 120-121) Shaw, however, could not say specifically whether there were light duty tasks that needed to be done at that time, he did not believe that permanent light duty positions were available, and never knew of anyone in Chamberlain who held a permanent light duty position. (Shaw Dep. 120-21)

On November 5, 2003, Dr. Mogerman again concluded that Shaw could lift only ten to twenty-five pounds, and felt that Shaw was available for full time light duty work. (Def. Ex. F, Mogerman Return to Work Eval., Nov. 5, 2003) On November 17, 2003, Shaw visited Northeast Rehabilitation Associates for a functional capacity evaluation to test his responses to physical exertion. (Shaw Dep. 124-25) On December 27, 2003, Dr. Mogerman reexamined Shaw and determined that Shaw was capable of resuming heavy work and could lift 50-75 pounds. (*Id.* at 127) Around the same time, Shaw submitted to testing by Dr. Greco, who, after performing range of motions tests, decided not to return Shaw to full duty. (*Id.* at 135) He opined within a reasonable degree of medical certainty that Shaw would never be able to return to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 4

Slip Copy, 2006 WL 2382284 (M.D.Pa.), 33 NDLR P 92

**(Cite as: 2006 WL 2382284 (M.D.Pa.))**

work without restrictions. (Def. Ex. F, Dr. Greco Letter, Jan. 29, 2004)

In either December of 2003 or January of 2004, Shaw and his union representatives met with Chamberlain representatives to discuss the possibility of his return to work. (Shaw Dep. 135-37) Shaw discussed returning to work with thirty pound shells. (*Id.* at 138-39) During this meeting, Chamberlain's nurse and another official referred to Shaw as "disabled." (*Id.* at 138) When the official said he was disabled, Shaw explained, "the whole conversation was about me to come back [sic] to work and the way they were refusing and that, no, he is disabled, like if I am broke." (*Id.* at 218) Chamberlain, however, wanted further information because Dr. Mogerman's previous reports indicated that he was permanently restricted to light duty work, but the recent report indicated that he could lift 50 to 75 pounds. (*Id.* at 138, 141) Chamberlain desired that he submit to an independent medical examination (IME), and the union agreed. (*Id.* at 141-42)

On May 5, 2004, Dr. Mogerman completed another Return to Work Evaluation on May 5, 2004, again indicating that Shaw could perform his pre-injury duties and could lift 50 to 75 pounds. (Def.Ex.M) Shaw then submitted to the IME with Dr. Wolk at Allied Medical facility on May 24, 2004. (Shaw Dep. 149-50; Def. Ex. R) Dr. Wolk concluded that he had completely recovered from his shoulder injury and could return to work. (Def.Ex.R) Shaw then was permitted to return to work on June 28, 2004. (Shaw Dep. 149) When he returned, he had some restrictions, particularly in carrying shells for some distance. (*Id.* at 166-67) He could, however, frequently sit, walk, lift, bend, squat, climb, kneel, twist, or stand. (*Id.* at 167) He could frequently use either hand. (*Id.* at 168) He was able to lift, push, and pull 50 to 70 pounds. (*Id.*)

*5 On July 5, 2005, Shaw filed the instant four count complaint. In Count I, he alleges that Chamberlain violated the American with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-17, by refusing to accommodate his request to return to light duty work. In Count II, he alleges that

Chamberlain retaliated against him for his request for an accommodation in violation of the ADA. In Count III, he avers that Chamberlain violated the Pennsylvania Human Relations Act, 43 PA. STAT. ANN. §§ 951-63, by failing to provide him with light duty work and by retaliating against him for his request for an accommodation. In Count IV, he avers that Defendants Nayavich, Flaherty, and Holly-Febbo individually discriminated against him in violation of the PHRA.

**II. Jurisdiction**

Since a federal question is before the Court pursuant to the ADA, we have jurisdiction over this dispute under 28 U.S.C. § 1331. We have supplemental jurisdiction over the state claims pursuant to 28 U.S.C. § 1367.

