SA-10

Westlaw.

Not Reported in F.Supp.2d

Page 1

Not Reported in F.Supp.2d, 2002 WL 501494 (E.D.Pa.)

**(Cite as: 2002 WL 501494 (E.D.Pa.))**

**C**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
John SYNESIOU, Plaintiff,
v.
DESIGNTOMARKET, INC., Mardi Harrison, Don
Brown, and Tom Lawrence, Defendants.
**No. 01-5358.**

April 3, 2002.

*MEMORANDUM and ORDER*

YOHN, J.

**\*1** Plaintiff, John Synesiou ("Synesiou"), brings this action against defendants, DesignToMarket ("DTM"), Mardi Harrison ("Harrison"), Don Brown ("Brown") and Tom Lawrence ("Lawrence") (collectively, "defendants"), alleging a violation of the Pennsylvania Wage Payment and Collection Law ("WPCL"), 43 P.S. § 260.1 *et. seq.* (Count I), breach of contract against DTM only (Count II), promissory estoppel (Count III), and unjust enrichment (Count IV).

Presently before the court is defendants' motion to dismiss Counts I, III and IV of plaintiff's complaint. For the reasons set forth below, I will deny defendants' motion to dismiss Count I, and I will grant defendants' motion to dismiss Counts III and IV.

## BACKGROUND

In his complaint, Synesiou alleges the following relevant facts. On April, 1, 2001, Synesiou entered an employment agreement with DTM, a corporation with its principal place of business in Warminster,

Pennsylvania, and members of DTM's board of directors whereby he was to serve as president and CEO for a one year term, to be automatically extended at the expiration of each term. Compl. ¶ ¶ 9, 10. As part of his employment, Synesiou was required to relocate from Minneapolis to a city with a larger concentration of venture capital firms. Compl. ¶ 23. As a result, Synesiou sold his house in Minneapolis and moved to San Diego. Compl. ¶ 24. The employment agreement, which was to be governed by Pennsylvania law, provided that DTM would cover Synesiou's relocation costs. Compl. ¶ ¶ 14, 21. The employment agreement also set forth the amount of Synesiou's compensation and a schedule for when this compensation would be paid. Compl. ¶ ¶ 11-13.

On August 7, 2001, less than 5 months into his employment, Synesiou was terminated without cause. Compl. ¶ 26. Synesiou did not receive advance notice of his termination, nor did he receive the severance or relocation costs to which he was entitled under the employment agreement. Compl. ¶ ¶ 31-33. As a result, on October 22, 2001, Synesiou filed the instant action.

## STANDARD of REVIEW

In ruling on a motion to dismiss for failure to state a claim upon which relief may be granted, the court must accept as true all well-pleaded allegations of fact, and any reasonable inferences that may be drawn therefrom, in the plaintiff's complaint and must determine whether "under any reasonable reading of the pleadings, the plaintiff may be entitled to relief." *Nami v. Fauver,* 82 F.3d 63, 65 (3d Cir.1996) (citations omitted); *Colburn v. Upper Darby Township,* 838 F.2d 663, 665-66 (3d Cir.1988), *cert. denied,* 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 808 (1989) (citations omitted). Although the court must construe the complaint in the light most favorable to the plaintiff, it need not accept as true legal conclusions or unwarranted factual inferences. *Conley v. Gibson,* 355 U.S. 41,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 501494 (E.D.Pa.)

(Cite as: 2002 WL 501494 (E.D.Pa.))

Page 2

45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Claims should be dismissed under Rule 12(b)(6) only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Id.*

DISCUSSION

I. Count I: Violation of Wage Payment and Collection Law

**\*2** In Count I of his complaint, Synesiou alleges that defendants violated Pennsylvania's Wage Payment and Collection Law ("WPCL"), 43 P.S. § 260.1 *et. seq.*, by failing to pay Synesiou the compensation due to him under the employment agreement. Defendants maintain that Synesiou's WPCL claim fails as a matter of law because (1) DTM is not an "employer" within the meaning of the WPCL, and (2) Synesiou, as a resident of California, is not an employee entitled to WPCL protection.

A. *DTM is an "employer" as defined by the WPCL*

The WPCL defines "employer" as "every person, firm, partnership, association, corporation, receiver or other officer of a court of this Commonwealth and any agent or officer of the above-mentioned classes employing *any person* in this Commonwealth." 43 P.S. § 260.2a (emphasis added). Defendants' contend that DTM is not such an employer, as Synesiou did not and cannot allege that DTM employs any person in Pennsylvania. This is not so.

First, Synesiou alleges that DTM was an "employer" as defined by the WPCL. Compl. ¶ 41. In ruling on this motion to dismiss, this court must accept Synesiou's allegation as true unless defendants can definitively show that it is a false statement or an unwarranted factual inference. However, defendants have not provided any reason as to why this court should not believe Synesiou's contention that DTM is an "employer" as defined by the WPCL.

Second, although the term "employee" is not defined in the WPCL, the Pennsylvania Superior

Court has determined that in applying the WPCL, the definitions of employee provided in the Pennsylvania Unemployment Compensation Act ("UCA"), 43 P.S. § 751 *et. seq.*, and the Pennsylvania Worker's Compensation Act ("WCA"), 77 P.S. § 1 *et. seq.*, are "persuasive." *Frank Burns, Inc. v. Interdigital Communications Corp.,* 704 A.2d 678, 680 (Pa.Super.1998). Both the UCA and WCA define employee to include the officers of a corporation. 43 P.S. § 753(l)(1) (The definition of employee includes one employed to perform "service as an officer of a corporation."); 77 P.S. § 22 (The term employee includes "every executive officer of a corporation elected or appointed in accordance with the charter and by-laws of the corporation."). [FN1] In his complaint, Synesiou also alleges that Harrison and Brown, two of DTM's officers and executives, are residents of Pennsylvania. Compl. ¶¶ 3,4. Given the fact that DTM's officers and executives may be considered employees of DTM, and two of DTM's officers reside in Pennsylvania, Synesiou's complaint has alleged sufficient facts for this court to find that DTM employs people within this state and is, therefore, an "employer" as defined by WPCL.

> FN1. Further support that the officers of DTM are employees under the WPCL is found in the Third Circuit case of *Scully v. U.S. Watts, Inc.,* 238 F.3d 497 (3d Cir.2001). In *Scully,* the Third Circuit allowed a corporation's president and chief operating officer to bring a claim under the WPCL against his former corporate employer. Because only employees may assert the protections of the WPCL, *Scully* indicates that the Third Circuit considers corporate officers to be employees.

B. *Synesiou is an "employee" entitled to the protections of the WPCL*

Defendants argue that even if DTM is an "employer" under the WPCL, Synesiou's WPCL claim must be dismissed, as Synesiou, a nonresident, was not an employee entitled to the protections of the WPCL. Defendants maintain that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 3

Not Reported in F.Supp.2d, 2002 WL 501494 (E.D.Pa.)

**(Cite as: 2002 WL 501494 (E.D.Pa.))**

it is "settled" that a nonresident may not recover for violations of the WPCL. In support of this contention, defendants rely upon *Killian v. McCulloch,* 873 F.Supp. 938 (E.D.Pa.1995). In *Killian,* the district court held that the WPCL's protections did not extend to employees who were never based in Pennsylvania and who were not residents of Pennsylvania. 873 F.Supp. at 942. In arriving at this conclusion, the court found that "while the [WPCL] assuredly has the effect of deterring wrongful behavior on the part of employers, its primary aim is to ensure that those who are employed in Pennsylvania receive compensation for their work." *Id.* Thus, the court found that the legislature's interest in enacting the WPCL was to protect those who work within Pennsylvania, and not those who work outside the state. *Id.*

At the time *Killian* was decided, no Pennsylvania state court had ruled on the issue of whether a nonresident employee may bring suit in Pennsylvania pursuant to the WPCL, and therefore the *Killian* court was forced to predict what Pennsylvania courts would do when faced with this issue. Such predictions are no longer required without the guidance of any Pennsylvania court whatsoever. In January 2000, a Pennsylvania court rejected *Killian's* holding and allowed a nonresident employee to maintain a WPCL claim when his employment agreement required the use of Pennsylvania law and made Pennsylvania the exclusive forum for employer-employee disputes. *Crites v. Hoogovens Tech. Services, Inc.,* 43 Pa.D. & C. 4th 449 (Pa.Com.Pl.2000). In *Crites,* the Pennsylvania court considered whether an Ohio resident, whose employment obligation was in Mexico, was able to bring a WPCL claim against his Pennsylvania employer. 43 Pa.D. & C. 4th at 451. The *Crites* court found that applying the *Killian* holding when an employment agreement specified that it was to be governed by Pennsylvania law would bring about "absurd" results. *Id.* at 456-57. If *Killian* applied, the court found that the nonresident employee would be effectively out of court, as he would be unable to bring suit under the WPCL because of his nonresident status and unable to bring the action under another state's equivalent of

the WPCL because of the employment agreement's choice of Pennsylvania law. *Id.* at 456. This result was inconsistent with the purposes of the WPCL, which the court found to be *both* protection of Pennsylvania employee wages *and* punishment of "wayward employers" who failed to pay its employees' wages. *Id.* at 455. Accordingly, the Pennsylvania court rejected *Killian* and allowed the nonresident employee to maintain his WPCL claim.

**\*3** Applying the Pennsylvania precedent of *Crites* to the present action, this court will allow Synesiou's WPCL claim. [FN2] Synesiou is a California resident who was employed by DTM, a Pennsylvania corporation, pursuant to an employment agreement that specified that it was governed by Pennsylvania law. [FN3] Compl. ¶ 21. As a result of the choice of law provision, no matter where Synesiou chose to pursue this action against defendants, he was required to bring his statutory claim for wages under the WPCL. [FN4] Because the protections of another state's equivalent of the WPCL are unavailable to Synesiou, if he is not afforded the protections of the WPCL, Synesiou will effectively be out of court and DTM will be immune from any statutory liability for its failure to pay the compensation due to him. [FN5] This result offends the second purpose behind the enactment of the WPCL as enunciated by the *Crites* court, to punish recalcitrant employers for failing to pay employee wages. Accordingly, defendants' motion to dismiss Count I of Synesiou's complaint will be denied.

> FN2. Defendants argue that the *Crites* precedent is distinguishable from the present action because *Crites* involved an employment agreement with both a choice of law and choice of forum clause. Doc. 10 at 1-2. Defendants maintain that since the employment agreement here does not contain a choice of forum clause, the holding in *Crites* is inapplicable. Contrary to defendants' belief, the existence of a choice of forum provision was merely incidental to the *Crites* court's holding. Even if there had not been a choice of forum clause in *Crites* and the nonresident

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 501494 (E.D.Pa.)

**(Cite as: 2002 WL 501494 (E.D.Pa.))**

Page 4

employee was able to sue his employer in a forum other than Pennsylvania, the choice of law clause would have prevented the nonresident employee from suing under another state's equivalent of the WPCL. The court reasoned that if nonresidents were absolutely barred from bringing WPCL claims, an employer would effectively be able to protect itself against WPCL liability simply by hiring nonresidents and including a Pennsylvania choice of law clause in its employment agreements. *Crites,* 43 Pa.D. & C. 4th at 456. It was because of this employers' liability shield created by the Pennsylvania choice of law provision that the *Crites* court allowed the nonresident employee to maintain his WPCL claim.

FN3. This court has diversity jurisdiction over the present action, and therefore Pennsylvania choice of law rules will apply. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 196 (1941) Because "Pennsylvania courts generally honor the intent of the contracting parties and enforce choice of law provisions in contracts executed by them," this court will honor the choice of law provision and apply Pennsylvania law to the employment agreement at issue. *Kruzits v. Okuma Machine Tool, Inc.,* 40 F.3d 52, 55 (3d Cir.1994).

FN4. Defendants also argue that the choice of Pennsylvania law provision in the employment agreement does not necessarily mean that the agreement is governed by the WPCL. Doc. 10 at 2. Defendants suggest that the choice of law clause allows them to selectively choose which Pennsylvania employment laws apply to Synesiou's employment agreement. This is a novel interpretation of contractual choice of law provisions for which defendants have not provided any support. Defendants have not explained why the choice of Pennsylvania law

provision in the employment agreement means anything other than what it says, namely that the "employment agreement shall be governed by the laws of the Commonwealth of Pennsylvania." Such laws necessarily include the Pennsylvania WCPL.

FN5. The other district court cases cited by defendants to support their position that Synesiou is not entitled to the protections of the WPCL do not involve choice of law provisions. As such, these cases are not analogous to the present action where a choice of law provision governed the employment agreement and required Synesiou's statutory cause of action for wages to be brought under the Pennsylvania WPCL.

II. Counts III & IV--Promissory Estoppel and Unjust Enrichment

*4 In Counts III and IV of his complaint, Synesiou brings claims of promissory estoppel and unjust enrichment, respectively. Synesiou's promissory estoppel claim is that he was told by defendants that DTM would pay his relocation costs and that he relied on this promise when he sold his home in Minnesota and relocated to San Diego. Compl. ¶¶ 58-61. Synesiou's unjust enrichment claim is that as a result of defendants' wrongful actions, he was damaged and defendants obtained a benefit to which they were not entitled. Compl. ¶¶ 62-65. Defendants argue that because there is a valid and enforceable written employment agreement that governs these matters, Synesiou's claims for promissory estoppel and unjust enrichment must be dismissed.

A cause of action for promissory estoppel arises when a party relies to his detriment on the representations of another party. *Carlson v. Arnot-Ogden Memorial Hospital,* 918 F.2d 411, 416 (3d Cir.1990); *Thomas v. E.B. Jermyn Lodge No. 2,* 693 A.2d 974, 977 (Pa.Super.1997). Promissory estoppel applies to enforce a promise that is not supported by consideration, in other

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 501494 (E.D.Pa.)

**(Cite as: 2002 WL 501494 (E.D.Pa.))**

Page 5

words, when there is no binding contract. *Carlson,* 918 F.2d at 416; *Constar, Inc. v. National Distribution Centers, Inc.,* 101 F.Supp.2d 319, 323 (E.D.Pa.2000). Thus, promissory estoppel has no application when parties have entered into an enforceable agreement. *Carlson,* 918 F.2d at 416. Similarly, a claim of unjust enrichment is defeated by the existence of an enforceable and binding contract. *Schott v. Westinghouse Electric Corp.,* 436 Pa. 279, 259 A.2d 443, 448 (Pa.1969); *see also Matter of Penn Center Transp. Co.,* 831 F.2d 1221, 1230 (3d Cir.1987) (plaintiff cannot maintain a claim of unjust enrichment when an express contract existed on the same subject). "Under Pennsylvania law, 'the quasi-contractual doctrine of unjust enrichment is inapplicable when the relationship between the parties is founded on a written agreement or express contract.' " *Hershey Foods Corp. v. Ralph Chapek, Inc.,* 828 F.2d 989, 999 (3d Cir.1987) (quoting *Schott v. Westinghouse Electric Corp.,* 436 Pa. 279, 259 A.2d 443, 448 (Pa.1969)). This is because the essence of an unjust enrichment claim is that there is no direct relationship between the parties under which the plaintiff may recover. *Rade, v. Transition Software Corp.,* 1998 WL 767455 at * 9 (E.D.Pa. Oct. 30, 1998).

