Addendum:
EEOC Charge of Discrimination Form

Charge No: 170-2004-01136
Zechman v. Christiana Care

IV. Dr Lamar Ekbladh and The Residency Review Committee refused my request for reasonable accommodation for my disability that was needed for me to continue and progress in my position as resident physician in training. Then refused to address my request for Family Medical Leave and ultimately forced me to resign.

Ellen Huffman Zechman

Ellen Huffman Zechman EHZ 6/14/04

Margolis Edelstein
Zechman, E. v. Christiana Care
0009

CHRISTIANA CARE HEALTH SERVICES
Department of Obstetric and Gynecology
Resident Review Committee Members

| NAME | TITLE | DATE OF BIRTH | AGE |
|---|---|---|---|
| Anthony Bell, D.O. | Physician | REDACTED/67 * | 37 |
| Colleen Bratsch, D.O. | Resident | REDACTED /71 * | 32 |
| Faith Brosch, M.D. | Physician | REDACTED /61 | 43 |
| Garrett Colmorgen, M.D. | Physician | REDACTED /51 | 53 |
| Gregory Demeo, D.O. | Physician | REDACTED /60 | 43 |
| Lamar Ekbladh, M.D. | Chair, Ob/GYN | REDACTED /42 | 62 |
| Moses Hochman, M.D. | Physician | REDACTED /45 | 59 |
| Paul Kaminski, M.D. | Physician | REDACTED /39 | 64 |
| Christine Maynard, M.D. | Physician | REDACTED /48 | 55 |
| Jeffrey Russell, M.D. | Physician | REDACTED /54 | 49 |
| Anthony Sciscione, D.O. | Resident | REDACTED /60 | 43 |
| Phillip Shlossman, M.D. | Physician | REDACTED /55 | 49 |
| Janice Tildon-Burton, M.D. | Physician | REDACTED /45 | 58 |
| Charles Whitney, M.D. | Physician | REDACTED /48 | 56 |
| Estelle Whitney, M.D. | Physician | REDACTED /57 | 46 |

* UNDER 40 YEARS OF AGE

REDACTED

NRMP005
CONFIDENTIAL

REDACTED

NRMP006
CONFIDENTIAL

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ELLEN ZECHMAN,

Plaintiff,

v. : C.A. No. 05-159

CHRISTIANA CARE HEALTH SYSTEMS,

Defendant.

AFFIDAVIT OF LAMAR EKLBADH, M.D.

I, Lamar Ekbladh, hereby declare and state as follows:

1. I am Chair of the Obstetrics and Gynecology ("OB/GYN") Department at Christiana Hospital, in Newark, Delaware, a position I have held since 1994.

2. In 2003, I was the interim OB/GYN residency program director.

3. The Resident Review Committee ("Committee"), which consists of Christiana Care OB/GYN faculty members and outside attending physicians, allows the OB/GYN Chief Resident (typically, a fourth-year resident) to attend its quarterly meetings as a representative of the residents.

4. The Chief Resident does not vote on Committee decisions regarding individual residents' special curriculum or status within the residency program.

5. The Chief Resident leaves the meeting prior to final disciplinary decisions or votes regarding the residents.

I swear under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge and belief.

Lamar Ekbladh, M.D.

Dated October 19, 2006

VICKY M. COLLINS
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires June 14, 2007

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ELLEN ZECHMAN, )
)
Plaintiff, )
)
v. ) Civil Action No.
) 05-159 JJF
CHRISTIANA CARE HEALTH SYSTEMS, )
)
Defendant. )

Deposition of ELLEN ZECHMAN taken pursuant to notice at the offices of Morris James Hitchens & Williams, LLP, 222 Delaware Avenue, 10th Floor, Wilmington, Delaware, beginning at 9:30 a.m. on Tuesday, June 20, 2006, before Ann M. Calligan, Registered Merit Reporter and Notary Public.

APPEARANCES:

LORI BREWINGTON, Esquire
MARGOLIS EDELSTEIN
1509 Gilpin Avenue
Wilmington, Delaware 19806
on behalf of the Plaintiffs,

THOMAS S. BLOOM, Esquire
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, Pennsylvania 19103-2921
on behalf of the Defendant.

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477

Page 2

ELLEN ZECHMAN,
the witness herein, having first been duly sworn on oath, was examined and testified as follows:

EXAMINATION

BY MR. BLOOM:

Q. Good morning, Dr. Zechman.

**A. Good morning.**

Q. We met briefly this morning. I'm Tom Bloom, and I represent Christiana Care in this case.

Have you ever given a deposition before?

**A. No, I have not.**

Q. Have you ever testified under oath before?

**A. I think so.**

Q. Well, today is really an opportunity for me to learn the facts of your case and to learn about what your claims are. It is not a test. You may not necessarily have the answer to every question that I have, but neither your lawyer nor I want you to speculate about things that you don't have personal knowledge of. So if you don't have personal knowledge of the answer to a given question, it's perfectly okay to say that you don't know. Will you follow that instruction?

Page 3

**A. Yes, sir.**

Q. And as you can see, we have a court reporter who's taking down everything that you and I say. So it's important that you give verbal responses instead of gestures. Will you do that?

**A. Yes.**

Q. And also, because we have a court reporter, it's important that we let each other finish, that I finish the question before you start answering, and I will do my best to let you finish your answer before I ask the next question, even though I know that's not how people normally talk in conversation. You may know what the end of my question is. I'd appreciate it if you would try to wait until the question is actually complete before you answer it. Will you do that?

**A. Yes.**

Q. Are you currently taking any medication that would affect your ability to remember facts accurately?

**A. No.**

Q. Are you taking any medication that would affect your ability to testify truthfully today?

**A. No.**

Page 4

Q. And during the course of the day, if there's a point at which you want to take a break, just let me know and you can certainly do that. All right?

**A. Okay.**

Q. And lastly, if you don't understand a question of mine or if you think it's confusing, please let me know and I'll try and rephrase it because, if you don't let me know, I'm going to assume that you understood it and that your answer is based upon your understanding the question. Okay?

**A. Okay.**

Q. Your lawyer brought with the both of you today some additional documents in this case, and I'm not going to mark these as exhibits, but -- these are not numbered. Okay.

I'm going to put a stack of unnumbered documents that your lawyer handed me this morning. Can you tell me what this stack is I'm putting in front of you right now?

**A. Am I supposed to go through the stack or do I just look at what's in front of me?**

Q. Feel free to look through, and when you are satisfied that you know what it is, let me know.

**A. This is the -- primarily my husband's income**

Page 5

**data.**

Q. Okay. Is that --

**A. We file jointly, but this is mostly his income data.**

Q. And is that, to the best of your understanding, a complete tax return for the tax year 2004?

**A. I do not have privilege to this information at home. It is his information. So I cannot answer that. But it is my information.**

Q. Where did you obtain that document before you gave it to your lawyer?

**A. My husband.**

Q. Your husband had a copy of your joint tax return for 2004?

**A. Yes, sir.**

Q. You can hand that back to me, and I'm going to hand to you another package of documents that was given to me this morning, which looks to be your joint tax return for the tax year 2003.

Would you please just take a look at that and confirm that that's what that is?

**A. Yes. And this is my information. The rest of it is his information.**

Q. You just referred to something as being your

A-100

Page 6

information, and it looked to me like you were pointing to the W-2 on the first page?
**A. That's my W-2.**
Q. And I'm going to hand you a third collection of documents that were handed to me today. Can you just, please, take a look at this and confirm for me that this is your complete joint tax return for tax year 2001?
**A. It appears to be, but I do not have privilege to this information at home. My husband gave this to me. This is his tax information.**
Q. Okay.
**A. And we are joint.**
Q. To your understanding?
**A. So my information is here, but this is primarily his income information.**
Q. Finally, I'm going to hand you another stack of documents that was given to me today, and could you confirm for me that this is your joint tax return for the tax year 2005?
**A. It appears to be.**
Q. Okay. Thank you.
Dr. Zechman, could you tell me, where did you to go high school?

Page 7

**A. New Hanover High School in Wilmington, North Carolina.**
Q. What year did you graduate high school?
**A. 1975.**
Q. And you went to college after high school?
**A. No, I did not.**
Q. You eventually went to college?
**A. I did.**
Q. What did you do immediately after high school?
**A. I went to work for DuPont.**
Q. And what did you do for DuPont?
**A. I was out in their factory at their Wilmington Dacron plant.**
Q. And what did you do in the factory?
**A. Various things. It's been a while, so it's hard to remember.**
Q. And how long did you work at that factory?
**A. I was laid off in 1982.**
Q. Do you recall what you did after that?
**A. I started to go to college at that part time.**
Q. Do you remember the year you started to go to college part time?
**A. No, I don't.**
Q. Do you remember the name of the institution

Page 8

where you started to go to college?
**A. No. Because I was taking various courses primarily under Cape Fear Technical Institute.**
Q. And was there something else you were doing at the same time you were going to school part time?
**A. Working odd jobs while I was in college.**
Q. Did there come a time when you became a full-time college student?
**A. There did. I can't remember the exact date.**
Q. When you became a full-time college student, was that at Coastal Carolina Community College in Jacksonville, North Carolina?
**A. It was prior to that at Cape Fear Community College in Wilmington, North Carolina.**
Q. And is it your memory that you started at Coastal Carolina Community College in the fall of 1985?
**A. I'm not sure of the date.**
Q. I'm going to put in front of you what's previously been marked as Zechman 1.
MR. BLOOM: Off the record for one second.
(Discussion off the record.)
(Zechman Deposition Exhibit 1 was marked for identification.)

Page 9

BY MR. BLOOM:
Q. Do you recognize the document that I just put in front of you, Zechman 1?
**A. Yes.**
Q. What is that?
**A. That is my application for residencies.**
Q. And it says at the top, ERAS Common Application Form. That's E-R-A-S.
Do you have a understanding of what that means?
**A. It's an electronic residency application.**
Q. And is it your understanding that you submitted this application to all of the residency programs that you're applying to at a given time?
**A. That's correct.**
Q. So it's a standard application?
**A. Yes.**
Q. And I take it that this application is then forwarded to all of the residency programs that you express an interest in?
**A. That's correct.**
Q. And if you'll turn to the second page of Zechman 1, under undergraduate education, the earliest entry in time is that you were a student at Coastal

A-101

Page 10

Carolina Community College in Jacksonville, North Carolina, from August 1985 through May 1987. Did I read that right?

**A. Yes.**

Q. Does looking at that refresh your memory of the years you attended that institution?

**A. That is more likely correct, but you know, I don't have my transcripts in front of me. So it was -- it's been a while.**

Q. This application that we are looking at is the information that you were presenting to the residency programs on which, at least in part, to base a decision about whether to admit you or not into the program?

**A. That's correct.**

Q. Did you prepare this application yourself?

**A. Yes, I did.**

Q. And at the time you prepared it, were you careful to make sure that the information you provided was accurate?

**A. To the best of my knowledge with my transcripts and my degrees in front of me.**

Q. And your transcripts and degrees are things that you would have had in front of you at the time

Page 11

you completed this application?

**A. Yes.**

Q. And you actually would have submitted copies of those things along with your application?

**A. Yes. And they would have had to be submitted into my medical school as well.**

Q. You mean transcripts from your medical school?

**A. No. For into medical school, you would send transcripts with these.**

Q. And then according to Zechman 1, in 1987, you continued your college education at East Carolina University in Greenville, North Carolina, is that correct?

