Zechman
Ellen Zechman

v.

C.A. # 05-159 JJF

Christiana Care Health Systems
June 20, 2006

**Page 110**

1  born. And the woman needed to know what was going on,
2  and she was asking to know what was going on. And I
3  could not tell her because I did not have a
4  supervising physician there with me.
5  Q.  Returning back to Dr. Hochburg —
6  A.  Hochman.
7  Q.  Hochman. Thank you.
8      Dr. Hochman, is he somebody who you
9  contend in this case discriminated or retaliated
10  against you in any way?
11  A.  In that letter he mentioned — the letter of
12  recommendation, he did mention my age in it, which I
13  don't feel that it was a malicious thing, but I think
14  it was a factor that, you know, she's an old girl, you
15  know. But it was brought out very clearly in that
16  letter.
17  Q.  Was there anybody else in the residency program
18  while you were at Christiana Care — back up a second.
19      I mean, we've now either seen or referred
20  to three or four different letters by people at
21  various institutions who have referred to the fact
22  that you are a non-traditional resident or an older
23  resident. Do you think that's an inappropriate
24  comment to make in the context of a residency program?

**Page 111**

1  A.  Yes. Because age should not be a factor. And
2  anything that alludes to the patient being older
3  leaves open the gate for discrimination.
4  Q.  Why is that?
5      MS. BREWINGTON: Did you say patient being
6  older?
7      THE WITNESS: I might have. That was a —
8      MS. BREWINGTON: I don't know, but...
9      THE WITNESS: The applicant. The
10  resident. Thank you for pulling that — but that —
11  that puts that aspect of that individual front and
12  center when it doesn't need to be. Just like somebody
13  doesn't need to say this is a Chinese applicant. You
14  don't need to say this a mature, non-traditional
15  applicant.
16  BY MR. BLOOM:
17  Q.  Well, suppose — first of all, I mean, this
18  information would be in your application, right, your
19  date of birth?
20  A.  Some applications do have that. Most do not.
21  Q.  It's a standard application, though, correct?
22  You fill out one application and you send it to
23  multiple residency programs, correct?
24  A.  If you go through the electronic one.

**Page 112**

1  Q.  And on that application, it asks for your date
2  of the birth, right?
3  A.  It does.
4  Q.  And in support of your application, you're also
5  required to produce transcripts and dates that you
6  attended schools, correct?
7  A.  That is correct.
8  Q.  And so, I mean, it was jumping off — I
9  shouldn't say jumping off the page, but it clearly is
10  there in your application what your age is?
11  A.  No. Not always.
12  Q.  Okay.
13  A.  Because, if someone goes to college directly
14  after high school, then that resets that time scale
15  and at this level you usually only report your
16  degrees. You don't report, oh, I graduated from high
17  school, and so that's not on these applications
18  because, you know, we are beyond that. We are...
19  Q.  Did it ever occur to you that somebody your age
20  might be relevant in a positive way in terms of
21  somebody wanting to have a diverse residency class?
22  A.  Technically it should be.
23  Q.  Why do you say technically?
24  A.  Because it should be a positive balancing force

**Page 113**

1  to have a diverse population.
2  Q.  And Dr. Hochman, when he wrote this letter for
3  you, would you agree — I mean, he was writing this
4  letter to help you?
5  A.  Yes.
6  Q.  And I mean, do you have any reason to doubt
7  that Dr. Hochman actually referred to your age and
8  intended this in a positive way?
9      MS. BREWINGTON: Objection. Calls for
10  speculation.
11  A.  I don't know. I don't know. I don't know what
12  was on his mind when he did that.
13  Q.  And so — all right.
14  A.  But it obviously was an issue or he would have
15  not have written it down.
16  Q.  Who is Dr. Paul Kaminski?
17  A.  You've already asked me that, and we've already
18  answered it.
19  Q.  Remind me.
20  A.  He was a staff physician and one of the
21  teaching physicians.
22  Q.  Is he somebody who you contend in this case
23  discriminated or retaliated against you in some way?
24  A.  I cannot remember whether I specifically

Zechman               v.               Christiana Care Health Systems
Ellen Zechman          C.A. # 05-159 JJF               June 20, 2006

**Page 114**

1 mentioned him or not. I don't know.

2     Q. As you sit here today, do you have any reason

3 to think that he discriminated or retaliated against

4 you?

5     A. At this moment I cannot remember.

6     Q. Okay. Other than the documents that you've

7 produced in this case, do you have any other documents

8 that relate to your allegations or that would refresh

9 your memory about who it is you think discriminated or

10 retaliated against you?

11     A. Dr. Ekbladh. But that's very clear in the

12 documentation.

13     Q. So Dr. Ekbladh is one of the physicians who you

14 believe discriminated against you and retaliated

15 against you, is that what you're saying?

16     A. Yes.

17     Q. Who is Dr. Colmorgen?

18     A. Dr. Colmorgen is a staff physician with the

19 high risk. I had minimal contact with him.

20     Q. So I take it he's not somebody who you contend

21 in this case discriminated against you or retaliated

22 against you?

23     A. I have no idea. He was on the resident review

24 committee. I have minimal contact. So I

**Page 115**

1 have no idea what his perception or thoughts on me

2 would have been because there was minimal personal

3 contact or professional contact.

4     Q. What about Faith Brosch, do you know who that

5 is?

6     A. Yes.

7     Q. Who's Faith Brosch?

8     A. She is one of the private physicians that is a

9 teaching physician at Christiana Care.

10     Q. Did you ever have any personal interactions

11 with her?

12     A. I did. I saw many of her patients for her

13 while she slept in her bed at night on call when I was

14 working in triage.

15     Q. I mean, did you have negative interactions with

16 Dr. Brosch?

17     A. There were both positive and negative

18 interactions with her. One in particular was a case

19 when she sent a patient in to be admitted. I was in

20 triage. And she wanted me to do the work-up because

21 she could not come in on call and take care of this.

22 She had something else going on. She sent the patient

23 in to triage. The nurses were upset because they said

24 she should not be in triage. She should go straight

**Page 116**

1 to the floor as a direct admit. It was an

2 administrative thing. And the nurses were the ones

3 that said, "She's not coming in triage. She's a

4 direct admit. Send her up to the hospital floor."

5        She was very angry at me for not doing the

6 admit procedures on that patient and the fact that was

7 she was sent up on the floor. And I told her I could

8 not leave triage to go up to the floor because, when

9 you were in triage, your assignment was to stay in

10 triage unless you were relieved, and there was no

11 relief until the next morning when the shift was over.

12        And she was angry at that particular

13 incident and there were words between her and

14 Dr. Sciscione because Dr. Sciscione supported me

15 saying, "You were on call. She's your private

16 patient. You should have come in and done it

17 yourself." And she was very angry about that.

18     Q. Do you have any evidence that Dr. Brosch

19 discriminated against you because of your age or your

20 disability or retaliated against you in some way?

21     A. She was rude and condescending in our actions

22 after that incident.

23     Q. Anything else about her?

24     A. I cannot recall.

**Page 117**

1     Q. So you just referred to Dr. Sciscione. He

2 backed you up on that incident with Dr. Brosch?

3     A. Yes, he did.

4     Q. That wasn't the only time that he backed you up

5 with a private attending, right?

6     A. No, he had backed me up on several occasions.

7     Q. And can you tell me what you remember about the

8 other occasions where Dr. Sciscione backed you up?

9     A. I can't. I can't remember them. They are not

10 coming to me right now.

11        Dr. Sciscione was very supportive of all

12 his residents.

13     Q. And of you too?

14     A. Yes. Best he could be. And I have letters to

15 that extent.

16     Q. And so I take it you don't believe that

17 Dr. Sciscione is somebody who would intentionally take

18 action against you because of your age or your

19 disability?

20     A. No, but I feel that he was having to take

21 actions or was, as he was saying, catching heat from

22 the residency review committee, from others that were

23 discriminating. And I don't know the exact persons

24 that were, but like I referred to earlier, he says

Zechman                v.                    Christiana Care Health Systems
Ellen Zechman               C.A. # 05-159 JJF               June 20, 2006

Page 118

1  that "they gave me more grief over hiring you than
2  they did over Rita Vinod" who was a foreign medical
3  graduate, which they typically -- --
4  Q.  And that's -- we've talked about that
5  conversation a few times.
6  A.  Yes, we have.
7  Q.  This is August or September of 2002?
8  A.  Yes. Yes.
9  Q.  Other than that conversation that you had with
10  Dr. Sciscione, is there any other information that you
11  have knowledge of that supports a belief that
12  Dr. Sciscione was getting heat or pressure from other
13  people with respect to you?
14  A.  There were, but I cannot come up with them
15  right now.
16  Q.  Who is Dr. Anthony Bell?
17  A.  One of the private physicians that he works
18  with.  I'm not sure -- I think he is in private
19  practice with Dr. Brosch, or he may have been at one
20  time.  They kind of change frequently.
21  Q.  Is Dr. Bell somebody you had personal
22  interaction with?
23  A.  Yes.  I assisted him on several occasions with
24  C-sections and surgeries, and I also saw many of his

Page 119

1  patients while I was on call and he did not come in
2  for those call patients, but I saw them for them in
3  triage.
4  Q.  Is he somebody you had positive
5  interactions with, or negative interactions?
6  A.  I would say neutral professional interactions.
7  Q.  Do you have any evidence that he is somebody
8  who discriminated or retaliated against you?
9  A.  I don't.
10  Q.  Who is Dr. Waleez Shalaby?
11  And first, can you tell me how you
12  pronounce the last name?
13  A.  I'm not quite sure myself, but I think it's
14  Shalaby.
15  Q.  Who is that?
16  A.  He was a fairly new physician that came in --
17  I'm not quite sure when, but I think after I had been
18  there at least six months.  He came in later.  I did
19  not have any interactions with him that I am aware of,
20  or that I can recall.
21  Q.  So I take it you don't have any evidence one
22  way or the other whether he --
23  A.  I have no clue.
24  Q.  Let me finish the question.

Page 120

1  You don't have any evidence that
2  Dr. Shalaby discriminated or retaliated against you?
3  A.  I have no clue.  I really don't know the guy.
4  (Zechman Deposition Exhibit 19 was marked
5  for identification.)
6  BY MR. BLOOM:
7  Q.  Dr. Zechman, I'm going to put in front you
8  what's been marked as Zechman 19.  This was the letter
9  we were just talking about.  It's a recommendation
10  letter from Dr. Moses Hochman on your behalf dated
11  April 4, 2003, correct?
12  A.  Mm-hmm.
13  Q.  You have to say yes or no?
14  A.  Yes.  Excuse me.
15  Q.  I think you just said before that you asked
16  Dr. Hochman to write this letter of recommendation on
17  your behalf?
18  A.  Mm-hmm.
19  Q.  Yes?
20  A.  Yes.
21  Q.  And the reason you asked Dr. Hochman to write
22  this letter is because you viewed him as somebody who
23  was particularly supportive of you within the
24  department?

Page 121

1  A.  Yes.  And he had told me that there was
2  animosity against me, that I should get a lawyer.
3  Q.  What did he say specifically?
4  A.  Basically that.  That there was animosity
5  against me at -- that I should get a lawyer.
6  Q.  For what purpose?
7  A.  It had to do with the upcoming promotion and
8  the conversations that were -- he had privilege to
9  concerning they didn't want me there.
10  Q.  Was he more specific than that?
11  A.  No, because he was not supposed to share this
12  with me.
13  Q.  This letter is addressed to a program director
14  at Eastern Virginia Medical School, correct?
15  A.  That was the Norfolk that I was accepted into
16  and I chose Christiana instead.
17  Q.  And did you actually, in this time frame, April
18  2003, did you actually apply to transfer to another
19  program transferring out of Christiana Care?
20  A.  I was starting -- I can't remember whether I
21  actually applied, but I was starting to collect my
22  data like this because of what I was hearing from
23  Dr. Patruno, Dr. Sciscione, and Dr. Hochman about how
24  there was members of the residency review committee

A-129

31 (Pages 118 to 121)

Zechman
Ellen Zechman

v.

C.A. # 05-159 JJF

Christiana Care Health Systems
June 20, 2006

Page 122

1  that did not want me there and they wanted to get rid
2  of me.
3      Q.  That was based upon your conversation with who?
4      A.  Patruno, Sciscione, and Hochman.
5      Q.  Did you just tell me everything that you
6  remember about the conversation with Dr. Hochman?
7      A.  Everything I remember at the second.
8      Q.  At the second?
9      A.  At this moment.
10     Q.  What about Dr. Patruno, have you already told
11 me today everything you remember about your
12 conversation with Dr. Patruno?
13     A.  That I can remember at this time.
14     Q.  And Dr. Sciscione, we've already covered the
15 conversation you had with him in August or September
16 2002, right, we already talked about that?
17     A.  Yes.
18     Q.  Looking at Exhibit Zechman 19, is there
19 anything that Dr. Hochman writes in here that you
20 think is wrong?
21     A.  The statement, it's one, two, three, four,
22 five -- this fifth indentation, fifth paragraph.
23     Q.  Yeah.
24     A.  "Dr. Zechman is much older than her

Page 123

1  co-residents."
2      Q.  Mm-hmm.
3      A.  Much older?
4      Q.  What were the ages of your co-residents, did
5  you know?
6      A.  Dr. Kirsch and Heinle were under 30.  I'm not
7  sure how old Dr. Fides was, but I think he was maybe
8  mid thirties.  And then I was 46, 47 during that time.
9      Q.  That was Alex Fides?
10     A.  Yes.
11     Q.  Incidentally, one of the incidents you referred
12 to earlier was Dr. Gray asking you to attend morning
13 rounds, right?
14     A.  That's correct.
15     Q.  And you followed up with Dr. Ekbladh regarding
16 that incident?
17     A.  Right.  Well, first, I gave Dr. Gray the
18 opportunity to respond to me in e-mail where I asked
19 her -- and I mentioned this earlier -- you know, has
20 the policy changed?  This has not been the policy.
21 Has the policy changed?  And I sent her an e-mail.
22 And she didn't respond that morning.  I think I had
23 sent the e-mail early morning.  And then later I had
24 not heard from her, her response on that.

Page 124

1      And then I called Alex, and I asked Alex,
2  you know, is this something new?  Did I miss
3  something?  Are you going to these meetings?  And his
4  response was, well, if I just happen to be in the
5  meetings -- in the building at the time of the
6  meeting, I go there.  And he was not -- he was
7  non-committal as to whether he was required or not.
8  He didn't state that.
9      And I says, "Well, she's demanding that I
10 come to these meetings, and I feel like she's
11 harassing me and I want to talk to you, you know,
12 Dr. Ekbladh about this."
13     And he says, "Well, talk to her first."
14     And she never responded.  And then, the
15 next day, Dr. Ekbladh responded to my request, but
16 Dr. Gray never responded.  And I had sent Dr. Ekbladh
17 an e-mail stating that I felt she was harassing me.
18 And basically saying the same thing, you know, and
19 that, you know, I begged him to stop it.  I said,
20 "She's harassing me.  Please, you know, help me."  And
21 I begged him.  I says, "I want to finish this
22 residency.  You know, I want to get through this.
23 Please, help me.  And what is happening on the floor,
24 you know, what you said we would do?  My schedule is

Page 125

1  not being backed up on the floor.  Please help me and,
2  you know, do something about this."  And I begged him.
3  And I even said in my e-mail, "I am begging you to
4  help me."
5      Q.  And Dr. Ekbladh responded to you that you are
6  not required to go to morning rounds but he thought,
7  when you were able to, it's a very good learning
8  opportunity for you to do it and you should when you
9  can, is that accurate?
10     A.  That is accurate.
11     Q.  And do you agree that attending at morning
12 rounds is a good learning opportunity?
13     A.  It was when you had the opportunity to do it.
14 But at this time, I was asking for time off.  I had
15 already put in my request for the time off.  And this
16 was adding more work to my schedule, adding a longer
17 workday when I was asking for help and time off.  This
18 was increasing my work schedule, increasing my workday
19 to over a 12-hour day after I had put in a request
20 saying, "Hey, I need time off.  I need, you know,
21 accommodation.  I need FMLA.  I need some help here."
22     Q.  Is there anything else other than you mentioned
23 the "much older" comment in the letter from
24 Dr. Hochman -- is there anything else in his letter,

Zechman                              v.              Christiana Care Health Systems
Ellen Zechman                  C.A. # 05-159 JJF                      June 20, 2006

Page 126

1 Zechman 19, that you think is wrong or inaccurate?
2    A.  I feel that he should have left out the comment
3 about my husband and my four small children because
4 that has no place in an application that I have small
5 children. In work applications and things, I feel
6 that that information should not be included in that.
7 Also it's inaccurate that I did not have four small
8 children. I had three small children and one older
9 child. So there's an inaccuracy.
10    Q.  You think there should not be any reference to
11 your family life at all here?
12    A.  I agree, to my age or my family life, my skin
13 color, my religion, or my race, or my marital status.
14    Q.  So even if there were comments saying that "her
15 family has been very supportive," you don't think that
16 belongs in an application or residency program?
17    A.  No.
18    Q.  Have you ever referred to your family in an
19 application of yours to a residency program?
20    A.  When I was specifically asked.
21    Q.  When were you specifically asked?
22    A.  Every time I went on interview I was asked,
23 "What does your husband think about this? What are
24 you going to do with your children?" Multiple

Page 127

1 occasions that came up. On almost every interview I
2 would go on.
3    Q.  At all the institutions you applied to?
4    A.  And different institutions.
5    Q.  And I think you will agree with me that being a
6 resident and particularly in an ob/gyn program is a
7 grueling experience. Is that a fair characterization
8 of what it is?
9    A.  It's an intense experience.
10    Q.  Why do you think that's a completely out of
11 bounds topic as to whether or not, you know, having a
12 family or having young kids makes this even more
13 grueling? Why should that not even be discussed?
14    A.  Because it shouldn't. It should be based on
15 the person, their education, and their abilities to do
16 the job.
17    Q.  But don't you have demands on your life that
18 are created by having kids? Is that just not
19 relevant, or don't you have things pulling you in
20 different directions?
21    A.  Doesn't everybody?
22    Q.  So everywhere you went, people brought up your
23 family?
24    A.  Not everywhere, but it was a repeating theme at

Page 128

1 different institutions.
2    Q.  They wanted to know, why are you doing this at
3 this stage of your life?
4       Is that a yes?
5    A.  Yes.
6    Q.  And why do you want to do this when you have
7 three small kids and an older kid at home?
8       Is that yes?
9    A.  Not specifically that question, but there were
10 questions related to family and husband.
11    Q.  Apart from interviews or discussions that you
12 had with people, have you ever written about your
13 family in a written application for a residency
14 program?
15    A.  I cannot recall.
16    Q.  Can you tell me what your understanding is of
17 who conducts evaluations of your performance as a
18 resident and how those evaluators are selected? Do
19 you know how that process works?
20    A.  No, I do not. But I know there were frequent
21 evaluations from peers, from nursing staff, from
22 private physicians as well as staff physicians. I do
23 not know the frequency of these evaluations, but I did
24 know that they did occur.

