1    in the corner.

2        Q.   Is that the conversation that you said before

3    that is reflected in the e-mail?

4        A.   Yes.

5        Q.   The e-mail that you're referring to -- well,

6    we will discuss it when we get to it.

7             Dr. Zechman, I am going to shift topics

8    briefly.  Because we spent a lot of time during our

9    last session talking about your discrimination claims

10   in this case and the bases of the claims.  I don't

11   want to rehash it.  But I want to make sure that I've

12   got the boundaries of it correctly and that I fully

13   understand who the people are that are involved.  So

14   I just want to recap it briefly and make sure we did

15   not miss anything that you meant to testify about.

16            My understanding, based on the last day

17   we spent together, was that you contend in this case,

18   you've asserted claims of discrimination based upon

19   both your age and your disability, correct?

20       A.   That's correct.

21       Q.   You have also asserted claims of harassment

22   based either on your age or your disability.  Is that

23   true?

24       A.   That's correct.

252

1    or harassment.

2             At least based on your last deposition,

3    the three people that I heard you to be accusing of

4    that sort of conduct were Dr. Ekbladh, Dr. Gray and

5    Dr. Heinle.  Is that true?

6        A.   Sandy Kardos as well.  But Dr. Heinle, she

7    was not really involved in that part of it.  She did

8    not really have say so.

9             But the buck stops at Dr. Ekbladh.  He

10   could have stepped in at any moment and straightened

11   everything out.  He was the boss.  He was the

12   director.  And he knew firsthand, because I was in

13   his office every week talking to him, asking for the

14   medical leave.  Well, if you can't give me medical

15   leave, can I have vacation?  Can I have sick leave?

16   Nothing.

17       Q.   I just want to make sure I have the players

18   right.

19       A.   The players are right.  But Ekbladh was

20   number one.  He is the boss.  The buck stops there.

21   He could have said one word and everybody else would

22   have jumped.

23       Q.   Is there anybody else that you are accusing

24   of discrimination, harassment or retaliation in this

254

1        Q.   And you also asserted claims of retaliation?

2        A.   Yes.

3        Q.   Is there anything else that I've left out?

4        A.   I would say that with the failure to give me

5    the medical leave and increasing my schedule and

6    continuing, you know, to pile stuff on me when I was

7    begging for time off for two months.  I put in a

8    verbal request like maybe July 14th.  But the first

9    written one was July 23rd.  And not getting anything,

10   even e-mails -- what's 9?  September, right?

11            I was begging for a day off, because

12   they wouldn't even let me have a day off for me to go

13   to my doctor, and the e-mail said I am exhausted.

14   Every joint in my body hurts.  I need time off.  Have

15   you heard from my doctor concerning my request for

16   creative scheduling, basically referring to my

17   request for accommodation, sick leave, family medical

18   leave whatever the heck they would give me I needed

19   time off.  I was exhausted.  I was hurting.  I was

20   sick.

21            That goes beyond discrimination.  That

22   is abuse.

23       Q.   I want to make sure I understand the people

24   who you are accusing of discrimination or retaliation

253

1    case other than what we have just discussed?

2        A.   Going back to the original document, I think

3    there are other things that are just not coming to my

4    mind.  You know, whatever is in that original

5    Complaint.

6        Q.   As you sit here today -- because your

7    Complaint is not evidence.  And this deposition is a

8    process of gathering evidence.  Do you have evidence

9    that anybody other than the three people you've just

10   identified discriminated against you?

11       A.   There were other instances where Dr. Vakili

12   during surgery did not want me in surgery.  And later

13   on I did a case with him and Dr. Vakili -- we talked

14   about this the other day.  We are rehashing stuff

15   that we have already talked about.

16            Dr. Vakili -- I think I did an abdominal

17   hysterectomy with him either July or August.  And he

18   even said you do so good.  Why are they mad at you?

19       Q.   Anybody else that you've left out?

20            MS. BREWINGTON:  I'm going to object.

21   Asked and answered.  We have gone through this at the

22   first deposition.  She has gone over this.

23   BY MR. BLOOM:

24       Q.   I'm just going to note that we spent a lot --

255

1  go ahead.

2      A.  I am sure there are.  It's all written down.

3  It's hard.  There's a lot of stuff here.  It's hard

4  for me to remember every detail.  If you want to pull

5  the original Complaint and let's go through it line

6  by line and add to it, let's do that.  That will help

7  my memory if you want to do that.  We rehashed all

8  this last time, so how much of this do you want me to

9  repeat?  Do you want to pull the original Complaint?

10  How much more of this do you need to hear a second or

11  third time?

12      Q.  I just want to make sure you haven't left out

13  people.  You've made very serious allegations,

14  accusations of discrimination and retaliation and

15  harassment.  You're accusing people of doing that.  I

16  want to make sure I have the names of the people who

17  you are accusing.  We've gone through Dr. Heinle, Dr.

18  Gray, Dr. Ekbladh.  Now you've just referred to Dr.

19  Vakili.  Is there anybody we've left out?

20      A.  I would have to see the original Complaint

21  because there is just so much here.

22      Q.  Dr. Vakili, to your understanding, is not a

23  Christiana Care employee; is that true?

24      A.  No.  And that was very humiliating.  And we

1      Q.  The incident that you just talked about with

2  Dr. Vakili, this is what we talked about last time

3  where Dr. Sciscione then backed you up?

4      A.  Yes.  And you do have documents on that.

5          In addition Dr. -- oh, the name just

6  left my head.  We have a letter from one of the

7  attendings that he sent a letter in my behalf to Dr.

8  Brian Little saying that my surgical skills in his

9  opinion were appropriate for my level of training.

10  And guess what?  That never showed up.

11          All of the good letters mysteriously did

12  not show up in my discovery documents from

13  Christiana.  We have copies of them and we had

14  submitted them.  But how come these good documents,

15  two letters from --

16          MS. BREWINGTON:  If you would like me to

17  say the name.  I can help her.

18          THE WITNESS:  Dr. Carlson.  Two letters

19  from the department commending me for teaching the

20  medical students and having exceptional knowledge and

21  good teaching skills, letters of commendation, two of

22  them from the department, Dr. Shlossman.  They

23  weren't in my file with the discovery.

24  BY MR. BLOOM:

1  talked about this last time, an extremely humiliating

2  thing when he wouldn't see me and then later -- it's

3  purely -- they say you're no good, and then later he

4  saw that I was good, that I knew what I was doing.

5          In that abdominal hysterectomy, I did

6  all the surgery and we had less than 25 cc's of blood

7  loss.  That is fantastic for abdominal surgery.

8      Q.  It is your understanding that Dr. Vakili is

9  an outside physician?

10      A.  Oh, yes, but he still is an attending

11  physician that evaluated me, and these evaluations

12  have not shown up.  They were not in discovery.  And

13  there were others that I know were put in that Dr.

14  McIntosh said I filled out a good evaluation on you.

15  Did you see it?

16      Q.  Who is Dr. McIntosh?

17      A.  She is a private physician.

18          Dr. Beth Shubert filled out good

19  evaluations on my surgical skills.  None of those

20  showed up in discovery.  Now what happened to those

21  things?

22      Q.  Who is Dr. Shubert?

23      A.  She is another private Ob-Gyn that I worked

24  with.

1      Q.  That was from the medical school, right?

2      A.  No.  That was from the department.  And all

3  of these mysteriously, the good stuff, hasn't shown

4  up in our discovery file from Christiana.  Why is it

5  not there?  How come I have these letters, and they

6  have been plucked and not surfaced in my discovery

7  file from Christiana?  A little bit strange, huh?

8      Q.  Well, Dr. Zechman, I am not going to address

9  why there are not duplicate copies of things produced

10  in the record.

11      A.  We requested the full file.  Why are the good

12  letters not there?

13      Q.  Dr. Zechman, do you contend that when Dr.

14  Vakili, I guess, asked you not to participate in that

15  surgery, do you contend he was discriminating against

16  you for some reason?

17      A.  Yes.

18      Q.  What leads you to believe that Dr. Vakili was

19  motivated by discrimination?

20      A.  By whatever he heard from his colleagues,

21  because he said specifically, They say you're not

22  good.  I don't want you in here.

23      Q.  So you're understanding is that he was acting

24  based upon things he heard from other people?

1    A.  Yes.  And that was early in my training.

2    That would have gone back to -- and I might not be

3    absolutely correct on this date.  But the dates would

4    be consistent with the letters Dr. Sciscione.  It was

5    maybe September, October, November 2002.  I was still

6    the newby there.  And he had never worked with me

7    before, so he was strictly going off of something he

8    had heard from his colleagues.

9    Q.  To your understanding, Dr. Ekbladh is older

10    than you are; is that true?

11    A.  I hope so, because -- yes.  Not a fair

12    question.

13    Q.  But he is a man in his of 60s; is that true?

14    A.  I don't know whether he is late 50s or late

15    60s, but yes, he is older than me.

16    Q.  And I understand you have claims against Dr.

17    Ekbladh.  But my question is, do you contend that Dr.

18    Ekbladh discriminated against you because of your

19    age?

20    A.  I feel the age factor was more the other

21    residents and the other attendings.  With Dr. Ekbladh

22    I think it was more retaliation when I would speak

23    out against things that I knew were wrong.

24    And having helped my husband start his

1    own clinic, like the OSHA violations, certain things

2    you know, I knew this stuff.  And I would speak out,

3    and he didn't like that, and he was very angry about

4    me going over his head and getting that accommodation

5    request from Dr. Brian Little.  That put him through

6    the ceiling.  His face turned red when I did that.

7    He was very angry.  He even told me I had chutzpa in

8    one of the those languages.  He said I hope you make

9    it, because you really have got chutzpa.  And it was

10    in reference to me getting those forms.

11    Q.  When did that interaction happen?

12    A.  That would have happened at our first meeting

13    after I had put in the request.  And it would have

14    been that meeting where he was threatening to

15    terminate me immediately where he had that list where

16    it was a bullying technique after I had put in for

17    the request for, you know, the altered schedule on

18    the 23rd.  The very next week he gives me this form.

19    And I had just signed the contract weeks before of

20    terminate, bla bla bla, after going over his head and

21    getting the forms for accommodation.

22    Q.  I want to make sure that we also have the

23    complete universe of the complaints that you're

24    referring to.  You just referred to the complaint

1    about the OSHA violation.  And there was also, I know

2    a complaint that you sent to the ACGNE; is that

3    correct?

4    A.  That's correct.

5    Q.  Are there any other complaints that you made

6    in connection to your retaliation claim?

7    A.  There is a complaint concerning --

8    MS. BREWINGTON:  I want to object and

9    make clear on the record that she has mentioned

10    things previously in the deposition.  Do you mean

11    other than what she has already said last time?

12    MR. BLOOM:  Yes.

13    MS. BREWINGTON:  So anything you had not

14    mentioned last time, if you can remember that, and

15    what you had not mentioned today already.

16    THE WITNESS:  Yes; because we are

17    rehashing already a lot of this stuff.

18    I cannot think of anything at this

19    moment.  But if it comes to me while we are talking,

20    I will let you know.  Okay?

21    BY MR. BLOOM:

22    Q.  I appreciate that.  But so far as you can

23    remember right now, it's the complaint to the ACGNE

24    and the complaint about the OSHA violations with

1    lunch in the triage rooms?

2    A.  And the exam beds.  That was a big one.

3    We've talked about that already.

4    Q.  We talked about that, the mechanical problem

5    with the beds.  Was that the issue?

6    A.  You've got it, yes.

7    Q.  That's the general issue?

8    A.  You've got it, yes.

9    Q.  I am going to try not to touch on things we

10    went over last time.  But you referred the last time

11    to a closing window of opportunity that related to

12    the illness of your father and your mother no longer

13    being available to you to help with your kids and

14    your family; is that right?

15    A.  Yes.  I feel that personally it's going on

16    three years.  This October it will be three years.  I

17    should have graduated and been home back in North

18    Carolina practicing as an Ob-Gyn doctor.

19    When I was talking to Barbara McElwaine

20    concerning the labor law violations that Christiana

21    was found in violation of labor laws concerning my

22    leave, she asked me, Do you want your job back?  And

23    I told her, I said I would be scared to go back there

24    for retaliation.  I said, And my window of

8/16/2006 Plaintiff Zechman (Vol. 2)

1  opportunity has closed to be that far away from home.
2       But the main thing is I'd be scared to
3  walk in there. If Barbara McElwaine with the
4  Department of Labor says, Here, you have got to take
5  her back, I would be so scared. I told Barbara
6  McElwaine this. I said, For God's sake, look at me
7  when I didn't have a labor law violation against
8  them. Just imagine what they would do if I went back
9  to work after the Department of Labor -- putting this
10 labor law violations on them.
11      Q.   Let me be more precise with my question. Did
12 I hear you correctly last time that the window of
13 opportunity closing that you just referred to
14 happened in late 2003, early 2004?
15      A.   My life changed and my ability to be away
16 from my family did change because of my father dying,
17 my mother going back to work, and the nanny that had
18 been with my children, each one of them, the last
19 three, when I walked in the door with my newborn baby
20 one day old from the hospital, she died.
21      So there's been a change in my life and
22 my ability to leave my children for two, three weeks
23 at a time.
24      Q.   I'm just trying to pin down the time when

264

8/16/2006 Plaintiff Zechman (Vol. 2)

1  that happened. And I thought you said late 2003,
2  early 2004. I just want to make sure we have the
3  time frame right.
4       A.   My father died last January. So what was
5  that? And it was slightly before that when he got
6  sick, that my mother could no longer help me with the
7  children, because she was having to take care of him.
8  He was under hospice care at home. But I can't give
9  you the exact date of when all that, you know, went
10 down, because she was having to take care of him
11 before he went under hospice. I can't give you an
12 exact date on that. Sorry.
13      Q.   And I think I have seen a document somewhere
14 in the record in this case that it was an obituary
15 from May 2003?
16      A.   That obituary was my stepfather. The one
17 that you had seen was not my father. That was my
18 stepfather. And I just went in for that funeral.
19 That did not affect my life.
20      Q.   I'm going to switch topics now. And I want
21 to ask you about remediation at Christiana Care.
22 When I say remediation, do you know generally what
23 that refers to?
24      A.   Yes.

265

8/16/2006 Plaintiff Zechman (Vol. 2)

1       Q.   You were given a remediation program while
2  you were at Christiana Care, right?
3       A.   Yes.
4       Q.   Do you object to the fact that you were given
5  a remediation program?
6       A.   No. I object to the fact that there were
7  people who were doing less than me -- they based that
8  remediation on my CREOG scores which is the in-house
9  exam. And there were people who made worse than me
10 that they did not remediate.
11      Q.   Who?
12      A.   Kirfides and Dr. Gray. And here I was, a
13 fully licensed physician. I had passed all my
14 national Boards. These people had not. They had
15 made less than I did on that exam. They were not put
16 on remediation.
17      Q.   How do you know that?
18      A.   Your discovery documents say it.
19      Q.   I think we are going to get to those
20 documents. Other than the paper that's in this case,
21 do you have any other personal knowledge that
22 supports your believe that neither Dr. Kirfides or
23 Dr. Gray were given remediation?
24      MS. BREWINGTON: Other than the papers

266

8/16/2006 Plaintiff Zechman (Vol. 2)

1  in this case?
2  BY MR. BLOOM:
3       Q.   I'm asking if you have any independent
4  knowledge of that fact. You just referred to
5  documents you've seen in the discovery record. I'm
6  asking what you know. Do you have any personal
7  knowledge about whether or not Kirfides or Gray were
8  on remediation?
9       A.   They were not.
10      Q.   How do you know that?
11      A.   The residents talked about this stuff in the
12 gossipy lounge, you know, in the middle of the night
13 when we're sitting there with our cups of coffee
14 trying to stay awake. It's common knowledge.
15      Q.   Did you object to the content or substance of
16 the remediation program that you were given?
17      A.   I wanted to do whatever it took to finish
18 that program and be Board certified. If they would
19 have said, you know, do like the Marine Corps and do
20 100 pushups in front of me every day, I would have
21 done it, because I wanted to finish that program and
22 be a Board certified Ob-Gyn.
23      Q.   Dr. Zechman, I'm not asking you whether you
24 would have done it or wouldn't have done it. I am

267

8/16/2006 Plaintiff Zechman (Vol. 2)

1  asking if you objected to the content or the
2  substance of the remediation program that was
3  developed for you.
4        MS. BREWINGTON:  I object.  The question
5  is vague, but you could answer him if you can.
6        THE WITNESS:  I don't know what you're
7  really trying to get at by "objecting," because I
8  didn't-- I felt I was being singled out because there
9  were people that were doing less than I on the test
10 that they base this on.  And they weren't being
11 required to do this.  So I felt there was a
12 discrimination.  I felt I had been singled out.
13        I did agree that I needed more surgery,
14 you know, that my skills needed more surgery.
15 Because they had had more surgery training than what
16 I had.  But then I kept getting bumped out of surgery
17 where I wasn't getting the training.  It was another
18 catch 22.  Oh, you need to improve your surgery
19 skills, but yet they kept bumping me out of the very
20 training that would have given me those skills to
21 improve.
22        And I actually improved in spite of
23 that.  And there were good evaluations given by the
24 doctors that I did surgery there that somehow did not

268

8/16/2006 Plaintiff Zechman (Vol. 2)

1  make it into the file from the discovery in
2  Christiana.  Because they were given directly to
3  Sandy Kardos.  We don't have records of those.  They
4  are only showing the bad stuff, and they are not
5  bringing -- you know, they have plucked or failed to
6  produce the good stuff out of my files.
7     Q.  You just mentioned Sandy Kardos again?
8     A.  Yes.
9     Q.  She is not somebody we talked about last
10 time?
11    A.  In what way do you believe Sandy Kardos
12 discriminated against you?
13        MS. BREWINGTON:  I object.  We did talk
14 about her last time.
15        THE WITNESS:  We did talk about her ad
16 nauseam.  She is a main player in this.  We talked
17 about her constantly.  And she is in the initial
18 Complaint.  You need to review that.
19 BY MR. BLOOM:
20    Q.  Why do you think that Sandy Kardos was
21 motivated by discrimination against you?
22        MS. BREWINGTON:  I object to
23 speculation, but you could answer that.
24        THE WITNESS:  I don't know what her

