1    just his letter of recommendation for me.
2        Q.    Did you ask Dr. Weathers to prepare this
3    letter for you?
4        A.    No.  He had asked me to prepare one for him,
5    and I did.  And then he just on his own sent this to
6    me for my files.
7        Q.    I'm going to ask it a different way.  Did you
8    approach Dr. Weathers about whether he would be
9    willing to either write or sign a letter of
10   recommendation for you?
11       A.    No, I didn't.  He had approached me saying
12   that he needed one, because we were working together.
13   And I said yes, I would be glad to do it.  And he
14   just on his own sent this, you know, because he
15   figured eventually I'd need it.
16       Q.    Do I understand you wrote a letter of
17   reference for him as well?
18       A.    I wrote a letter of reference for him.  We
19   worked together.  We had a close working
20   relationship.  He would ask me questions and consult
21   me.  I would ask him questions.  He is an older guy.
22   He is probably late 60s.  And you know, he was taking
23   a job closer to his home and ask me to do a letter
24   since I was one of the main doctors he was working

396

1    with at that time.
2            I said I'll do it now.  I said
3    eventually I will probably need one from you, so
4    don't forget me, you know, since he was moving on.
5    And he sent this to me.
6        Q.    When in time did you receive this from Dr.
7    Weathers?
8        A.    Gosh, I'm not sure, because it came into my
9    office and ended up in my file before I paid a whole
10   lot of attention, you know, the girl that gets these
11   things, she has got her Dr. Ellen important stuff and
12   she will, you know, stuff this stuff in my file.
13       Q.    Do you think it was in 2006 or earlier?
14       A.    It's been recently.  I would say within the
15   past year, because I worked with him, you know, this
16   past year.
17       Q.    And I think I understand you.  I just want to
18   make sure the record is clear that you and Dr.
19   Weathers essentially wrote letters of reference for
20   each other?
21       A.    Well, we were a team at this office, and he
22   was leaving and needed me to write a letter for him,
23   which I did, because he was taking another job.  And
24   the last time I saw him, I said, well, don't forget

397

1    me, because I will probably eventually need you to
2    write a letter for me.  And it just appeared.  I
3    guess he did it before he forgot me.
4        Q.    I'm going to show you what's been marked as
5    Zechman 102.  It's a printout from a Web page of the
6    American Academy of General Physicians.
7            MS. BREWINGTON:  I don't see a Bates
8    stamp on this.
9            MR. BLOOM:  No.  It's being produced
10   right now.  It was just printed off the Web recently.
11           MS. BREWINGTON:  Can we just go off the
12   record for a moment so that I can read this.
13           (Discussion off the record)
14   BY MR. BLOOM:
15       Q.    Dr. Zechman, what is the American Academy of
16   General Physicians?
17       A.    It is basically the professional organization
18   for GPs.  These are different from family physicians.
19   This is a separate organization.  It is "ye old GPs."
20   And they are not considered family physicians.  We do
21   not get the pay scale or the reimbursement, because
22   family physicians say they are specialists and get
23   special pay.  We are GPs, and I'm a member of the
24   organization.  I was elected president for my charm

398

1    and good looks and that's all there is to it.  It is
2    not a paid position.  This is a voluntary position.
3        Q.    How many members are there approximately of
4    the AAGP?
5        A.    I would say at least a thousand.
6        Q.    Is this a Nationwide organization?
7        A.    Yes, it is.
8        Q.    And you have been president of that
9    organization since when?
10       A.    I was just reelected.  And I served the
11   previous term.  So that would have been 2005.  And
12   then now I'm currently the president.  And that term
13   will end in the spring.
14       Q.    What are your functions and responsibilities
15   as president of the AAGP?
16       A.    Mainly to be the voice of the members
17   whenever, you know, we've got like a motion coming up
18   to be their representative.  If it's not an
19   everybody-vote thing to meet with them in committees
20   and say, well, we've got so many members that feel
21   this.
22            It's more of a figurehead and then I
23   basically help MC the yearly meetings.  My biggest
24   task is going to the yearly meetings and being over

399

1  them. It's more of a figurehead representing the
2  people, and you are elected by the membership.
3          There is a CEO that does the work.
4      Q.  Can you estimate on a week-to-week basis how
5  much time you spend on AAGP responsibilities?
6      A.  Oh, Gosh, I'd estimate one a month. I'd say
7  two or three hours a month.
8      Q.  I'm handing you Zechman 100. Zechman 100 is
9  a federal court Complaint filed by you against, among
10  other defendants, East Carolina University; is that
11  true?
12      A.  That's correct.
13      Q.  And this is the Complaint that you filed
14  against ECU after they rejected you from the Ob-Gyn
15  program?
16      A.  That's correct. I had interviewed for the
17  Ob-Gyn program. The assistant director was very
18  supportive. And all the residents could only ask me
19  why was I doing this, and what was I going to do with
20  my children.
21      Q.  And so part of your claim against ECU is that
22  they were discriminating against you because of your
23  age and your disability?
24      A.  That as well, and they knew of my disability

1  is that true?
2      A.  I forget exactly. If that's the filing date,
3  yeah -- well, no. January was the beginning of 2003.
4  So I was six months into it, yeah.
5      Q.  All right. You can put that away. I am
6  going to hand you Zechman 101. Zechman 101 is a
7  Notice of Voluntary Dismissal in the same Complaint
8  that we were just referring to.
9      A.  Yes.
10      Q.  Is that your signature on the lower left-hand
11  corner?
12      A.  That is.
13      Q.  Did you receive anything from ECU in exchange
14  for your agreement to drop your lawsuit?
15      A.  Absolutely nothing. I was doing my
16  residency. All I wanted was my residency. And there
17  was just no need to pursue this, because although,
18  you know, they did discriminate against me, and I
19  feel that they did even in the interview. I had a
20  residency. All I wanted to do was become an Ob-Gyn.
21      Q.  Wasn't that also true at the time you filed
22  the initial complaint in 2003?
23      A.  The works were already in process prior to
24  that. That was lawyer stuff of, you know, when it

1  because I had had all my children there. And that
2  was a big factor in monitoring me during my
3  pregnancies. Because this took place in 2003 and my
4  last baby was born in 2000. In fact, it might have
5  even been before 2003, because that's when it was
6  filed.
7          Okay, the actual interview was 2001 so
8  this was just a year after I had had my baby, so that
9  a lot of these people were in the hospital looking at
10  my records when I was delivering my last baby.
11      Q.  And this Complaint was filed in January 2003?
12      A.  Was that when it was filed? I was going to
13  say I reference -- yes.
14      Q.  If you'll turn to the very last page of
15  Zechman 100 --
16      A.  Yes
17      Q.  -- do you recognize that as the signature of
18  your lawyer at the time?
19      A.  That is.
20      Q.  And the date of the signature is January 30th
21  2003; is that right?
22      A.  Yes, right.
23      Q.  So you were well into your residency at
24  Christiana Care by the time you filed this Complaint;

1  actually got filed and all that.
2      Q.  I'm going to hand you two documents to look
3  at at the same time, and they are Zechman 56 and
4  Zechman 122.
5      A.  These are basically the same thing.
6      Q.  I thought they might be. Are these two
7  exhibits in exchange of e-mails between you and Dr.
8  Sciscione?
9      A.  Yes.
10      Q.  Do those appear to be accurate reproductions
11  of the e-mail exchanges that actually occurred
12  between you and Dr. Sciscione?
13      A.  Yes.
14      Q.  Okay, you can put them aside.
15      A.  You don't want to talk about the contents of
16  them?
17      Q.  You could talk about them. Is there
18  something in these e-mails that you view as
19  significant in this case?
20      A.  Yes. Because this is where we, the residents
21  were supposed to go to Philadelphia, downtown
22  Philadelphia to the Obstetrical Society of
23  Philadelphia. And I had never driven in Philadelphia
24  at that time, was terrified of driving in the middle

1   of the city. And I begged someone to either give me
2   a ride in or let me follow them in, and nobody would.
3   And then at the last moment I was still begging to
4   either let me ride with them or just let me follow,
5   because I'm from the boonies. I have never driven in
6   a big city. And they all left without me, which
7   really hurts my feelings even to this day.
8          So I said, well, just let me stay here.
9   Let me just fill in for everybody else while
10  everybody else goes to the meeting because I'm scared
11  to drive by myself. And Dr. Patruno just wanted me
12  to just stay.
13         And then somebody else -- I don't know
14  whether it was Dr. Sciscione or somebody else --
15  would not let me just stay and work and told me just
16  to drive to Philadelphia. And I didn't know my way
17  around, and I got lost and called Dr. Kaminski on my
18  cell phone and told them I was lost. And then when I
19  did find the place, I couldn't find a parking lot,
20  because it was in the middle of the city. And I just
21  turned around and went home.
22         And Dr. Sciscione was all upset with me.
23  He didn't know the full story, but he said because I
24  didn't make it to the meeting, unfortunately this

1          Q.   When did you hear that?
2          A.   Maybe two weeks later. They were planning an
3   outing, partying after that on the town in
4   Philadelphia.
5          Q.   Who is the "they" that you keep referring to?
6          A.   The other residents.
7          Q.   All the Christiana Care residents?
8          A.   No; just the Ob-Gyn ones, my colleagues.
9          Q.   All classes?
10         A.   Yes, all four years.
11         Q.   I'm going to show you Zechman 57.
12              Actually before we get to Zechman 57, do
13  you remember who told you or how you learned through
14  the grapevine that the other residents didn't want
15  you out partying with them?
16         A.   It came from one of the chief residents, Dr.
17  Liu who graduated after that. And in fact, I think
18  Dr. Patruno specifically asked her to give me a ride,
19  and she got very upset about it, that she had other
20  plans and didn't, you know, want to. And then later,
21  you know, it was, you know, they didn't want me
22  hanging out with them, because they had a party
23  planned.
24         Q.   Who told you that?

1   puts me in the position of having to credit you with
2   a half day of vacation. So he penalized me by taking
3   my vacation time away from me for not being at the
4   meeting. And here I even called Dr. Kaminski on the
5   telephone. Well, how do I get there? Where do I
6   park?
7          In the past they had provided
8   transportation for the residents to get them to the
9   meeting and back. Why didn't they do it this way?
10         Q.   What was the meeting?
11         A.   It was the Obstetrical Society of
12  Philadelphia residents' activity. So it was some
13  Philadelphia medical society, you know, residents'
14  activity things.
15         But the thing that is so hurtful is that
16  for two weeks I begged everybody, please let
17  somebody, let me ride with you and/or just let me
18  follow you. And you know, they would not let me.
19  And I know some of them were going to go out that
20  night and party. It was a Friday, and it was
21  Philadelphia. And they did not want an old woman
22  hanging out with them.
23         Q.   Did somebody say that to you?
24         A.   I heard that in the grapevine later.

1          A.   Dr. Liu said that they all had a party, and
2   they didn't want me.
3          Q.   Was Dr. Liu telling you something
4   communicating her own opinion to you, or was she
5   relaying something to you that someone told her?
6          A.   I'm not sure how that was. I do not know.
7          Q.   You made a reference a few moments ago to
8   your age and being older and that being related to
9   the partying. Did anybody say that to you or was
10  that sort of what you assumed from the circumstances?
11         A.   That had been alluded to that I did not fit
12  in. And I was a good 15 to 20 years older than a lot
13  of them.
14         Q.   How was it alluded to? And we are talking
15  specifically about the series of events --
16         A.   I don't know. You would have had to have
17  been there. The conversation was over four years
18  ago. I might not be remembering all of the
19  conversation. I don't know, but that was the gist of
20  it.
21              MS. BREWINGTON: Could we go off the
22  record for one second?
23              (Discussion off the record)
24  BY MR. BLOOM:

1  Q.  Dr. Zechman, do you have in front of you
2  Exhibit 57?
3  A.  Yes, I do.
4  Q.  Number 57 is an e-mail from you to Dr.
5  Ekbladh, July 26, 2003?
6  A.  Yes.
7  Q.  Is this the e-mail that you referred to in
8  the past where you complained to Dr. Ekbladh about
9  Dr. Gray?
10  A.  Yes.  And this is one of them.  There were
11  more.  But this is one of them.  I also note that I
12  am also referring to that case I got bumped out of
13  what Dr. Kaminski says was on Friday which was a
14  Saturday, which would reference back to July 25th.
15  So this is further documentation of that particular
16  day when I did not get sent to the OR and I should
17  have been.  But yes, this was letting him know,
18  basically how she was harassing me.
19  Q.  The second sentence here refers to Dr. Gray
20  not allowing you to make patient care decisions.  Can
21  you tell me why you think it was inappropriate for
22  Dr. Gray to involve herself in patient decisions made
23  by you?
24  A.  She should be involved, but she was going

1  A.  Yes, I did.  And I expressed this again in
2  person to Dr. Ekbladh, because he completely ignored
3  this e-mail.  And so the next time I was in the
4  meeting with him personally in his office, I went
5  over this again and he would just sit there and, you
6  know, make no comments about it.
7  Q.  What did Dr. Gray say to you when you raised
8  this issue to her?
9  A.  She would just run off and not even address
10  the issue.
11  Q.  Is she somebody who you viewed as more
12  impatient than the other chief residents?
13  A.  No.  She did not like me.  She and Rachel
14  just did not like me for whatever reason.  She and
15  Rachel were best friends, and they for some reason
16  did not like me.
17  And I think Dr. Kaminski enforced that
18  in his depositions as well, because it was Robyn Gray
19  that was doing a lot of the scheduling where I got
20  bumped out and Dr. Rachel Heinle got put in the OR.
21  And I got bumped out of cases.  They were best
22  friends.
23  Q.  I am going to hand you what's been marked as
24  Zechman 121.  The lower portion of this document is

1  ahead of me and doing the work without me go, you
2  know, do the chart and discuss it with her.  She is
3  my chief resident.  So I am going to make a decision.
4  And you know, before I make any changes in patient
5  care, I'm going to run it by her.
6  And then for the private doctors,
7  because we were taking care of private patients as
8  well, I would not use her.  These were for only our
9  service, what she was responsible for, but I would
10  run it by the private physician.  And she was just
11  running ahead and leaving me out of the loop.  And
12  that's not allowing me to learn and not allowing me
13  to prove myself.  And I was very upset with this,
14  because this was in July when I was needing to prove
15  myself and I was needing to, you know, be assertive
16  in, you know, taking the lead in care.  And she was
17  undermining me, not allowing me to do that.
18  Now, I was not going to do anything
19  without her permission, but she was not even letting
20  me make the decisions to present them to her for her
21  approval or not.
22  Q.  And the complaint that you are expressing in
23  this e-mail to Dr. Ekbladh, did you express that to
24  Dr. Gray also?

1  an e-mail from you to Dr. Gray; is at that true?
2  A.  I was forwarding this to my husband.  Yes,
3  the bottom one is where we discussed this.  But this
4  top part is me forwarding this to my husband, what
5  was going on and the stuff I was putting up with.
6  Q.  And so the lower portion, the e-mail that is
7  being forwarded is your e-mail to Dr. Gray in which
8  you complained about her asking you to attend morning
9  rounds?
10  A.  Yes.  This was the harassment that we talked
11  about earlier about going to their rounds and when I
12  asked has the rule changed?  Why are you requiring me
13  to do this when other people are not being requiring
14  me to do this?  And she was very harassing about you
15  need to be at these rounds even when it was not my
16  turn to be there.  And this was just harassment.
17  This was not about Ellen, I think you
18  need to -- you could gain from this or bla-bla-bla.
19  It was, You need to be there.  You are not coming
20  early enough.  It was harassment.
21  Q.  So it was the way that the suggestion was
22  presented to you that you found objectionable?  Is it
23  the way she presented the idea of going to morning
24  rounds to you?

1    A.   It was the way she was fussing at me every
2  day for not being at rounds even when I was not on
3  assignment and I was not on call and technically did
4  not need to be there.  You know, she was demanding
5  that I come anyway, adding another half hour to my
6  workday when I was already asking for some relief and
7  time off.
8        You see, this is July 29th.  This was
9  right after I had asked for the accommodation.  She
10 never responded to this either, not to me anyway.
11    Q.   Did you ever publicly threaten to sue Robyn
12 Gray?
13    A.   I didn't threaten to sue her.  I told her
14 when she kept bumping me out of the OR when I should
15 be going, I said you are bumping me out of cases that
16 I need and that I have been assign to.  This is
17 discrimination, and I will report you.
18        I did not threaten to sue her.  I
19 threatened to report her for not properly assigning
20 me to the cases as she should have.
21    Q.   Did you ever tell Alex Kirfides that you were
22 thinking of suing Robyn Gray?
23    A.   No, I never said anything about suing.  I
24 said that I would report her for discrimination.  And

412

1  that would be within the chain of command within
2  Christiana Care.  But no, I never said sue, reporting
3  her for not giving me the cases I was assigned to is
4  what I would have reported.  And that's what I was
5  doing here when I sent the one to Ekbladh.  I was
6  reporting her.  And that was what I meant.
7    Q.   Did you express that also to Alex Kirfides?
8    A.   I was feeling him out to see if he was being
9  treated the same way.  And I said if she is doing
10 this to me and singling me out, I am going to report
11 her.  But that's my words, I will report her, you
12 know, within our chain of command.  And this was my
13 method of reporting her, reporting her to the boss.
14    Q.   Are you saying that Dr. Gray's pulling you
15 from surgical experiences started in July 2003?
16    A.   No.  It started before then, but I was under
17 more of a microscope in July.  And you know, I became
18 more sensitive to it, because I wanted these
19 surgeries in order to prove myself.
20    Q.   When in time do you think that started to
21 happen that you were being pulled from surgeries by
22 Dr. Gray or anyone?
23    A.   It started early on.  My very first GYN
24 rotation I started noticing it, but I was new then.

