38

1  were talking about.
2      Q.  Oh, Prednisone is the oral steroid?
3      A.  Yes, sir.
4      Q.  Okay.  Does taking that oral steroid have any
5  side effects; I should say taking it intermittently, does
6  that have any side effects?
7      A.  Not necessarily.  It depends on the frequency,
8  and it depends on the dose.  However, I'm a firm believer the
9  only good steroid is no steroid.  But long-term and
10  continuously, steroids can cause weight gain, fluid
11  retention, stomach upset, diabetes, high blood pressure,
12  osteoporosis, cataracts, thinning of the skin, infections
13  and, unfortunately, the list goes on and on and on.
14      Q.  And are you aware of any side effects that
15  Dr. Zechman suffered from taking the steroids?
16      A.  No, none at all.
17      Q.  And when—what is—can you interrupt for me what
18  the dosage and the frequency that you're prescribing in terms
19  of the Prednisone?
20      A.  Prednisone 5 milligrams is a very, very small
21  dose.  In fact, 5 milligrams a day is the only long-term—
22  it's the only—or, the highest long-term dose that I would
23  prescribe to a patient who absolutely, positively needs
24  steroids and nothing else works.  I try my very, very best to
25  get patients off of any steroid more than 5 milligrams a day.

39

1  In fact, I try to get my patients off steroids completely.
2      Q.  And, so, you're prescribing 5 milligrams once a
3  day?
4      A.  Well, as directed.  And she knew to take this
5  intermittently, basically in small tapers, like, you know, 5
6  milligrams a day for a couple of days until she felt better.
7  And that's the way she took it.
8      Q.  And what is the—there's a reference that has a
9  number sign 120.  What does that refer to?
10      A.  I gave her 120 pills, and I gave her three
11  refills.
12      Q.  Okay.  So does that mean a total of four
13  prescriptions for 120 pills?
14      A.  Yes, sir.
15      Q.  Was there any concern on your part about giving
16  Dr. Zechman a prescription of about 480 of these pills,
17  which, I mean, this is potentially a prescription that if
18  she's using it intermittently, you know, could go on for a
19  couple of years without coming back to you for another
20  prescription.  Did that present any concern to you?
21      A.  Well, if she had come back to me relatively
22  soon, I would have had to sit down and read her the riot act
23  and tell her she taking too many.  And then we would have had
24  to talk about other medications, perhaps these modifying
25  agents, in lieu of the steroids.

40

1      Q.  Okay.  And am I correct, given that you were
2  instructing her to take it for a few days when she needed it
3  and then stop taking it—
4      A.  Yes.
5      Q.  —am I correct that this prescription should
6  last well over a year, probably two years?
7      A.  It should last well over a year, and most of the
8  time people—pharmacies will not refill prescriptions,
9  obviously, if they are so many years out of date.
10      Q.  Okay.  And if you will flip to the two previous
11  pages in Exhibit Fraser [1], there looks to be a duplicate of
12  your May 23, 2003, note, but I notice at the very bottom of
13  page DF35 there's a print time, and it looks like it's 9:38
14  a.m., and then on the next two pages that we were just
15  talking about it has a print time of 9:31.  Do you know why
16  this list printed twice at two different times?
17      A.  No.  I—okay.  You're talking about 34 and 35?
18      Q.  Yeah.
19      A.  Huh.  Well, no, I have no idea.  The only thing
20  I can think of is I didn't think the note had printed out,
21  and so I just printed it out again, and just signed it and
22  left it at that.  So—but the note, once I signed it, it's a
23  done deal, so I can't change it.
24      Q.  All right.  And if you would please turn to the
25  page that's marked DF31, which is your notes from August 8,

41

1  2003, and let me know when you're there.
2      A.  Okay.  I'm there.
3      Q.  And would you please read your description of
4  History of Present Illness?
5      A.  "HPI.  Has had several disease flares; severe
6  knee pain as well, causing difficulty walking.  No synovitis
7  or rash; occasional aphthous ulcers and fevers; intermittent
8  chest pain and palpitations; no dizziness or shortness of
9  breath or cough; on Atenolol; fatigue the worst part of her
10  illness.  No diffuse musculoskeletal pain, but a.m. stiffness
11  and diffuse achiness.  Was taking unknown muscle relaxer that
12  helped her at night.  Not sure of the name of it, though.
13      Q.  Okay.  And when you—when the reference says
14  "not sure of the name of it," the muscle relaxer, that means
15  Dr. Zechman wasn't sure of the name of it when she was
16  talking to you?
17      A.  Yes, she was not sure of the name of it.
18      Q.  Okay.  There's also a reference here that
19  there's quote no diffuse musculoskeletal pain close quote.
20      A.  Yes.
21      Q.  What is that kind of pain?
22      A.  Well, that's like a total body pain, like I hurt
23  all over.
24      Q.  Okay.  So am I correct that Dr. Zechman's
25  complaints of pain during this visit were localized?

42

1    A. Yes.
2    Q. Okay. And they were localized in her knees?
3    A. Her knees, but she also complained of diffuse
4  achiness, and those were in her joins.
5    Q. Okay. Any particular joints or all joints?
6    A. Basically, all joints. You know, when you--it's
7  sort of like getting up--you know, as you get older, you get
8  up in the morning, and, you know, it takes you several steps
9  to limber up. You know, your joints just can't get going.
10  That's the achiness I'm referring to.
11    Q. And at the bottom of this page there's a
12  reference to a medication called Zanaflex?
13    A. Yes.
14    Q. Is that something that you prescribed or
15  provided to her?
16    A. Yes. I gave her some samples of that. That is
17  a muscle relaxant. I told her to stop taking that other
18  unknown muscle relaxant, and I gave her some samples of
19  something that I knew and gave her some samples of the
20  Zanaflex.
21    Q. All right. And if you will flip to page DF28,
22  which is your note from September 22, 2003.
23    A. Okay.
24    Q. And is this when she came to see you after she
25  hurt herself moving furniture around on her patio?

43

1    A. Yes, it is.
2    Q. Okay. Is there anything in this note that
3  refers to any changes in Dr. Zechman's pre-existing medical
4  condition?
5    A. I'm sorry; I'm just reading the note to make
6  sure. No; no. I think the remainder of her medical
7  conditions at that time I do not mention anything being out
8  of the ordinary. However, you know, this note, obviously,
9  was done in the urgency of her back and leg pain.
10    Q. What is the medication Sterapred,
11  S-t-e-r-a-p-r-e-d?
12    A. That is a term for a steroid dose pak, sort of
13  like a Medrol dose pak. It's a very high dose of steroids
14  the first day, tapering on down, all the way to nothing over
15  twelve days.
16    Q. And was your prescription of this steroid pak in
17  addition to the Prednisone that she was taking?
18    A. No. She would stop the Prednisone 5 milligram
19  intermittent pills I gave her and take the dose pak.
20    Q. And what's the medication Soma, S-o-m-a?
21    A. That was the muscle relaxer that she had told me
22  that she was on previously and she couldn't remember the
23  name. It's a very potent muscle relaxer.
24    Q. Does that require a prescription?
25    A. Yes, it does.

44

1    Q. Do you know who prescribed that for her?
2    A. No, I do not.
3    Q. Do you know whether Dr. Zechman received the
4  prescription for Soma from somebody other than herself or her
5  husband?
6    A. I cannot--I don't think she did, but I cannot
7  say with absolute certainty. I believe she got it from
8  someone she was working with in Delaware.
9    Q. And what is the medication Bextra, B-e-x-t-r-a?
10    A. That's no longer on the market. That is a COX-2
11  inhibitor, and it is an Aspirin-type medicine; it's an anti-
12  inflammatory.
13    Q. And, so, am I correct that Soma is the muscle
14  relaxer that Dr. Zechman had previously taken which had not
15  been prescribed by you, and you sought to replace that muscle
16  relaxant with a different one that you were more comfortable
17  with?
18    A. Yes.
19    Q. Okay. And was Dr. Zechman agreeable to that
20  substitution?
21    A. At the time, yes, she was.
22    Q. Could there come a time when that change?
23    A. I assume so, because, evidently, she got some
24  more Soma, and she was taking it for her back pain at the
25  time.

45

1    Q. At which time?
2    A. At this 9/22/2003 time.
3    Q. Okay. All right. And if you will turn to page
4  DF26, which is your note from October 3, 2003.
5    A. Okay.
6    Q. And would you please read the narrative
7  paragraph at the top?
8    A. "HPI. Not any better at all. Also discussed
9  personal matter pertaining to her work. Will have to give
10  her a note so she can go back on Monday. MRI will be
11  scheduled but no idea when this will be. Steroids did not
12  help. Patient taking two Soma's at night for sleep. Worried
13  about this," that is me, I'm worried about this. "Denies
14  numbness, tingling in extremities or changes in bowel or
15  bladder. Pain in her right hip now, but this could be from
16  her impalgic gait."
17    Q. What is impalgic gait?
18    A. Means you walk funny.
19    Q. Do you have any understanding is that something
20  that Dr. Zechman has on a regular basis or just from time to
21  time?
22    A. Oh, no, not at all. This was from her back,
23  sciatica slash radiculopathy from her injury.
24    Q. Oh, I see. All right. So am I right, then, she
25  suffered an injury moving furniture around on the deck--

46

```
1        A.  Yes.
2        Q.  --and that sort of to compensate for the injury
3   or pain, she started to walk differently?
4        A.  Yes.
5        Q.  Okay.  And you said that when--this paragraph
6   refers to quote unquote worried about this, referring to
7   Dr. Zechman taking two Soma's at night, that the person who
8   was worried about this was you, Dr. Fraser, right?
9        A.  Yes.
10       Q.  Okay.  Can you tell me why you were worried
11   about that?
12       A.  Well Soma is a very potent muscle relaxer, and
13   it is one, honestly, that I just don't like prescribing.  It
14   has a lot of side effects.  In fact, it has an active
15   metabolite that has a longer half-life than the actual drug
16   itself.  So if you take a lot of it, the active metabolite
17   actually accumulates in your system and you can actually
18   become addicted to it.  I don't think--I'm not insinuating
19   anything here at all.  That was not the case here, because
20   you have to take, like, one or two three times a day
21   regularly, you know, for, like, weeks and months.  But I just
22   do not like prescribing it.  It's like a happy pill.  You
23   know, one is okay, but two is, I just think, a little
24   excessive.
25       Q.  And what are the side effects from taking Soma?
```

47

```
1        A.  Oh, drowsiness, dizziness, increased somnolence,
2   grogginess the next day, trouble functioning, basically just
3   wipes you out.  It does help your back, though.
4        Q.  Would taking Soma exacerbate the fatigue that
5   Dr. Zechman feels?
6        A.  Well, that's an interesting question.  It
7   actually helps people sleep, but it may make them excessively
8   groggy the next day.  So it may not actually allow them to
9   function as well the next day.
10       Q.  And the grogginess that you just referred to,
11   would that result from taking one Soma at night?
12       A.  It could; it could.  I have patients who can't
13   even take, like, a half or quarter of a muscle relaxer at
14   night because they wake up feeling terrible.
15       Q.  Did you have any understanding as to what side
16   effects Dr. Zechman actually experienced when she was taking
17   two Soma's per night?
18       A.  She told me she really wasn't having any
19   problems getting up in the morning, that it was helping her
20   back.
21       Q.  All right.  If you will flip to the entry--this
22   is your October 15, 2003, notes, which is part of Exhibit
23   Fraser [1] at DF24.
24       A.  Okay.
25       Q.  And would you please read the narrative at the
```

48

```
1   top?
2        A.  "HPI.  Continues with her numbness in her lower
3   leg and thigh complaints.  Reviewed MRI and, indeed, patient
4   has degenerative joint disease and degenerative disk disease
5   at several levels.  This combined with disk protrusions at
6   three levels is accounting for her complaints.  Discussed and
7   will proceed with trial of epidurals.  Also discussed
8   possible EMG nerve conduction, but will wait the epidurals.
9   As last resort, will send to neurosurgery.  Patient
10   agreeable."
11       Q.  Was--a "trial of epidurals," what does that
12   mean?
13       A.  Epidural steroid injection is a selected steroid
14   injection at a disk space in a person's back.  Basically,
15   you're injecting steroids into the epidural space around
16   where the nerve root is pinched, coming out of the back, and
17   the steroid, with the numbing medicine, decreases the pain
18   and reduces the swelling around the nerve root, thereby
19   relieving the symptoms.
20       Q.  Do you recall whether Dr. Zechman actually
21   received her epidural injection?
22       A.  No, she did not go.
23       Q.  Okay.  Do you know why?
24       A.  She did not feel she could take the time off of
25   work.
```

49

```
1        Q.  And why would--well, let me ask it this way.
2            Would receiving an epidural injection cause her
3   to miss time from work?
4        A.  Well, there was the time in terms of driving
5   down to New Bern, the day getting it, then she--you know, you
6   really shouldn't be doing anything in terms of exerting
7   yourself for the next 24 to 48 hours, and then, of course,
8   driving back.
9        Q.  Did you ever discuss with Dr. Zechman whether it
10   might have been advisable for her to see a physician that was
11   located close to her residency program in Delaware?
12       A.  Yes, we did talk about that.
13       Q.  Okay.  Who raised that possibility, was it you
14   or her?
15       A.  I did.
16       Q.  Okay.  And why did you raise that possibility
17   with her?
18       A.  Well, I thought it would just be more convenient
19   for her.  You know, I hate to have people drive all the way
20   down here to see little ol' me.  But, you know, she had been
21   seeing me for several years, she felt comfortable with me.
22   Her husband also had seen me twice.  And she was coming down
23   in any event at least twice a month to see her family.  The
24   only issue, obviously, is having the studies down.
25   Obviously, you know, I don't have a license to practice
```

13 (Pages 46 to 49)

50

1  medicine in Delaware, so I can't order any tests up there.
2      Q.  Oh, I see.  All right.  So she couldn't have
3  just had the epidural injections done in Delaware?
4      A.  Unfortunately, not.
5      Q.  Am I hearing you right that she would need a
6  Delaware physician to prescribe that?
7      A.  Yes.
8      Q.  Okay.  And does this visit on 10/15 in the
9  narrative description that you just read, does this all
10  relate to the specific injury that she suffered moving the
11  furniture around?
12     A.  Yes.
13     Q.  Okay.  Was there any interaction so far as you
14  could tell between the injury she suffered moving furniture
15  and whether that interacted with or affected the other
16  medical conditions that she already had, or was it a separate
17  discreet thing?
18     A.  Well, in terms of her autoimmune syndrome,
19  obviously, this had nothing to do with that.  All right.
20  Unless you want to make the case that the stress of her
21  having a pinched nerve and the problem with her back may have
22  cause for the disease flares, which I think is a valid
23  consideration.  However, going back to the MRI she had, she
24  had known degenerative arthritis and degenerative disk
25  changes in her back.  And looking at her age, that makes

51

1  sense.  That, obviously, did not happen from lifting deck
2  furniture, you know, because of the hurricane.  Those were
3  long-term degenerative changes that had been coming on over
4  years.  Lifting the deck furniture was just basically the
5  straw that broke the camel's back, pardon the pun.
6      Q.  And if you will turn to your notes from November
7  12, 2003, which is the page marked DF22, and will you please
8  read the narrative at the top?
9      A.  "Doing much better, and never had an injection.
10  99.8 percent better.  No other complaint.  Discussed several
11  other issues today."
12     Q.  Do you remember what else you discussed that
13  day?
14     A.  The only thing I can remember is that she was
15  hopeful that she was going to--since her back was doing so
16  much better, that she was going to be able to continue on in
17  her residency program as if nothing had happened, but she had
18  had to take so much time off, evidently, that she thought
19  that maybe something was going to be made of that.
20     Q.  Okay.  And this may help refresh your
21  recollection.  I think I can represent to you that
22  Dr. Zechman had already left the residency program as of the
23  first week of October 2003.  Does that change your
24  recollection of what was discussed at this visit in November?
25     A.  Maybe.  I'm not--I know she told me.  I don't

52

1  know whether she told me then--she may have.  She may have
2  told me then.  But I can't--I'm not--I know she told me.  I
3  know we sat down and talked about it.  I could be mistaken,
4  and this is one of the reasons why I don't put personal
5  things in notes, but now it's coming back to haunt me, I
6  guess, because I cannot be absolutely certain.
7          I thought at one point she was actually very
8  hopeful about continuing on in her residency, and I think
9  initially she did not tell me.  I don't think she told me,
10  honestly, until later.  And--but I can't--I don't have any
11  evidence to that.  But as I recall, she did not tell me.  I
12  mean, she did not call me up on the phone, and she did not
13  tell me the first time she saw me, saying Guess what I just
14  did.  I think it wasn't until later, she said, "I've left the
15  program."
16     Q.  Okay.  And if I'm understanding you right, are
17  you saying that you were under the impression that she was
18  still in the program for some period of time after she, in
19  fact, had already left?
20     A.  Yes.
21     Q.  Okay.
22     A.  But I can't swear to that, and I do not know
23  exactly when the date was when she told me that she had left.
24     Q.  Do you remember what she told you when she first
25  told you she had left the program?

