Zechman                                    v.                    Christiana Care Health Systems
Lamar Ekbladh, M.D.              C.A. # 05-159 (JJF)                              August 2, 2006

Page 70

1   Q   Do you know whether she provided you with a
2   telephone number?
3   A   I know she provided us with a name and address. But
4   I do not recall whether she provided the telephone number or
5   not.
6   Q   Do you know whether she gave you permission to talk
7   to Dr. Frazier?
8   A   I do not remember.
9   Q   Do you know whether you told her you were going to
10  call Dr. Frazier?
11  A   I don't remember specifically.
12  Q   Do you know what prompted you to call Dr. Frazier?
13  A   Wanting to get information about the best way to
14  work with Helen with her medical issues.
15  Q   And is that based on the letter that she sent to you
16  about her medical disability or is that based on -- what is
17  it based on?
18  A   It was based on our interest in being able to
19  respond to her medical needs in an appropriate way given her
20  medical needs.
21  Q   Okay. I understand that. I guess my question is,
22  how did this come about, though? Like when I ask what
23  prompted you to call her doctor. We discussed the letter,
24  the July 23rd, 2003 letter, that she sent to you, or was it

Page 71

1   that she discussed her disability in a meeting with you.
2         MR. BLOOM: Objection. Asked and answered.
3   You can answer it again.
4         THE WITNESS: I don't remember the specific
5   thing. I'm sure the letter had some impact on wanting to
6   get that information. We did have discussions about her
7   medical issues. So they both probably impacted.
8   BY MS. BREWINGTON:
9   Q   You and Dr. Zechman had discussions?
10  A   Yes.
11  Q   We took Dr. Frazier's deposition last week. And
12  I'll represent to you that he testified that he spoke with
13  you and that he faxed the request for accommodation form to
14  Christiana Care on August 11th of 2003. Do you have any
15  knowledge of whether or not Christiana Care received that
16  document?
17  A   Only in the fact of the document that I previously
18  saw.
19  Q   Do you have any understanding whether or not, as of
20  August 13th, 2003, whether Christiana Care had received the
21  accommodation form?
22  A   On August 13th, I do not believe that I knew whether
23  they had or had not.
24  Q   Did you contact Employee Health to find out whether

Page 72

1   they had the form, had received the form?
2   A   I do not remember.
3   Q   When you talked with Dr. Frazier, did he tell you he
4   was going to fax the form?
5   A   I don't remember.
6   Q   Take a look at the second page of Ekbladh 14. That
7   one right there. In the last sentence, you write, at the
8   end of the conversation, he stated that his written report
9   would be faxed to us.
10  A   Apparently he did tell me.
11  Q   So he told you that after August 11th that he would
12  fax the form to you, or fax the form to us?
13  A   To the number, yes.
14  Q   Is it fair to say that the request for accommodation
15  form may have been faxed to Employee Health in or around
16  August 11th?
17  A   I believe so.
18  Q   Back to this one. It's 13. At the bottom of the
19  second note, the note dated August 13th, 2003. It says, I
20  expressed to her that she first needs to totally accept the
21  fact that she is repeating the second year and that, until
22  she does so, with or without help, the amount of stress she
23  feels will not disappear.
24        Okay. As of August 13, 2003, she was going to

Page 73

1   be repeating her second year, is that correct?
2   A   She was repeating her second year.
3   Q   She was in her second year?
4   A   Yes.
5   Q   And that's because it starts in July?
6   A   That is correct.
7         MS. BREWINGTON: This we're going to have
8   marked as 15.
9         (Ekbladh Deposition Exhibit No. 15 was marked
10  for identification.)
11  BY MS. BREWINGTON:
12  Q   I have just placed in front of you what has
13  previously been marked as Ekbladh 15. It's another e-mail.
14  It's from Dr. Zechman to Sandi Kardos. And you're cc'd on
15  it. And it's dated 8/11/2003. And the subject is gyn
16  rotation.
17        Do you recall receiving this e-mail?
18  A   I believe I do.
19  Q   Do you know whether or not you responded to this
20  e-mail?
21  A   I do not recall whether I responded or not.
22  Q   Do you know whether Sandy responded to this e-mail?
23  A   I don't know.
24  Q   Did you have any discussion with anyone concerning

Zechman                                    v.                    Christiana Care Health Systems
Lamar Ekbladh, M.D.                C.A. # 05-159 (JJF)                        August 2, 2006

Page 74

1    what Dr. Zechman brought to your attention?
2        A    I do not recall.
3        Q    Now, was it a concern to you that she wasn't listed
4    on the board for cases?
5            MR. BLOOM:  Objection to the form of the
6    question.  It assumes a fact to be true, which may not be
7    true.  But subject to that, you can answer the question.
8            THE WITNESS:  On any given day, the number of
9    cases that are available upon which the residents may
10   participate varies.  On any given day, not every resident
11   gets a case to do.  So on any given day, if a resident is
12   not assigned to a case, that would not be a major concern.
13   BY MS. BREWINGTON:
14       Q    And the assignment board, does that just give the
15   cases for that day?
16       A    That is correct.
17       Q    So this would have been the date of August 11th,
18   2003?
19       A    If the date on the e-mail is the same as the date
20   she is talking about looking at the board, yes.
21       Q    Dr. Zechman's last sentence on here is actually a
22   question.  How am I supposed to improve my skills without
23   any cases.
24            Is it a fair statement that these surgical

Page 75

1    cases are necessary to improve the skills?
2        A    Repetition for technical skills is important.
3        Q    And this would include being assigned cases?
4        A    Yes.
5            (Ekbladh Deposition Exhibit No. 16 was marked
6    for identification.)
7    BY MS. BREWINGTON:
8        Q    I have just placed in front of you Ekbladh 16.  It's
9    another Residency Review Committee meeting minutes, I
10   believe.  It's dated August 18, 2003.
11           I just want you to take a look at it and let me
12   know when you're finished.  Okay?
13       A    Um-hmm.
14       Q    At this meeting on August 18, 2003, a special
15   meeting or a special invitation was given to faculty members
16   involved in training Dr. Zechman.
17           Do you know whether or not these doctors
18   attended?
19       A    They apparently did.
20       Q    You said apparently.  Is that because they were
21   invited?
22       A    They were invited and they were not excused.
23       Q    Okay.  So Dr. Hoffman, Dr. Patruno and Dr. Ostrum
24   attended this August 18th, 2003 meeting?

Page 76

1        A    Yes.
2        Q    At the bottom of the first page, not all the way to
3    the bottom, but it lists some concerns about Dr. Zechman.
4    And the first one is learning ability.  Do you see where it
5    says that?
6        A    Yes.
7        Q    Can you tell me what is meant by that?
8        A    That would most likely apply to her ability to
9    acquire and process knowledge.
10       Q    So were members of the committee concerned that she
11   may have some sort of cognitive deficit?
12       A    I don't remember if that was specifically discussed.
13       Q    Why did the committee feel that she may have a
14   learning ability problem?
15       A    I don't know specifically.
16       Q    Do you know anything?
17       A    I'm sorry?
18       Q    Do you know anything as to why the Residency Review
19   Committee would feel that way?
20       A    Since there is a composite of many people's input, I
21   don't remember specifically what prompted that concern.
22       Q    What was the plan of action with respect to the
23   committee's concern that she may have some concern with
24   learning?

Page 77

1        A    I don't remember.  There is none specifically noted.
2        Q    Well, based on my review of this document, it is
3    actually the second page, almost towards the middle, it
4    says, must get learning ability test.
5        A    I'm sorry.  I skipped over that part.
6        Q    Okay.  So is it fair to say that the committee, as
7    of August 2003, wanted Dr. Zechman to take a learning
8    ability test?
9        A    It would be offered to her.
10       Q    Okay.  Do you know whether it was ever offered to
11   her?
12       A    I believe it was.
13       Q    Who would have offered it to her?
14       A    It would have been myself.
15       Q    So you offered her a learning ability test?
16       A    I believe we did.
17       Q    Do you recall when you offered her a learning
18   ability test?
19       A    I do not recall.
20       Q    Did she accept your offer?
21       A    No.
22       Q    Why?
23       A    I do not recall.
24       Q    Do you recall her responding in any way to your —

A-270

20 (Pages 74 to 77)

Zechman
Lamar Ekbladh, M.D.

v.

C.A. # 05-159 (JJF)

Christiana Care Health Systems
August 2, 2006

Page 78

1   A   I don't recall.

2   Q   As of this August 18th, 2003 meeting, would it be

3   fair to say that the committee decided to continue her

4   probation with the special PGY2 rotation?

5   A   Yes.

6   Q   So as of the August 18th, 2003 meeting, would it

7   also be fair to say that there wasn't a decision to

8   terminate her at that point?

9   A   That is correct.

10   Q   When we go back to the learning ability test and you

11   indicated that you offered that to her, what type of testing

12   were you offering?

13   A   Specifically, we have people within the medical

14   center that if people accept this will talk to them about

15   what their needs are and arrange testing as appropriate.

16   Q   So is it fair to say there were no specifics on what

17   she was going to be tested on?

18   A   That is correct.

19   Q   It was also discussed in this meeting of August 2003

20   that Dr. Zechman had started the process of ADA; is that

21   accurate?

22   A   That is accurate.

23   Q   Her specific illness was also discussed in this

24   meeting as it indicates connective tissue disease?

Page 79

1   A   Um-hmm.

2   Q   Why was there a discussion about her particular

3   illness?

4   A   Why was there a discussion?

5   Q   Um-hmm.

6   A   Because a response to special rotations and so forth

7   may be forthcoming to the RRC so they are aware because our

8   internal Residency Review Committee would keep them aware of

9   modifications in residents' schedules and how call is set up

10   and so forth.

11   Q   Take a look at where it says -- it's in the last

12   paragraph before the ACGME letter paragraph.

13   A   Um-hmm.

14   Q   And it's the second sentence there and it says, she

15   went on 8/8/03 to her doctor in North Carolina to have him

16   fill out the paperwork.  To date, nothing has been received.

17        Is that an accurate statement?

18   A   Apparently at that time, we, me as a department, had

19   not received anything as far as paperwork.

20   Q   But as far as Christiana Care, is that an accurate

21   statement?

22   A   They may have.  We had not at that time.

23        MS. BREWINGTON:  Off the record.

24        (Discussion held off the record.)

Page 80

1        (A brief recess was taken.)

2        MS. BREWINGTON:  Back on the record.

3        (Ekbladh Deposition Exhibit No. 17 was marked

4   for identification.)

5   BY MS. BREWINGTON:

6   Q   Take a look at the document that's in front of you.

7   It's been previously marked as Ekbladh 17.  It's dated

8   August 20th, 2003.  And it's a letter from you to

9   Dr. Zechman.

10        I want to call your attention to the second

11   paragraph of this e-mail.  Okay.  It indicates the committee

12   has recommended that you currently remain on the GYN service

13   in the same status as a second year resident with your

14   future rotations to be decided once it is clear what

15   accommodations must be made for your disability.

16        Is it fair to say that, as of August 20th,

17   2003, Dr. Zechman was in her second year rotation and she

18   was like currently repeating it?

19   A   Yes.

20   Q   And the intent at that time was for her to continue

21   repeating her second year rotation?

22   A   Yes.

23   Q   It also says that we are currently awaiting the

24   final report from Dr. Frazier.

Page 81

1        Would it be fair to say that, as of August

2   20th, 2003, Dr. Zechman's schedule had not been altered in

3   any way?

4        MR. BLOOM:  Objection to the form.

5        THE WITNESS:  Her formal on call schedule had

6   not been changed in any way.

7   BY MS. BREWINGTON:

8   Q   So is it fair to say that she was working the same

9   schedule or similar schedule to the other residents in the

10   program?

11   A   Yes.

12   Q   And that her disability had not altered her schedule

13   in any way?

14   A   At this point, it had not, no.

15        (Ekbladh Deposition Exhibit No. 18 was marked

16   for identification.)

17   BY MS. BREWINGTON:

18   Q   This is a letter from you to Dr. Zechman and it's

19   dated September 4th, 2003.  And we have had this marked as

20   Ekbladh 18.

21        This letter provided Dr. Zechman with her

22   upcoming schedule, is that correct?

23   A   Yes.

24   Q   And it provides a schedule beginning the week of

A-271

21 (Pages 78 to 81)

Zechman                                                v.                    Christiana Care Health Systems
Lamar Ekbladh, M.D.                        C.A. # 05-159 (JJF)                              August 2, 2006

Page 82

1   9/8/03 and continuing through November 17th of 2003, is that
2   correct?
3      A   That's correct.
4      Q   Is it fair to say that, as of September 4th, 2003,
5   the plan for Dr. Zechman was to continue as a PGY2 in the
6   same rotation?
7      A   I'm sorry.  When you say in the same rotation.  The
8   rotations as described here?
9      Q   Let me reask the question.  I understand what you're
10  saying.
11      Was it the plan as of September 4th, 2003, to
12  continue Dr. Zechman as a PGY2 with a special program?
13         MR. BLOOM: Objection to the form.  You can
14  answer it.
15         THE WITNESS: Yes.  Since this is special as
16  compared to the other residents' rotations, yes.
17  BY MS. BREWINGTON:
18      Q   Okay.  Thank you.
19         You also indicate in the last paragraph, we
20  have still not received a written reply from Dr. Frazier in
21  spite of numerous requests.
22         Who made numerous requests?
23      A   I suspect that we did probably through Sandy,
24  although I don't remember who made the requests.

Page 83

1      Q   Did you?
2      A   I don't remember specifically.
3      Q   And do you know to whom the requests were made?
4      A   I do not know specifically.  I would suspect to the
5   office of Dr. Frazier.
6      Q   And at this point, September 4th, 2003, you yourself
7   had already spoken to Dr. Ekbladh who indicated that she
8   needed time off for her disability?
9      A   I spoke to Dr. Frazier, yes.
10      Q   I'm sorry.  You spoke with Dr. Frazier.  Okay.
11      A   Yes.
12         (Ekbladh Deposition Exhibit No. 19 was marked
13  for identification.)
14  BY MS. BREWINGTON:
15      Q   I have just placed in front of you Ekbladh 19.  And
16  it is a document entitled, Christiana Care Health Services,
17  Department of Obstetrics and Gynecology, Resident Review
18  Committee, September 29th, 2003.
19         And these are the minutes from the September
20  29th, 2003 Residency Review Committee meeting, correct?
21      A   Yes.
22      Q   And you were in attendance at this meeting?
23      A   Yes.
24      Q   And it was determined at the September 29th meeting

Page 84

1   that Dr. Zechman would be dismissed from the program.  Is
2   that accurate?
3      A   That is correct.
4      Q   And why is that?
5      A   For the reasons listed in the minutes here.
6      Q   Do you have any recollection of why Dr. Zechman was
7   terminated from the program?
8      A   Because we felt at this time that she was not
9   progressing.  We felt that an appropriate fashion that would
10  allow her to complete the program overall in a satisfactory
11  fashion.
12      Q   Okay.  Well, let me take you back to what we have
13  previously marked as Ekbladh 18.  And in Ekbladh 18,
14  Dr. Zechman was to continue as a PGY2.
15         What changed between September 4th, 2003, and
16  September 29th, 2003?
17      A   What changed?  The change did not occur just between
18  September 4th and September 29th.  This was a reorganization
19  of her schedule because her initial special schedule ended
20  at this time.  So we had to, you know, continue a schedule
21  for her.  The reason for dismissal was an accumulation of
22  all the data.
23      Q   Okay.  But at the previous Resident Review Committee
24  meeting of August 18th, the plan was for her to continue as

Page 85

1   a PGY2?
2      A   Yes.
3      Q   So my question is, what changed between August 18th
4   and September 29th for you to decide to end her program?
5      A   In that period of time -- in the August meeting, it
6   was felt that there was concern about her not progressing
7   appropriately.  But our original plan had been to reevaluate
8   in three months.  And that was an interim evaluation to see
9   progress.  And little, if any, progress had been made.  That
10  was confirmed at the next meeting and it was felt that there
11  hadn't been anything at all between those two meetings and
12  that termination should follow.
13      Q   Do you know whether or not Dr. Zechman was tested
14  for any learning disabilities prior to September 29th?
15      A   I do not believe that she was.
16      Q   And is it fair to say that Dr. Zechman was dismissed
17  from the program for, quote, academic reasons?
18      A   Yes.
19      Q   And it also indicates in the September 29th
20  Residency Review Committee meeting that it was majority
21  approval with two abstained.  Who were the two that
22  approval?
23      A   I do not recall.  We don't keep specific vote
24  records.

A-272

22 (Pages 82 to 85)

Zechman                                    v.                    Christiana Care Health Systems
Lamar Ekbladh, M.D.              C.A. # 05-159 (JJF)                        August 2, 2006

Page 86

1  Q  Dr. Kaminski, we deposed him a few weeks back and he
2  testified that he was one of the ones that abstained.  Does
3  that refresh your recollection at all?
4  A  I would not have known that.
5      (Ekbladh Deposition Exhibit No. 20 was marked
6  for identification.)
7  BY MS. BREWINGTON:
8  Q  Take a look at this document we have previously
9  marked as Ekbladh 20.  It's an e-mail to Dr. Zechman.
10  Actually, it's a memo.  I'm sorry.  To Dr. Zechman from you
11  dated September 16th, 2003.  And it's regarding request for
12  family/medical leave.
13     The first sentence indicates, it has been
14  brought to our attention that you may need to take periods
15  of intermittent leave.
16     Is it fair to say that it was brought to your
17  attention that she may need to take intermittent leave as
18  early as July 2003?
19  A  Yes.
20  Q  Why did you then wait to send the e-mail until
21  September 16th, 2003?
22  A  Because I became aware that, if it was going to
23  become a formal process of intermittent leave, we needed to
24  have FMLA -- I don't know what it's called -- approvable

Page 87

1  eligibility and so forth documented.
2  Q  When did you become aware of that?
3  A  Apparently around this time.
4  Q  And who made you aware of that?
5  A  I believe it was our personnel, human resources.
6  Q  Did you talk to them about Dr. Zechman?
7  A  I believe I did.
8  Q  Okay.  Did you talk with Dr. Zechman about her leave
9  around this time?
10  A  I'm going to say I will make an assumption that I
11  did.  I have no specific recollection.
12  Q  Okay.  And is that because, when you send memos, you
13  usually talk with the resident?
14  A  Most of the time, I do, yes.
15  Q  Do you recall Dr. Zechman saying to you that she had
16  already submitted medical documentation?
17  A  I don't recall.
18  Q  And at the time that you sent this memo on September
19  16, 2003, were you aware of whether or not she had already
20  sent documentation to Christiana Care?
21  A  I don't recall.
22  Q  When I say documentation, I mean a request for an
23  accommodation?
24  A  Yes.  I don't recall.

