## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **ELLEN ZECHMAN,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **C.A. No. 05-159 (JJF)** |
| | : | |
| **CHRISTIANA CARE HEALTH** | : | |
| **SYSTEMS,** | : | |
| | : | |
| **Defendant.** | : | |

## PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

MARGOLIS EDELSTEIN
Jeffrey K. Martin (DE Bar ID 2407)
Lori A. Brewington (DE Bar ID 4522)
1509 Gilpin Avenue
Wilmington, Delaware 19806
(302) 777-4680
Attorneys for Plaintiff
Ellen Zechman

Dated: November 22, 2006

**TABLE OF CONTENTS**

**PAGE**

NATURE AND STAGE OF PROCEEDINGS..............................................................................1

I.      SUMMARY OF ARGUMENT ...................................................................................2

II.     STATEMENT OF FACTS............................................................................................3

III.    ARGUMENT     ...........................................................................................................11

A.      Standard of Review .....................................................................................................11

B.      Plaintiff Can Establish That Defendant's Reasons for Her Termination Are
        a Pretext for Age Discrimination.  Therefore, Defendant Is Not Entitled to
        Summary Judgment On Plaintiff's Claim of Age Discrimination. ....................................12

        1.      There Was An Inherent Age Based Bias Against Plaintiff Which Influenced
                The RRC's Opinion And Ultimately Lead To Plaintiff's Termination................13

        2.      Christiana Care's Reasons For Plaintiff's Termination Are Pretextual ...............15

C.      Christiana Care Is Not Entitled to Summary Judgment With Respect
        to Plaintiff's Disability Claims.........................................................................................17

        1.      Plaintiff Does Have A "Disability" Under The ADA ..........................................18

        2.      Defendant Discriminated Against Plaintiff When It Failed To
                Reasonably Accommodate Her ...........................................................................23

        3.      Defendant Discriminated Against Plaintiff When It Terminated Her
                Employment After She Made A Request For Reasonable Accommodations......27

D.      Defendant Is Not Entitled To Summary Judgment on Plaintiff's Retaliation Claim ........29

        1.      Plaintiff Can Establish A Prima Facie Case of Retaliation
                Because A Causal Link Between the Alleged Protected Activities
                and Her Termination Exists .................................................................................30

        2.      Plaintiff Can Establish A Pretext .........................................................................32

E.      Plaintiff's "Detrimental Reliance" Claims Does Not Fail As A Matter of Law ...............33

IV.     CONCLUSION .............................................................................................................35

# TABLE OF AUTHORITIES

Adickes v. S.H. Kress & Co.,
    398 U.S. 144, 157 (1970) ............................................................................................12

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242, 255 (1986) ........................................................................................11, 12

Arrieta-Colon v. Wal-Mart,
    434 F. 3d 75, 86 (1st Cir. 2006) ..................................................................................14

Carruth v. Continental General Tire, Inc.
    2001 U.S. Dist. LEXIS *18 (22368) ........................................................................19, 20

Clark County Sch. Dist. v. Breeden,
    532 U.S. 268, 269 (2001) ............................................................................................30

Crowley v. L.L. Bean, Inc.,
    303 F. 3d 387, 401 (1st Cir. 2002) ..............................................................................15

E.E.O.C. v. Sears,
    233 F. 3d 432, 440 (7th Cir. 2000) ..............................................................................19

Fuentes v. Perskie,
    32 F. 3d 759, 763 (3d Cir. 1994) .................................................................................27

Haschmann v. Time Warner Entertainment Co.,
    151 F.3d 591, 599-600 (7th Cir. 1998) .......................................................................20

Hendricks-Robinson v. Excel Corp.,
    154 F. 3d 686 (7th Cir.1998) ......................................................................................27

Horowitz v. Fed. Kemper Life Assurance Co.,
    57 F.3d 300, 302 n.1 (3d Cir. 1995) ...........................................................................11

Jalil v. Avdel Corp.,
    873 F. 2d 701, 708 (3rd Cir. 1989) .............................................................................31

Logan v. Commercial Un. Ins. Co.,
    96 F.3d 971, 978 (7th Cir. 1996) ................................................................................11

MacDonald v. Delta Air Lines, Inc.,
    94 F.3d 1437, 1440 (10th Cir. 1996) ..........................................................................11

Matczak v. Frankford,
    136 F. 3d 933, 937 (3rd Cir. 1997) .............................................................................20

McDonnell Douglas Corp. v. Green
    411 U.S. 792 (1973) ....................................................................................................12

Mengine v. Runyon,
    114 F.3d 415, 420 (3d Cir. 1997)..................................................................................23

Pa. Coal Ass'n v. Babbitt,
    63 F.3d 231, 236 (3d Cir. 1995)..................................................................................11

Point-Du-Jour v. County of Bucks,
    2000 U.S. Dist. LEXIS 3061 (March 7, 2000)................................................................27

Reeves v. Sanderson Plumbing Products, Inc.,
    530 U.S. 133 (2000)............................................................................................ 12, 33

Robinson v. SEPTA,
    982 F. 2d 892, 894 (3rd Cir. 1993)...............................................................................31

Rodgers v. Monumental Life Ins. Co.,
    289 F.3d 442, 448 (6th Cir. 2002)................................................................................11

Scott v. Potter,
    182 Fed. Appx. 521, 526 (6th Cir. 2006) ........................................................................13

Scott-Douglas Corp v.Greyhound Corp.,
    304 A. 2d 309, 319 (Del. Super. 1973) ..........................................................................33

Shaw v. Chamberlain Mfg. Corp.,
    2006 WL 2382284, at *10 (M.D. Pa. Aug. 17, 2006)......................................................29

St. Mary's Honor Ctr. v. Hicks,
    509 U.S. 502 (1993)...................................................................................................12

Sutton v. United Airlines,
    527 U.S. 471, 483, 144 L. Ed. 2d 450, 119 S. Ct. 2139 (1999) ........................................18

Taylor v. Phoenixville,
    184 F. 3d 296, 309 (3rd Cir. 1999).....................................................................20, 21, 27

Troy Chemical Corp. v. Teamsters Union Local No. 408,
    37 F.3d 123, 126 (3d Cir. 1994)..................................................................................11

Vande Zande v. Wisconsin,
    44 F. 3d 538, 544 (7th Cir. 1995).......................................................................17, 19, 25

Weiss v. Northwest Broad., Inc.
    140 F. Supp. 2d 336, 344 (D. Del. 2001) ......................................................................34

Williams v. Philadelphia Housing Authority Police Department,
    380 F.3d 751 (3rd Cir. 2004).......................................................................................18

Woodson v. Scott Paper Co.,
    109 F. 3d 913, 920 (3rd Cir. 1997) ...............................................................................29

## OTHER AUTHORITIES

Fed. R. Civ. P. 56(c) ....................................................................................................11

42 U.S.C. § 12101 ...................................................................................18, 20, 23, 25

29 C.F.R. 1630.2 ...............................................................................................19, 23

29 U.S.C. § 621 ..........................................................................................................1

Del. Code Ann. Tit. 19, § 711 (2006)...........................................................................1

Del. Code Ann. Tit. 19, §§ 723, 724, and 726 (2006).....................................................1

## NATURE AND STAGE OF PROCEEDINGS

On April 21, 2004. Plaintiff Ellen Zechman ("Plaintiff") filed the instant Complaint against Defendant Christiana Care Health Systems ("Christiana Care"), asserting claims of age discrimination under the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, et seq. ("ADEA") and Del. Code Ann. Tit. 19, § 711 (2006). Disability discrimination under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, et seq. ("ADA") and Del. Code Ann. Tit. 19, §§ 723, 724, and 726 (2006), retaliation, breach of the covenant of good faith and fair dealing, and detrimental reliance, arising out of the termination of her employment. Plaintiff has agreed to voluntarily dismiss her claim of a breach of the covenant of good faith and fair dealing. Discovery is now closed and Christiana Care ("Defendant") has moved for summary judgment.

This is Plaintiff's Answering Brief in opposition to Defendant's Motion for Summary Judgment. There are genuine issues of material fact and Defendant is not entitled to judgment as a matter of law.

1

# I.    SUMMARY OF ARGUMENT

A.    STANDARD OF REVIEW

B.    Plaintiff Can Establish That Defendant's Reasons for Her Termination Are a Pretext for Age Discrimination. Therefore, Defendant Is Not Entitled to Summary Judgment On Plaintiff's Claim of Age Discrimination.

     *1.    There Was An Inherent Age Based Bias Against Plaintiff Which Influenced The RRC's Opinion And Ultimately Lead To Plaintiff's Termination.*

     *2.    Christiana Care's Reasons For Plaintiff's Termination Are Pretextual*

C.    Christiana Care Is Not Entitled to Summary Judgment With Respect to Plaintiff's Disability Claims

     *1.    Plaintiff Does Have A "Disability" Under The ADA*

     *2.    Defendant Discriminated Against Plaintiff When It Failed To Reasonably Accommodate Her*

     *3.    Defendant Discriminated Against Plaintiff When It Terminated Her Employment After She Made A Request For Reasonable Accommodations*

D.    Defendant Is Not Entitled To Summary Judgment on Plaintiff's Retaliation Claim

     *1.    Plaintiff Can Establish A Prima Facie Case of Retaliation Because A Causal Link Between the Alleged Protected Activities and Her Termination Exists*

     *2.    Plaintiff Can Establish A Pretext*

E.    Plaintiff's "Detrimental Reliance" Claims Does Not Fail As A Matter of Law

## II.    STATEMENT OF FACTS

In 2002, Plaintiff was accepted into both Christiana Care's Residency Program and a residency program in Norfolk, Virginia. (Zechman at 27-28, B-0158). However, Plaintiff declined the invitation to attend the residency program in Norfolk, Virginia and to attend the program at Christiana Care relying on Dr. Sciscione's ("Sciscione"), Residency Director, representation during the interview process that she would be provided with ample opportunity to increase her surgical skills. Additionally, Dr. Ekbladh ("Ekbladh"), Residency Director following Sciscione's departure as Director, and Dr. Kaminski ("Kaminski"), a teaching physician in the OB/GYN program, testified that they were aware that her surgical skills fell below those of other residents in her class prior to her acceptance into the Program. (Ekbladh at 11, Kaminski at 10, B-0266). Further, in a letter to Dr. Vakili, ("Vakili"), a teaching physician in the OB/GYN program, Sciscione acknowledges that he recognized that Plaintiff would be "significantly behind when she started the program." (B-0001).

