U.S. DEPARTMENT OF LABOR EMPLOYMENT STANDARDS ADMINISTRATION
Wage and Hour Division
6525 Belcrest Road, Room 560
Hyattsville, MD 20782
(301) 436-6767
(301) 436-4222

Transmission from Fax:
(301) 436-4222

Date: 7-10-06 Number of Pages (Including Cover Sheet): 2

From: Barbara King McIlwain, INV

To: Michelle Eklund, SR. ERS

Subject: Back Wage Summary Re Ellen Zechman Fax Number: 302-428-4130

Message:

Backwages computed base on 25 weeks of lost pay, salaried (Annual) $ 41,891.20 Please feel free to contact me @ (301) 436-6768 x22 if you require additional information. The original copy will go sent to you FedEX.

B-0077

# Summary of Unpaid Wages

**U.S. Department of Labor**
Employment Standards Administration
Wage and Hour Division

(Office Address) Baltimore MD District Office
207 Appraisers Stores Building
103 South Gay Street
Baltimore, MD 21202
410-962-2240

Investigator: *Barbara McIlwain*

Date: *06/28/2006*

Employer Fed Tax ID Number *51-0103684*

| 1. Name | 2. Address | 3. Period Covered by Work Week Ending Dates | 4. Act(s) | 5. Gross Amounts Due |
|---|---|---|---|---|
| *Huffman Zechman, Ellen* | *502 Emman Road New Bern, NC 28562* | *01/10/2004 to 07/03/2004* | | *$20,623.36* |
| | | | TOTAL | *$20,623.36* |

I agree to pay the listed employees the back wages shown due and to mail proof of payment to the Wage and Hour District Office shown above by

Signed:

Employer Name and Address:
*Christiana Care Hospital*
*Christina Care Health Services*
*4755 Ogletown Stanton Road*
*Newark, DE 19718*

B-0078

* Column 4-Code
FLSA 1
FCA 2
SCA 3
CWHSSA 5
CCPA 6
FMLA 7

Form WH-56

Date: 06/28/2006 3:35:51 PM

Case ID: 1430258

D01108
CONFIDENTIAL

# Receipt For Payment of Lost or Denied Wages, Employment Benefits, or Other Compensation

**U.S. Department of Labor**
Wage and Hour Division
Employment Standards Administration

As computed or approved by the Wage and Hour Division

I, ______________________________ , hereby acknowledge receipt of payment in full
(Type or print name of employee)

from ______________________________
(Name and location of establishment)

for the period beginning with the workweek ending ______________________________ through the workweek

ending ______________________________ of unpaid wages, employment benefits, or other compensation due me (as shown in the column to the right) under the Act(s) indicated in the marked box(es):

- ☐ The Fair Labor Standards Act [1]
- ☐ The Employee Polygraph Protection Act [2]
- ☐ The Family and Medical Leave Act [3]
- ☐ The Walsh-Healey Public Contracts Act
- ☐ H2A
- ☐ The Service Contract Act
- ☐ The Davis-Bacon and Related Acts
- ☐ The Contract Work Hours and Safety Standards Act
- ☐ Title III - Consumer Credit Protection Act
- ☐ Other ______________

Gross amount $ ______________

Legal deductions $ ______________

Net amount received $ ______________

[1] **NOTICE TO EMPLOYEE UNDER THE FAIR LABOR STANDARDS ACT** - Your acceptance of back wages due under the Fair Labor Standards Act means that you have given up any right you may have to bring suit for such back wages under Section 16(b) of that Act. Section 16(b) provides that an employee may bring suit on his/her own behalf for unpaid minimum wages and/or overtime compensation and an equal amount as liquidated damages, plus attorney's fees and court costs. Generally, a 2-year statute of limitations applies to the recovery of back wages. Do not sign this receipt unless you have actually received payment of the back wages due.

[2] **NOTICE TO EMPLOYEE UNDER THE EMPLOYEE POLYGRAPH PROTECTION ACT** - Your acceptance of lost wages and benefits under the Employee Polygraph Protection Act means that you have given up any right you may have to bring suit for such lost wages and benefits, attorney's fees and court costs. Generally, a 3-year statute of limitations applies to the recovery of lost wages and benefits. Do not sign this receipt unless you have actually received payment of the amounts due.

[3] **NOTICE TO EMPLOYEE UNDER THE FAMILY AND MEDICAL LEAVE ACT** - Your acceptance of lost or denied wages, employment benefits, or other compensation due under the Family and Medical Leave Act means that you have given up any right you may have to bring suit for such amounts under Section 107(a) of that Act. Section 107(a) provides that an employee may bring suit on his/her own behalf for lost or denied wages, salary, employment benefits or other compensation, interest on the lost or denied amounts calculated at the prevailing rate, an additional amount as liquidated damages, plus attorney's fees and court costs. Generally, a 2-year statute of limitations applies to the recovery of amounts due. Do not sign this receipt unless you have actually received payment of the amounts due.

Signature of employee ______________________________

Date ______________________ Address ______________________________
(Number, Street, (Apt. No.), City, State, ZIP Code)

## EMPLOYER'S CERTIFICATION

To Wage and Hour Division, Employment Standards Administration, U.S. Department of Labor

I hereby certify that I have on this (date) ______________________ paid the above-named employee in full covering lost or denied wages, employment benefits, or other compensation as stated above.

Signed ______________________________ Title ______________________
(Employer or authorized representative)

D01109
CONFIDENTIAL

PENALTIES INCLUDING FINES OR IMPRISONMENT ARE PRESCRIBED FOR A FALSE STATEMENT OR MISREPRESENTATION UNDER U.S. CODE, TITLE 18, SEC. 1001.

B-0079

U.S. DEPARTMENT OF LABOR EMPLOYMENT STANDARDS ADMINISTRATION
Wage and Hour Division
6525 Belcrest Road, Room 560
Hyattsville, MD 20782
(301) 436-6767
(301) 436-4222

Transmission from Fax:
(301) 436-4222

Date: 5-18-06 Number of Pages (Including Cover Sheet): 1

From: Barbara McIlwain, Inv.

To: Michelle Eklund, Sr. Employee Rel

Subject: FMLA Complaint Fax Number: 1-302-428-4130
Re: Ellen Zechman

Message:

Please provide this office with Zechman's payroll records for the months of August and September, 2003, For the purpose of computing backwages, due to the complainant. Christiana failed to designate FMLA leave, As Requested by Zechman for her serious Health Condition "Lupus" requested in letter dated 7/23/03.

Thank you for your continued cooperation.

D01110
CONFIDENTIAL

B-0080

| COMP | P/E DATE | PP | PAGE |
|---|---|---|---|
| MCD0745290 | 08/02/2003 | 16 | 333 |

CHECK DATE 08/08/2003

# PAYROLL REGISTER

CHRISTIANA CARE HEALTH SERVICES INC
P O BOX 2653 WILMINGTON DE 19805

| NAME / EMPLOYEE NO. / CH/DEP NO / STAT / YTDGROSS / EX / SALY/RATE / AVG RATE / CITY GRS / HOURS | GROSS / ADJ. NET / TOTAL DED. / NET PAY / GROSS YTD | EARNINGS NAME | CURRENT UNITS | Y-T-D UNITS | CURRENT AMT. | Y-T-D AMOUNT | DEDUCTIONS NAME | CURRENT AMT. | Y-T-D AMT. | NAME | CURRENT AMT. | Y-T-D AMT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| E H ZECHMAN | 141263 | DAY | 8000 | 128000 | 161120 | 2507200 | SOC SEC | 8758 | 135748 | FED TAX | 21585 | 326263 |
| 240980157 | | FLEX- | | | 19857- | 317712- | STATE TX | 5660 | 86634 | PHARMACY | | 8823 |
| 0393050550 | 38052 | | | | | | REFUND | | 1946 | MEDICARE | 2049 | 31748 |
| 2507200 | 103211 | | | | | | | | | | | |
| 20.1400 | | | | | | | | | | | | |
| 8000 | 2189468 | | | | | | | | | | | |

| COMP | P/E DATE | PP | PAGE |
|---|---|---|---|
| MCD0745290 | 08/16/2003 | 17 | 337 |

CHECK DATE 08/22/2003

# PAYROLL REGISTER

CHRISTIANA CARE HEALTH SERVICES INC
P O BOX 2653 WILMINGTON DE 19805

| NAME / EMPLOYEE NO / CH/DEP NO. / STAT / YTDGROSS / EX / SALY/RATE / AVG RATE / CITY GRS / HOURS | GROSS / ADJ. NET / TOTAL DED. / NET PAY / GROSS YTD | EARNINGS NAME | CURRENT UNITS | Y-T-D UNITS | CURRENT AMT. | Y-T-D AMOUNT | DEDUCTIONS NAME | CURRENT AMT. | Y-T-D AMT. | NAME | CURRENT AMT. | Y-T-D AMT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| E H ZECHMAN | 141263 | DAY | 8000 | 136000 | 161120 | 2668320 | SOC SEC | 8759 | 144507 | FED TAX | 20585 | 346848 |
| 240980157 | | FLEX- | | | 19857- | 337569- | STATE TX | 5660 | 92294 | PHARMACY | | 8823 |
| 0393050550 | 37052 | | | | | | REFUND | | 1946 | MEDICARE | 2048 | 33796 |
| 2668320 | 104211 | | | | | | | | | | | |
| 20.1400 | | | | | | | | | | | | |
| 8000 | 2330751 | | | | | | | | | | | |

| COMP | P/E DATE | PP | PAGE |
|---|---|---|---|
| MCD0745290 | 08/30/2003 | 18 | 339 |

CHECK DATE 09/05/2003

# PAYROLL REGISTER

CHRISTIANA CARE HEALTH SERVICES INC
P O BOX 2653 WILMINGTON DE 19805

| NAME / EMPLOYEE NO. / CH/DEP NO. / STAT / YTDGROSS / EX / SALY/RATE / AVG RATE / CITY GRS / HOURS | GROSS / ADJ. NET / TOTAL DED / NET PAY / GROSS YTD | EARNINGS NAME | CURRENT UNITS | Y-T-D UNITS | CURRENT AMT. | Y-T-D AMOUNT | DEDUCTIONS NAME | CURRENT AMT. | Y-T-D AMT. | NAME | CURRENT AMT | Y-T-D AMT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| E H ZECHMAN | 141263 | DAY | 8000 | 144000 | 161120 | 2829440 | SOC SEC | 8758 | 153265 | FED TAX | 20585 | 367433 |
| 240980157 | | FLEX- | | | 19857- | 357426- | STATE TX | 5660 | 97954 | PHARMACY | | 8823 |
| 0393050550 | 37051 | | | | | | REFUND | | 1946 | MEDICARE | 2048 | 35844 |
| 2829440 | 104212 | | | | | | | | | | | |
| 20.1400 | | | | | | | | | | | | |
| 8000 | 2472014 | | | | | | | | | | | |

D01111
CONFIDENTIAL

COMP MCD0745290 | P/E DATE 09/13/2003 | PP 19 | PAGE 342 | CHECK DATE 09/19/2003

# PAYROLL REGISTER

CHRISTIANA CARE HEALTH SERVICES INC
P O BOX 2653 WILMINGTON DE 19805

| NAME / EMPLOYEE NO. / CH/DEP NO / STAT / YTD GROSS / EX / SAL/RATE / AVG RATE / PTYY GRS / HOURS | GROSS / ADJ NET / TOTAL DED. / NET PAY / GROSS YTD | EARNINGS NAME | CURRENT UNITS | Y-T-D UNITS | CURRENT AMT. | Y-T-D AMOUNT | DEDUCTIONS NAME | CURRENT AMT | Y-T-D AMT | NAME | CURRENT AMT | Y-T-D AMT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| E H ZECHMAN | 141263 | DAY | 8000 | 152000 | 161120 | 2990560 | SOC SEC | 8758 | 162023 | FED TAX | 20585 | 388018 |
| 240980157 | | FLEX- | | | 19857- | 377263- | STATE TX | 5660 | 103614 | PHARMACY | | 8823 |
| 0393050550 | 37052 | | | | | | REFUND | | 1946- | MEDICARE | 2049 | 37893 |
| 2990560 | 104211 | | | | | | | | | | | |
| 20.1400 | | | | | | | | | | | | |
| 8000 | 2613277 | | | | | | | | | | | |

COMP MCD0745290 | P/E DATE 09/27/2003 | PP 20 | PAGE 345 | CHECK DATE 10/03/2003

# PAYROLL REGISTER

CHRISTIANA CARE HEALTH SERVICES INC
P O BOX 2653 WILMINGTON DE 19805

| NAME / EMPLOYEE NO. / CH/DEP NO. / STAT / YTD GROSS / EX / SAL/RATE / AVG RATE / CITY GRS / HOURS | GROSS / ADJ. NET / TOTAL DED. / NET PAY / GROSS YTD | EARNINGS NAME | CURRENT UNITS | Y-T-D UNITS | CURRENT AMT. | Y-T-D AMOUNT | DEDUCTIONS NAME | CURRENT AMT. | Y-T-D AMT. | NAME | CURRENT AMT. | Y-T-D AMT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| E H ZECHMAN | 141263 | DAY | 8000 | 160000 | 161120 | 3151680 | SOC SEC | 8758 | 170781 | FED TAX | 20585 | 408603 |
| 240980157 | | FLEX- | | | 19857- | 397140- | STATE TX | 5660 | 109274 | PHARMACY | | 8823 |
| 0393050550 | 37051 | | | | | | REFUND | | 1946- | MEDICARE | 2048 | 39941 |
| 3151680 | 104212 | | | | | | | | | | | |
| 20.1400 | | | | | | | | | | | | |
| 8000 | 2754540 | | | | | | | | | | | |

B-0082



05/31/2006 13:17 PAYROLL-CFC CHRISTIANA CARE301 → 84284130 NO.530 D01

CHRISTIANA CARE
HEALTH SERVICES

3

CONFIDENTIAL

## FACSIMILE COVER LETTER

DATE: 5/31/06 No. of Pages (Including Cover): 3

TO: Michelle Eklund

FAX Number: 4284130

Company Name: CCHS

Telephone No.: 4285729

FROM: LINDA EVANS

Company Name: CHRISTIANA CARE HEALTH SERVICES

Department Name: PAYROLL DEPARTMENT

Company Address: 200 HYGEIA DRIVE
NEWARK DE 19713-2049

FAX Number: (302) 623-7301

Telephone No.: (302) 623-7245

D01113
CONFIDENTIAL

Re:

Message:

B-0083

☐ Urgent ☐ For Review ☐ Please Comment ☐ Please Reply ☐ Per Your Request

Notice: The information contained in this facsimile message is intended only for the use of the recipient(s) named above or their designees. It may contain information that is privileged, confidential and exempt from disclosure under applicable law. The recipient of this information is prohibited from disclosing the information to any other party and is required to destroy the information after the stated need has been fulfilled. If you have received this communication in error, please notify the sender immediately at the telephone number listed above and return the original communication to us at the above address via the US Postal Service. Thank You



CHRISTIANA CARE
HEALTH SERVICES

Human Resources
Employee Relations

4755 Ogletown-Stanton Road
Newark, Delaware 19718

302-733-1120 phone

January 25, 2006

Ms. Barbara McIlwain, Investigator
Department of Labor, Employment Standards Administration
Wage and Hour Division
780 Presidential Building
6525 Belcrest Road
Hyattsville, MD 20782

RE: Ellen Zechman, MD FMLA Complaint

Dear Ms. McIlwain:

This letter is in response to your request for information regarding Ellen Zechman, who was previously employed by Christiana Care as a second-year Resident in the Department of Obstetrics and Gynecology.

