through her mentor, Dr. Patruno, who assisted Plaintiff with providing her

request for medical leave to Employee Health and Sandi Kardos.

58.     On or about September 22, 2003, Plaintiff provided her FMLA request forms

to Employee Health and Sandi Kardos, only six (6) days after Dr. Ekbladh's

September 16, 2003 letter.

59.     On or about October 3, 2003, Plaintiff contacted Ms. Sandi Kardos to inform

her that Plaintiff had a medical release to return to work and would be faxing

same to Employee Health and Kardos. Plaintiff also informed Kardos that

Plaintiff would have "lifting restrictions" upon her return. Kardos told

Plaintiff "if you can't lift, you might as well not come back." When Plaintiff

responded that lifting was not a requirement of a physician, Kardos replied,

"you are a resident; you do whatever you are told to do."

60.     Shortly after her conversation with Kardos, Plaintiff received a telephone call

from Dr. Kaminski informing her that Dr. Ekbladh had "dismissed" her.

61.     On or about October 4, 2003, Plaintiff sent a letter to Brian Little, Director of

Academic Affairs, indicating that she wished to challenge Dr. Ekbladh's

actions.

62.     On or about October 8, 2003, Plaintiff received a letter dated September 29,

2003 stating that the Residency Review Committee voted unanimously to

dismiss Plaintiff for academic reasons.

63.     Plaintiff met with her assigned mentor, Dr. Patruno, for advice and

information about Defendant's "fair hearing procedure." Patruno questioned

Plaintiff, asking her what she thought she would accomplish by challenging

Dr. Ekbladh, stating "don't you see they do not want you here." Patruno told Plaintiff, "if you win by challenging the decision, you will just be ignored; you can't learn if they won't teach you."

64.    On or about October 22, 2003, Plaintiff met with Dr. Charles Whitney for advice. Whitney told Plaintiff, "they sure have pushed people through this program who were much worse than you." Whitney also informed Plaintiff that he had a prior incident with Dr. Ekbladh and told her "no one will stand up for you because they saw what he [Ekbladh] did to me and they are all scared."

65.    After her visit with Dr. Whitney, Plaintiff decided to visit Dr. Ekbladh in his office. Dr. Ekbladh told Plaintiff that it was "no use" to challenge his decision because "even if you win, I will still be your Residency Director and you will still be under my supervision and I will just find another reason to get rid of you." Ekbladh further threatened Plaintiff by stating that if she challenged him and lost, then he would "report [Plaintiff] to the National Practitioners' database and give [Plaintiff] unfavorable recommendations."

66.    Plaintiff, fearful that her future in Ob/Gyn was in jeopardy, felt she had no choice but to resign from her position, and was constructively discharged by forcing her resignation under duress, on October 28, 2003.

67.    After Plaintiff submitted her resignation on October 28, 2003, she received an e-mail from Brian Little indicating that Plaintiff would have to "back-date" her resignation letter to September 28, 2003. Plaintiff informed Dr. Little of the abuse she had endured and asked to meet with him to discuss her situation

further. However, once Plaintiff submitted her back-dated letter of resignation, no further communication was received from Dr. Little.

68. In an effort to move forward, Plaintiff applied to the Family Practice program in Greenville, North Carolina, but was declined a position due to "poor recommendations from the Christiana Residency Program" according to Dr. Dean Patton who informed Plaintiff of her rejection via telephone.

69. Plaintiff then applied for various positions in eastern North Carolina, but due to the fact that Plaintiff was not Board-certified in an ACGME approved specialty, Plaintiff was not eligible for most of the positions in that region.

70. Plaintiff filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") on or about June 9, 2004, alleging age discrimination, disability discrimination and retaliation. A copy of Plaintiff's Charge of Discrimination is attached hereto as Exhibit "A."

71. Plaintiff was issued a Right to Sue letter from the EEOC dated December 13, 2004 for the Charge of Discrimination filed on June 9, 2004. A copy of this Right to Sue letter is attached hereto as Exhibit "B."

### COUNT I
***Violation of the Age Discrimination in Employment Act***

72. Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 71 by reference as if specifically set forth herein.

73. Plaintiff was over the age of forty (40) at the time she entered Defendant's Residency Program.

74. The practices of Defendant, as complained of above, had the effect of depriving Plaintiff of equal employment opportunities and otherwise affected her employment because of her age.

75. The practices employed by Defendant violate Plaintiff's rights under the *Age Discrimination in Employment Act* ("ADEA") were intentional and were done with malice and/or reckless indifference to the federally-protected rights of Plaintiff and were designed to further injure Plaintiff.

76. The practices of Defendant, as complained of above, caused Plaintiff to experience conscious pain and suffering and other emotional harm.

77. As a direct and proximate result of said acts, Plaintiff has suffered and continues to suffer, loss of employment, loss of income, loss of other employment benefits, and has suffered, and continues to suffer, distress, humiliation, great expense, embarrassment, and damages to her reputation.

## COUNT II
### *Violation of 19 Del. C. §711*

78. Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 77 by reference as if specifically set forth herein.

79. Defendant's aforesaid actions constituted discrimination against Plaintiff on the basis of age in violation of 19 Del. C. §711.

80. Defendant's violation of Plaintiff's rights under 19 Del. C. §711 was intentional and therefore were done with malice and reckless indifference to the federally-protected and state-protected rights of Plaintiff and were designed to further injure Plaintiff.

81.   As a direct and proximate result of said acts, Plaintiff has suffered and continues to suffer, loss of employment, loss of income, loss of other employment benefits, and has suffered, and continues to suffer, distress, humiliation, great expense, embarrassment, and damages to her reputation.

## COUNT III
### *Violation of 19 Del. C. §723, §724, §726*

82.   Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 81 by reference as if specifically set forth herein.

83.   Defendant's aforesaid actions constituted discrimination against Plaintiff on the basis of an actual and/or perceived disability in violation of 19 Del. C. §723, §724, §726.

84.   Defendant's violation of Plaintiff's rights under 19 Del. C. §723, §724, §726 was intentional and therefore was done with malice and reckless indifference to the federally-protected and state-protected rights of Plaintiff and was designed to further injure Plaintiff.

85.   As a direct and proximate result of said acts, Plaintiff has suffered and continues to suffer, loss of employment, loss of income, loss of other employment benefits, and has suffered, and continues to suffer, distress, humiliation, great expense, embarrassment, and damages to her reputation.

## COUNT IV
### *Violation of the Americans with Disabilities Act (the "ADA")*

86.   Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 85 by reference as if specifically set forth herein.

87. Defendant violated Plaintiff's rights under the ADA by constructively discharging her as a result of a disability.

88. Defendant violated Plaintiff's rights under the ADA by constructively discharging her as a result of a perceived disability.

89. Defendant violated Plaintiff's rights under the ADA by denying her request for a reasonable accommodation due to her disability.

90. At all relevant times, Plaintiff was able to perform the essential functions of her position as a resident physician.

91. Defendant's violations of Plaintiff's rights under the ADA were intentional and therefore were done with malice and reckless indifference to the federally-protected rights of Plaintiff and were designed to further injure Plaintiff.

92. As a direct and proximate result of said acts, Plaintiff has suffered and continues to suffer, loss of employment, loss of income, loss of other employment benefits, and has suffered, and continues to suffer, distress, humiliation, great expense, embarrassment, and damages to her reputation.

## COUNT V
### *Disability Discrimination*

93. Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 92 by reference as if specifically set forth herein.

94. The practices of Defendant, as complained of above, had the effect of depriving Plaintiff of equal employment opportunity and otherwise adversely affected her employment because of an actual and/or perceived disability. The practices of Defendant were intentional and therefore were done with

B-0141

malice and reckless indifference to the federally-protected and state-protected rights of Plaintiff and were designed to further injure Plaintiff.

95.   Defendant failed to provide reasonable accommodations to Plaintiff based upon Plaintiff's disability.

96.   The practices of Defendant, as complained of above, caused Plaintiff to experience conscious pain and suffering and other emotional harm.

97.   As a direct and proximate result of said acts, Plaintiff has suffered and continues to suffer, loss of employment, loss of income, loss of other employment benefits, and has suffered, and continues to suffer, distress, humiliation, great expense, embarrassment, and damages to her reputation.

## COUNT VI
### *Detrimental Reliance*

98.   Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 97 by reference as if specifically set forth herein.

99.   Based upon the foregoing facts, Plaintiff relied to her detriment upon the representations of Defendant that she would be afforded the opportunity to improve upon her surgical skills, and that Defendant would accommodate her disability.

100.  The practices of Defendant, as complained of above, caused Plaintiff to experience conscious pain and suffering and other emotional harm.

101.  As a direct and proximate result of said acts, Plaintiff has suffered and continues to suffer, loss of employment, loss of income, loss of other employment benefits, and has suffered, and continues to suffer, distress, humiliation, great expense, embarrassment, and damages to her reputation.

## COUNT VII
### *Retaliation*

102. Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 101 by reference as if specifically set forth herein.

103. The practices of Defendant, as complained of above, had the effect of depriving Plaintiff of equal employment opportunities or otherwise adversely affected her employment through repeated acts of retaliation directed toward Plaintiff, for her repeated complaints about the way she was being treated by her colleagues, supervisors and/or instructors, and for filing a complaint with the ACGME, and for requesting a reasonable accommodation for her disability and for complaining repeatedly when she was not receiving the training she was supposed to receive by Defendant.

104. The practices employed by Defendant to retaliate against Plaintiff were intentional and were done with malice and/or reckless indifference to the federally-protected rights of Plaintiff and were designed to further injure Plaintiff.

105. The practices of Defendant, as complained of above, caused Plaintiff to experience conscious pain and suffering and other emotional harm.

106. As a direct and proximate result of said acts, Plaintiff has suffered and continues to suffer, loss of employment, loss of income, loss of other employment benefits, and has suffered, and continues to suffer, distress, humiliation, great expense, embarrassment, and damages to her reputation.

<u>COUNT VIII</u>
### *Breach of the Covenant of Good Faith and Fair Dealing*

107.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 106 by reference as if specifically set forth herein.

108.    The actions of Defendant constitute a violation of the Covenant of Good Faith and Fair Dealing implicit in every employment agreement.

109.    Defendant breached the Covenant of Good Faith and Fair Dealing to Plaintiff by terminating her based upon an actual and/or perceived disability and/or based upon her limitations due to her disability and/or based upon retaliatory motives, and by discriminating against her based upon her age.

110.    Defendant's discrimination was willful, wanton, and malicious. As a result, Plaintiff is entitled to an award of compensatory and punitive damages.

111.    The above-stated damages were not the result of any act or omission on the part of the Plaintiff.


**WHEREFORE,** Plaintiff Ellen Zechman, respectfully requests that this Court enter judgment in her favor and against Defendant, Christiana Care Health Systems:

(a)    Declaring that the conduct engaged in by the Defendant to be in violation of Plaintiff's rights;

(b)    Issuing a judgment in Plaintiff's favor ordering Defendant to provide appropriate back pay with pre- and post-judgment interest, in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of Defendant's unlawful employment practices;

(c)    Issuing a judgment in Plaintiff's favor ordering Defendant to provide

compensation for non-pecuniary losses, including, but not limited to,

pain, suffering, and humiliation, in amounts to be determined at trial,

and other affirmative relief necessary to eradicate the effects of

Defendant's unlawful employment practices;

(d)    Issuing a judgment in Plaintiff's favor ordering Defendant to provide

compensation for past and future pecuniary losses, in amounts to be

determined at trial;

(e)    Issuing a judgment in Plaintiff's favor ordering Defendant to pay

punitive damages for its malicious and/or reckless conduct in amounts

to be determined at trial;

(f)    Issuing a judgment in Plaintiff's favor ordering the Defendant to pay

the costs of reasonable attorneys' fees and expenses and the costs of

this litigation; and

(g)    Granting such other further relief as this Court deems just and proper.


MARGOLIS EDELSTEIN


Jeffrey K. Martin, Esquire (#2407)
1509 Gilpin Avenue
Wilmington, Delaware 19806
302-777-4680 phone
302-777-4682 facsimile
Attorney for Plaintiff Ellen Zechman


Dated:  March 14, 2005

**B-0145**

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA  ☒ EEOC | 170-2004-01136 |

| Delaware Department Of Labor | | and EEOC |
|---|---|---|
| State or local Agency, if any | | |

| Name (Indicate Mr., Ms., Mrs.) | Home Phone No. (Incl Area Code) | Date of Birth |
|---|---|---|
| Dr. Ellen Zechman | (252) 636-2625 | 01-08-1957 |

| Street Address | City, State and ZIP Code |
|---|---|
| 1608 Tryon Road, New Bern, NC 28560 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| CHRISTIANA CARE | 101 - 200 | (302) 733-1000 |

| Street Address | City, State and ZIP Code |
|---|---|
| 4755 Ogletown-Stanton Road, Po Box 6001, Newark, DE 19718 | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☐ RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN
☒ RETALIATION   ☒ AGE   ☒ DISABILITY   ☐ OTHER (Specify below.)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest: 09-29-2003    Latest: 09-29-2003
☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I. I began working for Respondent in or about June 2002, as a Resident Physician in training for the Department of Obstetrics and Gynecology. During my tenure I was denied educational opportunities and subject to different terms and conditions of employment. I was also subjected to ongoing harassment and slander by Dr. Robyn Gray (Chief Resident) and Dr. Rachel Heinle (co-worker) and placed of remediation for performance deficiencies. I voiced several complaints to the Dr. Lamar Ekbladh, Residency Director about various problems with the program. I also complained about discrimination with regard to opportunities to advance in surgical skills. When these complaints were not addressed, I contacted the ~~American College of Graduate Medical Education.~~ *Accreditation Council on Graduate Medical Education Etf*

In addition, I was forced to take vacation time to seek medical care instead of using my sick time. I requested a reasonable accommodation to modify my schedule which was denied. After I applied for Family Medical Leave (FMLA), on October 3, 2003, I was advised the Residency Review Committee voted to dismiss me. As a result, I was forced to resign from my position.

*recommended my dismissal ef*

II. I was later informed that the Residency Review Committee ~~did not~~ recommend that my employment ~~be retained~~ based upon my alleged performance deficiencies.

**B-0146**

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| Jun 09, 2004 _____ Date    Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS (month, day, year) |

EXHIBIT A  tabbies®

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 170-2004-01136 |

**Delaware Department Of Labor** and EEOC

*State or local Agency, if any*

THE PARTICULARS ARE *(Continued from previous page)*:

**III. I believe that I was discriminated against because of my age (46), disability and retaliation in violation of the Age Discrimination in Employment Act, and the Americans with Disabilities Act, when I was subjected to different terms and conditions of employment and ~~ultimately discharged.~~** *Forced to resign. EWB*

*Please See Addendum.*

B-0147

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| Jun 09, 2004<br>*Date*     *Charging Party Signature* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year )* |

Addendum:
EEOC Charge of Discrimination Form

Charge No: 170-2004-01136
Zechman v. Christiana Care

IV. Dr Lamar Ekbladh and The Residency Review Committee refused my
request for reasonable accommodation for my disability  that was needed for
me to continue and progress in my position as resident physician in training.
Then refused to address my request for Family Medical Leave and
ultimately forced me to resign.

Ellen Huffman Zechman

*Ellen Huffman Zechman   EHZ  6/14/04*

B-0148

EEOC Form 161 (10/96)　　　　　U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

To: Dr. Ellen Zechman
　　1608 Tryon Road
　　New Bern, NC 28560

From: Equal Employment Opportunity Commission
Philadelphia District Office
The Bourse
21 S. Fifth Street, Suite 400
Philadelphia, PA 19106-2515

[　] *On behalf of person(s) aggrieved whose identity is*
*CONFIDENTIAL (29 CFR § 1601.7(a))*

| Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 170-2004-01136 | Legal Unit | (215) 440-2828 |

## THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[　] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[　] Your allegations did not involve a disability that is covered by the Americans with Disabilities Act.

[　] The Respondent employs less than the required number of employees or is not otherwise covered by the statues.

[　] We cannot investigate your charge because it was not filed within the time limit required by law.

[　] Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available fo interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

[　] While reasonable efforts were made to locate you, we were not able to do so.

[　] You had 30 days to accept a reasonable settlement offer that afford full relief for the harm you alleged.

[X] The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that th information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with th statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[　] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[　] Other *(briefly state)* _____

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice o dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based o this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS from your receipt of this Notice**; otherwise, you right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may no be collectible.

On behalf of the Commission

_____　　　　　December 13, 200?

Marie M. Tomasso, District Director　　　　　*(Date Mailed)*

Enclosure(s)

cc:　Christiana Care
　　Michelle Eklund, Employee Relations Respresentatives (For Respondent)

EXHIBIT
B

Zechman
Ellen Zechman

v.
C.A. # 05-159 JJF

Christiana Care Health Systems
June 20, 2006

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ELLEN ZECHMAN,                          )
                                        )
          Plaintiff,                    )
                                        )
                                        ) Civil Action No.
v.                                      )    05-159 JJF
                                        )
CHRISTIANA CARE HEALTH SYSTEMS,         )
                                        )
          Defendant.                    )

          Deposition of ELLEN ZECHMAN taken pursuant
to notice at the offices of Morris James Hitchens &
Williams, LLP, 222 Delaware Avenue, 10th Floor,
Wilmington, Delaware, beginning at 9:30 a.m. on
Tuesday, June 20, 2006, before Ann M. Calligan,
Registered Merit Reporter and Notary Public.


APPEARANCES:

          LORI BREWINGTON, Esquire
          MARGOLIS EDELSTEIN
             1509 Gilpin Avenue
             Wilmington, Delaware  19806
             on behalf of the Plaintiffs,

          THOMAS S. BLOOM, Esquire
          MORGAN, LEWIS & BOCKIUS, LLP
             1701 Market Street
             Philadelphia, Pennsylvania  19103-2921
             on behalf of the Defendant.

**B-0151**

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477

Page 2

1    ELLEN ZECHMAN,
2        the witness herein, having first been
3        duly sworn on oath, was examined and
4        testified as follows:
5            EXAMINATION
6    BY MR. BLOOM:
7    Q.   Good morning, Dr. Zechman.
8    **A.   Good morning.**
9    Q.   We met briefly this morning. I'm Tom Bloom,
10   and I represent Christiana Care in this case.
11           Have you ever given a deposition before?
12   **A.   No, I have not.**
13   Q.   Have you ever testified under oath before?
14   **A.   I think so.**
15   Q.   Well, today is really an opportunity for me to
16   learn the facts of your case and to learn about what
17   your claims are. It is not a test. You may not
18   necessarily have the answer to every question that I
19   have, but neither your lawyer nor I want you to
20   speculate about things that you don't have personal
21   knowledge of. So if you don't have personal knowledge
22   of the answer to a given question, it's perfectly okay
23   to say that you don't know. Will you follow that
24   instruction?

Page 3

1    **A.   Yes, sir.**
2    Q.   And as you can see, we have a court reporter
3    who's taking down everything that you and I say. So
4    it's important that you give verbal responses instead
5    of gestures. Will you do that?
6    **A.   Yes.**
7    Q.   And also, because we have a court reporter,
8    it's important that we let each other finish, that I
9    finish the question before you start answering, and I
10   will do my best to let you finish your answer before I
11   ask the next question, even though I know that's not
12   how people normally talk in conversation. You may
13   know what the end of my question is. I'd appreciate
14   it if you would try to wait until the question is
15   actually complete before you answer it. Will you do
16   that?
17   **A.   Yes.**
18   Q.   Are you currently taking any medication that
19   would affect your ability to remember facts
20   accurately?
21   **A.   No.**
22   Q.   Are you taking any medication that would affect
23   your ability to testify truthfully today?
24   **A.   No.**

Page 4

1    Q.   And during the course of the day, if there's a
2    point at which you want to take a break, just let me
3    know and you can certainly do that. All right?
4    **A.   Okay.**
5    Q.   And lastly, if you don't understand a question
6    of mine or if you think it's confusing, please let me
7    know and I'll try and rephrase it because, if you
8    don't let me know, I'm going to assume that you
9    understood it and that your answer is based upon your
10   understanding the question. Okay?
11   **A.   Okay.**
12   Q.   Your lawyer brought with the both of you today
13   some additional documents in this case, and I'm not
14   going to mark these as exhibits, but -- these are not
15   numbered. Okay.
16           I'm going to put a stack of unnumbered
17   documents that your lawyer handed me this morning.
18   Can you tell me what this stack is I'm putting in
19   front of you right now?
20   **A.   Am I supposed to go through the stack or do I
21   just look at what's in front of me?**
22   Q.   Feel free to look through, and when you are
23   satisfied that you know what it is, let me know.
24   **A.   This is the -- primarily my husband's income**

Page 5

1    **data.**
2    Q.   Okay. Is that --
3    **A.   We file jointly, but this is mostly his income
4    data.**
5    Q.   And is that, to the best of your understanding,
6    a complete tax return for the tax year 2004?
7    **A.   I do not have privilege to this information at
8    home. It is his information. So I cannot answer
9    that. But it is my information.**
10   Q.   Where did you obtain that document before you
11   gave it to your lawyer?
12   **A.   My husband.**
13   Q.   Your husband had a copy of your joint tax
14   return for 2004?
15   **A.   Yes, sir.**
16   Q.   You can hand that back to me, and I'm going to
17   hand to you another package of documents that was
18   given to me this morning, which looks to be your joint
19   tax return for the tax year 2003.
20           Would you please just take a look at that
21   and confirm that that's what that is?
22   **A.   Yes. And this is my information. The rest of
23   it is his information.**
24   Q.   You just referred to something as being your

2 (Pages 2 to 5)

Zechman
Ellen Zechman

v.

C.A. # 05-159 JJF

Christiana Care Health Systems
June 20, 2006

Page 6

1 information, and it looked to me like you were
2 pointing to the W-2 on the first page?
3 **A. That's my W-2.**
4 Q. And I'm going to hand you a third collection of
5 documents that were handed to me today. Can you just,
6 please, take a look at this and confirm for me that
7 this is your complete joint tax return for tax year
8 2001?
9 **A. It appears to be, but I do not have privilege**
10 **to this information at home. My husband gave this to**
11 **me. This is his tax information.**
12 Q. Okay.
13 **A. And we are joint.**
14 Q. To your understanding?
15 **A. So my information is here, but this is**
16 **primarily his income information.**
17 Q. Finally, I'm going to hand you another stack of
18 documents that was given to me today, and could you
19 confirm for me that this is your joint tax return for
20 the tax year 2005?
21 **A. It appears to be.**
22 Q. Okay. Thank you.
23 　　Dr. Zechman, could you tell me, where did
24 you to go high school?

Page 7

1 **A. New Hanover High School in Wilmington, North**
2 **Carolina.**
3 Q. What year did you graduate high school?
4 **A. 1975.**
5 Q. And you went to college after high school?
6 **A. No, I did not.**
7 Q. You eventually went to college?
8 **A. I did.**
9 Q. What did you do immediately after high school?
10 **A. I went to work for DuPont.**
11 Q. And what did you do for DuPont?
12 **A. I was out in their factory at their Wilmington**
13 **Dacron plant.**
14 Q. And what did you do in the factory?
15 **A. Various things. It's been a while, so it's**
16 **hard to remember.**
17 Q. And how long did you work at that factory?
18 **A. I was laid off in 1982.**
19 Q. Do you recall what you did after that?
20 **A. I started to go to college at that part time.**
21 Q. Do you remember the year you started to go to
22 college part time?
23 **A. No, I don't.**
24 Q. Do you remember the name of the institution

Page 8

1 where you started to go to college?
2 **A. No. Because I was taking various courses**
3 **primarily under Cape Fear Technical Institute.**
4 Q. And was there something else you were doing at
5 the same time you were going to school part time?
6 **A. Working odd jobs while I was in college.**
7 Q. Did there come a time when you became a
8 full-time college student?
9 **A. There did. I can't remember the exact date.**
10 Q. When you became a full-time college student,
11 was that at Coastal Carolina Community College in
12 Jacksonville, North Carolina?
13 **A. It was prior to that at Cape Fear Community**
14 **College in Wilmington, North Carolina.**
15 Q. And is it your memory that you started at
16 Coastal Carolina Community College in the fall of
17 1985?
18 **A. I'm not sure of the date.**
19 Q. I'm going to put in front of you what's
20 previously been marked as Zechman 1.
21 　　MR. BLOOM: Off the record for one second.
22 　　(Discussion off the record.)
23 　　(Zechman Deposition Exhibit 1 was marked
24 for identification.)