**III. Standard**

Granting summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Knabe v. Boury,* 114 F.3d 407, 410 n. 4 (3d Cir.1997) (citing FED. R. CIV. P. 56(c)). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion. *International Raw Materials, Ltd. v. Stauffer Chemical Co.,* 898 F.2d 946, 949 (3d Cir.1990). The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the non-moving party. *Anderson,* 477 U.S. at 248 (1986). A fact is material when it might affect the outcome of the suit under the governing law. *Id.* Where the non-moving

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                Page 5

Slip Copy, 2006 WL 2382284 (M.D.Pa.), 33 NDLR P 92

**(Cite as: 2006 WL 2382284 (M.D.Pa.))**

party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. *Celotex v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. *Id.* at 324.

**IV. Discussion**

The ADA provides that: "No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112. In order to establish a prima facie case, a plaintiff must prove that he or she: (1) has a "disability"; (2) is a "qualified individual" able to perform the essential functions of his or her position with or without a reasonable accommodation; and (3) has suffered an adverse employment action because of that disability. *Deane v. Pocono Medical Center,* 142 F.3d 138, 142 (3d Cir.1998). Defendants argue that they are entitled to summary judgment because Shaw was not a "qualified individual with a disability" within the definition of the ADA. [FN3] Furthermore, Defendants claim that Shaw has failed to create a genuine issue of material fact regarding his retaliation claims. For the following reasons, we agree, and will grant summary judgment and dismiss this case.

> FN3. Claims under the PHRA are analyzed under the same standard as the ADA. *Kelly v. Drexel Univ.,* 94 F.3d 102, 105 (3d Cir.1996). Thus, we will not discuss the two statutes separately.

**A. Disability**

*6 In order to be considered "disabled" under the ADA, a plaintiff must establish that he: 1) has a physical or mental impairment [FN4] that substantially limits one or more major life activities, (2) has a record of such an impairment, or (3) is regarded as having such an impairment. 42 U.S.C.A. § 12102(2); 29 C.F.R § 1630.2(g); *Toyota Motor Mfg., Kentucky, Inc. v. Williams,* 534 U.S. 184, 187, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002). Shaw argues that his work-related rotator cuff injury constitutes a disability under the ADA, and even if it did not, Chamberlain considered him disabled. We will address these issues separately, and for the following reasons, disagree.

> FN4. The parties do not dispute that Shaw's rotator cuff injury is a physical impairment. The EEOC regulations broadly define "physical impairment" as including any physiological condition affecting the ... musculoskeletal systems. *See* 29 C.F.R. § 1630.2(h)(1). The EEOC regulations, "while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).

**1. Actual Disability**

"Whether an individual has a disability under the ADA is an individualized inquiry." *Sutton v. United Airlines, Inc.,* 527 U.S. 471, 483, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). "The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual." *Id.; see also Settle v. S.W. Rodgers, Co., Inc.,* 998 F.Supp. 657, 662 (E.D.Va.1998) ("[a]s courts have consistently and sensibly noted, the ADA's individualized focus requires a case-by-case determination of whether a particular plaintiff's impairment is disabling" because "some rotator cuff injuries may be so severe as to limit a person's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 2382284 (M.D.Pa.), 33 NDLR P 92

(Cite as: 2006 WL 2382284 (M.D.Pa.))

Page 6

major life activities in some respect, while others may not."). Therefore, the proper inquiry for this element is whether Shaw's rotator cuff injury substantially limited one or more of his major life activities.

Shaw has alleges that he is disabled under the ADA because his injury substantially limited the major life functions of working, lifting, and reaching. [FN5] He argues that he is limited in reaching and lifting over seventy-five pounds, and is substantially limited in his working ability because he cannot perform the class of jobs requiring reaching and lifting over seventy-five pounds.