Here, neither party disputes the existence of a valid and enforceable employment agreement nor does either party dispute the fact that the existence of this agreement precludes Synesiou from obtaining relief under a promissory estoppel or unjust enrichment theory. [FN6] As a result, Synesiou argues (1) that he is entitled to plead promissory estoppel and unjust enrichment claims in the alternative and (2) that because his promissory estoppel and unjust enrichment claims are based on matters outside the scope of the employment agreement, these claims are not precluded by the existence of this agreement.

> FN6. Should defendants later attempt to change their position with reference to the validity of the employment contract, the court will reconsider this issue.

Under Fed.R.Civ.P. 8(a), plaintiffs are free to plead alternative theories of relief. However, the fact that

the federal rules permit alternative pleading does not mean that alternatively plead claims may not be dismissed if they fail to state a claim. As stated above, the finding of an enforceable contract defeats the validity of promissory estoppel and unjust enrichment claims. *Carlson,* 918 F.2d at 416 (promissory estoppel claim must fail when a valid contract exists); *Halstead v. Motorcycle Safety Foundation Inc.,* 101 F.Supp.2d 455, 459 (E.D.Pa.1999) (unjust enrichment claim must fail when a valid contract exists); *Schott,* 259 A.2d at 448 (unjust enrichment claim inapplicable when a contractual relationship exists between parties); *see also Matter of Penn Center Transp. Co.,* 831 F.2d 1221, 1230 (3d Cir.1987) (plaintiff cannot maintain a claim of unjust enrichment when an express contract existed on the same subject). Thus, because the parties agree that a valid employment agreement exists here, Synesiou cannot maintain a claim for either promissory estoppel or unjust enrichment, as neither theory is available to provide Synesiou with relief. [FN7]

> FN7. Synesiou's reliance on *Eastland v. Du Pont,* 1996 WL 421940 (E.D.Pa. July 23, 1996), and *Gonzalez v. Old Kent Mortgage Co.,* 2000 WL 1469313 (E.D.Pa. Sept. 21, 2000), is misplaced here. These cases are readily distinguishable from the present action. In both *Eastland* and *Gonzalez,* the validity and existence of the underlying contractual agreement was in dispute. *Eastland,* 1996 WL 421940 at *2; *Gonzalez,* 2000 WL 1469313 at *4. As such, these courts allowed claims of unjust enrichment to be plead in the alternative in case it was found that no valid contract existed between the parties. By contrast, in the present action, the validity and enforceability of the employment agreement are not at issue. Because of this key difference, the *Eastland* and *Gonzalez* precedents do not instruct this court.

*5 In apparent recognition of the obstacle that the valid employment agreement presents to his promissory estoppel and unjust enrichment claims,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 6

Not Reported in F.Supp.2d, 2002 WL 501494 (E.D.Pa.)

**(Cite as: 2002 WL 501494 (E.D.Pa.))**

Synesiou argues that these claims are based on representations that were made to him *after* the execution of the employment agreement and that these claims are beyond the scope of the agreement. As such, Synesiou maintains that his promissory estoppel and unjust enrichment claims are not barred by the existence of the employment agreement.

Synesiou's promissory estoppel and unjust enrichment claims [FN8] are premised on the allegation that Synesiou relied on defendants' representations that as part of his employment he was required to relocate and that DTM would cover his relocation costs. Compl. ¶ 59. As a result, Synesiou seeks to recover for damages incurred in connection with his relocation. Compl. ¶ 61. An examination of the allegations contained in Synesiou's complaint leads this court to conclude that these matters are within the scope of the employment agreement. In his complaint, Synesiou alleges that the employment agreement provides that DTM would pay plaintiff $60,000 for his relocation costs. Compl. ¶¶ 14, 23. Additionally, as part of his breach of contract claim, Synesiou alleges that DTM failed to pay the relocation costs that were provided for and due to him under his employment agreement. Compl. ¶¶ 51, 54. Given that Synesiou seeks to recover the same damages under his promissory estoppel and unjust enrichment claims as his breach of contract claim, namely reimbursement for his costs of relocating to San Diego, it is evident that Synesiou's promissory estoppel and unjust enrichment claims concern matters within the four corners of the employment agreement. Thus, Synesiou's promissory estoppel and unjust enrichment claims are defeated by the existence of the employment agreement. Accordingly, these claims will be dismissed. [FN9]

FN8. Synesiou's complaint does not specifically indicate that his unjust enrichment claim is premised on defendants' representations regarding relocation. Rather, Synesiou's claim of unjust enrichment is based on all of defendants' actions described in his complaint to the extent that defendants

accepted a benefit to which they were not entitled and have not paid. Compl. ¶ 63. However, in his memorandum in opposition to defendants' motion to dismiss, Synesiou states that his unjust enrichment claim pertains to his relocation. Doc. 9 at 15.

FN9. Because the existence of the employment agreement bars Synesiou's promissory estoppel and unjust enrichment claims, it is unnecessary for this court to consider defendants' argument that the parol evidence rule also bars these claims. Additionally, by dismissing Synesiou's promissory estoppel and unjust enrichment claims, this court need not consider defendants' argument that Synesiou has not plead a factual basis to maintain these claims against the individual defendants.

CONCLUSION

**6** Defendants' motion to dismiss will be granted in part and denied in part. This court will not dismiss Synesiou's WPCL claim (Count I). Synesiou has alleged sufficient facts for this court to find that DTM is an "employer" as defined by the WPCL, and recent Pennsylvania caselaw instructs this court that plaintiff, although not a Pennsylvania resident, is an employee entitled to the protections of this act. This court will, however, dismiss Synesiou's promissory estoppel (Count III) and unjust enrichment (Count IV) claims. Because the validity of the employment agreement is uncontested and the factual basis for Synesiou's promissory estoppel and unjust enrichment claims is encompassed by this agreement, Synesiou is not entitled to relief under either a promissory estoppel or an unjust enrichment theory.

An appropriate order follows.

ORDER

And now this _____ day of April, 2002, upon consideration of plaintiff's complaint (Doc. No. 1); defendants' motion to dismiss Counts I, III, and IV of plaintiff's complaint (Doc. No. 3); plaintiff's opposition thereto (Doc. No. 9); defendants' reply

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 7

Not Reported in F.Supp.2d, 2002 WL 501494 (E.D.Pa.)

**(Cite as: 2002 WL 501494 (E.D.Pa.))**

(Doc. No. 10); and plaintiff's letter brief dated March 15, 2002; it is hereby ORDERED that defendants' motion to dismiss Count I of plaintiff's complaint is DENIED. It is further ORDERED that defendants' motion to dismiss Counts III and IV is GRANTED and Counts III and IV are dismissed.

Not Reported in F.Supp.2d, 2002 WL 501494 (E.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

• 2:01CV05358 (Docket) (Oct. 22, 2001)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

SA-11

Westlaw.

Not Reported in F.Supp.                                                                Page 1

Not Reported in F.Supp., 1997 WL 820934 (D.Del.), 11 NDLR P 307

**(Cite as: 1997 WL 820934 (D.Del.))**

c

United States District Court,
D. Delaware.
Gordon W. TESTERMAN, Plaintiff,
v.
CHRYSLER CORPORATION, a Delaware
corporation, Defendant.
**No. CIV.A. 95-240 MMS.**

Dec. 30, 1997.

David A. Boswell, Esq., of Schmittinger &
Rodriguez, P.A., Wilmington, Delaware; attorneys
for plaintiff.

Laurence V. Cronin, Esq., of Smith, Katzenstein &
Furlow, Wilmington, Delaware; Of Counsel: John
D. Dunbar, Esq., and Kelly S. May, Esq., of Daniels
& Kaplan, P.C., Kansas City, Missouri; attorneys
for defendant.

OPINION

SCHWARTZ, Senior District J.

INTRODUCTION

*1 On April 18, 1995, Gordon Testerman filed a
complaint against his former employer, Chrysler
Corp., alleging violation of the Americans with
Disabilities Act, 42 U.S.C. § 12101 et. seq. (ADA),
and the Delaware Handicapped Persons
Employment Protections Act (DHPEPA), Del. Stat.
Ann. tit. 19, § 720 et. seq. (1995), breach of a
collective bargaining agreement, and intentional
infliction of emotional distress, all arising out of his
termination from Chrysler. On March 28, 1997,
Testerman filed a motion for summary judgment on
his ADA claim and Chrysler filed a motion for
summary judgment on all four of Testerman's
claims. Testerman's answering brief conceded his
inability to pursue either the breach of the collective
bargaining agreement claim or the intentional
infliction of emotional distress claim.
Consequently, Chrysler's motion for summary

judgment on these two claims will be granted
without discussion. Cross motions on the ADA
claim and Chrysler's motion on the DHPEPA claim
remain. This Court has jurisdiction pursuant to 28
U.S.C. § 1331, federal question jurisdiction. For
the reasons stated below, both defendant's and
plaintiff's motions for summary judgment will be
granted in part and denied in part.

STATEMENT OF FACTS

Testerman began working for Chrysler at the
Newark, Delaware, assembly plant in 1971. Since
the inception of Testerman's employment with
Chrysler, he has suffered from a back sprain, for
which Chrysler assigned him PQX (physically
qualified with restrictions) codes. These codes
indicated that Testerman should not be assigned
duties which required lifting or carrying over twenty
pounds or demanded more than intermittent
twisting, stooping, or squatting. [FN1] In addition
to his back problems, Testerman has battled with
alcoholism since before his employment with
Chrysler. Although the parties dispute the degree
of Testerman's drinking problem, he received
in-patient alcohol treatment in the mid-1970's, the
mid-1980's, and 1992, and received probation
and/or jail time for several Driving While
Intoxicated ("DWI"), including one in 1987 and one
in 1992. Chrysler had a record of the 1985 and
1992 in-patient treatments; however, it is not clear
which supervisors knew about his alcoholism.

In the late 1980s, Testerman's physical and mental
health began to deteriorate. In 1987, Testerman
claims he began to experience bouts of depression,
for which he received therapy several times,
including during the years 1988, 1989, 1991 and
1992. He was diagnosed with depression in 1992
and was prescribed related medications. Chrysler
was aware that Testerman was receiving
psychological services in 1987 and at other times
supervisors showed some evidence that they were
cognizant of Testerman's negative mood and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Page 2

Not Reported in F.Supp., 1997 WL 820934 (D.Del.), 11 NDLR P 307

(Cite as: 1997 WL 820934 (D.Del.))

difficulty relating to others. The parties disagree, however, about the degree to which individual supervisors, particularly the one who fired Testerman, knew of the depression.

In 1988, Testerman was diagnosed with Type I diabetes. Both Chrysler's and the Veterans Administration's medical records show the diabetes caused fatigue, frequency of urination, excessive thirst, and some loss of sensation in his lower extremities. Testerman was hospitalized for diabetes related conditions twice in 1988. Chrysler periodically monitored Testerman's blood sugar level and sent him home for diabetes related problems (e.g., high blood sugar level) on several occasions. These medical problems caused Testerman to take frequent breaks and to miss work on a few occasions.

*2 Despite these problems, Testerman proved able to fulfill his duties as a finesse sealer. At oral argument, defendant conceded Testerman was able to perform the "essential functions" of his job. His job consisted of applying sealer to sheet metal seams in cars as they passed down the assembly line. Some conflicts were created, however, over Testerman's increasingly frequent breaks and absences from work. There is some disagreement over the extent to which different supervisors considered Testerman's breaks and absences disruptive to the assembly line, the degree to which co-workers complained, and whether supervisors criticized and harassed Testerman about his medical problems. There is also a dispute over how much the breaks and absences were due to the diabetes and the degree to which Testerman's supervisors were informed about Testerman's reasons for them. Further, some of the co-workers complaints revolved not around Testerman's breaks but rather around his tendency to "work back" on the line and disrupt other employees. "Working back on the line" means that he would occasionally perform his duties in the adjacent worker's station in the assembly line in order to get ahead on the cars coming down the line.

During this period of deterioration, Chrysler terminated Testerman twice, in September of 1987

and February of 1989, for unexcused absences from work. After both dismissals, the union negotiated with defendant and obtained plaintiff's reinstatement based on plaintiff's consent to a "Last Chance Agreement" (LCA). Both the first and second LCAs required a few years of model behavior, including virtually no absences and no evidence of inferior work, under penalty of reprimand or discharge. In addition, the second LCA contained a random substance abuse urine test provision which Chrysler imposed on at least two occasions, once in 1989 and another time in 1991. On August 9, 1993, supervisors counseled Testerman for violation of his second LCA, specifically for violation of Conduct Rule 9 regarding inferior work and excessive scrap.

In July and August 1993, Chrysler underwent a "changeover," during which the assembly line shut down and line workers took on different jobs to assist with the transition. These jobs required sanitation work, from which Testerman was excluded because Chrysler's supervisors determined he could not participate as a result of his PQX codes. Testerman argues there were light duty jobs available to him but Chrysler was unwilling to make the effort to accommodate Testerman's needs. Testerman had been assigned tasks during changeovers in the past when he had the same restrictions.

On August 16, 1993, Testerman filed an informal complaint regarding his exclusion from employment during the changeover period. On August 20, 1993, while Testerman was subject to the provisions of the second Last Chance Agreement, defendant terminated plaintiff, allegedly because he inadequately sealed a series of cars, thereby violating the Agreement. Although the supervisor's report supports this contention, Chrysler's subsequent written response to the union's resulting grievance said plaintiff had violated the LCA because he had been away from his work area during the time these cars went down the line and he missed the jobs. Plaintiff asserts that, as the management's second response indicates, he was not at the workstation at the time but rather at the infirmary. As a result, another employee had been

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 3

Not Reported in F.Supp., 1997 WL 820934 (D.Del.), 11 NDLR P 307

(Cite as: 1997 WL 820934 (D.Del.))

filling in for Testerman and had done the inferior scrap work. Defendant claims plaintiff was not at the infirmary at the time the cars passed his station but argues that, even if he was, defendant reasonably believed at the time that Testerman had completed the inferior work. As indicated above, there is contradictory evidence, including assembly line time sheets and infirmary records, over plaintiff's responsibility for the errors and defendant's knowledge of another employee's potential role in the errors. Defendant alleges plaintiff was terminated based on a legitimate belief that plaintiff was responsible for these errors. Testerman alleges defendant knew he was not responsible and used the event to justify a termination that was actually based on his disabilities.