**A. That's correct.**

Q. Can you tell me why it was you switched from Coastal Carolina Community College to East Carolina?

**A. The community college is a two-year degree, an associate's degree. East Carolina University is a major university with a bachelor's degree. So I wished to pursue my bachelor's degree at that time, interested in attending medical school.**

Q. And you did apply to medical school upon graduation from East Carolina University in 1990?

**A. Yes.**

Page 12

Q. And did you actually matriculate at a medical school the following fall?

**A. Reword that question, please.**

Q. Sure. Did you apply for medical school while you were in your last year of college?

**A. Yes.**

Q. And then, did you actually start at medical school the next fall?

**A. Yes.**

Q. So that was also in 1990 that you started medical school?

**A. Yes, sir.**

Q. And where did you go to medical school?

**A. East Carolina University.**

Q. Do you recall the medical schools that you applied to at the time?

**A. No.**

Q. Do you recall whether it was more than five?

**A. I really don't remember.**

Q. Do you remember whether you applied to go to medical school outside of North Carolina?

**A. I did not.**

Q. So your applications were limited to North Carolina?

Page 13

**A. Yes.**

Q. What's the next step after graduating from medical school?

**A. Going straight into residency.**

Q. Okay. And does that process start as you're nearing the end of your medical school program?

**A. Yes. Usually.**

Q. And did it in your case?

**A. Yes.**

Q. And I understand that, when you're entering a residency program, that the application process goes through what's referred to as the match program?

**A. Yes.**

Q. And did you go through the match program at that time when you were applying to your first residency?

**A. Yes.**

Q. Can you tell me your understanding of how the match process works?

**A. I really do not have a clear understanding of it. You pretty well do what you're told to do when you're in medical school.**

Q. Does the match program, from your memory, involve identifying or listing the residency programs

Page 14

that you're interested in?
**A. Yes.**
Q. And your application is submitted through a common application or a standard application?
**A. Not at that time.**
Q. At that time did you submit applications directly to different residency programs?
**A. Yes.**
Q. And so do you know what role the match played in assigning you to a particular residency program?
**A. I don't know what you're asking me.**
Q. Let me put it this way and you tell me if you think I've got this right: that you, as the applicant, provide a list of residency programs that you're interested in and materials get submitted to the programs and then the various medical programs express interest in a list of people whose applications they've received and if there's a match, the match program tells you where you've matched. Is that your understanding of how it works?
**A. Vaguely.**
Q. And when you're applying, focussing on this first application to your first residency program, I take it part of the process is submitting

Page 15

recommendations?
**A. Who are you referring to?**
Q. Well, do you submit any recommendations, either from former professors or other people that you work for?
**A. Yes.**
Q. How do you decide who you're going to submit recommendations from?
**A. I'm not sure. That is taken care of in your medical school where they do evaluations of you, your dean's letter, certain things are kind of built into the system in order to facilitate that.**
Q. Do you recall whether you had an opportunity to ask particular professors or other people to write a recommendation on your behalf?
**A. I don't recall. That's been a few years. But there was always that option.**
Q. And the year after you finished medical school you did, in fact, start a residency program, pathology at East Carolina University, is that right?
**A. That's correct.**
Q. And you were in the pathology residency program for two years?
**A. That's correct.**

Page 16

Q. Can you tell me why you left that program?
**A. Yes, I can. Personal reasons.**
Q. Would you tell me why?
**A. Personal reasons.**
Q. Well, Dr. Zechman, I'm not here to unnecessarily intrude into your privacy or to embarrass you, but you have to answer the questions. And I will let you know also, we have a confidentiality agreement in the case. If you want, we can designate on the record that your answer to these questions are confidential, but you need to answer them.
**A. Personal reasons. Very difficult pregnancy.**
Q. When did your pregnancy make you unable to continue in the pathology residency program?
**A. I took a leave of absence prior to that because of the pregnancy, but after that, it was a family decision because we wanted to have another child because of my age and with the experience of the first one, having so much difficulty, that I went out and with intention of going back into residency after I had children.**
Q. Do you recall how far along you were in the pregnancy when you needed to leave the residency

Page 17

program?
**A. No.**
Q. While you were a resident in pathology in East Carolina University, did you make a decision to pursue having a family while you were in the residency program?
**A. I was pregnant when I entered the residency program.**
Q. I see. Okay.
So did you have a child while you were in the residency program?
**A. I have a child that was born in October of 1995.**
Q. And then you came back to the pathology residency?
**A. That's correct.**
Q. And then let me pause right now. How many children do you have now?
**A. Four children living.**
Q. Can you give me their years of birth?
**A. The first is I think -- he just turned 21. So what's that? I'm blanking. My mind has just gone blank.**
Q. Around 1985 maybe?

Page 18

**A. That sounds correct. He just turned 21.**
**Then the second one was the one I had in '95 and then the third one was '98 and the fourth one is a millennium baby.**
Q. Okay. Born in 2000?
**A. That's correct.**
Q. So is that because you were having a family, is that why you didn't return to a residency program in 2001?
**A. That's exactly why.**
Q. My understanding is, although you were no longer in a residency program between 1996 and 2001, that you did practice medicine in some respects, is that true?
**A. Absolutely. I was a fully licensed physician in North Carolina.**
Q. And so you worked as a physician in North Carolina during that period?
**A. Yes.**
Q. Can you tell me where and in what capacity you worked as a physician during that period between '96 and 2001?
**A. I worked with my husband as his assistant as well as working in the local public clinic doing**

Page 19

**general medicine.**
Q. And so at that time, even before having completed any residency, you were able to work as a physician?
**A. You are licensed after one year of medicine and passing all your national competency exams. I had met those requirements. I was fully licensed as a physician, a general physician, in North Carolina.**
Q. For example, does that mean -- I'm just trying to learn. I'm not a doctor. Does that mean you could run a general medical practice?
**A. That has to do a lot with the insurance carriers. Legally you can, but whether you can do that on your own with insurance and other things is a different story.**
Q. And to your understanding what would determine whether you could clear those things?
**A. It's individual, depending on who your major insurance carriers are, different state regulations, that come into being. It's -- it really depends on what you're trying to do and what the population you're doing it with.**
Q. And apart from starting your own general practice, I mean, I take it you were licensed and

Page 20

capable of joining a medical practice and working as a fully licensed physician?
**A. As a GP only, not a specialist, not an internist. As a GP, general physician.**
Q. During that period of time between 1996 and 2001, when you were assisting at your husband's practice, were you compensated for that work at that time?
**A. No. He was just starting his business, and I did it to help him.**
Q. And there also came a time, as I understand it, that you actually started a women's clinic in North Carolina, is that right?
**A. Yes.**
Q. Did that happen roughly in the spring of 1998?
**A. That -- I'm not sure about the date, but it was after that third child was born. I'm not sure about that date.**
Q. And if you look at the third page of the document that's currently in front of you, which is still Zechman 1, it indicates there that the clinic started in April '98. Does that look right to you?
**A. That would be correct. When I filled all this in, I had all my stuff and documents in front of me.**

Page 21

**I have not looked at this probably since it was filled out, so...**
Q. What sort of services did the Ladies Clinic provide?
**A. Mostly PAP smears, breast exams, that sort of stuff. Just preventative stuff.**
Q. I take it that, in working at the Ladies Clinic, you're working in a capacity as a licensed physician?
**A. As general practitioner doing general women's wellness.**
Q. Did you have any other physicians working at the clinic with you?
**A. My husband was my basically head physician. He's boarded in internal medicine, and so he was kind of the supervising physician that would handle things when I was not there or would be my expert when I needed additional advice from someone that was -- had greater training than I did.**
Q. Was your husband compensated for his work at the Ladies Clinic financially?
**A. No. Because I don't think at what time we started making a profit. So I don't -- I don't know.**
Q. Did there come a time when the clinic became

Page 22

profitable?
A. **I don't know because I don't do the accounting. I turn all that stuff over to him.**
Q. To your husband?
A. **Mm-hmm.**
Q. Does your husband personally prepare your tax return?
A. **No. That accounting firm that is listed on there does that, national accounting firm.**
Q. So sitting here today, do you have any recollection of whether the Ladies Clinic ever turned a profit?
A. **I don't know.**
Q. Did there ever come a time at the Ladies Clinic where you had anybody -- any physician working there other than you and your husband?
A. **We had a nurse practitioner when I went to Delaware. A nurse practitioner took care of my patients and my husband was the supervising physician, and I was no longer a part of it. I was a part of it on paper, but I was no longer a part of it when I was in residency because it was turned over legally to them.**
Q. And when you say it was turned over legally to

Page 23

them, what do you mean? Did you sell it?
A. **There was something done. The lawyers and the accountant took care of that, but where they were responsible for it while I was in residency.**
Q. And did there come a time when the Ladies Clinic ever closed?
A. **No.**
Q. And so is it still in operation today?
A. **It is.**
Q. And who's the owner of it today?
A. **I am the owner today. My husband is my advisor. It is not making a profit. It is deep in the red, actually.**
Q. Is there a distinction in your mind between being a -- I'm referring specifically to the work you've done at your husband's allergy clinic. Is there a distinction in your mind between being an assisting physician and a physician's assistant?
A. **I don't know what you're getting at.**
Q. *Do those two terms have different meanings to* you?
A. **There is a medical/legal difference.**
Q. Okay. Tell me what that is.
A. **A physician's assistant is a separate license.**

Page 24

**An assisting physician is a physician that helps but might not have the same credentials as the person that is doing the billing or has the clinic under their name. So any physician can assist another physician.**
Q. And so, to your understanding, a physician's assistant is not actually a licensed physician?
A. **No. There is a specific license called a physician's assistant license. They are licensed physician's assistant. Licensed nurse practitioner that assist physicians as what is called -- there's a special name for them. Physician extenders is what they are called, but they are not physicians.**
Q. Okay. When you just referred to as physician extenders, that's like a synonym for physician's assistant?
A. **And nurse practitioners.**
Q. Okay. And all three of those categories are not doctors?
A. **They are not doctors.**
Q. There came a point in approximately 2001 where you applied for a second residency program, is that right?
A. **That's correct.**
Q. And you applied for a residency program in

Page 25

obstetrics and gynecology?
A. **Yes.**
Q. Do you recall, when you applied for residency that second time, whether you went through the match program again?
A. **I don't recall. I had been on the phone talking to different professors and different contacts about going into obstetrics and gynecology, and I don't recall whether it was just phone contacts or whether it was formal. I don't recall.**
Q. You eventually started an ob/gyn residency at Riverside Regional Medical Center in Newport News, Virginia, right?
A. **That's correct.**
Q. Do you recall whether you applied to any other residency programs at the same time?
A. **I cannot recall.**
Q. So, as you sit here today, it's possible that you only applied to that one?
A. **I don't know. I don't remember.**
Q. Well, first, you stayed in that residency program for one year, am I right?
A. **It was a one-year non-continuing position that I took.**

Page 26

Q. And did that residency program also have continuing residency positions in the ob/gyn department?

**A. They did. But I was not part of that. They were full. I took this open position that was a one-year non-continuing position.**

Q. Was that position, the one-year non-continuing position, was that a position that they created for you to do or did they have a vacancy?

**A. That was an ongoing position that they would have an extra first year ob/gyn trainee. Every year they would have -- I forget the number, but they would have an extra first year, and it was advertised as a one-year non-continuing position.**

Q. So you knew going into that residency program at Riverside that you would need to continue the ob/gyn residency somewhere else?