Page 129

1    Q.  And then I've also seen a reference to
2 residents being able to send out basically requests to
3 sort of identify physicians who the residents think
4 should be somebody evaluating them. Does that also
5 occur?
6    A.  We were requested to have evaluations from
7 every surgical case that we assisted on. So when we
8 did the case with the teaching physicians, we were to
9 hand them an evaluation form of our performance, our
10 weaknesses, and then recommendations for each and
11 every procedure that we went in on. We did not
12 necessarily have this like on your routine labor and
13 delivery stuff, but especially your gynecology
14 surgical case that went to the operating room.
15       So you were encouraged and you -- it was a
16 requirement to have an evaluation filled out on the --
17 now, there were times when you handed those forms to
18 the physician and you found them later, you know,
19 whether the physician had dropped them or forgotten
20 them, but it was our responsibility to hand it to
21 them. It was their responsibility to turn it in to
22 the office. We, for the most part, were not privy to
23 that information.
24    Q.  It sounds like you would be handing out a lot

A-131

33 (Pages 126 to 129)

Zechman
Ellen Zechman

v.

C.A. # 05-159 JJF

Christiana Care Health Systems
June 20, 2006

Page 130

1  of evaluation forms.
2      **A.  Within a week's time, yes.**
3      Q.  So apart from those, I gather that, in addition
4  to the evaluation forms that you hand out after every
5  case, there are other evaluations which are a more
6  considered look at your overall performance?  Were
7  there other kinds of evaluations like that?
8      **A.  There were, but I don't know the frequency of**
9  **them and who was chosen.**
10         **(Zechman Deposition Exhibit 5 was marked**
11  **for identification.)**
12  **BY MR. BLOOM:**
13      Q.  I'm going to show you Zechman 5, and Zechman 5
14  is a letter, January 29, 2004, letter from you to the
15  EEOC regarding your claims in this case, right?
16      **A.  That's correct.**
17      Q.  You typed this letter?
18      **A.  I did.**
19      Q.  If you'll turn to the second page of this
20  letter, first of all, is all that handwriting on the
21  bottom your handwriting?
22      **A.  Yes.**
23      Q.  Do you recall when in time you wrote these
24  notes on the bottom of the document?

Page 131

1      **A.  No, I do not.**
2      Q.  Was it sometime after you actually sent this
3  letter to the EEOC in 2004?
4      **A.  I don't recall.  I really don't remember.**
5      Q.  Focus your attention at the top paragraph on
6  the second page and it says, "In order to salvage my
7  name and my medical career, the administration agreed
8  to allow me to resign."
9          It continues, "dating the resignation in
10  order not to have a dismissal on my records."
11          Is that accurate?
12      **A.  Well, I was --**
13          MS. BREWINGTON:  Wait.  It was not close
14  quote there.  Did you finish the whole statement?
15          MR. BLOOM:  I was reading the part that
16  was --
17          MS. BREWINGTON:  Okay.
18      **A.  I was going to say, I was forced into -- I was**
19  **threatened into resigning.  When I tried to appeal the**
20  **process, Dr. Ekbladh told me, in his office, if you**
21  **appeal, I will still be your boss and I will get you**
22  **later.**
23      Q.  I think what you say here is that was
24  preferable to you to resign rather than be dismissed.

Page 132

1  Do you want to retract that now?
2      **A.  It was preferable, but I was also forced to.**
3      Q.  If I understand you, what you're saying is you
4  were told the committee has already voted to terminate
5  your residency contract, right?
6      **A.  I was told that it was a unanimous decision,**
7  **and I filed for appeal.**
8      Q.  Right.  Because you had received a letter
9  notifying you of the --
10      **A.  No.  I had gotten the phone call, and I called,**
11  **you know, what's going on here?  What can I do about**
12  **this?  I was told I could file an appeal, but it had**
13  **to be done immediately.  So I typed it up that day and**
14  **then sent it certified mail.**
15      Q.  Why I did not get the actual notification till
16  much later?
17      **A.  Dr Ekbladh was supposedly on vacation.  I did**
18  **not know how long he was on vacation at that time, but**
19  **that was why Dr. Kaminski told me he was calling me to**
20  **tell me this, because Ekbladh was not there to do it;**
21  **Ekbladh was on vacation.**
22          **And it was much later when I came back to**
23  **Delaware, and I was also meeting with Charles -- I'm**
24  **blanking -- Whitney in the hopes that he would help me**

Page 133

1  with the appeal.  And that was before I saw -- I went
2  to Dr. Whitney's office.  I went to talk to
3  Dr. Ekbladh, and that was when he said, "Well, even if
4  you win the appeal, I'll still be your supervisor, and
5  I'll get you later."
6      Q.  Did he have any reason to think you would win
7  the appeal?
8      **A.  I didn't know, but I knew that he meant what he**
9  **was saying.  And from the way he had humiliated me and**
10  **abused me prior to that, I knew he was serious about**
11  **that threat that he would get me later because he had**
12  **gotten away with this up until this point.**
13      Q.  What did he do --
14      **A.  By keeping -- where I didn't have a call room**
15  **to put my supplies in when I was on call for the first**
16  **time.  And I would have to sneak around and find a**
17  **place to lay down.  Everybody else, all of the other**
18  **residents had a call room to put their stuff in, and I**
19  **was left out.  And I would have to stash my stuff in**
20  **the locker room and sneak around to find a place to**
21  **lay down when I was on call.**
22          MS. BREWINGTON:  Would you like to take a
23  break?
24          THE WITNESS:  No.  I would like to finish

Wilcox & Fetzer, Ltd.                Proressional Court Reporters                (302)655-0477

Zechman                                    v.                    Christiana Care Health Systems
Ellen Zechman                        C.A. # 05-159 JJF                              June 20, 2006

Page 134

1  this.
2          MS. BREWINGTON: Okay.
3    A.  And when I talked to Dr. Patruno about it, he
4  says, "Ellen, they are kicking you out in the hall.
5  They don't want you here. You've got to get out of
6  here. They are going to ruin you."
7  BY MR. BLOOM:
8    Q.  Is there any other way in which you think
9  Dr. Ekbladh discriminated against you other than what
10  you've described?
11    A.  I've got other stuff. Right now, I cannot come
12  up with it. You know, I'm not remembering it.
13    Q.  And since we are not going to entirely finish
14  today, Dr. Zechman, I'm going to ask you that, between
15  now and the date we continue this deposition, that you
16  sit down and review the documents that you've produced
17  in this case because you've -- I don't want to say
18  every question, but most of your answers have ended
19  with "I can't recall everything right now," and "I may
20  recall it some other time." And this isn't an
21  open-ended exercise that we are doing. So I'm going
22  to ask you -- you don't need to respond to this, but
23  to sit down and familiarize yourself with the
24  documents that you've written and that you have

Page 135

1  produced, so that you are in a position to testify in
2  this deposition in support of the claims that you've
3  asserted, you know, because we can't just let
4  everything hang open that, well, maybe I'll remember
5  some things at some other time. So I'm going to ask
6  you to do that.
7    A.  There's a lot of information here and there's a
8  lot of documents here.
9    Q.  How did resigning from Christiana Care -- was
10  that better than having the termination vote stand as
11  a termination?
12    A.  Well, I feel that I would have won the appeal,
13  but I would have still been under him. So it would
14  have been a moot -- you know, I would have continued
15  to put myself in that position, and this abuse and
16  discrimination would have escalated even more. And I
17  discussed this with Dr. Brian Little, and he was the
18  one -- and Dr. Charles Whitney were the ones that
19  recommended that I see if I could resign rather than
20  appeal because they cannot -- even Brian Little says,
21  he says, I cannot protect you if you win this and you
22  go back into that department.
23    Q.  Who's Brian Little?
24    A.  He is the director of like the overall

Page 136

1  residency programs, you know, the surgical, the family
2  medicine, all of them. Kind of the head honcho over
3  the residency programs.
4    Q.  And does Dr. Ekbladh report to Dr. Little?
5    A.  I am not sure, but I think so.
6    Q.  And is Dr. Little somebody who you believe
7  discriminated against you or retaliated against you in
8  some way?
9    A.  I had no clinical dealings with Dr. Little. He
10  was in administrative.
11    Q.  So you don't have any evidence that you're
12  aware of that he discriminated against you or
13  retaliated against you?
14    A.  There was not an opportunity, no.
15    Q.  Now, assuming that the decision of the review
16  committee had not been reversed, was it still your
17  view that resigning from the program was preferable,
18  from your perspective, to having the termination
19  decision stand?
20          MS. BREWINGTON: Objection. Calls for
21  speculation.
22    A.  Yeah. I don't know. I don't know.
23    Q.  In your letter here you refer to, quote,
24  salvaging your name in this letter, that resigning

Page 137

1  enabled you to salvage your name as a physician. How
2  did it do that?
3    A.  Well, it didn't because, for the rest of my
4  life, every application I fill out for hospital
5  privileges, for insurance providers, anything, I have
6  got to write this on it. My career is permanently,
7  irrevocably damaged by this because I will always have
8  to put this down that did I not finish this residency
9  and have to put this down for whatever reason.
10    Q.  But you're --
11    A.  And I am permanently on the -- not done.
12  Permanently, irrevocably have a black spot on my
13  career forever because of this.
14    Q.  Now, your understanding was, though, that the
15  arrangement that was reached is that you could
16  legitimately, for the rest of your life, say, "I
17  resigned from Christiana Care," right? And I'm going
18  to ask you for a yes-or-no answer to that question.
19    A.  I did not know at that time. I did not know.
20  I was going by what Dr. Charles Whitney had advised me
21  to do.
22    Q.  Well, your expectation, I assume, was that,
23  after having reached this arrangement with Christiana
24  Care. that. if asked, Christiana Care would say that

A-133

35 (Pages 134 to 137)

Zechman
Ellen Zechman

v.

C.A. # 05-159 JJF

Christiana Care Health Systems
June 20, 2006

Page 138

1  you resigned rather than saying they terminated you; I
2  mean, that was the point of this arrangement, right?
3  A.  I was acting on the advice of Dr. Charles
4  Whitney.
5  Q.  I'm not asking who was advising you. I'm
6  asking you what your understanding is of what the
7  arrangement you reached was with Christiana Care?
8  A.  I was not sure the arrangement was, but I
9  was acting on the advice of my advisors, and I knew
10  that, if I stayed there, I'd be subject to more even
11  worse conditions than I was currently experiencing.
12  Q.  Did you ever ask Dr. Ekbladh for a letter of
13  recommendation?
14  A.  Something had to go in the file.
15  Q.  What file?
16  A.  The permanent file.
17  Q.  Whose permanent file?
18  A.  My Christiana permanent file.
19  Q.  What makes you think that?
20  A.  It's a requirement from my understanding.
21  Q.  What's a requirement?
22  A.  That there be a letter from your residency
23  director. If you apply to any new residency
24  positions, you have to have a letter from any previous

Page 139

1  residency program that you were in in order to -- it
2  is a requirement in order to apply for residency
3  programs. So it's kind of -- it has to be -- it's
4  part of the system and a requirement of the system.
5  Q.  In connection with applying for another
6  residency program, were you ever asked, either in
7  writing or orally, why you left the Christiana Care
8  residency program?
9  A.  Yes.
10  Q.  How many times did that happen?
11  A.  I don't know. I don't remember.
12  Q.  Do you remember any specific instance in which
13  you were asked?
14  A.  When I was applying to East Carolina University
15  after this happened.
16  Q.  And so what did you tell them?
17  A.  I told them that I had requested family medical
18  leave, that they had not given it to me, and that I
19  was forced to resign.
20  Q.  How did you communicate that to Eastern
21  Carolina University?
22  A.  I don't remember.
23  Q.  I mean, that doesn't seem like -- can you
24  imagine a circumstance in which you would put that in

Page 140

1  a written form to a program you're applying to?
2  A.  I can't remember what -- you know, how I
3  communicated that, but yes, I had to. I had to
4  communicate something.
5  This has all been extremely emotionally
6  painful for me. And I have nightmares about this.
7  Q.  Did you retain a copy of your application to
8  Eastern Carolina University the second time when you
9  applied to them after Christiana Care?
10  A.  I don't know. I don't know.
11  Q.  That was for a family practice residency?
12  A.  I applied twice, I think, to the obstetrics and
13  gynecology program. I'm not sure.
14  Q.  After you left Christiana Care?
15  A.  No. No. That was the family medicine program.
16  Q.  You actually did not apply to any ob/gyn
17  residency program after Christiana Care, correct?
18  A.  That's correct.
19  Q.  Do you need a break?
20  A.  I'm trying to think whether that statement I
21  just said is accurate. I'm having trouble -- I was
22  almost in shock after this happened. And I don't
23  remember a lot of the specifics of this time period
24  because I was truly in shock and in great emotional

Page 141

1  distress over all this, and I do not remember this
2  stuff correctly. This was extremely traumatic to me,
3  and still is.
4  Q.  Is your inability to recall events that relate
5  to your lawsuit something that you're experiencing
6  today, or do you think that that's going to change in
7  a week or two weeks or is, you know, what you remember
8  today what you remember?
9  A.  I have moments where I remember more. I wake
10  up frequently in the middle of the night with my brain
11  replaying these incidents in my head, in my dreams,
12  and I'll wake up. If it's something that I need to
13  remember, I'll write it down so that I can remember to
14  follow up on it. So in my deep subconscious mind,
15  during my deep sleep, I tend to remember some things
16  and, you know, write it down. And then I'll remember
17  things, and if I don't write it down, I'll forget it
18  and it will come to me later. But this whole incident
19  is extremely emotionally painful to me, and I have
20  frequent nightmares where I'm reliving these incidents
21  and wake up, you know, remembering certain specific
22  incidents that happened.
23  Q.  How does your medical condition, which you
24  contend is a disability, this mixed connective tissue

A-134

Wilcox & Fetzer, Ltd.

Professional Court Reporters

(302)655-0477

Zechman
Ellen Zechman

v.

C.A. # 05-159 JJF

Christiana Care Health Systems
June 20, 2006

Page 142

1  disorder, how does that affect you physically?
2  A.  That is an autoimmune syndrome.  So I have
3  various symptoms, joint pains like arthritis.  But the
4  main thing that affects me in my ability to work is
5  this overwhelming fatigue at times which is very
6  consistent in all the autoimmune diseases like
7  rheumatoid arthritis, lupus, mixed connective tissue.
8  These episodes where you feel like you have the flu
9  but you don't have the flu virus, and the only thing
10 you can do about that is rest.  And that is what was
11 going on in July when I was begging for time off.
12    Q.  Are the symptoms that you just described of
13 mixed connective tissue disorder, in your particular
14 case -- I take it they flare up unpredictably?
15    A.  Sometimes it will pass in two days and you're
16 good to go.  Other times it takes longer than that to
17 get over it.  It's very unpredictable and kind of a
18 day-to-day basis, but you can go years and weeks, you
19 know, and be asymptomatic.
20    Q.  And I take it even when you were at Christiana
21 Care, you were there approximately a year before you
22 became symptomatic there, is that true?
23    A.  I was having symptoms, but they were not -- I
24 was just dealing with them.  You know, that was the

Page 143

1  first time that things were escalating, and it was
2  directly related to the stresses that they were
3  putting me under, and especially the emotional and
4  physical stress of not having a call room when I was
5  on call.  That was exacerbating the whole flare-up.
6  But most of the time, you know, I would rest and be
7  good to go.
8     Q.  Was being away from your family for prolonged
9  periods of time, did that contribute to your stress at
10 all?
11    A.  No, because they would come up frequently.  We
12 specifically bought a motor home.  It was an old motor
13 home in order to transport the children back and forth
14 to Delaware comfortably without a million bathroom
15 stops with little ones.  And so my husband, being in
16 business for himself, was able to take frequent long
17 weekends and load the kids up in the motor home, you
18 know, and shoot on up and spend time.  So we really
19 did not go long periods of time without seeing each
20 other.  We saw each other just about every weekend
21 unless I was working all that weekend, and I say, hey,
22 it's not worth the effort coming in here because I'm
23 on call too much.
24          But in a lot of ways, it was good because

Page 144

1  I didn't have the day-to-day responsibilities of
2  fixing supper and things like that that facilitated my
3  work schedule.
4     Q.  And I think you've at least written, if not in
5  your complaint, in other places -- I mean there was
6  times residents in your group were working 75, 80
7  hours a week.
8     A.  And I was too.
9     Q.  You were all working those hours?
10    A.  Yes.
11    Q.  And so, I mean, even if your husband was down
12 the block, I mean, being a resident in ob/gyn program
13 would cut significantly in the time of your family;
14 that's a true fact, isn't it?
15    A.  Yeah.  That was kind of a no-brainer.
16    Q.  But your family was not down the block; they
17 were in North Carolina, right?
18    A.  Yes.
19    Q.  Now, focus your attention on the second half of
20 2002, which is your first six months there, from
21 roughly June to the end of December 2002.  Do you
22 recall, let's say, on a permanent basis, you know, how
23 frequently you saw your family, either you going down
24 there or them coming up here?