269

8/16/2006 Plaintiff Zechman (Vol. 2)

1  motivations would be.  But I know one time I asked
2  her specifically how can you do this?  You know this
3  is illegal in reference to the family medical leave,
4  denying that and the ADA.  How can you do this?  You
5  know this is illegal to do this.
6        And her answer was -- and I quoted this
7  last time too.  And this will be in the deposition
8  from last time -- I am just the secretary.  I do what
9  I am told to do.
10    Q.  Sandy Kardos is an administrative assistant
11 in the residency program?
12    A.  She is considered the residency coordinator.
13 She is directly under the director.  She does
14 whatever he tells her to do.
15    Q.  She is not a doctor?
16    A.  No.  I don't even know if she has a college
17 education.
18    Q.  Your remediation program extended to areas
19 other than surgical skills.  Do you agree with that?
20    A.  It was at -- no, no.  Hold on.  I'm
21 stumbling.  It primarily was the surgical skills
22 because that was the primary thing they felt that I
23 needed more practice with.  But it also included
24 reading the chapters and taking the test as well as

270

8/16/2006 Plaintiff Zechman (Vol. 2)

1  an altered schedule where they had me -- I was
2  supposed to get more surgery experience, but it
3  wasn't happening.  And I was supposed to work with
4  one of the operating room technicians on one of the
5  dummies that I kept getting reassigned, where we
6  would make an appointment and Dr. Gray would reassign
7  me and put me somewhere else where I wouldn't get the
8  training I was supposed to have.
9     Q.  And there was also a schedule developed for
10 you where you would be shadowing doctors on a
11 one-on-one basis; is that true?
12    A.  Yes.
13    Q.  That was not limited to shadowing them in
14 surgery, right?
15    A.  It would be clinical shadowing too. I did
16 that with Dr. Hoffman. I did that with Dr. Kaminski.
17 We had a great time. Dr. Hoffman, I did that with
18 him. And to my knowledge, they gave me very good
19 evaluations from those shadowings. And for some
20 strange reason they are not there.
21    Q.  Did you have any problem with the fact that
22 your remediation extended to areas other than
23 surgical skills?
24    A.  No.  I welcomed it.  I enjoyed working with

271

**A-167**

8/16/2006 Plaintiff Zechman (Vol. 2)

1  these people one-on-one. I had a wonderful time when
2  I worked with each one of them in the clinic. I got
3  along well with all of them.
4      Q.  I'm going to shift topics briefly. When you
5  started to repeat your second year of your residency,
6  that meant that the people who had previously been
7  the first year residents were now your classmates?
8      A.  Yes.
9      Q.  Do you remember who those people were?
10     A.  Andrea DeMichael. Una Likhyani. It's kind
11 of an Asian name, Una Likhyani. I can't spell that.
12 If you got the e-mail in one of your discovery
13 documents, any of the e-mails that were to any of us
14 from Sandy Kardos the names would be spelled
15 correctly.
16     Q.  Were there any other names that you remember
17 that were in that class?
18     A.  It will take a minute. There would be four.
19 There was Una. There was Andrea. There was
20 Jennifer. I can't remember Jennifer's last name.
21 And there was somebody else that I am blanking on.
22     Q.  Well, let me know if you remember it.
23     A.  Fair enough.
24     Q.  At that point when you started to repeat the

272

8/16/2006 Plaintiff Zechman (Vol. 2)

1  second year in July 2003, was Dr. Heinle still in the
2  program at that point?
3      A.  Yes.
4      Q.  She then became a forth year?
5      A.  Third year. She was my equal.
6      Q.  Dr. Heinle was in your class?
7      A.  Until I was given the second year contract.
8  And then she was a third year, and I was considered a
9  second year. And I was told all along that I had the
10 possibility of being put up to third year at any
11 time. And Dr. Hoffman said that that was part of the
12 agreement when they made that decision. And he was
13 in the meeting when they made that decision.
14     Q.  Was there ever a point where Dr. Heinle was
15 in a supervisory position over you?
16     A.  Yes; several times during that summer.
17     Q.  This is after she graduated to the third
18 year?
19     A.  Yes.
20     Q.  At that point, did you in your own mind feel
21 capable of supervising junior Ob-Gyn residents?
22     A.  In certain areas I did. In other areas I did
23 not. And I welcomed assistance.
24          The main thing is, we are never supposed

273

8/16/2006 Plaintiff Zechman (Vol. 2)

1  to be alone. We are always supposed to have a
2  supervising physician, as I spoke last time, within
3  hollering distance. That never happened at
4  Christiana.
5          Even in Dr. Kaminski's deposition he
6  said there were not enough attendings. What would
7  happen would be you would have one doctor that was
8  the attending for the residents for Ob triage for
9  surgery for the labor floor. You could have some
10 person have to go to the operating room with an
11 ectopic pregnancy having a hemorrhage, life
12 threatening. And that one attending would have to go
13 to OR and be tied up in the OR. And then you would
14 have no attending to help you on the labor deck or to
15 help you in Ob triage. You would have two areas
16 totally uncovered by a supervising physician because
17 there was only one in-house. And when they had to go
18 to OR, they had to go to the OR. And so that made me
19 uncomfortable. They were not following national
20 guidelines.
21     Q.  Dr. Zechman, I am going to have to interrupt
22 you or we're never going to get out of here today,
23 because your answer had nothing to do with the
24 question I asked. The question is, I think you just

274

8/16/2006 Plaintiff Zechman (Vol. 2)

1  said that there were some areas in which you felt you
2  were capable of supervising residents --
3      A.  Yes.
4      Q.  -- and there were other areas in which you
5  were not; is that true?
6      A.  That is true.
7      Q.  Can you tell me the areas in which you felt
8  you were competent as of the summer of 2003 to
9  supervise junior Ob-Gyn residents?
10     A.  Uncomplicated deliveries.
11     Q.  Anything else?
12     A.  And triage.
13     Q.  Anything else?
14     A.  That's it.
15     Q.  What is the areas in which you did not feel
16 capable of supervising junior residents at that time?
17     A.  Is that with or without a supervising
18 physician? Because that is a big difference. And
19 there were many times when we did not have an
20 immediately available supervising physician.
21     Q.  Tell me in that circumstance.
22     A.  With a supervising physician?
23     Q.  No; without.
24     A.  I want to break it up --

275

8/16/2006 Plaintiff Zechman (Vol. 2)

1    Q.   Give it to me both ways, please.

2    A.   With a supervising physician to bounce any

3  questions off of at my call as it should be, I would

4  feel comfortable supervising any of them with having

5  my attending within hollering distance at any moment

6  for any questions that I had, any area.

7         But the fact that there were many, many,

8  times that that supervising physician was not

9  available -- that puts it in a whole different -- you

10 know.  And technically I should not be required to do

11 that until the last 12 months of my training.  And I

12 was only halfway through my program.

13        By the national standards you are only

14 required -- it's called the green book.  You are only

15 required to supervise independently the last 12

16 months of your four-year training period.  You should

17 have that attending at your elbow.

18   Q.   Are you done with your answer?

19   A.   Maybe.

20   Q.   What you described was a lack of direct

21 supervision at Christiana Care.  I take it from your

22 testimony that you view that as a widespread problem;

23 is that true?

24   A.   At nights and on holidays and weekends, yes.

8/16/2006 Plaintiff Zechman (Vol. 2)

1    Q.   That was less of a problem during the week?

2    A.   During regular working hours it was not a

3  problem.  There were plenty of people running around.

4  But that was only a third of the day, and that did

5  not encompass holidays and weekends.

6    Q.   So I take it that during those periods where

7  there was less supervision by senior physicians, that

8  that was a circumstance that existed for all the

9  residents in your class?

10   A.   Yes.

11   Q.   Now, during those periods which you described

12 as not having the amount of supervision you thought

13 was appropriate, what are the areas in which you felt

14 you were not capable of supervising junior residents?

15   A.   Surgery.

16   Q.   Anything else?

17   A.   That's mainly it.  Additional high risk

18 pregnancy.  Where it's the Ob intensive care.  I had

19 not had enough experience in that to feel comfortable

20 within that area.

21   Q.   I'm going to shift topics and talk about your

22 medical condition and the accommodation that you have

23 referred to.  Okay?

24   A.   Okay.

8/16/2006 Plaintiff Zechman (Vol. 2)

1    Q.   Dr. Fraser is the physician who primarily

2  treats you for your connective tissue disorder?

3    A.   That's right.  He's a specialist in that

4  area.

5    Q.   He gave a deposition a couple weeks ago.  And

6  he testified that your condition is called an

7  unspecified diffuse connective tissue disorder and it

8  is not a mixed connective tissue disorder.  Do you

9  agree with that?

10   A.   I will agree with anything he said, because

11 he is the specialist in that area.  And we are

12 splitting hairs in the pathology book by doing this.

13 And whatever he says is the truth.  He is considered

14 a national expert in this area.  And his credentials

15 just blow me away.  So his word is the word of God,

16 as far as I am concerned, when it comes to that.

17   Q.   And I think you mentioned the last time you

18 were here that the symptoms of the condition happen

19 occasionally and are not with you all the time.  Is

20 that true?

21   A.   There are certain symptoms that are with me

22 all the time that I just deal with.  Others come when

23 I have a flare-up and others with a severe flare-up.

24   Q.   What are the symptoms that are always

8/16/2006 Plaintiff Zechman (Vol. 2)

1  present?

2    A.   Various aches and pains of the joints.

3    Q.   On a day-to-day basis, does your connective

4  tissue disorder limit your daily activities?

5    A.   Not unless I have a flare-up.

6    Q.   So apart from when you're having a flare-up,

7  you are not limited in the activities you do on a

8  daily basis?

9    A.   I need my eight hours of sleep.  The fatigue

10 component is with me all the time.  Like if I go a

11 24-hour period without sleeping, I really need 12

12 hours of sleep after that.  I can go through, you

13 know, I would say several days of having a little bit

14 of sleep or no sleep.  But it's almost a cumulative

15 thing that then I crash.

16        But in order to stay optimal, I really,

17 you know, need eight hours of sleep a night.  Or if I

18 go a 24-hour period without sleep like pulling a

19 call, I really need to get 12 hours of sleep the next

20 night.  Because that's when I start the downward

21 slide of going into a flare-up.

22   Q.   Right now you're currently working, right?

23   A.   Yes.

24   Q.   And you also have kids at home?

1    A.    I do.

2    Q.    I take it from your testimony the last time

3    that you spend a significant amount of time caring

4    for your kids and bringing them around?

5    A.    Yes; I share with my husband, so yes.

6    Q.    Does your connective tissue disorder limit

7    your ability to do any of the activities that you

8    currently do on a daily basis?

9    A.    It depends on what all is going on.  If I

10   have a rough day at the office.  And there are times

11   when, say, there's a cub scout meeting that evening,

12   I tell my husband, Honey, I'm tired.  I need to lay

13   down on a sofa.  You cook supper tonight.  You take

14   the kids.  I'm tired.  I just need to lay down.  And

15   I do.

16        The main thing to keeping optimal

17   operating is to get to sleep.  And if I have a rough

18   day -- like last night I had a rough night.  I had

19   all of this going in my head.  I had nightmares

20   because I read the deposition.  I woke up with

21   flashbacks of all this again.  I probably only slept

22   two hours straight last night.

23        If I don't sleep well tonight, I will

24   probably be sick by Thursday or Friday.

280

1    Q.    And when you just referred to being sick, is

2    that what you refer to as a flare-up?

3    A.    Yes.

4    Q.    When you have a flare-up, are there any

5    activities in your life that you physically can't do?

6    A.    I physically can keep going.  But I'm

7    tremendously fatigued.  I get sores in my mouth, like

8    canker sores in my mouth.  My stomach gets upset,

9    because these canker sores go all the way through my

10   digestive system when they act up.  So I'll get

11   diarrhea.

12        I'll have joint pain.  I could keep

13   going with that.  I can take medicines and go with a

14   mouth full of sores.  But it is the fatigue component

15   where I literally feel like I have the flu, and I

16   just want to lay down and go to sleep.

17   Q.    And what you described is when you are having

18   a flare-up with your connective tissue disorder?

19   A.    Yes.

20   Q.    And so I take it that when you are not having

21   a flare-up, you are not limited physically?

22   A.    No, I can go full blast, and I can get a lot

23   done.

24   Q.    You were hospitalized at Christiana Care in

281

1    February 2003; is that correct?

2    A.    Yes.

3    Q.    Other than that instance in February 2003,

4    was there ever another instance in which you were

5    hospitalized at Christiana Care?

6    A.    I went into Ob triage one time.  I was having

7    a severe migraine headache.  And I was throwing up

8    and dehydrated.  And I went in for that.  Had I not

9    nipped that in the bud, I would have laid out of

10   work.  It would have gotten worse.  It would have

11   been a spiral.  But we nipped that one in the bud by

12   rehydrating me, getting the medicine for the headache

13   and getting rest, and I was going to go right after

14   that.

15   Q.    Migraines are not related to your connective

16   tissue disorder; is it?

17   A.    I do get migraines with that too.  That is

18   one of the symptoms that I have.

19   Q.    The instance in which you were actually

20   admitted to the hospital at Christiana Care, was that

21   when you had spinal meningitis?

22   A.    I never got an absolute diagnosis on that.

23   But I had a stiff neck.  I had photophobia.  That

24   means light sensitivity.  My head hurt every time I

282

1    moved it.  So I do not know what the final diagnosis

2    was.  They never told me.

3    Q.    You're a doctor.  Did you ask?

4    A.    I did.

5    Q.    Who was treating you, by the way, when you

6    were in the hospital in February 2003?

7    A.    I went into the emergency room.  And one of

8    their staff doctors treated me.  I did see him in a

9    followup visit afterwards.  And I can't remember his

10   name.

11   Q.    After being in the emergency room, you were

12   actually admitted, weren't you?

13   A.    Yes.

14   Q.    Was there a particular physician who was

15   following after you were admitted?

16   A.    Yes; that is the one I can't remember his

17   name.  And I did see him in followup afterwards.

18   Q.    What did he tell you about the diagnosis?

19   A.    He felt that there was not a clear diagnosis.

20   Q.    Did you tell Dr. Fraser about the

21   hospitalization was related to spinal meningitis?

22   A.    I gave Dr. Fraser the symptoms.  And he might

23   have made his own diagnosis or read it somewhere.  I

24   don't know.  But I just told him what was going on.

283

8/16/2006 Plaintiff Zechman (Vol. 2)

1  That was part of the differential diagnosis, because
2  they did a spinal tap on me at that time. But I
3  don't recall what they finally called it.
4      Q.  And spinal meningitis, it's your
5  understanding, is an infection?
6      A.  There are several kinds. Spinal meningitis
7  is simply an inflammation of the meninges. It can be
8  what they call aseptic. You can have an inflation
9  that is just irritation. Or you could have viral or
10  you could have bacterial. Bacterial is the one that
11  scares everybody. But viral can also happen.
12          And with different like lupus and
13  multiple sclerosis and these auto immune diseases,
14  you can have what is called an aseptic meningitis.
15  Aseptic means that it is more of an auto immune
16  reaction and not an outward virus or bacteria causing
17  the inflammation of the meninges.
18      Q.  Did the circumstance that lead to you being
19  hospitalized in 2003 eventually resolve?
20      A.  Yes; and haven't seen anything of it since.
21      Q.  That was like a one-shot problem?
22      A.  Yes, it was like a one-shot deal, whatever it
23  was.
24          MS. BREWINGTON:  Can we take a break?

284

8/16/2006 Plaintiff Zechman (Vol. 2)

1      Q.  And this is the letter where you refer to
2  creative schedule?
3      A.  Right.
4      Q.  If you'll turn to the second page, the very
5  last sentence you say, "I am very grateful for all of
6  the efforts that have been made to help me achieve
7  this goal." Am I right that the goal that you're
8  referring to there is to complete the residency
9  program?
10      A.  Absolutely.
11      Q.  Can you tell me what the efforts that have
12  been made are that you are referring to in this
13  letter?
14      A.  Giving me the opportunity, accepting me into
15  the program.
16      Q.  Is there anything else that you were
17  referring to?
18      A.  That was the main thing. My goal was to be
19  an Ob-Gyn.
20          (A brief break was taken.)
21  BY MR. BLOOM:
22      Q.  Dr. Zechman, I put in front of you two
23  exhibits, Zechman-69 and Zechman-71. Zechman-69 is
24  the request for disability accommodation form that

286

8/16/2006 Plaintiff Zechman (Vol. 2)

1          (A brief break was taken.)
2  BY MR. BLOOM:
3      Q.  Dr. Zechman, I'm going to hand you an exhibit
4  premarked as Zechman-67. This is a July 29, 1997
5  letter from your doctor, Dr. Fraser to whom it may
6  concern. I take it you have seen this letter before.
7      A.  Yes.
8      Q.  Do you know for what purpose this letter was
9  created?
10      A.  I really cannot remember. I had actually
11  seen him before then, and yeah, for quite some time--
12  yes, because at first he didn't know what was going
13  on with me.
14      Q.  Did you ask him to write you a letter for
15  some reason?
16      A.  I can't remember. If this is correct with
17  the date July 1997, you are going almost on ten
18  years. I can't remember.
19      Q.  Okay. You can put that aside. I'm going to
20  hand you what's been marked as Zechman 68. If you
21  can just confirm for me, this is the July 23rd, 2003
22  letter to Dr. Ekbladh that you've referred to
23  previously?
24      A.  Yes.