413

1    I said, Hey, they are just making me earn my stripes
2  here.  And I didn't pay any attention.
3        I did not formally start complaining
4  until May.  And we've got the first e-mails here
5  where I say to Dr. Sciscione at that time.  And I
6  think it was May where I was distressed that I am
7  repeatedly pulled from my GYN, you know, task and yet
8  I am being criticized for not having surgical skills.
9  And I think that one was May of 2003 when I first
10 formally started complaining about it.
11        It was happening a lot more, but I
12 thought, hey, I am the newby, they are making me earn
13 my stripes.  I will just suck it up.  But then when I
14 started being criticized for not having the surgical
15 skills, I said, okay, they want me to have these
16 skills, but they are bumping me out of surgery where
17 I can't get them.
18    Q.   Who was criticizing your surgical skills?
19    A.   The other attendings were criticizing my
20 surgical skills.  And Dr. Sciscione was relating that
21 to me.  And that's when I started keeping track of
22 how many times I was getting bumped.  But it was
23 happening, I would say, from the first time I was
24 assigned to that service.  I sucked it up, because I

414

1  figured I am the new person.  They are going to pick
2  on me a little bit.  You are going to expect that
3  being the new kid on the block.
4    Q.   I think you said this before, Dr. Ekbladh
5  resolved the issue regarding going to morning rounds
6  in a way that was satisfactory to you?
7    A.   Yes.
8    Q.   I'm going to hand you what's been marked as
9  Zechman 107.  This appears to be an August 1, 2003
10 e-mail from you.  Is that true?
11    A.   That's correct.  This is to my husband.
12    Q.   So this is an e-mail you sent to your husband
13 on August 1st?
14    A.   Yes.
15    Q.   What is the website that you referred to?
16 The www.anion.com?
17    A.   That was the formal schedule of a call
18 schedule that was listed on the website.  They would
19 put that in, and that was the website you would go
20 to.  That was the password in order to pull your
21 schedule up.  And everybody would pull their own
22 schedule up and be able to access it.  So if you were
23 on vacation, you would be able to access this website
24 and see when you would be on call when you came back

415

1    But this is basically me telling my
2  husband that look what they are doing to me.  How
3  does this facilitate my learning when they are not
4  giving me the assignments, and just basically
5  ventilating to him about the discrimination I was
6  enduring.
7    Q.  I'm going to hand you Zechman 61.  Is Zechman
8  61 an exchange of e-mails between you and Sandy
9  Kardos on August 11, 2003?
10   A.  Yes.  And the bottom one was the first one
11 about I was supposed to be on the gynecology surgery
12 cases, and I wasn't even listed on the board.  I was
13 being reassigned at the last minute that morning.
14 And I was ventilating to Sandy, you know, how am I
15 supposed to improve my skills when I am not being
16 assigned any cases.
17   Q.  You just referred a second ago to being
18 reassigned, and I don't see any reference to that in
19 your e-mail.  Is there a difference in your mind
20 between showing up and not being on the board as
21 opposed to being reassigned from the assignment that
22 you had?
23   A.  There is a difference.  The chief resident,
24 which was Robyn Gray at that time.  When she had the

416

1  day's OR schedule which would have been posted at
2  five in the morning, she would put it on the
3  blackboard in our assignment room.  And she would
4  assign the cases.  And here I was supposed to be
5  assigned cases, and this time she was not reassigning
6  me.
7    I will define it.  I was not getting the
8  initial assignments.  And this is where she was
9  plugging somebody else in on cases when it was my
10 turn to go to the operating room.
11   Q.  Wait a second, because I think in your own
12 e-mail at the top of this you say that you had been
13 assign a case, it just wasn't up on the board yet?
14   A.  She had not put it on the board yet.  And I
15 didn't know whether she was leaving me out and
16 putting somebody else's name on there.  Because it
17 was where I was supposed to be going to this, and she
18 had not formally assigned me to that.  So I didn't
19 know whether she was just not going to put somebody
20 else's name up there.  Everybody else's number was up
21 there and mine was not.
22   Q.  Did you end up doing this case with Dr.
23 Whitney?
24   A.  I can't remember.  Now being reassigned is

417

1  when you were up on the board in the morning, you're
2  planned to go to that case, and at the last minute
3  you get a call saying you are not going to that case,
4  you go to labor and deliver a baby.  And they push
5  somebody else in your place at the last minute.  So
6  all the paperwork would say that you went to that
7  case, but the actual operating room record would have
8  that somebody else actually showed up for the case
9  where you had been bumped at the last minute, and
10 somebody else had been stuck in there in your place.
11 And that happened frequently thanks to Dr. Gray.
12   Q.  You referred earlier in the day to you
13 complaining to Dr. Ekbladh about the fact that you
14 kept having to take more quizzes and that after you
15 complained to him, he said you didn't have to do that
16 anymore.  Did I hear you right?
17   A.  Yes.  When I told him that that was
18 discrimination for me to be taking these tests and
19 nobody else had to take the tests --
20   Q.  Let me ask you.  If people on the committee
21 or Dr. Ekbladh believed you were behind your
22 classmates academically, is it still discrimination
23 for him to give you additional academic work to catch
24 up?

418

1    A.  Additional academic work, yes, but additional
2  testing constantly, no.  You could have the
3  additional academic work without the formal testing.
4  And then when the year's test comes around, you take
5  the test like everybody else does.
6    Q.  Well, let me make sure we have this straight
7  though, because these quizzes -- I think you've said
8  this before -- that it was combined with reading
9  assignments in a textbook and then a quiz based on
10 reading the assignment you did.  Would that be true?
11   A.  Sometimes.  Sometimes they would be quizzes
12 that the attending just made up out of their head.
13 And that was really unfair, because they could pull
14 things to try to trip you up.
15   And even in one of the internal memos
16 where it says, but we should not try to trip her up,
17 like it was discussed like how to trip me up to make
18 me look bad.  And we have that in our discovery
19 documents where it's very blatantly we should not try
20 to trip her up.
21   Q.  Do you have any reason to doubt that
22 attending physicians, in fact, asked trick questions
23 of the other residents but did not of you?
24   A.  I have no idea.  But I know I was being

419

1    treated differently at this time.

2        Q.    And after Dr. Ekbladh told you that you

3    didn't need to keep taking the quizzes, did you tell

4    him that you actually wanted to keep taking them

5    voluntarily?

6        A.    Voluntarily, but at a different schedule so

7    that I could continue proving myself but not at such

8    a rapid pace that was stressing me since I was, you

9    know, asking for time off and needing a reduced

10   schedule.  But to do it, you know, in a more relaxed

11   method.  I didn't mind doing the reading.  I enjoyed

12   that, but he was killing me when I was asking for

13   time off, just adding more work to my schedule.

14       Q.    I think we already covered the substance of

15   this, but I am going to put in front of you Zechman

16   62, and this is an e-mail from Sandy Kardos addressed

17   to both you and Dr. Ekbladh.

18             Did you receive this?

19       A.    Yes, I did.

20       Q.    And I have haven't seen in the record a

21   response to this e-mail by you.  Are you aware of any

22   response by you?

23       A.    I think it was a verbal response where I ran

24   through her office and gave her a verbal response

1    rather than an e-mail.

2        Q.    So did you continue to take reading

3    assignments and quizzes voluntarily?

4        A.    I took a few.  But once Dr. Ekbladh did not

5    require it of her, she did not have the time to work

6    with -- it was not her job anymore.  And so, you

7    know, she did not put the effort into it anymore and,

8    you know, she did not have time to give me the

9    quizzes.

10       Q.    Was that something that you complained about?

11       A.    No; I was trying to keep a low profile and

12   just be the whipped puppy at this stage.

13       Q.    I'm going to hand you Zechman 115.  Actually

14   we may have come across another version of this.

15       A.    Yes.  This goes with -- we just went through

16   this.  This is just a different copy of that.

17       Q.    My only question is, when you forwarded an

18   e-mail you sent to Robyn Gray about morning rounds

19   and you forwarded it to your husband, right?

20       A.    Yes.

21       Q.    My only question of this document is, when

22   you forwarded the e-mail to your husband and you say,

23   quote, "This is the e-mail I sent her asking,

24   quote/unquote diplomatically, why--"  My question

1    is, you put the word "diplomatically" in quotes.  And

2    my question is why.

3        A.    Because I was trying to be nice.  Why are you

4    requiring me?  She didn't like me to begin with, so I

5    was treading on, you know, thin ice.  And you know, I

6    was trying to be diplomatic.  Well, why are you

7    insisting on this?  So diplomatically I'm asking why,

8    because I was treading on thin ice with her and I

9    knew that.  But yet I wanted to know why she was

10   harassing me like this.

11       Q.    And so is it your view that your e-mail to

12   Robyn, that the tone of that e-mail was diplomatic?

13       A.    I tried to be, yes.  Have you changed the

14   rules?  Did I miss something.  If something went out

15   and I missed it, I need to know about it.

16       Q.    Dr. Zechman, I've just handed you Zechman 92

17   this is a September 20th, 2002 letter from you to Dr.

18   Sciscione and then there is an attachment?  Is that

19   yes?

20       A.    That's yes.

21       Q.    In your letter you tell Dr. Sciscione that

22   you need to testify in a domestic abuse case and so

23   you will be out of the area for that; is at that

24   true?

1        A.    I just needed time off, and I was just giving

2    them proof that, yes.

3        Q.    What is this underlying case that you needed

4    to go down and testify about?

5        A.    It was a domestic abuse case.

6        Q.    Is this person who is listed on the subpoena,

7    your ex-husband?

8        A.    Yes.  This is the problems I was having

9    ex-husband at an earlier while, but it was just

10   coming through to the courts.

11       Q.    Is this there a reason?  Do you know why your

12   husband's is listed in the plaintiff as in this

13   document or is listed as the top party?

14       A.    No.  I can't remember exactly, because we had

15   a lot going on at that time and I can't remember what

16   this was about.

17       Q.    Was there at this time, July 2002, was there

18   still ongoing divorce proceedings or had the divorce

19   happened in the past?

20       A.    It was more about the child.  You know, my

21   oldest child is from this marriage.  So it was to do

22   with that.

23       Q.    Relating to child support?

24             Visitation, interactions with the child.

8/16/2006 Plaintiff Zechman (Vol. 2)

1   the raising of the child, that sort of thing.

2            MS. BREWINGTON:  Off the record.

3            MR. BLOOM:  I have no further questions.

4   Thank you for your time coming up here, Dr. Zechman.

5            (At 5:10 p.m. the deposition was

6   concluded.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

424

---

8/16/2006 Plaintiff Zechman (Vol. 2)

|   | EXHIBITS   (Continued) | MARKED |
|---|---|---|
| 5 | March 11, 2003 letter from Dr. Sciscione | 332 |
| 66 | In-house residents' grades | 333 |
| 25 | March 24, 2003 letter from Dr. Sciscione | 337 |
| 54 | April 21, 2003 e-mail between Dr. Zechman and Dr. Sciscione | 343 |
| 17 | Remediation plan | 347 |
| 18 | Remediation plan | 347 |
| 112 | Schedule | 354 |
| 30 | July 30, 2003 memo from Dr. Ekbladh | 354 |
| 31 | August 19, 2003 e-mail exchange between Dr. Zechman and Sandy Kardos | 359 |
| 32 | August 20, 2003 letter from Dr. Ekbladh | 134 |
| 34 | September 4, 2003 letter from Dr. Ekbladh | 365 |
| 35 | September 30, 2003 letter from Dr. Ekbladh | 367 |
| 37 | Letter to Drs. Kaminski and Little | 369 |
| 46 | E-mail that you wrote to Dr. O'Connor June 18, 2003 | 374 |
| 47 | Follow-up e-mail to Dr. O'Connor | 378 |
| 48 | Follow-up letter to Exhibit 47 | 379 |
| 49 | January 6, 2004 letter Mr. Laskowski | 380 |
| 50 | October 18th, 2004 e-mail from Dr. Zechman | 383 |
| 118 | December 17th, 2004 letter from the executive director of the Board of Medical Practice | 386 |
| 117 | Administrative Charge | 389 |

426

---

8/16/2006 Plaintiff Zechman (Vol. 2)

1            I N D E X

Testimony of:  ELLEN ZECHMAN

By Mr. Bloom ......................229

Certificate of Reporter...........429

            E X H I B I T S

| NUMBER | | MARKED |
|---|---|---|
| 67 | July 29, 1997 letter from Dr. Fraser | 285 |
| 68 | July 23, 2003 letter to Dr. Ekbladh | 285 |
| 69 | Request for Disability Accommodation Form | 286 |
| 71 | August 25th, 2003 letter to Dr. Fraser | 293 |
| 73 | E-mail to Sandy Kardos | 296 |
| 77 | September 16, 2003 letter from Dr. Ekbladh | 303 |
| 79 | Letter September 22, 2003 | 304 |
| 80 | Form | 305 |
| 83 | October 3, 2003 note from Dr. Fraser | 306 |
| 82 | Form | 307 |
| 6 | ADA Intake Questionnaire | 313 |
| 15 | Schedule of CREOG study sessions | 322 |
| 22 | December 12, 2002 letter from Dr. Sciscione | 322 |
| 23 | December 13, 2002 memo from Dr. Sciscione to all Ob-Gyn attendings | 328 |

425

---

8/16/2006 Plaintiff Zechman (Vol. 2)

|   | EXHIBITS   (Continued) | MARKED |
|---|---|---|
| 109 | Personal diaries | 389 |
| 110 | recap of diary | 393 |
| 119 | Document created by Dr. Zechman | 394 |
| 3 | Letter from local community college | 395 |
| 104 | Letter of reference | 395 |
| 102 | printout from Web page of the American Academy of General Physicians | 398 |
| 100 | Complaint against East Carolina University | 400 |
| 101 | Notice of Voluntary Dismissal | 403 |
| 56 | Exchange of e-mail between Dr. Zechman and Dr. Sciscione | 403 |
| 122 | Exchange of e-mail between Dr. Zechman and Dr. Sciscione | 403 |
| 57 | E-mail to Dr. Ekbladh, July 26, 2003 | 408 |
| 121 | E-mail from Dr. Zechman to Dr. Gray | 411 |
| 107 | August 1, 2003 e-mail from Dr. Zechman | 415 |
| 61 | Exchange of e-mail between Dr. Zechman and Sandy Kardos August 11, 2003 | 416 |
| 62 | e-mail from Sandy Kardos | 420 |
| 115 | E-mail to husband and Dr. Gray | 421 |
| 92 | September 20th, 2002 letter to Dr. Sciscione | 422 |

427

8/16/2006  Plaintiff Zechman (Vol. 2)

```
 1
 2
 3
 4
 5
 6                    REPLACE THIS PAGE
 7                    WITH THE ERRATA SHEET
 8                    AFTER IT HAS BEEN
 9                    COMPLETED AND SIGNED
10                    BY THE DEPONENT.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

428

8/16/2006  Plaintiff Zechman (Vol. 2)