53

1      A.  Actually, I'm looking through my notes here.  I
2  want to say it wasn't until the next year she told me she had
3  left.  But, honestly, I cannot be certain.  So--I honestly
4  cannot be certain.
5      Q.  I understand that.  Putting aside the "when" she
6  told you--
7      A.  Right.
8      Q.  --do you remember what she told you about her
9  leaving the program?
10     A.  I want to say that she told me something to the
11  effect that she was forced out.
12     Q.  And--all right.  And if you will flip to the
13  previous note, which is your note of February 16, 2004, page
14  DF19 of Fraser Exhibit [1], could you please read the
15  narrative from this note?
16     A.  Yes.  "Depressed and concerned.  Lot back pain
17  noted but not radicular as before.  No other complaints.
18  Wants to lose weight, impatient, id"--it should be "is"--my
19  wonderful spelling--"trying to do everything"--that should be
20  everything she "possibly can, including an Atkins-type diet,
21  et cetera.  Taking steroids about twice a week," and that was
22  her.  And, of course, I have question marks about that.
23  "Long discussion concerning this, obviously.  Will stop and
24  see how she does.
25          Alternates between Bextra and Motrin.  Here,

54

1  again, this is what she wanted to do. Also, patient out of
2  Soma and we"--of course, only one "e"--" will not refill
3  this." We've already talked about why. "Patient wants
4  Wellbutrin, and this could be worth a try"--it could also
5  help her lose weight, that's why--oh, well, I already say
6  that--"her weight gain and her depression."
7      Q.  And going back to the beginning of this entry,
8  do you have any understanding as to why Dr. Zechman was quote
9  unquote depressed and concerned?
10      A.  Honestly--and here, again, I can't swear to
11  this--but I think at this visit, this is when she told me
12  that she had stopped the program.
13      Q.  Okay.  Did she--now this is February 16, 2004.
14      A.  Yes.
15      Q.  During this meeting, do you think she told you
16  that she had just then left the program or is it that she was
17  telling you then that she had left the program four-and-a-
18  half months earlier?
19      A.  I think she had told me now that she had left
20  the program, you know, some time before, that it just didn't
21  work out and she had been forced out because of all the time
22  she had to take off because of her back.
23      Q.  And I take it from this note that Dr. Zechman
24  was taking steroids about twice a week, and that you, Dr.
25  Fraser, was concerned about that?

55

1      A.  Yes.
2      Q.  Okay.  Can you tell me when you expressed that
3  concern to Dr. Zechman?
4      A.  I basically told her that that was not a good
5  thing to do because of the risks or side effects, and we
6  discussed that, and she concurred.
7      Q.  Are these steroids that you're referring to
8  different than the 5 milligrams of Prednisone she had been
9  taking?
10      A.  No, sir.  They're one and the same.
11      Q.  So taking it twice a week is too much?
12      A.  Well, unfortunately, twice a week may turn into
13  three weeks, which may turn into five times a week, which may
14  turn into every day, which may turn into two every day, and
15  you can see the problem.
16      Q.  Did you ever believe that Dr. Zechman had, you
17  know, had taken a step or two down that path?
18      A.  I could not--I cannot answer that.  I hope not.
19      Q.  And when it says quote The patient out of Soma,
20  and we will not refill this close quote, was she asking you
21  for a prescription for Soma?
22      A.  I believe she may have been hinting around about
23  it.  She may not have come out to say Oh, by the way, I need
24  a refill of Soma; it may have been one of those situations
25  where Well, I just used my last Soma, hint, hint.  And I just

56

1  basically, you know, cut her off and said, Well, that's good,
2  because, you know, I don't like that medicine, that's lousy
3  medicine, and I'm glad you're out of that now.
4      Q.  Just bear with me one minute, Doctor.  If you
5  will flip to the page marked DF13--
6      A.  Okay.
7      Q.  --this is actually--looks to be a note of yours
8  from April 11, 2003, so this one may be a little out of order
9  in the exhibit.  And just let me know when you're there.
10      A.  Yeah, I noticed when I was reviewing my chart
11  that some of them got out of order.  Okay.
12      Q.  And am I correct that the chief complaint at the
13  to--again, this is something that your assistant typed?
14      A.  Yes.
15      Q.  Okay.  Would you read the narrative below that?
16      A.  "HPI.  Not doing well at all.  Crops of aphthous
17  ulcers noted.  Had spinal meningitis several months ago and
18  eventually hospitalized in Delaware.  Patient given
19  Rocephin," which is an IV antibiotic, "for four days.  Has
20  never quote fully recovered end quote from this.  Always
21  tired but living the life of a resident.  Rash noted over the
22  past several days on her trunk and extremities.  Not
23  photosensitive at all.  Seen by emergency room at work and
24  told this was perhaps a coxsackievirus.  Patient limited from
25  patient contact.  Intermittent fevers as well.  No headache

57

1  or photophobia now, though.  Joints painful but no swelling
2  noted.  Denies chest pain or shortness of breath or cough.
3  No weight loss, sicca, weakness, dysphagia, et cetera.
4  Reviewed labs from last time.  All normal.  Patient tells me
5  she is taking several vitamins and other supplements in order
6  to have enough energy to work as a resident."
7      Q.  Was this a recurring theme for Dr. Zechman, that
8  she was sort of constantly struggling to have sufficient
9  energy to deal with the demands of being a resident?
10      A.  Well, fatigue was always a major component of
11  her visits.
12      Q.  Okay.  And is that something that, I take it,
13  did exist before she was a resident?
14      A.  Yes.
15      Q.  Okay.  And it exists to this day?
16      A.  Yes.
17      Q.  Okay.  And when I'm referring to "it," you
18  understand I'm referring to her fatigue?
19      A.  Yes.
20      Q.  Okay.  And what is spinal meningitis?
21      A.  Spinal meningitis is a infectious disease of the
22  spinal fluid, brain and, basically, a spinal infection of the
23  meninges, or the covering of the spinal cord and the brain.
24      Q.  Do you have any understanding as to how
25  Dr. Zechman contracted spinal meningitis?

15 (Pages 54 to 57)

**58**

1    A. Well, it can be either viral or bacterial. It
2    can be from a variety of different causes. For example, it's
3    very common in young people, for example, military recruits
4    when they first, you know, go into the military. And there
5    are usually several cases of spinal meningitis in the
6    barracks.
7        Q. And what are the symptoms of spinal meningitis?
8        A. Headache, trouble focusing, painful eyes, fever,
9    trouble concentrating, things of that sort.
10       Q. And I take it that Dr. Zechman's contracting
11   spinal meningitis is unrelated to her pre-existing medical
12   conditions?
13       A. Yes, although patients with autoimmune diseases
14   do tend to have abnormal immune systems, and that may put
15   them—may, I stress—at a slightly increased risk of
16   infectious diseases.
17       Q. Okay. But if Dr. Zechman were hospitalized due
18   to spinal meningitis, would you agree with me that that is
19   not the same thing as being hospitalized for diffuse
20   connective tissue disorder, for example?
21       A. Oh, no, they're not the same thing at all.
22       Q. Right. And spinal meningitis is a discreet
23   infection that she contracted?
24       A. Yes.
25       MR. BLOOM: OFF THE RECORD.

**59**

1        COURT REPORTER'S NOTE: AN OFF-THE-RECORD BREAK
2    WAS TAKEN.
3        MR. BLOOM: Okay, Lori, are you there?
4        MS. BREWINGTON: Yeah, I am, but if we could
5    just read the last question back. I want to be sure that
6    he's finished his response. If we could ask him whether he
7    was finished. I didn't get if the court reporter
8    interrupting or if that was it.
9        MR. BLOOM: Sure. Do you mind reading back the
10   last question and answer.
11       COURT REPORTER: Wait just a second, please.
12   Right. And spinal meningitis a discreet infection that she
13   contracted? Yes.
14       MR. BLOOM: That was the last question and
15   answer?
16       COURT REPORTER: That was the very last
17   question and his answer.
18       Q. Okay. Okay, back on. All right, Dr. Fraser,
19   we're still looking at your April 11, 2003, note, which is a
20   part of Fraser Exhibit [1] at page DF 13. And is Dr. Zechman
21   the person who told you that she had contracted spinal
22   meningitis?
23       A. Yes.
24       Q. Okay. And when it refers in your notes to her
25   being hospitalized in Delaware, did you have any

**60**

1    understanding as to whether she was hospitalized actually at
2    the hospital where she was a resident?
3        A. She told me she had been.
4        Q. She told you that she had been hospitalized in
5    the hospital where she was working?
6        A. At the same complex.
7        Q. Okay. And did she mention to you that she—her
8    hospitalization began with a visit to the emergency room?
9        A. Yes, she did.
10       Q. Okay. And the note that we're looking at from
11   your record is April 11, 2003, and your reference to the
12   spinal meningitis is that she was—that it happened several
13   months ago.
14       Is it consistent with your memory that this
15   hospitalization for spinal meningitis occurred in or around
16   February of 2003?
17       A. I had no idea as to the exact date.
18       Q. Okay. All right. And if you would flip to the
19   page of your medical records which is marked F0008, and if
20   you would read the narrative from that visit?
21       A. "HPL A lot of stress recently. Her lawsuit
22   continues, and then her father was diagnosed with esophageal
23   carcinoma just before Christmas. Patient was on her way to
24   Wilmington last week after hearing her father was quote
25   throwing up blood end quote. Developed left chest pain

**61**

1    associated with radiation to her left arm up into her neck,
2    felt sick. This resolved, and patient did find someplace to
3    stop and took Aspirin. No reoccurrence at all. Father did
4    pass away the next day. Patient distraught and feels quote
5    it was all stress end quote. Still, patient has hypertension
6    and is of the age which should take her pain with caution.
7    Will make arrangements. No synovitis, aphthous ulcers,
8    fevers, rash, pleurisy, no headache, photophobia, et cetera.
9    Denies numbness, tingling in extremities or change in bowels
10   or bladder. Patient does take intermittent steroids as
11   needed for her symptoms, including joint pain and fatigue.
12   Urged caution concerning this."
13       Q. And when urged caution regarding the
14   intermittent use of steroids, was this—was there anything
15   particular that you were cautioning about apart from the
16   general cautions you had previously issued to her?
17       A. Well, previously, you know, I thought we had
18   been able to successfully take her off of this, but,
19   evidently, she still had some, I guess, hanging around, for
20   lack of a better term. And, I guess, under the stress of her
21   symptoms increasing, she restarted taking the steroids, and,
22   so, I just asked her to be careful because of the side
23   effects and just a general precaution from the fact that I
24   didn't like people taking intermittent steroids.
25       Q. And when there's a reference to—I suppose

**62**

1  you're quoting her when you say "quote it was all stress
2  close quote"; is that right?
3      A.  Yes.
4      Q.  What's the "it" that she's referring to?
5      A.  The chest pain.
6      Q.  What is "all stress"?
7      A.  The chest pain.  The chest pain she was
8  experiencing at that time.
9      Q.  Okay.  And when you refer to "making
10 arrangements" at the end of the first paragraph, can you tell
11 me what it refers to?
12     A.  We referred her to a cardiologist in town for
13 evaluation.  We also get an EKG on her as well.
14     Q.  Okay.  And if you will flip to page DF0005,
15 which is your note from August 5, 2005, will you please read
16 the narrative at the top of that note?
17     A.  "HPL  Taking medications intermittently in
18 disgust.  Out"--it should be out "of several of these.
19 Several other issues discussed.  Spent 20 minutes with
20 patient.  No synovitis, aphthous ulcers, fevers, rash,
21 pleurisy, no headache, photophobia, et cetera.  Denies
22 numbness, tingling in extremities or changes in bowels or
23 bladder.  No weakness noted.  Denies sicca.  Occasional low
24 back pain noted.  Reviewed X rays and MRIs from several years
25 ago.  Talked about her job and new house.  Normal cardiac

**63**

1  evaluation noted.  No stress test done.  Patient has had
2  normal colonoscopy, but endoscopy with ulcer.  This improved,
3  she tells me; stress-induced."
4      Q.  What is it that was stress-induced?
5      A.  The ulcer.
6      Q.  Okay.  And did you have an understanding of what
7  was the cause of Dr. Zechman's stress at that time?
8      A.  No.  Just, I would assume, just life stressors.
9      Q.  Okay.  In your experience treating Dr. Zechman,
10 is she somebody who feels the effects of stressors more so
11 than the average person?
12     A.  Yes.
13     Q.  And do you recall--the reference that you had
14 talked to Dr. Zechman about her job and the new house, do you
15 remember what job she was working at at that time?
16     A.  She has a medical practice in her husband's
17 office in our town called The Ladies' Clinic, and she does
18 primary care with a gynecologic--I'm sorry; that's my cell
19 phone.  Let's go off the record.
20         COURT REPORTER:  We're gonna go off the record a
21 moment.
22         MR. BLOOM:  Okay.
23         COURT REPORTER'S NOTE:  AN OFF-THE-RECORD BREAK
24 WAS TAKEN.
25         DR. FRASER:  That--her job, basically, is to do

**64**

1  primary care for women, and she does a lot of GYN-type
2  things, obviously.  And we talked about that and how that was
3  going, and then she and her husband were building a new house
4  in a subdivision in our area, and we talked about how that
5  was going as well.
6      Q.  And you referred a moment ago, I thought, to the
7  fact that Dr. Zechman--that stress, or stressors, affect
8  Dr. Zechman more than the average person.  Did I hear that
9  right?
10     A.  Yes.
11     Q.  Okay.  Can you elaborate on that and tell me in
12 what way stress tends to more affect Dr. Zechman?
13     A.  All I--you know, I'm not--I'm a medical
14 physician, so all I can do is tell you how I see how she, you
15 know, interacts and how certain things cause her to react.
16 And when things don't go well, or when things upset her, or
17 when she feels bad, or when she's sick or when, for example,
18 her father or other stress-type situations, for example,
19 there were some doctors that were trying to squeeze her out
20 of the women's clinic here a couple of years ago, she tends
21 to, I guess, internalize that.  And it tends to cause her
22 undue anxiety and depression and problems.
23     Q.  Does it in your experience also cause her to
24 verbally react to people who she believes are causing her
25 stress?

**65**

1      A.  Oh, honestly, I never experienced that.  I have
2  had limited experience--I mean, I've known them for years,
3  you know, since 1995.  I've had limited experience with them.
4  However, Hi, how're you doing, in the mall; several offices
5  as you can tell from my notes; been at maybe six to eight
6  different social functions in the past six years where I've
7  seen them.  And, basically, you know, that's it.  Talked
8  about her kids, you know, talked about, you know, how life
9  was going, and that sort of thing.
10     Q.  Did Dr. Zechman tell you why she thought people
11 were trying to force her out of The Ladies Clinic?
12     A.  The OB-GYN group here in town, they all merged
13 together, and they did not want--as she put it to me--this is
14 all the way she put it to me, obviously.  They did not want
15 any quote unquote competition, and, so, they were, from what
16 she was telling me, badmouthing her and telling people they
17 shouldn't go to see her, and things of that sort.
18     Q.  Do you have any understanding as to whether or
19 not that circumstance resolved itself?
20     A.  As far as I know, she's still doing the job, and
21 she still has some patients.  Admittedly, she says not enough
22 to pay her bills.  I mean, you know, she works--she has her
23 clinic in the same office that her husband works in.  You
24 know, they own the office building.  They share a physician
25 assistant.  And I think she only works about three days a

**66**

1  week because of her disease. But I think that's okay with
2  her.
3      Q.  So your understanding is that Dr. Zechman is
4  currently working three days a week because of her connective
5  tissue disease?
6      A.  You know, I cannot swear to that, but I don't
7  think she's working full time. And it could be because she
8  doesn't have enough business. It also could be because she
9  has an active family and she has a big house to take care of.
10     Q.  Do you have any--as her treating physician, do
11  you have any judgment as to whether or not Dr. Zechman is
12  capable of working full time?
13     A.  I don't honestly know whether she would be
14  capable of working full time. I think that she would want to
15  try to work full time, but I honestly, given her history,
16  and, you know, the amount of time I've seen her, you know,
17  ten-plus years, I honestly don't know.
18     Q.  And I take it you would agree that working as a
19  resident is more demanding than merely working a full-time
20  job; would you agree with that?
21     A.  Yes.
22     Q.  Okay. Based upon your experience treating
23  Dr. Zechman, do you believe she's able to handle the rigors
24  of being a resident?
25     A.  Here again, I think that she honestly--as she

**67**

1  communicated directly to me, she honestly wanted this. And
2  she pursued it, and I can remember when she came to me after
3  she had been at Delaware for a year and a half and she told
4  me--because it was all news to me--that she had looked into
5  several, several different programs, and this was something
6  she actively pursued. And she wanted it very dearly. So I
7  would have thought that she would have tried her utmost to
8  finish her residency. And the fact is, I mean, she did,
9  what, two-plus years. And, I mean, she was halfway through.
10  She had done the worst two years. And if--I can't think of
11  any reason why anyone in their right mind would have just
12  walked away from that.
13     Q.  Did her--any of the medical conditions for which
14  you were treating Dr. Zechman inhibit her ability to handle
15  the hours and the demands of her residency?
16     A.  Well, aside from the fatigue, she had no
17  disabling disorders.
18     Q.  Okay. And, so, what about the fatigue, did that
19  inhibit her ability to handle the demands or hours of her
20  residency program?
21     A.  Well, honestly, if handled in the right way, no.
22     Q.  What would be handling it in the right way?
23     A.  If she had been able to structure her life in
24  the correct manner, even setting her priorities, and I'm not
25  in any way, shape or form trying to put myself into her

**68**

1  shoes, and I'm not trying to preach or anything. But, also,
2  if she had had, obviously, some help in terms of the
3  residency program as well. Basically, I think it would have
4  taken two to tango. It would have taken both parties to come
5  together for some common ground here in order to make this
6  work.
7      Q.  Okay. So let's break it down to those two
8  components. The first was you referred to Dr. Zechman's
9  priorities. Taking that part first, what do you think needed
10  to change on Dr. Zechman's end in order for her to be able to
11  complete her residency?
12     A.  You know, I'm saying this all retrospectively,
13  and this is all conjecture. Perhaps--I mean, she went
14  through medical school. That's saying a whole lot, okay;
15  medical school is extremely, extremely demanding in terms of
16  time. So she knew how to manage time. Residency, likewise,
17  is very important in terms of managing time. But it's also
18  physically demanding as well, because especially in a program
19  like OB-GYN, I mean, you're on your feet, doing surgeries,
20  delivering babies, checking on people maybe every 15 minutes,
21  things of that sort, and, you know, OB-GYN, it's, like, when
22  you're delivering babies, 99 percent sheer boredom, 1 percent
23  sheer terror. And that terror, it can really get to you, can
24  cause you a lot of stress.
25     Maybe, you know, she could have managed her time

**69**

1  better. Maybe, you know, going to Delaware was not in her
2  best interests. Maybe it was too far away. But, you know,
3  if you do what you have to do in order to get through a
4  program and get a degree or get through a residency program
5  and be Board-certified. You know, I don't know what else to
6  say, you know. I'm certainly not an expert in terms of
7  dealing with stress or dealing with, you know, time
8  management myself.
9      Q.  What is the time management issue that you're
10  referring to with Dr. Zechman; how could she have better
11  managed her time, as you understand it?
12     A.  Well, in my limited evaluation of her, you know,
13  just limited to the medical visits, you know, as physicians,
14  we tend to, at least when we're dealing with patients, we
15  like to get straight to the point. We like to deal with the
16  most important issues first, and we tend to want to
17  prioritize things.
18     Like, for example, I mean, you know, I'm rather
19  forebode at times. I guess you can tell that right now. But
20  in some of these notes we've gone through, like when she came
21  in and had her back pain and her leg was hurting her, you
22  know, I didn't really spend a whole lot of time about the
23  rest of her disease, because it really wasn't at that time a
24  big deal. Her back pain and probable radiculopathy was a big
25  deal. So that was Goal No. 1.