Page 88

1      (Ekbladh Deposition Exhibit No. 21 was marked
2  for identification.)
3  BY MS. BREWINGTON:
4  Q  I just placed in front of you Ekbladh 21.  It's
5  dated September 30th, 2003, and it's a letter from you to
6  Dr. Zechman.
7  A  Yes.
8  Q  Why don't you tell me what this document is?
9  A  This is the document informing Dr. Zechman of the
10  decision of the Residency Review Committee.
11  Q  That she was terminated from the program for
12  academic reasons?
13  A  Yes.
14  Q  Who notified Dr. Zechman that she would be
15  terminated from the program?
16  A  I did.
17  Q  And how did you notify her?  Did you call her on the
18  phone or did you meet with her?
19  A  I don't remember.
20  Q  Do you recall any response that Dr. Zechman may have
21  given to you?
22  A  Specifically, no.
23  Q  In general, anything?
24  A  I would suspect that she, since a fair hearing

Page 89

1  process was set up, that she requested a fair hearing
2  process.
3      (Ekbladh Deposition Exhibit No. 22 was marked
4  for identification.)
5  BY MS. BREWINGTON:
6  Q  I just placed in front of you what's been previously
7  marked as Ekbladh 22.  And it's dated October 6, 2003.  Is
8  this the day that you met with her to discuss her
9  termination?
10  A  Apparently it is, yes.
11  Q  And this is also the day that you discussed the fair
12  hearing process?
13  A  Yes.
14  Q  Did you discourage her in any way from pursuing a
15  fair hearing process?
16  A  Not to my knowledge, no.
17  Q  I understand that you met with her on October 6,
18  2003, to discuss the termination.  Was she already aware
19  that she was terminated at this point?
20  A  I believe she was.
21  Q  Okay.  Do you recall how she became aware of the
22  termination?
23  A  I'm not totally aware.  That was probably by letter.
24  Q  That's fine.

A-273

Wilcox & Fetzer, Ltd.              Professional Court Reporters
                                                              (302)655-0477

Zechman                                    v.                    Christiana Care Health Systems
Lamar Ekbladh, M.D.              C.A. # 05-159 (JJF)                          August 2, 2006

Page 90

1          (Ekbladh Deposition Exhibit No. 23 was
2    marked for identification.)
3    BY MS. BREWINGTON:
4        Q    I believe that's Ekbladh 23. Okay. Have you ever
5    seen this document before?
6        A    As supplied to me recently, yes.
7        Q    Do you know whether or not this form was faxed to
8    your office?
9        A    I do not recall it being faxed.
10       Q    These fax numbers at the bottom, are either of them
11   your fax number?
12       A    They are not.
13       Q    Do you know whose fax number they are?
14       A    I do not.
15           (Ekbladh Deposition Exhibit No. 24 was marked
16   for identification.)
17   BY MS. BREWINGTON:
18       Q    I have just placed in front of you what's previously
19   been marked as Ekbladh 24. It's a document from Employee
20   Health Services. And it indicates regarding FMLA
21   approval/denial. And it indicates on 10/3/03, we were
22   provided with a certification of health care provider form
23   for Ellen Hoffman Zechman. Following is a result of our
24   review. Approved for intermittent time including reduced

Page 91

1    work schedule and it was reviewed by Chris Collins and the
2    date is 10/6/03.
3           It's fair to say that the date of her approval
4    is after her termination; is that accurate?
5        A    Yes.
6        Q    Okay. And, actually, the date of the receipt of the
7    FMLA certification of health care provider is after her
8    termination; is that accurate?
9        A    Yes. I remember that date. This occurred after
10   that, yes.
11       Q    And for the record, he is pointing to the Employee
12   Health Services form that was sent and approved after she
13   was terminated; is that accurate?
14       A    Yes.
15       Q    Let me just make sure I don't have any other
16   questions.
17           Have you ever seen this document before?
18       A    This particular document? Only recently.
19       Q    Were you aware that Christiana Care approved her
20   intermittent time off?
21       A    Not until I saw this document.
22           MS. BREWINGTON: I don't have anything further.
23   Thank you for your time.
24           MR. BLOOM: Okay. I may or may not have a

Page 92

1    couple of quick follow-ups. Can we take a five minute
2    break?
3           MS. BREWINGTON: Okay.
4           MR. BLOOM: Okay. Back on the record.
5              EXAMINATION
6    BY MR. BLOOM:
7        Q    Dr. Ekbladh, I'm just going to put back in front of
8    you what was previously marked as Ekbladh 4. And I'll just
9    direct your attention to the entry regarding Dr. Zechman and
10   the decision to have her repeat her second year of residency
11   program.
12           Do you see that entry?
13       A    Yes, I do. 6.3?
14       Q    Yes.
15           And there is a note in that box that
16   Dr. Zechman would be re-reviewed at three and six months.
17   Do you see that?
18       A    Yes.
19       Q    Was there any guarantee that Dr. Zechman would
20   remain in the program for that next six months?
21       A    No.
22       Q    And I take it you were aware that, even prior to
23   this meeting, there had already been a vote on the committee
24   as to whether or not to terminate Dr. Zechman's residency?

Page 93

1        A    Yes.
2        Q    Did there ever come a time at which the option of
3    terminating Dr. Zechman's residency was an option that was
4    taken off the table?
5        A    No, there was not.
6        Q    Okay. You can put that aside. Thank you.
7           And I'm just going to direct your attention to
8    what was previously marked as Exhibits Ekbladh 23 and 24.
9    And these are a health care certification and also a form
10   from Employee Health Services at Christiana Care
11   respectively.
12           Did you receive or see either of these two
13   documents at the time they were generated in 2003?
14       A    No, I did not.
15       Q    As we sit here today on August 2nd, 2006, can you
16   approximate the period of time during which you first saw
17   these two documents?
18       A    It was within the past month or two.
19           MR. BLOOM: I have nothing else.
20           MS. BREWINGTON: Okay.
21              EXAMINATION
22   BY MS. BREWINGTON:
23       Q    Dr. Ekbladh, we just went off the record for five
24   minutes. And my question to you is, did you have any

A-274

24 (Pages 90 to 93)

Zechman
Lamar Ekbladh, M.D.

v.

C.A. # 05-159 (JJF)

Christiana Care Health Systems
August 2, 2006

Page 94

1  discussions with Mr. Bloom at that time?

2       MR. BLOOM:  You can answer that with a yes or

3  no answer.

4       THE WITNESS:  Yes.

5  BY MS. BREWINGTON:

6   Q   What was the content of your conversation with

7  Mr. Bloom?

8       MR. BLOOM:  I'm going to object and instruct

9  the witness not to answer.  He was off the stand.  Your

10  examination was complete.  I'm entitled to have privileged

11  communications with the client.

12      MS. BREWINGTON:  For the record, I am objecting

13  to your client not answering the question.  I said I had no

14  further questions and then you indicated that you may ask

15  some questions.  And that's on the record.

16      MR. BLOOM:  That's fine.

17      MS. BREWINGTON:  Okay.

18  BY MS. BREWINGTON:

19   Q   Did you review any documents during that time?

20      MR. BLOOM:  If you reviewed any documents other

21  than documents that I showed you, you can answer that

22  question.

23      THE WITNESS:  Only documents that I was shown

24  here.

Page 95

1  BY MS. BREWINGTON:

2   Q   And did you have discussions with Mr. Bloom

3  concerning the content of your deposition testimony during

4  that five minute break?

5       MR. BLOOM:  Hang on one second.

6       Can you read back that last question?

7       (The previous question was read back by the

8  court reporter.)

9       MR. BLOOM:  You can answer that.  You can

10  answer that with a yes or no.

11      THE WITNESS:  Yes.

12  BY MS. BREWINGTON:

13   Q   And what was the content of that conversation?

14      MR. BLOOM:  All right.  I'm going to object and

15  instruct the witness not to answer that.

16      MS. BREWINGTON:  I have no further questions.

17      MR. BLOOM:  Okay.

18      (Deposition concluded at 1:00 p.m.)

19

20

21

22

23

24

Page 96

1            I N D E X
2  DEPONENT: LAMAR EKBLADH, M.D.
3   Examination by Ms. Brewington            PAGE
    Examination by Mr. Blood              2
4   Examination by Ms. Brewington        92
5                                        93
6        E X H I B I T S
7
    EKBLADH DEPOSITION
8
9  NUMBER      DESCRIPTION        MARKED
10  1   EEO Survey Form            12
11  2   Christiana Care Health Services   16
        Department of Obstetrics and
12      Gynecology Resident Review
        Committee, October 28, 2002
13  3   Special Meeting, March 17, 2003   19
14  4   Christiana Care Health Services   24
        Department of Obstetrics and
15      Gynecology Resident Review
        Committee, June 16, 2003
16
17  5   Note: June 25, 2003            32
18  6   Request for Disability Accomodation  39
19  7   Letter dated July 23, 2003, to   41
        Dr. Ekbladh from Ellen Zechman, M.D.
20  8   Letter dated July 28, 2003, to   45
        Lamar Ekbladh, M.D., from Marsha
21      A. Miller
22  9   E-mail from Ellen H. Zechman sent   53
        July 28, 2003, to Lamar Ekbladh, M.D.
23
24  10  E-mail to Lamar Ekbladh, M.D. from   58
        Sandra L. Kardos

Page 97

1         E X H I B I T S
2
3   EKBLADH DEPOSITION
4   NUMBER      DESCRIPTION        MARKED
5  11  Memo dated July 30, 2003, RE:   59
        Ellen Zechman, M.D.
6
7  12  E-mail from Ellen H. Zechman   62
        sent August 1, 2003, to Lamar
8       Ekbladh
9  13  File Note - August 7, 2003     67
10  14  Handwritten notes from telephone   68
        call with Dr. David Frazier -
11      August 11, 2003 (1:45 p.m.)
12  15  Memo from Ellen H. Zechman to   73
        Sandra L. Kardos dated 8/11/2003
13  16  Christiana Care Health Services   75
        Department of Obstetrics and
14      Gynecology, Resident Review
        Committee, August 18, 2003
15
16  17  Letter dated August 20, 2003, to   80
        Ellen Zechman, M.D., from Lamar
17      Ekbladh, M.D.
18  18  Letter dated September 4, 2003,   81
        to Ellen Zechman, M.D., from
19      Lamar Ekbladh, M.D.
20  19  Christiana Care Health Services   83
        Department of Obstetrics and
21      Gynecology, Resident Review
        Committee, September 29, 2003
22  20  Memo to Ellen Zechman, M.D., from   86
        Lamar Ekbladh, M.D., dated September
23      16, 2003
24

A-275

Wilcox & Fetzer, Ltd.        Professional Court Reporters        (302)655-0477



Zechman                                    v.              Christiana Care Health Systems
Lamar Ekbladh, M.D.          C.A. # 05-159 (JJF)                      August 2, 2006

Page 98

```
1              E X H I B I T S
2
          EKBLADH DEPOSITION
3
     NUMBER         DESCRIPTION          MARKED
4
     21   Letter dated September 30, 2003,      88
5         to Ellen Zechman, M.D., from
          Lamar Ekbladh, M.D.
6
     22   Handwritten noted dated October       89
7         6, 2003, To Whom It May Concern
          from Lamar Ekbladh
8
     23   Certificate of Health Care            90
9         Provider with Confidential Fax
          Cover Sheet
10
     24   Memo from Employee Health Services    90
11        to Academic Affairs
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 100

```
1    State of Delaware )
                      )
2    New Castle County )
3
4              CERTIFICATE OF REPORTER
5
6         I, Allen S. Blank, Registered Merit Reporter and
     Notary Public, do hereby certify that there came before me
7    on the 2nd day of August, 2006, the deponent herein, LAMAR
     EKBLADH, M.D., who was duly sworn by me and thereafter
8    examined by counsel for the respective parties; that the
     questions asked of said deponent and the answers given were
9    taken down by me in Stenotype notes and thereafter
     transcribed by use of computer-aided transcription and
10   computer printer under my direction.

11        I further certify that the foregoing is a true and
     correct transcript of the testimony given at said
12   examination of said witness.

13        I further certify that I am not counsel, attorney,
     or relative of either party, or otherwise interested in the
14   event of this suit.
15
16
17            Allen S. Blank, RMR
              Certification No. 103-RPR
18            (Expires January 31, 2008)
19
     DATED:  August 4, 2006
20
21
22
23
24
```

Page 99

```
1
2
3         REPLACE THIS PAGE
4         WITH THE ERRATA SHEET
5         AFTER IT HAS BEEN
6         COMPLETED AND SIGNED
7         BY THE DEPONENT.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

A-276

26 (Pages 98 to 100)

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ELLEN ZECHMAN,                          )
                                        )
                    Plaintiff,          )
                                        )    Civil Action
          v.                            )    No. 05-159
                                        )       (JJF)
CHRISTIANA CARE HEALTH SYSTEMS,         )
                                        )
                    Defendant.          )


          Deposition of ANTHONY C. SCISCIONE, D.O.,
taken pursuant to notice at the law offices of
Margolis Edelstein, 1509 Gilpin Avenue, Wilmington,
Delaware, beginning at 3:00 p.m. on Thursday,
September 7, 2006, before Kathleen White Palmer,
Registered Merit Reporter and Notary Public.


APPEARANCES:

          LORI BREWINGTON, ESQUIRE
          MARGOLIS EDELSTEIN
            1509 Gilpin Avenue
            Wilmington, Delaware  19899
            for the Plaintiff

          KENDRA L. BAISINGER, ESQUIRE
          MORGAN LEWIS & BOCKIUS LLP
            1701 Market Street
            Philadelphia, Pennsylvania 19103
            for the Defendant

-------------------------------------------------------

          WILCOX & FETZER, LTD.
  1330 King Street - Wilmington, Delaware 19801
                (302) 655-0477
                www.wilfet.com
                    A-277

Zechman
Anthony C. Sciscione, D.O.

v.

C.A. # 05-159 (JJF)

Christiana Care Heath Systems
September 7, 2006

Page 2

1     ANTHONY C. SCISCIONE, D.O.,
2     the witness herein, having first been
3     duly sworn on oath, was examined and
4     testified as follows:
5     BY MS. BREWINGTON:
6     Q.   Good afternoon, Dr. Sciscione.
7     A.   Hi.
8     Q.   My name is Lori Brewington and I'm here to take
9     your deposition today.
10    A.   What's your last name?
11    Q.   Brewington.
12    A.   Okay. I'll remember that. Thanks.
13    Q.   Great. I'm sure you have testified at a
14    deposition before?
15    A.   Yes, ma'am.
16    Q.   I'm just going to ask you a series of
17    questions. The one rule that we need to have is that
18    you don't answer the question while I'm speaking and I
19    won't ask you a question if you're not finished saying
20    your answer. Okay? We have a court reporter here who
21    will be taking down your responses to the questions.
22    At times Christiana Care's attorney may object and
23    that's entirely proper. The only thing that I ask is
24    that you go ahead and answer the question unless she

Page 3

1     specifically advises you not to answer the question.
2         Do you understand?
3     A.   Fair enough.
4     Q.   Why don't we begin by you stating your full
5     name for me.
6     A.   Anthony Sciscione.
7     Q.   If you could spell your last name...
8     A.   S-c-i-s-c-i-o-n-e.
9     Q.   Did you do anything in preparation for your
10    deposition testimony today?
11    A.   I read briefly through some of the — I guess
12    some of the papers and communications that went back
13    and forth between Dr. Zechman and myself.
14    Q.   Before you continue, did you review them with
15    your attorney?
16        MS. BAISINGER: Yes.
17    A.   Yes.
18    Q.   That's fine.
19        Let's begin by telling me a little bit
20    about your educational background. Okay?
21    Specifically, where did you attend medical school?
22    A.   I went to medical school at the University of
23    New England.
24    Q.   Is that where you did your residency program,

Page 4

1     as well?
2     A.   No. I did my residency program at the Medical
3     Center of Delaware.
4     Q.   What did you do after your residency program?
5     A.   I did a fellowship in maternal-fetal medicine.
6     Q.   When was that?
7     A.   '92 to '94.
8     Q.   Are you board certified?
9     A.   Yes, ma'am.
10    Q.   In what specialty?
11    A.   Obstetrics and gynecology and maternal-fetal
12    medicine.
13    Q.   When did you begin working at Christiana Care?
14    A.   1994.
15    Q.   As I understand it, you are working there again
16    now?
17    A.   Correct.
18    Q.   Take me through your work experience at
19    Christiana Care with respect to like when you started,
20    what you did while you were there, when you left and
21    when you came back.
22    A.   How exhaustive — I mean, you don't want me to
23    tell you every time I walked in and out of the
24    building.

Page 5

1     Q.   No.
2     A.   You want me to —
3     Q.   At some point, as I understand it, your
4     employment ended with Christiana Care; is that
5     correct?
6     A.   Correct. In 2002, I believe.
7     Q.   So you started —
8     A.   Or 2003. I can't remember. One or the other.
9     Q.   2002 or 2003?
10    A.   Yes.
11    Q.   So you started in 1994?
12    A.   Correct.
13    Q.   What was your job title at that time?
14    A.   Faculty maternal-fetal medicine and director of
15    research.
16    Q.   Did your title change any time between 1994 and
17    2002-2003?
18    A.   It must have been 2003, to be more clear. It
19    had to be 2003 when I left, July of 2003.
20    Q.   Okay.
21    A.   At any rate, I became associate residency
22    director.
23    Q.   When was that?
24    A.   I don't remember.

A-278

Zechman
Anthony C. Sciscione, D.O.

v.
C.A. # 05-159 (JJF)

Christiana Care Heath Systems
September 7, 2006

Page 6

1    Q.   Okay.

2    A.   And then I became residency director in 2002.

3    Q.   Why did you leave Christiana Care?

4    A.   I had another position as director of

5    maternal-fetal medicine at Drexel University.