Plaintiff began working for Christiana Care on a full-time basis on or about June 23, 2002 as a second-year resident physician ("PGY-2") in the Department of Obstetrics and Gynecology ("OB/GYN") through the Department of Graduate Medical Education. (Zechman at 57, B-0165). Plaintiff was hired to replace another resident who had left the program becoming the fourth resident in a group of three other PGY-2 physicians-in-training which was of Dr. Rachel Heinle, Dr. Kirsh and Dr. Kirifides, who all began working together in or around June 2001. (B-0124). At the time Dr. Zechman entered the Residency Program she was forty-six years old, more than ten (10) years older than the other residents in the Program. (Zechman at 80, 23, B-0171)

Prior to beginning her Residency Program, Plaintiff was asked to provide a copy of her license to Sandy Kardos ("Kardos"), Christiana Care's Residency Coordinator. (B-0124). Dr. Zechman complied with Kardos' request. When Kardos saw Plaintiff's license she responded, "You certainly don't look your age." (B-0124). In or around August 2002, Sciscione informed Plaintiff that various teaching physicians "did not like" her because she was "different" and that the Residency Review Committee ("RRC") gave him a hard time for hiring her. (Zechman at 54, 46, B-0152-0153, B-0165). Plaintiff was routinely

3

questioned by various teaching physicians and Ob/Gyn resident colleagues, specifically Robyn Gray ("Gray"), Chief Resident and fourth year resident of the Program as to why she wanted to "do this at this stage in [her] life." (Zechman at 79, email to Sciscione). Plaintiff was also told that this was a "young person's specialty." (Zechman at 80, B-0171).

Further, Plaintiff was routinely reassigned from surgical training by the Chief Resident responsible for scheduling, namely Gray. Dr. Zechman sent several emails to Sciscione and Ekbladh explaining that she was being repeatedly reassigned to Triage, or Labor and Delivery by the Chief Resident, Robyn Gray. (B-0016, B-0017, B-0020, B-0022). Plaintiff also talked to her mentor about her concern that she was not getting the opportunity to get surgical experience. (Patruno at 25, B-0330). Patruno's advice to Plaintiff was to continue to be aggressive about getting those skills that she needed. (Patruno at 25, B-0330). Often times it is the Chief Resident who makes the determination of who will perform surgeries. (Patruno at 26, B-0331). When asked if it was a concern to him that Plaintiff was routinely reassigned to Triage, Ekbladh testified that it was not a concern because it was up to the Chief Resident and the attending physician to determine who assisted in certain areas and that Plaintiff was not reassigned any more than other residents. (Ekbladh at 55-57). However, Dr. Kaminski ("Kaminski") sent an evaluation form to Dr. Ekbladh indicating that he did not understand why Plaintiff was being taken off all of her surgical assignments and replaced with other residents. (Kaminski at 35-36).

Gray, the Chief Resident, required Plaintiff to do rigorous tasks that the other residents in the Program were not required to do. (Zechman at 92, B-0017). For example, Dr. Gray, as Plaintiff's supervisor, demanded that only Dr. Zechman attend morning rounds at 6:30 a.m. and check out rounds in the evening. (Zechman at 89, 90-91, B-0018, B-0173-0174). As a consequence, Plaintiff was forced to attend these rounds after working all night and by this time Plaintiff had already made a request to Ekbladh for additional time off due to her disability that was being completely ignored. (Zechman at 95, B-0175). She was forced to attend these rounds until she sent an email to Ekbladh inquiring as to why she was the only resident required to attend these rounds. (B-0021).

Plaintiff was isolated from the other residents in the Program because of her special rotation and because there were conflicts between her and the other residents. (Tildon-Burton at 19, B-0115). One of the reasons Dr. Zechman did not fit in was because she was older than the other residents and the members of the committee recognized that she was "obviously a little older than her other peers." (Tildon-Burton at 22, 23, B-0116). Dr. Tildon-Burton, a teaching physician, testified that Plaintiff's age contributed to the isolation of Plaintiff. (Tildon-Burton at 23, B-0116). She was aware that Plaintiff was isolated from other residents and testified that she gave Plaintiff a journal to write down how she was feeling. (Tildon-Burton at 21, B-0116).

Every resident is assigned a mentor when they start the Program. (Patruno at 13, B-0327). Dr. Patruno ("Patruno"), Plaintiff's mentor, told Plaintiff that they did not want her there because of her age. (Zechman at 82, B-0172). Patruno also told Plaintiff that "the knives in her head would become knives in her back" if she did not pass the CREOG exam. (Zechman at 87-88, B-0173). Dr. Heinle, one of the four residents in the second year class with Plaintiff, had animosity toward Plaintiff, and Patruno characterized their relationship as "volatile". (Patruno at 20, B-0329). Heinle was of the opinion that Plaintiff could not "keep up" (Patruno at 20, B-0329). Plaintiff was looked at as an "outsider" by the other residents. (Patruno at 70, B-0342). When Plaintiff was forced to repeat her second year she no longer had a place to keep her belongings because she was instructed that she could no longer use the third year call room. (Zechman at    , Tildon-Burton at 29, B-0117). Plaintiff had a conversation with Patruno concerning the call room and where she should place her belongings when she did not get promoted to a third year. (Patruno at 41, B-0334). In response, Patruno told Plaintiff, "Can't you see, they don't want you here. They're kicking you out of the call room into the hallway." (Zechman at 13, B-0154).

An anonymous evaluation completed by a teaching physician states, in part,

> I don't think we should try to trick her on the test question...ask her questions which test her understanding of classic OB/Gyn conditions...There exists an inherent bias against her by both residents and attendings. You can't learn surgery by watching...She needs assignments to residents that will allow her to be the primary surgeon and to attendings that will allow her to do at least half of the major cases and minor cases if not the entire case.

(B-0379-0381). Patruno agreed that there may have been bias against Plaintiff that prevented her from working with certain people and prevented her from having the opportunity to learn. (Patruno at 96). Dr. Chassem Vakili, M.D. ("Vakili"), a teaching physician, refused to scrub with Plaintiff because according to Vakili, "She [Dr. Zechman] was not teachable and I'm not in the mood to teach someone today." (B-0001).

Plaintiff was diagnosed with an unspecified diffuse connective tissue disorder in 1997. (Fraser at 6, B-0355). She also has various chronic pain disorders, such as myofascial pain and low back pain. (Fraser at 6, B-0355). In addition, Dr. Fraser has treated Plaintiff for degenerative arthritis of her back, recurrent sciatica and a pinched nerve in her back, along with spinal stenosis. Id. As a result of her disease, she has symptoms of Lupus, Rheumatoid Arthritis, and scleroderma. (Fraser at 7, B-0355). As a result of her disorder, Plaintiff has suffered from occasional crops of aphthous ulcers and intermittent rashes from time to time since 1995 or 1996. (Fraser at 14, B-0357). Additionally, Plaintiff has suffered from arthritis caused by the mixed connective tissue disorder since 1995 or 1996. (Fraser at 15, B-0357). Further, Plaintiff's disorder causes her to suffer from an occasional inability to concentrate and depression. (Fraser at 29, B-0360). Additionally, patients with autoimmune diseases tend to have abnormal immune systems and as a result, it places them at a slightly increased risk of infectious diseases. (Fraser at 58, B-0368). Plaintiff was diagnosed with spinal meningitis in February of 2003. (Fraser at 60, B-0368). Plaintiff's symptoms manifest themselves in flare-ups. (Fraser at 17, B-0357). The cause of these flare-ups can vary. (Fraser at 18, B-0358). A cold, trauma or stress can cause a flare-up of connective tissue disease. Id. The more physically exhausting the labor is, the higher incidence of flare-up exists. (Fraser at 19, B-0358).

One of the major manifestations of this autoimmune disease is fatigue and her treating physician, Dr. Fraser ("Fraser"), recommended an alteration in her work schedule in or around July 2003. Fatigue has always been a major component of Plaintiff's visits to Dr. Fraser even before she was a resident. (Fraser at 57, B-0367). Plaintiff is able to perform the duties of her job with accommodations. (Fraser at 94, B-0377). If she did not have significant stress during the time of her residency program, Plaintiff

6

would have been able to function appropriately as a resident. (Fraser at 23, B-0359). If Plaintiff was able to successfully take care of herself and manage herself and not be under any condition that might precipitate a flare-up of her disease, Plaintiff would have been able to do and complete a residency. (Fraser at 72, B-0371). However, at the time Dr. Fraser and Plaintiff made her request for accommodations, she could not function at work because of the stress and she was in a "perpetual state of flare." (Fraser at 89, B-0375).