During the Fall of 2003, Ms. Zechman informed her supervisor that she was unable to work the demanding hours required of all OB/GYN residents. Christiana Care actively encouraged her to apply for FMLA leave. Ms. Zechman provided the required Certification of Health Care Provider on October 3, 2003. However, by that time, the Residency Review Committee of the Department of Obstetrics and Gynecology had already terminated Ms. Zechman's employment for academic reasons that were totally unrelated to any medical condition or request for leave. (A copy of the Committee's September 30, 2003 letter is enclosed). Ms. Zechman was not on an approved FMLA leave when her employment was terminated, nor did Ms. Zechman ever ask to be reinstated to her former position.

Finally, you should be aware that Ms. Zechman has filed a lawsuit against Christiana Care relating to the termination of her employment. The lawsuit is currently pending. Notably, Ms. Zechman's lawsuit does not allege any violation of the FMLA.

For the foregoing reasons, Christiana Care requests that you dismiss Ms. Zechman's FMLA complaint in its entirety. Please feel free to contact me at 302-428-5729 if you need additional information.

Sincerely,

Michelle Eklund

**B-0084**

Michelle Eklund, Senior Employee Relations Representative

Wilmington Hospital
501 West 14th Street
P.O. Box 1668
302-428-5729 phone
302-428-4130 fax

**Christiana Care Health System**

| To: Barbara McIlwain | From: Michelle Eklund |
|---|---|
| Fax: 301-436-4222 | Pages: |
| Phone: | Date: 01/30/2006 |
| Re: | CC: |

☐ Urgent ☑ For Review ☐ Please Comment ☐ Please Reply ☐ Please Recycle

B-0085

D01137
CONFIDENTIAL

# MESSAGE CONFIRMATION

01/30/2006 16:15

| DATE | S,R-TIME | DISTANT STATION ID | MODE | PAGES | RESULT | |
|---|---|---|---|---|---|---|
| 01/30 | 00'34" | 813014364222 | TX | 02 | OK | 0000 |

01/30/2006 16:14 NO.271 00

Wilmington Hospital
501 West 14th Street
P.O. Box 1668
302-428-5729 phone
302-428-4130 fax

| | | | |
|---|---|---|---|
| To: | Barbara McIlwain | From: | Michelle Eklund |
| Fax: | 301-436-4222 | Pages: | |
| Phone: | | Date: | 01/30/2006 |
| Re: | | CC: | |

B-0086

☐ Urgent ☑ For Review ☐ Please Comment ☐ Please Reply ☐ Please Recycle

D01138
CONFIDENTIAL

# Evaluation Summary for Zechman, Ellen

All Evaluations BY Listed User(s).
Distributed between 07/01/2002 and 06/30/2003

| User | Type | Assigned | Complete | InComplete |
|---|---|---|---|---|
| Zechman, Ellen | Resident | 188 | 42 | 144 |

| * | Evaluation Form | Related Event | Evaluatee | Date Distributed | Due Date |
|---|---|---|---|---|---|
| | *Rotation Evaluation* | | | | |
| | Rotation Eval of Float 07/01/02 - Rotation Schedul | Rotation | N/A | 07/21/02 | 07/28/02 X |
| | Rotation Eval of OB 2 07/29/02 - Rotation Schedule | Rotation | N/A | 08/18/02 | 08/25/02 X |
| | Rotation Eval of Triag 08/26/02 - Rotation Schedul | Rotation | N/A | 09/15/02 | 09/22/02 X |
| | Rotation Eval of Gyn 2 09/23/02 - Rotation Schedul | Rotation | N/A | 10/13/02 | 10/20/02 X |
| ic | Rotation Eval of Float 10/21/02 - Rotation Schedul | Rotation | N/A | 11/10/02 | 11/17/02 due |
| ic | Rotation Eval of OB 2 11/18/02 - Rotation Schedule | Rotation | N/A | 12/08/02 | 12/15/02 due |
| ic | Rotation Eval of Triag 12/16/02 - Rotation Schedul | Rotation | N/A | 01/05/03 | 01/12/03 due |
| ic | Rotation Eval of Gyn 2 01/13/03 - Rotation Schedul | Rotation | N/A | 02/02/03 | 02/09/03 due |
| | *Resident Evaluation* | | | | |
| ic,an | Anonymous Evaluation of Residents by Residents | N/A | Naqvi, Fatima | 12/20/02 | 01/10/03 due |
| ic,an | Anonymous Evaluation of Residents by Residents | N/A | Kersh, Stefanie | 12/20/02 | 01/10/03 due |
| ic,an | Anonymous Evaluation of Residents by Residents | N/A | Heinle, Rachel | 12/20/02 | 01/10/03 due |
| ic,an | Anonymous Evaluation of Residents by Residents | N/A | Bratsch, Colleen | 12/20/02 | 01/10/03 due |
| ic,an | Anonymous Evaluation of Residents by Residents | N/A | Payne, Karroll | 12/20/02 | 01/10/03 due |
| ic,an | Anonymous Evaluation of Residents by Residents | N/A | Liu, Sharon | 12/20/02 | 01/10/03 due |
| ic,an | Anonymous Evaluation of Residents by Residents | N/A | Vinod, Rita | 12/20/02 | 01/10/03 due |
| ic,an | Anonymous Evaluation of Residents by Residents | N/A | DiMichele, Andrea | 12/20/02 | 01/10/03 due |
| ic,an | Anonymous Evaluation of Residents by Residents | N/A | Barlow, Jennifer | 12/20/02 | 01/10/03 due |
| ic,an | Anonymous Evaluation of Residents by Residents | N/A | Hammond, Sharice | 12/20/02 | 01/10/03 due |
| ic,an | Anonymous Evaluation of Residents by Residents | N/A | Likhyani, Oona | 12/20/02 | 01/10/03 due |
| ic,an | Anonymous Evaluation of Residents by Residents | N/A | Sturrock, Kelley | 12/20/02 | 01/10/03 due |
| ic,an | Anonymous Evaluation of Residents by Residents | N/A | Deluca, Samantha | 12/20/02 | 01/10/03 due |
| ic,an | Anonymous Evaluation of Residents by Residents | N/A | Kirifides, Alexander | 12/20/02 | 01/10/03 due |
| | *Attending Evaluation* | | | | |
| pv,an | Faculty Eval of Triag 08/26/02 - Rotation Schedule | Rotation | Patruno, Joseph | 09/15/02 | 09/22/02 X |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Whitney, Charles | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Larson, James | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Ang, Nestor | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Baltazar, Rodney | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Bradfield, James | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Brosch, Faith | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Carlson, John | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Chatterjee, Uma | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by | N/A | Cosgrove, James | 12/20/02 | 01/10/03 due |

B-0087

D1019

CONFIDENTIA

| | | | | | |
|---|---|---|---|---|---|
| | the Residents | | | | |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Elliott, Amy | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Gwathney, Jamal | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Chen, Jenny | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Prosseda, Julie | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Kruszka, Paul | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Sciscione, Anthony | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | DeMeo, Gregory | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Patruno, Joseph | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Ekbladh, Lamar | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Kaminski, Paul | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Hoffman, Matthew | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Kelley, Kevin | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Smalls, Arlene | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Colmorgen, Garrett | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Manley, James | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Mulla, Wadia | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Shlossman, Philip | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Hochman, Moses | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Hohman, William | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Ehrenthal, Deborah | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Rode, Martha | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Domingo, Ronaldo | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Duque, Nieva | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Dworkin, Albert | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Fan, Nancy | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Fink, David | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Gordon Jr., Cecil | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Gorondy, Susan | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Goshow-Harris, Joanne | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Hendrixson, Scott | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Henderson, Richard | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Hickok, Robert | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Imran, Mohammed | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Johnson, William | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Kanaga, Margo | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Kobasa, Walter | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Liarakos, George | 12/20/02 | 01/10/03 due |
| | Semi-Annual - Faculty evaluations by | | | | |

B-0088

D1020
CONFIDENTIA

| | | | | | |
|---|---|---|---|---|---|
| ic,an | the Residents | N/A | Lytle-Glover, Karen | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Mamberg, Elias | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Maynard, Christine | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | McCullough, Helen | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Mesa, Jose | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Ostrum , Gordon jr. | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Palacio, Joaquin | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Picazo, Jose | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Russell, Jeffrey | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Talley, Lynne | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Tildon-Burton, Janice | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Vakili, Ghassem | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | White, Russell | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Whitney, Estelle | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Wiercinski, Stanley | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Wisniewski, Robert | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Angstadt, Diane | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | McBride, Molly | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Bender, Renee | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Schubert, Beth | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Bell, Anthony | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Ahn, Sei | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Larkin, Molly | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Akins, Jennifer | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | McIntosh, LaShauna | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Cooksey, Michael | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Simpson, David | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Cooper, Michelle | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Dickson-Witmer, Diana | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Imran, Chantel | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | OConnor, Robert | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Westerberg, Dyanne | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Persaud, Arlene | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Saul, Howard | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Szabo, Susan | 12/20/02 | 01/10/03 due |
| | Semi-Annual - Faculty evaluations by the Residents | N/A | Zubrow, Marc | 12/20/02 | 01/10/03 due |
| ic,an | Semi-Annual - Faculty evaluations by the Residents | N/A | Caraballo, Ricardo | 12/20/02 | 01/10/03 due |
| | Semi-Annual - Faculty evaluations by the Residents | N/A | Maccarone, Joseph | 12/20/02 | 01/10/03 due |

Faculty Eval of Triag 12/16/02 -

B-0089

D1021
CONFIDENTIAL

| ic,an | Rotation Schedule *Didactic Evaluation* | Rotation | Patruno, Joseph | 01/05/03 | 01/12/03 due |
|---|---|---|---|---|---|
| | Approach to New OB/ Patient (Dr. Payne & Dr. Hoffm | N/A | N/A | 07/03/02 | 07/05/02 X |
| | Placenta Suturing | N/A | N/A | 07/03/02 | 07/05/02 X |
| | Universal Precautions / Hochman - Heinle | N/A | N/A | 07/10/02 | 07/12/02 X |
| | Sterile Technique | N/A | N/A | 07/10/02 | 07/12/02 X |
| | Knot Tying | N/A | N/A | 07/10/02 | 07/12/02 X |
| | Review of OP notes and discharge sum/Shlossman | N/A | N/A | 07/10/02 | 07/12/02 X |
| | Selection of Surgical insturments/Bratsch & Kelley | N/A | N/A | 07/17/02 | 07/19/02 X |
| | Oral Contraceptions/ Kaminski | N/A | N/A | 07/17/02 | 07/19/02 X |
| | Domestic violence / Matthew Hoffman, MD | N/A | N/A | 07/31/02 | 08/02/02 X |
| | The GYN patient & the HEDIS guideline | N/A | N/A | 07/31/02 | 08/02/02 X |
| | Chronic Pelvic Pain / Joseph Patruno, MD | N/A | N/A | 07/31/02 | 08/02/02 X |
| | Repair of Midline episiotomy | N/A | N/A | 07/31/02 | 08/02/02 X |
| | EvaluationUrogyn & Pelvic reconstruction minimally | N/A | N/A | 08/09/02 | 08/12/02 X |
| | The Principal Incisions for Pelvic Surgery/Kelley | N/A | N/A | 08/09/02 | 08/12/02 X |
| | Sexually transmitted disease (Arlene Smalls) | N/A | N/A | 08/09/02 | 08/12/02 X |
| | Abnormal Uterine Bleeding (Anthony Bell, MD) | N/A | N/A | 09/05/02 | 09/13/02 X |
| | Laser & Loop electrosurgical Excision Procedure (L | N/A | N/A | 09/05/02 | 09/13/02 X |
| | Closing an Abdominal incision (Stefanie Kersh - Ho | N/A | N/A | 09/05/02 | 09/13/02 X |
| | Laparoscopic Training skills (Kevin Kelley) | N/A | N/A | 09/05/02 | 09/13/02 X |
| | Dr. Sultana (prog dir from Jefferson) "h | N/A | N/A | 09/05/02 | 09/13/02 X |
| | Vaginitis (Molly Larkin, MD) | N/A | N/A | 09/05/02 | 09/13/02 X |
| | Tumor board / Larson | N/A | N/A | 09/05/02 | 09/13/02 X |
| | *Fluid & electrolyte balance (James Larson, MD) | N/A | N/A | 09/05/02 | 09/13/02 X |
| | breastfeeding, depression and bereavement (Klopfen | N/A | N/A | 09/05/02 | 09/13/02 X |
| | Ehrenthal / Case discussions in Primary Care | N/A | N/A | 09/12/02 | 09/20/02 X |
| | Basic Ultrasound (Phil Shlossman) | N/A | N/A | 09/12/02 | 09/20/02 X |
| | Child placement issues / Harlan Tenenbaum-Adoption | N/A | N/A | 09/12/02 | 09/20/02 X |
| | "The Perplexing Problem of Persistent Vaginitis | N/A | N/A | 09/19/02 | 09/27/02 X |
| | Ehrenthal / Viral Hepatitis: Understanding serolo | N/A | N/A | 09/19/02 | 09/27/02 X |
| | Urodynamics - dick Poore / Promethus | N/A | N/A | 09/19/02 | 09/27/02 X |
| | Critical Care OB (Marie Essex - Marie Rode/Zubrow) | N/A | N/A | 09/26/02 | 10/04/02 X |
| | Pelvic Pain | N/A | N/A | 10/11/02 | 10/15/02 X |
| | Primary Case/ Case Discussion | N/A | N/A | 10/11/02 | 10/15/02 X |
| | Thyroid disease in pregnancy | N/A | N/A | 10/11/02 | 10/15/02 X |
| | Isolation and Ligation of blood vessels | N/A | N/A | 10/11/02 | 10/15/02 X |
| | Incontinence | N/A | N/A | 10/11/02 | 10/15/02 X |
| | GYN-Current status of uterine artery embolication | N/A | N/A | 10/11/02 | 10/15/02 X |
| ic | HIV in Pregnancy / Dr. Colmorgen | N/A | N/A | 10/23/02 | 10/25/02 due |
| ic | Ectopic Pregnancy / Dr. Hoffman | N/A | N/A | 10/23/02 | 10/25/02 due |
| ic | GYN Anatomy / Dr. patruno | N/A | N/A | 10/23/02 | 10/25/02 due |
| ic | Pathology - Endometrium / Dr. Kaminski | N/A | N/A | 10/23/02 | 10/25/02 due |
| ic | Inheritance Patterns / Stacy Schmidt, MS | N/A | N/A | 10/23/02 | 10/25/02 due |
| ic | Office Gynecology / Dr. E. Whitney | N/A | N/A | 10/25/02 | 10/28/02 due |
| ic | JELLO - Amnio training | N/A | N/A | 10/30/02 | 11/01/02 due |
| ic | Prolactic Disorders / Dr. Faith Brosch | N/A | N/A | 10/30/02 | 11/01/02 due |
| ic | Operative Endoscopy / Dr. Ostrum | N/A | N/A | 10/30/02 | 11/01/02 due |
| ic | Breast disease / Beingn | N/A | N/A | 11/01/02 | 11/05/02 due |