Page 9

1 BY MR. BLOOM:
2 Q. Do you recognize the document that I just put
3 in front of you, Zechman 1?
4 **A. Yes.**
5 Q. What is that?
6 **A. That is my application for residencies.**
7 Q. And it says at the top, ERAS Common Application
8 Form. That's E-R-A-S.
9 　　Do you have an understanding of what that
10 means?
11 **A. It's an electronic residency application.**
12 Q. And is it your understanding that you submitted
13 this application to all of the residency programs that
14 you're applying to at a given time?
15 **A. That's correct.**
16 Q. So it's a standard application?
17 **A. Yes.**
18 Q. And I take it that this application is then
19 forwarded to all of the residency programs that you
20 express an interest in?
21 **A. That's correct.**
22 Q. And if you'll turn to the second page of
23 Zechman 1, under undergraduate education, the earliest
24 entry in time is that you were a student at Coastal

3 (Pages 6 to 9)

B-0153

Page 10

1  Carolina Community College in Jacksonville, North
2  Carolina, from August 1985 through May 1987.  Did I
3  read that right?
4    A.  Yes.
5    Q.  Does looking at that refresh your memory of the
6  years you attended that institution?
7    A.  That is more likely correct, but you know, I
8  don't have my transcripts in front of me.  So it
9  was -- it's been a while.
10   Q.  This application that we are looking at is the
11 information that you were presenting to the residency
12 programs on which, at least in part, to base a
13 decision about whether to admit you or not into the
14 program?
15   A.  That's correct.
16   Q.  Did you prepare this application yourself?
17   A.  Yes, I did.
18   Q.  And at the time you prepared it, were you
19 careful to make sure that the information you provided
20 was accurate?
21   A.  To the best of my knowledge with my transcripts
22 and my degrees in front of me.
23   Q.  And your transcripts and degrees are things
24 that you would have had in front of you at the time

Page 11

1  you completed this application?
2    A.  Yes.
3    Q.  And you actually would have submitted copies of
4  those things along with your application?
5    A.  Yes.  And they would have had to be submitted
6  into my medical school as well.
7    Q.  You mean transcripts from your medical school?
8    A.  No.  For into medical school, you would send
9  transcripts with these.
10   Q.  And then according to Zechman 1, in 1987, you
11 continued your college education at East Carolina
12 University in Greenville, North Carolina, is that
13 correct?
14   A.  That's correct.
15   Q.  Can you tell me why it was you switched from
16 Coastal Carolina Community College to East Carolina?
17   A.  The community college is a two-year degree, an
18 associate's degree.  East Carolina University is a
19 major university with a bachelor's degree.  So I
20 wished to pursue my bachelor's degree at that time,
21 interested in attending medical school.
22   Q.  And you did apply to medical school upon
23 graduation from East Carolina University in 1990?
24   A.  Yes.

Page 12

1    Q.  And did you actually matriculate at a medical
2  school the following fall?
3    A.  Reword that question, please.
4    Q.  Sure.  Did you apply for medical school while
5  you were in your last year of college?
6    A.  Yes.
7    Q.  And then, did you actually start at medical
8  school the next fall?
9    A.  Yes.
10   Q.  So that was also in 1990 that you started
11 medical school?
12   A.  Yes, sir.
13   Q.  And where did you go to medical school?
14   A.  East Carolina University.
15   Q.  Do you recall the medical schools that you
16 applied to at the time?
17   A.  No.
18   Q.  Do you recall whether it was more than five?
19   A.  I really don't remember.
20   Q.  Do you remember whether you applied to go to
21 medical school outside of North Carolina?
22   A.  I did not.
23   Q.  So your applications were limited to North
24 Carolina?

Page 13

1    A.  Yes.
2    Q.  What's the next step after graduating from
3  medical school?
4    A.  Going straight into residency.
5    Q.  Okay.  And does that process start as you're
6  nearing the end of your medical school program?
7    A.  Yes.  Usually.
8    Q.  And did it in your case?
9    A.  Yes.
10   Q.  And I understand that, when you're entering a
11 residency program, that the application process goes
12 through what's referred to as the match program?
13   A.  Yes.
14   Q.  And did you go through the match program at
15 that time when you were applying to your first
16 residency?
17   A.  Yes.
18   Q.  Can you tell me your understanding of how the
19 match process works?
20   A.  I really do not have a clear understanding of
21 it.  You pretty well do what you're told to do when
22 you're in medical school.
23   Q.  Does the match program, from your memory,
24 involve identifying or listing the residency programs

4 (Pages 10 to 13)

Zechman
Ellen Zechman

v.

C.A. # 05-159 JJF

Christiana Care Health Systems
June 20, 2006

Page 14

1 that you're interested in?
2   **A. Yes.**
3   Q. And your application is submitted through a
4 common application or a standard application?
5   **A. Not at that time.**
6   Q. At that time did you submit applications
7 directly to different residency programs?
8   **A. Yes.**
9   Q. And so do you know what role the match played
10 in assigning you to a particular residency program?
11   **A. I don't know what you're asking me.**
12   Q. Let me put it this way and you tell me if you
13 think I've got this right: that you, as the
14 applicant, provide a list of residency programs that
15 you're interested in and materials get submitted to
16 the programs and then the various medical programs
17 express interest in a list of people whose
18 applications they've received and if there's a match,
19 the match program tells you where you've matched. Is
20 that your understanding of how it works?
21   **A. Vaguely.**
22   Q. And when you're applying, focussing on this
23 first application to your first residency program, I
24 take it part of the process is submitting

Page 15

1 recommendations?
2   **A. Who are you referring to?**
3   Q. Well, do you submit any recommendations, either
4 from former professors or other people that you work
5 for?
6   **A. Yes.**
7   Q. How do you decide who you're going to submit
8 recommendations from?
9   **A. I'm not sure. That is taken care of in your**
10 **medical school where they do evaluations of you, your**
11 **dean's letter, certain things are kind of built into**
12 **the system in order to facilitate that.**
13   Q. Do you recall whether you had an opportunity to
14 ask particular professors or other people to write a
15 recommendation on your behalf?
16   **A. I don't recall. That's been a few years. But**
17 **there was always that option.**
18   Q. And the year after you finished medical school
19 you did, in fact, start a residency program, pathology
20 at East Carolina University, is that right?
21   **A. That's correct.**
22   Q. And you were in the pathology residency program
23 for two years?
24   **A. That's correct.**

Page 16

1   Q. Can you tell me why you left that program?
2   **A. Yes, I can. Personal reasons.**
3   Q. Would you tell me why?
4   **A. Personal reasons.**
5   Q. Well, Dr. Zechman, I'm not here to
6 unnecessarily intrude into your privacy or to
7 embarrass you, but you have to answer the questions.
8 And I will let you know also, we have a
9 confidentiality agreement in the case. If you want,
10 we can designate on the record that your answer to
11 these questions are confidential, but you need to
12 answer them.
13   **A. Personal reasons. Very difficult pregnancy.**
14   Q. When did your pregnancy make you unable to
15 continue in the pathology residency program?
16   **A. I took a leave of absence prior to that because**
17 **of the pregnancy, but after that, it was a family**
18 **decision because we wanted to have another child**
19 **because of my age and with the experience of the first**
20 **one, having so much difficulty, that I went out and**
21 **with intention of going back into residency after I**
22 **had children.**
23   Q. Do you recall how far along you were in the
24 pregnancy when you needed to leave the residency

Page 17

1 program?
2   **A. No.**
3   Q. While you were a resident in pathology in East
4 Carolina University, did you make a decision to pursue
5 having a family while you were in the residency
6 program?
7   **A. I was pregnant when I entered the residency**
8 **program.**
9   Q. I see. Okay.
10     So did you have a child while you were in
11 the residency program?
12   **A. I have a child that was born in October of**
13 **1995.**
14   Q. And then you came back to the pathology
15 residency?
16   **A. That's correct.**
17   Q. And then let me pause right now. How many
18 children do you have now?
19   **A. Four children living.**
20   Q. Can you give me their years of birth?
21   **A. The first is I think -- he just turned 21. So**
22 **what's that? I'm blanking. My mind has just gone**
23 **blank.**
24   Q. Around 1985 maybe?

5 (Pages 14 to 17)

Zechman
Ellen Zechman

v.

C.A. # 05-159 JJF

Christiana Care Health Systems
June 20, 2006

Page 18

1  A. That sounds correct. He just turned 21.
2       Then the second one was the one I had in
3  '95 and then the third one was '98 and the fourth one
4  is a millennium baby.
5  Q. Okay. Born in 2000?
6  A. That's correct.
7  Q. So is that because you were having a family, is
8  that why you didn't return to a residency program in
9  2001?
10  A. That's exactly why.
11  Q. My understanding is, although you were no
12  longer in a residency program between 1996 and 2001,
13  that you did practice medicine in some respects, is
14  that true?
15  A. Absolutely. I was a fully licensed physician
16  in North Carolina.
17  Q. And so you worked as a physician in North
18  Carolina during that period?
19  A. Yes.
20  Q. Can you tell me where and in what capacity you
21  worked as a physician during that period between '96
22  and 2001?
23  A. I worked with my husband as his assistant as
24  well as working in the local public clinic doing

Page 19

1  general medicine.
2  Q. And so at that time, even before having
3  completed any residency, you were able to work as a
4  physician?
5  A. You are licensed after one year of medicine and
6  passing all your national competency exams. I had met
7  those requirements. I was fully licensed as a
8  physician, a general physician, in North Carolina.
9  Q. For example, does that mean -- I'm just trying
10  to learn. I'm not a doctor. Does that mean you could
11  run a general medical practice?
12  A. That has to do a lot with the insurance
13  carriers. Legally you can, but whether you can do
14  that on your own with insurance and other things is a
15  different story.
16  Q. And to your understanding what would determine
17  whether you could clear those things?
18  A. It's individual, depending on who your major
19  insurance carriers are, different state regulations,
20  that come into being. It's -- it really depends on
21  what you're trying to do and what the population
22  you're doing it with.
23  Q. And apart from starting your own general
24  practice, I mean, I take it you were licensed and

Page 20

1  capable of joining a medical practice and working as a
2  fully licensed physician?
3  A. As a GP only, not a specialist, not an
4  internist. As a GP, general physician.
5  Q. During that period of time between 1996 and
6  2001, when you were assisting at your husband's
7  practice, were you compensated for that work at that
8  time?
9  A. No. He was just starting his business, and I
10  did it to help him.
11  Q. And there also came a time, as I understand it,
12  that you actually started a women's clinic in North
13  Carolina, is that right?
14  A. Yes.
15  Q. Did that happen roughly in the spring of 1998?
16  A. That -- I'm not sure about the date, but it was
17  after that third child was born. I'm not sure about
18  that date.
19  Q. And if you look at the third page of the
20  document that's currently in front of you, which is
21  still Zechman 1, it indicates there that the clinic
22  started in April '98. Does that look right to you?
23  A. That would be correct. When I filled all this
24  in, I had all my stuff and documents in front of me.

Page 21

1  I have not looked at this probably since it was filled
2  out, so...
3  Q. What sort of services did the Ladies Clinic
4  provide?
5  A. Mostly PAP smears, breast exams, that sort of
6  stuff. Just preventative stuff.
7  Q. I take it that, in working at the Ladies
8  Clinic, you're working in a capacity as a licensed
9  physician?
10  A. As general practitioner doing general women's
11  wellness.
12  Q. Did you have any other physicians working at
13  the clinic with you?
14  A. My husband was my basically head physician.
15  He's boarded in internal medicine, and so he was kind
16  of the supervising physician that would handle things
17  when I was not there or would be my expert when I
18  needed additional advice from someone that was -- had
19  greater training than I did.
20  Q. Was your husband compensated for his work at
21  the Ladies Clinic financially?
22  A. No. Because I don't think at what time we
23  started making a profit. So I don't -- I don't know.
24  Q. Did there come a time when the clinic became

6 (Pages 18 to 21)

Page 22

1    profitable?

2    A.  I don't know because I don't do the accounting.

3    I turn all that stuff over to him.

4    Q.  To your husband?

5    A.  Mm-hmm.

6    Q.  Does your husband personally prepare your tax

7    return?

8    A.  No.  That accounting firm that is listed on

9    there does that, national accounting firm.

10   Q.  So sitting here today, do you have any

11   recollection of whether the Ladies Clinic ever turned

12   a profit?

13   A.  I don't know.

14   Q.  Did there ever come a time at the Ladies Clinic

15   where you had anybody -- any physician working there

16   other than you and your husband?

17   A.  We had a nurse practitioner when I went to

18   Delaware.  A nurse practitioner took care of my

19   patients and my husband was the supervising physician,

20   and I was no longer a part of it.  I was a part of it

21   on paper, but I was no longer a part of it when I was

22   in residency because it was turned over legally to

23   them.

24   Q.  And when you say it was turned over legally to

Page 23

1    them, what do you mean?  Did you sell it?

2    A.  There was something done.  The lawyers and the

3    accountant took care of that, but where they were

4    responsible for it while I was in residency.

5    Q.  And did there come a time when the Ladies

6    Clinic ever closed?

7    A.  No.

8    Q.  And so is it still in operation today?

9    A.  It is.

10   Q.  And who's the owner of it today?

11   A.  I am the owner today.  My husband is my

12   advisor.  It is not making a profit.  It is deep in

13   the red, actually.

14   Q.  Is there a distinction in your mind between

15   being a -- I'm referring specifically to the work

16   you've done at your husband's allergy clinic.  Is

17   there a distinction in your mind between being an

18   assisting physician and a physician's assistant?

19   A.  I don't know what you're getting at.

20   Q.  Do those two terms have different meanings to

21   you?

22   A.  There is a medical/legal difference.

23   Q.  Okay.  Tell me what that is.

24   A.  A physician's assistant is a separate license.

Page 24

1    An assisting physician is a physician that helps but

2    might not have the same credentials as the person that

3    is doing the billing or has the clinic under their

4    name.  So any physician can assist another physician.

5    Q.  And so, to your understanding, a physician's

6    assistant is not actually a licensed physician?

7    A.  No.  There is a specific license called a

8    physician's assistant license.  They are licensed

9    physician's assistant.  Licensed nurse practitioner

10   that assist physicians as what is called -- there's a

11   special name for them.  Physician extenders is what

12   they are called, but they are not physicians.

13   Q.  Okay.  When you just referred to as physician

14   extenders, that's like a synonym for physician's

15   assistant?

16   A.  And nurse practitioners.

17   Q.  Okay.  And all three of those categories are

18   not doctors?

19   A.  They are not doctors.

20   Q.  There came a point in approximately 2001 where

21   you applied for a second residency program, is that

22   right?

23   A.  That's correct.

24   Q.  And you applied for a residency program in

Page 25

1    obstetrics and gynecology?

2    A.  Yes.

3    Q.  Do you recall, when you applied for residency

4    that second time, whether you went through the match

5    program again?

6    A.  I don't recall.  I had been on the phone

7    talking to different professors and different contacts

8    about going into obstetrics and gynecology, and I

9    don't recall whether it was just phone contacts or

10   whether it was formal.  I don't recall.

11   Q.  You eventually started an ob/gyn residency at

12   Riverside Regional Medical Center in Newport News,

13   Virginia, right?

14   A.  That's correct.

15   Q.  Do you recall whether you applied to any other

16   residency programs at the same time?

17   A.  I cannot recall.

18   Q.  So, as you sit here today, it's possible that

19   you only applied to that one?

20   A.  I don't know.  I don't remember.

21   Q.  Well, first, you stayed in that residency

22   program for one year, am I right?

23   A.  It was a one-year non-continuing position that

24   I took.

7 (Pages 22 to 25)

(302)655-0477

B-0157

Zechman
Ellen Zechman

v.

C.A. # 05-159 JJF

Christiana Care Health Systems
June 20, 2006

Page 26

1    Q.   And did that residency program also have
2    continuing residency positions in the ob/gyn
3    department?
4    A.   They did.  But I was not part of that.  They
5    were full.  I took this open position that was a
6    one-year non-continuing position.
7    Q.   Was that position, the one-year non-continuing
8    position, was that a position that they created for
9    you to do or did they have a vacancy?
10   A.   That was an ongoing position that they would
11   have an extra first year ob/gyn trainee.  Every year
12   they would have -- I forget the number, but they would
13   have an extra first year, and it was advertised as a
14   one-year non-continuing position.
15   Q.   So you knew going into that residency program
16   at Riverside that you would need to continue the
17   ob/gyn residency somewhere else?
18   A.   Absolutely.
19   Q.   And then you, in fact, applied to other
20   residency programs to continue your residency?
21   A.   Yes.
22   Q.   And one of them was Christiana Care?
23   A.   Yes.
24   Q.   Do you remember, when you applied to Christiana

Page 27

1    Care, whether that was through the match program or
2    through some other process?
3    A.   I'm not sure.  I can't remember.
4    Q.   Where else did you apply other than Christiana
5    Care?
6    A.   East Carolina University and Norfolk.
7    Q.   Anywhere else?
8    A.   I'm not sure.
9    Q.   As you sit here now, do you think that there
10   probably were others that you're not remembering?
11   A.   I can't remember.
12   Q.   You were eventually accepted into the residency
13   program at Christiana Care, right?
14   A.   That's correct.
15   Q.   Do you remember whether you were offered a
16   residency position anywhere else?
17   A.   Norfolk.
18   Q.   What led you to choose Christiana Care over
19   Norfolk?
20   A.   I felt I would get better surgery training in a
21   wider aspect at Christiana Care.
22   Q.   And you've only referred to the Norfolk
23   residency program as Norfolk.  Do you know what the
24   fuller name of that institution is?

Page 28

1    A.   No.
2    Q.   But it's in Norfolk, Virginia?
3    A.   Norfolk, yeah.
4    Q.   Were you accepted to any residency program
5    other than Christiana Care and the Norfolk program you
6    just described?
7    A.   No.
8    Q.   My understanding is that a resident in an
9    ob/gyn program -- being a resident entails applying
10   direct patient care in some instance, am I correct
11   about that?
12   A.   Yes.
13   Q.   It involves providing patient care sometimes
14   with direct supervision of another physician, is that
15   true?
16   A.   Under national guidelines, it should always be
17   direct supervision of a teaching physician.
18   Q.   So I want to just make sure I'm understanding
19   you right.  Are you saying there is never a
20   circumstance in which a resident should be alone
21   interacting with a patient?
22   A.   You need to reword that.  That didn't make
23   sense to me.
24   Q.   You just referred to some national guidelines.

Page 29

1    Is it your understanding that, according to those
2    guidelines, there always needs to be a teaching
3    physician present when you're interacting with a
4    patient when you're the resident?
5    A.   Very close by.  Walking within the physical
6    structure where that teaching physician can walk in
7    and assist you at any moment that you need that
8    teaching physician.
9    Q.   I understand.  Okay.  So the teaching physician
10   needs to be accessible to you?
11   A.   Very immediately accessible.  Not necessarily
12   in the same room, but within hearing distance or
13   walking distance or running distance.
14   Q.   And if those guidelines, to your understanding,
15   are being followed and there's a teaching physician
16   that's very close by, under those circumstances do
17   residents provide care to patients without a teaching
18   physician in the room?
19   A.   Yes.
20   Q.   And that's normal in your experience?
21   A.   Yes.
22   Q.   And is it your understanding also that being a
23   resident is, in part, a learning and academic program?
24   A.   Yes.

8 (Pages 26 to 29)

Zechman
Ellen Zechman

v.

C.A. # 05-159 JJF

Christiana Care Health Systems
June 20, 2006

Page 30

1    Q.   And you would agree that it's important for --
2    I think you just said it -- for the residency program
3    to closely supervise the progress and performance of
4    its residents?
5    **A.   By national guideline.  They are to follow the**
6    **national guidelines.**
7    Q.   Okay.
8    **A.   Set out by the American College of Graduate**
9    **Medical Education.**
10   Q.   And you would expect any residency program
11   would be monitoring the progress of the skills of its
12   residents?
13   **A.   By national requirements, they should follow**
14   **those set requirements.**
15   Q.   I'm not asking you about what the national
16   guidelines are, unless you're in a position to tell me
17   what they are, what the national guidelines are.
18   **A.   I cannot quote them, but they are directly**
19   **specified what the guidelines are in a book.**
20   Q.   Is it your understanding that, in an ob/gyn
21   residency program, that the performance and progress
22   of residents are frequently evaluated?
23   **A.   Yes.**
24   Q.   And that's an important part of the residency

Page 31

1    program, I take it?
2    **A.   It's part of it, yes.**
3    Q.   When you started at Christiana Care, am I right
4    that there were only four slots, four spaces in the
5    resident class in the ob/gyn program?
6    **A.   That's correct.**
7    Q.   So you were transferring in as a second-year
8    resident because one of their four residents had left
9    the program?
10   **A.   That's correct.**
11   Q.   Do you know what the circumstances or reasons
12   were that that resident left the Christiana Care
13   program?
14   **A.   I do not.**
15   Q.   And is it your understanding that Christiana
16   Care has some limitations in the number of residents
17   that it can have at a given time?
18   **A.   It does.**
19   Q.   And when Christiana Care eventually offered you
20   the residency program, do you recall -- first, how did
21   you learn that you had been accepted into the
22   Christiana Care residency program as a second year.
23   **A.   Directly from the residency director.**
24   **Dr. Sciscione wanted me to sign a contract.**

Page 32

1    Q.   Did he inform you of that decision
2    face-to-face?
3    **A.   Face-to-face.**
4    Q.   That face-to-face meeting took place at
5    Christiana Care?
6    **A.   Pardon?**
7    Q.   Did that face-to-face meeting with
8    Dr. Sciscione occur at Christiana Care physically?
9    **A.   Yes, sir.**
10   Q.   Was that the same visit when you interviewed
11   for the residency program?
12   **A.   Yes.**
13   Q.   And do you recall who interviewed you?
14   **A.   Dr. Sciscione, of course.  I did speak with**
15   **Dr. Ekbladh, and there was someone else I also spoke**
16   **to that I don't recall who they were.**
17   Q.   Do you recall if you met with Dr. Ekbladh and
18   Dr. Sciscione separately?
19   **A.   Separately.**
20   Q.   And was it your understanding that the decision
21   about whether to offer you the position or not was a
22   decision made by a committee?
23   **A.   I have no idea.**
24   Q.   What is required to become a fully licensed and

Page 33

1    certified ob/gyn physician?  I mean, in addition to
2    completing medical school.
3    **A.   Completing medical school.  Completing the**
4    **residency.  After residency, taking a board**
5    **certification examination.**
6    Q.   And the board certification, is there a written
7    board exam?
8    **A.   Yes.**
9    Q.   And is there's also an oral board exam?
10   **A.   I -- I'm not sure.  I know that immediately**
11   **after you finish your residency, after you have four**
12   **years of training, you take the boards.  I'm not sure**
13   **where the oral comes in, but I know there is an oral**
14   **component somewhere.**
15   Q.   So there's a written and oral component to the
16   board certification process?
17   **A.   After residency.**
18   Q.   And do you have any understanding as to whether
19   it's rare for an ob/gyn resident to fail their boards?
20   **A.   Just that residents frequently failed their**
21   **boards.  The year I was there, their graduating class**
22   **of four, from what I have heard, only one immediately**
23   **passed their boards.**
24   Q.   The four you just referred to were the

9 (Pages 30 to 33)

Page 34

1  fourth-year residents in the ob/gyn program?
2  **A. That's correct.**
3  Q. And how did you learn that?
4  **A. Through other residents.**
5  Q. Do you remember who told you?
6  **A. That was common knowledge in the residency.**
7  Q. Do you remember who told you?
8  **A. No.**
9  Q. And do you have any understanding as to whether
10 those three who failed the first time, whether they
11 eventually passed?
12 **A. I have no idea.**
13 Q. Is it your understanding that passing the board
14 exams, both the written and oral, is a demanding
15 testing procedure?
16     MS. BREWINGTON: I'm going to object to
17 form.
18 **A. I don't know what you're getting at. I don't**
19 **know what -- you know, I don't know what you're asking**
20 **me.**
21 Q. Let me phrase it differently. Other than the
22 three that you just referred to at Christiana Care who
23 failed their boards, do you have any understanding at
24 all as to whether or not that's unusual generally for

Page 35

1  ob/gyn residents to fail the first time?
2  **A. No. That isn't -- I mean, it is not common.**
3  **That's unusual --**
4  Q. Okay.
5  **A. -- to have such a poor failure rate of your**
6  **graduating seniors. These are graduated seniors that**
7  **have failed their boards.**
8  Q. And can you tell me what the basis for your
9  belief about that is, about the graduating rate at
10 Christiana Care being less than at other institutions?
11 **A. I have seen statistics, but I cannot recall**
12 **what magazine. They published those statistics in the**
13 **professional journals, but I cannot recall where and**
14 **when I read that.**
15 Q. Okay. You think --
16 **A. But it was a comon thing to publish, you know,**
17 **your pass rates, your match rates, your board passing**
18 **rates. The professional journals frequently publish**
19 **those statistics.**
20 Q. And when you pursued an ob/gyn residency, did
21 you have in your mind a plan for what you wanted to do
22 if and when you became a fully licensed ob/gyn
23 physician?
24 **A. Absolutely.**

Page 36

1  Q. Okay. What was that?
2  **A. To come back home to rural North Carolina and**
3  **work with the health department and do women's care.**
4  **There's a great need in our area for ob/gyns.**
5  Q. When you just referred to the health
6  department, is that a North Carolina government agency
7  that you're referring to?
8  **A. Yes.**
9  Q. So I take it that your plan was not necessarily
10 to go out and make the most money that you could?
11 **A. No. I wanted to provide wonderful health care**
12 **to the women of North Carolina in something that was**
13 **near and dear to my heart as the mother of four**
14 **children.**
15 Q. And I think you said that your plan was to work
16 in the health department in a rural part of North
17 Carolina?
18 **A. That's where I live. Rural North Carolina.**
19 Q. What's the nearest city to where you live?
20 **A. I don't know what you want to call a city, but**
21 **the nearest large city would be Raleigh, North**
22 **Carolina, the state capital, which is at least two**
23 **hours away.**
24 Q. How close are you to Greenville?