> FN5. Shaw also alleges that his impairment has limited his ability to play volleyball or golf, lift weights, shovel snow, do yard work, and help build a deck onto his house. (Shaw Dep. 173-74, 240.) These claims are not applicable because it is well-established that recreational activities are not major life activities. *See, e.g., Weber v. Strippit, Inc.,* 186 F.3d 907 (8th Cir.1999) (shoveling snow, gardening, playing tennis, fishing, and hiking not major life activities).

"Whether a particular impairment substantially limits a major life activity requires an individualized assessment on a case-by-case basis." *See Toyota Motor Mfg. Ky. Inc. v. Williams,* 534 U.S. 184, 199, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002). The Third Circuit employs the EEOC's two-step analysis in making the determination whether an individual is substantially limited in one or more major life activities. *Lombardo v. Air Prod. and Chem. Inc.,* No. 05-1120, 2006 WL 18926 (E.D.Pa. July 7, 2006) (citing *Mondzelewski v. Pathmark Stores,* 162 F.3d 778, 783-84 (3d. Cir.1998)); *see* 29 C.F.R. pt. 1630, app. § 1630.2(j) . The court first determines whether or not the individual is substantially limited in any major life activity other than working. *Id.* (emphasis added). "If the court finds that the individual is substantially limited in any of these major life activities, the inquiry ends there. On the other hand, if the individual is not so limited, the court's next step is

to determine whether the individual is substantially limited in the major life activity of working." *Id.* The EEOC has defined "substantially limited" as (1) "unable to perform a major life activity that the average person in the general population can perform"; or (2) "significantly restricted as to the condition, manner, or duration under which an individual [the plaintiff] can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C .F.R. § 1630.2(j)(1)(i)-(ii). The EEOC has provided the following factors to aid the determination: "(i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2)(i)-(iii).

**\*7** Although Shaw correctly alleges that lifting and reaching are major life activities, the weight restrictions placed upon him by his physicians did not constitute a "substantial limitation" on lifting. *See Marinelli v. City of Erie, Pa.,* 216 F.3d 354, 363 (3d.Cir.2000). In Marinelli, the court found that a city employee's lifting restrictions of more than ten pounds did not constitute a "substantial limitation" on a major life activity, as required to establish a claim under the ADA. *Id.* at 364 (citing *Williams v. Channel Master Satellite Sys., Inc.,* 101 F.3d 346 (4th Cir.1996) (twenty-five pound lifting restriction is not significantly limiting)). When Shaw sought to return to work, he was restricted to a ten to twenty-five pound lifting range, well above the ten pound restriction that the *Marinelli* court found did not constitute a substantial limitation. [FN6]

> FN6. Although Shaw's medical records indicate periods of greater lifting restrictions, these periods were brief and temporary, and thus, he does not have a record an impairment that substantially limited a major life activity.

In addition, we find that Shaw was not substantially limited in his ability to work. The term,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                Page 7

Slip Copy, 2006 WL 2382284 (M.D.Pa.), 33 NDLR P 92

**(Cite as: 2006 WL 2382284 (M.D.Pa.))**

"substantially limits," in the context of "working", is defined as "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 CFR § 1630.2(j)(3)(I); *Murphy v. United Parcel Service, Inc.,* 527 U.S. 516, 517, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999). Thus, "one must be precluded from more than one type of job, a specialized job, or a particular job choice." *Tice v. Centre Area Transp. Auth.,* 247 F.3d 506, 512 (3d Cir.2001) (quoting *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999)). "If a host of different jobs are available, one is not precluded from a broad range of jobs." *Sutton,* 527 U.S. at 491.