*3 The union, on Testerman's behalf, filed a grievance alleging that the discharge was "unjust." The claim was submitted to arbitration, pursuant to the Collective Bargaining Agreement (CBA) between the local union and defendant, and the arbitrator found plaintiff had been properly discharged. Plaintiff then filed a complaint with the EEOC alleging violation of the ADA and the DHPEPA. Plaintiff received a right to sue letter and filed a complaint with this court.

STANDARD OF REVIEW

Under the Federal Rules of Civil Procedure, the Court shall grant summary judgment if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute is genuine only if a reasonable jury could return a verdict for the nonmoving party. *Id.* When considering a motion for summary judgment, the Court must "view all facts and inferences in the light most favorable to the party opposing the motion." *Stephens v. Kerrigan,* 122 F.3d 171, 176-177 (3d Cir.1997).

The Supreme Court has clarified that the moving party must "bear the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). After such a demonstration has been made, however, the nonmoving party must go beyond the pleadings and, based on the same types of evidence, must demonstrate "specific facts showing that there is a genuine issue for trial." Id. at 324. The nonmoving party cannot rest on his allegations without "any significant probative evidence tending to support the complaint." *Anderson,* 477 U.S. at 249 (1986) (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

On cross motions for summary judgment, the same standard and burdens apply. *See Peters Township School District v. Hartford Accident and Indemnity Co.,* 833 F.2d 32, 34 (3d Cir.1987); *Appelmans v. City of Philadelphia,* 826 F.2d 214, 216 (3d Cir.1987). Further, when presented with cross motions for summary judgment, the Court must consider the motions separately. *See Williams v. Philadelphia Hous. Auth.,* 834 F.Supp. 794, 797 (E.D.Pa.1993), *aff'd mem.,* 27 F.3d 560 (3d Cir.1994).

DISCUSSION

Chrysler contends the mandatory arbitration provision of the collective bargaining agreement (CBA) in which Testerman participates precludes Testerman from pursuing ADA and DHPEPA remedies. Alternatively, Chrysler argues Testerman is not disabled under the ADA and, therefore, has no colorable claim to assert. Testerman rejects both of these arguments, which the Court will address in turn.

I. Impact of the Collective Bargaining Agreement

*4 Chrysler argues Testerman had an opportunity to resolve his disability discrimination claim through the union's pursuit of an "unjust discharge"

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 4

Not Reported in F.Supp., 1997 WL 820934 (D.Del.), 11 NDLR P 307

**(Cite as: 1997 WL 820934 (D.Del.))**

complaint on his behalf. Consequently, Chrysler contends the arbitrator's judgment is a final and binding resolution of the discrimination claim. [FN2] In the alternative, Chrysler argues that even if the unjust discharge complaint did not incorporate the discrimination claim, Testerman is required to pursue arbitration as the exclusive means of resolving this dispute. Chrysler argues the Third Circuit Court of Appeals case *Orlando v. Interstate Container Corp.,* 100 F.3d 296 (3d Cir.1996), and the Fourth Circuit Court of Appeals case *Austin v. Owens-Brockway Glass Container, Inc.,* 78 F.3d 875 (4th Cir.), *cert. denied,*--U.S.--, 519 U.S. 980, 117 S.Ct. 432, 136 L.Ed.2d 330 (1996), compel judgment in Chrysler's favor. The Court disagrees.

The first of the two seminal Supreme Court cases on the applicability of mandatory arbitration provisions to statutory discrimination claims is *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). In *Alexander,* a black employee brought a Title VII suit after the union arbitrated his claim pursuant to a CBA and he received an adverse judgment. *Id.* at 38-43. The employer asserted that the employee's prior submission of the claim to final arbitration [FN3] precluded the Title VII suit. *Id.* at 38.

The Court held the employee had not foreclosed his right to a trial de novo on his Title VII claim by submitting his complaint to final arbitration under the nondiscrimination clause of a collective-bargaining agreement. *Id.* at 59- 60. One of the Court's primary bases for its decision was that the employee was constrained by the CBA because he could not individually compel arbitration and pursue his claim with the company. 415 U.S. at 51. The Court distinguished a union's waiver of rights relating to collective activity, such as the right to strike, from a union's waiver of individual rights. The Court explained that a union's waiver of rights relating to collective activity is acceptable because

[t]hese rights are conferred on employees collectively to foster the processes of bargaining and properly may be exercised or relinquished by the union as collective-bargaining agent to obtain

economic benefits for union members. Title VII, on the other hand, ... concerns not majoritarian processes, but an individual's right to equal employment opportunities. Title VII's strictures are absolute and represent a congressional command that each employee be free from discriminatory practices. Of necessity, the rights conferred can form no part of the collective-bargaining process since waiver of these rights would defeat the paramount congressional purpose behind Title VII.
*Id.* [FN4]

The Court also relied heavily on the differences between the nature of contractual rights and statutory rights. *Id.* at 49-40. [FN5] The Court stated that the arbitrator's "source of authority is the collective-bargaining agreement, and he must interpret and apply that agreement.... He has no general authority to invoke public laws that conflict with the bargain...." *Id.* at 53. [FN6] Although the CBA in *Alexander* had a clause prohibiting the discriminatory application of the CBA, *id.* at 39, [FN7] the Court concluded the arbitrator had authority to resolve only questions of contractual rights. [FN8] This was true even though the anti-discrimination contractual rights were similar to or duplicative of the statutory anti-discrimination rights. 415 U.S. at 52-54. Further, the Court determined Congress did not intend for judicial remedies under Title VII to be prospectively waivable, *id.* at 47-49, and the arbitration process was an inadequate forum for the resolution of such claims. *Id.* at 56-60.

**\*5** Subsequently, in *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), the Supreme Court revisited limitations imposed by CBAs on the adjudication of statutory claims. The Court addressed whether, under the Federal Arbitration Act (FAA), an employee could be compelled to submit his Age Discrimination in Employment Act claim to mandatory arbitration pursuant to an individual agreement to arbitrate. [FN9] *Id.* at 23. The Court held that he could be so compelled. *Id.* First, the Court noted the FAA's " 'liberal federal policy favoring arbitration agreements." ' Second, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Page 5

Not Reported in F.Supp., 1997 WL 820934 (D.Del.), 11 NDLR P 307

**(Cite as: 1997 WL 820934 (D.Del.))**

Court reasoned that "having made the bargain to arbitrate, the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue." *Id.* at 26 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473, U.S. 614, 625 (1985)). The Court concluded the ADEA's language and legislative history did not explicitly or implicitly preclude a waiver of a judicial forum for an ADEA claim. 500 U.S. at 26-29. The Court recognized, however, that "all statutory claims may not be appropriate for arbitration." *Id.* at 26. Third, the *Gilmer* Court construed the New York Stock Exchange (N.Y.SE) registration application language as broad enough to encompass statutory claims. *Id.* at 23, 35.

The *Gilmer* Court distinguished Alexander and its progeny [FN10] in three fundamental ways:

First, those cases did not involve the issue of the enforceability of an agreement to arbitrate statutory claims. Rather, they involved ... whether arbitration of contract-based claims precluded subsequent judicial resolution of statutory claims. Since the employees there had not agreed to arbitrate their statutory claims, and the labor arbitrators were not authorized to resolve such claims, the arbitration in those cases understandably was held not to preclude subsequent statutory actions. Second, because the arbitration in those cases occurred in the context of a collective-bargaining agreement, ... an important concern [for the Alexander Court] was the tension between collective representation and individual statutory rights, a concern not applicable here. Finally, those cases were not decided under the FAA, which reflects a liberal federal policy favoring arbitration agreements.

*Id.* at 35 (internal quotations omitted). The *Gilmer* Court also discussed that the NYSE's arbitration proceedings involved in that case addressed many of *Alexander's* concerns over the adequacy of arbitration procedures in resolving statutory claims. *Id.* at 30-33.

Based on *Alexander* and *Gilmer,* The Third Circuit Court of Appeals has recently rendered a decision that controls the instant issue--*Martin v. Dana*

*Corp.,* No. 96-1746 (3d Cir. filed Dec. 16, 1997). [FN11] Because the Third Circuit Court of Appeals decided that Martin did not have an individual right to "grieve a matter or take it to arbitration, absent union consent," the court decided *Alexander* controlled and Martin retained the ability to pursue his Title VII claim in court. No. 96-1746, at 5. This holding is particularly noteworthy because the CBA at issue in *Martin* clearly covered statutory claims. [FN12] By placing controlling weight on the fact that a union "cannot prospectively waive an employee's rights under Title VII" as long as the employee has no independent power to arbitrate, the court implicitly concluded that this distinguishing factor between *Gilmer* and *Alexander* can trump the other critical factor--the language of the CBA regarding contractual versus statutory claims. *See Gilmer,* 500 U.S. at 35.

*6 Turning to the Agreement between Testerman and Chrysler, the three factors that distinguish *Alexander* from *Gilmer* will be considered. First, the defendant has not invoked the FAA in its argument. [FN13] Second, both parties agree the collective bargaining agreement does not provide Testerman with an individual right to compel arbitration but rather mandates reliance on the union for such action. This second factor alone, according to *Martin,* compels judgment in Testerman's favor.

However, this case proves even stronger for Testerman than that confronting the plaintiff in *Martin* because, unlike the CBA in *Martin,* the language of the CBA in the case at bar does not include the mandatory arbitration of statutory discrimination claims. Throughout the portions of the CBA provided in the record, the Agreement only refers generally to "grievances" and never speaks of statutory claims. On the contrary, various provisions demonstrate the Agreement only covers contract claims. Similar to the language in the *Alexander* CBA that was limited to contract claims, [FN14] the Chrysler CBA states that the Appeal Board "shall not have authority to add to, subtract from, or modify any of the terms of the agreement ...." D.I. 56 at 30. [FN15] Similarly, the provision pertaining to law suits states that the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 6

Not Reported in F.Supp., 1997 WL 820934 (D.Del.), 11 NDLR P 307

**(Cite as: 1997 WL 820934 (D.Del.))**

Union "shall have the right to assert and press against the Corporation in any judicial or adjudicatory proceeding any claim or action asserting a violation of *the Agreement.*" *Id.* at 29-30 (emphasis added).

In addition, the Agreement includes information about a Special Arbitration Program, which deals with "a limited number of certain discharge and discipline credibility issues." *Id.* at 50. The letter pertaining to this special program explains that "grievances which involve any contract interpretation" [FN16] shall not be subject to the Special Arbitration Program but rather will be left to the standard arbitration procedures. This language strongly suggests these contract based grievances are the only claims remaining for the regular arbitration program to resolve.

Although defendant presented at oral argument language of the CBA stating the CBA will not be applied discriminatorily, [FN17] defendant's belated submission is unavailing. *Alexander* made clear such clauses will be construed as addressing only contract-based discrimination claims, regardless of how similar these claims may be to statutorily based ones. 415 U.S. at 52-54. [FN18] This finding is compelled, among other reasons articulated in *Alexander,* because the non-discrimination policy addresses how *the Agreement* will be applied. Even without this holding in *Alexander,* however, the presented anti-discrimination clause would not alter the Court's findings. Instead, the additional sections of the CBA confirm the Court's interpretation.

Immediately after the anti-discrimination clause, the CBA states that any employee who claims, "in violation of this [anti-discrimination] principle, he has been denied rights guaranteed by *this Agreement* may complain as provided in the grievance procedure." [FN19] (emphasis added). This sentence indicates the anti-discrimination protections refer only to the remaining contractual terms of the Agreement rather than to additional statutory protections. This interpretation is supported by language at the end of the section, which states the "grievance and arbitration

procedure shall be the exclusive *contractual* procedure for remedying such claims." Further, a letter contained in the CBA elaborates upon this provision and states the CBA provides the " *contractual* grievance and arbitration procedure for the resolution of alleged violations of the [anti-discrimination] principle." (emphasis added).

*7 Finally, with respect to the ADA claim, the non-discrimination clause referred to "handicapped" individuals, reflecting that it was drafted prior to the implementation of the Americans with Disabilities Act. [FN20] Consequently, neither the defendant nor the beneficiaries could have understood the protections of the ADA to be included in the CBA.

In light of the above analysis, it is apparent this case falls, like *Martin,* under the *Alexander* line of cases, not those adhering to *Gilmer.* The defendant has not articulated any significant difference between the situation presented to the Supreme Court in *Alexander* and the case at bar which would compel a different result. Although defendant argues alternatively that Testerman either has arbitrated his claim and is bound by the judgment or has not arbitrated his claim and must do so, plaintiff's right to bring the instant suit remains whether or not the discrimination claim has actually been submitted to arbitration. *Alexander,* 415 U.S. at 52; *Martin,* No. 96-1746 at 3, 8; *Bristentine v. Stone & Webster Engineering Corp.,* 117 F.3d 519, 524 (11th Cir.1997); *Varner v. National Super Markets, Inc.,* 94 F.3d 1209, 1213 (8th Cir.1996); *Nieves,* 961 F.Supp. at 792. Testerman has exhausted his contractual claims under the collective bargaining agreement entered into by his union and Chrysler. He has retained an independent right to pursue his statutory claims. The defendant's motion for summary judgment on the grounds that plaintiff's ADA and DHPEPA claims are precluded by the collective bargaining agreement is denied.

II. ADA Claims

The ADA prohibits discrimination against a "qualified individual with a disability." 42 U.S.C. § 12112(a). A disability is: (A) a physical or mental

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1997 WL 820934 (D.Del.), 11 NDLR P 307

**(Cite as: 1997 WL 820934 (D.Del.))**

impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment. *Id.* § 12102(2). "Physical or mental impairment" means "[a]ny physiological disorder, or condition ... affecting one or more of the following body systems: neurological, musculoskeletal, ... hemic and lymphatic, ...and endocrine; or ... [a]ny mental or psychological disorder, such as ... emotional or mental illness ...." 29 C.F.R. § 1630.2(h).

A. An Impairment that Substantially Limits One or More Major Life Activities

At oral argument, Chrysler conceded that Testerman's back injury, alcoholism, and diabetes were impairments from which Testerman suffered. However, although Chrysler does not dispute depression is a mental illness qualifying as a mental impairment, it denies Testerman suffered from depression. In addition, Chrysler argues none of these conditions substantially limited a major life activity.