**A. Absolutely.**

Q. And then you, in fact, applied to other residency programs to continue your residency?

**A. Yes.**

Q. And one of them was Christiana Care?

**A. Yes.**

Q. Do you remember, when you applied to Christiana Care, whether that was through the match program or through some other process?

Page 27

**A. I'm not sure. I can't remember.**

Q. Where else did you apply other than Christiana Care?

**A. East Carolina University and Norfolk.**

Q. Anywhere else?

**A. I'm not sure.**

Q. As you sit here now, do you think that there probably were others that you're not remembering?

**A. I can't remember.**

Q. You were eventually accepted into the residency program at Christiana Care, right?

**A. That's correct.**

Q. Do you remember whether you were offered a residency position anywhere else?

**A. Norfolk.**

Q. What led you to choose Christiana Care over Norfolk?

**A. *I felt I would get better surgery training in a* wider aspect at Christiana Care.**

Q. And you've only referred to the Norfolk residency program as Norfolk. Do you know what the fuller name of that institution is?

Page 28

**A. No.**

Q. But it's in Norfolk, Virginia?

**A. Norfolk, yeah.**

Q. Were you accepted to any residency program other than Christiana Care and the Norfolk program you just described?

**A. No.**

Q. My understanding is that a resident in an ob/gyn program -- being a resident entails applying direct patient care in some instance, am I correct about that?

**A. Yes.**

Q. It involves providing patient care sometimes with direct supervision of another physician, is that true?

**A. Under national guidelines, it should always be direct supervision of a teaching physician.**

Q. So I want to just make sure I'm understanding you right. Are you saying there is never a circumstance in which a resident should be alone interacting with a patient?

**A. You need to reword that. That didn't make sense to me.**

Q. You just referred to some national guidelines. Is it your understanding that, according to those guidelines, there always needs to be a teaching physician present when you're interacting with a patient when you're the resident?

Page 29

**A. Very close by. Walking within the physical structure where that teaching physician can walk in and assist you at any moment that you need that teaching physician.**

Q. I understand. Okay. So the teaching physician needs to be accessible to you?

**A. Very immediately accessible. Not necessarily in the same room, but within hearing distance or walking distance or running distance.**

Q. And if those guidelines, to your understanding, are being followed and there's a teaching physician that's very close by, under those circumstances do residents provide care to patients without a teaching physician in the room?

**A. Yes.**

Q. And that's normal in your experience?

**A. Yes.**

Q. And is it your understanding also that being a resident is, in part, a learning and academic program?

**A. Yes.**

Page 30

Q. And you would agree that it's important for -- I think you just said it -- for the residency program to closely supervise the progress and performance of its residents?
**A. By national guideline. They are to follow the national guidelines.**
Q. Okay.
**A. Set out by the American College of Graduate Medical Education.**
Q. And you would expect any residency program would be monitoring the progress of the skills of its residents?
**A. By national requirements, they should follow those set requirements.**
Q. I'm not asking you about what the national guidelines are, unless you're in a position to tell me what they are, what the national guidelines are.
**A. I cannot quote them, but they are directly specified what the guidelines are in a book.**
Q. Is it your understanding that, in an ob/gyn residency program, that the performance and progress of residents are frequently evaluated?
**A. Yes.**
Q. And that's an important part of the residency

Page 31

program, I take it?
**A. It's part of it, yes.**
Q. When you started at Christiana Care, am I right that there were only four slots, four spaces in the resident class in the ob/gyn program?
**A. That's correct.**
Q. So you were transferring in as a second-year resident because one of their four residents had left the program?
**A. That's correct.**
Q. Do you know what the circumstances or reasons were that that resident left the Christiana Care program?
**A. I do not.**
Q. And is it your understanding that Christiana Care has some limitations in the number of residents that it can have at a given time?
**A. It does.**
Q. And when Christiana Care eventually offered you the residency program, do you recall -- first, how did you learn that you had been accepted into the Christiana Care residency program as a second year.
**A. Directly from the residency director. Dr. Sciscione wanted me to sign a contract.**

Page 32

Q. Did he inform you of that decision face-to-face?
**A. Face-to-face.**
Q. That face-to-face meeting took place at Christiana Care?
**A. Pardon?**
Q. Did that face-to-face meeting with Dr. Sciscione occur at Christiana Care physically?
**A. Yes, sir.**
Q. Was that the same visit when you interviewed for the residency program?
**A. Yes.**
Q. And do you recall who interviewed you?
**A. Dr. Sciscione, of course. I did speak with Dr. Ekbladh, and there was someone else I also spoke to that I don't recall who they were.**
Q. Do you recall if you met with Dr. Ekbladh and Dr. Sciscione separately?
**A. Separately.**
Q. And was it your understanding that the decision about whether to offer you the position or not was a decision made by a committee?
**A. I have no idea.**
Q. What is required to become a fully licensed and

Page 33

certified ob/gyn physician? I mean, in addition to completing medical school.
**A. Completing medical school. Completing the residency. After residency, taking a board certification examination.**
Q. And the board certification, is there a written board exam?
**A. Yes.**
Q. And is there's also an oral board exam?
**A. I -- I'm not sure. I know that immediately after you finish your residency, after you have four years of training, you take the boards. I'm not sure where the oral comes in, but I know there is an oral component somewhere.**
Q. So there's a written and oral component to the board certification process?
**A. After residency.**
Q. And do you have any understanding as to whether it's rare for an ob/gyn resident to fail their boards?
**A. Just that residents frequently failed their boards. The year I was there, their graduating class of four, from what I have heard, only one immediately passed their boards.**
Q. The four you just referred to were the

Page 34

fourth-year residents in the ob/gyn program?
**A. That's correct.**
Q. And how did you learn that?
**A. Through other residents.**
Q. Do you remember who told you?
**A. That was common knowledge in the residency.**
Q. Do you remember who told you?
**A. No.**
Q. And do you have any understanding as to whether those three who failed the first time, whether they eventually passed?
**A. I have no idea.**
Q. Is it your understanding that passing the board exams, both the written and oral, is a demanding testing procedure?
MS. BREWINGTON: I'm going to object to form.
**A. I don't know what you're getting at. I don't know what -- you know, I don't know what you're asking me.**
Q. Let me phrase it differently. Other than the three that you just referred to at Christiana Care who failed their boards, do you have any understanding at all as to whether or not that's unusual generally for

Page 35

ob/gyn residents to fail the first time?
**A. No. That isn't -- I mean, it is not common. That's unusual --**
Q. Okay.
**A. -- to have such a poor failure rate of your graduating seniors. These are graduated seniors that have failed their boards.**
Q. And can you tell me what the basis for your belief about that is, about the graduating rate at Christiana Care being less than at other institutions?
**A. I have seen statistics, but I cannot recall what magazine. They published those statistics in the professional journals, but I cannot recall where and when I read that.**
Q. Okay. You think --
**A. But it was a comon thing to publish, you know, your pass rates, your match rates, your board passing rates. The professional journals frequently publish those statistics.**
Q. And when you pursued an ob/gyn residency, did you have in your mind a plan for what you wanted to do if and when you became a fully licensed ob/gyn physician?
**A. Absolutely.**

Page 36

Q. Okay. What was that?
**A. To come back home to rural North Carolina and work with the health department and do women's care. There's a great need in our area for ob/gyns.**
Q. When you just referred to the health department, is that a North Carolina government agency that you're referring to?
**A. Yes.**
Q. So I take it that your plan was not necessarily to go out and make the most money that you could?
**A. No. I wanted to provide wonderful health care to the women of North Carolina in something that was near and dear to my heart as the mother of four children.**
Q. And I think you said that your plan was to work in the health department in a rural part of North Carolina?
**A. That's where I live. Rural North Carolina.**
Q. What's the nearest city to where you live?
**A. I don't know what you want to call a city, but the nearest large city would be Raleigh, North Carolina, the state capital, which is at least two hours away.**
Q. How close are you to Greenville?

Page 37

**A. I am, depending on traffic, 45 minutes to an hour away from Greenville, North Carolina.**
Q. And when your referring to where you are, that's New Bern, North Carolina?
**A. New Bern, North Carolina**
Q. Would you just spell that for the reporter, please?
**A. What, New Bern?**
Q. Yes.
**A. N-e-w, separate word B-e-r-n.**
Q. And where does a resident fall in the hierarchy of medical personnel within a hospital?
**A. They are considered physicians, but they are considered trainees. They are not to operate on their own. They are not expected to be able go on their own. When I say operating, patient care. They are to be supervised at all times, to have help close by, physically, at all times.**
Q. When you say physically, I think you said before, it doesn't necessarily mean they're in the room, but they are close enough that you can get them?
**A. They have to be, by national requirements, they have to be able, if you say I need help, to be there quickly.**

Page 38

Q. And putting aside nurses and assistants and all that, I'm focussing your attention on physicians that are in the hospital. Is it your understanding that the residents are, for lack of a better term, the lowest on the totem pole of that progression?
**A. Rephrase that, please.**
Q. Sure.
When you refer to the residents as trainees, are there physicians within the hospital that are working there on the basis of less experience than the residents themselves? Is there a category below resident is what I'm asking.
**A. As a physician?**
Q. Yes.
**A. No.**
Q. So who are the categories of physicians that would be immediately above or supervising residents?
**A. Your staff-paid teaching physician.**
Q. And then, I understand there are also teaching physicians who are not staff-paid physicians?
**A. In private -- in private practice, but are also teaching physicians within the institution.**
Q. What's the chief resident? And I'm talking about the ob/gyn program at Christiana Care.

Page 39

**A. The chief resident is a resident -- and you'll have more than one -- the residents in their last year of training -- so they are in their fourth year of the fourth year -- that are in a supervising position. By national guidelines, all residents are required to pull a supervising year the fourth year and to be in charge of the specific service.**
Q. So if I'm understanding you right, part of completing a residency program is to spend a period of your fourth year where you are actually providing supervision and direction to more junior residents?
**A. That's correct.**
Q. You can put that document, Zechman 1, aside.
THE WITNESS: Break?
(Discussion off the record.)
(Recess taken.)
(Zechman Deposition Exhibit 2 was marked for identification.)
BY MR. BLOOM:
Q. Dr. Zechman, I'm going to put in front of you what's been marked as Zechman 2, and my understanding is that this is a letter of recommendation that you submitted in support of your application for an ob/gyn residency in October 2001, is that right?