Page 145

1  A.  It was, I would say, almost every weekend.
2  They came up more often than I went down, which is why
3  we purchased the motor home.
4     Q.  Was it your experience that the other residents
5  in the program socialized outside of the hospital
6  setting?
7     A.  My particular classmates did, and they would
8  have those meetings at Dr. Heinle's house for studying
9  that they would not invite me to.
10    Q.  When did those study meetings happen?
11    A.  I'm not sure because they didn't invite me to
12 them.  I heard, you know, secondhand, when they would
13 be in their little groups talking about them.
14    Q.  During the time you were at Christiana Care,
15 was the weekend time a time that you sort of set
16 aside, as long as you're not working, to see your
17 family or would you go socialize with your residents
18 instead, if you had been invited to do that?
19    A.  I would have taken time to socialize, maybe not
20 every time they did it, but I would definitely have
21 made that, you know, part of the schedule because I
22 think that's important for bonding.
23    Q.  And you mentioned the joint pain and fatigue
24 that can be symptomatic of mixed connective tissue

A-135

37 (Pages 142 to 145)

Zechman                                    v.                    Christiana Care Health Systems
Ellen Zechman                      C.A. # 05-159 JJF                          June 20, 2006

Page 146

1  disorder. Did that medical condition, apart from
2  those two symptoms, actually physically prevent you
3  from doing certain tasks that you would normally need
4  to be doing as a resident?
5  A.  No.
6       (Zechman Deposition Exhibits 44 and 45
7  were marked for identification.)
8  BY MR. BLOOM:
9  Q.  Dr. Zechman, I'm going to put in front of you
10  what's been marked as Zechman 44, and I'm also going
11  to hand you Zechman 45?
12       And would you agree with me that Zechman
13  44 and Zechman 45 are two versions of a letter that
14  you sent out to various doctors you knew through
15  Christiana Care regarding this case?
16  A.  That is correct.
17  Q.  And if you'll turn to the second page of
18  Zechman 44, that's your hand writing at the top of the
19  page?
20  A.  Yes.
21  Q.  And so there are list of physicians on the
22  second page of this exhibit, and you sent an identical
23  letter to all of these physicians?
24  A.  I don't know how identical, but similar.

Page 147

1  Q.  And in addition to the physicians that are
2  listed on the second page of Zechman 44, you sent a
3  version of this letter to Dr. Maynard, and that's
4  exhibit Zechman 45, right?
5  A.  That's correct.
6  Q.  Can you recall, sitting here today, whether you
7  sent a version of this letter to any other doctors
8  other than Dr. Maynard and the ones that are reflected
9  in Zechman 44?
10  A.  I cannot recall.
11  Q.  And I'll just direct your attention to
12  Zechman 44 in the middle — the second paragraph, and
13  I'll read the second sentence. It says, "Regardless
14  of my perceived medical abilities, Dr. Ekbladh is in
15  violation of the Americans with Disabilities Act,
16  which is protected by federal law."
17       Did I read that right?
18  A.  That's correct.
19  Q.  Did you ever have an understanding of what
20  Dr. Ekbladh's evaluation of your medical abilities
21  was?
22  A.  Say that again, please, or rephrase.
23       MR. BLOOM:  Can you read that back,
24  please?

Page 148

1  (Record read.)
2  A.  I'm not sure since I did not work directly with
3  him. He was administrative. So he did not directly
4  observe my cases, whereas these physicians did.
5  Q.  When you say these physicians, are these the
6  physicians that are identified on exhibits 44 and 45
7  that we are talking about?
8  A.  They are some of them.
9  Q.  And I take it these physicians, Dr. Maynard and
10  all physicians listed on Zechman 44, these are doctors
11  who you are writing to because you thought they could
12  help your case?
13  A.  That I would see their patients in the middle
14  of the night while they chose to stay home and trust
15  my ability in seeing their private patients. So, yes,
16  I felt that they trusted my medical judgment because,
17  if not, they were legally responsible for their
18  private patients and they were receiving payment for
19  caring for their private patients and if they had any
20  reservations about my medical abilities, they should
21  have brought themselves in and saw their private
22  patients with me or instead of me, rather than staying
23  home and only receiving a phone contact that their
24  patient had been there.

Page 149

1  Q.  Look briefly at this list of physicians. I'm
2  talking about the physicians identified in exhibit 44
3  and 45. Are any of these physicians people who you
4  believe discriminated or retaliated against you?
5  A.  I do not know because I not know who was on the
6  committees that Dr. Patruno, Dr. Hochman, and
7  Dr. Sciscione were referring to. So I have no idea if
8  these people — I do know that Maynard was a part of
9  the committee.
10  Q.  My question is, because I assume you'll agree
11  with me, just being on a committee doesn't make you a
12  discriminator?
13  A.  No.
14  Q.  So my question is, what evidence do you have,
15  if any, that any of these physicians that are
16  identified in Zechman 44 or Zechman 45 discriminated
17  against you or retaliated against you?
18  A.  I have not said that these patients did that.
19  I mean —
20  Q.  These physicians?
21  A.  These physicians. Excuse me. These are the
22  physicians that — and these are just a small amount
23  of them that I was seeing their patients, their
24  private patients for them while they chose to stay at

A-136

38 (Pages 146 to 149)

Zechman                                         v.                          Christiana Care Health Systems
Ellen Zechman                              C.A. # 05-159 JJF                                June 20, 2006

Page 150

1  home and not come in and see their own patient in the
2  emergency room, called ob/gyn triage.
3  Q.  And apart from you sometimes covering these
4  doctors' patients when they are not in the building, I
5  take it, because you say so in your letter, that each
6  of these physicians helped you and provided teaching
7  experiences with you?
8  A.  Yes.
9  Q.  And at the bottom of this letter it says, I
10  appreciate -- I'm going to quote this.  "I appreciate
11  all the help and teaching you gave me while I was
12  there at Christiana, and I was devastated over all of
13  this.  I particularly miss you.  I enjoyed your lively
14  personality."
15      Do you think, as far as you recall, that
16  you included a statement like that in all these
17  letters that you sent to these people?
18  A.  There will be different ones.  That statement
19  was particular to this particular teaching physician,
20  that I had a special appreciation for.
21  Q.  That's Dr. Duque --
22  A.  Salva.
23  Q.  And if you look at Zechman 45, I think I see
24  what you're talking about because the last paragraph

Page 151

1  here, says, "I appreciate all the help and teaching
2  you gave me while I was there at Christiana, and I am
3  devastated over all of this.  I regret having to take
4  this to the public courts."
5      The reference to the help and the teaching
6  that the physician provided, do you have any reason to
7  doubt that you included a statement like that in the
8  letters to all of these people?
9  A.  I think I individualized the last statement to
10  the particular relationship that I had to each
11  physician and would add a personal note depending on
12  the relationship which, you know, is quite obviously
13  that this was a closer relationship when you say this.
14  Dr. Duque-Salva was a someone I greatly appreciated.
15  Dr. Christine Maynard was a little bit more stern and
16  rough on students and residents, and there was not
17  that excitement and joy of working with her as there
18  was with Dr. Duque.
19  Q.  But all these people that you wrote to,
20  exhibits 45 and 44, were people who you did have
21  positive teaching and learning experiences with?
22  A.  That I had teaching and learning experiences
23  with.
24  Q.  Are there any on this list with whom you did

Page 152

1  not have positive teaching or learning experiences?
2  A.  There is one in particular that I'm noticing,
3  Dr. Vakili, who was very discriminatory towards me in
4  November of 2002, ordering me out of the operating
5  room one morning, that he did not want to work with
6  me.  "Get her out of here.  I want someone else."
7  Q.  Why is that discriminatory?
8  A.  Because he did not even know me at that time,
9  and he was acting on what he had heard at various
10  committee meetings.
11  Q.  You don't know what he heard at various
12  committee meetings, do you?
13  A.  No, but that is what I heard later.  And later,
14  towards the end of my time I operated on him --
15  operated with him, and we had a very positive case.
16  And he even said, "Why don't they like you?  You're
17  good.  Who's mad at you?  Why were they doing it?"
18  Q.  And what you just referred to is that initial
19  experience in November 2002 where he didn't want you
20  to scrub with him, is that what it was?  Is that
21  correct, your use of that phrase, he didn't want you
22  to scrub with him?
23  A.  Yes.
24  Q.  And you referred to things he had heard.  I

Page 153

1  take it you don't have personal knowledge of what he
2  heard from other people?
3  A.  I do after, retrospectively.
4  Q.  How could you have personal knowledge of
5  something when you're not there?
6  A.  Excuse me.  It's retrospective knowledge that
7  he shared with me, that "why are they mad at you?  Why
8  don't they like you?  You're good.  Why are they doing
9  it to you?"
10  Q.  I'm sorry.  I'm going to rephrase the question.
11  When you had this interaction with Dr. Vakili in
12  November 2002, you just made a statement a moment ago
13  that you think he refused to scrub with you because of
14  things he had heard.  And I want to know if you have
15  any personal direct knowledge of what led him to
16  believe those things about you in November 2002?
17  A.  He said, "They say you're no good.  I don't
18  want you here."  And he had never worked with me prior
19  to that event.
20  Q.  I'm just going to remind you, Dr. Zechman, this
21  is not a test.  You don't need to have personal
22  knowledge of every fact that was relevant to this
23  case.  I just want to know what you observed
24  personally and maybe other witnesses have knowledge of

A-137

39 (Pages 150 to 153)

Zechman
Ellen Zechman

v.

C.A. # 05-159 JJF

Christiana Care Health Systems
June 20, 2006

Page 154

1  different things. So I'm just going to repeat that
2  instruction.
3          And Dr. Sciscione actually -- this was
4  another instance in which he stuck up for you, right?
5  **A.  Yes, it was.  Yes it was.**
6  Q.  And how did Dr. Sciscione stick up for you in
7  this instance?
8  **A.  He wrote a letter to Dr. Vakili supporting me**
9  **and saying that you know, he should treat all the**
10  **residents the same and give them all the same**
11  **opportunities.  And that was a paraphrase.  That's not**
12  **a direct quote.**
13  Q.  And then Dr. Sciscione also sent out a memo to
14  the other attendings at Christiana Care to make sure
15  that you were getting the attention and learning
16  experiences that he thought you deserved to get?
17  **A.  I'm not aware of that.**
18  Q.  Have you ever seen a memo like that?
19  **A.  Not the one you're referring to at this moment,**
20  **no, I have not.**
21  Q.  The one that you think I'm referring to is the
22  one that was actually the day after he wrote
23  Dr. Vakili around December 13th, 2002.
24  **A.  I have no knowledge of that.**

Page 155

1          (Zechman Deposition Exhibit 26 was marked
2  for identification.)
3  BY MR. BLOOM:
4  Q.  I'm going to hand you what's been marked
5  Zechman 26.  You've seen this document before, right?
6  **A.  Yes.**
7  Q.  And this is a letter an April 30th, 2003,
8  letter from you, and it's addressed, "Dear OB/GYN
9  Attending Physician," right?
10  **A.  That's correct.**
11  Q.  And my understanding is that you sent this
12  letter to a number of attending physicians asking them
13  to provide feedback on your performance?
14  **A.  That's correct.  I was being criticized for my**
15  **surgical skills not being equal to my colleagues.  And**
16  **I had continually been reassigned to triage, which was**
17  **the emergency room for the pregnant females.  It was**
18  **call the ob/gyn triage.  So I had complained to**
19  **Dr. Sciscione that, how can you -- how can you state,**
20  **you know, that I continue to be behind in my surgical**
21  **skills when I am not getting the opportunities.  I'm**
22  **being reassigned to triage and not getting the**
23  **opportunities that have been allowed in my schedule**
24  **for me to progress in my surgical skills.  So, in**

Page 156

1  order to do this, I was trying to get the attending
2  physicians that I would routinely see their private
3  patients for them as well as staff physicians to
4  comment on this since I was spending most of my time
5  here.  And I sent this out to at least ten physicians.
6  And I asked -- and you can see -- "please fax this
7  directly to Sandi Kardos," and that is her number.  So
8  I faxed this -- these were faxed from the triage fax
9  machine to their offices.  And they were to fill it
10  out and fax it directly to Sandi Kardos.
11  Q.  And -- I'm sorry.  Go ahead.  I didn't mean to
12  interrupt you.
13  **A.  And this one Dr. Hochman gave me a copy of**
14  **after he faxed it in because he wanted me to have a**
15  **copy as well.  But there should have been at least ten**
16  **of these that were sent out and sent...**
17  Q.  Was this your idea to send these out or did
18  somebody suggest that you do this?
19  **A.  Dr. Patruno told me that I needed more**
20  **evaluations, and he said, start getting, you know,**
21  **seeing if you can get evaluations out of these people**
22  **to counteract what's being said about you in these**
23  **committee meetings.  So it was on his -- he did not**
24  **recommend it, but it was on his suggestion that I did**

Page 157

1  this on my own.
2  Q.  And incidentally you've referred to criticism
3  about the progress of your surgical skills, and I want
4  to ask you about a different subject which is, were
5  you aware that there was also criticism relating to
6  your being defensive or resistant to criticism?  I'm
7  not asking if you agree with that criticism I just
8  described, but were you aware that that was a
9  perception at Christiana Care?
10  **A.  I think Dr. Patruno had mentioned that at one**
11  **of our meetings.**
12  Q.  And what did he say about that?
13  **A.  I can't recall.  But I do remember him alluding**
14  **to that, and I cannot remember the exact conversation.**
15  **And that was at the same time that he was saying that**
16  **"these people are not warm and fuzzy.  They don't like**
17  **you." And he was basically telling -- you know,**
18  **saying you need to kind of butter up to these people**
19  **because they don't like you and they want to get rid**
20  **of you.**
21  Q.  And Dr. Patruno was your mentor, right?
22  **A.  Yes.**
23  Q.  And Dr. Patruno, I gather, is a -- the
24  conversation you were just relaying to me about this

A-138

40 (Pages 154 to 157)

Zechman                                    v.            Christiana Care Health Systems
Ellen Zechman                      C.A. # 05-159 JJF                      June 20, 2006

Page 158

1  perception of your resistance to criticism, he was
2  relaying to you things that he heard from other
3  people, was that your understanding of it?
4      A.  Yes.  And he was telling me that I needed to
5  act like a whipped puppy and those -- that's his
6  direct quote, "act like a whipped puppy and butter up
7  to these people because they don't want you here."
8      Q.  I've never been a resident.  I mean, do first-
9  and second-year residents, do they act like whipped
10  puppies?
11      A.  I don't know.  I've never been a whipped puppy,
12  so I can't call that.
13      Q.  Well, what about your co-residents, I mean, did
14  they tend to sort of, you know, snap to attention when
15  snapped at?
16      A.  We rarely worked together.  We work with people
17  over us or under us.  And so, for my co-residents,
18  that's hard to make that statement since I — we would
19  not be on the same assignment at the same time where I
20  would see them working.  We would be in different
21  places at the hospital.
22      Q.  Okay.  And so I take it that, if your
23  co-residents are getting reassigned at the last minute
24  or pulled from one case to go do something else, that

Page 159

1  that's not something that you would have personal
2  knowledge of one way or the other?
3      A.  To a certain extent I would because then there
4  would be someone else doing it and not me.  And I was
5  repeatedly getting pulled for these assignments away
6  from my surgical assignment that I was supposed to be
7  on.
8      Q.  Let me ask the question again because I think
9  maybe we are misunderstanding each other which is
10  that, if your co-residents were assigned to cases and
11  were pulled from them and replaced by a more senior
12  resident or another co-resident, I gather from your
13  previous answer that you, would not ordinarily have
14  any knowledge of an event like that?
15      A.  Yes.  I would because there were two areas that
16  we would be pulled and reassigned to.  One was the
17  ob/gyn triage that was a labor intensive area, and the
18  other was the labor deck which was high risk and, you
19  know, the labor rooms.  I would have seen them there
20  because you would be working in those areas.  And you
21  would see them there if they had been pulled, but...
22      Q.  How do you know what your co-residents are
23  assigned to do for a particular day?
24      A.  There is a board, and then we have a formal

Page 160

1  schedule that's on paper, that's our assignments, and
2  then each day you would have the assignment board, a
3  chalk board, and you would see, you know, who was
4  where.
5      Q.  Does the board list assignments to different
6  sections of the hospital or does it list specific
7  tasks that person will be doing at a given time?
8      A.  Both.
9      Q.  Is every task that you are going to perform
10  during the day listed up on that board?
11      A.  If they are separate tasks like a surgical case
12  with, say, Dr. Hochman, another surgical case, you
13  would have Dr. Hochman, operating room so-and-so, such
14  and such time, and they want the resident's name
15  there.  If you were in the Wilmington Clinic, it would
16  say clinics, and then it would have the names down
17  there of the residents that were assigned to come into
18  Wilmington to do the clinics.
19      Q.  Dr. Zechman, if you could just briefly look
20  back again at exhibits 44 and 45.  They are not dated,
21  but exhibit 44 has a date in the fax line at the top,
22  and that date's January, it looks like, 2005.  Do you
23  have a memory of when you sent these letters out,
24  exhibits 44 and 45, or does the fax line refresh your

Page 161

1  memory about when you sent them out?
2      A.  It would have been either late December or
3  early January because this was before I sought a lawyer.
4      Q.  Okay.  So late December --
5      A.  I was --
6      Q.  – 2004 or January 2005?
7      A.  I'm blanking on the year, but this was my last
8  ditch effort to try to get things resolved or taken
9  care of before getting legal help.
10      Q.  Okay.
11      A.  And I'm not quite sure exactly when, you know,
12  I called up the lawyer, but this was kind of my last
13  ditch effort that, you know, guys, I need help.  And I
14  also sent a letter to the CEO, and he responded as
15  well.
16      Q.  But these two letters that we are looking at,
17  44 and 45, I mean, it refers in the letter that you've
18  already gotten your right to sue letter from the EEOC.
19      A.  Yes.  Yes.
20      Q.  So we know you wrote these letters after that?
21      A.  Mm-hmm.
22      Q.  Yes?
23      A.  Yes.
24      Q.  All right.  Put those aside.