285

8/16/2006 Plaintiff Zechman (Vol. 2)

1  you filled out?
2      A.  That's correct.
3      Q.  Am I right that the handwriting in the top
4  portion where it's completed by the employee is in
5  your handwriting?
6      A.  That's in my handwriting, and that's me
7  dating it the 24th. Now, the signature down here is
8  Dr. Brian Little's administrative assistant and down
9  there and she dated it and signed it before she gave
10  it to me 7/23/03. She signed it, gave it to me. I
11  signed it and then it gets sent in. And this was
12  sent to Dr. Fraser.
13          And please note at the bottom where his
14  office staff circled the fax number they faxed it to
15  him and faxed it back into that number. And I
16  actually -- because I believe I was in the office
17  when she faxed this one out. I'm not sure, but she
18  faxed it both to the employee health services and to
19  Sandy Kardos, both places. And this is the office
20  personnel's signature of it was faxed 8/11.
21      Q.  That handwriting notation you're talking
22  about, that was written by the person who sent the
23  fax?
24      A.  Yes; by Dr. Fraser's office.

287

1    Q.   So Dr. Little's assistant who signed it, her
2    first name is Joanne?
3    A.   Yes.
4    Q.   Do you know what her last name is?
5    A.   No, I can't figure that out, and I really
6    didn't know her.
7    Q.   And if you look at the second exhibit that is
8    in front of you --
9    A.   Can I say something more about this?
10   Q.   Sure.
11   A.   I want you to turn to the back page and look
12   at that essential job functions from obstetric and
13   gynecology residents.  That is the official form that
14   was given me which is very much unlike the one you
15   showed me last time in the first part of this
16   deposition where I had said I had never seen that
17   before.
18        And I thought it was very ironic about
19   the lifting part, how we were on that particular one
20   that you showed me that I had never seen before, that
21   we were expected to lift patients.  And I said isn't
22   that funny since the nurses have mechanical devices
23   to lift patients in that form that you showed me.
24   And this is the official one from the director of

288

1    think is significant.  Am I getting that right?
2    A.   No.  I'm saying that that paper that you
3    showed me before, I have no idea where that came
4    from.  And that does not appear to be accurate
5    wherever that came from.  This is the job functions
6    of the Ob-Gyn.  This came from the director of
7    graduate education, essential job functions of
8    Ob-Gyn.  This is the form that I have seen before
9    (indicating document).
10   Q.   And you just referred -- the other form you
11   referred to last time, you just talked about lifting
12   on that form, right?
13   A.   That's all I can remember right now from that
14   form.  I just wanted to point out the fact that you
15   had produced that form.  You had asked me if I had
16   ever seen it before, and I said no, I have not.  And
17   how I had picked up on that, that is not a form that
18   we are shown or told that that those are our
19   essential functions.  So whatever that came from is
20   questionable.
21   Q.   You think somebody made it up?
22        MS. BREWINGTON:   Objection.
23   Argumentative.
24   BY MR. BLOOM:

290

1    education.  This is the one I've seen before.  This
2    is the official.  I do not know what you had in your
3    hand that was part of discovery last time saying that
4    our job description was to lift patients.
5    Q.   Is that why you are directing my attention
6    this last page of --
7    A.   Yes.
8    Q.   Let me finish the question.  Because you're
9    saying that the true essential job functions of being
10   an Ob-Gyn resident do not include lifting?
11        MS. BREWINGTON:   Objection, because of
12   mischaracterizing.  You can answer.
13        THE WITNESS:   According to this, this is
14   the description that my physical attributes or
15   qualities or disabilities or whatever are to be
16   evaluated.
17        That sheet that you handed me last time
18   that I commented on the lifting, I have never seen
19   before.  I have no idea where that came from.
20   BY MR. BLOOM:
21   Q.   That's fine.  Keep looking at this page that
22   you are directing my attention to.  So I gather
23   you're telling me that there is something that is not
24   listed in these essential job functions that you

289

1    Q.   Do you?
2    A.   I don't know where it came from.
3    Q.   Look at this last page of Exhibit 69.  Is
4    this what you believe is an accurate description of
5    the essential job functions of your residency
6    position?
7    A.   Yes.
8    Q.   Is there anything in this list of essential
9    job functions that you view as a lifting requirement?
10   A.   No.
11   Q.   In your view, is lifting an essential job
12   function of your position as an Ob-Gyn resident?
13   A.   Not in the context that was relayed in that
14   other sheet that I had never seen before until you
15   had produced it.
16   Q.   So in what respect do you think that lifting
17   is an essential job function being a resident?
18   A.   There's a certain amount where you have to
19   readjust a patient's leg or something on the
20   operating table or during delivery.  But the nurses
21   have mechanical devices to aid them in lifting,
22   moving patients so that they do not hurt their backs.
23        We, as residents, should have the same
24   devices for safety and OSHA regulations.

291

Q.   And that limited amount of lifting that
you've just referred to, lifting a patient's leg,
does that sort of lifting -- I'm going to rephrase
that question.  Is there any other kind of lifting
that you view as part of your essential job functions
as a resident in addition to the moving a patient's
leg that you just referred to?

A.   The lifting of certain operating room
equipment for adjusting the operating table.  But in
addition, there are supposed to be operating room
assistants that come in and do that as well.  And it
is done for the older physicians and the nurses.

Q.   With respect to the lifting that you consider
to be part of your essential job functions, was there
ever a time where you were physically unable to do
those physical lifting tasks that you just described
as part of your job?

A.   No.  I always did what was required of me --

Q.   And you were physically capable of doing?

A.   -- capably.  There were times when I was
sick, especially and specifically when I was begging
for time off for accommodation, for FMLA that I did
it anyway, you know.  I was sick.  I was hurting.  I
was begging for time off, but I did it anyway.

292

Q.   I understand that, Dr. Zechman.  But
physically, you could move a patient's leg if you
needed to?  Am I hearing that right?

A.   Yes.

Q.   I am going to use these two exhibits
together, 69 and 71.  71 is an August 25th, 2003
letter from you to Dr. Fraser, right?

A.   That's correct.

Q.   And you're asking him to get the
accommodation form which I believe is a reference to
69.  Is that true?

A.   It is.  May I speak?

Q.   Of course.

A.   Dr. Fraser was saying he had already sent the
stuff in and Sandy Kardos and Dr. Ekbladh were saying
we don't have this information.  And so this was a
second attempt to get it done, because he was saying,
I sent it in.  I sent it in shortly after you gave it
to me which would be consistent with this date with
8/11.  And Dr. Ekbladh and Sandy Kardos were saying,
we don't have anything.
And they were ignoring my requests for further
accommodation for vacation leave.  They were just
ignoring and denying my requests.

293

Q.   Is any of the other handwriting on Zechman 69
other than the top portion your handwriting?

A.   This is completed by the physician.  That is
Dr. Fraser's handwriting beyond a doubt.  And please
note the date is 8/9/03 where he signed it, and it
was sent into them.

Q.   You are aware, are you not, that Dr. Ekbladh
actually followed up with a telephone call to Dr.
Fraser?

A.   It was not a followup.  He demanded that he
talk to my physician.

Q.   Did you have any problem with that?

A.   Yes, I did.  I thought that was being
intrusive.  But I knew I couldn't say no, because I
feared retribution.  And I was already getting enough
retribution that, you know, I was just scare to say
anything by that point.  But he demanded to talk to
my physician.

Q.   And you understood you were asking for
special treatment because of a medical condition you
had, right?

A.   I was not asking for special treatment.  I
was asking for accommodation, family medical leave.
That is legal rights.  That's not special treatment.

294

Q.   That's correct, but you were asking for
something other than your regular job duties based on
your condition.  Would you agree with that?

A.   I was asking for federally protected
accommodation or FMLA.  And I will not word that any
other way, because that's the truth.  And that's what
I was asking for.

Q.   Did you understand that you needed to
medically justify that request in this way?

A.   Absolutely; and that's what these forms are
doing.  That's exactly what these forms are doing.

Q.   Did you view it as inappropriate that Dr.
Ekbladh wanted a followup conversation with your
physician?

A.   Yes; because he demanded it before he had
even seen this, before he had even seen this "To be
completed by physician" he demanded to speak to my
doctor.  And I was scared to say something other than
"uh-huh."

Q.   There is a medical records release portion of
Exhibit Zechman 69.  Is all of that in your
handwriting and your signature there?

MS. BREWINGTON:  Where?

THE WITNESS:  I'm not seeing it.

295

1  BY MR. BLOOM:

2  Q.    The very first page of Exhibit Zechman 69.

3       MS. BREWINGTON:  At the bottom?

4  BY MR. BLOOM:

5  Q.    In the middle.

6  A.    That is my handwriting.

7  Q.    That's your signature on the line that says

8  "Employee Signature"?

9  A.    Yes; 7/24/03 is the date that I did it, the

10  same morning I did that.

11  Q.    Okay.  You can put that aside.

12  Dr. Zechman, I'm handing you what is marked Zechman

13  73.  Is this an e-mail from you to Sandy Kardos with

14  a copy to Dr. Ekbladh, the top portion?  I'm not

15  asking about the handwritten portion.

16  A.    This handwriting I have no idea what that is.

17  Q.    You do not recognize whose handwriting that

18  is?

19  A.    No.  I have no idea what that is.  That was

20  not on the original one.

21  Q.    That was not part of the e-mail you sent?

22  A.    Yes, sir.

23  Q.    And there in the handwriting there are dates

24  and some of them with the date next to it it says

296

1  A.    I am talking about what happened every time

2  you're on a Saturday.  They say you are working this

3  day, but you work eight hours into the next time.  I

4  am speaking specifically of this time, but I am also

5  speaking of any time you have call on Saturday, you

6  work eight hours Sunday morning.

7  Q.    What about at the bottom there is a notation

8  for August 30th, 2003 where it says you're off from

9  8:00 a.m. to Sunday eight o'clock?  Is that accurate

10  or inaccurate?

11  A.    I do not know.  But I do specifically, you

12  know, what I said about Saturday and Sunday, you work

13  a 24-hour period and you're working 16 hours Saturday

14  and you're working eight hours Sunday.  So it's not

15  an off day.

16  Q.    When do you come back?

17  A.    Monday morning.  So you have no day off that

18  whole week.  So you will work straight through from

19  Monday through the weekend through the next week, and

20  hopefully you get one day off the next week.  So

21  you're working close to, you know, four days.

22  Q.    If I'm hearing you correctly, you're saying

23  on Sundays you're talking about you work until eight

24  o'clock in the morning Sunday.  And then you are off

298

1  "off."  And next to it, it says "work."  As you sit

2  here today do you know whether these notations

3  reflect days you were working and days you had off?

4  A.    They do not.

5  Q.    Tell me which ones you think are wrong.

6  A.    Going to the very first entry, 8/2 Saturday

7  work.  That's a call day.  I go in at eight o'clock

8  Saturday morning.  I do not get off until eight

9  o'clock Sunday morning.  So I have worked from

10  midnight, when it changes from Saturday to Sunday, to

11  eight o'clock Sunday morning.

12       So Sunday is not an off day when you've

13  worked eight to nine hours sometimes.  When you are

14  coming off of call, you did not get out of there

15  until nine or ten o'clock after writing the notes.

16  In fact, it could have been more nine hours that I

17  worked Sunday.  So I worked from eight o'clock

18  Saturday, if I went in earlier to write notes which

19  often I had to do.  I might have gone in 7:00 that

20  morning and worked until midnight.

21  Q.    Let me interrupt you for one second, Dr.

22  Zechman.  Are you talking about what happened

23  specifically on August 3, 2003, or are you talking

24  generally about what sometimes happens?

297

1  until 8:00 in the morning the follow Monday?

2  A.    No.  You go in six o'clock Mondays doing your

3  rounds.  So you don't get a 24-hour period off.

4  Technically, legally you are supposed to, but it was

5  not happening.

6  Q.    So it was 22 hours?

7  A.    Sometimes it would be less than that

8  depending on what time you got out Sunday.  But you

9  could not leave until you were done with your work,

10  whether it was nine o'clock, ten o'clock.

11       If you were stuck in the operating room,

12  you were stuck there until noon, get off at noon and

13  have to be back in at six o'clock the next morning.

14  Q.    Did you always attend morning rounds on

15  Mondays?

16  A.    It depends on which rounds.  There were

17  several different rounds.

18  Q.    Morning rounds.

19  A.    There were morning rounds for everybody at

20  seven o'clock.  There were Ob high risk rounds at

21  6:30.  You are only required while all the other

22  residents were only required to be at morning rounds

23  for the early 6:30 ones if they were participating in

24  that service that day; like if they were going to

299

A-174

8/16/2006 Plaintiff Zechman (Vol. 2)

```
 1    take over the shift, or if they were coming off of
 2    call and they needed to relay a change of shifts.
 3              I was harassed by Dr. Gray demanding
 4    that I be at those meetings at 6:30 every morning
 5    even when I was not assigned to the service.  No one
 6    else was.  I sent her an e-mail asking her when the
 7    rule had changed.  I sent Dr. Ekbladh an e-mail
 8    saying that Dr. Gray was harassing me about that.
 9    And once again, this is after I had put in leave,
10    they are adding to my schedule, making it a longer
11    day for me, harassing me about coming in at 6:30 when
12    I was not on service.
13              Now, the times I was on call, I was
14    supposed to be there.  That was not a problem.  But
15    Dr. Gray was demanding I be there every morning which
16    none of the other residents that were not assigned to
17    that service had to be there.  And I even sent her an
18    e-mail saying, Is there something new?  Did the rules
19    change?  Am I missing something?  Why am I required
20    to come to these when it is not the status quo for
21    anybody else?  It was harassment by Dr. Gray.
22        Q.   Did she tell you she thought it was a good
23    learning opportunity for you?
24        A.   No, she didn't.  She was just demanding.  Now
```

300

8/16/2006 Plaintiff Zechman (Vol. 2)

```
 1    Dr. Ekbladh sent back a letter saying, Well, you do
 2    not have to go, but it's a good learning experience.
 3    If you could be there, it's always a good learning
 4    experience.  So he basically backed me up in saying
 5    that you're not required to be there, but, you know,
 6    it's a learning experience.  So you can if you want
 7    to, but you don't have to.
 8              You have those e-mails, both of me
 9    complaining to Dr. Ekbladh that she is harassing me
10    as well as his response.  You have all of that in
11    your discovery.
12        Q.   You agree with Ekbladh that going in the
13    morning rounds is a good learning opportunity?
14        A.   Not always.  There were times it was a good
15    opportunity.  Most of the time you are just rehashing
16    what happens over the night and into the change of
17    shift.
18              Your true learning and your true
19    lectures occurred at seven o'clock which were the
20    teaching rounds.  Our teaching morning rounds were
21    the seven o'clocks where we had lectures and it was
22    part of our teaching curriculum per ACGME
23    requirements.
24        Q.   And with respect to any given morning round,
```

301

8/16/2006 Plaintiff Zechman (Vol. 2)

```
 1    do you know ahead of time whether that day's morning
 2    rounds are or are not going to be a good learning
 3    experience?
 4        A.   No.  It all depends how busy doctors are.  It
 5    is kind of an ad lib thing.  If they are in a hurry
 6    and have to go to surgery or they've got a C section
 7    pending, it's what happened, what do I need to do,
 8    out of here.
 9        Q.   Are morning rounds when you are sort of
10    walking around with a more senior physician taking
11    stock of cases?
12        A.   That's not how they did it there.  We just
13    sat at nurses' station and recited what had happened
14    through the night and what needed their attention.
15        Q.   Okay, you can put that document aside.
16        A.   Can I make a statement in addition to that?
17        Q.   No; there isn't a question pending.
18             MS. BREWINGTON:  Is it regarding a
19    previous question that she did not finish her
20    answer--
21    BY MR. BLOOM:
22        Q.   You didn't finish your answer?
23        A.   Yes.  Depending upon who the teacher was.
24    Some of the teachers were better of making a point of
```

302

8/16/2006 Plaintiff Zechman (Vol. 2)

```
 1    teaching than others.
 2              Others just blew through it, you know,
 3    what's going on.  The learning experience depended
 4    really on the teacher that was in charge that
 5    morning.
 6        Q.   Who were the ones who were good at teaching
 7    during rounds?
 8        A.   Dr. Sciscione was excellent at teaching the
 9    rounds.  He was pretty much the best.  Dr. Shlossman
10    was excellent.
11        Q.   Dr. Zechman, I'm giving you Zechman 77, which
12    is a September 16, 2003 letter from Dr. Ekbladh to
13    you.  Did Ekbladh give you this letter on September
14    16, 2003?
15        A.   Yes.  And please make note that this letter
16    is talking about FMLA which I had been requesting
17    since July.  And I get this letter in September
18    saying that it has been brought to our attention and
19    that they need the enclosed certificate health care
20    provider.  I had been requesting FMLA since the
21    16th -- I mean since July.  And this was the first
22    time I am given the formal forms for FMLA, on
23    September 16th.
24        Q.   Fine.  You've said that many times today.
```

303

A-175

1  I'm going to ask that when you're done answering the
2  question that's been asked, that you just answer the
3  that's been asked.  You are filibustering this
4  deposition.  I mean it's taking a lot longer than it
5  needs to.
6          MS. BREWINGTON:  I'm going to object to
7  that just simply because you want her to recall
8  things.  She is recalling things and other times you
9  don't want her to.  I mean, this is her deposition to
10 get it on the record.
11         MR. BLOOM:  That's fine.  I am getting
12 the same speech packed into a lot of different
13 questions.
14         THE WITNESS:  You are asking me the same
15 questions over and over, so yes, you're going to get
16 the answer over and over.
17         MR. BLOOM:  I will try not to repeat
18 questions.
19 BY MR. BLOOM:
20     Q.    Dr. Zechman, I'm going to hand you what's
21 been marked Zechman 79.  Am I right that this is a
22 September 22nd, 2003 note from your doctor regarding
23 the pinched nerve you got moving deck furniture
24 around?

1      A.    That's correct.
2      Q.    Were you out on leave during this time
3  period?
4      A.    I was out on leave and this also bled into my
5  scheduled vacation.  So there was an overlap.  And
6  this is the note that I sent as soon as I got it into
7  Sandy Kardos.
8      Q.    I'm handing you what's been marked as Zechman
9  80.  Is any of the handwriting on the first page of
10 this exhibit yours?
11     A.    No; that is my husband's handwriting.  This
12 is in relation to this same request, and I was
13 sending in the forms requesting for leave of absence.
14 Please note the date is September 22nd.  And I am
15 requesting leave of absence because I still have not
16 had any ADA, sick leave or FMLA.
17     Q.    Is all of the handwriting, other than the
18 first page which is the fax cover sheet -- is all of
19 the remaining handwriting in this exhibit your
20 handwriting?
21     A.    Yes, it appears to be.
22     Q.    And after sending this form you were on leave
23 of absence?
24     A.    The pinched nerve, yes.