```
 1    State of Delaware        )
                               )
 2    New Castle County        )
 3
 4                    CERTIFICATE OF REPORTER
 5         I, Elise Alvarado, Registered Professional
      and Certified Court Reporter and Notary Public, do
 6    hereby certify that there came before me on August
      16, 2006, the deponent herein, ELLEN ZECHMAN, who was
 7    duly sworn by me and thereafter examined by counsel
      for the respective parties; that the questions asked
 8    of said deponent and the answers given were taken
      down by me in stenotype notes and thereafter
 9    transcribed by use of computer-aided transcription
      and computer printer under my direction.
10
           I further certify that the foregoing is a
11    true and correct transcript of the testimony given at
      said examination of said witness.
12
           I further certify that I am not counsel,
13    attorney, or relative of either party, or otherwise
      interested in the event of this suit.
14
15
      _____
16         Elise Alvarado, RPR, CSR
17         Certification No. 256
18         Expires January 31, 2008)
19
      DATED: _____
20
21
22
23
24
```

429                    **A-207**

Zechman
Paul F. Kaminski, M.D.

v.

C.A. # 05-159 JJF

Christiana Care Health Systems
July 14, 2006

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE


ELLEN ZECHMAN,                          )
                                        )
            Plaintiff,                  )
                                        )
v.                                      ) Civil Action No.
                                        )    05-159 JJF
CHRISTIANA CARE HEALTH SYSTEMS,         )
                                        )
            Defendant.                  )


            Deposition of PAUL F. KAMINSKI, M.D. taken
pursuant to notice at the offices of Margolis
Edelstein, 1509 Gilpin Avenue, Wilmington, Delaware,
beginning at 9:30 a.m. on Friday, July 14, 2006,
before Ann M. Calligan, Registered Merit Reporter and
Notary Public.

APPEARANCES:
            LORI BREWINGTON, Esquire
            MARGOLIS EDELSTEIN
              1509 Gilpin Avenue
              Wilmington, Delaware  19806
            on behalf of the Plaintiffs,
            THOMAS S. BLOOM, Esquire
            MORGAN, LEWIS & BOCKIUS, LLP
              1701 Market Street
              Philadelphia, Pennsylvania  19103-2921
              on behalf of the Defendant.



                WILCOX & FETZER
     1330 King Street - Wilmington, Delaware 19801
                  (302) 655-0477
                  www.wilfet.com

Zechman
Paul F. Kaminski, M.D.

v.

C.A. # 05-159 JJF

Christiana Care Health Systems
July 14, 2006

Page 2

1  ALSO PRESENT:
2       KAREN DeCREASE, Paralegal
3       ----
4       PAUL F. KAMINSKI, M.D.,
5       the witness herein, having first been
6       duly sworn on oath, was examined and
7       testified as follows:
8              EXAMINATION
9  BY MS. BREWINGTON:
10  Q.  Good afternoon, Doctor.
11  A.  Good afternoon.
12  Q.  My name is Lori Brewington, and I represent
13  Ellen Zechman in a discrimination action against
14  Christiana Care.
15        Have you ever testified at a deposition
16  before?
17  A.  A deposition, yes.
18  Q.  Yes.  Okay.  So I'm sure you know I'm going to
19  ask you a series of questions.  I'll make every effort
20  to ask them one at a time, and I'll ask you to answer
21  those questions.  If you have any questions about the
22  question that's being asked or if you'd like me to
23  rephrase it, just go ahead and let me know, and I'll
24  go ahead and do that for you.

Page 3

1        At times Christiana Care's attorney may
2  object to some of the questions that I ask, and that
3  is entirely proper.  Only thing that I ask is that you
4  go ahead and answer the question anyway unless he
5  specifically advises you not to answer the question.
6  Is that understood?
7  A.  Yes.
8  Q.  If at any time you need to take a break, just
9  let me know.  I don't think we're going to go too
10  long, but if you need to take a break, just let me
11  know.
12        Let's start with your full name for the
13  record.
14  A.  Paul F. Kaminski.
15  Q.  And what did you do in preparation for your
16  deposition testimony today?
17  A.  Met with him for about 45 minutes.
18  Q.  Did you review any documents?
19  MR. BLOOM:  Before you answer that
20  question, you can answer that question to the extent
21  you reviewed documents other than documents that I
22  selected for you to review.
23  A.  I did not review any documents, no.
24  MS. BREWINGTON:  Okay.  Thank you.

Page 4

1  MR. BLOOM:  Sure.
2  Q.  I want to ask you about your educational
3  background.
4  A.  Okay.
5  Q.  If you could just start with college.
6  A.  Loyola College in Baltimore, Maryland.
7  Q.  When did you graduate?
8  A.  1955 I think.
9  Q.  Close enough.
10        And then just tell me about the
11  progression up?
12  A.  University of Maryland School of Medicine.
13  College was '59.  Medical was '63.
14  Q.  Okay.
15  A.  Did a residency in ob/gyn at St. Agnes Hospital
16  in Baltimore, Maryland, from 1963 to 1967.
17        You said education now, is that correct?
18  Q.  Yes.
19  A.  I did a fellowship in breast and gyn pathology
20  from Armed Forces Institute of Pathology from 1981 to
21  1983.
22        And I got a master's degree in education
23  from Penn State in 1993 -- 1995.
24  Q.  Anything else?

Page 5

1  A.  That's enough.
2  Q.  It's quite enough.  I was just checking.
3        Now, let's talk about your employment with
4  Christiana Care?
5  A.  Yes.
6  Q.  When did you first become employed with
7  Christiana Care?
8  A.  July 1st, 1995.
9  Q.  And what was your position at that time?
10  A.  I came to Christiana as the residency program
11  director and the director of the Division of
12  Education.
13  Q.  And this is the residency program director of
14  obstetrics and gynecology?
15  A.  Yes.
16  Q.  And how long were you residency director?
17  A.  Seven years.
18  Q.  And what did you do after that?
19  A.  I stepped down to associate program director.
20  That was the beginning of kind of getting out of the
21  administrative duties before retiring.
22  Q.  And when was that?
23  A.  That would be from 2003.  2004, I think I was
24  the associate program director.  I'm not sure exactly

2 (Pages 2 to 5)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Zechman
Paul F. Kaminski, M.D.

v.
C.A. # 05-159 JJF

Christiana Care Health Systems
July 14, 2006

Page 6

1  when I gave up that job specifically.  Now I'm just a
2  staff physician.
3  Q.  You're not just anything.
4      So that I have the time frame right, you
5  were residency program director beginning in 1995?
6  A.  Yes.
7  Q.  And that was for about seven years?
8  A.  Through June 30th, 1992 -- 2002.  I'm sorry.
9  Q.  Then the assistant program director, 2000 --
10  A.  3, 2004.  Probably not 2004, but I may have
11  been.
12  Q.  And after that staff physician?
13  A.  Correct.
14  Q.  And that's what you are currently?
15  A.  Currently right now.
16  Q.  Dr. Zechman was employed with Christiana Care
17  in June of 2002 through September of 2003.
18  A.  Yes.
19  Q.  What was your position at that time?
20  A.  At the time she was hired, I was the program
21  director, and I will say I interviewed her and made a
22  recommendation to hire her.
23  Q.  And when she left the program were you serving
24  as assistant program director?

Page 7

1  A.  I'm not sure whether I was associate program
2  director or whether I had just given up that job.  I
3  don't remember.  I probably was still the associate
4  program director, but somebody would need to tell me.
5  Q.  Now, you were the residency program director,
6  but as I understand it, at some point, Dr. Sciscione
7  also served?
8  A.  July 1st, 2003, he took over as the program
9  director.
10  Q.  And then when did Dr. Ekbladh take over?
11  A.  When Dr. Sciscione left, and I'm not sure
12  exactly time-wise when.
13  Q.  You know it was you, then Sciscione, then
14  Ekbladh?
15  A.  Yes.
16  Q.  You mentioned that you were the one that
17  recommended Dr. Zechman for the program, is that
18  correct?
19  A.  Yes.
20  Q.  Tell me about the recommendation process or the
21  process that came about.
22      Do you understand the question?
23  A.  She came up for an interview.  I interviewed
24  her along with -- there were one or two other

Page 8

1  residents there at that time, who also talked to her.
2  And since it was a weekend and we were kind of running
3  short on time, we made a -- she was the best qualified
4  of the candidates that came, at least in my opinion.
5  Q.  Why is that?
6  A.  Well, you have to make a decision.  You
7  interview four people which one is --
8  Q.  Yeah.  But why did you feel that she was the
9  best compared to the others?
10  A.  Just after going through the interview process,
11  how you would evaluate people.  And I don't have
12  anything formal in front of me --
13  Q.  Right?
14  A.  -- but she was the best of the three or four
15  applicants.
16  Q.  Do you recall -- and I know it was a while ago.
17  Do you recall what were some of the qualities about
18  Dr. Zechman that made her better than the other
19  candidates?
20  A.  She seemed genuine, and she seem to have a
21  genuine desire to want to learn.
22  Q.  Did you have an understanding of Dr. Zechman's
23  background?
24  A.  Only what she told me.

Page 9

1  Q.  And what do you remember about what she told
2  you?
3  A.  I know she had a couple of children.  I forget
4  whether it was two or three.
5  Q.  Okay.
6  A.  That she was coming from Virginia.  Her husband
7  was in practice in North Carolina, I think.  And that
8  her husband flew back and forth to Delaware at times
9  to be with her.  And that was their plan, even when
10  she was hired, that they were going to do a lot of
11  flying back and forth.  I mean, that was kind of what
12  I remembered.
13  Q.  Now, this previous school that she attended in
14  Virginia, do you or did you have an understanding of
15  whether that school was comparable to Christiana Care
16  standards.
17  A.  It was an approved residency program, so it
18  should have been.
19  Q.  Are you saying that it may not have been or you
20  don't know?
21  A.  From what I remember, it was an approved
22  residency program at that time.  So it should have
23  been equal.
24  Q.  Did you have discussions with Dr. Zechman

Zechman                                    v.              Christiana Care Health Systems
Paul F. Kaminski, M.D.              C.A. # 05-159 JJF                        July 14, 2006

Page 10

1  before she was hired about her surgical skills or
2  anything like that?
3     A.  I knew she had -- I knew she did very little
4  surgery at her previous program.
5     Q.  That would be the one at Virginia?
6     A.  Yeah.
7     Q.  Did you feel that she would still be able to be
8  successful in the Christiana Care program?
9     A.  Yes. Yes.
10    Q.  Why is that?
11    A.  Because we've had other people come with lower
12  surgical background, and they've caught up. So there
13  was no reason to think she was any different.
14    Q.  So is it your understanding that she may not
15  have been at the level as other residents before
16  entering the program?
17    A.  We knew surgical-wise she was not going to be
18  at the level of the other residents in that area. We
19  anticipated.
20    Q.  But it was your understanding that based on
21  other students being at that same level, that she'd be
22  able to --
23    A.  Catch up.
24    Q.  Okay.

Page 11

1        How would she be able to catch up? What
2  was the plan?
3     A.  The plan was to put her in as many surgical
4  cases as possible.
5     Q.  So the best way to get that surgical is to do
6  it.
7     A.  Is to operate.
8     Q.  Now, this may be a crazy question, but are you
9  saying actually in there doing the surgery or
10  observing, just being a part of it?
11    A.  Acting first as assistant, and as she developed
12  skills, then giving more and more responsibility to
13  eventually do the surgery.
14    Q.  And do you know whether that happened with
15  Dr. Zechman? And when I say that happened, I mean, do
16  you know whether or not she received as much surgery
17  as possible?
18    A.  Do I have first-hand knowledge of it? No,
19  because by the time she was in that position, I was no
20  longer the program director. So I did not look at her
21  statistical numbers to any extent, nor did I operate
22  with her a lot.
23    Q.  You didn't?
24    A.  No, just because I was at the point in my life

Page 12

1  where I was trying to operate less and less.
2     Q.  So the reason why you didn't operate with her a
3  lot is because you didn't operate a lot?
4     A.  That would be correct.
5     Q.  I know that you recommended her for the
6  program. Once you make that recommendation, are you
7  making it to the resident review committee?
8     A.  It goes to them and then to the institution.
9     Q.  Do you recall whether there was any difficulty
10  in getting Dr. Zechman voted on or getting her
11  approved?
12    A.  No.
13    Q.  No, you don't recall?
14    A.  No, there was no problem.
15    Q.  And as director of the program you served on
16  the resident review committee, right?
17    A.  Yes.
18    Q.  Tell me when the resident review committee --
19  what is it?
20    A.  That's a -- there are two residency review
21  committees. One is departmental. One is
22  institutional. The departmental deals strictly with
23  the ob/gyn residency program, the 16 residents
24  evaluate -- go through, evaluate each resident at each

Page 13

1  meeting, and also administrative things that come from
2  the residency review committee as far as changes in
3  requirements and et cetera.
4     Q.  Okay.
5     A.  Okay.
6     Q.  Take a look at this document that we are going
7  to have marked.
8        MS. BREWINGTON: I am actually going to
9  ask you to mark that one. I think he has the
10  original.
11        (Kaminski Deposition Exhibit 1 was marked
12  for identification.)
13  BY MS. BREWINGTON:
14    Q.  Do you know whether or not these are the
15  members of the resident review committee?
16    A.  That looks correct.
17        MR. BLOOM: I'm going to interject an
18  objection to the form. We don't have a time period.
19        MS. BREWINGTON: I was going to actually
20  ask, but he answered the question before.
21  BY MS. BREWINGTON:
22    Q.  But my question was, do you know whether or not
23  these are the members of the resident review committee
24  that approved Dr. Zechman into the program in 2000?

A-211

4 (Pages 10 to 13)

Zechman                                                    v.                    Christiana Care Health Systems
Paul F. Kaminski, M.D.                          C.A. # 05-159 JJF                                  July 14, 2006

**Page 14**

1    A.  I can't answer that question.  I don't have a
2    date on here.
3    Q.  So you can't tell me based on the names of the
4    people?
5    A.  Most of the people are permanent members, but
6    there are some people that rotate in and out.
7    Q.  Well, tell me how that works.  Do you get voted
8    onto the committee?
9    A.  Appointed.
10   Q.  Appointed?
11   A.  By the chairman.
12   Q.  And it's a lifetime appointment?
13   A.  No.  There are certain people.  The chairman is
14   a permanent member.  The program director is a
15   permanent member.  The associate program director is a
16   permanent member.  And the division heads, which would
17   be the -- which would have been at that time
18   Dr. Colmorgen and Dr. Whitney, and then the rest of
19   the people would be -- there's always a resident
20   member, which at that point it says Colleen Bratsch.
21   Dr. Sciscione was not a resident.  That's a misprint?
22   Q.  Okay.
23   A.  There's always a resident member of the
24   committee.  Then there are several members from the

**Page 15**

1    private community that are appointed for, I believe,
2    two- or three-year terms.
3    Q.  Do you know whether or not the vote for Zechman
4    was a unanimous decision?
5            MR. BLOOM:  Object to the form.  Which
6    vote?
7            MS. BREWINGTON:  I'm sorry.  This vote --
8    right now I'm specifically asking you about
9    Dr. Zechman and her being accepted into the program.
10   BY MS. BREWINGTON:
11   Q.  So the vote that I'm talking about is -- I'm
12   not sure when it occurred, but I know that Zechman
13   began the program in June of 2002.
14   A.  June or July.  I forget which.
15   Q.  June or July.  Okay.
16           So my question is, when the resident
17   review committee approved her into the program, do you
18   have an understanding of whether it was a majority or
19   unanimous?
20   A.  I don't remember.
21   Q.  Are these votes secret ballot or anything like
22   that?
23   A.  If it's close, it might be.  If it's going to
24   be pretty much unanimous, it's anybody -- all in favor

**Page 16**

1    say, "Aye."
2            MS. BREWINGTON:  Off the record for two
3    seconds.
4            (Discussion off the record.)
5    BY MS. BREWINGTON:
6    Q.  Are residents in the program evaluated,
7    Dr. Kaminski?
8    A.  Yes.  Oh, yes.  Residents in the program are
9    evaluated.
10   Q.  Tell me about the evaluation process.
11   A.  All of the attending physicians get a form
12   which evaluates professionalism, knowledge, surgical
13   skills, et cetera.  I believe it's a one to five
14   scale.  And they are turned into the program
15   coordinator.  They are tabulated by the program
16   coordinator and brought to the residency review
17   committee meeting.
18           Also there's room at the bottom of that
19   form for comments from the evaluators.
20           The evaluation process is different now.
21   Q.  It's different since Dr. Zechman left?
22   A.  Yes.
23   Q.  Then I'm not really concerned about that.
24           Let's confine our discussion to what the

**Page 17**

1    evaluation process was when Dr. Zechman --
2    A.  Okay.
3    Q.  Now, all the attending physicians are given
4    these forms.  Who are they given these forms by?
5    A.  The program coordinator.
6    Q.  So the program coordinator gives the form to
7    attending physicians?
8    A.  Right.
9    Q.  Now, these attending physicians, are these the
10   physicians that work with the residents in surgery
11   or --
12   A.  In any aspect.
13           MR. BLOOM:  I'm going to remind you,
14   Dr. Kaminski, to allow Ms. Brewington to complete her
15   question before you answer.
16   Q.  Is it mandatory that they complete these
17   evaluations?
18   A.  No.
19   Q.  So, in your opinion, do the doctors complete
20   these evaluations?
21   A.  The full-time physicians all have to complete
22   the evaluation, but the private attending physicians,
23   it's voluntary.
24   Q.  So the full time physicians must complete the

**A-212**

Zechman
Paul F. Kaminski, M.D.

v.
C.A. # 05-159 JJF

Christiana Care Health Systems
July 14, 2006

Page 18

1 evaluations?
2 **A. Yes.**
3 Q. And are there other types of evaluations,
4 meaning nurses evaluating residents and residents
5 evaluating other residents?
6 **A. Residents evaluate other residents. Whether**
7 **nurses were evaluating them at that time -- they do**
8 **now. I don't remember whether they did then.**
9 Q. Are evaluations supposed to be completed on a
10 monthly or weekly basis or is it --
11 **A. It's rotational basis. As the -- the residents**
12 **on the rotation for three months, they may just get**
13 **evaluated at the end of the third month. If they are**
14 **on one-month rotation, obviously it's going to be a**
15 **monthly evaluation.**
16 Q. The oral boards, is that considered an
17 evaluation?
18 **A. Yes.**
19 Q. Now, Dr. Zechman took part in the oral boards,
20 and I don't remember the year that she actually took
21 them.
22 **A. Okay.**
23 Q. But my question is, is it standard practice to
24 be evaluated by more than one doctor in your oral

Page 19

1 boards?
2 **A. Yes.**
3 MR. BLOOM: I'm going to interpose an
4 objection. I don't think it's -- are you talking
5 about mock oral or actual boards?
6 Q. Well, I guess it's the mock because Dr. Zechman
7 took it, and that's the one I'm talking about. It was
8 an oral board, and it was considered an oral board. I
9 don't know whether it was --
10 **A. It's a knowledge evaluation tool.**
11 Q. But is it mock?
12 **A. It's mock. From the standpoint is it board --**
13 **for board certification, no. It's strictly for**
14 **departmental use.**
15 Q. Is there a standard in terms of how many people
16 will administer the oral boards?
17 **A. When Dr. Sciscione became the program director,**
18 **I don't have direct knowledge because I didn't**
19 **participate in it.**
20 Q. Take a look at that for me. Is this an example
21 of the evaluation form that the attending physicians
22 would complete?
23 **A. Yes.**
24 MR. BLOOM: Objection to the form.

Page 20

1 Q. Now, based on what I see here, it doesn't look
2 like this was completed. Is that a fair statement?
3 **A. It appears to be blank.**
4 Q. Because if it was completed, there would be
5 like some writing or circles with the numbers?
6 **A. Yes.**
7 MR. BLOOM: I'm going to note for the
8 record that there's no Bates number or other
9 indication on this document.
10 THE WITNESS: There's a date.
11 MR. BLOOM: That it's been produced in
12 this case. I don't know one way or the other whether
13 it has, but...
14 BY MS. BREWINGTON:
15 Q. Now, is it a fair statement that Dr. Zechman
16 should have several of these in her file?
17 **A. You would hope.**
18 Q. You would hope.
19 Well, if the full-time physicians are
20 required to complete these, right?
21 **A. Not on every case.**
22 Q. Okay. So in which cases are the physicians
23 required to complete this form, the evaluation form?
24 MR. BLOOM: You're talking about this

Page 21

1 specific kind of form?
2 MS. BREWINGTON: This one. Exhibit 2, or
3 Kaminski 2.
4 (Kaminski Deposition Exhibit 2 was marked
5 for identification.)
6 **A. Since I was not the program director, I cannot**
7 **tell you what the requirements were at that time.**
8 BY MS. BREWINGTON:
9 Q. Was this the form that you are speaking of
10 earlier?
11 **A. It is one of several forms.**
12 Q. Tell me about the different forms.
13 **A. This was one that was used for -- this is**
14 **knowledge of -- there's another one used just**
15 **basically for outpatient clinic, a similar form, with**
16 **knowledge. You don't have use of assistance in the**
17 **clinic, so it was different questions but a similar**
18 **type form.**
19 Q. Did the residents give these forms to the
20 attending physicians on occasion?
21 **A. Yes.**
22 **They would give these to the attending**
23 **physician on occasions that they wanted to be**
24 **evaluated on.**

A-213

Zechman
Paul F. Kaminski, M.D.

v.

C.A. # 05-159 JJF

Christiana Care Health Systems
July 14, 2006

Page 22

1    Q.   Were they supposed to give them to them for all
2    their --
3    A.   Not necessarily for all their cases.
4         (Kaminski Deposition Exhibit 3 was marked
5    for identification.)
6    BY MS. BREWINGTON:
7    Q.   Take a look at this document.  We are going to
8    have this marked as Kaminski 3.  It's a memo to ob/gyn
9    attendings from Anthony Sciscione regarding Ellen
10   Zechman.  It's dated December 13th, 2002.
11        Did you receive this memo?
12   A.   I should have because it has ob/gyn attending.
13   Q.   But you don't recall?
14   A.   No.
15   Q.   Well, let me ask you this, part of the memo
16   indicates, "I would ask that the faculty attending
17   would review the history, physical, and counseling
18   with Dr. Zechman, concentrating on critical thinking
19   skills and increasing knowledge."
20   A.   Mm-hmm.
21   Q.   Do you know whether you did this, meaning, did
22   you concentrate with Dr. Zechman on critical thinking
23   and --
24   A.   I had very little contact with Dr. Zechman on a

Page 23

1    day-to-day basis.
2    Q.   Did you have any contact with her?
3    A.   I'm sure I did.
4    Q.   Do you recall having any contact?
5    A.   Before or after this memo, no, I can't tell.
6    Q.   So as it stands here today, do you recall
7    working with her at any level to develop her skills or
8    anything?
9    A.   When I did have contact with her, we would work
10   on informally trying to develop her skills.
11   Q.   What do you mean by that?
12   A.   That I filled out a paper and evaluation every
13   time she saw a patient, no, I didn't.  Did I review
14   things when she was in triage if I was the in-house
15   attending physician, yes, I did.  I would have had to.
16   Q.   Do you recall whether you filled out any
17   evaluations for Dr. Zechman?
18   A.   Specifically related to this?
19   Q.   Oh, no.  Just ever.
20   A.   Yeah, I did.
21   Q.   You did?
22   A.   Yes.
23   Q.   Dr. Zechman worked in triage, that's fair to
24   say?

Page 24

1    A.   Yes.
2    Q.   And some of your patients were in triage,
3    correct?
4    A.   Yes and no.
5    Q.   Explain to me why that's a yes and a no?
6    A.   Patients that would have had my name stamped on
7    them as being -- was I physically the person rendering
8    care that day, maybe yes, maybe no.  If there are
9    eight attending physicians, the chance of that would
10   be one in eight.  All of the patients that came from a
11   particular site had my name on them whether I was
12   there or not.
13   Q.   Because you were the attending?
14   A.   Because I was the responsible -- well, I was
15   responsible -- I was responsible for those patients in
16   the outpatient area.  If they came to triage, my name
17   appeared but I didn't necessarily see the patient.  I
18   probably didn't.
19   Q.   Now, tell me how that works.  When you have a
20   resident and you have attending physicians in triage
21   or in the outpatient area -- is outpatient area and
22   triage the same thing?
23   A.   Two different things.
24   Q.   What's the outpatient area?

Page 25

1    A.   Wilmington Hospital.  That's where the
2    residency patients -- and there's always an attending
3    physician present at Wilmington Hospital to supervise
4    whatever residents are there.
5    Q.   Tell me about triage, then.  How is that
6    different than outpatient?  Is triage the emergency
7    room?
8    A.   It's kind of like an emergency room.
9    Q.   Is there always an attending physician there
10   present?
11   A.   At that time I guess that question would be no.
12   Q.   At that time meaning when Dr. Zechman --
13   A.   That's right.
14   Q.   Why not?
15   A.   There weren't enough attending physicians.
16   Q.   So where would the attending physicians be?
17   A.   Well, these for the most part were private
18   patients and their private attending would be called
19   about every one of their patients.
20   Q.   So the attending person would be on call?
21   A.   Right.
22   Q.   And so, with Dr. Zechman being in triage, there
23   wouldn't be an attending physician there, but she
24   would --

A-214

Page 26

1   A. Call -- the patient who's attending said
2   Dr. Bell, she would call Dr. Bell and say your
3   patient, Ms. So and So, is here with such and such.
4   Q. Now, as I understand it -- and I need you to
5   correct me if I'm wrong -- the attending physician
6   with respect to residents treating patients, are they
7   supposed to be within walking distance or within -- on
8   the same grounds as the resident?
9   A. The RRC mandates that there be an in-house
10  attending physician. So there always is someone in
11  the hospital that's available for consultation from
12  any resident or any -- and also to handle emergencies
13  if the other -- real attending physician is not
14  available.
15  Q. So this person's not the attending physician,
16  it's someone else.
17  A. Wait a minute. You --
18  Q. Let's go back because I guess I'm confused.
19  You said if the real attending physician is not
20  available?
21  A. Well, Dr. Bell may be at home. If a patient of
22  his has an acute emergency that requires immediate
23  attention, that in-house attending physician will fill
24  in until he got there.

Page 27

1   Q. So the attending in-house physician fills in?
2   A. Right.
3   Q. And that's acceptable under the mandate?
4   A. The mandate is that there be an in-house
5   attending physician available 24 hours for
6   emergencies.
7   Q. I may have already asked you this, but I don't
8   remember your answer. Do you recall a time actually
9   working with Dr. Zechman in surgery?
10  A. I'm sure I did a few C-sections with her, but I
11  don't recall anything else.
12  Q. How were her surgical skills based on your
13  experience.
14  A. Below average, but acceptable.
15  Q. What do you mean by below average? And what I
16  mean by that is, whose average?
17  A. Based on the fact that I've been in resident
18  education since 1977, it's an idea of what's average
19  for all the residents that I've gone through. Some
20  are better than others, and it stands out.
21  Q. I guess my question is, was she below average
22  for a second year? Is that what you were --
23  A. Yes.
24  Q. And do you know whether or not you worked with

Page 28

1   Dr. Zechman toward the end of her career at
2   Christiana, or before that?
3   A. Towards the end I had very little contact with
4   her.
5   Q. So this had to be like probably in the --
6   A. Early on.
7   Q. Did you say below average but acceptable?
8   A. Yes.
9   Q. When you say acceptable, what do you mean by
10  that? Do you mean that she was still functioning at
11  an acceptable level as a second year?
12      MR. BLOOM: Object to the form of the
13  question, but you can answer.
14  A. It needed to get better, but with time I
15  thought it probably would get better.
16      (Kaminski Deposition Exhibit 4 was marked
17  for identification.)
18  BY MS. BREWINGTON:
19  Q. Take a look at what we are going to mark as
20  Kaminski 4 title on the top is "July 2003 Curriculum
21  for Ellen Zechman"?
22  A. Yes.
23  Q. Do you see where it indicates, July 21st, 2003,
24  with Dr. Kaminski?

Page 29

1   A. Yes.
2   Q. And then on the 22nd, "Westside with
3   Dr. Kaminski all day"?
4   A. Yes.
5   Q. Would that have been her rotation with you
6   during the week of the 21st through the 25th?
7   A. That would be correct.
8   Q. Now, that's later on in her career with
9   Christiana Care, would you agree?
10  A. She came in July of 2002, is that correct?
11  Q. Yeah.
12  A. Then that would be the second year, yes?
13  Q. Do you know whether she actually worked with
14  you that week?
15  A. I know she came to Westside. I specifically
16  remember that. I can't tell you about the other ones.
17  Q. What is Westside?
18  A. Westside is the federally funded health clinic
19  over on Fourth Street.
20  Q. What would she have been doing with you during
21  that week, everything that you did?
22  A. Yeah. Basically whatever I did, she did.
23  Wilmington is clinic and all the residents have clinic
24  one day a week. So I would have been her supervisor

A-215

Zechman
Paul F. Kaminski, M.D.

v.

C.A. # 05-159 JJF

Christiana Care Health Systems
July 14, 2006

Page 30

1  in the clinic that day. And I'm sure she did that.
2  Like I say, Westside, I do remember her being there.
3  I do remember her being in the colposcopy clinic which
4  I do on Wednesday mornings. Thursday, I couldn't tell
5  you. There could have been a lot, there may have been
6  none. I couldn't tell you. The same thing with the
7  operating room, whether I did any cases or not.
8      Q.  Now, previously before I showed you document, I
9  actually asked you about her surgical skills.
10     A.  Mm-hmm.
11     Q.  Do you have an understanding of how the other
12  doctors viewed her surgical skills?
13     A.  Directly, no.
14     Q.  Not directly, but as I understand it, you
15  served on the resident review committee?
16     A.  Yes.
17     Q.  And correct me if I'm wrong. I'm thinking you
18  had discussions about Dr. Zechman and her skills?
19     A.  In context of that committee, yes.
20     Q.  Is that the only context in which you had
21  discussions about her surgical skills?
22     A.  With me and her surgical skills, yes.
23     Q.  So are you saying that, in those resident
24  review meetings, you discussed your contact with

Page 31

1  Dr. Zechman?
2      A.  Any comments that I had, I would have shared at
3  that time.
4      Q.  Is it fair to say that the other doctors did
5  the same?
6      A.  I would hope so.
7      Q.  Well, did they?
8      A.  Yes.
9      Q.  And based on your experience in the resident
10  review committees, what was your understanding of how