**70**

1 And some people, I guess, maybe just can't see
2 the forest through the trees, so to speak, and they tend to
3 get lost, and they just can't prioritize. And when you're a
4 resident, you certainly need to know what's important and
5 what's not.
6 Q. Okay. And, so, if I'm hearing you right, when
7 you referred earlier, you know, it takes two to sort of make
8 this work from Dr. Zechman's end, what she could have done or
9 perhaps what was limiting on her end of the deal was not
10 being able to prioritize?
11 A. Yeah. I mean, it's a, sort of an unwritten law
12 as a resident that you don't quote sweat the small stuff end
13 quote, you know, and you basically take care of the big
14 problems, you know, because if you're trying to sweat the
15 small stuff, you're gonna be there all day, you're gonna be
16 there all night, you're not gonna get anything done.
17 Q. And I take it you're impression was that Dr.
18 Zechman sweats the small stuff?
19 A. Well, maybe she was just wrapped up in a lot of
20 different things.
21 Q. And what is it in you view that could have or
22 should have been done on Christiana Care's end that might
23 have enabled Dr. Zechman to complete her residency?
24 A. Well, that's probably an unfair question. I'll
25 answer it, absolutely, but it's probably an unfair question,

**71**

1 because all the information I have received, aside from a
2 somewhat, you know, brief conversation but very pleasant
3 conversation I had with the Chairman of the OB department,
4 was from Dr. Zechman. And from what I was led to understand
5 was that the department was unyielding, unbending in terms of
6 giving her time off, did not understand about her disease.
7 The other residents were very upset because she was having to
8 take so many sick days and use vacation days, and that there
9 was a virtual backlash against her, not only from her fellow
10 residents, but also from the attending. And, quite honestly,
11 when you're in a residency program, that's sort of like being
12 in a military unit. You know, who's watching your back?
13 Q. And what you just described, Dr. Fraser, is that
14 truly what Dr. Zechman told you?
15 A. Yes.
16 Q. Okay. But in terms of--what I'm trying to
17 figure out is whether Dr. Zechman's medical condition
18 presented any barrier to her successfully performing with the
19 hours and demands of her residency program.
20 Did her medical condition inhibit her ability to
21 do that?
22 A. If her medical condition was controlled, no.
23 Q. Okay. And what does that mean, if her medical
24 condition was controlled?
25 A. If she was able to successfully take care of

**72**

1 herself and manage herself and not be under any condition
2 that might precipitate a flare of her disease, then, yes, she
3 could do a residency and complete a residency.
4 Q. Is there anything special that Christiana Care
5 needed to do to enable her to do that? I mean, does--well,
6 let me rephrase that question, Dr. Fraser.
7 What medically needs to happen for Dr. Zechman
8 when she has a flare-up of her medical condition?
9 A. Well, it depends how the flare is manifested.
10 If she has fevers, joint swelling, pleurisy, then, obviously,
11 you know, medications. If it's pain and fatigue, you know,
12 rest, pain medicines. If it's her back pain, obviously, you
13 know, muscle relaxants. So it really depends on what type of
14 flare, I guess, we're talking about.
15 Q. Okay. Dr. Fraser, have you been asked to render
16 any expert opinions in this case?
17 A. No.
18 Q. Okay. And, so, I take it you are not rendering
19 or offering any expert opinions?
20 A. No.
21 Q. And I'll ask the court reporter to hand
22 Dr. Fraser Exhibit Fraser [2]. Dr. Fraser, do you have
23 Exhibit [2] in front of you?
24 A. Not yet.
25 Q. Just let me know when you do.

**73**

1 A. All right. All right, I do now.
2 Q. All right. And Exhibit [2] is a Request for
3 Disability Accommodation Form, and the date at the top if
4 July 24, 2003. Dr. Fraser, I take it you have seen this
5 document before?
6 A. Yes. I have a copy of it in my records.
7 Q. Okay. And the handwriting on the first page, is
8 any of that handwriting yours?
9 A. No, it is not.
10 Q. And if you turn to the second page, is the
11 handwriting on the second page your handwriting?
12 A. Yes, it is.
13 Q. Okay. I'm gonna direct your attention to
14 Question 2A, which is to be completed by physician, and the
15 first question or instruction says "Please identify physical
16 slash mental limitations caused by employee's disability."
17 And then you have a handwritten response after that, right?
18 A. Yes.
19 Q. Could you read that, please?
20 A. All right. "Disease characterized by
21 intermittent episodes of fatigue, joint pain, rash, fever,
22 pleurisy. Occasional problems walking, working,
23 concentrating."
24 Q. And the next question, which is Question 2B, is
25 "What essential job responsibilities are affected by

19 (Pages 70 to 73)

**74**

1  employee's disability, and to what degree is employee's
2  performance and essential function limited?" And can you
3  tell me what your handwritten response it?
4      A. "As above."
5      Q. Okay. And then in response to Question C, it
6  asks the duration of the disability. Can you tell me what
7  your handwritten response is?
8      A. "Intermittent."
9      Q. And then Question C1 asks "Is employee's
10  limitation permanent?" And you have a question mark there.
11      A. Yes.
12      Q. Is that your question mark?
13      A. Yes, I have a question mark.
14      Q. Okay. And can you tell me what your question
15  mark indicates?
16      A. Well, I didn't want to--there's a fine line
17  here. She has a disease, but you can go for months or years
18  and not be bothered by it, for example. But then you can
19  have a severe flare and have to go to the doctor and be on
20  multiple medications for six months, for example. So I had a
21  question in my mind about whether I should really, truly put
22  down whether this was a permanent limitation or not. So
23  that's why I put down "intermittent."
24      Q. And then question C2 says "If limitations are
25  not permanent, how long will they persist?" Can you tell me

**75**

1  what your handwritten response is?
2      A. "As above; intermittent."
3      Q. It says "Please suggest any accommodations
4  parenthesis Please be specific close parens that will allow
5  employee to fully perform each essential job function
6  affected by employee's disability." Could you please read
7  your handwritten response?
8      A. "Allowing employee to have periods of rest
9  during working hours and use her vacation liberally would
10  help prevent major disease flares. During major flares,
11  patient will not be able to further" something "at work."
12  And I can't read that. I guess somebody has very bad
13  handwriting.
14      Q. And apart from--well, let me rephrase that.
15      Is one of the things that you're suggesting that
16  Dr. Zechman be allowed to use vacation time when she's having
17  a flare-up?
18      A. Yes.
19      Q. All right. And apart from taking rest time or
20  vacation time when Dr. Zechman is actually experiencing a
21  flare-up, did you have any specific recommendation as to any
22  specific change to her schedule that should be made to
23  prevent flare-ups?
24      A. I did not have any specific time requirements.
25  I did have a couple of conversations with her in which I

**76**

1  thought she needed to go to the Chairman of the department if
2  she felt she was having problems in this area and sit down
3  with him and have a heart to heart talk with him to see what
4  could be arranged.
5      Q. And how was that--was that conversation that you
6  were suggesting that Dr. Zechman have with the Chair of the
7  department, was that for a different purpose than the
8  conversation that you actually had with the Chair of the
9  department?
10      A. Actually, what I'm pertaining to was actually
11  some time before, and--because she had been telling me that
12  she had been having--this was not a--although the problem
13  with her back might have been the last straw. But she had
14  been having this very, very slowly evolving problem from what
15  I was led to understand with the other residents and
16  attending in terms of her work and schedule, and sometimes it
17  was being straightened out, sometimes it was not being
18  straightened out, and it was causing her a lot of stress.
19  And, so, I had mentioned to her about Well, just go, be up
20  front, talk to them, see what can be worked out. You know,
21  you need to be reasonable, they need to be reasonable, sit
22  down, straighten things out.
23      You know, you want to finish the program, you
24  know, you've done two years, almost two years, just see what
25  can be worked out. You know, certainly things can be worked

**77**

1  out here. You're almost halfway through.
2      Q. Was it your understanding that what Dr. Zechman
3  was telling you was that her absences from work were creating
4  resentment among the co-residents?
5      A. Yes.
6      Q. Okay. And was it your understanding that
7  resentment related to the fact there's a fixed number of
8  residents, and that if Dr. Zechman's not there, they needed
9  to pick up the slack for her?
10      A. Yes.
11      Q. Now you mentioned that you did have a
12  conversation with Dr. Eckblood, who was the Chair of the OB-
13  GYN department at Christiana Care. Did I hear you right?
14      A. Yes.
15      Q. Do you remember that conversation with him?
16      A. Briefly. It was after I had filled out and we
17  had faxed this form to the department.
18      MR. BLOOM: Okay. And--all right. I actually
19  have--I don't have it as an exhibit for you, but Dr. Eckblood
20  prepared a note after he spoke to you, and, so--Lori, for
21  your reference, this is Document D182--and, Dr. Fraser, I'm
22  just gonna read you portions of this, and I want to ask if
23  this sort of corresponds with your recollection of the
24  conversation with him.
25      MS. BREWINGTON: I'm just gonna object to this,

**78**

1  that I don't have the document in front of me and it wasn't
2  identified as an exhibit, so I won't be in a position to--
3       MR. BLOOM: Well, it's not being used an
4  exhibit. Do you want to pull it, though? You do have it in
5  your office.
6       MS. BREWINGTON: It might take a minute to pull
7  it, if that's all right.
8       MR. BLOOM: Yeah, sure. I'll wait.
9       MS. BREWINGTON: All right. Thanks. What's the
10 number again?
11      MR. BLOOM: D182.
12      MS. BREWINGTON: Okay. I have it.
13      Q. Okay. And, Dr. Fraser, did I hear you correctly
14 that you did not have a specific recommendation for how
15 Christians Care might alter Dr. Zechman's schedule to
16 accommodate her medical condition. Did I hear you correctly?
17      MS. BREWINGTON: Object; mis-characterization.;
18 but go ahead and answer.
19      DR. FRASER: Should I answer.
20      MS. BREWINGTON: Yes.
21      A. Oh. No, I did not have a specific
22 recommendation, maybe some periods of taking time off. But it
23 wasn't my job, and I certainly wouldn't be presumptive to
24 tell the residency department how to treat their residents,
25

**79**

1  so we talked in generalities.
2       So Dr. Zechman had, obviously, had read the
3  employee residency manual, and had various ideas on her own,
4  and, at least I thought, had already talked to the chairman
5  of the department about how they could perhaps work with her
6  to better suit her requirements.
7       Q. Okay. And was your knowledge of that based
8  solely on what Dr. Zechman told you?
9       A. Yes.
10      Q. Can you tell me what you remember of your
11 conversation with Dr. Eckblood?
12      A. He was very nice, very polite, listened, and
13 basically said they would try to do whatever they possibly
14 could.
15      Q. And did you make any specific recommendations to
16 Dr. Eckblood?
17      A. Ellen--or, Dr. Zechman had mentioned about the
18 use of vacation times and interspersing these with her other
19 days off, and we might have talked about that because she had
20 mentioned that to me on a previous visit. So I might have
21 brought that up. I didn't make any notes or anything like
22 this about my conversation. And that's where this Exhibit
23 [2], that's where all that stuff came from, as well.
24      Q. And it came from when Dr. Zechman suggested to
25 you?

**80**

1       A. Yeah, about vacation days?
2       Q. Uh-huh.
3       A. Yes, that's what she said, that she had
4  researched, and she had talked to the people up at Christiana
5  about this, and that they thought that maybe they could work
6  things out. And I know that we had talked about that she
7  would have to fill out a Family Medical Act, and this was
8  another piece of paper that she would have to fill out.
9  Basically, as I understood, this was just another part of the
10 paper trail that they were gonna have to do in order to
11 document things so they could work things out.
12      The rest of the conversation, I have to tell
13 you, I mean, there was nothing specific. I mean, there was
14 nothing earth-shaking. I left the conversation thinking
15 that, you know, nice guy, and I really, really hoped that he
16 and Ellen could work things out, and I honestly believe I
17 recall him saying that they would do their utmost to try to
18 accommodate Dr. Zechman.
19      Q. Do you know what intermittent FMLA leave is?
20      A. Well, I have the Family Medical Leave Act
21 paperwork here in my chart. Do you want me to get that?
22      Q. You mean the paperwork for Dr. Zechman?
23      A. Yes.
24      Q. No. We're gonna get to that.
25      A. Oh, okay.

**81**

1       Q. I just wanted to know if you have a general
2  understanding of what it means for an employee to be able to
3  take intermittent FMLA leave?
4       A. Yeah, because most of my patients have chronic
5  medical conditions characterized by intermittent disease
6  flares, so at the drop of a hat, obviously, you know, they
7  might need to take time off, yes.
8       Q. Okay.
9       A. Okay. I'm certainly not an expert, but I've
10 filled out the paperwork several times.
11      Q. I'm sorry; I didn't mean to interrupt you. Were
12 you finished with your answer.
13      A. All I said is that I'm certainly not an expert
14 in terms of the legal ramifications, but I have filled out
15 the paperwork numerous times for my patients.
16      Q. Okay. And based on your treatment of Dr.
17 Zechman, would approving her to take intermittent FMLA leave
18 on an as-needed basis from your perspective be a medically
19 acceptable response from the residency program?
20      A. Yes.
21      Q. All right. Dr. Fraser, I'm going to read to
22 you, and I apologize I don't have the document as part of
23 your exhibits, but Dr. Zechman's counsel now has it in front
24 of her. And this is Document D182, and these are--it's a
25 note prepared by Dr. Eckblood after his conversation with

82

1  you. And the title at the top is "Telephone call with
2  Dr. David Fraser, August 11, 2003, 1:45 p.m." And I'm gonna
3  read you the first paragraph. There are three paragraphs.
4  I'm gonna read them one at a time and ask if there's anything
5  you disagree with about Dr. Eckblood's recollection of the
6  conversation, okay?
7      A. All right.
8      Q. Okay. The first paragraph says quote Today I
9  had a telephone conversation with Dr. Fraser concerning Ellen
10  Zechman. He states that Dr. Zechman has been under his care
11  for approximately ten years and that she has an unspecified
12  connective tissue disorder of which she has intermittent
13  flares. She can go many years without any problems and then
14  for a while may see him on a regular basis.
15      He also stated that she had a chronic pain
16  syndrome, a diagnosis that she refuses to accept, with her
17  having recurrent ulcers and pleurisy. He also states that
18  she will complain diffuse fatigue close quote. Is there
19  anything that I just read from Dr. Eckblood's note that you
20  can think is inaccurate?
21      There's only one thing. The ulcers and pleurisy
22  component, those would be unspecified diffuse connective
23  tissue disease, do not go with the chronic pain disorder.
24      Q. Okay. Other than that?
25      A. Other than that, no. That sounds very fine.

83

1      Q. Okay. Can you tell me what it means when—that
2  you believe that Dr. Zechman has a chronic pain syndrome, but
3  that she doesn't accept that diagnosis?
4      A. Well, chronic pain syndromes are—well, it's
5  sort of like saying you have arthritis. There are a variety
6  of different chronic pain disorders. And I'll just take one
7  for example. One is called fibromyalgia. Now Ellen—or,
8  Dr. Zechman does not have fibromyalgia, per se. But at times
9  she, you know, may have some criteria of that disease. But
10  fibromyalgia is a chronic pain disorder where you have
11  widespread musculoskeletal pain, diffuse fatigue, and you
12  have to meet certain select criteria.
13      Basically, it is a diagnosis of exclusion, that
14  is you have to exclude everything else under the sun it could
15  possibly be. A lot of people don't like the stigma of having
16  a chronic pain disorder. One of the reasons is that you can
17  be walking down the street, people look at you, you look
18  fine, no problems at all, but you're hurting. And, so, when
19  you complain, people look at you and say But you look fine;
20  how can you have arthritis? You must be crazy.
21      And, so, there is a stigma that goes along with
22  having a chronic pain disorder. And, certainly, for a
23  physician to have a chronic pain disorder for which there's,
24  obviously, no cure, sometimes you just want to push it out of
25  your mind, Oh, I don't have that.