6    Q.   Why did you decide to return to

7    Christiana Care?

8    A.   To be residency director and director of

9    maternal-fetal medicine.

10    Q.   Was there a reason why you wanted to leave

11    Drexel and go back to Christiana Care?

12    A.   I thought this was a neat opportunity, plus my

13    chair left at Drexel.

14    Q.   Now, as I understand it, Dr. Ekbladh was acting

15    director of the program, or no?

16    A.   I do not know the answer to that question.

17    Q.   Do you have an understanding of what his role

18    was at all?

19    A.   Not specifically.

20    Q.   Do you know generally?

21    A.   Generally.

22    Q.   Do you know who he is?

23    A.   I know who he is.

24    Q.   Have you ever worked with him?

Page 7

1    A.   Sure. He was my chair. But when it comes to

2    the residency, after I left, I really don't know what

3    he did.

4    Q.   Okay.

5    A.   I mean what his title was.

6    Q.   But is he there now?

7    A.   Yes.

8    Q.   Does he have a title now?

9    A.   He's chair of the department.

10    Q.   Oh, he is chair of the department.

11        Dr. Zechman was a resident in the

12    Christiana Care program, I believe, from June of 2002

13    through September of 2003. Am I correct that you were

14    the director of the residency program in the beginning

15    of a residency through at least July of 2003?

16    A.   Correct.

17    Q.   Do you recall when you first met Dr. Zechman?

18    A.   I believe I first met her on her interview.

19    Q.   Tell me about that interview.

20    A.   I can't remember specifics. I just remember

21    generalities about meeting her. There was other

22    candidates for a position that was open in our program

23    and we decided on taking Dr. Zechman.

24    Q.   So she came to your office and met with you and

Page 8

1    interviewed with you?

2    A.   I don't remember those specifics. I

3    interviewed with her, correct. Whether it was my

4    office or not, I'm not sure.

5    Q.   Was there more than one person that interviewed

6    Dr. Zechman that day?

7    A.   I'm sure there's more than one.

8    Q.   Because that's the procedure; is that correct?

9    A.   Yes.

10    Q.   You said that she was chosen among other

11    candidates for that position?

12    A.   I believe we had other candidates.

13    Q.   Do you know why you chose Dr. Zechman over the

14    other candidates?

15    A.   I can't say specifically.

16    Q.   Can you say anything?

17    A.   I think generally --

18        (Interruption.)

19    A.   Sorry about that.

20    BY MS. BREWINGTON:

21    Q.   That's fine.

22    A.   I think generally we thought she came from a

23    very good medical school. She was very affable on her

24    interview. She seemed eager. That's what I remember.

Page 9

1    Q.   You talked about her previous medical school.

2    What was your understanding of her medical background

3    at that time that you were interviewing her?

4    A.   I can't recall exactly what -- what -- what I

5    was told or what I knew.

6    Q.   As you sit here today, do you have an

7    understanding of Dr. Zechman's medical background

8    prior to coming into Christiana Care's program?

9    A.   A general understanding, but not the specifics.

10    I probably had a much better understanding at the

11    time.

12    Q.   That's understandable. Tell me what you can

13    remember now.

14    A.   I remember that she was in another program, and

15    I want to say it was a family practice, OB -- it

16    was -- I don't remember the specifics, so I shouldn't

17    say. And I remember at some point she trained in

18    pathology. That's what I remember.

19    Q.   Do you have an understanding of the surgical

20    experience that she had at her previous program?

21    A.   You mean as I sit here today or back when I met

22    her?

23    Q.   As you sit here today.

24    A.   No. I probably had a very good handle on it

A-279

Zechman
Anthony C. Sciscione, D.O.
v.
C.A. # 05-159 (JJF)
Christiana Care Heath Systems
September 7, 2006

Page 10

1  when I met her.
2     Q.   When you met her.  But as you sit here today,
3  you don't recall?
4     A.   I don't recall specifics of her surgical
5  background, no.
6     Q.   Do you recall anything about her surgical
7  background as you sit here today?
8     A.   No.
9     Q.   Do you know whether you inquired as to her
10 surgical background when you hired her in 2002?
11    A.   Either I probably did or Dr. Kaminski did.
12 Dr. Kaminski was probably the residency director when
13 she interviewed would be my bet.
14    Q.   Is discussing someone's surgical skills or
15 medical knowledge something that you would do during
16 the interview process?
17    A.   Customarily, no.  Customarily, no, about
18 medical knowledge or surgical skills.
19    Q.   Where do you get that information?  Would that
20 be something like in terms of on their transcripts?
21    A.   Oh, her letters of recommendation.  I assume
22 she had letters of recommendation when she applied
23 from her previous program director.
24    Q.   How about the name of the school?  Would that

Page 11

1  tell you something about how much surgical experience
2  the individual had?
3     A.   It depends on the school.  Some I know very
4  well and some I don't know very well, so I depend -- I
5  always depend on the program director and the letters
6  of recommendation.
7     Q.   Did you talk with Dr. Zechman about her
8  surgical skills during the interview process?
9     A.   I don't recall.
10    Q.   What do you recall specifically or in general
11 about your interview with Dr. Zechman?
12    A.   Again, specifically, I don't -- I mean, it was
13 many years ago and I don't remember specifics.
14      Generally, I just remember that she was an
15 affable person who seemed eager to get started and
16 that was -- I thought those were two very good reasons
17 to hire her.
18      MS. BREWINGTON:  If I could have that
19 marked.
20      (Sciscione Exhibit 1 was marked for
21 identification.)
22 BY MS. BREWINGTON:
23    Q.   What I've just placed in front of you is what
24 we just had labeled Sciscione 1.  Okay?  I'll

Page 12

1  represent to you that it is a copy of a complaint in
2  this case.  I want you to take a look at specifically
3  paragraph 15 of the complaint.  Once you've had an
4  opportunity to read paragraph 15, let me know.
5     A.   (The witness reviews the document.)  Okay.
6     Q.   My first question about paragraph 15 of the
7  complaint is:  Do you recall after reading this
8  paragraph whether or not you had a conversation with
9  Dr. Zechman about how she was different than the other
10 residents?
11    A.   I don't believe that we ever -- I ever used the
12 word that she was different.
13    Q.   Do you know that for sure?
14    A.   To the best of my recollection, the first line
15 of this paragraph is not true.
16    Q.   The first line is:  "In or around August of
17 2002, Dr. Sciscione informed Plaintiff that various
18 teaching physicians 'did not like' Plaintiff because
19 she was 'different'."
20    A.   Correct.
21    Q.   Now, my question to you is, and I want to break
22 this down in two parts:  That you did not inform her
23 that these physicians did not like her, and are you
24 also saying that the physicians never said that?

Page 13

1     A.   I don't --
2     Q.   Do you see my question?
3     A.   Yes.  Let me be really clear about this,
4  Miss Brewington.
5     Q.   Okay.
6     A.   I don't believe I ever told Dr. Zechman that
7  someone didn't like her.
8     Q.   Now, did you have any knowledge of treating
9  physicians not liking Dr. Zechman?
10    A.   No, I wouldn't say that's true at all.
11    Q.   Dr. Zechman is alleging that this conversation
12 actually took place between you and herself.
13    A.   I see that.
14    Q.   My question is to you:  Do you have any
15 understanding of why she may consider this to have
16 taken place?  When I say "this," this conversation
17 between the two of you.
18      MS. BAISINGER:  Objection.  Speculation.
19      You can answer.
20    A.   I think that she is using the term "did not
21 like" -- I think she's confusing -- Miss Brewington,
22 when I spoke with her about did not like, which
23 really, I believe, is personal.  So if I say I don't
24 like Lori Brewington, that's personal, versus -- and

A-280

Wilcox & Fetzer, Ltd.
Professional Court Reporters
(302)655-0477

Zechman
Anthony C. Sciscione, D.O.

v.

C.A. # 05-159 (JJF)

Christiana Care Heath Systems
September 7, 2006

Page 14

1  I'm not saying this by any chance. You seem like an
2  excellent attorney. But me saying I don't think
3  you're a good attorney, that's not personal. That's
4  professional. I'm saying, geez, I don't think you're
5  a good attorney and you can interpret that as, well,
6  Tony Sciscione doesn't like me.
7    Q.  Okay.
8    A.  And I think that is what happened with
9  Dr. Zechman.
10   Q.  So is it fair to say that you did have a
11  conversation with her concerning the other treating
12  physicians, the teaching physicians?
13   A.  I think the most fair thing to say is that I
14  had multiple conversations about concerns over her
15  skills and her competency of as an
16  obstetrician/gynecologist.
17   Q.  How about this Rita Vinod?
18   A.  Vinod.
19   Q.  Vinod. Do you recall discussing Dr. Rita Vinod
20  with Dr. Zechman?
21   A.  No.
22   Q.  Was there any concern or difficulty with hiring
23  Dr. Vinod?
24   A.  No, not that I recall, no.

Page 15

1    Q.  Did the Residency Review Committee have any
2  concern about hiring Dr. Zechman?
3    A.  The residency review committee wasn't consulted
4  about hiring Dr. Zechman.
5    Q.  Who was consulted? What committee?
6    A.  It's no committee. It's based on interviews,
7  Miss Brewington. So what would happen is you would
8  meet -- just like in a law firm, you would meet all
9  the partners and they would decide whether you were a
10  good fit or you weren't a good fit. It's based on
11  four, maybe six hours' worth of information, letters
12  of recommendation, medical school transcripts.
13   Q.  Am I understanding that it's the interviewees
14  that make the decision?
15   A.  It's the interviewees that make the decision,
16  consensus decision. Ultimately the decision is left
17  up to the residency director, who probably at that
18  time was Dr. Kaminski.
19   Q.  So this decision to hire or fire does not go to
20  the committee? Is that what you are saying?
21   A.  I think we are getting confused.
22   Q.  Not hire or fire. I just mean to higher.
23   A.  Because fire is different.
24       Hire, no. This is very typical. And so we

Page 16

1  are totally clear on the subject, Miss Brewington --
2    Q.  Yes.
3    A.  -- this is the way we handle all of our medical
4  students who come in. This isn't just for Dr. Zechman
5  who came in for a postgraduate year 2 position.
6    Q.  Okay.
7    A.  They all come in for an interview. We review
8  their medical transcripts. They all have interviews
9  with the committee. We review their letters of
10  recommendation. We review a personal statement with
11  them. And it's very similar for every year.
12   Q.  You indicated they all have interviews with the
13  committee. Which committee?
14   A.  It's not a committee. It's a group of
15  interviewees, usually faculty. Interviewers, I'm
16  sorry, instead of interviewees.
17   Q.  So it's a group of faculty?
18   A.  Correct.
19   Q.  Not called a committee?
20   A.  No.
21   Q.  How many?
22   A.  I don't remember how many people Dr. Zechman
23  interviewed with.
24   Q.  How many generally in the process of --

Page 17

1    A.  It varies from situation to situation. On
2  average, it's, I would guess, somewhere between six
3  and eight faculty members.
4    Q.  What happens when there's a dispute, meaning
5  three people want to hire, three people don't? How is
6  that handled? Is it by vote? Is it majority?
7    A.  First of all, I should point out that it's a
8  rare event, surprisingly. Even as I say it, I think
9  it's surprising. But thinking about -- and I've been
10  in medical education for a long time, but it is a rare
11  event that people aren't on the same page. It's not
12  because we communicate with each other ahead of time.
13  It's more independently.
14       Actually, what more likely happens is
15  people are more neutral, and then there are other
16  folks who feel very strongly one way or the other. So
17  if there is -- in the unlikely occurrence that there
18  would be a split, ultimately it would be up to the
19  residency director.
20   Q.  At this time you were the residency director?
21   A.  No. I believe it was Dr. Kaminski when she was
22  interviewed. I was residency director when she
23  started working.
24   Q.  When was the interview? If she was hired in

A-281

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Zechman                                v.                    Christiana Care Heath Systems
Anthony C. Sciscione, D.O.        C.A. # 05-159 (JJF)              September 7, 2006

Page 18

1   June, would the interview be like a month or two
2   before that?
3       A.   I don't recall.
4       Q.   Do you recall Dr. Zechman asking you if the
5   teaching physicians didn't like her because of the way
6   she talked or anything like that?
7       A.   She may have said that. But again, I think
8   we're mixing up professional versus personal and I
9   think Dr. Zechman may have done that in this. Do not
10  like, I think, is strong. I think we are all here --
11  all of us are committed to graduating a competent
12  obstetrician/gynecologist, and it's our charge to do
13  that. And if that happens that someone doesn't
14  believe they are going to be a competent
15  obstetrician/gynecologist, that's a professional
16  decision, not a personal decision.
17          And to be perfectly clear, we've had
18  multiple residents from all over the country, really
19  all over the world, so the way someone speaks -- of
20  course, what I mean by that is the inflections in
21  their voice or accents. It has never, never come up
22  in my experience. Saying things that are
23  inappropriate, that's a different story.
24      Q.   How about her age, did you have a discussion

Page 19

1   with Dr. Zechman about her age?
2       A.   I don't think once did we discuss her age.
3       Q.   Take a look at allegation number 22 for me.
4       A.   (The witness reviews the document.) Okay.
5       Q.   Do you recall a conversation with Dr. Zechman
6   regarding a Dr. Rachel Heinle?
7       A.   We did have a discussion about this and I do
8   have an independent recollection of it.
9       Q.   Let me start, though, by asking you who Rachel
10  Heinle is.
11      A.   She would have been in her year, so she would
12  have been her colleague.
13      Q.   Dr. Zechman's?
14      A.   Yes.
15          And looking at the statement, if I can sort
16  of see where I think this is going, the first part or
17  the first sentence is correct, which is: "Also, in or
18  around October 2002" -- again, not remembering exactly
19  October 2002. That we can debate all day long. I
20  don't remember that, specifically.
21      Q.   Okay.
22      A.   -- "Plaintiff mentioned to Dr. Sciscione that
23  she was experiencing increasingly rude behavior toward
24  her from Dr. Rachel Heinle." I do remember having

Page 20

1   that conversation.
2          The last part I disagree with. I don't
3   believe I ever said that "'If anyone ever had it out
4   for you, it's Rachel Heinle.'"
5          MS. BAISINGER:  Could you just read that
6   sentence into the record showing that it's from --
7          MS. BREWINGTON:  Paragraph 22.
8          MS. BAISINGER:  Yes, that he was referring
9   to the words in paragraph 22.
10         MS. BREWINGTON:  Paragraph 22 indicates,
11  for the record: "Also, in or around October 2002,
12  Plaintiff mentioned to Dr. Sciscione that she was
13  experiencing increasingly rude behavior toward her
14  from Dr. Rachel Heinle."
15         And it's your position that you do recall
16  that part of paragraph 22?
17      A.   Correct.
18      Q.   That the conversation took place?
19      A.   We had that conversation.
20      Q.   Then it indicates in the complaint, paragraph
21  22: "Dr. Sciscione agreed with Plaintiff and told
22  her, 'if anyone ever had it out for you, it's Rachel
23  Heinle.'"
24         That part of section 22 did not occur?

Page 21

1       A.   I disagree with that, what Dr. Zechman is
2   alleging that I said.
3       Q.   Did the other residents have issues with
4   Dr. Zechman?
5       A.   The other residents or Rachel Heinle?
6       Q.   Well, my first question is the other residents.
7       A.   Okay.
8       Q.   Then we can go specifically as to who, if there
9   is anyone.
10         MS. BAISINGER:  Objection. Speculation.
11         You can answer.
12      A.   I think most of the issues surrounding
13  Dr. Zechman came from probably the chief class which
14  interact with second year residents and her own class.
15      Q.   Is Robyn Gray one of the members of the chief
16  class?
17      A.   She would have been the chief resident.
18      Q.   The other members of Dr. Zechman's class would
19  have been Kirifides?
20      A.   Kirifides, Kirsh, who is now Marshall, and
21  Heinle.
22      Q.   Why did you have that sense that there were
23  some issues there?
24      A.   We should be clear. It wasn't a sense. They

Zechman                                        v.                    Christiana Care Heath Systems
Anthony C. Sciscione, D.O.          C.A. # 05-159 (JJF)              September 7, 2006

Page 22

1  came to me and actually brought up issues about
2  Dr. Zechman's turnover to her of patients, that they
3  were incomplete. They weren't -- they weren't
4  accurate, that she often left things not done. That
5  was really the crux of their issues with her.
6        Dr. Heinle had little bit different issues
7  with her. I'll talk about that when you're ready.
8     Q.   Tell me about the different issues that
9  Dr. Heinle had with Dr. Zechman.
10    A.   Yeah. I'd be happy to. This was a real
11  interpersonal issue between the two of them. You
12  never having been a residency director, but you may
13  have led groups in the past I'm sure. You seem like a
14  very accomplished attorney.
15        You have to realize in a group that there's
16  always interpersonal issues. Just always. If you
17  have a big enough group, that's going to happen. And
18  with 16 residents, it's going to happen. Look, I have
19  issues with my brother and I love him. I mean, we
20  live together. It's just the way it goes.
21        Dr. Heinle, and let me give you some real
22  background into this because I think this is where
23  this came from. And it should be also clear that I
24  spoke to Dr. Heinle about this issue, too.

Page 23

1        Dr. Heinle was -- came from Temple Medical
2  School, top of her medical school class. Was our
3  absolute top recruit. Was probably the top recruit in
4  the area. She was what I would call a very high
5  performer. In other words --
6        MS. BREWINGTON:  Off the record for one
7  minute.
8        (Discussion off the record.)
9  BY MS. BREWINGTON:
10    Q.   I'm sorry.
11    A.   Rachel Heinle is -- I can tell you in Rachel's
12  life I would be willing to bet everything came pretty
13  easily to her. She probably performed well in school
14  her whole life. There is just some people that, and
15  I'm sure you've met them, information just goes very
16  easily into their brain for whatever reason and they
17  retain information very well. That's Rachel Heinle.
18  Rachel Heinle does well on tests. Rachel Heinle does
19  well on everything academic. She's just a neat, neat
20  person.
21        With that positive come some challenges,
22  and one of the challenges for Dr. Heinle that, you
23  know, I coached her through was she really had
24  difficulty with people who didn't perform up to her

Page 24

1  level. Like she expected everybody to do like her,
2  like to be like her. Like Lance Armstrong would
3  expect everybody to pedal a bike as fast as he can.
4  It just isn't going to happen.
5        And I think that was their issue. And I
6  think Dr. Heinle had that issue, not just with
7  Dr. Zechman, but with other residents that weren't --
8  that weren't, in her estimation, weren't pulling their
9  weight. They weren't moving as quick as her. They
10  weren't synthesizing data and coming to rapid, quick,
11  accurate decisions like she did.
12        My explanation always to her is that, you
13  know, everything is a bell curve. She's on this side
14  of the bell curve, so some folks are just in the
15  average or below average and she needs to understand
16  that she's not always going to interact with people
17  like her in her life, and that's really a
18  professionalism issue. And that was something I
19  needed to deal with as residency director.
20    Q.   So did she treat Dr. Zechman poorly?
21    A.   I wouldn't say poorly. What I would say is
22  that at times she was more short with Dr. Zechman.
23  And I think that if you asked Dr. Zechman, she would
24  say, yes, she was short with her.