On July 23, 2003, Dr. Zechman began to suffer from increasing fatigue due to an increasingly demanding workload. (Zechman at 234, B-0217). Additionally, Plaintiff began to suffer from increasing stress due to problems with other residents and attendings with respect to her work and schedule. (Fraser 76, B-0372). Plaintiff made a verbal request to accommodate her schedule due to fatigue to Sandy Kardos ("Kardos"), Administrative Assistant to the Ob/Gyn Residency Progam. Kardos denied her request and stated, "Our Program cannot support people going out on family medical leave." (Zechman at 75-76, B-0170). Thereafter, that same day, Plaintiff sent a letter to Ekbladh requesting an adjusted schedule. (B-0010-0011). Since the Residency Program would not provide Plaintiff with the proper forms to complete, she went to Dr. Brian Little's ("Little"), Director of Academic Affairs, office and received Request for Accommodation forms from his office. (Zechman at 236, 293, B-0212, B-0227). Ekbladh recalled receiving this letter from Plaintiff requesting an adjusted schedule but does not recall discussing it with anyone other than Plaintiff. (Ekbladh at 86). This is despite the fact that the Chief Resident is responsible for determining the schedules and, therefore, would need to be informed of a request for accommodation such as this. (Ekbladh at 43, B-0292). A few days after Plaintiff's request for an adjustment to her schedule, which was the *very first time*, Plaintiff was threatened with termination from the Residency Program. (B-0023; Zechman at 76, B-0170).

Dr. Fraser completed and faxed the "Request for Accommodation Form" to Christiana Care on August 11, 2003. (Fraser at 97, B-0377) (B-0012 - 0015). The Request for Accommodation Form indicated in part:

> Allowing employee to have periodic periods of rest during working hours and use her
> vacation liberally would help prevent major disease flares. During major flares, patient
> will not be able to further…at work.

(emphasis added) (B-0012 - 0015). Dr. Fraser believed that Plaintiff was able to handle the rigors of being

in a residency program with certain accommodations for her disability. (Fraser at 94, B-0377). Also,

Ekbladh called Dr. Fraser on or about August 11, 2003, at which time Dr. Fraser informed Ekbladh that

time-off would indeed be appropriate to treat Dr. Zechman's condition; however, a specific time-off could

not be determined because flare-ups are "unpredictable". (Fraser at 78, B-0373). Dr. Fraser left it to the

Residency Program to arrange the time off for Plaintiff. (Fraser at 96, B-0377). Ekbladh advised Dr.

Fraser that Christiana Care would do their utmost to try to accommodate Plaintiff's disability. (Fraser at

79, 80, B-0373). Plaintiff's request for accommodation was ignored and she continued to work over 85

hours per week because the Program did not alter her schedule in any way. Plaintiff continued to work the

same schedule as other residents in the Program. (Ekbladh at 81, B-0029). Plaintiff was required to use

her vacation time rather than her sick time for days off to treat her condition which is against Christiana

Care's "Paid Time Off/Leave Policy." (B-0030; B-0029).

On or about August 22, 2003, Patruno, Plaintiff's mentor, expressed to Plaintiff that her situation

in the program had gotten to the point where it was "dire". (Patruno at 45, B-0335). She was stressed out

and tired. (Patruno at 46, B-0336). Patruno expressed to Plaintiff that he might resign from the Program

if he was in her same situation. (Patruno at 44, B-0335).

It was not until September 16, 2003, (a month and a half after her request for an accommodation)

that Ekbladh responded to Dr. Zechman's request by sending her a memo requesting that her physician

complete a "Certificate of Healthcare Provider." (B-0045). Thereafter, Plaintiff had Dr. Fraser complete

an additional form entitled "Christiana Care Health Services Request for Leave of Absence" that was

faxed to Christiana Care on or about September 22, 2003. (B-0046 - 0049). Plaintiff's request for a leave

of absence/accommodation was not granted until October 6, 2003, three days after that Kaminski

informed Plaintiff that she was "dismissed" from the Program. (Zechman at 67, B-0068, B-0054).

On August 18, 2003, the Resident Review Committee meeting was held wherein the Committee discussed Plaintiff's progress in the Program. The Committee determined that Plaintiff would continue in Program as a PGY-2 with a special PGY-2 rotation. (B-0024 – 0025, see notes from meeting). Also, during this meeting, the Committee was informed that Plaintiff had requested time off for her disability and that an anonymous resident had lodged a complaint with the ACGME. (B-0024-0025). Although the ACGME complaint was sent anonymously, Dr. Kaminski believed that it was Plaintiff that made the complaint because she was having the most problems in the Program. (Kaminski at 45-46, B-0274-0275). The RRC also thought that Plaintiff may have a learning disability that was impeding her being able to get up to speed. (Tildon-Burton at 35, B-0118).

Even as late as August 20, 2003, the plan was that Dr. Zechman was going to be repeating her second year in the Program and that she would not be terminated. (B-0026-0027). Even as late as September 4, 2003, Plaintiff's schedule indicated that she would be part of the Residency Program through November of 2003 (B-0040).

Just six weeks later, on or about September 29, 2003, the Residency Review Committee (RRC) voted to terminate Plaintiff's participation in the Program. Dr. Kaminski and Dr. Tildon-Burton, both members of the RRC, could not identify nor articulate anything that occurred between the RRC meeting on August 18 and the RRC meeting on September 29 to warrant Plaintiff's termination from the Program. (Kaminski at 49, B-0275; Tildon-Burton at 40, B-0119). Also, Dr. Patruno could not recall what occurred during that six week period to warrant Plaintiff's termination from the Program. (Patruno at 104, B-0350). According to Ekbladh, "...And little to any progress had been made. That was confirmed at the next meeting and it was felt that there hadn't been anything at all between those two meetings that termination should follow." (Ekbladh at 85, B-0302). Kaminski and Dr. Hochman ("Hochman") abstained from voting Plaintiff out of the Program. (Kaminski at 52, B-0294). The only thing that changed between August 18 and September 29 is that the RRC was informed that Plaintiff had requested accommodations for her disability.

9

A letter from Dr. Philip Shlossman, medical student coordinator at Christiana Care, to Plaintiff stated in part,

> When the previous medical students rotated through our department, they had many positive comments about our program and the individuals within our group. You were specifically named as being extremely helpful, knowledgeable and instructive. It is with help like yours that our medical student training is so well received and enjoyed. On behalf of both the medical students and the department, I want to know how appreciative we are of your efforts. Please keep up the enthusiasm.

(B-0102). Plaintiff saw many of the attending physicians' patients, specifically Drs. Faith Brosh's and Dr. Maynard's, without any supervision from an attending physician while she worked in Triage. (Zechman at 116, 148, B-0180, B-0188). These doctors entrusted Dr. Zechman to provide appropriate care to their patients. Plaintiff worked with Patruno in Triage two or three times per week and he was of the opinion that she showed signs of improvement through the year. (Patruno at 60, B-0339). When we quantify Plaintiff's medical knowledge in terms of the CREOG scores, there were other residents in the Program that had less medical knowledge than the Plaintiff but they were not terminated from the Program. (Patruno at 63, 35, B-0340, B-0333). Moreover, no other resident physician had been dismissed for performance within the two years prior to Plaintiff's termination from the Program. (B-0056). Plaintiff did well with patients for the most part and she was concerned about them. (Patruno at 64, B-0340). The mock oral boards are an oral test in which residents are tested by outside visiting professors. (Patruno at 77, B-0343). According to the mock oral boards which took place in May 2003, Plaintiff was functioning "at the expected level". (B-0004-0007).

Ms. Barbara MacIlwain, at the United States Department of Labor, conducted an investigation of Christiana Care's Family Medical Leave Act ("FMLA") Policy, specifically as it relates to Plaintiff. (B-0071-0084). Ms. MacIlwain determined that Defendant violated Plaintiff's rights under FMLA by failing to properly and timely address Plaintiff's request for FMLA. Id.

### III.    ARGUMENT

#### A.    Standard of Review

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment "shall be rendered" where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c).

A fact is material if it might affect the outcome under the governing substantive law. *See* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Material facts are those that could alter the outcome of the case, "and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995). A fact is only material if the "establishment thereof might affect the outcome of the lawsuit under governing substantive law." Rodgers v. Monumental Life Ins. Co., 289 F.3d 442, 448 (6th Cir. 2002); *see also,* Logan v. Commercial Un. Ins. Co., 96 F.3d 971, 978 (7th Cir. 1996) ("The nonmovant must do more . . . than demonstrate some factual disagreement between the parties; the issue must be 'material.' Irrelevant or unnecessary facts do not preclude summary judgment even when they are not in dispute.").

A material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." MacDonald v. Delta Air Lines, Inc., 94 F.3d 1437, 1440 (10th Cir. 1996); *see also,* Troy Chemical Corp. v. Teamsters Union Local No. *408*, 37 F.3d 123, 126 (3d Cir. 1994) (holding that factual issues are not "genuine" unless a reasonable jury could return a verdict for nonmovant based on nonmovant's submissions). A dispute over a material fact must be "genuine", *i.e.,* the evidence is such "that a reasonable jury could return a verdict in favor of the non-moving party." *Id.*

The court must "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). In meeting its burden of showing an absence of a genuine issue as to any material fact, "the material [the movant] lodge[s] must be viewed in the light most favorable to the opposing party."

Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). "[E]vidence of nonmovant is to be believed and all reasonable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

This case will involve drawing inference from fact. Drawing inferences from fact is a duty reserved for a jury at trial. *See,* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

**B.    Plaintiff Can Establish That Defendant's Reasons for Her Termination Are a Pretext for Age Discrimination. Therefore, Defendant Is Not Entitled to Summary Judgment On Plaintiff's Claim of Age Discrimination.**

Defendant contends that it terminated Plaintiff's residency because of her alleged poor performance and failure to significantly improve. (Def's Mem. at 15). In support of its position, the Defendant asserts that there is "no evidence that any of the relevant decisions makers (the RRC members) were motivated by age discrimination, or that the RRC's stated reasons for its decision were pretextual." (Def's Mem. at 15). However, the Chief Residents, namely Robyn Gray, attended the RRC meetings in which junior residents, like Plaintiff, were discussed in great detail. (B-0024-0025; B-0051-0053). The Chief Residents, played an integral role in supervising the Plaintiff, a junior resident. (Zechman at 89). There is sufficient evidence to establish that the RRC members were influenced by the age based biased opinions of Plaintiff from both attending physicians and other residents. Further, the evidence is clear that Defendant's reasons for terminating Plaintiff were because of her age and not because of any alleged lack of skill.

As noted in Defendant's Opening Brief, Plaintiff's age based discrimination claim is governed by the framework set forth by the Supreme Court in McDonnell Douglas Corp. v. Green 411 U.S. 792 (1973), and clarified in St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993). Because the question facing triers of fact in discrimination cases is both sensitive and difficult, and there will seldom be eyewitness testimony as to the employer's mental processes, the courts employ some variant of the McDonnell Douglas framework to analyze age discrimination. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000).

1.    **There Was An Inherent Age Based Bias Against Plaintiff Which Influenced The RRC's Opinion And Ultimately Lead To Plaintiff's Termination.**

When Plaintiff entered the Residency Program, she was forty-six (46) years old and more than ten (10) years older than the other residents in the Program. (Zechman at 80, 23, B-0171, B-0157). Prior to beginning her Residency Program, Plaintiff was asked to provide a copy of her license to Kardos, Christiana Care's Residency Coordinator. (B-0124). When Kardos saw Plaintiff's license she responded, "You certainly don't look your age." (B-0124). Plaintiff was routinely questioned by various teaching physicians and Ob/Gyn resident colleagues, specifically Gray, Chief Resident, member of the RRC, and supervisor of junior residents of the Program, as to why she wanted to "do this at this stage in [her] life." (Zechman at 79). Plaintiff was also told that this is a young person's specialty." (Zechman at 80, B-0171).

Additionally, Plaintiff was looked at as an "outsider" by the other residents. (Patruno at 70, B-0342). Dr. Heinle, one of the four residents in the second year class with Plaintiff, had animosity towards Plaintiff because Plaintiff could not "keep up." (Patruno at 20, B-0329). Dr. Janice Tildon-Burton, a member of the RRC, believed Plaintiff's age contributed to her isolation and that one of the reasons Plaintiff did not fit in was because she was older than the other residents. (Tildon-Burton at 22, 23, B-0116). Dr. Sciscione, the Residency Director, informed Plaintiff that various teaching physicians "did not like" her because she was "different" and that the RRC gave him "a hard time" for hiring Plaintiff. An employer might routinely use a facially innocuous term to refer to an older worker in a disparaging way. Evidence of such routine usage is direct evidence of age discrimination. Scott v. Potter, 182 Fed. Appx. 521, 526 (6th Cir. 2006).

Gray, the Chief Resident, required Plaintiff to do rigorous tasks that the other younger residents in the Program were not required to do. (Zechman at 92, B-0174). For example, Gray demanded that only Plaintiff attend morning rounds at 6:30 am and check out rounds in the evening. (Zechman at 89-91, B-0173-0174). As a consequence, Plaintiff was forced to attend these rounds after working all night and by this time Plaintiff had already made a request for an adjusted schedule due to her disability. (Zechman at

95, B-0175). She was forced to attend these rounds until she sent an email to Ekbladh inquiring as to why

she was the only resident required to attend these rounds. (B-0018). An employer is subject to vicarious

liability to a victimized employee for an actionable hostile environment created by a supervisor with

immediate authority over the employee. Arrieta-Colon v. Wal-Mart, 434 F. 3d 75, 86 (1st Cir. 2006).

Thus, Defendant is liable for the discriminatory actions of Gray, Plaintiff's supervisor.

Further, Plaintiff was routinely reassigned from surgical training by the Chief Resident

responsible for scheduling, namely Dr. Gray. Often times it is the Chief Resident who makes the

determination of who will perform surgeries. (Patruno at 26, B-0331). Plaintiff sent several emails to

Sciscione and Ekbladh explaining that she was being routinely reassigned to Triage, or Labor and

Delivery by Dr. Gray. (B-0016-0017, B-0020). In an email to Ekbladh, Plaintiff wrote, in part:

> Am I going to be able to participate in decisions to better prepare me for duties as a PGY-3 or am I going [to be ] assigned to the PGY-1 duties. Do you see how this plan is actually detrimental to my learning progress? What was said on paper is not being enforced on the floors. I was supposed to get OR time with the teaching attending, this has not happened. Just last week I was bumped out of surgery with my assigned attending…I did not do anything wrong to deserve this. Please…I am begging you, Help me.

(B-0020).

> I am greatly distressed that during my current GYN rotation, I am reassigned to Triage, or Labor and Deliver routinely…Recently I have been criticized for being behind in my surgical skills when compared to other 2nd year residents. How can I improve my skills if I am left in Triage and denied the opportunity to improve??

(B-0016)  Plaintiff also spoke with her mentor about her concern that she was not getting the opportunity

to get surgical experience. (Patruno at 25, B-0330).

Further, some of the evaluations of Plaintiff's performance acknowledge that Plaintiff was treated

differently than the other residents and that there was an inherent bias against her. An anonymous

evaluation completed by a treating physician stated in part,

> I don't think we should try to trick her on the test questions…There exists an inherent bias against her by both residents and attending. You can't learn by watching surgery…She needs assignments to residents that will allow her to be the primary surgeon and to attendings that will allow her to do at least half of the major cases and minor cases if not the entire cases.

14

(B-0379-0381) (emphasis added). An evaluation from Dr. Moses Hochman addressed to Ekbladh stated in part,

> She was in a very small program as a first year resident and did not have the opportunities of our first years to refine her surgical skills. I am of the position that this is only a matter of practice, practice, and practice. We are to blame for part of this deficit. Ellen was often pulled from the gynecology rotation to cover triage or the clinics… Some of the attendings hold a bias against her and I'm not sure she will ever get a fair evaluation from those physicians…I insist that Ellen is the most dedicated of our residents and I only hope she gets a fair opportunity to prove herself.

(B-0103) (emphasis added). An evaluation from Dr. Kaminski to Ekbladh stated in part,

> I sense a deep resentment by Robyn in her treatment of Ellen. Covering triage and scrubbing on any old case, I'm not sure is productive…I'm not sure what's right. Ellen is beginning to feel frustrated, and I sense and share frustration.

(B-0104) (emphasis added). Patruno agreed that there may have been bias against Plaintiff that prevented her from working with certain people and prevented her from having the opportunity to learn. (Patruno at 96, B-0348). Dr. Vakili, a teaching physician refused to scrub with Plaintiff because, "She [Dr. Zechman] was not teachable and I'm not in the mood to teach someone today." (B-0001). When Ekbladh was asked if it was a concern to him that Plaintiff was routinely reassigned to Triage, he testified that it was not a concern because it was up to the Chief Resident and that Plaintiff was *not* reassigned any more than other residents. (Ekbladh at 55-57, B-0277). However, Ekbladh's statement that Plaintiff was not reassigned any more than other residents is contrary to the evidence in this case as highlighted *infra*. Thus, Ekbladh was more than aware that Plaintiff was discriminated against by the other residents, namely Gray, and he did nothing to stop it. When the discrimination is by a co-worker, the employer is liable if the plaintiff can show that the employer knew of should have known of the charged discrimination and failed to implement prompt and appropriate action. Crowley v. L.L. Bean, Inc., 303 F. 3d 387, 401 (1st Cir. 2002).

### 2. Christiana Care's Reasons For Plaintiff's Termination Are Pretextual

Defendant contends that it terminated Plaintiff's residency because she exhibited "a constellation of serious deficiencies." (Def's Mem. at 20). However, Defendant was aware that Plaintiff was behind the other residents when she entered the Program and Sciscione assured her that she would be given an opportunity to improve her skills. (Zechman at 48, B-0163). Plaintiff and other attending physicians

routinely complained to Ekbladh that she was being reassigned out of surgery and not given the opportunity to improve. (B-0016-0017, B-0020, B-0103-0104, B-0379-0381)    Yet, Ekbladh did absolutely nothing when confronted with the knowledge that Plaintiff was denied learning opportunities. (Ekbladh at 55-57, B-0277).    Additionally, with respect to her medical knowledge, Plaintiff received a "meets expectations" on her mock oral boards; yet she was inexplicably terminated from the Program. (B-0004-0007).    Also, the CREOG exam is a mechanism for testing a resident's medical knowledge. Patruno opined that Plaintiff was terminated from the Program because she received a 12%. (Patruno at 35, B-0333).    However, when we quantify medical knowledge in terms of the CREOG scores, there were other residents in the Program that had less medical knowledge than Plaintiff. (Patruno at 63, 35, B-0340, B-0333). But those residents who scored lower than Plaintiff on the CREOG exam were not terminated from the Program. (B-0002).

With respect to the evaluations, many of the evaluations referenced an inherent bias against Plaintiff by both the residents and attending physicians. (B-0103-0104).    Also, Patruno opined that there was a bias against Plaintiff that prevented her from working with certain people and prevented her from having the opportunity to learn. (Patruno at 96, B-0348). Yet, Defendant terminated her from the Program. Dr. Vakili refused to scrub with Zechman because she was "not teachable". Dr. Heinle did not want to work with Plaintiff because she could not "keep up".  (Patruno at 20, B-0329). Kaminski and Hochman abstained from terminated Plaintiff from the Program. (Kaminski at 50, B-0276).    However, Hochman acknowledged that it was Christiana Care's fault that Plaintiff was not receiving the necessary training; while, Kaminski complained to Ekbladh about the growing resentment of Robyn Gray (B-0103).