B-0090

D1022

CONFIDENTIA

| | | | | | |
|---|---|---|---|---|---|
| | Osteoporosis - Dr. ehrenthal | N/A | N/A | 11/01/02 | 11/05/02 due |
| ic | OB Anatomy / Dr. Rode | N/A | N/A | 11/05/02 | 11/08/02 due |
| ic | VBAC - Dr. Hoffman | N/A | N/A | 11/05/02 | 11/08/02 due |
| ic | Sexual Dysfunctions / Dr. Chatterjee | N/A | N/A | 11/08/02 | 11/10/02 due |
| ic | Ultrasound and Genetics evaluation / Dr. Shlossman | N/A | N/A | 11/12/02 | 11/15/02 due |
| ic | Managing the premature infant - Fern Butler and Ca | N/A | N/A | 11/11/02 | 11/15/02 due |
| ic | Debate - Mild preeclampsia- Dr. Kelley sturrock | N/A | N/A | 11/18/02 | 11/22/02 due |
| ic | Adnexal mass | N/A | N/A | 11/19/02 | 11/22/02 due |
| ic | Sleep deprivation and fatigue | N/A | N/A | 11/22/02 | 11/25/02 due |
| ic | Lap Training / Dr. Kevin Kelley | N/A | N/A | 11/27/02 | 11/30/02 due |
| ic | Fetal Reduction - Dr. Mark Evans | N/A | N/A | 11/27/02 | 11/30/02 due |
| ic | cystogenetics / Curtis Coughlin, MS | N/A | N/A | 11/26/02 | 11/30/02 due |
| ic | Surpacervical vs total hys. Panel discussion - con | N/A | N/A | 12/03/02 | 12/06/02 due |
| ic | Ultrasound and genetic evaluation | N/A | N/A | 12/02/02 | 12/06/02 due |
| ic | forceps delivery | N/A | N/A | 12/09/02 | 12/13/02 due |
| ic | Pathology Myometrium | N/A | N/A | 12/13/02 | 12/16/02 due |
| ic | Group dynamics / Dr. Melanie Lewis | N/A | N/A | 12/27/02 | 12/30/02 due |
| ic | Embryology / Dr. Demeo | N/A | N/A | 01/07/03 | 01/10/03 due |
| ic | Embryology, Part II / Demeo | N/A | N/A | 01/07/03 | 01/10/03 due |
| ic | Debate - Tocolyzing labor @ 34 weeks / Sturrock | N/A | N/A | 01/03/03 | 01/10/03 due |
| ic | CREOG review primary care / Ehrenthal | N/A | N/A | 01/10/03 | 01/15/03 due |
| ic | MFM CREOG Review / James Manley | N/A | N/A | 01/13/03 | 01/15/03 due |
| ic | Eating Disorders / Dr. Waitz | N/A | N/A | 01/14/03 | 01/17/03 due |
| ic | REI Creog Review / Dr. Russell | N/A | N/A | 01/17/03 | 01/22/03 due |
| ic | Thrombosis in Pregnancy / Dr. Raymond Powrie | N/A | N/A | 01/22/03 | 01/25/03 due |
| ic | Antibiotics Overview / Kim Couch, Pharm D | N/A | N/A | 01/20/03 | 01/25/03 due |
| ic | Ultrasound Review / Dr. Shlossman | N/A | N/A | 01/21/03 | 01/25/03 due |
| ic | First and second trimester screening / | N/A | N/A | 01/28/03 | 01/30/03 due |
| ic | Pastoral Services / REV Singleton | N/A | N/A | 01/29/03 | 01/30/03 due |
| ic | EvaluationPreventative Care in the Elderly / Dr. S | N/A | N/A | 01/31/03 | 02/02/03 due |
| ic | Vulvar Pathology - Cynthia flynn, MD | N/A | N/A | 02/04/03 | 02/07/03 due |
| ic | Vulvar Lesions - Dr. Matthew Hoffman | N/A | N/A | 02/07/03 | 02/10/03 |
| ic | vulvodynia - Dr. Kirsten Smith | N/A | N/A | 02/07/03 | 02/15/03 |

**Total Users: 1** 188 42 144

* *an*= Anonymous, *ic*= InComplete, *pv*= Pending Review, *pr*= Pending Release

B-0091

D1023
CONFIDENTIAL

CHRISTIANA CARE
HEALTH SERVICES

**Resident Agreement of Appointment**

This Agreement is made and executed by and between Christiana Care Health Services (hereafter referred to as Christiana Care) and **Ellen H. Zechman, MD** (hereafter referred to as Resident) for a position as a **2nd year Obstetrics/Gynecology** Resident, and shall be effective from **1 July 2003** through **30 June 2004**.

**I. Mutual Responsibilities:** The Resident and Christiana Care mutually agree to: 1) fulfill the educational requirements as set forth by the accrediting body of the graduate training program to which the resident has been admitted. Specifically: Allopathic Programs: Accreditation Council for Graduate Medical Education (ACGME); Dental and Oral Maxillofacial Programs: American Dental Association (ADA); Osteopathic Programs: American Osteopathic Association (AOA); Podiatric Programs: Council of Podiatric Medical Education (CPME); Pharmacy Programs: American Society of Hospital-System Pharmacists (ASHP), 2) fulfill the established program of each individual residency program to which the Resident is accepted, and 3) abide by the applicable portions of the Medical-Dental Staff Rules and Christiana Care rules, regulations, policies, and procedures that may be changed or amended from time to time.

**II. Resident Responsibilities:** The Resident agrees to:

a. Fulfill the patient care requirements of the graduate training program and meet expected competencies of their program. The resident further agrees to provide safe, effective, efficient, and compassionate patient care as assigned or required under the circumstances and delineated by the accrediting body as listed in Section I, the established residency program of each Department to which the Resident is assigned, the Resident's department, as well as the department to which he/she will rotate, and the applicable portions of the Medical Dental Staff Rules and Christiana Care rules, regulations, policies, and procedures which may change or be amended from time to time.

b. Perform his/her duties as required including but not limited to the completion of medical records in a timely fashion for the duration of this Agreement as defined in Christiana Care policies.

c. Meet the professional licensing requirements of the State of Delaware to be licensed to practice as required by the specific specialty.

d. Present at all times a proper appearance and display a professional cooperative attitude towards patients, visitors, Christiana Care employees, fellow Resident members, and Medical-Dental Staff. This will include participation in the CCHS program of Unsurpassed Excellence.

e. Abide by Christiana Care rules and regulations, policies and procedures, including but not limited to requirements for pre-employment physicals (including drug screen) and adequate immunizations, infection control, quality improvement, risk management, and stress management.

**B-0092**

f. Abide by the Christiana Care policy regarding sexual harassment as outlined in Section III of the Resident Manual.

g. Abide by all other policies and procedures as outlined in the Resident Manual, including but not limited to:
   - Fair Hearing and Academic Appeal [Grievance Procedures],
   - Impaired Physician [including substance abuse].
   - Psychiatric issues,
   - Resident Stress,
   - Leaves of Absence, both Professional and Parental.
   - Duty Hours

h. Resident will cooperate with CCHS Risk Management and Legal Affairs in the review, investigation, and adjudication of all complaints or other legal actions brought against CCHS or its agents. This provision shall survive the termination of this Agreement of Appointment.

III. **Christiana Care Responsibilities:** Christiana Care agrees to:

a. Assure that the educational programs of hospitals used for affiliated and integrated training meet the criteria for Board certification in the respective specialty or specific regulations of the program.

b. Pay Resident a stipend at the annual rate of **$41,891.20**. Such stipend shall be paid bi-weekly in equal installments. Christiana Care shall have the right to withhold any taxes, social security contributions, or any other sums required to be withheld by law or requested to be withheld by the Resident.

c. Maintain professional liability insurance as outlined in Section II of the Resident Manual covering Resident while he/she is performing services pursuant to this Agreement. Resident acknowledges that <u>only</u> activities prescribed and supervised in the education/training program of the Resident shall be covered. Insurance is designated as "occurrence", with tail.

d. Assist Resident in obtaining a State of Delaware Limited Institutional License as required by the accrediting bodies listed in Section I.

e. Provide and maintain suitable on-call quarters for nights on duty. Quarters will be assigned and access provided by the program through which Resident is rotating.

f. When assigned to night call Resident will be provided an evening meal and the following morning meal at no charge. This does not include any meals that are part of normal working hours.

B-0093

g. Provide and launder prescribed uniforms and lab coats as outlined in Section I of the Resident Manual.

h. Provide benefits to Resident as outlined in Appendix A. These benefits or the eligibility conditions may be changed to conform to future legal requirements and/or future Christiana Care Human Resources policies. The administration of benefits is governed by the Plan documents, hospital policies, and current legislation.

i. Provide counseling and support services as described in Sections III and IV of the Resident Manual.

**IV. Duty Hours Requirements and Off-Duty Activities:** Residency is a full time position with time devoted to both learning and supervised patient care. Limits on duty hours are placed on Residency programs to ensure optimal learning, safe patient care, and time for resident personal and family obligations. Resident recognizes that remunerative professional activities outside the scope of the residency program are considered not to be in the best interest of the Resident or Christiana Care. Christiana Care does not encourage nor condone any off-duty professional remunerative activities that might interfere with the Resident's performance in, or obligations to the CCHS Residency Program. Christiana Care does not provide malpractice for these activities. Resident shall not participate in any outside remunerative activity in the PGY1 year. In the PGY2 year and above, Resident must have prior written permission of the Program Director to undertake outside professional remunerative activities. Resident must provide regular, written documentation of all outside professional remunerative activities or Program Director; failure to do so will result in immediate suspension. Residents on remediation, suspension, or after failure to promote shall not undertake any outside professional remunerative activities. Resident will abide by the Moonlighting Policy as outlined in Section IV of the Resident Manual. Each CCHS Residency Education Committee may set policies which are more restrictive. Resident will cooperate with CCHS and any accreditation or regulatory body requiring information about outside professional remunerative activities.

**V. Reappointment**

Upon the recommendation of the Department Education Committee and Program Director, fulfillment of all licensure and regulatory requirements, and approval of the Graduate Medical Education Committee, Resident will be offered a position at the next level of graduate medical training for the upcoming academic year. This offer will be made no later than eight months after the start date of this contract, and will be contingent on the successful completion of the present year of training, as determined by the Department Education Committee, the Program Director, and the Graduate Medical Education Committee. Resident may use the Fair Hearing and Academic Appeal Process to appeal any decision to not re-appoint Resident for upcoming year. Should any Fair Hearing and Academic Appeal process extend past the termination date of this contract, Christiana Care has no obligation to continue to employ Resident but will complete the Fair Hearing and Academic Appeal process according to the current procedures.

**VI. Termination**

A. **By Resident:**
   1. The Parties agree that if it should become necessary for the Resident to terminate the Agreement before its expiration date, the Resident will provide 30 days written notice.

B. **By Mutual Consent:**
   1. The effective date of this Agreement may be modified or terminated at any time by mutual written consent of the Resident and the Program Director.

C. **Dismissal for Academic Reasons and Summary Dismissal:**
   1. A final determination to summarily dismiss or dismiss for academic reasons (as defined in the Fair Hearing and Academic Appeal Policy) shall result in a termination of the Agreement of Appointment.

VI. **Applicable Law:** The laws of the State of Delaware shall govern This Agreement.

VII. **Waiver of Breach:** The waiver by either party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to be, a waiver of any subsequent breach of the same or other provision hereof.

VIII. **Severability:** In the event any provision of this Agreement is held to be unenforceable for any reason, the unenforceability thereof shall not affect the remainder of this Agreement, which shall remain in full force and effect and enforceable in accordance with its terms.

IX. **Nondiscrimination:** Christiana Care agrees (I) not to discriminate against any of its employees or applicants for employment because of race, color, religion, sex, or national origin, and further that it will take affirmative action to ensure that applicants are employed and that employees are treated during employment without regard to race, color, religion, sex, or national origin and (2) to comply with all provisions of Executive Order 11246 of September 24, 1965, the rules, regulations, and relevant orders of the Secretary of Labor, and any other applicable laws.

X. **Term:** The term of this agreement is for one year.

XI. **Entire Agreement:** This Agreement constitutes the entire Agreement between the parties and supersedes all previous agreements. Any amendments to the Agreement must be in writing and executed by the parties hereto.



**By signature it is acknowledged that the Resident has read the entire Agreement prior to its execution.**

Ellen H. Zechman, MD 6/27/03
Resident Date

Lamar Ekbladh, MD 6-30-03
Program Director Date

Brian W. Little, MD, Ph.D. 7/1/03
Vice President, Academic Affairs and Research Date

Resident Agreement of Appointment
5

B-0096

D0225
CONFIDENTIAL



**Resident Agreement of Appointment**

This Agreement is made and executed by and between Christiana Care Health Services (hereafter referred to as Christiana Care) and **Ellen Huffman-Zechman** (hereafter referred to as Resident) for a position as a **2nd year Obstetrics/Gynecology** Resident, and shall be effective from **1 July 2002** through **30 June 2003**.

**I. Mutual Responsibilities:** The Resident and Christiana Care mutually agree to: 1) fulfill the educational requirements as set forth by the accrediting body of the graduate training program to which the resident has been admitted. Specifically: Allopathic Programs: Accreditation Council for Graduate Medical Education (ACGME); Dental and Oral Maxillofacial Programs: American Dental Association (ADA); Osteopathic Programs: American Osteopathic Association (AOA); Podiatric Programs: Council of Podiatric Medical Education (CPME); Pharmacy Programs: American Society of Hospital-System Pharmacists (ASHP), 2) fulfill the established program of each individual residency program to which the Resident is accepted, and 3) abide by the applicable portions of the Medical-Dental Staff Rules and Christiana Care rules, regulations, policies, and procedures that may be changed or amended from time to time.

**II. Resident Responsibilities:** The Resident agrees to:

a. Fulfill the patient care requirements of the graduate training program and meet expected competencies of their program. The resident further agrees to provide safe, effective, efficient, and compassionate patient care as assigned or required under the circumstances and delineated by the accrediting body as listed in Section I, the established residency program of each Department to which the Resident is assigned, the Resident's department, as well as the department to which he/she will rotate, and the applicable portions of the Medical Dental Staff Rules and Christiana Care rules, regulations, policies, and procedures which may change or be amended from time to time.

b. Perform his/her duties as required including but not limited to the completion of medical records in a timely fashion for the duration of this Agreement as defined in Christiana Care policies.

c. Meet the professional licensing requirements of the State of Delaware to be licensed to practice as required by the specific specialty.

d. Present at all times a proper appearance and display a professional cooperative attitude towards patients, visitors, Christiana Care employees, fellow Resident members, and Medical-Dental Staff. This will include participation in the CCHS program of unsurpassed Excellence.

e. Abide by Christiana Care rules and regulations, policies and procedures, including but not limited to requirements for pre-employment physicals (including drug screen) and adequate

immunizations, infection control, quality improvement, risk management, and stress management.

f. Abide by the Christiana Care policy regarding sexual harassment as outlined in Section III of the Resident Manual.

g. Abide by all other policies and procedures as outlined in the Resident Manual, including but not limited to:
   - Fair Hearing and Academic Appeal [Grievance Procedures],
   - Impaired Physician [including substance abuse].
   - Psychiatric issues,
   - Resident Stress,
   - Leaves of Absence, both Professional and Parental.

h. Resident will cooperate with CCHS Risk Management and Legal Affairs in the review, investigation, and adjudication of all complaints or other legal actions brought against CCHS or its agents. This provision shall survive the termination of this Agreement of Appointment.