Page 37

1  **A. I am, depending on traffic, 45 minutes to an**
2  **hour away from Greenville, North Carolina.**
3  Q. And when your referring to where you are,
4  that's New Bern, North Carolina?
5  **A. New Bern, North Carolina**
6  Q. Would you just spell that for the reporter,
7  please?
8  **A. What, New Bern?**
9  Q. Yes.
10 **A. N-e-w, separate word B-e-r-n.**
11 Q. And where does a resident fall in the hierarchy
12 of medical personnel within a hospital?
13 **A. They are considered physicians, but they are**
14 **considered trainees. They are not to operate on their**
15 **own. They are not expected to be able go on their**
16 **own. When I say operating, patient care. They are to**
17 **be supervised at all times, to have help close by,**
18 **physically, at all times.**
19 Q. When you say physically, I think you said
20 before, it doesn't necessarily mean they're in the
21 room, but they are close enough that you can get them?
22 **A. They have to be, by national requirements, they**
23 **have to be able, if you say I need help, to be there**
24 **quickly.**

10 (Pages 34 to 37)

Zechman
Ellen Zechman

v.

C.A. # 05-159 JJF

Christiana Care Health Systems
June 20, 2006

Page 38

1    Q.   And putting aside nurses and assistants and all
2    that, I'm focussing your attention on physicians that
3    are in the hospital.  Is it your understanding that
4    the residents are, for lack of a better term, the
5    lowest on the totem pole of that progression?
6    **A.   Rephrase that, please.**
7    Q.   Sure.
8         When you refer to the residents as
9    trainees, are there physicians within the hospital
10   that are working there on the basis of less experience
11   than the residents themselves?  Is there a category
12   below resident is what I'm asking.
13   **A.   As a physician?**
14   Q.   Yes.
15   **A.   No.**
16   Q.   So who are the categories of physicians that
17   would be immediately above or supervising residents?
18   **A.   Your staff-paid teaching physician.**
19   Q.   And then, I understand there are also teaching
20   physicians who are not staff-paid physicians?
21   **A.   In private -- in private practice, but are also**
22   **teaching physicians within the institution.**
23   Q.   What's the chief resident?  And I'm talking
24   about the ob/gyn program at Christiana Care.

Page 40

1    **A.   I guess so, yeah, because this is to ECU School**
2    **of Medicine.**
3    Q.   Okay.
4    **A.   So, yes.**
5    Q.   And did you send this recommendation letter to
6    Christiana Care also?
7    **A.   I don't remember.  I don't remember what I sent**
8    **to them.**
9    Q.   Is it your memory, then, that, when you
10   applied, that you sent your application materials to
11   Christiana Care?
12   **A.   Yeah.  Well, I sent them too, but I don't**
13   **remember what I sent.**
14   Q.   Is there anything about this particular
15   recommendation that you view negatively?
16   **A.   That would be a subjective thing, depending on**
17   **who reads it.  I think it looks fine.  But "you**
18   **brought maturity," that could be -- that could be a**
19   **comment of my age or it could be a compliment.  That**
20   **could go either way.**
21   Q.   Okay.
22   **A.   Subjective, you know, depends.**
23   Q.   When you first saw this evaluation, did it
24   strike you that the word "maturity" was used in a

Page 39

1    **A.   The chief resident is a resident -- and you'll**
2    **have more than one -- the residents in their last year**
3    **of training -- so they are in their fourth year of the**
4    **fourth year -- that are in a supervising position.  By**
5    **national guidelines, all residents are required to**
6    **pull a supervising year the fourth year and to be in**
7    **charge of the specific service.**
8    Q.   So if I'm understanding you right, part of
9    completing a residency program is to spend a period of
10   your fourth year where you are actually providing
11   supervision and direction to more junior residents?
12   **A.   That's correct.**
13   Q.   You can put that document, Zechman 1, aside.
14        THE WITNESS:  Break?
15        (Discussion off the record.)
16        (Recess taken.)
17        (Zechman Deposition Exhibit 2 was marked
18   for identification.)
19   BY MR. BLOOM:
20   Q.   Dr. Zechman, I'm going to put in front of you
21   what's been marked as Zechman 2, and my understanding
22   is that this is a letter of recommendation that you
23   submitted in support of your application for an ob/gyn
24   residency in October 2001, is that right?

Page 41

1    negative way?
2    **A.   Actually, it says, "She has waived her right to**
3    **see this letter of recommendation," so I don't know**
4    **that I have seen this.**
5    Q.   Well, as you look at it now, tell me who
6    Dr. David Rayl is.  R-a-y-l.
7    **A.   He is a wonderful, wonderful man that was my**
8    **residency director at Riverside.**
9    Q.   And so he's somebody you had a good
10   relationship with?
11   **A.   Yes.  Wonderful teacher.**
12   Q.   I take it you don't have any reason to think
13   that he was trying to signal something negative about
14   you when he referred to your maturity?
15   **A.   I don't know.**
16   Q.   Do you have any reason to think that he did?
17   **A.   I don't -- I don't -- I don't know.  You are**
18   **asking me to speculate, and I can't -- I can't read**
19   **somebody else's mind.  I'm sorry.**
20        (Zechman Deposition Exhibit 3 was marked
21   **for identification.)**
22   BY MR. BLOOM:
23   Q.   I'm going to hand you what's been marked as
24   Zechman 3.  And this is a recommendation for you dated

11 (Pages 38 to 41)

Zechman                                    v.                     Christiana Care Health Systems
Ellen Zechman                        C.A. # 05-159 JJF                      June 20, 2006

Page 42

1  December 5, 2000, that was prepared by Dr. Samuel
2  Atkinson, is that right?
3  **A. Mm-hmm.**
4  Q.  Do I have that right?
5  **A. Pardon? Say it again.**
6  Q.  Is this a recommendation on your behalf dated
7  December 5, 2000, from Dr. Samuel Atkinson?
8  **A. That's correct.**
9  Q.  Who is Dr. Atkinson?
10 **A. He was one of my teaching physicians from**
11 **medical school.**
12 Q.  Did you have a positive relationship with him?
13 **A. Yes.**
14 Q.  Did you ask him to write this letter for you?
15 **A. Yes, I did.**
16 Q.  After you've reviewed this letter, I'd like to
17 know if there's anything in this recommendation that
18 you view as a criticism of you?
19 **A. I can't say that I do.**
20 Q.  There's a reference in the second paragraph to
21 being somewhat older -- I'm quoting -- "somewhat older
22 than the traditional fast track student."
23 **A. I missed that.**
24 Q.  Did I read that right?

Page 43

1  **A. Yes. Somewhat older. That would be -- I'm**
2  **sorry.**
3  Q.  No. Finish your answer.
4  **A. You told me not to do that. I'm sorry.**
5  Q.  I would read the full sentence. "She impressed
6  us as a student as she was somewhat older than the
7  traditional fast track student."
8       Did I read that right?
9  **A. Mm-hmm.**
10 Q.  Does "traditional fast track student" have a
11 meaning to you?
12 **A. Not to me.**
13 Q.  Do you have any reason to think that
14 Dr. Atkinson would have any reason to try to sabotage
15 your application to another residency program?
16 **A. No. But he's making it clear that I'm older**
17 **and not a young, traditional person.**
18 Q.  Why would a young person be traditional?
19      MS. BREWINGTON: Objection. Calls for
20 speculation.
21      MR. BLOOM: That's fine. You can answer.
22      MS. BREWINGTON: You can certainly answer.
23 I'm sorry.
24 **A. Well, older students are called non-traditional**

Page 44

1  **students. So, evidently, society's view is**
2  **traditional students go straight from high school to**
3  **college to medical school on. And I was older.**
4  **BY MR. BLOOM:**
5  Q.  And apart from the fact that this exhibit,
6  Zechman 3, from Dr. Atkinson refers to you as being
7  somewhat older, I mean, you would expect that any
8  residency program that would consider you is doing so
9  on the basis of a complete application that you
10 submitted?
11      MS. BREWINGTON: Again, calls for
12 speculation.
13 **A. I don't know what they do.**
14 Q.  They know your age when you're applying for a
15 residency position, right?
16 **A. I don't know.**
17 Q.  You provide the dates you went to college, for
18 example, right?
19 **A. I do.**
20 Q.  And when you interviewed with Dr. Sciscione,
21 was there any reference to your age or whether you are
22 a non-traditional student during that interview?
23 **A. I can't recall.**
24 Q.  And what about with Dr. Ekblach, was there any

Page 45

1  reference to your age or being a non-traditional
2  student?
3  **A. I cannot recall our conversation.**
4  Q.  I've read in one of your notes or e-mails that
5  Dr. Sciscione, according to you, once told you early
6  on that some other members of the residency review
7  committee gave him a hard time for hiring you because
8  you were non-traditional. Do you recall that?
9  **A. Very clearly I recall that, yes.**
10 Q.  When did Dr. Sciscione tell you that?
11 **A. I can't recall the exact time, but it was early**
12 **like August, September, around that time, shortly**
13 **after I had come on board in July and they were seeing**
14 **who I was.**
15 Q.  When you say July or August, you're talking
16 2002?
17 **A. Yes.**
18 Q.  And did he tell you why he had been given a
19 hard time for selecting you into the residency
20 program?
21 **A. Because I was different.**
22 Q.  You assumed, based on that, that that might
23 refer to your age?
24 **A. I specifically asked him, why am I different?**

12 (Pages 42 to 45)

Case 1:05-cv-00159-JJF    Document 58-4    Filed 11/22/2006    Page 27 of 59

Zechman
Ellen Zechman

v.

C.A. # 05-159 JJF

Christiana Care Health Systems
June 20, 2006

Page 46

1  **Is it my southern accent?  Is it my age?  And he**
2  **wouldn't answer.**
3  Q.  Did you have any reason to think that -- well,
4  first of all, did he tell you who specifically was,
5  quote/unquote, giving him a hard time?
6  **A.  The members of the residency review committee.**
7  Q.  And do you have any reason to believe that the
8  members of the residency review committee knew your
9  age?
10 **A.  I have no idea.**
11 Q.  Okay.
12 **A.  By that time, they had worked with me and had**
13 **seen me.**
14 Q.  And so I take it what you're saying is that,
15 when somebody meets you and sees you face-to-face,
16 that they might come to some conclusion that you're
17 older than the other residents?  I hate to put it that
18 way, but I think that's what you're telling me.  Do I
19 have that right?
20 **A.  I think you've got that right.**
21 Q.  Okay.  You can put that document aside.
22        Did transferring from your first year
23 residency program to the Christiana Care ob/gyn
24 residency program entail any specific challenges to

Page 47

1  you in making that transition?
2  **A.  Yes.  And Dr. Sciscione and I discussed this in**
3  **great detail, that I had not had the same surgical**
4  **experience as I would have had I started at Christiana**
5  **Care because the residents at Riverside, their first**
6  **year, they were -- their primary duty was the labor**
7  **deck, you know, managing labor, learning how to manage**
8  **labor.  They were not -- they would assist in**
9  **surgeries, but they were not actively doing the**
10 **surgery.  And it was a tradition for that step not to**
11 **be taken until the second year.  It was kind of a, you**
12 **know, award, you know, to be -- in the second year,**
13 **you're handed the scalpel.**
14        **You were present in the surgeries, but you**
15 **were holding retractors.  You might close, but you**
16 **weren't (indicating), you know and doing the surgery.**
17 **Whereas, at Christiana, they dug in with a scalpel**
18 **day 1.  And that was a very big difference in the**
19 **number of surgeries and then the role you played while**
20 **you were in the OR room between the first year and the**
21 **second year.**
22 Q.  I think you testified before that that was one
23 of the reasons why you wanted to go to Christiana was
24 to get more surgical experience?

Page 48

1  **A.  Absolutely.**
2  Q.  And this conversation that you just referred to
3  with Dr. Sciscione, was this during that initial
4  interview that you had with him?
5  **A.  We discussed this, yes.**
6  Q.  So, during the interview, you discussed that
7  you were behind what were soon to be your second-year
8  classmates in surgical experience?
9  **A.  We didn't use those words, but we were**
10 **discussing the differences in the programs and he came**
11 **to the conclusion because, you know, I couldn't see**
12 **ahead, I couldn't see what his people had been**
13 **through.  That was his assessment.  And he assured me**
14 **that he would give me time to make this up, not to**
15 **worry about it.**
16 Q.  To catch up to your classmates?
17 **A.  Yeah.**
18 Q.  And when you were just comparing the level of
19 surgical training from the program that you were
20 transferring from as compared to the Christiana
21 program, can you tell me, was one of those two
22 programs more typical than the other in terms of the
23 amount of surgical experience provided?
24        And I'll explain a little further.  What

Page 49

1  I'm trying to figure out is, did the Riverside program
2  you were coming from actually provide less than the
3  usual amount of surgical experience, or did Christiana
4  Care actually provide more than is typical?
5  **A.  I'm not sure how to answer that because you're**
6  **asking me to speculate.  I would only be able to**
7  **answer that had I gone through both programs the whole**
8  **way.  It's hard for me to make that assessment.**
9  Q.  I think you testified earlier that you selected
10 to travel to Delaware to Christiana Care, because you
11 thought you would get more surgical experience there?
12 **A.  And a broader base of types of surgery.**
13 Q.  Okay.  And you had an understanding that that
14 broader and more extensive surgical experience was
15 more than would have been provided at Norfolk, for
16 example?
17 **A.  I'm not sure about Norfolk.  I did choose**
18 **Christiana over Norfolk, but I -- I chose it because I**
19 **felt that -- I can't remember the exact thought**
20 **process.**
21 Q.  How far away geographically was the Norfolk
22 residency program from the Riverside program that you
23 were transferring from?
24 **A.  Miles-wise I can't answer that.  But 30, 40**

13 (Pages 46 to 49)

Page 50

1  minutes driving.
2  Q.  Was there anything else that played a part in
3  your decision to choose Christiana Care other than
4  your expectation that you would get more surgical
5  experience?
6  A.  I thought it was more of a community, quieter,
7  more laid back hospital than Norfolk, which would have
8  been an inner city hospital.
9  Q.  And did you also have a discussion when you
10  interviewed with Dr. Ekbladh about whether you would
11  need to catch up to your classmates?
12  A.  I can not recall.
13        (Zechman Deposition Exhibit 12 was marked
14  for identification.)
15  BY MR. BLOOM:
16  Q.  I'm going to put in front of you what's been
17  marked as Zechman 12, and this is a document that you
18  sent in support of your administrative charge of
19  discrimination.  Do you recognize this letter as
20  something that you typed?
21  A.  Yes.
22  Q.  Do you recognize this also as something that
23  you submitted in connection with your EEOC charge?
24  A.  Yes, I do.

Page 51

1  Q.  And I'm going to direct your attention to the
2  first paragraph, and in the middle, it says -- I'm
3  going to quote -- "Dr. Sciscione and Dr. Ekbladh knew
4  I did not have extensive surgical experience at my
5  former program in Virginia.  We discussed this when I
6  interviewed.  They stated they would help me catch
7  up."
8        Did I read that right?
9  A.  Yes, you did.
10  Q.  Does that refresh your memory as to whether or
11  not you discussed catching up with Dr. Ekbladh?
12  A.  I cannot remember.  Right now, I cannot
13  remember what that conversation was with Dr. Ekbladh.
14  Q.  And after you started as a resident, as a
15  second-year at Christiana Care, did you ever come to
16  an opinion in your own mind about whether or not you
17  had catching up to do?
18  A.  Yes.  And I was eager to get as much experience
19  as I could.
20  Q.  Did you ever come to an understanding in your
21  mind as to whether, in fact, you had some catching up
22  to do with respect to your co-residents?
23  A.  I did not have the surgical numbers that they
24  had.  So, yes, I did not have the level of experience

Page 52

1  in the operating room as they had by sheer numbers.
2  Q.  And apart from the numbers and the numbers of
3  cases that they had done, did you ever come to an
4  opinion in your own mind about whether you had
5  catching up to do in terms of surgical skills?
6  A.  But I needed the opportunity.  I just needed
7  the opportunity to get in there and do it.
8  Q.  And I understand that, but is that a yes, that
9  you agreed that was an area where you needed to catch
10  up?
11  A.  Yes.  But I needed the opportunity to catch up.
12  Q.  You can put that document aside.
13        (Zechman Deposition Exhibit 13 was marked
14  for identification.)
15  BY MR. BLOOM:
16  Q.  I'm going to show you what has been marked as
17  Zechman 13, and this is a letter from you dated July
18  20th, 2004.  And do you recognize it as a letter you
19  sent to the EEOC in connection with your
20  administrative charge?
21  A.  Yes.
22  Q.  You typed the first page of this exhibit?
23  A.  Yes.
24  Q.  And you're referring to a Christiana Care

Page 53

1  letter that you're attaching to your letter, and
2  you're submitting it to the EEOC?
3  A.  Yes.
4  Q.  Could I have that?
5  A.  Mm-hmm.
6  Q.  Is that yes?
7  A.  Yes.
8  Q.  And I'm looking at the middle paragraph of the
9  July 20th, 2004, letter that you wrote, and there was
10  a reference here that Dr. Sciscione "recognized my
11  difficulty from transferring into the Christiana Care
12  program, that he looked forward to my completing the
13  program, and that I was dedicated, energetic, and
14  endearing."
15        Did I read that right?
16  A.  Mm-hmm.
17  Q.  I think you said this before, that, so far as
18  you know, Christiana Care is only permitted to have
19  four second-year residents at a time?
20  A.  That's correct.
21  Q.  They had one open slot, and they chose you for
22  that slot?
23  A.  That's correct.
24  Q.  Do you have any reason to think that, when

14 (Pages 50 to 53)

Zechman
Ellen Zechman

v.

C.A. # 05-159 JJF

Christiana Care Health Systems
June 20, 2006

Page 54

1  Dr. Sciscione and Christiana Care offered you that
2  fourth and only slot in the second year, do you have
3  any reason to doubt that they sincerely wanted you to
4  succeed and to complete the program?
5      MS. BREWINGTON: Objection. Calls for
6  speculation. You can answer.
7  **A. I have no idea.**
8  Q. Do you have any reason to believe that?
9  **A. The way Dr. Sciscione said that members of the**
10 **committee gave him such a hard time about hiring me,**
11 **anything would just be speculation, but that was a big**
12 **point that he made to me.**
13 Q. And you told me a little while ago that that
14 conversation between you and Dr. Sciscione happened in
15 August or September of 2002?
16 **A. Yeah.**
17 Q. So when the position was offered to you, I take
18 it you don't have any reason to believe or any reason
19 to doubt that you were hired with the expectation that
20 you would catch up and succeed in the program?
21 **A. I don't know. I don't know. I don't know what**
22 **their expectations or their -- you know, I can't read**
23 **their minds.**
24 Q. Do you know of any facts that would lead you to

Page 55

1  conclude that anyone at Christiana Care involved in
2  the decision to hire you as a second-year resident,
3  actually hoped that you would not succeed?
4  **A. I have no idea who was involved in the actual**
5  **decision to hire me.**
6  Q. And I'm not asking for names, but what's the
7  general composition of the residency review committee?
8  Who are the types of people that are on that
9  committee?
10 **A. They are members of the department, but I don't**
11 **know the exact composition.**
12 Q. Is it your understanding that the membership of
13 that committee fluctuates or changes over time?
14 **A. I don't know.**
15 Q. When you started at the Christiana Care
16 residency program, I take it your family stayed back
17 in New Bern, North Carolina?
18 **A. Yes.**
19 Q. How frequently did you go back and forth
20 between Delaware and North Carolina?
21 **A. I would go back at least one off weekend. They**
22 **would come up most of the time.**
23 Q. So that means one full weekend a month? Is
24 that what you mean when you say one off weekend?

Page 56

1  **A. Yeah. Whatever was my off weekend, that's when**
2  **I would go down. The rest of the time they would come**
3  **up.**
4  Q. Is that the way the schedule works that each
5  resident has one off weekend per month?
6  **A. It varied, but that was more often the case.**
7  Q. So, typically, through your time at Christiana
8  Care, you went to North Carolina about once a month?
9  **A. Sometimes everybody just came up to see me. So**
10 **it varied.**
11 Q. You can put number 13 away.
12     Dr. Zechman, you mentioned a second ago
13 that you didn't know who was involved in the decision
14 to hire at Christiana Care. Did I hear you right?
15 **A. That's correct. I don't know who all -- how**
16 **many -- who all was involved in the decision.**
17 Q. Do you know whether Dr. Sciscione played a part
18 in the decision?
19 **A. I think he did.**
20 Q. That's based on the fact that he was one of the
21 people who interviewed you?
22 **A. Yes.**
23 Q. Was it based on anything else?
24 **A. He was the residency director.**

Page 57

1  Q. Anything other than those two facts?
2      You have to answer verbally.
3  **A. I -- I don't think so.**
4  Q. What about Dr. Ekbladh, do you have any reason
5  to believe that he was involved in the decision to
6  hire you?
7  **A. I don't know.**
8  Q. What about the fact that he was one of the
9  people who interviewed you, did that lead to you
10 believe that he played some role in the decision?
11 **A. I would suppose that it would, but I don't know**
12 **who actually made the decision. I do not know.**
13     **(Zechman Deposition Exhibits 51 and 52**
14 **were marked for identification.)**
15 BY MR. BLOOM:
16 Q. I'm going to show you Zechman 51. Would you
17 just confirm for me that Zechman 51 -- I'm going to
18 give you two at a time. I'm also going to give you
19 Zechman 52. And let's look at Zechman 52 first.
20     Am I correct that this is a copy of your
21 resident agreement between you and Christiana Care
22 from when you first joined Christiana Care for the
23 year of July 2002 through June 2003?
24 **A. That's correct.**

15 (Pages 54 to 57)

Zechman
Ellen Zechman

v.
C.A. # 05-159 JJF

Christiana Care Health Systems
June 20, 2006

Page 58

1  Q.  And if you'll turn to the second to last page
2  of this document, there's a signature of the resident.
3  That's you.  And is that your signature on that line?
4  A.  Yes.
5  Q.  You can put that away.
6       And if you will look now at Zechman 51, am
7  I correct that Zechman 51 is the resident agreement
8  between you and Christiana Care covering the
9  subsequent year, which is July 2003 through June 2004?
10 A.  That's correct.
11 Q.  If you will turn to the second to last page,
12 would you just confirm for me that that's your
13 signature on the line where it says, "Ellen Zechman"?
14 A.  That's correct.
15 Q.  And when you entered into this second resident
16 agreement, it was to repeat the second year that you
17 had just done, right?
18 A.  No.  There were to be meetings and the
19 possibility of me advancing to the third year.
20 Q.  All right.  I understand that.
21      This agreement says in the very first line
22 that it's an agreement for you to be a second-year
23 resident.  I understand that there was discussion of
24 possibly progressing, but do you agree that this

Page 59

1  appointment was a second appointment to the same year
2  you had just done?
3  A.  Yes.
4  Q.  Do you have any knowledge of who was involved
5  in the decision to offer you this appointment as a
6  second year again as opposed to offering you an
7  appointment to progress to the third year?
8  A.  No.
9  Q.  You can put that aside.
10      (Zechman Deposition Exhibit 53 was marked
11 for identification.)
12 BY MR. BLOOM:
13 Q.  I'm going to show you Zechman 53, and first I
14 want you to tell me if you know whether you've ever
15 seen Zechman 53 before?
16 A.  I don't think I have.
17 Q.  Would you take a second to look at that
18 document.  It says at the top that Zechman 53 is a job
19 specification for an intern/resident.  Take a second
20 to review it and let me know if you think it's
21 accurate.
22 A.  There is something that is, I would say,
23 unusual.
24 Q.  What is that?