Relying on *Williams v. Philadelphia Hous. Auth. Police Dept.,* 380 F.3d 751, 763 (3d Cir.2004), Shaw argues that he was substantially limited in working because he could not perform the class of jobs that requires lifting over seventy-five pounds. In *Williams,* a former police officer was unable to carry a firearm due to his severe depression, a condition that "temporarily limited the jobs that were available to him to those jobs that do not require him to carry a firearm." 380 F.3d at 763. The court found that law enforcement constituted a class of jobs, and a reasonable jury could determine that the plaintiff's inability to carry a firearm significantly restricted his ability to work in law enforcement compared to the average person with comparable training, skills, and ability. *Id.*

Unlike Williams, Shaw does not argue that he was precluded from performing a broad class of jobs, such as law enforcement. Other classes of jobs include, for example, meatpacker, pilot, or chef. *See Marinelli,* 21 F.3d at 364. Shaw does not argue that he is precluded from performing work as a laborer or manufacturer, but instead argues that he cannot perform jobs that include his particular lifting restrictions. [FN7]

> FN7. Plaintiff's brief argues he cannot perform jobs requiring lifting over seventy-five pounds. Although those are his current restrictions, at the time of the

alleged discrimination, he was permanently restricted to lifting between ten and twenty-five pounds. Thus, viewing the evidence in a light most favorable to the plaintiff, we will discuss his restriction as twenty-five, rather than seventy-five, pounds.

**\*8** In *Sutton v. United Air Lines, Inc.,* the Supreme Court rejected an ADA claim made by myopic job applicants who challenged an airline's minimum vision requirement for the job of "global airline pilot." 527 U.S. 471, 493, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). The Court held that the plaintiffs "failed to allege adequately that their poor eyesight was regarded as a [substantially limiting] impairment" because they only alleged that they were precluded from the position of "global airline pilot" which is "a single job" for a particular company and "the inability to perform a single particular job does not constitute a substantial limitation in the major life activity of working." *Id.* (quoting 29 C.F.R. § 1630.2(j)(3)(I) (1998)). In addition, the Court rejected plaintiffs' argument that "if one were to assume that a substantial number of airline carriers have similar vision requirements, they would be substantially limited in the major life activity of working." *Id.* The Court found this reasoning to be "flawed" because "it is not enough to say that if the physical criteria of a single employer were *imputed* to all similar employers one would be regarded as substantially limited in the major life activity of working *only as a result of this imputation.*" *Id.* (emphasis in original).

In *Marinelli,* the court found that no reasonable juror could find that the inability to lift over ten pounds substantially limits the life activity of working. 216 F.3d at 364-66. There, the plaintiff was limited to jobs with a "medium range of exertion" and could not lift more than ten pounds. *Id.* at 363-64. He argued that he was substantially limited in his ability to work because he could not continue his job on the "shift crew" for the municipality, which required that he answer telephones, respond to emergency needs for labor, pump gas, and plow snow, because his arm pain prevented him from plowing snow. *Id.* at 357. The

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                      Page 8

Slip Copy, 2006 WL 2382284 (M.D.Pa.), 33 NDLR P 92

**(Cite as: 2006 WL 2382284 (M.D.Pa.))**

court found this argument insufficient because the plaintiff was able to perform all of his other duties, and he demonstrated solely that he was unable to plow snow under the conditions of his particular job. *Id.*

Similarly, Shaw has testified that he could perform the vast majority of the laborer tasks at Chamberlain, and was restricted from performing his pre-injury job solely because it required that he rotate among various laborer positions, some of which required that he perform lifting beyond his restrictions. As in *Sutton,* Shaw only alleged that he was precluded from the position of laborer at Chamberlain which is a "single job" with a particular company. *Id.* This does not constitute a substantial limitation on the major life activity of working. Furthermore, Shaw cannot assume that a substantial number of companies who employ "laborers" have similar lifting and rotation requirements because "it is not enough to say that if the physical criteria of a single employer were *imputed* to all similar employers one would be regarded as substantially limited in the major life activity of working *only as a result of this imputation." Id.* Shaw has presented no evidence that all employers hiring laborers or manufacturers require their employees to lift over twenty-five pounds or rotate through jobs that include this requirement. Therefore, we find that Shaw has failed to create a genuine issue of material fact that he was substantially limited in his ability to work because he failed to demonstrate that his restrictions prevented him from working in a broad range of jobs or a class of jobs such as laborer or manufacturer. Accordingly, we find he has failed to create a genuine issue of material fact that he was actually disabled.