Testerman engaged in ongoing treatment for depression from 1988 through 1992, including therapy and medication, and was evaluated as having depression in 1992, which was determined to be long-standing. In 1995, Testerman was again diagnosed with moderate to severe depression. While this latter diagnosis cannot establish as a matter of law that Testerman suffered from depression immediately prior to termination, it more than suffices to raise a genuine factual dispute about whether the depression he suffered from in 1992 had been successfully treated in the late summer of 1993. Therefore, for purposes of the present summary judgment motion, the Court will analyze Testerman's claim of depression as though he suffered from the impairment at the time of his termination. Consequently, regarding Testerman's status as a "disabled" individual under the ADA, only the dispute over the existence of a substantial limitation on a major life activity remains.

*8 "Major life activities" are defined in the EEOC regulations and include "caring for oneself,

performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). The EEOC also has issued Interpretive Guidelines to the ADA, which state "other major life activities include, but are not limited to, sitting, standing, lifting and reaching." 29 C.F.R. Pt. 1630, App. § 1630.2(i).

As outlined above, not all impairments are disabilities under the ADA; only those that "substantially" limit major life activities are covered. The EEOC regulations indicate "substantially limits" means either the individual is unable to perform a major life activity, or, the individual is "[s]ignificantly restricted as to the condition, manner or duration" under which he can perform the major life activity, when compared to the average person in the general population. 29 C.F.R. § 1630.2(j)(1). The regulations indicate certain factors are to be considered in connection with the "substantially limited" inquiry: "(i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." *Id.* § 1630.2(j)(2).

Defendants argue the substantiality of the limitation caused by a disability should be assessed giving consideration to the impact of mitigating measures, such as auxiliary aids and medications. Contrary to this position, the EEOC interpretive guidelines state that "[t]he determination of whether an individual is substantially limited in a major life activity must be made on a case by case basis, without regard to mitigating measures such as medicines, or assistive or prosthetic devices." 29 C.F.R. Pt.1630, App. § 1630.2(j). *See also id.* § 1630.2(h). [FN21] Of course, although the guidelines do offer "a body of experience and informed judgment to which courts and litigants may properly resort for guidance," *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), they "do not have the force and effect of law and are not accorded that weight in the adjudicatory process." *Shalala v. Guernsey Memorial Hosp.,* 514 U.S. 87, 99, 115 S.Ct. 1232, 131 L.Ed.2d 106 (1995).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                      Page 8

Not Reported in F.Supp., 1997 WL 820934 (D.Del.), 11 NDLR P 307

**(Cite as: 1997 WL 820934 (D.Del.))**

The Third Circuit Court of Appeals has not made a pronouncement on the issue of mitigating measures and the circuit courts that have ruled on it are split, although a bare majority have ruled consistent with the guidelines. *See, e.g., Doane v. City of Omaha,* 115 F.3d 624, 627-628 (8th Cir.1997) (relying, without discussion, on the EEOC guidelines and the other circuits holding consistent with them); *Harris v. H & W Contracting Co.,* 102 F.3d 516, 520- 521 (11th Cir.1996) (adopting the EEOC guidelines because they are consistent with the language and legislative history of the statute); *Holihan v. Lucky Stores,* 87 F.3d 362, 366 (1966) (applying the EEOC guidelines without discussion); and *Roth v. Lutheran General Hospital,* 57 F.3d 1446, 1454 (7th Cir.1995) (applying EEOC guidelines without discussion). *But see Sutton v. United Air Lines, Inc.,* 130 F.3d 893, 1997 WL 732520, *5-8 (10th Cir.1997) (adopting the EEOC guidelines when determining the existence of an impairment but rejecting the EEOC guidelines when deciding if the impairment is substantially limiting because they are inconsistent with the language of the statute and other portions of the guidelines); *Gilday v. Mecosta County,* 124 F.3d 760, 767-768 (6th Cir.1997) (rejecting the EEOC guidelines in a 2-1 decision because they conflict with the plain language of the statute); *Ellison v. Softward Spectrum,* 85 F.3d 187, 191 n. 3 (5th Cir.1996) (declining to address the issue but discussing the guidelines with disapproval).

**\*9** The statutory language which partially fuels the division among the circuits provides that a disability is "a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual." 42 U.S.C. § 12102(2)(A). Because the language is silent as to mitigating measures, it is unsurprising the circuits are divided on whether the EEOC interpretative guidelines on mitigation are consistent with the statute, *Harris,* 102 F.3d at 521, and *Doane,* 115 F.3d at 627-628, or in conflict with the statute, *Sutton,* 130 F.3d 893, 1997 WL 732520 at *6-8, and *Gilday,* 124 F.3d at 766-768. However, this Court believes the mitigation guidelines effectively eliminate the requirement that an individual be "substantially limit[ed]" in a major life activity in order to qualify as "disabled" under the ADA.

If one is able voluntarily to use a mitigating measure which cures a weakness, for example, if eyeglasses correct vision to 20-20, can it be said that person is truly disabled within the meaning of the ADA? I think not. The simple fact is that an individual with corrected vision does not suffer from an impairment which substantially limits a major life activity. *Accord, Sutton,* 1997 WL 732520 at *8; *but see Wilson v. Pennsylvania State Police Dept.,* 964 F.Supp. 898, 907-909 (E.D.Pa.1997). Similarly, a person with defective hearing may, with the assistance of a hearing aid, have hearing ability commensurate with that of the general population. It is my belief that person is not disabled within the meaning of the ADA because he or she is not substantially limited in the major life activity of hearing.

As recognized by the Third Circuit Court of Appeals, the ADA was intended to protect only those individuals with serious disabilities. *See Kelly v. Drexel Univ.,* 94 F.3d 102, 107 (3d Cir.1996) (stating that "[i]mpairments that result in only mild limitations are not disabilities" and holding that plaintiff who walked slowly and used a handrail when climbing stairs is not substantially limited in the major life activity of walking). In resolving the role of mitigating measures vis-a-vis the ADA, courts must remain faithful to the overarching, noble purpose stated above. *See Forrisi v. Bowen,* 794 F.2d 931, 934 (4th Cir.1986) ("It would debase th[e] high purpose [of the disability discrimination statutes] if the statutory protections available to those truly handicapped could be claimed by anyone whose disability was minor and whose relative severity of impairment was widely shared."); *Gilday,* 124 F.3d at 767 ("I do not believe that Congress intended the ADA to protect as 'disabled' all individuals whose life activities would hypothetically be substantially limited were they to stop taking medication") (Kennedy, J., concurring in part and dissenting in part); H.Rep. 101-485, Pt. 2, 101 Cong., 2d Sess., 52 (May 15, 1990) ("A person with a minor, trivial impairment ... is not impaired in a major life activity").

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                    Page 9

Not Reported in F.Supp., 1997 WL 820934 (D.Del.), 11 NDLR P 307

**(Cite as: 1997 WL 820934 (D.Del.))**

**\*10** There are potential conceded negatives to the above conclusions. For example, a chemical company working with hazardous materials would not have to provide reasonable accommodation to people who wear glasses if the protective masks would not fit over the glasses. Similarly, an employer would not be required to accommodate a hearing aid user with a special phone if the hearing aid lacked a telecoil. While regrettable, these are problems for Congress, not the courts.

When one moves from medical devices to mitigating measures such as medication, exercise and nutrition, however, the problem can become more complex. For example, a situation may arise in which one physical or mental impairment precludes an individual from continuously controlling another impairment, or in which a mitigating measure itself creates a disabling condition. However, when a qualifying impairment that can ordinarily be controlled is not controlled because, for example, a mental illness precludes the person from strictly adhering to a medical regimen, the ADA provides protection. On the other hand, where the "impairment is fully controlled by mitigating measures, and such measures do not themselves substantially limit an individual's major life activity ... the ADA provides no protection." *Gilday,* 124 F.3d at 767 (Kennedy, J., concurring in part and dissenting in part).

In the final analysis "the impact of mitigating measures must be decided on a case-by-case basis. In some cases a person with a 'controlled' medical problem or condition will be completely functional and should be evaluated as such." *Id. at* 768 (Guy, J ., concurring in part and dissenting in part). If, however, a physical or mental condition or mitigating measure prevents an individual from ameliorating a qualifying impairment, the individual will not be left without relief. With this framework, the Court now turns its attention to the four allegedly disabling conditions.

1. Back Sprain

Plaintiff claims his back sprain substantially limited his major life activities of lifting, carrying, stooping,

squatting, and twisting. [FN22] There is a dearth of case law on the activities of stooping, twisting, squatting and carrying, but courts have generally been hesitant to find a disability when an individual has a minimal to moderate restriction on lifting. For example, the Ninth, Fourth and Eighth Circuit Courts of Appeal have held that a 25 or more pound limit on lifting does not, as a matter of law, render a person disabled. *See Thompson v. Holy Family Hospital,* 121 F.3d 537, 539-540 (9th Cir.1997); *Williams v. Channel Master Satellite Sys., Inc.,* 101 F.3d 346 (4th Cir.1996), *cert. denied,* 520 U.S. 1240, 117 S.Ct. 1844, 137 L.Ed.2d 1048 (1997); *Aucutt v. Six Flags Over Mid-America, Inc.,* 85 F.3d 1311 (8th Cir.1996). [FN23]

Other courts have been similarly resistant to finding a disability in cases they perceived as reflecting relatively common or insubstantial back injuries. *See, e.g., Halperin v. Abacus Technology Corporation,* 128 F.3d 191, 200 (4th Cir.1997) (granting summary judgment to a defendant on plaintiff's ADA claim based on a temporary 20 pound restriction on lifting); *Ray v. Glidden Co.,* 85 F.3d 227 (5th Cir.1996) (holding that an employee who could not lift 44-56 pounds continuously throughout the day but could only do so for one to three and one-half hours in one day was not disabled); *Horth v. General Dynamics Land Systems,* 960 F.Supp. 873, 877-879 (M.D.Pa.1997) (holding that employee whose back injury prevented him from sitting or standing for more than two hours and from continually lifting objects over 20 pounds was not substantially limited in major life activities of walking, lifting, standing, sitting or working); *Kirkendall v. United Parcel Service, Inc.,* 964 F.Supp. 106, 111 (W.D.N.Y.1997) (holding inability to lift more than 30 pounds, to sit for more than three hours at a time, and to engage in certain leisure activities does not constitute a disability); *Kriskovic v. Walmart Stores, Inc.,* 948 F.Supp. 1355, 1363-1365 (E.D.Wis.1996) (inability to lift, push or pull more than 25 pounds did not demonstrate that the plaintiff was foreclosed from a class or broad range of jobs). *But see Frix v. Florida Title Industries,* 970 F.Supp. 1027, 1033-1034 (N.D.Ga.1997) (rejecting this line of cases and holding that a 25

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 10

Not Reported in F.Supp., 1997 WL 820934 (D.Del.), 11 NDLR P 307

(Cite as: 1997 WL 820934 (D.Del.))

pound lifting limitation, especially when coupled with a limitation on bending and stooping, prevents plaintiff from performing an entire class of jobs, i.e., medium and heavy labor jobs, and is a disability under the ADA); *Brown v. Lankenau Hospital,* 1997 WL 277354, *3-4 (E.D.Pa.1997) (denying defendant's motion for summary judgment and holding that plaintiff's lifting limitation, which had been upgraded from no more than 11-25 pounds to no more than 51-100 pounds could qualify as a disability). [FN24] Consistent with the majority of courts on this issue, this Court decided in *Mondzelewski v. Pathmark,* 976 F.Supp. 277, 280 (D.De.1997), that a restriction on lifting 50 pounds or more and carrying 25 pounds or more was not a substantial limitation on a major life activity.

*11 However, the line regarding back injuries is a fine one and courts have found only somewhat more severe back injuries may qualify as a disability. *See, e.g., Lowe v. Angelo's Italian Foods, Inc.,* 87 F.3d 1170 (10th Cir.1996) (holding issue of fact existed as to disability of a woman with multiple sclerosis who could not lift more than 15 pounds, and should not often lift less than that, and who also faced limitations on her stooping and bending); *Haysman v. Food Lion, Inc.,* 893 F.Supp. 1092 (S.D.Ga.1995) (same, where plaintiff was limited to lifting 10-15 pounds, could only stand for 30 minutes and walk for 3 minutes); *Cheatwood v. Roanoke Industries,* 891 F.Supp. 1528 (N.D.Ala.1995) (accepting plaintiff's statement that he was limited in the major life activities of lifting, where he could not lift more than 5 pounds without pain; *Perez v. Philadelphia Housing Authority,* 677 F.Supp. 357 (E.D.Pa.1987), *aff'd,* 841 F.2d 1120 (3d Cir.1988) [FN25] (holding that a woman who suffered a back injury which caused residual pain affecting her "work ... her ability to walk, sit, stand, drive, care for her home and child, and engage in leisure pastimes" was disabled).

A review of these cases reveals that the ambiguity in finding a disability in back injury cases generally begins with lifting restrictions between 15 and 25 pounds. Consistent with this Court's decision in *Whitfield v. Pathmark,* 971 F.Supp. 851

(D.De.1997), this Court believes Testerman's situation falls on the side of the "commonplace" rather than the "severe." Id. at 858. In *Whitfield,* the Court decided the plaintiff's inability to lift more than 20 pounds, to engage in repeated reaching, bending and stooping, or to stand in one place for longer than one hour in a four-hour period, could not defeat defendant's motion for summary judgment on the issue of whether the plaintiff was disabled. *Id.* Similar to Whitfield, Testerman could not lift or carry more than 20 pounds. In addition, any stooping, squatting, or twisting could only be done intermittently. These facts fail to raise a genuine factual dispute as to whether Testerman was substantially limited in the major life activities of lifting, carrying, stooping, squatting or twisting. As a result, the Court will grant summary judgment for Chrysler and will deny summary judgment for Testerman on the issue of whether Testerman's back injury constituted a disability. Because the definition of a handicapped person" under the DHPEPA mirrors the definition of a "disabled person" under the ADA, the Court's holding applies to Chrysler's motion for summary judgment on Testerman's DHPEPA claim as well.

2. Depression

Voluminous medical records show Testerman was treated for depression during significant periods from 1988 through 1992. He received psychotherapy and utilized anti-depressant medication. In 1992, Testerman was evaluated by several doctors who reported Testerman suffered from depression. These evaluations also indicated a long-history of depression. In 1995, plaintiff was diagnosed with moderate to severe depression. Chrysler has not put forth record evidence that Testerman could have or should have engaged in any activities that would have further mitigated his depression. As a result, the Court will consider Testerman's depression as presented.