Page 40

**A. I guess so, yeah, because this is to ECU School of Medicine.**
Q. Okay.
**A. So, yes.**
Q. And did you send this recommendation letter to Christiana Care also?
**A. I don't remember. I don't remember what I sent to them.**
Q. Is it your memory, then, that, when you applied, that you sent your application materials to Christiana Care?
**A. Yeah. Well, I sent them too, but I don't remember what I sent.**
Q. Is there anything about this particular recommendation that you view negatively?
**A. That would be a subjective thing, depending on who reads it. I think it looks fine. But "you brought maturity," that could be -- that could be a comment of my age or it could be a compliment. That could go either way.**
Q. Okay.
**A. Subjective, you know, depends.**
Q. When you first saw this evaluation, did it strike you that the word "maturity" was used in a

Page 41

negative way?
**A. Actually, it says, "She has waived her right to see this letter of recommendation," so I don't know that I have seen this.**
Q. Well, as you look at it now, tell me who Dr. David Rayl is. R-a-y-l.
**A. He is a wonderful, wonderful man that was my residency director at Riverside.**
Q. And so he's somebody you had a good relationship with?
**A. Yes. Wonderful teacher.**
Q. I take it you don't have any reason to think that he was trying to signal something negative about you when he referred to your maturity?
**A. I don't know.**
Q. Do you have any reason to think that he did?
**A. I don't -- I don't -- I don't know. You are asking me to speculate, and I can't -- I can't read somebody else's mind. I'm sorry.**
**(Zechman Deposition Exhibit 3 was marked for identification.)**
**BY MR. BLOOM:**
Q. I'm going to hand you what's been marked as Zechman 3. And this is a recommendation for you dated

Page 42

December 5, 2000, that was prepared by Dr. Samuel Atkinson, is that right?
**A. Mm-hmm.**
Q. Do I have that right?
**A. Pardon? Say it again.**
Q. Is this a recommendation on your behalf dated December 5, 2000, from Dr. Samuel Atkinson?
**A. That's correct.**
Q. Who is Dr. Atkinson?
**A. He was one of my teaching physicians from medical school.**
Q. Did you have a positive relationship with him?
**A. Yes.**
Q. Did you ask him to write this letter for you?
**A. Yes, I did.**
Q. After you've reviewed this letter, I'd like to know if there's anything in this recommendation that you view as a criticism of you?
**A. I can't say that I do.**
Q. There's a reference in the second paragraph to being somewhat older -- I'm quoting -- "somewhat older than the traditional fast track student."
**A. I missed that.**
Q. Did I read that right?

Page 43

**A. Yes. Somewhat older. That would be -- I'm sorry.**
Q. No. Finish your answer.
**A. You told me not to do that. I'm sorry.**
Q. I would read the full sentence. "She impressed us as a student as she was somewhat older than the traditional fast track student."
Did I read that right?
**A. Mm-hmm.**
Q. Does "traditional fast track student" have a meaning to you?
**A. Not to me.**
Q. Do you have any reason to think that Dr. Atkinson would have any reason to try to sabotage your application to another residency program?
**A. No. But he's making it clear that I'm older and not a young, traditional person.**
Q. Why would a young person be traditional?
MS. BREWINGTON: Objection. Calls for speculation.
MR. BLOOM: That's fine. You can answer.
MS. BREWINGTON: You can certainly answer. I'm sorry.
**A. Well, older students are called non-traditional**

Page 44

**students. So, evidently, society's view is traditional students go straight from high school to college to medical school on. And I was older.**
**BY MR. BLOOM:**
Q. And apart from the fact that this exhibit, Zechman 3, from Dr. Atkinson refers to you as being somewhat older, I mean, you would expect that any residency program that would consider you is doing so on the basis of a complete application that you submitted?
MS. BREWINGTON: Again, calls for speculation.
**A. I don't know what they do.**
Q. They know your age when you're applying for a residency position, right?
**A. I don't know.**
Q. You provide the dates you went to college, for example, right?
**A. I do.**
Q. And when you interviewed with Dr. Sciscione, was there any reference to your age or whether you are a non-traditional student during that interview?
**A. I can't recall.**
Q. And what about with Dr. Ekbladh, was there any

Page 45

reference to your age or being a non-traditional student?
**A. I cannot recall our conversation.**
Q. I've read in one of your notes or e-mails that Dr. Sciscione, according to you, once told you early on that some other members of the residency review committee gave him a hard time for hiring you because you were non-traditional. Do you recall that?
**A. Very clearly I recall that, yes.**
Q. When did Dr. Sciscione tell you that?
**A. I can't recall the exact time, but it was early like August, September, around that time, shortly after I had come on board in July and they were seeing who I was.**
Q. When you say July or August, you're talking 2002?
**A. Yes.**
Q. And did he tell you why he had been given a hard time for selecting you into the residency program?
**A. Because I was different.**
Q. You assumed, based on that, that that might refer to your age?
**A. I specifically asked him, why am I different?**

Page 46

**Is it my southern accent? Is it my age? And he wouldn't answer.**

Q. Did you have any reason to think that -- well, first of all, did he tell you who specifically was, quote/unquote, giving him a hard time?

**A. The members of the residency review committee.**

Q. And do you have any reason to believe that the members of the residency review committee knew your age?

**A. I have no idea.**

Q. Okay.

**A. By that time, they had worked with me and had seen me.**

Q. And so I take it what you're saying is that, when somebody meets you and sees you face-to-face, that they might come to some conclusion that you're older than the other residents? I hate to put it that way, but I think that's what you're telling me. Do I have that right?

**A. I think you've got that right.**

Q. Okay. You can put that document aside.

Did transferring from your first year residency program to the Christiana Care ob/gyn residency program entail any specific challenges to

Page 47

you in making that transition?

**A. Yes. And Dr. Sciscione and I discussed this in great detail, that I had not had the same surgical experience as I would have had I started at Christiana Care because the residents at Riverside, their first year, they were -- their primary duty was the labor deck, you know, managing labor, learning how to manage labor. They were not -- they would assist in surgeries, but they were not actively doing the surgery. And it was a tradition for that step not to be taken until the second year. It was kind of a, you know, award, you know, to be -- in the second year, you're handed the scalpel.**

**You were present in the surgeries, but you were holding retractors. You might close, but you weren't (indicating), you know and doing the surgery. Whereas, at Christiana, they dug in with a scalpel day 1. And that was a very big difference in the number of surgeries and then the role you played while you were in the OR room between the first year and the second year.**

Q. I think you testified before that that was one of the reasons why you wanted to go to Christiana was to get more surgical experience?

Page 48

**A. Absolutely.**

Q. And this conversation that you just referred to with Dr. Sciscione, was this during that initial interview that you had with him?

**A. We discussed this, yes.**

Q. So, during the interview, you discussed that you were behind what were soon to be your second-year classmates in surgical experience?

**A. We didn't use those words, but we were discussing the differences in the programs and he came to the conclusion because, you know, I couldn't see ahead, I couldn't see what his people had been through. That was his assessment. And he assured me that he would give me time to make this up, not to worry about it.**

Q. To catch up to your classmates?

**A. Yeah.**

Q. And when you were just comparing the level of surgical training from the program that you were transferring from as compared to the Christiana program, can you tell me, was one of those two programs more typical than the other in terms of the amount of surgical experience provided?

And I'll explain a little further. What

Page 49

I'm trying to figure out is, did the Riverside program you were coming from actually provide less than the usual amount of surgical experience, or did Christiana Care actually provide more than is typical?

**A. I'm not sure how to answer that because you're asking me to speculate. I would only be able to answer that had I gone through both programs the whole way. It's hard for me to make that assessment.**

Q. I think you testified earlier that you selected to travel to Delaware to Christiana Care, because you thought you would get more surgical experience there?

**A. And a broader base of types of surgery.**

Q. Okay. And you had an understanding that that broader and more extensive surgical experience was more than would have been provided at Norfolk, for example?

**A. I'm not sure about Norfolk. I did choose Christiana over Norfolk, but I -- I chose it because I felt that -- I can't remember the exact thought process.**

Q. How far away geographically was the Norfolk residency program from the Riverside program that you were transferring from?

**A. Miles-wise I can't answer that. But 30, 40**

Page 50

**minutes driving.**

Q. Was there anything else that played a part in your decision to choose Christiana Care other than your expectation that you would get more surgical experience?

**A. I thought it was more of a community, quieter, more laid back hospital than Norfolk, which would have been an inner city hospital.**

Q. And did you also have a discussion when you interviewed with Dr. Ekbladh about whether you would need to catch up to your classmates?

**A. I can not recall.**

**(Zechman Deposition Exhibit 12 was marked for identification.)**

**BY MR. BLOOM:**

Q. I'm going to put in front of you what's been marked as Zechman 12, and this is a document that you sent in support of your administrative charge of discrimination. Do you recognize this letter as something that you typed?

**A. Yes.**

Q. Do you recognize this also as something that you submitted in connection with your EEOC charge?

**A. Yes, I do.**

Page 51

Q. And I'm going to direct your attention to the first paragraph, and in the middle, it says -- I'm going to quote -- "Dr. Sciscione and Dr. Ekbladh knew I did not have extensive surgical experience at my former program in Virginia. We discussed this when I interviewed. They stated they would help me catch up."

Did I read that right?

**A. Yes, you did.**

Q. Does that refresh your memory as to whether or not you discussed catching up with Dr. Ekbladh?

**A. I cannot remember. Right now, I cannot remember what that conversation was with Dr. Ekbladh.**

Q. And after you started as a resident, as a second-year at Christiana Care, did you ever come to an opinion in your own mind about whether or not you had catching up to do?

**A. Yes. And I was eager to get as much experience as I could.**

Q. Did you ever come to an understanding in your mind as to whether, in fact, you had some catching up to do with respect to your co-residents?

**A. I did not have the surgical numbers that they had. So, yes, I did not have the level of experience**

Page 52

**in the operating room as they had by sheer numbers.**

Q. And apart from the numbers and the numbers of cases that they had done, did you ever come to an opinion in your own mind about whether you had catching up to do in terms of surgical skills?

**A. But I needed the opportunity. I just needed the opportunity to get in there and do it.**

Q. And I understand that, but is that a yes, that you agreed that was an area where you needed to catch up?

**A. Yes. But I needed the opportunity to catch up.**

Q. You can put that document aside.

(Zechman Deposition Exhibit 13 was marked for identification.)

BY MR. BLOOM:

Q. I'm going to show you what has been marked as Zechman 13, and this is a letter from you dated July 20th, 2004. And do you recognize it as a letter you sent to the EEOC in connection with your administrative charge?

**A. Yes.**

Q. You typed the first page of this exhibit?

**A. Yes.**

Q. And you're referring to a Christiana Care

Page 53

letter that you're attaching to your letter, and you're submitting it to the EEOC?

**A. Yes.**

Q. Could I have that?

**A. Mm-hmm.**

Q. Is that yes?

**A. Yes.**

Q. And I'm looking at the middle paragraph of the July 20th, 2004, letter that you wrote, and there was a reference here that Dr. Sciscione "recognized my difficulty from transferring into the Christiana Care program, that he looked forward to my completing the program, and that I was dedicated, energetic, and endearing."

Did I read that right?

**A. Mm-hmm.**

Q. I think you said this before, that, so far as you know, Christiana Care is only permitted to have four second-year residents at a time?

**A. That's correct.**

Q. They had one open slot, and they chose you for that slot?

**A. That's correct.**

Q. Do you have any reason to think that, when

A-112

Page 54

Dr. Sciscione and Christiana Care offered you that fourth and only slot in the second year, do you have any reason to doubt that they sincerely wanted you to succeed and to complete the program?

MS. BREWINGTON: Objection. Calls for speculation. You can answer.

**A. I have no idea.**

Q. Do you have any reason to believe that?

**A. The way Dr. Sciscione said that members of the committee gave him such a hard time about hiring me, anything would just be speculation, but that was a big point that he made to me.**

Q. And you told me a little while ago that that conversation between you and Dr. Sciscione happened in August or September of 2002?

**A. Yeah.**

Q. So when the position was offered to you, I take it you don't have any reason to believe or any reason to doubt that you were hired with the expectation that you would catch up and succeed in the program?

**A. I don't know. I don't know. I don't know what their expectations or their -- you know, I can't read their minds.**

Q. Do you know of any facts that would lead you to

Page 55

conclude that anyone at Christiana Care involved in the decision to hire you as a second-year resident, actually hoped that you would not succeed?