A-139

41 (Pages 158 to 161)

Zechman                                           v.                    Christiana Care Health Systems
Ellen Zechman                              C.A. # 05-159 JJF                        June 20, 2006

Page 162

1      (Discussion off the record.)
2      (Recess taken.)
3      (Zechman Deposition Exhibit 86 was marked
4   for identification.)
5   BY MR. BLOOM:
6      Q.  I'm going to show you what's been marked as
7   Zechman 86.  Have you seen this document before?
8      A.  Yes.
9      Q.  And this is a letter from your husband
10  regarding your employment at his allergy clinic?
11     A.  Mm-hmm.
12     Q.  Yes?
13     A.  Yes.
14     Q.  And it says that, as of May 2004, you have been
15  working at the clinic, is that accurate?
16     A.  No.  I have worked all along.  I became
17  compensated at that time.  Before I was not pulling a
18  salary.
19     Q.  Has your compensation been the same since May
20  2004 up to the present day?
21     A.  Yeah.
22     Q.  And can you tell me what the compensation is?
23  Is it set at a monthly amount or a biweekly amount?
24     A.  It was a bimonthly amount.

Page 163

1      Q.  Do you know what it is, whatever that adds up
2   to be?
3      A.  No, because I just literally sign it and put it
4   in the checking account.  So I don't you know.  I
5   don't really look at it.  I just sign it and goes to
6   groceries and whatever else it needs to go to.
7      Q.  Do you know how your compensation level was
8   determined?
9      A.  My husband spoke with our accountant who works
10  at a national accounting firm called Mass Mutual that
11  specializes in physicians' and dentists' offices, and
12  they came up with the salary.
13     Q.  So is it your understanding that your salary
14  was determined, at least in part, based on tax
15  reasons?
16     A.  No.  It was based on the work that I provide
17  for the clinic.
18     Q.  As of now, how many hours a week do you work at
19  the clinic?
20     A.  I don't keep track of specific hours.  So it
21  will vary.  My usual days are Mondays, Tuesdays,
22  Friday afternoons, and sometimes I go in and just do
23  some book work.  And a lot of it is just doing charts,
24  calling in prescriptions, you know, not direct patient

Page 164

1   care, but just cleaning up tasks that it takes a
2   physician's discernment to make those calls.
3      Q.  So is it fair to say that, on average, you work
4   Mondays, Tuesdays, and Friday afternoons in the
5   clinic?
6      A.  I would estimate two to three afternoons a
7   week.
8      Q.  I want to make sure I'm understanding it right.
9   Two to three afternoons per week total, or are there
10  some days that you work a whole day?
11     A.  There are times when I work a whole day, if
12  needed.  It's kind of like routinely Monday afternoon,
13  Tuesday afternoon, Friday afternoon, sometimes a
14  Thursday, sometimes a Friday.  Kind of as needed
15  basically.  I also work for a VA clinic, so I have a
16  set schedule with the VA clinic and I will rotate
17  those hours with the allergy clinic.
18     Q.  So, in a typical week, at the allergy clinic,
19  you're three afternoons a week?
20     A.  I'd say that's correct.
21     Q.  And has that been typical since you started
22  working at the clinic in May 2004?
23     A.  Since I started being compensated in May 2004.
24     Q.  And what were you doing prior to May 2004?  And

Page 165

1   I'm focussing on the period between when you left
2   Christiana Care in October 2003 and then continuing to
3   May 2004.  Were you working during that period?
4      A.  I was looking for employment.  And I would go
5   in and help in the clinic routinely, but I don't know
6   how many hours.  Less than, I would say, 20 a week.
7      Q.  That was on a volunteer basis?
8      A.  Yes.
9      Q.  Are there any other employees currently of the
10  Allergy & Asthma Clinic?
11     A.  Yes.
12     Q.  How many, can you estimate how many people work
13  there?
14     A.  Four not including Dr. Zechman.  Four office
15  personnel.
16     Q.  Four not including your husband?
17     A.  Yeah.  Not including my husband, there's four
18  ladies that are on the payroll.
19     Q.  Can you tell me what those four ladies'
20  positions are?
21     A.  Two of them are nursing assistants.  One of
22  them is the office personnel.  And the other one does
23  insurance billing and assists in the clinic, but she's
24  not like a nurse .  She doesn't have a certification

A-140

42 (Pages 162 to 165)

Zechman
Ellen Zechman

v.

C.A. # 05-159 JJF

Christiana Care Health Systems
June 20, 2006

Page 166

1  in nursing or nursing assistant.
2      Q.  Other than your husband, are you the only
3  licensed medical doctor at the clinic?
4      A.  Yes.  He is a solo practitioner as an
5  allergist.
6      Q.  How long has your husband's clinic been in
7  existence?
8      A.  September of 1994.
9      Q.  And does it have regular office hours?
10     A.  Yes.
11     Q.  What are the office hours like weekly?
12     A.  Monday through Friday, eight to five.
13     Q.  No set weekend hours?
14     A.  No.
15         (Zechman Deposition Exhibit 85 was marked
16  for identification.)
17  BY MR. BLOOM:
18     Q.  You can put that document away.
19         I'm going to hand you what's been marked
20  Zechman 85 and these are plaintiff's, meaning you,
21  answers to defendant's interrogatories.  So I want you
22  to flip through that document and let me know if
23  you've seen that document before?
24     A.  Okay.

Page 167

1      Q.  You've seen this before?
2      A.  Yes.
3      Q.  And you understand that what this document is
4  is your answers to various questions that my office
5  put in writing to ask you and your lawyers to answer
6  in writing?
7      A.  Yes.
8      Q.  And did you, in fact, provide these answers to
9  your lawyer?
10     A.  Yes.
11     Q.  And there might be some objections in some of
12  them, but when you provided factual information, did
13  you do your very best to provide complete and accurate
14  information to the best of your ability?
15     A.  To the best of my knowledge.
16     Q.  And do you recall whether you signed what's
17  called a verification page where you swore that the
18  statements in those responses are true?
19     A.  Yes, I did.
20         MR. BLOOM:  I don't think I ever got the
21  verification.  So if you could check your files or,
22  if you don't have one, execute one.
23         MS. BREWINGTON:  Okay.
24         MR. BLOOM:  Do you know from memory that

Page 168

1  there is one?
2          MS. BREWINGTON:  I wasn't here at the
3  time.  It looks like the previous attorney signed it.
4          MR. BLOOM:  Right.
5          MS. BREWINGTON:  If there isn't one, what
6  we can do is have her execute another one if it wasn't
7  done.  I don't know why it wasn't attached, but she
8  says she remembers.  I wasn't there.  Sorry.
9  BY MR. BLOOM:
10     Q.  Dr. Zechman, you remember signing a
11  verification page swearing that this is all accurate
12  to the best of your knowledge?
13     A.  To the best of my knowledge, yes.
14     Q.  And you remember physically signing something?
15     A.  Yes.
16     Q.  Saying that this was correct?
17     A.  Yes.
18     Q.  I can direct your attention to page 4 and there
19  was an interrogatory number 5 which asks about income
20  that you've earned since October 2003.  Do you see
21  that?
22     A.  Yes.
23     Q.  And one of the answers in your response is that
24  you did not receive any income of any kind between

Page 169

1  October 2003 and February 2005.  I think, from the
2  conversation we were just having, that that's a
3  mistake?
4      A.  I agree with you because this is saying May
5  2004.
6          MS. BREWINGTON:  When you say this, you're
7  pointing to —
8          THE WITNESS:  I'm pointing to the Allergy
9  & Asthma Clinic, May 2004.  These numbers came
10  directly from my accountant.
11  BY MR. BLOOM:
12     Q.  And just so we are clear, the numbers you're
13  referring to are the numbers that are in Zechman 86,
14  which is the letter from your husband's allergy
15  clinic?
16     A.  Yes.
17     Q.  Okay.
18     A.  So if this — this information would have come
19  directly from our accountant.  So that the May 2004 is
20  correct.
21     Q.  Okay.  So I just want to make sure we've got it
22  straight.  So in the interrogatory responses which
23  were prepared at an earlier date than this letter,
24  when the interrogatory response says that you didn't

A-141

Zechman
Ellen Zechman

v.
C.A. # 05-159 JJF

Christiana Care Health Systems
June 20, 2006

Page 170

1  have any income from between October 2003 to February
2  2005 because you were unable to work, that's just a
3  mistake?
4      A.  That appears to be a mistake.
5      Q.  And although the date is wrong, the next
6  sentence says that the amount of your compensation is
7  $3,000 per month at the allergy clinic.  Does that
8  sound accurate to you?
9      A.  That is an estimate.  And I believe that is
10 accurate.  I would have -- you know, this is not
11 something I know off the top of my head.  It would be
12 something that I would have to see --
13     Q.  Okay.
14     A.  -- or ask my accountant because this is not
15 something that stays with me.
16     Q.  The next sentence of your response to
17 interrogatory number 5, it says, "Beginning in May
18 2005 through the present, plaintiff receives income in
19 the amount of $8,100 per month as an independent
20 contractor for QTC Medical Services."
21         Do you know what that refers to?
22     A.  Yes.  That is a subcontractor -- I subcontract
23 and provide medical services for their VA disability
24 exams.  And so QTC is a government subcontractor that

Page 171

1  has the VA contract, and I, in turn, subcontract under
2  them and go into their office and do their exams.
3  That number is high.  It might have been accurate at
4  the time that I wrote this -- I forget when we put in
5  this information -- but I'm not making that by a long
6  shot now.
7      Q.  And is this the same thing that you referred to
8  earlier when you said you were working for a VA
9  clinic?
10     A.  Yes.  Yes.  It's a subcontract.
11     Q.  And so as part of this subcontract, you do
12 exam -- do you do actual examinations of patients?
13     A.  Physical examinations of the veterans, yes.
14     Q.  And for what purposes do you do the
15 examinations?
16     A.  It's for government documentation of their
17 claims of injury that are secondary to their military
18 service.
19     Q.  Are the examinations limited to claims relating
20 to injuries incurred during military service?
21     A.  Or related claims from prior claims.
22     Q.  And so I guess one of the things you do is to
23 make a determination of whether or not somebody is
24 disabled?

Page 172

1      A.  No.  I don't do that.  The VA disability raters
2  do that.  What I do is a physical assessment and put
3  down my findings, which would be range of motion.  My
4  arm has arthritis.  How much does it move?  That's the
5  kind of information I would be relaying to the VA.
6  They, in turn, take that information and they have
7  raters that do the rating.
8      Q.  If I'm following you right, you analyze the
9  person's physical capacity and any limitations that
10 they have?
11     A.  Yes.  Physical only.
12     Q.  All right.  And then somebody else at the VA
13 takes that medical information that you've determined
14 and decides whether it qualifies for something?
15     A.  Black hole of the VA it goes into.
16     Q.  Do I get that process generally right?
17     A.  Yes.
18     Q.  What determines the amount of work per week
19 that you do for this QTC subcontractor?  Is it up to
20 you or up to them?
21     A.  Both.  Demand, and then my hours that I'm
22 available.  It's both.
23     Q.  If you wanted to do that work full-time, could
24 you?

Page 173

1      A.  I don't know that there would be the
2  availability.  I don't know that they would have the
3  patients to keep me busy full time.
4      Q.  And since the time you left Christiana Care and
5  today, have you been employed anywhere else other than
6  the allergy clinic and QTC?
7      A.  No.  I have put in many applications, and I
8  have gotten no responses.
9      Q.  In terms of what's been your post-Christiana
10 Care mix of employment, which is a combination of QTC
11 and working at your husband's clinic is that
12 combination of employment something that you've chosen
13 purely for your purposes of maximizing your monthly
14 income, or are there other factors that go into your
15 decision to use that mix of those two jobs?
16     A.  I have not been able to find anything else.  I
17 have applied.  And this lists several of the places I
18 have applied.  And I have not been able -- I have not
19 had any offers.
20     Q.  We are going to get to that list.
21     A.  Okay.  On page 6 -- well, let me see -- no.  I
22 take that back.  Where is it listed?  Yeah.  It starts
23 on page 6.
24     Q.  All right.  Well, let's turn to that, then.

A-142

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Zechman
Ellen Zechman

v.

C.A. # 05-159 JJF

Christiana Care Health Systems
June 20, 2006

Page 174

1  Page 6 is your response to interrogatory number 7
2  which asks for everything that you've done to either
3  look for a new job or continued education which would
4  include a new residency program, right?
5  **A.  Yes.**
6    Q.  And take a minute and look at this and tell me
7  if you agree that this is complete and accurate, and
8  let me know if there's anything that needs to be
9  added.
10  **A.  That's correct.**
11    Q.  Is it complete?
12  **A.  Yes.**
13    Q.  And actually I want briefly to switch subjects
14  and ask you about when you were applying to transfer
15  into Christiana Care as a second-year resident.  Is
16  that something that -- are there typically, in your
17  experience, lots of open mid-level residency positions
18  that are out there to apply for?  Is it usually there
19  aren't that many people that leave the program in the
20  middle?
21  **A.  It's pretty rare.**
22    Q.  It was pretty rare that somebody would leave in
23  the middle of a program?
24  **A.  Yes, but it does happen.  There are usually**

Page 175

1  **openings, and they do not go through the match.  They**
2  **are like an individual application thing.  But it's --**
3  **I would say it's throughout the country.  It happens,**
4  **but it's rare.**
5    Q.  And is it any more rare or more common in North
6  Carolina than it is nationally to your understanding?
7  **A.  I would say less so in North Carolina because**
8  **North Carolina is a desirable place to live and often**
9  **fills up very quickly in the match.  And people tend**
10  **not to leave once they are in the programs.**
11    Q.  So, based on your experience, you would expect
12  to find fewer positions that become available in the
13  second or third year?
14  **A.  That's correct.**
15    Q.  Is it true that the way the process works is
16  that the match only applies when you're applying to
17  start at ground zero as a first-year within a
18  residency program?
19  **A.  Pretty much so.  There are incidents where**
20  **people do one year of internal medicine and then match**
21  **into a urology program or dermatology.  It is**
22  **specialty specific, but for the majority, it's a**
23  **ground zero thing and they very much favor immediate**
24  **graduates out of medical school.**

Page 176

1    Q.  Who favors immediate graduates out of medical
2  school?
3    **A.  The institutions.  I was told by Chapel Hill**
4  **that they will not even consider applications that are**
5  **not direct graduates from medical school.**
6    Q.  Okay.
7    **A.  So if you are not directly graduating from**
8  **medical school, they will not even look at your**
9  **application.**
10    Q.  Is it your understanding that that's common?
11  **A.  I don't know.**
12    Q.  Am I hearing from you correctly that there was
13  something of a preference within residency programs to
14  pluck people straight out of medical school?
15  **A.  I think so.**
16    Q.  Now, when you're not applying to start a new
17  residency, a new specialty, and when you want to
18  transfer from being a one-year at one school,
19  institution to a second-year at different institution,
20  is it your understanding that sort of application is
21  not done through the match?
22  **A.  That's correct.  It's get on the phone and see**
23  **what's available or start begging.**
24    Q.  Is there anyplace where you would go or have

Page 177

1  gone to look to find out about open ob/gyn residency
2  positions that you could transfer to at the level that
3  you left Christiana Care?
4  **A.  Yes.**
5    Q.  Okay.  How did you go about doing it?
6  **A.  Calling on the phone, asking if they were**
7  **accepting applications, if they anticipated any**
8  **openings, if anybody had given notice and they were**
9  **anticipating any openings, asking them would they take**
10  **my application and put it on file in case something**
11  **came open?  And I was fully declined on all phone**
12  **accounts.**
13    Q.  So when you say you were declined, you never
14  sent an application to those people because they told
15  you that they had no vacancy?
16  **A.  They weren't accepting applications was what --**
17  **you know, don't send it.  We are not accepting it.**
18    Q.  And did you call any ob/gyn residency program
19  outside of North Carolina?
20  **A.  No, I did not.**
21    Q.  Was there a reason you didn't?
22  **A.  A part of it was just such a bad experience in**
23  **Delaware.  I felt I had a better chance just staying**
24  **within home turf.**

A-143

45 (Pages 174 to 177)

Zechman                                    v.                    Christiana Care Health Systems
Ellen Zechman                      C.A. # 05-159 JJF                        June 20, 2006

Page 178

1    Q. I think you've already said this, but I want to
2  make sure I haven't left this uncovered. Although you
3  made inquiries about whether any place was accepting
4  applications in an ob/gyn program, you did not submit
5  an application to an ob/gyn program following your
6  leaving Christiana Care.
7    A. I don't think anybody would even take them.
8    Q. Did you make some additional inquiries apart
9  from ob/gyn about a new residency specialty which is
10  called family practice?
11    A. Yes, I did.
12    Q. You had not previously been part of the family
13  practice residency, right?
14    A. That is correct.
15    Q. So is that something you could then go through
16  the match for?
17    A. Yes. And I did go through the match for that.
18  And I was -- I did not match.
19    Q. I understand that there's some -- I've heard
20  the term "scramble" as something that happens after
21  the match. Have you ever heard that term before?
22    A. Yes, I have.
23    Q. What does that term mean to you?
24    A. That's where I get a list of openings that did

Page 179

1  not fill in the match. And you make phone calls to
2  try to make contact and get your application looked at
3  for one of those.
4    Q. So there are residency applicants who did not
5  match anywhere, and then there are residency programs
6  who didn't match with enough people to fill their
7  ranks and so people start calling each other?
8    A. Yes.
9    Q. Where were you actually able to obtain in one
10  place a list of unfilled positions?
11    A. I did not pursue that. I did not get the list.
12  But there were no, to my knowledge, within my area of
13  North Carolina.
14    Q. No what?
15    A. East Carolina University where I applied had
16  unmatched positions, but they had already turned me
17  down so there was no need for me to apply to them
18  again when they had turned me down on the first round.
19    Q. Okay.
20    A. And there were not any openings nearby, say,
21  within a two-hour driving distance that I applied for
22  or that I knew of.
23    Q. So you went through the match for family
24  practice. And then, when you didn't match, that was

Page 180

1  the end of it for family practice residency?
2    A. Yeah. I was pretty discouraged after all that.
3    Q. Was there a reason you limited your interest to
4  a two-hour radius from your home?
5    A. Yes.
6    Q. Okay.
7    A. When I went to Virginia and went to Delaware, I
8  had a lot of family support to do that. I lost my
9  window of opportunity to be free to travel after that
10  when my father died and my mother's life changed. She
11  was not free to help me any more. Another dear family
12  member that helped me a lot died as well from
13  pneumonia. And so my window of opportunity to travel
14  distances and leave my family in safe hands had
15  closed, and had closed by that time. I had lost my
16  window of opportunity to go wherever I could go.
17    Q. So these people what you just referred to have
18  passed away. They were helping with family
19  responsibilities with your kids when you were at
20  Christiana Care?
21    A. And in Virginia, yes.
22    Q. So this is not something that your husband
23  could have stepped in all by himself to fill that
24  void?