1      Q.    I am handing you Zechman 83.  Is that a note
2  October 3, 2003 note from your doctor saying you are
3  able to return to work?
4      A.    That's correct.
5      Q.    Is the handwriting at the top of this exhibit
6  your handwriting?
7      A.    That's my handwriting, yes.
8      Q.    Am I correct that actually you did not send
9  this to Christiana Care because you learned earlier
10 in the day that your residency was terminated.
11     A.    That's incorrect.  I had sent this in because
12 I was ready to come back to work after my vacation.
13 And it was after Sandy received this that she called
14 me.
15     Q.    Well, you say at the top that this was a note
16 that you were going to fax Sandy Kardos.  You wrote
17 that, didn't you?
18     A.    I did.
19     Q.    It doesn't say you sent it to Sandy Kardos,
20 does it?
21     A.    I sent it to her.  I did.  And it was after
22 this that I talked to her on the phone, and she says
23 Dr. Kaminski needs to call you.  And that is when she
24 had Dr. Kaminski call me back and tell me I was

1  terminated.
2      Q.    What time do you think you sent this to Sandy
3  Kardos?
4      A.    It was early in the morning.
5      Q.    Are you aware of any document in this case
6  that reflects the fact that this was actually sent?
7      A.    I would have no idea.
8      Q.    As you sit here now, you can think of one
9  that you've seen?
10     A.    I can't remember.
11     Q.    All right.  You could put that away --
12 actually one other question about that exhibit, Dr.
13 Zechman.  When did you write this note at the top of
14 Zechman 83?
15     A.    I wrote that note later when I was submitting
16 this to the EEOC Complaint.  And it was my
17 documentation for the EEOC Complaint explaining it to
18 the investigator.
19     Q.    I'm handing you now what has been marked as
20 Zechman 82.  You recognize this document, right?
21     A.    Yes.
22     Q.    Is there any handwriting on Zechman 82 that
23 is not your handwriting?
24     A.    Dr. Fraser's signature and address.  And I

8/16/2006 Plaintiff Zechman (Vol. 2)

1    was sitting in the exam room, and we did this
2    together.
3        Q.   So other than the lines, the signature line
4    and the address line near the end of this document,
5    the rest of your writing is your handwriting?
6        A.   It was my writing but I was in the exam room
7    with Dr. Fraser when we went over this line to line
8    together.  And I was doing the writing and we were
9    talking about it.  And filling it out together.
10       Q.   Were you physically present with Dr. Fraser
11   when he faxed this to Christiana Care?
12       A.   I was physically present when one of these
13   documents were faxed.  I think it was this one
14   because I was in the office that morning when we also
15   did -- you see this is received October 3rd and that
16   was -- it was received along with this other one that
17   we've just talked about.  Let me pull it, 83.  These
18   went over together.  And I was in the office watching
19   the girls when they sent both of these over.
20            MS. BREWINGTON:  And for the record, she
21   identified 83.
22            THE WITNESS:  That morning I was in
23   there first thing in the morning at that office.  His
24   office was ten minutes from my house at that time.

308

8/16/2006 Plaintiff Zechman (Vol. 2)

1    this document.  One is from September 2004, a year
2    after you left Christiana Care, right?
3        A.   Yes.
4        Q.   The other fax line is October 3rd, 2003; is
5    that correct?
6        A.   Yes.
7        Q.   And that's the date you say Dr. Fraser faxed
8    this to Christiana Care?
9        A.   Yes.
10       Q.   Do you have any basis to dispute that this
11   document was faxed at 2:17 in the afternoon of
12   October 3rd?
13       A.   The number is there.  I'm not going to
14   dispute that, but I don't know whether that was the
15   first faxing or the second faxing.  I don't know.
16   But I was in the office that day when these things
17   went out.
18       Q.   And you would agree that Zechman 83 does not
19   have a fax line on it at all, right?
20       A.   I'm not seeing it.  But this is the copy that
21   I made.  This would not have been the copy coming
22   from his office.  This is a copy of one of my
23   documents that I sent in to the EEOC.  His document
24   that he sent in from his office would look different

310

8/16/2006 Plaintiff Zechman (Vol. 2)

1    And this one, he filled this out and his office sent
2    them in at the same time.  And I saw them go through
3    the fax machine.
4    BY MR. BLOOM:
5        Q.   So you're referring to Zechman 82 and 83
6    faxed together?
7        A.   Yes.
8        Q.   In the fax line on Zechman 82, it says that
9    this was faxed from Dr. Fraser's office at 2/17 in
10   the afternoon of October 3rd, 2003.  Do you see that?
11       A.   I do not see that.
12       Q.   On the upper left-hand corner.
13       A.   I see an 8/27 fax at the time.  Well, that's
14   a 9:15 one -- 1470 -- I don't know.  I might have my
15   times wrong.  I think the best thing to do is to get
16   Dr. Fraser's records.
17            MS. BREWINGTON:  But that's the time;
18   isn't it (indicating)?
19            MR. BLOOM:  That's 2004.
20            THE WITNESS:  That's when it was faxed
21   another time.  That would go with that.  I must have
22   faxed it twice.  And that's always a possibility.
23   BY MR. BLOOM:
24       Q.   Well, there are two fax lines at the top of

309

8/16/2006 Plaintiff Zechman (Vol. 2)

1    from this.
2        Q.   Have you seen the document that you just said
3    you believe Dr. Fraser has?
4        A.   I don't have a copy of it.  This is the one
5    that I have, and I actually have the real one in my
6    documents, the actual prescription pad he wrote on.
7        Q.   Do you remember what time in the morning you
8    first showed up in Dr. Fraser's office October 3rd?
9        A.   No, I have no idea.
10       Q.   Does Dr. Fraser, in your experience, see
11   patients before 8:30?
12       A.   I don't know.
13       Q.   Have you ever seen them before 8.30?
14       A.   I can't remember, but he does start early.
15   But I don't know his first appointment time.  I don't
16   know.
17       Q.   Can you think of an instance in which he has
18   seen you before 8:30 in the morning?
19       A.   I've been seeing that doctor since 1995.  I
20   can't remember.
21       Q.   I'm handing you what's been marked as Zechman
22   6.  The title of the top is ADA Intake Questionnaire
23   Is this a document that you filled out in connection
24   with your EEOC charge?

311

A-177

8/16/2006 Plaintiff Zechman (Vol. 2)

1    A.    Yes, it is.

2    Q.    And when you were preparing this document,

3  did you try to answer the questions as completely and

4  as accurately as you could?

5    A.    At the time I was still very upset and almost

6  in shock over what had happened to me.  So I would

7  say this was done, to the best of my ability, at that

8  time, because I was truly in shock over this

9  happening to me.

10    Q.    What does that mean when you say you were in

11  shock?

12    A.    I could not believe what Christiana Care had

13  done to me.  I could not believe it.  I was

14  horrified.  I was shocked.  It was just unbelievable,

15  that all this had happened.

16    Q.    Can you just confirm that all of the

17  handwriting on Zechman 6 is your handwriting?

18    A.    This is not my handwriting on the last page.

19    Q.    Are you referring to the part where it says

20  check off those that are affected by your disability?

21    A.    Yes.

22    Q.    Do you know whose handwriting that is?

23    A.    No.  I assume that it was the EEOC agent.

24    Q.    But the rest of the handwriting on that page

312

8/16/2006 Plaintiff Zechman (Vol. 2)

1  is your writing?

2    A.    Yes.

3    Q.    And that's your signature at the bottom?

4    A.    Yes.

5    Q.    Dr. Zechman, I am going to shift topics and

6  talk to you about remediation at Christiana Care.

7    A.    Haven't we already talked about this?

8    Q.    We have.  We will talk about it in more

9  detail.  You were --

10    A.    Do you remember your comment about me not

11  repeating things?  That goes both ways.

12    Q.    In 2002 you learned that the committee had

13  voted to appoint you a mentor; is that true?

14    A.    I can't remember the exact date.  It's in

15  e-mails, but that's not what I've committed to

16  memory.

17    Q.    And Dr. Patruno was appointed as your mentor?

18    A.    Yes.

19    Q.    And you didn't have a mentor when you first

20  started Christiana Care on July 1st, 2003, correct?

21    A.    No, I did not.

22    Q.    And Dr. Patruno became your mentor

23  approximately the end of October 2002?

24    A.    I'm not sure about the time, but he became my

313

8/16/2006 Plaintiff Zechman (Vol. 2)

1  mentor, yes.

2    Q.    In 2002, though, right?

3    A.    Yes.

4    Q.    Was it your understanding that Dr. Patruno

5  had been appointed as your mentor to help you catch

6  up to your classmates?

7    A.    Yes.

8    Q.    Were you told -- who told you that you were

9  going to now have a mentor?

10    A.    Dr. Sciscione, I believe.

11    Q.    Did he tell you why?

12    A.    He felt that it would be useful for me to

13  have someone that I could sit down with and discuss

14  topics one on one with and go over certain concerns,

15  because lots of times the teaching physicians were

16  too busy running around because they were

17  understaffed with teaching physicians doing their

18  clinical duties, delivering babies, that that would

19  give me an opportunity to have one-on-one time with a

20  teaching physician.

21    Q.    Was Dr. Patruno a good mentor?

22    A.    Dr. Patruno is a wonderful, personable, good

23  guy.  But he had just come to Christiana himself and

24  was just learning the system and the ropes of that

314

8/16/2006 Plaintiff Zechman (Vol. 2)

1  institution himself.

2    Q.    Did Dr. Sciscione tell you that one of the

3  reasons they decided to appoint you a mentor was

4  because they thought your medical knowledge was

5  behind what they expected it to be?

6    A.    I don't remember him saying that he thought

7  that my surgical skills were behind.  And we

8  discussed that before I hired on.

9         I find it ironic that they would say

10  that my medical knowledge was behind when I had

11  already passed the national competency test for

12  licensure.  It is called the USMLE, United States

13  Medical Licensing Examination.  And my colleagues had

14  not even taken the test yet.  I had passed the

15  national medical competency test to be a full

16  licensed physician.

17         I had to have sufficient knowledge to

18  pass the tests that every physician has to.  And they

19  even had concerns of my colleagues having not even

20  taken the test.

21    Q.    I'm not asking whether you agreed with the

22  criticism.  But were you aware in the fall of 2002

23  that there was concern among the faculty about the

24  level of your medical knowledge?  Were you aware that

315

1   that concern existed?

2       A.   NO.  I was aware that they were not happy

3   with my surgical skills.  I knew that they were

4   constantly giving me oral exams, you know, asking me

5   questions while I was doing something.  And it made

6   me very nervous.  And I had trouble answering the

7   exams because I was nervous around them because I

8   could feel, you know, some of the animosity.

9            And there was a certain, I would say

10  anxiety, I call it test anxiety, because I realized

11  that they were, you know, trying to test me, and it

12  made me nervous.  You know, with certain ones.

13  Others like Dr. Patruno I was uncomfortable with, but

14  a lot of them were almost hostile in their

15  questioning me about different things.

16      Q.   Was this also in the fall of 2002?

17      A.   Yes.  It was from day one.  First day I

18  showed up on the scene.

19      Q.   Were you also aware -- and again, I'm not

20  asking if you agree with the criticism -- but were

21  you aware that there existed a concern about your

22  medical judgment in the fall of 2002?

23      A.   No.  But that concern is very unfounded and

24  prejudiced in that I was a fully-licensed physician

316

1   that had been practicing medicine and I had never had

2   an adverse outcome.  I have never had a lawsuit.  I

3   never had any incidents.  I was a fully-licensed

4   physician.  And I had passed all of my Boards and had

5   been practicing medicine independently.  And my

6   colleagues weren't even licensed yet.

7       Q.   Just so we're clear, what you've been talking

8   about is your licensing and passing exams.  None of

9   that is to be an Ob-Gyn physician, correct?

10      A.   No; but it is general physician and general

11  medical knowledge that you have to be competent in in

12  order to pass the test to begin with.

13           I also in my first year in the CREOG

14  exam did very well, which is testimony to my basic

15  knowledge at that time in obstetrics and gynecology

16  as a first year student.  My first year test results

17  were good.  Everyone that saw them said they were

18  excellent.  That was one of the reasons they accepted

19  me at Christiana was because I did good on that first

20  year competency test that demonstrated good medical

21  knowledge.

22      Q.   How do you think you did on the second year

23  of your CREOG test?

24      A.   I did less than optimal, because I had been

317

1   on call twice that week, and I was exhausted.  I was

2   even out sick shortly after that.

3       Q.   Am I correct that Dr. Patruno as your mentor

4   met with you basically weekly?

5       A.   You're incorrect.  It was not weekly.  I

6   forget.  At first it was frequently.  And then it

7   became less and less frequent just because he did not

8   have time with his busy work schedule.  We met as

9   much as we possibly could.  But it did decreased I

10  would say in December.

11      Q.   Dr. Patruno told you, did he not that there

12  was a perception within the faculty that your medical

13  knowledge was lacking?  Again, I am not asking if you

14  agree that the perception is accurate, but he told

15  you that the perception existed, didn't he?

16      A.   Dr. Patruno told me that there was great

17  animosity.  And that these people did not like me

18  because I was different.

19      Q.   My question is -- he may have told you lots

20  of other things, but one of the things he told you

21  was that there was a perception in 2002 that your

22  medical knowledge was lacking.  Did he tell you that?

23      A.   I don't recall that statement.  I recall him

24  telling me that these people did not like me, that I

318

1   had to do good on this exam or the knives on my back

2   would become knives in my head if I did not do well

3   on that exam, because they did not like me.

4       Q.   Do you remember when he told you that?

5       A.   It was at one of our meetings before

6   Christmas in 2002.  And I don't remember the exact

7   meeting.

8       Q.   Did Dr. Patruno also tell you that there was

9   a perception that you didn't respond well to --

10           MS. BREWINGTON:  Objection.  Wait.  Also

11  tell you she didn't agree when he told her the other

12  statement.

13           MR. BLOOM:  I'll rephrase the question.

14           MS. BREWINGTON:  Thank you.

15  BY MR. BLOOM:

16      Q.   Did Dr. Patruno tell you that in the fall of

17  2002 that there was a concern that you did not

18  respond well to criticism?

19      A.   I don't remember him saying that.  I remember

20  him saying that I needed to act more like a whipped

21  puppy.  Because I didn't act like I was scared of

22  them, and I didn't act like a whipped puppy.  He

23  perceived that I should act more like a "whipped

24  puppy."  And that is a direct quote, the

319

A-179

1  whipped-puppy part.

2     Q.  And part of what Dr. Patruno was supposed to

3  do was to develop a remedial curriculum; is that

4  true?

5     A.  That was not my understanding.  My

6  understanding was that we would go over cases and

7  concerns that I had had the previous week or since

8  the last time I had a meeting and that we would cover

9  certain things that we knew were coming up on the

10  CREOG test as a study session.  But that was not

11  relayed as remedial.  It was relayed as let's work on

12  these things.  Let's have some time where you could

13  have a teaching physician to yourself to go over

14  these things, to study for this CREOG exam.  That is

15  how that was relayed to me.

16     Q.  So Dr. Patruno set up a curriculum to help

17  you prepare for the CREOG exam?

18     A.  That's correct.

19     Q.  And that started in the fall of 2002 by Dr.

20  Patruno?

21     A.  It probably started more like late November.

22     Q.  I show you what has been marked as Zechman

23  15.  Tell me if you recognize that document.

24     A.  I had seen the document in the discovery

1  stuff, but I have not been shown it before that.  I

2  have never seen this prior, never.

3     Q.  Is this schedule of CREOG study sessions

4  consistent with your recollection of what you

5  actually did with Dr. Patruno?

6     A.  No, it's not.  We went over surgical

7  instruments.  This is not consistent with what we

8  talked about.  This was not ever given to me.  And

9  this was not part of our plan.  I have never seen

10  this prior to seeing this for discovery.

11     Q.  I am not suggesting that you have.  Are you

12  telling me at that you did not review any of these

13  CREOG topics with Dr. Patruno?

14     A.  We might have randomly reviewed a few.  But

15  we certainly were not following the schedule.  And

16  this was not a schedule that was given to me and it

17  was certainly not a schedule that we were abiding by

18  in our discussions.  We were concentrating more on

19  surgical skills and surgical instruments and surgical

20  procedures.  This is totally different from what we

21  were doing.

22     Q.  Prior to discovery in this case, had you seen

23  Dr. Patruno's notes from his meetings with you?

24     A.  No.  I did not even know that he was making

1  notes.

2     Q.  Have you seen them since then?

3     A.  I have seen a few of them in discovery stuff.

4  But I was not even aware that he was making any

5  notes.  And are they signed by him?  Are they his

6  notes?

7     Q.  Did Dr. Patruno ever tell you that he thought

8  you're focusing too much on surgical skills and not

9  acknowledging other areas that the faculty thought

10  you needed to work on?  Did he ever tell you that?

11     A.  No.  We discussed different things, a lot of

12  things, but we were not going by something like this.

13  I don't know where this came from.

14     Q.  You can put that aside.

15     A.  Can I say something else?  We did a lot of

16  just chatting too during those sessions, person to

17  person chatting.

18     Q.  Dr. Zechman I'm going to hand you what has

19  been marked Zechman 22.  December 12, 2002 letter

20  from Dr. Sciscione to you.

21     A.  Yes.

22     Q.  You have seen this letter, correct?

23     A.  Yes.

24     Q.  I take it from this letter that prior to

1  getting this letter you had a sit-down discussion

2  with Dr. Sciscione?

3     A.  We probably did.  I don't remember the date.

4  But I do remember seeing this letter, because I was

5  surprised that here I was saying in here remove you

6  from remediation, and I had no idea I was on

7  remediation.  He's talking about removing me.  And I

8  had no clue that I was on remediation.  That was news

9  to me.