11  other doctors viewed her surgical skills?
12     A.  Probably -- you're asking me to speculate on
13  how they did. I don't specifically remember.
14     Q.  I don't want you to speculate. I guess I want
15  to know, as you attended the resident review
16  committees and Dr. Zechman's name was discussed and
17  her surgical skills were discussed, what did you learn
18  or what did you have an understanding of based on the
19  conversations?
20     A.  That her skills would be below average to
21  unacceptable.
22     Q.  And do you know whether that was all of the
23  members of committee?
24     A.  No, I don't.

Page 32

1      Q.  Do you know whether it was more than half of
2  the members of the committee?
3      A.  No, I don't.
4      Q.  Do you have an understanding of whether it was
5  one or two people that thought that her skills were
6  unacceptable?
7      A.  I would say more than one or two, but I
8  wouldn't go further than that.
9      Q.  If you turn to the second page of Kaminski 4, I
10  believe, I'm going to ask you to look at the dark
11  portion of this document, and it begins with Zyrtec-D
12  12 hour.
13     A.  Okay.
14     Q.  If you look at where it says 7/25/06, do you
15  see where it says that?
16     A.  Yes.
17     Q.  It's difficult to read.
18          It says, "Assigned to OR with Kaminski.
19  Was reassigned to triage. Denied surgical training."
20          Do you see where it says that?
21     A.  Yes.
22     Q.  Now, I've read that statement to you. Does
23  that refresh your recollection as to whether she was
24  reassigned to triage?

Page 33

1      A.  No, it doesn't.
2          MR. BLOOM: Object to the question. Go
3  ahead.
4      A.  No, it doesn't.
5          MR. BLOOM: I'm going to note for the
6  record -- I believe I could be wrong -- that this is
7  Dr. Zechman's handwriting. I'm sorry for the
8  interruption.
9  BY MS. BREWINGTON:
10     Q.  Now, being assigned to triage -- I guess I'm
11  trying to get an understanding of, when you're
12  assigned for surgery -- and I'm talking about when
13  you're, meaning a resident -- they are obviously
14  supposed to be in surgery to learn. That's a fair
15  statement?
16     A.  Correct.
17     Q.  Now, what would be the reason reassigning a
18  resident to triage?
19     A.  I can't answer that. Those decisions were the
20  discretion of the chief resident.
21     Q.  Does the chief resident have to consult anyone
22  when she makes a determination who gets reassigned?
23     A.  She's trying to run the entire surgical
24  schedule, the entire triage, labor and delivery, so

Zechman                                    v.            Christiana Care Health Systems
Paul F. Kaminski, M.D.              C.A. # 05-159 JJF                       July 14, 2006

Page 34

1    she has -- he or she has to make adjustments
2    periodically as to who needs to do what.
3        Q.   Was Robyn Gray the chief resident while
4    Dr. Zechman was employed?
5        A.   She would have been for part of that time.
6    They rotated that.  Whether she was the one in July, I
7    could not tell you.
8        Q.   What's the rotation like?  Is it quarterly?
9        A.   For each -- it's different.  For some rotations
10   it's quarterly.  For some it's once a month.
11       Q.   Now, the chief resident would be someone in
12   the --
13       A.   Fourth year.
14            (Kaminski Deposition Exhibit 5 was marked
15   for identification.)
16   BY MS. BREWINGTON:
17       Q.   Take a look at this document.  We are going to
18   mark this as Kaminski 5.  It's an e-mail from
19   Dr. Zechman to Dr. Ekbladh.  It was sent on January
20   26, 2003, at 5:10.
21            Based on the exhibit that I showed to you
22   earlier, Kaminski 4, would it be fair to say that this
23   e-mail was sent the same week that she was supposed to
24   be or scheduled to work with you?

Page 35

1        A.   It appears to be.
2        Q.   I want to direct your attention to the line
3    that begins with "on Friday," and I will go ahead and
4    read that out loud.
5            "On Friday I was left relieving in triage
6    rather than being allowed to go to the OR on a
7    possible perforation on a patient that Dr. Kaminski
8    and I had seen in the clinic the day before."
9            My question is, based on your review of
10   this document, does it refresh your recollection as to
11   whether Dr. Zechman was removed from surgery with you
12   or from working with you?
13       A.   No.
14            MS. BREWINGTON:  I'm going to have this
15   marked.
16            (Kaminski Deposition Exhibit 6 was marked
17   for identification.)
18   BY MS. BREWINGTON:
19       Q.   You can go ahead and flip to the next page of
20   that document that I just put in front of you.  We are
21   going to mark that as Kaminski 6.  And what it is is
22   Dr. Zechman's complaint.  And I want to refer you to a
23   specific section of the complaint and then ask you a
24   question about it.

Page 36

1        A.   Okay.
2        Q.   It's paragraph 38, I believe.
3        A.   I've read it.
4        Q.   Did you have discussions or a discussion with
5    Dr. Zechman about being reassigned?
6        A.   On that particular day -- you jogged my memory
7    and I can say, yes, I did, and I did send to
8    Dr. Ekbladh -- I don't remember whether it was an
9    e-mail or a note.
10       Q.   It was an e-mail or a note, but it wasn't an
11   evaluation?
12       A.   Not a formal evaluation.
13       Q.   So you had a discussion with Dr. Zechman that
14   day?
15       A.   I think she came to me, and we had a discussion
16   about that.
17       Q.   I want to ask you about that.  Tell me
18   everything that you remember about that.
19       A.   That's about it.
20       Q.   There's nothing else.
21       A.   I wouldn't have remembered had I not seen this.
22   I do remember seeing this.  I think I showed it to
23   her.  Does it say I showed it to her?
24       Q.   It does.

Page 37

1        A.   Okay.
2        Q.   So that's an accurate statement?
3            MR. BLOOM:  Object to the form.  You can
4    answer it.
5        Q.   I'm sorry.  The portion of paragraph 38 that
6    pertains to you, that's an accurate --
7        A.   Yes.
8        Q.   Okay -- statement?
9            Do you have an understanding of whether or
10   not Dr. Zechman was reassigned more often than other
11   residents?
12       A.   No, I don't.
13       Q.   We talked about her surgical skills and I asked
14   you to tell me what you thought about them and you
15   mentioned, blow average but acceptable.  How about her
16   medical knowledge?
17       A.   Below average.
18       Q.   Acceptable?
19       A.   Barely.
20       Q.   Do you have an understanding of -- okay.  Back
21   to that question.  Let me get a clarification of a
22   time frame.
23            Are we talking about towards the beginning
24   of her --

A-217

Zechman
Paul F. Kaminski, M.D.

v.

C.A. # 05-159 JJF

Christiana Care Health Systems
July 14, 2006

Page 38

1   A.  Throughout.
2   Q.  Throughout.  Okay.
3       How about Dr. Zechman's ability to relate
4  to patients and treat patients, how would you
5  characterize them?
6   A.  Acceptable.
7   Q.  Why did you feel she was acceptable in that
8  area?
9       MR. BLOOM:  I'm going to object to the
10  form.  I think it's compound, but you can answer.
11  A.  Why did I feel it was acceptable?
12  Q.  Yes.  Why?
13  A.  I mean, patients -- she did not generate a lot
14  of patient complaints.  Patients seemed to be
15  generally happy with her.  Again, no one can please
16  everyone, so -- and her interactions, I thought, were
17  acceptable.
18      (Kaminski Deposition Exhibit 7 was marked
19  for identification.)
20  BY MS. BREWINGTON:
21  Q.  Tell me about the CREOG scores.  What are they?
22  A.  The CREOG exam is an in-training exam given to
23  o-b residents nationwide.  It happens to be the
24  Saturday after Martin Luther King Day.

Page 39

1   Q.  Every year?
2   A.  Every year.
3       They are compared to residents nationwide
4  at their level.  So all residents take it.  I mean,
5  yes, if they are sick or occasionally somebody
6  doesn't, but basically everybody does it, every
7  program nationwide.
8   Q.  Does it count for any type of certification?
9   A.  No.
10  Q.  How does Christiana Care use these scores?
11  A.  Use them in two ways.
12  Q.  Okay.
13  A.  The program gets reported how many residents
14  got every particular question right or wrong.  If
15  there's a particular question that everyone got wrong,
16  then it's basically the program's fault for teaching
17  that particular form and we make sure that we include
18  it in the curriculum the following year.
19      The other thing is to compare the
20  residents knowledge-wise.
21  Q.  When you say compare the residents
22  knowledge-wise, are you comparing Christiana Care
23  residents to residents outside?
24  A.  Mm-hmm.  If somebody gets 50th percentile and

Page 40

1  50th percentile nationwide -- actually, there's no
2  percentile given on the CREOG, but the standard -- the
3  standard score is 200 but the standard deviation --
4  the median is 200 but standard deviation is 20.
5       But using the standard deviation, you can
6  to go a statistic chart and figure out what percentile
7  that is.
8   Q.  These are the CREOG scores as of March 17,
9  2003, is that correct?
10  A.  That's what it says.
11  Q.  If I look at the second years, the PGY2s --
12  A.  Yes.
13  Q.  -- Heinle, Kersh, Kirifides, and Zechman.
14  A.  Mm-hmm.
15  Q.  Now, is it fair to say that Zechman did better
16  than Kirifides?
17  A.  I would consider that pretty much equal.
18  Q.  They are pretty much equal.
19  A.  The test isn't that discriminatory.
20  Q.  And how about Dr. Gray's score, if you look at
21  the PGY3s?
22  A.  Again, it is comparable.
23  Q.  So you would say that Kirifides, Zechman, and
24  Gray were comparable scores on the CREOG?

Page 41

1   A.  All were bad?
2   Q.  Now, I'll take you to the bottom half of the
3  document here.  Is it fair to say that Robyn Gray was
4  given remediation with promotion?
5   A.  Yes.
6   Q.  And Dr. Kirifides was given a mentor, correct?
7   A.  It would appear that way.
8   Q.  And Dr. Zechman was given remediation with
9  possible no promotion, is that correct?
10  A.  That would be correct.
11  Q.  Do you know why she was given the possibility
12  of no promotion when she scored similar to these other
13  residents?
14  A.  No, I don't, not just -- just based on this
15  sheet of paper.
16      (Discussion off the record.)
17      (Pause.)
18      (Kaminski Deposition Exhibit 8 was marked
19  for identification.)
20  BY MS. BREWINGTON:
21  Q.  Take a look at what we are going to have marked
22  as Kaminski 8.  Tell me what this document is.
23  A.  It appears to be a meeting from the residency
24  review committee.

Wilcox & Fetzer, Ltd.                Professional Court Reporters                (302)655-0477

Zechman                              v.                    Christiana Care Health Systems
Paul F. Kaminski, M.D.              C.A. # 05-159 JJF                       July 14, 2006

Page 42

1  Q.  The minutes from the meeting, is that what it
2  is?
3  A.  A copy of the minutes.
4  Q.  It's dated August 18, 2003?
5  A.  Yes.
6  Q.  And you were present at this meeting?
7  A.  It says I was.
8  Q.  And it says, "Invited Matthew Hoffman, Joseph
9  Patruno, and Gordon Ostrum."
10         Do you know whether they actually attended
11  the meeting?
12  A.  No, I don't.
13  Q.  And you don't recall?
14  A.  No, I don't.
15  Q.  Take a look at the second page.  It indicates
16  sort of there in the middle, "After a long discussion
17  on where to go from here with her course of study, it
18  was suggested by the committee to do the following:
19  Continue probation with the special PGY2 rotation,
20  must get active and continuous counseling for stress
21  and depression, must get learning ability test."
22         Did I read that accurately?
23  A.  Yes.
24  Q.  Is it fair to say that, at the end of this

Page 43

1  meeting which took place in August of 2003, the plan
2  was to continue Dr. Zechman in the program as a PGY2?
3  A.  That would be correct.
4  Q.  And the decision was also to get a learning
5  ability test, is that correct?
6  A.  Yes.
7  Q.  Did the committee have a concern that
8  Dr. Zechman had some sort of the cognitive deficit?
9  A.  Not specifically, but wanted to give her the
10  benefit of the doubt in case there was one.  We would
11  have to evaluate her in case there was one.  And I
12  think it was very much on our mind because a resident
13  two years before that was diagnosed with a specific
14  learning disability, and when that was addressed, the
15  performance markedly improved.
16  Q.  That happened previously with a different
17  resident?
18  A.  Yes.
19  Q.  Do you remember the name of the resident?
20  A.  Yes, I do.
21  Q.  What was the name of the resident that you
22  addressed his or her disabilities?
23  A.  Her name was Kay.  Her married name was Dohr,
24  D-o-h-r.

Page 44

1  Q.  And did the resident review committee have
2  discussions on the type of disability?  Like I guess
3  my question is, did you have a sense of what kind of
4  ability or disability she may have?
5  A.  I did not.
6  Q.  Did anyone?
7  A.  I don't -- not that I -- I'd be speculating to
8  answer that question.
9  Q.  When we talk about disabilities, are we talking
10  about like ADHD?
11  A.  That would be one example.
12  Q.  Dyslexia?
13  A.  Another example.  Something that we may all
14  have missed.
15  Q.  Still during this committee meeting in August
16  of 2003, there was also some discussion about
17  Dr. Zechman requesting ADA accommodations, is that
18  correct?
19  A.  I don't remember that.
20  Q.  Is it fair to say that based on your review of
21  the minutes that that's accurate?  It's actually the
22  paragraph down from what I just read?
23  A.  Okay.  That's what it states.
24  Q.  You also had a discussion about an ACGME

Page 45

1  letter, is that correct?  It says, 3.4 ACGME letter.
2         MR. BLOOM:  Are you asking the witness if
3  he remembers that discussion or if the document says
4  that?
5  Q.  I am asking both.
6  A.  Not specifically.
7  Q.  Is it accurate that the document indicates that
8  you discussed that?
9  A.  The documents indicates that there was a letter
10  sent and discussed.
11  Q.  What's ACGME?  I don't need the acronym.
12  A.  Graduate medical education.  It's the
13  organization above the residency review committees.
14  Q.  Did you know that a letter was sent?
15  A.  I did.
16  Q.  Did you know it as a result of this meeting or
17  did you know prior to?
18  A.  As a result of this meeting.
19  Q.  Do you know who sent the letter?
20  A.  The letter was sent anonymously.  We can
21  speculate, but I don't know who sent it.
22  Q.  Well, if I ask you to speculate, do you know
23  who sent the letter?
24         MR. BLOOM:  Object to the form.

Zechman                              v.                Christiana Care Health Systems
Paul F. Kaminski, M.D.        C.A. # 05-159 JJF                        July 14, 2006

Page 46

1  A.  I would say probably Dr. Zechman, but it could
2  have been anyone, any one of the other residents.
3  Q.  I did ask you to speculate, and you speculated
4  Dr. Zechman.  Why did you speculate Dr. Zechman as
5  opposed to any of the other residents?
6  A.  Because she was having the most difficulty at
7  that time.
8  Q.  And when you say difficulty, do you mean like
9  learning difficulty or difficulty with the residents?
10 A.  I think, if we go back to the -- everything
11 that's stated in -- I think if you look at that,
12 that's quite a laundry list.
13 Q.  So let's look at the laundry list.  The
14 concerns listed, learning ability -- that goes back to
15 perhaps a--
16 A.  Test for what we said earlier, that learning
17 disability.
18 Q.  Adaptability, poor political judgment, very
19 abrupt moods, attitude, behavioral.  Okay.
20      So based on these concerns, you speculated
21 that perhaps Dr. Zechman was the one that sent the
22 complaint?
23 A.  Yes.
24 Q.  Were there discussions in the committee

Page 47

1  meetings about who may have sent the complaint?
2  A.  No.
3  Q.  Did you share your view with anyone else?
4  A.  Outside the committee, no.
5  Q.  But within the committee, did you share your