84

1      Q. And are you done with your last answer, Dr.
2  Fraser?
3      A. Yes.
4      Q. Okay. I'm gonna read the next paragraph of
5  Document D182. And the second paragraph of Dr. Eckblood's
6  contemporaneous note says quote, We discussed what might help
7  her handle the stresses and fatigue of a residency program.
8  He stated that extra time off might help the fatigue, but he
9  had no specific recommendations of how that time should be
10  arranged. He stated that he suspected that no matter what
11  time we gave her off, she might request more close quote. Is
12  there anything in that description of the conversation that
13  you think is inaccurate?
14      A. I don't remember saying something—and I'm
15  pretty sure I would have remembered saying something as
16  specific as that about Ellen that, you know, whatever time
17  they gave her, she would just ask for more time off. I don't
18  remember saying that. Maybe we talked about something, and
19  he may have read into that.
20      But in terms of the first part, I can't recall
21  our conversation specifically, and I don't know whether I—as
22  I told you before, I don't know whether we specifically
23  talked about anything. I mean, I included it here in the
24  paper, and I thought maybe I had said something about Well,
25  you know, like, Ellen said that maybe you all could give her

85

1  some time off, vacation days, something like that. I can't
2  swear to it. I honestly do not remember.
3      But on the other hand, I would not be so bold as
4  to tell the chairman of the department how to manage his own
5  people. So I, obviously—you know, I wouldn't be so strong
6  as to say Hey, you need to give her some more time off, and
7  why don't you use some vacation days? We probably talked in
8  generalities, okay. So that first part of the statement I
9  can sort of understand, although I think I may have said
10  something about Well, Dr. Zechman, you know, said something
11  about you all had talked about using vacation days, and she
12  had talked to me about it, you know; what do you think about
13  it?
14      But as for the second statement, I honestly do
15  not recall ever making that statement. I just—I don't know
16  where that came from. I mean, perhaps we talked about the
17  fact that this was an episodic, intermittent disease, and she
18  might require more time off from time to time, you know,
19  because there's not a set schedule for these sort of flares.
20  But I certainly would not cast any aspersions on her needing
21  more and more and more and more time off.
22      Q. Okay. Is there anything else that you want to
23  say about that paragraph I just read?
24      A. No.
25      Q. Right. And just for the sake of completeness, I

86

1 would read the third and final paragraph, and it says quote
2 At the end of the conversation he stated that his written
3 report would be faxed to us close quote. And at some point
4 you did fax him the report that we had just been looking at--
5     A. Yes--
6     Q. --as Fraser [2], correct?
7     A. Yes.
8     Q. Okay. All right. Could you please hand the
9 witness Fraser [3]?
10     A. Okay.
11     Q. And Fraser [3] is a document with the heading at
12 the top "Certification of Health Care Provider parentheses
13 Family and Medical Leave Act of 1993 close parentheses.
14     A. Yes.
15     Q. You've seen this document before?
16     A. Oh, yes, I have it in my records.
17     Q. Okay. And the handwriting--actually, can you
18 tell me other than the signature at the end, is any of the
19 handwriting in this exhibit your handwriting?
20     A. The signature, type of practice, address,
21 telephone number are all mine. Everything else is not mine.
22     Q. Okay. Do you know if the rest of it is Dr.
23 Zechman's handwriting?
24     A. I would assume so.
25     Q. Okay. And take a moment to review this document

87

1 because I only want to confirm that when you sign at the end
2 of this document that your signature indicates that you agree
3 with the handwritten responses that Dr. Zechman had filled
4 in.
5     A. Yes. I, actually--and I can guarantee you I
6 went through it with a fine-tooth comb before I put my name
7 to it the first time--or, the only time.
8     Q. Okay. So you agree with what Dr. Zechman says
9 in her responses to these questions?
10     A. Yes.
11     Q. Okay. And would you agree with me that--I mean,
12 what I see repeated in most, if not all, of these responses
13 is that the symptoms of Dr. Zechman's condition are
14 unpredictable; am I right?
15     A. Yes, that's true.
16     Q. Okay. An is it your view that the optimal
17 approach to trying to permit Dr. Zechman to complete the
18 residency program consistent with her medical condition was
19 to approve her for intermittent Family Medical Leave so she
20 could take leave when she had a flare-up?
21     A. I'm trying to formulate my answer. Can I answer
22 and then give an explanation?
23     Q. Of course.
24     A. Yes. However, this was not a carte blanche to
25 take any time off at all. And I made specific requests of

88

1 Dr. Zechman to work with her chairman and to settle any
2 differences that she had with anybody at her residency
3 program.
4     Q. Okay. Am I understanding you correctly that you
5 didn't want Dr. Zechman to use her intermittent FMLA leave as
6 a way to avoid interactions with other residents that were
7 causing her stress?
8     A. I didn't want her to use this as Oh, I don't
9 feel good, I think I'll just call in sick.
10     Q. Okay. And that's something that you emphasized
11 to Dr. Zechman?
12     A. Yes.
13     Q. So with that, and with that caveat, that this
14 was not carte blanche, you agree that the optimal approach
15 here was for her to pursue intermittent family medical leave
16 so she could take it when she had a flare-up?
17     A. Yes. Under those conditions, yes, sir.
18     Q. Okay. Would you please hand Dr. Fraser Exhibit
19 Fraser [4]?
20     A. Okay.
21     Q. And am I correct, Dr. Fraser, that Fraser [4] is
22 a letter that you wrote to Dr. Zechman's lawyer, Lori
23 Brewington?
24     A. Yes, it is.
25     Q. Okay. And is that your signature on the second

89

1 page of Fraser [4]?
2     A. Yes, it is.
3     Q. Okay. And if I can direct your attention to the
4 second page of your letter, there's a reference in the top
5 paragraph that you quote unquote believed Dr. Zechman's work
6 load was detrimental for her health at that time quote
7 unquote. Can you tell me in what way Dr. Zechman's work load
8 was detrimental to her health?
9     A. Well, the duties she was experiencing--well,
10 let's step back in a minute. I can't take this in a vacuum.
11     Q. Okay.
12     A. And I can't give you a simple answer because the
13 situation is that one thing caused another which caused
14 another, and sort of like a snowball rolling downhill,
15 getting bigger and bigger and bigger and bigger. And by the
16 time all this came to fruition, she couldn't function at work
17 because of the stress and because she was in almost a, from
18 what she was telling me, almost a perpetual state of flare,
19 okay. And part of my reasoning for having her to go talk
20 things out, straighten things out, is Get things taken care
21 of, get the stress off, work things out, rearrange things,
22 get things straightened out so that you can get back to the
23 task at hand of being a resident, okay.
24     Q. What were the things that needed to be
25 straightened out so that she could get back to the task of

**90**

1  being a resident?
2  A. Well, basically, the stress she felt that she
3  was under because of the way the residents were feeling about
4  her, the attending. Evidently, she had told me that they had
5  changed her schedule so that she didn't have--she had to work
6  so many days in a row. And, you know, everything was sort of
7  snowballing, okay. And, so, I was not trying to get her out
8  of work. I was not trying to lessen the load. What I was
9  trying to do was trying to basically just even the playing
10 field and having her and the department basically just, you
11 know, settle things, settle their differences, however you
12 want to put it, so that they could work together. You know,
13 'cause honestly, I mean, I'm, you know, I'm getting on my
14 soapbox. I don't think either one of them were working
15 together, and I think that's the whole reason we're here
16 right now.
17 Q. I think you said before your understanding of
18 these interactions, other than a short conversation with
19 Dr. Eckblood, is based entirely on what Dr. Zechman told you,
20 correct?
21 A. Absolutely true; absolutely true.
22 Q. All right. So you would agree you only have one
23 side of the story?
24 A. Absolutely true.
25 Q. Okay. In the next paragraph on the second page,

**91**

1  there's a reference to Dr. Zechman being treated with various
2  NSAIDs?
3  A. Yes.
4  Q. Tell me what that is.
5  A. Non-steroidal anti-inflammatory drugs, such as
6  the Bextra we talked about before, Motrin, various things
7  like that.
8  Q. What is Provigil?
9  A. Provigil is a rather interesting medicine. It's
10 somewhat akin to an antidepressant, but it is used, actually,
11 for fatigue. It has very, very specific indications. One of
12 them is for shift work sleep deprivation, and it works very,
13 very well for people who have fatigue from either multiple
14 sclerosis or sleep apnea or sleep deprivation due to shift
15 work.
16 Q. Dr. Fraser, did Dr. Zechman ever tell you that
17 she was required to repeat her second year OB-GYN residency
18 for academic reasons?
19 A. No. She did tell me, now that you mention it,
20 that it--something about her surgical skills. But she told
21 me this in the same vein as some of the attendings didn't
22 pick her to assist on surgeries. They picked the other
23 residents, and this was part and parcel of the, I guess, the
24 freeze-out she thought she was experiencing during that time.
25 So she did not get the experience, the surgical experience,

**92**

1  the other residents got. But, no, she did not specifically
2  tell me that she had to repeat a year.
3  Q. Okay. And what you just referred to in terms of
4  relative experiences that people got, that's based on what
5  Dr. Zechman told you?
6  A. Yes.
7  MR. BLOOM: Dr. Fraser, just stay with me one
8  minute. I'm just gonna look over my notes. I think we may
9  be done. I have no further questions.
10 I'm just gonna remind you, Dr. Fraser, to please
11 send me a copy of the remainder of your file regarding Dr.
12 Zechman.
13 DR. FRASER: Yes. I have them right here, and
14 I'll certainly send them to you.
15 DR. BLOOM: Okay. And for that reason, I'm
16 gonna hold the deposition open. I don't necessarily expect
17 that we'll need to continue this, but I'm gonna hold it open
18 just in case.
19 MS. BREWINGTON: Okay. And I just have just a
20 few questions for Dr. Fraser, if I may.
21 MR. FRASER: Okay.
22 CROSS-EXAMINATION BY MS. LORI BREWINGTON:
23 Q. Good afternoon, Dr. Fraser. I will try not to
24 keep you much longer. I just have a few questions. Just for
25 the record, again, my name is Lori Brewington, and I

**93**

1  represent the plaintiff, Dr. Zechman, in this matter.
2  I want to ask you about a few things. You
3  mentioned earlier that Dr. Zechman did not see a physician in
4  Delaware for her injections; is that correct?
5  A. That's true.
6  Q. Okay. Do you know whether she treated with any
7  Delaware physicians?
8  A. Not that I know of; not that I know.
9  Q. Okay. And what was your understanding of why
10 she did not treat with a Delaware physician?
11 A. I think that she did not want people up there to
12 know her business. She did not want people to know about her
13 illness, except as far as, obviously, they needed to know
14 that she had this condition. But I don't think--you know how
15 people in hospitals talk and that sort of thing. She did not
16 want people to, basically, be gossiping about her medical
17 condition.
18 Q. Do you think it was reasonable for her to
19 continue treating with you as opposed to beginning treatment
20 with a new doctor in Delaware?
21 A. Well, yes. I mean, it's really a personal
22 choice. For example, I mean, I've been a rheumatologist in
23 eastern North Carolina since 1991, and I've been taking care
24 of patients, the same patients, since 1991. I've had
25 patients that have seen me years ago, and, like, some have

**94**

1  moved up to the Norfolk area. I have one that more recently,
2  just two years ago, he moved up to Raleigh. I referred him
3  to a rheumatologist, a friend of mine, up in Raleigh. He,
4  unfortunately, just didn't hit it off with her, so he drives
5  down every three months to see me down here.
6      So, you know, your physician is a personal
7  choice, and, especially when you deal with chronic diseases
8  and you see somebody, you know, like, for example, rheumatoid
9  arthritis, I generally see people every three months, and
10  oftentimes I see them much more often than their primary care
11  doctor, you know, do blood work and that sort of thing. Some
12  people just don't like changing.
13      Q.  Is it fair to say that that has a lot to do with
14  the patient's comfort level with the physician?
15      A.  Oh, absolutely.
16      Q.  In your opinion, is Dr. Zechman able to handle
17  the rigors of being in a residency program?
18      A.  Under the right circumstances, yes.
19      Q.  Okay. And by that, you mean with certain
20  accommodations for her disability?
21      MR. BLOOM: Object to the form. You can answer.
22      MS. BREWINGTON: You can go ahead and answer
23  that.
24      A.  Oh, I can answer that. Yes, but, as I mentioned
25  before, it takes two to tango. Dr. Zechman has to do her

**95**

1  part, and the residency program has to do their part.
2      Q.  Okay. And by the residency program doing their
3  part, what do you mean by that?
4      A.  Well, they have to be understanding and
5  accommodating in terms of the person's illness--or, a
6  patient's illness, respect the Family Medical Leave Act, try
7  to make reasonable accommodations in terms of time off for
8  disease flares, all right, that sort of thing.
9      Q.  Okay. And with respect to your testimony today,
10  is it fair to say that you are providing your professional
11  opinion as to Dr. Zechman's medical condition?
12      A.  Yes.
13      MR. BLOOM: Object to the form. You can answer
14  that.
15      DR. FRASER: Yes.
16      Q.  I'm sorry; I didn't year.
17      A.  Yes.
18      Q.  Okay; thank you. You mentioned earlier that you
19  did not provide a specific requirement or time requirement or
20  time frame to alleviate the flare-ups. I guess my question
21  is--hold on one second. Someone opened my door. Where was
22  I? Oh, okay. You mentioned that you didn't identify a
23  specific time frame for these flare-ups. Would it be fair to
24  say that there isn't necessarily a specific time frame for
25  each individual flare-up?

**96**

1      A.  That's absolutely true. There is no specific
2  time frame. Someone might have a flare, but go home, rest,
3  you know, take some, you know, NSAIDs, muscle relaxants, be
4  good to go by the next morning. Someone may have to take a
5  couple of days off for a disease flare. Someone may have to
6  go to visit their doctor and have a dose pak of steroids. It
7  just depends on the situation and any possible complications.
8      Q.  Okay. And as I understand you, Doctor, and
9  please correct me if I'm wrong, your recommendation at
10  Christiana Care was that Dr. Zechman receive some time off,
11  but you were leaving it to the department, namely Dr.
12  Eckblood, to arrange the time off?
13      A.  Yes, because I would not presume to tell a
14  chairman of the department how to treat his residents. I was
15  talking in generalities, and I would never make a specific
16  recommendation. I mean, it's like someone coming into my
17  house that I've never seen before and telling me that I need
18  to beat my kids. I beat my kids regularly anyway, so why
19  does he need to tell me?
20      Q.  Okay. Take a look at Exhibit [2], Fraser [2].
21      A.  Okay.
22      Q.  Okay. The title of this document is "Request
23  for Disability Accommodation." And the title of Exhibit [3]
24  is "Certification of Health Care Provider Family Medical
25  Leave Act."

**97**

1      A.  Yes.
2      Q.  My question is Is there a reason why you
3  completed both forms; do you have any understanding of why
4  you were required to complete the Disability Accommodation
5  and then the Certification of Health Care Provider?
6      A.  Well, I am used to doing the FMLA. I mean, that
7  is very common to me. And Dr. Zechman, even though she is a
8  resident and she is training, she is an employee of the
9  hospital. Now the Request for Disability Accommodation, as I
10  far as I was concerned--as far as I knew, and this was from
11  Dr. Zechman--it was just another form I would have to do for
12  the residency program for the hospital.
13      Q.  Okay. And you completed the Request for
14  Disability Accommodation on--or, actually, it's dated July
15  24, 2003. Do you know when you completed this document?
16      A.  Yes. I signed it on 8/9/03.
17      Q.  8/9/03. And do you recall the date when you
18  sent it to Christiana Care?
19      A.  Yes, on 8/11.
20      Q.  Do you know who you sent it to?
21      A.  We sent it to the same--I sent it to Dr.--what
22  was--I have the phone numbers in my chart here, but we
23  actually sent it to two different phone numbers.
24      Q.  Okay.
25      A.  Let me get that. I just put all that staff--

**25 (Pages 94 to 97)**

98

1  here we go. We faxed it to both phone numbers. I can give
2  them to you.
3  Q.  Go ahead and give them to me, if you have them.
4  A.  Yes. Area Code--they're both Area Code 302.
5  Then the first phone number is 733-1890.
6  Q.  Okay.
7  A.  Second number is 733-2990.
8  Q.  Okay. Now that first number that you mentioned,
9  that number is actually listed at the bottom of the second
10  page of the Request for Disability Accommodations.
11  A.  Oh, okay; okay.
12  Q.  Do you see it?
13  A.  Yes.
14  Q.  Well, you said you sent it to that. And then
15  you also sent it to a second number. Do you know why you
16  sent it to the second number?
17  A.  Probably because Ellen told me to.
18  Q.  Okay.
19  A.  Yes. I have a letter from her, and she said Fax
20  it to both phone numbers.
21  Q.  Okay. Do you recall whether you spoke with
22  Dr. Eckblood after you faxed this Request for Disability
23  Accommodation to Christiana Care?
24  A.  I believe it was before. I told him that I had
25  completed it, I went over it with him, and I told him that I

99

1  would be faxing it to his attention--or, faxing it to his
2  office.
3  Q.  What did you say; what was the last part?
4  A.  I would be faxing it to his office momentarily.
5  Q.  Okay. Hold on. I'm gonna make sure I don't
6  have anything else. Okay. I don't have anything further.
7  That you, Doctor.
8  A.  All right. Thank you.
9  ON REDIRECT BY MR. THOMAS S. BLOOM:
10  Q.  Dr. Fraser, I apologize; one last question.
11  A.  Okay.
12  Q.  Tom Bloom again. Did you ever suggest or
13  discuss with Dr. Zechman that she see a psychiatrist or
14  psychologist?
15  A.  I believe I did mention to her that maybe there
16  --that she might consider talking to someone about things,
17  but I'll put this in the same vein of her not wanting to
18  truly recognize that she has a chronic pain ailment.
19  Q.  You mean that she did not want to acknowledge
20  that she might have a need for psychiatric help?
21  A.  True; yes.
22  Q.  But it appeared to you, as her treating
23  physician, that maybe she did need some kind of help like
24  that?
25  A.  Well, at times, maybe we all can use some help
like that. But, for example, in one of my notes we went
over, I did talk to her, and I believe I put her on an
antidepressant called Wellbutrin. Not only to help her lose

100

1  some weight, but I thought perhaps it would also help with
2  her depression. So I had mentioned to her possibly seeing
3  someone to help her with some issues. But I don't--I would
4  not, knowing Dr. Zechman, I would not have put it as strongly
5  as saying I think you need to see a psychiatrist.
6  Q.  Do you know--as you sit there today, do you know
7  whether Dr. Zechman has, in fact, seen a psychiatrist or
8  psychologist?
9  A.  No.
10  Q.  The answer is she didn't or you don't know?
11  A.  I do not know.
12  MR. BLOOM: Okay. Thank you very much, Dr.
13  Zechman. I have nothing else.
14  DR. FRASER: Okay.
15  MR BLOOM: Are we all done, Lori?
16  MS. BREWINGTON: Yes; thank you.
17  MR. BLOOM: Okay. We're off the record.
Thanks, everybody.
18  DR. FRASER: Thank you.
19  * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
20  DEPOSITION CONCLUDED AT 4:47 P.M.