Page 25

1        Now, Dr. Zechman is a very sensitive
2  person, and when someone is short with you, that can
3  make you not feel good. There's some folks who have,
4  I'm sure you've heard the term, have very thick skin.
5  That was not Dr. Zechman.
6        But on the other hand, it should be clear I
7  spoke to Dr. Heinle about that behavior, as well,
8  because I didn't think it was proper.
9     Q.   You talked about the other residents in her
10  class and the chief residents coming to you with some
11  concerns about Dr. Zechman.
12    A.   Correct.
13    Q.   You mentioned one of them is patient turnover?
14    A.   Correct.
15    Q.   What is that?
16    A.   Especially with the new -- I'm sure you are
17  well aware of the new 80-hour workweek, the new real
18  compartmentalization of medical education. What
19  happens is patients don't just come in nine to five,
20  Miss Brewington. You know that. They come in
21  24 hours a day and the acuity of their care can be
22  very different.
23        When we have different folks taking care of
24  them, they need to communicate when they are not

A-283

7 (Pages 22 to 25)

Zechman
Anthony C. Sciscione, D.O.

v.
C.A. # 05-159 (JJF)

Christiana Care Heath Systems
September 7, 2006

Page 26

1  taking care of them anymore to the new physician
2  taking over what are the issues, what's the
3  background, what needs to be done. And that's a very,
4  very important part of what we do.
5      Q.  So with respect to Dr. Zechman, was there an
6  issue with the way she handled the patients?
7      A.  I think the issue was mostly that her
8  documentation was not very good and that her -- what
9  we would call turnover, explanation of the patients
10  were not very complete.
11          I think Dr. Zechman, because she became
12  sensitive to this, would often just stay and stay a
13  little bit longer to try to synthesize it because she
14  moved a little bit slower than the rest of the folks,
15  which is fine. I have no problem with that. And I
16  think I made that clear to her. She has to do what
17  she has to do to get the turnover to be correct. But
18  she wasn't always very detail oriented on that and I
19  think that sometimes was an issue.
20      Q.  I guess what I'm trying to understand is: How
21  does that reflect upon the other residents? Is it
22  that they rely on what she writes in treating the
23  patient?
24      A.  Correct. So supposed we turned over and I'll

Page 27

1  just give you an example. I say, Listen. There's a
2  guy here and he's got right leg pain and he has -- he
3  has something that needs to be attended to tonight in
4  surgery in his right leg.
5          But suppose I made a mistake and it was
6  really the left leg. That's a huge issue because they
7  could do surgery on the left leg by accident if they
8  weren't paying close enough attention.
9          So they have to be very careful when they
10  turn over and it needs to be very detail oriented and
11  it needs to be very complete. Otherwise, things get
12  missed and patients are treated poorly.
13      Q.  Was Dr. Zechman ever disciplined or talked to
14  about her patient turnover?
15      A.  Yeah. I don't like to use the word
16  "disciplined" as a residency director. I like to use
17  the term "coached."
18      Q.  Okay.
19      A.  I coached her about these issues. I coached
20  her about sort of the way to approach patients the way
21  that she learns is really important and the way that
22  she's perceived is important. And there may have been
23  a disassociation between that.
24      Q.  Did you notice whether or not the coaching that

Page 28

1  you provided improved her -- let me finish.
2      A.  Go ahead.
3      Q.  -- improved her skills?
4      A.  I think there was some improvement in her
5  skills. I think that the one thing that Dr. Zechman
6  did is that she was at least on the surface
7  self-effacing. She would acknowledge that maybe this
8  was happening or wasn't happening. In all fairness,
9  though, so was Dr. Heinle when I mentioned it to her.
10  I said this is just the way it is. You really have to
11  learn to deal with this. And they both tried to make
12  some changes.
13          MS. BAISINGER:  Just a clarification. The
14  last question did you mean the patient turnover skills
15  or skills, in general?
16          MS. BREWINGTON:  I meant skills, in
17  general.
18          THE WITNESS:  And I was speaking as skills,
19  in general.
20          MS. BAISINGER:  Okay.
21          MS. BREWINGTON:  Okay.
22  BY MS. BREWINGTON:
23      Q.  Were you aware that Dr. Zechman had mixed
24  connective tissue disease?

Page 29

1      A.  No.
2      Q.  Were you aware of any illness that she had
3  through her residency program?
4      A.  No. The only illness I was aware of is one
5  time she wasn't feeling well, so I escorted her down
6  to the emergency room.
7      Q.  Is that the time when she had a rash?
8      A.  I don't recall.
9      Q.  Take a look at paragraph 25. Okay?
10      A.  (The witness reviews the document.)
11      Q.  It indicates: "On or about February 24th,
12  2003, Plaintiff reported to Defendant's emergency room
13  with a severe headache, stiff neck, and photophobia.
14  Plaintiff informed Dr. Sciscione, Defendant's
15  Residency Director, that she suffered from Mixed
16  Connective Tissue Disease."
17          Do you know whether this February 24, 2003,
18  incident is the same time that you took her down to
19  the emergency room?
20      A.  I don't.
21      Q.  Do you know whether Dr. Zechman was admitted to
22  the emergency room on more than one occasion?
23      A.  I don't remember.
24      Q.  You don't recall her telling you that she had

A-284

Wilcox & Fetzer, Ltd.

Professional Court Reporters

(302)655-0477

Zechman
Anthony C. Sciscione, D.O.

v.

C.A. # 05-159 (JJF)

Christiana Care Heath Systems
September 7, 2006

Page 30

1 mixed connective tissue disease?
2   A.  No.
3       MS. BAISINGER:  Objection.  Asked and
4 answered.
5       You can answer.
6       MS. BREWINGTON:  Okay.
7 BY MS. BREWINGTON:
8   Q.  Take a look at paragraph 27 of the complaint.
9   A.  (The witness reviews the document.)  Okay.
10   Q.  My question is:  Do you recall asking
11 Dr. Zechman to sit in the library when she had this
12 rash or spotted rash or when she was ill?
13   A.  I don't have an independent recollection of
14 this, no.
15   Q.  When an individual is sick —
16   A.  Can I actually address this as I read this a
17 second time?
18   Q.  Sure.
19   A.  Because the way this reads, I mean, if I was
20 reading this and I was independent, I would say, wow,
21 this Sciscione guy is a real ogre.  But the truth of
22 the matter is, I can tell you absolutely 100 percent
23 if I thought she was really ill, I would have sent her
24 home.

Page 31

1       And the fact — and I think the truth of
2 the matter, and I'm actually surprised that
3 Dr. Zechman said this because as a residency director,
4 I went with her, I took her down to the emergency room
5 when she was sick and I sat with her and held her
6 hand.
7       And I just think it's unfair of her to
8 portray me like this.  I think I was her advocate her
9 whole time there and personally it makes me not feel
10 very good when she says stuff like this or alleges
11 stuff like this.
12       And I want that to be on the record because
13 I really just thought if she was contagious to
14 pregnant folks and she still felt well, she could go
15 and read.  I didn't think that was unreasonable.  I
16 don't think that is unreasonable as I read this today.
17   Q.  So you don't have any recollection of this, but
18 you are saying that if you did, it would have been
19 reasonable for you to have her be in the library?
20   A.  Or to read.  I don't know if I would have said
21 the library.  I may have even said go home and read or
22 whatever.  But, yeah, absolutely.
23   Q.  Would that have still been reasonable even if
24 she had a work release from employee health?

Page 32

1   A.  No.  If she had a work release, and maybe I
2 didn't read this close enough, Miss Brewington, but I
3 didn't see that she did have a work release.  But if
4 she did have a work release, we would have let her go
5 home.  Actually, I would have let her go home if she
6 told me she didn't feel well.  And if I remember
7 right, it said in here she was only slightly sick.
8 Yeah.  Slightly sick means to me she wasn't very ill.
9   Q.  It says "initially."
10   A.  Yes, and initially it sounds like from what she
11 alleges that I asked her to read.  So if you are
12 slightly sick, ask you to read, no different than I
13 ask my kids when they feel sick.
14   Q.  You can put that to the side.
15       MS. BREWINGTON:  If I can have that marked
16 as Sciscione 2.
17       (Sciscione Exhibit 2 was marked for
18 identification.)
19 BY MS. BREWINGTON:
20   Q.  Take a look at what we just placed in front of
21 you.  That is Sciscione 2.  Let me know when you've
22 had an opportunity to review it.
23   A.  Yes, I've already read this, so I'm familiar
24 with it.  Thank you.

Page 33

1   Q.  Tell me who Dr. Vakili is.
2   A.  He's one of the volunteer faculty
3 obstetrician/gynecologists.
4   Q.  When you say "volunteer faculty," is that
5 different than teaching physician?
6   A.  No.  It means he's not paid.
7   Q.  There are different levels of physicians with
8 respect to the residency program; is that correct?
9   A.  No.
10   Q.  My question is, and maybe I'm not being clear.
11 There's some teaching physicians that are employed by
12 Christiana Care; correct?
13   A.  I would put it a different way.
14   Q.  Okay.
15   A.  I would say everybody who is an
16 obstetrician/gynecologist at Christiana, it's an
17 expectation they will be an educator.  Some people are
18 paid specifically for that.
19   Q.  So he's an educator, but he's just not paid for
20 it?
21   A.  Correct.
22   Q.  Is he obligated to teach?
23   A.  In my opinion.
24   Q.  But that's just your opinion?

A-285

9 (Pages 30 to 33)

Zechman                                    v.              Christiana Care Heath Systems
Anthony C. Sciscione, D.O.        C.A. # 05-159 (JJF)              September 7, 2006

Page 34

1    A.  I don't know that there's a dictum from the
2    department.  That would come from the chair,
3    Dr. Ekbladh.  But in my opinion, and maybe I'm just
4    too idealistic, Miss Brewington, but we were all
5    learning at one point and everybody has the obligation
6    to train people.
7    Q.  Is that the general custom at Christiana Care?
8    A.  Yes, it is.
9    Q.  Tell me why you wrote this letter to
10   Dr. Vakili.
11   A.  Because Dr. Zechman came to me and told me that
12   he asked her not to scrub with him in a case.
13   Q.  So it was Dr. Zechman that brought this to your
14   attention?
15   A.  Yes.
16   Q.  Did anyone else say anything to you about this?
17   A.  No.
18   Q.  Was Dr. Zechman upset?
19   A.  Yes.
20   Q.  Was she crying?
21   A.  Don't remember.
22   Q.  This letter is dated November 21st, 2002.  Is
23   it fair to say that you wrote this on or about the
24   same day that Dr. Zechman came to you?

Page 35

1    A.  Yes.
2    Q.  In this letter you indicate that Dr. Vakili
3    gave reasons for not wanting to scrub with Dr. Zechman
4    and --
5    A.  As told to me by Dr. Zechman.
6    Q.  The first one is "I have an office full of
7    patients."  "I need to hurry" is the second one.  "She
8    is not teachable" is the third one.  "I'm not in the
9    mood to teach someone today."
10         What were your thoughts when you heard
11   those comments?
12   A.  Outraged.
13   Q.  Did you have any reason to disbelieve
14   Dr. Zechman?
15   A.  No.  I took it at the face value.
16   Q.  Did you ever have a conversation with
17   Dr. Vakili about his comments?
18   A.  No.  I believe I did it all through a letter
19   and he responded in a letter.
20   Q.  What do you recall about his response?
21   A.  I believe he was penitent.
22   Q.  Did he give a reason?
23   A.  I don't recall.
24   Q.  The second sentence of the second paragraph

Page 36

1    says:  "She came from a program, which we had
2    recognized was not as academically or clinically
3    rigorous as our program.  I had recognized that she
4    would be significantly behind when she started this
5    program."
6         Based on what you wrote here, is it fair to
7    say that when you hired Dr. Zechman, you recognized
8    that she would be significantly behind when she
9    started the program?
10   A.  Yeah.  This probably is more generally correct,
11   and I may have said it was right when she came we knew
12   it.  And what I meant is within a month or so we knew,
13   we recognized that her skills were behind.
14         Really, the best way to judge whether
15   someone -- what their skills or what they were taught
16   was is to see them performing.  And if their
17   performance is below what we would expect is
18   competency, well, then, obviously they didn't get what
19   they should have gotten in another program.
20   Q.  How about that second sentence of the first
21   paragraph where it says that "she came from a program,
22   which we had recognized was not as academically or
23   clinically rigorous as our program."
24         When you hired Dr. Zechman, did you

Page 37

1    recognize that the program that she was previously in
2    was not as academically or clinically rigorous as the
3    Christiana Care program?
4    A.  I have to be honest with you.  I think every
5    program is not as good as ours.
6    Q.  And not as academically or clinically rigorous?
7    A.  No.  I think we have the best program in the
8    country.
9    Q.  So you recognized that and accepted
10   Dr. Zechman, anyway?
11   A.  Because any resident that is going to come from
12   another program with few exceptions is going to have
13   their challenges because we really want the best of
14   the best.
15         MS. BREWINGTON:  Let's have this marked as
16   Sciscione 3.
17         (Sciscione Exhibit 3 was marked for
18   identification.)
19   BY MS. BREWINGTON:
20   Q.  Take a look at the second sentence of this
21   letter.  It's a letter dated December 12, 2002, from
22   you to Dr. Zechman.  The second sentence begins with:
23   "Unfortunately, this is the most likely secondary to
24   the poor educational base that you received in your

A-286

Wilcox & Fetzer, Ltd.        Professional Court Reporters        (302)655-0477

Zechman                                    v.                    Christiana Care Heath Systems
Anthony C. Sciscione, D.O.        C.A. # 05-159 (JJF)                    September 7, 2006

Page 38

1  previous program."
2          Now, I know that you stated that
3  Christiana Care, you feel as though that's the best
4  program; is that correct?
5  A.  Correct.
6  Q.  The program that she was previously in, is it
7  your opinion that that was a poor program?
8  A.  I can say this:  I think they poorly prepared
9  Dr. Zechman.  I don't know if they are a poor program,
10  but that's what they did.
11  Q.  You felt as though she had a poor educational
12  base?
13  A.  I felt that it wasn't as strong as it should
14  be.
15  Q.  Towards the bottom of the first paragraph you
16  write:  "I will ask that you run all the patients that
17  you see in the triage area past the attending in the
18  triage area that day or on call."
19          Is there always an attending there?
20  A.  I don't remember.
21  Q.  You don't remember?
22  A.  I don't remember.  Now there is an attending
23  there at least during the day till 8:00, but not at
24  night.

Page 39

1  Q.  What would she do or what was she supposed to
2  do if there wasn't an attending?
3  A.  There's always an attending covering.
4  Q.  So it would be the one on call?
5  A.  Yes, yes.
6  Q.  Now, is that a realistic expectation of
7  Dr. Zechman and the attendings?
8  A.  Yes.
9  Q.  Do you know whether this happened?  And when I
10  say "this," do you know whether Dr. Zechman was able
11  to run each and every patient — when I say "run," I
12  mean run all the patients to the attendings, like ask
13  them about them?
14  A.  It was my expectation that was going to happen
15  and I think it did.
16  Q.  What would be the purpose of doing that?
17  A.  Really, there was two reasons to do that.  One
18  is, and the more important one in my mind, was so that
19  she could role model her thinking after seasoned
20  doctors or faculty.  And two is for patient safety.
21  Q.  Do you know whether this was something that the
22  other attending physicians were willing to do?  Do you
23  know whether you faced any resistance, I guess, is my
24  question.

Page 40

1  A.  I think it was enthusiastically accepted in
2  this instance.  And I have to tell you, this is the
3  first time I think we ever asked anybody to do that.
4          MS. BREWINGTON:  If I can have that marked
5  as Sciscione 4.
6          (Sciscione Exhibit 4 was marked for
7  identification.)
8  A.  (The witness reviews the document.)  Okay.
9  BY MS. BREWINGTON:
10  Q.  This is a letter from you to Dr. Zechman and
11  it's dated March 24th, 2003.  The first sentence says:
12  "The Departmental Education Committee met Monday,
13  March 17, 2003 to discuss the progress of each
14  resident and the results of their CREOG In-Service
15  Training Examination."
16          My first question to you:  The Departmental
17  Education Committee, is that the Residency Review
18  Committee?
19  A.  Yes.
20  Q.  That's just like another name for it?
21  A.  Yes.
22  Q.  As of March 24, 2003, as I'm reading this, the
23  Residency Review Committee met on March 17 of 2003 to
24  discuss Dr. Zechman and her progress along with the

Page 41

1  other residents.
2  A.  We probably discussed lots of things, but
3  that's one of the things we discussed.
4  Q.  Based on your review of this letter, you had an
5  opportunity to review it; is that correct?
6  A.  Yes.
7  Q.  Can you tell me in your own words what the plan
8  was for Dr. Zechman?
9  A.  The plan was to continue her mentorship, and
10  some of it is written here:  to continue her
11  mentorship, continue her remediation, continue what I
12  call an immersion program, continue following her.
13  And then there was some hurdles or some goals for her
14  to meet.
15  Q.  What were some of her goals that she had to
16  meet?
17  A.  I think it's described in here, but it says
18  there was an oral examination in May.  In order to
19  progress to the PGY3, you must meet or exceed the
20  expectation of PGY2 resident just prior to entering
21  PGY3 year.  Surgical evaluation cards, faculty
22  performance evaluations on her performance, 80 percent
23  of the evaluations were meet or exceed an average
24  rating for a PGY2 resident.