In short, the Defendant discriminated against Plaintiff based on her age when it failed to ensure that she would be provided the same opportunities to learn like other younger residents in the Program. The inherent bias against Plaintiff based on her age permeated the Program and Defendant did nothing to stop it.

16

**C.**    **Christiana Care Is Not Entitled to Summary Judgment With Respect to Plaintiff's Disability Claims**

Defendant contends that Plaintiff's Disability claims fail for three reasons. First, Defendant argues that Plaintiff's connective tissue disease does not constitute a disability under the ADA because Plaintiff's symptoms are intermittent and her condition does not limit any of her major life activities. (Def's Mem. at 23). However, an intermittent impairment that is a characteristic manifestation of a disability is a part of the underlying disability and hence a condition that the employer must reasonably accommodate. Vande Zande v. Wisconsin, 44 F. 3d. 538, 544 (7th Cir. 1995). Moreover, at the time Dr. Fraser requested that Plaintiff receive an adjusted work schedule due to her illness, Plaintiff was unable to function at work because of the stress due to problems with other residents and also because she was in a "perpetual state of flare." (Fraser at 89, B-0375).

Second, Defendant argues that even if Plaintiff has a disability, her accommodation claim fails because Defendant engaged in the interactive process by offering her an alternative accommodation. However, the Defendant's assertion that it actively engaged in a process to accommodate Plaintiff's request for an adjusted schedule is completely contrary to the evidence in this case. Plaintiff's first request for disability took place in July of 2003. (See letter to Ekbladh, B-0010-0011). Although Ekbaldh assured Dr. Fraser in early August 2003 that Christiana Care would do their utmost to accommodate Plaintiff's disability, Plaintiff's request for accommodations was ignored. She continued to work over 85 hours per week because the Program would not alter her schedule in anyway. (B-0029). Plaintiff's request for a leave of absence/accommodation was not granted until October 6, 2003, three days after Kaminski informed Plaintiff she was terminated from the Program. (Zechman at 67, B-0068).

Third, Defendant argues that Plaintiff's termination claim fails because there is no evidence that the RRC's stated reasons for terminating Plaintiff's residency were a pretext for disability discrimination or retaliation. (Def's Mem. 23). However, the RRC met in August 2003 and determined that Plaintiff would continue in the Program as a PGY-2 with a special PGY-2 rotation. (B-0024-0025). Thereafter, it was announced to the RRC that Plaintiff had requested time off for her disability. Id. Just six weeks after

17

the Committee learned of Plaintiff's request for disability, the RRC voted to terminate Plaintiff's participation in the Program. (B-0051-0053). In the ADA retaliation context, temporal proximity between the protected activity and the adverse employment action can be itself sufficient to establish a causal link. Williams v. Philadelphia Housing Authority Police Department, 380 F.3d 751 (3rd Cir. 2004).

### 1.    Plaintiff Does Have A "Disability" Under The ADA

Defendant hangs its hat on the proposition that because Plaintiff has intermittent flare-ups of her connective tissue disease, she cannot qualify as having a disability. (Def's Mem. at 23). However, there is no bright line test to determine what qualifies as a disability under the law. Whether a person has a disability under the ADA is a highly individualized determination. Sutton v. United Airlines, 527 U.S. 471, 483, 144 L. Ed. 2d 450, 119 S. Ct. 2139 (1999). Since 1997 Plaintiff has suffered from an autoimmune disease which her treating physician identifies as an unspecified connective tissue disease. (Fraser at 7, B-0355). In addition, Plaintiff has myofascial pain and low back pain, both characterized as chronic pain disorders. (Fraser at 6, B-0355). As a result of her disorder, Plaintiff has symptoms of Lupus, Rheumatoid Arthritis and Sclerodoma. (Fraser at 7, B-0355). Her symptoms include but are not limited to arthritis in the joints, occasional crops of aphthous ulcers, intermittent rashes and an inability to concentrate, along with depression. (Fraser at 14-15, 29, B-0357, B-0360). Plaintiff's symptoms manifest themselves in flare-ups which can be caused by a cold, trauma or stress. (Fraser at 18, B-0358). The more physically demanding the labor, the higher incidence of flare-up exists. (Fraser at 19, B-0358).

In order to establish a prima facie case of disability discrimination under the ADA, a plaintiff must prove that (1) she has a disability, (2) she is a qualified individual, and (3) she has suffered an adverse employment action because of that disability. 42 U.S.C. § 12101 et seq. The ADA defines "disability" as (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment or (C) being regarded as having such an impairment. 42 U.S.C. § 12102 (2). A "major life activity" is one which is of central importance to daily life. 42 U.S.C. § 12101 et seq. To be "substantially limiting," an impairment must prevent or severely restrict the individual's ability to perform the major life activities alleged. Id. Regulations identify several

factors that courts should consider when determining whether an individual's impairment is "substantially limiting," namely" (i) the nature and severity of the impairment, (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact or the expected permanent or long term impact of or resulting from the impairment. 29 C.F.R. 1630.2(j)(2).

A court has an obligation to undertake an individualized inquiry in a case based on the particular circumstances of each case brought under the ADA to determine whether the actual limiting effects could reach the level of "substantial". Carruth v. Continental General Tire, Inc. 2001 U.S. Dist. LEXIS *18 (22368). An individual suffering one episodic impairment caused by a temporary injury (e.g., a broken leg) is not disabled. Id. at *22. However, episodic, impairing manifestations of or flare-ups (i.e., a numb leg) caused by an underlying chronic condition (i.e., diabetes/neuropathy) should be treated differently. Id. at *23. Employees suffering from such impairments can be disabled. Id. at *23.

In Vande Zande, *supra*, the court admitted that AIDS (*i.e.* a chronic condition that destroyed the immune system) would not intuitively meet the statutory definition of "disability"-presumably because people can work fine without an immune system-unless courts looked at the cumulative effects that having such disease had on that afflicted individual's ability to work generally (*i.e.*, the destruction of afflicted individual's immune system allowed a whole host of common, opportunistic diseases to invade the individual who could not fight them off because he had no immune system). Vande Zande, 44 F.3d. 538 at 544. That set up a distinction between non-recurring impairments caused by one-time injuries (*e.g.*, broken legs) as opposed to recurring, episodic, impairing manifestations of chronic, underlying conditions from which an individuals suffer. Id.

In E.E.O.C. v. Sears, the plaintiff's diabetes and neuropathy resulted in intermittent numbness in her right leg after she had to walk long distances. E.E.O.C. v. Sears, 233 F. 3d 432, 440 (7th Cir. 2000). The Sears court concluded that the episodic and intermittent nature of manifestations chronic conditions did not bar an impaired individual's ADA claim. Id. at 440 (holding that the fact that employee's neuropathy was episodic, in that it worsened the longer and farther she was forced to walk and manifested itself in a predictable yet intermittent pattern, did not preclude finding that she was disabled under ADA).

19

A temporary, episodic impairment that recurs periodically as a result of some underlying, chronic condition from which the individual suffers (*i.e.*, a manifestation of or a flare-up caused by the underlying condition), may constitute a disability if, the cumulative impact of the flare-ups still substantially limits that individual's ability to work generally. <u>Carruth</u>, 2001 U.S. Dist. LEXIS 22368 at *28. See also <u>Haschmann v. Time Warner Entertainment Co.</u>, 151 F.3d 591, 599-600 (7th Cir. 1998) (noting that the impairing effects of lupus, which "lie dormant and flare from time to time," could support an inference that she was disabled after the first lupus flare).

In <u>Matczak</u>, the court acknowledged that plaintiff's epilepsy would constitute a physical impairment under the ADA but found that plaintiff's impairment did not substantial limit major life activities because he was only restricted from participating in a small number of activities and would only be restricted to that degree for a few months. <u>Matczak v. Frankford</u>, 136 F. 3d 933, 937 (3rd Cir. 1997). On appeal, the Third Circuit determined that this reasoning was flawed because there was no evidence to support the conclusion that plaintiff would have been cured after that period. <u>Id</u>.

The testimony of Plaintiff and her doctor establishes without a doubt that, as a matter of law, Plaintiff's connective tissue disorder is a disabling impairment under the ADA; despite the fact that her symptoms occur intermittently. Her flare-ups are the result of an underlying condition and the cumulative impact of these flare-ups inhibited Plaintiff's ability to think and function as a resident in the program. <u>Carruth</u>, 2001 U.S. Dist. LEXIS 22368 at *28. Working and thinking are both "major life activities." 29 C.F.R. § 1630.2(i), <u>Taylor v. Phoenixville</u>, 184 F. 3d at 307. Moreover, the testimony of Dr. Fraser and Plaintiff conclusively establishes that Plaintiff's flare-ups are a manifestation of Plaintiff's chronic connective tissue disorder that she has suffered from since 1997.

The Defendant errantly contends that Plaintiff is capable of performing the essential functions of her position as an OB/Gyn resident and therefore, Christiana Care was not required to provide any accommodations. (Def's Mem. at 27). However, under the ADA a "qualified individual with a disability" is defined as a person with a disability who, with or without reasonable accommodations, can perform the essential functions of the employment position that such individual holds. 42 U.S.C. § 12111 (emphasis

added). Thus, Plaintiff's ability to perform the essential functions of her job without accommodations does not disqualify her from having a disability as a matter of law nor does it negate Christiana Care's duty to accommodate her disability.