III. **Christiana Care Responsibilities:** Christiana Care agrees to:

a. Assure that the educational programs of hospitals used for affiliated and integrated training meet the criteria for Board certification in the respective specialty or specific regulations of the program.

b. Pay Resident a stipend at the annual rate of **$40,476.80**. Such stipend shall be paid bi-weekly in equal installments. Christiana Care shall have the right to withhold any taxes, social security contributions, or any other sums required to be withheld by law or requested to be withheld by the Resident.

c. Maintain professional liability insurance as outlined in Section II of the Resident Manual covering Resident while he/she is performing services pursuant to this Agreement. Resident acknowledges that <u>only</u> activities prescribed and supervised in the education/training program of the Resident shall be covered. Insurance is designated as "occurrence", with tail.

d. Assist Resident in obtaining a State of Delaware Limited Institutional License as required by the accrediting bodies listed in Section I.

e. Provide and maintain suitable on-call quarters for nights on duty. Quarters will be assigned and access provided by the program through which Resident is rotating.

f. When assigned to night call Resident will be provided an evening meal and the following morning meal at no charge. This does not include any meals that are part of normal working hours.

g. Provide and launder prescribed uniforms and lab coats as outlined in Section I of the Resident Manual.

h. Provide benefits to Resident as outlined in Appendix A. These benefits or the eligibility conditions may be changed to conform to future legal requirements and/or future Christiana Care Human Resources policies. The administration of benefits is governed by the Plan documents, hospital policies, and current legislation.

i. Provide counseling and support services as described in Sections III and IV of the Resident Manual.

**IV. Off-Duty Activities:** Resident recognizes that this residency is a full time position and that off-duty hours are to be used as Resident sees fit as long as such activity does not interfere with his/her obligations to Christiana Care residency program. Resident also recognizes that remunerative professional activities outside the scope of the residency program are considered not to be in the best interest of the Resident and Christiana Care does not insure the resident for these activities. Resident agrees to abide by the Moonlighting policy as outlined in Section IV of the Resident Manual.

**V. Reappointment**

Upon the recommendation of the Department Education Committee and Program Director, fulfillment of all licensure and regulatory requirements, and approval of the Graduate Medical Education Committee, Resident will be offered a position at the next level of graduate medical training for the upcoming academic year. This offer will be made no later than eight months after the start date of this contract, and will be contingent on the successful completion of the present year of training, as determined by the Department Education Committee, the Program Director, and the Graduate Medical Education Committee. Resident may use the Fair Hearing and Academic Appeal Process to appeal any decision to not re-appoint Resident for upcoming year. Should any Fair Hearing and Academic Appeal process extend past the termination date of this contract, Christiana Care has no obligation to continue to employ Resident but will complete the Fair Hearing and Academic Appeal process according to the current procedures.

**VI. Termination**

A. **By Resident:**
   1. The Parties agree that if it should become necessary for the Resident to terminate the Agreement before its expiration date, the Resident will provide 30 days written notice.

B. **By Mutual Consent:**
   1. The effective date of this Agreement may be modified or terminated at any time by mutual written consent of the Resident and the Program Director.

C. **Dismissal for Academic Reasons and Summary Dismissal:**
   1. A final determination to summarily dismiss or dismiss for academic reasons (as defined in the Fair Hearing and Academic Appeal Policy) shall result in a termination of the Agreement of Appointment.

VI. **Applicable Law:** The laws of the State of Delaware shall govern This Agreement.

VII. **Waiver of Breach:** The waiver by either party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to be, a waiver of any subsequent breach of the same or other provision hereof.

VIII. **Severability:** In the event any provision of this Agreement is held to be unenforceable for any reason, the unenforceability thereof shall not affect the remainder of this Agreement, which shall remain in full force and effect and enforceable in accordance with its terms.

IX. **Nondiscrimination:** Christiana Care agrees (I) not to discriminate against any of its employees or applicants for employment because of race, color, religion, sex, or national origin, and further that it will take affirmative action to ensure that applicants are employed and that employees are treated during employment without regard to race, color, religion, sex, or national origin and (2) to comply with all provisions of Executive Order 11246 of September 24, 1965, the rules, regulations, and relevant orders of the Secretary of Labor, and any other applicable laws.

X. **Term:** The term of this agreement is for one year.

XI. **Entire Agreement:** This Agreement constitutes the entire Agreement between the parties and supersedes all previous agreements. Any amendments to the Agreement must be in writing and executed by the parties hereto.

**By signature it is acknowledged that the Resident has read the entire Agreement prior to its execution.**

[signature] April 15, 2002

**Ellen Huffman-Zechman** Date
Resident

[signature] 16 April 02

Paul F. Kaminski, MD Date
Program Director

[signature] 29 May 02

Brian W. Little, MD, Ph.D. Date
Vice President, Academic Affairs and Research

D0277
CONFIDENTIAL

**B-0100**



CHRISTIANA CARE
HEALTH SERVICES

**Benefits Plan for Residents**

---

**The Benefits Plan for the Christiana Care Health Services, Inc. provides the following benefits at no cost to CCHS Residents:**

**Paid Leave:** As defined in the Academic Affairs "Paid Leave Policy"

**Group Health Insurance*:** Mid Atlantic Advantage "Plan A" (in State)
Care First Plan E (out of State)

**Group Dental Insurance*** Standard Plan

**Group Life and AD&D Insurance*:** (1X Salary)

**Long Term Disability Insurance*:** Plan "A"

* Effective the first day of the month following employment, health and dental include coverage of eligible dependents.

**Optional Benefits:**

Optional benefits available requiring contributions by participants include:

- Tax Deferred Annuity/Matching Contributions Program
- Savings Bond Program
- Credit Union
- Dependent Care Reimbursement Program
- Health Care Reimbursement Program
- Additional Life, Health and LTD Insurance options under CCHS Flexible Benefits Program

Please see Benefits Booklets for more detailed information relative to the above. You will receive a Benefit Booklet under separate cover.

**B-0101**

D0278
CONFIDENTIAL



CHRISTIANA CARE
HEALTH SERVICES

Department of Obstetrics & Gynecology

Maternal-Fetal Medicine Division
4755 Ogletown Stanton Road
PO Box 6001
Newark, Delaware 19718-6001

302-733-2326 phone
302-733-2392 fax
302-733-2987 fax

Garrett HC Colmorgen, M.D.
Director

Phillip A. Shlossman, M.D.
Associate Director
Director of
Medical Student Education

James S Manley, M.D.
Director of Perinatal Education

Anthony C. Sciscione, D.O.
Director of Research

Wadia R. Mulla, M.D.
Director of Perinatal Genetics

Martha Rode, M.D.
Maternal-Fetal Medicine

Jodi J. Hartlep, MHA, MBA
Practice Administrator

Marjorie Pollock, MSN, CRNP
Perinatal Assessment Coordinator

Deborah B. Dougan, RN
High Risk Service Coordinator

Beth Keena, MS
Stacy Schmidt, MS
Lori Wells, MS
Janice O'Connell, MS
Genetic Counselors

Carol Foster, RDMS
Chief Ultrasound Technician

February 18, 2003

Ellen Zechman, MD
Department of Obstetrics & Gynecology
Christiana Hospital

Dear Dr. Zechman: Ellen

When the previous medical students rotated through our Department, they had many positive comments about our program and the individuals within our group. You were specifically named as being extremely helpful, knowledgeable and instructive. It is with help like yours that our medical student training is so well received and enjoyed. On behalf of both the medical students and the Department I want you to know how appreciative we are of your efforts. Please keep up the enthusiasm.

Sincerely,

Phil

Philip A. Shlossman, MD
Director
Medical Student Education

/cb



4755 Ogletown-Stanton Road
PO Box 6001
Newark, Delaware 19718-6001

302-733-1000

July, 3, 2003

RE: Ellen Zechman, MD

Lamar:

I was the first educational supervisor for Ellen Zechman 6/30/03-7/03/03.

Ellen has improved markedly compared to her start as a second year. In triage she is very comfortable as she is in the outpatient setting. I think her diagnostic and management plans are acceptable. Anyone can argue their plan is better, but I find no deficits in Ellen's plans.

Ellen is also very comfortable in labor and delivery. She delivers babies very well vaginally and when I have observed her during Cesarean Sections she does quite well.

Ellen's weakest attribute to me is her surgical skills. She was in a very small program as a first year resident and did not have the opportunities of our first years to refine her surgical skills. I am positive this is only a matter of practice, practice, and practice. We are to blame for part of this deficit. Ellen was often pulled from the gynecology rotation to cover triage or the clinics. When she was assigned to gynecology cases they were not the "cream of the crop" and certainly not with the better teaching attendings.

Additionally the "word" is out that Ellen is receiving special attention. Some of the attendings hold a bias against her and I'm not certain she will ever get a fair evaluation from those physicians. I tried to assign her to a Cesarean Section with Dr. Picazo Monday, June 30, 2003. Granted this was a repeat section on a patient with a previous kidney transplant but Fatima called me and asked if it was proper to send Ellen to that section. I told Fatima Ellen needed the experience but if she felt she needed to scrub that case then both of them could assist Jose. The next day I asked Ellen how the section went. She told me it went fine but basically Fatima did the surgery. Somehow we need to stop selected assignments to attendings by the resident or at the request of attendings. If the attending is not happy with their resident assignment then they should be required to find their own assistants.

I still insist that Ellen is the most dedicated of our residents and I only hope she gets a fair opportunity to prove herself.

Moe

Moe

B-0103

D1061
CONFIDENTIAL

**Collins, Vicky**

**From:** Kaminski, Paul MD
**Sent:** Friday, July 25, 2003 1:10 PM
**To:** Ekbladh, Lamar MD

Subject: My week with Dr. Zechman.

The weeks began with a phone call from Robyn Monday morning, asking if she could use Ellen in the OR. Since surgical skills are allegedly an issue, I agreed to this. Ellen came to Wilmington clinic in the afternoon. No patients had been scheduled for her, and the show rate overall was poor. She saw a few minor patients and did reasonably well. Ellen asked me that she scrub with individuals who would teach her, and not "those that would only let her hold retractors." At that time I had no idea what cases she scrubbed on. She was used for the OR Tuesday all day. On Wednesday, I thought it appropriate she participate in laparoscopic skill training along with the other residents. She did the last few colposcopies with me. There was nothing out of the ordinary. Thursday AM Ellen was used for the OR. In the afternoon, she did 3 vaginal ultrasounds with me, 2 on missed abortions and 1 on a GYN patient. She did well. She saw her first cystometric study. Since she had never seen one, she did not understand much of what was happening, but seemed interested and willing to learn. This AM, I went to the OR with Molly Larkin. Fatima operated with her. Ellen went to do laparoscopic skills. I met her in triage, where Drs. Hammond and Smalls had just removed from omentum on a D&E. Robyn, Sharice and Arlene went to the OR. Ellen was tasked with covering triage during this time.

Thus my one on one was very limited with her. We discussed her chapters .She has a basis understanding of the content. We also discussed a chapter on CIN that I thought originally had been assigned to her. We discussed it, but according to her she did not do well on the quiz. I gave it to her for fun and practice. She had not read the chapter.

I question whether we are doing right by her. Last week she did float. I happened to be in house on Sunday and Thursday. Ellen functioned as a super intern, doing menial work. On Thursday, Robyn and I did a section for HELLP. I was disappointed that Ellen was not invited to participate. Again, there was a potential delivery that could have happened, but did not. Robyn did forceps. She should have done this, She has done fewer than 5.

I sense a deep resentment by Robyn in her treatment of Ellen. Covering triage and scrubbing on any old case, I', not sure is productive. Again I can understand Robyn's point of view, her and the other resident's education.

Ellen said I needed to PIMP her in clinic, But there are also other residents and students that cannot be ignored. If this schedule continues, Ellen will need patients scheduled when she is to be at Wilmington. She will need surgical cases cherry picked before Robyn can assign them.

I'm not sure what's right. Ellen is beginning to feel frustrated, and I sense and share her frustration.

If you want or need any elaboration, let me know.

*Paul F. Kaminski M.D.*
*Mullerian System Analyst*

B-0104

D1063
CONFIDENTIAL

Return

CCHS.-Obstetrics and Gynecology
Date: 09/25/2003

House Officer Evaluation Form

Dr. Ellen Zechman

Completed By: Dr. Moses Hochman
on 09/07/2003

Image Not Available

July 2003 / September 2003

**The most valuable part of this form is the evaluator's comments. You are strongly encouraged to record your specific comments concerning this house officer's performance. In particular, note individual strengths and weaknesses and suggest ways in which individual performance could be improved.**

## COMMENTS

I'm probably Ellen's biggest supporter but I can't say I've sen very much improvement.

In evaluating the resident's performance, use as your standard the level of knowledge, skills and attitudes expected from the clearly satisfactory resident at this state of training. For any component that needs attention or is rated a 4 or less, please provide specific comments and recommendations in the comment section above. Be as specific as possible, including reports of critical incidents and/or outstanding performance. Global adjectives or remarks, such as "good resident," do not provide meaningful feedback to the resident.

## 1. PATIENT CARE:

| | Unsatisfactory | Satisfactory | Superior | |
|---|---|---|---|---|
| - · Incomplete, inaccurate medical interviews, physical examinations, and review of other data; incomplete performance of essential procedures; fails to analyze clinical data and consider patient preferences when making medical decisions | 1 2 3 | 4 5 6 | 7 8 9 | - · Superb, accurate, comprehensive medical interviews, physical examinations, review of other data, and procedural skills; always makes diagnostic and therapeutic decisions based on available evidence sound judgment, and patient preferences |

7

B-0105

Margolis Edelstein
Zechman, E. v. Christiana Care
0446

*0 = Insufficient Contact to Judge*

Performance needs attention? *No*

Specify:

## 2. MEDICAL KNOWLEDGE

| | Unsatisfactory | Satisfactory | Superior | | |
|---|---|---|---|---|---|
| - · Limited knowledge of basic and clinical sciences; minimal interest in learning; does not understand complex relations, mechanisms of disease | 1 2 3 | 4 5 6 | 7 8 9 | - · Exceptional knowledge of basic and clinical sciences; highly resourceful development of knowledge; comprehensive understanding of complex relationships, mechanisms of disease | *6* |

*0 = Insufficient Contact to Judge*

Performance needs attention? *No*

Specify:

## 3. PRACTICE-BASED LEARNING/IMPROVEMENT

| | Unsatisfactory | Satisfactory | Superior | | |
|---|---|---|---|---|---|
| - · Fails to perform self-evaluation; lacks insight, initiative; resists or ignores feedback; fails to use information technology to enhance patient care or pursue self-improvement | 1 2 3 | 4 5 6 | 7 8 9 | - · Constantly evaluates own performance; actively uses practice-based data to improve care; incorporates feedback into improvement activities; effectively uses technology to manage information for patient care and self-improvement | *5* |

*0 = Insufficient Contact to Judge*

Performance needs attention? *Yes*

Specify:

B-0106

Margolis Edelstein
Zechman, E. v. Christiana Care
0447

Ellen needs to realize that she has a problem.