Page 60

1  A.  The occasional lifting, carrying, or pulling of
2  patients.  The carrying of patients, that's -- that's
3  interesting.
4  Q.  Why is that interesting?
5  A.  Because this is requiring the occasional
6  carrying of patients, whereas the nursing staff had
7  many mechanical devices to facilitate mechanical,
8  non-physical lifting of patients for safety reasons.
9  Q.  And at Christiana Care, apart from what you
10 just referred to as mechanical devices or other
11 non-physicians, was it your experience that, in fact,
12 residents were involved in turning patients and moving
13 patients and physically manipulating patients?
14 A.  We were required to pull patients off of the
15 operating room table when the nurses were allowed to
16 use mechanical devices rather than physically move the
17 patients themselves.
18 Q.  Are you aware of any reason for that?
19 A.  Employee safety.
20 Q.  No.  What I meant is, are you aware of any -- I
21 think you were just telling me that the residents
22 moved patients manually and physically; whereas other
23 people in the hospital used mechanical devices.  Did I
24 hear that right?

Page 61

1  A.  Yes.
2  Q.  Are you aware of any reason for that difference
3  that you just described?
4  A.  The safety of the nurses.
5  Q.  And why don't you tell me, in your own words,
6  what you observed in terms of residents doing lifting
7  or pulling or other physical events?  Describe that
8  for me in your own words.
9  A.  We would be ordered to move the patient off the
10 operating bed to the table.  Whereas, in the operating
11 rooms, the nurses had these mechanical devices that
12 they would put under the patient and crank them up,
13 transfer them, and did not have to physically pull.
14 And we were individually ordered to do that.
15 Q.  The residents were?
16 A.  At times.
17 Q.  Other than pulling the patient off of the
18 operating table, were there any other aspects of your
19 position as a resident that were physically demanding?
20 A.  Be more specific in what you mean by physically
21 demanding.
22 Q.  Any other lifting involved in being a resident
23 in the ob/gyn?
24 A.  In triage, we were required to use these

16 (Pages 58 to 61)

Zechman
Ellen Zechman

v.
C.A. # 05-159 JJF

Christiana Care Health Systems
June 20, 2006

Page 62

1  mechanical beds that would often malfunction. And you
2  would have a pregnant patient on the bed, some of them
3  weighing two, two-fifty pounds. And the mechanical
4  beds would have levers, and it would come down. And
5  they would malfunction. And for patient's safety, we
6  would have to sometimes hold them up manually until
7  you could holler for some help.
8      Q.  Was the malfunctioning of these beds that you
9  just described something that happened on a daily
10 basis, or was it something that happened occasionally?
11     A.  Frequently.
12     Q.  Other than what you've just described, were
13 there any other aspects of the job of being an ob/gyn
14 resident that involved physically manipulating
15 patients?
16     A.  Just getting them in position for labor, moving
17 a leg.
18     Q.  And might it also involve helping them turn or
19 adjust in their bed?
20     A.  Yes. But there was supposed to be nursing
21 personnel and accessory personnel to do that.
22     Q.  And so from your perspective anyway, this is an
23 area in which Christiana Care was not supporting the
24 residents?

Page 63

1          Let me rephrase that. What you just
2  described, these physical tasks, was this something
3  that all of the ob/gyn residents dealt with?
4      A.  At times.
5      Q.  Do you have any reason to think that the
6  physical tasks you did as a second year ob/gyn
7  resident were any different than the physical tasks
8  that your co-residents were doing?
9      A.  Be more specific in the task. That's a very
10 general statement that you're saying there. So just
11 be clearer, be more specific in what you're asking.
12     Q.  Well, we've just gone through a list of areas
13 of physical activities. You've talked about moving
14 patients off operating room tables. Let's start with
15 that. Do you think you did that more than your other
16 residents?
17     A.  I don't know.
18     Q.  Do you have any reason to think that you had to
19 deal with the malfunctioning beds that you described
20 any more so than your co-residents?
21     A.  I don't know.
22     Q.  Is there any other physical tasks that you do
23 as a resident that you think you did more frequently
24 than your co-residents?

Page 64

1      A.  I don't know.
2          (Zechman Deposition Exhibit 10 was marked
3  for identification.)
4  BY MR. BLOOM:
5      Q.  You can put Zechman 53 aside and I'm going to
6  hand you Zechman 10. And I'd like you to take a
7  second, just flip through the document so that you
8  know what it is.
9      A.  Mm-hmm.
10     Q.  You've seen this document before?
11     A.  Yes.
12     Q.  Zechman 10 is a letter that you sent to the
13 EEOC in support of your discrimination charge in this
14 case?
15     A.  That's correct.
16     Q.  Then the back half of it is actually you attach
17 a copy of a letter from EEOC that you are responding
18 to. Do I have that right?
19     A.  That's correct.
20     Q.  And the second letter that's attached to
21 Zechman 10 is October 6, 2004, letter, and there are
22 numbers that are circled in the margin that look to be
23 numbering the paragraphs. Do you see that?
24     A.  Mm-hmm.

Page 65

1      Q.  Did you write those numbers there?
2      A.  Yes.
3      Q.  That was so, in your letter to the EEOC, you
4  could respond by paragraph number to what you were
5  addressing?
6      A.  Mm-hmm.
7      Q.  And I take it that, when you were writing this
8  letter to the EEOC, you were trying to provide as
9  accurate and as truthful a response as you could?
10     A.  That's correct.
11     Q.  Now, if you'll turn to the second page of this
12 exhibit, and I'm looking at the paragraph number 4,
13 and the first sentence says, "Initially I was behind
14 my colleagues in surgical skills after transferring
15 into the Christiana program. I made this fact known
16 prior to accepting the residency position."
17         Did I read that right?
18     A.  That's correct.
19     Q.  And this paragraph is referring to something
20 that you made known before you even accepted the
21 position at Christiana care, right?
22     A.  I'm referring to Dr. Sciscione's and my
23 conversation concerning the surgical programs during
24 that initial discussion.

17 (Pages 62 to 65)

Page 66

1    Q.   Is there anything about this paragraph number 4
2    that's inaccurate or that you think should be changed?
3    **A.   I stand by this statement.**
4    Q.   You stand by everything that's in paragraph
5    number 4?
6    **A.   Yeah.**
7    Q.   I want to direct your attention to the bottom
8    of the same page, paragraph number 6, and there's a
9    sentence in there where you write, "In an effort to
10   cover his discrimination, in July Dr. Ekbladh changed
11   my agenda and put Dr. Hoffman in charge of my training
12   and assigning me to various teaching positions."
13          Did I read that right?
14   **A.   I'm not seeing that.**
15   Q.   I apologize.  I'm looking at paragraph
16   number 6, which starts at the bottom of the page, and
17   then I read the third sentence of it.
18          MS. BREWINGTON:  Do you see it?
19          THE WITNESS:  I see it, yeah.
20   BY MR. BLOOM:
21   Q.   Have you read that sentence?
22   **A.   I'm looking at it, yeah.  Okay.**
23   Q.   And so there was a reference here to
24   Dr. Ekbladh changing your agenda and putting

Page 67

1    Dr. Hoffman in charge.  Is the change you're referring
2    to, is that related in any way to a change in who your
3    mentor was?
4    **A.   I cannot remember the exact -- what I was**
5    **referring to that.**
6    Q.   Okay.
7    **A.   So I can't -- you know, I'm not recalling this.**
8    Q.   Now, around the time that you learned that the
9    committee had voted to terminate your residency at the
10   program, which was -- tell me if this is consistent
11   with your memory -- around late September or beginning
12   of October of 2003, does that seem like the right time
13   frame to you?
14   **A.   Late September is when the letter was written.**
15   Q.   So you don't know when the committee actually
16   voted on that?
17   **A.   I was not there, so I do not know for sure.**
18   Q.   Do you know when you learned of the decision?
19   **A.   I learned of the decision by telephone October**
20   **3rd.**
21   Q.   And who was your telephone conversation with?
22   **A.   Initially it was Sandi Kardos.  And then she**
23   **had Dr. Kaminski call me back.**
24   Q.   Is that because you asked to talk to

Page 68

1    Dr. Kaminski?
2    **A.   No.**
3    Q.   Tell me what you remember of that conversation
4    with Sandi Kardos.
5    **A.   I do not remember what Sandi Kardos told me.**
6    **But she says, "I'll have Dr. Kaminski call you back."**
7    **I do remember that part.**
8    Q.   Do you remember whether or not you learned
9    during your conversation with Sandi of the fact that
10   this decision had been made?
11   **A.   I can't remember that part of it.  I can't**
12   **remember what she said to me.**
13   Q.   So you don't remember one way or the other
14   whether Dr. Kaminski was the first or the second
15   person to tell you the decision?
16   **A.   I can't remember.**
17   Q.   Do you remember your conversation with
18   Dr. Kaminski?
19   **A.   I remember parts of it.**
20   Q.   Tell me what you remember?
21   **A.   It's like a knife sticking in me, these words,**
22   **"Dr. Ekbladh has decided to dismiss you."**
23   Q.   What's Dr. Kaminski's position, if any, within
24   the Christiana Care system?

Page 69

1    **A.   He's one of the teaching physicians, and he**
2    **would act as the residency director when Dr. Ekbladh**
3    **was not there.**
4    Q.   Was Dr. Kaminski on staff?
5    **A.   Yes.**
6    Q.   And around that same time you were away from
7    the hospital for an about a week, is that right?
8    **A.   I had gone out on disability prior to that and**
9    **I was officially on vacation that day and that week.**
10   Q.   Is this related to a pinched nerve that you had
11   suffered?
12   **A.   Yes.**
13   Q.   The reason you were out for a week was because
14   you had suffered a pinched nerve?
15   **A.   Yes.**
16   Q.   And the pinched nerve, as I understand, anyway,
17   was related to moving or resulted from moving some
18   furniture around preparing for a hurricane at home?
19   **A.   That's correct.  In Delaware.**
20   Q.   You can put that document aside.
21          And I want to ask you, Dr. Zechman, about
22   some of the claims you've asserted in this case.  I
23   actually have one question for you about something
24   that's in your complaint.  So I'm going to put a copy

18 (Pages 66 to 69)

Zechman
Ellen Zechman

v.

C.A. # 05-159 JJF

Christiana Care Health Systems
June 20, 2006

Page 70

1   of your complaint in front of you.
2       Well, first, tell me if you recognize this
3   document as the complaint in this case, and then let
4   me know when you can.
5   A.  Yes.
6   Q.  And if you will turn to paragraph 99 and read
7   that to yourself and let me know when you're done.
8       Are you done reading that?
9   A.  Mm-hmm.
10  Q.  There is a reference in paragraph 99 of your
11  complaint that you relied upon a representation of
12  Christiana Care, quote, that defendant would
13  accommodate her disability, close quote.
14      First of all, do you have an understanding
15  as to when the first time was anybody at Christiana
16  Care learned that you might have a disability of some
17  kind?
18  A.  Yes.
19  Q.  When did that happen?
20  A.  I was required to fill out a form called an
21  EEOC survey either in August or September of 2002
22  shortly after I came on that specifically asked me, do
23  you have a disability?
24  Q.  And you checked, yes, that you do on that form?

Page 71

1   A.  I had to.  I would have been lying to say
2   anything else.  Yes.
3   Q.  And so am I right that you filled out this form
4   approximately three months after you had already
5   started as a second-year resident at Christiana Care?
6   A.  Either two or three months.  It was either
7   August or September of -- I cannot remember the exact
8   time, but I was called to Sandi Kardos's office, and
9   she would not let me go back to my duties until I
10  filled out that form and handed it to her.
11  Q.  And I take it that this was a form that had
12  previously been presented to you along with other
13  personnel forms when you were first hired?
14  A.  Yes.
15  Q.  And you made a decision that you did not want
16  to complete that form, am I right about that?
17  A.  I just -- I did not complete it.  It didn't get
18  back in, and she was insisting that I fill it out.
19  Q.  Was that a conscious decision on your part not
20  to fill out the EEO form the first time?
21  A.  I cannot recall the circumstances of that,
22  whether it was -- you know, I just got left in the
23  shuffle or what.  I cannot recall the circumstances.
24  Q.  At the time you filling out this form, what was

Page 72

1   the disability that you were disclosing at that time?
2   A.  I was not required to disclose the particular
3   disability.  It just asked, do you have a disability?
4   Q.  And at that time do you have an opinion as --
5   when I say at that time, I mean August, September,
6   2002.  Did you have a belief that your disability
7   interfered in any way with your ability to do your job
8   then?
9   A.  No.
10  Q.  So I take it that the disability you're
11  referring to at that time did not interfere with your
12  ability to do your job as a second-year resident?
13  A.  No.
14  Q.  You can put that document away.
15      Dr. Zechman, I'm going to ask you about
16  the claims you've asserted in this case, and what I'm
17  going to ask you about, sort of going in reverse
18  chronological order, are the decision to terminate
19  your residency in 2003.  I take it your claim relates
20  in part to that decision, is that true?
21  A.  Rephrase that question.  I don't know what
22  you're asking me here.
23  Q.  You do understand that the lawsuit that you
24  filed this case relates to the termination of your

Page 73

1   residency?
2   A.  Yes.  Okay.
3   Q.  And tell me if I understand the allegations
4   you've made that you believe that the end of your
5   residency was based upon either discrimination based
6   on your age -- well, let's leave it at that.
7       That's part of your claim, right, that it
8   was discrimination based on your age?
9   A.  I feel the actual decision was based on me
10  requesting family medical leave.
11  Q.  Do you think that the decision was based on
12  anything else?
13  A.  And age.  But the timing and the sequence of
14  events is directly related to my request for
15  accommodation and family medical leave as well as the
16  ongoing age issue.
17  Q.  What's the ongoing age issue that you just
18  referred to?
19  A.  The discrimination.
20  Q.  That's what I'm trying to find out.  What is
21  the discrimination?
22  A.  Ask more specific incidents.
23  Q.  I can't.  You're the one who knows what your
24  lawsuit is about.  I need to know from you what it is

19 (Pages 70 to 73)

Page 74

1   you're alleging that was discriminatory here. I'm
2   trying to break it down by decisions. I can ask it
3   more broadly, but I don't think I can ask it any more
4   narrowly than why do you think the termination
5   decision was based upon your age, your disability, or
6   some other sort of retaliation or discrimination.
7   I'll let you say it in your own words.
8          MS. BREWINGTON: I'm going to object
9   because it's compound. Go ahead.
10  **A. The discrimination was ongoing, which are**
11  **explained in the events and the complaint. But the**
12  **actual decision to terminate, coincided closely and**
13  **directly with first my request for accommodation in**
14  **July and then directly with my time off for the**
15  **pinched nerve and my ongoing request for family**
16  **medical leave from the middle of July when they would**
17  **not even give me the forms to fill out when I asked**
18  **for them in the department and they said, "We can't do**
19  **that. Nobody takes leave in this department."**
20  Q. Well, as I understand it, what you asked for in
21  July was not a leave of absence, that you wanted --
22  **A. I --**
23  Q. Let me finish the question.
24         That it was an adjustment to your

Page 75

1   schedule, do I have that right?
2   **A. Prior to that I had verbally asked for a family**
3   **medical leave and they refused to give it to me. They**
4   **refused to even give me the forms to fill out.**
5   Q. Who's the "they" that you are referring to?
6   **A. Sandi Kardos.**
7   Q. At some point later in the process you had some
8   interaction, I take it, with the employee relations
9   department at Christiana Care with respect to FMLA
10  leave?
11  **A. Yes.**
12  Q. And I take it you understood throughout your
13  time at Christiana Care that there was an employee
14  relations department?
15  **A. I was told that I was supposed to get my stuff**
16  **from the department.**
17  Q. Who told that you?
18  **A. Sandi Kardos and Dr. Ekbladh.**
19  Q. What's the stuff that you're referring to?
20  **A. The forms I was requesting, the family medical**
21  **leave, I had to go through them.**
22  Q. Other than what you've just described as the
23  coinciding of the time between the various leave
24  requests that you've made and the end of your

Page 76

1   residency, is there anything else other than that
2   timing that leads you to believe that the decision was
3   discriminatory in some way, the decision meaning the
4   termination decision?
5   **A. Yes. I was on the schedule. We were**
6   **continuing our training. It was an abrupt decision**
7   **when I went out on leave.**
8   Q. Well --
9   **A. I had a schedule on -- for the rest of the year**
10  **to -- for my planned activities. After I had asked**
11  **verbally for the leave and they -- "we don't do that**
12  **in our department; nobody takes leave in our**
13  **department" was the response. Our department, quote,**
14  **cannot support people going out on family medical**
15  **leave was the exact words that Sandi Kardos told me.**
16  **Then I gave this written letter in July to Dr. Ekbladh**
17  **so that I would have that request in writing.**
18         **Exactly one week after that, he gave me a**
19  **form saying we are going to have a committee meeting**
20  **and termination is an option.**
21  Q. I am sorry. Were you finished?
22  **A. Yeah.**
23  Q. The letter you just referred to in July 2003,
24  that was the letter which you're saying documents your

Page 77

1   request for family medical leave?
2   **A. No. The verbal request for family medical**
3   **leave and requesting forms had been totally ignored.**
4   **So I was putting in this second request for an altered**
5   **work schedule. Since they were refusing to even**
6   **consider giving me family medical leave, then I says,**
7   **well, let's have altered work schedule under the**
8   **Americans with Disabilities Act. And that is the**
9   **written request that I am putting in in July.**
10  Q. What was the basis for your needing a family
11  medical leave at the time you just referred to?
12  **A. I was having a flare up of my disability,**
13  **connective tissue disease, and the main component of**
14  **that is just overwhelming fatigue. I just needed time**
15  **to rest, get back up to, you know, par, and then I**
16  **could hit the road running again.**
17  Q. So it was for a medical leave for what length
18  of time?
19  **A. When I initially made the verbal request, I was**
20  **not making a specific time. I was just begging for**
21  **time off because I needed to rest. I needed to see my**
22  **doctor. I needed down time.**
23  Q. Was there an amount of time you needed?
24  **A. At that time I was -- I was asking for**

20 (Pages 74 to 77)

Case 1:05-cv-00159-JJF    Document 58-4    Filed 11/22/2006    Page 35 of 59

Zechman
Ellen Zechman

v.

C.A. # 05-159 JJF

Christiana Care Health Systems
June 20, 2006

Page 78

1 anything, a week, two weeks, three weeks. Just let me
2 rest and we'll go from there.
3    Q. And at that time, in terms of the initial
4 request, I take it you did not at that time provide
5 any note or certification from your doctor with
6 respect to that initial request for a leave?
7    A. I was not getting any forms to fill out for
8 that. You know, they just were ignoring me
9 completely.
10    Q. Now, you've now described twice, I think, how
11 you believe that the timing of your request for leave
12 is, you believe, the reason why your residency was
13 ended.
14    A. At that time, yes. At that abrupt decision.
15    Q. Other than what you just described, are there
16 any other facts that you know of that lead you to
17 believe that the end of your residency was motivated
18 in some way by your age?
19    A. I feel, additionally, playing into that
20 decision was that very first prejudice against me:
21 they don't like you because you're different. I feel
22 that was a shadow hanging over me the whole time.
23    Q. What I've just referred to is the conversation
24 that you had with Dr. Sciscione in roughly August,

Page 79

1 September of 2002?
2    A. Yes.
3    Q. Is there anything else that you have knowledge
4 of that leads you to believe that the termination
5 decision was related to your age?
6    A. All the preceding events prior to that that
7 I've documented.
8    Q. Well, tell me, other than what you've just
9 described for me, what facts lead you to think that
10 the termination decision was motivated by your age?
11    A. The way they were treating me. The way they
12 were denying me cases to go to surgery.
13    Q. What is it that makes you believe that that was
14 related in any way to your age?
15    A. Because of this original, or beginning when I
16 first came on, "they don't like you because you're
17 different."
18    Q. This is the conversation with Dr. Sciscione
19 August, September 2002?
20    A. And there were other conversations by different
21 attendings. "Why are you doing this at your stage of
22 your life?"
23    Q. Who said that?
24    A. I cannot remember. I have it documented, but I

Page 80

1 do not remember it from memory right now.
2    Additionally, different attendings -- and
3 I have this documented where -- in my documents that
4 you have on discovery, where I was told this is a
5 young person's specialty.
6    Q. Who said that?
7    A. I cannot recall at this moment, but I have it
8 documented in my diary and in the documents I have,
9 but I'm blanking right now.
10    Q. How old were you when you started at Christiana
11 Care?
12    A. 46 or 47. I can't remember.
13    Q. From your perspective, does starting a
14 residency, an ob/gyn residency at 46 or 47 present any
15 challenges that are different than somebody starting
16 at 26?
17    A. No.
18    Q. What about in terms of -- I take it that
19 residents, especially first- and second-year residents
20 get a lot of orders barked at them by other physicians
21 in the hospital. Is that an accurate characterization
22 of what happens?
23    A. Typically, yes.
24    Q. You know, physicians -- let me put it a

Page 81

1 different way. I take it it had been a long time
2 since you were in a circumstance where people barked
3 orders at you in that way, is that true?
4    A. No. I had been in a residency right after I
5 graduated from medical school, plus I had just
6 finished a year as an intern at Riverside. So I was
7 used to being in that environment.
8    Q. And so I take it that physicians supervising
9 you could be curt?
10    A. Physicians not supervising me are curt. People
11 are curt. I mean, that's just a normal trait of
12 people. So that's not a problem.
13    Q. Is there anything other than what you've
14 already described that leads to you believe that the
15 termination of your residency was motivated by your
16 age?
17    A. Also I had pointed out that there were some
18 things that were not right in the residency, and so I
19 think there was a retaliation as well as the
20 discrimination, as well as this component.
21    Q. And I understand that. We are going to move
22 into those other areas. I'm trying to break it down.
23 And when I've got everything that you have to tell me
24 about the age component, we'll move on to the others.

21 (Pages 78 to 81)

Page 82

1  Is there anything else other than what you've
2  described so far that leads you to conclude that the
3  end of your residency program is motivated by your
4  age?
5     A.  I am not coming up with specifics at this
6  moment. I am sure there are others, but I am -- they
7  are not coming to me at this moment.
8     Q.  Is there a person who you think, in your mind,
9  is a person at Christiana Care who discriminated
10 against you because of your age?
11    A.  I think there were several.
12    Q.  Who are they?
13    A.  Two were my colleagues: Residents Robyn Gray,
14 and her best friend, Dr. Rachel Heinle.
15    Q.  Other than Robyn Gray and Rachel Heinle, is
16 there anybody else at Christiana Care who you believe
17 discriminated against you because of your age?
18    A.  I feel there was a general atmosphere of "she's
19 different," and I'm quoting my mentor, Dr. Patruno, in
20 what he said to me: "Ellen, you're different. They
21 don't like you. They don't want you here."
22    Q.  And did Dr. Patruno say to you in what way he
23 thought you were different?
24    A.  Yes, because I specifically asked him.