**II. Regarded As Disabled**

*9 Shaw also avers that Chamberlain regarded him as disabled because a Chamberlain representative called him "disabled" during the December 2003/January 2004 meeting between union representatives and Chamberlain. Shaw testified that Chamberlain's nurse as well as another official referred to him as "disabled." When the official said

he was disabled, Shaw explained, "the whole conversation was about me to come back [sic] to work and the way they were refusing and that, no, he is disabled, like if I am broke." (Shaw Dep. 218).

To establish that the plaintiff was "regarded as" disabled, the plaintiff must show that he has:

(1) a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation; (2) a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or (3) none of the impairments defined [by the regulations] ... but is treated by a covered entity as having a substantially limiting impairment.

*Sever v. Henderson,* 381 F.Supp.2d 405, 416 (M.D.Pa.2005) (citing 29 C.F.R. § 1630.2(I)(1)-(3) ). "[T]he mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that perception caused the adverse employment action." *Kelly v. Drexel Univ.,* 94 F.3d 102, 109 (3d Cir.1996). Instead, the plaintiff must show that the employer believed that a major life activity was substantially limited by the plaintiff's impairment. *Sever,* 381 F.Supp.2d at 416. In a "regarded as" claim, "the definition of 'substantially limits' remains the same as it does in other parts of the statute-i.e., if the individual is attempting to establish that the employer believed the individual to be limited in the life activity of 'working,' then 'working' must encompass a broad class of jobs." *Tice,* 247 F.3d at 514; *see also Sutton,* 527 U.S. at 492 (stating that a "regarded as" plaintiff is required to show that the employer regards him or her as unable to work in a broad class of jobs.). The Third Circuit has found that an employer "regarded" an employee as disabled when the employer believed that the employee was unable to perform a wide range of jobs, not just his or her previous position. *See Taylor v. Pathmark Stores Inc.,* 177 F.3d 180, 188 (3d Cir.1999).

Although Chamberlain's nurse and an official referred to Shaw as "disabled" during the December 2003/January 2004 meeting, it is clear that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                       Page 9

Slip Copy, 2006 WL 2382284 (M.D.Pa.), 33 NDLR P 92

**(Cite as: 2006 WL 2382284 (M.D.Pa.))**

Chamberlain did not perceive him as unable to perform a wide range of jobs, but only perceived him as unable to perform his pre-injury position at Chamberlain. Shaw admitted that "disabled" comment occurred in the context of determining whether he could perform his past work. (Shaw Dep. 218) In addition, the meeting discussed his ability to work with thirty pound shells and his previous job, not his ability to work a wide range of jobs. (*Id.* at 138-39) Moreover, it is undisputed that in the time period in question Chamberlain regarded Shaw as unable to lift more than ten to twenty-five pounds. From the time Shaw sought to return to work, this was the limitation that his doctors consistently applied until they raised it to fifty to seventy-five pounds, and Chamberlain refused to allow him to return to work because Shaw's doctor believed this restriction was permanent. Chamberlain regarded his impairment precisely as it was: he could not lift more than ten to twenty-five pounds and could not perform his pre-injury job at Chamberlain. It considered him only unable to perform a single job at a single employer, but believed he was able work a wide range and class of jobs. Thus, Chamberlain neither treated him as substantially limited in a major life activity, nor was Shaw substantially limited in a major life activity as a result of Chamberlain's attitude towards his impairment.