*12 Plaintiff's depression caused him, among other problems, extreme lethargy and poor motivation, and affected his ability to interact with others. [FN26] Even more significant are numerous, uncontroverted records reflecting that the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                      Page 11

Not Reported in F.Supp., 1997 WL 820934 (D.Del.), 11 NDLR P 307

**(Cite as: 1997 WL 820934 (D.Del.))**

depression substantially hindered Testerman's ability to care for himself, specifically to monitor and control his diabetes and to adhere to his treatment for both depression and alcoholism. [FN27] A substantial limitation on Testerman's ability to care for himself brings him squarely within the definition of a disability under the ADA. [FN28]

Numerous courts have found depression constituted a disability when the plaintiff established a substantial limitation resulting from problems similar to those demonstrated by Testerman. *See, e.g ., Weigel v. Target Stores,* 122 F.3d 461, 462 (7th Cir.1997); *Office of the Senate Sergeant at Arms v. Office of Senate Fair Employment Practices,* 95 F.3d 1102, 1107 (Fed.Cir.1996); *Guice-Mills v. Derwinski,* 967 F.2d 794, 797 (2d Cir.1992); *Liff v. Secretary of Transportation,* 1994 WL 579912, *3-4 (D.D.C.1994); *see also Pritchard v. Southern Company Services,* 92 F.3d 1130, 1133-1134 (11th Cir.1996) (finding genuine dispute over whether depression substantially limited ability to work); *Doe v. Region 13 Mental Health-Mental Retardation Commission,* 704 F.2d 1402, 1408 (5th Cir.), *reh'g denied,* 709 F.2d 712 (1983) (finding employee who was depressed and had been hospitalized numerous times for suicide attempts was substantially limited under the Rehabilitation Act).

As discussed earlier, the Court will deny summary judgment for both parties regarding whether Testerman suffered from the impairment of depression at the time of his termination. Although the Court concludes Testerman's depression through 1992 substantially limited a major life activity, the Court is unable to assess the severity or impact of his depression, if any, at the time of termination. As a result, summary judgment will be denied for both parties on the issue of whether Testerman suffered from a disability or a handicap based on depression at the time of his termination.

3. Diabetes

Testerman was diagnosed in early 1988 with Type I diabetes, meaning he produces no insulin of his own and requires insulin injections to survive. His condition was serious enough to require hospitalization twice that year. Chrysler monitored Testerman's blood sugar level on numerous occasions from 1988 through 1993 and sent him home several times due to a high blood sugar level or problems associated with his diabetes, such as fatigue, weakness, nausea, blurred vision, numbness of his extremities and headaches. [FN29] There is evidence in the record, however, that Testerman did not consistently monitor his condition, take his insulin, or otherwise control his diabetes to the greatest degree possible.

Several courts have held that the dangers or problems related to diabetes, if established by a plaintiff, may constitute a disability. *See, e.g., Gilday v. Mecosta County,* 124 F.3d 760, 765 (6th Cir.1997) (finding a genuine dispute over whether plaintiff's fluctuating blood sugar level caused irritability and an inability to get along with others that substantially affected his ability to work); *Riel v. Electronic Data Systems Corp.* 99 F.3d 678, 680-682 (5th Cir.1996) (holding plaintiff had raised a genuine dispute over whether the fatigue resulting from his renal condition and diabetes was the cause of his inability to meet milestone deadlines at work); *Coghlan,* 851 F.Supp. at 814-815 (finding a genuine dispute as to the existence of a disability because plaintiff's diabetes affected the major life activities of eating and sleeping); *Canon v. Clark,* 883 F.Supp. 718, 721 (S.D.Fla.1995) (finding disability based on diabetes); *Sarsycki v. United Parcel Service,* 862 F.Supp. 336, 340 (W.D.Okla.1994) (same); *Davis v. Meese, III,* 692 F.Supp. 505, 517 (E.D.Pa.1988) (same).

**\*13** In light of his condition, Testerman has raised a genuine dispute as to whether he was disabled based on his diabetes at the time of his termination. However, Chrysler has raised a genuine dispute as to whether his diabetes would have been substantially limiting if it had been more diligently treated. As discussed with regard to Testerman's depression, however, Testerman may challenge any evidence Chrysler produces regarding potential mitigation with evidence that Testerman suffered

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Page 12

Not Reported in F.Supp., 1997 WL 820934 (D.Del.), 11 NDLR P 307

**(Cite as: 1997 WL 820934 (D.Del.))**

from depression or another mental condition at the time of termination that precluded him from continuously mitigating the effects of the diabetes. In other words, if Testerman establishes by a preponderance of the evidence that he suffered from depression or other mental condition at the time of his termination and was thereby prevented from adhering to prescribed medical treatment for his diabetes, he may not be penalized for any related failure to mitigate the diabetes and his condition must be evaluated in the state presented.

In addition, Testerman raises a genuine dispute over whether or not he was regarded as disabled based on his diabetes. There is evidence that supervisors were aware of complaints by employees and were independently very frustrated by and critical of Testerman's frequent breaks and occasional absences, which at least partly resulted from his renal problems associated with the diabetes. Such evidence supports a claim that Chrysler regarded Testerman as being substantially limited in his ability to work. There is also evidence, however, that the supervisors, while occasionally annoyed, did not view Testerman as substantially limited in a major life activity. Of course, with respect to how Chrysler regarded Testerman, the potential for greater mitigation is irrelevant.

Summary judgment on whether Testerman was disabled as a result of his diabetes will be denied for both parties.

4. Alcoholism

Testerman has required in-patient treatment for alcoholism at least four times in approximately the last two decades, including the year before he was terminated. He has also been convicted of or pleaded guilty to driving while intoxicated on several occasions, including the year before he was terminated. He has participated on and off in counseling and Alcoholics Anonymous meetings. Chrysler's records reflect at least some of the in-patient treatments and at least one DWI, demonstrating that it was aware of his alcoholism. This awareness is confirmed by deposition

testimony of various supervisors. Further, Chrysler imposed a random substance abuse urine test on Testerman as part of his second LCA.

Despite the Court's sensitivity to the destructive ways in which alcoholism may permeate the life of an alcoholic, Testerman has failed to establish that at the time of his termination, he was substantially limited in a major life activity as a result of alcoholism. The Court has found no record evidence to determine whether he was an active alcoholic or recovering, or how, if at all, his current or past alcoholism was substantially limiting him at that time. As a result, the Court need not decide if Testerman could have further mitigated his alcoholism.

*14 Testerman has, however, established as a matter of law that he had a record of an impairment that substantially limited a major life activity. In *School Board of Nassau County, Florida v. Arline,* 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307, reh'g denied, 481 U.S. 1024, 107 S.Ct. 1913, 95 L.Ed.2d 519 (1987), [FN30] the Supreme Court held that a woman who had been hospitalized for tuberculosis twenty years before and who had relapsed three times within a few years of her termination had an impairment that substantially limited a major life activity. *Id.* at 281. The Court stated that the fact the disease had been "serious enough to require hospitalization," was "more than sufficient to establish that one or more of her major life activities were substantially limited by her impairment." Id. Although some courts have rejected an interpretation of *Arline* that requires a finding of a disability regardless of number and duration of the hospital stays and the severity of the illness, *see, e.g., Demming v. Housing and Redevelopment Authority,* 66 F.3d 950, 955 (8th Cir.1995); *Taylor v. United States Postal Service,* 946 F.2d 1214, 1217 (6th Cir.1991), courts have generally applied *Arline* to find a disability in cases with factual patterns equal to or less compelling than the evidence presented by Testerman. *See, e.g., Anderson v. University of Wisconsin,* 841 F.2d 737, 740 (7th Cir.1988); *Hunt v. St. Peter School,* 963 F.Supp. 843, 850 (W.D.Mo.1997); *Coghlan,* 851 F.Supp. at 814-815; *Braverman v. Penobscot*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1997 WL 820934 (D.Del.), 11 NDLR P 307

(Cite as: 1997 WL 820934 (D.Del.))

Page 13

*Shoe Co.,* 859 F.Supp. 596, 603 (D.Me.1994); *Desper v. Montgomery Co.,* 727 F.Supp. 959, 963 (E.D.Pa.1990). *See also Despears v. Milwaukee Co.,* 63 F.3d 635, (7th Cir.1995) (holding plaintiff had an impairment that substantially limited a major life activity based on undisputed alcoholism that led to four DWIs).

Even without his record, Testerman would have raised a genuine dispute as to whether he was regarded as having a disability. Chrysler had knowledge of at least some of the in-patient treatments and DWIs. Although a defendant's knowledge of an impairment does not automatically demonstrate the defendant thought the impairment substantially limited a major life activity, *Kelly,* 94 F.3d at 109; *Aucutt,* 85 F.3d at 1319; *Howell,* 959 F.Supp. at 269, this knowledge led Chrysler to impose a substance abuse screening requirement on Testerman in his second LCA. *See Miners v. Cargill Communications,* 113 F.3d 820, 820-823 (8th cir.1997) (on suspicion that plaintiff was an alcoholic, defendant required plaintiff to participate in substance abuse counseling, under penalty of being fired). Such a provision was obviously in recognition of Testerman's alcoholism rather than standard LCA language, as it was missing from his first LCA and Testerman was actually subject to random testing on at least two occasions.

The Court will grant summary judgment for Testerman and deny summary judgment for Chrysler on the issue of whether Testerman was disabled by reason of his alcoholism. However, summary judgment is granted to Testerman based only on his known record of alcoholism.

B. Fired "because of" his disability

*15 Because the Court has concluded Testerman has established or raised a genuine dispute as to whether he was disabled, depending on the disability, and Chrysler has necessarily conceded that plaintiff was qualified, [FN31] the Court must ascertain whether there is a genuine factual dispute over whether Chrysler terminated Testerman because of his disabilities. For the reasons below, the Court concludes that there is.

Stated simply, a reasonable juror could view the occurrences of August 20, 1993 in one of two ways. First, a jury could focus on the fact that Testerman had a history of reprimands for various conduct violations and decide Chrysler had been more than accommodating. Chrysler had given him time off to deal with his alcoholism and related criminal problems, had respected his back restrictions, and had reinstated him twice without any mandate to do so. In addition, although the evidence is conflicting around whether Testerman was always permitted to take breaks and seek medical assistance in response to his diabetically related problems, it is undisputed Chrysler generally responded to these needs, even if the response had occasionally been coupled with criticism or harassment. Finally, in this version of the story, Chrysler's belief that Testerman was on the assembly line at the critical time was genuine and reasonable, even if erroneous. Given his history of violations and the clear language of the last chance agreement, Chrysler's reason for terminating Testerman was legitimate and fair.

Alternatively, a reasonable juror could find ample evidence that Chrysler was tired of dealing with Testerman's health problems. For example, there is record evidence that supervisors were extremely frustrated and annoyed by Testerman's frequent breaks and absences resulting from his diabetes. Co-workers had complained about the breaks and the assembly line was affected. Moreover, after factoring in Chrysler's concern over the alcoholism that had to be monitored, Testerman was believed to be burdensome at best. Then, on August 20, 1993, some cars were sealed poorly. Although supervisors either knew or should have known that Testerman was away from the assembly line at the time, Chrysler saw this as an opportunity to rid itself of him. Given the evidence showing Chrysler's frustration with Testerman's limitations and the contradictory evidence about whether Chrysler actually knew that Testerman was absent from the assembly line at the time the cars were inadequately sealed, a jury could find in favor of Testerman.

Testerman has not, however, raised a genuine

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 14

Not Reported in F.Supp., 1997 WL 820934 (D.Del.), 11 NDLR P 307

**(Cite as: 1997 WL 820934 (D.Del.))**

factual dispute over whether he was fired because of his depression. While the existence and severity of his depression or other mental condition, if any, at the time of his termination is still relevant to determining issues surrounding his diabetes, there is insufficient evidence that the depression directly contributed to or caused the termination. The only evidence Testerman has presented that Chrysler had any awareness of his mental health problems is one entry in Chrysler's medical records in September 1987 that Testerman was receiving psychological services at the Veteran's Administration and deposition testimony by one supervisor who stated:

**\*16** [Testerman] always had a hungry look in his eye. He did not look like a happy camper. If I were to look at him and give my opinion, I'd say that guy's depressed.

I don't remember seeing him smile. In my association with him in a couple years, probably.

\* \* \*

He had several problems communicating and interacting with other employees, to the point where I would call him a loaner [sic].

D.I. 60 at Ex. P, pp. 114-115, 118.

Although this quote arguably raises a genuine dispute as to whether Chrysler thought Testerman's depression substantially limited his ability to communicate and interact with others, it is unnecessary to decide whether such activities constitute a major life activity. [FN32] There is simply no evidence in the record that Chrysler fired Testerman because of his depression. Unlike the words and/or actions of supervisors that demonstrated frustration, criticism, or serious concern about Testerman's diabetes and alcoholism, Testerman has not provided evidence that his termination may have been motivated by anyone's awareness that his ability to get along with others was hindered.

Nevertheless, given the fact that there still exist two reasonable, possible outcomes at trial, summary judgment will be denied for both parties as to Testerman's ADA and DHPEPA claims.

III. Plaintiff's Requests for Attorney's Fees

A.   The   Disability   Status   of   Testerman's Replacements

Although Chrysler may not have made the most diligent efforts in conveying information to Testerman about the disability status of his replacements, Chrysler explained at oral argument its difficulties in obtaining this information. Without reason to disbelieve Chrysler's explanation, the Court will deny plaintiff's motion for attorney's fees on this issue.

B. Testerman was qualified for the position

Chrysler conceded at oral argument that Testerman was able to perform the essential functions of the sealer position with or without reasonable accommodation and failed to offer any reason for denying this point until then. In its briefs, Chrysler's defense for its prior position was that Testerman failed to perform the essential functions of his job on the day he was fired. As Chrysler acknowledged at oral argument, however, this is not the standard by which a plaintiff is deemed qualified or not. Chrysler's other argument for denying Testerman's ability to perform the essential functions of his job was that, *if* Testerman was claiming he was substantially limited in his major life activity of working, the issue of whether he was qualified must be evaluated. Testerman did not, however, in his briefs or at oral argument, rely on any limitation on his ability to work as a basis for claiming his disability status. As a result, this Court will grant reasonable attorney's fees for the costs incurred by Testerman in briefing this limited portion of the case.

CONCLUSION

Chrysler's motion for summary judgment based on the collective bargaining agreement will be denied. Chrysler's motion for summary judgment as to whether Testerman is a qualified individual with a disability will be denied as to his diabetes, depression and alcoholism but granted as to his back injury, on both the ADA and DHPEPA claims. Testerman's motion for summary judgment as to his status as a qualified individual with a disability will be granted based on his alcoholism

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1997 WL 820934 (D.Del.), 11 NDLR P 307

(Cite as: 1997 WL 820934 (D.Del.))