**A. I have no idea who was involved in the actual decision to hire me.**

Q. And I'm not asking for names, but what's the general composition of the residency review committee? Who are the types of people that are on that committee?

**A. They are members of the department, but I don't know the exact composition.**

Q. Is it your understanding that the membership of that committee fluctuates or changes over time?

**A. I don't know.**

Q. When you started at the Christiana Care residency program, I take it your family stayed back in New Bern, North Carolina?

**A. Yes.**

Q. How frequently did you go back and forth between Delaware and North Carolina?

**A. I would go back at least one off weekend. They would come up most of the time.**

Q. So that means one full weekend a month? Is that what you mean when you say one off weekend?

Page 56

**A. Yeah. Whatever was my off weekend, that's when I would go down. The rest of the time they would come up.**

Q. Is that the way the schedule works that each resident has one off weekend per month?

**A. It varied, but that was more often the case.**

Q. So, typically, through your time at Christiana Care, you went to North Carolina about once a month?

**A. Sometimes everybody just came up to see me. So it varied.**

Q. You can put number 13 away.

Dr. Zechman, you mentioned a second ago that you didn't know who was involved in the decision to hire you at Christiana Care. Did I hear you right?

**A. That's correct. I don't know who all -- how many -- who all was involved in the decision.**

Q. Do you know whether Dr. Sciscione played a part in the decision?

**A. I think he did.**

Q. That's based on the fact that he was one of the people who interviewed you?

**A. Yes.**

Q. Was it based on anything else?

**A. He was the residency director.**

Page 57

Q. Anything other than those two facts?

You have to answer verbally.

**A. I -- I don't think so.**

Q. What about Dr. Ekbladh, do you have any reason to believe that he was involved in the decision to hire you?

**A. I don't know.**

Q. What about the fact that he was one of the people who interviewed you, did that lead to you believe that he played some role in the decision?

**A. I would suppose that it would, but I don't know who actually made the decision. I do not know.**

**(Zechman Deposition Exhibits 51 and 52 were marked for identification.)**

**BY MR. BLOOM:**

Q. I'm going to show you Zechman 51. Would you just confirm for me that Zechman 51 -- I'm going to give you two at a time. I'm also going to give you Zechman 52. And let's look at Zechman 52 first.

Am I correct that this is a copy of your resident agreement between you and Christiana Care from when you first joined Christiana Care for the year of July 2002 through June 2003?

**A. That's correct.**

Page 58

Q. And if you'll turn to the second to last page of this document, there's a signature of the resident. That's you. And is that your signature on that line?
**A. Yes.**
Q. You can put that away.
And if you will look now at Zechman 51, am I correct that Zechman 51 is the resident agreement between you and Christiana Care covering the subsequent year, which is July 2003 through June 2004?
**A. That's correct.**
Q. If you will turn to the second to last page, would you just confirm for me that that's your signature on the line where it says, "Ellen Zechman"?
**A. That's correct.**
Q. And when you entered into this second resident agreement, it was to repeat the second year that you had just done, right?
**A. No. There were to be meetings and the possibility of me advancing to the third year.**
Q. All right. I understand that.
This agreement says in the very first line that it's an agreement for you to be a second-year resident. I understand that there was discussion of possibly progressing, but do you agree that this

Page 59

appointment was a second appointment to the same year you had just done?
**A. Yes.**
Q. Do you have any knowledge of who was involved in the decision to offer you this appointment as a second year again as opposed to offering you an appointment to progress to the third year?
**A. No.**
Q. You can put that aside.
(Zechman Deposition Exhibit 53 was marked for identification.)
BY MR. BLOOM:
Q. I'm going to show you Zechman 53, and first I want you to tell me if you know whether you've ever seen Zechman 53 before?
**A. I don't think I have.**
Q. Would you take a second to look at that document. It says at the top that Zechman 53 is a job specification for an intern/resident. Take a second to review it and let me know if you think it's accurate.
**A. There is something that is, I would say, unusual.**
Q. What is that?

Page 60

**A. The occasional lifting, carrying, or pulling of patients. The carrying of patients, that's -- that's interesting.**
Q. Why is that interesting?
**A. Because this is requiring the occasional carrying of patients, whereas the nursing staff had many mechanical devices to facilitate mechanical, non-physical lifting of patients for safety reasons.**
Q. And at Christiana Care, apart from what you just referred to as mechanical devices or other non-physicians, was it your experience that, in fact, residents were involved in turning patients and moving patients and physically manipulating patients?
**A. We were required to pull patients off of the operating room table when the nurses were allowed to use mechanical devices rather than physically move the patients themselves.**
Q. Are you aware of any reason for that?
**A. Employee safety.**
Q. No. What I meant is, are you aware of any -- I think you were just telling me that the residents moved patients manually and physically; whereas other people in the hospital used mechanical devices. Did I hear that right?

Page 61

**A. Yes.**
Q. Are you aware of any reason for that difference that you just described?
**A. The safety of the nurses.**
Q. And why don't you tell me, in your own words, what you observed in terms of residents doing lifting or pulling or other physical events? Describe that for me in your own words.
**A. We would be ordered to move the patient off the operating bed to the table. Whereas, in the operating rooms, the nurses had these mechanical devices that they would put under the patient and crank them up, transfer them, and did not have to physically pull. And we were individually ordered to do that.**
Q. The residents were?
**A. At times.**
Q. Other than pulling the patient off of the operating table, were there any other aspects of your position as a resident that were physically demanding?
**A. Be more specific in what you mean by physically demanding.**
Q. Any other lifting involved in being a resident in the ob/gyn?
**A. In triage, we were required to use these**

Page 62

**mechanical beds that would often malfunction. And you would have a pregnant patient on the bed, some of them weighing two, two-fifty pounds. And the mechanical beds would have levers, and it would come down. And they would malfunction. And for patient's safety, we would have to sometimes hold them up manually until you could holler for some help.**

Q. Was the malfunctioning of these beds that you just described something that happened on a daily basis, or was it something that happened occasionally?

**A. Frequently.**

Q. Other than what you've just described, were there any other aspects of the job of being an ob/gyn resident that involved physically manipulating patients?

**A. Just getting them in position for labor, moving a leg.**

Q. And might it also involve helping them turn or adjust in their bed?

**A. Yes. But there was supposed to be nursing personnel and accessory personnel to do that.**

Q. And so from your perspective anyway, this is an area in which Christiana Care was not supporting the residents?

Page 63

Let me rephrase that. What you just described, these physical tasks, was this something that all of the ob/gyn residents dealt with?

**A. At times.**

Q. Do you have any reason to think that the physical tasks you did as a second year ob/gyn resident were any different than the physical tasks that your co-residents were doing?

**A. Be more specific in the task. That's a very general statement that you're saying there. So just be clearer, be more specific in what you're asking.**

Q. Well, we've just gone through a list of areas of physical activities. You've talked about moving patients off operating room tables. Let's start with that. Do you think you did that more than your other residents?

**A. I don't know.**

Q. Do you have any reason to think that you had to deal with the malfunctioning beds that you described any more so than your co-residents?

**A. I don't know.**

Q. Is there any other physical tasks that you do as a resident that you think you did more frequently than your co-residents?

Page 64

**A. I don't know.**

**(Zechman Deposition Exhibit 10 was marked for identification.)**

**BY MR. BLOOM:**

Q. You can put Zechman 53 aside and I'm going to hand you Zechman 10. And I'd like you to take a second, just flip through the document so that you know what it is.

**A. Mm-hmm.**

Q. You've seen this document before?

**A. Yes.**

Q. Zechman 10 is a letter that you sent to the EEOC in support of your discrimination charge in this case?

**A. That's correct.**

Q. Then the back half of it is actually you attach a copy of a letter from EEOC that you are responding to. Do I have that right?

**A. That's correct.**

Q. And the second letter that's attached to Zechman 10 is October 6, 2004, letter, and there are numbers that are circled in the margin that look to be numbering the paragraphs. Do you see that?

**A. Mm-hmm.**

Page 65

Q. Did you write those numbers there?

**A. Yes.**

Q. That was so, in your letter to the EEOC, you could respond by paragraph number to what you were addressing?

**A. Mm-hmm.**

Q. And I take it that, when you were writing this letter to the EEOC, you were trying to provide as accurate and as truthful a response as you could?

**A. That's correct.**

Q. Now, if you'll turn to the second page of this exhibit, and I'm looking at the paragraph number 4, and the first sentence says, "Initially I was behind my colleagues in surgical skills after transferring into the Christiana program. I made this fact known prior to accepting the residency position."

Did I read that right?

**A. That's correct.**

Q. And this paragraph is referring to something that you made known before you even accepted the position at Christiana care, right?

**A. I'm referring to Dr. Sciscione's and my conversation concerning the surgical programs during that initial discussion.**

Page 66

Q. Is there anything about this paragraph number 4 that's inaccurate or that you think should be changed?
**A. I stand by this statement.**
Q. You stand by everything that's in paragraph number 4?
**A. Yeah.**
Q. I want to direct your attention to the bottom of the same page, paragraph number 6, and there's a sentence in there where you write, "In an effort to cover his discrimination, in July Dr. Ekbladh changed my agenda and put Dr. Hoffman in charge of my training and assigning me to various teaching positions."
Did I read that right?
**A. I'm not seeing that.**
Q. I apologize. I'm looking at paragraph number 6, which starts at the bottom of the page, and then I read the third sentence of it.
MS. BREWINGTON: Do you see it?
THE WITNESS: I see it, yeah.
BY MR. BLOOM:
Q. Have you read that sentence?
**A. I'm looking at it, yeah. Okay.**
Q. And so there was a reference here to Dr. Ekbladh changing your agenda and putting

Page 67

Dr. Hoffman in charge. Is the change you're referring to, is that related in any way to a change in who your mentor was?
**A. I cannot remember the exact -- what I was referring to at that.**
Q. Okay.
**A. So I can't -- you know, I'm not recalling this.**
Q. Now, around the time that you learned that the committee had voted to terminate your residency at the program, which was -- tell me if this is consistent with your memory -- around late September or beginning of October of 2003, does that seem like the right time frame to you?
**A. Late September is when the letter was written.**
Q. So you don't know when the committee actually voted on that?
**A. I was not there, so I do not know for sure.**
Q. Do you know when you learned of the decision?
**A. I learned of the decision by telephone October 3rd.**
Q. And who was your telephone conversation with?
**A. Initially it was Sandi Kardos. And then she had Dr. Kaminski call me back.**
Q. Is that because you asked to talk to

Page 68

Dr. Kaminski?
**A. No.**
Q. Tell me what you remember of that conversation with Sandi Kardos.
**A. I do not remember what Sandi Kardos told me. But she says, "I'll have Dr. Kaminski call you back." I do remember that part.**
Q. Do you remember whether or not you learned during your conversation with Sandi of the fact that this decision had been made?
**A. I can't remember that part of it. I can't remember what she said to me.**
Q. So you don't remember one way or the other whether Dr. Kaminski was the first or the second person to tell you the decision?
**A. I can't remember.**
Q. Do you remember your conversation with Dr. Kaminski?
**A. I remember parts of it.**
Q. Tell me what you remember?
**A. It's like a knife sticking in me, these words, "Dr. Ekbladh has decided to dismiss you."**
Q. What's Dr. Kaminski's position, if any, within the Christiana Care system?