Page 181

1    A. No. My window of opportunity closed in my
2  life.
3    Q. When is this a point in time where that window
4  of opportunity closed?
5    A. I'm trying to come up with a date.
6        My father died last January. So that
7  would be January of 2005. But the window of
8  opportunity closed as he became sicker and my mom had
9  to redirect her efforts towards caring for him and not
10  helping out with my family. And I cannot remember the
11  exact time frame that that actually occurred, when --
12  I can't remember that.
13    Q. Is it roughly within the few months before
14  January 2005?
15    A. No. It was -- it was -- I had already come
16  home from Christiana, and it was a while. It was
17  either late 2003 or early into 2004 when those things
18  started changing where I was not free to leave the
19  state and work any more.
20    Q. And is that why, incidentally, that for a
21  period of six or seven months right after you get back
22  to North Carolina from Christiana Care where you're
23  not working a lot, is that related to what's going on
24  in your family?

A-144

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Zechman
Ellen Zechman

v.

C.A. # 05-159 JJF

Christiana Care Health Systems
June 20, 2006

Page 182

1    A. No. I did not try to work at that time when
2    I was trying to get this stuff straightened out
3    because I could not believe that this had happened to
4    me and I felt that, if I wrote letters, if I, you
5    know, pleaded to people for intervention that I would
6    be coming back here or that something was done. I
7    pleaded with Dr. Ekbladh and Patruno that — well, if
8    they don't want me here, please help me find another
9    position. And I told Ekbladh that — I said, if you
10   don't want me here, then for God's sake, help me find
11   another position. Get on the phone. Help me because
12   I don't want to give up my career.
13   Q. I think you said this before that you applied
14   to Eastern Carolina University twice, is that right?
15   A. I can't remember, but I did apply to them.
16   Q. And you applied to ECU at the time that you
17   applied to Christiana Care to transfer, right?
18   A. Yes. After my one year in Virginia because we
19   knew it was for one year. You were going to have to
20   find another place unless they had, you know, an
21   immediate opening. I applied to Christiana, Norfolk,
22   and ECU.
23   Q. I will direct your attention to paragraph 3.
24   We are still looking at the response to interrogatory

Page 183

1    number 7 of Exhibit 85. Your response to number 3
2    says you sent two letters in March 2004 and January
3    2005 to Atlantic Integrated Health, a local HMO. Do
4    you remember sending those two letters?
5    A. I sent letters asking, you know, if they were
6    accepting applications.
7    Q. So you weren't responding to a specific
8    available position that you knew of?
9    A. No. I was sending out feelers.
10   Q. Never got a response from either of those two?
11   A. No. No response from either of them.
12   Q. In paragraph 4, you say you sent an application
13   to Coastal Carolina Physicians, and it's in the same
14   months, one letter in March 2004 and another letter in
15   January 2005?
16   A. Yes. That's correct.
17   Q. And so this was the same circumstance where you
18   were not responding to a specific available position
19   but you were sending an unsolicited application?
20   A. I was saying, hey, I'm out here. You know, if
21   you need me, give me a call. I'm interested. Yes.
22   Q. So with respect to these two potential
23   employers that we just referred to, Atlantic
24   Integrated Health and Coastal Carolina Physicians, how

Page 184

1    did you identify them as places that you wanted to
2    apply to?
3    A. Because they are the major health care
4    providers in my area.
5    Q. Do you have any understanding of how many
6    physicians Atlantic Integrated Health employs?
7    A. No.
8    Q. What about for Coastal Carolina Physicians, do
9    you have a sense of how big that is?
10   A. No. But they are large groups. Well, I take
11   that back. Large for my neck of the woods. Large for
12   North Carolina is not large for Delaware or
13   Pennsylvania. So it's relative.
14   Q. That's good. I appreciate that. I mean, when
15   you say large, is it greater than 100 physicians?
16   A. Greater than ten. Our relativity here is
17   different.
18   Q. Are you reasonably confident that both of those
19   practices have fewer than 30 physicians?
20   A. Absolutely.
21   Q. In paragraph 5 you say that you sent an
22   application to an employer named Physicians East, one
23   letter in January 2004 and another letter in January
24   2005, but they were not accepting applications, is

Page 185

1    that right?
2    A. That's correct.
3    Q. And there was a reference here that you had a
4    phone conversation with a personnel administrator at
5    Physicians East. Do you remember that conversation?
6    A. I called, but I do not remember the name of
7    person I talked to or anything other than that I had
8    told them that I had sent in the application. I sent
9    the application in prior to that. And they said they
10   just weren't accepting unsolicited applications, that
11   they recruited on their own.
12   Q. It says they recruit only ACGE certified
13   physicians. What does that mean?
14   A. That's people who have finished their
15   residencies in like internal medicine, family
16   medicine, ob/gyn, that sort of thing.
17   Q. Did you ever do any search to find out and
18   identify specific positions for doctors that were
19   available?
20   A. I did frequently on the websites for both
21   federal government and state government as well as
22   submitting my application to their physicians
23   placement service, through health and human services
24   to try to connect rural physicians with groups that

A-145

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Zechman
Ellen Zechman

v.

C.A. # 05-159 JJF

Christiana Care Health Systems
June 20, 2006

Page 186

1  need a physician. I submitted my application to them,
2  and I never got any response on that.
3     Q.  It was an examination placement service run
4  through what?
5     A.  I'm not sure of the address. It was some sort
6  of division that was sent out for rural health, and it
7  was -- it was through the state of North Carolina and
8  one of their divisions, but I cannot recall who it
9  was. And you just put your application, what you're
10  looking for, what area you're looking for, what you
11  would like to do on file, and then people are supposed
12  to, you know, contact them if -- you know, to make a
13  match. And I never heard from them. And to my
14  knowledge, that application is still on their file and
15  still available for whoever would call that service.
16     Q.  Do you have any papers or documents in your
17  possession that relate to that application?
18     A.  No. No, I don't.
19     Q.  Other than what we've just gone through, is
20  there anything else that you did looking for a new job
21  that we haven't covered?
22     A.  Not that I can recall right now.
23     Q.  Any other methods of searching for jobs other
24  than what we've just gone through?

Page 187

1     A.  Not that I can recall.
2     Q.  If you'll turn to page 2, page 8. And this is
3  the response to interrogatory number 9. We are still
4  in Exhibit Zechman 85. This asks you to identify
5  figures or health care providers who provided care to
6  you. Who is Dr. Harris who you identified here?
7     A.  She is my ob/gyn doctor.
8     Q.  Does her treatment of you relate in any way to
9  this case?
10     A.  We discussed it, and we discussed the stresses
11  that I was going through secondary to this happening
12  to me. And my tremendous disappointment in not
13  finishing my ob/gyn training. She was my chief
14  resident when I was in medical school. And she is one
15  of the people that encouraged me to go into this
16  field. And she was a shining example of how I would
17  love to have been had I finished my training.
18     Q.  Other than your conversations with Dr. Harris,
19  does she have any other knowledge or involvement about
20  this case that you know of?
21     A.  No. Not that I know of.
22     Q.  What about Dr. Beth Foyle, who is that?
23     A.  She was -- she has died from breast cancer.
24  She was a trauma and general surgeon that was on staff

Page 188

1  at East Carolina University School of Medicine as one
2  of the trauma physicians but also she had a private
3  practice where she would do women's procedures for
4  breast surgery and GI surgery. And she also did GI
5  procedures, endoscopy and colonoscopy, and that's what
6  I sought her for was my endoscopy and colonoscopy.
7     Q.  And does Dr. Foyle's treatment of you have
8  anything to do with this case?
9     A.  Yes. I was having a lot of stomach problems
10  secondary to all this happening. And so we had the
11  upper and lower endoscopy, plus I was having a lot of
12  GI disturbance and I had the beginnings of an ulcer,
13  stomach ulcer secondary to this.
14     Q.  When you say GI, you mean gastrointestinal?
15     A.  A stomach ulcer.
16     Q.  You referred on here a second ago to a
17  procedure or --
18     A.  Endoscopy. That's where they use the light to
19  go peaking in to see, you know, what kind of problems
20  and take a pinch for a biopsy.
21     Q.  So that's a testing procedure?
22     A.  Yes.
23     Q.  I guess part of that is to determine whether
24  you have an ulcer?

Page 189

1     A.  That's correct.
2     Q.  Did you, in fact, have an ulcer?
3     A.  I had what they call erosions which are the
4  beginning of an ulcer.
5     Q.  In your case, did those erosions eventually
6  repair themselves?
7     A.  I think they have since then because I no
8  longer have those symptoms.
9     Q.  And you never developed an ulcer?
10     A.  That was an ulcer. Technologically an erosion
11  is an ulcer. An erosion is a breaking of the lining
12  of the stomach. Ulcer is a layman's term. Erosions
13  are a medical term where there's breaking in the --
14  erosion of the epithelial lining of the stomach.
15     Q.  If I'm understanding you right, in layman's
16  terms, we use the word "ulcer" that covers the more
17  severe kind of erosion. Like, in layman's terms, we
18  wouldn't refer to all erosions as ulcers is what I'm
19  hearing you say.
20     A.  You would. Any erosion, any sore would be
21  considered, I think, ulcer, whereas --
22     Q.  To a doctor you mean?
23     A.  No. To a layman. Ulcer would be -- any kind
24  of sore in the stomach would a be an ulcer unless it

A-146

48 (Pages 186 to 189)

Zechman
Ellen Zechman

v.

C.A. # 05-159 JJF

Christiana Care Health Systems
June 20, 2006

Page 190

1 was a cancer, if it was one of these erosions.
2 Whereas a -- you have different grades of, you know,
3 depth and pathological descriptions of how deep, how
4 wide, you know. It's a pathology thing.
5    Q. When did dr. Foyle pass away, do you recall?
6    A. I'm trying to think. It was -- I've got her
7 obituary note at my desk in work. I'm trying to
8 think. I think it was last year. It was not that
9 long ago.
10    Q. Sometime in 2005, do you think?
11    A. Yeah. Early 2005.
12    Q. And if you will turn to page 10, still on
13 Exhibit 85, there's a reference here that you had gone
14 to Christiana Care's employee health services
15 department. Does that relate to anything other than
16 the hospitalization that you referred to earlier?
17    A. There were -- there was another event where I
18 had a rash. And it did not result in hospitalization,
19 that I went to the employee health service.
20    Q. Did you ever sign a release and request records
21 from employee health services?
22    A. Yes, I did.
23    Q. When did that happen?
24    A. I think about a year ago, and they refused to

Page 191

1 give me those records.
2    Q. Did you speak to anybody there?
3    A. I sent a fax, and I had our office manager
4 call.
5    Q. Okay.
6    A. And they would -- she had the signed release
7 form. And she was told that they were put away in
8 storage and they could not get them for her.
9    Q. Do you know who she spoke to?
10    A. She would know. I think we have it documented
11 somewhere, but I don't -- don't know it off the top of
12 my head.
13    Q. What's the name of the office manager who made
14 this call for you?
15    A. Theresa Benton.
16    Q. Is she still employed in the allergy clinic?
17    A. Yes.
18    Q. During your residency at Christiana Care, you
19 would go back to North Carolina to see Dr. Frasier
20 when you needed treatment or examination relating to
21 your mixed connective tissue disorder, is that true?
22    A. That's correct.
23    Q. And there were periods when you were going back
24 to see him frequently, is that true?

Page 192

1    A. That's relative to what you call frequently.
2    Q. Fair enough. Is there a reason why you didn't
3 see anybody who was at Christiana Care or just closer
4 to where you were spending most of your time?
5    A. Yes. Dr. Frasier has been my doctor for in
6 excess of ten years and is an expert on the subject.
7 He trained at NIH. And I felt I would get the best
8 care from a doctor that had been following me all
9 these years and knew me than having to change to a
10 doctor that had no clue of my condition. And because
11 of the high specialty of this condition, I just felt
12 that I would get better care sticking with a doctor
13 that had been treating me since 1995.
14    Q. Now, am I right that there's not a lot that can
15 actually be done to treat your mixed connective tissue
16 disorder, am I right about that?
17    A. It's a case of treating the symptoms, and then,
18 often, if you just need rest, just resting. But it's
19 not going to go away. It goes into remission and you
20 have flare ups and you treat whatever is the
21 presenting issue with the flare-up.
22    Q. Right. And I think you said before, the
23 flare-ups just happen unpredictably and not at regular
24 intervals?

Page 193

1    A. That's right. It does not run a schedule. It
2 does its own thing. And stress does have a factor in
3 a flare-up, yes.
4    Q. And so one of the things that would be a
5 response to a flare-up you mentioned was rest, right?
6    A. That's correct.
7    Q. And another one would be medications of some
8 kind?
9    A. That's correct.
10    Q. What kind of medications have been effective in
11 treating your flare-ups?
12    A. Ibuprofen, the old over-the-counter ibuprofen.
13 Prednisone. Different arthritis medications have been
14 used mostly -- both ones that have been taken off the
15 market for other problems, Vioxx, Bextra. These have
16 been used. And it was all on an as-needed basis. You
17 know, when you have a flare up, you know, you do this.
18 You take the Prednisone. Providium is one of the
19 drugs that is used for the episodes of fatigue. That
20 sort of stuff.
21    Q. Is there with respect to the Prednisone, is
22 there any reason why you would be reluctant to take
23 that while you were working as a resident, or is that
24 okay to take on an as-needed basis while you were

A-147

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Zechman
Ellen Zechman

v.

C.A. # 05-159 JJF

Christiana Care Health Systems
June 20, 2006

Page 194

1 working at Christiana Care?
2    A.  It's an individual thing.  It has lots of side
3 effects.  And so no one would want to take any more
4 than they absolutely have to.  But it is not -- I
5 mean, asthmatics take it every day.  People with lupus
6 take it every day.  And it's very -- it's very
7 individual as to your benefits versus your side
8 effects, as to when you take it, and how much you
9 should take, and that's a decision only a patient and
10 a doctor may make on a, you know, individual basis.
11    Q.  What's your experience with Prednisone, is it
12 effective for you?
13    A.  For certain problems, it is.
14    Q.  For which problems?
15    A.  When I'm having a severe joint pain, if I'm
16 having a flare-up of just hives, rash, mouth sores,
17 that are all part of this connective tissue, it will
18 help at those times.  Other times it doesn't do any
19 good.  I can take it, and it just doesn't do any good.
20 So it's kind of a hit-and-miss thing.
21    Q.  Did it cause -- it meaning Prednisone -- cause
22 any side effects with you that made you reluctant to
23 take it sometimes?
24    A.  That's dose dependent, and so, when I have had

Page 195

1 to take higher doses, it made me very hyper and also
2 made me sick to my stomach where I'd be throwing up.
3 Low doses, I tolerate it very well, but then, at low
4 doses, sometimes it has no effect on what we are
5 treating.  But the nausea and vomiting is one of the
6 worst side effects that bother me when I get into
7 higher doses.  It just really tears up my GI system.
8    Q.  When you're having a severe flare-up of the
9 connective tissue disorder, is there a particular
10 medication that you consider a medication that would
11 be the one you would look to when you are having a
12 severe flare-up?
13    A.  The best thing to do is just go to bed.  That's
14 what I do.  I just go to bed.
15    Q.  And if you go to bed, is it with the hope that
16 you will wake up in the morning and it will be over?
17    A.  No.  Rest.  Sometimes rest for -- you know,
18 just a light schedule, and frequent -- and just rest
19 makes it better.  And sometimes it's a week.
20 Sometimes it two weeks.  Sometimes it's the next day.
21 This is very hit and miss.
22        (Zechman Deposition Exhibit 87 was marked
23 for identification.)
24

Page 196

1 BY MR. BLOOM:
2    Q.  I want you to identify a couple of documents
3 for me.  I'm going to put in front you what's marked
4 Zechman 87.  My understanding is that these are
5 several documents and agreements that relate to your
6 the work that you do for QTC Medical Group which is
7 the Veterans Administration subcontractor.  Do I have
8 that right?
9    A.  That's correct.
10    Q.  How did you get this job?
11    A.  I got it by word of mouth.  One of the old
12 retired docs in town that knows me and loves me told
13 me that he did this and they needed somebody.  So why
14 don't I go talk to them?
15    Q.  Do you know whether you're paid by the
16 examination or you're paid by time or --
17    A.  By the examination.
18    Q.  And do you have any sense of if, on a given
19 day, you're doing examinations for a full workday, how
20 many examinations would that entail?
21    A.  That would entail eight or nine examinations,
22 but they can be of varying intensity or you know, they
23 are not all going to be equal.  They can be like a
24 small examination that you only get $30 for, a large