10     Q.  So you didn't know that Christiana Care

11  viewed the work you were doing with Dr. Patruno's

12  remediation?

13     A.  No.

14     Q.  But you knew that was something that was done

15  for you that wasn't necessarily being done for other

16  residents at that time?

17     A.  I knew other residents had mentors and had

18  had meetings with them, but I thought it was more of

19  a teaching tool and not a remediation.  I thought it

20  was just a mentoring and not a remediation, and I

21  thought this was a mentoring.  I was totally

22  flabbergasted when I saw the word "remediation,"

23  because I thought I was under a mentoring program.

24     Q.  You did not know that they considered that

1  remediation?

2    A.    No. I considered it more positive mentoring.

3    Q.    And Dr. Sciscione communicated to you, I take

4  it, that there has been concern over your progress in

5  your first few months at Christiana Care?

6    A.    Yes. And that was -- what we had discussed

7  before I had even been hired on, is that I had not

8  had the level of surgery training that first years do

9  at my previous program. It was just a different

10 sequence of teaching in Virginia than the sequence of

11 teaching at Christiana. And there were certain

12 skills that I had that were better. There were

13 others that I didn't. And surgery was a big thing.

14          In Virginia, you really didn't do any of

15 your own surgery until the second year. It was kind

16 of an award to be handed the scalpel.

17   Q.    Does working in triage relate to developing

18 your surgical skills?

19   A.    Absolutely no. Triage is an emergency room

20 clinic. It's more of the slave labor part of this

21 residency program.

22   Q.    Dr. Sciscione tells you in this letter that

23 he going to create a, quote, "more intense education

24 curriculum" for you; is that true?

324

1    A.    I'm not seeing that. Where are you seeing

2  that? Give me a paragraph or a line.

3    Q.    In the middle of the first main paragraph I'm

4  going to read a portion to you, and you tell me if I

5  read this right.

6          "We" -- and "we" I take it refers to his

7  discussion with you. "We discussed your approach to

8  diagnosis, and we discussed creating a more intense

9  education curriculum. As you know, I assigned you a

10 mentor, Dr. Patruno two months ago when we recognized

11 your challenges in our program. I would like you to

12 continue to meet with Dr. Patruno"-- I'm going to

13 stop there. Did I read at that much correctly?

14   A.    Why do you want to stop there? I think the

15 next line is very important.

16          "I will ask that you run all the

17 patients that you see in the triage area past the

18 attendings." And he is saying that, because I had

19 been complaining about there were not enough

20 attendings, and we were unsupervised in that area.

21 And this is his response in acknowledging that

22 complaint, that we do not have enough attendings.

23          I am left there with nobody. And that

24 should not happen in a training program. Already

325

1  this early I was seeing that problem. And this is

2  his response getting it on paper to acknowledging

3  that complaint that I was being unsupervised in that

4  area with not enough attending physicians.

5          I am sorry, but we are not conveniently

6  stopping where you want to stop.

7    Q.    No, no. We're going to get to that part too.

8  He says he wants you to go over every patient in the

9  triage area with an attending physician. And then he

10 goes on to say -- that's the part you just read,

11 right?

12   A.    Yes.

13   Q.    And then he goes on to say, quote, "This is

14 an effort to teach and review with you the critical

15 thinking process that occurs in a seasoned faculty

16 member." Did I read that right?

17   A.    That's correct. Because I had complained to

18 him that we were left alone in triage without

19 supervision.

20   Q.    There is no reference to that complaint in

21 this letter?

22   A.    That is what that is in reference to. That

23 is what that remark is in reference to.

24   Q.    You believe that?

326

1    A.    I know that. I was there. I was there when

2  I complained to him about this. And keep in mind,

3  that I had already been practicing medicine as a

4  seasoned, licensed physician for six years prior to

5  this.

6    Q.    Do you disagree that the purpose of this

7  letter was to, quote, "create a more intense

8  education curriculum for you"? Do you disagree with

9  that?

10   A.    Say that again.

11        MR. BLOOM:    Could you read that?

12        (The Court Reporter read the pending

13 question.)

14        MS. BREWINGTON:    Before she answers that

15 question I just want to lodge an objection on the

16 grounds of speculation. But you can certainly answer

17 if you have an understanding.

18        THE WITNESS:    I feel like Mr. Bloom is

19 trying to impose his opinion upon me with that.

20        MS. BREWINGTON:    But I want to instruct

21 you to just answer his questions without comments

22 about what Mr. Bloom is trying to do. Okay?

23        THE WITNESS:    He is saying that he wants

24 to create a more intense curriculum for me.

327

BY MR. BLOOM:

Q.    It doesn't say anything in this letter about creating a more intense curriculum for any of the other residents, does it?

A.    No; but I don't know what was going on with the other residents.  I don't know the letters they got.  They don't know the letter I got.

Q.    Fair enough.  You can put that away.  I hand you Zechman 23.  This is a December 13th, 2002 memo from Dr. Sciscione to all Ob-Gyn attendings.  And that appears to be the date after the letter you were just looking at.  Isn't that true?

A.    Yes.

Q.    Have you seen this memo before?

A.    I had not seen this memo until I looked at the discovery documents.

Q.    Is this memo from Dr. Sciscione consistent with what he told you he was going to do the day before in terms of getting you more one-on-one attention with the physicians?

A.    Yes; and it's also consistent with my complaint that I was not getting enough supervision from the attendings and that I wanted a higher profile over there because it needed to be.

Q.    And what you are referring to was a lack of supervision.  That is something that you believe was the case for all of the residents?

A.    For all of the residents.

Q.    But this memo doesn't refer to giving special attention to any resident other than specifically you, does it?

A.    But I was the one that was complaining that the place was not properly supervised with attending physicians.

Q.    Did you view this step by Dr. Sciscione of increasing your one-on-one instruction with attending physicians as a positive thing that Dr. Sciscione did?

A.    Absolutely.  I wanted to learn as much as I could.  And the more I could squeeze out of those teaching physicians, the more I could put in my brain.  And that's the whole reason I was there.

Q.    All of the residents, in your experience anyway, view more one-on-one attention with attending physicians as a positive thing?

MS. BREWINGTON:  Objection.  It calls for speculation, but you can answer.

THE WITNESS:  I don't know.  But having

been out in private practice for six years I treasured and appreciated having an attending physician with me discussing things, going over with them, because I know what it was like to be out in the world alone.  And I just enjoyed having a teaching physician with me.  Because that's the way it is supposed to be.  That is what residency is all about.

BY MR. BLOOM:

Q.    Did you notice after your meeting with Dr. Sciscione on December 12th, 2002 that you, in fact, started to receive more one-on-one attention from attending physicians?

A.    From most of them, certain ones in particular.

Q.    Which ones in particular?

A.    Dr. Hoffman.  Dr. Kaminski when he was in triage.  Dr. Hochman.  And I appreciated it.  I enjoyed it.

Q.    Is there any person or persons whom you view as physicians who are most supportive of you during your residency?

A.    Dr. Hochman.

Q.    That's H-O-C-H-M-A-N?

A.    H-O-C-H.  I think that is correct.

Q.    Anything else?

A.    Beth -- I'm blanking --Shubert.

I would have to see her name.  I am blanking on her name -- Dr. McIntosh.  I'm trying to think of some of the other ones.  I'd have to see my book.  There were a lot of them that I worked with, Dr. Carlson, Dr. White, Dr. Mamberg.  As I can spit them out, it comes to me.  Dr. Jose -- what is Jose's last name, a Spanish guy?  Absolutely delightful.  I mean just loved to work with him.  I would take on extra cases to get in the operating room with him.

Q.    I'm going to ask you a hypothetical question.  If Dr. Hochman were to tell you he doubted whether you could successfully complete the program, would you view that differently than -- would you give that more credence than if it came from somebody else?

MS. BREWINGTON:  Objection.  It calls for speculation.

THE WITNESS:  I can't read somebody's mind.

BY MR. BLOOM:

Q.    I'm asking what's on your mind.  If they were to tell that to you.

1    A.   I don't think that's a fair thing to ask me,
2  either.
3    Q.   Why is it unfair to ask you?
4    A.   Because you're asking me to speculate.  And I
5  don't know.
6    Q.   I'm going to show you Zechman Number 5.  This
7  is a March 11th, 2003 letter from Dr. Sciscione to
8  you.  You received this letter, right?
9    A.   I did.
10    Q.   Did you, in fact, have a conversation with
11  Dr. Sciscione about your 2003 CREOG scores?
12    A.   I went into the office, and he told me that I
13  was in the 12th percentile.  And he led me to believe
14  that I made the lowest score out of the whole bunch.
15  And we found out later through discovery documents it
16  wasn't the lowest score.  In fact, the chief resident
17  getting ready to graduate made less than I did
18  percentagewise.  And I think that's very ironic that
19  he was making me feel so bad when I had two more
20  years of training when his chief resident did 8
21  percent, did poorer than I did.
22    Q.   Two questions on that.  One, you don't know
23  what conversations Dr. Sciscione had with other
24  residents about their scores, correct?

332

1    A.   That is true.
2    Q.   Second question.  Your scores on the CREOG
3  test are not scored on the same scale as a
4  fourth-year resident; that's also correct, right?
5    A.   I don't know how they score those, because
6  these are not the national scores.  This is some sort
7  of calculation they're doing in-house.  The national
8  scores that come from, you know, where all of them
9  are graded are different from this.  And I don't know
10  where they are coming up with this number.
11         But we find out later that Dr. Kirfides
12  did less than I, and Dr. Gray had a less percentile,
13  and they were not put on remediation.  And they were
14  not threaten to not promote.  And during that visit,
15  he acted like I was just the lowest score in the
16  whole bunch was what he led me to believe.  Which at
17  that time, I said, oh, well.  But now I think that
18  was quite unfair of him to come across that way.
19    Q.   I'm going to show you Zechman 66.  You've
20  seen this document before, right?
21    A.   Yes.  And this is the one that I have been
22  referring to where Dr. Gray is 8 percent.  Dr.-- I'm
23  trying to see that name.  Dr. Liu, a graduating
24  senior was 13 percent.

333

1    Q.   You don't have any reason to believe that the
2  percentages that apply to people in different classes
3  than you are similar percentages that apply to second
4  years, do you?
5    A.   The percentage is, to my understanding -- and
6  nobody ever explained this to me, but to my
7  understanding, that is the percentage of their class.
8  And so my 12 is based on PGY2s, all second years.  So
9  my actual grade was higher than that nationally.
10    Q.   These are percentiles?
11    A.   Only with in-house.  My grade was more in
12  line nationally.  This is only comparing --
13    Q.   Well, how would that be?  If that's the case,
14  they are only comparing you to three other people,
15  right?
16    A.   Or maybe just all PGY2s in the nation, but
17  not all residents in the nation.  The number that we
18  get from the national grading thing is a national
19  number comparing us with the national statistics.
20    Q.   I'm going to direct your attention to the
21  lower portion of this.  There's a section that says
22  remediation with promotion.  And it lists Robyn Gray
23  and Alex Kirfides as two people who are going to be
24  on remediation with promotion, correct?

334

1    A.   I'm not seeing Kirfides.  Your Kirfides was
2  at the very bottom of the list, and it just says that
3  he is assigned a mentor.  Look at that.
4         Now, Robyn Gray was remediation with
5  promotion.  And she was going up to be a graduating
6  senior.  But they promoted her to a chief resident
7  with those kind of grades.
8         "Remediation with no promotion," look at
9  me.  And for Dr. Likhyani, she was under me, and she
10  is not even enlisted here.  So how come she is making
11  less than I am and they're not giving her a mentor?
12  Do you see where I have been singled out here?
13    Q.   You did not prepare this document, right?
14    A.   I did not.
15    Q.   And I take it -- when did you first see this
16  document, Zechman 66?
17    A.   In discovery documents.
18    Q.   So when you say Alex Kirfides is not on
19  remediation, that's just your interpretation of this
20  document?
21    A.   Do you see the words there?  Look there.
22  "Remediation with promotion Dr. Robyn Gray."  And the
23  next "Dr. Kirfides, Mentor."  He was not under
24  remediation.

335

1   "Remediation with possible no promotion,
2   Dr. Zechman."
3       "Mandatory Board preparation -- each one
4   of these is a separate evaluation of their plans.
5   Here Kirfides is just given a mentor.
6   Q.   That's your interpretation of this document?
7   A.   It's saying it right here.  It's right in
8   front of you in black and white, sir.  Can't you read
9   it?
10  Q.   Dr. Zechman, so as of March 17th, 2003, there
11  is already the possibility that you are not going to
12  be promoted to the next year, correct?  You just read
13  it?
14  A.   Yes.  It says "possible."  The decision was
15  not made.
16  Q.   Right; but it was a possibility as of March
17  17, 2003 that you would not be promoted?
18  A.   Yes.
19  Q.   And at the bottom you will see there is also
20  a possibility that you would be offered no contract
21  at all.  Do you see that?
22  A.   I see that.
23  Q.   And if you were not offered a contract, that
24  would be functionally the same as terminating your

336

1   residency?
2   A.   I had not thought about that.  I had not seen
3   that.
4   Q.   Is that true, though?
5   A.   I don't know.  I had never put up with this
6   before.
7   Q.   If you are not offered a contract at the end
8   of your second year, does your residency end?
9   A.   I don't know.  I had not faced that problem
10  before.
11  Q.   Dr. Zechman, I'm handing you what has been
12  marked as Zechman 25.  It's a March 24th, 2003 letter
13  from Dr. Sciscione to you; is that correct?
14  A.   That's right.
15  Q.   And you received this letter?
16  A.   Yes.
17  Q.   There's handwriting at the bottom.  It
18  continues onto the second page.  That's your
19  handwriting.
20  A.   That's my handwriting.
21  Q.   And in this letter, specifically the second
22  sentence of the second paragraph, Dr. Sciscione
23  notifies you, at least as of March 24th, 2003, the
24  recommendation of the committee is that you repeat

337

1   your second year?
2   A.   Yes.
3   Q.   And then he tells you that he is going to
4   extend your remediation plan, correct?
5   A.   Hold on and let me read this a minute.
6   Q.   Sure.  Let me know when you're ready.
7   A.   Yes; okay, go ahead.  I read some of that.
8   Q.   You agree that Dr. Sciscione is telling you
9   that he is going to extend your remediation program?
10  A.   Yes.
11  Q.   And he also told that you this time was going
12  to be carved out of your resident schedule.  Is that
13  true?
14  A.   I don't know.  Do you want to give me a line
15  that you are seeing that?  Are you extrapolating or
16  are you actually seeing that?
17  Q.   No.  I will read you the quote, eighth line
18  down.
19  A.   I see it.  All right.
20  Q.   I am going to read you in the middle of the
21  paragraph starting with the word "during."  I'm going
22  to read a couple sentences.
23  A.   Okay.
24  Q.   "During this time and as part of your

338

1   extended remediation plan, you are expected to create
2   a schedule to meet with your mentor or coach, Dr.
3   Joseph Patruno.  This time is to be carved out of
4   your resident schedule.  It is your responsibility to
5   contact Dr. Patruno, set this up, and convey this
6   information to Sandy Kardos so that she can make the
7   proper arrangements in the schedule," close quote.
8       Did I read that portion correctly?
9   A.   That's correct.
10  Q.   And so it was your understanding that your
11  schedule was actually going to be modified so that it
12  could incorporate the extended remediation?
13  A.   This meant that in my opinion and how it
14  actually happened is that Dr. Patruno and I would get
15  together and come up with a schedule according to
16  what he had to do, because his schedule was priority
17  over my schedule, and that if arrangements had to be
18  made for me to have relief so that I could go meet
19  him, then that would be done.
20      Now, what we did most of the time is
21  waited until the end of the day when I was done with
22  my schedule.  And then we would go meet in his office
23  before I left for the day.
24      But where we were having problems was

339

A-184

1  meeting with his schedule. His schedule was so busy,
2  that we were having trouble getting together
3  sometimes. But they are saying we would meet
4  together and she would get relief when it was okay
5  for him to meet with me. And if I was assigned to
6  something, she would send me relief so that I could
7  meet with him. But the problem with meeting was more
8  with his schedule and how busy he was that interfered
9  with us getting together.
10     Q.  Did you have any problem with the fact that
11  Dr. Sciscione was extending remediation?
12     A.  No. I wanted to do whatever it took to
13  finish the program. If it took five years to finish
14  the program, then I was willing to give it that time.
15  I wanted to finish the program. I wanted to be a
16  Board certified Ob-Gyn.
17     Q.  Let me ask you a little differently. Im not
18  asking what you are going to do. I want to know if
19  you thought that Dr. Sciscione's or the committee's
20  decision to extend your remediation plan seems
21  unjustified to you.
22     A.  I felt that they needed to focus on allowing
23  me to advance my surgical skills, because I was not
24  getting into surgery. I was being reassigned even on

340

1  my Ob-Gyn rotations, I would get sent to triage. And
2  I felt I was not getting the base in order to get
3  that knowledge base.
4         The test taking comes with reading, and
5  taking the test and being well-rested when you take
6  the test so that you can get through the test. But I
7  felt that they were being a little unfair in
8  criticizing. Because most of the criticism that I
9  was getting was the surgical skills. And I had
10  already proven myself with the knowledge and would
11  continue to do that with the next test that was
12  coming up. That test only came up once a year.
13     Q.  You just said that most of the criticism
14  related to the surgical skills. What did the rest of
15  the criticism relate to you?
16     A.  Why are you doing this? You have got four
17  children at home. Why do you even want to do this?
18  Why are you here? That's where a lot of the
19  criticism came. You have got four children, and your
20  husband is a doctor. Why are you here? You are a
21  licensed physician. Why do you want to do this? Why
22  don't you go home to your children? That was the
23  rest of the criticism.
24     Q.  Did Dr. Sciscione tell you that there was a