6  view?
7  A.  No.
8  Q.  So are you saying that you didn't share your
9  view?
10 A.  I didn't share my view.
11 Q.  Let me just ask the question, and then you can
12 answer.
13      Are you saying that you did not share your
14 view that Zechman may have written this letter with
15 anyone?
16 A.  No, I didn't.
17      MS. BREWINGTON:  Let's mark that.  We are
18 going to mark this as Kaminski 9.
19      (Kaminski Deposition Exhibit 9 was marked
20 for identification.)
21 BY MS. BREWINGTON:
22 Q.  This is a document that was dated September
23 30th, 2003.  It's on Christiana Care letterhead.  It's
24 from Dr. Ekbladh who, at the time, was the residency

Page 48

1  program director?
2  A.  Yes.
3  Q.  It's to Dr. Zechman, and it indicates that "at
4  the September 29, 2003, meeting of the resident review
5  committee, it was the unanimous decision of the
6  members of the committee to dismiss you for academic
7  reasons."
8      My question is, in August of 2003 -- and I
9  think it was August 18, which was approximately six
10 weeks prior to September 29 meeting, the decision by
11 the committee was to continue her on the second year
12 path.
13      MR. BLOOM:  Objection to the form.  The
14 testimony on the document was that she was on
15 probation.  Subject to that, you can answer the
16 question.
17 A.  I'd have to see the document because we are
18 getting too many things thrown at me.
19 Q.  Let's go back to it then.
20      This is the August 18, 2003.  The second
21 page of it indicates what the plan would be for
22 Dr. Zechman.
23 A.  Okay.
24 Q.  Okay?

Page 49

1  A.  Yes.
2  Q.  Is it fair to say that that indicates that she
3  would continue as a second year in the program --
4  A.  Yes, it does.
5  Q.  -- as of August 2003.
6      The committee met again on the 29th of
7  September, which was, I guess, I would say, six weeks
8  later?
9  A.  Yes.
10 Q.  What changed in terms of -- why did the
11 committee decide to terminate her six weeks later?
12 A.  I don't specifically recollect.
13 Q.  Were you part of the committee at that time?
14 A.  Yes, I was.
15 Q.  Do you generally recollect why the committee
16 chose to terminate her at that time?
17 A.  No, I don't.  I know they did.
18 Q.  Did you vote to terminate her?
19 A.  Actually, no.
20 Q.  So the statement here that it's a unanimous
21 decision of the members --
22 A.  At the meeting it says two abstentions.
23 Q.  It does, but this letter says, "unanimous
24 decision."  Okay.

Zechman                              v.                Christiana Care Health Systems
Paul F. Kaminski, M.D.          C.A. # 05-159 JJF                  July 14, 2006

Page 50

1    A.  Abstention is not a yes or a no, I guess.
2    Q.  Right.  It's not.
3    A.  So the yeses were unanimous.
4    Q.  But there were two abstentions?
5    A.  Yes.
6    Q.  Dr. Kaminski, who else abstained from
7    terminating Dr. Zechman?
8    A.  I would believe it would be Dr. Hochman.
9        MR. BLOOM:  Objection.
10   Q.  Tell me why you decided to abstain from this
11   decision?
12   A.  Because I still thought maybe she would be
13   salvageable as a resident in ob/gyn.
14   Q.  Did you say that in the resident review
15   committee meeting?
16   A.  I'm sure I had my say.  I don't remember
17   specifically -- specifics one way or another at this
18   point.
19   Q.  Why did you abstain as opposed to voting no?
20   A.  You knew you were going to be on the short end
21   of the vote.  I don't think it would have made any
22   difference to the ultimate decision.
23   Q.  And I think I asked you this and I think you
24   said you don't know specifically, but let me ask you

Page 51

1    again.  Do you have an understanding of why the
2    committee chose to terminate her six weeks later?
3    A.  No.  I just have to go on the basis of what it
4    states here.
5    Q.  Let's look at what it states here.  The first
6    one is "overall evaluation scores very low."
7    A.  Okay.
8    Q.  Six weeks prior, is it fair to say that her
9    overall evaluation skills were low at that time?
10   A.  Yes.
11   Q.  And six weeks prior they still decided to keep
12   her on as a second year, correct?
13   A.  Yes.
14   Q.  Let's go to the next one.  "Surgical skills are
15   that of a PGY1."  Is that accurate?
16   A.  Yeah.
17   Q.  Is it fair to say that six weeks prior to that
18   her stills were at the PGY1 level?
19   A.  Yes.
20   Q.  And at that time they still decided to keep her
21   on, is that correct?
22   A.  Yes.
23   Q.  "Failure to meet a special rotation and
24   mainstreaming resulted in performance which is still

Page 52

1    below expected level."
2        Is it fair to say, that her performance
3    was at that level six weeks prior?
4    A.  Yeah.  But there's a special rotation thrown in
5    there.  Doesn't look like she did very well with that.
6    Q.  Special rotation?
7    A.  I don't know what that is.
8    Q.  "No significant improvement with surgical
9    skills."  Is six weeks enough time to have a
10   significant improvement in surgical skills?
11   A.  For many people, yes.
12   Q.  What about someone that may perhaps have a
13   learning disability?
14       MR. BLOOM:  Objection to the form.
15   A.  I can't answer that question, having been faced
16   specifically with that.
17   Q.  "Very poor clinical judgment which lead toss
18   concerns about patient care and safety."  Okay.
19       My question is, as I understand it,
20   Dr. Zechman saw an awful lot of patients --
21   A.  She did.
22   Q.  -- in triage.  Was there a concern about
23   patient safety at that time?
24   A.  I don't know specifically.

Page 53

1    Q.  Do you know why she would be assigned to triage
2    and seeing so many patients if, in fact, there was
3    such a concern about her patient care and safety?
4        MR. BLOOM:  Objection to the form.
5    A.  I had no -- I had nothing to do with why she
6    was assigned where.
7    Q.  I know, but I guess I'm asking you, do you know
8    why she would be assigned to triage to treat so many
9    patients if there was a real concern about patient
10   care and safety?
11   A.  With appropriate supervision she can -- she can
12   see a maximum number of patients with the idea that
13   she's going to improve that.  So there would be a
14   rationale for doing that, but I don't know that that
15   was the rationale.
16   Q.  And the last one, "unreceptive to educational
17   interaction, therefore very hard to work with and
18   teach."
19       Would you agree that six weeks prior she
20   was having concerns that she was very hard to work
21   with and very hard to teach?
22   A.  I don't understand.
23   Q.  Okay.  I guess my question is, is this
24   something new, this unreceptive to educational

A-221

14 (Pages 50 to 53)

Zechman
Paul F. Kaminski, M.D.

v.

C.A. # 05-159 JJF

Christiana Care Health Systems
July 14, 2006

Page 54

1   interaction and therefore hard to work with?
2   A. I don't know.
3   Q. Okay. But you were on the committee?
4   A. I was on the committee. I don't know whether
5   that was something new --
6   Q. Okay.
7   A. -- because I personally did not find that.
8   Q. With Dr. Zechman?
9   A. Yes.
10      (Discussion off the record.)
11      (Pause.)
12      (Kaminski Deposition Exhibit 10 was marked
13  for identification.)
14  BY MS. BREWINGTON:
15  Q. Take a look at this document we are going to
16  mark as Kaminski 10. It's a letter from Dr. Ellen
17  Zechman to you, and Dr. Brian Little, October 3rd
18  2003.
19      My question, is, did you contact
20  Dr. Zechman to information her that she was being
21  terminated from the program?
22  A. No. She called the -- she called Sandi Kardos,
23  the program coordinator.
24  Q. Okay.

Page 55

1   A. And Dr. Ekbladh, Dr. Sciscione were not around.
2   So they found me to deliver the news from -- the
3   letter, I guess, had already been sent. I was the
4   messenger.
5   Q. Now, was Dr. Zechman working that day?
6   A. She was not -- I don't know where she was that
7   day. She was not in the hospital.
8   Q. Do you know why she called in?
9   A. I don't know.
10  Q. Do you know whether she was on a leave of
11  absence at that time?
12  A. I don't know. She may have been, but I don't
13  know.
14  Q. Did someone instruct you to tell her that she
15  was terminated from the program?
16  A. I was instructed. I was the messenger.
17  Q. From Dr. Ekbladh?
18  A. From Dr. Ekbladh since he wasn't around.
19  Q. What did you say to her?
20  A. It was just -- I'm instructed to tell you that
21  you have -- something. I'm instructed to tell you
22  that you've been terminated. She said something, does
23  that mean I don't have to come in tomorrow or
24  whatever? I would say that would be correct.

Page 56

1   Or next week. Whatever she put.
2   Q. Did she ask you why?
3   A. Not that I remember. It was a very -- it was a
4   brief conversation.
5   Q. Did she know a vote was coming up or something
6   like that?
7   A. I don't know if she did or not.
8      MS. BREWINGTON: I don't think I have
9   anything further.
10     MR. BLOOM: I just have a little bit of
11  Dr. Kaminski.
12     EXAMINATION
13  BY MR. BLOOM:
14  Q. Did I hear you correctly at the start of
15  today's deposition you said when Dr. Zechman was hired
16  that there were approximately three or four
17  applicants?
18  A. There were three or four that we chose to
19  interview. There were probably more than that number
20  of applicants.
21  Q. And at the time that Dr. Zechman was accepted
22  into the program, I think I heard you say that you
23  were aware that she was had some catching up to do in
24  surgical skills?

Page 57

1   A. Yes.
2   Q. At the time you recommended that she be hired,
3   were you aware of any other deficiencies in
4   Dr. Zechman's skills or experience?
5   A. I was not.
6   Q. Did you become aware of any after she started?
7   A. Knowledge deficit, yes.
8   Q. What about her clinical judgment?
9   A. Clinical judgment, was difficult. She -- I was
10  never comfortable with, say, turning her loose because
11  of that. I was afraid she might do something. She
12  never got my full confidence.
13  Q. What do you mean when you say turning her
14  loose?
15  A. A lot of residents you can say, well, I did
16  this, this, and this, and you say, well, that's going
17  to be fine. With her you always say, maybe I need to
18  recheck it.
19  Q. Was it a concern to you that Dr. Zechman would
20  take action with respect to patients without
21  consulting supervising physicians?
22  A. She was known to do that.
23  Q. Was that an area of concern with respect to
24  Dr. Zechman?

A-222

15 (Pages 54 to 57)

Zechman
Paul F. Kaminski, M.D.

v.

C.A. # 05-159 JJF

Christiana Care Health Systems
July 14, 2006

Page 58

1  A. To me, it would be an area of concern.
2  Q. When you personally worked with Dr. Zechman,
3  did your interactions with her lead you to conclude
4  that she had a poor medical knowledge base?
5  A. Poor medical knowledge, but I think I got along
6  with well her with as far as working with her on the
7  few occasions that I did.
8  Q. How did Dr. Zechman react to criticism?
9  A. Oftentimes poorly insofar as she would cry,
10  responses like that.
11  Q. And did you ever observe that?
12  A. I observed it. I was never the cause of it.
13  Q. And when Dr. Zechman would cry in response to
14  criticism, any of those instances did the person who
15  was offering the criticism behave in a way that you
16  found inappropriate?
17  A. I did not.
18  Q. So when Dr. Zechman received criticism that
19  prompted her to cry, did you view the criticism as
20  more mean or nasty than would be directed at another
21  resident?
22  A. No. No.
23  Q. When the committee ultimately voted to
24  terminate Dr. Zechman's residency, when it came up at

Page 59

1  that meeting in September 2003, did that come as a
2  surprise to you that the committee was going to
3  consider her termination?
4  A. No.
5  Q. You could see it coming?
6  A. Yes.
7  Q. Was that based on Dr. Zechman's performance
8  over the course of the time she was at the program?
9  A. And previous timeline that was given for her to
10  improve or be -- we can't carry her on probation
11  forever.
12  Q. In your judgment, was the decision to terminate
13  Dr. Zechman's residency in 2003 a reasonable decision?
14  A. I think it was reasonable.
15  Q. Do you think the decision was justified?
16  A. Yes, I do.
17  Q. Earlier there were some questions by
18  Ms. Brewington about Dr. Zechman's treatment of
19  patients, and I think that's where you were talking
20  about how patients didn't complain about a lot about
21  her.
22  A. From a personal interaction with patients, she
23  was fine.
24  Q. And when you gave that testimony earlier, I

Page 60

1  take it you were not describing her medical judgment
2  in dealing with patients?
3  A. Yes.
4  Q. When you say yes, which do you mean?
5  A. I was referring to personal and not medical.
6  Q. You also testified, I think, that, when
7  Dr. Zechman was initially hired, that she had a strong
8  desire to learn, did I hear that right?
9  A. Yes.
10  Q. At during the course of her residency, did you
11  ever come to a view as an opinion as to whether or not
12  Dr. Zechman was resistant to teaching?
13  A. I think she more gave up than be resistant.
14  Q. And how was Dr. Zechman's relationships with
15  other residents?
16  A. Generally not good.
17  Q. Did other residents complain about her?
18  A. Yes. But unofficially they gripe about each
19  other all the time, but they griped about her a lot
20  more than other residents.
21  Q. Did other residents express a desire not to
22  work with Dr. Zechman?
23  A. They preferred not to.
24  Q. Do you know why?

Page 61

1  A. Because of the personal interactions.
2  Q. What personal interactions are you referring
3  to?
4  A. They didn't -- they didn't like working with
5  her. I don't think anyone got to the point where they
6  could trust her.
7  Q. Trust her in what way?
8  A. Her decision making.
9  Q. Do you agree with that, that her decision
10  making is questionable?
11  A. Enough to be dangerous -- I wouldn't say enough
12  to be dangerous, but it was questionable at times.
13      MR. BLOOM: I don't have anything else.
14      MS. BREWINGTON: I don't have anything.
15      (Deposition ended at approximately
16  3:30 p.m.)
17
18
19
20
21
22
23
24

A-223

Zechman
Paul F. Kaminski, M.D.

v.
C.A. # 05-159 JJF

Christiana Care Health Systems
July 14, 2006

Page 62

1          INDEX TO TESTIMONY
2
3    PAUL F. KAMINSKI, M.D.              PAGE
4        Examination by Ms. Brewington        2
5        Examination by Mr. Bloom            56
6
                    ——
7
8          INDEX TO EXHIBITS
9
     KAMINSKI DEPOSITION EXHIBIT NO.        PAGE
10
     1    Resident Review Committee Members    13
11
     2    Case Specific Operative Skills
12        Evaluation                        21
13   3    Memorandum dated December 13, 2002  22
14   4    July 2003 Curriculum for Ellen
         Zechman                          28
15
     5    E-mail from Ellen H. Zechman to
16        Lamar Ekbladh, M.D., dated July
         26, 2003                         34
17
     6    Civil Cover Sheet and Complaint    35
18
     7    CREOG scores                      38
19
     8    Resident Review Committee minutes,
20        August 18, 2003                  41
21   9    Letter dated September 30, 2003    47
22   10   Letter dated October 3, 2003      54
23
24

Page 63

Page 64

State of Delaware  )
                   )
New Castle County  )

CERTIFICATE OF REPORTER

I, Ann M. Calligan, Registered Merit
Reporter and Notary Public, do hereby certify that
there came before me on the 14th day of July, 2006,
the deponent herein, PAUL F. KAMINSKI, M.D., who was
duly sworn by me and thereafter examined by counsel
for the respective parties; that the questions asked
of said deponent and the answers given were taken down
by me in Stenotype notes and thereafter transcribed by
use of computer-aided transcription and computer
printer under my direction.

I further certify that the foregoing is a true
and correct transcript of the testimony given at said
examination of said witness.

I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.

Ann M. Calligan, RMR
(Certification No. 186-RPR)
(Expires January 31, 2008)

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT.

A-224

1