101

1  STATE OF NORTH CAROLINA
2  COUNTY OF GREENE
3     C-E-R-T-I-F-I-C-A-T-I-O-N
4
5  I, SHEILA B. DARDEN, A COURT REPORTER AND NOTARY
6  PUBLIC IN AND FOR THE AFORESAID COUNTY AND STATE, HEREBY
7  CERTIFY THAT THE FOREGOING IS AN ACCURATE TRANSCRIPT OF THE
8  DEPOSITION OF DAVID D. FRASER, M.D., WHICH WAS TAKEN BY ME BY
9  STENOMASK, AND TRANSCRIBED BY ME.
10  I FURTHER CERTIFY THAT THE DEPONENT WAS FIRST
11  DULY SWORN BY ME, AND THAT THE DEPONENT AND PARTIES WAIVED
12  THE SIGNING OF THE DEPOSITION BY THE DEPONENT.
13  I FURTHER CERTIFY THAT I AM NOT FINANCIALLY
14  INTERESTED IN THE OUTCOME OF THIS ACTION, A RELATIVE,
15  EMPLOYEE, ATTORNEY OR COUNSEL OF ANY OF THE PARTIES, NOR A
16  RELATIVE OR EMPLOYEE OF SUCH ATTORNEY OR COUNSEL.
17
18  WITNESS, MY HAND AND SEAL, THIS DATE: AUGUST 2,2006.
19  MY COMMISSION EXPIRES: FEBRUARY 27, 2010.
20
21
22
23     SHEILA B. DARDEN
24     COURT REPORTER AND NOTARY PUBLIC
25     GREENVILLE, NORTH CAROLINA

26 (Pages 98 to 101)

Zechman
Lamar Ekbladh, M.D.

v.

C.A. # 05-159 (JJF)

Christiana Care Health Systems
August 2, 2006

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

ELLEN ZECHMAN,                          )
                                        )
            Plaintiff,                  )
                                        )  Civil Action
        Vs.                             )  No. 05-159 (JJF)
                                        )
CHRISTIANA CARE HEALTH SYSTEMS,         )
                                        )
            Defendant.                  )

            Deposition of LAMAR EKBLADH, M.D., taken
pursuant to notice at the law offices of Margolis Edelstein,
1509 Gilpin Avenue, Wilmington, Delaware, beginning at 10:03
a.m., on Wednesday, August 2, 2006, before Allen S. Blank,
Registered Merit Reporter and Notary Public.

APPEARANCES:

        LORI A. BREWINGTON, ESQUIRE
        MARGOLIS EDELSTEIN
        1509 Gilpin Avenue
        Wilmington, DE 19806

            For - Plaintiff

        THOMAS S. BLOOM, ESQUIRE
        MORGAN, LEWIS & BOCHIUS, LLP
        1701 Market Street
        Philadelphia, PA 19103
            For - Defendant

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477
www.wilfet.com
A-251

Zechman
Lamar Ekbladh, M.D.

v.
C.A. # 05-159 (JJF)

Christiana Care Health Systems
August 2, 2006

Page 2

1
2              LAMAR EKBLADH, M.D.,
3         the deponent herein, having first been
4         duly sworn on oath, was examined and
5         testified as follows:
6              EXAMINATION
7    BY MS. BREWINGTON:
8      Q   Good morning, Dr. Ekbladh.
9      A   Good morning.
10     Q   My name is Lori Brewington and I have the pleasure
11   of taking your deposition today in connection with
12   Dr. Zechman's age and disability discrimination action
13   against Christiana Care.
14         Have you ever testified in a deposition before?
15     A   Yes, I have.
16     Q   I'm going to ask you a series of questions, make
17   every effort to ask them one at a time. If at any time you
18   don't understand anything that I ask, just let me know and
19   I'll go ahead and try to rephrase it or repeat it for you.
20   If you do decide to answer the question, then we'll both
21   assume that you understood the question. Do you understand?
22     A   Yes, I do.
23     Q   Okay. We have a court reporter here. And he will
24   be taking down your answers. Because the court reporter is

Page 3

1    here, we have to make sure that the record is clear. So we
2    want to make sure that we are not talking over each other.
3    So I'll make every effort not to talk while you're talking
4    and I just request that you do the same.
5         Mr. Tom Bloom is here. And he is representing
6    Christiana Care in this matter, as you know. And at times,
7    he will object to some of the questions that I ask. And
8    that is entirely proper.
9         The only thing that I ask is that you go ahead
10   and answer the question unless he specifically directs you
11   not to answer that question. Do you understand?
12     A   Yes.
13     Q   Okay. The last thing is that Delaware, in Delaware,
14   we have a practice where attorneys do not discuss the
15   deposition testimony with the deponent during the deposition
16   and while the deposition is ongoing. And that includes
17   breaks in the deposition of any kind, whether it be five or
18   ten minutes. If you do, however, choose to discuss that
19   testimony with Mr. Bloom, then I will then ask you what was
20   discussed. Because you will have waived that privilege. Do
21   you understand?
22     A   Yes.
23         MR. BLOOM: I'm going to object to that last
24   instruction. But go ahead.

Page 4

1              MS. BREWINGTON: Okay.
2    BY MS. BREWINGTON:
3      Q   Let's start. Please state your name for the record?
4      A   Lamar Ekbladh.
5      Q   Okay. And how do you spell Ekbladh?
6      A   E-k-b-l-a-d-h.
7      Q   And what did you do in preparation for your
8    deposition testimony today?
9      A   I reviewed materials submitted by my attorney.
10     Q   Did you do anything else?
11     A   No.
12     Q   Did you speak with anyone besides your attorney?
13     A   No.
14     Q   I want to start off by asking you about your
15   educational background. And you can begin with college for
16   me, please.
17     A   I went to Boston University, undergraduate school.
18   To Yale University for medical school. To Hartford Hospital
19   for my internship. Hartford Hospital in Hartford,
20   Connecticut. To the University of North Carolina in Chapel
21   Hill for my residency.
22     Q   And I'm assuming your residency was in obstetrics?
23     A   In obstetrics and gynecology, yes.
24     Q   And when did you graduate from medical school?

Page 5

1      A   1968.
2      Q   And is that when you began your residency?
3      A   No. I did an internship at Hartford Hospital.
4      Q   And how long was the internship at Hartford?
5      A   One year.
6      Q   And then after that, you went to Connecticut?
7      A   After the internship?
8      Q   Yes.
9      A   The internship was at Hartford Hospital in Hartford,
10   Connecticut. My residency was at the University of North
11   Carolina at Chapel Hill, North Carolina.
12     Q   And tell me about your work experience?
13     A   After my residency, I spent two years in the United
14   States Navy at the Bethesda Naval Hospital for my service
15   obligation. I then went back to the University of North
16   Carolina in Chapel Hill where I was for eight years. Next
17   was four years in private practice in Williamsburg,
18   Virginia. And then I was at Hershey Medical Center, Penn
19   State University, for eight years. And since 1994, I have
20   been at Christiana Hospital.
21     Q   And when you started at Christiana Hospital in 1994,
22   what was your title at that time?
23     A   Chair of the Department of Obstetrics and
24   Gynecology.

A-252

Zechman                                                    v.                    Christiana Care Health Systems
Lamar Ekbladh, M.D.                          C.A. # 05-159 (JJF)                                   August 2, 2006

Page 6

1   Q   And did you hold any other titles at Christiana Care
2   besides chair?
3   A   At that time, no.
4   Q   At any time?
5   A   Titles, for the past year plus, I have been
6   associate residency program director, interim program
7   director.
8   Q   When did you become interim program director?
9   A   When Dr. Sciscione took a position at Drexel
10  University.
11  Q   Do you recall when that was?  Around what year?
12  A   That was I believe 2003.
13  Q   Now, Dr. Zechman was enrolled in the residency
14  program there between I believe June of 2002 through October
15  or September 2003.  Were you the residency director towards
16  the end of that in 2003?
17  A   I was the residency director for the very last part
18  of that.
19  Q   And prior to that time, were you an assistant
20  director or anything like that with respect to the residency
21  program?
22  A   No, I was not.
23  Q   How did you end up being the interim director?
24  A   Well, I took that position when Dr. Sciscione left

Page 7

1   and was mentoring someone else in the process to take over
2   as program director.
3   Q   And who was that?
4   A   At that point, we were mentoring Dr. Patruno.
5   Q   And did he take over the program?
6   A   He ended up not taking over the program.
7   Q   Why is that?
8   A   He took another position as director of
9   gynecological services at another hospital.
10  Q   Are there any plans right now for you to become the
11  director as opposed to the interim director?
12  A   No.  In fact, we have hired a permanent director.
13  Q   And who is that?
14  A   Dr. Sciscione.
15  Q   You hired him back?
16  A   Yes.
17  Q   So is he currently working at Christiana Care?
18  A   No, he is not.
19  Q   Where is he?
20  A   He is currently at Crozer.
21  Q   Now, is he eventually going to be back at Christiana
22  Care?
23  A   Yes, he will be.
24  Q   Do you know when?

Page 8

1   A   I believe the date is August 21st.
2   Q   As I already represented to you, Dr. Zechman began
3   her residency program in June of 2002; is that accurate?
4   A   Yes, I believe that's accurate.
5   Q   Okay.  I just want to make sure we are on the same
6   page there.
7   A   Although I believe it was July.
8   Q   July.  Okay.  I wasn't sure.  So it was July.
9   A   Very end of June or July.
10  Q   Is that when the academic year starts?
11  A   That's when the academic year starts, is the 1st of
12  July.
13  Q   And is it one rolling year?
14  A   Yes.
15  Q   So July 2002.
16      Did you have any part in accepting her into the
17  program?
18  A   Yes, I did.
19  Q   Can you tell me about that?
20  A   I was one of the interviewers.
21  Q   And who else interviewed Dr. Zechman?
22  A   I do not remember specifically all of the other
23  interviewers.
24  Q   How many interviewers were there?

Page 9

1   A   I don't remember exactly.
2   Q   Were you chosen to be an interviewer?
3   A   As chair, I usually interviewed all candidates for
4   the residency program.
5   Q   And tell me about the interview process?
6   A   The interview process would be for a candidate to
7   come to interview with a number of the faculty and with some
8   of the residents.  I spend usually about a half an hour with
9   each.
10  Q   So is it fair to say you spent about a half an hour
11  with Dr. Zechman?
12  A   Probably, at least.
13  Q   And is there a standard list of questions that you
14  ask her or does it depend on the resident?
15  A   A lot of it depends on the circumstance.
16  Interviewing for a first year position and second year
17  position might be different.
18  Q   So you were interviewing Dr. Zechman for a second
19  year position, correct?
20  A   Yes.
21  Q   What do you recall about your interview with
22  Dr. Zechman?
23  A   Nothing specific.
24  Q   How about in general?  Do you recall anything about

A-253

Zechman                                          v.                    Christiana Care Health Systems
Lamar Ekbladh, M.D.                    C.A. # 05-159 (JJF)                          August 2, 2006

Page 10

1   that interview, that first interview?
2   A   When you use the term in general --
3   Q   What was your impression of Dr. Zechman?
4   A   It was a positive impression.
5   Q   And by positive, do you mean -- I'll ask you.  What
6   did you mean by positive?
7   A   It is a person that we would consider offering a
8   position to.
9   Q   And based on what?
10  A   On the interview, on review of her previous
11  information from her previous program.
12  Q   And as you sit here today, is there anything that
13  you can remember about what you considered with respect to
14  Dr. Zechman?
15  A   We would consider the standard application form and
16  our interview process.
17  Q   And of that, you don't really remember?
18  A   I don't remember the details.
19  Q   And is it your testimony you don't remember anything
20  about that interview?
21  A   Other than it was a positive impression, no, I do
22  not.
23  Q   Did you consult with anyone else about hiring
24  Dr. Zechman?

Page 11

1   A   The process would be, after interviewing someone,
2   would be to get together with the other interviewers and
3   make a decision on hiring or on whether or not to hire the
4   individual or to offer the position.
5   Q   Were there any concerns that you can recall about
6   Dr. Zechman at that time?
7   A   I don't remember any specific concerns, no.
8   Q   How about with respect to her surgical skills?
9   A   That was not so much a concern as it was letting any
10  resident coming into the second year of our program be aware
11  that they would not likely have had the same surgical
12  experience as our first year residents.
13  Q   And why is that?
14  A   Simply because our residency program has a lot of
15  surgical experience in the first year for our residents
16  whereas most programs do not.
17  Q   And how do you know that?  Do you know that just
18  based on --
19  A   From case logs from other programs and other
20  residents.
21  Q   And in your opinion, would you say that that makes
22  Christiana Care's program like a step above the other
23  residency programs?
24  A   Not necessarily.  It just means the experience comes

Page 12

1   from different levels.
2   Q   So some other schools, although they may not get
3   that surgical experience in that first year, they may get
4   that same experience maybe in their second or third year?
5   A   That would be my assumption for purposes of
6   training, yes.
7   Q   At the time of your interview with Dr. Zechman, did
8   you feel that she was capable of completing the program?
9   A   Yes.
10  Q   And what was the reason for that opinion?
11  A   By the evaluation of the materials that we mentioned
12  before.
13  Q   And that would have been her grades, her previous
14  work experience?
15  A   Her previous work experience and information that we
16  received from her previous program.
17  Q   And also the actual interview with her?
18  A   And the actual interview, yes.
19       MS. BREWINGTON:  If I could have this document
20  marked as Ekbladh 1, please.
21       (Ekbladh Deposition Exhibit No. 1 was marked
22  for identification.)
23  BY MS. BREWINGTON:
24  Q   I have just placed in front of you what we have had

Page 13

1   marked as Ekbladh 1.  The title of it is Christiana Care
2   Health System EEO Survey Form.
3        Are you familiar with the EEO Survey Form?
4   A   Only indirectly.
5   Q   Tell me what you know about the form?
6        MR. BLOOM:  Objection to the form of the
7   question.  You can answer it, if you can.
8        THE WITNESS:  Please repeat the question.  I'm
9   sorry.
10       MS. BREWINGTON:  Sure.
11  BY MS. BREWINGTON:
12  Q   You mentioned that you know about the form
13  indirectly; is that accurate?
14  A   I know that a form is filled out.  Do I see all of
15  the form?  No.
16  Q   Well, you said you know about the form and you know
17  it's filled out.  Who is it filled out by?
18  A   It should be filled out by the employee.
19  Q   So it's all employees of Christiana Care fill out
20  this form?
21  A   That is my impression, yes.
22  Q   In the residency program, who ensures that this form
23  is filled out?
24  A   Within the residency program, information would come

A-254

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Zechman
Lamar Ekbladh, M.D.

v.

C.A. # 05-159 (JJF)

Christiana Care Health Systems
August 2, 2006

Page 14

1  from human resources to Sandi Kardos, who is the program
2  director.
3      Q   So is Sandi Kardos the person that handles --
4      A   The program coordinator. Excuse me. Coordinator.
5      Q   So as program coordinator, she coordinates filling
6  out these forms?
7      A   She makes sure that forms are appropriately
8  completed. All of the non clinical term forms, yes.
9      Q   Have you ever seen this form before?
10     A   I have only seen this form as presented in the
11 material that's presented to me.
12     Q   By your attorney?
13     A   Yes.
14     Q   This form indicates -- the printed name is Zechman?
15     A   Yes.
16     Q   And the question -- I guess it's not halfway down
17 the page, but it says, are you disabled. And she checks
18 yes. And other. Do you see where it says that?
19     A   Yes.
20     Q   When did you become aware that Dr. Zechman was
21 disabled?
22         MR. BLOOM:  Objection to the form of the
23 question. But you can answer it, if you understand it.
24         THE WITNESS:  Late in her first full year.