Zechman
Anthony C. Sciscione, D.O.

v.

C.A. # 05-159 (JJF)

Christiana Care Heath Systems
September 7, 2006

Page 42

1   Q. One part I want to focus on is: "There will be
2 an oral examination in May. In order to progress to
3 the PGY3 year you must meet or exceed the expectations
4 of a PGY2 resident just prior to entering their PGY3
5 year."
6         Would that be, this meets expectation or
7 exceeds expectations, would that be based on the oral
8 examination that takes place in May?
9   A. I think -- actually, I think that's exactly
10 what this says, but I think when you read the whole
11 letter in context, I think it was very clear to
12 Dr. Zechman on all fronts she really needed to
13 demonstrate that she was ready to progress to the
14 PGY3.
15   Q. Okay.
16   A. Not just oral examinations, but her -- I mean
17 their surgical evaluation, her faculty evaluations and
18 so forth and so on.
19   Q. As of March 24th, 2003, was the plan to
20 continue Dr. Zechman as a PGY2? Was that the plan?
21   A. No. The plan was to assess her and see if she
22 could move into the PGY3 year.
23   Q. Let me read you the second paragraph, and it
24 says, and let me start with the beginning: "The

Page 43

1 committee felt after reviewing all the information
2 above that you are performing more in accord with a
3 PGY1, rather than a PGY2 resident and the committee
4 felt that you should continue in our program, but in
5 the PGY2 position starting July 1, 2003."
6   A. Okay.
7   Q. So my question is: As of March 24th, 2003, was
8 the plan for Dr. Zechman to repeat the second year in
9 July of 2003?
10   A. No.
11   Q. Okay.
12   A. You have to read this really closely --
13   Q. Okay.
14   A. -- Miss Brewington, and what it says here is
15 the committee wanted to do something, and if you
16 really look at this, is that I trumped them as a
17 residency director. They wanted to not progress her
18 and I wanted to give her every opportunity to prove to
19 the committee that she could be progressed. And
20 that's what this is saying here.
21   Q. Okay.
22   A. And I convinced the committee to set some goals
23 in a last-ditch effort to have Dr. Zechman progress.
24         So again, and this is why I was still so

Page 44

1 disappointed in what she said, I'm trying to give
2 Dr. Zechman the fairest possible evaluation to the
3 point where I'm actually going around the committee to
4 try to progress her.
5   Q. So it's almost like I have to read between the
6 lines almost with this?
7   A. Well, no. I think if you read it, "The
8 committee felt," and then it says "the PGY2 position
9 starting July 1, 2003. Therefore I am notifying you
10 that at this point in time, the recommendation of the
11 committee is to offer you a PGY2 position at the
12 conclusion of this academic year. However, the
13 committee agreed" -- in other words, I convinced
14 them -- "to extend your remediation plan."
15         Okay? Do you read that.
16   Q. Yes.
17   A. Now you see the change?
18   Q. Yes.
19   A. Now you see how I was her advocate?
20   Q. Yes.
21   A. How I was trying to defend her, how I was
22 trying to be an idealist, trying to give her every
23 chance.
24   Q. But at some point you left.

Page 45

1   A. I left, but that's -- I can't talk about after
2 I left because I wasn't there.
3   Q. Exactly.
4   A. But the point is the committee felt one way, I
5 was trying to make sure she had every opportunity to
6 prove herself because that's my job as a residency
7 director, is to be her advocate.
8   Q. In fact, nowhere in this letter to her is the
9 mention of termination; is that correct?
10   A. I don't believe there is, no.
11   Q. As I understand it, there were two
12 alternatives, and please correct me if I'm wrong,
13 because you wrote this letter, but as I understand it,
14 if she met these goals and met the criteria, she would
15 then progress to a PGY3?
16   A. Correct.
17   Q. However, if she did not meet these goals, she
18 would remain a PGY2?
19   A. Correct.
20   Q. I guess then my next question to you is: Why
21 was she terminated from the program?
22         MS. BAISINGER: Objection. Speculation.
23   A. I can't comment. I wasn't there. I was at
24 Drexel University at the time. But again, you can see

A-288

12 (Pages 42 to 45)

Zechman
Anthony C. Sciscione, D.O.

v.

C.A. # 05-159 (JJF)

Christiana Care Heath Systems
September 7, 2006

Page 46

1  she's struggling in the program.
2         (Sciscione Exhibit 5 was marked for
3  identification.)
4  A.  (The witness reviews the document.)
5  BY MS. BREWINGTON:
6  Q.  Have you had an opportunity to read this?
7  A.  Yes.
8  Q.  You're looking at Sciscione 5.  Do you recall
9  receiving this e-mail?
10 A.  I didn't, but now that I read it --
11 Q.  You didn't recall --
12 A.  No, I didn't, but now it sparks some memory.
13 Q.  Did you talk with Dr. Zechman about her concern
14 that she was being reassigned to triage and labor and
15 delivery and not doing the surgeries?
16 A.  I talked to her superior.
17 Q.  Is that Dr. Ekbladh?
18 A.  No, no.  I talked to whoever her GYN chief
19 resident was.  That's who assigns cases.
20 Q.  Okay.
21 A.  And asked them to assign her, to continue
22 assigning her to surgical cases, to encourage her to
23 be on surgical cases.
24 Q.  Do you know who that would have been around

Page 47

1  this time?
2  A.  I do not.  I think it was probably Dr. DeLuca,
3  but I'm not sure.
4  Q.  After you talked to them, what happens after
5  that?  Do you follow up?  Did you look at the schedule
6  to make sure she was on it?  Did anything happen?
7  A.  Yes.  I follow up.  I asked them.  Did you do
8  it?  I don't remember exactly, but I'm sure they said,
9  yeah, we're assigning her to more cases.
10 Q.  Okay.
11 A.  Remember, she is talking about two days.  You
12 know, she let me know early and I took care of it.
13 Q.  Was it a concern of yours that Dr. Zechman did
14 not receive surgical training as much as the other
15 residents?
16 A.  Well, let me be clear about this.  I was
17 concerned about Dr. Zechman on many levels.
18 Q.  Okay.
19 A.  I mean, not just surgically.  I mean, the way
20 she processed information, the way she came to
21 conclusions, the conclusions she came to, and if I
22 remember right, she had a spotty interaction with some
23 patients.
24         In fact, I remember one letter of complaint

Page 48

1  about the way she treated a patient and I had to call
2  the patient.  I always call the patients on letters of
3  complaints when they were very upset about the way they
4  were treated by Dr. Zechman.
5         So there was lots of different things I was
6  concerned about, not just her surgical skills.
7  Q.  I hear what you are saying, but my question is
8  more:  Was it a concern to you that Dr. Zechman may or
9  may not have been getting the surgery and the surgical
10 training that she needed?
11 A.  No.  I think she was afforded the
12 opportunities.  What did concern me is what happened
13 with Dr. Vaidil, which is -- and you can see this
14 happening, and I mention in the letter, which is the
15 folks that aren't as skilled people don't want to work
16 with because they are not as skilled, but they can't
17 ever get more skilled until they work.
18         There are some folks that are just not
19 good -- they don't have good dexterity, for whatever
20 reason.  The way they're wired.  I don't understand
21 it, but they just don't.  Some people are excellent
22 surgeons.  Some people are mediocre surgeons.  Some
23 people are poor surgeons.  Unfortunately, I can't
24 change that.  All I can do is give them the

Page 49

1  opportunity to operate, and she was given the
2  opportunity to operate.
3         And after my experience at other programs,
4  compared to other programs, even with her thinking she
5  was limited compared to other residents in our
6  program, probably operated maybe twice as much as
7  residents in other programs.  Certainly residents in
8  Drexel, at the university.
9  Q.  How about operated as much as other residents
10 in the program?
11 A.  I assumed she was given the exact same
12 opportunities as everyone else, and I do believe that
13 occurred as any other second year in the program.
14 Q.  Did Dr. Zechman send you an e-mail concerning
15 the beds in triage being a hazard?
16 A.  Now that you say it, it sounds familiar, but I
17 can't recall.
18 Q.  So I guess then you wouldn't recall whether you
19 followed up and sent an e-mail to anyone else
20 concerning the beds?
21 A.  I can tell you this, and anybody who knows me,
22 I'm not a person who doesn't follow up on stuff.  If I
23 get an e-mail, you'll get an e-mail back from me or
24 something.  I don't let things just go.

A-289

13 (Pages 46 to 49)

Zechman                                                        Christiana Care Heath Systems
Anthony C. Sciscione, D.O.        v.        September 7, 2006
                              C.A. # 05-159 (JJF)

Page 50

1  Q.  Was there a problem with the beds?
2  A.  I don't recall.
3  Q.  If there had been a problem with the beds,
4  would you consider that a safety hazard?
5  A.  I would have asked for somebody who understands
6  the beds to look into it, which would have been either
7  the head nurse of labor and delivery, Donna Smith, or
8  it would have been somebody from bioengineering.
9  Q.  Okay.
10  A.  Was someone injured on one of the beds?  I
11  don't recall that.
12  Q.  I'm asking questions.
13  A.  Oh, I'm sorry.
14  Q.  Were you aware that Dr. Zechman sent a
15  complaint to the ACGME?
16  A.  No.  Do you mean during -- when I was residency
17  director?
18  Q.  I mean, and I should have said were you aware.
19      Are you aware that she sent a complaint?
20  A.  No.
21  Q.  Okay.
22  A.  And I think the ACGME would have contacted me
23  as residency director, so I assume it didn't occur
24  during my time there.

Page 51

1  Q.  But you weren't aware of it even if it did
2  occur?
3  A.  No.  But I assume since you are the one asking
4  the questions that it must have occurred.
5  Q.  Maybe it did; maybe it didn't.  It did occur
6  and it was while Dr. Ekbladh was the director.
7      I guess my question was simply:  Did you
8  know that?  Were you aware of that?
9  A.  No.  I want to make it clear, when I left
10  Delaware, I left Delaware.
11  Q.  But you could have become aware of it when you
12  came back.  How long have you been back?
13  A.  Nine days.
14  Q.  Okay.
15  A.  At least I didn't have a deposition.
16  Q.  Welcome back.
17  A.  Thanks.
18      MS. BAISINGER:  Off the record.
19      (Discussion off the record.)
20      (Sciscione Exhibit 6 was marked for
21  identification.)
22  BY MS. BREWINGTON:
23  Q.  We've just placed in front of you Sciscione 6.
24  Take a look at it.  Then I just want to ask you what

Page 52

1  exactly it is.
2  A.  (The witness reviews the document.)  These were
3  the assessments for the oral boards that we gave all
4  the second year residents.
5  Q.  So would each resident have four assessments,
6  individual assessments?
7  A.  When you say "four" --
8  Q.  I guess I mean there's four different
9  evaluators, so would each second year resident have
10  four different evaluations similar to Dr. Zechman?
11  A.  Oh, I see.  I'm sorry.
12      They would have had not only the same
13  evaluation, but would have had the exact same
14  questions.  And there was anticipated answers to the
15  questions, right answers.  So the folks who did it
16  were sitting there just saying did they get this
17  right, did they get to this, did they get to that.
18  Q.  So everybody has the same questions?
19  A.  Yeah, yes.
20  Q.  The same people ask the questions, the same
21  evaluators?
22  A.  Yes, correct.
23  Q.  Now, am I correct that Dr. Zechman was at the
24  expected level in the opinion of each evaluator?

Page 53

1  A.  You know, I don't want to speak for each of
2  them.
3  Q.  Okay.
4  A.  What I mean specifically is Patrice, it's not
5  an accident.  I know Patrice.  It's not an accident
6  that that X is not on that line that says "At Expected
7  Level," but I'll let you talk to her yourself.  Her
8  quote is "I had difficulty working" -- she had
9  difficulty working through the cases with Ellen and
10  keeping her focused on the point at hand.  So
11  obviously she had some concerns.
12  Q.  But she didn't mark "Below Expected Level," did
13  she?
14  A.  No.
15  Q.  Okay.
16  A.  I don't think she marked "At," either.
17  Q.  Michael Beidin, did he mark "Below Expected
18  Level"?
19  A.  No.  He marked "At."
20  Q.  How about Craig Sobolewski?
21  A.  To save you some time, both Craig Sobolewski
22  and Matt Hoffman both marked "At Expected Level."
23  Q.  Tell me what "At Expected Level" means.
24  A.  Can you be more specific?  I mean, I think it's

A-290

14 (Pages 50 to 53)

Zechman                                    v.                Christiana Care Heath Systems
Anthony C. Sciscione, D.O.        C.A. # 05-159 (1JF)                    September 7, 2006

Page 54

1  self-explanatory.
2    Q.  With respect to Dr. Zechman, if she's at the
3  expected level, what is the expected level?
4    A.  PGY2.
5    Q.  So she was acting at the level that she was
6  supposed to be at at the time?
7    A.  According to them, yes. This is only one part
8  of her evaluation.
9    Q.  Just one minute. I think I'm finished.
10         MS. BREWINGTON: I don't have anything
11  further.
12         MS. BAISINGER: I just have one question, a
13  follow-up question.
14  BY MS. BAISINGER:
15    Q.  Back to Exhibit 4, I believe, it's the
16  March 24th, 2003, letter to Dr. Zechman.
17    A.  Yes.
18    Q.  I believe that you stated that you convinced
19  the committee to give Dr. Zechman a chance to prove
20  that she could advance to a PGY3 in June 2003.
21    A.  Right. I really wanted to give her every
22  chance, even if it was to the last minute to prove
23  herself before they would say that she couldn't be
24  promoted.

Page 55

1    Q.  Did you believe that the committee's concerns
2  about Dr. Zechman at this time were valid concerns?
3    A.  I thought they were legitimate.
4         MS. BAISINGER: That's all I have.
5         MS. BREWINGTON: I don't have anything
6  further.
7         (The deposition was then concluded at
8  4:15 p.m.)
9         - - - - -
10
11         INDEX TO TESTIMONY
12
13  ANTHONY SCISCIONE, D.O.              PAGE
14
15  Examination by Ms. Brewington            2
16  Examination by Ms. Baisinger            54
17
18         - - - - -
19
20
21
22
23
24

Page 56

1         INDEX TO EXHIBITS
2
3  SCISCIONE EXHIBIT NO.:              PAGE
4
5   1  A multipage copy of a Complaint        11
6   2  A one-page copy of a letter dated
       November 21, 2002, to Ghassem Vakili, M.D.,
7      from Anthony C. Sciscione, D.O.        32
8   3  A one-page copy of a letter dated
       December 12, 2002, to Ellen Huffman-Zechman,
9      M.D., from Anthony C. Sciscione, D.O.    37
10  4  A one-page copy of a letter dated March 24,
       2003, to Dr. Ellen H. Zechman from Anthony
11     C. Sciscione, D.O.                 40
12  5  A one-page copy of an e-mail dated Tuesday,
       May 13, 2003, from Ellen H. Zechman to
13     Anthony Sciscione, MD               46
14  6  A four-page copy of Mock Oral Boards forms  51
15
16         - - - - -
17
18
19
20
21
22
23
24

Page 57

1
2
3
4
5
6
7
8         REPLACE THIS PAGE
9
10         WITH THE ERRATA SHEET
11
12         AFTER IT HAS BEEN
13
14         COMPLETED AND SIGNED
15
16         BY THE DEPONENT.
17
18
19
20
21
22
23
24

A-291

Wilcox & Fetzer, Ltd.        Professional Court Reporters        (302)655-0477

Zechman
Anthony C. Sciscione, D.O.

v.
C.A. # 05-159 (JJF)

Christiana Care Heath Systems
September 7, 2006

Page 58



```
 1   State of Delaware )
 2                    )
 3   New Castle County )
 4
 5
 6        CERTIFICATE OF REPORTER
 7
 8        I, Kathleen White Palmer, Registered
     Professional Reporter and Notary Public, do hereby
 9   certify that there came before me on the 7th day of
     September, 2006, the deponent herein, ANTHONY C.
10   SCISCIONE, D.O., who was duly sworn by me and
     thereafter examined by counsel for the respective
11   parties; that the questions asked of said deponent and
     the answers given were taken down by me in Stenotype
12   notes and thereafter transcribed into typewriting
     under my direction.
13
          I further certify that the foregoing is
14   a true and correct transcript of the testimony given
     at said examination of said witness.
15
          I further certify that I am not counsel,
16   attorney, or relative of either party, or otherwise
     interested in the event of this suit.
17
18
19
20        _____
21        Kathleen White Palmer, RPR, RMR, CLR
          Certification No. 149-RPR
22        (Expires January 31, 2008)
23
     DATED:  September 15, 2006
24
```

A-292

*Ellen Zechman   v.*
*Christiana Health Care Systems*

---

*Janice Tildon-Burton, OB/GYN*
*September 20, 2006*

---

***Hawkins Reporting Service***
***715 N King Street***
***Suite 3***
***Wilmington, DE  19801***
***(302) 658-6697***

*Original File 092006-2.TXT, 46 Pages*
*Min-U-Script® File ID: 0812636151*

**Word Index included with this Min-U-Script®**

Oct 19 06 03:25p     Hawkins Reporting     3026588418     p.3

Ellen Zechman v.
Christiana Health Care Systems

Janice Tildon-Burton, OB/GYN
September 20, 2006

**Page 1**

IN THE UNITED COURT DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ELLEN ZECHMAN,
Plaintiff,

v.                    C.A. No. 05-159(JJF)

CHRISTIANA HEALTH
CARE SYSTEMS,
Defendant.

The Deposition of JANICE TILDON-BURTON,
OB/GYN, was taken pursuant to notice before
Christine M. Baird, DCR, RPR and CRR, on
Wednesday, September 20, 2006, held in the law
offices of Margolis Edelstein, 1509 Gilpin
Avenue, Wilmington, Delaware, 19806, commencing
at 10:00 a.m.