Contrary to the Defendant's assertion that Plaintiff does not have a disability because her symptoms are intermittent, a person who does not experience problems every day does not defeat their claim under ADA. Taylor v. Phoenixville, 184 F. 3d 296, 309 (3rd Cir. 1999). Chronic, episodic conditions can easily limit how well a person performs an activity as compared to the rest of the population: repeated flare-ups of poor health can have a cumulative weight that wears down a person's resolve and continually breaks apart long-term projects. Id. This is exactly what happened to Plaintiff in the instant case. Plaintiff began to experience increasing flare-ups of her condition beginning in July 2003. (Zechman at 142, B-0187). As the months progressed and Plaintiff's request for accommodations was routinely and regularly ignored, it became increasingly difficult for Plaintiff to successfully function as a resident in the Program.

The Defendant points to Plaintiff's statement that she "physically can keep going" as an indication that Plaintiff is not substantially limited in her major life activities. (Def's Mem. at 26). However, we should not insist that all plaintiffs with a disorder have the self-awareness and expressive powers before we allow that their condition is substantially limiting. Taylor, *supra* at 310 (holding that one would expect a plaintiff to inflate the severity of her condition when talking to opposing counsel's expert; however, plaintiff made her hospitalization sound like a simple trip to visit her mother and had obvious difficulty conveying the extent of her illness). According to Dr. Fraser, Plaintiff suffers from an unspecified connective tissue disorder of which she has intermittent flares and "chronic pain syndrome, a diagnosis which she refuses to accept, with her having recurrent ulcers and pleurisy...There is a stigma that goes along with having a chronic pain disorder. And, certainly, for a physician to have a chronic pain disorder for which there's obviously, no cure, sometimes you just want to push it out of your mind, Oh, I don't have that. (Fraser at 82-83) (emphasis added). Obviously, Plaintiff, as a physician, is hesitant to accept that her illness limits her ability to function in any way. Plaintiff testified:

Q:     And I think you mentioned the last time you were here that the symptoms of the condition happen occasionally and are not with you all the time. Is that true?

A:     There are certain symptoms that are with me all the time that I just deal with. Others come when I have a flare-up and others with a severe flare-up.

Q:     What are the symptoms that are always present?

A:     Various aches and pains of the joints.

Q:     On a day-to-day basis, does your connective tissue disorder limit your daily activities?

A:     Not unless I have a flare-up.

(Zechman at 278-280) (emphasis added). Plaintiff's daily activities are limited when she experiences a flare-up. One of the major manifestations of Plaintiff's autoimmune disease is fatigue. (Fraser at 19, 29-30, B-0358, B-0360-0361). However, during a flare-up Plaintiff also experiences sores in her mouth, an upset stomach because the canker sores go through her digestive system, diarrhea, and joint pain. (Zechman at 281). As previously noted, the cause of these flare-ups can vary. (Fraser at 18, B-0358). A cold, trauma or stress can cause a flare-up of connective tissues disease. Id. The more physically exhausting the labor, the higher incidence of flare-up. (Fraser at 19, B-0358). If Plaintiff was able to successfully take care of herself and manage herself and not be under any condition that might precipitate a flare-up of her disease, Plaintiff would have been able to do and complete a residency. (Fraser at 72, B-0371). At the time Plaintiff requested an accommodation in her schedule she "could not function at work" and she was in "a perpetual state of flare", according to Dr. Fraser. (Fraser at 89, B-0375). Further, the Defendant eventually acknowledged that Plaintiff suffered from a "serious health condition" and approved her request for an adjusted schedule albeit the same day she was informed that she was terminated from the Program. (B-0068).

The Court should not grant summary judgment as to Plaintiff's disability claim because whether the Plaintiff has a disability under the ADA is based on the individualized facts of this case and is therefore, a question for the jury.

**2.     Defendant Discriminated Against Plaintiff When It Failed To Reasonably Accommodate Her**

Discrimination under the ADA encompasses not only adverse actions motivated by prejudice and fear, but can also include failing to make a reasonable accommodation for a plaintiff's known disability. 42 U.S.C. §12112(b)(5)(A).  An employer commits unlawful discrimination under the ADA if the employer does "not make reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an employee, unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the employer. 42 U.S.C. §12112 (b)(5)(A). "To determine the appropriate reasonable accommodation it may be necessary for the employer to initiate an informal, interactive process with the employee in need of accommodation. This process should identify that accommodations that could overcome those limitations. 29 C.F.R. § 1630.2(o)(3). Once a qualified individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation. (emphasis added). The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the employee with a disability. 29 C.F.R. Pt. 1630, App.§ 1630.9 at 359.

The ADA itself specifically provides that reasonable accommodations can include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B) (emphasis added).  To show that an employer failed to participate in the interactive process, a disabled employee must demonstrate: 1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith. Mengine v. Runyon, 114 F.3d 415, 420 (3d Cir. 1997). In the instant case, Plaintiff is

23

able to prove all four elements necessary to show that Defendant failed to participate in the interactive process in violation of the ADA.

First, Plaintiff made a verbal request to Sandy Kardos, Administrative Assistant to the Ob/Gyn Residency Program for FMLA forms in an effort to accommodate her schedule due to fatigue related to her disorder. (Zechman at 75, 76, B-0170). Kardos denied Plaintiff's request and informed Plaintiff that, "Our Program cannot support people going out on medical leave." (Zechman at 75, 76, B-0170).

Second, on July 23, 2003, Plaintiff sent a letter to Ekbladh informing him of her disability and requesting an adjusted schedule. (B-0010-0011). Plaintiff wrote in part:

> Unfortunately, as you know I have a disability, Mixed Connective Tissue Disease…One of the major manifestations of these autoimmune diseases in [sic.] fatigue and with our busy work schedule, I am having problems in this area…I am asking for some creative scheduling to help me maintain optimal health in addition to meeting my requirements as a resident …

(B-0010-0011). Since the Residency Program would not provide Plaintiff with the proper forms to complete, Plaintiff went to the office of Dr. Brian Little, Director of Academic Affairs, and she was given a "Request for Disability Accommodation" form signed by Dr. Little's administrative assistant, Joanne. (B-0012-0014).

Third, Defendant did not make a good faith effort to accommodate Plaintiff's disability. Defendant ignored her request for an adjusted schedule until October 3, 2003, the very same day Plaintiff was notified by Dr. Kaminski that she was terminated from the program. (Zechman at 67, B-0068). Although Ekbladh testified that he recalled receiving Plaintiff's letter requesting accommodations in July 2003, he did not discuss this request with anyone other than Dr. Zechman. (Ekbladh).[1] This is despite the fact that the Chief Resident is responsible for determining the schedules and therefore, would need to be informed of a request for accommodations such as this. Dr. Fraser testified that he completed, signed and

---

[1] Barbara MacIlwain, an investigator at the United States Department of Labor investigated Plaintiff's request for an adjusted work schedule. Ms. MacIlwain informed Plaintiff's counsel that she determined that Defendant violated Plaintiff's rights under FMLA by failing to properly and timely address Plaintiff's request for an adjusted schedule to her disability. (B-0071-0080).

faxed the "Request for Disability Accommodation" form to Defendant's on August 11, 2003. (Fraser at 97). The form stated in part:

> Allowing employee to have periodic periods of rest during working hours and use her vacation liberally would prevent major disease flares. During major flares, patient will not be able to further…at work.

(emphasis added). (B-0012-0014). Ekbladh called Dr. Fraser on or about August 11, 2003, at which time Dr. Fraser confirmed that time-off would indeed be appropriate to treat Plaintiff's condition; however, a specific time-off could not be determined because her flare-ups are "unpredictable". (Fraser at 78, B-0373).

Plaintiff's request for an accommodation to her work schedule was completely ignored. Defendant contends that it offered Plaintiff "an alternative accommodation", specifically, that Plaintiff apply for intermittent FMLA leave. However, Defendant's offer to accommodate Plaintiff by allowing her to apply for FMLA is simply a smoke screen to mask the disability discrimination against Plaintiff and an attempt to explain away the reason Defendant ignored her request for disability accommodations for nearly two months.

An adjustment to an employee's work schedule to accommodate a disability is an entirely proper request under the ADA. 42 U.S.C. § 12111(9)(B). It is plain enough what "accommodation" means. The employer must be willing to consider making changes in its ordinary work rules, facilities, terms and conditions in order to enable a disabled individual to work. Vande Zande, 44 F. 3d at 542. Defendant failed to even address Plaintiff's request for accommodations. It was not until September 16, 2003, almost two months after Plaintiff's initial request for accommodations, that Ekbladh decided to suggest to Plaintiff that she apply for FMLA and that her doctor complete a "Certificate of Healthcare Provider." (B-0045). The information requested by Defendant and submitted by Dr. Fraser on both the Request for Accommodation form and the Certification of Healthcare Provider form is nearly identical. Thus, Defendant had the necessary information to approve Plaintiff's request for an adjusted schedule in July 2003. Unfortunately for Plaintiff, her reduced schedule was not approved until October of 2003, ironically, the day she was terminated from the Program. Because Ekbladh ignored Plaintiff's request for

accommodations, she was forced to work in a state of constant flare-up. In an email to Kardos and Ekbladh, Plaintiff wrote:

> Is there anyway I can get either Friday or Monday 9/5/03, or 9/8/03 off as a vacation/sick/excused day. In line with my July 23rd request for some creative scheduling, I am now working 18 consecutive days without a 24 hour break, all my large joints ache and I'm wore out…

(B-0029). Kardos responded to Zechman in email which stated:

> You can certainly request a vacation day through the normal channels. Fill out the vacation form (one is attached, just in case you need one). Give it to the administrative chief for consideration.