4. INTERPERSONAL AND COMMUNICATION SKILLS

| | Unsatisfactory | Satisfactory | Superior | | |
|---|---|---|---|---|---|
| - · Does not establish even minimally effective therapeutic relationships with patients and families; does not demonstrate ability to build relationships through listening, narrative or nonverbal skills; does not provide education or counseling to patients, families, or colleagues | 1 2 3 | 4 5 6 | 7 8 9 | - · Establishes a highly effective therapeutic relationship with patients and families; demonstrates excellent relationship building through listening, narrative, and nonverbal skills; excellent education and counseling of patients, families, and colleagues; always "interpersonally" engaged | *7* |

*0 = Insufficient Contact to Judge*

Performance needs attention? *No*

Specify:

5. PROFESSIONALISM

| | Unsatisfactory | Satisfactory | Superior | | |
|---|---|---|---|---|---|
| - · Lacks respect, compassion, integrity, honesty; disregards need for self-assessment; fails to acknowledge errors; does not consider needs of patients, families, colleagues; does not display responsible behavior | 1 2 3 | 4 5 6 | 7 8 9 | - · Always demonstrates respect, compassion, integrity, honesty; teaches/role models responsible behavior; total commitment to self-assessment; willingly acknowledges errors; always considers needs of patients, families, colleagues | *8* |

*0 = Insufficient Contact to Judge*

Performance needs attention? *No*

Specify:

B-0107

Margolis Edelstein
Zechman, E. v. Christiana Care
0448

## 6. SYSTEM-BASED LEARNING

| | Unsatisfactory | Satisfactory | Superior | | |
|---|---|---|---|---|---|
| - · Unable to access/mobilize outside resources; actively resists efforts to improve systems of care; does not use systematic approaches to reduce error and improve patient care | 1 2 3 | 4 5 6 | 7 8 9 | - · Effectively accesses/utilizes outside resources; effectively uses systematic approaches to reduce errors and improve patient care; enthusiastically assists in developing systems' improvement | 5 |

*0 = Insufficient Contact to Judge*

Performance needs attention? *Yes*

Specify:
Read!!!!!

| Resident's Overall Clinical Competence | 1 2 3 | 4 5 6 | 7 8 9 | 5 |
|---|---|---|---|---|

Performcance needs attention? *Yes*

Specify:
Still needs a special curriculum. I'm doubting if she will ever catch up.

**Total Contact Hours with Resident per Block** *>20*

Form Publication : Ver.11 07/25/2002

**B-0108**

Margolis Edelstein
Zechman, E. v. Christiana Care
0449

# Ellen Zechman,MD

*1608 Tryon Road*
*New Bern, NC*
ELLENZECHMAN@aol.com
April 30, 2003

# URGENT

Dear OB/GYN Attending Physician;

Since I transferred here to Christiana, from a Community based program in Virginia, I have spent all my call nights, week-ends and the majority of my time here at Christiana in Ob Triage. Since this is where I have received the majority of my training experience as a 2nd year resident, I am asking that you submit an evaluation of my performance with your patients in triage.

Are you satisfied with the way I have evaluated your Patients? very

Have I appropriately treated and reported the cases to you? yes

<u>At this time</u>, towards the end of my PGY-2 year are you comfortable with my performance... acting as "your eyes and ears" when taking care of your patients in the middle of the night? yes

Please fax this directly to Sandy Kardos at 733-2990.

Thanks, Ellen Z

Moses Hochman MD
HOCHMAN

B-0109



4755 Ogletown-Stanton Road
PO Box 6001
Newark, Delaware 19718-6001

302-733-1000

Moses Hochman, MD, FACOG
OB/GYN Department
Room 1901A

April 4, 2003

Dr. Peter Heyl
Program Director
Eastern Virginia Medical School
601 Colley Avenue
Norfolk, Virginia 23507

RE: Ellen Zechman, MD

Dear Dr. Heyl,

I am happy to write this letter of recommendation for Ellen Zechman.

Ellen spoke with me this week. Unfortunately for Christiana Care Health Systems, Ellen decided to finish her Obstetrics and Gynecology Residency closer to her North Carolina home and family.

Ellen started at Christiana Care as a second year Ob/Gyn resident transferring from a program in Newport News, Virginia. I admire Ellen and give her a lot of credit for transferring to our program to expose herself to a much larger obstetrics and gynecology volume.

Our first year residents are exposed to more intensive clinical training than Ellen experienced in her first year. This left Ellen behind her second year peers technically. Ellen tried to catch up and made remarkable progress. I have no doubt she would attain equal footing with her fellow third and fourth year residents if she elected to stay.

Dr. Zechman is much older than her coresidents, but by my observation is the most dedicated physician, I have seen, desiring to complete her OB/GYN residency. I can't imagine how difficult it is for Ellen to learn ten or more hours away from her husband and four small children. To me this illustrates the dedication Dr. Zechman invests toward attaining her career goals.

Unfortunately, our program places entirely too much significance on the annual CREOG examination. Ellen did well on her first year CREOG exam but poorly on the exam this year. Personally, I find no relationship between test scores and the quality of physician ultimately graduated. I have no doubt Ellen will pass her written and oral boards. She will be an outstanding obstetrician/gynecologist.

I am a full time academic Obstetrics and Gynecology physician with direct daily involvement with our residents. Personally, I observed Ellen in our triage unit, obstetrical floors, operating rooms and on-call situations. Under extreme stress levels Ellen performs exceptionally well. She is excellent with patients and a true team player. Her level of compassion is exceptional and her dedication to obstetrics and gynecology unsurpassed.

Our loss is your institution's gain. Dr. Zechman as a third and fourth year resident will excel.

Please do not hesitate to contact me if you desire any further information.

Sincerely,

Moses Hochman, MD, FACOG
Full Time Academic Faculty
Obstetrics and Gynecology Department
Christiana Care Health System

*Ellen Zechman v.*
*Christiana Health Care Systems*

---

*Janice Tildon-Burton, OB/GYN*
*September 20, 2006*

---

*Hawkins Reporting Service*
*715 N King Street*
*Suite 3*
*Wilmington, DE 19801*
*(302) 658-6697*

*Original File 092006~2.TXT, 46 Pages*
*Min-U-Script® File ID: 0812636151*

**Word Index included with this Min-U-Script®**

Page 1

IN THE UNITED COURT DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
ELLEN ZECHMAN,
Plaintiff,
v. C.A. No. 05-159(JJF)
CHRISTIANA HEALTH
CARE SYSTEMS,
Defendant.

The Deposition of JANICE TILDON-BURTON, OB/GYN, was taken pursuant to notice before Christine M. Baird, CCR, RPR and CRR, on Wednesday, September 20, 2006, held in the law offices of Margolis Edelstein, 1509 Gilpin Avenue, Wilmington, Delaware, 19806, commencing at 10:00 a.m.

APPEARANCES:
MARGOLIS EDELSTEIN
BY: LORI BREWINGTON, Esquire
1509 Gilpin Avenue
Wilmington, DE 19806
Attorney for the Plaintiff
MORGAN LEWIS
BY: KENDRA BAISINGER
1701 Market Street
Philadelphia, PA 19103
Attorney for the Defendant

Page 2

JANICE TILDON-BURTON, OB/GYN, the witness herein, having first been duly sworn on oath was examined and testified as follows:

DIRECT EXAMINATION

BY MS. BREWINGTON:

Q: Good morning. I represent Dr. Zechman in a discrimination action against Christiana Care. You are here today so I can ask you a series of questions. I'm sure you have testified in a deposition numerous times.

A: Yes.

Q: We have a court reporter here. She will be taking down your answers to the questions. The only thing I ask is we try not to talk over each other so we can get a clear record. The other thing I ask is if you would answer with a yes or no as opposed to uh-huh or uh-uh.

At times Christiana Care's attorney will object and I ask you to go ahead and answer the question unless she tells you not to answer the question.

Why don't we start with your name.

A: Janice Tildon-Burton.

Page 3

Q: Where do you work?

A: 2600 Glasgow Avenue, Suite 27, Wilmington, Delaware.

Q: Do you also work or are you employed by Christiana Care?

A: I am not employed by Christiana Care.

Q: Okay.

What is your profession?

A: Obstetrics/gynecologist.

Q: How long have you been in that profession?

A: Completed residency in 1996.

Q: Where did you complete your residency?

A: Einstein Medical Center Northern Division in Pennsylvania.

Q: At Christiana, is that where you do your surgeries? Is that how it works?

I just need to understand this. You are a private physician. Do you contract with Christiana to do surgeries?

A: It is not a contract. As a private physician, you request privileges at the hospital in which you wish to admit your patients. So I have privileges at Christiana Hospital and St. Francis hospital in Delaware.

Page 4

Q: Is there anywhere else that you have privileges?

A: I have — I'm trying to think of the right word there, not honorary, but courtesy privileges at Einstein Hospital in Philadelphia.

Q: And do you have an understanding of any of the claims that Dr. Zechman is asserting in this lawsuit?

A: What do you mean by understanding?

Q: Do you know why she brought a lawsuit against Christiana Care?

MS. BAISINGER: Objection, vague.

You can answer.

THE WITNESS: Based on what I have read, she is alleging discrimination on the part of Department of OB/GYN.

MS. BREWINGTON:

Q: Are these documents you have read from Christiana Care?

A: Correct.

Q: Have you read anything outside of your discussions with the attorney for Christiana Care?

A: What period of time? I have read nothing

Page 5

in the last year or more regarding Ellen Zechman.

Q: Prior to your year of not reading anything, what exactly did you read or can you remember what you even read a year ago?

A: I cannot.

Q: Do you know why you would have read something on Dr. Zechman?

A: It would have been when the whole issue of her filing a case first arose. And that may — my timeframe may be off a little, but it would go back to that point in time.

Q: How long have you had privileges at Christiana Care?

A: I think I'm correct when I say 1990. Prior to that I practiced at Einstein as an attending there and began my practice in Delaware in 1990.

Q: Now, would you still be considered an attending physician at Christiana Care too?

A: Yes.

Q: How about a teaching physician, would you also be considered a teaching physician?

A: Yes.

Q: And that's for the OB/GYN program?

Page 6

A: Correct.

Q: When did you first become aware that she filed a lawsuit?

A: I would say — and I'm guessing, because I don't remember, even though I just kind of looked at when the date was, I don't remember the date. But whenever — around the month or two of the time she filed the lawsuit and it came to the attention of the department.

Q: And how did it come to the attention of the department?

A: Well, other than knowing, the chairman knew there was a suit. I can't give you any other information.

Q: Did you discuss it with the chairman?

A: Only that he had mentioned to me that there was a suit that was being filed.

Q: And the chairman was who?

A: Dr. Lamar Ekbladh.

Q: Did he discuss it with you alone or in a meeting?

A: It — if I'm correct, I think it was at a Residency Review Committee meeting it was announced.

Page 7

Q: And you also serve on the Residency Review Committee?

A: That's correct.

Q: How long have you served on that committee?

A: I'm not certain. At least five years, but perhaps longer than that.

Q: How often did you work with Dr. Zechman?

A: Not frequently.

Q: You did work with her, but not frequently?

A: Correct.

Q: What would you say is not frequently; can you quantify that in some way?

Oct 19 06 03:25p Hawkins Reporting 3026588418 p.4

Janice Tildon-Burton, OB/GYN
September 20, 2006

Ellen Zechman v.
Christiana Health Care Systems

A: I can only recall two or three surgical cases that we actually were involved together with.

Q: Okay. Did she service any of your patients in triage?

A: I'm sure she did, but I don't have a firm recollection of that. She would have had to because as a second year being in triage all the patients come through that area and certainly I have — I stopped in mid- sentence I know.

Q: So about two or three surgical cases, is

Page 8

that accurate?

A: Yes.

Q: Can you give me an opinion of her surgical skills?

A: Compared to other residents in her class she was not on the same level as they.

Q: Would you care to elaborate a little?

A: The residents at Christiana have a large number of surgical cases beginning in their first year. So their skills, I think, are comparable to the more active program in the country. Having said that, if you are coming in from a gram where your exposure is much , you are not going to have the same skills as someone who started there from if very beginning.

Q: Who were the other residents in her class?

A: You know, if you told me I would say oh, yes, they were in that class. But to be honest, it all merges together, one year into the next so I can't say with certainty who was in that class.

Q: But you do recall, I guess, Dr. Zechman's skills versus the other residents in her class, their skills?

A: Yes.

Page 9

Q: How often did you work with the other residents?

A: It would be some more than others. I would say I tended to have cases more with the upper-year residents than with the second year residents on gynecologic cases. On obstetrical cases it would be the first year residents, primarily, that I would have experience with.

Q: And back to Dr. Zechman's skills not being the same as or equal to that he other residents in her class, is it our opinion that that would be as expected?

A: Yes. Someone coming from a different program with not the volume that is seen at Christiana, yes.

Q: Did you feel or do you feel that Dr. Zechman could have improved with experience?

A: That's a very difficult question to answer. And the reason being, there are just some physicians that are just naturally skilled surgically. There are others that work at developing those skills. And based on my exposure to her, I don't have a good sense that she would ever be as surgically adept as many of

Page 10

her colleagues or peers would be.

Q: Why is that?

A: I'm not certain why that is.

Q: Is that based on your observations of her?

A: Based on my observations, yes.

Q: And can you tell me what you observed of her to make you feel that way?

A: There was one case in particular that we scrubbed together on that would be a case in which she would either first assist or would be the primary surgeon with me first assisting as a teacher. And from the beginning there was not an ease of proceeding with the procedure without my instructing her what to do on a step-by-step basis. That was something I didn't expect from somebody at a second year level. So that's the reason I question the whole — your question as to whether or not she could have gained those skills. I just wasn't certain if time would address what she actually needed or if there wasn't just inherent deficit in her surgical ability.

Q: Okay. Is there any other instance that makes you recall that you felt that way?

Page 11

A: There was a laparoscopic case. And again, I think having very little laparoscopic exposure, her ability to proceed with the case was compromised or hindered by her not being very facile in certain aspects of the procedure.

Q: And I guess my next question is, would experience in surgery improve those skills or did you feel as if she could never improve?

MS. BAISINGER: Objection. Asked and answered.

THE WITNESS: I'm not sure I could say never improved. Most of us improve based on just the repetitiveness of the procedure. I didn't think she was — what is the word I want to use — totally inept.

MS. BREWINGTON:

Q: Did you feel there was still some hope for Dr. Zechman?

A: I'm an optimist, so I always feel there is hope, particularly when someone has a desire, I think that's a part of learning to be a good surgeon.

Q: Is it fair to say that you can't give an opinion either way as to whether she would have

Page 12

succeeded in the program?

A: That's a different question than what we were originally talking about, because success in the program entails so many other aspects of the program. So can you be a little more specific?

Q: Well, success meaning successfully graduate the program. Whatever is needed to successly graduate. So I'm thinking about surgical skills, medical knowledge, I guess, care of patients, mock oral boards, surgical evaluations.

A: That's an extremely difficult question to answer. And I'm not sure I have enough information about other aspects of her performance that I could give you what I feel is an honest answer.

Q: Okay. So, if I'm hearing you correctly, you cannot give an opinion either way as to whether you feel she could have successfully completed the program?

A: I had concerns about her successfully completing the program. But having said that, if you have this unending ability to complete the program, then perhaps she could have successfully

Page 13

completed it. But based on where she was and where the program was at that time, I didn't see that occurring.

Q: Okay. Are you saying that you didn't see improvement?

A: Correct.

Q: And that would be based on the two or three surgical cases?

A: As well as other information given at the time of residency review.

Q: Okay. So information from whom?

A: Well, the program director, the residency director, other members on the committee that had interfaced with Ellen, and other information that was brought to the committee's attention.

Q: Do you recall some of the things that were brought to the committee's attention on the basis of your op-

Page 8 - Page 13 (4) Min-U-Script®

A-295

B-0114

inion?

A: Specific things, no. But just based on that she was not performing surgically for someone at her level. Questions about interactions with staff, both private and hospital staff. So all of those things came to the attention of the committee and I was aware

Page 14

of.

Q: Okay. Can you remember anything at all about the discussions at the committee meeting concerning her interactions with staff, both private and hospital?

A: I can't remember specifics. I can't. You know, with time things kind of meld together and you have a general memory of things that occur but not where someone said this or the other person responded in a certain fashion.