Page 83

1     Q.  What did he say?
2     A.  What's different about me?
3     Q.  Mm-hmm.
4     A.  And he says, "You're older."
5     Q.  Was this a conversation where you were talking
6  about Robyn Gray and Rachel Heinle?
7     A.  I forget the exact conversation. This was one
8  of our mentor meetings in his office, and I was
9  specifically asking him, why don't they like me? Is
10 there anything I can change? You know, because I
11 wanted to stay there. You know, I wanted to finish my
12 residency so I could go back to North Carolina. And I
13 wanted to know why I was different and they didn't
14 like me. And he says because of my age, and he felt
15 that -- he says, "You are too self-assured. You don't
16 act like a whipped puppy when they bark at you.
17 You're not scared of them. And they want you to be
18 scared of them." And he was referring to the
19 attendings.
20    Q.  Did that, in your mind, mean that people
21 expected you to be less challenging or disagreeing
22 with instructions or orders that you were given?
23    A.  I didn't disagree. I just, you know, was just
24 self confident. I don't know what exactly was so

Page 84

1  different about me, but I -- you know, I had practiced
2  medicine in private practice. I was a fully licensed
3  physician. And I wasn't scared of them. I was there
4  to learn. I wanted to learn from them. I didn't
5  challenge their instructions, but I did want
6  knowledge. You know, I didn't take what they said as,
7  you know, oh, I just run and do it. But I would want
8  the education. I was hungry for the education so I
9  could take it back to North Carolina because I would
10 be practicing out in the boonies and I needed that
11 knowledge.
12    Q.  From your perspective, do you think that you
13 responded differently than your residents?
14    A.  I probably did because, having been in private
15 practice and knowing what it's like to be out there
16 without people to help you, I was hungry to suck up
17 all knowledge because -- and I would ask questions,
18 and I would say, "Well, what if this?" because I
19 wanted the knowledge, because I knew what challenges I
20 would face alone in the dark in the night. These
21 other people didn't. So I did have a different
22 attitude. I was more hungry for knowledge than they
23 were, and I knew some of the challenges that were
24 ahead of me. Whereas -- that made me hungry for that

Page 85

1  knowledge that they did not know because they had not
2  even there yet. They had always been in a protected
3  environment.
4     Q.  Apart from the hunger for knowledge that you
5  described, did you also think that you had a greater
6  confidence in the medical knowledge that you did have
7  than your co-residents?
8     A.  I had -- both. I had a confidence in certain
9  things, but I had -- you know, I needed training and I
10 was hungry for knowledge in other things. So I had --
11 I had greater hunger in many areas for the knowledge
12 and training, but then, yes, I did have greater
13 knowledge just because I had done it longer.
14    Q.  Can you tell me, what are the areas in which
15 you think you had greater knowledge than your
16 co-residents?
17    A.  That -- that's too broad to really say other
18 than just the limitations of being out there in the
19 world alone as, you know, a practitioner outside of
20 the protected ivory tower, you know, where you have
21 people to call on for help.
22    Q.  Which I guess leads to a greater confidence in
23 your decision making.
24    A.  No. It makes you appreciative having the broad

22 (Pages 82 to 85)

v.

Zechman                                                    Christiana Care Health Systems
Ellen Zechman              C.A. # 05-159 JJF                June 20, 2006

Page 86

1   base of people to say, what do you think about this?
2   What's your opinion? That's so wonderful to have.
3   When you haven't had that out in private practice.
4       Q.  When you referred a moment ago to your
5   conversation with Dr. Patruno and you asked him, what
6   did they have against me, did you ask him that?
7       A.  Yes. What was it about me that's different,
8   and the main thing was my age.
9       Q.  Well, wait. Who was it that you thought was
10  treating you differently? Was that Robyn Gray and
11  Rachel Heinle?
12      A.  On the day-to-day basis, they were the ring
13  leaders, yes. And Rachel in particular was one of my
14  colleagues, was very rude to me and would even turn
15  her back to me like this if I was sitting next to her,
16  would turn her back to me and would not speak to me.
17  They would have study parties for studying for
18  preparing for their boards, you know, their tests and
19  all and they wouldn't invite me, you know.
20      Q.  And when you went to Dr. Patruno, was your
21  concern when you raised this with him specifically
22  related to Robyn Gray and Rachel Heinle?
23      A.  That was part of it, but also the attendings,
24  the teaching physicians. Dr. Patruno specifically

Page 87

1   said, "Ellen, this is not a warm and fuzzy bunch of
2   people. They don't like you. They don't want you
3   here." He even said, and I quote, those knives in
4   your back are going to be knives in your head if you
5   don't do well on -- this was a student exam coming up.
6   "They don't want you here. They don't want to teach
7   you."
8       Q.  That exam you just referred to, is that what's
9   called the CREOG exam?
10      A.  Yes.
11      Q.  When you had this conversation with
12  Dr. Patruno, do you remember roughly when that was,
13  like month and year?
14      A.  I don't know the month but it -- I know the
15  year. It was -- it was either November or December of
16  2002. I think.
17      Q.  Okay.
18      A.  If the -- excuse me -- that conversation was
19  repeated at intervals so that was not the -- you know,
20  that was the only time he and I discussed that in our
21  meetings, but it was definitely the time frame when he
22  said, "Those knives in your back would become knives
23  in your head if you don't do well on this exam." And
24  he was referring to the exam that would be taken in

Page 88

1   January of 2003. So it was late 2002 when that --
2       Q.  And when Dr. Patruno told you -- and I think
3   this is what you said before -- that they, referring
4   to Rachel Heinle and Robyn Gray, don't like you
5   because you're different, and he told you that that
6   was because you were older -- did I capture your
7   testimony accurately right there?
8       MS. BREWINGTON:  I'm going to object
9   because it mischaracterizes, but you can answer.
10      A.  I cannot remember the exact words.
11      Q.  Well, did he tell you why it was he believed
12  that, that it was related to your age?
13          In other words, was this something that he
14  was speculating about or was he relaying something
15  that somebody else told him?
16      A.  I don't know.
17      Q.  Is there any person other than Robyn Gray
18  or Rachel Heinle who you think treated you differently
19  because of your age?
20      A.  There are others. I cannot recall specific
21  incidents at this moment.
22      Q.  And there's a claim of harassment in this case,
23  and my understanding is that this claim relates to
24  what you were just referring to about Robyn Gray and

Page 89

1   Rachel Heinle, is that true?
2       A.  Yes. The actual documentation that I have is
3   related to Robyn where she was my supervising resident
4   at the times the incidents were occurring, and I have
5   submitted documentation on that.
6       Q.  Other than the conversation you had with
7   Dr. Patruno, is there anything else that you have
8   personal knowledge of that leads you to believe that
9   Robyn Gray treated you differently because of your
10  age?
11      A.  She would ask me why was I here? Why don't I
12  just go home to my children?
13      Q.  Anything else?
14      A.  There are other things, but I'm not recalling
15  them at this moment.
16      Q.  Are there any facts that you know of that lead
17  you to think that Rachel Heinle treated you
18  differently because of your age?
19      A.  Just the way she treated me.
20      Q.  How did she treat you?
21      A.  I just described it, the rudeness, the turning
22  her back on me, the not inviting me to parties, and
23  this was from the beginning. You know, it was not
24  like she decided she didn't like me after she got to

23 (Pages 86 to 89)

(302)655-0477

Page 90

1  know me. It was she was that way very early on.
2    Q.  So your assumption is that it might have been
3  related to your age at this point?
4    A.  She would not talk to me; she only talked to me
5  when she absolutely had to and would turn her back to
6  me if we had to sit next to each other.
7    Q.  Other than what you've just described, is there
8  anything else that relates to you or supports your
9  leave that Rachel Heinle discriminated against you or
10  created you differently because of your age?
11   A.  I cannot recall at this time.
12       MS. BREWINGTON:  Off the record.
13       (Discussion off the record.)
14       (Recess taken.)
15  BY MR. BLOOM:
16   Q.  So, Dr. Zechman, am I correct that, at least
17  with respect to the harassment part of your lawsuit,
18  that is sort of focussed on Robyn Gray?
19   A.  Not only Robyn Gray, but Dr. Ekbladh as well.
20   Q.  Let's start with Robyn Gray.  How did Robyn
21  Gray, in your view, harass you?
22   A.  There were many incidents, and I've submitted
23  documentation on them. I do not remember them all at
24  this moment to quote back to you. One of the major

Page 91

1  ones was she was giving me a hard time saying I had to
2  come to these morning rounds and then -- as well as
3  the afternoon rounds.
4       Now, typically, if you were not on the
5  particular service -- like the morning rounds were for
6  the high risk OB service. And if you were not on that
7  service, you didn't go to those rounds. Well, she was
8  insisting that I go to the rounds. The afternoon
9  rounds would be either the surgery check-out rounds or
10  the check-out for the OB service. If you were not
11  assigned to that, you know, service, typically you did
12  not go to those rounds. And she was insisting that I
13  be at both. And I was not assigned to that particular
14  service.
15       And so there was quite a bit of, you know,
16  you need to be there, fussing, and I would say, you
17  know, well, typically we don't do this. Why are you
18  insisting that I come to these rounds other than the
19  fact that she was just harassing me to make my day
20  longer? And I even e-mailed her asking, has there
21  been a change of policy? You know, has there been an
22  e-mail? Has there been a letter? I haven't seen it,
23  but if there was a change of policy, please let me
24  know. Otherwise why are you insisting that I be at

Page 92

1  these rounds when, number 1, it hasn't been in the
2  policy in the past and you're not requiring anybody
3  else to do this? And she would not respond to it.
4  But she would continue to harass me about not being
5  there.
6       Then she was constantly reassigning me at
7  the last minute. Where my schedule would say, do --
8  you know, you're supposed to be on this service today.
9  You're supposed to go a certain place. One of the
10  particular incidents was I was to have training
11  with -- I'm blanking on his name, but one of the
12  operating room techs that worked the laparoscopic
13  equipment to get extra practice on their dummy for
14  laparoscopic surgery. She would deliberately assign
15  me a task, go check a labor patient at so and so, in
16  the times that I was supposed to go there, you know,
17  for my training session, basically keeping me from the
18  training session that I was supposed to have.
19  Repeatedly doing this.
20       One incident that is well documented is
21  Dr. Domingo specifically requested me for a surgery
22  where he was going -- he wanted to help teach me. He
23  wanted to work with me. And she specifically
24  reassigned me and would not let me to go that surgery.

Page 93

1  I begged her. Dr. Domingo has requested this. It's
2  on my schedule to go to him. He wants to work with
3  me. Call him. You know, if you need verification,
4  call him, you know, but I need to go to surgery. She
5  would not hear any of it. She reassigned me to
6  another position. I can't remember whether it was the
7  labor deck or down in the triage unit and sent a PA.
8       And I heard through the grapevine that
9  Dr. Domingo even held up surgery waiting for me to
10  come. And I couldn't get to him. I couldn't call him
11  because I had been assigned this other task.
12       It was a repeating theme. I would be
13  assigned one thing, and at the last minute she would
14  send me in another direction to prevent me from
15  getting the task I was scheduled to do and would
16  assign me to the leftovers. And it was not that she
17  was taking turns on the available people. She was
18  repeatedly grabbing me, pulling me off of assignments
19  and putting me there. And I said -- I have submitted
20  documentation to support this.
21   Q.  The incidents which you contend are harassment
22  which you just described, are there any other specific
23  ones that you can recall right now?
24   A.  There's others, but they are not coming to me

24 (Pages 90 to 93)

Zechman
Ellen Zechman

v.

C.A. # 05-159 JJF

Christiana Care Health Systems
June 20, 2006

Page 94

1  at this moment.

2   Q.  Are the ones you just described, are those the

3  ones that really stick out in your mind as the most

4  significant?

5   A.  There may be others that are just as

6  significant. I'm just not able to regurgitate it at

7  the moment.

8   Q.  And why is it that you believe that the actions

9  that you've just described by Robyn Gray were

10  motivated by your age?

11   A.  Because she would talk to me, why are you here?

12  Why are you doing this? Why don't you go home? You

13  know, you're so and so years old. You know, why are

14  you here? And even encouraged me to quit and go home.

15   Q.  And anything else?

16   A.  Not that I can come up with right now.

17   Q.  And do you have any reason to think that Robyn

18  Gray was treating you differently because of the

19  disability you've identified in this case?

20   A.  Yes. I feel that there was a resentment that I

21  was asking for this time off when they just didn't do

22  that in this department. How dare I even think of

23  asking? Because that was their attitude when I asked

24  that.

Page 95

1   Q.  Did you have a conversation with Robyn Gray in

2  which you discussed your request for leave or

3  accommodations?

4   A.  Many because she, being the chief resident at

5  that time, would have had to either pick up the slack

6  or redone the schedule in order to make things work

7  with me being absent. So there were multiple

8  conversations concerning that.

9   Q.  Okay.

10   A.  And I would say resentment as well.

11   Q.  And all of this, I take it, based on your prior

12  testimony, occurred after you first disclosed your

13  disability at the end of July 2003?

14   A.  This actually began to occur prior to that July

15  when I was out and hospitalized secondary to my

16  problem. I was hospitalized at Christiana, and it

17  became common knowledge among all my colleagues that I

18  had this disability.

19   Q.  Who's the first person at Christiana Care who

20  learned that -- let me step back. The disability that

21  you refer to is this mixed connective tissue disease?

22  Disorder?

23   A.  Disease. Disorder. It depends on what book

24  you pull as to how it's, you know, written.

Page 96

1   Q.  But that was the only medical condition that we

2  are dealing with in this case that relates to your

3  disability, that is the basis of your disability

4  claims?

5   A.  Yes.

6   Q.  Who's the first person at Christiana Care that

7  you know of that learned that you had mixed connective

8  tissue disorder?

9   A.  Dr. Sciscione.

10   Q.  And when did he learn?

11   A.  When he was down in the emergency room with me

12  when I was having problems, and he took me down to the

13  emergency room because I asked him to.

14   Q.  When was that?

15   A.  I can't remember the exact date, but it was

16  early in 2003.

17   Q.  Does February 2003 sound right to you?

18   A.  That is -- that's getting close, but I don't,

19  you know, remember the exact date.

20   Q.  And now you just described Dr. Sciscione

21  personally being with you in the emergency room. Is

22  there anybody else who you know learned of your mixed

23  connective tissue disorder?

24   A.  It was discussed in our rounds at that time

Page 97

1  when I was not able to go to my assignments that day,

2  and it became common knowledge at that time among all

3  the residents.

4   Q.  What is it that you think became common

5  knowledge?

6   A.  The fact that I had mixed connective tissue

7  disease, and that I was having a problem, and I wasn't

8  there to do my work that day because I was in the

9  emergency room that day.

10   Q.  And how is it that you know that other people

11  were aware of this specific medical condition that you

12  have?

13   A.  Because they -- the residents wanted to know,

14  where's Ellen? You know, why do I have to fill in on

15  Ellen's job? And that's when it became common

16  discussion.

17   Q.  Did people ever have conversations with you in

18  which they referred to your mixed connective tissue

19  disorder?

20   A.  There were incidents when I would be asked

21  about it.

22   Q.  By who?

23   A.  The residents.

24   Q.  Can you give me an example?

25 (Pages 94 to 97)

(302)655-0477

Zechman
Ellen Zechman

v.

C.A. # 05-159 JJF

Christiana Care Health Systems
June 20, 2006

Page 98

1   A.  No.  There were many examples, but, no, I
2   cannot, you know, specifically come up with one at
3   this time.
4       Q.  Do you contend that there were any instances in
5   which you were asked about it?  Are there any
6   instances where you believe those questions were
7   inappropriate in some way?
8       A.  I don't know their intentions in asking the
9   question.
10      Q.  Right.  I mean, their question could be just
11  out of legitimate concern for a co-resident.  That's
12  one possibility.  Would you agree with that?
13          MS. BREWINGTON:  Objection.  Speculation.
14      A.  I do not know.  I do not know their motives in
15  questioning me.
16      Q.  So you have no personal knowledge that would
17  make you aware of the motivation behind these people
18  asking about your mixed connective tissue disorder?
19      A.  There is an e-mail that was sent to Sandi
20  Kardos by the chief resident that was commenting on my
21  request for time off concerning my mixed connective
22  tissue disease, and it was a very derogatory e-mail.
23      Q.  What was derogatory about it?  I've seen this
24  e-mail.  What's derogatory about it?

Page 99

1       A.  I cannot quote it right now, but the overall
2   tone of it was derogatory.
3       Q.  Anything other than that e-mail that leads you
4   to believe that?
5       A.  There were comments made to me, you know,
6   throughout the time in passing.
7       Q.  By your co-residents?
8       A.  Derogatory comments, yes.
9       Q.  But you can't think of any examples?
10      A.  Not at this moment.
11      Q.  Is there anything that would help you remember
12  what these comments were?
13      A.  Not at the moment.  I don't know.  I don't
14  think so.  It might come to me later in the middle of
15  the night but not at this moment.
16      Q.  Other than what you've already described, is
17  there anything in addition to that that forms the
18  basis for your belief that Robyn Gray and her actions
19  with respect to you was motivated by discrimination
20  based on your age or your disability?
21      A.  I have discussed other things in my documents.
22  I cannot remember it at the moment.  But I stand by
23  those documents.
24      Q.  What documents are you referring to?

Page 100

1       A.  The EEOC complaint as well as the discovery
2   documents.
3       Q.  The EEOC complaint that you filed, that was --
4   all right.  You think your EEOC complaint would
5   refresh your recollection about these comments?
6       A.  We could read it aloud, but I don't think --
7   you know, I don't know that it's going to refresh
8   anything, you know, as far as this moment.  But like I
9   say, I have submitted different specific incidents
10  and --
11      Q.  Incidentally, Dr. Zechman, you received a
12  resident manual when you started at Christiana Care,
13  right?
14      A.  That's correct.
15      Q.  I'm going to put in front of you a document
16  which has Bates number D847 through D960, and I just
17  want you to tell me if you recognize that as the
18  resident manual?
19      A.  Yes.  I recognize this as the resident manual.
20      Q.  Okay.  And you physically received a copy of it
21  when you started Christiana Care?
22      A.  Yes, I did.
23      Q.  You can hand that back.  Okay.
24          Other than what you've already described

Page 101

1   today, do your claims relate to Robyn Gray in any
2   other way?
3       A.  I'm blanking right now.  I'm getting tired and
4   I'm starting to blank on these things.  So I just -- I
5   can't comment on that.
6       Q.  Would it help you if we took a break?
7       A.  I don't know.  I think we should just go
8   forward.
9       Q.  Are you sure?  Because I don't want -- I mean,
10  this is important, and I don't want your fatigue to
11  be, you know, a reason for you're not putting your
12  best foot forward in terms of getting out all of the
13  information that you have that relates to your claim.
14  So I'm more than happy to take a break.  We can break
15  for lunch.  Do you want to do that?
16      A.  I think I'm starting to get tired, and I feel
17  like I'm my brain is turning into mush right now.
18          MR. BLOOM:  Okay.  All right.  It's now
19  12:30.  Let's break for lunch.
20          Off the record.
21          (Discussion off the record.)
22          (Luncheon recess taken.)
23  BY MR. BLOOM:
24      Q.  Dr. Zechman, I think, before the break, you

26 (Pages 98 to 101)

B-0176

Zechman
Ellen Zechman

v.

C.A. # 05-159 JJF

Christiana Care Health Systems
June 20, 2006

Page 102

1  testified to three ways in which you thought Robyn
2  Gray was harassing you. One was telling you to attend
3  morning and afternoon rounds. The second was
4  reassigning you out of training experiences. I
5  think you described one of those. And the third was
6  an instance where you had a case with Dr. Domingo and
7  Dr. Gray reassigned you. Do you remember that
8  testimony?
9  **A.  Yes.**
10  Q.  First of all, I think you also testified that
11  Dr. Gray did those things that I just described in
12  order to prevent you from having learning experiences.
13  **A.  Yes.**
14  Q.  You believe that was her intent?
15  **A.  Yes. And harassment as well.**
16  Q.  What's the basis for your belief regarding
17  Robyn Gray's intent, that it was her intent to prevent
18  from you having learning opportunities?
19  **A.  I don't know why that was her motivation. I**
20  **don't know, but the fact that she was constantly**
21  **reassigning me and even at -- I have recorded**
22  **incidents of where I was not assigned surgical cases**
23  **that I was supposed to be sent in on, and she assigned**
24  **her buddy Rachel Heinle and sent her into the cases**

Page 103

1  **rather than me who was supposed to be -- gynecology**
2  **surgery at that time, and I have documented cases on**
3  **that.**
4  Q.  Why do you think that has to do with you and
5  not the patient or the particular case?
6  **A.  Because she didn't know the patient. She**
7  **didn't know the particular case. I was assigned to**
8  **the service, so the resident that is assigned to that**
9  **service at that time has to -- you know, is supposed**
10  **to go regardless of who the patient is.**
11  Q.  Do you think Robyn Gray would have any reason
12  to retaliate again you?
13  **A.  I had complained about her being rude to me and**
14  **being ugly towards me while we were on call. So, yes,**
15  **she would have reason to do that because I had, you**
16  **know, complained to Ekbladh that she was bothering me,**
17  **she was harassing me, she was demanding that I come to**
18  **these meetings that nobody else off service was**
19  **required to come to.**
20  Q.  Any other reasons that you think she might have
21  a reason to retaliate against you?
22  **A.  I can't -- I can't come up with them now.**
23  Q.  Do you think you thought there were some other
24  reasons at some other time?

Page 104

1  **A.  I can't recall.**
2  Q.  When you applied for your first ob/gyn
3  residency program, I think you said you started at a
4  non-continuing first-year position?
5  **A.  Yes.**
6  Q.  At that time, did you apply for positions that
7  were regular for your continuing residency positions?
8  **A.  I had applied at East Carolina University, yes.**
9  Q.  I take it you weren't accepted there?
10  **A.  No, I was not.**
11  Q.  And I take it it would have been your
12  preference to start from the very beginning at a
13  continuing four-year residency program?
14  **A.  Yes. That would have been preferable.**
15  Q.  Is there anybody other than Robyn Gray who you
16  believe would reassign you from learning opportunities
17  in a way that you thought was motivated by
18  discrimination or retaliation?
19  **A.  I do not know whether the orders were coming**
20  **from higher up and she was acting on someone else's**
21  **recommendation to do this or whether she was acting on**
22  **her own. I do not know that.**
23  Q.  Who is Dr. Hochman, Moses Hochman?
24  **A.  Moses Hochman is one of the staff-paid teaching**

Page 105

1  **physicians.**
2  Q.  So he is somebody who's on the staff at
3  Christiana?
4  **A.  That's correct.**
5  Q.  Is there any problems with your relationship
6  with Dr. Hochman?
7  **A.  No. We worked together a lot, and I felt that**
8  **he was a very good teacher.**
9  Q.  Did you think of him as somebody within the
10  hospital who was a supporter of yours?
11  **A.  Yes, I do.**
12  Q.  You asked him, or I've seen a letter of
13  recommendation that he wrote for you in April 2003.
14  **A.  Yes.**
15  Q.  Did you ask him to write that?
16  **A.  I did.**
17  Q.  And do you know if you sent it anywhere?
18  **A.  I can't recall.**
19  Q.  All right.
20  **A.  But he told me that there was great animosity**
21  **against me for speaking out against an incident that**
22  **happened over Easter weekend where there was a fetal**
23  **death, and I could not find an attending physician to**
24  **help me. My attending physician at that time was**

27 (Pages 102 to 105)

Page 106

1  Arlene Smalls. And she was tied up in surgery
2  upstairs in one of the OR suites repairing a bladder
3  that had been accidently lacerated during a C-section.
4         I had a fetal death, or I was suspicious
5  that there was a fetal death in one of the triage
6  patients. I was left in triage alone without any
7  supervision. By law, in order to say you've got a
8  fetal death, you have to have two physicians certify
9  that. And then, too, I was a resident. I had no
10  business making that call. And I had this patient
11  that was a private patient that came in. She was not
12  one of our regular service patients that we are
13  responsible -- this was a private patient that was
14  covered by a private doctor. The private doctor was
15  not around.
16        I saw the patient. I highly suspected a
17  fetal death, and I could not find anybody to come help
18  me to either confirm this or, you know, to find the
19  heartbeat by ultrasound. I called upstairs, you know,
20  looking for my supervising physician. She could not
21  come. She was in the OR. I called my chief resident.
22  She could not come. She was in the OR with the
23  other -- with Arlene Smalls. I had no one to help me.
24  I had the lady in labor with what I suspected was a

Page 107

1  fetal demise.
2         I was on the phone trying to find her
3  private physician that was responsible for her on
4  call. I could not get up with her. She was at a
5  family picnic in Pennsylvania. This was Easter
6  weekend. Holiday.
7         And I was at wit's end because I should
8  have not been left unsupervised and also this
9  physician that was on call should have been readily
10  available for her patients, her private patient. I
11  spoke out against this to Dr. Ekbladh, to everybody
12  that was in the residency conference room the morning
13  after it happened when everybody was back at work,
14  say, after the Easter holiday. And there was a lot of
15  animosity towards me for speaking up against, you
16  know, a -- announcing that I was unsupervised and I
17  needed help and nobody was there to help me.
18  Q.  The chief resident you referred to who was in
19  the OR with Dr. Smalls, was that Dr. Gray?
20  A.  I cannot remember. It may have been, but I
21  cannot remember.
22  Q.  The chief resident is a position that rotates
23  among the fourth-year residents?
24  A.  That's correct. But ultimately, she should be

Page 108

1  available to help me, but the main thing, there should
2  be a fully licensed board certified supervising
3  physician available to me, and my physician was tied
4  up. And when I called her, she said she could not
5  come down to help you. Get your private physician
6  because I'm not really responsible for this patient.
7  So then I'm on the phone trying to get the private
8  physician.
9         And there was no one to help me. And it
10  took at least 45 minutes to get somebody in to help me
11  with that patient. And then she's whisked away and
12  I did not know the outcome.
13  Q.  And the supervising physician who was tied up,
14  that was Dr. Smalls?
15  A.  That was Arlene Smalls, and she was in the OR
16  with another private patient that had to have an
17  emergency C-section that the private physician was
18  nowhere to be found.
19  Q.  Do you remember the name of the private
20  physician who you were trying to contact for 45
21  minutes?
22  A.  Her name was Molly -- we had two doctors that
23  first name was Molly. So I might not be completely
24  accurate on this, but I believe it was Molly Larkin.