*10 Moreover, during the period where Shaw alleges Chamberlain engaged in discrimination, confusion existed as to whether Shaw would be permanently restricted from working in his previous position as laborer because no permanent light duty position existed at Chamberlain. Shaw was not returned to work because of the conflicting reports as to whether he could perform his prior position of laborer. During this time period, Chamberlain, in light of the conflicting medical reports, sought to determine whether Shaw would ever be able to work in his prior job classification as laborer. It was, in fact, engaged in a process to determine whether he could return to his prior position. *See Haulbrook v. Michelin N. Am., Inc.,* 252 F.3d 696, 703-04 (4th Cir.2001) (holding that it would "fly in the face of common sense" to find that an employee was regarded as substantially limited in working

where employer made repeated efforts to secure employee's return to the workforce). Thus, Chamberlain did not believe Shaw to be substantially limited in the major life activity. Accordingly, Plaintiff failed to established either that he was actually disabled or that Chamberlain regarded him as such, and we will dismiss his ADA discrimination claims. [FN8]

> FN8. In addition, even if Shaw could establish a prima facie case of discrimination, for the reasons discussed more fully below, we find that his discrimination claims fail because he has not created a genuine issue of material fact that Chamberlain's legitimate reasons for the adverse employment actions were pretext for discrimination.

**B. Retaliation**

The ADA prohibits employer's from retaliating against employees for opposing any activity made unlawful under the ADA. *Williams v. Philadelphia Housing Authority Police Department,* 380 F.3d 751, 758-59 (3d Cir.2004). "No personal shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing, under this chapter." 42 U.S .C. 12203(a). An ADA retaliation claim based on a request for an accommodation does not require that the plaintiff establish he was disabled. *Williams,* 380 at 759 n. 2.

The three part burden shifting analysis announced in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) applies to ADA retaliation claims. *Id.* at 760 n. 3. First, the plaintiff must establish a prima facie case. *Id.* "In order to establish a prima facie case of illegal retaliation under the anti-discrimination statues, a plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 2382284 (M.D.Pa.), 33 NDLR P 92

**(Cite as: 2006 WL 2382284 (M.D.Pa.))**

Page 10

employer's adverse action." *Id.* at 259 (quoting *Shellenberger v. Summit Bancorp, Inc.,* 318 F.3d 183, 188 (3d Cir.2003)). If the plaintiff can establish a prima facie case, the burden shifts to the defendant to articulate some legitimate nondiscriminatory reason for the action. *Id.* at 260 n. 3. Finally, the plaintiff then must prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were pretext for discrimination. *Id.*

**\*11** The plaintiff can create a genuine issue of material fact that the nondiscriminatory explanation is pretext "only if he submits evidence from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Connors v. Chrysler Financial Corp.,* 160 F.3d 971, 974 n. 2 (3d Cir.1998). Under the first option, "a plaintiff can cast sufficient doubt on a defendant's legitimate non-discriminatory reason by showing 'weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action [such] that a reasonable fact finder could rationally find them unworthy of credence.' " *Sheridan v. E.I. DuPont de Nemours & Co.,* 100 F.3d 1061, 1072 (3d Cir.1996) (quoting *Reeves v. Sanderson Plumbing Products, Inc. ..* 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). Under the second option, "the plaintiff may show that the employer has previously discriminated against [the plaintiff], that the employer has previously discriminated against other persons within the plaintiff's protected class, or that the employer has treated more favorably similarly situated persons not within the protected class." *Simpson v. Kay Jewelers,* 142 F.3d 639, 645 (3d Cir.1998) (citing *Fuentes v. Perskie,* 32 F.3d 759, 765 (3d Cir.1994)).

Shaw argues that he engaged in protected activity when he received worker's compensation and requested to return with light duty restrictions. He maintains that Chamberlain retaliated against him by: 1) refusing to hire him for a permanent light duty position in June and September of 2003 and

instead hiring Karen Kane to find a position for him outside of the company; and 2) delaying his return to work in December 2003/January 2004 and insisting on an IME after Dr. Mogerman alleviated the lifting restrictions in December of 2003.

Assuming that Shaw can establish a prima facie case, we find that he has produced insufficient evidence to rebut the defendants' legitimate non-discriminatory reasons for refusing to hire him for permanent light duty work and for delaying his return in 2004. *Jones v. Sch. Dist.,* 198 F.3d 403, 410 (3d Cir.1999) ("most [discrimination] cases turn on the third stage, *i.e.* can the plaintiff establish pretext").