Page 15

and denied based on all other impairments. Summary judgment will be denied for both parties regarding whether Testerman was terminated because of his alcoholism and/or his diabetes but granted for Chrysler with respect to Testerman's depression. Therefore, Testerman may proceed with both his ADA and DHPEPA claims under the theory that he was terminated because of his diabetes and/or because of his alcoholism. As stated in the opinion, Testerman's inability to raise depression or other mental condition as a basis for the termination does not preclude him from offering evidence of the same to address his ability or inability to mitigate his diabetes. Testerman's motion for attorney's fees as to the disability status of Testerman's replacements will be denied and his motion for attorney's fees as to his ability to perform the essential functions of the job will be granted.

FN1. Chrysler has always abided by these restrictions.

FN2. For purposes of this opinion, the Court need not decide whether the arbitration agreement clearly states that the arbitrator's decision is final and binding and will assume for this opinion only that it is. It should be noted, however, that the language of the CBA is ambiguous. The CBA states:
There shall be no appeal from any Appeal Board's decision. Each such decision shall be final and binding on the Union and its members, the employee or employees involved, and the Corporation. *The Union will discourage any attempt of its members, and will not encourage or cooperate with any of its members in any appeal to any Court or Labor Board from a decision of an Appeal Board* (emphasis added).
D.I. 56 at 46 (emphasis added).
The CBA also states:
Any grievance that either (a) is not processed or (b) is disposed of in accordance with this Grievance Procedure shall be considered settled, and such

settlement shall be final and binding.... *[O]nly the Union shall have the right to assert and press against the Corporation in an judicial or adjudicatory proceeding any claim or action asserting a violation of the Agreement* (emphasis added). *Id.* at 34.

FN3. Like the CBA in the case at bar, the CBA in *Alexander* specifically stated that the arbitrator's decision was to be "final and binding upon the Company, the Union, and any employee or employees involved." 415 U.S. at 42. In addition, the CBA in *Alexander* incorporated an arbitration clause addressing "differences aris[ing] between the Company and the Union as to the meaning and application of the provisions of this Agreement" and "any trouble aris[ing] in the plant." *Id.* at 40.

FN4. The Court expressed concern that in the collective bargaining context, "the interests of the individual employee may be subordinated to the collective interests of all employees in the bargaining unit." *Id.* at 58, n. 19. As a result, the Court stated that "[i]n no event can the submission to arbitration of a claim under the nondiscrimination clause of a collective-bargaining agreement constitute a binding waiver with respect to an employee's rights under Title VII." 415 U.S. at 52, n .15.
This holding was followed by the Court in the two subsequent cases, in which the prior arbitration of claims was held not to preclude judicial review. *McDonald v. City of West Branch,* 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984) (holding plaintiff who arbitrated termination and was allegedly discharged for just cause could pursue 1983 suit); *Barrentine v. Arkansas-Best Freight Sys. Inc.* 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981) (holding plaintiffs could pursue Fair Labor Standards Act suit despite unsuccessful grievance process).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1997 WL 820934 (D.Del.), 11 NDLR P 307

**(Cite as: 1997 WL 820934 (D.Del.))**

Page 16

Both cases noted the potential conflict of interest between a union and an individual member, the difference between contractual rights under a collective-bargaining agreement and individual statutory rights, and the limited authority and power of arbitrators. *McDonald,* 466 U.S. at 288-292; *Barrentine,* 450 U.S. at 737-746.

FN5. The Court explained:
In submitting his grievance to arbitration, an employee seeks to vindicate his contractual right under a collective-bargaining agreement. By contrast, in filing a lawsuit under Title VII, an employee asserts independent statutory rights accorded by Congress. The distinctly separate nature of these contractual and statutory rights is not vitiated merely because both were violated as a result of the same factual occurrence. And certainly no inconsistency results from permitting both rights to be enforced in their respectively appropriate forums.
415 U.S. at 49-50.

FN6. By submitting a grievance, a union employee "seeks to vindicate his contractual right[s]" under the agreement but does not assert his "independent statutory rights accorded by Congress." *Id.* at 49-50.

FN7. The anti-discrimination clause within the CBA in *Alexander* did not indicate that it covered related statutory claims. It stated: "[T]here shall be no discrimination against any employee on account of race, color, religion, sex, national origin, or ancestry." 415 U.S. at 39.

FN8. The CBA stated that "[t]he arbitrator shall not amend, take away, add to, or change any of the provision of this Agreement, and the arbitrator's decision must be based solely upon an interpretation of the provision of this

Agreement." 415 U.S. at 42. *Alexander* recognized that an arbitration clause in a collective bargaining agreement, at least historically, implicates only contractual rights under that agreement. *Id.* at 49.

FN9. The agreement provided for the arbitration of "any controversy ... arising out of [the employee's] employment or termination of employment." 500 U.S. at 23.

FN10. *See supra* note 4 and accompanying text.

FN11. *Martin* was originally decided on June 12, 1997. *Martin v.. Dana Corp.,* 114 F.3d 421 (3d Cir.1997). On July 1, 1997, the Third Circuit Court of Appeals vacated that opinion and granted rehearing *en banc. Martin v. Dana Corp.,* 114 F.3d 428 (3d Cir.1997). On September 12, 1997, the *en banc* court vacated the order granting rehearing *en banc* and referred the case back to the original panel for rehearing. *Martin v. Dana Corp.,* 124 F.3d 590 (3d Cir.1997).
Prior to the *Martin* case, however, the Third Circuit Court of Appeals had held that a grievance settlement was equivalent to an arbitration decision for purposes of the *Alexander/Gilmer* issue and that a grievance settlement by a union did not preclude the employee from subsequently pursuing judicial remedies. *Bolden v. Southeastern Pennsylvania,* 953 F.2d 807, 825-826 (3d Cir.1991) *(en banc), cert. denied* 504 U.S. 943, 112 S.Ct. 2281, 119 L.Ed.2d 206 (1992).

FN12. The arbitration provision covered:
Any and all claims regarding equal employment opportunity provided for under this Agreement or under any federal, state or local fair employment practice law shall be exclusively addressed by an individual employee or the Union under the grievance and arbitration provisions of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                            Page 17

Not Reported in F.Supp., 1997 WL 820934 (D.Del.), 11 NDLR P 307

(Cite as: 1997 WL 820934 (D.Del.))

this Agreement.
No. 96-1746 at 4.

FN13. Even if the Court were to apply the FAA, *see Nieves v. Individualized Shirts,* 961 F.Supp. 782, 791 (D.N.J.1997), *Martin* confirms that *Nieves* is correct in its statement that the FAA distinction between *Alexander* and *Gilmer* does not unilaterally control the outcome in these types of cases given the meaningfulness and viability of the other distinctions. *Id.*

FN14. *See supra* notes 3 and 8.

FN15. *See also Whitfield v. Pathmark Stores,* 971 F.Supp. 851 (D.Del.1997), in which this Court reviewed language stating that the procedure for grievances and arbitration was the "exclusive method of determining employee grievances or disputes *concerning the interpretation or application of the provision of this Agreement* ." *Id.* at 856. (emphasis added). This Court held the language applicable only to claims relating to the terms of the CBA, i.e., contract claims. *Id.*

FN16. The letter also assigns to the regular arbitration procedures grievances involving "discipline for violation of Section (5) of the Production and Maintenance Agreement or Parts Depot Agreement." D.I. 56 at 50. Although Section (5) is not part of the record, there has been no indication by the defendants that this section in any way relates to discrimination claims, let alone statutory based discrimination claims.

FN17. "It is the policy of Chrysler Corporation and the UAW that the provisions of this Agreement be applied to all employees covered by this Agreement without discrimination because of race, color, religion, age, national origin, handicap or sex, including sexual harassment."

FN18. Other courts in this circuit have decided that similar anti-discrimination provisions do not cover statutory claims. *Glickstein v. Neshaminy School District,* 1997 WL 666961, *5 (E.D.Pa.1997); *Nieves,* 961 F.Supp. at 785-786; *Randolph v. Cooper Industries,* 879 F.Supp. 518, 520 (W.D.Pa.1994). Although this Court has previously suggested that a clear and appropriate anti-discrimination policy may be some evidence of an intent to cover statutory discrimination claims, *Whitfield,* 971 F.Supp. at 856, the language of the clause in the case at bar does not qualify.

FN19. These additional pages of the CBA were submitted subsequent to oral argument.

FN20. The Americans with Disabilities Act was passed on July 26, 1990 and was effective July 26, 1992. 42 U.S.C. §§ 12101-12111. The CBA was published in November 1990. Prior to the passing of the ADA, most state statutes and contracts referred to "handicapped" individuals, as was true of the federal statute preceding the ADA--the Rehabilitation Act, 29 U.S.C. §§ 506, 791-704. The Rehabilitation Act, however, only applied to government employers, recipients of federal financial assistance and federal contractors.

FN21. The guidelines explain that a "diabetic who without insulin would lapse into a coma would be substantially limited because the individual cannot perform major life activities without the aid of medication." 29 C.F.R. Part 1630, App. § 1630.2(j).

FN22. Chrysler has not argued that Testerman could have or should have mitigated his back sprain in any way. Moreover, the record is devoid of evidence that such mitigation was available. As a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 18

Not Reported in F.Supp., 1997 WL 820934 (D.Del.), 11 NDLR P 307

**(Cite as: 1997 WL 820934 (D.Del.))**

result, the Court will consider Testerman's back problem as it was presented to the Court.

FN23. *See also Snow v. Ridgeview Medical Center,* 128 F.3d 1201, 1207 (8th Cir.1997) (holding that "a general lifting restriction imposed by a physician, without more, is insufficient to constitute a disability").

FN24. The Eastern District of Pennsylvania has stated, however, that "even a medically documented, moderate lifting restriction is not sufficient to withstand summary judgment if the employee cannot demonstrate how the lifting restriction substantially limits his or her ability to engage in the major life activity of working." *Howell v. Sam's Club,* 959 F.Supp. 260, 266 n. 10 (E.D.Pa.1997). In *Howell,* the court held that there was insufficient evidence either of the plaintiff's alleged 25 pound lifting restriction or that the alleged restriction was substantially limiting his ability to work. *Id.* at 266-267.

FN25. This case was decided under the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et. seq.,* which is applicable to federal employees. However, the substantive analysis is the same as the analysis of ADA cases. *Antol,* 82 F.3d at 1299.

FN26. The EEOC Compliance Manual lists interacting with others as a major life activity. EEOC Compliance Manual (CCH) 902.3 at 902-15 (1995). However, not all courts have accepted this interpretation of the statute. *See Soileau v. Guilford of Maine, Inc.,* 105 F.3d 12, 15 (1st Cir.1997) (recognizing depression as an impairment but rejecting ability to get along with others as a major life activity); but see *Gilday,* 124 F.3d at 765 (finding "ability to get along with coworkers" implicated a major life activity). Because

the Court finds that Testerman's depression might have substantially limited his ability to care for himself, it need not resolve this issue.

FN27. This discussion aptly reflects that even when an individual has impairments that do not independently substantially limit him, the combination of the impairments may. Legitimately combining interactive impairments to establish a disability is acceptable according to the EEOC guidelines. 29 C.F.R. Pt. 1630, App. § 1630.2(j).

FN28. Testerman also argues that he was regarded as being disabled by virtue of his depression. It appears the only evidence supporting this contention is that Chrysler had a record of Testerman receiving psychological services in 1987 and one supervisor said he thought Testerman was depressed because he was a loner and had problems communicating and getting along with others. As stated *supra,* note 26, the Court declines to decide unnecessarily whether the supervisor's views of Testerman implicate a major life activity.

FN29. At the time of his discharge, Chrysler had assigned Testerman the following PQX codes: "(i) No climbing--permits ground level or platform work and ordinary stair climbing; * * * (v) Subject to dizziness, fainting or convulsions. Not to operate moving machinery. Not to work near open pits, chemical or fire hazards. Floor level work only." D.I. 60, Ex. T. Although these limitations might be related to his diabetes, Testerman has not established on the current record that these PQX codes are a result of his diabetic condition.

FN30. Although the *Arline* decision was based on the Rehabilitation Act, the definition of a handicapped individual was the same as the definition of a disabled

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                          Page 19

Not Reported in F.Supp., 1997 WL 820934 (D.Del.), 11 NDLR P 307

**(Cite as: 1997 WL 820934 (D.Del.))**

individual, because the ADA "borrowed wholesale the provisions of [the Rehabilitation Act's] section 504 to define what was meant by a 'disability....'" ' *Doe v. Kohn et. al,* 862 F.Supp. 1310, 1322 (E.D.Pa.1994).

FN31. A "qualified" individual is a person who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

FN32. *See supra* note 26.

Not Reported in F.Supp., 1997 WL 820934 (D.Del.), 11 NDLR P 307

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

SA-12

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1

Not Reported in F.Supp.2d, 2003 WL 1738993 (S.D.N.Y.), 25 NDLR P 306

**(Cite as: 2003 WL 1738993 (S.D.N.Y.))**

C

**Motions, Pleadings and Filings**

United States District Court,
S.D. New York.
Alex TOJZAN, Plaintiff,
v.
NEW YORK PRESBYTERIAN HOSPITAL,
Defendant.
**No. 00 Civ. 6105(WHP).**

March 31, 2003.
David M. Rosoff, Law Offices of Carton & Rosoff,
P.C., Harrison, NY, for plaintiff.

James S. Frank, Phillips, Nizer, Benjamin, Krim &
Ballon, LLP, New York, NY, for defendant.

*MEMORANDUM and ORDER*

PAULEY, J.

**\*1** Plaintiff Alex Tojzan ("Tojzan") brings this
discrimination action against his former employer
New York Presbyterian Hospital (the "Hospital"),
pursuant to the Americans with Disabilities Act
("ADA"), 42 U.S.C. § 11201 *et seq.* (2003), the
Age Discrimination in Employment Act ("ADEA"),
29 U.S.C. § 626(b) (2003), and the New York State
Human Rights Law ("NYSHRL"), N.Y. Exec. Law
§ 296 *et seq.* (2003). Tojzan alleges that the
Hospital unlawfully discriminated against him and
forced him to resign because of his physical
disability and age. The Hospital moves for summary
judgment pursuant to Fed.R.Civ.P. 56, arguing that
Tojzan has not established a *prima facie* case of
disability or age discrimination.

For the reasons set forth below, the Hospital's
summary judgment motion is granted.