Page 69

**A. He's one of the teaching physicians, and he would act as the residency director when Dr. Ekbladh was not there.**
Q. Was Dr. Kaminski on staff?
**A. Yes.**
Q. And around that same time you were away from the hospital for an about a week, is that right?
**A. I had gone out on disability prior to that and I was officially on vacation that day and that week.**
Q. Is this related to a pinched nerve that you had suffered?
**A. Yes.**
Q. The reason you were out for a week was because you had suffered a pinched nerve?
**A. Yes.**
Q. And the pinched nerve, as I understand, anyway, was related to moving or resulted from moving some furniture around preparing for a hurricane at home?
**A. That's correct. In Delaware.**
Q. You can put that document aside.
And I want to ask you, Dr. Zechman, about some of the claims you've asserted in this case. I actually have one question for you about something that's in your complaint. So I'm going to put a copy

Page 70

of your complaint in front of you.
Well, first, tell me if you recognize this document as the complaint in this case, and then let me know when you can.
**A. Yes.**
Q. And if you will turn to paragraph 99 and read that to yourself and let me know when you're done.
Are you done reading that?
**A. Mm-hmm.**
Q. There is a reference in paragraph 99 of your complaint that you relied upon a representation of Christiana Care, quote, that defendant would accommodate her disability, close quote.
First of all, do you have an understanding as to when the first time was anybody at Christiana Care learned that you might have a disability of some kind?
**A. Yes.**
Q. When did that happen?
**A. I was required to fill out a form called an EEOC survey either in August or September of 2002 shortly after I came on that specifically asked me, do you have a disability?**
Q. And you checked, yes, that you do on that form?

Page 71

**A. I had to. I would have been lying to say anything else. Yes.**
Q. And so am I right that you filled out this form approximately three months after you had already started as a second-year resident at Christiana Care?
**A. Either two or three months. It was either August or September of -- I cannot remember the exact time, but I was called to Sandi Kardos's office, and she would not let me go back to my duties until I filled out that form and handed it to her.**
Q. And I take it that this was a form that had previously been presented to you along with other personnel forms when you were first hired?
**A. Yes.**
Q. And you made a decision that you did not want to complete that form, am I right about that?
**A. I just -- I did not complete it. It didn't get back in, and she was insisting that I fill it out.**
Q. Was that a conscious decision on your part not it fill out the EEO form the first time?
**A. I cannot recall the circumstances of that, whether it was -- you know, I just got left in the shuffle or what. I cannot recall the circumstances.**
Q. At the time you filling out this form, what was

Page 72

the disability that you were disclosing at that time?
**A. I was not required to disclose the particular disability. It just asked, do you have a disability?**
Q. And at that time do you have an opinion as -- when I say at that time, I mean August, September, 2002. Did you have a belief that your disability interfered in any way with your ability to do your job then?
**A. No.**
Q. So I take it that the disability you're referring to at that time did not interfere with your ability to do your job as a second-year resident?
**A. No.**
Q. You can put that document away.
Dr. Zechman, I'm going to ask you about the claims you've asserted in this case, and what I'm going to ask you about, sort of going in reverse chronological order, are the decision to terminate your residency in 2003. I take it your claim relates in part to that decision, is that true?
**A. Rephrase that question. I don't know what you're asking me here.**
Q. You do understand that the lawsuit that you filed this case relates to the termination of your

Page 73

residency?
**A. Yes. Okay.**
Q. And tell me if I understand the allegations you've made that you believe that the end of your residency was based upon either discrimination based on your age -- well, let's leave it at that.
That's part of your claim, right, that it was discrimination based on your age?
**A. I feel the actual decision was based on me requesting family medical leave.**
Q. Do you think that the decision was based on anything else?
**A. And age. But the timing and the sequence of events is directly related to my request for accommodation and family medical leave as well as the ongoing age issue.**
Q. What's the ongoing age issue that you just referred to?
**A. The discrimination.**
Q. That's what I'm trying to find out. What is the discrimination?
**A. Ask more specific incidents.**
Q. I can't. You're the one who knows what your lawsuit is about. I need to know from you what it is

A-117

Page 74

you're alleging that was discriminatory here. I'm trying to break it down by decisions. I can ask it more broadly, but I don't think I can ask it any more narrowly than why do you think the termination decision was based upon your age, your disability, or some other sort of retaliation or discrimination. I'll let you say it in your own words.

MS. BREWINGTON: I'm going to object because it's compound. Go ahead.

**A. The discrimination was ongoing, which are explained in the events and the complaint. But the actual decision to terminate, coincided closely and directly with first my request for accommodation in July and then directly with my time off for the pinched nerve and my ongoing request for family medical leave from the middle of July when they would not even give me the forms to fill out when I asked for them in the department and they said, "We can't do that. Nobody takes leave in this department."**

Q. Well, as I understand it, what you asked for in July was not a leave of absence, that you wanted --

**A. I --**

Q. Let me finish the question.

That it was an adjustment to your

Page 75

schedule, do I have that right?

**A. Prior to that I had verbally asked for a family medical leave and they refused to give it to me. They refused to even give me the forms to fill out.**

Q. Who's the "they" that you are referring to?

**A. Sandi Kardos.**

Q. At some point later in the process you had some interaction, I take it, with the employee relations department at Christiana Care with respect to FMLA leave?

**A. Yes.**

Q. And I take it you understood throughout your time at Christiana Care that there was an employee relations department?

**A. I was told that I was supposed to get my stuff from the department.**

Q. Who told that you?

**A. Sandi Kardos and Dr. Ekbladh.**

Q. What's the stuff that you're referring to?

**A. The forms I was requesting, the family medical leave, I had to go through them.**

Q. Other than what you've just described as the coinciding of the time between the various leave requests that you've made and the end of your

Page 76

residency, is there anything else other than that timing that leads you to believe that the decision was discriminatory in some way, the decision meaning the termination decision?

**A. Yes. I was on the schedule. We were continuing my training. It was an abrupt decision when I went out on leave.**

Q. Well --

**A. I had a schedule on -- for the rest of the year to -- for my planned activities. After I had asked verbally for the leave and they -- "we don't do that in our department; nobody takes leave in our department" was the response. Our department, quote, cannot support people going out on family medical leave was the exact words that Sandi Kardos told me. Then I gave this written letter in July to Dr. Ekbladh so that I would have that request in writing.**

**Exactly one week after that, he gave me a form saying we are going to have a committee meeting and termination is an option.**

Q. I am sorry. Were you finished?

**A. Yeah.**

Q. The letter you just referred to in July 2003, that was the letter which you're saying documents your

Page 77

request for family medical leave?

**A. No. The verbal request for family medical leave and requesting forms had been totally ignored. So I was putting in this second request for an altered work schedule. Since they were refusing to even consider giving me family medical leave, then I says, well, let's have altered work schedule under the Americans with Disabilities Act. And that is the written request that I am putting in in July.**

Q. What was the basis for your needing a family medical leave at the time you just referred to?

**A. I was having a flare up of my disability, connective tissue disease, and the main component of that is just overwhelming fatigue. I just needed time to rest, get back up to, you know, par, and then I could hit the road running again.**

Q. So it was for a medical leave for what length of time?

**A. When I initially made the verbal request, I was not making a specific time. I was just begging for time off because I needed to rest. I needed to see my doctor. I needed down time.**

Q. Was there an amount of time you needed?

**A. At that time I was -- I was asking for**

A-118

Page 78

**anything, a week, two weeks, three weeks. Just let me rest and we'll go from there.**

Q. And at that time, in terms of the initial request, I take it you did not at that time provide any note or certification from your doctor with respect to that initial request for a leave?

**A. I was not getting any forms to fill out for that. You know, they just were ignoring me completely.**

Q. Now, you've now described twice, I think, how you believe that the timing of your request for leave is, you believe, the reason why your residency was ended.

**A. At that time, yes. At that abrupt decision.**

Q. Other than what you just described, are there any other facts that you know of that lead you to believe that the end of your residency was motivated in some way by your age?

**A. I feel, additionally, playing into that decision was that very first prejudice against me: they don't like you because you're different. I feel that was a shadow hanging over me the whole time.**

Q. What I've just referred to is the conversation that you had with Dr. Sciscione in roughly August,

Page 79

September of 2002?

**A. Yes.**

Q. Is there anything else that you have knowledge of that leads you to believe that the termination decision was related to your age?

**A. All the preceding events prior to that that I've documented.**

Q. Well, tell me, other than what you've just described for me, what facts lead you to think that the termination decision was motivated by your age?

**A. The way they were treating me. The way they were denying me cases to go to surgery.**

Q. What is it that makes you believe that that was related in any way to your age?

**A. Because of this original, or beginning when I first came on, "they don't like you because you're different."**

Q. This is the conversation with Dr. Sciscione August, September 2002?

**A. And there were other conversations by different attendings. "Why are you doing this at your stage of your life?"**

Q. Who said that?

**A. I cannot remember. I have it documented, but I**

Page 80

**do not remember it from memory right now.**

**Additionally, different attendings -- and I have this documented where -- in my documents that you have on discovery, where I was told this is a young person's specialty.**

Q. Who said that?

**A. I cannot recall at this moment, but I have it documented in my diary and in the documents I have, but I'm blanking right now.**

Q. How old were you when you started at Christiana Care?

**A. 46 or 47. I can't remember.**

Q. From your perspective, does starting a residency, an ob/gyn residency at 46 or 47 present any challenges that are different than somebody starting at 26?

**A. No.**

Q. What about in terms of -- I take it that residents, especially first- and second-year residents get a lot of orders barked at them by other physicians in the hospital. Is that an accurate characterization of what happens?

**A. Typically, yes.**

Q. You know, physicians -- let me put it a

Page 81

different way. I take it it had been a long time since you were in a circumstance where people barked orders at you in that way, is that true?

**A. No. I had been in a residency right after I graduated from medical school, plus I had just finished a year as an intern at Riverside. So I was used to being in that environment.**

Q. And so I take it that physicians supervising you could be curt?

**A. Physicians not supervising me are curt. People are curt. I mean, that's just a normal trait of people. So that's not a problem.**

Q. Is there anything other than what you've already described that leads to you believe that the termination of your residency was motivated by your age?

**A. Also I had pointed out that there were some things that were not right in the residency, and so I think there was a retaliation as well as the discrimination, as well as this component.**

Q. And I understand that. We are going to move into those other areas. I'm trying to break it down. And when I've got everything that you have to tell me about the age component, we'll move on to the others.

Page 82

Is there anything else other than what you've described so far that leads you to conclude that the end of your residency program is motivated by your age?

**A. I am not coming up with specifics at this moment. I am sure there are others, but I am -- they are not coming to me at this moment.**

Q. Is there a person who you think, in your mind, is a person at Christiana Care who discriminated against you because of your age?

**A. I think there were several.**

Q. Who are they?

**A. Two were my colleagues: Residents Robyn Gray, and her best friend, Dr. Rachel Heinle.**

Q. Other than Robyn Gray and Rachel Heinle, is there anybody else at Christiana Care who you believe discriminated against you because of your age?