Page 197

1 examination that you might get paid $100 for.  But
2 this is very low pay for what you do.  And then you
3 dictate 10- to 20-page reports after this.  So
4 whatever time I spend seeing patients, an equal if not
5 more time is spent sitting in a corner just doing the
6 exhaustive medical government reports.
7    Q.  By the way, when you were travelling back and
8 forth between Christiana Care, does the drive
9 exacerbate your mixed connective tissue disorder at
10 all like if you're sitting in a car for six or eight
11 hours, whatever it takes?
12    A.  No.  It did not seem to affect that.  I mean,
13 it was either aching and I drove anyway or it wasn't
14 aching.  I mean it had no effect on what was going on.
15    Q.  In your experience, is that something that
16 could have an effect but just didn't in your case?
17    A.  I don't know.  My main thing was the fatigue,
18 and when I was fatigued, I didn't drive.  And I would
19 have family come up in the motor home.
20        (Zechman Deposition Exhibit 88 was marked
21 for identification.)
22 BY MR. BLOOM:
23    Q.  I'm going to show you Zechman 88.  And this
24 looks to go at least a par they will payment print-out

A-148

50 (Pages 194 to 197)

Zechman                                v.                    Christiana Care Health Systems
Ellen Zechman                  C.A. # 05-159 JJF                          June 20, 2006

Page 198

1  of payments you received from QTC, is that right?
2  A.  That's correct.
3  Q.  Is it your understanding that, regardless of
4  the number of examinations you do, that QTC pays you
5  on a biweekly basis?
6  A.  That's correct.  And if you didn't do any
7  patients within that time period, you just don't get a
8  check.
9  Q.  So if you did one for a two-week period, you
10  get a check covering one?
11  A.  That's correct.
12  Q.  And the first entry in Zechman 88 is the
13  paycheck date of May 8, 2005.  Do I have that right?
14  A.  That looks correct.
15  Q.  And from the previous exhibit we were just
16  looking at, which was Zechman 87, you had signed the
17  contract with QTC in February 2005, right?
18  A.  That's correct.
19  Q.  Is there a period of time where you were doing
20  examinations that is not necessarily reflected in
21  Zechman 88, meaning the time between February and May
22  of 2005?
23  A.  There is a delay in payment.  So whatever check
24  that you get paid for were the patients you saw

Page 199

1  earlier.
2  Q.  Are you telling me that May 8, 2005, you think
3  is the first date on which you were paid by QTC?
4  A.  Possibly, yeah.
5  Q.  Are you confident of that or are you not sure?
6  A.  Not sure.
7       (Zechman Deposition Exhibit 89 was marked
8  for identification.)
9  BY MR. BLOOM:
10  Q.  All right.  You can put Zechman 88 away.
11       I'm showing you Zechman 89 and would you
12  just confirm for me that this is your W-2 from
13  Christiana Care from 2003?
14  A.  That's correct.
15       (Zechman Deposition Exhibit 90 was marked
16  for identification.)
17  BY MR. BLOOM:
18  Q.  You can put that away.
19       And next I'm going to hand you Exhibit
20  Zechman 90.  Would you please confirm for me that that
21  is your W-2 from the allergy clinic run by your
22  husband James for the year 2004?
23  A.  That's correct.
24       (Zechman Deposition Exhibit 91 was marked

Page 200

1  for identification.)
2  BY MR. BLOOM:
3  Q.  Zechman 91, which I'm handing you, would you
4  please just confirm is the W-2 for 2005 for the
5  allergy clinic for you?
6  A.  That looks correct.
7  Q.  Dr. Zechman, I'm going to refer you back to the
8  document which is right in front of you, Zechman 85,
9  which is your interrogatory responsibilities, if you
10  would turn to page 6 and let me know when you're
11  there.
12  A.  I'm there.
13  Q.  And I think you testified earlier, but I want
14  to confirm that, when you applied for a family
15  medicine residency as a first-year resident, that the
16  two that you applied for or tried to match with were
17  Eastern Carolina University and University of North
18  Carolina, Chapel Hill.
19  A.  What page was that again?
20  Q.  It has page 6 at the bottom, and this is the
21  response to interrogatory number 7.
22  A.  Okay.
23       I don't think I actually got a chance to
24  apply to North Carolina because they did not take

Page 201

1  people that were not straight out of residency.  I
2  called them to see if there was any openings, but I
3  cannot recall whether I actually was able to get an
4  application in front of them.  I don't remember.
5  Q.  I think you said before that, for ECU, Eastern
6  Carolina University, that you were declined by them in
7  the family practice program through the match program?
8  A.  Yes.
9  Q.  Do you remember whether at this time, which is
10  after you left Christiana Care, whether you applied
11  for family practice residency anywhere other than
12  Eastern Carolina?
13  A.  I did not apply through the match, but I made
14  phone contact with the various different places and
15  they were not accepting applications or did not have
16  any openings.
17  Q.  This is the scramble period that we talked
18  about before?
19  A.  I cannot remember the exact period that it was
20  done in.  With the scramble, that is pretty much
21  limited to people that have been registered in the
22  match.  So I don't recall having the list for the
23  scramble.  But I did call later on requesting to see
24  if programs had filled, if they had any openings, and

A-149

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Zechman                                    v.                    Christiana Care Health Systems
Ellen Zechman                        C.A. # 05-159 JJF                        June 20, 2006

Page 202

1  even did that later on in the year in case somebody
2  didn't show up for their position, which happens.
3  Somebody gets pregnant and can't make it, and so they
4  say, well, I'll come next year. And I did follow up,
5  calling to see if there might have been an opening,
6  you know, just something going wrong later on in the
7  year.
8      Q.  After learning that ECU had not matched with
9  you for family practice -- and I think you said
10  earlier, at that point you saw that they had had an
11  opening but that there was no point in pursuing it
12  because you had already failed to match?
13      A.  Right. And I had already called them about it
14  as well.
15      Q.  Do you remember that phone conversation?
16      A.  Some of it. And I asked them, you know, you've
17  got -- you didn't fill. Why am I not on there? And
18  he told me he did not even list me in the match.
19      Q.  Did he say anything else?
20      A.  He said that they had called Christiana and
21  talked to one of the chief residents and they had
22  given a poor recommendation and that is why they did
23  not even list me in the match.
24      Q.  I've seen a reference in some of your letters

Page 203

1  to a man named Dean Patton, P-a-t-t-o-n.  Is that the
2  person you had the conversation with?
3      A.  He is one of them.  I had the conversation with
4  a couple people.  He is one of them that I did -- I
5  cannot remember whether I spoke to him directly or
6  whether the other person I was talking to said that
7  Dr. Patton had said.  I can't remember the
8  conversation.  I'm getting things scrambled here.  I
9  can't remember it.
10      Q.  Does that seem unusual to you that a residency
11  program or any institution would actually respond to a
12  question like that, asking them why they didn't match
13  with you? Were you surprised that they answered?
14      A.  No.  Because these are the people that
15  graduated me from medical school, so there was already
16  a rapport there.  You know, I was one of them.  Why
17  were they not giving me a position?
18      Q.  ECU, you mean?
19      A.  Yes.  That's where I graduated from medical
20  school.
21      Q.  And so you already had some rapport and
22  relationship with ECU?
23      A.  Yes.
24      Q.  What about with Dean Patton personally?

Page 204

1      A.  Personally?
2      Q.  What was Dean Patton's position at ECU?
3      A.  I don't -- I'm blanking.  I don't know whether
4  he was the chairman of the department --
5      Q.  When you say --
6      A.  -- of family medicine or exactly what his --
7  but he was -- now, he used to be the residency
8  director himself back when I was in medical school and
9  I worked directly with him as a medical student, and
10  he was in a supervisory position.  But it was more,
11  you know, higher up.  He was not directly, you know,
12  involved with the residents at that time when this
13  conversation occurred.
14      Q.  This most recent time you applied to ECU to the
15  family practice resident program, do you believe that
16  there -- that ECU's decision not to accept you into
17  that position was based on discrimination or
18  retaliation of any kind?
19      A.  Are you referring to --
20      Q.  I'm just asking very generally if you think
21  anybody at ECU discriminated against you or denied you
22  that position for some improper reason?
23      A.  Family medicine position?
24      Q.  Yeah.

Page 205

1      A.  No.  I think it was directly related to what
2  was said about me when they called since I had not
3  finished my program here.  And they called to get the
4  scoop on it.  It was directly related to whatever
5  whoever they talked to told them.
6      Q.  And I take it your knowledge of that is based
7  simply upon what Dr. Patton or Mr. Patton or somebody
8  else at ECU told you about it?
9      A.  That's correct.
10      Q.  And --
11      A.  It was a poor recommendation when they
12  contacted the chief residents at Christiana Care.
13      Q.  And you don't know who it was that they spoke
14  to?
15      A.  He would not give the name.  He says he must
16  keep it confidential.
17      Q.  And do you recall the month and the year you
18  had this conversation with Mr. Patton?
19      A.  No, I don't.
20      Q.  And --
21      A.  But it --
22      Q.  I'm sorry.
23      A.  Can I add something?
24          But it was within a time frame of the

A-150

52 (Pages 202 to 205)

Zechman                                          v.                    Christiana Care Health Systems
Ellen Zechman                                        C.A. # 05-159 JJF              June 20, 2006

Page 206

1    match when I found out the match results. It would
2    have been closely, meaning closely, a week or two
3    weeks, related to whenever that information came
4    through.
5        Q.  And you had previously applied to the ob/gyn
6    residency program at ECU in the same year that you
7    applied to Christiana Care, right?
8        A.  That's correct.
9        Q.  And you were not accepted by ECU then?
10       A.  That's correct.
11       Q.  And do you have any understanding why you were
12   not accepted to the ECU ob/gyn program back in 2002?
13       A.  There was a lot of questions during my
14   interview process with the residents because the
15   residents do the majority of the interviewing for
16   residency positions of why do you want to do this?
17   You've got children at home? You don't want to be
18   doing this. Your husband's a doctor. Why do you want
19   to do this? Why don't you stay home with your
20   children?
21           It was a repeated theme because they knew
22   me, they knew my husband. My husband used to be on
23   staff there as an allergist. They knew I had my
24   children and they knew about my mixed connective

Page 207

1    tissue disease because I had been diagnosed at that
2    hospital and treated at that hospital as well as it
3    was an issue during my pregnancies with the last two
4    children that I had at that hospital where they had
5    privilege to all -- my understanding -- in the labor
6    and delivery suites.
7        Q.  Did you sue ECU for discrimination?
8        A.  I began a complaint on them, but I did not
9    follow through on it.
10       Q.  What does that mean, you did not follow through
11   on it?
12       A.  I did file a complaint. I did seek a lawyer's
13   advice on it. But I did not continue it because I had
14   gotten the position at Virginia and I had
15   accomplished -- you know, I didn't feel I needed to
16   pursue it because I was okay. I had, you know, a
17   position and I was continuing, you know, my training.
18   So it was -- you know, it was like I don't want to
19   deal with this.
20       Q.  So the employment decision that we are talking
21   about at ECU and the ob/gyn program, you were applying
22   for that position at the same time that you were
23   applying to Norfolk and Christiana, right?
24       A.  That's correct.

Page 208

1        Q.  Did you learn the result of those three
2    applications at approximately the same time?
3        A.  I cannot recall because they were not with the
4    match and I cannot recall the time period of that, you
5    know, who I talked to and when. I don't remember
6    that.
7        Q.  But it wasn't like a year later?
8        A.  I can't remember. I don't think it was.
9        Q.  The first step of the complaint that you
10   referred to is EEOC, did you file a compliant with
11   EEOC or some other agency?
12       A.  I cannot remember. I honestly do not remember.
13       Q.  And did there come a point when you actually
14   filed a lawsuit in court?
15       A.  I cannot remember. I remember I did talk to a
16   lawyer about it. I cannot remember exactly what we
17   did.
18       Q.  Have you sued anybody else for discrimination
19   other than ECU and Christiana Care?
20           MS. BREWINGTON: I'm going to object. She
21   hasn't testified that she sued ECU.
22       Q.  Have you sued anybody else for discrimination?
23       A.  I didn't sue them.
24       Q.  You did not. I want to make sure I have this.

Page 209

1    You're testifying today that you did not file a
2    lawsuit against Eastern Carolina University in
3    connection with their rejection of your residency
4    application in the ob/gyn program?
5            MS. BREWINGTON: I'm going to object
6    because it mischaracterizes her testimony, but she can
7    answer.
8            You can answer if you understand the
9    question.
10       Q.  It's a very simple question. Did you or did
11   you not sue E --
12       A.  I filed.
13       Q.  Wait a minute. I'm sorry. I don't want us to
14   talk over each other.
15           Did you or did you not file a lawsuit
16   against ECU?
17       A.  I filed a complaint. I contacted a lawyer.
18       Q.  Do you know where the complaint was filed?
19       A.  No. I cannot remember that. The lawyer
20   handled it, and I was doing other things. So I cannot
21   remember what we did and at what point we quit. And
22   no longer pursued it. I do not remember. Was this --
23   I turned that over to the lawyer.
24           MS. BREWINGTON: Allow him to finish his

A-151

53 (Pages 206 to 209)

Zechman
Ellen Zechman

v.

C.A. # 05-159 JJF

Christiana Care Health Systems
June 20, 2006

Page 210

1  question and then have you answer because I — okay.
2    Q.  Were you don't with your answer?  What was the
3  answer, by the way?
4    **A.  I'm not sure because I lost my train of**
5  **thought.**
6        MS. BREWINGTON:  I interrupted.  You were
7  talking and she started.
8        MR. BLOOM:  Good job, Lori.  I'm sure that
9  was accidental.
10  BY MR. BLOOM:
11    Q.  You did file a complaint against ECU with
12  respect to their decision not to accept you to the
13  ob/gyn program?
14    **A.  With respect to how they handled my interviews.**
15    Q.  And because you thought the way they handled
16  the process was discriminatory based on your age,
17  right?
18    **A.  And my disability.**
19    Q.  So it was discrimination based on your
20  disability and your age?
21    **A.  That's correct.**
22    Q.  And do you remember whether this complaint that
23  you filed against ECU, was still active by the time
24  you actually started as a resident at Christiana Care?

Page 211

1    **A.  I cannot remember.**
2    Q.  Did there come a time where you settled that
3  case for money?
4    **A.  No.  It never went through.**
5    Q.  You're sure?
6    **A.  We did not pursue it.**
7    Q.  What does that mean to you?  When you tell me
8  that you filed a complaint, you know, that starts
9  something.  What does it mean to you when you tell me
10  you didn't pursue it because something needs to happen
11  to begin it to end it?
12    **A.  I don't know what the lawyer did, but we -- we**
13  **just, I guess, dropped it because I said I don't want**
14  **to deal with this.  You know, I was happy.  I had, you**
15  **know, something else going on.  I had a residency**
16  **position.  I didn't deal with it.**
17    Q.  So you don't have any memory of entering into a
18  settlement of that dispute?
19    **A.  There was no settlement.  It was dropped.**
20        MR. BLOOM:  This is a good place to take
21  like a five-minute break, and then I'll wrap up and I
22  won't keep us here very long.
23        (Discussion off the record.)
24        MR. BLOOM:  As long as we are all

Page 212

1  understood that this is going to be recessed and
2  continued at some point — I mean, I think we all
3  understand that, but I just —
4        MS. BREWINGTON:  With the hope that we can
5  continue from this point forward, right?  We won't
6  have to rehash all the previous documents?
7        MR. BLOOM:  I do not anticipate redoing
8  portions of the deposition that I've already done.
9        MS. BREWINGTON:  Thank you.
10        (Discussion off the record.)
11        (Recess taken.)
12  BY MR. BLOOM:
13    Q.  Dr. Zechman, given what you just testified to
14  about how you believed you were mistreated and
15  discriminated against by ECU in connection with your
16  application to the ob/gyn residency program, is there
17  a particular reason why, after that experience, you
18  applied to the same institution after you left
19  Christiana Care?
20    **A.  It was a different department.  It was**
21  **different people.**
22    Q.  Which department is Dean Patton in again?
23    **A.  Family medicine.**
24    Q.  And I take it that, when you heard from ECU

Page 213

1  about the family practice residency program, all you
2  got was notification that you had failed to match, is
3  that true?
4    **A.  That's correct.  And that's when I called them**
5  **because I knew they had not filled.  And so I wanted**
6  **to know what's going on here.**
7    Q.  And do you have any knowledge one way or the
8  other about whether Dean Patton or anybody else in the
9  family medicine group had spoken to or learned about
10  the allegations you just mentioned before with respect
11  to the ob/gyn group?
12    **A.  The complaint.**
13    Q.  What do you mean?
14    **A.  The complaint concerning the ob/gyn group.**
15    Q.  I want to make sure I'm understanding you.  Are
16  you saying that Dean Patton was aware of that
17  complaint?
18    **A.  No.  I'm trying to see if that is what you are**
19  **asking me.**
20    Q.  Yes.  Yes, it is.
21    **A.  Okay.  I have no idea.**
22    Q.  Do you have any knowledge one way or the other
23  about whether Dean Patton or anybody else in the
24  family practice program had knowledge of your

A-152

54 (Pages 210 to 213)

Zechman                                                              v.                    Christiana Care Health Systems
Ellen Zechman                                              C.A. # 05-159 JJF                              June 20, 2006

Page 214

1  dissatisfaction with how you were treated by the
2  ob/gyn group?
3      A.  I have no knowledge of any of that.
4      Q.  So the people in the family practice group may
5  have known about that prior issue or they may not
6  have?
7      A.  I have no idea.
8      Q.  Do you know who Robert Minnihan is, do you know
9  that name?
10     A.  Yes, I do.
11     Q.  Who is that?
12     A.  He's an economic specialist that specializes in
13  incomes and does like an economic evaluations.
14     Q.  And you understand that he's somebody who may
15  testify about your damages in this case?
16     A.  That's correct, yes.
17     Q.  Have you had any conversations with him?
18     A.  Yes.  I asked him to do an evaluation of
19  economic damages.
20     Q.  Have you personally spoken to him on the phone?
21     A.  Yes, I have.
22     Q.  More than once?
23     A.  Maybe twice.
24     Q.  You referred earlier to CREOG scores?