341

1  perception among the faculty that you were defensive
2  and resistant to constructive criticism about your
3  actual medical performance there?
4         Did he tell you that?
5     A.  I don't recall him telling me that. I do
6  recall Dr. Patruno saying that I needed to act more
7  like a whipped puppy.
8     Q.  Were you aware that that was a concern among
9  the faculty, that you were defensive and resistant to
10  constructive criticism?
11     A.  I don't know. I welcomed criticism. I
12  welcomed teaching. That's the whole reason I was
13  there.
14     Q.  Were you aware, though, that that perception
15  existed?
16     A.  I don't think I was. You've certainly driven
17  that point several times today about criticism.
18     Q.  Well, you have now seen the resident review
19  committee meeting notes in this case now, right?
20     A.  I've seen some of them. I can't remember
21  what they said other than the initial one where they
22  were so concerned over people not even having taken
23  their Boards.
24     Q.  I'm going to show you Zechman 54. This is an

342

1  April 21st, 2003 e-mail exchange between you and Dr.
2  Sciscione. Is that true?
3     A.  Yes.
4     Q.  And you cc's somebody on your initial e-mail.
5  Who did you cc?
6     A.  That was so that I would have a copy of this
7  for my records. And what I was doing is, on my own
8  time, this was without instruction, I was following
9  around the chief resident so that I could -- like I
10  say, I was hungry for teaching. And I was following
11  around on my own going in when I was not required to
12  go in to gain the benefit of, number one, bonding
13  with these people that I knew were not liking me.
14         I felt like well, maybe if I come help
15  them out, if I work with them, they'll like me and
16  they will realize how sincere I am about this and how
17  badly I want to do this. And so I was e-mailing Dr.
18  Sciscione, letting him know that I was taking these
19  extra steps to try to, you know, be more. I would say
20  eager to learn, be more willing to help, you know,
21  being more subjective and servantile so that I
22  would -- I wanted to stay there. I wanted to learn.
23         I was going in trying to help these
24  girls out so that they would consider me part of the

343

1    team, because they were not considering me part of
2    the team.  I was, quote, different.  And I wanted to
3    be part of the team.
4        Q.   In the very middle there is a sentence where
5    you write -- it's a half a line, "Additionally I
6    continue to meet with Dr. Patruno weekly."
7            Do you see that?
8        A.   I see that.
9        Q.   Is that true that you basically met with Dr.
10   Patruno on a weekly basis?
11       A.   I can't remember.  I know for a while it was
12   weekly.  I don't know at what point it started not
13   being weekly.  But at some point it was.
14       Q.   And then near the end of this e-mail, you say
15   to Dr. Sciscione that you think he will see an
16   academic difference now that we are on reduced hours.
17   Do you see that?
18       A.   Yes.
19       Q.   What does that refer to?
20       A.   My fatigue.  Do you see already this is April
21   21st.  He was aware of my disability, and I was
22   having problems with fatigue because we were on
23   longer work weeks.  And this is in reference to, I
24   think things are going to get better, and I will have

344

1    more emergency and be more alert, because it says --
2    the previous call schedule required 30 to 36-hour
3    shifts that were killing me.
4            And so this was -- I had not asked for
5    ADA yet I had not asked for family medical leave.
6    But notice I am saying I am fatigued.  I am tired.
7    The 36-hour work shifts are killing me.
8        Q.   What are the reduced work hours that you are
9    referring to?
10       A.   It was illegal or -- not illegal but it was
11   not the norm.  At the time this was written prior to,
12   I think it was July of 2003, a national law went into
13   place that they had to pull us off of the floors
14   after 24 hours.  They could not make us work 36
15   hours.  Because we were on our feet without resting,
16   for 36 hours.  So we would work a night shift and
17   then the next shift with no sleep.  And they made
18   that illegal in July of this year, and maybe it
19   started in March.  I forget when that law went into
20   effect.  And this was in response to the new rules
21   where we could only go 24 hours without resting or on
22   call rather than the previous 36.  And I was really
23   having fatigue problems with the 36 hours.  And
24   that's, you know, when -- with the CREOG I had pulled

345

1    two of those 36-hour shifts prior to the weekend of
2    taking that test.  I was extremely fatigued.
3            Before I crashed and was hospitalized, I
4    had pulled one or two of these 36-hour shifts, and
5    they were killing me.
6        Q.   Which shift are you talking about?
7        A.   They were 24-hour stints.
8        Q.   Were the shifts reduced just for you or for
9    everybody?
10       A.   Nationwide.  It was a Nationwide rule because
11   this was killing everybody.
12       Q.   The week before you started your second year
13   as a second year resident, this would be the last
14   week of June, do you recall having a meeting with Dr.
15   Ekbladh to discuss how things were going to progress
16   on the floor?
17       A.   I can't remember.
18       Q.   Do you remember him telling you that your
19   progress going forward and that your status would be
20   reviewed every six weeks?
21       A.   I can't remember.  I would meet with him
22   frequently.  I forget how frequently now.  But I
23   can't remember --
24       Q.   Well, let me clarify.  I don't mean that he

346

1    could meet with you every six weeks.  My question is
2    did Dr. Ekbladh tell you that once you started your
3    second, second year, that the committee would need to
4    review your status every six weeks?
5        A.   No, I don't remember that being said at all,
6    absolutely not.  I would have frequent evaluations by
7    the mentors that I was assigned to, but not what you
8    just said.  I never heard of that.
9        Q.   Dr. Zechman, I'm going to hand you two
10   exhibits at a time Zechman 17 and 18.
11       A.   Okay, go ahead.
12       Q.   Did you receive either of these two documents
13   while you were at Christiana Care?
14       A.   I received this top one.  And the page behind
15   it.  I did receive this one and this one.  Let me
16   see.  I received all of these.
17           MS. BREWINGTON:  Can you identify them?
18           THE WITNESS:  Zechman 17?
19   BY MR. BLOOM:
20       Q.   And 18; did you receive 18 too?
21       A.   They may not be different.  I received one of
22   these.  I don't know which one I received, but one of
23   the two.  But I don't remember which one it is
24       Q.   Just so the record is clear, unless you tell

347

1    me that there is a difference, I'm not sure there is
2    actually a difference between these two documents.
3    If you think there is a difference, point it out to
4    me.
5        A.    I don't know, you know, do you want to walk
6    through it line by line right and find out?  That's
7    not a fair assessment right now unless you want to
8    walk through it together.
9        Q.    Well, let's turn to -- well, first of all,
10   let's take the first page of Zechman 17.  This is
11   part of your remediation plan, right?
12       A.    Yes.
13       Q.    Who gave you this document?
14       A.    This top document was given to me by Dr.
15   Hoffman.
16       Q.    Did he say anything to you when he handed you
17   the document?
18       A.    I'm sure he did, but I don't recall it.  He
19   said lots.
20       Q.    Did you think any portion of this remediation
21   plan as it is described in Zechman 17 was unjustified
22   remediation?
23       A.    No; I welcomed this, and I enjoyed doing it.
24   I enjoyed practicing this stuff.  He never tested me

1    on it, though.  All of this was given to me, and I
2    would go and practice it.  I would even stay late and
3    practice, and I was never tested on it.
4             And then Dr. Ekbladh, when this first
5    came into being, Dr. Hoffman was going to now be my
6    mentor.  Dr. Patruno was no longer my mentor.  And
7    then for some reason Dr. Ekbladh basically took me
8    away from Dr. Hoffman, and Dr. Hoffman was no longer
9    my mentor.  I was never tested on this.
10       Q.    When you say tested on this, what was the
11   "this" you are referring to?
12       A.    These little instructions here.
13             Now, each quiz where we would have the
14   chapters, that's where I was talking about the test
15   where I would have to get up at 4:00 in the morning
16   to study.  And yes, that was unfair, because not only
17   were they adding to my work day, this had me having
18   to get up four o'clock in the morning to do this
19   reading before I went in at six o'clock in the
20   morning.  I don't remember when this was first given
21   to me.  I don't remember whether it was right after I
22   was requesting leave and time off or, you know,
23   after.  I'm not sure.
24             But what was happening was, they gave me

1    the schedule and they themselves did not allow me to
2    follow it.  They would reassign me.
3        Q.    Who is "they"?
4        A.    Dr. Gray.  And when I would complain to Dr.
5    Ekbladh, nothing would be done.
6             I even told Dr. Gray, This is what I am
7    supposed to be doing.  And I would show her the
8    schedule, go call Dr. Ekbladh if you don't believe
9    me.  And I don't know whether she did or not, but
10   there was no reinforcement on the floor, and I had to
11   go wherever Dr. Gray said to go.  I was supposed to
12   have practice sessions.  And she would assign me
13   labor or delivery to some urgent thing or C section
14   where I would not be able to get these training
15   sessions that I needed.
16             For Friday, the 25th, the operating
17   room, I was supposed to be there with Dr. Kaminski.
18   I was sent to triage.  We have documentation of this.
19   And other people went into the operating room.
20       Q.    What would be the documentation of that?
21       A.    The surgical things where I'm stuck at that
22   time in triage and where I document I am supposed to
23   be in the operating room, and so-and-so goes.  We
24   have got documentation of that.

1        Q.    These are documents that you wrote?
2        A.    These are documents as well as the case,
3    things from the OR or from triage.  When I was in
4    triage, I documented my presence in triage by keeping
5    the stickers that had the medical record numbers on
6    them.  That was my proof that I was there seeing
7    those patients and not in the OR where I was supposed
8    to be.
9        Q.    I'm going to show you Zechman 112.  This is I
10   believe the same schedule, but it has handwriting on
11   it.  Is that your handwriting?
12       A.    That looks like my handwriting.  And right
13   there, the February 25th, no OR.  You see, I was not
14   put in the OR.
15       Q.    Did you go through the schedule to mark off
16   the times were you were pulled from assignments that
17   were on the schedule?
18       A.    I did.  I would mark where I was.  And these
19   are my workday hours, 6:30 in the morning to 6:30 in
20   the p.m.  I notice, you know --
21       Q.    There is not a question pending yet.  When
22   would you mark off like you did on July 25th when you
23   were pulled from an assignment, did you make those
24   notations as the events were occurring, or was that

1    something you did more recently?

2        A.    I either did it like the weekend after it

3    occurred, like when I would review the week, because

4    I knew this was happening.  And I was so frustrated

5    about being reassigned when this was so critical to

6    me to prove myself.

7            So like at the end of the week I would

8    fill in these schedules.

9        Q.    You just referred to the one that's July

10   25th, and you indicated you were pulled from the

11   assignment with Dr. Kaminski by writing "no OR" and

12   circling it; is that true?

13       A.    Right.  That means I was not sent to the OR.

14   I was reassigned.  I was supposed to be in there with

15   Dr. Kaminski, and they would not let me go.

16           And it was Dr. Gray, and I forget sure

17   who exactly went in on that case, but it was Dr. Gray

18   that reassigned me.  And Dr. Kaminski even sent a

19   letter to Dr. Lamar that they were not letting me

20   have the surgical cases.  How can I improve if you

21   don't give me the training?

22       Q.    Are there any other assignments on this

23   schedule where you note here that you were pulled

24   from the assignment?

352

1        A.    I did not do my full documentation on these.

2    I did it more in some of my notebooks.

3        Q.    It's a "yes" or "no" question, really.  Are

4    there any other notations here that reflect you were

5    pulled from the assignment?

6        A.    Not on this page, but they are elsewhere.

7        Q.    Elsewhere where?  You mean elsewhere in

8    different kinds of documents?

9        A.    In my patient logs.

10       Q.    As you sit here today -- and let's just look

11   at the front page.  This is the July 2003 curriculum

12   for Ellen Zechman.  As you sit here now, can you

13   think of any other assignments during the month of

14   July other than July 25th where you were pulled from

15   your special schedule?

16       A.    I have made a list.  And my attorney has that

17   list where I went through my documents with that.  I

18   can't from memory say that.  I have to have my

19   diaries.  And I kept daily diaries, and there is

20   documentation of other pullings.  And we do have that

21   documentation.  My attorney has that, because we

22   broke it down and specifically, you know, gave days

23   and case numbers and that sort of thing.

24       Q.    How recently did you provide that to your

353

1    lawyer?

2        A.    I don't know.  We've got so much

3    documentation that it's --

4            MS. BREWINGTON:  Can I answer?

5            MR. BLOOM:  Sure.

6            MS. BREWINGTON:  It's months ago it's

7    been produced.

8            THE WITNESS:  That was prior to our

9    first deadline of having discovery.  So whenever that

10   was, because that's when I sat down and, you know,

11   went through the diaries and made those lists.

12   BY MR. BLOOM:

13       Q.    Dr. Zechman, I'm going to show you Zechman

14   30.  This is a July 30th, 2003 memo that Dr. Ekbladh

15   gave to you.  Is that true?

16       A.    This was at a private meeting in his

17   office --

18       Q.    Doctor, I am just going to ask you a "yes" or

19   "no" question.

20       A.    I am not going to answer "yes" or "no."

21   There is more than that.

22       Q.    Did you receive this document Zechman 30 from

23   Dr. Ekbladh?

24       A.    Yes, I did.

354

1        Q.    Is that your signature on the signature line

2    above the words "Ellen Zechman, M.D."?

3        A.    Yes, it is.  This was exactly seven days

4    after I requested leave or ADA.

5        Q.    Why is that significant to you?

6        A.    Because I had just signed a contract for the

7    whole year the very last days of June.  And it was

8    effective July 1st.  And the only thing that had

9    happened between now and then was that fact that I

10   was asking for leave or accommodation.

11       Q.    You were aware, weren't you, that the

12   committee was going to continue to review your status

13   as a resident?

14       A.    That was not up for a while.  That was not

15   due for at least --

16       Q.    Six weeks?

17       A.    No; it was going to be longer than six weeks.

18   It was more like two months, three months.  It was

19   not six weeks.

20       Q.    Were you aware that there had already been a

21   vote by the committee to consider terminating your

22   residency.  Are you aware of that?

23       A.    I heard one or two people did that, and the

24   vote was brought down.  And the vote that went

355

1  through what that I be given the PGY2 contract with
2  the possibility of being promoted to PGY3 once I got
3  more surgical skills.  It was not a unanimous
4  decision.
5     Q.  Some people wanted to terminate you before
6  that?
7     A.  No.  Some people wanted to just help me get
8  my surgical skills and send me forward.
9     Q.  What's the basis of your knowledge of the
10  committee meeting events that you were just
11  testifying about?  Where did you learn that?
12     MS. BREWINGTON:  I am going to object to
13  vague.  But you could go ahead and answer.
14     THE WITNESS:  The attendings on the
15  floor, the different attendings that I worked with,
16  the physicians told me that.
17  BY MR. BLOOM:
18     Q.  Who?
19     A.  I can't remember.  But it was common
20  knowledge that there were one or two that did not
21  like me and did not want me there.  There were others
22  that, you know, liked me and thought it was
23  ridiculous.
24     Q.  Thought what was ridiculous?

356

1  decided to not promote me, that there was, from what
2  I've heard, only one physician that said that.
3     Q.  Who told you that?
4     A.  I can't remember, but it was lounge talk.
5     Q.  Was that person who told you that a member of
6  the committee?
7     A.  Yes, they were.
8     Q.  Did that person tell you who wanted to
9  terminate your residency?
10     A.  No, they did not, but I heard through the
11  grapevine from some of the residents a name.
12     Q.  What residents told you the name?
13     A.  I'm trying to think.  I can't remember,
14  because like I said, this was lounge conversation
15  again and I can't remember.  I can't remember.
16     Q.  What was the name that they told you?
17     A.  Faith Brosch, B-R-O-S-C-H.
18     Q.  From your conversations with these other
19  residents whose names you don't now remember, but do
20  you remember from those conversations how they came
21  to learn that Faith Brosch wanted to terminate your
22  residency?
23     A.  I think there -- and I'm not sure, I think
24  there was a resident representative at these

358

1     A.  What they were doing, like Dr. Vakili, Why
2  are they mad at you?  Why are they doing this to you?
3     Q.  Do you have any reason to believe Dr. Vakili
4  has ever seen any of the evaluative materials that
5  relate to you?  Do you have any reason to believe
6  that?
7     A.  I think he has, and I think he probably
8  talked to the other attendings while they were
9  sitting in lounges waiting for babies to be born.
10  They discussed things.
11     Q.  You don't have any personal knowledge of what
12  documents he has seen or who he's talked to; is that
13  true?
14     A.  No; that's speculation.
15     MS. BREWINGTON:  Off the record.
16     (A brief break was taken.)
17  BY MR. BLOOM:
18     Q.  I just heard from you that there were a
19  couple of physicians on the committee that had wanted
20  to terminate your residency earlier in the spring of
21  2003.  Did I hear that right?  I don't want to put
22  words in your mouth, but I thought that's what you
23  were telling me.
24     A.  That is what I heard from the vote when they

357

1  meetings, and it came through the grapevine through
2  the resident that was attending those meetings, but I
3  don't know which one was attending and, you know, how
4  it came through the grapevine.
5     Q.  I'm going to hand you what's been marked as
6  Zechman 31.  And this is an August 19th, 2003 e-mail
7  exchange between you and Sandy Kardos?
8     A.  Yes.
9     Q.  I take it that you initiated this e-mail
10  exchange with a question asking what was discussed at
11  yesterday's meeting?
12     A.  I cannot remember.  It was in question, but I
13  don't know whether I was in turn, you know, sending
14  an e-mail over something that was asked me in person,
15  you know, and I was just responding later.  I don't
16  remember.  I honestly don't remember the surrounding
17  circumstances of this or the discussion that was
18  concerning it.
19     Q.  So you don't know whether this relates to the
20  committee vote that was held the day before?
21     A.  I don't know.  I don't know whether, you
22  know, it was relating to my requests from, you know,
23  my, to this point denied request for leave and
24  accommodation.  I cannot remember.  I really can't.

359

1    Q.    Okay.

2    A.    All I know is I was still trying to get FMLA.

3    I was still trying to get leave, sick leave,

4    whatever, and I was being ignored.

5    Q.    Incidentally, Dr. Zechman, a few questions

6    ago actually just before we took the break you made

7    reference to your surgical skills and that being the

8    area where you needed improvement; is that true?