```
 1              UNITED STATES DISTRICT COURT

 2           EASTERN DISTRICT OF NORTH CAROLINA

 3

 4    ELLEN ZECHMAN,

 5          PLAINTIFF,                CIVIL ACTION: 05-159-JJF

 6    V.

 7    CHRISTIANA CARE HEALTH

 8    SYSTEMS,

 9          DEFENDANT.

10

11                    DEPOSITION OF

12              DAVID D. FRASER, M.D.

13

14        AT THE HOME OF DAVID D FRASER, M.D.

15             NEW BERN, NORTH CAROLINA

16

17    FRIDAY, JULY 28, 2006, BEGINNING @ 1:05 P.M.

18                   VOLUME 1

19                 PAGES 1 - 101

20

21

22

23

24

25
```

2

1  APPEARANCES
2  FOR THE PLAINTIFF:
3  LORI A. BREWINGTON, ESQ.
4  MARGOLIS-EDELSTEIN
5  DELAWARE OFFICE
6  1509 GIFFIN AVENUE
7  WILMINGTON, DELAWARE 19806
8  (302)777-4680
9  loriabrewington@margolisedelstien.com
10
11  FOR THE DEFENDANT:
12  THOMAS S. BLOOM, ESQ.
13  MORGAN, LEWIS & BOCKIUS, LLP
14  1701 MARKET STREET
15  PHILADELPHIA, PENNSYLVANIA 19103-2921
16  215-963-5543
17  tbloom@morganlewis.com
18
19
20  COURT REPORTER:
21  SHEILA B. DARDEN
22        S T I P U L A T I O N S
23        BY NOTICE AND/OR CONSENT, THE DEPOSITION OF
24  DAVID D. FRASER, M.D., WAS TAKEN ON THE 28TH DAY OF JULY,
25  2006, BEGINNING AT 1:05 P.M., AT THE HOME OF DAVID D. FRASER,

4

1  INDEX
2
3  EXAMINATION
4  DIRECT
5  - BY THOMAS S. BLOOM          PAGES 5 - 1
6  CROSS
7  - BY LORI A. BREWINGTON       PAGES 92 - 8
8  REDIRECT
9  - BY MR. BLOOM            PAGES 98 - 100
10
11  ADJOURNMENT            PAGE 100
12  REPORTER CERTIFICATE       PAGE 101
13
14        EXHIBITS
15  NUMBER          IDENTIFIED
16  FRASER EXHIBIT [1] MEDICAL RECORDS
17  FRASER EXHIBIT [2] REQUEST FOR DISABILITY ACCOMMODATION
18  FRASER EXHIBIT [3] CERTIFICATION OF HEALTH CARE PROVIDER
19  FRASER EXHIBIT [4] LETTER TO MS. BREWINGTON FROM DR. FRASER
20        DATED 5/7/06
21
22
23
24
25

3

1  M.D., IN NEW BERN, NORTH CAROLINA, BEFORE SHEILA B. DARDEN, A
2  COURT REPORTER AND NOTARY PUBLIC IN AND FOR THE COUNTY OF
3  GREENE.
4        1.  SAID DEPOSITION SHALL BE TAKEN FOR THE PURPOSE OF
5  DISCOVERY OR FOR USE AS EVIDENCE IN THE ABOVE-ENTITLED ACTION
6  OR FOR BOTH PURPOSES, AS PERMITTED BY THE APPLICABLE RULES OF
7  CIVIL PROCEDURE;
8        2.  READING AND SIGNING OF THE TRANSCRIPT OF
9  TESTIMONY BY THE WITNESS IS WAIVED.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

5

1        P R O C E E D I N G S
2        Whereupon, DAVID D. FRASER, M.D., having been first
3  duly sworn, was examined and testified as follows:
4        ON DIRECT EXAMINATION CONDUCTED BY COUNSEL FOR THE
5  DEFENDANT:
6        BY: MR. THOMAS S. BLOOM:
7        Q.  Good afternoon, Dr. Fraser.  My name is Tom
8  Bloom, and I'm a lawyer from Morgan, Lewis, and we represent
9  Christiana Care in a lawsuit filed by Elaine—I mean; excuse
10  me—Ellen Zechman.
11        A.  Uh-huh; hi.
12        Q.  Hello.  Have you ever given a deposition before?
13        A.  Last one was probably about, maybe, about four
14  years ago.
15        Q.  Okay.  Do you remember what the circumstances
16  were of the deposition?
17        A.  A patient of mine was involved in a motor
18  vehicle accident, and it went to court.
19        Q.  Okay.  Well, the way this is gonna proceed is
20  I'm just gonna ask you questions and ask that you give as
21  complete and candid answers as you can.  We have a court
22  reporter who's sitting there with you, and she's gonna be
23  transcribing everything we say, so it's important that—it's
24  important, A., that you give verbal and audible responses—
25        A.  All right.

**6**

1  Q. --especially since I'm on the telephone and not
2  there with you. And it's also important that you permit me
3  to finish a question before you start answering, and I will
4  do the same thing and try not to cut off your answers. Will
5  you try to do that?
6  A. Yes.
7  Q. I understand that you--Dr. Zechman is currently
8  a patient of yours; is that right?
9  A. Yes, sir.
10  Q. Okay. And are you her primary care physician or
11  do you just treat her for a particular condition or
12  conditions?
13  A. I am a specialist. I just treat her for her
14  arthritis-related diseases.
15  Q. Okay. Can you tell me what specific conditions
16  you treat Ms. Zechman for?
17  A. She originally saw me in the mid-1990s, and she
18  has an unspecified diffuse connective tissue disorder. She
19  also has various chronic pain disorders, such as myofascial
20  pain, low back pain. In addition, I have seen her for
21  degenerative arthritis of her back, of various other joints,
22  for recurrent sciatica, and most recently as a couple of
23  years ago, she did have a pinched nerve in her back and
24  spinal stenosis.
25  Q. And the first condition you referred to, I think

**7**

1  you said it was an unspecified mixed connective tissue
2  disorder. Did I hear that right?
3  A. It was an unspecified diffuse connective tissue
4  disease, or disorder.
5  Q. Okay. Can you tell me what that is?
6  A. That basically is, for lack of other words, it's
7  a hodgepodge of a little bit of this and a little bit of
8  that, some symptoms of lupus, some symptoms of rheumatoid
9  arthritis, some symptoms of scleroderma, all sort of rolled
10  into one person, however, not meeting criteria for any
11  specific disorder.
12  Q. Is there a specific way in which you were able
13  to diagnose Dr. Zechman with that particular disorder you
14  just described?
15  A. Well, with her clerical symptoms, with some
16  blood work in terms of a positive ANA test she had years ago,
17  some--an abnormally elevated sedimentation rate, but,
18  basically, that was about it. She has no other auto-antibody
19  findings or other tests objectively which are positive.
20  Q. Am I hearing you correctly that your diagnosis
21  was based upon eliminating the possibility of other
22  objectively determinable conditions and that the connective
23  tissue disorder was sort of the explanation that was left?
24  A. No, not quite. In some ways, that is true, but
25  she does certainly have symptoms and some criteria for

**8**

1  various connective tissue diseases, but she does not meet
2  criteria for any specific disease. For example, she does not
3  meet the American College of Rheumatology criteria for
4  rheumatoid arthritis. She does not meet the American College
5  of Rheumatology criteria for lupus. However, she has a few
6  criteria of lupus, she has a few criteria for rheumatoid
7  arthritis. So she certainly has symptoms, she certainly has
8  objective physical findings.
9  In addition, she did have a positive ANA years
10  ago, and she has had at some times a low white count, anemia,
11  which, obviously, can occur for other reasons, and she has
12  had a slightly elevated sedimentation rate for her age. So
13  all this taken in combination, yes, led me to the diagnosis
14  of an unspecified diffuse connective tissue disease.
15  Q. What you just referred to, a positive ANA,
16  A. Yes.
17  Q. Can you tell me what that means?
18  A. An ANA is an anti-nuclear antibody. It is
19  basically a screen for autoantibodies in a patient's
20  bloodstream, and it is a very, very rough measure of antibody
21  production. It is commonly thought to be a test for lupus.
22  However, that really gets us into a great deal of problems,
23  because, for example, it's estimated that upwards of 10
24  percent of women in the United States will have a positive
25  test for lupus. However, less than 1 percent of people in

**9**

1  the United States actually have lupus. So you can see it's a
2  really bad test for that disorder.
3  Now a lot of other diseases can have associated
4  with it a positive test or a positive ANA test or a positive
5  test for lupus. For example, autoimmune thyroid disease,
6  insulin-dependent diabetes, autoimmune liver disease, even
7  rheumatoid arthritis, 20 percent of patients with rheumatoid
8  arthritis can have a positive ANA as well. So, in general,
9  it is just a rough measure of autoimmune disease, and only
10  with certain other criteria that the patient exhibits can we
11  actually diagnose lupus.
12  Q. You referred also to an elevated sedimentation
13  rate. Can you tell me what that means?
14  A. That is a very rough measure of inflammation in
15  the body, and we rheumatologists, doctors routinely use it to
16  see if there's any inflammation, infection, other things
17  going on. It's a very common and a very inexpensive test to
18  do as a general screen. However, it can be influenced by a
19  number of things, such as a low blood count, whether someone
20  has a cold, even the time of day, and various other
21  conditions such as that.
22  It also is affected by the age, for example.
23  And generally it's felt to--if someone is being seen and has
24  an elevated sedimentation rate or a sedimentation rate
25  greater than their age, that is thought to be clinically

10

1  significant.
2      Q.  Okay.  And how is the sedimentation rate
3  affected by somebody's age?
4      A.  Well, generally, as we all, you know,
5  unfortunately, as we're all growing older at the same rate,
6  there are certain physiologic changes which happen, one of
7  which is that the plasma proteins in the bloodstream tend to
8  change, and the sedimentation rate is actually performed by
9  actually watching or monitoring or timing the red cells
10  settling in a tube of blood.  And the plasma proteins, by
11  coating the red cells, can either inhibit or actually hasten
12  the red cells actually settling to the bottom of the test
13  tube.  So when the plasma proteins change as we get older,
14  for example, the red cells tend to settle out faster.  So
15  that's why as we get older the sedimentation rate tends to
16  increase slightly with age.
17      Q.  Okay.  Does that mean that it's—the red blood
18  cells are settling quicker in the Petri dish, is that
19  indicative of a higher level of inflammation within the body;
20  is that what you were saying?
21      A.  Well, yes, somewhat.  I mean, you know, with
22  other things taken into account, if you can rule out other
23  facts, like someone having an active infection, someone
24  having a severe anemia, you know, other things like that, all
25  other things being taken into consideration, if someone had a

11

1  high sedimentation rate and the right clinical symptoms,
2  then, yes, we do believe that a high sedimentation rate does
3  equal active inflammation in the body.
4      Q.  And do you remember in what year you first
5  diagnosed Dr. Zechman with the unspecified diffuse mixed
6  connective tissue disease?
7      A.  The unspecified diffuse connective tissue
8  disease, and I know I'm saying that over and over again
9  because I do not want to have you all refer to it as a mixed
10  connective tissue disease.  It is not a mixed connective
11  tissue disease.  That is a totally different diagnose with
12  other autoantibodies being present.  She does not have that.
13      Q.  Let me stop you there, then.  Can you explain to
14  me what the difference is between the mixed connective tissue
15  disease and the unspecified diffuse connective tissue disease
16  that Dr. Zechman has?
17      A.  Well, a diffuse connective tissue disease is
18  basically what I have already said.  It is a few criteria of
19  this, a few criteria of that, with some abnormal laboratory
20  findings in the right individual, and we can't diagnose a
21  specific disorder, a specific disease, so, well, for lack of
22  a better word, we put them under this umbrella of an
23  unspecified diffuse connective tissue disease.  And the mixed
24  connective tissue disease was actually—is a very, very
25  specialized disease that was actually first recognized,

12

1  actually, at Duke University back in the late '60s and early
2  '70s and it is, basically, a combination of rheumatoid
3  arthritis, polymyositis, systemic lupus and scleroderma, all
4  rolled together into the same individual with very high
5  levels of a very specific antibody called ribonucleoprotein,
6  or RNP, very high levels of this auto-antibody.  And
7  Ms. Zechman—or, Dr. Zechman, does not have positive
8  antibodies to RNP.
9      Q.  Do those two conditions, and when I refer to the
10  "two conditions," I'm referring to the mixed connective
11  tissue disease as opposed to the unspecified diffuse
12  connective tissue disease—
13      A.  Yes.
14      Q.  —does those two conditions manifest themselves
15  differently in terms of symptoms?
16      A.  No, not necessarily.  Sometimes—let me give you
17  a for example using two other conditions, if I may.
18  Sometimes—in fact, Ms.—Dr. Zechman; I'm sorry—Dr. Zechman
19  has this as well, too.  But sometimes a patient will have a
20  condition called sicca, or dryness to their mouth and eyes,
21  and it's very common in autoimmune diseases or disorders,
22  very common in rheumatoid arthritis, very common in lupus and
23  in scleroderma.
24      It is not necessarily a disease on its own, but
25  it can be.  If someone has sicca, or dry mouth and dry eyes,

13

1  by itself and they have positive antibodies, that is a
2  positive SSA and a positive SSB antibody in high titers, that
3  is called Sj+gren's syndrome.  Now there is really no
4  clinical difference in terms of sicca syndrome versus
5  Sj+gren's syndrome.  The only difference is that one person
6  has positive antibodies, the other one does not have positive
7  antibodies.
8      However, there is a difference in terms of
9  prognosis.  Patients who have Sj+gren's syndrome, or the
10  positive antibodies, they tend to have more complications,
11  more vasculitis, more pulmonary disease, and a higher
12  incidence of lymphoma associated with their disorder.  And
13  unspecified diffuse connective tissue disease versus a mixed
14  connective tissues disease is somewhere—you can think of it
15  somewhat in the same way.
16      Q.  Okay.  And is there a difference in the
17  prognosis between those two diseases?
18      A.  Yes.  Generally, patients who have mixed
19  connective tissue disease, they have more of a
20  sclerodermatous disorder, more scleroderma, worse—more
21  problems with arthritis, and they can also have end-organ
22  manifestations of lupus such as nephritis, cerebritis, you
23  know, vasculitis, things of that sort.
24      Q.  And Dr. Zechman told me that the primary
25  symptoms of her connective tissue disease are fatigue and

**14**

1  joint pain. Do you agree with that?

2      A. Yes, somewhat. She also has aphthous ulcers.

3  She has intermittent rashes, as well. Those will rear its

4  ugly head from time to time.

5      Q. Okay. And do you have any understanding as to

6  when Dr. Zechman first began to experience ulcers in terms of

7  just a year?

8      A. Oh, yes. When I first saw her back in '95 or

9  '96, she was having some aphthous ulcers back at that time.

10  However, back, I believe, when she was in her fellowship, she

11  really had a great exacerbation of her aphthous ulcers.

12      Q. And do you know what the condition of her ulcers

13  is today?

14      A. She gets occasional crops of what--we call them

15  "crops"--occasional flares or crops of the aphthous ulcers

16  from time to time. In fact, I have given her some Dukes--a

17  mouthwash called Dukes Magic Mouthwash. It was actually a

18  combination of medicines that were originally formulated at

19  Duke University, and I originally gave this to her back in, I

20  believe, 2003, and she has an open prescription for this that

21  she uses as needed.

22      Q. And you also referred to rashes. Is that a

23  symptom that Dr. Zechman exhibited when you first started

24  seeing her in '95 or '96?

25      A. Yes.

**15**

1      Q. And has that persisted till today?

2      A. Yes.

3      Q. And in terms of the rashes, is this something

4  that is constant or episodic?

5      A. It is episodic, or intermittent.

6      Q. Okay. And what about Dr. Zechman's arthritis,

7  is that something that she had when you first started

8  treating her in 1995 or '96?

9      A. Yes, sir.

10      Q. Okay. Have the symptoms of her arthritis

11  worsened over time?

12      A. Her arthritis is more--how could I say it--it is

13  not a deforming--it is not a destructive arthritis. It is--

14  it can have joint swelling and tenderness, but it is a

15  nuisance more than anything else.

16      Q. And is that still true today, that it's

17  basically just a nuisance?

18      A. Yes.

19      Q. Okay. And you referred to sciatica. Is that a

20  condition that Dr. Zechman had when you first met her in 1995

21  or '96?

22      A. She had some low back symptoms, but, no, she did

23  not have that at that time.

24      Q. Do you recall when in time Dr. Zechman was

25  diagnosed with sciatica?

**16**

1      A. Yes. Actually, it was after the birth of one of

2  her children, and by carrying the child around frequently,

3  she started having hip and leg pain.

4      Q. Do you remember a year; could you put a year to

5  that?

6      A. If I can open up my charts, I will take a look.

7  Oh, I saw her on 12/20/2002, and, actually, she was a second-

8  year resident at that time. I had not seen her prior for

9  almost--let me see here. I'm just looking through the pages.

10  I'd not seen her in about two-and-a-half years--no, I'm

11  sorry--18 months. And she said--I'm reading from the

12  records-- "have not seen her in quite a while. Her family is

13  doing well, and her baby is now two-and-a-half years. She is

14  having difficulty lifting him up and carrying him; has

15  recurrent sciatica." So that was on 12/20/2002.

16      Q. And are you saying that that's the first time

17  there was mention of Dr. Zechman having sciatica?

18      A. Yes. Prior to that, I do have documented low

19  back pain, but that is the first instance I have documented

20  sciatica.

21      Q. Okay. And I'm just gonna pause for a second,

22  Dr. Fraser, because I think that--you produced documents to

23  us pursuant to a Subpoena for Dr. Zechman's medical records,

24  and the earliest note that I have is from December 20, 2002,

25  but I take it from your last few answers that you actually

**17**

1  have records that are earlier than that.

2      A. Oh, yes. I've been seeing her for--well, in my

3  own practice, since I left and I was on my own--let's see

4  here. I can tell you the exact date. The first time I saw

5  her in my own practice was on 5/1/1997.

6      Q. Okay. And what I'm gonna ask you to do,

7  Dr. Fraser, is when we get all done today is for you to

8  produce the remainder of her records, and we'll reimburse you

9  for any copying costs that there that may be entailed in

10  that.

11      A. That'll be fine.

12      Q. Okay. And you also referred earlier that

13  Dr. Zechman suffered a pinched nerve.

14      A. Yes.

15      Q. Was that from the injuries she suffered moving

16  deck furniture around during a hurricane?

17      A. Yes, sir.

18      Q. Okay. And Dr. Zechman told me during her

19  deposition that the symptoms of her connective tissue disease

20  are--manifest themselves in intermittent flares, but that

21  they're not--in other words, that they're not always present,

22  but they flare up from time to time.

23      A. Yes.

24      Q. Do you agree with that characterization?

25      A. Yes, sir.

5 (Pages 14 to 17)

**18**

1    Q. Okay. And, so, the flare-up of the connective
2    tissue disorder are not predictable; is that true?
3    A. Yes, sir.
4    Q. Is there anything in particular or any
5    combination of things that tend to trigger a flare-up in the
6    symptoms of Dr. Zechman's connective tissue disorder?
7    A. Infectious complications. For example, if
8    someone has a cold that can throw them into a flare-up of
9    their connective tissue disease. If someone has suffered a
10   trauma, if someone is under some sort of a stress, if, say,
11   someone goes outside and works all day in the sun gardening,
12   for example, they can get a photosensitive rash, that can
13   throw them into a flare of their disease. You know, various
14   things like that.
15   Q. What about--apart from working outside in the
16   sun, what about just working unusually long hours, would that
17   precipitate a flare-up?
18   A. It possibly could. Oftentimes patients with
19   connective tissue diseases we do recommend that they do get
20   enough rest so that they don't overstress themselves and run
21   into any flares.
22   Q. And does--if somebody is working long hours,
23   does it make a difference in terms of triggering a flare-up,
24   whether those hours are spent at a desk versus on your feet
25   all day?

**19**

1    A. Generally, you know, the more physically
2    exhausting the labor is, then the higher the incidence of a
3    flare could be. However, I do have to tell you that there
4    have been reports in the literature of, for example, a
5    hairdresser with lupus getting a flare from being under
6    fluorescent lights. So there are really no hard and fast
7    rules in terms of this.
8    Q. Did you have any conversations with Dr. Zechman
9    about the fact that she going to be doing an OB-GYN residency
10   before she actually started doing that residency?
11   A. No, sir.
12   Q. Do you remember when you first learned that she
13   was pursuing an OB-GYN residency?
14   A. Yes, sir. It was that date I mentioned, 12/20
15   of--what was it, 2002, I believe. That was the first time I
16   had seen her. In fact, let me go ahead and read from that
17   note, in the third paragraph. "She is working hard as a
18   second-year resident at Delaware in OB-G." That's the first
19   I had known of that.
20   Q. And you've completed a residency, Dr. Fraser,
21   did you not?
22   A. Oh, please do not remind me.
23   Q. Why do you say that?
24   A. That was hard, hard, hard. In fact--
25   Q. Your residency was in internal medicine?

**20**

1    A. Yes; yes.
2    Q. Okay. And I take it from your answer to the
3    last question that that was a fairly grueling experience?
4    A. Well, maybe I overstated that. I thoroughly
5    enjoyed those years, but thank God I will never have to go
6    back and repeat them.
7    Q. And why do you say that; what was either
8    difficult or not so fun about that experience?
9    A. Well, the time away from family, the long hours
10   at the hospital. You know, this was back in the late '80s