Page 15

1  BY MS. BREWINGTON:
2      Q   And how did that come about?
3      A   I don't remember specifically, you know, the exact
4  dates or how it came about.
5      Q   That's fine.
6      A   But we got information from Ellen about saying that
7  she had a connective tissue disorder and was being seen for
8  it.
9      Q   And when you say late in the first full year, that's
10 2002, right?
11     A   Well, late in the academic year, which would be into
12 2003.
13     Q   Once these forms are completed by the resident, do
14 you happen to know what happens to them after that?
15     A   Specifically, no.
16     Q   You can actually put that aside.
17         Dr. Ekbladh, can you tell me about the
18 Residency Review Committee?
19     A   The Residency Review Committee is -- consists of
20 physicians within the department whose purpose it is to
21 review the progress of the residents through the program.
22     Q   And how often does the committee meet?
23     A   Quarterly.
24     Q   And you were or are a member of that committee? Are

Page 16

1  you currently a member?
2      A   Yes.
3      Q   And were you a member of the committee when
4  Dr. Zechman was employed?
5      A   Yes.
6      Q   And was that throughout the whole time that she was
7  employed?
8      A   Yes.
9      Q   Are there certain leadership roles on the Residency
10 Review Committee?
11     A   The Residency Review Committee is convened and run
12 by the program director.
13     Q   So that would have been Dr. Sciscione?
14     A   Sciscione.
15     Q   And then towards the end of Dr. Zechman's career
16 would be you?
17     A   Would have been myself, yes.
18         MS. BREWINGTON:  Off the record.
19         (Discussion held off the record.)
20         MS. BREWINGTON:  Okay. Back on the record.
21         If I could have that marked as Ekbladh 2.
22         (Ekbladh Deposition Exhibit No. 2 was marked
23 for identification.)
24 BY MS. BREWINGTON:

Page 17

1      Q   Have a look at that document for me. I have just
2  put in front of you Ekbladh 2. It's entitled, Christiana
3  Care Health Services, Department of Obstetrics and
4  Gynecology, Resident Review Committee. And the date is
5  October 28th, 2002.
6         My first question is, are these minutes from
7  the meeting?
8      A   Yes.
9      Q   And would these minute be generated after each
10 quarterly meeting?
11     A   Yes.
12     Q   And at times, are there special meetings?
13     A   Yes.
14     Q   Who decides whether there is going to be like a
15 special meeting of the residency review committee?
16     A   The program director.
17     Q   Is that something that everyone is required to
18 attend, everyone meaning --
19     A   Every one of the membership that can attend is
20 supposed to attend, yes.
21     Q   And what would be some of the circumstances where
22 you would have a special meeting? Is that considered an
23 emergency meeting?
24     A   It's when there are special circumstances with which

A-255

5 (Pages 14 to 17)

Zechman                                                      v.                    Christiana Care Health Systems
Lamar Ekbladh, M.D.                              C.A. # 05-159 (JJF)                            August 2, 2006

Page 18

1   to convene the meeting for either program or individual
2   resident issues.
3       Q   So an example of that would be if there was like a
4   problem with one of the residents or something?
5       A   Yes.
6       Q   At this meeting on October 28th, Dr. Zechman's
7   performance was discussed; is that accurate?
8       A   According to the minutes. I was not present.
9       Q   Do you know whether her performance was discussed
10  prior to this October 28th meeting? And I mean when I say
11  discussed, meaning in previous Resident Review Committee
12  meetings?
13      A   I have no specific knowledge of that.
14      Q   So this may have been the first discussion but
15  you're not sure?
16      A   It may have been.
17      Q   It was in October of 2002 that a motion was made to
18  have Dr. Patruno appointed as a mentor; is that accurate?
19      A   According to the minutes of the meeting.
20      Q   Do you or did you feel that it was appropriate for
21  her to have a mentor?
22      A   I was not at the meeting.
23      Q   I understand you weren't there. I understand. But
24  in retrospect?

Page 19

1       A   For any resident for whom we have concerns, we
2   believe mentors are appropriate.
3       Q   And for what purpose?
4       A   To assist the resident with any of the difficulties
5   that had been discussed and to give the resident a contact
6   person to discuss issues with and to be available for them.
7       Q   Now, in each Residency Review Committee meeting, do
8   you go through each and every resident?
9       A   Yes, we do.
10      Q   So that's the PG1's through the PG4's by name?
11      A   By name.
12      Q   And you can actually put that one aside.
13          (Ekbladh Deposition Exhibit No. 3 was marked
14  for identification.)
15  BY MS. BREWINGTON:
16      Q   I have just put in front of you what was marked as
17  Exhibit 3 or technically Ekbladh 3, and it is a special
18  meeting from March 17th of 2003. And the attendees were
19  Dr. Sciscione, Dr. E. Whitney, Dr. Hochman, yourself,
20  Dr. Demeo, Dr. Shlossman and Dr. Brosch.
21          And is it fair to say that all these
22  individuals are part of the Residency Review Committee.
23      A   Yes.
24      Q   Could you tell me what this document is?

Page 20

1       A   This document is a review of the -- of the
2   residents' CREOG examination. That is an in-training
3   examination for obstetrics and gynecology.
4       Q   Is it similar to like a prep for the board exam?
5       A   No. It's more like an exam to look at progress,
6   knowledge, progress, through their residency.
7       Q   So if we look at the list of the PGY3's, Dr. Gray is
8   at an eight percent as a third year resident. Was that a
9   concern of the Residency Review Committee?
10      A   Yes.
11      Q   And why was the Residency Review Committee concerned
12  about her eight percent?
13      A   That's eighth percentile. Because it's low. We
14  have concern for her being able to pass the boards.
15      Q   And what did the committee decide to do about Gray?
16      A   As noted here, was to assign her a mentor.
17      Q   Was there any concern at that time that she may have
18  to like repeat her third year?
19      A   I don't remember specifically that discussion.
20      Q   But is it fair to say that's not notated on --
21      A   It is not notated on here, yes.
22      Q   And how about Dr. Kirifides? He was a PGY2 along
23  with Dr. Zechman, is that correct?
24      A   Yes.

Page 21

1       Q   And he was in the 10th percentile?
2       A   Yes.
3       Q   Is it fair to say that the Residency Review
4   Committee was concerned about him, too?
5       A   Yes.
6       Q   And what did the committee decide to do in his
7   instance?
8       A   Assign a mentor.
9       Q   And was there any discussion with respect to
10  Dr. Kirifides about repeating the second year?
11      A   I have no recollection of whether there was or was
12  not.
13      Q   Is it fair to say that that's not notated on this
14  form?
15      A   Yes.
16      Q   Then we have Dr. Zechman. And she is at 12 percent,
17  the 12th percentile, is that correct?
18      A   Yes.
19      Q   And it's fair to say that Kirifides and Gray were
20  both below Dr. Zechman?
21      A   Yes.
22      Q   And what was the determination for Dr. Zechman at
23  this March 17th, 2003 meeting?
24      A   As noted here, remediation with possible no

Wilcox & Fetzer, Ltd.            Professional Court Reporters            (302)655-0477

Zechman                                              v.                           Christiana Care Health Systems
Lamar Ekbladh, M.D.                    C.A. # 05-159 (JJF)                              August 2, 2006

Page 22

1 promotion.

2    Q    And why was this an option for Dr. Zechman and not

3 an option for Kirifides or Dr. Gray?

4    A    I do not remember the specific discussions which

5 resulted in that recommendation.

6    Q    Looking back now, do you have any reason to know or

7 understand why Dr. Zechman would need to or may not be able

8 to go forward to a third year but Kirifides, who was in the

9 same class and had a lower score, would be able to continue?

10   A    I don't remember any details about that.

11   Q    What are the mock oral boards?

12   A    Mock oral boards are an oral exam where individual

13 residents are questioned by a faculty person, usually not

14 from our institution, and an evaluation of their ability to

15 respond to the clinical situations presented is evaluated.

16   Q    Okay. Is it just one faculty person?

17   A    No. There are four different faculty persons.

18   Q    Is it always four?

19   A    It has been four, yes.

20   Q    Do you recall whether or not it was four, like

21 specifically whether or not it was four when Dr. Zechman

22 took the oral boards?

23   A    I believe it was four. I don't remember

24 specifically.

Page 23

1    Q    And are the administers of the oral or the mock oral

2 boards required to submit some type of evaluation?

3    A    Yes.

4    Q    Do you happen to recall the names of those

5 individuals that administered the mock oral boards?

6    A    Specifically, no, I do not.

7         MS. BREWINGTON: I'm actually not going to mark

8 this document. But what I'll do is just use it to just help

9 refresh recollection.

10        MR. BLOOM: Let me just take a peak at that

11 first.

12        MS. BREWINGTON: I was going to give you a

13 copy.

14        MR. BLOOM: Thank you.

15 BY MS. BREWINGTON:

16   Q    As you look at this document — I have actually

17 stapled two e-mails together. If this first one is an

18 e-mail. It may be a memo. But the first one is from

19 Patrice Weiss and it's to Susan Knerr cc:  Patrice Weiss and

20 it was sent on May 4, 2003. And the subject is, Christiana

21 Care Reviews.

22        And then the second one is from Dr. Hoffman and

23 it's to Anthony Sciscione. And it's dated May 7th, 2003.

24        My question is, after you have had an

Page 24

1 opportunity to review it, does this help to refresh your

2 recollection as to whether Patrice Weiss and Dr. Hoffman

3 participated in the mock oral boards?

4    A    Apparently they did.

5         MS. BREWINGTON: Ekbladh 4, please.

6         (Ekbladh Deposition Exhibit No. 4 was marked

7 for identification.)

8 BY MS. BREWINGTON:

9    Q    I have just put in front of you what we have

10 previously marked as Christiana Care Health Services,

11 Department of Obstetrics and Gynecology, Residency Review

12 Committee. And the date is June 16th, 2003.

13        Take a look at the second page. If you could

14 read for me the first block where it says, 6.2, Oral Boards?

15   A    Yes.

16   Q    That rectangle box. Could you read that aloud for

17 me?

18   A    The PGY2's took their mock oral boards on May 2nd.

19 Three of the people giving the oral boards were not

20 associated with this program, which allowed for an equal

21 across the board evaluation for all the residents. Kersh

22 and Heinle scored above average. Kirifides at or above

23 average. Zechman at or below average.

24   Q    It indicates in here that three of the four people

Page 25

1 giving the oral board were not associated with this program.

2 Based on that statement, would it be fair to is assume that

3 there were at least four people administering the exam?

4    A    Yes.

5    Q    And we have already mentioned Patrice Weiss and

6 Dr. Hoffman?

7    A    Yes.

8    Q    Dr. Hoffman is associated with the program, right?

9    A    Yes, he is.

10   Q    And Weiss is not associated with the program?

11   A    That is correct.

12   Q    So is it fair to say that there are at least three

13 others that are not associated with the program?

14        MR. BLOOM: Objection to the form. You can

15 answer it.

16        THE WITNESS: No, at least two others that are

17 not associated.

18        MS. BREWINGTON: You're right. My math.

19 BY MS. BREWINGTON:

20   Q    So Dr. Weiss is not associated with the program?

21   A    Correct.

22   Q    And then two others that are not associated?

23   A    Correct.

24   O    And Dr. Hoffman that is?

A-257

Zechman
Lamar Ekbladh, M.D.

v.

C.A. # 05-159 (JJF)

Christiana Care Health Systems
August 2, 2006

Page 26

1    A   Yes.

2         MS. BREWINGTON:  At this time, I'd like to put

3    on the record a formal document request for the two other

4    oral board evaluations of those that gave the oral boards I

5    believe in May, May 2nd.

6         MR. BLOOM:  Just put the request in writing and

7    we'll respond to it.

8         MS. BREWINGTON:  Sure.  Thank you.

9    BY MS. BREWINGTON:

10   Q   Did you attend this Residency Review Committee

11   meeting?

12   A   Yes, I did.

13   Q   And there was some discussion about Dr. Zechman; is

14   that accurate?

15   A   That is correct.

16   Q   Tell me what was discussed in this Residency Review

17   Committee meeting with respect to Dr. Zechman?

18   A   Specifics of the discussion, I certainly don't

19   remember all the specifics, but what we would have discussed

20   were a composite of her evaluations and performance.

21   Q   And do you recall how Dr. Zechman was doing as of

22   June of 2003?

23        MR. BLOOM:  You mean other than what's

24   reflected in this document?

Page 27

1         MS. BREWINGTON:  I mean anything.  If it's

2    reflected in this document.

3         THE WITNESS:  I'm sorry.  I don't understand.

4    BY MS. BREWINGTON:

5    Q   You can certainly rely on this document if it helps

6    to refresh your recollection.

7         And my question is, what do you recall about

8    Dr. Zechman's performance at this time in June of 2003?

9    A   My recollection was that it was in general by most

10   people not to be progressing at the rate that we would

11   anticipate.

12   Q   It also indicates here that there are questions or

13   concerns about her ability to complete the program or

14   concerns about her fitting in with the upcoming second

15   years.

16        What was the concern with respect to fitting in

17   with the second years?

18   A   I don't remember specifically.

19   Q   Now, in June of 2003, she would have been -- I guess

20   that's when you get ready to go into your third year?

21   A   It would be going into the third year in July of

22   2003, yes.

23   Q   July of 2003.

24        So at the time in June 2003, there was a

Page 28

1    concern by the Residency Review Committee that she wouldn't

2    fit in with the second years that were coming into the

3    program, coming into the second year?

4    A   My reading of this is that the upcoming second

5    years.

6    Q   Okay.  And at the end of this meeting, there was a

7    decision to offer her a second year contract with a novel

8    curriculum and to review her at three and six months, is

9    that correct?

10   A   Yes.

11   Q   Do you recall what this novel curriculum would

12   entail?

13   A   I do not remember all the details.  But those that I

14   recall is that she was to work more closely with specific

15   attendings.

16   Q   Do you recall anything else?

17   A   Specifically, no.

18   Q   Anything generally that you recall?

19   A   That she would be monitored closely to ensure that

20   she was progressing.

21   Q   Now, monitored closely, would that be by the

22   attendings?

23   A   It would be by the attendings and by the program

24   director.

Page 29

1    Q   How about the chief residents?

2    A   And the chief residents.

3    Q   How about the nurses?

4    A   Not specifically.

5    Q   When you say monitored closely, what exactly do you

6    mean?

7    A   That we would check in with her about her

8    performance on a regular basis.

9    Q   Okay.  And what would be the purpose of re-reviewing

10   her in three months and then at six months?  Do you

11   understand the question?

12   A   I understand the question.  The purpose would be to

13   evaluate her progress.

14   Q   And after evaluating the progress, then you would

15   what?

16   A   Make a decision as to whether the progress was

17   appropriate or not.

18   Q   And you would then tailor her program in a different

19   way?

20   A   The program might be tailored or other decisions

21   about her continuing in the program might be made.

22   Q   Like what?

23   A   Including dismissal.

24   Q   And in three months, that would have been September

Zechman
Lamar Ekbladh, M.D.

v.

C.A. # 05-159 (JJF)

Christiana Care Health Systems
August 2, 2006

Page 30

1  and December, is that correct?
2  A   Yes.
3  Q   Of 2003?
4  A   Yes.
5  Q   Okay.  You can put that aside.
6       Did you have discussions with Dr. Zechman about
7  the call room?
8  A   I vaguely remember discussions about the call room,
9  yes.
10 Q   Did Dr. Zechman have concerns about the call room?
11 A   From what I remember, she felt she was being not
12 given an appropriate call room.
13 Q   Do you know why?
14 A   I believe she felt that she should have the third
15 year on call room.
16 Q   And what was your feeling on that?
17 A   That she was, indeed, part of the second year class
18 and would share the call room with the second year call
19 room.
20 Q   Now, how many residents are in the second year
21 program?
22 A   I'm sorry?
23 Q   How many residents are second years?  Is it four?
24 A   It's usually four, yes.

Page 31

1  Q   Do you recall how many there were when Dr. Zechman
2  was —
3  A   When she was repeating her second year, there would
4  be five in that year.
5  Q   Including Dr. Zechman?
6  A   Including Dr. Zechman, yes.
7  Q   And what exactly is in a call room?
8  A   A bed, a desk and some places to keep books.
9  Q   And that's the area that the residents use whenever
10 they are at the hospital?
11 A   Whenever they are on call, yes.
12 Q   And in Dr. Zechman's second year call room, there
13 would be four sets of like four beds?
14 A   No.  No.  There would be one bed.  Because there
15 would only be one — only necessary for one person to sleep
16 there at any given time.
17 Q   So what would happen when Dr. Zechman would be on
18 call and another second year resident would be on call?
19 A   At that point, she would be able to use the third
20 year on call room.
21 Q   When did you tell her that she could use the third
22 year?
23 A   I don't remember specifically.  But it was probably
24 around the time of her concern.

Page 32

1  Q   So she brought a concern to you, like where shall I
2  put my things, and then you said what?
3  A   My recollection is that the response was that her
4  formal place would be in the second year on call room, that
5  she could use the other on call room if she were the
6  second — second year on call on any given night.
7  Q   Okay.  And would that basically always ensure that
8  she had someplace to be?
9  A   Yes.
10 Q   And was she okay with using the third year call
11 room?
12 A   I cannot attest for how she felt about it.
13 Q   She didn't respond to you in any way?
14 A   No.
15      (Ekbladh Deposition Exhibit No. 5 was marked
16 for identification.)
17 BY MS. BREWINGTON:
18 Q   Can you take a look at this document, Ekbladh 5?  On
19 the top, it says note, June 25th, 2003.  And at the bottom,
20 it's typed Dr. Ekbladh.  Is this your statement or a note?
21 A   It's a note.
22 Q   Okay.
23 A   About a discussion.
24 Q   Do you normally take notes on your discussions with

Page 33

1  residents?
2  A   Usually, yes.
3  Q   And would that be each and every time you meet with
4  the resident?
5  A   Any time I met with the resident, where I felt the
6  conversation was of a significant concern, you know, and
7  warranted a note.
8  Q   Okay.  Did you feel that your discussion with her on
9  June 25th was of a significant concern?
10 A   Yes, it was a concern to her.  Therefore, it was a
11 concern.
12 Q   Okay.  Tell me about your conversation with her on
13 June 25th, 2003?
14 A   Other than what I have written here, my recollection
15 is what I mentioned to you before about our discussion and
16 what is noted here.
17 Q   Okay.  Well, have you had an opportunity to read it?
18 A   Um-hmm.
19 Q   Did you type this?
20 A   I probably did not type this myself, no.
21 Q   So did you write the note?
22 A   I probably dictated the note.
23 Q   And then someone else typed it?
24 A   Yes.