APPEARANCES:
    MARGOLIS EDELSTEIN
    BY: LORI BREWINGTON, Esquire
    1509 Gilpin Avenue
    Wilmington, DE 19806
    Attorney for the Plaintiff
    MORGAN LEWIS
    BY: KENDRA BAISINGER
    1701 Market Street
    Philadelphia, PA 19103
    Attorney for the Defendant

**Page 2**

[1] JANICE TILDON-BURTON, OB/GYN,
[2] the witness herein, having first [3] been
duly sworn on oath was examined and [4]
testified as follows:

[5] DIRECT EXAMINATION

[6] BY MS. BREWINGTON:

[7] Q: Good morning. I represent Dr.
Zechman in [8] a discrimination action
against Christiana Care. [9] You are here
today so I can ask you a series of [10]
questions. I'm sure you have testified in a
[11] deposition numerous times.

[12] A: Yes.

[13] Q: We have a court reporter here.
She will [14] be taking down your answers
to the questions. [15] The only thing I ask
is we try not to [16] each other so
we can get a clear record. The [17] other
thing I ask is if you would answer with a
[18] yes or no as opposed to uh-huh or uh-
uh.

[19] At times Christiana Care's attorney
[20] will object and I ask you to go ahead
and answer [21] the question unless she
tells you not to answer [22] the question.

[23] Why don't we start with your name.

[24] A: Janice Tildon-Burton.

**Page 3**

[1] Q: Where do you work?

[2] A: 2600 Glasgow Avenue, Suite 27,
Wilmington, [3] Delaware.

[4] Q: Do you also work or are you
employed by [5] Christiana Care?

[6] A: I am not employed by Christiana
Care.

[7] Q: Okay.

[8] What is your profession?

[9] A: Obstetrics/gynecologist.

[10] Q: How long have you been in that
profession?

[11] A: Completed residency in 1996.

**Page 1**

[12] Q: Where did you complete your
residency?

[13] A: Einstein Medical Center Northern
Division [14] in Pennsylvania.

[15] Q: At Christiana, is that where you do
your [16] surgeries? Is that how it works?

[17] I just need to understand this. You [18]
are a private physician. Do you contract
with [19] Christiana to do surgeries?

[20] A: It is not a contract. As a private [21]
physician, you request privileges at the
hospital [22] in which you wish to admit
your patients. So I [23] have privileges at
Christiana Hospital and St. [24] Francis
hospital in Delaware.

**Page 4**

[1] Q: Is there anywhere else that you
have [2] privileges?

[3] A: I have --- I'm trying to think of the
right [4] word there, not honorary, but
courtesy privileges [5] at Einstein Hos-
pital in Philadelphia.

[6] Q: And do you have an understanding
of any of [7] the claims that Dr. Zechman
is asserting in this [8] lawsuit?

[9] A: What do you mean by under-
standing?

[10] Q: Do you know why she brought a
lawsuit [11] against Christiana Care?

[12] MS. BAISINGER: Objection, vague.
[13] You can answer.

[14] THE WITNESS: Based on what I have
[15] read, she is alleging discrimination on
the part [16] of Department of OB/GYN.

[17] MS. BREWINGTON:

[18] Q: Are these documents you have
read from [19] Christiana Care?

[20] A: Correct.

[21] Q: Have you read anything outside of
your [22] discussions with the attorney
for Christiana [23] Care?

[24] Q: What period of time? I have read
nothing

**Page 5**

[1] in the last year or more regarding Ellen
Zechman.

[2] Q: Prior to your year of not reading [3]
anything, what exactly did you read or
can you [4] remember what you even
read a year ago?

[5] A: I cannot.

[6] Q: Do you know why you would have
read [7] something on Dr. Zechman?

[8] A: It would have been when the
whole issue of [9] her filing a case first
arose. And that may ---[10] my timeframe
may be off a little, but it would go [11]
back to that point in time.

[12] Q: How long have you had privileges
at [13] Christiana Care?

[14] A: I think I'm correct when I say

**Page 6**

1990. [15] Prior to that I practiced at
Einstein as an [16] attending there and
began my practice in Delaware [17] in
1990.

[18] Q: Now, would you still be con-
sidered an [19] attending physician at
Christiana Care too?

[20] A: Yes.

[21] Q: How about a teaching physician,
would you [22] also be considered a
teaching physician?

[23] A: Yes.

[24] Q: And that's for the OB/GYN pro-
gram?

**Page 6**

[1] A: Correct.

[2] Q: When did you first become aware
that she [3] filed a lawsuit?

[4] A: I would say --- and I'm guessing,
because I [5] don't remember, even
though I just kind of looked [6] at when
the date was, I don't remember the date.
[7] But whenever --- around the month or
two of the [8] time she filed the lawsuit
and it came to the [9] attention of the
department.

[10] Q: And how did it come to the
attention of [11] the department?

[12] A: Well, other than knowing, the
chairman [13] knew there was a suit. I
can't give you any [14] other information.

[15] Q: Did you discuss it with the chair-
man?

[16] A: Only that he had mentioned to me
that [17] there was a suit that was being
filed.

[18] Q: And the chairman was who?

[19] A: Dr. Lamar Ekbladh.

[20] Q: Did he discuss it with you alone or
in a [21] meeting?

[22] A: It --- if I'm correct, I think it was at
a [23] Residency Review Committee
meeting it was [24] announced.

**Page 7**

[1] Q: And you also serve on the Resid-
ency Review [2] Committee?

[3] A: That's correct.

[4] Q: How long have you served on that
[5] committee?

[6] A: I'm not certain. At least five years,
but [7] perhaps longer than that.

[8] Q: How often did you work with Dr.
Zechman?

[9] A: Not frequently.

[10] Q: You did work with her, but not
frequently?

[11] A: Correct.

[12] Q: What would you say is not freq-
uently; can [13] you quantify that in some
way?

Min-U-Script®

(3) Page 1 - Page 7

Janice Tildon-Burton, OB/GYN
September 20, 2006

Ellen Zechman   v.
Christiana Health Care Systems

[14] A: I can only recall two or three surgical [15] cases that we actually were involved together [16] with.

Q: Okay. Did she service any of your [...] patients in triage?

[19] A: I'm sure she did, but I don't have a firm [20] recollection of that. She would have had to [21] because as a second year being in triage all the [22] patients come through that area and certainly I [23] have — I stopped in mid-sentence I know.

[24] Q: So about two or three surgical cases, is

Page 8

[1] that accurate?

[2] A: Yes.

[3] Q: Can you give me an opinion of her surgical [4] skills?

[5] A: Compared to other residents in her class [6] she was not on the same level as they.

[7] Q: Would you care to elaborate a little?

[8] A: The residents at Christiana have a large [9] number of surgical cases beginning in their first [10] year. So their skills, I think, are comparable [11] to the most active program in the country. [12] Having said that, if you are coming in from a [13] program where your exposure is much [...], you are [14] not going to have the same skills as someone who [15] started there from if very beginning.

[16] Q: Who were the other residents in her class?

[17] A: You know, if you told me I would say oh, [18] yes, they were in that class. But to be honest, [19] it all merges together, one year into the next so [20] I can't say with certainty who was in that class.

[21] Q: But you do recall, I guess, Dr. Zechman's [22] skills versus the other residents in her class, [23] their skills?

[24] A: Yes.

Page 9

[1] Q: How often did you work with the other [2] residents?

[3] A: It would be some more than others. I [4] would say I tended to have cases more with the [5] upper-year residents than with the second year [6] residents on gynecologic cases. On obstetrical [7] cases it would be the first year residents, [8] primarily, that I would have experience with.

[9] Q: And back to Dr. Zechman's skills [10] not being the same as or equal to that [...] the other [11] residents in her class, is it [...] your opinion that [12] that would be as expected?

[13] A: Yes. Someone coming from a different [14] program with not the volume that is seen at [15] Christiana, yes.

[16] Q: Did you feel or do you feel that Dr. [17] Zechman could have improved with experience?

[18] A: That's a very difficult question to [19] answer. And the reason being, there are just [20] some physicians that are just naturally skilled [21] surgically. There are others that work at [22] developing those skills. And based on my [23] exposure to her, I don't have a good sense that [24] she would ever be as surgically adept as many of

Page 10

[1] her colleagues or peers would be.

[2] Q: Why is that?

[3] A: I'm not certain why that is.

[4] Q: Is that based on your observations of her?

[5] A: Based on my observations, yes.

[6] Q: And can you tell me what you observed of [7] her to make you feel that way?

[8] A: There was one case in particular that we [9] scrubbed together on that would be a case in [10] which she would either first assist or would be [11] the primary surgeon with me first assisting [12] her as a [12] teacher. And from the beginning there was not an [13] ease of proceeding with the procedure without my [14] instructing her what to do on a step-by-step [15] basis. That was something I didn't expect from [16] somebody at a second year level. So that's the [17] reason I question the whole — your question as [18] to whether or not she could have gained those [19] skills. I just wasn't certain if time would [20] address what she actually needed or if there [21] wasn't just inherent deficit in her surgical [22] ability.

[23] Q: Okay. Is there any other instance that [24] makes you recall that you felt that way?

Page 11

[1] A: There was a laparoscopic case. And again, [2] I think having very little laparoscopic exposure, [3] her ability to proceed with the case was [4] compromised or hindered by her not being very [5] facile in certain aspects of the procedure.

[6] Q: And I guess my next question is, would [7] experience in surgery improve those skills or did [8] you feel as if she could never improve?

[9] MS. BAISINGER: Objection. Asked [10] and answered.

[11] THE WITNESS: I'm not sure I could [12] say never improved. Most of us improve based on [13] just the repetitiveness of the procedure. I [14] didn't think she was — what is the word I want [15] to use — totally inept.

[16] MS. BREWINGTON:

[17] Q: Did you feel there was still some hope for [18] Dr. Zechman?

[19] A: I'm an optimist, so I always feel there is [20] hope, particularly when someone has a desire, I [21] think that's a part of learning to be a good [22] surgeon.

[23] Q: Is it fair to say that you can't give an [24] opinion either way as to whether she would have

Page 12

[1] succeeded in the program?

[2] A: That's a different question than what we [3] were originally talking about, because success in [4] the program entails so many other aspects of the [5] program. So can you be a little more specific?

[6] Q: Well, success meaning successfully [7] graduate the program. Whatever is needed to [8] successfully graduate. So I'm thinking about [9] surgical skills, medical knowledge, I guess, care [10] of patients, mock oral boards, surgical [11] evaluations.

[12] A: That's an extremely difficult question to [13] answer. And I'm not sure I have enough [14] information about other aspects of her [15] performance that I could give you what I feel is [16] an honest answer.

[17] Q: Okay. So, if I'm hearing you correctly, [18] you cannot give an opinion either way as to [19] whether you feel she could have successfully [20] completed the program?

[21] A: I had concerns about her successfully [22] completing the program. But having said that, if [23] you have this unending ability to complete the [24] program, then perhaps she could have successfully

Page 13

[1] completed it. But based on where she was and [2] where the program was at that time, I didn't see [3] that occurring.

[4] Q: Okay. Are you saying that you didn't see [5] improvement?

[6] A: Correct.

[7] Q: And that would be based on the two or [8] three surgical cases?

[9] A: As well as other information given at the [10] time of residency review.

[11] Q: Okay. So information from whom?

[12] A: Well, the program director, the residency [13] director, other members on the committee that had [14] interfaced with Ellen, and other information that [15] was brought to the committee's attention.

[16] Q: Do you recall some of the things that were [17] brought to the committee's attention on the basis [18] of your op-

Page 8 - Page 13 (4)

Min-U-Script®

A-295

Ellen Zechman  v.
Christiana Health Care Systems

Janice Tildon-Burton, OB/GYN
September 20, 2006

inion?

[19] A: Specific things, no. But just based on [20] that she was not performing surgically for [21] someone at her level. Questions about [22] interactions with staff, both private and [23] hospital staff. So all of those things came to [24] the attention of the committee and I was aware

---

Page 14

[1] of.

[2] Q: Okay. Can you remember anything at all [3] about the discussions at the committee meeting [4] concerning her interactions with staff, both [5] private and hospital?

[6] A: I can't remember specifics. I can't. You [7] know, with time things kind of meld together and [8] you have a general memory of things that occur [9] but not where someone said this or the other [10] person responded in a certain fashion.

[11] Q: Okay. What is your opinion of her medical [12] knowledge?

[13] A: That's an extremely difficult question to [14] answer, because for me to say either she is [15] proficient or deficient in her medical knowledge [16] I would have to have specific instances that I [17] could bring to mind readily and I can't do that.

[18] Q: So, would it be fair to say that you don't [19] have an opinion either way of her medical [20] knowledge, whether she was proficient or [21] deficient?

[22] A: That would be fair to say.

[23] Q: Okay. How about Dr. Zechman's bedside [24] manner. When I say bedside manner, just dealing

---

Page 15

[1] with patients. Do you have an opinion either way [2] of Dr. Zechman's ability to handle patients?

[3] A: I don't, because I never personally saw [4] her interface with the patients, other than prior [5] to her performing surgery. But I didn't see her [6] interact after the surgical procedure. She would [7] have seen the patient after the surgical [8] procedure, but I have no information to give an [9] opinion about my patients.

[10] Q: Correct me if I'm wrong, but it seems you [11] did not have a lot of interaction with Dr. [12] Zechman.

[13] A: I had more interactions with Dr. Zechman [14] in the locker room than anywhere else.

[15] Q: Tell me why you had more interactions with [16] her in the locker room than anywhere else?

[17] A: It just seemed many times as I was coming [18] or going she would be — Ellen would be coming [19] and going and we would sit and chat and see how [20]

things were going and give her encouragement and [21] see what was going on in her world.

[22] Q: Is this a locker room as you are going in [23] to surgery?

[24] A: It is in the health care building and both

---

Page 16

[1] attendings and residents have a locker there and [2] that's where we go to put our personal effects [3] and change into scrubs or go to the labor suite [4] or operating room, which is in a different area [5] of the hospital.

[6] Q: I don't know if I already asked you this [7] question, but if I did you can just repeat your [8] same answer.

[9] Do you know why Dr. Zechman is no [10] longer in the program?

[11] A: I think I do.

[12] Q: Okay.

[13] A: The decision was made that she was not [14] proceeding in a fashion that would enable her to [15] complete the program successfully, having given [16] her a few opportunities to correct certain [17] deficits that were believed to be present.

[18] Q: Okay. And the decision was made by whom?

[19] A: The Residency Review Committee.

[20] Q: And you also serve on that committee?

[21] A: Correct.

[22] Q: So would you say the decision was made by [23] you as well or no?

[24] A: Yes, I would, because I was part of the

---

Page 17

[1] committee.

[2] Q: Were you there the day the decision was [3] made?

[4] A: I can't recall that. I can't recall [5] whether I was there that day or not.

[6] Q: Are you aware of whether or not Dr. [7] Zechman was placed on a certain rotation schedule [8] during her time at Christiana Care?

[9] A: Yes, I'm aware of that.

[10] Q: Can you tell me what you can about this [11] special rotation schedule?

[12] A: Generally, when you complete the second [13] year you would go, of course, to the third year. [14] The decision was made, at the time of review, for [15] each resident, whether or not they should be [16] graduated to the next year, that she was not [17] ready to move to the next year. So the question [18] became should she repeat that second year, be [19] dismissed or given a mixture or different

type of [20] program that would address what were felt to be [21] her deficits. And the committee decided to give [22] her a program that would, hopefully, address the [23] deficits as identified by the staff.

[24] Q: So this was a committee decision? A

---

Page 18

[1] committee vote?

[2] A: A committee vote.

[3] Q: Okay. Were you in favor of this special [4] rotation schedule?

[5] A: No.

[6] Q: Why not?

[7] A: I guess I'm an up or down kind of person, [8] meaning either you can move on to the next year [9] or you are not ready to move on to the next year, [10] should either repeat it or be dismissed.

[11] And I just foresaw, in my own mind, [12] problems with making a special case for someone [13] because then they become more isolated, the way I [14] looked at it. Whether that was going to be the [15] case or not, only time would tell. But the way I [16] viewed this special case that it would create [17] problems that might be better avoided.

[18] Q: When you say isolated do you mean being [19] treated differently than the rest of the [20] residents?

[21] A: Well, you would be treated differently [22] because you would have a special program.

[23] Q: Is that what you meant?

[24] A: Yes.

---

Page 19

[1] Q: Do you think that happened in Dr. [2] Zechman's case, that she was somehow isolated [3] from the other residents because of this special [4] rotation?

[5] A: I don't think it was just the special [6] rotation that caused the isolation.

[7] Q: What else, in your opinion, caused this [8] isolation?

[9] A: There were — I wouldn't say conflicts, [10] but I guess conflicts is really the word, between [11] herself and other residents and other staff [12] members. So that will also cause a person to [13] become more internalized or more protective of [14] their space when they feel as though people are [15] not working with them.

[16] Q: Do you know what the subject of these [17] conflicts were or what these conflicts were [18] about?

[19] A: The only one that I have been able to [20] recall, it was the whole area of her space in the [21] call room because she wasn't a third year, she [22] wasn't a second year, she was somewhere in [23] never, never land, you know. And for

Oct 19 06 03:26p        Hawkins Reporting                3026588418              P.6

Janice Tildon-Burton, OB/GYN                                      Ellen Zechman  v.
September 20, 2006                                        Christiana Health Care Systems

her trying to find [24] a space where she could put her belongings. And

**Page 20**

. do remember talking about it in the call room [2] saying, you know, just try to work with — go to [3] somebody directly. Are you sure this is what [4] they really think or are you just internalizing [5] this yourself? You need to just sit down with [6] the residents that are involved. That was a [7] recommendation I made. And around the same time [8] I knew she was feeling down on herself and was in [9] a card shop and saw this little day I thought [10] was really quite clever. It was a good day/bad [11] day and you could write the good day and flip it [12] over and write the bad day on the opposite page. [13] And I gave it to her just as a way that she could [14] write down some of her thoughts or problems that [15] she was experiencing on a day-to-day basis.

[16] Q: Do you think that some of the other [17] residents were unkind to Dr. Zechman?

[18] A: I can't say with any certainty. It is [19] hearsay that some didn't like her.

[20] Q: So, is that something you heard that some [21] didn't like Dr. Zechman?

[22] A: Yes.

Q: Is that anything that you saw [23] urself?

[24] A: I did not personally see it.

**Page 21**

[1] Q: Is this — the fact that you heard they [2] didn't like her, is this something you heard in [3] the Resident Review Committee meetings?

[4] A: Not — yes. But not just there, just in [5] general conversation on the labor and delivery [6] suite or wherever you might congregate with other [7] physicians.