Id. Contrary to Defendant's own Paid Time Off/Leave Policy, Plaintiff was forced to use her vacation time rather than the allotted 6 weeks of annual sick time given to all residents. (B-0030). What is more, neither Ekbladh nor Kardos addressed the status of Plaintiff's request for accommodations. Plaintiff's request for accommodation was ignored and she continued to work over 85 hours per week because the Program refused to alter her schedule in any way. (B-0028).

Defendant contends that the only reason Plaintiff's request for an adjusted schedule was not approved until October 6, 2003 was because Defendant did not receive the Certification of HealthCare Provider form from Plaintiff's physician until October 3, 2003. Assuming this contention as true, given the fact that (1) Ekbladh had already spoken with Plaintiff's physician about Plaintiff's condition and her need for an adjusted schedule in early August 2003, (2) Plaintiff was in a constant state of flare and "begging" for time off due to her illness, (3) Dr. Fraser had completed and signed a Request for Accommodation form that was given to Plaintiff by Defendant, Defendant could have followed their *own* policy and approved Plaintiff's leave on a contingent basis, pending the submission of medical certification. (B-0031-0039). Rather than participate in a good faith effort to accommodate her disability, Defendant decided to terminate Plaintiff from the Program "for academic reasons" despite their knowledge of Plaintiff's overwhelming fatigue related to her disorder. An employer, having received adequate notice of an employee's disability and desire for accommodations, cannot fail to engage the employee in the interactive process of finding accommodations, increase the disabled employee's job

responsibilities, and then simply document the employee's failures. Taylor v. Phoenixville, 184 F. 3d. at 319.

Fourth, the evidence supports the Plaintiff's contention that she could have been accommodated in the absence of Defendant's bad faith. Dr. Fraser informed Ekbladh that time-off would indeed be appropriate to treat Plaintiff's condition; however, Dr. Fraser left it to the Residency Program to arrange the time off for Plaintiff. (Fraser at 78, B-0373). In response, Ekbladh advised Dr. Fraser that Christiana Care would do "their utmost" to try to accommodate Plaintiff's disability. (Fraser at 79, 80, B-0373). Obviously Plaintiff's request for an adjusted schedule was reasonable because Defendant finally agreed to accommodate her disability in early October 2003, around the time of her termination from the Program. (B-0068). Thus, Plaintiff has met the four elements of proving that Defendant failed to engage in the interactive process.

Where there is a genuine dispute about whether the employer acted in good faith, summary judgment should be precluded. Cf., Hendricks-Robinson v. Excel Corp., 154 F. 3d 686 (7th Cir.1998) (Refusing to grant an employer summary judgment because it may not have participated in good faith in finding accommodations). In the instant case, there is a genuine issue of fact as to whether Defendant acted in good faith, for this reason summary judgment should be granted.

### 3. Defendant Discriminated Against Plaintiff When It Terminated Her Employment After She Made A Request For Reasonable Accommodations

The termination of her residency was motivated by anti-disability bias based on her connective tissue disorder. To prevail on a discrimination claim based upon a violation of the ADA, a plaintiff must establish a *prima facie* case of unlawful discrimination. To do this, she must establish that (1) she belongs to a protected category; (2) she was qualified to perform the essential functions of the job; and (3) she has suffered an otherwise adverse employment action as a result of discrimination. Point-Du-Jour v. County of Bucks, 2000 U.S. Dist. LEXIS 3061 (March 7, 2000). If the plaintiff succeeds, the burden of production shifts to the defendant to articulate some legitimate nondiscriminatory reason for the employee's termination. Fuentes v. Perskie, 32 F. 3d 759, 763 (3d Cir. 1994). Once the defendant has

met this burden, the burden of production rebounds to the plaintiff to show by a preponderance of the evidence that the employer's explanation is pretextual and that discrimination was the real reason for the plaintiff's termination. Id.

For the reasons set forth above, Plaintiff belongs to a protected category because she is a "qualified individual with a disability. Additionally, Plaintiff is qualified to perform the essential functions of a resident in the OB/Gyn program, with or without reasonable accommodations and she suffered an adverse employment action when the Program chose to terminate Plaintiff after they learned that she requested accommodations for her disability.

In July 2003, Plaintiff informed Ekbladh that she suffered from an autoimmune disease and requested disability accommodations. (B-0010-0011). A few days after Plaintiff's request for an adjusted scheduled, Ekbladh threatened to terminate Plaintiff from the Program. (B-0023). By August 18, 2003, the Resident Review Committee (RRC) held a meeting and determined that Plaintiff would not be terminated from the Program; rather Plaintiff would continue in the Program as a PGY-2 with a special PGY-2 rotation. (B-0024-0025). Shortly thereafter, the RRC was informed that Plaintiff had started the process of ADA. (B-0024-0025). Just six weeks later, on September 29, 2003, the very next time the RRC met, it voted to terminate Plaintiff's attendance in the Program. (B-0051-0053). Dr. Kaminski and Dr. Tildon-Burton, both members of the RRC, could not identify nor articulate anything that occurred within this time frame to warrant Plaintiff's termination from the Program (Kaminski at 49, Tildon-Burton at 40, B-0119). Dr. Patruno, Plaintiff's mentor, could not recall what, if anything, occurred within this six week time frame to warrant Plaintiff's termination from the Program. (Patruno at 104, B-0350 ). Thus, the only thing that changed during that time was that the RRC was informed that Plaintiff requested disability and therefore, Plaintiff has established a *prima facie* case of unlawful termination.

Defendant contends that the RRC voted to terminate Plaintiff's residency because she failed to significantly improve or acknowledge her deficiencies. Is it plausible for Plaintiff to improve *significantly* in just six weeks time? As previously noted, as of August 2003, the RRC voted that Plaintiff would continue in the Program as a PGY-2. By September she was terminated for failing to *significantly*

improve. No other resident had been dismissed from the Residency Program for performance within the two years prior to Plaintiff's termination from the Program. (B-0056). Plaintiff scored a "meets expectation" on her mock oral boards; an exam administered by outside physicians and Plaintiff scored higher than other resident on the CREOG scores, an objective test, yet she was the only resident terminated from the Program. (B-0004-0007, B-0002). Moreover, Plaintiff saw many of these attending physicians' patients unsupervised when she worked in Triage. (Zechman at 116, 148, B-0180, B-0188). Surely, these doctors entrusted Plaintiff to provide the appropriate care.

Without a doubt, there a genuine issues of material fact as to whether the Defendant's reasons for terminating Plaintiff's residency were a pretext for discrimination. Accordingly, summary judgment should not be granted as to Plaintiff's claim that Defendant terminated her residency based on disability discrimination.

**D.    Defendant Is Not Entitled To Summary Judgment on Plaintiff's Retaliation Claim**

Plaintiff's retaliation claim is based upon both her e-mail complaint that she sent to the Accreditation Council for Graduate Medical Education ("ACGME"); and (2) her request for disability accommodation under the ADA. There is substantial evidence that could permit both claims to survive summary judgment.

To establish a prima facie case of retaliation under the ADA, Plaintiff must show: (1) that she engaged in protected; (2) she was discharged subsequent to or contemporaneously with such activity; and (3) there is a causal link between the protected activity and the discharge. Woodson v. Scott Paper Co., 109 F. 3d 913, 920 (3rd Cir. 1997). Once a plaintiff establishes a prima facie case, the employer may rebut the claim by proffering a legitimate, non-discriminatory reason for the adverse action. Shaw v. Chamberlain Mfg. Corp., 2006 WL 2382284, at *10 (M.D. Pa. Aug. 17, 2006). There are genuine issues of material fact as to Plaintiff's retaliation claim. Therefore, Defendant is not entitled to summary judgment.

1.    **Plaintiff Can Establish A Prima Facie Case of Retaliation Because A Causal Link
        Between the Alleged Protected Activities and Her Termination Exists**

Defendant contends that Plaintiff's complaint to the ACGME cannot serve as a predicate for a

retaliation claim because the Plaintiff requested anonymity and therefore, the RRC did not have any

knowledge that Plaintiff was the source of the anonymous complaint. (Def's Mem. at 32).  However, at

the time Plaintiff sent the email there were less than 16 residents in the Ob/Gyn Program. Dr. Kaminski

speculated that it was Dr. Zechman who sent the anonymous letter because "she was having the most

difficulty at the time." (Kaminski at 45-46, B-0274-0275).  Although Plaintiff requested anonymity, the

reality is that there was an inherent bias against Plaintiff and the perception was that she was having the

most difficulty in the Program. By process of elimination, Kaminski deduced that Plaintiff wrote the

complaint. It is not a terribly large leap to infer that other members of the RRC thought the same way as

Kaminski.

Defendant also contends that Plaintiff's email contained only "one sentence vaguely referring to

discrimination" and the remainder contained allegations that are not protected under the ADA. (Def's

Mem. at 32, 33). Interestingly, Defendant chose not to include this sentence in their argument. However,

Plaintiff's statements at the conclusion of her email summarized her purpose for notifying the ACGME.

Plaintiff's complaint to the ACGME states in part,

> I am aware that this has happened to a previous resident that transferred in as a PGY-2 as
> well, Rita Vinod...She reports being discriminated against as well, so this apparently is
> an ongoing problem. I am an older resident and have a disability...I feel I am being
> targeted for this abuse secondary to being "nontraditional"

(B-0008-0009). "Protected activity" means oppos[ing] any practice made unlawful employment

practice" under the ADA or ADEA. Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 269

(2001). Surely, Plaintiff's complaint to the ACGME that she was being "targeted" because of

both her age and her disability qualifies as such protected activity.