Q: Okay. What is your opinion of her medical knowledge?

A: That's an extremely difficult question to answer, because for me to say either she is proficient or deficient in her medical knowledge I would have to have specific instances that I could bring to mind readily and I can't do that.

Q: So, would it be fair to say that you don't have an opinion either way of her medical knowledge, whether she was proficient or deficient?

A: That would be fair to say.

Q: Okay. How about Dr. Zechman's bedside manner. When I say bedside manner, just dealing

Page 15

with patients. Do you have an opinion either way of Dr. Zechman's ability to handle patients?

A: I don't, because I never personally saw her interface with the patients, other than prior to her performing surgery. But I didn't see her interact after the surgical procedure. She would have seen the patient after the surgical procedure, but I have no information to give an opinion about my patients.

Q: Correct me if I'm wrong, but it seems you did not have a lot of interaction with Dr. Zechman.

A: I had more interactions with Dr. Zechman in the locker room than anywhere else.

Q: Tell me why you had more interactions with her in the locker room than anywhere else?

A: It just seemed many times as I was coming or going she would be — Ellen would be coming and going and we would sit and chat and see how things were going and give her encouragement and see what was going on in her world.

Q: Is this a locker room as you are going in to surgery?

A: It is in the health care building and both

Page 16

attendings and residents have a locker there and that's where we go to put our personal effects and change into scrubs or go to the labor suite or operating room, which is in a different area of the hospital.

Q: I don't know if I already asked you this question, but if I did you can just repeat your same answer.

Do you know why Dr. Zechman is no longer in the program?

A: I think I do.

Q: Okay.

A: The decision was made that she was not proceeding in a fashion that would enable her to complete the program successfully, having given her a few opportunities to correct certain deficits that were believed to be present.

Q: Okay. And the decision was made by whom?

A: The Residency Review Committee.

Q: And you also serve on that committee?

A: Correct.

Q: So would you say the decision was made by you as well or no?

A: Yes, I would, because I was part of the

Page 17

committee.

Q: Were you there the day the decision was made?

A: I can't recall that. I can't recall whether I was there that day or not.

Q: Are you aware of whether or not Dr. Zechman was placed on a certain rotation schedule during her time at Christiana Care?

A: Yes, I'm aware of that.

Q: Can you tell me what you can about this special rotation schedule?

A: Generally, when you complete the second year you would go, of course, to the third year. The decision was made, at the time of review, for each resident, whether or not they should be graduated to the next year, that she was not ready to move to the next year. So the question became should she repeat that second year, be dismissed or given a mixture or different type of program that would address what were felt to be her deficits. And the committee decided to give her a program that would, hopefully, address the deficits as identified by the staff.

Q: So this was a committee decision? A

Page 18

committee vote?

A: A committee vote.

Q: Okay. Were you in favor of this special rotation schedule?

A: No.

Q: Why not?

A: I guess I'm an up or down kind of person, meaning either you can move on to the next year or you are not ready to move on to the next year, should either repeat it or be dismissed.

And I just foresaw, in my own mind, problems with making a special case for someone because then they become more isolated, the way I looked at it. Whether that was going to be the case or not, only time would tell. But the way I viewed this special case that it would create problems that might be better avoided.

Q: When you say isolated do you mean being treated differently than the rest of the residents?

A: Well, you would be treated differently because you would have a special program.

Q: Is that what you meant?

A: Yes.

Page 19

Q: Do you think that happened in Dr. Zechman's case, that she was somehow isolated from the other residents because of this special rotation?

A: I don't think it was just the special rotation that caused the isolation.

Q: What else, in your opinion, caused this isolation?

A: There were — I wouldn't say conflicts, but I guess conflicts is really the word, between herself and other residents and other staff members. So that will also cause a person to become more internalized or more protective of their space when they feel as though people are not working with them.

Q: Do you know what the subject of these conflicts were or what these conflicts were about?

A: The only one that I have been able to recall, it was the whole area of her space in the call room because she wasn't a third year, she wasn't a second year, she was somewhere in never never land, you know. And for

Case 1:05-cv-00159-JJF Document 58-3 Filed 11/22/2006 Page 40 of 60

her trying to find a space where she could put her belongings. And

Page 20

I do remember talking about it in the call room saying, you know, just try to work with — go to somebody directly. Are you sure this is what they really think or are you just internalizing this yourself? You need to just sit down with the residents that are involved. That was a recommendation I made. And around the same time I knew she was feeling down on herself and was in a card shop and saw this little diary I thought was really quite clever. It was a good day/bad day and you could write the good day and flip it over and write the bad day on the opposite page. And I gave it to her just as a way that she could write down some of her thoughts or problems that she was experiencing on a day-to-day basis.

Q: Do you think that some of the other residents were unkind to Dr. Zechman?

A: I can't say with any certainty. It is hearsay that some didn't like her.

Q: So, is that something you heard that some didn't like Dr. Zechman?

A: Yes.

Q: Is that anything that you saw ırself?

A: I did not personally see it.

Page 21

Q: Is this — the fact that you heard they didn't like her, is this something you heard in the Resident Review Committee meetings?

A: Not — yes. But not just there, just in general conversation on the labor and delivery suite or wherever you might congregate with other physicians.

Q: Were there specific names involved in residents who didn't like her?

A: Not that I was aware, prior to reading the complaint.

Q: Would it just come up in conversation that you would hear that others didn't like Dr. Zechman?

A: Let's just say you are sitting around with some other attorneys and you are just discussing just day-to-day things and you might say in passing oh, so and so is having a problem with this person or they seem to be not fitting in well with their group. So it is just a ·v of general conversation, not that ıebody specifically came up and said let's talk about Ellen Zechman. I don't want to give you the framework —

Page 22

Q: No.

A: Yeah.

Q: Now, based on your observation did you see whether or not Dr. Zechman fit in with her group?

A: You asked if I remembered the residents in her group and I couldn't remember the names of the residents in her group. But I can say Ellen had a whole different experience. She was older than they, married with children. She was far away from home and didn't live where her family was, during her training.

One of the things I related to Ellen was that I was older when I was in my residency program and I had family, and I commuted, but I commuted from Philadelphia to Wilmington, which is an entirely different situation. But I could have some empathy for her just based on a similarity in coming into a program. I didn't start at Einstein, I finished at Einstein, so I was new going into a program from another program. And those kinds of things made that kind of connection and I guess that's why we probably talked more most did in the locker room.

Q: Do you think those differences, you

Page 23

mentioned several differences, the fact that she was older, her family was away, that she was married, travelling, do you think that those differences contributed to the isolation that we spoke of earlier?

A: It probably did.

Q: Do you know whether any other members of the committee were aware of Dr. Zechman's isolation?

A: I can't say personally that anyone else was aware. But we all knew the things that I mentioned, that she was away from her family and that she was obviously a little older than her other peers.

Q: What could the program do in order to minimize the isolation?

A: I don't think I'm qualified to answer that question.

Q: Okay.

A: No.

Q: Why don't you feel you are qualified to answer the question?

A: I'm not hired by the department, so I don't know all of the intricacies that go into

Page 24

developing the program itself and some of the things they have in place. So I'm in the periphery, so to comment on what should have been done, I couldn't comment on those things.

Q: What about the committee? Could the committee have done anything to bridge the gap between Dr. Zechman and the other residents?

A: I know she had a mentor available. There were physicians on the committee who said let her scrub with them so, again, we could get a better sense of her skills. So in that way, I think there was some outreach. I don't know if you mean on a personal level whether there should have been more outreach, and I'm not sure that would have been the appropriate way to go, other than some of the things that we as individuals would do.

Q: How about the other attending physician? We just spent a lot of time talking about the residents and the differences between Dr. Zechman and the residents and how that somehow contributed to her isolation. I want to turn now to the attending physicians. Did you have an understanding or know of how Dr. Zechman related

Page 25

to the attendings?

MS. BAISINGER: Objection. Speculation.

You can answer.

THE WITNESS: No, I don't know.

BY MS. BREWINGTON:

Q: I think what you said earlier was some of the attendings that said let her scrub with me.

A: Okay.

Q: Were there some attendings that did not want to scrub with Dr. Zechman?

MS. BAISINGER: Speculation. You can answer?

THE WITNESS: Not that I'm aware of.

BY MS. BREWINGTON:

Q: Okay. Do you know what the continuity clinics are?

A: Yes.

Q: Can you tell me what they are?

A: At the Wilmington Hospital where the outpatient — one of the primary outpatient areas, because now in Christiana they do have some outpatients that are seen there as well — but on a regular basis the residents go to the

Page 26

Wilmington Hospital to see OB and GYN patients at that facility.

It used to be that the residents were not assigned to a patient, you just saw

whoever came in the door. The intent of the continuity was to try to establish continuity with a patient, being obstetrical or gynecologic, so you would carry their care through in order to develop a relationship and be able to see how care was developed over a period of time or a longer period of time.

Q: Are the continuity clinics something that the residents are required to attend?

A: Yes.

Q: Do you know whether or not Dr. Zechman attended the continuity clinics?

A: I don't know that.

Q: But she should have attended?

A: Yes.

Q: Do you know whether or not the special rotation schedule prohibited her in any way from attending the continuity clinics?

A: I can't say with certainty if that happened or not.

Page 27

Q: When Dr. Zechman and you would talk in the locker room, and I'm assuming — correct me if I'm wrong — she would advise you of her concerns about how she was being treated when you were in the locker room, do you feel her concerns were vague in any way?

MS. BAISINGER: Objection. Vague.

THE WITNESS: With regard to what? The residents or what?

BY MS. BREWINGTON:

Q: We can break it down. Did Dr. Zechman express to you her concerns about how she was being treated by other residents? I will name names. Robin Gray, Rachel Heinley, those are the residents I'm speaking of, but if you can't remember names that's fine. But did she express concerns about those individuals and how she was being treated?

A: I can't say she specifically mentioned names, and I don't recall her mentioning names. I had more of a sense that it was a year problem, meaning the second year problem that she was not getting along well with them for whatever reason. I know at one point she was concerned she hadn't

Page 28

been able to go home and see her family and finally she had a weekend off and I saw her in the locker room and she was really excited she was going home to see her family. And I don't remember specifically names, and I don't want to do that, because you don't want to pick people out, because that's something you don't do as a resident.

Q: So again, then, it would be difficult for you to speak on whether you felt her concerns about other residents were legitimate or not?

A: It would be difficult to answer that.

Q: How about the special rotation schedule? Did she discuss her concerns with you about this special rotation schedule or her schedule in general?

A: She may have, but I don't recall specifically having that discussion.

Q: How about the call room? Did you have discussions with Dr. Zechman about this call room?

A: Right. And I mentioned earlier that she did bring up the call room and I suggested she speak to the resident that was giving her the

Page 29

problem and try to come to some sort of resolution as to what was causing that. Apparently she was hearing from one person or another that this couldn't happen or that couldn't happen. And I said you need to go to that particular person and confront the issue or have somebody in the program deal with this issue if you can't do that. So I remember that discussion but not about a specific person.

Q: The issue about the call room, was it where she could put her things? Was it one person telling her one thing and one telling her another and you told her to go to this person?

A: One was — one said she couldn't put her things in the room and one was a third year, and I don't know what the problem was, but for her to move forward she had to address it. She had to put her things someplace.

Q: Would the appropriate thing to do would be to address it with the chair or chief resident?

A: That's hard to say what would be appropriate because it depended on how you worked with your group. Each resident group works a little differently as far as hierarchy. Some

Page 30

work as a group, others are more individuals and will do things a little differently. Others will always go to the residency director or the chair. So each group is a little different. And that group had their own chemistry.

Q: So you didn't — what do you mean by chemistry?

A: There were — I'm going back. It's funny. Out of 16 residents there was only one male. There had been two and one left so I think we were down just to one male. So if you can imagine working with 15 women all headstrong and all secure where they are, it can be difficult. That's what I mean by chemistry.

Q: Back to the call room. You didn't tell Dr. Zechman who to go to, you just told her to take care of it?

A: If she remembers that, maybe I did. But I don't remember specifically telling her who to talk to.

Q: Okay. Let's go back to the journal. You mentioned that earlier. The — this journal was purchased and intended for Dr. Zechman; is that correct?

Page 31

A: Yes.

Q: And it was for her to dialog — I guess, just write down her experiences?

A: It was really just a diary. You know, if you keep a daily journal. But sometimes you have good things that happen during the course of the day and some days are really bad days, and you can write that down as well. So it was just a way to put down things that were occurring with her. My idea was to write down things, look at it and let it go. Because sometimes if you don't have the opportunity to do that, don't have somebody to talk to on a regular basis you continually internalize and that just makes things fester.

Q: Were you aware Dr. Zechman suffered a disability?

A: Not until the end. I was not aware of that.

Q: The end would be — she ended her relationship with the program in September 2003?

A: Yes.

Q: Would it have been in or around September or August or July?

Page 32

A: It would have been between July and September.

Q: Okay. How did you become aware of her disability or that she had a disability?

A: To the best of my recollection it was mentioned during a residency committee meeting, and I can't remember the entire circumstances that it came up. But there was a comment made about her saying she had chronic fatigue and that was the first I was aware that this was an issue.

Q: Do you know whether her actual disability was discussed at that meet-

ing? Like what her actual disability was?

A: I don't recall.

Q: Okay. And there was there a decision made by the committee at that time; do you understand?

MS. BAISINGER: Regarding?

BY MS. BREWINGTON:

Q: A decision made by the residency committee about how to handle her chronic fatigue?

A: I don't remember being a part of that discussion if it did occur.

Q: Okay.

MS. BREWINGTON: If I could have

Page 33

that marked as Tildon-Burton 1.

(Tildon-Burton Exhibit 1 was marked for identification.)

BY MS. BREWINGTON:

Q: Take a look at this document. We have marked that as Tildon-Burton 1. As I understand it, and you can correct me if I'm wrong, these are minutes of a Resident Review Committee meeting?

A: That's correct.

Q: And you were in attendance at that meeting; is that correct?

A: That's correct.

Q: Take a look at that and tell me when you have had an opportunity to review. And I want to ask you a couple questions about it.

Okay?

A: Okay. Okay.

Q: Invited to this meeting were Dr. Patruno, Dr. Hoffman and Dr. Ostrum; do you know whether they attended this meeting?

A: No.

Q: Do you remember this meeting?

A: Yes.

Page 34

Q: And it is just you can't remember whether they were there?

A: Correct.

Q: Okay. So is it fair to say that you don't recall them saying anything specifically during this meeting?

MS. BAISINGER: Objection. Asked and answered.

THE WITNESS: It is difficult to say, specifically, that I remember Matt Hoffman speaking at that meeting, or Joe Patruno or even if Mickey Ostrum was there — his name is Gordon, we don't call him Gordon. But when I look at this, I thought Matt Hoffman was always there, so I would have expected him to have been there and to have spoken. And just going back in a three year interval, how things have changed, because he is a part of that committee now. So that kind of threw me a little that he was invited.

So I would have to say I remember Matt speaking. I cannot address whether Joe or Mickey spoke at the meeting or not. Although, they are listed as having been there.

MS. BREWINGTON:

Page 35

Q: Are they listed as having been there, though it says invited.

A: You are interpreting — okay.

Q: I don't know. I have certainly asked the question before and I can't seem to get an answer and I believe it says invited.

Based on your experience with the Resident Review Committee, if it says invited does that mean that they were present?

A: Yes.

Q: Was the committee concerned that Dr. Zechman may have had a learning disability?