Page 109

1  Q.  What do you remember happened in that
2  particular case?
3  A.  I was seeing other patients because I was the
4  only person down in this room, and I had to see like
5  60 patients that particular day. And eventually a
6  physician did come in. I don't know whether it was
7  the one that was supposed to be there.
8  Q.  I'm sorry. I apologize for interrupting, but I
9  just want to focus you. What I meant to ask is, do
10  you recall whether you ever learned whether you had a
11  fetal death situation or not?
12  A.  No. There was no word. No one would talk to
13  me about that case. I never heard another word about
14  it.
15  Q.  And what was the decision that you were
16  confronted with that you needed to talk to somebody
17  about in terms of? I mean, I understand you don't
18  know whether there's a fetal death or not. So how was
19  that going to affect how you proceeded?
20  A.  That affects patient care. If you don't have a
21  heartbeat and the patient's -- if you have a weak
22  heartbeat, you immediately call for a C-section. If
23  you have no heartbeat and you have a fetal death, you
24  allow the woman to progress to delivering a still

28 (Pages 106 to 109)

Zechman
Ellen Zechman

v.

C.A. # 05-159 JJF

Christiana Care Health Systems
June 20, 2006

Page 110

1  born. And the woman needed to know what was going on,
2  and she was asking to know what was going on. And I
3  could not tell her because I did not have a
4  supervising physician there with me.
5      Q.  Returning back to Dr. Hochburg --
6      A.  Hochman.
7      Q.  Hochman. Thank you.
8          Dr. Hochman, is somebody who you
9  contend in this case discriminated or retaliated
10  against you in any way?
11     A.  In that letter he mentioned -- the letter of
12  recommendation, he did mention my age in it, which I
13  don't feel that it was a malicious thing, but I think
14  it was a factor that, you know, she's an old girl, you
15  know. But it was brought out very clearly in that
16  letter.
17     Q.  Was there anybody else in the residency program
18  while you were at Christiana Care -- back up a second.
19          I mean, we've now either seen or referred
20  to three or four different letters by people at
21  various institutions who have referred to the fact
22  that you are a non-traditional resident or an older
23  resident. Do you think that's an inappropriate
24  comment to make in the context of a residency program?

Page 111

1      A.  Yes. Because age should not be a factor. And
2  anything that alludes to the patient being older
3  leaves open the gate for discrimination.
4      Q.  Why is that?
5          MS. BREWINGTON:  Did you say patient being
6  older?
7          THE WITNESS:  I might have. That was a --
8          MS. BREWINGTON:  I don't know, but...
9          THE WITNESS:  The applicant. The
10  resident. Thank you for pulling that -- but that --
11  that puts that aspect of that individual front and
12  center when it doesn't need to be. Just like somebody
13  doesn't need to say this is a Chinese applicant. You
14  don't need to say this a mature, non-traditional
15  applicant.
16  BY MR. BLOOM:
17     Q.  Well, suppose -- first of all, I mean, this
18  information would be in your application, right, your
19  date of birth?
20     A.  Some applications do have that. Most do not.
21     Q.  It's a standard application, though, correct?
22  You fill out one application and you send it to
23  multiple residency programs, correct?
24     A.  If you go through the electronic one.

Page 112

1      Q.  And on that application, it asks for your date
2  of the birth, right?
3      A.  It does.
4      Q.  And in support of your application, you're also
5  required to produce transcripts and dates that you
6  attended schools, correct?
7      A.  That is correct.
8      Q.  And so, I mean, it was jumping off -- I
9  shouldn't say jumping off the page, but it clearly is
10  there in your application what your age is?
11     A.  No. Not always.
12     Q.  Okay.
13     A.  Because, if someone goes to college directly
14  after high school, then that resets that time scale
15  and at this level you usually only report your
16  degrees. You don't report, oh, I graduated from high
17  school, and so that's not on these applications
18  because, you know, we are beyond that. We are...
19     Q.  Did it ever occur to you that somebody your age
20  might be relevant in a positive way in terms of
21  somebody wanting to have a diverse residency class?
22     A.  Technically it should be.
23     Q.  Why do you say technically?
24     A.  Because it should be a positive balancing force

Page 113

1  to have a diverse population.
2      Q.  And Dr. Hochman, when he wrote this letter for
3  you, would you agree -- I mean, he was writing this
4  letter to help you?
5      A.  Yes.
6      Q.  And I mean, do you have any reason to doubt
7  that Dr. Hochman actually referred to your age and
8  intended this in a positive way?
9          MS. BREWINGTON:  Objection. Calls for
10  speculation.
11     A.  I don't know. I don't know. I don't know what
12  was on his mind when he did that.
13     Q.  And so -- all right.
14     A.  But it obviously was an issue or he would have
15  not have written it down.
16     Q.  Who is Dr. Paul Kaminski?
17     A.  You've already asked me that, and we've already
18  answered it.
19     Q.  Remind me.
20     A.  He was a staff physician and one of the
21  teaching physicians.
22     Q.  Is he somebody who you contend in this case
23  discriminated or retaliated against you in some way?
24     A.  I cannot remember whether I specifically

29 (Pages 110 to 113)

Zechman
Ellen Zechman

v.
C.A. # 05-159 JJF

Christiana Care Health Systems
June 20, 2006

Page 114

1  mentioned him or not. I don't know.
2  Q. As you sit here today, do you have any reason
3  to think that he discriminated or retaliated against
4  you?
5  A. At this moment I cannot remember.
6  Q. Okay. Other than the documents that you've
7  produced in this case, do you have any other documents
8  that relate to your allegations or that would refresh
9  your memory about who it is you think discriminated or
10  retaliated against you?
11  A. Dr. Ekbladh. But that's very clear in the
12  documentation.
13  Q. So Dr. Ekbladh is one of the physicians who you
14  believe discriminated against you and retaliated
15  against you, is that what you're saying?
16  A. Yes.
17  Q. Who is Dr. Colmorgen?
18  A. Dr. Colmorgen is a staff physician with the
19  high risk. I had minimal contact with him.
20  Q. So I take it he's not somebody who you contend
21  in this case discriminated against you or retaliated
22  against you?
23  A. I have no idea. He was on the resident review
24  committee. I have minimal contact with him. So I

Page 115

1  have no idea what his perception or thoughts on me
2  would have been because there was minimal personal
3  contact or professional contact.
4  Q. What about Faith Brosch, do you know who that
5  is?
6  A. Yes.
7  Q. Who's Faith Brosch?
8  A. She is one of the private physicians that is a
9  teaching physician at Christiana Care.
10  Q. Did you ever have any personal interactions
11  with her?
12  A. I did. I saw many of her patients for her
13  while she slept in her bed at night on call when I was
14  working in triage.
15  Q. I mean, did you have negative interactions with
16  Dr. Brosch?
17  A. There were both positive and negative
18  interactions with her. One in particular was a case
19  when she sent a patient in to be admitted. I was in
20  triage. And she wanted me to do the work-up because
21  she could not come in on call and take care of this.
22  She had something else going on. She sent the patient
23  in to triage. The nurses were upset because they said
24  she should not be in triage. She should go straight

Page 116

1  to the floor as a direct admit. It was an
2  administrative thing. And the nurses were the ones
3  that said, "She's not coming in triage. She's a
4  direct admit. Send her up to the hospital floor."
5  She was very angry at me for not doing the
6  admit procedures on that patient and the fact that was
7  she was sent up on the floor. And I told her I could
8  not leave triage to go up to the floor because, when
9  you were in triage, your assignment was to stay in
10  triage unless you were relieved, and there was no
11  relief until the next morning when the shift was over.
12  And she was angry at that particular
13  incident and there were words between her and
14  Dr. Sciscione because Dr. Sciscione supported me
15  saying, "You were on call. She's your private
16  patient. You should have come in and done it
17  yourself." And she was very angry about that.
18  Q. Do you have any evidence that Dr. Brosch
19  discriminated against you because of your age or your
20  disability or retaliated against you in some way?
21  A. She was rude and condescending in our actions
22  after that incident.
23  Q. Anything else about her?
24  A. I cannot recall.

Page 117

1  Q. So you just referred to Dr. Sciscione. He
2  backed you up on that incident with Dr. Brosch?
3  A. Yes, he did.
4  Q. That wasn't the only time that he backed you up
5  with a private attending, right?
6  A. No, he had backed me up on several occasions.
7  Q. And can you tell me what you remember about the
8  other occasions where Dr. Sciscione backed you up?
9  A. I can't. I can't remember them. They are not
10  coming to me right now.
11  Dr. Sciscione was very supportive of all
12  his residents.
13  Q. And of you too?
14  A. Yes. Best he could be. And I have letters to
15  that extent.
16  Q. And so I take it you don't believe that
17  Dr. Sciscione is somebody who would intentionally take
18  action against you because of your age or your
19  disability?
20  A. No, but I feel that he was having to take
21  actions or was, as he was saying, catching heat from
22  the residency review committee, from others that were
23  discriminating. And I don't know the exact persons
24  that were, but like I referred to earlier, he says

30 (Pages 114 to 117)

B-0180

Zechman
Ellen Zechman

v.

C.A. # 05-159 JJF

Christiana Care Health Systems
June 20, 2006

Page 118

1  that "they gave me more grief over hiring you than
2  they did over Rita Vinod" who was a foreign medical
3  graduate, which they typically -- --
4  Q.  And that's -- we've talked about that
5  conversation a few times.
6  A.  Yes, we have.
7  Q.  This is August or September of 2002?
8  A.  Yes.  Yes.
9  Q.  Other than that conversation that you had with
10  Dr. Sciscione, is there any other information that you
11  have knowledge of that supports a belief that
12  Dr. Sciscione was getting heat or pressure from other
13  people with respect to you?
14  A.  There were, but I cannot come up with them
15  right now.
16  Q.  Who is Dr. Anthony Bell?
17  A.  One of the private physicians that he works
18  with.  I'm not sure -- I think he is in private
19  practice with Dr. Brosch, or he may have been at one
20  time.  They kind of change frequently.
21  Q.  Is Dr. Beli somebody you had personal
22  interaction with?
23  A.  Yes.  I assisted him on several occasions with
24  C-sections and surgeries, and I also saw many of his

Page 119

1  patients while I was on call and he did not come in
2  for those call patients, but I saw them for them in
3  triage.
4  Q.  Is he somebody who you had positive
5  interactions with, or negative interactions?
6  A.  I would say neutral professional interactions.
7  Q.  Do you have any evidence that he is somebody
8  who discriminated or retaliated against you?
9  A.  I don't.
10  Q.  Who is Dr. Waleez Shalaby?
11      And first, can you tell me how you
12  pronounce the last name?
13  A.  I'm not quite sure myself, but I think it's
14  Shalaby.
15  Q.  Who is that?
16  A.  He was a fairly new physician that came in --
17  I'm not quite sure when, but I think after I had been
18  there at least six months.  He came in later.  I did
19  not have any interactions with him that I am aware of,
20  or that I can recall.
21  Q.  So I take it you don't have any evidence one
22  way or the other whether he --
23  A.  I have no clue.
24  Q.  Let me finish the question.

Page 120

1      You don't have any evidence that
2  Dr. Shalaby discriminated or retaliated against you?
3  A.  I have no clue.  I really don't know the guy.
4      (Zechman Deposition Exhibit 19 was marked
5  for identification.)
6  BY MR. BLOOM:
7  Q.  Dr. Zechman, I'm going to put in front you
8  what's been marked as Zechman 19.  This was the letter
9  we were just talking about.  It's a recommendation
10  letter from Dr. Moses Hochman on your behalf dated
11  April 4, 2003, correct?
12  A.  Mm-hmm.
13  Q.  You have to say yes or no?
14  A.  Yes.  Excuse me.
15  Q.  I think you just said before that you asked
16  Dr. Hochman to write this letter of recommendation on
17  your behalf?
18  A.  Mm-hmm.
19  Q.  Yes?
20  A.  Yes.
21  Q.  And the reason you asked Dr. Hochman to write
22  this letter is because you viewed him as somebody who
23  was particularly supportive of you within the
24  department?

Page 121

1  A.  Yes.  And he had told me that there was
2  animosity against me, that I should get a lawyer.
3  Q.  What did he say specifically?
4  A.  Basically that.  That there was animosity
5  against me at -- that I should get a lawyer.
6  Q.  For what purpose?
7  A.  It had to do with the upcoming promotion and
8  the conversations that were -- he had privilege to
9  concerning they didn't want me there.
10  Q.  Was he more specific than that?
11  A.  No, because he was not supposed to share this
12  with me.
13  Q.  This letter is addressed to a program director
14  at Eastern Virginia Medical School, correct?
15  A.  That was the Norfolk that I was accepted into
16  and I chose Christiana instead.
17  Q.  And did you actually, in this time frame, April
18  2003, did you actually apply to transfer to another
19  program transferring out of Christiana Care?
20  A.  I was starting -- I can't remember whether I
21  actually applied, but I was starting to collect my
22  data like this because of what I was hearing from
23  Dr. Patruno, Dr. Sciscione, and Dr. Hochman about how
24  there was members of the residency review committee

31 (Pages 118 to 121)

Page 122

1  that did not want me there and they wanted to get rid
2  of me.
3    Q.  That was based upon your conversation with who?
4    A.  Patruno, Sciscione, and Hochman.
5    Q.  Did you just tell me everything that you
6  remember about the conversation with Dr. Hochman?
7    A.  Everything I remember at the second.
8    Q.  At the second?
9    A.  At this moment.
10   Q.  What about Dr. Patruno, have you already told
11 me today everything you remember about your
12 conversation with Dr. Patruno?
13   A.  That I can remember at this time.
14   Q.  And Dr. Sciscione, we've already covered the
15 conversation you had with him in August or September
16 2002, right, we already talked about that?
17   A.  Yes.
18   Q.  Looking at Exhibit Zechman 19, is there
19 anything that Dr. Hochman writes in here that you
20 think is wrong?
21   A.  The statement, it's one, two, three, four,
22 five -- this fifth indentation, fifth paragraph.
23   Q.  Yeah.
24   A.  "Dr. Zechman is much older than her

Page 123

1  co-residents."
2    Q.  Mm-hmm.
3    A.  Much older?
4    Q.  What were the ages of your co-residents, did
5  you know?
6    A.  Dr. Kirsch and Heinle were under 30.  I'm not
7  sure how old Dr. Fides was, but I think he was maybe
8  mid thirties.  And then I was 46, 47 during that time.
9    Q.  That was Alex Fides?
10   A.  Yes.
11   Q.  Incidentally, one of the incidents you referred
12 to earlier was Dr. Gray asking you to attend morning
13 rounds, right?
14   A.  That's correct.
15   Q.  And you followed up with Dr. Ekbladh regarding
16 that incident?
17   A.  Right.  Well, first, I gave Dr. Gray the
18 opportunity to respond to me in e-mail where I asked
19 her -- and I mentioned this earlier -- you know, has
20 the policy changed?  This has not been the policy.
21 Has the policy changed?  And I sent her an e-mail.
22 And she didn't respond that morning.  I think I had
23 sent the e-mail early morning.  And then later I had
24 not heard from her, her response on that.

Page 124

1          And then I called Alex, and I asked Alex,
2  you know, is this something new?  Did I miss
3  something?  Are you going to these meetings?  And his
4  response was, well, if I just happen to be in the
5  meetings -- in the building at the time of the
6  meeting, I go there.  And he was not -- he was
7  non-committal as to whether he was required or not.
8  He didn't state that.
9          And I says, "Well, she's demanding that I
10 come to these meetings, and I feel like she's
11 harassing me and I want to talk to, you know,
12 Dr. Ekbladh about this."
13         And he says, "Well, talk to her first."
14         And she never responded.  And then, the
15 next day, Dr. Ekbladh responded to my request, but
16 Dr. Gray never responded.  And I had sent Dr. Ekbladh
17 an e-mail stating that I felt she was harassing me.
18 And basically saying the same thing, you know, and
19 that, you know, I begged him to stop it.  I said,
20 "She's harassing me.  Please, you know, help me."  And
21 I begged him.  I says, "I want to finish this
22 residency.  You know, I want to get through this.
23 Please, help me.  And what is happening on the floor,
24 you know, what you said we would do?  My schedule is

Page 125

1  not being backed up on the floor.  Please help me and,
2  you know, do something about this."  And I begged him.
3  And I even said in my e-mail, "I am begging you to
4  help me."
5    Q.  And Dr. Ekbladh responded to you that you are
6  not required to go to morning rounds but he thought,
7  when you were able to, it's a very good learning
8  opportunity for you to do it and you should when you
9  can, is that accurate?
10   A.  That is accurate.
11   Q.  And do you agree that attending at morning
12 rounds is a good learning opportunity?
13   A.  It was when you had the opportunity to do it.
14 But at this time, I was asking for time off.  I had
15 already put in my request for the time off.  And this
16 was adding more work to my schedule, adding a longer
17 workday when I was asking for help and time off.  This
18 was increasing my work schedule, increasing my workday
19 to over a 12-hour day after I had put in a request
20 saying, "Hey, I need time off.  I need, you know,
21 accommodation.  I need FMLA.  I need some help here."
22   Q.  Is there anything else other than you mentioned
23 the "much older" comment in the letter from
24 Dr. Hochman -- is there anything else in his letter,

32 (Pages 122 to 125)

B-0182

Zechman
Ellen Zechman

v.

C.A. # 05-159 JJF

Christiana Care Health Systems
June 20, 2006

Page 126

Zechman 19, that you think is wrong or inaccurate?

1    Zechman 19, that you think is wrong or inaccurate?

2    A.  I feel that he should have left out the comment

3    about my husband and my four small children because

4    that has no place in an application that I have small

5    children.  In work applications and things, I feel

6    that that information should not be included in that.

7    Also it's inaccurate that I did not have four small

8    children.  I had three small children and one older

9    child.  So there's an inaccuracy.

10   Q.  You think there should not be any reference to

11   your family life at all here?

12   A.  I agree, to my age or my family life, my skin

13   color, my religion, or my race, or my marital status.

14   Q.  So even if there were comments saying that "her

15   family has been very supportive," you don't think that

16   belongs in an application or residency program?

17   A.  No.

18   Q.  Have you ever referred to your family in an

19   application of yours to a residency program?

20   A.  When I was specifically asked.

21   Q.  When were you specifically asked?

22   A.  Every time I went on interview I was asked,

23   "What does your husband think about this?  What are

24   you going to do with your children?"  Multiple

Page 127

1    occasions that came up.  On almost every interview I

2    would go on.

3    Q.  At all the institutions you applied to?

4    A.  And different institutions.

5    Q.  And I think you will agree with me that being a

6    resident and particularly in an ob/gyn program is a

7    grueling experience.  Is that a fair characterization

8    of what it is?

9    A.  It's an intense experience.

10   Q.  Why do you think that's a completely out of

11   bounds topic as to whether or not, you know, having a

12   family or having young kids makes this even more

13   grueling?  Why should that not even be discussed?

14   A.  Because it shouldn't.  It should be based on

15   the person, their education, and their abilities to do

16   the job.

17   Q.  But don't you have demands on your life that

18   are created by having kids?  Is that just not

19   relevant, or don't you have things pulling you in

20   different directions?

21   A.  Doesn't everybody?

22   Q.  So everywhere you went, people brought up your

23   family?

24   A.  Not everywhere, but it was a repeating theme at

Page 128

1    different institutions.

2    Q.  They wanted to know, why are you doing this at

3    this stage of your life?

4        Is that a yes?

5    A.  Yes.

6    Q.  And why do you want to do this when you have

7    three small kids and an older kid at home?

8        Is that yes?

9    A.  Not specifically that question, but there were

10   questions related to family and husband.

11   Q.  Apart from interviews or discussions that you

12   had with people, have you ever written about your

13   family in a written application for a residency

14   program?

15   A.  I cannot recall.

16   Q.  Can you tell me what your understanding is of

17   who conducts evaluations of your performance as a

18   resident and how those evaluators are selected?  Do

19   you know how that process works?

20   A.  No, I do not.  But I know there were frequent

21   evaluations from peers, from nursing staff, from

22   private physicians as well as staff physicians.  I do

23   not know the frequency of these evaluations, but I did

24   know that they did occur.

Page 129

1    Q.  And then I've also seen a reference to

2    residents being able to send out basically requests to

3    sort of identify physicians who the residents think

4    should be somebody evaluating them.  Does that also

5    occur?

6    A.  We were requested to have evaluations from

7    every surgical case that we assisted on.  So when we

8    did the case with the teaching physicians, we were to

9    hand them an evaluation form of our performance, our

10   weaknesses, and then recommendations for each and

11   every procedure that we went in on.  We did not

12   necessarily have this like on our routine labor and

13   delivery stuff, but especially your gynecology

14   surgical case that went to the operating room.

15       So when we were encouraged and you -- it was a

16   requirement to have an evaluation filled out on the --

17   now, there were times when you handed those forms to

18   the physician and you found them later, you know,

19   whether the physician had dropped them or forgotten

20   them, but it was our responsibility to hand it to

21   them.  It was their responsibility to turn it in to

22   the office.  We, for the most part, were not privy to

23   that information.

24   Q.  It sounds like you would be handing out a lot

33 (Pages 126 to 129)

Page 130

1  of evaluation forms.
2    **A. Within a week's time, yes.**
3    Q.  So apart from those, I gather that, in addition
4  to the evaluation forms that you hand out after every
5  case, there are other evaluations which are a more
6  considered look at your overall performance? Were
7  there other kinds of evaluations like that?
8    **A. There were, but I don't know the frequency of**
9  **them and who was chosen.**
10        (Zechman Deposition Exhibit 5 was marked
11  for identification.)
12  BY MR. BLOOM:
13    Q.  I'm going to show you Zechman 5, and Zechman 5
14  is a letter, January 29, 2004, letter from you to the
15  EEOC regarding your claims in this case, right?
16    **A. That's correct.**
17    Q.  You typed this letter?
18    **A. I did.**
19    Q.  If you'll turn to the second page of this
20  letter, first of all, is all that handwriting on the
21  bottom your handwriting?
22    **A. Yes.**
23    Q.  Do you recall when in time you wrote these
24  notes on the bottom of the document?