Chamberlain has explained that it hired Karen Kane to find a position for Shaw outside the company in June of 2003 because at the time Shaw's medical records indicated that he was permanently restricted to light duty work, and it had no permanent light duty positions. [FN9] Although some light duty tasks were available, it reserved these duties for employees recovering from temporary injuries. Plaintiff argues that the defendants explanation is pretext because they had light duty tasks available. Plaintiff has produced no evidence, however, to rebut Chamberlain's assertion that it had no permanent light duty position available. Furthermore, Chamberlain's reasoning is supported by their record of accommodating Shaw on a temporary basis. In 2002, when Dr. Mogerman released Shaw to return to temporary light duty work, Chamberlain allowed him to perform light duty tasks at full pay. It was only when he requested a permanent light duty position, which they did not have, that they hired Karen Kane to locate a full-time light duty position for Shaw.

> FN9. "The ADA does not require an employer to create a new position to accommodate an employee." *Buskirk v. Apollo Metals,* 307 F.3d 160, 169 (3d Cir.2002) (citing *Shiring v. Runyon,* 90 F.3d 827, 831 (3d Cir.1996)).

**\*12** Similarly, we find that Shaw has failed to create a genuine issue of material fact that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 11

Slip Copy, 2006 WL 2382284 (M.D.Pa.), 33 NDLR P 92

**(Cite as: 2006 WL 2382284 (M.D.Pa.))**

Chamberlain's explanation for delaying his rehire in 2004 was pretext for discrimination. Chamberlain explained that it needed another medical opinion after Dr. Mogerman released him to work and alleviated his lifting restrictions to fifty to seventy pounds in December of 2003. Only six months prior, Dr. Mogerman had opined that Shaw would be permanently restricted. Furthermore, in January 2004, Dr. Greco opined that Shaw would be permanently restricted. Thus, Chamberlain sought an independent medical examination to resolve the discrepancies prior to allowing Shaw to return to work.

Shaw argues that this explanation is implausible because there were no conflicting medical reports because it is typical for a doctor to change an assessment if a patient improves. First, this argument ignores Dr. Greco's January 2004 opinion that Shaw would be permanently restricted, which conflicts with Dr. Mogerman's opinion at that time that he could lift fifty to seventy pounds. In addition, Shaw's argument mischaracterizes Dr. Mogerman's view of June through September of 2003, which was that Shaw was permanently limited to light duty. Although patients frequently improve with treatment, Dr. Mogerman's opinion that he was permanently limited indicated that he felt that treatment would not improve Shaw's impairment. Thus, when he opined that Shaw did improve, his opinion contradicted his previous view.

Therefore, we find that Shaw has failed to create a genuine issue of material fact that Chamberlain's legitimate non-discriminatory reasons were pretext for retaliation or discrimination, and we will grant summary judgment on claims under the ADA and PHRA. As we will grant summary judgment on both Shaw's discrimination and retaliation claims, we will also grant summary judgment on his claim against the individual defendants. Accordingly, we will grant summary judgment on each count and will dismiss the case. An appropriate order follows.

### ORDER

AND NOW, to wit, this 17th day of August 2006, Defendants' Motion for Summary Judgment (Doc. 15) is hereby GRANTED. The Clerk of Court is directed to enter judgment on behalf of the defendants and close this case in this district.

Slip Copy, 2006 WL 2382284 (M.D.Pa.), 33 NDLR P 92

**Motions, Pleadings and Filings (Back to top)**

• 2006 WL 1854057 (Trial Motion, Memorandum and Affidavit) Defendants' Reply in Support of Their Motion for Summary Judgment (May 12, 2006)Original Image of this Document (PDF)

• 2006 WL 1021571 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment (Mar. 9, 2006)Original Image of this Document (PDF)

• 2005 WL 2613361 (Trial Pleading) Answer to Complaint (Aug. 2, 2005)Original Image of this Document (PDF)

• 3:05cv01344 (Docket) (Jul. 5, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.