*BACKGROUND*
I. *Tojzan's Employment and Resignation*

Tojzan was employed as a Senior Tradesman in the
Hospital's Plan Operations Department at its
Westchester, New York campus from November
12, 1979 through July 9, 1999. (Affidavit of Alex
Tojzan, dated April 2, 2002 ("Tojzan Aff.") ¶ 3;
Def.'s 56.1 ¶¶ 2, 4 .) Tojzan's duties included
heavy construction work, repairs and maintenance
at the Hospital, as well as various carpentry and
locksmith work. (Tojzan Aff. ¶¶ 4-6, 22, 30;
Def.'s 56.1 ¶ 18.) On June 25, 1999, Tojzan
tendered a resignation letter to the Hospital,
effective July 9, 1999. (Pl.'s 56.1 ¶ 3; Def.'s 56.1 ¶
¶ 11, 16; Affirmation of Steven M. Post, Esq.
("Post Aff.") Ex. 3.) At the time of his resignation,
Tojzan performed carpentry and locksmithing on an
alternating monthly basis. (Def.'s 56.1 ¶ 6;
Deposition of Alex Tojzan, dated August 24, 2001
("Tojzan Dep.") at 113-115.)

II. *Attendance*

The Hospital's established attendance policy, as
stated in its Employee Handbook, advises
employees that "excessive or habitual absence or
lateness must be controlled and may result in
disciplinary action, up to and including discharge."
(Tojzan Aff. Ex. L at D00373.) The Hospital's
policy permits employees no more than three
incidents of absence or lateness in any six
consecutive months, or five incidents of absence or
lateness in any twelve consecutive months. (Tojzan
Aff. Ex. L at D00373; Tojzan Dep. at 33-34.) The
Hospital warns in its policy that "continued absence
and/or lateness will result in progressive discipline."
(Tojzan Aff. Ex. L at D00373.) An incident of
absence is "one day absent or a number of
consecutive days absent." (Tojzan Aff. Ex. L at
D00373.)

On January 25, 1999, the Hospital issued a Report

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 2

Not Reported in F.Supp.2d, 2003 WL 1738993 (S.D.N.Y.), 25 NDLR P 306

**(Cite as: 2003 WL 1738993 (S.D.N.Y.))**

of Caution to Tojzan, notifying him that he had incurred five incidents of absence over the previous twelve months. (Post Aff. Ex. 2.) Subsequently, Tojzan was absent from February 22 through February 24, 1999. (Post Aff. Ex. 1.) Tojzan attributes all of his absences to severe back pain. (Tojzan Aff. ¶ 17.) Consequently, on February 25, 1999, the Hospital issued a written Corrective Action Report to Tojzan for violating the Hospital's attendance policy, and placed him on probation for three months. (Def.'s 56.1 ¶ 8; Tojzan Dep. at 35, 48; Tojzan Aff. Ex. I; Post Aff. Ex. 1.) On June 21, 1999, Tojzan received a Corrective Action Follow-Up notice which noted that he had no incidents of absence since February 25, 1999. (Post Aff. Ex. 2; Tojzan Aff. Ex. K.)

*2 Four days later, Tojzan submitted his resignation, effective July 9, 1999. (Pl.'s 56.1 ¶ 3; Def.'s 56.1 ¶¶ 11, 16; Post Aff. Ex. 3.) Tojzan concedes that during the course of his employment no one at the Hospital made any comments regarding his age. (Def.'s 56.1 ¶ 37; Tojzan Dep. at 97.) Tojzan further concedes that no one at the Hospital ever threatened to suspend or terminate him or withhold "substantial retirement benefits" if he did not resign. (Def.'s 56 .1 ¶ 13; Tojzan Dep. at 101-02, 130-31.) Indeed, Tojzan recognizes that at the time of his resignation the Hospital wanted to continue his employment. (Tojzan Dep. at 51.) Nevertheless, Tojzan now maintains that the Hospital forced his resignation, and that he would have lost his retirement benefits had he been fired. (Pl.'s Opp. at 4, 12; Tojzan Aff. at ¶¶ 52-53.) In contrast, the Hospital contends that Tojzan's resignation was not a constructive discharge, and that Tojzan resigned of his own volition. (Def.'s Br. at 5, 14-19.) Tojzan submits that he requested the Hospital provide him with lighter work to accommodate his physical impairments, but the Hospital ignored or denied such requests. (Tojzan Aff. ¶ 76, Tojzan Dep. at 24, 29-31, 69.)

III. *Tojzan's Medical Condition*

Tojzan has various back conditions for which he consulted Dr. Tina Sacchetti, a chiropractor, beginning in March 1998. Tojzan's back problems arose in or around 1995, while he was employed at the Hospital. (Tojzan Dep. at 7.) Dr. Sacchetti treated Tojzan for radiculitis, which causes inflamation of the nerve and bone, and muscle spasms in the spine. (Deposition of Dr. Tina Sacchetti, dated January 18, 2002 ("Sacchetti Dep.") at 17-18.) She also treated Tojzan for cervical brachial syndrome, a strain to the cervical muscles which causes pain from the shoulder to the neck, for myofascitis, an inflamation of the fascia over the muscles caused by strain, and for subluxation in the thoracic spine, a misalignment of a vertebrae that becomes locked and presses on a nerve. (Sacchetti Dep. at 24-25.) These conditions were episodic in nature, not permanent. (Sacchetti Dep. at 19, 26; Tojzan Dep. at 106, 123.)

In August 1999, Dr. Sacchetti diagnosed Tojzan with moderate to severe degenerative disk disease. (Affidavit of Dr. Tina Sacchetti, dated April 5, 2002 ("Sacchetti Aff.") ¶ 8, Ex. E.) This condition caused Tojzan to have intermittent episodes of severe pain radiating down his legs, spasm of the back muscles, and periods of immobility. (Sacchetti Aff. ¶¶ 6-10; Sacchetti Dep. at 25-26; Post Aff. Ex. 8.) Each of Dr. Sacchetti's chiropractic treatments for his various medical conditions alleviated Tojzan's back pain. (Sacchetti Dep. at 26; Post Aff. Ex. 8.) Dr. Sacchetti advised Tojzan not to work for certain short periods of time, but never recommended to Tojzan that he restrict activities such as driving, sexual relations, walking, lifting and bending. (Sacchetti Dep. at 29-30, 40.)

*3 Tojzan's primary physician, Dr. Louis Vizioli, treated him for various medical complaints in March 1998, and January, February and August 1999. (Def.'s 56.1 ¶ 25; Deposition of Dr. Louis Vizioli, dated January 15, 2002 ("Vizioli Dep.") at 12, 17, 19, 24-25.) Dr. Vizioli never diagnosed Tojzan as having a medical condition affecting his back, and was unaware of any back problem until nearly one year after Tojzan's resignation from the Hospital. (Def.'s 56.1 ¶¶ 26-27; Vizioli Dep. at 30, 35-36.) Additionally, Dr. Vizioli knew of no activity in which Tojzan was limited to any degree and never placed restrictions on his activities. (Vizioli Dep. at 35-37.) Nor was he advised that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 3

Not Reported in F.Supp.2d, 2003 WL 1738993 (S.D.N.Y.), 25 NDLR P 306

**(Cite as: 2003 WL 1738993 (S.D.N.Y.))**

any other physician had placed restrictions on Tojzan. (Def.'s 56.1 ¶ 28; Vizioli Dep. at 30-31, 34-35.) Indeed, the one specialist Dr. Vizioli referred Tojzan to was Dr. Ronald Preston, a cardiologist. (Vizioli Dep. at 35.) After a full physical examination of Tojzan, Dr. Preston did not detect any back or neck impairments, and reported that Tojzan was in "no acute distress," was "spritely acting," and had a "supple" neck. (Post Aff. at Ex. 7.)

Tojzan avers that whenever he experienced back pain, it was so severe that he was unable to work, leave bed, "sit up, straighten [his] back, bend, walk or take care of [himself]." (Tojzan Aff. ¶¶ 14-15.) His wife, Rose Tojzan, avers that when her husband has severe back pain she helps him with various activities like walking and dressing. (Affidavit of Rose Tojzan, dated April 2, 2002 ("Rose Tojzan Aff.") ¶¶ 4-8, 10.) She also claims that even when her husband is not in severe pain he cannot stand or walk straight. (Rose Tojzan Aff. ¶ 4.)

*DISCUSSION*
I. *Summary Judgment Standard*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *accord Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986). The burden of demonstrating the absence of any genuine dispute as to a material fact rests with the moving party. *See, e.g. Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970); *Grady v. Affiliated Cent., Inc.,* 130 F.3d 553, 559 (2d Cir.1997). The movant may meet this burden by demonstrating a lack of evidence to support the nonmovant's case on an issue on which the nonmovant has the burden of proof. *Celotex,* 477 U.S. at 323; *Douglas v. Victor Capital Group,* 21 F.Supp.2d 379, 387 (S.D.N.Y.1998).

To defeat a summary judgment motion, the non-moving party must do "more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). In contrast, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *accord Matsushita Elec. Indus. Co.,* 475 U.S. at 587. In evaluating the record to determine whether there is a genuine issue as to any material fact, the "evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor." *Liberty Lobby,* 477 U.S. at 255.

*4 Since employment discrimination cases often turn on the intent of one party, a "trial court must be cautious about granting summary judgment." *Gallo v. Prudential Residential Servs., Ltd. P'shp,* 22 F.3d 1219, 1224 (2d Cir.1994). Where a plaintiff's argument is based on conclusory allegations of discrimination and the employer provides a legitimate rationale for its conduct, a court may find that no material issue of fact exists and grant summary judgment. *Stern v. Trs. of Columbia Univ.,* 131 F.3d 305, 312 (2d Cir.1997). Specifically, the question on summary judgment is "whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination. To get to the jury, '[i]t is not enough ... to disbelieve the employer; the factfinder must [also] believe the plaintiff's explanation of intentional discrimination." ' *Weinstock v. Columbia Univ.,* 224 F.3d 33, 42 (2d Cir.2000) (quotation omitted) (alteration in original); *accord Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 714 (2d Cir.1996).

As a preliminary matter, Tojzan's affidavit directly contradicts several portions of his deposition testimony without any explanation for the inconsistencies. (*Compare* Tojzan Dep. at 7 *with* Tojzan Aff. at ¶ 7; Tojzan Dep. at 69 *with* Tojzan Aff. at ¶ 18; Tojazan Dep. at 24-25 *with* Tojzan Aff. at ¶¶ 27, 64; Tojzan Dep. at 28-31 *with* Tojzan Aff. at ¶ 28; Tojzan Dep. at 44-46 *with* Tojzan Aff. at ¶¶ 29, 38.) "A party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that contradicts the affiant's previous deposition

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 4

Not Reported in F.Supp.2d, 2003 WL 1738993 (S.D.N.Y.), 25 NDLR P 306

**(Cite as: 2003 WL 1738993 (S.D.N.Y.))**

testimony." *Bickerstaff v. Vassar College,* 196 F.3d 435, 455 (2d Cir.1999); *accord Johns-Davila v. City of New York,* 99 Civ. 1885(RMB)(AJP), 2000 WL 1725418, at *8 (S.D.N.Y. Nov. 20, 2000) ("It is black letter law that affidavits which contradict deposition testimony are disregarded on a summary judgment motion.") (citing cases). Thus, where there is such a conflict, this Court credits Tojzan's deposition testimony.

II. *Tojzan's ADA Claim*

Tojzan alleges that the Hospital violated the ADA by forcing him to resign because of his disability, without offering him any reasonable accommodation. "The ADA prohibits employment discrimination against 'a qualified individual with a disability because of the disability of such individual.' " *Greicus v. Liz Claiborne, Inc.,* No. 00 Civ. 9518(SHS), 2002 WL 244598, at *3 (S.D.N.Y. Feb. 20, 2002) (quoting 42 U.S.C. § 12112(a)). The ADA requires employers, such as the Hospital, to provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship." 42 U.S.C. §§ 12112(b)(5)(A), 12111(2). A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The ADA defines a "disability" as:

**\*5** (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2).

To establish a *prima facie* case of disability discrimination, a plaintiff must show that: (1) his employer is subject to the ADA; (2) he suffers from a disability within the meaning of the statute; (3) he could perform the essential functions of his job with or without reasonable accommodation, and (4) he

was fired because of his disability. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973); *Ryan v. Grae & Rybicki, P.C.,* 135 F.3d 867, 869-70 (2d Cir.1998). A plaintiff must establish a *prima facie* case of discrimination to succeed on an ADA claim. If the plaintiff does so, the burden shifts to the former employer to show "some legitimate non-discriminatory reason" for the employment action challenged by the plaintiff. *McDonnell Douglas,* 411 U.S. at 802.

The Hospital argues that Tojzan cannot establish a *prima facie* case of disability discrimination because he is not disabled, cannot perform the essential functions of his job with or without reasonable accommodation, and was not fired due to disability. (Def.'s Br. at 8.)

A. *Disability*

In order to succeed on his ADA claim, Tojzan must establish the threshold requirement that he has a physical or mental impairment that substantially limits one or more major life activities, and accordingly has a disability under the ADA. 42 U.S.C. § 12102(2)(A); *Manessis v. New York City Dep't of Transp.,* No. 02 Civ. 359(SAS), 2003 WL 289969, at *16 (S.D.N.Y. Feb. 10, 2003) (granting summary judgment to defendant where plaintiff could not show he was disabled under the ADA). To establish that he has a "disability" within the meaning of the ADA, Tojzan must show that: (1) he suffered from a physical or mental impairment; (2) he has identified a major life activity that his impairment restricts; and (3) his physical impairment substantially limits the major life activity identified. *Bragdon v. Abbott,* 524 U.S. 624, 630 (1998); *Colwell v. Suffolk County Police Dep't,* 158 F.3d 635, 641 (2d Cir.1998).

1. *Physical Impairment*

The material facts are undisputed. During the time he was employed by the Hospital, Tojzan had a physical impairment to his back that was ongoing for approximately four years prior to his resignation, and worsened with time. (Tojzan Dep. at 7.) Tojzan consulted his chiropractor, Dr.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                     Page 5

Not Reported in F.Supp.2d, 2003 WL 1738993 (S.D.N.Y.), 25 NDLR P 306

**(Cite as: 2003 WL 1738993 (S.D.N.Y.))**

Sacchetti, for treatment for his back pain. Dr. Sacchetti treated Tojzan for "recurrent sprain strain to his lower back, [which] caused inflammation of a nerve and a bone out of place and muscle spasm in his spine, tightness of the muscle, [and] muscle pain," cervical brachial syndrome, a strain to the cervical muscles causing pain to shoot into the shoulder from the neck, myofascitis, "an inflamation of the fascia over the muscles", and subluxation in the thoracic spine, "a misalignment of a vertebrae that becomes locked and presses on a nerve." (Sacchetti Dep. at 19, 25.) Dr. Sacchetti also testified at her deposition that Tojzan's medical conditions were not permanent. (Sacchetti Dep. at 19.) Approximately one month after Tojzan's resignation from his position at the Hospital, Dr. Sacchetti diagnosed him with moderate to severe degenerative disk disease. (Sacchetti Aff. Ex. E; Tojzan Aff. Ex. G.)