**A. I feel there was a general atmosphere of "she's different," and I'm quoting my mentor, Dr. Patruno, in what he said to me: "Ellen, you're different. They don't like you. They don't want you here."**

Q. And did Dr. Patruno say to you in what way he thought you were different?

**A. Yes, because I specifically asked him.**

Page 83

Q. What did he say?

**A. What's different about me?**

Q. Mm-hmm.

**A. And he says, "You're older."**

Q. Was this a conversation where you were talking about Robyn Gray and Rachel Heinle?

**A. I forget the exact conversation. This was one of our mentor meetings in his office, and I was specifically asking him, why don't they like me? Is there anything I can change? You know, because I wanted to stay there. You know, I wanted to finish my residency so I could go back to North Carolina. And I wanted to know why I was different and they didn't like me. And he says because of my age, and he felt that -- he says, "You are too self-assured. You don't act like a whipped puppy when they bark at you. You're not scared of them. And they want you to be scared of them." And he was referring to the attendings.**

Q. Did that, in your mind, mean that people expected you to be less challenging or disagreeing with instructions or orders that you were given?

**A. I didn't disagree. I just, you know, was just self confident. I don't know what exactly was so**

Page 84

**different about me, but I -- you know, I had practiced medicine in private practice. I was a fully licensed physician. And I wasn't scared of them. I was there to learn. I wanted to learn from them. I didn't challenge their instructions, but I did want knowledge. You know, I didn't take what they said as, you know, oh, I just run and do it. But I would want the education. I was hungry for the education so I could take it back to North Carolina because I would be practicing out in the boonies and I needed that knowledge.**

Q. From your perspective, do you think that you responded differently than your residents?

**A. I probably did because, having been in private practice and knowing what it's like to be out there without people to help you, I was hungry to suck up all knowledge because -- and I would ask questions, and I would say, "Well, what if this?" because I wanted the knowledge, because I knew what challenges I would face alone in the dark in the night. These other people didn't. So I did have a different attitude. I was more hungry for knowledge than they were, and I knew some of the challenges that were ahead of me. Whereas -- that made me hungry for that**

Page 85

**knowledge that they did not know because they had not even there yet. They had always been in a protected environment.**

Q. Apart from the hunger for knowledge that you described, did you also think that you had a greater confidence in the medical knowledge that you did have than your co-residents?

**A. I had -- both. I had a confidence in certain things, but I had -- you know, I needed training and I was hungry for knowledge in other things. So I had -- I had greater hunger in many areas for the knowledge and training, but then, yes, I did have greater knowledge just because I had done it longer.**

Q. Can you tell me, what are the areas in which you think you had greater knowledge than your co-residents?

**A. That -- that's too broad to really say other than just the limitations of being out there in the world alone as, you know, a practitioner outside of the protected ivory tower, you know, where you have people to call on for help.**

Q. Which I guess leads to a greater confidence in your decision making.

**A. No. It makes you appreciative having the broad**

Zechman v. Christiana Care Health Systems
Ellen Zechman C.A. # 05-159 JJF June 20, 2006

Page 86

**base of people to say, what do you think about this? What's your opinion? That's so wonderful to have. When you haven't had that out in private practice.**

Q. When you referred a moment ago to your conversation with Dr. Patruno and you asked him, what did they have against me, did you ask him that?

**A. Yes. What was it about me that's different, and the main thing was my age.**

Q. Well, wait. Who was it that you thought was treating you differently? Was that Robyn Gray and Rachel Heinle?

**A. On the day-to-day basis, they were the ring leaders, yes. And Rachel in particular was one of my colleagues, was very rude to me and would even turn her back to me like this if I was sitting next to her, would turn her back to me and would not speak to me. They would have study parties for studying for preparing for their boards, you know, their tests and all and they wouldn't invite me, you know.**

Q. And when you went to Dr. Patruno, was your concern when you raised this with him specifically related to Robyn Gray and Rachel Heinle?

**A. That was part of it, but also the attendings, the teaching physicians. Dr. Patruno specifically**

Page 87

**said, "Ellen, this is not a warm and fuzzy bunch of people. They don't like you. They don't want you here." He even said, and I quote, those knives in your back are going to be knives in your head if you don't do well on -- this was a student exam coming up. "They don't want you here. They don't want to teach you."**

Q. That exam you just referred to, is that what's called the CREOG exam?

**A. Yes.**

Q. When you had this conversation with Dr. Patruno, do you remember roughly when that was, like month and year?

**A. I don't know the month but it -- I know the year. It was -- it was either November or December of 2002. I think.**

Q. Okay.

**A. If the -- excuse me -- that conversation was repeated at intervals so that was not the -- you know, that was the only time he and I discussed that in our meetings, but it was definitely the time frame when he said, "Those knives in your back would become knives in your head if you don't do well on this exam." And he was referring to the exam that would be taken in**

Page 88

**January of 2003. So it was late 2002 when that --**

Q. And when Dr. Patruno told you -- and I think this is what you said before -- that they, referring to Rachel Heinle and Robyn Gray, don't like you because you're different, and he told you that that was because you were older -- did I capture your testimony accurately right there?

MS. BREWINGTON: I'm going to object because it mischaracterizes, but you can answer.

**A. I cannot remember the exact words.**

Q. Well, did he tell you why it was he believed that, that it was related to your age?

In other words, was this something that he was speculating about or was he relaying something that somebody else told him?

**A. I don't know.**

Q. Is there any other person other than Robyn Gray or Rachel Heinle who you think treated you differently because of your age?

**A. There are others. I cannot recall specific incidents at this moment.**

Q. And there's a claim of harassment in this case, and my understanding is that this claim relates to what you were just referring to about Robyn Gray and

Page 89

Rachel Heinle, is that true?

**A. Yes. The actual documentation that I have is related to Robyn where she was my supervising resident at the times the incidents were occurring, and I have submitted documentation on that.**

Q. Other than the conversation you had with Dr. Patruno, is there anything else that you have personal knowledge of that leads you to believe that Robyn Gray treated you differently because of your age?

**A. She would ask me why was I here? Why don't I just go home to my children?**

Q. Anything else?

**A. There are other things, but I'm not recalling them at this moment.**

Q. Are there any facts that you know of that lead you to think that Rachel Heinle treated you differently because of your age?

**A. Just the way she treated me.**

Q. How did she treat you?

**A. I just described it, the rudeness, the turning her back on me, the not inviting me to parties, and this was from the beginning. You know, it was not like she decided she didn't like me after she got to**

A-121

23 (Pages 86 to 89)

Wilcox & Fetzer, Ltd. Professional Court Reporters (302)655-0477

know me. It was she was that way very early on.

Q. So your assumption is that it might have been related to your age at this point?

A. She would not talk to me; she only talked to me when she absolutely had to and would turn her back to me if we had to sit next to each other.

Q. Other than what you've just described, is there anything else that relates to you or supports your leave that Rachel Heinle discriminated against you or created you differently because of your age?

A. I cannot recall at this time.

MS. BREWINGTON: Off the record.

(Discussion off the record.)

(Recess taken.)

BY MR. BLOOM:

Q. So, Dr. Zechman, am I correct that, at least with respect to the harassment part of your lawsuit, that that is sort of focussed on Robyn Gray?

A. Not only Robyn Gray, but Dr. Ekbladh as well.

Q. Let's start with Robyn Gray. How did Robyn Gray, in your view, harass you?

A. There were many incidents, and I've submitted documentation on them. I do not remember them all at this moment to quote back to you. One of the major

ones was she was giving me a hard time saying I had to come to these morning rounds and then -- as well as the afternoon rounds.

Now, typically, if you were not on the particular service -- like the morning rounds were for the high risk OB service. And if you were not on that service, you didn't go to those rounds. Well, she was insisting that I go to the rounds. The afternoon rounds would be either the surgery check-out rounds or the check-out for the OB service. If you were not assigned to that, you know, service, typically you did not go to those rounds. And she was insisting that I be at both. And I was not assigned to that particular service.

And so there was quite a bit of, you know, you need to be there, fussing, and I would say, you know, well, typically we don't do this. Why are you insisting that I come to these rounds other than the fact that she was just harassing me to make my day longer? And I even e-mailed her asking, has there been a change of policy? You know, has there been an e-mail? Has there been a letter? I haven't seen it, but if there was a change of policy, please let me know. Otherwise why are you insisting that I be at

these rounds when, number 1, it hasn't been in the policy in the past and you're not requiring anybody else to do this? And she would not respond to it. But she would continue to harass me about not being there.

Then she was constantly reassigning me at the last minute. Where my schedule would say, do -- you know, you're supposed to be on this service today. You're supposed to go a certain place. One of the particular incidents was I was to have training with -- I'm blanking on his name, but one of the operating room techs that worked the laparoscopic equipment to get extra practice on their dummy for laparoscopic surgery. She would deliberately assign me a task, go check a labor patient at so and so, in the times that I was supposed to go there, you know, for my training session, basically keeping me from the training session that I was supposed to have. Repeatedly doing this.

One incident that is well documented is Dr. Domingo specifically requested me for a surgery where he was going -- he wanted to help teach me. He wanted to work with me. And she specifically reassigned me and would not let me to go that surgery.

I begged her. Dr. Domingo has requested this. It's on my schedule to go to him. He wants to work with me. Call him. You know, if you need verification, call him, you know, but I need to go to surgery. She would not hear any of it. She reassigned me to another position. I can't remember whether it was the labor deck or down in the triage unit and sent a PA.

And I heard through the grapevine that Dr. Domingo even held up surgery waiting for me to come. And I couldn't get to him. I couldn't call him because I had been assigned this other task.

It was a repeating theme. I would be assigned one thing, and at the last minute she would send me in another direction to prevent me from getting the task I was scheduled to do and would assign me to the leftovers. And it was not that she was taking turns on the available people. She was repeatingly grabbing me, pulling me off of assignments and putting me there. And I said -- I have submitted documentation to support this.

Q. The incidents which you contend are harassment which you just described, are there any other specific ones that you can recall right now?

A. There's others, but they are not coming to me

Page 94

**at this moment.**

Q. Are the ones you just described, are those the ones that really stick out in your mind as the most significant?

**A. There may be others that are just as significant. I'm just not able to regurgitate it at the moment.**

Q. And why is it that you believe that the actions that you've just described by Robyn Gray were motivated by your age?

**A. Because she would talk to me, why are you here? Why are you doing this? Why don't you go home? You know, you're so and so years old. You know, why are you here? And even encouraged me to quit and go home.**

Q. And anything else?

**A. Not that I can come up with right now.**

Q. And do you have any reason to think that Robyn Gray was treating you differently because of the disability you've identified in this case?

**A. Yes. I feel that there was a resentment that I was asking for this time off when they just didn't do that in this department. How dare I even think of asking? Because that was their attitude when I asked that.**

Page 95

Q. Did you have a conversation with Robyn Gray in which you discussed your request for leave or accommodations?

**A. Many because she, being the chief resident at that time, would have had to either pick up the slack or redone the schedule in order to make things work with me being absent. So there were multiple conversations concerning that.**

Q. Okay.

**A. And I would say resentment as well.**

Q. And all of this, I take it, based on your prior testimony, occurred after you first disclosed your disability at the end of July 2003?

**A. This actually began to occur prior to that July when I was out and hospitalized secondary to my problem. I was hospitalized at Christiana, and it became common knowledge among all my colleagues that I had this disability.**

Q. Who's the first person at Christiana Care who learned that -- let me step back. The disability that you refer to is this mixed connective tissue disease? Disorder?

**A. Disease. Disorder. It depends on what book you pull as to how it's, you know, written.**

Page 96

Q. But that was the only medical condition that we are dealing with in this case that relates to your disability, that is the basis of your disability claims?