Page 215

1      A.  That's correct.
2      Q.  What is the CREOG test and what are the scores?
3      A.  Okay.  Let me -- can I use a pen and I'll --
4      Q.  Wait a second.  If you're going to draw
5  something, let's give you a clean sheet of paper at
6  the very least.
7      A.  That's how you spell CREOG is that correct.
8      Q.  C-R-E-O-G?
9      A.  Council for Resident Education in Obstetrics
10  and Gynecology.  That's what that is.  I had to write
11  it out to get it.
12     Q.  And how frequently does a resident take the
13  CREOG test?
14     A.  Once a year.
15     Q.  And is it in January?
16     A.  Yes.
17     Q.  For what purpose are CREOG test scores used
18  with respect to residents?
19     A.  They are supposed to be uses in order to
20  evaluate the teaching categories of the program
21  itself, to give the Council of Resident Education in
22  Obstetrics and Gynecology an indication that this
23  program is teaching what it should be teaching and to
24  make adjustments in their program when residents are

Page 216

1  not getting taught enough in a particular area.  It is
2  to identify weaknesses in the program's teaching, not
3  identify weaknesses in the individual residents?
4      Q.  I take it that the individual residents, those
5  scores are ranked nationally, correct?
6      A.  That's correct.  It is a national exam that all
7  residents in obstetrics and gynecology are required to
8  take each year that they are in training.
9      Q.  The CREOG test, to your understanding, is
10  specific to ob/gyn?
11     A.  That's correct.  Now, they might have a
12  different test each year because they draw it out of
13  the some sort of data bank and they say, these are the
14  tests we are giving this year.  And they'd be
15  different from the ones over five or six years.  But
16  they are supposed to be national where everybody in
17  the country has taken questions that were similar or
18  from the same database at that particular year for
19  these residents.
20     Q.  And when the scores of the residents are ranked
21  nationally, is that so you compare all second-year
22  ob/gyn residents to the scores of over second-year
23  ob/gyn residents nationally?  Is that how that works?
24     A.  They have two scores on their report that they

Page 217

1  sent to us.  One is your score of how you rank
2  compared to everybody that took the test.  And then
3  there's a second that's year specific, how you ranked
4  against everybody in your year.  And these are the
5  numbers that come back from there and they are
6  specifically on a piece of paper that comes from the
7  council.
8      Q.  So is it true, then, that in a particular year,
9  for example, 2003, that every ob/gyn resident in the
10  country actually takes the same CREOG exam?
11     A.  I don't know.  I don't know whether it's the
12  same exam exactly or whether it's different form, like
13  different questions within the same category, you
14  know, like we are going to give them five questions in
15  this category, you know, and five in that, the actual
16  questions themselves being different, or whether it's
17  a blanket test.  I have no clue.
18     Q.  And I think you mentioned earlier that you
19  think that the purpose of the CREOG test is to measure
20  the teaching performance of the program, correct?
21     A.  That's correct.
22     Q.  Would you also agree that, at least at
23  Christiana Care, in your experience, the CREOG test
24  scores are also used as a basis for evaluating how the

A-153

Zechman                                          v.                    Christiana Care Health Systems
Ellen Zechman                            C.A. # 05-159 JJF                          June 20, 2006

Page 218

1  resident is doing?
2      A.  The program gets rated by the council on these
3  scores as to how good a program they are and their
4  performance. And in turn, Christiana's department of
5  ob/gyn has pressured the residents into performing
6  well on the exam in order not to reflect poorly on
7  them because it's crucial to their certification.
8      Q.  But I mean, you would agree, wouldn't you, that
9  a big part of what goes into a resident's CREOG score
10  is the resident as well, right?
11      A.  It's both the resident and the teaching
12  opportunities. It is both.
13      Q.  Is it true that, at least in your experience at
14  Christiana Care, that the CREOG test scores are used
15  as something of a proxy for how you're progressing in
16  terms of knowledge base, medical knowledge base?
17      A.  Yes. Christiana does do that. Other
18  residencies do not.
19      Q.  Is it your testimony that Christiana Care is
20  unique in that regard or that just different programs
21  put different emphasis on CREOG scores?
22      A.  I don't know. I posed that question to the
23  College of Graduate Medical Education and did not get
24  an answer back from them. But I posed that specific

Page 219

1  question because I was unsure and the literature that
2  I read, I could not decipher that from. And I
3  e-mailed the council and never got an e-mail back from
4  them. They never answered that question.
5      Q.  But for Christiana Care, based on your
6  experience, they do track the ob/gyn residents on the
7  CREOG scores?
8      A.  Yes.
9      Q.  It was a point of attention by the faculty?
10      A.  Attention and contention.
11      Q.  What do you mean by that?
12      A.  That was the remark with Patruno that, if I did
13  not do well on the CREOG exams, that the knives in my
14  back would be knives in my head.
15      Q.  Were there other people at Christiana Care who
16  thought, so far as you know, that there were other
17  factors that are more important than CREOG scores in
18  evaluating residents?
19      A.  Yes, there were.
20      Q.  And what are some of the factors that might be
21  equally or more important than CREOG scores?
22      A.  Patient care, performance, and just patient
23  care skills, and surgical skills, and a person's
24  rapport with the patient.

Page 220

1      Q.  And is surgical skills — I gather that a
2  significant component of that is just physical
3  dexterity?
4      A.  Physical dexterity and just doing it enough to
5  learn how to do it. You know, experience. Getting in
6  the OR, do it until you can do it.
7      Q.  Was there anybody other than Dr. Robyn Gray who
8  you believe was improperly reassigning you out of
9  surgical experiences?
10      A.  There were other incidents, but she, by far,
11  had the majority of the incidents.
12          MR. BLOOM:  This will be my last document
13  and then we'll wrap it up.
14          THE WITNESS:  It's after five.
15          MR. BLOOM:  Do you want to stop now? I
16  mean, we are sort of at the end of a topic, so...
17          THE WITNESS:  Let's finish. We need to be
18  considerate of these other people here.
19          MS. BREWINGTON:  I'd like you to have
20  sufficient time to do what you need to do. Honestly,
21  if you'd like to continue, that is fine.
22          MR. BLOOM:  Let's do one last document and
23  then we'll be out of here.
24          (Zechman Deposition Exhibit 24 was marked

Page 221

1  for identification.)
2  BY MR. BLOOM:
3      Q.  I'm putting in front of you what's been mark at
4  Zechman 24. And this is a March 11, 2003, letter from
5  Dr. Sciscione to you, right?
6      A.  That's correct.
7      Q.  And first of all, in the first paragraph, he
8  reports your percentile score in your 2003 CREOG
9  scores was in the 12th percentile. Do you agree that
10  that's what that first paragraph says?
11      A.  I agree that that is what is on this paper.
12      Q.  Did you ever have a conversation with
13  Dr. Sciscione about what's said in that paragraph?
14      A.  We did because I did not know where he was
15  calculating this 12th percentile. That was not on the
16  papers that came in from CREOG, and it was some sort
17  of calculation that he did himself, and I could --
18  never did understand how they were doing that
19  calculation because it was not something that came on
20  the sheet from the council. It was something that was
21  calculated by him.
22      Q.  How do you know that it was calculated by him?
23      A.  I saw him calculating it on his calculator.
24      Q.  He did it in your presence?

A-154

56 (Pages 218 to 221)

Zechman
Ellen Zechman

v.

C.A. # 05-159 JJF

Christiana Care Health Systems
June 20, 2006

Page 222

1   A.  Yes.

2   Q.  And he did that -- did he do that in your

3   presence before he gave you this letter?

4   A.  I don't know.

5   Q.  So he might have given you this letter and then

6   you were sitting down with him and he says, here, I'll

7   show you how I calculated it?

8   A.  He didn't show me.  He just did it in front of

9   me.

10  Q.  Oh, all right.

11  A.  Because I asked him, where did that come from?

12  It was not on my official papers from the CREOG with

13  my exam scores.

14  Q.  What they sent to you?

15  A.  Yes.

16  Q.  But you would expect that the residency program

17  is getting some information from CREOG that allows

18  them to compare their program's performances compared

19  to others, right?  Because I think you said that

20  that's what you think is the main purpose of the exam?

21        MS. BREWINGTON:  Objection.  Calls for

22  speculation.  You may answer.

23  A.  It calls -- that's speculation, but it is

24  possible that this was within the Christiana people

Page 223

1   itself because it was not part of the national test

2   scores.  So it could have been a percentage that was

3   within either my classmates or the department itself,

4   but it was not -- that number was not a part of the

5   national report.

6   Q.  Oh, I see.  So one of the possibilities that

7   you just referred to was that it might be a comparison

8   of you to all of the second-year residents throughout

9   Christiana Care?

10  A.  No.  Only the ob/gyns because the other

11  residents didn't take this test.

12  Q.  Right.

13  A.  Only ob/gyns take this test, and I don't know

14  whether that number is from just comparing the 16

15  students that were the ob/gyn residents or whether it

16  was a comparison with the four in my class.  But it

17  was not part of the national report.

18  Q.  You would agree with me that if it was just the

19  four in your class, you could not possibly be in the

20  12th percentile, correct?

21  A.  I don't know.  I didn't see the rest of their

22  scores.

23        MR. BLOOM:  We'll adjourn for the day and

24  go off the record.

Page 224

1        (Discussion off the record.)

2        (Deposition adjourned at approximately

3   5:10 p.m.)

4

5        ----

6

7        INDEX TO TESTIMONY

8

9   ELLEN ZECHMAN                        PAGE

10     Examination by Mr. Bloom            2

11

12        ----

13

14        INDEX TO EXHIBITS

15   ZECHMAN DEPOSITION EXHIBIT NO.            PAGE

16   1   ERAS Common Application Form          8

17   2   Letter of recommendation             39

18   3   Recommendation dated December 5, 2000,
         prepared by Dr. Samuel Atkinson       41

19   12  Document sent in support of charge of
         discrimination                        50

20   13  Letter dated July 20, 2004            52

21

22   51  Agreement with Christiana Care for
         July 2003 through June 2004           57

23   52  Agreement with Christiana Care for
         July 2002 through June 2003           57

24

Page 225

1        INDEX TO EXHIBITS  (Cont'd)

2   ZECHMAN DEPOSITION EXHIBIT NO.            PAGE

3   53  Job Specification for Intern/Resident  59

4   10  Letter sent to the EEOC in support of
         discrimination charge                 64

5   6   19  Letter from Moses Hochman, M.D., dated
             April 4, 2003                     120

7

8   5   Letter dated January 29, 2004
         to the EEOC                          130

9   44  Letter sent to various doctors        146

10  45  Letter sent to Dr. Maynard           146

11  26  Letter dated April 30, 2003          155

12  86  Letter from Allergy & Asthma Clinic   162

13  85  Plaintiff's Answers to Defendant's
         Interrogatories                      166

14

15  87  Documents relating to work
         QTC Medical Group                    195

16  88  Print-out of payments received from QTC 197

17  89  W-2 from Christiana Care, 2003.       199

18  90  W-2 from Allergy & Asthma Clinic, 2004 199

19  91  W-2 from Allergy & Asthma Clinic, 2005 199

20  24  Letter dated March 11, 2003, from
         Dr. Sciscione                        221

21

22

23

24

A-155

57 (Pages 222 to 225)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Zechman                                                    Christiana Care Health Systems
Ellen Zechman                    v.                              June 20, 2006
                          C.A. # 05-159 JJF

Page 226

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT.

Page 227

State of Delaware  )
                   )
New Castle County  )

CERTIFICATE OF REPORTER

I, Ann M. Calligan, Registered Merit
Reporter and Notary Public, do hereby certify that
there came before me on the 20th day of June, 2006,
the deponent herein, ELLEN ZECHMAN, who was duly sworn
by me and thereafter examined by counsel for the
respective parties; that the questions asked of said
deponent and the answers given were taken down by me
in Stenotype notes and thereafter transcribed by use
of computer-aided transcription and computer printer
under my direction.

I further certify that the foregoing is a true
and correct transcript of the testimony given at said
examination of said witness.

I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.

Ann M. Calligan, RMR
(Certification No. 186-RPR)
(Expires January 31, 2008)

DATED:  June 27, 2006

A-156

58 (Pages 226 to 227)

0228

```
                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF DELAWARE


ELLEN ZECHMAN                 )
                              )
        Plaintiff             )Civil Action
                              )No. 05-159JJF
        vs.                   )
                              )
CHRISTIANA CARE HEALTH SYSTEMS)
                              )
        Defendant             )

                         VOLUME II
              Deposition of ELLEN ZECHMAN taken pursuant
    to notice at the law offices of Morris James Hitchens
    & Williams, LLP, 222 Delaware Avenue, 10th Floor,
    Wilmington, Delaware, beginning at 10:45 a.m on
    Wednesday, August 16, 2006 before Elise Alvarado,
    R.P.R., C.S.R., court reporter and Notary Public.

    APPEARANCES:

    LORI BREWINGTON, ESQUIRE
    Margolis Edelstein
         1509 Gilpin Avenue
         Wilmington, Delaware 19806
         for the Plaintiff

    THOMAS S. BLOOM, ESQUIRE
    Morgan, Lewis & Bockius, LLP
         1701 Market Street
         Philadelphia, Pennsylvania 19103-2921
         for the Defendant
                     -  -  -  -  -
                WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
                  (302) 655-0477
```

228

```
                    ELLEN ZECHMAN,
    the deponent herein, having first been duly
    sworn on oath, was examined and testified as
    follows:
    BY MR. BLOOM:
        Q.   Good morning, Dr. Zechman.  This is the
    continuation of the deposition on June 20th, 2006.
    Have you received a transcript of your first
    deposition?
        A.   I have.
        Q.   Did you read it?
        A.   No.
        Q.   You didn't read it?
        A.   No.  I said it.  Do I need to read it?
        Q.   I'm just asking.
        A.   The truth doesn't change, does it?
        Q.   Is there anything that you believe in your
    testimony the last time you met that is wrong or that
    you need to correct today?
        A.   Since I haven't reviewed it, you know, that's
    not a fair question.  I said what I said is the
    truth.  The truth stands.
        Q.   Is there anything that you didn't remember
    the last time we met that you have now since come to
```

229

```
    remember that relates to your claims?
        A.   Yes.  I've had several things, different
    areas of, I would say harassment, that, you know,
    have come to me.  I have nightmares about this stuff.
    I have trouble remembering it lots of times, because
    it's extremely painful, emotional to me, but I have
    nightmares about it and that's when I remember these
    things.
        Q.   Can you tell me specifically what you've now
    come to remember that you couldn't think of the last
    time?
        A.   One thing in particular that was quite
    distressing and disturbing, while we were in Ob-Gyn
    triage, and we would spend at that time, sometimes
    36 hours in the female emergency room where people
    coming in for labor checks but also for gynecology
    problems.  Basically if a woman had a uterus or had
    had one removed, the emergency room would defer those
    patients to us to take the main load off the
    emergency room.  So it was basically a female
    emergency room.  It was very busy.  It was very
    intense.
             I have documented one shift period, I
    think it was a 24-hour shift, where I saw 64
```

230

```
    patients.  That is tremendous.  A seasoned, trained
    Ob-Gyn would have difficulty seeing that many
    patients.  And I was seeing that many on my own.  And
    that has been documented in my logs.  And that is in
    discovery.
             But one of the things that I thought was
    extremely abusive was at that time -- now they have
    changed it since.  And a lot of this has been changed
    because I bust about so much while we were there.
    They would not give us lunch breaks.  We had to stay
    in that area.  And I was -- how can I say --
    chastised for leaving the area to eat.
             Well, to eat in the area is an OSHA
    violation, and people were eating in that area.  And
    to eat in a work area where you urine and blood
    samples, you know, out there is a flagrant OSHA
    violation.  And I would want to leave the area to an
    OSHA-approved area to eat, whether it was a snack or
    a lunch.  And I was chastised for disappearing.
             Well, I started saying, "Well, I am
    going to get a bite to eat for a few minutes.  Call
    me if you need me."  I would have all my work caught
    up.  I would be waiting for labs.  Nothing was
    urgent.  I would leave the immediate area to get a
```

231

1   bite to eat to an OSHA-approved area. Having helped
2   my husband establish clinics I know OSHA rules. We
3   have to abide by them.
4           So they chastised me for leaving the
5   area. Other people were eating in the area. And I
6   started pitching a fit. Well, then I was chastised
7   for saying, well, you can't leave the area. So what
8   they were basically saying was, you can't leave the
9   area because you are disappearing, but you can't tell
10  where you're going either, because we don't want the
11  other people to get mad, because you're going to eat
12  and they have to sit there and either not get to eat
13  or they're eating in the area.
14          I did make verbal complaints about this
15  being an OSHA violation. And they were not very
16  happy with me about that. We even had e-mail that
17  was part of the discovery stuff that you sent us that
18  is addressing this issue of me being chastised for
19  disappearing. And I quote the thing Dr. Patruno is
20  saying, "She is entitled to eat." Well, I should
21  hope so, that I am entitled to eat or drink during a
22  36-hour shift.
23          It was a case of being chastised if --
24  you know, you were breaking OSHA regulations if you

1           I had just signed my contract that was
2   effective July 1st. About July 14th or 15th I had
3   verbally requested family medical leave because I was
4   having a flare-up. I was sick. I was exhausted. I
5   needed time off. They refused to give me sick leave.
6   They would not even give me the forms for family
7   medical leave. And they said -- they being Sandy
8   Kardos as well as my chief resident Robyn Gray -- our
9   department can't support that. We don't give that to
10  anybody. And in turn, I gave the letter which you
11  have a copy of the 23rd to Dr. Ekbladh requesting an
12  altered schedule.
13          Well, if they won't give me family
14  medical leave, they won't even give me the forms for
15  it, let me ask for an altered schedule. He would not
16  even address the issue. So then I go over his head
17  to Brian Little's office to get the accommodation
18  sheets, which you have copies of that. And his I
19  would say administrative assistant signed them. And
20  it was dated 7/23, which was after Ekbladh totally
21  ignored my request. I went over his head to
22  basically the department which is in charge of all
23  graduate medical offices. And I got the form from
24  them and took it back.