9    A.    Initially I felt that the improvement had

10   been greatly improved by August, and I was getting

11   good evaluations which, for some reason, they had not

12   appeared in the discovery stuff.  And that was --

13   once I got the chance to get in the operating room,

14   you know, and got experience, those skills were

15   coming up, because that's what I needed.  I needed,

16   you know, a chance to get in there and do it, you

17   know, needed practice.

18   Q.    Do you acknowledge that faculty members

19   expressed to you concerns about your progress in

20   areas other than surgical skills?

21   A.    Other than those letters, no, they didn't.

22   They did not discuss it with me personally.

23   Q.    I'm going to hand you Zechman 32.  This is an

24   August 20th, 2003 letter from Dr. Ekbladh to you,

1    A.    I think I needed my rest and my recuperation

2    and then discuss anything else that needed to be

3    discussed.  But already we were close to over a month

4    for me asking for sick leave, FMLA, ADA, whatever I

5    could get.  I still had not had it.  My schedule was

6    being increased and, you know, they are talking here

7    about me -- that I seemed stressed and have many

8    signs of depression.  Yes, I was stressed.  I was

9    sick and they were not giving me time off.

10   Q.    And Dr. Ekbladh asked you to see a

11   psychiatrist, didn't he?

12   A.    You're right.  And do you know what I told

13   that psychiatrist?  I said, I need sleep, I need

14   rest.  I'm sick.  I need to have leave.  I said, talk

15   to me after I have rest and leave.

16   Q.    This is Dr. Marcus?

17   A.    Yes.  And she suggested, well, do you think

18   you're depressed?  I said, no, I'm exhausted.  I'm

19   not depressed, I am exhausted and sick.

20   Q.    Dr. Marcus did tell you that she thought you

21   should pursue ongoing counseling, correct?

22   A.    I forget what she said, but I told her that,

23   you know, she needed to help me get some time off

24   because I had put in for this ADA.  I had put in for

1    correct?

2    A.    Yes.

3    Q.    And you received a copy of this letter?

4    A.    I did.

5    Q.    Let me know when you're ready.

6    A.    Go ahead.  I'm ready.  I'll have you stop if

7    it's something I have not seen.

8    Q.    Did Dr. Ekbladh express to you verbally,

9    apart from within this letter, that he thought you

10   should be tested for a learning disability?

11   A.    No, he did not.  He never said anything about

12   being tested for a learning disability.  This was the

13   first I had ever seen anything about that underlying

14   learning disability, "but that these could not be

15   clearly separated."  I have no idea what he was

16   talking about there.

17        I was exhausted.  I was sick.  I needed

18   time off.  And I don't know why, you know, here it is

19   a month later they are talking about all this kind of

20   stuff and yet they are not giving me the one thing

21   that I needed, and that was time off to rest and

22   recuperate.

23   Q.    That's the one thing you thought you needed

24   was rest?

1    the FMLA and, I said they're not giving it to me.

2    You know, don't talk to me about, you know,

3    counseling when they are not even giving me the time

4    to recuperate from a physical illness that I need

5    time to recuperate from.

6    Q.    Did you tell her that?

7    A.    I did.  I said, you know, help me get time

8    off.

9    Q.    Did you tell her, don't talk to me about

10   counseling?

11   A.    I didn't say it that way.  I didn't say don't

12   talk to me about counseling.  I said, what I need is

13   rest.  I said, you know, that's what I need.  That

14   should come first the fact that we take care of the

15   physical illness that I have been trying to get time

16   off for, then if there is psychological counseling

17   needed after that, you know, let's discuss that after

18   we take care of the physical problem.  That's just

19   good medicine.

20   Q.    Did you pursue counseling at any time since

21   your meeting with Dr. Marcus?

22   A.    No, because I was still trying to get my

23   leave and my --

24   Q.    Just to clarify, I mean at any time after

8/16/2006 Plaintiff Zechman (Vol. 2)

1    your meeting with Dr. Marcus until today.

2        A.   I had used my preachers as my counselors.  I

3    have used my family and my friends.  All of this has

4    been tremendously emotionally traumatic for me.  And

5    I have used my personal support system as my

6    counseling to get me through it as well as my pastors

7    at church.  That's the counseling I've had.

8        Q.   Now, Dr. Fraser testified that he also

9    suggested to you that you speak to somebody

10   professionally for counseling.

11           MS. BREWINGTON:  I'm going to object.

12   That mischaracterizes the testimony.

13           THE WITNESS:  I speak to him.  He's part

14   of my counseling network.  And I speak to my Ob-Gyn.

15   BY MR. BLOOM:

16       Q.   What was your reaction when you saw this

17   reference to a potential underlying learning

18   disability?  Did you respond in any way to Dr.

19   Ekbladh about that?

20       A.   No, I had no idea what he was talking about.

21   He is not one you get to talk to things about.  He

22   just, you know, gives orders and you do it.  No, I

23   kind of blew it off because, you know, it was like

24   what's he talking about, you know?  The only problem

364

8/16/2006 Plaintiff Zechman (Vol. 2)

1    I had was I was sick and I needed time off.  I needed

2    rest.

3        Q.   All right, you can put that document aside.

4    I'm going to hand you Zechman 34, which is a

5    September 4, 2003 letter from Dr. Ekbladh to you.

6        A.   Uh-huh.

7        Q.   Is that what this document is?

8        A.   Yes, that was my schedule for the rest of the

9    year.  And please note that there's nothing about

10   leave, sick leave, FMLA and ADA on here.

11       Q.   Dr. Zechman, I'm sorry.  You're going on to

12   give speeches that do not respond to the questions

13   I'm asking.

14       A.   I'm sorry, but that point needs to be made.

15       Q.   Let me finish.  I'm going to ask you

16   questions and ask you if you could just -- I just

17   asked you if the document is what it says it is.  If

18   at the end of the deposition your lawyer wants to ask

19   you other questions, this case is going to go on, and

20   you'll have every opportunity to say whatever you

21   want to say, but if we're going to finish this, I'll

22   ask you to just answer the question and then wait for

23   the next question.

24           Did you receive this document, Zechman

365

8/16/2006 Plaintiff Zechman (Vol. 2)

1    34?

2        A.   Yes, I did.

3        Q.   And so you're aware that you were going to

4    have another evaluation on September 29th, 2003 by

5    the review committee?

6        A.   When this was down here, yes.

7        Q.   You can put that away.

8            Did Dr. Marcus suggest that you consider

9    taking medication?

10       A.   She suggested that, and I told her that if

11   that was needed, I would be open to that, but I

12   needed to get rest and time off before doing that.

13           You don't throw medication on somebody

14   that, you know, just for the sake of it when you have

15   got an ongoing medical condition that has not been

16   taken care of and not addressed.  But I was open to

17   that, but first things first.  Let's get me

18   recuperated and then let's, you know, address those

19   issues.

20       Q.   Did you express any concern to Dr. Marcus

21   that medication might hinder your ability to function

22   as a resident?

23       A.   You never know.  Any medication can have side

24   effects.  I did not want to take medications and show

366

8/16/2006 Plaintiff Zechman (Vol. 2)

1    up to work the next day.

2        Q.   So is that a yes, that you did express that

3    concern to her?

4        A.   Yes, I said, I need time off.  I need time

5    off to recuperate and see what's going on here.  And

6    they still didn't give me time off.

7        Q.   I'm giving you Zechman 35.  This is a

8    September 30th, 2003 letter from Dr. Ekbladh to you,

9    correct?

10       A.   That's correct.

11       Q.   And you received this letter?

12       A.   I did not receive it until sometime late in

13   October in the mail.

14       Q.   So you heard over the telephone the

15   decision --

16       A.   Dr. Kaminski, yes, sir.

17       Q.   He told you on October 3rd?

18       A.   Yes, sir.  When I called in to tell them that

19   I was coming back, I had been released by my doctor,

20   he said, don't come back.  Dr. Ekbladh says you're

21   terminated.

22       Q.   Did that seem like an odd thing to you that

23   he would say Dr. Ekbladh terminated you?

24       A.   That's what he said.  And you're right, I

367

**A-191**

1   thought it was very odd.  He said Dr. Ekbladh had
2   terminated me.
3       Q.   Is that typical in your experience that
4   members of the resident review committee would
5   disclose to a resident the internal communications of
6   the committee meetings?
7           MS. BREWINGTON:  Objection.
8           THE WITNESS:  I don't have any prior
9   experience in things like this, so I have no idea.
10  BY MR. BLOOM:
11      Q.   Had anybody else who was a member of the
12  resident review committee ever divulged to you
13  discussions that were held in that meeting?
14      A.   Which meeting are we talking about?
15      Q.   Any resident review committee meeting.
16      A.   There were always rumors of, you know, lounge
17  talk and, you know, of what went on any time there
18  was a meeting.
19      Q.   But this is serious.  I mean, you're saying
20  that Dr. Kaminski, who was a member of the resident
21  review committee, divulged to you internal
22  communications of a meeting of that committee; is
23  that what you're saying?
24      A.   I don't know whether that was a meeting of

1   the committee.  All I know was he called me back and
2   said not to come back to work, that Dr. Ekbladh had
3   terminated me.  He didn't say anything about the
4   committee meeting.
5       Q.   I'm handing you Zechman 37.  Did you type
6   this document?
7       A.   That very day, shortly after I got off the
8   phone with Dr. Kaminski.
9       Q.   And you say right here in this letter that
10  you learned of the decision at 8:30 in the morning on
11  October 3rd; is that correct?
12      A.   I would assume that this is correct because
13  this is -- you know, I typed it that day.
14      Q.   Whose idea was it to permit you to resign as
15  opposed to going through the fair hearing process?
16      A.   It was Dr. Ekbladh's as well as I had -- I
17  was going to proceed with the fair hearing process,
18  and I talked to Dr. Brian Little and, you know, told
19  him what was going on.  And I also had contacted
20  Dr. -- I'm blanking -- Charles Whitney concerning
21  being my advocate because he was a previous residency
22  director.  And both Dr. Little and Dr. Whitney said
23  that you, you know, can't fight this.  He'll get you
24  later.  And when I talked to Dr. Ekbladh about

1   fighting it, he basically threatened me and he says,
2   well, if you fight it and you win, I'll just get you
3   later.  And he threatened to report me to the
4   National Data Practitioner's Bank and basically
5   didn't give me a choice.  And it was like, well, why
6   fight me, because I will just get you later.  If you
7   win, I'm still your supervisor; I'll still get you.
8           And then when I talked to Dr. Whitney,
9   Charles Whitney, about this, he says, you know, he's
10  right, he'll just get you later.  And he told me
11  about what Ekbladh had done to him about -- just
12  about putting him out of business by cutting out his
13  operating room time and being a surgeon.
14          Dr. Charles Whitney is a GYN oncologist,
15  which is a cancer surgeon for the GYN.  He stood up
16  against Dr. Ekbladh and Dr. Ekbladh basically gave
17  away all his operating room time and just about put
18  Charles Whitney out of business.  Because a surgeon
19  makes his living by operating, and if are you not
20  given any OR time, you're in bad shape.  And he says,
21  he'll get you later and, you know, he is still going
22  to be there.  And he says, you have got to resign.
23  You have got to get out of there because he will ruin
24  you.  He is out to ruin you.

1       Q.   Do you have any knowledge of the
2   circumstances that you just described that relate to
3   Dr. Whitney's privileges other than what Dr. Whitney
4   told you?
5       A.   There was talk with the attendings when I
6   would be operating.  Let me see if I can remember one
7   of the surgeon's name.  She's not there anymore and
8   the name is not coming to me.  But she and I
9   discussed it.  And this was before I ever had this
10  incident, about how Dr. Whitney was coming to all the
11  other GYN surgeons asking them if he could have their
12  operating room time if they didn't need it because
13  Dr. Ekbladh had cut him out of the schedule and he
14  needed more operating room time in order to take care
15  of his patients.
16          So it was common knowledge among the
17  other GYN surgeons because Dr. Whitney had gone
18  through, you know, asking for more operating room
19  time.  And this was the discussion among the
20  surgeons, could they give him any time.
21          But Dr. Ekbladh basically said, you
22  know, if you try to fight me, I'm still going to be
23  your supervisor; I am still the department chair and
24  I will get you later.  So I was forced to resign.

1    Q.   In your mind, was resigning preferable or
2    worse than if the termination decision just stood as
3    an involuntary termination?
4         They are equally as bad because I still
5    have to justify them for the rest of my life.  Any
6    application I put on, both of them are permanent
7    damage to my career, permanent damage, because any
8    time I fill out any application, if I -- I probably
9    could not even get another residency position if I
10   wanted one in Ob-Gyn, because in the minute they
11   said, well, what happened to the last, the
12   resignation is just as bad as this.  I didn't
13   complete the program and people are going to count
14   that against me.
15        I would have rather stayed in a horrible
16   program and been abused for six years rather than
17   this happen, because at least I would have finished
18   and been Board certified at the end.
19   Q.   So just the fact that you left the program
20   prematurely you view as something that will be held
21   against you?
22   A.   It is held against you, it is.  When you
23   interview at other places, anywhere, it is held
24   against you.

1    Q.   Just the fact that you didn't finish?
2    A.   Yes.  My career is permanently ruined because
3    of this.  And had I had time to get some rest and
4    accommodation, I could have finished this.  It might
5    have taken an extra six months, but I could have done
6    it.  And that's something I'm never going to get
7    over.
8    Q.   Dr. Zechman, you have seen a lot of documents
9    during this case that you didn't see at the time,
10   true?
11   A.   I have.
12   Q.   Has it occurred to you now, now that you have
13   seen a lot more documents, that you and the faculty
14   had different perceptions at the time as to what were
15   the areas in which you needed to improve?
16        Has it occurred to you now that there
17   might have been a disparity between what you thought
18   were the areas that you needed to improve and the
19   areas that the faculty thought you needed to improve?
20   A.   I was open to all areas of improvement.  What
21   was being told to me was, you know, it was my
22   surgical skills.  It was primarily my surgical
23   skills.  That was repeatedly told to me, you know,
24   but I was open.  I mean, I was reading, you know.  I

1    just wanted to do it.  You know, whatever it took,
2    however long it took, I just wanted to finish.
3         And I wanted the opportunity to finish
4    and -- but I was having problems because of the work
5    schedule and because of my physical problems, but it
6    was not something that couldn't be overcome had they
7    just worked with me and given me the opportunities.
8    Q.   I'm going to hand you what has been marked as
9    Zechman 46.  This is an e-mail that you wrote to a
10   Dr. O'Connor; is that true?
11   A.   That's correct.
12   Q.   Is it true that you sent this e-mail on June
13   18th, 2003 and then you resent it to him the next
14   day?
15   A.   That's correct.
16   Q.   Who is Dr. O'Connor?
17   A.   He is basically the head of Ob-Gyn training
18   programs nationally.
19   Q.   This is an e-mail in which you communicated
20   to Dr. O'Connor that you have certain complaints
21   about the residency program at Christiana Care?
22   A.   Yes; and we have gone over quite a few of
23   these already.
24   Q.   And you say in the first paragraph that you

1    are asking Dr. O'Connor to keep your name
2    confidential?
3    A.   At that time, yes.
4    Q.   Why did you want him to keep your name
5    confidential?
6    A.   Because I knew that this would be the kiss of
7    death for me if they found out I did it.  Read the
8    last line.
9    Q.   That's exactly where I was going to turn.
10   This is the part where you -- once again, is that the
11   sentence you were about to point to?
12   A.   Huh-uh, the I am scared, but I cannot keep my
13   mouth shut and see this abuse continue.
14   Q.   And in the previous sentence, this is the
15   second to the last sentence of the e-mail, you write,
16   quote, "Once again, I am begging you not to reveal me
17   as a source.  I am sure they would seek out any
18   reason possible to get rid of me," close quote.
19   A.   Absolutely.  Yes.
20   Q.   So it was important to you that Dr. O'Connor
21   maintain your anonymity?
22   A.   Yes.
23   Q.   And so I take it that you did not, given your
24   concerns about being retaliated against, I take it

1    that you did not disclose to anybody at Christiana
2    Care that you had filed this complaint?
3        A.    No, not at that time.  I might have mentioned
4    it, you know, later after all was said and done, you
5    know, like after October.
6        Q.    Oh, after you were terminated?
7        A.    Yes.  But not at this time, because I really
8    felt and I very strongly feel this was contributory
9    to especially the turn of events in August, because I
10   am probably the only one that would have enough, as
11   Dr. Ekbladh would say, chutzpa to do this, to
12   complain and to try to get things corrected on a
13   higher level when nothing was happening locally.
14       Q.    But you were careful not to disclose the fact
15   that you had sent this complaint to anybody at
16   Christiana Care while you were still employed by
17   Christiana Care?
18       A.    Yes.  But I'm sure that by reasonable
19   deduction that they knew it was me, because like I
20   said, I am the only outspoken one that had, you know,
21   the guts to say, hey, this is wrong, because I wasn't
22   that whipped puppy.
23       Q.    You sent this e-mail after you had learned
24   that you were not going to progress to the third

1    year.  So they were still, you know, saying that I
2    was -- you know, they were considering giving me the
3    second year, but it was not a done deal yet when this
4    went out.  But I was already, you know, continually
5    being reassigned away from surgery where, you know, I
6    wasn't getting those opportunities.
7             Do you see down here at the bottom of
8    the page where I just read that?
9        Q.    You're reading a document that was written by
10   Dr. Sciscione, right?
11       A.    Yes.
12       Q.    I'm going to hand you what was marked as
13   Zechman 47.  This is a follow-up e-mail from you to
14   Dr. O'Connor regarding the complaint you had sent him
15   in June?
16       A.    Uh-huh.
17       Q.    Okay.
18       A.    That's yes, excuse me.
19       Q.    This is now approximately almost four months
20   since you left Christiana Care that you sent this?
21       A.    This copy was printed.  I don't know where
22   this copy came from, whether it's my copy.  This was
23   actually sent in October shortly after, but this was
24   printed off the computer for my EEOC Complaint on

1    year, true?
2        A.    I don't think it was engraved in stone.  It
3    had not transpired yet.
4        Q.    But you had been told in March by Dr.
5    Sciscione that that --
6        A.    That it was a consideration.  It was still a
7    consideration at that point.  It was not a done deal.
8        Q.    He actually told you that was the
9    recommendation as of that point, right?
10       A.    But it also said that there was wiggle room
11   there.  Let me see if I can dig it up where we can
12   read that.  Because it said if I did this, that and
13   the other, I would be offered PGY3, a third year
14   contract.  And actually I was told that if I did
15   all -- that if my surgical skills improved and
16   everything went fine through the summer, that I would
17   be offered a PGY3 contract in the fall.  And Dr.
18   Hochman can testify to that when you get him in here,
19   because, you know, that was still what they were
20   saying.
21             Okay.  This is March 24th.  If you meet
22   these criteria and prove that you are capable of
23   performing the PGY 3 responsibilities, you will be
24   offered a contract as a PGY 3 for the 2004 academic

1    January 29th, 2004.  Do you see that number right
2    there?  That's the date I printed it off and, you
3    know, added it to my stuff that was being sent.  The
4    actual e-mail was sent in October after I had been
5    forced to resign.
6        Q.    Okay, you can put that away.
7        A.    Okay.
8        Q.    I'm going to give you Zechman 48.  What is
9    Zechman 48?
10       A.    This is a follow-up to this one that we just
11   read.  Notice the date is October 28th?  And that's
12   the actual date it was sent.  So this one was sent
13   prior to that because this one came next.
14       Q.    Just so we clear, you're saying that --
15       A.    Zechman 47.  And this Zechman 48 was a
16   follow-up to Zechman 47.  And the actual date this
17   was sent is October 28th.
18       Q.    Hang on one second.  So Zechman 47 is
19   something that you sent before you sent Zechman 48?
20       A.    Yes.
21       Q.    Zechman 47 occurred earlier in time, earlier
22   in October than Zechman 48?
23       A.    I think so, yes.
24       Q.    Who is Ms. Miller?