11   when they didn't have the work-hour changes they have now.
12   My daughter is an OB-GYN resident currently, and, well, she
13   has, honestly, a whole lot more time off than I did. But I
14   can remember my first month as an intern, I had one day off,
15   and, actually, I still had to go in and do rounds. So it was
16   pretty tough. And when they say 24 hours on/24 hours off,
17   you know, 24 hours on, but you still had to do your rounds,
18   and you were lucky if you got home by 2:00, 3:00 in the
19   afternoon.
20   Q. Okay. And you just mentioned that your daughter
21   is currently an OB-GYN resident?
22   A. Yes, sir.
23   Q. Okay. And is it your understanding that a
24   residency in OB-GYN today is still a very demanding and time-
25   consuming endeavor?

**21**

1    A. Oh, yes, I get a blow-by-blow description of it.
2    Q. Okay. And is it fair to say that that sort of
3    residency, in OB-GYN, demands more hours, more working hours,
4    than is typically required when you're done with your
5    residency and you're just practicing medicine?
6    A. Well, I think a lot of different residencies
7    will demand more hours, all in different ways. For example,
8    an internal medicine residency, I mean, you're not up waiting
9    for babies to be delivered, you know, each night when you're
10   on call, but you're up taking care of, you know, sick
11   patients, you know, each night. But, for example, my
12   daughter, so far she's been on call, I think, five nights
13   this month, and three of them she got no sleep.
14   Q. Now I thank you for that clarification. So I'm
15   gonna back and break my question down. The first part is I
16   take it you would agree with me that, in general, being a
17   resident is a more demanding, more time-consuming endeavor
18   than when you're done with your residency and then just
19   practicing?
20   A. Yes.
21   Q. Okay. And from among the group of residency
22   programs that exist, do you have any understanding as to
23   whether or not an OB-GYN residency program typically is more
24   or less time-consuming and demanding than other types of
25   residencies?

**22**

1    A. More demanding and time-consuming than others.
2    I mean, it is a four-year residency. Generally, the first
3    two years are very, very tough and time-consuming, obviously,
4    between surgery and labor and delivery. However, there are
5    other residency programs that may even be more grueling. For
6    example, cardio-thoracic surgery, for example.
7    Q. And given what you know about residency programs
8    in general and your daughter's OB-GYN residency program, have
9    you ever formed a judgment as to whether or not Dr. Zechman's
10   physical condition is compatible with completing a program
11   like that?
12   A. Oh, honestly, I don't know whether I could
13   comment on that. I would think that physically she could
14   complete a program, a residency program. But, you know,
15   honestly, I—that's all I can say about that.
16   Q. Other than what you just referred to, physically
17   possibly being able to complete a residency program, do you
18   have doubts for other reasons about whether Dr. Zechman could
19   complete a residency program?
20   MS. BREWINGTON: I'm gonna object; asked and
21   answered. But you can go ahead and answer, Doctor.
22   A. I don't know whether I'm really qualified,
23   honestly. You know, I am a specialist, and I deal only with
24   arthritis and arthritis-related diseases. I don't know,
25   honestly, whether I would be able to render any sort of

**23**

1    logical opinion at all.
2    Q. Well, I understand that, Dr. Fraser. And with
3    the caveat that your answer is not a medical expert opinion
4    or anything like it, but you are her—one of her treating
5    physicians who's known her for a long time, and, so, just as
6    an observer of her, I'm gonna ask that you answer that
7    question to the extent that you have opinions in your mind
8    about it.
9    A. If she did not have significant stress during
10   that time period, I think that she would be able to function
11   appropriately as a resident.
12   Q. From your observation of Dr. Zechman, does she
13   have difficulty coping with stress?
14   A. I've seen her only in a medical situation. I've
15   seen her personally—you know, she's another physician in the
16   area, and I know her husband. I've seen them socially,
17   maybe, a handful of times. I have not noticed anything
18   inappropriate about her behavior, about her functioning out
19   in the general community.
20   Q. Okay. And you would agree with me, I take it,
21   Dr. Fraser, that an OB-GYN residency program, indeed, maybe
22   most residency programs, is a stressful experience?
23   A. Yes.
24   Q. Okay. All right. I'm gonna ask that the
25   reporter take out Fraser Exhibit [1] and present it to the

**24**

1    witness, please. Dr. Fraser, do you have Exhibit [1] in
2    front of you now?
3    A. Yes, sir, I do.
4    Q. Okay. Exhibit [1] is a multi-page document
5    which contains all of the records that you produced to us in
6    response to our Subpoena, and if you would, just take a
7    moment and flip through and let me know if that is an
8    accurate description of what Fraser [1] is.
9    A. Yes, sir.
10   Q. Okay. And what I'm gonna do, Dr. Fraser, is I
11   think a lot of your records appear in this exhibit in reverse
12   chronological order, so I'm gonna direct your attention to
13   near the back of Fraser one, and I ask that you look for a
14   document that has a number in the lower right-hand corner
15   called DF0038.
16   A. Okay. DF—
17   Q. This has your December 20, 2002 note.
18   A. 38, DF0038?
19   Q. Yes.
20   A. All right. I have it right here.
21   Q. Okay. And I'm gonna direct your—this is your
22   medical notes from a visit with Dr. Zechman on December 20,
23   2002?
24   A. Yes.
25   Q. Okay. And there's a section that says History

**25**

1    of Present Illness, and then it says Chief Complaint colon
2    doing about the same close quote.
3    A. Yes.
4    Q. Do you see that?
5    A. Yes.
6    Q. What does that mean, when you write "Doing about
7    the same"?
8    A. Actually, I have to explain. I don't write
9    that. The nurse writes that. The nurse goes in when she is
10   bringing the patient to the room. She says Well, how're you
11   doing today? And, unfortunately, someone will say Oh, I'm
12   doing about the same, or I'm doing okay, or You know, I'm
13   doing fine. And, so, that's what they write down. Whereas
14   when I get in the room, guess what happens? They start
15   complaining. So—
16   Q. Okay. And—all right. So are you telling me
17   that I shouldn't—from the comment that she's doing about the
18   same, I should not infer that she had been at your office at
19   any relatively recent time?
20   A. Right, 'cause she hadn't, because the other
21   time, the last time she was there was in June of 2000.
22   Q. All right. And the next section of this page
23   has a heading HPI.
24   A. Yes.
25   Q. It's HPI all capitalized.

26

1     A. Yes.

2     Q. Do you know what that stands for?

3     A. History of present illness.

4     Q. Okay. And who completes that section?

5     A. I do. I type, so any mistakes in the typing is

6   totally my fault.

7     Q. Understood. And this first paragraph under HPI,

8   this was the paragraph that you read from earlier; is that

9   true?

10     A. Yes; yes, sir.

11     Q. Okay. And in the last sentence of this first

12   paragraph, it says quote Elevated emergency room previously

13   as well close quote. Can you tell me what that refers to?

14     A. That--this program--and this has to go back with

15   my proofreading skills; I apologize. But my proofreading

16   skills are pretty lacking, and once I sign off on a note,

17   obviously, for medical/legal reasons, I can't go back and

18   change it. But it should say "Elevated ESR previously as

19   well," and when I was typing the "ER" came out and the "S"

20   didn't get added in. And, so, when I hit the spacebar, this

21   program takes "ER spacebar" and explodes it into emergency

22   room.

23     Q. Okay. And, so, what--is it supposed to say

24   "ESR"?

25     A. Yes.

27

1     Q. Can you tell me what that means?

2     A. Sedimentation rate.

3     Q. Okay.

4     A. Sometimes it can be rather embarrassing because,

5   for example, sometimes I would see, like, a black male, and

6   imagine what a "BM spacebar" expands into.

7     Q. Got it. Would you please read the second

8   paragraph of this HPI section?

9     A. Let's see. "Dif," of difficulty "with aphthous

10   ulcers and even has developed these in her gastrointestinal

11   tract, cervix, et cetera. suggestive of Behtet's. Her

12   family is from Eastern Europe. Also has neuropsychiatric

13   difficulties from time to time, no synovitis, fevers, rash,

14   pleurisy, no weight loss, denies sicca, diffuse back pain as

15   above, denies prodromal illnesses, insect bites, trauma, et

16   cetera, denies declytis, SI pain or sacroiliac pain, eye

17   complaints, no headaches, photophobia, et cetera."

18     Q. Thank you. And in the first portion of the

19   paragraph where it refers to ulcers, and then there's a

20   phrase that says "suggestive of Becket's," B-e-c-h-e-t-'-s.

21     A. Yes, Behtet's syndrome.

22     Q. Is Behtet's a condition that is frequently

23   linked up with ulcers?

24     A. Yes; yes, sir.

25     Q. Okay. Have you ever come to a conclusion

28

1   whether Dr. Zechman has Behtet's?

2     A. She does not strictly meet criteria. Here again

3   I go talking about criteria. But she does not strictly meet

4   the criteria for Behtet's, but she does--in fact, only on a

5   few isolated occurrences has she told me about gastro--lower

6   gastrointestinal and cervical ulcers. But usually her

7   aphthous ulcers are in her upper gastrointestinal tract, her

8   mouth, for example.

9     Q. And I take it from this note that Behtet's is

10   more commonly found in people of Eastern European decent?

11     A. Yes. It is a genetic disorder, yes. It is also

12   an autoimmune disorder.

13     Q. And later in this paragraph there's a reference

14   to--it says, I think as you read it, quote Also has

15   neuropsychiatric difficulties from time to time close quote.

16     A. Yes.

17     Q. Can you tell me what that means?

18     A. Oh, trouble concentrating, possibly some

19   depression, headache, some blurred vision, things of that

20   sort.

21     Q. Do you know whether this visit with Dr. Zechman

22   in December of 2002, was that the first time you were aware

23   of that or had you previously been aware of those symptoms?

24     A. No, I'd previously been aware that she, from

25   time to time, will have--and we call this neuropsychiatric

29

1   difficulties a grab-bag term. Patients with autoimmune

2   disease will have this. For example, it's estimated that 80

3   percent of patients with lupus will have neuropsychiatric

4   problems. And this can range anywhere from a dull headache

5   from time to time all the way to a seizure disorder.

6     Q. So is it accurate to say that from the time when

7   you first started treating her in the mid-1990s that Dr.

8   Zechman also had these other symptoms of occasional inability

9   to concentrate and depression?

10     A. Yes.

11     Q. And in the next sentence it says "No synovitis,"

12   s-y-n-o-v-i-t-i-s. Can you tell me what that means?

13     A. That is documented swelling, tenderness of the

14   synovial tissue around joints.

15     Q. Okay. So when you say "no synovitis," it means

16   that she doesn't have that swelling, at least at that time?

17     A. Yes.

18     Q. And what does pleurisy mean?

19     A. Pleurisy is a very sharp penetrating chest pain,

20   and it is commonly seen in autoimmune diseases, for example,

21   lupus-type diseases, and is somewhat like someone taking a

22   knife and sticking it between your ribs.

23     Q. And then in the next sentence you say "she

24   denies prodromal illness," p-r-o-d-r-o-m-a-l.

25     A. Yes.

30

1    Q. Can you tell me what that is?

2    A. Well, like, for example, as I was mentioning

3    before, some things that can cause a flare, one thing can be,

4    like, an infection, like an upper respiratory tract

5    infection, a sinus infection, something such as that.

6    Q. And, Dr. Fraser, would you please read the third

7    paragraph of this HPI section?

8    A. Yes. "She is working hard as a second-year

9    resident at Delaware in OB-G; has to travel back and forth on

10   the weekend, et cetera. This is taking a toll on her.

11   Diffuse fatigue and myalgia is noted; no dysphagia or

12   hoarseness."

13   Q. Can you tell me in what way the traveling back

14   and forth to Delaware was taking a toll on Dr. Zechman?

15   A. Basically, just running her down, the fatigue,

16   the tiredness.

17   Q. And what does myalgia refer?

18   A. Muscle pain, muscle aches, like, you know, for

19   example, if you and I had been out working all day in the

20   yard, later that night we probably would have some muscle

21   aches or muscle pains.

22   Q. So was it your understanding, Dr. Fraser, that

23   in addition to the ordinary rigorous job of being a resident,

24   that the traveling back and forth between Delaware and North

25   Carolina was exacerbating Dr. Zechman's condition?

31

1    A. Well, I think it was a combination of things. I

2    don't think it was any one thing. I think everything taken

3    in total was contributing to her difficulties.

4    Q. And when you refer to "everything taken in

5    total," can you tell me what you're referring to?

6    A. Her work as a resident, the traveling back and

7    forth, her family, the stress, you know, those sort of

8    things.

9    Q. Okay. And if you'll turn to the very next page,

10   which is labeled DF39, and I turn your attention to the

11   section where it lists the medications that Dr. Zechman was

12   taking. One of them Zyrtec, Z-y-r-t-e-c.

13   A. Yes.

14   Q. Can you tell me what that is and what it was

15   prescribed for?

16   A. Yes. That is a medicine for allergies, for

17   seasonal allergies.

18   Q. And what about Atenolol, A-t-e-n-o-l-o-l.

19   A. Yes, Atenolol. That is a medicine that can be

20   used either for headaches or for hypertension. In this low

21   dose, however, it was for her headaches.

22   Q. And as we go through your records, when we have

23   a session like this which lists medications, is that limited

24   to medications that you're prescribing or all the medications

25   that she's taking?

32

1    A. Hopefully, that is all the medications that she

2    is taking and because there's nothing beyond that giving you

3    the number prescribed and the number of refills, I did not

4    prescribe any of these?

5    Q. I see. So you were just noting the medicines

6    that Dr. Zechman told you that she was taking?

7    A. Yes; yes, sir.

8    Q. Okay. All right. If you will please,

9    Dr. Fraser, flip backwards in Exhibit Fraser [1] to the page

10   marked DF36, and this should be your notes from a visit on

11   May 23, 2003.

12   A. Yes.

13   Q. Okay. And would you please read the section

14   that you wrote under History of Present Illness.

15   A. Yes. "Doing much, much better and in better

16   spirits as well; no synovitis, aphthous ulcers, fevers, rash,

17   pleurisy. No headaches, photophobia, et cetera. Denies

18   numbness, tingling in extremities or changes in bowels or

19   bladder; will be starting her third year soon. Wants oral

20   steroids to take intermittently, and we discussed this.

21   Fatigue improved on Provigil as well."

22   Q. All right. Focusing on the first paragraph, do

23   you see that Dr. Fraser denied that she was having numbness;

24   is numbness something that she had experienced in the past?

25   A. I think in terms of her fingers from her

33

1    Raynaud's, yes, but at this point, she had not had any in her

2    legs, if that's what you're pertaining to.

3    Q. Okay. Does Dr. Zechman's connective tissue

4    disease affect one part of the body more than others?

5    A. From time to time it can, but it can hop, skip

6    and jump around. For example, the arthritis can be in the

7    hands, can be in the hip, can be in the shoulder, can be in

8    the feet, you know, something like that.

9    Q. Do you have any understanding as to when

10   Dr. Zechman was first diagnosed with this condition?

11   A. As I recall—in fact, if you will allow me, let

12   me get my notes from when I first saw her at my previous

13   office. Can I do that?

14   Q. Sure. Just let me know when you're ready.

15   A. All right. All right. I first saw her,

16   actually, in October of 1996. At that time, she was having

17   severe back pain. I saw her twice when I was at another

18   office. I went on to practice on my own in February of 1997.

19   I first saw her in my own office on May 1, 1997, and the

20   first mention of an unspecified diffuse connective disease,

21   with Raynaud's disease or Raynaud's phenomenon, was made on

22   my note of May 1, 1997. However, although I did not diagnose

23   her with this, when I saw her at the previous office in 1996

24   I did make note of the fact that she had been seeing,

25   actually, some allergists up at ECU who had suggested that

**34**

1 she had some sort of a diffuse autoimmune disease.
2    Q. Okay. And do you--apart from the date on which
3 she may have received the diagnosis, do you have any
4 understanding as to how long Dr. Zechman has actually
5 suffered from this particular condition?
6    A. When I saw her back in October of '96, she said
7 that she had been ill on and off for eleven-and-a-half years.
8    Q. Okay. All right. So since the mid '80s?
9    A. Yes.
10    Q. Did Dr. Zechman ever mention to you that she
11 felt the demands of her residency program in OB-GYN were too
12 stressful or demanding?
13    A. She told me that at her current stressful
14 situation she was hopeful that she could complete her
15 residency and she was going to try her utmost.
16    Q. So am I understanding you correctly that
17 although Dr. Zechman expressed her hope to complete it, that
18 she also expressed some doubts as to whether she could?
19    A. She expressed some trepidation.
20    Q. Okay. Can you explain to me what you mean by
21 that, that "she expressed some trepidation"?
22    A. She thought that perhaps she was being forced
23 out.
24    Q. Okay. Did she tell you why?
25    A. She thought that the people up there did not

**35**

1 like her because she was sick and she had to have time off.
2    Q. Okay. Do you remember when in time Dr. Zechman
3 told you that?
4    A. Let me see here. It was approximately the same
5 time--I did not include this in any of my notes--it was
6 approximately the same time that I filled out the paperwork
7 and I talked to the Chairman of the department.
8    Q. Okay. That was Dr. Lamar Eckblood?
9    A. Yes.
10    Q. Okay. Just focusing your attention back to page
11 DF36, which is your May 23, 2003 note, there's a reference
12 here that Dr. Zechman quote wants oral steroids to take
13 intermittently, and we discussed this close quote. Can you
14 tell me what that means?
15    A. Well, Dr. Zechman--well, obviously, she's a
16 physician. And--well, it's sort of like a lawyer
17 representing themselves, if you know what I mean.
18    Q. I think I do. So Dr. Zechman had an opinion in
19 her own mind that oral steroids would be beneficial for her?
20    A. Yes, to take intermittently.
21    Q. Okay.
22    A. And I--honestly, I don't like that, and I tried
23 to dissuade her. But Ellen, Dr. Zechman, she's an
24 intelligent woman, and she knows how to take them, and I
25 reviewed with her at length ad nauseam about taking them

**36**

1 intermittently, and she assured me that she would only take
2 them in the prescribed manner.
3    Q. And what did Dr. Zechman say to you about the
4 reasons why she thought she would benefit from taking oral
5 steroids?
6    A. It would give her more energy and also take care
7 of her rashes, her intermittent fevers, and her joint pain
8 and swelling, and, of course, her occasional pleurisy.
9    Q. Incidentally, when--do you have an understanding
10 as to what the medical cause is of the fatigue that Dr.
11 Zechman experiences?
12    A. It really is multifactorial. There are a lot of
13 theories, everything from elevated anti-tumor necrosis factor
14 in the bloodstream to the anemia to other cytokine mediators,
15 but then you also have to consider that there's more than
16 just the autoimmune disease going on here. There's also the
17 chronic pain component of this as well.
18    Q. And you referred a moment ago--I take it you
19 were reluctant to prescribe the oral steroids to Dr. Zechman.
20    A. Yes.
21    Q. Okay. Can you tell me what your concerns were
22 about prescribing oral steroids.
23    A. Steroids are the world's greatest medicine if
24 taken for less than two weeks. They're the world's worst
25 medicine if taken for longer than two weeks. There's just

**37**

1 too many side effects and risks associated with long-term
2 steroids. And, unfortunately, once you get someone on
3 steroids, they feel so wonderful--in fact, almost a euphoric
4 type effect--that oftentimes people want to take more and
5 more and more continuously. Dr. Zechman, however, has taken
6 them very judiciously, and I know this because of the refills
7 that she has gotten.
8    Q. And how do the refills that she's gotten lead
9 you to that conclusion?
10    A. Well, she's only called for refills very, very
11 infrequently. So she's, obviously, not taking them every
12 day. In fact, far from it.
13    Q. Is Dr. Zechman able to write her own
14 prescription for oral steroids?
15    A. That--well, to answer your question, yes.
16 However, that would be an ethical conflict, so I very much
17 doubt that Ellen would do it. And I also sincerely doubt
18 that her husband would write her any prescriptions.
19    Q. And if you will turn to the next page of your
20 May 23, 2003 note, in the medication section there's a
21 reference to Prednisone. Do you see that?
22    A. Yes.
23    Q. Is that--is Prednisone a medication that you
24 prescribed for Dr. Zechman?
25    A. That is the steroid that I gave her that we just