A-259

9 (Pages 30 to 33)

Zechman                                                    Christiana Care Health Systems
Lamar Ekbladh, M.D.              C.A. # 05-159 (JJF)                    August 2, 2006

Page 34

1   Q   Is the first part of this note consistent with what
2   you were telling me earlier about the third call room versus
3   the second call room?
4   A   I believe it is.
5   Q   And during this conversation on June 25th, 2003, did
6   you also discuss her repeating her second year?
7   A   Yes.
8   Q   Do you recall what exactly you discussed about that?
9   A   Specifically, no.
10  Q   How about based on your review of your note?
11  A   Other than what that first part of the year would
12  be, we discussed that apparently that she should work hard,
13  that her success or failure was in her hands. And it would
14  be reviewed again. And at that point, another determination
15  of her progress would be made. We then discussed the role
16  of the attending on any service in designing, you know, in
17  helping her with her program.
18  Q   At this conversation, did she discuss concerns with
19  you about being pulled from her rotations for other
20  opportunities?
21  A   Yes.
22  Q   What exactly was she talking about there?
23  A   At any given time, obviously in any medical service,
24  and especially in an obstetrical service, the day is very

Page 35

1   difficult to specifically plan. And there may be times when
2   reallocation of residents may need to be made, where they
3   will help out, where they will be at any given time. And
4   this reflected that.
5   Q   It reflected --
6   A   The fact that at any given time she or any other
7   resident may need to be somewhere else other than where it
8   was specifically planned for them to be.
9   Q   So would an example of that be when she was
10  assigned to surgery and then had to be in triage?
11  A   That could be a possibility, yes.
12  Q   Is there any other possibility?
13  A   There could be lots of other possibilities.
14  Q   Give me a couple of possibilities?
15  A   Because I'm trying to understand how it works in the
16  hospital. And I really don't know. And that's the only
17  thing that came to my head, that being assigned specifically
18  to surgery, then having to be in perhaps triage. I think
19  the chief resident and/or the attending together, their
20  responsibility for any given day is to be sure that care is
21  given appropriately in all areas in which we give care,
22  which are multiple.
23  Q   Okay.
24  A   I'll probably give -- the simplest example may be

Page 36

1   labor and delivery, where if you all of a sudden have three
2   deliveries going on at the same time and a Cesarean section
3   that needs to be done, you need to look for the people who
4   are available, you know, is something which is not, you
5   know, specifically committed to come and be able to help for
6   those periods of time.
7   Q   And was Dr. Zechman's concern that she was -- was it
8   her concern that she was being pulled from certain things to
9   do other things?
10  A   That appears to be her concern, yes.
11  Q   And did you talk with her about that in this
12  meeting?
13  A   Yes.
14  Q   And how did you respond to her?
15  A   That it would be up to -- you know, ultimately, the
16  attending on service. I mean usually it is the chief
17  resident but ultimately the attending on service to decide
18  where the most appropriate place for any resident to be at
19  any given time.
20  Q   And Dr. Gray was one of the chief residents, is that
21  correct?
22  A   That is correct.
23  Q   So would she play a role in determining where
24  Dr. Zechman would be at any given time?

Page 37

1   A   She may, yes.
2   Q   Okay. You also indicate in this note that the first
3   six weeks is an intensive review by specific attendings who
4   will report each week on her progress.
5        Did the attendings submit evaluations?
6   A   They would either submit written evaluations or
7   verbal comments.
8   Q   Now, these written evaluations, who would they
9   submit them to?
10  A   They would be submitted to Sandi Kardos and then to
11  me at this particular time.
12  Q   Because you were the director?
13  A   At that time, yes.
14  Q   How about the verbals? Who would they discuss this
15  with?
16  A   The verbals would usually be with me.
17  Q   Did you take notes on these verbal evaluations?
18  A   Not always.
19  Q   Sometimes?
20  A   Sometimes. And they would be noted and dictated.
21  Q   So not always but sometimes?
22  A   Yes.
23  Q   Verbal evaluations. Okay.
24        And what was the feedback that you were

A-260

Page 38

1  getting?
2  A  I don't remember specifically.
3  Q  Do you remember —
4  A  No.
5  Q  Do you remember in general?
6  A  In general, it was continued concern about her
7  progress.
8  Q  Were there any positive evaluations?
9  A  I'm sure there were some positives in there.
10  Q  Is it your opinion that the negatives outweighed the
11  positives?
12  A  At this time, we weren't making an evaluation. But
13  there seems to be more negatives than positives.
14  Q  What do you mean by we weren't making an evaluation?
15  A  Until we come back to the Residency Review Committee
16  where everything can be reviewed altogether.
17  Q  I see. Okay.
18      So in June, you weren't really making an
19  evaluation?
20  A  I was not specifically evaluating her.
21  Q  So the next Residency Review Committee —
22  A  Would be the formal.
23  Q  Okay. You can put that aside.
24      MS. BREWINGTON:  Let's have that marked.

Page 39

1      (Ekbladh Deposition Exhibit No. 6 was marked
2  for identification.)
3  BY MS. BREWINGTON:
4  Q  This document is titled, Request for Disability
5  Accommodation. And the date at the top is July 24th, 2003.
6      Have you ever seen this document before?
7  A  Yes.
8  Q  Can you tell me when?
9  A  As submitted by my attorney for review.
10  Q  Is that the first time you saw it?
11  A  Yes.
12  Q  The accommodation requested in July of 2003 was
13  additional days off for long rest breaks with scheduled time
14  off.
15      Is that accurate what I have read?
16  A  Additional days off for longer rest breaks with
17  scheduled — yeah, that looks like that's what it says, yes.
18  Q  And the second page, at the bottom, it says, request
19  for accommodation forms should be returned to Employee
20  Health Services. And then it provides a fax number,
21  733-1890. Do you see that?
22  A  Yes.
23  Q  Is that your fax number?
24  A  No, it is not.

Page 40

1  Q  Is that the fax number to Employee Health Services?
2  A  I cannot specifically state whether it is or is not.
3  Q  But what you do know is that it's not your fax
4  number?
5  A  Yes.
6  Q  Did you receive any information from anyone at
7  Employee Health that this form was completed?
8  A  I don't remember receiving any specific information
9  to that effect.
10  Q  And when you say specific information, do you mean
11  no information at all?
12  A  I don't remember anybody — I do not remember
13  anybody telling me that this form had been completed.
14  Q  Do you know whether this request for disability
15  accommodation was ever considered?
16  A  I'm sorry?
17  Q  Do you know whether this request for disability
18  accommodation was ever considered by Christiana Care?
19  A  My assumption is it was considered because it was
20  submitted. So it was considered, yes.
21  Q  It was considered.
22      And when you say it was considered, do you mean
23  it was considered by Employee Health?
24  A  Yes.

Page 41

1  Q  I may have asked you this. And I think what I asked
2  you is, did anyone contact you from Employee Health
3  Services. Did you receive any conversation from anybody
4  from Employee Health Services regarding this request for
5  disability accommodation?
6  A  No.
7      MS. BREWINGTON:  Mark this as Ekbladh 7.
8      (Ekbladh Deposition Exhibit No. 7 was marked
9  for identification.)
10  BY MS. BREWINGTON:
11  Q  This is a letter from Dr. Zechman to you and it's
12  dated July 23rd, 20003.
13      Did you ever receive this letter?
14  A  Yes.
15  Q  Do you know when you received it?
16  A  I don't remember exactly when.
17  Q  The date of it is July 23rd, 2003. Do you know
18  whether you received it near that date?
19  A  I don't remember the specific date that I received
20  it.
21  Q  Did you receive it from Dr. Zechman?
22  A  Yes.
23  Q  So this is not something that you received and
24  reviewed later on, like with your attorney or something like

A-261

Zechman                                              Christiana Care Health Systems
Lamar Ekbladh, M.D.          C.A. # 05-159 (JJF)              August 2, 2006

Page 42

1 that?
2           MR. BLOOM: I'm going to object to the question
3 to the extent it seeks to probe communications with counsel.
4           MS. BREWINGTON: I apologize. Let me clarify
5 it.
6 BY MS. BREWINGTON:
7     Q    I guess what I'm trying to understand is, I have
8 given you previous documents and you said you reviewed them
9 with your attorney. I guess I just want to clarify whether
10 this document you received contemporaneously with the date
11 of July 23rd, 2003?
12    A    I received this document somewhere in the vicinity
13 of that time frame.
14    Q    Okay. Thank you.
15          In this letter to you, is it fair to say that
16 she is requesting additional time off for her disability?
17    A    Yes.
18    Q    And specifically, she requested two periods of 72
19 hour breaks in a four week cycle.
20          And I guess my question is, the normal four
21 week schedule, do you get one weekend off?
22    A    I don't remember the schedules exactly.
23    Q    Okay. But is it fair to say --
24    A    It's fair to say that that is like --

Page 43

1     Q    Go ahead.
2     A    That is likely.
3     Q    And as I read this, as I understood it to be, she
4 was requesting an additional day off besides that one
5 weekend. So she would have Saturday and Sunday off and then
6 she requested either a Monday or a Friday; is that accurate?
7           MR. BLOOM: Objection to the form of the
8 question.
9           THE WITNESS: That could be the inference from
10 the request.
11 BY MS. BREWINGTON:
12    Q    What is your understanding of Dr. Zechman's letter?
13    A    My understanding is, it literally exactly the way
14 she wrote it, looking for a three day break, you know,
15 around a weekend twice in four weeks.
16    Q    Did you respond to this request?
17    A    It is my recollection that we discussed it.
18    Q    So you discussed it at a meeting with her?
19    A    I believe so.
20    Q    But you don't recall writing anything to her?
21    A    That is correct.
22    Q    Did you discuss this request with anyone?
23    A    I don't remember specifically.
24          MR. BLOOM: I'm just going to interpose an

Page 44

1 objection. The last question, do you mean did he discuss it
2 with anyone else at Christiana Care?
3           MS. BREWINGTON: Yes. We can phrase it that
4 way. But anyone is the question.
5 BY MS. BREWINGTON:
6     Q    Did you discuss it with anyone?
7     A    It is likely. I don't remember with whom.
8     Q    What were your thoughts about her request for a
9 change in her schedule?
10    A    I thought these were some things which we could look
11 at and consider, you know, at that time.
12    Q    Did you feel as if her request was something that
13 could be arranged?
14    A    It would be a challenge but it could be arranged.
15    Q    And who would take part in trying to rearrange the
16 schedule? Would this be something that you would do as the
17 director or would there be --
18    A    We would look to the chief residents because it
19 would involve everybody's schedule.
20    Q    And the chief residents were in charge of making
21 everyone's schedule?
22    A    Of creating their own schedule, yes.
23          MS. BREWINGTON: Eight.
24          (Ekbladh Deposition Exhibit No. 8 was marked

Page 45

1 for identification.)
2 BY MS. BREWINGTON:
3     Q    Please review that document that I have placed in
4 front of you labeled Ekbladh 8.
5           The first one is dated July 28, 2003. The
6 first document. And then the second one is dated August 6,
7 2003.
8           What is the document that I put in front of
9 you?
10    A    The first is a document from the ACGME about a
11 complaint against the program. And the second is a response
12 to the complaint.
13    Q    And the response to the complaint was written by
14 you, is that correct?
15    A    It was written over my signature, yes.
16    Q    Who wrote it?
17    A    Well, we usually get together with the people
18 involved with the program so that we know everything that's
19 going on. But basically I wrote the response. But we have
20 input from the coordinator from people who take calls.
21    Q    Did you have input from the committee?
22    A    The committee would be involved, yes.
23    Q    And what was your understanding of the complaint
24 that was filed with the ACGME?

Zechman                                    v.                Christiana Care Health Systems
Lamar Ekbladh, M.D.              C.A. # 05-159 (JJF)                      August 2, 2006

Page 46

1    A  Specifically, you know, as they say here. Would you
2    like me to read each of the complaints? Because my
3    understanding is only that of what was communicated by the
4    ACGME.
5    Q  Okay. Well, you can either tell me what you recall
6    or, if you have to rely solely on the document, you
7    certainly can.
8        MR. BLOOM: I think the witness has indicated
9    that his knowledge and understanding of the complaint is
10   what the document says.
11       MS. BREWINGTON: Then we can certainly read it
12   into the record.
13       MR. BLOOM: All right. The document is in the
14   record. Do you want him to read the entire document?
15       MS. BREWINGTON: Certainly. Maybe it will
16   refresh his recollection.
17       MR. BLOOM: Okay.
18       MS. BREWINGTON: I mean if we have to go
19   document by document, we certainly will.
20       THE WITNESS: It is alleged that for evenings,
21   weekends and holidays, a junior resident is the only
22   physician in-house. There is no direct supervision by an
23   attending. The majority are private patients, and residents
24   see these patients alone. They evaluate and treat the

Page 47

1    patients with only telephone guidance from the attending who
2    never sees the patient.
3    BY MS. BREWINGTON:
4    Q  Okay. The next one?
5    A  It is alleged that residents are used for service
6    and that the program has failed to provide the training
7    needed to advance their surgical skills. Allegedly, junior
8    residents spend much of the year in OB/GYN triage. The
9    triage is a high volume area and residents treat 30 to 40
10   private patients within a 12 hour shift. Residents are
11   pulled from the GYN rotation to fill in at OB/triage or L&D.
12       Residents view themselves as unsupervised slave
13   laborers for the private physicians. It is alleged that the
14   residents write daily notes on the private patients who are
15   not seen by their physician. If they do not complete the
16   notes, they stay beyond normal duty hours to complete the
17   task or else suffer harassment by the private doctors.
18   Q  Okay. Now, as to this first allegation. How did
19   you respond?
20   A  My response is as written under the response to
21   allegation number one.
22   Q  Do you recall, without reading this, anything that
23   you responded?
24   A  I responded that we do have a 24 hour attending in

Page 48

1    the house at all times and is always available for
2    consultation by the residents who are on call. There are
3    private patients that are seen by the residents, that when
4    they are seen, they call the private attending; and, if it
5    is a complicated problem or if the patient needs to be
6    admitted, the attending would come in and see the patient.
7    If it is something that they felt that they have dealt with
8    appropriately over the phone, the patient might be let go
9    home.
10   Q  How about the second allegation, that residents are
11   used for service and that the program has failed to provide
12   the training needed to advance their surgical skills?
13   A  I just reviewed, I believe, in the response and I
14   would, you know, refer to the response in allegation number
15   two. If you would like me to read it, I will.
16   Q  Well, I guess my question is to you, and you can
17   certainly rely on the writing, but there was an allegation
18   made that residents are used for services and that the
19   program has failed to provide the training needed to advance
20   these skills.
21       How do you respond to that as the director?
22   A  I disagree.
23   Q  Okay. And in what way do you disagree?
24   A  By reviewing the fact that, as in paragraph one,

Page 49

1    that the program has been very careful to be sure that there
2    is an educational component to the service that is provided.
3    The majority of the residents who come to this program, come
4    to this program because of the reputation it has for
5    teaching surgical skills. We have an excellent surgical
6    teaching faculty and the volume ensures a comprehensive
7    education for all operative procedures and surgical skills
8    that graduating residents will need.
9    Q  And it was also alleged, the third allegation was
10   that residents view themselves as unsupervised slave
11   laborers.
12       As the director of the program, how did you or
13   how would you respond to that?
14   A  I will read my response. Residents are asked to do
15   post-operative or post-delivery notes only on patients upon
16   which they have operated or done the delivery. Residents
17   have no care responsibility for the bulk of private
18   obstetrical patients with whom they have had no contact.
19   Their attending physician sees all of the patients admitted
20   to the hospital at least daily and this has been not been a
21   problem or a concern for any of our attending physicians. I
22   am not aware of any harassment by our private physicians of
23   residents to get them to write progress or discharge notes
24   on patients the residents have not cared for.

Zechman
Lamar Ekbladh, M.D.

v.

C.A. # 05-159 (JJF)

Christiana Care Health Systems
August 2, 2006

Page 50

1 Q   Now, did you receive a response from the ACGME?

2 A   No, we did not.

3 Q   Were you going to say something else?

4 A   No.

5 Q   Okay. Did you receive a document or anything from

6 any source concerning these allegations?

7 A   Other than this document, that's the only one I

8 have.

9 Q   And when did you first become aware that someone had

10 filed a complaint with the ACGME?

11 A   When I got this document.

12 Q   So that date is –

13 A   Received August 4th, 2003.

14 Q   And is it fair to say that you were aware that the

15 complaint was made by a resident?

16 A   All we become aware of is that a complaint was made.

17 I can see exactly what was written in the complaint. It is

18 just that a complaint was made. Whether it was made by a

19 resident or an attending.

20 Q   So you were not aware that it was made by a

21 resident?

22 A   We were not made aware specifically by whom it was

23 made, no.

24 Q   Did you know that it was Dr. Zechman?

Page 51

1       MR. BLOOM: I'm going to object to the form.

2 Do you mean at the time or now?

3       MS. BREWINGTON: I'm going to ask him now.

4 See, what I want to ask him is, did he know that it was

5 Dr. Zechman.

6 BY MS. BREWINGTON:

7 Q   And what's your answer?

8       MR. BLOOM: Same objection. You can answer.

9       THE WITNESS: No. At the time I received this

10 document, I was not aware that it was Dr. Zechman.

11 BY MS. BREWINGTON:

12 Q   At any time, did you become aware that it was

13 Dr. Zechman?

14 A   Only in some of the papers that I have had a chance

15 to review where Dr. Zechman specifically states that she

16 made a complaint to the ACGME.

17       MR. BLOOM: Just to clarify for the record.

18 When you say you reviewed documents that you just referred

19 to, do you mean documents that you reviewed within the last

20 few months of 2006?

21       THE WITNESS: Yes.

22       MR. BLOOM: Okay.

23       MS. BREWINGTON: And I'm going to put a

24 statement on the record that you'll certainly have your

Page 52

1 chance to ask him questions.

2 BY MS. BREWINGTON:

3 Q   Do you know that ACGME issued a decision or a

4 finding on the allegations?

5 A   I have had no direct communication from ACGME on

6 their findings.

7 Q   Do you have any indirect communication, any

8 knowledge of anything?

9 A   Indirect knowledge would be that our program was

10 totally reviewed in 2004 and there were no references to any

11 concerns about the program as raised in this complaint.

12 Q   Were there other concerns about the program?

13 A   Yes.

14 Q   Like what?

15 A   Numbers of procedures within specific areas and the

16 recording of those numbers.

17 Q   Numbers of procedures in certain areas; is that what

18 you're saying?

19 A   Yes.

20 Q   What do you mean by that?

21 A   The total number reported by the residents within

22 areas -- within areas that they are supposed to report

23 numbers of. Of which they are supposed to report numbers.

24 Q   I don't understand.

Page 53

1 A   I would have to look at the report of that review to

2 tell you specifically.

3 Q   Well, are you saying that the numbers, that the

4 residents' numbers were too high or something? Is that what

5 you're saying?