[8] Q: Were there specific names involved in [9] residents who didn't like her?

[10] A: Not that I was aware, prior to reading the [11] complaint.

[12] Q: Would it just come up in conversation that [13] you would hear that others didn't like Dr. [14] Zechman?

[15] A: Let's just say you are sitting around with [16] some other attorneys and you are just discussing [17] just day-to-day things and you might say in [18] passing oh, so and so is having a problem with [19] this person or they seem to be not fitting in [20] well with their group. So it is just a 'v of [21] general conversation, not that nebody [22] specifically came up and said let's talk about [23] Ellen Zechman. I don't want to give you the [24] framework —

**Page 22**

[1] Q: No.

[2] A: Yeah.

[3] Q: Now, based on your observation did you see [4] whether or not Dr. Zechman fit in with her group?

[5] A: You asked if I remembered the residents in [6] her group and I couldn't remember the names of [7] the residents in her group. But I can say Ellen [8] had a whole different experience. She was older [9] than they, married with children. She was far [10] away from home and didn't live where her family [11] was, during her training.

[12] One of the things I related to Ellen [13] was that I was older when I was in my residency [14] program and I had family, and I commuted, but I [15] commuted from Philadelphia to Wilmington, which [16] is an entirely different situation. But I could [17] have some empathy for her just based on a [18] similarity in coming into a program, I didn't [19] start at Einstein, I finished at Einstein, so I [20] was new going into a program from another [21] program. And those kinds of things made that [22] kind of connection and I guess that's why we [23] probably talked more most did in the locker room.

[24] Q: Do you think those differences, you

**Page 23**

[1] mentioned several differences, the fact that she [2] was older, that she was away, that she was [3] married, travelling, do you think that those [4] differences contributed to the isolation that we [5] spoke of earlier?

[6] A: It probably did.

[7] Q: Do you know whether any other members of [8] the committee were aware of Dr. Zechman's [9] isolation?

[10] A: I can't say personally that anyone else [11] was aware. But we all knew the things that I [12] mentioned, that she was away from her family and [13] that she was obviously a little older than her [14] other peers.

[15] Q: What could the program do in order to [16] minimize the isolation?

[17] A: I don't think I'm qualified to answer that [18] question.

[19] Q: Okay.

[20] A: No.

[21] Q: Why don't you feel you are qualified to [22] answer the question?

[23] A: I'm not hired by the department, so I [24] don't know all of the intricacies that go into

**Page 24**

[1] developing the program itself and some of the [2] things they have in place. So I'm in the [3] periphery, so to comment on what should have been [4] done, I

couldn't comment on those things.

[5] Q: What about the committee? Could the [6] committee have done anything to bridge the gap [7] between Dr. Zechman and the other residents?

[8] A: I know she had a mentor available. There [9] were physicians on the committee who said let her [10] scrub with them so, again, we could get a better [11] sense of her skills. So in that way, I think [12] there was some outreach. I don't know if you [13] mean on a personal level whether there should [14] have been more outreach, and I'm not sure that [15] would have been the appropriate way to go, other [16] than some of the things that we as individuals [17] would do.

[18] Q: How about the other attending physician? [19] We just spent a lot of time talking about the [20] residents and the differences between Dr. Zechman [21] and the residents and how that somehow [22] contributed to her isolation. I want to turn now [23] to the attending physicians. Did you have an [24] understanding or know of how Dr. Zechman related

**Page 25**

[1] to the attendings?

[2] MS. BAISINGER: Objection. [3] Speculation.

[4] You can answer.

[5] THE WITNESS: No, I don't know.

[6] BY MS. BREWINGTON:

[7] Q: I think what you said earlier was some of [8] the attendings that said let her scrub with me.

[9] A: Okay.

[10] Q: Were there some attendings that did not [11] want to scrub with Dr. Zechman?

[12] MS. BAISINGER: Speculation.        [13] You can answer?

[14] THE WITNESS: Not that I'm aware of.

[15] BY MS. BREWINGTON:

[16] Q: Okay. Do you know what the continuity [17] clinics are?

[18] A: Yes.

[19] Q: Can you tell me what they are?

[20] A: At the Wilmington Hospital where the [21] outpatient — one of the primary outpatient [22] areas, because now in Christiana they do have [23] some outpatients that are seen there as well — [24] but on a regular basis the residents go to the

**Page 26**

[1] Wilmington Hospital to see OB and GYN patients at [2] that facility.

[3] It used to be that the patients [4] were not assigned to a patient, you just saw [5]

Oct 19 06 03:27p    Hawkins Reporting    3026588418    p.7

Ellen Zechman  v.                                    Janice Tildon-Burton, OB/GYN
Christiana Health Care Systems                                    September 20, 2006

whoever came in the door. The intent of the [6] continuity was to try to establish continuity [7] with a patient, being obstetrical or gynecologic, [8] so you would carry their care through in order to [9] develop a relationship and be able to see how [10] care was developed over a period of time or a [11] longer period of time.

[12] Q: Are the continuity clinics something that [13] the residents are required to attend?

[14] A: Yes.

[15] Q: Do you know whether or not Dr. Zechman [16] attended the continuity clinics?

[17] A: I don't know that.

[18] Q: But she should have attended?

[19] A: Yes.

[20] Q: Do you know whether or not the special [21] rotation schedule prohibited her in any way from [22] attending the continuity clinics?

[23] A: I can't say with certainty if that [24] happened or not.

Page 27

[1] Q: When Dr. Zechman and you would talk in the [2] locker room, and I'm assuming — correct me if [3] I'm wrong — she would advise you of her concerns [4] about how she was being treated when you were in [5] the locker room, do you feel her concerns were [6] vague in any way?

[7] MS. BAISINGER: Objection. Vague.

[8] THE WITNESS: With regard to what? [9] The residents or what?

[10] BY MS. BREWINGTON:

[11] Q: We can break it down. Did Dr. Zechman [12] express to you her concerns about how she was [13] being treated by other residents? I will name [14] names. Robin Gray, Rachel Heinley, those are the [15] residents I'm speaking of, but if you can't [16] remember names that's fine. But did she express [17] concerns about those individuals and how she was [18] being treated?

[19] A: I can't say she specifically mentioned [20] names, and I don't recall her mentioning names. [21] I had more of a sense that it was a year problem, [22] meaning the second year problem that she was not [23] getting along well with them for whatever reason. [24] I know at one point she was concerned she hadn't

Page 28

[1] been able to go home and see her family and [2] finally she had a weekend off and I saw her in [3] the locker room and she was really excited she [4] was going home to see her family. And I don't [5] remember specifically names, and I don't want to [6] do that, because you

don't want to pick people [7] out, because that's something you don't do as a [8] resident.

[9] Q: So again, then, it would be difficult for [10] you to speak on whether you felt her concerns [11] about other residents were legitimate or not?

[12] A: It would be difficult to answer that.

[13] Q: How about the special rotation schedule? [14] Did she discuss her concerns with you about this [15] special rotation schedule or her schedule in [16] general?

[17] A: She may have, but I don't recall [18] specifically having that discussion.

[19] Q: How about the call room? Did you have [20] discussions with Dr. Zechman about this call [21] room?

[22] A: Right. And I mentioned earlier that she [23] did bring up the call room and I suggested she [24] speak to the resident that was giving her the

Page 29

[1] problem and try to come to some sort of [2] resolution as to what was causing that. [3] Apparently she was hearing from one person or [4] another that this couldn't happen or that [5] couldn't happen. And I said you need to go to [6] that particular person and confront the issue or [7] have somebody in the program deal with this issue [8] if you can't do that. So I remember that [9] discussion but not about a specific person.

[10] Q: The issue about the call room, was it [11] where she could put her things? Was it one [12] person telling her one thing and one telling her [13] another and you told her to go to this person?

[14] A: One was — one said she couldn't put her [15] things in the room and one was a third year, and [16] I don't know what the problem was, but for her to [17] move forward she had to address it. She had to [18] put her things someplace.

[19] Q: Would the appropriate thing to do would be [20] to address it with the chair or chief resident?

[21] A: That's hard to say what would be [22] appropriate because it depended on how you worked [23] with your group. Each resident group works a [24] little differently as far as hierarchy. Some

Page 30

[1] work as a group, others are more individuals and [2] will do things a little differently. Others will [3] always go to the residency director or the chair. [4] So each group is a little different. And that [5] group had their own chemistry.

[6] Q: So you didn't — what do you mean by [7] chemistry?

[8] A: There were — I'm going back. It's

funny. [9] Out of 16 residents there was only one male. [10] There had been two and one left so I think we [11] were down just to one male. So if you can [12] imagine working with 15 women all headstrong and [13] all secure where they are, it can be difficult. [14] That's what I mean by chemistry.

[15] Q: Back to the call room. You didn't tell [16] Dr. Zechman who to go to, you just told her to [17] take care of it?

[18] A: If she remembers that, maybe I did. But I [19] don't remember specifically telling her who to [20] talk to.

[21] Q: Okay. Let's go back to the journal. You [22] mentioned that earlier. The — this journal was [23] purchased and intended for Dr. Zechman; is that [24] correct?

Page 31

[1] A: Yes.

[2] Q: And it was for her to dialog — I guess, [3] just write down her experiences?

[4] A: It was really just a diary. You know, if [5] you keep a daily journal. But sometimes you have [6] good things that happen during the course of the [7] day and some days are really bad days, and you [8] can write that down as well. So it was just a [9] way to put down things that were occurring with [10] her. My idea was to write down things, look at [11] it and let it go. Because sometimes if you don't [12] have the opportunity to do that, don't have [13] somebody to talk to on a regular basis you [14] continually internalize and that just makes [15] things fester.

[16] Q: Were you aware Dr. Zechman suffered a [17] disability?

[18] A: Not until the end. I was not aware of [19] that.

[20] Q: The end would be — she ended her [21] relationship with the program in September 2003?

[22] A: Yes.

[23] Q: Would it have been in or around September [24] or August or July?

Page 32

[1] A: It would have been between July and [2] September.

[3] Q: Okay. How did you become aware of her [4] disability or that she had a disability?

[5] A: To the best of my recollection it was [6] mentioned during a residency committee meeting, [7] and I can't remember the entire circumstances [8] that it came up. But there was a comment made [9] about her saying she had chronic fatigue and that [10] was the first I was aware that this was an issue.

[11] Q: Do you know whether her actual disability [12] was discussed at that meet-

Janice Tildon-Burton, OB/GYN                    Ellen Zechman  v.
September 20, 2006                      Christiana Health Care Systems

ing? Like what her [13] actual disability was?

[14] A: I don't recall.

[15] Q: Okay. And there was there a decision made [16] by the committee at that time; do you understand?

[17] MS. BAISINGER: Regarding?

[18] BY MS. BREWINGTON:

[19] Q: A decision made by the residency committee [20] about how to handle her chronic fatigue?

[21] A: I don't remember being a part of that [22] discussion if it did occur.

[23] Q: Okay.

[24] MS. BREWINGTON: If I could have

**Page 33**

[1] that marked as Tildon-Burton 1.

[2] (Tildon-Burton Exhibit 1 was marked [3] for identification.)

[4] BY MS. BREWINGTON:

[5] Q: Take a look at this document. We have [6] marked that as Tildon-Burton 1. As I understand [7] it, and you can correct me if I'm wrong, these [8] are minutes of a Resident Review Committee [9] meeting?

[10] A: That's correct.

[11] Q: And you were in attendance at that [12] meeting; is that correct?

A: That's correct.

[14] Q: Take a look at that and tell me when you [15] have had an opportunity to review. And I want to [16] ask you a couple questions about it.

[17] Okay?

[18] A: Okay. Okay.

[19] Q: Invited to this meeting were Dr. Patruno, [20] Dr. Hoffman and Dr. Ostrum; do you know whether [21] they attended this meeting?

[22] A: No.

[23] Q: Do you remember this meeting?

[24] A: Yes.

**Page 34**

[1] Q: And it is just you can't remember whether [2] they were there?

[3] A: Correct.

[4] Q: Okay. So is it fair to say that you don't [5] recall them saying anything specifically during [6] this meeting?

[7] MS. BAISINGER: Objection. Asked [8] and answered.

[9] THE WITNESS: It is difficult to [10] say, specifically, that I remember Matt Hoffman [11] speaking at that meeting, or Joe Patruno or even [12] if Mickey Ostrum was there — his name is Gordon, [13] we don't call him Gordon. But when I look at [14] this, I thought Matt Hoffman was always there, so [15] I would have expected him to have been there and [16] to

have spoken. And just going back in a three [17] year interval, how things have changed, because [18] he is a part of that committee now. So that kind [19] of threw me a little that he was invited.

[20] So I would have to say I remember [21] Matt speaking. I cannot address whether Joe or [22] Mickey spoke at the meeting or not. Although, [23] they are listed as having been there.

[24] MS. BREWINGTON:

**Page 35**

[1] Q: Are they listed as having been there, [2] though it says invited?

[3] A: You are interpreting — okay.

[4] Q: I don't know. I have certainly asked the [5] question before and I can't seem to get an answer [6] and I believe it says invited.

[7] Based on your experience with the [8] Resident Review Committee, if it says invited [9] does that mean that they were present?

[10] A: Yes.

[11] Q: Was the committee concerned that [12] Dr. Zechman may have had a learning disability?

[13] A: The question was whether or not there [14] could have been a learning disability that was [15] impeding her being able to get up to speed. And [16] so in order to assess whether somebody has [17] another reason to explain why they are having [18] difficulty, you want to look at all aspects. And [19] that would just be an aspect you would look at as [20] someone who has gotten this far and now seems to [21] having some problems.

[22] Q: Do you know whether Dr. Zechman was tested [23] for a learning disability?

[24] A: I'm not aware if that happened or not.

**Page 36**

[1] Q: Okay. Take a look at the second page [2] there.

[3] Now that we have looked at this [4] document, do you think that it was at this [5] meeting, the August 18, 2003 meeting, where it [6] was discussed — where her disability was [7] discussed?

[8] A: Yes. Based on the minutes of the meeting.

[9] Q: And would you say that this is the first [10] time that you became aware of her disability?

[11] A: Yes.

[12] Q: And this would be consistent with the [13] conversation we just had earlier about you [14] learning of her disability?

[15] A: Correct.

[16] Q: Based on my review of the min-

utes, and [17] please correct me if I'm wrong, the plan for [18] Dr. Zechman as of August, 2003 was to continue [19] probation with the special PGY rotation; is that [20] correct?

[21] A: Correct.

[22] Q: There is also talk in the minutes of a [23] complaint that was filed with the ACGME; do you [24] see where it says that?

**Page 37**

[1] A: Yes.

[2] Q: Do you know who filed this ACGME [3] complaint?

[4] A: No.

[5] Q: Was it discussed at the meeting who could [6] have filed the ACGME complaint?

[7] A: I don't remember.

[8] Q: Do you remember a discussion about the [9] ACGME complaint?

[10] A: Vaguely, but no specifics as to what the [11] actual complaint was. I don't believe that was [12] revealed at the meeting.

[13] Q: Okay. So is it your testimony that today [14] is the first day you are learning that [15] Dr. Zechman filed the ACGME complaint?

[16] A: Yes.

[17] Q: You can put that document aside. Thank [18] you.

[19] One more thing on that document. [20] Turn to the second page.

[21] It says that: "The meeting was [22] adjourned at 6:45. Next meeting will be held [23] September 15, 2003 at 5:30."

[24] A: Yes.

**Page 38**

[1] Q: My question is next meeting that I have [2] noted in my records is September 29th, 2003, not [3] September 15th, 2003. Is it a normal practice [4] that the date would be changed for some reason or [5] another or would there have been a September 15th [6] meeting and September 29th meeting?

[7] A: No. It does happen on occasion that the [8] Residency Review Committee meeting time has been [9] adjusted, so that's not unusual.

[10] Q: So this document I'm about to show you, [11] after we have it marked, is the Resident Review [12] Committee meeting of September 29th, 2003.

[13] A: Okay.

[14] Q: Do you have any reason to think that there [15] was a meeting between August 15th and — August 18th — [16] I'm sorry — and September 29th?

[17] A: No reason to think that would have [18] happened.

Oct 19 06 03:29p     Hawkins Reporting         3026588418         p.9

Ellen Zechman  v.                                    Janice Tildon-Burton, OB/GYN
Christiana Health Care Systems                              September 20, 2006

[19] Q: Okay.

[20] MS. BAISINGER: Is this an exhibit?

[21] MS. BREWINGTON: Yes. I'm going to [22] have her mark it, I just kept talking.

[23] (Tildon-Burton Exhibit Number 2 was [24] marked for identification.)

Page 39

[1] BY MS. BREWINGTON:

[2] Q: The document that is in front of you, we [3] have marked Tildon-Burton 2. And it is minutes [4] from the Resident Review Committee Meeting of [5] September 29, 2003. You did not attend that [6] meeting, did you?

[7] A: Correct.

[8] Q: What is the procedure for not attending [9] the meeting? Do you send a letter to Dr. Ekbladh [10] or do you just not attend?

[11] A: Usually you let Sandy know if there is a [12] conflict.

[13] Q: Are you aware of the names of the two [14] individuals that abstained from voting that [15] Dr. Zechman be terminated from the program?

[16] A: No.

[17] Q: As of the August 18, 2003 meeting the plan [18] was for Dr. Zechman to continue as a PGY2 with a [19] special rotation. Just a few weeks later it was [20] determined that she be terminated from the [21] program. As a member of the Resident Review [22] Committee, can you tell me what was the [23] determining factor during that period of time or [24] what changed in deciding that she should be

Page 40

[1] terminated?

[2] A: Other than what is presented in the [3] minutes I cannot give you any ad- ditional [4] information.

[5] Q: And I guess when I look at this list, my [6] question that pops out to me is, did the [7] committee expect to see drastic change within [8] those three weeks? Because it seems to me, that [9] those comments right here are consistent with how [10] the Resident Review Committee felt about her [11] throughout this whole time, yet the decision in [12] August was for her to continue as a PGY2. I [13] guess I go back to my same question, was there [14] something that you can recall that occurred in [15] those weeks to change the mind of the committee?

[16] MS. BAISINGER: Objection.   Asked [17] and answered.

[18] THE WITNESS: Not that I'm aware of.