Turning to Plaintiff's request for accommodation for her disability, Defendant contends

that three months elapsed between the date of Plaintiff's request and her termination from the

Program which is "not sufficiently close in time to establish the causal link required for a *prima*

*facie* case. (Def's Mem. at 34). However, the "mere passage of time is not legally conclusive proof against retaliation." Robinson v. SEPTA, 982 F. 2d 892, 894 (3rd Cir. 1993) (finding retaliation where almost two years passed between the protected activity and plaintiff's discharge). The Defendant submits that the RRC was actively discussing terminating Plaintiff from the Program in March and June of 2003. But Defendant fails to point out that in August 2003, the RRC decided that Plaintiff would continue her residency as a PGY-2. (B-0024-0025). What is perhaps more telling is that only a few weeks elapsed from the time that the members of the RRC learned of Plaintiff's request for disability accommodations and her complaint to the ACGME, August 18, 2003, and the time that the RRC terminated Plaintiff from the Program, September 29, 2003. (B-0024-0025, B-0051-0053). Moreover, three days after Plaintiff was approved for an adjusted schedule on October 3, 2003, she was informed by Kaminski that she was terminated from the Program. (Zechman at 67, B-0168). Thus, under the facts of this case we have temporal proximity between the protected activity and the termination which is sufficient to establish causal link. Jalil v. Avdel Corp., 873 F. 2d 701, 708 (3rd Cir. 1989).

Defendant also asserts that there is "no evidence that Dr. Ekbladh or anyone else reacted negatively to Plaintiff's request for an accommodation. (Def's Mem. at 34). This is contrary to the facts of this case. Plaintiff testified that she initially requested FMLA forms from Kardos, the administrator of the Program, who advised Plaintiff that the Program cannot support residents going out on FMLA. (Zechman at 75, 76, B-0170). As a consequence, Plaintiff went to Brian Little's office and was given request for accommodation forms from Mr. Little's secretary who signed and dated the forms. (B-0012). Further, Ekbladh first became aware of her disability in July 2003. He admitted that he did not talk to anyone else at Christiana Care to aid in adjusting her schedule. (Ekbladh at 43, B-0292). Plaintiff was forced to continue working over 85 hours per week in a constant flare-up of her condition without even a call room to rest and place her belongings because she had been kicked out of the third year call room. (See Tildon-Burton at 29, Zechman, Patruno at 41, B-0334). Finally, in September 2003, Ekbladh sent a letter to Plaintiff

31

suggesting she apply for FMLA. In short, Ekbladh's failure to act is more than enough evidence of a negative reaction to Plaintiff's request for an accommodation. Thus, Plaintiff has established a prima facie case of retaliation because there is ample evidence that both her complaint to the ACGME and her request for an accommodation were linked to her termination.

### 2.    Plaintiff Can Establish A Pretext

Defendant contends that the termination of Plaintiff was "the natural culmination of a prolonged but unfortunately unsuccessful effort to help Plaintiff meet the minimum expectations…despite many months of extra educational opportunities…" Defendant's statement is nothing more than a pretext for discrimination for several reasons.   Only a few weeks elapsed between the RRC's notification of Plaintiff's request for disability and her termination from the Program; notwithstanding the fact that the RRC had already made the decision that Plaintiff would continue in the Program as PGY-2. Kaminski and Tildon-Burton, members of the RRC, and Plaintiff's mentor, Patruno, could not identify or articulate anything during that time period specifically that occurred to warrant her termination. (Tildon-Burton at 40, B-0119; Kaminski at 49, B-0273; Patruno at 104, B-0350). Additionally, no other resident had been dismissed from the Residency Program for performance within the two years prior to Plaintiff's termination from the Program. (B-0056).  Further, Sciscione, informed Plaintiff that if she received a meets expectations or higher, she would progress to the PGY-3 year. (B-0003). Plaintiff received a "meets expectations" on her mock oral boards; yet she was inexplicably terminated from the Program. (B-0004-0007).  Also, the CREOG exam is a mechanism for testing a resident's medical knowledge. Patruno opined that Plaintiff was terminated from the Program because she received a 12%. (Patruno at 34-35, B-0333). However, when we quantify medical knowledge in terms of the CREOG scores, there were other residents in the Program that had less medical knowledge than Plaintiff. (Patruno at 63, B-0340; Patruno at 35, B-0333). But those residents who scored lower than Plaintiff on the CREOG exam were not terminated from the Program. (B-0002).

Further, Defendant errantly contends that she was afforded the opportunity to learn. (Def's Mem. at 35). But Plaintiff and other attending physicians routinely complained to Ekbladh that she was being

reassigned out of surgery. (B-0016-0017, B-0020, B-0103-0104, B-379-381). Yet, Ekbladh did absolutely nothing when confronted with the knowledge that Plaintiff was denied learning opportunities. (Ekbladh at 56, B-0295). What is more, Plaintiff's supervisor Gray, served on the RRC and encouraged Plaintiff to quit the Residency Program. (B-0017, B-0024, B-0051). (Zechman Depo.) Unfortunately for Plaintiff, Gray was not the only one who encouraged Plaintiff to quit. Patruno, Plaintiff's mentor, advised Plaintiff that he might quit the Program if he was in her same situation because she was stressed out and tired. (Patruno 44-45, B-0335). What is also telling about the Defendant's discriminatory motives is that even as late as September 4, 2003, the plan was that Plaintiff would continue her rotation through November 2003. (B-0040). Yet, once Plaintiff was approved for FMLA, she was notified of her termination from the Program. (B-0068). Moreover, Defendant was not interested in providing Plaintiff with opportunities to succeed in the Program as evidenced by the fact that it refused to provide Plaintiff with accommodations for her disability. Proof that the defendant's explanation is unworthy of credence is a form of circumstantial evidence that is probative of intentional discrimination, and it can be quite persuasive. Reeves v. Sandreson Plumbing Products, Inc., 530 U.S. 133, 145 (2000).

In short, there is ample evidence from which a fact finder could infer that the RRC terminated Plaintiff's residency in retaliation for her ACGME complaint and for her request for disability.

E.    **Plaintiff's "Detrimental Reliance" Claims Does Not Fail As A Matter of Law**

Defendant asserts that "detrimental reliance" is not recognized as a cause of action under Delaware law. (Def's Mem. at 37). However, this is not an accurate statement of the law in Delaware. Under Delaware employment law, in order to succeed on a claim for promissory estoppel, a plaintiff must prove (i) the making of a promise; (ii) with the intent to induce action or forbearance based on a promise; (iii) reasonable reliance; and (iv)injury. Scott-Douglas Corp v.Greyhound Corp., 304 A. 2d 309, 319 (Del. Super. 1973). Promissory estoppel may arise where the party to be estopped has promised to do an act in the future, although unsupported by consideration, if it was intended to be a promise relied upon and in fact, was relied upon. Id. at 319. As such, Plaintiff can bring a claim of detrimental reliance under Delaware law.

33

Also, Defendant contends that Plaintiff's claim of promissory estoppel fails because the parties' relationship is governed by two employment contracts. (Def's Mem. at 37). Promissory estoppel is generally viewed as a consideration substitute for promises which are reasonably relied upon, but which would otherwise not be enforceable. Weiss v. Northwest Broad., Inc. 140 F. Supp. 2d 336, 344 (D. Del. 2001). A party cannot assert a promissory estoppel claim based on promises that contradict the terms of a valid, enforceable contract. Id. at 345 (emphasis added).

In the instant case, Plaintiff is not asserting a claim based on promises that contradict the terms of the employment contract between the parties. Plaintiff is, however, asserting a claim of promissory estoppel based upon Defendant's representation that Plaintiff would be afforded the opportunity to improve upon her surgical skills.

In 2002, Plaintiff was accepted into both Christiana Care's Residency Program and a residency program in Norfolk, Virginia. (Zechman at 27-28, B-0158). Defendant was aware, prior to Plaintiff's entry into its Program, that her skills were behind the other residents and that she needed to catch up (Sciscione recognized that Plaintiff would be significantly behind when she started the Program at 48; Ekbladh and Kaminski were aware that Plaintiff's skills fell below other residents in her class prior to her acceptance in the Program. (Ekbladh at 11, B-0284; Kaminski at 10, B-0266). Notwithstanding Plaintiff's deficits, Defendant agreed to offer Plaintiff a residency and Sciscione promised Plaintiff that she would be provided with ample opportunity to increase her surgical skills. (Zechman at 48, B-0162). Relying on Defendant's promise, Plaintiff agreed to attend Defendant's Program rather than the Program at Norfolk, Virginia. Unfortunately for Plaintiff, while at Christiana Care she was routinely reassigned from surgical cases because of an inherent bias against her as shown *infra*. When she and other attending physicians brought this to Ekbladh's attention, he ignored her. In short, Plaintiff relied to her detriment on Defendant's promise that she would be afforded the opportunity to increase her surgical skills in an effort to catch up to other residence. Therefore, Defendant is not entitled to summary judgment on Plaintiff's detrimental reliance claim.

## IV.    CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment should be denied because there are genuine issues of material fact and Defendant is not entitled to judgment as a matter of law.

Respectfully submitted,

MARGOLIS EDELSTEIN

Jeffrey K. Martin (DE Bar ID 2407)
Lori A. Brewington (DE Bar ID 4522)
1509 Gilpin Avenue
Wilmington, Delaware 19806
(302) 777-4680
Attorneys for Plaintiff
Ellen Zechman

Dated:  November 22, 2006