A: The question was whether or not there could have been a learning disability that was impeding her being able to get up to speed. And so in order to assess whether somebody has another reason to explain why they are having difficulty, you want to look at all aspects. And that would just be an aspect you would look at as someone who has gotten this far and now seems be having some problems.

Q: Do you know whether Dr. Zechman was tested for a learning disability?

A: I'm not aware if that happened or not.

Page 36

Q: Okay. Take a look at the second page there.

Now that we have looked at this document, do you think that it was at this meeting, the August 18, 2003 meeting, where it was discussed — where her disability was discussed?

A: Yes. Based on the minutes of the meeting.

Q: And would you say that this is the first time that you became aware of her disability?

A: Yes.

Q: And this would be consistent with the conversation we just had earlier about you learning of her disability?

A: Correct.

Q: Based on my review of the minutes, and please correct me if I'm wrong, the plan for Dr. Zechman as of August, 2003 was to continue probation with the special PGY rotation; is that correct?

A: Correct.

Q: There is also talk in the minutes of a complaint that was filed with the ACGME; do you see where it says that?

Page 37

A: Yes.

Q: Do you know who filed this ACGME complaint?

A: No.

Q: Was it discussed at the meeting who could have filed the ACGME complaint?

A: I don't remember.

Q: Do you remember a discussion about the ACGME complaint?

A: Vaguely, but no specifics as to what the actual complaint was. I don't believe that was revealed at the meeting.

Q: Okay. So is it your testimony that today is the first day you are learning that Dr. Zechman filed the ACGME complaint?

A: Yes.

Q: You can put that document aside. Thank you.

One more thing on that document. Turn to the second page.

It says that: "The meeting was adjourned at 6:45. Next meeting will be held September 15, 2003 at 5:30."

A: Yes.

Page 38

Q: My question is next meeting that I have noted in my records is September 29th, 2003, not September 15th, 2003. Is it a normal practice that the date would be changed for some reason or another or would there have been a September 15th meeting and September 29th meeting?

A: No. It does happen on occasion that the Residency Review Committee meeting time has been adjusted, so that's not unusual.

Q: So this document I'm about to show you, after we have it marked, is the Resident Review Committee meeting of September 29th, 2003.

A: Okay.

Q: Do you have any reason to think that there was a meeting between August 15th and — August 18th — I'm sorry — and September 29th?

A: No reason to think that would have happened.

Q: Okay.

MS. BAISINGER: Is this an exhibit?

MS. BREWINGTON: Yes. I'm going to have her mark it, I just kept talking.

(Tildon-Burton Exhibit Number 2 was marked for identification.)

Page 39

BY MS. BREWINGTON:

Q: The document that is in front of you, we have marked Tildon-Burton 2. And it is minutes from the Resident Review Committee Meeting of September 29, 2003. You did not attend this meeting, did you?

A: Correct.

Q: What is the procedure for not attending the meeting? Do you send a letter to Dr. Ekbladh or do you just not attend?

A: Usually you let Sandy know if there is a conflict.

Q: Are you aware of the names of the two individuals that abstained from voting that Dr. Zechman be terminated from the program?

A: No.

Q: As of the August 18, 2003 meeting the plan was for Dr. Zechman to continue as a PGY2 with a special rotation. Just a few weeks later it was determined that she be terminated from the program. As a member of the Resident Review Committee, can you tell me what was the determining factor during that period of time or what changed in deciding that she should be

Page 40

terminated?

A: Other than what is presented in the minutes I cannot give you any additional information.

Q: And I guess when I look at this list, my question that pops out to me is, did the committee expect to see drastic change within those three weeks? Because it seems to me, that those comments right here are consistent with how the Resident Review Committee felt about her throughout this whole time, yet the decision in August was for her to continue as a PGY2. I guess I go back to my same question, was there something that you can recall that occurred in those weeks to change the mind of the committee?

MS. BAISINGER: Objection. Asked and answered.

THE WITNESS: Not that I'm aware of.

BY MS. BREWINGTON:

Q: Are you aware that during this time in September, prior to this meeting of September 29th, Dr. Zechman was out of work due to a pinched nerve?

A: I vaguely recall her missing some time.

Page 41

Q: Was that a concern of the committee that she was missing time?

A: Well, I wasn't there for this, so I don't know if that came up in the discussion and it is not recorded, so.

Q: Is there anything that could have been done differently — I'm not sure if you can answer because I think I asked you something similar to this before — but is there anything, in your opinion, that could have been done differently in order for Dr. Zechman to successfully complete the program?

MS. BAISINGER: Objection. Asked and answered.

THE WITNESS: No.

MS. BREWINGTON: I don't have anything further.

CROSS-EXAMINATION

BY MS. BAISINGER:

Q: I just have one.

If we could turn back to Exhibit 1, which is the August 18, 2003 meeting. On page 2 it says that the committee suggests that she continue with the probation with the special PGY2

Page 42

rotation; do you see that?

A: Yes.

Q: On the first page does it also state that the committee would re-review Dr. Zechman at the next meeting?

A: Correct. It says that.

MS. BAISINGER: That's it.

MS. BREWINGTON: I don't have anything further.

(The deposition concluded at 11:05 a.m.)

(Reading and signing of the deposition were not waived.)

Page 43

STATE OF DELAWARE:

NEW CASTLE COUNTY:

I, Christine Mason Baird, Certified Realtime Reporter and Notary Public, do hereby certify that the foregoing record is a true and accurate transcript of my stenographic notes taken on September 20, 2006 in the above-captioned matter.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 9th day of October, 2006 at Wilmington.

Christine Mason Baird, RPR, CRR Certification:*157-PS Expiration: Permanent

Page 44

INSTRUCTIONS TO WITNESS

It is your right to read your deposition and make any changes in form or substance. Note the reason for any changes directly on the errata sheet.

Please sign and date the errata sheet and your deposition in the spaces provided. You are signing this transcript subject to the changes you have made on the errata sheet. Unless otherwise agreed to by counsel to this deposition, you must sign before a notary public.

Return the original errata sheet and signature to the deposing attorney promptly. Court rules require completion of this process within 30 days after receipt of the transcript or signature is deemed waived.

Page 45

INSTRUCTIONS TO DEPOSING ATTORNEY

Upon receipt of the signed errata sheet and signature page, please distribute copies to all parties in attendance and place the original signed pages in the original transcript.

If you do not receive the signed errata sheet and signature page within 30 days after receipt of the original transcript, you may assume that signature has been waived.

Page 46

ERRATA SHEET

PAGE/LINE# CORRECTION AND REASON

Lawyer's Notes



W&F
WILCOX & FETZER LTD.

In the Matter Of:

# Zechman
v.
# Christiana Care Health Systems

C.A. # 05-159 JJF

---

Transcript of:

Ellen Zechman

June 20, 2006

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

B-0150

JS 44 (Rev. 11/04)

159

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**
ELLEN ZECHMAN

**DEFENDANTS**
CHRISTIANA CARE HEALTH SYSTEMS

(b) County of Residence of First Listed Plaintiff NEW BERN, N.CAROLINA
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant NEW CASTLE
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
JEFFREY K. MARTIN (#2407) 302-777-4680
MARGOLIS EDELSTEIN
1509 GILPIN AVENUE

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

**CONTRACT**
☐ 110 Insurance; ☐ 120 Marine; ☐ 130 Miller Act; ☐ 140 Negotiable Instrument; ☐ 150 Recovery of Overpayment & Enforcement of Judgment; ☐ 151 Medicare Act; ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans); ☐ 153 Recovery of Overpayment of Veteran's Benefits; ☐ 160 Stockholders' Suits; ☐ 190 Other Contract; ☐ 195 Contract Product Liability; ☐ 196 Franchise

**REAL PROPERTY**
☐ 210 Land Condemnation; ☐ 220 Foreclosure; ☐ 230 Rent Lease & Ejectment; ☐ 240 Torts to Land; ☐ 245 Tort Product Liability; ☐ 290 All Other Real Property

**TORTS**
PERSONAL INJURY: ☐ 310 Airplane; ☐ 315 Airplane Product Liability; ☐ 320 Assault, Libel & Slander; ☐ 330 Federal Employers' Liability; ☐ 340 Marine; ☐ 345 Marine Product Liability; ☐ 350 Motor Vehicle; ☐ 355 Motor Vehicle Product Liability; ☐ 360 Other Personal Injury
PERSONAL INJURY: ☐ 362 Personal Injury - Med. Malpractice; ☐ 365 Personal Injury - Product Liability; ☐ 368 Asbestos Personal Injury Product Liability
PERSONAL PROPERTY: ☐ 370 Other Fraud; ☐ 371 Truth in Lending; ☐ 380 Other Personal Property Damage; ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
☐ 441 Voting; ☒ 442 Employment; ☐ 443 Housing/ Accommodations; ☐ 444 Welfare; ☐ 445 Amer. w/Disabilities - Employment; ☐ 446 Amer. w/Disabilities - Other; ☐ 440 Other Civil Rights

**PRISONER PETITIONS**
☐ 510 Motions to Vacate Sentence; Habeas Corpus: ☐ 530 General; ☐ 535 Death Penalty; ☐ 540 Mandamus & Other; ☐ 550 Civil Rights; ☐ 555 Prison Condition

**FORFEITURE/PENALTY**
☐ 610 Agriculture; ☐ 620 Other Food & Drug; ☐ 625 Drug Related Seizure of Property 21 USC 881; ☐ 630 Liquor Laws; ☐ 640 R.R. & Truck; ☐ 650 Airline Regs.; ☐ 660 Occupational Safety/Health; ☐ 690 Other

**LABOR**
☐ 710 Fair Labor Standards Act; ☐ 720 Labor/Mgmt. Relations; ☐ 730 Labor/Mgmt.Reporting & Disclosure Act; ☐ 740 Railway Labor Act; ☐ 790 Other Labor Litigation; ☐ 791 Empl. Ret. Inc. Security Act

**BANKRUPTCY**
☐ 422 Appeal 28 USC 158; ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
☐ 820 Copyrights; ☐ 830 Patent; ☐ 840 Trademark

**SOCIAL SECURITY**
☐ 861 HIA (1395ff); ☐ 862 Black Lung (923); ☐ 863 DIWC/DIWW (405(g)); ☐ 864 SSID Title XVI; ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
☐ 870 Taxes (U.S. Plaintiff or Defendant); ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
☐ 400 State Reapportionment; ☐ 410 Antitrust; ☐ 430 Banks and Banking; ☐ 450 Commerce; ☐ 460 Deportation; ☐ 470 Racketeer Influenced and Corrupt Organizations; ☐ 480 Consumer Credit; ☐ 490 Cable/Sat TV; ☐ 810 Selective Service; ☐ 850 Securities/Commodities/ Exchange; ☐ 875 Customer Challenge 12 USC 3410; ☐ 890 Other Statutory Actions; ☐ 891 Agricultural Acts; ☐ 892 Economic Stabilization Act; ☐ 893 Environmental Matters; ☐ 894 Energy Allocation Act; ☐ 895 Freedom of Information Act; ☐ 900Appeal of Fee Determination Under Equal Access to Justice; ☐ 950 Constitutionality of State Statutes

**V. ORIGIN** (Place an "X" in One Box Only)
☒ 1 Original Proceeding; ☐ 2 Removed from State Court; ☐ 3 Remanded from Appellate Court; ☐ 4 Reinstated or Reopened; ☐ 5 Transferred from another district (specify); ☐ 6 Multidistrict Litigation; ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing (**Do not cite jurisdictional statutes unless diversity**): 42 U.S.C. §12101; 29 U.S.C. §621
Brief description of cause: Age Discrimination in Employment and Disability Discrimination in Employment

**VII. REQUESTED IN COMPLAINT:** ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 **DEMAND $**
CHECK YES only if demanded in complaint: **JURY DEMAND:** ☒ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY** (See instructions): JUDGE ______ DOCKET NUMBER ______

DATE 3/14/05 SIGNATURE OF ATTORNEY OF RECORD [signature]

**B-0121**

FOR OFFICE USE ONLY

RECEIPT # ______ AMOUNT ______ APPLYING IFP ______ JUDGE ______ MAG. JUDGE ______

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ELLEN ZECHMAN, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. NO. 05 - 159 |
| | ) | |
| v. | ) | JURY TRIAL DEMANDED |
| | ) | |
| CHRISTIANA CARE HEALTH SYSTEMS, | ) | |
| | ) | |
| Defendant. | ) | |

FILED CLERK U.S. DISTRICT COURT DISTRICT OF DELAWARE 2005 MAR 1[illegible] PM 1:34

# COMPLAINT

## INTRODUCTION

1. This is a Complaint brought pursuant to the *Americans with Disabilities Act of 1990*, codified as 42 U.S.C. §12101 et seq. and the *Age Discrimination in Employment Act of 1967*, codified as 29 U.S.C. §621 et seq.

## PARTIES

2. Plaintiff, Ellen Zechman (hereinafter "Plaintiff"), was at all times relevant to this Complaint, a resident of the State of Delaware, residing at Newtown Place, Newark, Delaware 19702. Plaintiff is currently a resident of the State of North Carolina, residing at 1608 Tryon Road, New Bern, North Carolina 28560. Plaintiff is a forty-six (46) year old female who suffers from Mixed Connective Tissue Disease.

3. Defendant, Christiana Care Health Systems (hereinafter "Defendant"), is and was at all times relevant to this Complaint, a Delaware corporation whose registered agent for the service of process is Christiana Care Corporation, 501 West 14th Street, Wilmington, Delaware 19801.

**JURISDICTION AND NATURE OF ACTION**

4. Jurisdiction is founded on the existence of a question arising under federal statutes. This action arises under the *Americans with Disabilities Act of 1990*, 42 U.S.C. §12101 et seq. and 28 U.S.C. §§1331 and 1343(4) (the "ADA"). The jurisdiction of this Court is invoked to secure protection and redress deprivation of rights secured by federal law, which prohibits discrimination against employees because of their disability.

5. The jurisdiction of this Court is also invoked to secure protection and redress deprivation of rights secured by federal laws which prohibit discrimination against employees on the basis of age, in the terms, conditions and privileges of employment, and which prohibit retaliation against an employee for exercising such rights under Title VII of the *Civil Rights Act of 1962*, as amended, 42 U.S.C. §2000(e) et seq. (hereinafter "Title VII"), the *Age Discrimination in Employment Act of 1967*, as amended, 29 U.S.C. §621 et seq., and to secure protection and redress deprivation of similar rights secured by 19 Del. C. §711.

6. In addition, diversity jurisdiction exists under 28 U.S.C. §1332, in that the parties are based in different states and the amount in controversy is in excess of $75,000.00. An additional jurisdictional basis for Plaintiff's state law claim exists under the principles of pendant and supplemental jurisdiction and 28 U.S.C. §1367.

7. The state law claim regarding the breach of the implied covenant of good faith and fair dealing is brought pursuant to the pendant jurisdiction of this Court.

8. Injunctive and declaratory relief, damages and other appropriate legal and equitable relief are sought pursuant to 42 U.S.C. §2000(e), (f), and (g).

9. Plaintiff exhausted all administrative remedies before bringing this action, and received a Right to Sue letter from the U.S. Equal Employment Opportunity Commission (hereinafter "EEOC") dated December 13, 2004.

**FACTUAL BACKGROUND**

10. Plaintiff began working for Defendant on a full-time basis on or about June 23, 2002 as a second-year resident physician ("PGY-2") in the Department of Obstetrics and Gynecology through the Department of Graduate Medical Education.

11. Plaintiff was hired to replace another resident who had left the program, becoming the fourth (4th) resident in a group of three (3) other PGY-2 physicians-in-training which was comprised of Dr. Rachel Heinle, Dr. Kirsh, and Dr. Kirfides, who all began working together in or around June 2001.