Page 131

1    **A. No, I do not.**
2    Q.  Was it sometime after you actually sent this
3  letter to the EEOC in 2004?
4    **A. I don't recall. I really don't remember.**
5    Q.  Focus your attention at the top paragraph on
6  the second page and it says, "In order to salvage my
7  name and my medical career, the administration agreed
8  to allow me to resign."
9        It continues, "dating the resignation in
10  order not to have a dismissal on my records."
11        Is that accurate?
12    **A. Well, I was --**
13        MS. BREWINGTON: Wait. It was not close
14  quote there. Did you finish the whole statement?
15        MR. BLOOM: I was reading the part that
16  was --
17        MS. BREWINGTON: Okay.
18    **A. I was going to say, I was forced into -- I was**
19  **threatened into resigning. When I tried to appeal the**
20  **process, Dr. Ekbladh told me, in his office, if you**
21  **appeal, I will still be your boss and I will get you**
22  **later.**
23    Q.  I think what you say here is that was
24  preferable to you to resign rather than be dismissed.

Page 132

1  Do you want to retract that now?
2    **A. It was preferable, but I was also forced to.**
3    Q.  If I understand you, what you're saying is you
4  were told the committee has already voted to terminate
5  your residency contract, right?
6    **A. I was told that it was a unanimous decision,**
7  **and I filed for appeal.**
8    Q.  Right. Because you had received a letter
9  notifying you of the --
10    **A. No. I had gotten the phone call, and I called,**
11  **you know, what's going on here? What can I do about**
12  **this? I was told I could file an appeal, but it had**
13  **to be done immediately. So I typed it up that day and**
14  **then sent it certified mail.**
15    Q.  Why I did not get the actual notification till
16  much later?
17    **A. Dr Ekbladh was supposedly on vacation. I did**
18  **not know how long he was on vacation at that time, but**
19  **that was why Dr. Kaminski told me he was calling me to**
20  **tell me that, because Ekbladh was not there to do it;**
21  **Ekbladh was on vacation.**
22        **And it was much later when I came back to**
23  **Delaware, and I was also meeting with Charles -- I'm**
24  **blanking -- Whitney in the hopes that he would help me**

Page 133

1  with the appeal. And that was before I saw -- I went
2  to Dr. Whitney's office. I went to talk to
3  Dr. Ekbladh, and that was when he said, "Well, even if
4  you win the appeal, I'll still be your supervisor, and
5  I'll get you later."
6    Q.  Did he have any reason to think you would win
7  the appeal?
8    **A. I didn't know, but I knew that he meant what he**
9  **was saying. And from the way he had humiliated me and**
10  **abused me prior to that, I knew he was serious about**
11  **that threat that he would get me later because he had**
12  **gotten away with this up until this point.**
13    Q.  What did he do --
14    **A. By keeping -- where I didn't have a call room**
15  **to put my supplies in when I was on call for the first**
16  **time. And I would have to sneak around and find a**
17  **place too lay down. Everybody else, all of the other**
18  **residents had a call room to put their stuff in, and I**
19  **was left out. And I would have to stash my stuff in**
20  **the locker room and sneak around to find a place to**
21  **lay down when I was on call.**
22        MS. BREWINGTON: Would you like to take a
23  break?
24        THE WITNESS: No. I would like to finish

Christiana Care Health Systems
June 20, 2006

Zechman
Ellen Zechman

v.
C.A. # 05-159 JJF

Page 134

1  this.
2     MS. BREWINGTON:  Okay.
3     A.  And when I talked to Dr. Patruno about it, he
4  says, "Ellen, they are kicking you out in the hall.
5  They don't want you here.  You've got to get out of
6  here.  They are going to ruin you."
7  BY MR. BLOOM:
8     Q.  Is there any other way in which you think
9  Dr. Ekbladh discriminated against you other than what
10 you've described?
11    A.  I've got other stuff.  Right now, I cannot come
12 up with it.  You know.  I'm not remembering it.
13    Q.  And since we are not going to entirely finish
14 today, Dr. Zechman, I'm going to ask you that, between
15 now and the date we continue this deposition, that you
16 sit down and review the documents that you've produced
17 in this case because you've -- I don't want to say
18 every question, but most of your answers have ended
19 with "I can't recall everything right now," and "I may
20 recall it some other time."  And this isn't an
21 open-ended exercise that we are doing.  So I'm going
22 to ask you -- you don't need to respond to this, but
23 to sit down and familiarize yourself with the
24 documents that you've written and that you have

Page 135

1  produced, so that you are in a position to testify in
2  this deposition in support of the claims that you've
3  asserted, you know, because we can't just let
4  everything hang open that, well, maybe I'll remember
5  some things at some other time.  So I'm going to ask
6  you to do that.
7     A.  There's a lot of information here and there's a
8  lot of documents here.
9     Q.  How did resigning from Christiana Care -- was
10 that better than having the termination vote stand as
11 a termination?
12    A.  Well, I feel that I would have won the appeal,
13 but I would have still been under him.  So it would
14 have been a moot -- you know, I would have continued
15 to put myself in that position, and this abuse and
16 discrimination would have escalated even more.  And I
17 discussed this with Dr. Brian Little, and he was the
18 one -- and Dr. Charles Whitney were the ones that
19 recommended that I see if I could resign rather than
20 appeal because they cannot -- even Brian Little says,
21 he says, I cannot protect you if you win this and you
22 go back into that department.
23    Q.  Who's Brian Little?
24    A.  He is the director of like the overall

Page 136

1  residency programs, you know, the surgical, the family
2  medicine, all of them.  Kind of the head honcho over
3  the residency programs.
4     Q.  And does Dr. Ekbladh report to Dr. Little?
5     A.  I am not sure, but I think so.
6     Q.  And is Dr. Little somebody who you believe
7  discriminated against you or retaliated against you in
8  some way?
9     A.  I had no clinical dealings with Dr. Little.  He
10 was in administrative.
11    Q.  So you don't have any evidence that you're
12 aware of that he discriminated against you or
13 retaliated against you?
14    A.  There was not an opportunity, no.
15    Q.  Now, assuming that the decision of the review
16 committee had not been reversed, was it still your
17 view that resigning from the program was preferable,
18 from your perspective, to having the termination
19 decision stand?
20    MS. BREWINGTON:  Objection.  Calls for
21 speculation.
22    A.  Yeah.  I don't know.  I don't know.
23    Q.  In your letter here you refer to, quote,
24 salvaging your name in this letter, that resigning

Page 137

1  enabled you to salvage your name as a physician.  How
2  did it do that?
3     A.  Well, it didn't because, for the rest of my
4  life, every application I fill out for hospital
5  privileges, for insurance providers, anything, I have
6  got to write this on it.  My career is permanently,
7  irrevocably damaged by this because I will always have
8  to put this down that did I not finish this residency
9  and have to put this down for whatever reason.
10    Q.  But you're --
11    A.  And I am permanently on the -- not done.
12 Permanently, irrevocably have a black spot on my
13 career forever because of this.
14    Q.  Now, your understanding was, though, that the
15 arrangement that was reached is that you could
16 legitimately, for the rest of your life, say, "I
17 resigned from Christiana Care," right?  And I'm going
18 to ask you for a yes-or-no answer to that question.
19    A.  I did not know at that time.  I did not know.
20 I was going by what Dr. Charles Whitney had advised me
21 to do.
22    Q.  Well, your expectation, I assume, was that,
23 after having reached this arrangement with Christiana
24 Care, that, if asked, Christiana Care would say that

35 (Pages 134 to 137)

(302)655-0477

Case 1:05-cv-00159-JJF     Document 58-4     Filed 11/22/2006     Page 50 of 59

Zechman
Ellen Zechman

v.
C.A. # 05-159 JJF

Christiana Care Health Systems
June 20, 2006

Page 138

1  you resigned rather than saying they terminated you; I
2  mean, that was the point of this arrangement, right?
3  **A. I was acting on the advice of Dr. Charles**
4  **Whitney.**
5  Q. I'm not asking who was advising you. I'm
6  asking you what your understanding is of what the
7  arrangement you reached was with Christiana Care?
8  **A. I was not sure what the arrangement was, but I**
9  **was acting on the advice of my advisors, and I knew**
10 **that, if I stayed there, I'd be subject to more even**
11 **worse conditions than I was currently experiencing.**
12 Q. Did you ever ask Dr. Ekbladh for a letter of
13 recommendation?
14 **A. Something had to go in the file.**
15 Q. What file?
16 **A. The permanent file.**
17 Q. Whose permanent file?
18 **A. My Christiana permanent file.**
19 Q. What makes you think that?
20 **A. It's a requirement from my understanding.**
21 Q. What's a requirement?
22 **A. That there be a letter from your residency**
23 **director. If you apply to any new residency**
24 **positions, you have to have a letter from any previous**

Page 139

1  **residency program that you were in in order to -- it**
2  **is a requirement in order to apply for residency**
3  **programs. So it's kind of -- it has to be -- it's**
4  **part of the system and a requirement of the system.**
5  Q. In connection with applying for another
6  residency program, were you ever asked, either in
7  writing or orally, why you left the Christiana Care
8  residency program?
9  **A. Yes.**
10 Q. How many times did that happen?
11 **A. I don't know. I don't remember.**
12 Q. Do you remember any specific instance in which
13 you were asked?
14 **A. When I was applying to East Carolina University**
15 **after this happened.**
16 Q. And so what did you tell them?
17 **A. I told them that I had requested family medical**
18 **leave, that they had not given it to me, and that I**
19 **was forced to resign.**
20 Q. How did you communicate that to Eastern
21 Carolina University?
22 **A. I don't remember.**
23 Q. I mean, that doesn't seem like -- can you
24 imagine a circumstance in which you would put that in

Page 140

1  a written form to a program you're applying to?
2  **A. I can't remember what -- you know, how I**
3  **communicated that, but yes, I had to. I had to**
4  **communicate something.**
5  **This has all been extremely emotionally**
6  **painful for me. And I have nightmares about this.**
7  Q. Did you retain a copy of your application to
8  Eastern Carolina University the second time when you
9  applied to them after Christiana Care?
10 **A. I don't know. I don't know.**
11 Q. That was for a family practice residency?
12 **A. I applied twice, I think, to the obstetrics and**
13 **gynecology program. I'm not sure.**
14 Q. After you left Christiana Care.
15 **A. No. No. That was the family medicine program.**
16 Q. You actually did not apply to any ob/gyn
17 residency program after Christiana Care, correct?
18 **A. That's correct.**
19 Q. Do you need a break?
20 **A. I'm trying to think whether that statement I**
21 **just said is accurate. I'm having trouble -- I was**
22 **almost in shock after this happened. And I don't**
23 **remember a lot of the specifics of this time period**
24 **because I was truly in shock and in great emotional**

Page 141

1  **distress over all this, and I do not remember this**
2  **stuff correctly. This was extremely traumatic to me,**
3  **and still is.**
4  Q. Is your inability to recall events that relate
5  to your lawsuit something that you're experiencing
6  today, or do you think that that's going to change in
7  a week or two weeks or is, you know, what you remember
8  today what you remember?
9  **A. I have moments where I remember more. I wake**
10 **up frequently in the middle of the night with my brain**
11 **replaying these incidents in my head, in my dreams,**
12 **and I'll wake up. If it's something that I need to**
13 **remember, I'll write it down so that I can remember to**
14 **follow up on it. So in my deep subconscious mind,**
15 **during my deep sleep, I tend to remember some things**
16 **and, you know, write it down. And then I'll remember**
17 **things, and if I don't write it down, I'll forget it**
18 **and it will come to me later. But this whole incident**
19 **is extremely emotionally painful to me, and I have**
20 **frequent nightmares where I'm reliving these incidents**
21 **and wake up, you know, remembering certain specific**
22 **incidents that happened.**
23 Q. How does your medical condition, which you
24 contend is a disability, this mixed connective tissue

36 (Pages 138 to 141)

Zechman
Ellen Zechman

v.

C.A. # 05-159 JJF

Christiana Care Health Systems
June 20, 2006

Page 142

1  disorder, how does that affect you physically?
2  **A. That is an autoimmune syndrome. So I have**
3  **various symptoms, joint pains like arthritis. But the**
4  **main thing that affects me in my ability to work is**
5  **this overwhelming fatigue at times which is very**
6  **consistent in all the autoimmune diseases like**
7  **rheumatoid arthritis, lupus, mixed connective tissue.**
8  **These episodes where you feel like you have the flu**
9  **but you don't have the flu virus, and the only thing**
10 **you can do about that is rest. And that is what was**
11 **going on in July when I was begging for time off.**
12 Q. Are the symptoms that you just described of
13 mixed connective tissue disorder, in your particular
14 case -- I take it they flare up unpredictably?
15 **A. Sometimes it will pass in two days and you're**
16 **good to go. Other times it takes longer than that to**
17 **get over it. It's very unpredictable and kind of a**
18 **day-to-day basis, but you can go years and weeks, you**
19 **know, and be asymptomatic.**
20 Q. And I take it even when you were at Christiana
21 Care, you were there approximately a year before you
22 became symptomatic there, is that true?
23 **A. I was having symptoms, but they were not -- I**
24 **was just dealing with them. You know, that was the**

Page 143

1  **first time that things were escalating, and it was**
2  **directly related to the stresses that they were**
3  **putting me under, and especially the emotional and**
4  **physical stress of not having a call room when I was**
5  **on call. That was exacerbating the whole flare-up.**
6  **But most of the time, you know, I would rest and be**
7  **good to go.**
8  Q. Was being away from your family for prolonged
9  periods of time, did that contribute to your stress at
10 all?
11 **A. No, because they would come up frequently. We**
12 **specifically bought a motor home. It was an old motor**
13 **home in order to transport the children back and forth**
14 **to Delaware comfortably without a million bathroom**
15 **stops with little ones. And so my husband, being in**
16 **business for himself, was able to take frequent long**
17 **weekends and load the kids up in the motor home, you**
18 **know, and shoot on up and spend time. So we really**
19 **did not go long periods of time without seeing each**
20 **other. We saw each other just about every weekend**
21 **unless I was working all that weekend, and I say, hey,**
22 **it's not worth the effort coming in here because I'm**
23 **on call too much.**
24     **But in a lot of ways, it was good because**

Page 144

1  **I didn't have the day-to-day responsibilities of**
2  **fixing supper and things like that that facilitated my**
3  **work schedule.**
4  Q. And I think you've at least written, if not in
5  your complaint, in other places -- I mean there was
6  times residents in your group were working 75, 80
7  hours a week.
8  A. And I was too.
9  Q. You were all working those hours?
10 A. Yes.
11 Q. And so, I mean, even if your husband was down
12 the block, I mean, being a resident in ob/gyn program
13 would cut significantly in the time of your family;
14 that's a true fact, isn't it?
15 A. Yeah. That was kind of a no-brainer.
16 Q. But your family was not down the block; they
17 were in North Carolina, right?
18 A. Yes.
19 Q. Now, focus your attention on the second half of
20 2002, which is your first six months, from
21 roughly June to the end of December 2002. Do you
22 recall, let's say, on a permanent basis, you know, how
23 frequently you saw your family, either you going down
24 there or them coming up here?

Page 145

1  A. It was, I would say, almost every weekend.
2  They came up more often than I went down, which is why
3  we purchased the motor home.
4  Q. Was it your experience that the other residents
5  in the program socialized outside of the hospital
6  setting?
7  A. My particular classmates did, and they would
8  have those meetings at Dr. Heinle's house for studying
9  that they would not invite me to.
10 Q. When did those study meetings happen?
11 A. I'm not sure because they didn't invite me to
12 them. I heard, you know, secondhand, when they would
13 be in their little groups talking about them.
14 Q. During the time you were at Christiana Care,
15 was the weekend time a time that you sort of set
16 aside, as long as you're not working, to see your
17 family or would you go socialize with your residents
18 instead, if you had been invited to do that?
19 A. I would have taken time to socialize, maybe not
20 every time they did it, but I would definitely have
21 made that, you know, part of the schedule because I
22 think that's important for bonding.
23 Q. And you mentioned the joint pain and fatigue
24 that can be symptomatic of mixed connective tissue

37 (Pages 142 to 145)

(302)655-0477

Page 146

1   disorder. Did that medical condition, apart from
2   those two symptoms, actually physically prevent you
3   from doing certain tasks that you would normally need
4   to be doing as a resident?
5   **A. No.**
6   **(Zechman Deposition Exhibits 44 and 45**
7   **were marked for identification.)**
8   **BY MR. BLOOM:**
9   Q. Dr. Zechman, I'm going to put in front of you
10  what's been marked as Zechman 44, and I'm also going
11  to hand you Zechman 45?
12  And would you agree with me that Zechman
13  44 and Zechman 45 are two versions of a letter that
14  you sent out to various doctors you knew through
15  Christiana Care regarding this case?
16  **A. That is correct.**
17  Q. And if you'll turn to the second page of
18  Zechman 44, that's your hand writing at the top of the
19  page?
20  **A. Yes.**
21  Q. And so there are list of physicians on the
22  second page of this exhibit, and you sent an identical
23  letter to all of these physicians?
24  **A. I don't know how identical, but similar.**

Page 147

1   Q. And in addition to the physicians that are
2   listed on the second page of Zechman 44, you sent a
3   version of this letter to Dr. Maynard, and that's
4   exhibit Zechman 45, right?
5   **A. That's correct.**
6   Q. Can you recall, sitting here today, whether you
7   sent a version of this letter to any other doctors
8   other than Dr. Maynard and the ones that are reflected
9   in Zechman 44?
10  **A. I cannot recall.**
11  Q. And I'll just direct your attention to
12  Zechman 44 in the middle -- the second paragraph, and
13  I'll read the second sentence. It says, "Regardless
14  of my perceived medical abilities, Dr. Ekbladh is in
15  violation of the Americans with Disabilities Act,
16  which is protected by federal law."
17  Did I read that right?
18  **A. That's correct.**
19  Q. Did you ever have an understanding of what
20  Dr. Ekbladh's evaluation of your medical abilities
21  was?
22  **A. Say that again, please, or rephrase.**
23  MR. BLOOM: Can you read that back,
24  please?

Page 148

1   (Record read.)
2   **A. I'm not sure since I did not work directly with**
3   **him. He was administrative. So he did not directly**
4   **observe my cases, whereas these physicians did.**
5   Q. When you say these physicians, are these the
6   physicians that are identified on exhibits 44 and 45
7   that we are talking about?
8   **A. They are some of them.**
9   Q. And I take it these physicians, Dr. Maynard and
10  all physicians listed on Zechman 44, these are doctors
11  who you are writing to because you thought they could
12  help your case?
13  **A. That I would see their patients in the middle**
14  **of the night while they chose to stay home and trust**
15  **my ability in seeing their private patients. So, yes,**
16  **I felt that they trusted my medical judgment because,**
17  **if not, they were legally responsible for their**
18  **private patients and they were receiving payment for**
19  **caring for their private patients and if they had any**
20  **reservations about my medical abilities, they should**
21  **have brought themselves in and saw their private**
22  **patients with me or instead of me, rather than staying**
23  **home and only receiving a phone contact that their**
24  **patient had been there.**

Page 149

1   Q. Look briefly at this list of physicians. I'm
2   talking about the physicians identified in exhibit 44
3   and 45. Are any of these physicians people who you
4   believe discriminated or retaliated against you?
5   **A. I do not know because I not know who was on the**
6   **committees that Dr. Patruno, Dr. Hochman, and**
7   **Dr. Sciscione were referring to. So I have no idea if**
8   **these people -- I do know that Maynard was a part of**
9   **the committee.**
10  Q. My question is, because I assume you'll agree
11  with me, just being on a committee doesn't make you a
12  discriminator?
13  **A. No.**
14  Q. So my question is, what evidence do you have,
15  if any, that any of these physicians that are
16  identified in Zechman 44 or Zechman 45 discriminated
17  against you or retaliated against you?
18  **A. I have not said that these patients did that.**
19  **I mean --**
20  Q. These physicians?
21  **A. These physicians. Excuse me. These are the**
22  **physicians that -- and these are just a small amount**
23  **of them that I was seeing their patients, their**
24  **private patients for them while they chose to stay at**

38 (Pages 146 to 149)

Zechman
Ellen Zechman

v.

C.A. # 05-159 JJF

Christiana Care Health Systems
June 20, 2006

Page 150

1  home and not come in and see their own patient in the
2  emergency room, called ob/gyn triage.
3    Q.  And apart from you sometimes covering these
4  doctors' patients when they are not in the building, I
5  take it, because you say so in your letter, that each
6  of these physicians helped you and provided teaching
7  experiences with you?
8    A.  Yes.
9    Q.  And at the bottom of this letter it says, I
10  appreciate -- I'm going to quote this. "I appreciate
11  all the help and teaching you gave me while I was
12  there at Christiana, and I was devastated over all of
13  this. I particularly miss you. I enjoyed your lively
14  personality."
15      Do you think, as far as you recall, that
16  you included a statement like that in all these
17  letters that you sent to these people?
18    A.  There will be different ones. That statement
19  was particular to this particular teaching physician,
20  that I had a special appreciation for.
21    Q.  That's Dr. Duque --
22    A.  Salva.
23    Q.  And if you look at Zechman 45, I think I see
24  what you're talking about because the last paragraph

Page 151

1  here, says, "I appreciate all the help and teaching
2  you gave me while I was there at Christiana, and I am
3  devastated over all of this. I regret having to take
4  this to the public courts."
5      The reference to the help and the teaching
6  that the physician provided, do you have any reason to
7  doubt that you included a statement like that in the
8  letters to all of these people?
9    A.  I think I individualized the last statement to
10  the particular relationship that I had to each
11  physician and would add a personal note depending on
12  the relationship which, you know, is quite obviously
13  that this was a closer relationship when you say this.
14  Dr. Duque-Salva was someone I greatly appreciated.
15  Dr. Christine Maynard was a little bit more stern and
16  rough on students and residents, and there was not
17  that excitement and joy of working with her as there
18  was with Dr. Duque.
19    Q.  But all these people that you wrote to,
20  exhibits 45 and 44, were people who you did have
21  positive teaching and learning experiences with?
22    A.  That I had teaching and learning experiences
23  with.
24    Q.  Are there any on this list with whom you did

Page 152

1  not have positive teaching or learning experiences?
2    A.  There is one in particular that I'm noticing,
3  Dr. Vakili, who was very discriminatory towards me in
4  November of 2002, ordering me out of the operating
5  room one morning, that he did not want to work with
6  me. "Get her out of here. I want someone else."
7    Q.  Why is that discriminatory?
8    A.  Because he did not even know me at that time,
9  and he was acting on what he had heard at various
10  committee meetings.
11    Q.  You don't know what he heard at various
12  committee meetings, do you?
13    A.  No, but that is what I heard later. And later,
14  towards the end of my time I operated on him --
15  operated with him, and we had a very positive case.
16  And he even said, "Why don't they like you? You're
17  good. Who's mad at you? Why were they doing it?"
18    Q.  And what you just referred to is that initial
19  experience in November 2002 where he didn't want you
20  to scrub with him, is that what it was? Is that
21  correct, your use of that phrase, he didn't want you
22  to scrub with him?
23    A.  Yes.
24    Q.  And you referred to things he had heard. I

Page 153

1  take it you don't have personal knowledge of what he
2  heard from other people?
3    A.  I do after, retrospectively.
4    Q.  How could you have personal knowledge of
5  something when you're not there?
6    A.  Excuse me. It's retrospective knowledge that
7  he shared with me, that "why are they mad at you? Why
8  don't they like you? You're good. Why are they doing
9  it to you?"
10    Q.  I'm sorry. I'm going to rephrase the question.
11  When you this had interaction with Dr. Vakili in
12  November 2002, you just made a statement a moment ago
13  that you think he refused to scrub with you because of
14  things he had heard. And I want to know if you have
15  any personal direct knowledge of what led him to
16  believe those things about you in November 2002?
17    A.  He said, "They say you're no good. I don't
18  want you here." And he had never worked with me prior
19  to that event.
20    Q.  I'm just going to remind you, Dr. Zechman, this
21  is not a test. You don't need to have personal
22  knowledge of every fact that was relevant to this
23  case. I just want to know what you observed
24  personally and maybe other witnesses have knowledge of

39 (Pages 150 to 153)