**\*6** Although Tojzan suffered from a physical impairment, it is undisputed that his back problems were intermittent. (Sacchetti Dep. at 26; Tojzan Dep. at 105-06, 123.) Dr. Sacchetti never restricted Tojzan's physical activities, such as bending, lifting, walking and sitting during the time he was employed by the Hospital. (Sacchetti Dep. at 23.) Additionally, whenever Tojzan was in pain and sought treatment from Dr. Sacchetti, that treatment worked. (Sacchetti Dep. at 26.)

*2. Substantial Limitation of Major Life Activities*

Tojzan must also show that his impairment substantially limited a major life activity, as a mere showing of a physical impairment alone does not bring a plaintiff within the definition of "disabled" under the ADA. *See Toyota Motor Mfg., Kentucky, Inc. v. Williams,* 534 U.S. 184, 197 (2002); *Ryan v. Grae & Rybicki, P.C.,* 135 F.3d 867, 870 (2d Cir.1998); *accord Krikendall v. United Parcel Serv., Inc.,* 964 F.Supp. 106, 109 (W.D.N.Y.1997) (finding impairment of degenerative disc disease which affected certain life activities not substantially limiting).

The Supreme Court has instructed that the ADA's terms "need to be interpreted strictly to create a demanding standard for qualifying as disabled." *Toyota Motor,* 524 U.S. at 197. Accordingly,
> to be substantially limited in performing [a major life activity], an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives. The impairment's impact must also be permanent or long-term.

*Toyota Motor,* 534 U.S. at 198. Additionally, the ADA protects only a limited class of persons who suffer from physical impairments "significantly more severe than those encountered by ordinary people in everyday life." *Acquinas v. Fed. Express Corp.,* 940 F.Supp. 73, 77 (S.D.N.Y.1996).

The Equal Employment Opportunity Commission ("EEOC") regulations implementing the ADA state that "major life activities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(i) (2003) . Additionally, the Supreme Court has defined "major life activities" as
> those activities that are of central importance to daily life. In order for performing manual tasks to fit into this category--a category that includes such basic abilities as walking, seeing, and hearing--the manual tasks in question must be central to daily life. If each of the tasks included in the major life activity of performing manual tasks does not independently qualify as a major life activity, then together they must do so.

*Toyota Motor,* 534 U.S. at 197.

Tojzan has identified the following major life activities as substantially limited by his physical impairment: heavy lifting, walking, bending and sitting. [FN1] (Tojzan Dep. at 105-06.) However, Tojzan only identified bending, lifting and sitting as limitations to Dr. Sacchetti approximately one month after his resignation. (Post Aff. Ex. 8.) Further, Tojzan concedes that his pain "comes and goes" and is not constant. (Tojzan Dep. at 105-06, 123.) During those periods of pain, Tojzan and his wife aver in their respective affidavits, he could not engage in daily life activities such as walking, getting out of bed, and dressing himself without

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 1738993 (S.D.N.Y.), 25 NDLR P 306

**(Cite as: 2003 WL 1738993 (S.D.N.Y.))**

Page 6

assistance. (Tojzan Aff. ¶ 15; Rose Tojzan Aff. ¶ ¶ 4-8.)

> FN1. In his opposition memorandum, Tojzan argues that his limitations also include reaching, standing, performing manual tasks and working. (Pl.'s Opp. at 16.) These allegations are absent from Tojzan's Amended Complaint and were raised for the first time in that memorandum. As such this Court disregards such unsupported and unpleaded allegations. *See Johns-Davilla*, 2000 WL 1725418, at * 7 (citing cases). Even if such claims were properly pleaded, which they were not, the evidence does not demonstrate that Tojzan was substantially limited in these activities for the reasons described in this Memorandum and Order.

*7    Tojzan's physical impairments must substantially limit the major life activities he identified. *Toyota Motor*, 534 U.S. at 195-96. A substantial limitation on a major life activity is defined as "[u]nable to perform a major life activity that the average person in the general population can perform" or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j); *accord Toyota Motor*, 534 U.S. at 195-96; *Colwell*, 158 F.3d at 643 . The following factors are considered in determining whether an individual is substantially limited in a major life activity: (1) "the nature and severity of the impairment"; (2) "the duration or expected duration of the impairment"; and (3) "the permanent or long-term impact or expected long term impact resulting from the impairment." *Toyota Motor*, 534 U.S. at 196. "When addressing the major life activity of performing manual tasks, the central inquiry must be whether the claimant is unable to perform the variety of tasks central to most people's daily lives, not whether the claimant is unable to perform the tasks associated with her specific job." *Toyota Motor*, 534 U.S. at 200-01;

*accord* 29 C.F.R. § 1630.2(j)(2).

With regard to the nature and severity of the impairment, it is undisputed that Tojzan never complained to his primary physician, Dr. Vizioli, about his alleged disability, even though Dr. Vizioli treated Tojzan in March 1998, January, February and August 1999. (Vizioli Dep. at 30-31, 34, 36-37.) Nor was Dr. Vizioli ever aware of any limitation on Tojzan's activities, including walking, dressing, bending and lifting until June 19, 2000, approximately one year after Tojzan resigned from the Hospital. (Vizioli Dep. at 30-31, 34, 36- 37.) Further, Dr. Preston, Tojzan's cardiologist, performed a full physical examination on Tojzan in May 1998, but found no medical issue relating to his back. Indeed, Dr. Preston described Tojzan as "a well, spritely acting ... 61 year old man who is in no acute distress," and who appears "younger than his stated age." (Post Aff. Ex. 7.) In sum, Tojzan has submitted no evidence to show that his back problems are more severe than those of the general population.

With regard to the duration of the impairment and the impact resulting from the impairment, it is undisputed that Tojzan's physical impairments are not permanent. (Tojzan Dep. at 19, 106, 123; Sacchetti Dep. at 19.) Even accepting Tojzan's argument that when his back pain is acute it limits his ability to walk, dress himself, bend and lift, such limitations are only intermittent in nature. *See Ryan*, 135 F.3d at 872. "To hold that a person is disabled whenever that individual suffers from an occasional manifestation of an illness would expand the contours of the ADA beyond all bounds." *Equal Employment Opportunity Comm'n v. Sara Lee Corp.*, 237 F.3d 349, 352 (4th Cir.2001). Indeed, several courts have held that lifetime impairments which manifest intermittently do not qualify as a substantial limitation on any major life activity because they are insufficient in duration and long-term impact. *See, e.g. Sara Lee*, 237 F.3d at 352 (finding plaintiff who experienced seizures once to twice a week was not "disabled" under the ADA); *Ryan*, 135 F.3d at 871-72 (episodic symptoms of colitis which, when active severely limited plaintiff's ability to control bodily waste and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 1738993 (S.D.N.Y.), 25 NDLR P 306

**(Cite as: 2003 WL 1738993 (S.D.N.Y.))**

Page 7

care for herself did not substantially limit those activities); *Soileau v. Guilford of Maine, Inc.,* 105 F.3d 12, 16 (1ˢᵗ Cir.1997) (acute episodic depression not substantially limiting with respect to ability to interact with others even if underlying condition is life long).

**\*8** Since Tojzan's physical impairments are episodic and are not consistently severe, they do not substantially limit a major life activity. Thus, Tojzan is not disabled within the meaning of the ADA and consequently cannot establish a *prima facie* case of disability discrimination. As such, it is unnecessary to consider whether he is able to perform the essential functions of his position either with or without reasonable accommodation. Therefore, this Court grants the Hospital's motion for summary judgment on Tojzan's ADA claim.

III. *Tojzan's Age Discrimination Claims*

Tojzan also brings a claim for age discrimination under the Age Discrimination in Employment Act ("ADEA") and the New York State Human Rights Law ("NYSHRL") (Am. Comp. at ¶¶ 31-44, 65-78.) In order to establish an ADEA claim, a plaintiff must establish a *prima facie* case of age discrimination. *See Wolf v. Bd. of Educ.,* 93 Civ. 6059(WHP), 2000 WL 28157, at \*2 (S.D.N.Y. Jan. 14, 2000). Age discrimination claims pursuant to the NYSHRL are analyzed under the ADEA standards. *See Chastven v. Cigna,* 97 Civ. 6013 (RPP), 1999 WL 1034753, at \*5, n. 20 (S.D.N.Y. Nov. 12, 1999) (citing *Raskin v. Wyatt Co.,* 125 F.3d 55, 60 (2d Cir.1997)). "Once the plaintiff has made out a prima facie case, the employer is required to offer a legitimate, nondiscriminatory business rationale for its actions." *Schnabel v. Abramson,* 232 F.3d 83, 87 (2d Cir.2000). If the employer offers such a legitimate reason, the burden shifts to the plaintiff to prove that his age was the true reason for his discharge. *Schnabel,* 232 F.3d at 87; *accord Sklar v. New York Life Ins. Co.,* 00 Civ. 2254(WHP), 2001 WL 984724, at \*5 (S.D.N.Y. Aug. 27, 2001).

In order to establish a *prima facie* case of age discrimination, a plaintiff must show that he: (1)

was a member of a protected age classification; (2) was qualified for his position; (3) suffered an adverse job action; and (4) suffered the adverse job action under circumstances giving rise to an inference of age discrimination. *Schnabel,* 232 F.3d at 87; *Grady v. Affiliated Cent. Inc.,* 130 F.3d 553, 559 (2d Cir.1997). "The burden of proof that must be met to establish a prima facie case is minimal." *Hollander v. Am. Cyanamid Co.,* 172 F.3d 192, 199 (2d Cir.1999).

Tojzan, however, cannot meet this minimal burden because he failed to establish that he suffered an adverse job action giving rise to an inference of age discrimination. First, Tojzan has presented no evidence that his resignation was forced by the Hospital. (Tojzan Aff. Ex. I; Tojzan Dep. at 20, 39, 75-76, 92-94, 132.) Even if the Hospital forced Tojzan to resign, Tojzan has submitted no evidence tending to show that his discharge was related to his age. Tojzan conceded that he knew of no other employees, including younger ones, that had similar attendance problems and were not similarly disciplined. (Tojzan Dep. at 87-89.) Indeed, he presents no evidence that younger employees were treated more favorably. *See Chastven,* 1999 WL 1034753, at \*6-7 (granting summary judgment on age discrimination claim where plaintiff failed to present evidence defendant treated younger employees more favorably). Tojzan further admits that no Hospital employee ever commented on, or threatened him due to his age, (Def.'s 56.1 ¶ 37; Tojzan Dep. at 97-98, 101-03), and that he was merely "guessing" that he was "scheduled for termination" due to his age. [FN2] (Tojzan Dep. at 92; Am. Compl. at ¶ 27.) *See Mareno v. Madison Square Garden, L.P.,* 98 Civ. 2719(WHP), 1999 WL 777952, at \*4 (S.D.N.Y. Sept. 29, 1999) (dismissing age discrimination claim where plaintiff did not provide evidence that defendant made age-biased remarks). These deficiencies are fatal to Tojzan's age discrimination claims. *See Sklar,* 2001 WL 984724, at \*5 (granting defendant's summary judgment motion where plaintiff's ADEA claim was supported only by conclusory allegations).

FN2. Indeed, in the parties' joint pretrial order, dated March 29, 2002, Tojzan

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                        Page 8

Not Reported in F.Supp.2d, 2003 WL 1738993 (S.D.N.Y.), 25 NDLR P 306

**(Cite as: 2003 WL 1738993 (S.D.N.Y.))**

informed this Court that he will not pursue claims under the ADEA at trial. Further, Tojzan did not address his age discrimination claims in his memorandum of law in opposition to defendant's motion for summary judgment.

**\*9** Accordingly, the Hospital's motion for summary judgment is granted with respect to Tojzan's ADEA and NYSHRL age discrimination claims.

IV. *NYSHRL Disability Discrimination Claim*

Disability discrimination claims under the New York State Human Rights Law ("NYSHRL") are generally subject to the same analysis as claims brought under the ADA. *See Collins v. Christopher,* 48 F.Supp.2d 397, 411 (S.D.N.Y.1999). There are, however, significant differences between the ADA and its New York counterpart. Most importantly, the NYSHRL defines disability more broadly than the ADA in that it only requires an impairment, not an impairment that substantially limits a major life activity. *See Giordano v. City of New York,* 274 F.3d 740, 753-54 (2d Cir.2001); *Reeves v. Johnson Controls World Servs., Inc.,* 140 F.3d 144, 154 (2d Cir.1998).

This Court has discretion to retain jurisdiction over Tojzan's remaining state disability discrimination claim once his federal ADA claim is dismissed. *See* 28 U.S.C. § 1367(c)(3); *Marcus v. AT & T Corp.,* 138 F.3d 46, 57 (2d Cir.1998). However, "in the absence of any remaining federal claim, the appropriate analytic framework to be applied to discrimination claims based on a 'disability' as defined by New York State and municipal law is a question best left to the courts of the State of New York." *Giordano,* 274 F.3d at 754. Since this Court dismisses Tojzan's federal ADA claim before trial, it declines to retain jurisdiction over Tojzan's state NYSHRL disability discrimination claim. *See Seabrook v. Jacobson,* 153 F.3d 70, 72 (2d Cir.1998) (noting that it is particularly appropriate for the district court to dismiss where "the federal claim on which the state claim hangs has been dismissed"); *Travelers Ins. Co. v. Keeling,* 996 F.2d 1485, 1490 (2d Cir.1993) (discussing court's

discretion whether to exercise supplemental jurisdiction). Accordingly, Tojzan's NYSHRL disability discrimination claim is dismissed without prejudice.

*CONCLUSION*

For the reasons set forth herein, the Hospital's motion for summary judgment is granted with respect to Tojzan's ADA, AEDA and NYSHRL age discrimination claims. This Court declines to exercise supplemental jurisdiction over the remaining state NYSHRL disability discrimination claim and accordingly dismisses such claim without prejudice. The Clerk of the Court is directed to close this case.

Not Reported in F.Supp.2d, 2003 WL 1738993 (S.D.N.Y.), 25 NDLR P 306

**Motions, Pleadings and Filings (Back to top)**

• 7:00cv06105 (Docket) (Aug. 16, 2000)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.