**A. Yes.**

Q. Who's the first person at Christiana Care that you know of that learned that you had mixed connective tissue disorder?

**A. Dr. Sciscione.**

Q. And when did he learn?

**A. When he was down in the emergency room with me when I was having problems, and he took me down to the emergency room because I asked him to.**

Q. When was that?

**A. I can't remember the exact date, but it was early in 2003.**

Q. Does February 2003 sound right to you?

**A. That is -- that's getting close, but I don't, you know, remember the exact date.**

Q. And now you just described Dr. Sciscione personally being with you in the emergency room. Is there anybody else who you know learned of your mixed connective tissue disorder?

**A. It was discussed in our rounds at that time**

Page 97

**when I was not able to go to my assignments that day, and it became common knowledge at that time among all the residents.**

Q. What is it that you think became common knowledge?

**A. The fact that I had mixed connective tissue disease, and that I was having a problem, and I wasn't there to do my work that day because I was in the emergency room that day.**

Q. And how is it that you know that other people were aware of this specific medical condition that you have?

**A. Because they -- the residents wanted to know, where's Ellen? You know, why do I have to fill in on Ellen's job? And that's when it became common discussion.**

Q. Did people ever have conversations with you in which they referred to your mixed connective tissue disorder?

**A. There were incidents when I would be asked about it.**

Q. By who?

**A. The residents.**

Q. Can you give me an example?

Page 98

**A. No. There were many examples, but, no, I cannot, you know, specifically come up with one at this time.**

Q. Do you contend that there were any instances in which you were asked about it? Are there any instances where you believe those questions were inappropriate in some way?

**A. I don't know their intentions in asking the question.**

Q. Right. I mean, their question could be just out of legitimate concern for a co-resident. That's one possibility. Would you agree with that?

MS. BREWINGTON: Objection. Speculation.

**A. I do not know. I do not know their motives in questioning me.**

Q. So you have no personal knowledge that would make you aware of the motivation behind these people asking about your mixed connective tissue disorder?

**A. There is an e-mail that was sent to Sandi Kardos by the chief resident that was commenting on my request for time off concerning my mixed connective tissue disease, and it was a very derogatory e-mail.**

Q. What was derogatory about it? I've seen this e-mail. What's derogatory about it?

Page 99

**A. I cannot quote it right now, but the overall tone of it was derogatory.**

Q. Anything other than that e-mail that leads you to believe that?

**A. There were comments made to me, you know, throughout the time in passing.**

Q. By your co-residents?

**A. Derogatory comments, yes.**

Q. But you can't think of any examples?

**A. Not at this moment.**

Q. Is there anything that would help you remember what these comments were?

**A. Not at the moment. I don't know. I don't think so. It might come to me later in the middle of the night but not at this moment.**

Q. Other than what you've already described, is there anything in addition to that that forms the basis for your belief that Robyn Gray and her actions with respect to you was motivated by discrimination based on your age or your disability?

**A. I have discussed other things in my documents. I cannot remember it at the moment. But I stand by those documents.**

Q. What documents are you referring to?

Page 100

**A. The EEOC complaint as well as the discovery documents.**

Q. The EEOC complaint that you filed, that was -- all right. You think your EEOC complaint would refresh your recollection about these comments?

**A. We could read it aloud, but I don't think -- you know, I don't know that it's going to refresh anything, you know, as far as this moment. But like I say, I have submitted different specific incidents and --**

Q. Incidentally, Dr. Zechman, you received a resident manual when you started at Christiana Care, right?

**A. That's correct.**

Q. I'm going to put in front of you a document which has Bates number D847 through D960, and I just want you to tell me if you recognize that as the resident manual?

**A. Yes. I recognize this as the resident manual.**

Q. Okay. And you physically received a copy of it when you started Christiana Care?

**A. Yes, I did.**

Q. You can hand that back. Okay.

Other than what you've already described today, do your claims relate to Robyn Gray in any other way?

Page 101

**A. I'm blanking right now. I'm getting tired and I'm starting to blank on these things. So I just -- I can't comment on that.**

Q. Would it help you if we took a break?

**A. I don't know. I think we should just go forward.**

Q. Are you sure? Because I don't want -- I mean, this is important, and I don't want your fatigue to be, you know, a reason for you're not putting your best foot forward in terms of getting out all of the information that you have that relates to your claim. So I'm more than happy to take a break. We can break for lunch. Do you want to do that?

**A. I think I'm starting to get tired, and I feel like I'm my brain is turning into mush right now.**

MR. BLOOM: Okay. All right. It's now 12:30. Let's break for lunch.

Off the record.

(Discussion off the record.)

(Luncheon recess taken.)

BY MR. BLOOM:

Q. Dr. Zechman, I think, before the break, you

Page 102

testified to three ways in which you thought Robyn Gray was harassing you. One was telling you to attend morning and afternoon rounds. The second was reassigning you out of training opportunities. I think you described one of those. And the third was an instance where you had a case with Dr. Domingo and Dr. Gray reassigned you. Do you remember that testimony?

**A. Yes.**

Q. First of all, I think you also testified that Dr. Gray did those things that I just described in order to prevent you from having learning experiences.

**A. Yes.**

Q. You believe that was her intent?

**A. Yes. And harassment as well.**

Q. What's the basis for your belief regarding Robyn Gray's intent, that it was her intent to prevent from you having learning opportunities?

**A. I don't know why that was her motivation. I don't know, but the fact that she was constantly reassigning me and even at -- I have recorded incidents of where I was not assigned surgical cases that I was supposed to be sent in on, and she assigned her buddy Rachel Heinle and sent her into the cases**

Page 103

**rather than me who was supposed to be -- gynecology surgery at that time, and I have documented cases on that.**

Q. Why do you think that has to do with you and not the patient or the particular case?

**A. Because she didn't know the patient. She didn't know the particular case. I was assigned to the service, so the resident that is assigned to that service at that time has to -- you know, is supposed to go regardless of who the patient is.**

Q. Do you think Robyn Gray would have any reason to retaliate again you?

**A. I had complained about her being rude to me and being ugly towards me while we were on call. So, yes, she would have reason to do that because I had, you know, complained to Eldbladh that she was bothering me, she was harassing me, she was demanding that I come to these meetings that nobody else off service was required to come to.**

Q. Any other reasons that you think she might have a reason to retaliate against you?

**A. I can't -- I can't come up with them now.**

Q. Do you think you thought there were some other reasons at some other time?

Page 104

**A. I can't recall.**

Q. When you applied for your first ob/gyn residency program, I think you said you started at a non-continuing first-year position?

**A. Yes.**

Q. At that time, did you apply for positions that were regular for your continuing residency positions?

**A. I had applied at East Carolina University, yes.**

Q. I take it you weren't accepted there?

**A. No, I was not.**

Q. And I take it it would have been your preference to start from the very beginning at a continuing four-year residency program?

**A. Yes. That would have been preferable.**

Q. Is there anybody other than Robyn Gray who you believe would reassign you from learning opportunities in a way that you thought was motivated by discrimination or retaliation?

**A. I do not know whether the orders were coming from higher up and she was acting on someone else's recommendation to do this or whether she was acting on her own. I do not know that.**

Q. Who is Dr. Hochman, Moses Hochman?

**A. Moses Hochman is one of the staff-paid teaching**

Page 105

**physicians.**

Q. So he is somebody who's on the staff at Christiana?

**A. That's correct.**

Q. Is there any problems with your relationship with Dr. Hochman?

**A. No. We worked together a lot, and I felt that he was a very good teacher.**

Q. Did you think of him as somebody within the hospital who was a supporter of yours?

**A. Yes, I do.**

Q. You asked him, or I've seen a letter of recommendation that he wrote for you in April 2003.

**A. Yes.**

Q. Did you ask him to write that?

**A. I did.**

Q. And do you know if you sent it anywhere?

**A. I can't recall.**

Q. All right.

**A. But he told me that there was great animosity against me for speaking out against an incident that happened over Easter weekend where there was a fetal death, and I could not find an attending physician to help me. My attending physician at that time was**

A-125

Page 106

**Arlene Smalls. And she was tied up in surgery upstairs in one of the OR suites repairing a bladder that had been accidently lacerated during a C-section.**

**I had a fetal death, or I was suspicious that there was a fetal death in one of the triage patients. I was left in triage alone without any supervision. By law, in order to say you've got a fetal death, you have to have two physicians certify that. And then, too, I was a resident. I had no business making that call. And I had this patient that was a private patient that came in. She was not one of our regular service patients that we are responsible -- this was a private patient that was covered by a private doctor. The private doctor was not around.**

**I saw the patient. I highly suspected a fetal death, and I could not find anybody to come help me to either confirm this or, you know, to find the heartbeat by ultrasound. I called upstairs, you know, looking for my supervising physician. She could not come. She was in the OR. I called my chief resident. She could not come. She was in the OR with the other -- with Arlene Smalls. I had no one to help me. I had the lady in labor with what I suspected was a**

Page 107

**fetal demise.**

**I was on the phone trying to find her private physician that was responsible for her on call. I could not get up with her. She was at a family picnic in Pennsylvania. This was Easter weekend. Holiday.**

**And I was at wit's end because I should have not been left unsupervised and also this physician that was on call should have been readily available for her patients, her private patient. I spoke out against this to Dr. Ekbladh, to everybody that was in the residency conference room the morning after it happened when everybody was back at work, say, after the Easter holiday. And there was a lot of animosity towards me for speaking up against, you know, a -- announcing that I was unsupervised and I needed help and nobody was there to help me.**

Q. The chief resident you referred to who was in the OR with Dr. Smalls, was that Dr. Gray?

**A. *I cannot remember. It may have been, but I* cannot remember.**

Q. The chief resident is a position that rotates among the fourth-year residents?

**A. That's correct. But ultimately, she should be**

Page 108

**available to help me, but the main thing, there should be a fully licensed board certified supervising physician available to me, and my physician was tied up. And when I called her, she said she could not come down to help you. Get your private physician because I'm not really responsible for this patient. So then I'm on the phone trying to get the private physician.**

**And there was no one to help me. And it took at least 45 minutes to get somebody in to help me with that patient. And then she's whisked away and I did not know the outcome.**

Q. And the supervising physician who was tied up, that was Dr. Smalls?

**A. That was Arlene Smalls, and she was in the OR with another private patient that had to have an emergency C-section that the private physician was nowhere to be found.**

Q. Do you remember the name of the private physician who you were trying to contact for 45 minutes?

**A. Her name was Molly -- we had two doctors that first name was Molly. So I might not be completely accurate on this, but I believe it was Molly Larkin.**

Page 109

Q. What do you remember happened in that particular case?

**A. I was seeing other patients because I was the only person down in this room, and I had to see like 60 patients that particular day. And eventually a physician did come in. I don't know whether it was the one that was supposed to be there.**

Q. I'm sorry. I apologize for interrupting, but I just want to focus you. What I meant to ask is, do you recall whether you ever learned whether you had a fetal death situation or not?

**A. No. There was no word. No one would talk to me about that case. I never heard another word about it.**

Q. And what was the decision that you were confronted with that you needed to talk to somebody about in terms of? I mean, I understand you don't know whether there's a fetal death or not. So how was that going to affect how you proceeded?

**A. *That affects patient care. If you don't have a* heartbeat and the patient's -- if you have a weak heartbeat, you immediately call for a C-section. If you have no heartbeat and you have a fetal death, you allow the woman to progress to delivering a still**