1   didn't leave, but if you left, they were giving you
2   grief about it. And there were no provisions in
3   between for relief or, you know, breaks. And that
4   was a big thing, and that's another point of
5   retaliation that I feel turned the tides and the
6   prejudice against me in these incidences.
7       Q.  I'm going to ask you more specific questions
8   about what you've just described.
9       A.  Okay.
10      Q.  But apart from that general topic which is
11  the OSHA violation, is there anything else that you
12  remember now that you couldn't remember the last time
13  we met in June?
14      A.  That's the big one in my mind right now.
15  There are others that might come during the day right
16  now. Right now I am kind of focused on that.
17          And then I'm focused also on the fact
18  that I was begging for time off. I had asked middle
19  of July for family medical leave. I was exhausted.
20  They already knew from my hospitalization in February
21  that I had mixed connective tissue disease. They
22  knew a component to that is fatigue as well as joint
23  pain and systemic effects of it. And I was begging
24  for medical leave.

1           And he was totally angry for me going
2   over his head doing that. But it was the ADA, the
3   request for accommodation, because I felt like if
4   they legally have legal room by not giving me family
5   medical leave, they definitely were refusing to give
6   me sick leave or vacation, then I knew legally they
7   had to accommodate my disability. I had documented
8   disability. At least I know they will do this. And
9   they totally blew that off too.
10          Then they increased my work schedule,
11  which we have the documentation about. And then
12  Ekbladh was making me take these tests which in
13  addition to the increasing, you know, my work
14  schedule and work load, I was having to take these
15  tests every week which resulted in me having to get
16  up at four o'clock every morning to have time to
17  study and read the stuff to take that test every week
18  prior to going on my usual six o'clock in the morning
19  to 6:30 in the afternoon shift. So he was increasing
20  my workload after this.
21          And then -- I just lost my train of
22  thought here. Hold on. After this went on and I was
23  becoming increasingly fatigued, I continued to ask
24  for time off. I didn't care, give me vacation. Give

1  me family medical leave.  Give me ADA.  I need time
2  off.  I'm sick.  I can't go anymore.  I'm fatigued.
3  And he was just ignoring all of those requests.  And
4  I told him, and I said to his face in his office at
5  one of these private visits, this is discrimination
6  making me take these tests when nobody else has to
7  take them.  This is discrimination.
8       Well, the next day I got an e-mail, and
9  we have got a copy of this, you no longer have to
10  take those tests anymore.
11       Q.   You described a minute ago going to Dr.
12  Little on July 23rd, 2003.  Is that when you did
13  that?
14       A.   His office.  I didn't have an appointment
15  with him.  It was at his office, and his
16  administrative assistant gave me the forms.  She
17  signed them.  They are all over the place, because
18  they have been in discovery.  They have been in the
19  EEOC.  I bet all of us have at least five copies of
20  that particular form.
21       Q.   And that's the same day that you gave Dr.
22  Ekbladh the letter requesting an adjustment to your
23  schedule?
24       A.   Yes.  And he blew me off.  And that's when I

236

1  OSHA approved so that I wouldn't have to leave the
2  area.  There was no area.
3       Q.   You said you complained about people eating
4  in the triage area.  Who did you complain to?
5       A.   The nursing supervisor.  This is all oral.  I
6  didn't file a written complaint, because OSHA
7  violations are serious, and I didn't want to get
8  people mad at me, but I wanted to fix the problem,
9  you know.
10       Q.   Who else did you complain to?
11       A.   Dr. Patruno.  At that time Dr. Sciscione was
12  there.
13       Q.   You spoke to Dr. Sciscione about this?
14       A.   Yes, I did.
15       Q.   Anybody else?
16       A.   Probably whoever else was in the staff, you
17  know, people coming and going.  I don't know who
18  else.
19       Q.   Do you know the name of the nursing
20  supervisor you just referred to?
21       A.   No.
22       Q.   Can you tell me what you remember of your
23  conversation with the nursing supervisor?
24       A.   No, other than just the fact that we are not

238

1  went to Dr. Little's office later on that day after
2  Ekbladh just would have nothing, you know, he
3  wouldn't discuss it.  He looked at the letter and
4  just, you know basically blew me off.
5       Q.   I want to get back to what you described at
6  the beginning of our depositions OSHA violation or
7  what you say is an OSHA violation.
8       A.   Yes.
9       Q.   Did I hear you correctly that the other
10  residents did not leave the area to eat lunch?  They
11  were eating within the triage area?
12       A.   You only have one resident in that time.  So
13  I didn't know what they were doing.  But the nurses
14  were eating.  And that was one of the things that was
15  a dissension that I was saying I'm going to get a
16  bite to eat, and I'll be right back.  Or I got
17  everything quieted down.  And evidently there was
18  some chatter that how come she can leave to eat and
19  we can't.
20       But they were eating in the workplace.
21  And I said we're not supposed to do this.  This is an
22  OSHA violation.  You know, you have separate places
23  to eat.  I even discussed with Dr. Patruno about what
24  we could do to get a separate place to eat that was

237

1  supposed to be doing this, this is an OSHA violation.
2  We are not supposed to have eating in the working
3  area, that sort of thing.
4       Q.   So you just brought this to the attention to
5  the nursing supervisor?
6       A.   Yes; and whatever nurses were sitting at the
7  desk at that time.
8       Q.   Can you tell me about your conversation with
9  Dr. Patruno about this?
10       A.   No, I can't.  It's been four years now.  So
11  no, I can't remember the specifics of the
12  conversation.  But he and I did talk about it.  And I
13  remember making suggestions of where we could try to
14  establish an area.  And he kind of blew up.  He said
15  that will cost too much money.  He won't do that.
16       Q.   Did he also tell you to try to be discrete
17  about when you go out to take lunch because other
18  people might be resentful if they are not able to
19  leave for lunch?
20       A.   He told me -- it's in the e-mail, exactly
21  what he said.  And we would just have to pull that and
22  look at it.  I think that would be the most accurate
23  thing rather than my memory, to pull that document
24  and look at it.  And I know it's part of the

239

1   discovery stuff.

2       Q.   We will probably get to that letter, but I

3   mean just from memory.  Does that sound right to you?

4       A.   I don't know.  I would need to review the

5   letter.

6       Q.   What about Dr. Sciscione?  Do you remember

7   anything about your conversation with Dr. Sciscione

8   about what you say is the OSHA violation relating to

9   eating lunch?

10      A.   No, I can't remember the specifics, but I

11  know I did bring it to his attention.

12      Q.   Do you remember what he said in response to

13  the complaint you raised with him?

14      A.   I do not.  But he was always very open to

15  complaints, suggestions and tried to make

16  improvements.

17      Q.   So I take it he did no not react negatively

18  to your complaint?

19      A.   No, no.

20      Q.   Do you remember when in time you raised this

21  issue about potential violation of OSHA?

22      A.   No, I do not.

23      Q.   Have you stayed in contact with anybody at

24  Christiana Care since the time you left?

1       A.   Yes, I have.

2       Q.   Who did you stay in contact?

3       A.   I prefer to keep that confidential, because I

4   fear retribution against that person as I underwent

5   retribution with my job.

6       Q.   Nobody is going to retaliate.

7       A.   Well, look what happened to me.  I don't want

8   to put my friend under retaliation like what I went

9   through.

10      Q.   I understand that, Dr. Zechman.  This is a

11  lawsuit you filed against Christiana Care.  If you

12  are having communications with employees at

13  Christiana Care, you have got to say so.

14           MS. BREWINGTON:  Are they employees of

15  Christiana Care?

16           THE WITNESS:  They are.

17           MS. BREWINGTON:  You have to say.

18           THE WITNESS:  I want to put it on record

19  that I fear greatly that there will be retribution

20  against this person for talking to me just as this

21  had been done to me.  Dr. DeMichael.

22  BY MR. BLOOM:

23      Q.   DeMichael?

24      A.   Yes.

1       Q.   Do you know how to spell that?

2       A.   No.

3       Q.   Do you know his first name?

4       A.   It's a she.

5       Q.   What's her first name?

6       A.   Andrea.

7       Q.   In what capacity does Dr. DeMichael work at

8   Christiana Care?

9       A.   She is now working as an employee, because

10  she graduated from the residency program this past

11  year.  She was my best friend.

12      Q.   What residency program was she in?

13      A.   She is a graduate of the family medicine

14  residency program there as well as the obstetrics and

15  gynecology.  She is double-Boarded.

16      Q.   Was she in the Ob-Gyn residency program at

17  the same time you were?

18      A.   Yes.

19      Q.   What class was she in relative to you?

20      A.   She started a year later than I did.

21      Q.   So when you started as a second-year, she

22  started her first year?

23      A.   That's correct.  She had just finished the

24  family medicine program.  So she was taking her

1   Boards to be Board certified.  She did two residency

2   programs, family medicine and then Ob-Gyn after that.

3       Q.   When was the last time you spoke to Dr.

4   DeMichael?

5       A.   Last night.

6       Q.   What did you talk to her about?

7       A.   Her pregnancy.

8       Q.   Did you talk about anything that relates to

9   your case against Christiana Care?

10      A.   I told her that I was here doing the

11  deposition, yes.

12      Q.   Other than the fact that you were going to be

13  here for this deposition, did you discuss anything

14  else?

15      A.   No, I didn't, because I didn't want to drag

16  her into it.  We discussed her pregnancy, and she is

17  going to be moving to North Carolina and practicing

18  medicine there.  And I just wanted to know when she

19  was going to be moving to North Carolina.

20      Q.   Have you in the past had conversations with

21  Dr. DeMichael about the substance of your allegations

22  in this case?

23      A.   Yes, I have.

24      Q.   Can you tell me what you discussed with her?

8/16/2006  Plaintiff Zechman (Vol. 2)

1    A.   Probably everything.

2    Q.   Is there anything that you've told her that

3  you have not yet testified about in your deposition

4  in this case?

5         MS. BREWINGTON:  Objection.

6         THE WITNESS:  I have no idea.  That's

7  pretty broad.  I have no idea.  That question doesn't

8  make sense to me.

9  BY MR. BLOOM:

10   Q.   Do you view Dr. DeMichael as a witness who

11 has knowledge of facts relevant to your case?

12 (pause) Are you thinking?

13        Are you going to answer that question?

14   A.   I need a minute to word it properly.

15        MS. BREWINGTON:  Do you need him to

16 rephrase it?

17        THE WITNESS:  Yes.

18        MS. BREWINGTON:  Can you rephrase it?

19 BY MR. BLOOM:

20   Q.   Do you view Dr. DeMichael as a witness who

21 has knowledge of any of your allegations in this

22 case?

23   A.   Yes.

24   Q.   What, in your view, does she have knowledge

244

8/16/2006  Plaintiff Zechman (Vol. 2)

1  Dr. Gray or Dr. Heinle?

2    A.   Yes.

3    Q.   What complaints did she share with you?

4    A.   Their rudeness and the way they treated, you

5  know, me.  It was obvious.

6    Q.   Am I hearing you right that Dr. DeMichael

7  told you that she had complaints about -- I'm going

8  to rephrase that entirely.  My question is:  Did Dr.

9  DeMichael ever share with you that she had complaints

10 about Dr. Gray or Dr. Heinle?

11   A.   I cannot recall.  But she agreed with my

12 assessment of how I was being treated by them.

13   Q.   How did she know how you were being treated

14 by them?

15   A.   She saw it.

16   Q.   Did you know when other residents were being

17 reassigned from a surgical procedure?

18   A.   Sometimes you do, because it's on the board

19 in morning.  Other times it's a last-minute thing,

20 like you are on the board and you get a call, you're

21 not going to that surgery.  You go do this.  And you

22 do not have, you know -- since you're busy running

23 your own path, you don't see anything other than who

24 might be walking by you in that area.  So that's hard

246

8/16/2006  Plaintiff Zechman (Vol. 2)

1  about with respect to your case?

2         MS. BREWINGTON:  Objection.  It calls

3  for speculation.

4         THE WITNESS:  I don't know, you know,

5  what she would specifically -- she definitely has

6  knowledge of me being kicked out of the call room and

7  having to sneak around and find places to sleep when

8  I'm on call.  She has firsthand knowledge of that.

9         She has firsthand knowledge of how Dr.

10 Gray and Dr. Heinle treated me and how rude they were

11 to me.

12 BY MR. BLOOM:

13   Q.   Anything else?

14   A.   That's all I can think of at the moment.

15   Q.   Has Dr. DeMichael ever expressed to you a

16 belief on her part that she was treated unfairly by

17 Dr. Gray or Dr. Heinle?

18   A.   I don't know.

19   Q.   Well, I'm asking if she ever told you that.

20   A.   She agreed with me on them discriminating

21 against me and leaving me out of cases when I would

22 show her that.  But I don't know -- I can't remember

23 her saying that she had been treated that way.

24   Q.   Did she ever complain to you in any way about

245

8/16/2006  Plaintiff Zechman (Vol. 2)

1  to answer.  Because sometimes you will.  You know, you

2  will see like it was very obvious that I was supposed

3  to be on the GYN, which is gynecology surgery

4  rotation.  And my name wasn't on the board.  And

5  somebody who was not even on that rotation was in the

6  slot that I was supposed to have.  That was Dr.

7  Heinle.

8         And we have got documentation of that,

9  specific days and specific surgeries where I was on

10 the rotation.  I was supposed to be the one giving

11 those surgeries, and she was off in some clinic.  And

12 all of a sudden she shows up on a surgery schedule

13 with the cases that I was supposed to have.

14   Q.   I take it you told Dr. DeMichael that you

15 were being reassigned in what you viewed as an

16 excessive amount by Dr. Gray; is that true?

17   A.   I'm sure that I did tell her, yes.  I was

18 quite verbal about saying, Hey, why am I not getting

19 the assignments?  I'm on the rotation.  It's my turn

20 to learn to do this.

21   Q.   Did Dr. DeMichael ever tell you that she had

22 independent knowledge of that circumstance other than

23 what you had told her?

24   A.   I don't know.  I don't know that that

247

1  question came up.  That's not a question that I would
2  ask to somebody.  So I don't know.
3      Q.   Did I hear you right before when you were
4  describing that you told her this was happening and
5  she agreed with you, that your understanding was she
6  was agreeing with you based on what you were telling
7  her?
8           MS. BREWINGTON:  I want to object to
9  that question.
10          THE WITNESS:  There are times she could
11 see it blatantly on the board signs you could see in
12 the morning like coverage beginning of the shift
13 conference, and you can see, why aren't I up there?
14 So there are times where she would have firsthand
15 knowledge, you know, because she would know I was on
16 the surgery rotation and new people who are not on
17 the surgery rotation are on the board going to
18 surgery and I was not.
19 BY MR. BLOOM:
20     Q.   Did Dr. DeMichael ever express to you that
21 she ever had complaints about Dr. Ekbladh?
22     A.   I don't recall.  I'm getting water.
23          (A brief break was taken.)
24 BY MR. BLOOM:

248

1  bite to eat?
2      A.   They would send somebody in to relieve you.
3  Whereas before, there was no relief.  You had to stay
4  there.  They would send in one of the chief residents
5  to take your place so that you could go to the lunch
6  room to get something to eat.
7      Q.   You told me a minute ago that there were
8  three who you remember complaining to this about to.
9  And they were the nursing supervisor, Dr. Sciscione
10 and Dr. Patruno.
11     A.   Yes.
12     Q.   Anybody else?
13     A.   I was going to say whoever was in earshot,
14 you know, when it was going on.
15     Q.   And I think you told me that you don't
16 remember anything about your conversations on this
17 topic with either the nursing supervisor, Dr. Patruno
18 or Dr. Sciscione; is that true?
19     A.   I don't remember the specifics.
20     Q.   What do you remember?
21     A.   I know that I mentioned it to them.
22     Q.   Do you remember anything about their response
23 to you?  And when I say "their," I mean Patruno
24 Sciscione and the nursing supervisor.

250

1      Q.   Dr. Zechman, other than what you've just
2  described to me about being pulled from the surgery
3  shifts, is there anything else that you believe that
4  Dr. DeMichael has independent knowledge with respect
5  to your case?
6      A.   The eating in the triage area.
7      Q.   What is the basis for you saying that?
8      A.   Because she had to put up with the same
9  stuff.
10     Q.   Meaning what?
11     A.   Not being able to take breaks for eating, the
12 OSHA violation part of it.
13     Q.   Was that generally true that people weren't
14 able to take breaks to eat in the triage area?
15     A.   They did change it after I started fussing
16 about it.  But earlier on in my stay, yes.  When I
17 started saying hey, this is an OSHA violation, we
18 need to, you know, be able to get out of here to eat,
19 then things did start changing somewhat, not all the
20 time, but they did make a better effort to relieve
21 us.  But that was later on, I'd say, in the spring of
22 2003.
23     Q.   Is the change that you're describing for me
24 that people are allowed to leave the area to grab a

249

1      A.   We have already gone over this.  With
2  Patruno, we discussed where we could have lunch
3  rooms.  I mentioned that.  It hasn't changed.  And he
4  made the comment when I was making suggestions, we
5  could turn this room into a break room or add on a
6  room out here.  He says they will never do that.
7  That costs too much.
8           With Sciscione, he listened to me.  He
9  did not make any negative comments, you know.  He was
10 just supportive in my concern.
11     Q.   So you referred a while ago being chastised.
12 Who chastised you?
13     A.   Dr. Patruno.
14     Q.   Did he chastize you in any way other than
15 what you just described about they'll never do that,
16 that sort of thing?
17     A.   Just telling me that I shouldn't sneak away
18 or disappear.  He preferred that I not say that I was
19 going to eat that I just do it.  But then in turn he
20 says but you can't disappear either.  So it was like
21 a catch 22.  I can't announce that I am leaving to
22 get a bite to eat, but don't disappear either, which
23 basically leaves you either not having a break for 24
24 or 36 hours or having an OSHA violation by nibbling

251