1    A.   She is the complaints officer for Dr.

2  O'Connor, his assistant.  And I had been told not to

3  send the stuff to him but to send it to her instead.

4  And so that's why I was forwarding it to her, because

5  that's what I was told to do and I was trying to

6  follow the proper chain of command procedure.

7         (Brief recess taken.)

8  BY MR. BLOOM:

9    Q.   Dr. Zechman, I'm going to hand you Zechman

10  49, which is a January 6, 2004 letter to you from

11  Robert Laskowski.  Who is Robert Laskowski?

12    A.   Well, it says right there at the bottom of

13  the page, president and chief executive officer for

14  Christiana Care.

15    Q.   And this January 6th, 2004 letter from him,

16  did you receive this letter?

17    A.   I did.

18    Q.   And he refers in this letter to a letter that

19  you sent to Dr. Laskowski on December 13th, 2004

20  regarding Dr. Ekbladh; is that true?

21    A.   That's true.

22    Q.   Do you still have a copy of the letter that

23  you sent to Dr. Laskowski?

24    A.   No, I sure don't.  I wish I did.  This was

1  kind of a last ditch effort to get things corrected

2  concerning all this mess before I filed an EEOC

3  Complaint or sought legal action.  I wanted to get

4  things corrected.  I knew that this was all wrong and

5  shouldn't be happening and, you know, I was trying to

6  get help before I had to go outside and, you know,

7  bring in outside agencies.  You know, I just wanted

8  to finish my residency.  You know, I wanted it

9  corrected.  I wanted to finish my residency.

10         I even asked Dr. Ekbladh that, you know,

11  if he really didn't want me there to please get on

12  the phone and find another program that I could

13  transfer in, you know, because I knew that there was

14  this bad blood by July.  And I begged him, I said,

15  you know, if you don't want me here, get me in

16  another program.  Call your buddies.  Get on the

17  system.  You know, help me get in another program

18  because I want to do this, I want to finish this

19  training.  And, you know, he wouldn't lift a finger

20  to try to get me even in another program.  And there

21  is a big difference in the business and the intensity

22  of different programs.

23    Q.   Why is that significant to you?

24    A.   Just -- this was a very high volume program,

1  and once my disability started kicking in, you know,

2  in another program, you know, that was less intense,

3  if he was not going to accommodate my disability and

4  adjust my schedule so I could finish, possibly

5  another program, you know, that was less intense,

6  less fast-paced, I could have handled it without

7  accommodation.  And we discussed that, and I begged

8  him to help me.  I said, well, if you don't want to

9  accommodate this, then help me find another program

10  that will.  Get on the phone.  You know, there are

11  supposed to be mechanisms within the system to handle

12  this, because these programs get money from health

13  and human services.  This is Medicaid and Medicare

14  funding and it is their responsibility to train the

15  trainees because we are needed by the public.

16    Q.   The accommodation that you just referred to,

17  is that the modified schedule that you had set out --

18    A.   Yes.

19    Q.   Wait, let me just finish the question.  Was

20  that the modified schedule that you referred to in

21  that July 23rd letter to Dr. Ekbladh?

22    A.   Yes.  I was asking for accommodation with

23  that, quote, modified schedule.  That was my

24  suggestion of accommodate that would have been least

1  destructive to my colleagues.

2    Q.   I'm going to hand you Zechman 50.  Can you

3  tell me what Zechman 50 is?

4    A.   This is a complaint I filed with JCAHO and

5  this was after I had already left and it's concerning

6  what I have said many times about not enough

7  supervised physicians in that hospital.  They were

8  cutting costs and not hiring enough physicians to

9  handle us on weekends and holidays and nights.

10    Q.   This is an October 18th, 2004 e-mail, right?

11    A.   Evidently so by that date up there, yes.

12    Q.   And the from line says James Zechman.  Is

13  that your husband?

14    A.   That's my husband, yes.

15    Q.   So did you send this e-mail from his e-mail

16  account?

17    A.   Yes.

18    Q.   But you wrote this?

19    A.   I wrote it, yes.

20    Q.   And it's addressed to an e-mail address,

21  which is complaint@jcaho.org.

22    A.   Yes.

23    Q.   Can you tell me what JCAHO stands for?

24    A.   It's called the Joint Commission.  It is

1    basically the organization that credentials hospitals
2    for Medicaid/Medicare payment.  And when there is a
3    problem, and this is an official public complaint
4    thing, they go in and investigate the problem.  And
5    if they find violations, they correct them.  It's
6    kind of a regulatory thing for the institution.
7         Just like the ACGME was the regulatory
8    institution for the residents, this is for like
9    emergency rooms, that they follow the rules that they
10   are supposed to follow.
11   Q.    All right.  So this e-mail that's reflected
12   in Zechman 50 was sent to a different regulatory
13   agency than ACGME?
14   A.    Yes.
15   Q.    What about the prior e-mail that we saw that
16   was from you to Ms. Miller?  What organization is she
17   from?
18   A.    Same, with ACGME with Dr. O'Connor.  Let's
19   say that was Dr. O'Connor's kind of sidekick or
20   assistant, whatever, you know.  But that's the same
21   organization.
22   Q.    And then at the bottom of Zechman 50 there is
23   handwriting that says, "A letter similar to this was
24   also e-mailed to Delaware insurance commissioner and

1    Medicare/Medicaid."
2    A.    Yes.
3    Q.    Is that your handwriting?
4    A.    That's my handwriting.
5    Q.    Did you, in fact, send similar letters to the
6    Delaware Insurance Commissioner?
7    A.    I did.
8    Q.    And you sent a similar complaint to Medicare
9    and medicaid?
10   A.    No, not to them I didn't, but I did send it
11   to Delaware Insurance Commissioner.
12   Q.    So why is it that you write here at the
13   bottom that you also sent it to Medicare and
14   Medicaid?
15   A.    Maybe I did.  I can't remember.  I don't
16   know.  But this is concerning, you know, the 64
17   patients, you know, that were -- you know, they were
18   not properly staffing this organization.
19   Q.    Is there something in particular that
20   prompted you to send this Complaint more than a year
21   after you had left Christiana Care?
22   A.    Just the fact that I was hearing through the
23   grapevine that nothing had changed, that they were
24   still not having enough staff.

1         And since that time -- I don't know
2    which one of these precipitated the change, but now
3    they are changed and they keep a paid doctor on staff
4    in these departments to help out so that if the
5    attending physician for the residents has to go
6    upstairs to do a delivery or to the operating room,
7    that there is a doctor down in this area.
8         So evidently one of these complaints
9    finally got recognized and Christiana was forced to
10   make changes, which that was -- you know, they were
11   cutting costs.  They had to hire a doctor in order to
12   properly staff the thing.  That's why they didn't
13   want to do it, because it was costing money.
14   Q.    That's what you heard through the grapevine?
15   A.    Yes, sir.
16   Q.    I take it you don't have any personal
17   knowledge of whether things have changed at
18   Christiana Care since you --
19   A.    I haven't been in there.  No, I would be
20   scared somebody would shoot me if I went in there.
21   Q.    I am going to hand you Zechman 118.  This is
22   a December 17th, 2004 letter to you from the
23   executive director of the Board of Medical Practice
24   in Delaware.  Is that what this is?

1    A.    That's what that is.
2    Q.    Okay.  And I take it from this that you had
3    sent another complaint to the Delaware Department of
4    Administrative Services; is that true?
5    A.    Yes.
6    Q.    Do you still have a copy of what you sent to
7    that organization?
8    A.    No, I do not.  And once again, this was a
9    last ditch effort to try to get things straightened
10   out before turning it over to the EEOC and seeking
11   legal counsel.  You know, I tried on multiple levels
12   to get it handled internally first and then statewide
13   first before taking it on to the EEOC and seeking
14   legal counsel.
15   Q.    Did you seek legal counsel prior to filing
16   your EEOC charge?
17   A.    No, I made sure that -- you know, I wanted
18   the investigation to go through, and I had my
19   certificate of right to sue when I went and called
20   looking for a lawyer.  At each level I was hoping to
21   get things resolved before taking it to the next
22   level.
23   Q.    What did you think the Insurance Commissioner
24   of Delaware could do to help you with your residency

1   position?

2   A.   How does Christiana get their money?  Through

3   insurances.  By putting pressure, you know, and

4   bringing this to the Insurance Commissioner, that's a

5   controlling factor, how they get paid.  So it's a

6   very powerful controlling factor.

7   Q.   Did you think that the EEOC was not up to the

8   task to dealing with your complaints?

9   A.   Absolutely.  They were overwhelmed.  I don't

10  think they did a good investigation at all.  I even

11  complained that they did not even call in the

12  witnesses that I had given them to verify some of

13  this information.  But this is a pretty detailed,

14  overwhelming case.  And for people that don't know

15  medicine, it's overwhelming.

16  Q.   In what way did you complain about the EEOC's

17  investigation?

18  A.   After it was all said and done and I had seen

19  a letter of their remarks, I sent a letter asking,

20  well, why didn't you interview so and so?  I had sent

21  them a whole sheet of people, of possible contacts,

22  and even those contacts had called me and said, they

23  didn't call me.  Why didn't they call me?  So I knew

24  they had not done a thorough investigation.

388

1   Q.   I am going to hand you Zechman 117.  Could

2   you just confirm for me that this is the

3   Administrative Charge -- it's actually an addendum

4   that you filed with the EEOC?

5   A.   Yes.

6   Q.   Is all the handwriting on Zechman 117 your

7   handwriting?

8   A.   Yes.

9   Q.   And that's your signature on the second and

10  the third page of this document?

11  A.   Yes, and the first two.  This was the

12  beginning of the EEOC Complaint.

13  Q.   And you signed your first EEOC Complaint on

14  June 9th, 2004?

15  A.   That's right.

16  Q.   I'm going to give you what's been marked as

17  Zechman 109.  You don't need to describe to me the

18  contents of this, but can you tell me what this

19  document is?

20  A.   My personal diaries concerning being bumped

21  out of cases as I referenced earlier when you gave me

22  that schedule.  Please note that in the middle it

23  says Friday, 7/25/03, and I give more of a detailed

24  description of how I had been bumped out of Dr.

389

1   Kaminski's case.  And it says -- I couldn't remember

2   the person's name.  Well, it was Dr. Naqui, one of

3   the senior residents that got to go in on that case.

4   So this is where I would, you know,

5   document that sort of thing.

6   Q.   Are these the diary notes that you were

7   referring to earlier when you said that you also kept

8   a diary of surgical assignments you were pulled from?

9   A.   Yes.

10  Q.   Can you tell me when in time you made these

11  diary notes.  And when I say when in time, I mean how

12  long after the events occurred did you make these

13  notes?

14  A.   Either that day or within a day or two, like

15  if I was on call, the diary notation wouldn't be made

16  until I was well-rested.  So if I was on call one

17  night, let's say it happened -- let me just give an

18  example, if it happened on Monday, and I was on call

19  Monday night, and then I would work most of Tuesday,

20  then I was exhausted so I'd sleep.  So it might not

21  get documented until Wednesday night after I was

22  well-rested and could think clearly.  But it would be

23  within two or three days, if not the very day of the

24  actual event.

390

1   Q.   Did you carry around your diary with you as

2   you're working in the hospital, or is it something

3   you went to and filled out at the end of the day?

4   A.   I did both.  I had an overnight bag that I

5   kept with me, and it was my work stuff.  And I kept

6   it in my work stuff.

7   So if I was there on call, it would be

8   there with me or you know, it was not left like in a

9   room.  It was usually with me in my stuff bag.

10  Q.   I guess what I was really asking, and I

11  didn't ask it well is, did you whip out your diary

12  during your shift to make entries, or did you wait

13  until the end of your shift to make entries in the

14  diary?

15  A.   The end of my shift.  I did this in private.

16  Q.   Is all of the handwriting in Zechman 109 your

17  handwriting?

18  A.   It looks like it is all of mine, because it

19  was a private diary, yes.

20  Q.   Does this look to be a complete collection of

21  the diary notes that you kept?

22  A.   I would also keep little blurt notes in my

23  daily logs.  So this was not like my total.  My daily

24  logs is where I would have a surgery case, and I

391

A-197

8/16/2006 Plaintiff Zechman (Vol. 2)

1  would put the patient's sticker so that I could --
2  you have to prove that you've done so many surgeries
3  in order to get certified.  There would be little
4  notations in stuff like that that would not be in
5  here.  But this was my formal diary.  And actually
6  one of the attendings, Dr. -- my brain just went
7  blank -- suggested I keep a diary, because she was
8  seeing what was happening to me.
9       It will come to me.  I wish I had some
10  of my logs.  When I see these names, they jump out at
11  me.  Tilton-Burton.
12       Actually, this is not the diary that she
13  gave me.  But when I was kicked out of the call rooms
14  and having to keep my stuff in the locker rooms and
15  sneak around and find a place to sleep, she was upset
16  by that.  And she even gave me a diary to start
17  logging my stuff.
18  Q.  Start logging -- what do you mean your stuff?
19  A.  My experiences of what was happening to me.
20  Q.  So is Dr. Tilton-Burton somebody who was
21  helping you?
22  A.  I felt that she was a positive influence,
23  yes.
24  Q.  Did you view her as supportive of you?

392

8/16/2006 Plaintiff Zechman (Vol. 2)

1  A.  Yes, I did.
2  Q.  Dr. Zechman, I'm handing you Zechman 7 and am
3  I correct that Zechman 7 is a form you filled out in
4  connection with your EEOC charge?
5  A.  That's correct.
6  Q.  Would you just flip through this and confirm
7  for me that all of the handwriting -- and I
8  understand it's not all handwritten, but that the
9  handwriting is all yours?
10  A.  Yes.
11  Q.  Dr. Zechman, in addition to the handwritten
12  pages of Zechman 7 there are also some typewritten
13  pages.  Did you type all of the typewritten pages
14  that are in this exhibit?
15  A.  Yes.  And it pretty well rehashes what we
16  have been discussing the whole time.
17  Q.  And if you'll just turn to the last page
18  which is a typewritten page Discipline Questionnaire,
19  question number one, and then there is a statement.
20  Do you see that?
21  A.  Yes.
22  Q.  Did you write this statement?
23  A.  Yes.
24  Q.  Take a minute to review it, and I want to

393

8/16/2006 Plaintiff Zechman (Vol. 2)

1  know if there is anything that you think is incorrect
2  or that needs to be changed in this?
3  A.  No; this reiterates a lot of what we talked
4  about.
5  Q.  That's accurate?
6  A.  Yes.  I'm not seeing anything jump out at me
7  that appears to be inaccurate at this moment.
8  Q.  I'm going to show you Zechman 110.  Is
9  Zechman 110 a document that you created?
10  A.  Yes.  This is recapping some of my diary
11  things, and I think this was done for my lawyer.
12  Q.  You think these notes come from the
13  handwritten diary we were looking at a few minutes
14  ago?
15  A.  As well as the patient log diaries.  It is a
16  combination of both.
17  Q.  So is this an attempt to compile the surgical
18  cases that you were pulled from?
19  A.  Yes.  I think there were others.
20  Q.  I'm going to hand you Zechman 119.  Is
21  Zechman 119 a document you created?
22  A.  This is from my lawyer, yes.
23  Q.  Do you know when in time you created this
24  document?

394

8/16/2006 Plaintiff Zechman (Vol. 2)

1  A.  This was when we had our first discovery
2  deadline to get documents in.
3  Q.  But you personally prepared this document?
4  A.  Yes.
5  Q.  I'm handing you what is Zechman 3.  Can you
6  tell me what Zechman 3 is?
7  A.  This is just a letter from our local
8  community college just saying that they have
9  appointed me as an advisory committee to one of their
10  nursing programs.  This is a voluntary, nonpaid
11  position.
12  Q.  This position occurred in November 2005?
13  A.  Yes.
14  Q.  Do you still serve on that committee?
15  A.  It is something that I only get called
16  for a meeting once a year when they are working on
17  their curriculum just to have a physician's input,
18  and it's voluntary.
19  Q.  All right you can put that aside.
20  I'm handing you Zechman 104.  Could you tell me what
21  Zechman 104 is?
22  A.  This is a letter of reference from one of the
23  physicians I work with in New Bern and I had worked
24  with him at the clinic that I work at.  And this is

395