6 A   The numbers can either reflect too high, too low or

7 differential reporting by residents of their numbers.

8 Q   And basically the numbers should be at a certain

9 standard?

10 A   There is no standard set for the numbers.

11 Q   But there was a concern by the ACGME about that?

12 A   Pardon?

13 Q   Was there a concern by the ACGME about that, the

14 numbers?

15 A   About some numbers as reported, yes.

16       (Ekbladh Deposition Exhibit No. 9 was marked

17 for identification.)

18 BY MS. BREWINGTON:

19 Q   I have just put in front of you what's previously

20 been marked as Ekbladh 9. It is an e-mail from Dr. Zechman

21 to you. It's dated July 26th, 2003. And the subject is,

22 Update with Dr. Gray as chief resident.

23       If you could please review that document and

24 let me know when you're finished.

14 (Pages 50 to 53)

Wilcox & Fetzer, Ltd.

Professional Court Reporters

(302)655-0477

Zechman
Lamar Ekbladh, M.D.

v.

C.A. # 05-159 (JJF)

Christiana Care Health Systems
August 2, 2006

Page 54

1      Do you recall receiving this e-mail?
2  A  Yes.
3  Q  Did Dr. Zechman have concerns about Dr. Gray as the
4  chief resident?
5  A  She expresses some of them here, yes.
6  Q  And what was your understanding of her concerns?
7  A  As expressed here, that Dr. Gray was not allowing
8  her to make independent decisions.
9  Q  And did you respond to Dr. Zechman about her concern
10  that she wasn't allowing her to make independent decisions?
11  A  I do not remember specifically.
12  Q  Do you know whether you talked with Dr. Gray about
13  Dr. Zechman's concerns?
14  A  Specifically related to this?  I do not remember.
15  Q  Well, how about related to anything with respect to
16  Dr. Zechman?
17  A  Yes.  Dr. Gray.  I had conversations with Dr. Gray.
18  Q  Specifically with respect to Dr. Zechman?
19  A  Yes.
20  Q  And what were some of the topics of discussion?
21  A  Dr. Gray's concerns were her concern about
22  Dr. Zechman being able to make decisions and her progress
23  through the program.
24  Q  How often did you talk with Dr. Gray about this?

Page 55

1  A  I don't remember.
2  Q  Would you consider it like several times?
3  A  Over the course of a few months, it was probably
4  several times.
5  Q  Several times?  I didn't hear you.
6  A  Several times, yes.
7  Q  In this e-mail, Dr. Zechman alleges that Dr. Gray
8  has asked a nurse, Lisa Dempsey, to call her whenever there
9  are any patient care issues.  Do you see where it says that?
10  Is that something that Dr. Gray should be doing?
11  A  If Dr. Gray has concerns about any resident and
12  their patient care, it is something that she might ask.
13  Q  And that's entirely proper?
14  A  It's entirely proper.
15  Q  And did you tell Dr. Zechman that?
16  A  I don't remember specifically.
17  Q  Dr. Zechman also indicates in this e-mail that she
18  was left relieving triage rather than being allowed to go to
19  the OR on a possible perforation on a patient that
20  Dr. Kaminski and she saw in clinic the day before.
21      Is that a concern to you?
22      MR. BLOOM: Objection to the form.  You can
23  answer it, if you can.
24      THE WITNESS: No.

Page 56

1  BY MS. BREWINGTON:
2  Q  Tell me why not?
3  A  Because it is up to the team involved in the care at
4  any given time to decide who is the most appropriate to
5  assist or to cover what areas.
6  Q  And the team would be the chief resident and the
7  attending?
8  A  And the attending, yes.
9  Q  Do you think that it was determined by the chief and
10  the attending physicians that Dr. Zechman wasn't the most
11  qualified to do the surgery?
12      MR. BLOOM: Objection to the form.  You can
13  answer it.
14      THE WITNESS: I cannot specifically state what
15  they used to make that decision.  Could that be one of the
16  items used in making the -- it could be one of the things
17  used in making a decision.
18  BY MS. BREWINGTON:
19  Q  What are some of the other things that would be used
20  in making the decision to remove her from OR?
21  A  If they expected this to be a very complicated case
22  where they needed a more experienced resident for
23  assistance, if they felt that the -- another resident needed
24  experience doing that as much as -- another resident needed

Page 57

1  the experience as much as Dr. Zechman did.
2  Q  Do you know whether or not Dr. Zechman was pulled
3  away from surgery more than other residents?
4  A  I cannot specifically say whether she was or was
5  not.
6  Q  Was that a concern that she brought to your
7  attention?
8  A  Yes.
9  Q  Did you look into that?
10  A  We could not identify that she was being changed any
11  more than anybody else was in the daily changing of the
12  schedule.
13  Q  Okay.  So you looked into it and determined that she
14  wasn't being changed more than others?
15  A  We did not feel she was being changed more than
16  anybody else was.
17  Q  And when you say we, is that yourself and someone
18  else?
19  A  It might be myself, Dr. Patruno, other people
20  involved with deciding schedules, the chief residents.
21  Q  Did Dr. Kaminski ever send you an e-mail or somehow
22  express his concern to you that Dr. Zechman was being
23  transferred from surgery into another area?
24  A  I don't recall.

A-265

15 (Pages 54 to 57)

Zechman                                    v.                    Christiana Care Health Systems
Lamar Ekbladh, M.D.              C.A. # 05-159 (JJF)                      August 2, 2006

Page 58

1          (Ekbladh Deposition Exhibit No. 10 was marked
2    for identification.)
3    BY MS. BREWINGTON:
4      Q   Please review the document that I put in front of
5    you, Ekbladh 10. It's an e-mail. It's to you. And I'm not
6    sure who it's from. But it's cc'd to Sandi Kardos. And the
7    subject is, requested this in writing. And the first
8    sentence is, as per our conversation and my conversation
9    with Dr. Ekbladh, you are no longer required to take quizzes
10   that pertain to the chapters that are assigned to you each
11   week.
12          Is it fair to assume, based on this e-mail from
13   Sandi Kardos, that you had a conversation with her with
14   respect to quizzes?
15     A   Yes.
16     Q   What were these quizzes?
17     A   These were prepared quizzes on chapters that were
18   prepared by the attending physicians.
19     Q   Okay. Was this something that only Dr. Zechman had
20   to do?
21     A   That Dr. Zechman did. I do not remember if there
22   were any other residents who were being asked to do that at
23   that time.
24     Q   Who asked her to do that?

Page 59

1      A   That would be as part of the special attention given
2    to her during this period of time to help her improve.
3      Q   And why was she no longer required to do it at this
4    time?
5      A   I do not remember specifically. It may have been
6    that her performance was satisfactory on these. Although
7    she could still do it, it wasn't required.
8          (Ekbladh Deposition Exhibit No. 11 was marked
9    for identification.)
10   BY MS. BREWINGTON:
11     Q   Did you meet with Dr. Zechman on July 30th, 2003?
12     A   Apparently I did.
13     Q   And you say that because this document is dated July
14   30th, 2003?
15     A   Yes.
16     Q   And for the record, this document is labeled Ekbladh
17   11. Why don't you tell me what it is?
18     A   It's a document to Dr. Zechman telling her when we
19   were going to review her progress and to make her aware of
20   what the considerations would be at the time of that review.
21     Q   And specifically, is it fair to say it occurred on
22   July 30th, 2003, this meeting with her?
23     A   It would be fair to say.
24     Q   At this meeting with her, you advised her that there

Page 60

1    would be a mid quarter residency review meeting on August
2    18th, 2003, and the department was going to consider four
3    options. And the first one was proceed with mediation,
4    special PGY2 rotation. And is that what she was doing
5    currently?
6      A   That's what she was doing.
7      Q   The second option was mainstream into PGY2 position?
8      A   Correct.
9      Q   And that would be with the PGY2's but without doing
10   this special rotation?
11     A   That is correct.
12     Q   And the third one was termination from the program.
13   And then the fourth one was progress into PGY3 position?
14     A   Yes.
15     Q   The progression into the PGY3 position, would she
16   have been with the other PGY3's?
17     A   If that had been the decision at that time, yes.
18     Q   Is there a certain number of PGY3's that the school
19   can have?
20     A   We are approved for four per year.
21     Q   Okay.
22     A   We can't increase that number if the increase is due
23   to remediation, special programs and so forth.
24     Q   So you could have four plus Zechman, Dr. Zechman; is

Page 61

1    that what you're saying?
2      A   Yes.
3      Q   Is that based on like a rule?
4      A   The Residency Review Committee keeps us to four
5    unless the reason for the increase is for specific
6    education, remediation, of residents. That is why we were
7    able to have five in the second year.
8      Q   I see. Okay.
9          So is the same thing true that you could place
10   her with the threes?
11     A   If she had progressed through this, we would have
12   asked permission of the RRC, the main RRC, which would
13   usually give permission to bring her back into the year.
14     Q   You said the main RRC. Is there a different one
15   than the one --
16     A   There is our Residency Review Committee and then
17   there is the National Residency Review Committee.
18     Q   So you need to get permission from the National
19   Residency Review Committee to do that?
20     A   Yes.
21     Q   Did anyone look into getting this permission from
22   the Residency Review Committee, the National Residency
23   Review Committee?
24     A   You cannot ask for this permission in anticipation.

A-266

16 (Pages 58 to 61)

Zechman                                v.                    Christiana Care Health Systems
Lamar Ekbladh, M.D.              C.A. # 05-159 (JJF)                    August 2, 2006

Page 62

1  You can only ask if it is specifically requested.
2    Q   Do you recall anything else about the conversation
3  with Dr. Zechman other than what we have talked about?
4    A   No, ma'am.
5    Q   Do you have any recollection of any statements made
6  to you by Dr. Zechman at this meeting?
7    A   Specific statements, no. I believe her goal was to
8  progress into a PGY3 position. But other than that, any
9  specific parts of the discussion, I don't recall.
10       (Ekbladh Deposition Exhibit No. 12 was marked
11  for identification.)
12  BY MS. BREWINGTON:
13    Q   This is Ekbladh 12. This is an e-mail from
14  Dr. Zechman to you. It was sent out on August 1st, 2003.
15  The subject is regarding rounds and the importance is high.
16       Let me know when you have had an opportunity to
17  review it.
18    A   Okay.
19    Q   The bottom of the page is an e-mail from you to
20  Dr. Zechman. And it's dated Wednesday, July 23rd, 2003.
21  And the first part says, Ellen, I understand there are some
22  issues as to whether or not you should attend morning and/or
23  evening rounds.
24       What is your understanding of the issues with

Page 63

1  respect to the morning and evening rounds?
2    A   As I remember, the issue was at that time that Ellen
3  didn't want to necessarily attend those rounds but was being
4  asked to attend those rounds.
5    Q   Who was she being asked to attend the rounds by?
6    A   I don't remember specifically. It may be the chief
7  residents.
8    Q   It would either be the chief residents or the
9  attending?
10    A   Or the attending, yes.
11    Q   And did Dr. Zechman tell you why she didn't want to
12  attend?
13    A   Only as she progressed here. And I'm not sure there
14  is even a real reason, you know, listed here.
15    Q   Well, based on your review of the e-mail, what is
16  your understanding, if you have one, of why she didn't feel
17  she should have to attend the morning and evening rounds?
18    A   The impression that I got was that it is not
19  required of all other residents who are not on the service.
20  So why should it be required of her.
21    Q   Is that a fair statement, that it wasn't required of
22  others?
23    A   That is a fair statement.
24    Q   And was it required of Dr. Zechman?

Page 64

1    A   Dr. Zechman was apparently asked to attend.
2    Q   Okay. And your basic response was that you're not
3  required to attend; is that fair to say?
4    A   That is correct.
5    Q   Then we have the e-mail at the top. And I guess the
6  e-mail at the top is her response to your e-mail at the
7  bottom?
8    A   It appears that that is such.
9    Q   What are these morning and evening rounds? Are they
10  like really early in the morning or really late at night?
11    A   They are usually at 6:00 o'clock in the morning and
12  at 6:00 o'clock at night. And the 6:00 o'clock in the
13  morning especially are teaching rounds. The evening rounds
14  are a combination of teaching and work rounds. Work rounds
15  basically for handoff so that the people that are on the day
16  let the people coming on at night know and teaching points
17  may be brought up about any specific patient.
18    Q   In this e-mail to you, Dr. Zechman expressed a
19  concern that she was being singled out. Do you see where it
20  says that?
21    A   I remember reading it. I don't see exactly where it
22  is. Yes, about the 6th or 7th line down.
23    Q   Yes.
24       What were your thoughts or what are your

Page 65

1  thoughts about her feelings of being singled out?
2       MR. BLOOM: Objection to the form. You can
3  answer it, if you can.
4       THE WITNESS: There were a lot of people trying
5  to get her extra educational opportunities, which we felt
6  she needed. And this would be an extra educational
7  opportunity that she had the ability to participate in,
8  although not required.
9       Why she felt singled out, I could only surmise
10  to say. I don't know why she felt singled out.
11    Q   Did you feel it was a valid concern of hers?
12    A   I could understand how she felt that way. I did not
13  feel it was a valid concern.
14    Q   And why did you understand how she felt?
15    A   Because she said she felt that way.
16    Q   And so you just automatically understood it?
17    A   Understand, when somebody is asked to do something,
18  which everybody else isn't asked, that you might feel like
19  you're singled out.
20    Q   Do you have any knowledge of whether or not it was
21  difficult for Dr. Zechman to attend the morning rounds?
22    A   I don't have any specific knowledge on that.
23    Q   She goes on in this e-mail to ask you to review the
24  call schedule because what was said to be the plan on paper

Zechman                                    v.              Christiana Care Health Systems
Lamar Ekbladh, M.D.              C.A. # 05-159 (JJF)                  August 2, 2006

Page 66

1  was not enforced.
2        Do you see where it says that? It's kind of
3  towards the bottom. It's actually in the middle.
4    A  I do not believe that that is referring to the call
5  schedule but rather to her daily schedule.
6    Q  Okay. Did you review her daily schedule?
7    A  Her schedule, I believe I did at that time. And as
8  we discussed before, the attempt always was to adhere to the
9  schedule as much as possible. But the daily changes might
10 require changes in that.
11   Q  Where it says, also, please review the August call
12 schedule, are we talking about her personal schedule?
13   A  You know, I don't remember specifically.
14   Q  Well, if we keep reading, it says, there are two
15 PGY2's, an off service intern and PGY3 and PGY4 on call.
16       If you kept reading that, would it be fair to
17 assume that it's not her personal schedule that we are
18 talking about?
19   A  Correct. The assumption that I have from that, and
20 purely an assumption, is that she is saying there are too
21 many people on call.
22   Q  And did you say that you did review the call
23 schedule?
24   A  I usually, if asked to review the call schedule,

Page 67

1  And that would not be an unusual call schedule to have other
2  residents besides our own on it.
3        (Ekbladh Deposition Exhibit No. 13 was marked
4  for identification.)
5  BY MS. BREWINGTON:
6    Q  What you have in front of you is Ekbladh 13. What
7  is this document?
8    A  This is a document consisting of two notes of
9  apparent meetings with myself and Dr. Zechman on August 7th
10 and August 13th, 2003.
11   Q  So the August 7, 2003 note, the last sentence of
12 that says, I advised her that when we get the medical report
13 from her physician, we will take the next steps to look at
14 how we can potentially accommodate any medical handicaps?
15   A  Yes.
16   Q  Okay. Do you know what medical report you're
17 referencing here?
18   A  It would be a medical report from her physician
19 relative to her disability condition.
20   Q  Would it be a form that Christiana Care has provided
21 or would it just be a report from a doctor?
22   A  It could be a separate report, it could be a form.
23 At that point, I'm not sure I was aware exactly how the
24 report would get there.

Page 68

1    Q  Was this report supposed to come to you?
2    A  I would want information from that physician, yes.
3    Q  Okay. And it says when we get the medical report.
4  Do you mean Christiana Care or do you mean like the
5  residency program?
6    A  Both.
7    Q  Then the next note, August 13th, 2003. Do you
8  recall whether or not at this point you had spoken with
9  Dr. Frazier, Dr. Zechman's doctor?
10   A  I don't specifically remember the timing.
11   Q  I'm going to jump out of order.
12       (Ekbladh Deposition Exhibit No. 14 was marked
13 for identification.)
14 BY MS. BREWINGTON:
15   Q  Take a look at these two documents that we are going
16 to have labeled together as Ekbladh 14. Is that your
17 handwriting on that first page?
18   A  It appears to be.
19   Q  And it says Dr. David Frazier, 8-11-03, 1:45?
20   A  Yes.
21   Q  Is that the date that you talked to Dr. Frazier?
22   A  Apparently it was.
23   Q  And what exactly is the second document?
24   A  It is a dictated and formal note relating to the

Page 69

1  initial.
2    Q  So going back to Ekbladh 13. Okay. Is it fair to
3  say that, as of August 13th, 2003, you had talked to
4  Dr. Frazier about Dr. Zechman's disability?
5    A  Yes, it is.
6    Q  Tell me about this conversation with Dr. Frazier?
7    A  It was a conversation to inquire of what he felt her
8  problems were and confirmed that it was an unspecified
9  connective tissue disorder with intermittent flares. And we
10 discussed what would be the best way for her to work within
11 the program given her connective tissue disorder.
12   Q  And in terms of the best way to handle this
13 connective tissue disorder, did Dr. Frazier give an opinion?
14   A  He expressed that, since it was intermittent and
15 unpredictable as to when it would flare, we should be
16 prepared to give her time off when these flares occurred.
17   Q  Okay. How did you get in contact with Dr. Frazier?
18   A  By telephone.
19   Q  Let me be more specific.
20       Did Dr. Zechman ask you to call her doctor?
21   A  I do not remember when she specifically asked me to
22 call. She knew we were going to be speaking to her
23 physician. But I do not remember whether she specifically
24 asked me to call or not.

A-268