[19] BY MS. BREWINGTON:

[20] Q: Are you aware that during this time in [21] September, prior to this

meeting of September [22] 29th, Dr. Zechman was out of work due to a [23] pinched nerve?

[24] A: I vaguely recall her missing some time.

Page 41

[1] Q: Was that a concern of the com- mittee that [2] she was missing time?

[3] A: Well, I wasn't there for this, so I don't [4] know if that came up in the discussion and it is [5] not recorded, so.

[6] Q: Is there anything that could have been [7] done differently — I'm not sure if you can [8] answer because I think I asked you something [9] similar to this before — but is there anything, [10] in your opinion, that could have been done [11] differently in order for Dr. Zechman to [12] successfully complete the pro- gram?

[13] MS. BAISINGER: Objection.   Asked [14] and answered.

[15] THE WITNESS: No.

[16] MS. BREWINGTON: I don't have [17] anything further.

[18] CROSS-EXAMINATION

[19] BY MS. BAISINGER:

[20] Q: I just have one.

[21] If we could turn back to Exhibit 1, [22] which is the August 18, 2003 meeting. On [23] page 2 [23] it says that the committee suggests that she [24] continue with the probation with the special PGY2

Page 42

[1] rotation; do you see that?

[2] A: Yes.

[3] Q: On the first page does it also state that [4] the committee would re-review Dr. Zechman at the [5] next meeting?

[6] A: Correct. It says that.

[7] MS. BAISINGER: That's it.

[8] MS. BREWINGTON: I don't have [9] anything further.

[10] (The deposition concluded at 11:05 [11] a.m.)

[12] (Reading and signing of the [13] deposition were not waived.)

Page 43

[1] STATE OF DELAWARE:

[2] NEW CASTLE COUNTY:

[5] I, Christine Mason Baird, Certified [6] Realtime Reporter and Notary Public, do hereby [7] certify that the foregoing record is a true and [8] accurate transcript of my stenographic notes [9] taken on September 20, 2006 in the [10] above- captioned matter.

[13] IN WITNESS WHEREOF, I have here- unto [14] set my hand and seal this 9th day of October, [15] 2006 at Wilmington.

[21] Christine Mason Baird, RPR, CRR [22]

Certification: #157-PS [23] Expiration: Per- manent

Page 44

[1] INSTRUCTIONS TO WITNESS

[4] It is your right to read your [5] deposition and make any changes in form or [6] substance. Note the reason for any changes [7] directly on the errata sheet.

[8] Please sign and date the errata sheet [9] and your deposition in the spaces pro- vided. You [10] are signing this transcript subject to the [11] changes you have made on the errata sheet. [12] Unless otherwise agreed to by counsel to this [13] deposition, you must sign before a notary public.

[14] Return the original errata sheet and [15] signature to the deposing attorney promptly. [16] Court rules require com- pletion of this process [17] within 30 days after receipt of the transcript or [18] signature is deemed waived.

Page 45

[1] INSTRUCTIONS TO DEPOSING ATTORNEY

[4] Upon receipt of the signed errata [5] sheet and signature page, please dis- tribute [6] copies to all parties in attend- ance and place the [7] original signed pages in the original transcript.

[8] If you do not receive the signed [10] errata sheet and signature page within 30 days [11] after receipt of the original transcript, you may [12] assume that signature has been waived.

Page 46

ERRATA SHEET
PAGE/LINE#    CORRECTION AND REASON

**Lawyer's Notes**

Westlaw.

151 Fed.Appx. 162

151 Fed.Appx. 162, 2005 WL 2562617 (C.A.3 (Del.))
(Cite as: 151 Fed.Appx. 162)

H
Briefs and Other Related Documents
E.E.O.C. v. Avecia, Inc.C.A.3 (Del.).2005.This case was not selected for publication in the Federal Reporter.NOT PRECEDENTIAL Please use FIND to look at the applicable circuit court rule before citing this opinion. Third Circuit Local Appellate Rule 28.3(a) and Internal Operating Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3 IOP APP I 5.3.)
United States Court of Appeals,Third Circuit.
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; Lisa Stepler
v.
AVECIA, INC. Lisa Stepler, Appellant.
No. 04-3396.

Argued July 12, 2005.
Decided Oct. 13, 2005.

**Background:** Discharged employee brought action against former employer, alleging Title VII retaliation, wrongful termination in violation of Delaware law, and intentional infliction of emotional distress under Delaware law. The United States District Court for the District of Delaware, Susan L. Robinson, J., granted summary judgment in favor of employer on the retaliation and wrongful termination claims, and dismissed the emotional distress claim. Employee appealed.

**Holdings:** The Court of Appeals held that:

(1) genuine issue of material fact precluded summary judgment in employee's Title VII retaliation claim, and

(2) discharge did not violate public policy and did not involve a falsification of employment records, for purpose of employee's wrongful termination claim.

Affirmed in part; reversed and remanded in part.
West Headnotes
[1] Federal Civil Procedure 170A €=2497.1

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)2 Particular Cases
            170Ak2497 Employees and Employment Discrimination, Actions Involving
            170Ak2497.1 k. In General. Most Cited Cases
Genuine issue of material fact as to whether employee's discharge was related to her complaints about hostile work environment precluded summary judgment in employee's Title VII retaliation claim. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

[2] Labor and Employment 231H €=759

231H Labor and Employment
   231HVIII Adverse Employment Action
      231HVIII(A) In General
         231Hk759 k. Public Policy Considerations in General. Most Cited Cases
Under Delaware law, discharge of at-will employee did not violate public policy and did not involve a falsification of employment records, for purpose of employee's wrongful termination claim, absent showing of employer's violation of a recognized public interest, or actual manipulation of employment records.

*163 On Appeal from the United States District Court for the District of Delaware. Dist. Court Civil Action No. 03-CV-00320. District Judge: The Honorable Susan L. Robinson.

Phillip B. Bartoshesky (Argued), Biggs and Battaglia, Wilmington, Del., for Appellant.
Ginger D. Schroder (Argued), Schroder, Joseph & Associates LLP, Buffalo, N.Y., Jennifer C. Jauffret,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

151 Fed.Appx. 162

151 Fed.Appx. 162, 2005 WL 2562617 (C.A.3 (Del.))
**(Cite as: 151 Fed.Appx. 162)**

Page 2

Richards, Layton & Finger, Wilmington, DE, for Appellee.

Before ALITO, BECKER, and GREENBERG, Circuit Judges.

OPINION OF THE COURT
PER CURIAM.
**\*1** Lisa Stepler, a former laboratory technician for Avecia, Inc. ("Avecia") sued Avecia for retaliation under Title VII of the Civil Rights Act of 1964, wrongful termination under Delaware law, and intentional infliction of emotional distress under Delaware law. The District Court dismissed Stepler's claim for intentional infliction of emotional distress and granted summary judgment in favor of Avecia on Stepler's retaliation and wrongful termination claims. We affirm the dismissal of the claim for the intentional affliction of emotional distress and the entry of summary judgment in favor of Avecia on the wrongful termination claim. However, we reverse the entry of summary judgment in favor of Avecia on the retaliation claim and remand for further proceedings.

I.

Stepler asserts that this case should have been analyzed under the framework of *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989).[FN1] Under that framework, the "burden of production and the risk of non-persuasion are shifted to the defendant," and the defendant must show "that even if discrimination was a motivating factor in the adverse employment decision, it would have made the same employment decision regardless of its discriminatory animus." *Armbuster v. Unisys Corp.,* 32 F.3d 768, 778 (3d Cir.1994). This framework only applies, however, where the employee can show *"direct evidence* that an illegitimate criterion was a substantial factor in the decision." *Price Waterhouse,* 490 U.S. at 276 109 S.Ct. 1775 (O'Connor, J., concurring in the judgment) (emphasis added); *see also Walden v. Georgia-Pacific Corp.,* 126 F.3d 506, 513 (3d Cir.1997). We have carefully considered the evidence on which Stepler relies in this case, and

while the question is close we conclude that she did not meet the "direct evidence" standard.

FN1. 42 U.S.C. § 2000e-2(m) does not reach retaliation claims. *Woodson v. Scott Paper Co.,* 109 F.3d 913, 934 (3d Cir.), *cert. denied,* 522 U.S. 914, 118 S.Ct. 299, 139 L.Ed.2d 230 (1997).

Stepler's Title VII claims must be analyzed under the burden-shifting framework established by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny. Under**\*164** this framework, Stepler was first required to make out a prima facie case of retaliation by establishing (1) that she engaged in a protected activity, (2) that she suffered an adverse employment action, and (3) that there was a causal link between her protected activity and the adverse employment action. *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 279 (3d Cir.2000). If Stepler successfully made out a prima facie case, Avecia had to point to evidence in the summary judgment record that was sufficient, if believed, to support a finding that Stepler was not discharged because of her protected activity. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506-507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). If Avecia met this burden, Stepler was required to prove that unlawful retaliation was a determinative cause of her firing. *See McDonnell Douglas,* 411 U.S. at 802-803, 93 S.Ct. 1817.

[1] Stepler clearly satisfied the first two prongs of the prima facie case standard. Her complaints about a hostile work environment and retaliation were protected activities, and her firing by Avecia obviously was an adverse employment action. Whether she proffered sufficient evidence to meet the third prong of the prima facie case standard is less clear due to the gap of almost one year between her initial complaint and her termination, but a gap of this magnitude is not conclusive and can be outweighed by a "pattern of harassment" or a " pattern of antagonism" in the intervening period. *See Woodson v. Scott Paper Co.,* 109 F.3d 913, 920 (3d Cir.1997); *see also Robinson v. Southeastern Pennsylvania Transp. Auth.,* 982 F.2d 892, 894-95

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

151 Fed.Appx. 162

151 Fed.Appx. 162, 2005 WL 2562617 (C.A.3 (Del.))
**(Cite as: 151 Fed.Appx. 162)**

(3d Cir.1993). A reasonable jury considering the evidence in the light most favorable to Stepler-including Stepler's performance reviews, management's increased scrutiny of her, the tension with her co-workers, the memorandum of April 23, 2001, and the termination letter-could conclude that there was a causal link between Stepler's protected activities and Avecia's decision to fire her. We thus conclude that Stepler made out a prima facie case.

**\*\*2** Avecia's proffered reasons for Stepler's termination were poor work performance and disruptive behavior, but a reasonable jury considering the evidence in the light most favorable to Stepler, and drawing all inferences in Stepler's favor, could conclude otherwise. Particularly noteworthy are the references in both the April 23 memo and the May 4, 2001, termination letter to Stepler's "intense focus upon alleged harassment [and] retaliation." App. 264, 371.

### III.

Conversely, there are no issues of fact precluding summary judgment in favor of Avecia on Stepler's state law claim for breach of the covenant of good faith and fair dealing.

[2] The general rule in Delaware is that employees are employed "at will" and may be dismissed at any time without cause. *See Merrill v. Crothall-American, Inc.,* 606 A.2d 96, 103 (Del.1992). The general rule does not apply, however, in the following four situations:
(i) where the termination violated public policy;
(ii) where the employer misrepresented an important fact and the employee relied "thereon either to accept a new position or remain in a present one";
(iii) where the employer used its superior bargaining power to deprive an employee of clearly identifiable compensation related to the employee's past service; and
**\*165** (iv) where the employer falsified or manipulated employment records to create fictitious grounds for termination.

*Lord v. Souder,* 748 A.2d 393, 400 (Del.2000) (citing *E.I. DuPont de Nemours and Co. v. Pressman,* 679 A.2d 436, 442-44 (Del.1996)). Stepler claims that Avecia's actions fit into either the first or fourth category. She contends that the first category fits because being fired for opposition to sexual harassment and retaliation violates public policy, and she argues that the fourth category fits because she was subjected to false criticisms of her work in her performance evaluation, false claims that she was using work time to study, and false claims that she was fired for behavioral and performance issues.

In order to make out a claim of a public policy violation, a plaintiff must satisfy a two-part test: " (i) the employee must assert a public interest recognized by some legislative, administrative or judicial authority and (ii) the employee must occupy a position with responsibility for advancing or sustaining that particular interest." *Lord,* 748 A.2d at 401 (citing *Pressman,* 679 A.2d at 441-42). To satisfy the first part, Stepler relies on the Delaware Supreme Court's decision in *Schuster v. Derocili,* 775 A.2d 1029 (Del.2001), which recognized a cause of action for breach of the covenant of good faith and fair dealing where the employee alleged that she was terminated following sexual harassment in the workplace. But in 2004 the Delaware legislature amended 19 Del. C. § 710 *et seq.,* which prohibits discrimination in employment practices, in order to clarify that this statute was the "sole remedy" for an aggrieved employee "to the exclusion of all other remedies." 19 Del. C. § 712(b) (2005). In fact, the synopsis of the Senate Bill expressly states disagreement with the Delaware Supreme Court's decision in *Schuster:*
**\*\*3** This bill confirms that Chapter 7 is the exclusive and sole remedy for employment discrimination claims, requiring initial processing of all such claims with the Department of Labor for review and action. This bill effectively re-establishes the exclusive remedy put in question by the decision in *Schuster v. Derocili,* 775 A.2d 1029 (2001).

Delaware Bill Summary, 2004 Reg. Sess. S.B. 154. Moreover, when the bill is read in light of the sponsor statement, which "confirms" and "

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

151 Fed.Appx. 162

151 Fed.Appx. 162, 2005 WL 2562617 (C.A.3 (Del.))
(Cite as: 151 Fed.Appx. 162)

Page 4

re-establishes" the pre-existing rule "put in question by" *Schuster*, it is clear that the 2004 Amendment is meant to be retroactive. Thus Stepler has not asserted a recognized public interest, and Avecia's actions do not fit into the first category.

Nor do they fit into the fourth category: falsification or manipulation of employment records to create fictitious grounds for termination. Even if we assume that Stepler was subjected to false criticisms of her work performance and false claims that she was using work time to study, there is no evidence that these particular criticisms and claims were the grounds for Stepler's termination. And even if we assume that Avecia falsely claimed that Stepler was fired for behavioral and performance issues, this is not the kind of falsehood specified in the fourth category, which provides that an employer violates the covenant of good faith and fair dealing when it "falsifie[s] or manipulate[s] employment records to create fictitious grounds for termination." *Lord*, 748 A.2d at 400. If the employer did not actually falsify or manipulate employment records, then it does not matter if the employer gave a false rationale for termination. *See Williams v. Caruso*, 966 F.Supp. 287, 291 (D.Del.1997) ("Nothing in *Pressman* suggests an employer who gives an employee a false reason for termination*166 is subject to liability under the implied covenant of good faith and fair dealing. *Pressman* only held culpable the *manufacture* of grounds for dismissal, not the *statement* of a false reason for dismissal.") (emphasis in original); *see also Geddis v. University of Delaware*, 40 Fed. Appx. 650, 654 (3d Cir.2002) (unpublished) (noting that the employee did not claim his supervisor " intentionally created 'fictitious negative information ' about him in order to get him fired" and thus the conduct at issue did not fit the fourth *Pressman* category) (quoting *Schuster*, 775 A.2d at 1040).

## IV.

Under Delaware law, the general rule is that the worker's compensation administrative process is the exclusive remedy for an employee who suffers a work-related accident causing personal injury or death. *See 19 Del.Code Ann. § 2304 (2005)*.

However, the Delaware Supreme Court has held that "claims that involve a *true intent* by the employer to injure the employee fall outside of the Workers' Compensation Act and remain separately actionable as common law tort claims." *Rafferty v. Hartman Walsh Painting Co.*, 760 A.2d 157, 159 (Del.2000) (emphasis added); *see also Showell v. Langston*, No. Civ. A. 02C-01-016, 2003 WL 1387142, at *3 (Del.Super. March 5, 2003) (citing *Rafferty*). Thus, "for a complaint to survive a motion to dismiss, there must be more than a mere allegation that there was an intentional injury; there must be facts alleged which, if true, show deliberate intent to bring about an injury." *Rafferty*, 760 A.2d at 160. In other words, an employee must allege facts that, if true, would show that the employer intended to injure her. It would not be enough to allege facts showing that the employer intended to do an action and that the worker was injured as a result of that action. Specific intent is required.

**4 Stepler cites *Rafferty* and argues that her claim for intentional infliction of emotional distress is not barred. In a Memorandum Order of April 28, 2004, the District Court rejected Stepler's argument. We agree with the District Court's analysis.

We therefore affirm the District Court's order of summary judgment in favor of Avecia on Stepler's claims under Delaware law, but we reverse the District Court's order granting summary judgment in favor of Avecia on Stepler's retaliation claim, and we remand the case for further proceedings.

C.A.3 (Del.),2005.
E.E.O.C. v. Avecia, Inc.
151 Fed.Appx. 162, 2005 WL 2562617 (C.A.3 (Del.))

Briefs and Other Related Documents (Back to top)

• 04-3396 (Docket) (Aug. 23, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

ELLEN ZECHMAN,                          :
                                        :     C.A. No. 05-159 (JJF)
        Plaintiff,              :
                                        :
      v.                          :
                                        :
CHRISTIANA CARE HEALTH SYSTEMS,         :
                                        :
        Defendant.              :

### CERTIFICATE OF ELECTRONIC SERVICE

I hereby certify that on October 23, 2006, I served a copy of the attached **APPENDIX OF EXHIBITS TO BRIEF IN SUPPORT OF DEFENDANT CHRISTIANA CARE HEALTH SYSTEMS' MOTION FOR SUMMARY JUDGMENT** by hand delivery on the following counsel:

    Jeffrey K. Martin, Esquire
    Margolis Edelstein
    1509 Gilpin Avenue
    Wilmington, DE  19806

    *David H. Williams*
    David H. Williams (#616) (dwilliams@morrisjames.com)
    MORRIS, JAMES, HITCHENS & WILLIAMS, LLP
    222 Delaware Avenue
    P.O. Box 2306
    Wilmington, DE 19899
    (302) 888-6900

    Michael J. Ossip (mossip@morganlewis.com)
    Thomas S. Bloom (tbloom@morganlewis.com)
    MORGAN, LEWIS & BOCKIUS LLP
    1701 Market Street
    Philadelphia, PA  19103
    (215) 963-5543
    Attorneys for Defendant
Dated:  October 23, 2006    Christiana Care Health Services, Inc.

1473987/1