12. Prior to beginning her full-time residency employment with Defendant, in or around March 2002, Plaintiff signed her residency contract and was asked by Ms. Sandi Kardos, Defendant's Residency Coordinator, to provide a copy of her driver's license and her Social Security card for their employment file. Plaintiff complied with this request and upon reviewing the documentation, Ms. Kardos had a look of surprise on her face and commented to Plaintiff, "you certainly don't look your age."

13. Plaintiff immediately began working in the required capacity of the former resident and it was made clear to Plaintiff by everyone who interviewed her for the position that her previous experience as a first (1st) year resident was much different from that of a first (1st) year resident who had gone through Defendant's Ob/Gyn program. Defendant fully understood that Plaintiff had a minimal chance to participate as a primary surgeon during her first (1st) year of training in her former program, which is customary in many other programs of this nature.

14. Plaintiff was informed by Dr. Anthony Sciscione, Defendant's Residency Director, that she would be provided with ample opportunity to increase her surgical skills.

15. In or around August 2002, Dr. Sciscione informed Plaintiff that various teaching physicians "did not like" Plaintiff because she was "different." Dr. Sciscione also told Plaintiff that the Residency Review Committee was giving him as much "grief" over hiring Plaintiff as it did when he hired Dr. Rita Vinod, a foreign medical school graduate. Dr. Sciscione encouraged Plaintiff to work hard, be pleasant, and hopefully the Residency Review Committee would be won over by Plaintiff's "determination and endearing personality."

16. When Plaintiff asked Dr. Sciscione what he meant by "different," he did not respond. When Plaintiff specifically asked if it was her southern accent or her age, Dr. Sciscione just shrugged his shoulders and walked away.

17. In or around August 2002, Plaintiff was asked to complete an EEO survey.

18. On or about September 17, 2002, Plaintiff was called to Ms. Sandi Kardos' office and asked to submit her EEO survey. Plaintiff did not have the completed survey with her, so Ms. Kardos required Plaintiff to remain in her [Kardos'] office until another survey could be sent to her office via facsimile, and Ms. Kardos then required Plaintiff to complete the EEO survey before Plaintiff was permitted to return to work.

19. In or around October 2002, Plaintiff was notified that the Residency Review Committee was not satisfied with her surgical skills, so Plaintiff was assigned a mentor, Dr. Joseph Patruno, who was supposed to conduct periodic meetings with Plaintiff to act as an instructor as well as someone with whom she could talk.

20. During their initial meeting, Dr. Patruno told Plaintiff that various members of the Residency Review Committee disapproved of her. Patruno also told Plaintiff that she would have to work exceptionally hard to win the Committee's approval and he also told Plaintiff that the upcoming annual CREOG Exam would be pivotal for its approval. Patruno told Plaintiff, "these are not kind and loving people here," and warned Plaintiff, "if you do not do well on this exam, those knives in your back will be knives in your head."

21. Plaintiff was routinely questioned by various teaching physicians and Ob/Gyn resident colleagues as to why she wanted to "do this at this stage in [her] life." Plaintiff also noticed that Dr. Rachel Heinle was becoming increasingly rude toward Plaintiff, even turning her back towards Plaintiff when they were required to sit next to each other at their daily morning conferences.

22. Also, in or around October 2002, Plaintiff mentioned to Dr. Sciscione that she was experiencing increasingly rude behavior toward her from Dr. Rachel Heinle. Dr. Sciscione agreed with Plaintiff and told her, "if anyone ever had it out for you, it's Rachel Heinle."

23. Also, in or around October 2002, Nurse Practitioner Jackie Cook informed Plaintiff that she [Cook] heard Dr. Rachel Heinle accuse Plaintiff of failing to document a medical procedure that was performed on a triage patient on a day when Plaintiff was not even on duty.

24. On or about November 5, 2002, Plaintiff was assisting Dr. Russell White when he began to discuss with Plaintiff the physical demands of their specialty. Plaintiff responded that many of the teaching physicians were well into the sixties (60s) and were still carrying a full schedule. Dr. White told Plaintiff there is "a certain serviceability expected" of a trainee, and also told her that because the program desires a certain number of years of service from its trainees that it was "a young person's specialty."

25. On or about February 24, 2003, Plaintiff reported to Defendant's emergency room with a severe headache, stiff neck, and photophobia. Plaintiff informed Dr. Sciscione, Defendant's Residency Director, that she suffered from Mixed Connective Tissue Disease.

26. The very next day, on or about February 25, 2003, Planitiff returned to the emergency room with worsening symptoms, including nausea. Plaintiff was admitted to Christiana Hospital that day and knowledge of Plaintiff's disability became widespread and public among the staff and other resident

physicians. Plaintiff remained hospitalized from February 25, 2003 through February 28, 2003.

27. In or around March 2003, Plaintiff developed a red, spotted rash, reported to Defendant's Employee Health Department for evaluation, and was given a work release excuse. However, Dr. Sciscione did not allow Plaintiff to go home, despite the fact that she may have been contagious and potentially hazardous to pregnant women. Instead, Dr. Sciscione instructed Plaintiff to report to the resident library to read chapters in her textbook and take exams based on the reading material. Initially, Plaintiff was feeling only slightly sick. However, by mid-day of her first day with the rash, Plaintiff was feeling ill and lethargic.

28. Despite how she was feeling, Plaintiff was required to sit in the resident library and take exams for a full week. Plaintiff was not permitted to go home or take sick leave, and was informed by Ms. Sandi Kardos, Residency Coordinator, that if Plaintiff went home sick, the time missed would be counted against her vacation time, which was in direct contrast to Defendant's employee manual which stated that every resident was entitled to six (6) weeks of sick time in addition to their accrued vacation time.

29. Also in March 2003, on Easter weekend, Plaintiff filed a complaint with her supervisor about an incident involving Plaintiff being forced to examine a pregnant patient who was late in her third (3rd) trimester with no fetal heart rate without a supervising physician. Plaintiff felt this incident was in violation of the Accreditation Council on Graduate Medical Education

("ACGME") guidelines and that it was also just bad medicine to allow residents to continue seeing patients unsupervised, which had been ongoing for a significant period of time, causing Plaintiff to express her complaint to her supervisor.

30. In or around April 2003, Dr. Moses Hochman advised Plaintiff that she should start looking for another residency program because there was "great animosity toward [her]" for filing her complaint about the deceased baby incident over Easter weekend. Plaintiff requested that Dr. Hochman write her a letter of recommendation.

31. On or about April 4, 2003, Dr. Hochman provided Plaintiff with a letter of recommendation for the residency program at Eastern Virginia Medical School in Norfolk, Virginia. In this letter, Dr. Hochman stated, "Dr. Zechman is much older than her coresidents, but by my observation is the most dedicated physician, I have seen, desiring to complete her OB/GYN residency."

32. On or about May 13, 2003, Plaintiff sent an e-mail to Dr. Sciscione, Dr. Lamar Ekbladh, and Dr. Patruno, her mentor, stating that she was routinely being re-assigned from her current rotation in Gynecology Surgery to the Labor and Delivery and Ob/Gyn Triage Department, which Plaintiff found strange considering she was being criticized for her surgical skills, yet she was not being allotted time in the OR to improve her surgical skills. Plaintiff believed her re-assignments were in retaliation for her complaint about the deceased baby over Easter weekend.

33. On or about May 19, 2003, Plaintiff was left behind when Defendant's residents were required to attend a meeting in Philadelphia, Pennsylvania, despite the fact that Plaintiff had made it known to everyone during their morning check-in meetings for a period of two (2) weeks prior to this meeting that she had never driven in Philadelphia and would need to go with someone or, at minimum, follow another car to the meeting. Instead, Plaintiff was left behind and was forced to attempt to drive herself to this meeting, which resulted in Plaintiff getting lost and missing the meeting. As a result of getting lost and missing the meeting, Plaintiff's Residency Director threatened to take away her upcoming vacation time. Plaintiff believes she was intentionally left behind in retaliation for her complaint about the deceased baby incident over Easter weekend.

34. On or about June 19, 2003, Plaintiff sent a formal complaint via e-mail to Dr. O'Connor at the Accreditation Council on Graduate Medical Education ("ACGME") alleging residency abuse and discriminatory practices at Christiana Care, and also citing to the ACGME the deceased baby incident from Easter weekend as an example of the procedural violations that were occurring at Christiana Care.

35. On or about June 24, 2003, less than a week after filing her complaint with the ACGME, Plaintiff was informed that she would not be offered a third (3rd) year residency contract. Plaintiff was told she might be given an opportunity to advance in the fall if her surgical skills improved. Plaintiff concurrently noticed that her position had already been posted on the national website for

OB/GYN residency positions. Plaintiff strongly believes she was not offered this position in retaliation for her complaint to the ACGME.

36. On or about June 25, 2003, Plaintiff was informed by Residency Coordinator Sandi Kardos that she [Plaintiff] was no longer permitted to use the third (3rd) year call room since it had been decided that Plaintiff would not be promoted to third (3rd) year status. When Plaintiff asked Dr. Ekbladh what area she could use, she was told to use the second (2nd) year call room. When Plaintiff reported to the second (2nd) year call room, she noticed that there was only one single bed in the room and that there was another second (2nd) year resident assigned to that room on call at the exact same time she would have needed the room. Therefore, Plaintiff became the only resident out of the sixteen (16) resident physicians without a bed or an area for personal items when she was on call.

37. On or about July 1, 2003, Plaintiff was assigned an individual training schedule under the direction of Dr. Matthew Hoffman. Plaintiff, however, was routinely re-assigned from this schedule throughout the months of July, August, and September 2003, thus not receiving most of the surgical cases with her assigned teaching physicians that she was supposed to have.

38. Resident Physician Robyn Gray would re-assign Plaintiff from her surgical assignments, allowing other residents to step in and participate in the surgical cases that had originally been assigned to Plaintiff. At one point, Dr. Kaminski informed Plaintiff that he was going to include in his written evaluation report to Dr. Ekbladh that he did not understand why Plaintiff was

being taken off all of her surgical assignments and replaced with other residents. Dr. Kaminski read this statement in his report to Plaintiff when it was completed, but told her he could not give her a copy of the document.

39. On or about July 23, 2003, Plaintiff began to suffer from fatigue due to an increasingly demanding workload and she requested a reasonable accommodation from Defendant due to her disability. Plaintiff requested a seventy-two (72)-hour break (three (3) days) in every fourteen (14)-day period, which did not necessarily need to be on the weekends.

40. On or about July 23, 2003, Plaintiff was given a Request for Disability Accommodation Form to complete by the Assistant to the Director of the Graduate Medical Education Department. Plaintiff completed her portion of the request form on or about July 24, 2003 and returned it to Sandi Kardos on or about July 25, 2003. The physician's portion of the request form was completed by Dr. David Fraser and sent via facsimile ("fax") to Defendant's Employee Health Services Department on or about August 11, 2003.

41. On or about July 25, 2003, Plaintiff was assigned to assist Dr. Kaminski in the operating room, but was once again denied the opportunity to improve her surgical skills because Dr. Naqui took the case over and would not allow Plaintiff to even assist in the operating room. Plaintiff was instead re-assigned to Triage.

42. On or about July 26, 2003, Plaintiff was on a scheduled twenty-four (24)-hour call night when supervising resident physician Dr. Robyn Gray told Plaintiff she should just "quit or at least go to another program."

43. On or about July 29, 2003, Dr. Robyn Gray, supervising resident physician, informed Plaintiff that she was required to attend the 6:30 a.m. morning rounds in the High Risk Obstetrics Unit, even though Plaintiff was not currently assigned to that unit.

44. Plaintiff was scheduled to have weekly skill improvement sessions with Kirk Roberts using the operating room training equipment in order to improve her surgical skills. However, Dr. Robyn Gray would routinely assign Plaintiff to morning duties to prevent her from participating in these sessions, which were always scheduled for mornings, thus disallowing Plaintiff the opportunity to improve her surgical skills.

45. On or about July 30, 2003, only seven (7) days following Plaintiff's request for accommodation, Dr. Ekbladh called Plaintiff into his office and threatened her with termination. When Plaintiff asked Dr. Ekbladh how termination could be an option, Ekbladh laughed and replied, "well, we certainly would have to come up with a good reason, wouldn't we?"

46. On or about August 11, 2003, Plaintiff performed two (2) medical procedures with Dr. Ghassem Vakili. Dr. Vakili asked Plaintiff, "why are they holding you back" and "who is mad at you" while they were completing these procedures.

47. On or about August 12, 2003, Dr. Gray assigned Dr. Rachel Heinle to take Plaintiff's place in an operating room case, despite the fact that Heinle was assigned to another area, thus denying Plaintiff yet another opportunity for any surgery cases that day.

48.    In or around August and September 2003, Plaintiff was denied the opportunity to attend weekly half-day clinics at Wilmington Hospital; these clinics are a requirement of all Ob/Gyn training programs. When Plaintiff asked Dr. Hoffman why she was excluded from this opportunity, he shrugged his shoulders and told her to ask Dr. Ekbladh. When Plaintiff asked her assigned mentor, Dr. Patruno, why she was excluded from this opportunity, Patruno stated, "Can't you see? They kicked you out of the call room, now they're pushing you out the door."

49.    On or about August 20, 2003, Plaintiff met with her mentor, Dr. Patruno, who encouraged Plaintiff to quit and go home to be with her family. Patruno told Plaintiff, "you are not wanted here; they are all but ignoring you – it's not getting better, it's worse."

50.    On or about August 20, 2003, Plaintiff inquired as to why she had not yet received a response to her request for accommodation, to which Dr. Ekbladh replied that he was "awaiting the final report from Dr. Fraser." Ekbladh demanded to speak with Dr. Fraser personally and ordered Plaintiff to see a staff psychiatrist, Dr. Judith Martin.

51.    While awaiting a response to her request for accommodation, Plaintiff was required to work 85.25 hours from August 17, 2003 to August 23, 2003 and she was denied any time off for the months of July and August 2003.

52.    On August 20, 2003, Plaintiff received a letter from Dr. Lamar Ekbladh which stated, *"The committee noted that you seem to be exceedingly stressed and you have many signs of depression...There was also concern expressed that*

*your emotional status is preventing you from learning appropriately or that there might be an underlying learning disability but that these could not be clearly separated."*

53. On or about September 3, 2003, Plaintiff requested time off for September 5 or September 8, 2003, in line with her request for accommodation, stating that she had "worked 18 consecutive days without a full twenty-four (24) hour break." Plaintiff also stated that all of her joints ached and she was feeling worn out. Sandi Kardos informed Plaintiff that she would have to request time off through the proper channels.

54. Plaintiff requested to use a sick day on September 5, 2003 but was required to use one of her vacation days instead.

55. On or about September 4, 2003, Plaintiff received a schedule for the weeks of September 8, 2003 through November 17, 2003. Plaintiff was informed by Ms. Sandi Kardos that she would be part of "the regular team" in those rotations and that they would not be able to afford Plaintiff the accommodation she requested because the residency program could not tolerate having anyone out for that long a period of time.

56. On or about September 16, 2004, Plaintiff received a letter from Dr. Ekbladh informing her that she should apply for Family Medical Leave ("FMLA") and that she would have to have her FMLA forms returned to Employee Health within 15 days from the date of Dr. Ekbladh's letter.

57. On or about September 20, 2003, Plaintiff suffered a pinched nerve in her left leg, resulting in her left leg going numb. Plaintiff requested a medical leave