Page 154

1  different things. So I'm just going to repeat that
2  instruction.
3          And Dr. Sciscione actually -- this was
4  another instance in which he stuck up for you, right?
5  **A. Yes, it was. Yes it was.**
6  Q. And how did Dr. Sciscione stick up for you in
7  this instance?
8  **A. He wrote a letter to Dr. Vakili supporting me**
9  **and saying that you know, he should treat all the**
10  **residents the same and give them all the same**
11  **opportunities. And that was a paraphrase. That's not**
12  **a direct quote.**
13  Q. And then Dr. Sciscione also sent out a memo to
14  the other attendings at Christiana Care to make sure
15  that you were getting the attention and learning
16  experiences that he thought you deserved to get?
17  **A. I'm not aware of that.**
18  Q. Have you ever seen a memo like that?
19  **A. Not the one you're referring to at this moment,**
20  **no, I have not.**
21  Q. The one that you think I'm referring to is the
22  one that was actually the day after he wrote
23  Dr. Vakili around December 13th, 2002.
24  **A. I have no knowledge of that.**

Page 155

1          **(Zechman Deposition Exhibit 26 was marked**
2  **for identification.)**
3  BY MR. BLOOM:
4  Q. I'm going to hand you what's been marked
5  Zechman 26. You've seen this document before, right?
6  **A. Yes.**
7  Q. And this is a letter an April 30th, 2003,
8  letter from you, and it's addressed, "Dear OB/GYN
9  Attending Physician," right?
10  **A. That's correct.**
11  Q. And my understanding is that you sent this
12  letter to a number of attending physicians asking them
13  to provide feedback on your performance?
14  **A. That's correct. I was being criticized for my**
15  **surgical skills not being equal to my colleagues. And**
16  **I had continually been reassigned to triage, which was**
17  **the emergency room for the pregnant females. It was**
18  **call the ob/gyn triage. So I had complained to**
19  **Dr. Sciscione that, how can you -- how can you state,**
20  **you know, that I continue to be behind in my surgical**
21  **skills when I am not getting the opportunities. I'm**
22  **being reassigned to triage and not getting the**
23  **opportunities that have been allowed in my schedule**
24  **for me to progress in my surgical skills. So, in**

Page 156

1  **order to do this, I was trying to get the attending**
2  **physicians that I would routinely see their private**
3  **patients as well as staff physicians to**
4  **comment on this since I was spending most of my time**
5  **here. And I sent this out to at least ten physicians.**
6  **And I asked -- and you can see -- "please fax this**
7  **directly to Sandi Kardos," and that is her number. So**
8  **I faxed this -- these were faxed from the triage fax**
9  **machine to their offices. And they were to fill it**
10  **out and fax it directly to Sandi Kardos.**
11  Q. And -- I'm sorry. Go ahead. I didn't mean to
12  interrupt you.
13  **A. And this one Dr. Hochman gave me a copy of**
14  **after he faxed it in because he wanted me to have a**
15  **copy as well. But there should have been at least ten**
16  **of these that were sent out and sent...**
17  Q. Was this your idea to send these out or did
18  somebody suggest that you do this?
19  **A. Dr. Patruno told me that I needed more**
20  **evaluations, and he said, start getting, you know,**
21  **seeing if you can get evaluations out of these people**
22  **to counteract what's being said about you in these**
23  **committee meetings. So it was on his -- he did not**
24  **recommend it, but it was on his suggestion that I did**

Page 157

1  this on my own.
2  Q. And incidentally you've referred to criticism
3  about the progress of your surgical skills, and I want
4  to ask you about a different subject which is, were
5  you aware that there was also criticism relating to
6  your being defensive or resistant to criticism? I'm
7  not asking if you agree with that criticism I just
8  described, but were you aware that that was a
9  perception at Christiana Care?
10  **A. I think Dr. Patruno had mentioned that at one**
11  **of our meetings.**
12  Q. And what did he say about that?
13  **A. I can't recall. But I do remember him alluding**
14  **to that, and I cannot remember the exact conversation.**
15  **And that was at the same time that he was saying that**
16  **"these people are not warm and fuzzy. They don't like**
17  **you." And he was basically telling -- you know,**
18  **saying you need to kind of butter up to these people**
19  **because they don't like you and they want to get rid**
20  **of you.**
21  Q. And Dr. Patruno was your mentor, right?
22  **A. Yes.**
23  Q. And Dr. Patruno, I gather, is a -- the
24  conversation you were just relaying to me about this

40 (Pages 154 to 157)

Zechman
Ellen Zechman

v.

C.A. # 05-159 JJF

Christiana Care Health Systems
June 20, 2006

Page 158

1  perception of your resistance to criticism, he was
2  relaying to you things that he heard from other
3  people, was that your understanding of it?
4    A.  Yes.  And he was telling me that I needed to
5  act like a whipped puppy and those -- that's his
6  direct quote, "act like a whipped puppy and butter up
7  to these people because they don't want you here."
8    Q.  I've never been a resident.  I mean, do first-
9  and second-year residents, do they act like whipped
10  puppies?
11    A.  I don't know.  I've never been a whipped puppy,
12  so I can't call that.
13    Q.  Well, what about your co-residents, I mean, did
14  they tend to sort of, you know, snap to attention when
15  snapped at?
16    A.  We rarely worked together.  We work with people
17  over us or under us.  And so, for my co-residents,
18  that's hard to make that statement since I -- we would
19  not be on the same assignment at the same time where I
20  would see them working.  We would be in different
21  places at the hospital.
22    Q.  Okay.  And so I take it that, if your
23  co-residents are getting reassigned at the last minute
24  or pulled from one case to go do something else, that

Page 159

1  that's not something that you would have personal
2  knowledge of one way or the other?
3    A.  To a certain extent I would because then there
4  would be someone else doing it and not me.  And I was
5  repeatedly getting pulled for these assignments away
6  from my surgical assignment that I was supposed to be
7  on.
8    Q.  Let me ask the question again because I think
9  maybe we are misunderstanding each other which is
10  that, if your co-residents were assigned to cases and
11  were pulled from them and replaced by a more senior
12  resident or another co-resident, I gather from your
13  previous answer that, you would not ordinarily have
14  any knowledge of an event like that?
15    A.  Yes.  I would because there were two areas that
16  we would be pulled and reassigned to.  One was the
17  ob/gyn triage that was a labor intensive area, and the
18  other was the labor deck which was high risk and, you
19  know, the labor rooms.  I would have seen them there
20  because you would be working in those areas.  And you
21  would see them there if they had been pulled, but...
22    Q.  How do you know what your co-residents are
23  assigned to do for a particular day?
24    A.  There is a board, and then we have a formal

Page 160

1  schedule that's on paper, that's our assignments, and
2  then each day you would have the assignment board, a
3  chalk board, and you would see, you know, who was
4  where.
5    Q.  Does the board list assignments to different
6  sections of the hospital or does it list specific
7  tasks that person will be doing at a given time?
8    A.  Both.
9    Q.  Is every task that you are going to perform
10  during the day listed up on that board?
11    A.  If they are separate tasks like a surgical case
12  with, say, Dr. Hochman, another surgical case, you
13  would have Dr. Hochman, operating room so-and-so, such
14  and such time, and they want the resident's name
15  there.  If you were in the Wilmington Clinic, it would
16  say clinics, and then it would have the names down
17  there of the residents that are assigned to come into
18  Wilmington to do the clinics.
19    Q.  Dr. Zechman, if you could just briefly look
20  back again at exhibits 44 and 45.  They are not dated,
21  but exhibit 44 has a date in the fax line at the top,
22  and that date's January, it looks like, 2005.  Do you
23  have a memory of when you sent these letters out,
24  exhibits 44 and 45, or does the fax line refresh your

Page 161

1  memory about when you sent them out?
2    A.  It would have been either late December or
3  early January because it was before I sought a lawyer.
4    Q.  Okay.  So late December --
5    A.  I was --
6    Q.  -- 2004 or January 2005?
7    A.  I'm blanking on the year, but this was my last
8  ditch effort to try to get things resolved or taken
9  care of before getting legal help.
10    Q.  Okay.
11    A.  And I'm not quite sure exactly when, you know,
12  I called up the lawyer, but this was kind of my last
13  ditch effort that, you know, guys, I need help.  And I
14  also sent a letter to the CEO, and he responded as
15  well.
16    Q.  But these two letters that we are looking at,
17  44 and 45, I mean, it refers in the letter that you've
18  already gotten your right to sue letter from the EEOC.
19    A.  Yes.  Yes.
20    Q.  So we know you wrote these letters after that?
21    A.  Mm-hmm.
22    Q.  Yes?
23    A.  Yes.
24    Q.  All right.  Put those aside.

41 (Pages 158 to 161)

Page 162

1      (Discussion off the record.)
2      (Recess taken.)
3      (Zechman Deposition Exhibit 86 was marked
4   for identification.)
5   BY MR. BLOOM:
6      Q.   I'm going to show you what's been marked as
7   Zechman 86.  Have you seen this document before?
8      A.   Yes.
9      Q.   And this is a letter from your husband
10   regarding your employment at his allergy clinic?
11     A.   Mm-hmm.
12     Q.   Yes?
13     A.   Yes.
14     Q.   And it says that, as of May 2004, you have been
15   working at the clinic, is that accurate?
16     A.   No.  I have worked all along.  I became
17   compensated at that time.  Before I was not pulling a
18   salary.
19     Q.   Has your compensation been the same since May
20   2004 up to the present day?
21     A.   Yeah.
22     Q.   And can you tell me what the compensation is?
23   Is it set at a monthly amount or a biweekly amount?
24     A.   It was a bimonthly amount.

Page 163

1      Q.   Do you know what it is, whatever that adds up
2   to be?
3      A.   No, because I just literally sign it and put it
4   in the checking account.  So I don't you know.  I
5   don't really look at it.  I just sign it and goes to
6   groceries and whatever else it needs to go to.
7      Q.   Do you know how your compensation level was
8   determined?
9      A.   My husband spoke with our accountant who works
10   at a national accounting firm called Mass Mutual that
11   specializes in physicians' and dentists' offices, and
12   they came up with the salary.
13     Q.   So is it your understanding that your salary
14   was determined, at least in part, based on tax
15   reasons?
16     A.   No.  It was based on the work that I provide
17   for the clinic.
18     Q.   As of now, how many hours a week do you work at
19   the clinic?
20     A.   I don't keep track of specific hours.  So it
21   will vary.  My usual days are Mondays, Tuesdays,
22   Friday afternoons, and sometimes I go in and just do
23   some book work.  And a lot of it is just doing charts,
24   calling in prescriptions, you know, not direct patient

Page 164

1   care, but just cleaning up tasks that it takes a
2   physician's discernment to make those calls.
3      Q.   So is it fair to say that, on average, you work
4   Mondays, Tuesdays, and Friday afternoons in the
5   clinic?
6      A.   I would estimate two to three afternoons a
7   week.
8      Q.   I want to make sure I'm understanding it right.
9   Two to three afternoons per week total, or are there
10   some days that you work a whole day?
11     A.   There are times when I work a whole day, if
12   needed.  It's kind of like routinely Monday afternoon,
13   Tuesday afternoon, Friday afternoon, sometimes a
14   Thursday, sometimes a Friday.  Kind of as needed
15   basically.  I also work for a VA clinic, so I have a
16   set schedule with the VA clinic and I will rotate
17   those hours with the allergy clinic.
18     Q.   So, in a typical week, at the allergy clinic,
19   you're three afternoons a week?
20     A.   I'd say that's correct.
21     Q.   And has that been typical since you started
22   working at the clinic in May 2004?
23     A.   Since I started being compensated in May 2004.
24     Q.   And what were you doing prior to May 2004?  And

Page 165

1   I'm focussing on the period between when you left
2   Christiana Care in October 2003 and then continuing to
3   May 2004.  Were you working during that period?
4      A.   I was looking for employment.  And I would go
5   in and help in the clinic routinely, but I don't know
6   how many hours.  Less than, I would say, 20 a week.
7      Q.   That was on a volunteer basis?
8      A.   Yes.
9      Q.   Are there any other employees currently of the
10   Allergy & Asthma Clinic?
11     A.   Yes.
12     Q.   How many, can you estimate how many people work
13   there?
14     A.   Four not including Dr. Zechman.  Four office
15   personnel.
16     Q.   Four not including your husband?
17     A.   Yeah.  Not including my husband, there's four
18   ladies that are on the payroll.
19     Q.   Can you tell me what those four ladies'
20   positions are?
21     A.   Two of them are nursing assistants.  One of
22   them is the office personnel.  And the other one does
23   insurance billing and assists in the clinic, but she's
24   not like a nurse .  She doesn't have a certification

42 (Pages 162 to 165)

Zechman
Ellen Zechman

v.

C.A. # 05-159 JJF

Christiana Care Health Systems
June 20, 2006

Page 166

1  **in nursing or nursing assistant.**
2  Q.  Other than your husband, are you the only
3  licensed medical doctor at the clinic?
4  **A.  Yes.  He is a solo practitioner as an**
5  **allergist.**
6  Q.  How long has your husband's clinic been in
7  existence?
8  **A.  September of 1994.**
9  Q.  And does it have regular office hours?
10  **A.  Yes.**
11  Q.  What are the office hours like weekly?
12  **A.  Monday through Friday, eight to five.**
13  Q.  No set weekend hours?
14  **A.  No.**
15      **(Zechman Deposition Exhibit 85 was marked**
16  **for identification.)**
17  **BY MR. BLOOM:**
18  Q.  You can put that document away.
19      I'm going to hand you what's been marked
20  Zechman 85 and these are plaintiff's, meaning you,
21  answers to defendant's interrogatories.  So I want you
22  to flip through that document and let me know if
23  you've seen that document before?
24  **A.  Okay.**

Page 167

1  Q.  You've seen this before?
2  **A.  Yes.**
3  Q.  And you understand that what this document is
4  is your answers to various questions that my office
5  put in writing to ask you and your lawyers to answer
6  in writing?
7  **A.  Yes.**
8  Q.  And did you, in fact, provide these answers to
9  your lawyer?
10  **A.  Yes.**
11  Q.  And there might be some objections in some of
12  them, but when you provided very best to provide complete and accurate
13  you do your very best to provide complete and accurate
14  information to the best of your ability?
15  **A.  To the best of my knowledge.**
16  Q.  And do you recall whether you signed what's
17  called a verification page where you swore that the
18  statements in those responses are true?
19  **A.  Yes, I did.**
20      MR. BLOOM:  I don't think I ever got the
21  verification.  So if you could check your files or,
22  if you don't have one, execute one.
23      MS. BREWINGTON:  Okay.
24      MR. BLOOM:  Do you know from memory that

Page 168

1  there is one?
2      MS. BREWINGTON:  I wasn't here at the
3  time.  It looks like the previous attorney signed it.
4      MR. BLOOM:  Right.
5      MS. BREWINGTON:  If there isn't one, what
6  we can do is have her execute another one if it wasn't
7  done.  I don't know why it wasn't attached, but she
8  says she remembers.  I wasn't there.  Sorry.
9  BY MR. BLOOM:
10  Q.  Dr. Zechman, you remember signing a
11  verification page swearing that this is all accurate
12  to the best of your knowledge?
13  **A.  To the best of my knowledge, yes.**
14  Q.  And you remember physically signing something?
15  **A.  Yes.**
16  Q.  Saying that this was correct?
17  **A.  Yes.**
18  Q.  I can direct your attention to page 4 and there
19  was an interrogatory number 5 which asks about income
20  that you've earned since October 2003.  Do you see
21  that?
22  **A.  Yes.**
23  Q.  And one of the answers in your response is that
24  you did not receive any income of any kind between

Page 169

1  October 2003 and February 2005.  I think, from the
2  conversation we were just having, that that's a
3  mistake?
4  **A.  I agree with you because this is saying May**
5  **2004.**
6      MS. BREWINGTON:  When you say this, you're
7  pointing to --
8      THE WITNESS:  I'm pointing to the Allergy
9  & Asthma Clinic, May 2004.  These numbers came
10  directly from my accountant.
11  BY MR. BLOOM:
12  Q.  And just so we are clear, the numbers you're
13  referring to are the numbers that are in Zechman 86,
14  which is the letter from your husband's allergy
15  clinic?
16  **A.  Yes.**
17  Q.  Okay.
18  **A.  So if this -- this information would have come**
19  **directly from our accountant.  So that the May 2004 is**
20  **correct.**
21  Q.  Okay.  So I just want to make sure we've got it
22  straight.  So in the interrogatory responses which
23  were prepared at an earlier date than this letter,
24  when the interrogatory response says that you didn't

43 (Pages 166 to 169)

Zechman                                    v.                    Christiana Care Health Systems
Ellen Zechman                    C.A. # 05-159 JJF                              June 20, 2006

Page 170

1 have any income from between October 2003 to February
2 2005 because you were unable to work, that's just a
3 mistake?
4     A.  That appears to be a mistake.
5     Q.  And although the date is wrong, the next
6 sentence says that the amount of your compensation is
7 $3,000 per month at the allergy clinic.  Does that
8 sound accurate to you?
9     A.  That is an estimate.  And I believe that is
10 accurate.  I would have -- you know, this is not
11 something I know off the top of my head.  It would be
12 something that I would have to see --
13    Q.  Okay.
14    A.  -- or ask my accountant because this is not
15 something that stays with me.
16    Q.  The next sentence of your response to
17 interrogatory number 5, it says, "Beginning in May
18 2005 through the present, plaintiff receives income in
19 the amount of $8,100 per month as an independent
20 contractor for QTC Medical Services."
21       Do you know what that refers to?
22    A.  Yes.  That is a subcontractor -- I subcontract
23 and provide medical services for their VA disability
24 exams.  And so QTC is a government subcontractor that

Page 171

1 has the VA contract, and I, in turn, subcontract under
2 them and go into their office and do their exams.
3 That number is high.  It might have been accurate at
4 the time that I wrote this -- I forget when we put in
5 this information -- but I'm not making that by a long
6 shot now.
7     Q.  And is this the same thing that you referred to
8 earlier when you said you were working for a VA
9 clinic?
10    A.  Yes.  Yes.  It's a subcontract.
11    Q.  And so as part of this subcontract, you do
12 exam -- do you do actual examinations of patients?
13    A.  Physical examinations of the veterans, yes.
14    Q.  And for what purposes do you do the
15 examinations?
16    A.  It's for government documentation of their
17 claims of injury that are secondary to their military
18 service.
19    Q.  Are the examinations limited to claims relating
20 to injuries incurred during military service?
21    A.  Or related claims from prior claims.
22    Q.  And so I guess one of the things you do is to
23 make a determination of whether or not somebody is
24 disabled?

Page 172

1     A.  No.  I don't do that.  The VA disability raters
2 do that.  What I do is a physical assessment and put
3 down my findings, which would be range of motion.  My
4 arm has arthritis.  How much does it move?  That's the
5 kind of information I would be relaying to the VA.
6 They, in turn, take that information and they have
7 raters that do the rating.
8     Q.  If I'm following you right, you analyze the
9 person's physical capacity and any limitations that
10 they have?
11    A.  Yes.  Physical only.
12    Q.  All right.  And then somebody else at the VA
13 takes that medical information that you've determined
14 and decides whether it qualifies for something?
15    A.  Black hole of the VA it goes into.
16    Q.  Do I get that process generally right?
17    A.  Yes.
18    Q.  What determines the amount of work per week
19 that you do for this QTC subcontractor?  Is it up to
20 you or up to them?
21    A.  Both.  Demand, and then my hours that I'm
22 available.  It's both.
23    Q.  If you wanted to do that work full-time, could
24 you?

Page 173

1     A.  I don't know that there would be the
2 availability.  I don't know that they would have the
3 patients to keep me busy full time.
4     Q.  And since the time you left Christiana Care and
5 today, have you been employed anywhere else other than
6 the allergy clinic and QTC?
7     A.  No.  I have put in many applications, and I
8 have gotten no responses.
9     Q.  In terms of what's been your post-Christiana
10 Care mix of employment, which is a combination of QTC
11 and working at your husband's clinic is that
12 combination of employment something that you've chosen
13 purely for your purposes of maximizing your monthly
14 income, or are there other factors that go into your
15 decision to use that mix of those two jobs?
16    A.  I have not been able to find anything else.  I
17 have applied.  And this lists several of the places I
18 have applied.  And I have not been able -- I have not
19 had any offers.
20    Q.  We are going to get to that list.
21    A.  Okay.  On page 6 -- well, let me see -- no.  I
22 take that back.  Where is it listed?  Yeah.  It starts
23 on page 6.
24    Q.  All right.  Well, let's turn to that, then.

44 (Pages 170 to 173)

Zechman
Ellen Zechman

v.

C.A. # 05-159 JJF

Christiana Care Health Systems
June 20, 2006

Page 174

1  Page 6 is your response to interrogatory number 7
2  which asks for everything that you've done to either
3  look for a new job or continued education which would
4  include a new residency program, right?
5  **A. Yes.**
6  Q.  And take a minute and look at this and tell me
7  if you agree that this is complete and accurate, and
8  let me know if there's anything that needs to be
9  added.
10 **A. That's correct.**
11 Q.  Is it complete?
12 **A. Yes.**
13 Q.  And actually I want briefly to switch subjects
14 and ask you about when you were applying to transfer
15 into Christiana Care as a second-year resident.  Is
16 that something that -- are there typically, in your
17 experience, lots of open mid-level residency positions
18 that are out there to apply for?  Is it usually that
19 aren't that many people that leave the program in the
20 middle?
21 **A. It's pretty rare.**
22 Q.  It was pretty rare that somebody would leave in
23 the middle of a program?
24 **A. Yes, but it does happen.  There are usually**

Page 175

1  **openings, and they do not go through the match.  They**
2  **are like an individual application thing.  But it's --**
3  **I would say it's throughout the country.  It happens,**
4  **but it's rare.**
5  Q.  And is it any more rare or more common in North
6  Carolina than it is nationally to your understanding?
7  **A. I would say less so in North Carolina because**
8  **North Carolina is a desirable place to live and often**
9  **fills up very quickly in the match.  And people tend**
10 **not to leave once they are in the programs.**
11 Q.  So, based on your experience, you would expect
12 to find fewer positions that become available in the
13 second or third year?
14 **A. That's correct.**
15 Q.  Is it true that the way the process works is
16 that the match only applies when you're applying to
17 start at ground zero as a first-year within a
18 residency program?
19 **A. Pretty much so.  There are incidents where**
20 **people do one year of internal medicine and then match**
21 **into a urology program or dermatology.  It is**
22 **specialty specific, but for the majority, it's a**
23 **ground zero thing and they very much favor immediate**
24 **graduates out of medical school.**

Page 176

1  Q.  Who favors immediate graduates out of medical
2  school?
3  **A. The institutions.  I was told by Chapel Hill**
4  **that they will not even consider applications that are**
5  **not direct graduates from medical school.**
6  Q.  Okay.
7  **A. So if you are not directly graduating from**
8  **medical school, they will not even look at your**
9  **application.**
10 Q.  Is it your understanding that that's common?
11 **A. I don't know.**
12 Q.  Am I hearing from you correctly that there was
13 something of a preference within residency programs to
14 pluck people straight out of medical school?
15 **A. I think so.**
16 Q.  Now, when you're not applying to start a new
17 residency, a new specialty, and when you want to
18 transfer from being a one-year at one school,
19 institution to a second-year at different institution,
20 is it your understanding that sort of application is
21 not done through the match?
22 **A. That's correct.  It's get on the phone and see**
23 **what's available or start begging.**
24 Q.  Is there anyplace where you would go or have

Page 177

1  gone to look to find out about open ob/gyn residency
2  positions that you could transfer to at the level that
3  you left Christiana Care?
4  **A. Yes.**
5  Q.  Okay.  How did you go about doing it?
6  **A. Calling on the phone, asking if they were**
7  **accepting applications, if they anticipated any**
8  **openings, if anybody had given notice and they were**
9  **anticipating any openings, asking them would they take**
10 **my application and put it on file in case something**
11 **came open?  And I was fully declined on all phone**
12 **accounts.**
13 Q.  So when you say you were declined, you never
14 sent an application to those people because they told
15 you that they had no vacancy?
16 **A. They weren't accepting applications was what --**
17 **you know, don't send it.  We are not accepting it.**
18 Q.  And did you call any ob/gyn residency program
19 outside of North Carolina?
20 **A. No, I did not.**
21 Q.  Was there a reason you didn't?
22 **A. A part of it was just such a bad experience in**
23 **Delaware.  I felt I had a better chance just staying**
24 **within home turf.**

45 (Pages 174 to 177)