Page 178

1    Q. I think you've already said this, but I want to
2   make sure I haven't left this uncovered. Although you
3   made inquiries about whether any place was accepting
4   applications in an ob/gyn program, you did not submit
5   an application to an ob/gyn program following your
6   leaving Christiana Care.
7    **A. I don't think anybody would even take them.**
8    Q. Did you make some additional inquiries apart
9   from ob/gyn about a new residency specialty which is
10  called family practice?
11   **A. Yes, I did.**
12   Q. You had not previously been part of the family
13  practice residency, right?
14   **A. That is correct.**
15   Q. So is that something you could then go through
16  the match for?
17   **A. Yes. And I did go through the match for that.**
18  **And I was -- I did not match.**
19   Q. I understand that there's some -- I've heard
20  the term "scramble" as something that happens after
21  the match. Have you ever heard that term before?
22   **A. Yes, I have.**
23   Q. What does that term mean to you?
24   **A. That's where I get a list of openings that did**

Page 179

1   **not fill in the match. And you make phone calls to**
2   **try to make contact and get your application looked at**
3   **for one of those.**
4    Q. So there are residency applicants who did not
5   match anywhere, and then there are residency programs
6   who didn't match with enough people to fill their
7   ranks and so people start calling each other?
8   **A. Yes.**
9    Q. Where were you actually able to obtain in one
10  place a list of unfilled positions?
11  **A. I did not pursue that. I did not get the list.**
12  **But there were no, to my knowledge, within my area of**
13  **North Carolina --**
14   Q. No what?
15  **A. East Carolina University where I applied had**
16  **unmatched positions, but they had already turned me**
17  **down so there was no need for me to apply to them**
18  **again when they had turned me down on the first round.**
19   Q. Okay.
20  **A. And there were not any openings nearby, say,**
21  **within a two-hour driving distance that I applied for**
22  **or that I knew of.**
23   Q. So you went through the match for family
24  practice. And then, when you didn't match, that was

Page 180

1   the end of it for family practice residency?
2   **A. Yeah. I was pretty discouraged after all that.**
3    Q. Was there a reason you limited your interest to
4   a two-hour radius from your home?
5   **A. Yes.**
6    Q. Okay.
7   **A. When I went to Virginia and went to Delaware, I**
8   **had a lot of family support to do that. I lost my**
9   **window of opportunity to be free to travel after that**
10  **when my father died and my mother's life changed. She**
11  **was not free to help me any more. Another dear family**
12  **member that helped me a lot died as well from**
13  **pneumonia. And so my window of opportunity to travel**
14  **distances and leave my family in safe hands had**
15  **closed, and had closed by that time. I had lost my**
16  **window of opportunity to go wherever I could go.**
17   Q. So these people what you just referred to have
18  passed away. They were helping with family
19  responsibilities with your kids when you were at
20  Christiana Care?
21  **A. And in Virginia, yes.**
22   Q. So this is not something that your husband
23  could have stepped in all by himself to fill that
24  void?

Page 181

1   **A. No. My window of opportunity closed in my**
2   **life.**
3    Q. When is this a point in time where that window
4   of opportunity closed?
5   **A. I'm trying to come up with a date.**
6        **My father died last January. So that**
7   **would be January of 2005. But the window of**
8   **opportunity closed as he became sicker and my mom had**
9   **to redirect her efforts towards caring for him and not**
10  **helping out with my family. And I cannot remember the**
11  **exact time frame that actually occurred, when --**
12  **I can't remember that.**
13   Q. Is it roughly within the few months before
14  January 2005?
15  **A. No. It was -- it was -- I had already come**
16  **home from Christiana, and it was a while. It was**
17  **either late 2003 or early into 2004 when those things**
18  **started changing where I was not free to leave the**
19  **state and work any more.**
20   Q. And is that why, incidentally, that for a
21  period of six or seven months right after you get back
22  to North Carolina from Christiana Care where you're
23  not working a lot, is that related to what's going on
24  in your family?

46 (Pages 178 to 181)

Zechman
Ellen Zechman

v.

C.A. # 05-159 JJF

Christiana Care Health Systems
June 20, 2006

Page 182

1   A. No. I did not try to work at that time because
2   I was trying to get this stuff straightened out
3   because I could not believe that this had happened to
4   me and I felt that, if I wrote letters, if I, you
5   know, pleaded to people for intervention that I would
6   be coming back here or that something was done. I
7   pleaded with Dr. Ekbladh and Patruno that -- well, if
8   they don't want me here, please help me find another
9   position. And I told Ekbladh that -- I said, if you
10  don't want me here, then for God's sake, help me find
11  another position. Get on the phone. Help me because
12  I don't want to give up my career.
13  Q. I think you said this before that you applied
14  to Eastern Carolina University twice, is that right?
15  A. I can't remember, but I did apply to them.
16  Q. And you applied to ECU at the time that you
17  applied to Christiana Care to transfer, right?
18  A. Yes. After my one year in Virginia because we
19  knew it was for one year. You were going to have to
20  find another place unless they had, you know, an
21  immediate opening. I applied to Christiana, Norfolk,
22  and ECU.
23  Q. I will direct your attention to paragraph 3.
24  We are still looking at the response to interrogatory

Page 183

1   number 7 of Exhibit 85. Your response to number 3
2   says you sent two letters in March 2004 and January
3   2005 to Atlantic Integrated Health, a local HMO. Do
4   you remember sending those two letters?
5   A. I sent letters asking, you know, if they were
6   accepting applications.
7   Q. So you weren't responding to a specific
8   available position that you knew of?
9   A. No. I was sending out feelers.
10  Q. Never got a response from either of those two?
11  A. No. No response from either of them.
12  Q. In paragraph 4, you say you sent an application
13  to Coastal Carolina Physicians, and it's in the same
14  months, one letter in March 2004 and another letter in
15  January 2005?
16  A. Yes. That's correct.
17  Q. And so this was the same circumstance where you
18  were not responding to a specific available position
19  but you were sending an unsolicited application?
20  A. I was saying, hey, I'm out here. You know, if
21  you need me, give me a call. I'm interested. Yes.
22  Q. So with respect to these two potential
23  employers that we just referred to, Atlantic
24  Integrated Health and Coastal Carolina Physicians, how

Page 184

1   did you identify them as places that you wanted to
2   apply to?
3   A. Because they are the major health care
4   providers in my area.
5   Q. Do you have any understanding of how many
6   physicians Atlantic Integrated Health employs?
7   A. No.
8   Q. What about for Coastal Carolina Physicians, do
9   you have a sense of how big that is?
10  A. No. But they are large groups. Well, I take
11  that back. Large for my neck of the woods. Large for
12  North Carolina is not large for Delaware or
13  Pennsylvania. So it's relative.
14  Q. That's good. I appreciate that. I mean, when
15  you say large, is it greater than 100 physicians?
16  A. Greater than ten. Our relativity here is
17  different.
18  Q. Are you reasonably confident that both of those
19  practices have fewer than 30 physicians?
20  A. Absolutely.
21  Q. In paragraph 5 you say that you sent an
22  application to an employer named Physicians East, one
23  letter in January 2004 and another letter in January
24  2005, but they were not accepting applications, is

Page 185

1   that right?
2   A. That's correct.
3   Q. And there was a reference here that you had a
4   phone conversation with a personnel administrator at
5   Physicians East. Do you remember that conversation?
6   A. I called, but I do not remember the name of
7   person I talked to or anything other than that I had
8   told them that I had sent in the application. I sent
9   the application in prior to that. And they said they
10  just weren't accepting unsolicited applications, that
11  they recruited on their own.
12  Q. It says they recruit only ACGE certified
13  physicians. What does that mean?
14  A. That's people who have finished their
15  residencies in like internal medicine, family
16  medicine, ob/gyn, that sort of thing.
17  Q. Did you ever do any search to find out and
18  identify specific positions for doctors that were
19  available?
20  A. I did frequently on the websites for both
21  federal government and state government as well as
22  submitting my application to their physicians
23  placement service, through health and human services
24  to try to connect rural physicians with groups that

47 (Pages 182 to 185)

Case 1:05-cv-00159-JJF    Document 58-5    Filed 11/22/2006    Page 3 of 66

Zechman
Ellen Zechman

v.
C.A. # 05-159 JJF

Christiana Care Health Systems
June 20, 2006

Page 186

1 need a physician. I submitted my application to them,
2 and I never got any response on that.
3    Q.   It was an examination placement service run
4 through what?
5    A.   I'm not sure of the address. It was some sort
6 of division that was sent out for rural health, and it
7 was -- it was through the state of North Carolina and
8 one of their divisions, but I cannot recall who it
9 was. And you just put your application, what you're
10 looking for, what area you're looking for, what you
11 would like to do on file, and then people are supposed
12 to, you know, contact them if -- you know, to make a
13 match. And I never heard from them. And to my
14 knowledge, that application is still on their file and
15 still available for whoever would call that service.
16    Q.   Do you have any papers or documents in your
17 possession that relate to that application?
18    A.   No. No, I don't.
19    Q.   Other than what we've just gone through, is
20 there anything else that you did looking for a new job
21 that we haven't covered?
22    A.   Not that I can recall right now.
23    Q.   Any other methods of searching for jobs other
24 than what we've just gone through?

Page 187

1    A.   Not that I can recall.
2    Q.   If you'll turn to page 2, page 8. And this is
3 the response to interrogatory number 9. We are still
4 in Exhibit Zechman 85. This asks you to identify
5 figures or health care providers who provided care to
6 you. Who is Dr. Harris who you identified here?
7    A.   She is my ob/gyn doctor.
8    Q.   Does her treatment of you relate in any way to
9 this case?
10    A.   We discussed it, and we discussed the stresses
11 that I was going through secondary to this happening
12 to me. And my tremendous disappointment in not
13 finishing my ob/gyn training. She was my chief
14 resident when I was in medical school. And she is one
15 of the people that encouraged me to go into this
16 field. And she was a shining example of how I would
17 love to have been had I finished my training.
18    Q.   Other than your conversations with Dr. Harris,
19 does she have any other knowledge or involvement about
20 this case that you know of?
21    A.   No. Not that I know of.
22    Q.   What about Dr. Beth Foyle, who is that?
23    A.   She was -- she has died from breast cancer.
24 She was a trauma and general surgeon that was on staff

Page 188

1 at East Carolina University School of Medicine as one
2 of the trauma physicians but also she had a private
3 practice where she would do women's procedures for
4 breast surgery and GI surgery. And she also did GI
5 procedures, endoscopy and colonoscopy, and that's what
6 I sought her for was my endoscopy and colonoscopy.
7    Q.   And does Dr. Foyle's treatment of you have
8 anything to do with this case?
9    A.   Yes. I was having a lot of stomach problems
10 secondary to all this happening. And so we had the
11 upper and lower endoscopy, plus I was having a lot of
12 GI disturbance and I had the beginnings of an ulcer,
13 stomach ulcer secondary to this.
14    Q.   When you say GI, you mean gastrointestinal?
15    A.   A stomach ulcer.
16    Q.   You referred on here a second ago to a
17 procedure or --
18    A.   Endoscopy. That's where they use the light to
19 go peaking in to see, you know, what kind of problems
20 and take a pinch for a biopsy.
21    Q.   So that's a testing procedure?
22    A.   Yes.
23    Q.   I guess part of that is to determine whether
24 you have an ulcer?

Page 189

1    A.   That's correct.
2    Q.   Did you, in fact, have an ulcer?
3    A.   I had what they call erosions which are the
4 beginning of an ulcer.
5    Q.   In your case, did those erosions eventually
6 repair themselves?
7    A.   I think they have since then because I no
8 longer have those symptoms.
9    Q.   And you never developed an ulcer?
10    A.   That was an ulcer. Technologically an erosion
11 is an ulcer. An erosion is a breaking of the lining
12 of the stomach. Ulcer is a layman's term. Erosions
13 are a medical term where there's breaking in the --
14 erosion of the epithelial lining of the stomach.
15    Q.   If I'm understanding you right, in layman's
16 terms, we use the word "ulcer" that covers the more
17 severe kind of erosion. Like, in layman's terms, we
18 wouldn't refer to all erosions as ulcers is what I'm
19 hearing you say.
20    A.   You would. Any erosion, any sore would be
21 considered, I think, ulcer, whereas --
22    Q.   To a doctor you mean?
23    A.   No. To a layman. Ulcer would be -- any kind
24 of sore in the stomach would a be an ulcer unless it

48 (Pages 186 to 189)

Zechman
Ellen Zechman

v.

C.A. # 05-159 JJF

Christiana Care Health Systems
June 20, 2006

Page 190

1  was a cancer, if it was one of these erosions.
2  Whereas a -- you have different grades of, you know,
3  depth and pathological descriptions of how deep, how
4  wide, you know. It's a pathology thing.
5     Q. When did dr. Foyle pass away, do you recall?
6     A. I'm trying to think. It was -- I've got her
7  obituary note at my desk in work. I'm trying to
8  think. I think it was last year. It was not that
9  long ago.
10    Q. Sometime in 2005, do you think?
11    A. Yeah. Early 2005.
12    Q. And if you will turn to page 10, still on
13  Exhibit 85, there's a reference here that you had gone
14  to Christiana Care's employee health services
15  department. Does that relate to anything other than
16  the hospitalization that you referred to earlier?
17    A. There were -- there was another event where I
18  had a rash. And it did not result in hospitalization,
19  that I went to the employee health service.
20    Q. Did you ever sign a release and request records
21  from employee health services?
22    A. Yes, I did.
23    Q. When did that happen?
24    A. I think about a year ago, and they refused to

Page 191

1  give me those records.
2     Q. Did you speak to anybody there?
3     A. I sent a fax, and I had our office manager
4  call.
5     Q. Okay.
6     A. And they would -- she had the signed release
7  form. And she was told that they were put away in
8  storage and they could not get them for her.
9     Q. Do you know who she spoke to?
10    A. She would know. I think we have it documented
11  somewhere, but I don't -- don't know it off the top of
12  my head.
13    Q. What's the name of the office manager who made
14  this call for you?
15    A. Theresa Benton.
16    Q. Is she still employed in the allergy clinic?
17    A. Yes.
18    Q. During your residency at Christiana Care, you
19  would go back to North Carolina to see Dr. Frasier
20  when you needed treatment or examination relating to
21  your mixed connective tissue disorder, is that true?
22    A. That's correct.
23    Q. And there were periods when you were going back
24  to see him frequently, is that true?

Page 192

1     A. That's relative to what you call frequently.
2     Q. Fair enough. Is there a reason why you didn't
3  see anybody who was at Christiana Care or just closer
4  to where you were spending most of your time?
5     A. Yes. Dr. Frasier has been my doctor for in
6  excess of ten years and is an expert on the subject.
7  He trained at NIH. And I felt I would get the best
8  care from a doctor that had been following me all
9  these years and knew me than having to change to a
10  doctor that had no clue of my condition. And because
11  of the high specialty of this condition, I just felt
12  that I would get better care sticking with a doctor
13  that had been treating me since 1995.
14    Q. Now, am I right that there's not a lot that can
15  actually be done to treat your mixed connective tissue
16  disorder, am I right about that?
17    A. It's a case of treating the symptoms, and then,
18  often, if you just need rest, just resting. But it's
19  not going to go away. It goes into remission and you
20  have flare ups and you treat whatever is the
21  presenting issue with the flare-up.
22    Q. Right. And I think you said before, the
23  flare-ups just happen unpredictably and not at regular
24  intervals?

Page 193

1     A. That's right. It does not run a schedule. It
2  does its own thing. And stress does have a factor in
3  a flare-up, yes.
4     Q. And so one of the things that would be a
5  response to a flare-up you mentioned was rest, right?
6     A. That's correct.
7     Q. And another one would be medications of some
8  kind?
9     A. That's correct.
10    Q. What kind of medications have been effective in
11  treating your flare-ups?
12    A. Ibuprofen, the old over-the-counter ibuprofen.
13  Prednisone. Different arthritis medications have been
14  used mostly -- both ones that have been taken off the
15  market for other problems, Vioxx, Bextra. These have
16  been used. And it was all on an as-needed basis. You
17  know, when you have a flare up, you know, you do this.
18  You take the Prednisone. Providium is one of the
19  drugs that is used for the episodes of fatigue. That
20  sort of stuff.
21    Q. Is there with respect to the Prednisone, is
22  there any reason why you would be reluctant to take
23  that while you were working as a resident, or is that
24  okay to take on an as-needed basis while you were

49 (Pages 190 to 193)

Case 1:05-cv-00159-JJF    Document 58-5    Filed 11/22/2006    Page 5 of 66

Zechman
Ellen Zechman

v.

C.A. # 05-159 JJF

Christiana Care Health Systems
June 20, 2006

Page 194

1 working at Christiana Care?
2    A. It's an individual thing. It has lots of side
3 effects. And so no one would want to take any more
4 than they absolutely have to. But it is not -- I
5 mean, asthmatics take it every day. People with lupus
6 take it every day. And it's very -- it's very
7 individual as to your benefits versus your side
8 effects, as to when you take it, and how much you
9 should take, and that's a decision only a patient and
10 a doctor may make on a, you know, individual basis.
11    Q. What's your experience with Prednisone, is it
12 effective for you?
13    A. For certain problems, it is.
14    Q. For which problems?
15    A. When I'm having a severe joint pain, if I'm
16 having a flare-up of just hives, rash, mouth sores,
17 that are all part of this connective tissue, it will
18 help at those times. Other times it doesn't do any
19 good. I can take it, and it just doesn't do any good.
20 So it's kind of a hit-and-miss thing.
21    Q. Did it cause -- it meaning Prednisone -- cause
22 any side effects with you that made you reluctant to
23 take it sometimes?
24    A. That's dose dependent, and so, when I have had

Page 195

1 to take higher doses, it made me very hyper and also
2 made me sick to my stomach where I'd be throwing up.
3 Low doses, I tolerate it very well, but then, at low
4 doses, sometimes it has no effect on what we are
5 treating. But the nausea and vomiting is one of the
6 worst side effects that bother me when I get into
7 higher doses. It just really tears up my GI system.
8    Q. When you're having a severe flare-up of this
9 connective tissue disorder, is there a particular
10 medication that you consider a medication that would
11 be the one you would look to when you are having a
12 severe flare-up?
13    A. The best thing to do is just go to bed. That's
14 what I do. I just go to bed.
15    Q. And if you go to bed, is it with the hope that
16 you will wake up in the morning and it will be over?
17    A. No. Rest. Sometimes rest for -- you know,
18 just a light schedule, and frequent -- and just rest
19 makes it better. And sometimes it's a week.
20 Sometimes it's two weeks. Sometimes it's the next day.
21 This is very hit and miss.
22        (Zechman Deposition Exhibit 87 was marked
23 for identification.)
24

Page 196

1 BY MR. BLOOM:
2    Q. I want you to identify a couple of documents
3 for me. I'm going to put in front you what's marked
4 Zechman 87. My understanding is that these are
5 several documents and agreements that relate to your
6 the work that you do for QTC Medical Group which is
7 the Veterans Administration subcontractor. Do I have
8 that right?
9    A. That's correct.
10    Q. How did you get this job?
11    A. I got it by word of mouth. One of the old
12 retired docs in town that knows me and loves me told
13 me that he did this and they needed somebody. So why
14 don't I go talk to them?
15    Q. Do you know whether you're paid by the
16 examination or you're paid by time or --
17    A. By the examination.
18    Q. And do you have any sense of if, on a given
19 day, you're doing examinations for a full workday, how
20 many examinations would that entail?
21    A. That would entail eight or nine examinations,
22 but they can be of varying intensity or you know, they
23 are not all going to be equal. They can be like a
24 small examination that you only get $30 for, a large

Page 197

1 examination that you might get paid $100 for. But
2 this is very low pay for what you do. And then you
3 dictate 10- to 20-page reports after this. So
4 whatever time I spend seeing patients, an equal if not
5 more time is spent sitting in a corner just doing the
6 exhaustive medical government reports.
7    Q. By the way, when you were travelling back and
8 forth between Christiana Care, does the drive
9 exacerbate your mixed connective tissue disorder at
10 all like if you're sitting in a car for six or eight
11 hours, whatever it takes?
12    A. No. It did not seem to affect that. I mean,
13 it was either aching and I drove anyway or it wasn't
14 aching. I mean it had no effect on what was going on.
15    Q. In your experience, is that something that
16 could have an effect but just didn't in your case?
17    A. I don't know. My main thing was the fatigue,
18 and when I was fatigued, I didn't drive. And I would
19 have family come up in the motor home.
20        (Zechman Deposition Exhibit 88 was marked
21 for identification.)
22 BY MR. BLOOM:
23    Q. I'm going to show you Zechman 88. And this
24 looks to go at least a par they will payment print-out

50 (Pages 194 to 197)

Zechman
Ellen Zechman

v.

C.A. # 05-159 JJF

Christiana Care Health Systems
June 20, 2006

Page 198

1  of payments you received from QTC, is that right?
2  **A. That's correct.**
3  Q. Is it your understanding that, regardless of
4  the number of examinations you do, that QTC pays you
5  on a biweekly basis?
6  **A. That's correct. And if you didn't do any**
7  **patients within that time period, you just don't get a**
8  **check.**
9  Q. So if you did one for a two-week period, you
10  get a check covering one?
11  **A. That's correct.**
12  Q. And the first entry in Zechman 88 is the
13  paycheck date of May 8, 2005. Do I have that right?
14  **A. That looks correct.**
15  Q. And from the previous exhibit we were just
16  looking at, which was Zechman 87, you had signed the
17  contract with QTC in February 2005, right?
18  **A. That's correct.**
19  Q. Is there a period of time where you were doing
20  examinations that is not necessarily reflected in
21  Zechman 88, meaning the time between February and May
22  of 2005?
23  **A. There is a delay in payment. So whatever check**
24  **that you get paid for were the patients you saw**

Page 199

1  earlier.
2  Q. Are you telling me that May 8, 2005, you think
3  is the first date on which you were paid by QTC?
4  **A. Possibly, yeah.**
5  Q. Are you confident of that or are you not sure?
6  **A. Not sure.**
7  **(Zechman Deposition Exhibit 89 was marked**
8  **for identification.)**
9  **BY MR. BLOOM:**
10  Q. All right. You can put Zechman 88 away.
11  I'm showing you Zechman 89 and would you
12  just confirm for me that this is your W-2 from
13  Christiana Care from 2003?
14  **A. That's correct.**
15  **(Zechman Deposition Exhibit 90 was marked**
16  **for identification.)**
17  **BY MR. BLOOM:**
18  Q. You can put that away.
19  And next I'm going to hand you Exhibit
20  Zechman 90. Would you please confirm for me that that
21  is your W-2 from the allergy clinic run by your
22  husband James for the year 2004?
23  **A. That's correct.**
24  **(Zechman Deposition Exhibit 91 was marked**

Page 200

1  for identification.)
2  **BY MR. BLOOM:**
3  Q. Zechman 91, which I'm handing you, would you
4  please just confirm is the W-2 for 2005 for the
5  allergy clinic for you?
6  **A. That looks correct.**
7  Q. Dr. Zechman, I'm going to refer you back to the
8  document which is right in front of you, Zechman 85,
9  which is your interrogatory responsibilities, if you
10  would turn to page 6 and let me know when you're
11  there.
12  **A. I'm there.**
13  Q. And I think you testified earlier, but I want
14  to confirm that, when you applied for a family
15  medicine residency as a first-year resident, that the
16  two that you applied for or tried to match with were
17  Eastern Carolina University and University of North
18  Carolina, Chapel Hill.
19  **A. What page was that again?**
20  Q. It has page 6 at the bottom, and this is the
21  response to interrogatory number 7.
22  **A. Okay.**
23  **I don't think I actually got a chance to**
24  **apply to North Carolina because they did not take**

Page 201

1  **people that were not straight out of residency. I**
2  **called them to see if there was any openings, but I**
3  **cannot recall whether I actually was able to get an**
4  **application in front of them. I don't remember.**
5  Q. I think you said before that, for ECU, Eastern
6  Carolina University, that you were declined by them in
7  the family practice program through the match program?
8  **A. Yes.**
9  Q. Do you remember whether at this time, which is
10  after you left Christiana Care, whether you applied
11  for family practice residency anywhere other than
12  Eastern Carolina?
13  **A. I did not apply through the match, but I made**
14  **phone contact with the various different places and**
15  **they were not accepting applications or did not have**
16  **any openings.**
17  Q. This is the scramble period that we talked
18  about before?
19  **A. I cannot remember the exact period that it was**
20  **done in. With the scramble, that is pretty much**
21  **limited to people that have been registered in the**
22  **match. So I don't recall having the list for the**
23  **scramble. But I did call later on requesting to see**
24  **if programs had filled, if they had any openings, and**

51 (Pages 198 to 201)

Zechman                                                    Christiana Care Health Systems
Ellen Zechman          v.        C.A. # 05-159 JJF                June 20, 2006

Page 202

1  even did that later on in the year in case somebody
2  didn't show up for their position, which happens.
3  Somebody gets pregnant and can't make it, and so they
4  say, well, I'll come next year.  And I did follow up,
5  calling to see if there might have been an opening,
6  you know, just something going wrong later on in the
7  year.
8      Q.  After learning that ECU had not matched with
9  you for family practice -- and I think you said
10  earlier, at that point you saw that they had had an
11  opening but that there was no point in pursuing it
12  because you had already failed to match?
13     A.  Right.  And I had already called them about it
14  as well.
15     Q.  Do you remember that phone conversation?
16     A.  Some of it.  And I asked them, you know, you've
17  got -- you didn't fill.  Why am I not on there?  And
18  he told me he did not even list me in the match.
19     Q.  Did he say anything else?
20     A.  He said that they had called Christiana and
21  talked to one of the chief residents and they had
22  given a poor recommendation and that is why they did
23  not even list me in the match.
24     Q.  I've seen a reference in some of your letters

Page 203

1  to a man named Dean Patton, P-a-t-t-o-n.  Is that the
2  person you had the conversation with?
3      A.  He is one of them.  I had the conversation with
4  a couple people.  He is one of them that I did -- I
5  cannot remember whether I spoke to him directly or
6  whether the other person I was talking to said that
7  Dr. Patton had said.  I can't remember the
8  conversation.  I'm getting things scrambled here.  I
9  can't remember it.
10     Q.  Does that seem unusual to you that a residency
11  program or any institution would actually respond to a
12  question like that, asking them why they didn't match
13  with you?  Were you surprised that they answered?
14     A.  No.  Because these are the people that
15  graduated me from medical school, so there was already
16  a rapport there.  You know, I was one of them.  Why
17  were they not giving me a position?
18     Q.  ECU, you mean?
19     A.  Yes.  That's where I graduated from medical
20  school.
21     Q.  And so you already had some rapport and
22  relationship with ECU?
23     A.  Yes.
24     Q.  What about with Dean Patton personally?

Page 204

1      A.  Personally?
2      Q.  What was Dean Patton's position at ECU?
3      A.  I don't -- I'm blanking.  I don't know whether
4  he was the chairman of the department --
5      Q.  When you say --
6      A.  -- of family medicine or exactly what his --
7  but he was -- now, he used to be the residency
8  director himself back when I was in medical school and
9  I worked directly with him as a medical student, and
10  he was in a supervisory position.  But it was more,
11  you know, higher up.  He was not directly, you know,
12  involved with the residents at that time when this
13  conversation occurred.
14     Q.  This most recent time you applied to ECU to the
15  family practice resident program, do you believe that
16  there -- that ECU's decision not to accept you into
17  that position was based on discrimination or
18  retaliation of any kind?
19     A.  Are you referring to --
20     Q.  I'm just saying very generally if you think
21  anybody at ECU discriminated against you or denied you
22  that position for some improper reason?
23     A.  Family medicine position?
24     Q.  Yeah.

Page 205

1      A.  No.  I think it was directly related to what
2  was said about me when they called since I had not
3  finished my program here.  And they called to get the
4  scoop on it.  It was directly related to whatever
5  whoever they talked to told them.
6      Q.  And I take it your knowledge of that is based
7  simply upon what Dr. Patton or Mr. Patton or somebody
8  else at ECU told you about it?
9      A.  That's correct.
10     Q.  And --
11     A.  It was a poor recommendation when they
12  contacted the chief residents at Christiana Care.
13     Q.  And you don't know who it was that they spoke
14  to?
15     A.  He would not give the name.  He says he must
16  keep it confidential.
17     Q.  And do you recall the month and the year you
18  had this conversation with Mr. Patton?
19     A.  No, I don't.
20     Q.  And --
21     A.  But it --
22     Q.  I'm sorry.
23     A.  Can I add something?
24         But it was within a time frame of the

52 (Pages 202 to 205)

B-0202

Zechman
Ellen Zechman

v.

C.A. # 05-159 JJF

Christiana Care Health Systems
June 20, 2006

Page 206

1  match when I found out the match results. It would
2  have been closely, meaning closely, a week or two
3  weeks, related to whenever that information came
4  through.
5      Q.  And you had previously applied to the ob/gyn
6  residency program at ECU in the same year that you
7  applied to Christiana Care, right?
8      A.  That's correct.
9      Q.  And you were not accepted by ECU then?
10     A.  That's correct.
11     Q.  And do you have any understanding why you were
12  not accepted to the ECU ob/gyn program back in 2002?
13     A.  There was a lot of questions during my
14  interview process with the residents because the
15  residents do the majority of the interviewing for
16  residency positions of why do you want to do this?
17  You've got children at home? You don't want to be
18  doing this. Your husband's a doctor. Why do you want
19  to do this? Why don't you stay home with your
20  children?
21        It was a repeated theme because they knew
22  me, they knew my husband. My husband used to be on
23  staff there as an allergist. They knew I had my
24  children and they knew about my mixed connective

Page 207

1  tissue disease because I had been diagnosed at that
2  hospital and treated at that hospital as well as it
3  was an issue during my pregnancies with the last two
4  children that I had at that hospital where they had
5  privilege to all -- my understanding -- in the labor
6  and delivery suites.
7      Q.  Did you sue ECU for discrimination?
8      A.  I began a complaint on them, but I did not
9  follow through on it.
10     Q.  What does that mean, you did not follow through
11  on it?
12     A.  I did file a complaint. I did seek a lawyer's
13  advice on it. But I did not continue it because I had
14  gotten the position at Virginia and I had
15  accomplished -- you know, I didn't feel I needed to
16  pursue it because I was okay. I had, you know, a
17  position and I was continuing, you know, my training.
18  So it was -- you know, it was like I don't want to
19  deal with this.
20     Q.  So the employment decision that we are talking
21  about at ECU and the ob/gyn program, you were applying
22  for that position at the same time that you were
23  applying to Norfolk and Christiana, right?
24     A.  That's correct.

Page 208

1      Q.  Did you learn the result of those three
2  applications at approximately the same time?
3      A.  I cannot recall because they were not with the
4  match and I cannot recall the time period of that, you
5  know, who I talked to and when. I don't remember
6  that.
7      Q.  But it wasn't like a year later?
8      A.  I can't remember. I don't think it was.
9      Q.  The first step of the complaint that you
10  referred to is EEOC, did you file a compliant with
11  EEOC or some other agency?
12     A.  I cannot remember. I honestly do not remember.
13     Q.  And did there come a point when you actually
14  filed a lawsuit in court?
15     A.  I cannot remember. I remember I did talk to a
16  lawyer about it. I cannot remember exactly what we
17  did.
18     Q.  Have you sued anybody else for discrimination
19  other than ECU and Christiana Care?
20        MS. BREWINGTON: I'm going to object. She
21  hasn't testified that she sued ECU.
22     Q.  Have you sued anybody else for discrimination?
23     A.  I didn't sue them.
24     Q.  You did not. I want to make sure I have this.

Page 209

1  You're testifying today that you did not file a
2  lawsuit against Eastern Carolina University in
3  connection with their rejection of your residency
4  application in the ob/gyn program?
5        MS. BREWINGTON: I'm going to object
6  because it mischaracterizes her testimony, but she can
7  answer.
8        You can answer if you understand the
9  question.
10     Q.  It's a very simple question. Did you or did
11  you not sue E --
12     A.  I filed.
13     Q.  Wait a minute. I'm sorry. I don't want us to
14  talk over each other.
15        Did you or did you not file a lawsuit
16  against ECU?
17     A.  I filed a complaint. I contacted a lawyer.
18     Q.  Do you know where the complaint was filed?
19     A.  No. I cannot remember that. The lawyer
20  handled it, and I was doing other things. So I cannot
21  remember what we did and at what point we quit. And
22  no longer pursued it. I do not remember. Was this --
23  I turned that over to the lawyer.
24        MS. BREWINGTON: Allow him to finish his

53 (Pages 206 to 209)

(302)655-0477

Zechman
Ellen Zechman

v.
C.A. # 05-159 JJF

Christiana Care Health Systems
June 20, 2006

Page 210

1  question and then have you answer because I -- okay.
2    Q.  Were you don't with your answer?  What was the
3  answer, by the way?
4    A.  I'm not sure because I lost my train of
5  thought.
6        MS. BREWINGTON:  I interrupted.  You were
7  talking and she started.
8        MR. BLOOM:  Good job, Lori.  I'm sure that
9  was accidental.
10 BY MR. BLOOM:
11   Q.  You did file a complaint against ECU with
12 respect to their decision not to accept you to the
13 ob/gyn program?
14   A.  With respect to how they handled my interviews.
15   Q.  And because you thought the way they handled
16 the process was discriminatory based on your age,
17 right?
18   A.  And my disability.
19   Q.  So it was discrimination based on your
20 disability and your age?
21   A.  That's correct.
22   Q.  And do you remember whether this complaint that
23 you filed against ECU, was still active by the time
24 you actually started as a resident at Christiana Care?

Page 211

1    A.  I cannot remember.
2    Q.  Did there come a time where you settled that
3  case for money?
4    A.  No.  It never went through.
5    Q.  You're sure?
6    A.  We did not pursue it.
7    Q.  What does that mean to you?  When you tell me
8  that you filed a complaint, you know, that starts
9  something.  What does it mean to you when you tell me
10 you didn't pursue it because something needs to happen
11 to begin it to end it?
12   A.  I don't know what the lawyer did, but we -- we
13 just, I guess, dropped it because I said I don't want
14 to deal with this.  You know, I was happy.  I had, you
15 know, something else going on.  I had a residency
16 position.  I didn't deal with it.
17   Q.  So you don't have any memory of entering into a
18 settlement of that dispute?
19   A.  There was no settlement.  It was dropped.
20       MR. BLOOM:  This is a good place to take
21 like a five-minute break, and then I'll wrap up and I
22 won't keep us here very long.
23       (Discussion off the record.)
24       MR. BLOOM:  As long as we are all

Page 212

1  understood that this is going to be recessed and
2  continued at some point -- I mean, I think we all
3  understand that, but I just --
4        MS. BREWINGTON:  With the hope that we can
5  continue from this point forward, right?  We won't
6  have to rehash all the previous documents?
7        MR. BLOOM:  I do not anticipate redoing
8  portions of the deposition that I've already done.
9        MS. BREWINGTON:  Thank you.
10       (Discussion off the record.)
11       (Recess taken.)
12 BY MR. BLOOM:
13   Q.  Dr. Zechman, given what you just testified to
14 about how you believed you were mistreated and
15 discriminated against by ECU in connection with your
16 application to the ob/gyn residency program, is there
17 a particular reason why, after that experience, is
18 applied to the same institution after you left
19 Christiana Care?
20   A.  It was a different department.  It was
21 different people.
22   Q.  Which department is Dean Patton in again?
23   A.  Family medicine.
24   Q.  And I take it that, when you heard from ECU

Page 213

1  about the family practice residency program, all you
2  got was notification that you had failed to match, is
3  that true?
4    A.  That's correct.  And that's when I called them
5  because I knew they had not filled.  And so I wanted
6  to know what's going on here.
7    Q.  And do you have any knowledge one way or the
8  other about whether Dean Patton or anybody else in the
9  family medicine group had spoken to or learned about
10 the allegations you just mentioned before with respect
11 to the ob/gyn group?
12   A.  The complaint.
13   Q.  What do you mean?
14   A.  The complaint concerning the ob/gyn group.
15   Q.  I want to make sure I'm understanding you.  Are
16 you saying that Dean Patton was aware of that
17 complaint?
18   A.  No.  I'm trying to see if that is what you are
19 asking me.
20   Q.  Yes.  Yes, it is.
21   A.  Okay.  I have no idea.
22   Q.  Do you have any knowledge one way or the other
23 about whether Dean Patton or anybody else in the
24 family practice program had knowledge of your

54 (Pages 210 to 213)

Zechman
Ellen Zechman

v.

C.A. # 05-159 JJF

Christiana Care Health Systems
June 20, 2006

Page 214

1  dissatisfaction with how you were treated by the
2  ob/gyn group?
3  **A.  I have no knowledge of any of that.**
4  Q.  So the people in the family practice group may
5  have known about that prior issue or they may not
6  have?
7  **A.  I have no idea.**
8  Q.  Do you know who Robert Minnihan is, do you know
9  that name?
10  **A.  Yes, I do.**
11  Q.  Who is that?
12  **A.  He's an economic specialist that specializes in**
13  **incomes and does like an economic evaluations.**
14  Q.  And you understand that he's somebody who may
15  testify about your damages in this case?
16  **A.  That's correct, yes.**
17  Q.  Have you had any conversations with him?
18  **A.  Yes.  I asked him to do an evaluation of**
19  **economic damages.**
20  Q.  Have you personally spoken to him on the phone?
21  **A.  Yes, I have.**
22  Q.  More than once?
23  **A.  Maybe twice.**
24  Q.  You referred earlier to CREOG scores?

Page 215

1  **A.  That's correct.**
2  Q.  What is the CREOG test and what are the scores?
3  **A.  Okay.  Let me -- can I use a pen and I'll --**
4  Q.  Wait a second.  If you're going to draw
5  something, let's give you a clean sheet of paper at
6  the very least.
7  **A.  That's how you spell CREOG is that correct.**
8  Q.  C-R-E-O-G?
9  **A.  Council for Resident Education in Obstetrics**
10  **and Gynecology.  That's what that is.  I had to write**
11  **it out to get it.**
12  Q.  And how frequently does a resident take the
13  CREOG test?
14  **A.  Once a year.**
15  Q.  And is it in January?
16  **A.  Yes.**
17  Q.  For what purpose are CREOG test scores used
18  with respect to residents?
19  **A.  They are supposed to be uses in order to**
20  **evaluate the teaching categories of the program**
21  **itself, to give the Council of Resident Education in**
22  **Obstetrics and Gynecology an indication that this**
23  **program is teaching what it should be teaching and to**
24  **make adjustments in their program when residents are**

Page 216

1  **not getting taught enough in a particular area.  It is**
2  **to identify weaknesses in the program's teaching, not**
3  **identify weaknesses in the individual residents?**
4  Q.  I take it that the individual residents, those
5  scores are ranked nationally, correct?
6  **A.  That's correct.  It is a national exam that all**
7  **residents in obstetrics and gynecology are required to**
8  **take each year that they are in training.**
9  Q.  The CREOG test, to your understanding, is
10  specific to ob/gyn?
11  **A.  That's correct.  Now, they might have a**
12  **different test each year because they draw it out of**
13  **the some sort of data bank and they say, these are the**
14  **tests we are giving this year.  And they'd be**
15  **different from the ones over five or six years.  But**
16  **they are supposed to be national where everybody in**
17  **the country has similar questions that were similar or**
18  **from the same database at that particular year for**
19  **these residents.**
20  Q.  And when the scores of the residents are ranked
21  nationally, is that so you compare all second-year
22  ob/gyn residents to the scores of over second-year
23  ob/gyn residents nationally?  Is that how that works?
24  **A.  They have two scores on their report that they**

Page 217

1  **sent to us.  One is your score of how you rank**
2  **compared to everybody that took the test.  And then**
3  **there's a second that's year specific, how you ranked**
4  **against everybody in your year.  And these are the**
5  **numbers that come back from there and they are**
6  **specifically on a piece of paper that comes from the**
7  **council.**
8  Q.  So is it true, then, that in a particular year,
9  for example, 2003, that every ob/gyn resident in the
10  country actually takes the same CREOG exam?
11  **A.  I don't know.  I don't know whether it's the**
12  **same exam exactly or whether it's different form, like**
13  **different questions within the same category, you**
14  **know, like we are going to give them five questions in**
15  **this category, you know, and five in that, the actual**
16  **questions themselves being different, or whether it's**
17  **a blanket test.  I have no clue.**
18  Q.  And I think you mentioned earlier that you
19  think that the purpose of the CREOG test is to measure
20  the teaching performance of the program, correct?
21  **A.  That's correct.**
22  Q.  Would you also agree that, at least at
23  Christiana Care, in your experience, the CREOG test
24  scores are also used as a basis for evaluating how the

55 (Pages 214 to 217)

Zechman
Ellen Zechman

v.

C.A. # 05-159 JJF

Christiana Care Health Systems
June 20, 2006

Page 218

1 resident is doing?
2 **A. The program gets rated by the council on these**
3 **scores as to how good a program they are and their**
4 **performance. And in turn, Christiana's department of**
5 **ob/gyn has pressured the residents into performing**
6 **well on the exam in order not to reflect poorly on**
7 **them because it's crucial to their certification.**
8 Q. But I mean, you would agree, wouldn't you, that
9 a big part of what goes into a resident's CREOG score
10 is the resident as well, right?
11 **A. It's both the resident and the teaching**
12 **opportunities. It is both.**
13 Q. Is it true that, at least in your experience at
14 Christiana Care, that the CREOG test scores are used
15 as something of a proxy for how you're progressing in
16 terms of knowledge base, medical knowledge base?
17 **A. Yes. Christiana does do that. Other**
18 **residencies do not.**
19 Q. Is it your testimony that Christiana Care is
20 unique in that regard or that just different programs
21 put different emphasis on CREOG scores?
22 **A. I don't know. I posed that question to the**
23 **College of Graduate Medical Education and did not get**
24 **an answer back from them. But I posed that specific**

Page 219

1 **question because I was unsure and the literature that**
2 **I read, I could not decipher that from. And I**
3 **e-mailed the council and never got an e-mail back from**
4 **them. They never answered that question.**
5 Q. But for Christiana Care, based on your
6 experience, they do track the ob/gyn residents on the
7 CREOG scores?
8 **A. Yes.**
9 Q. It was a point of attention by the faculty?
10 **A. Attention and contention.**
11 Q. What do you mean by that?
12 **A. That was the remark with Patruno that, if I did**
13 **not do well on the CREOG exams, that the knives in my**
14 **back would be knives in my head.**
15 Q. Were there other people at Christiana Care who
16 thought, so far as you know, that there were other
17 factors that are more important than CREOG scores in
18 evaluating residents?
19 **A. Yes, there were.**
20 Q. And what are some of the factors that might be
21 equally or more important than CREOG scores?
22 **A. Patient care, performance, and just patient**
23 **care skills, and surgical skills, and a person's**
24 **rapport with the patient.**

Page 220

1 Q. And is surgical skills -- I gather that a
2 significant component of that is just physical
3 dexterity?
4 **A. Physical dexterity and just doing it enough to**
5 **learn how to do it. You know, experience. Getting in**
6 **the OR, do it until you can do it.**
7 Q. Was there anybody other than Dr. Robyn Gray who
8 you believe was improperly reassigning you out of
9 surgical experiences?
10 **A. There were other incidents, but she, by far,**
11 **had the majority of the incidents.**
12 MR. BLOOM: This will be my last document
13 and then we'll wrap it up.
14 THE WITNESS: It's after five.
15 MR. BLOOM: Do you want to stop now? I
16 mean, we are sort of at the end of a topic, so...
17 THE WITNESS: Let's finish. We need to be
18 considerate of these other people here.
19 MS. BREWINGTON: I'd like you to have
20 sufficient time to do what you need to do. Honestly,
21 if you'd like to continue, that is fine.
22 MR. BLOOM: Let's do one last document and
23 then we'll be out of here.
24 (Zechman Deposition Exhibit 24 was marked

Page 221

1 for identification.)
2 BY MR. BLOOM:
3 Q. I'm putting in front of you what's been mark at
4 Zechman 24. And this is a March 11, 2003, letter from
5 Dr. Sciscione to you, right?
6 **A. That's correct.**
7 Q. And first of all, in the first paragraph, he
8 reports your percentile score in your 2003 CREOG
9 scores was in the 12th percentile. Do you agree that
10 that's what that first paragraph says?
11 **A. I agree that that is what is on this paper.**
12 Q. Did you ever have a conversation with
13 Dr. Sciscione about what's said in that paragraph?
14 **A. We did because I did not know where he was**
15 **calculating this 12th percentile. That was not on the**
16 **papers that came in from CREOG, and it was some sort**
17 **of calculation that he did himself, and I could --**
18 **never did understand how they were doing that**
19 **calculation because it was not something that came on**
20 **the sheet from the council. It was something that was**
21 **calculated by him.**
22 Q. How do you know that it was calculated by him?
23 **A. I saw him calculating it on his calculator.**
24 Q. He did it in your presence?

56 (Pages 218 to 221)

Zechman
Ellen Zechman

v.

C.A. # 05-159 JJF

Christiana Care Health Systems
June 20, 2006

Page 222

1  **A. Yes.**

2  Q. And he did that -- did he do that in your

3  presence before he gave you this letter?

4  **A. I don't know.**

5  Q. So he might have given you this letter and then

6  you were sitting down with him and he says, here, I'll

7  show you how I calculated it?

8  **A. He didn't show me. He just did it in front of**

9  **me.**

10  Q. Oh, all right.

11  **A. Because I asked him, where did that come from?**

12  **It was not on my official papers from the CREOG with**

13  **my exam scores.**

14  Q. What they sent to you?

15  **A. Yes.**

16  Q. But you would expect that the residency program

17  is getting some information from CREOG that allows

18  them to compare their program's performances compared

19  to others, right? Because I think you said that

20  that's what you think is the main purpose of the exam?

21      MS. BREWINGTON: Objection. Calls for

22  speculation. You may answer.

23  **A. It calls -- that's speculation, but it is**

24  **possible that this was within the Christiana people**

Page 223

1  **itself because it was not part of the national test**

2  **scores. So it could have been a percentage that was**

3  **within either my classmates or the department itself,**

4  **but it was not -- that number was not a part of the**

5  **national report.**

6  Q. Oh, I see. So one of the possibilities that

7  you just referred to was that it might be a comparison

8  of you to all of the second-year residents throughout

9  Christiana Care?

10  **A. No. Only the ob/gyns because the other**

11  **residents didn't take this test.**

12  Q. Right.

13  **A. Only ob/gyns take this test, and I don't know**

14  **whether that number is from just comparing the 16**

15  **students that were the ob/gyn residents or whether it**

16  **was a comparison with the four in my class. But it**

17  **was not part of the national report.**

18  Q. You would agree with me that if it was just the

19  four in your class, you could not possibly be in the

20  12th percentile, correct?

21  **A. I don't know. I didn't see the rest of their**

22  **scores.**

23      MR. BLOOM: We'll adjourn for the day and

24  go off the record.

Page 224

1      (Discussion off the record.)

2      (Deposition adjourned at approximately

3  5:10 p.m.)

4

5      -----

6

7      INDEX TO TESTIMONY

8

9  ELLEN ZECHMAN                              PAGE

9      Examination by Mr. Bloom                  2

11

12      -----

13

14      INDEX TO EXHIBITS

15  ZECHMAN DEPOSITION EXHIBIT NO.            PAGE

15  1   ERAS Common Application Form              8

16  2   Letter of recommendation                 39

17  3   Recommendation dated December 5, 2000,
18      prepared by Dr. Samuel Atkinson          41
19  12  Document sent in support of charge of
20      discrimination                           50

20  13  Letter dated July 20, 2004               52

21  51  Agreement with Christiana Care for
22      July 2003 through June 2004              57
23  52  Agreement with Christiana Care for
        July 2002 through June 2003              57
24

Page 225

1      INDEX TO EXHIBITS  (Cont'd)

2  ZECHMAN DEPOSITION EXHIBIT NO.            PAGE

3  53  Job Specification for Intern/Resident    59

4  10  Letter sent to the EEOC in support of
5      discrimination charge                    64
6  19  Letter from Moses Hochman, M.D., dated
       April 4, 2003                            120

7
8  5   Letter dated January 29, 2004
       to the EEOC                              130
9  44  Letter sent to various doctors           146
10 45  Letter sent to Dr. Maynard               146
11 26  Letter dated April 30, 2003              155
12 86  Letter from Allergy & Asthma Clinic      162
13 85  Plaintiff's Answers to Defendant's
       Interrogatories                          166
14
15 87  Documents relating to work
       QTC Medical Group                        195
16 88  Print-out of payments received from QTC  197
17 89  W-2 from Christiana Care, 2003.          199
18 90  W-2 from Allergy & Asthma Clinic, 2004   199
19 91  W-2 from Allergy & Asthma Clinic, 2005   199
20 24  Letter dated March 11, 2003, from
       Dr. Sciscione                           221
21
22
23
24

Wilcox & Fetzer, Ltd.          Professional Court Reporters

Zechman
Ellen Zechman

v.

C.A. # 05-159 JJF

Christiana Care Health Systems
June 20, 2006

Page 226

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT.

Page 227

State of Delaware  )
                   )
New Castle County  )

CERTIFICATE OF REPORTER

I, Ann M. Calligan, Registered Merit
Reporter and Notary Public, do hereby certify that
there came before me on the 20th day of June, 2006,
the deponent herein, ELLEN ZECHMAN, who was duly sworn
by me and thereafter examined by counsel for the
respective parties; that the questions asked of said
deponent and the answers given were taken down by me
in Stenotype notes and thereafter transcribed by use
of computer-aided transcription and computer printer
under my direction.
I further certify that the foregoing is a true
and correct transcript of the testimony given at said
examination of said witness.
I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.

Ann M. Calligan, RMR
(Certification No. 186-RPR)
(Expires January 31, 2008)

DATED:  June 27, 2006

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

B-0208



**WILCOX & FETZER LTD.**

In the Matter Of:

# Zechman

## v.

# Christiana Care Health Systems

## C.A. # 05-159JJF

Transcript of:

# Ellen Zechman
Volume # 2

August 16, 2006

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

B-0209

Zechman
Ellen Zechman, Volume 2

v.
C.A. # 05-159JJF

Christiana Care Health Systems
August 16, 2006

```
 1            IN THE UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF DELAWARE
 3
      ELLEN ZECHMAN                    )
 4                                     )
              Plaintiff               )Civil Action
 5                                     )No. 05-159JJF
          vs.                          )
 6                                     )
      CHRISTIANA CARE HEALTH SYSTEMS)
 7                                     )
              Defendant               )
 8
 9                      VOLUME II
10           Deposition of ELLEN ZECHMAN taken pursuant
      to notice at the law offices of Morris James Hitchens
11    & Williams, LLP, 222 Delaware Avenue, 10th Floor,
      Wilmington, Delaware, beginning at 10:45 a.m on
12    Wednesday, August 16, 2006 before Elise Alvarado,
      R.P.R., C.S.R., court reporter and Notary Public.
13
14    APPEARANCES:
15
          LORI BREWINGTON, ESQUIRE
16        Margolis Edelstein
              1509 Gilpin Avenue
17            Wilmington, Delaware 19806
              for the Plaintiff
18
19        THOMAS S. BLOOM, ESQUIRE
          Morgan, Lewis & Bockius, LLP
20            1701 Market Street
              Philadelphia, Pennsylvania 19103-2921
21            for the Defendant
22                 -   -   -   -   -
23                   WILCOX & FETZER
      1330 King Street - Wilmington, Delaware 19801
24                   (302) 655-0477
```

**B-0210**

Zechman
Ellen Zechman, Volume 2

v.
C.A. # 05-159JJF

Christiana Care Health Systems
August 16, 2006

Page 229

1       ELLEN ZECHMAN,
2   the deponent herein, having first been duly
3   sworn on oath, was examined and testified as
4   follows:
5   BY MR. BLOOM:
6   Q.  Good morning, Dr. Zechman.  This is the
7   continuation of the deposition on June 20th, 2006.
8   Have you received a transcript of your first
9   deposition?
10  A.  I have.
11  Q.  Did you read it?
12  A.  No.
13  Q.  You didn't read it?
14  A.  No.  I said it.  Do I need to read it?
15  Q.  I'm just asking.
16  A.  The truth doesn't change, does it?
17  Q.  Is there anything that you believe in your
18  testimony the last time you met that is wrong or that
19  you need to correct today?
20  A.  Since I haven't reviewed it, you know, that's
21  not a fair question.  I said what I said is the
22  truth.  The truth stands.
23  Q.  Is there anything that you didn't remember
24  the last time we met that you have now since come to

Page 230

1   remember that relates to your claims?
2   A.  Yes.  I've had several things, different
3   areas of, I would say harassment, that, you know,
4   have come to me.  I have nightmares about this stuff.
5   I have trouble remembering it lots of times, because
6   it's extremely painful, emotional to me, but I have
7   nightmares about it and that's when I remember these
8   things.
9   Q.  Can you tell me specifically what you've now
10  come to remember that you couldn't think of the last
11  time?
12  A.  One thing in particular that was quite
13  distressing and disturbing, while we were in Ob-Gyn
14  triage, and we would spend at that time, sometimes
15  36 hours in the female emergency room where people
16  coming in for labor checks but also for gynecology
17  problems.  Basically if a woman had a uterus or had
18  had one removed, the emergency room would defer those
19  patients to us to take the main load off the
20  emergency room.  So it was basically a female
21  emergency room.  It was very busy.  It was very
22  intense.
23      I have documented one shift period, I
24  think it was a 24-hour shift, where I saw 64

Page 231

1   patients.  That is tremendous.  A seasoned, trained
2   Ob-Gyn would have difficulty seeing that many
3   patients.  And I was seeing that many on my own.  And
4   that has been documented in my logs.  And that is in
5   discovery.
6       But one of the things that I thought were
7   extremely abusive was at that time -- now they have
8   changed it since.  And a lot of this has been changed
9   because I bust about so much while we were there.
10  They would not give us lunch breaks.  We had to stay
11  in that area.  And I was -- how can I say --
12  chastised for leaving the area to eat.
13      Well, to eat in the area is an OSHA
14  violation, and people were eating in that area.  And
15  to eat in a work area where you have urine and blood
16  samples, you know, out there is a flagrant OSHA
17  violation.  And I would want to leave the area to an
18  OSHA-approved area to eat, whether it was a snack or
19  a lunch.  And I was chastised for disappearing.
20      Well, I started saying, "Well, I am
21  going to get a bite to eat for a few minutes.  Call
22  me if you need me."  I would have all my work caught
23  up.  I would be waiting for labs.  Nothing was
24  urgent.  I would leave the immediate area to get a

Page 232

1   bite to eat to an OSHA-approved area.  Having helped
2   my husband establish clinics I know OSHA rules.  We
3   have to abide by them.
4       So they chastised me for leaving the
5   area.  Other people were eating in the area.  And I
6   started pitching a fit.  Well, then I was chastised
7   for saying, well, you can't leave the area.  So what
8   they were basically saying was, you can't leave the
9   area because you are disappearing, but you can't tell
10  where you're going either, because we don't want the
11  other people to get mad, because you're going to eat
12  and they have to sit there and either not get to eat
13  or they're eating in the area.
14      I did make verbal complaints about this
15  being an OSHA violation.  And they were not very
16  happy with me about that.  We even had e-mail that
17  was part of the discovery stuff that you sent us that
18  is addressing this issue of me being chastised for
19  disappearing.  And I quote the thing Dr. Patruno is
20  saying, "She is entitled to eat."  Well, I should
21  hope so, that I am entitled to eat or drink during a
22  36-hour shift.
23      It was a case of being chastised if --
24  you know, you were breaking OSHA regulations if you

2 (Pages 229 to 232)

Page 233

1  didn't leave, but if you left, they were giving you
2  grief about it. And there were no provisions in
3  between for relief or, you know, breaks. And that
4  was a big thing, and that's another point of
5  retaliation that I feel turned the tides and the
6  prejudice against me in these incidences.
7      Q. I'm going to ask you more specific questions
8  about what you've just described.
9      A. Okay.
10     Q. But apart from that general topic which is
11 the OSHA violation, is there anything else that you
12 remember now that you couldn't remember the last time
13 we met in June?
14     A. That's the big one in my mind right now.
15 There are others that might come during the day right
16 now. Right now I am kind of focused on that.
17         And then I'm focused also on the fact
18 that I was begging for time off. I had asked middle
19 of July for family medical leave. I was exhausted.
20 They already knew from my hospitalization in February
21 that I had mixed connective tissue disease. They
22 knew a component to that is fatigue as well as joint
23 pain and systemic effects of it. And I was begging
24 for medical leave.

Page 234

1        I had just signed my contract that was
2  effective July 1st. About July 14th or 15h I had
3  verbally requested family medical leave because I was
4  having a flare-up. I was sick. I was exhausted. I
5  needed time off. They refused to give me sick leave.
6  They would not even give me the forms for family
7  medical leave. And they said -- they being Sandy
8  Kardos as well as my chief resident Robyn Gray -- our
9  department can't support that. We don't give that to
10 anybody. And in turn, I gave the letter which you
11 have a copy of the 23rd to Dr. Ekbladh requesting an
12 altered schedule.
13         Well, if they won't give me family
14 medical leave, they won't even give me the forms for
15 it, let me ask for an altered schedule. He would not
16 even address the issue. So then I go over his head
17 to Brian Little's office to get the accommodation
18 sheets, which you have copies of that. And his I
19 would say administrative assistant signed them. And
20 it was dated 7/23, which was after Ekbladh totally
21 ignored my request. I went over his head to
22 basically the department which is in charge of all
23 graduate medical offices. And I got the form from
24 them and took it back.

Page 235

1        And he was totally angry for me going
2  over his head doing that. But it was the ADA, the
3  request for accommodation, because I felt like if
4  they legally have legal room by not giving me family
5  medical leave, they definitely were refusing to give
6  me sick leave or vacation, then I knew legally they
7  had to accommodate my disability. I had documented
8  disability. At least I know they will do this. And
9  they totally blew that off too.
10        Then they increased my work schedule,
11 which we have the documentation about. And then
12 Ekbladh was making me take these tests which in
13 addition to the increasing, you know, my work
14 schedule and work load, I was having to take these
15 tests every week which resulted in me having to get
16 up at four o'clock every morning to have time to
17 study and read the stuff to take that test every week
18 prior to going on my usual six o'clock in the morning
19 to 6:30 in the afternoon shift. So he was increasing
20 my workload after this.
21        And then -- I just lost my train of
22 thought here. Hold on. After this went on and I was
23 becoming increasingly fatigued, I continued to ask
24 for time off. I didn't care, give me vacation. Give

Page 236

1  me family medical leave. Give me ADA. I need time
2  off. I'm sick. I can't go anymore. I'm fatigued.
3  And he was just ignoring all of those requests. And
4  I told him, and I said to his face in his office at
5  one of these private visits, this is discrimination
6  making me take these tests when nobody else has to
7  take them. This is discrimination.
8        Well, the next day I got an e-mail, and
9  we have got a copy of this, you no longer have to
10 take those tests anymore.
11     Q. You described a minute ago going to Dr.
12 Little on July 23rd, 2003. Is that when you did
13 that?
14     A. His office. I didn't have an appointment
15 with him. It was at his office, and his
16 administrative assistant gave me the forms. She
17 signed them. They are all over the place, because
18 they have been in discovery. They have been in the
19 EEOC. I bet all of us have at least five copies of
20 that particular form.
21     Q. And that's the same day that you gave Dr.
22 Ekbladh the letter requesting an adjustment to your
23 schedule?
24     A. Yes. And he blew me off. And that's when I

3 (Pages 233 to 236)

B-0212

Zechman
Ellen Zechman, Volume 2

v.
C.A. # 05-159JJF

Christiana Care Health Systems
August 16, 2006

Page 237

1  went to Dr. Little's office later on that day after
2  Ekbladh just would have nothing, you know, he
3  wouldn't discuss it. He looked at the letter and
4  just, you know basically blew me off.
5      Q. I want to get back to what you described at
6  the beginning of our depositions OSHA violation or
7  what you say is an OSHA violation.
8      A. Yes.
9      Q. Did I hear you correctly that the other
10  residents did not leave the area to eat lunch? They
11  were eating within the triage area?
12      A. You only have one resident in that time. So
13  I didn't know what they were doing. But the nurses
14  were eating. And that was one of the things that was
15  a dissension that I was saying I'm going to get a
16  bite to eat, and I'll be right back. Or I got
17  everything quieted down. And evidently there was
18  some chatter that how come she can leave to eat and
19  we can't.
20          But they were eating in the workplace.
21  And I said we're not supposed to do this. This is an
22  OSHA violation. You know, you have separate places
23  to eat. I even discussed with Dr. Patruno about what
24  we could do to get a separate place to eat that was

Page 238

1  OSHA approved so that I wouldn't have to leave the
2  area. There was no area.
3      Q. You said you complained about people eating
4  in the triage area. Who did you complain to?
5      A. The nursing supervisor. This is all oral. I
6  didn't file a written complaint, because OSHA
7  violations are serious, and I didn't want to get
8  people mad at me, but I wanted to fix the problem,
9  you know.
10      Q. Who else did you complain to?
11      A. Dr. Patruno. At that time Dr. Sciscione was
12  there.
13      Q. You spoke to Dr. Sciscione about this?
14      A. Yes, I did.
15      Q. Anybody else?
16      A. Probably whoever else was in the staff, you
17  know, people coming and going. I don't know who
18  else.
19      Q. Do you know the name of the nursing
20  supervisor you just referred to?
21      A. No.
22      Q. Can you tell me what you remember of your
23  conversation with the nursing supervisor?
24      A. No, other than just the fact that we are not

Page 239

1  supposed to be doing this, this is an OSHA violation.
2  We are not supposed to have eating in the working
3  area, that sort of thing.
4      Q. So you just brought this to the attention to
5  the nursing supervisor?
6      A. Yes; and whatever nurses were sitting at the
7  desk at that time.
8      Q. Can you tell me about your conversation with
9  Dr. Patruno about this?
10      A. No, I can't. It's been four years now. So
11  no, I can't remember the specifics of the
12  conversation. But he and I did talk about it. And I
13  remember making suggestions of where we could try to
14  establish an area. And he kind of blew up. He said
15  that will cost too much money. He won't do that.
16      Q. Did he also tell you to try to be discrete
17  about when you go out to take lunch because other
18  people might be resentful if they are not able to
19  leave for lunch?
20      A. He told me -- it's in the e-mail, exactly
21  what he said. And we would just have to pull that and
22  look at it. I think that would be the most accurate
23  thing rather than my memory, to pull that document
24  and look at it. And I know it's part of the

Page 240

1  discovery stuff.
2      Q. We will probably get to that letter, but I
3  mean just from memory. Does that sound right to you?
4      A. I don't know. I would need to review the
5  letter.
6      Q. What about Dr. Sciscione? Do you remember
7  anything about your conversation with Dr. Sciscione
8  about what you say is the OSHA violation relating to
9  eating lunch?
10      A. No, I can't remember the specifics, but I
11  know I did bring it to his attention.
12      Q. Do you remember what he said in response to
13  the complaint you raised with him?
14      A. I do not. But he was always very open to
15  complaints, suggestions and tried to make
16  improvements.
17      Q. So I take it he did no not react negatively
18  to your complaint?
19      A. No, no.
20      Q. Do you remember when in time you raised this
21  issue about potential violation of OSHA?
22      A. No, I do not.
23      Q. Have you stayed in contact with anybody at
24  Christiana Care since the time you left?

4 (Pages 237 to 240)

Zechman  
Ellen Zechman, Volume 2

v.  
C.A. # 05-159JJF

Christiana Care Health Systems  
August 16, 2006

Page 241

1  A.  Yes, I have.
2  Q.  Who did you stay in contact?
3  A.  I prefer to keep that confidential, because I
4  fear retribution against that person as I underwent
5  retribution with my job.
6  Q.  Nobody is going to retaliate.
7  A.  Well, look what happened to me. I don't want
8  to put my friend under retaliation like what I went
9  through.
10  Q.  I understand that, Dr. Zechman. This is a
11  lawsuit you filed against Christiana Care. If you
12  are having communications with employees at
13  Christiana Care, you have got to say so.
14       MS. BREWINGTON:  Are they employees of
15  Christiana Care?
16       THE WITNESS:  They are.
17       MS. BREWINGTON:  You have to say.
18       THE WITNESS:  I want to put it on record
19  that I fear greatly that there will be retribution
20  against this person for talking to me just as this
21  had been done to me. Dr. DeMichael.
22  BY MR. BLOOM:
23  Q.  DeMichael?
24  A.  Yes.

Page 242

1  Q.  Do you know how to spell that?
2  A.  No.
3  Q.  Do you know his first name?
4  A.  It's a she.
5  Q.  What's her first name?
6  A.  Andrea.
7  Q.  In what capacity does Dr. DeMichael work at
8  Christiana Care?
9  A.  She is now working as an employee, because
10  she graduated from the residency program this past
11  year. She was my best friend.
12  Q.  What residency program was she in?
13  A.  She is a graduate of the family medicine
14  residency program there as well as the obstetrics and
15  gynecology. She is double-Boarded.
16  Q.  Was she in the Ob-Gyn residency program at
17  the same time you were?
18  A.  Yes.
19  Q.  What class was she in relative to you?
20  A.  She started a year later than I did.
21  Q.  So when you started as a second-year, she
22  started her first year?
23  A.  That's correct. She had just finished the
24  family medicine program. So she was taking her

Page 243

1  Boards to be Board certified. She did two residency
2  programs, family medicine and then Ob-Gyn after that.
3  Q.  When was the last time you spoke to Dr.
4  DeMichael?
5  A.  Last night.
6  Q.  What did you talk to her about?
7  A.  Her pregnancy.
8  Q.  Did you talk about anything that relates to
9  your case against Christiana Care?
10  A.  I told her that I was here doing the
11  deposition, yes.
12  Q.  Other than the fact that you were going to be
13  here for this deposition, did you discuss anything
14  else?
15  A.  No, I didn't, because I didn't want to drag
16  her into it. We discussed her pregnancy, and she is
17  going to be moving to North Carolina and practicing
18  medicine there. And I just wanted to know when she
19  was going to be moving to North Carolina.
20  Q.  Have you in the past had conversations with
21  Dr. DeMichael about the substance of your allegations
22  in this case?
23  A.  Yes, I have.
24  Q.  Can you tell me what you discussed with her?

Page 244

1  A.  Probably everything.
2  Q.  Is there anything that you've told her that
3  you have not yet testified about in your deposition
4  in this case?
5       MS. BREWINGTON:  Objection.
6       THE WITNESS:  I have no idea. That's
7  pretty broad. I have no idea. That question doesn't
8  make sense to me.
9  BY MR. BLOOM:
10  Q.  Do you view Dr. DeMichael as a witness who
11  has knowledge of facts relevant to your case?
12  (pause) Are you thinking?
13       Are you going to answer that question?
14  A.  I need a minute to word it properly.
15       MS. BREWINGTON:  Do you need him to
16  rephrase it?
17       THE WITNESS:  Yes.
18       MS. BREWINGTON:  Can you rephrase it?
19  BY MR. BLOOM:
20  Q.  Do you view Dr. DeMichael as a witness who
21  has knowledge of any of your allegations in this
22  case?
23  A.  Yes.
24  Q.  What, in your view, does she have knowledge

5 (Pages 241 to 244)

Zechman
Ellen Zechman, Volume 2

v.

C.A. # 05-159JJF

Christiana Care Health Systems
August 16, 2006

Page 245

1  about with respect to your case?
2          MS. BREWINGTON: Objection. It calls
3  for speculation.
4          THE WITNESS: I don't know, you know,
5  what she would specifically -- she definitely has
6  knowledge of me being kicked out of the call room and
7  having to sneak around and find places to sleep when
8  I'm on call. She has firsthand knowledge of that.
9          She has firsthand knowledge of how Dr.
10  Gray and Dr. Heinle treated me and how rude they were
11  to me.
12  BY MR. BLOOM:
13      Q. Anything else?
14      A. That's all I can think of at the moment.
15      Q. Has Dr. DeMichael ever expressed to you a
16  belief on her part that she was treated unfairly by
17  Dr. Gray or Dr. Heinle?
18      A. I don't know.
19      Q. Well, I'm asking if she ever told you that.
20      A. She agreed with me on them discriminating
21  against me and leaving me out of cases when I would
22  show her that. But I don't know -- I can't remember
23  her saying that she had been treated that way.
24      Q. Did she ever complain to you in any way about

Page 246

1  Dr. Gray or Dr. Heinle?
2      A. Yes.
3      Q. What complaints did she share with you?
4      A. Their rudeness and the way they treated, you
5  know, me. It was obvious.
6      Q. Am I hearing you right that Dr. DeMichael
7  told you that she had complaints about -- I'm going
8  to rephrase that entirely. My question is: Did Dr.
9  DeMichael ever share with you that she had complaints
10  about Dr. Gray or Dr. Heinle?
11      A. I cannot recall. But she agreed with my
12  assessment of how I was being treated by them.
13      Q. How did she know how you were being treated
14  by them?
15      A. She saw it.
16      Q. Did you know when other residents were being
17  reassigned from a surgical procedure?
18      A. Sometimes you do, because it's on the board
19  in morning. Other times it's a last-minute thing,
20  like you are on the board and you get a call, you're
21  not going to that surgery. You go do this. And you
22  do not have, you know -- since you're busy running
23  your own path, you don't see anything other than who
24  might be walking by you in that area. So that's hard

Page 247

1  to answer. Because sometimes you will. You know, you
2  will see like it was very obvious that I was supposed
3  to be on the GYN, which is gynecology surgery
4  rotation. And my name wasn't on the board. And
5  somebody who was not even on that rotation was in the
6  slot that I was supposed to have. That was Dr.
7  Heinle.
8          And we have got documentation of that,
9  specific days and specific surgeries where I was on
10  the rotation. I was supposed to be the one giving
11  those surgeries, and she was off in some clinic. And
12  all of a sudden she shows up on a surgery schedule
13  with the cases that I was supposed to have.
14      Q. I take it you told Dr. DeMichael that you
15  were being reassigned in what you viewed as an
16  excessive amount by Dr. Gray; is that true?
17      A. I'm sure that I did tell her, yes. I was
18  quite verbal about saying, Hey, why am I not getting
19  the assignments? I'm on the rotation. It's my turn
20  to learn to do this.
21      Q. Did Dr. DeMichael ever tell you that she had
22  independent knowledge of that circumstance other than
23  what you had told her?
24      A. I don't know. I don't know that that

Page 248

1  question came up. That's not a question that I would
2  ask to somebody. So I don't know.
3      Q. Did I hear you right before when you were
4  describing that you told her this was happening and
5  she agreed with you, that your understanding is she
6  was agreeing with you based on what you were telling
7  her?
8          MS. BREWINGTON: I want to object to
9  that question.
10          THE WITNESS: There are times she could
11  see it blatantly on the board signs you could see in
12  the morning bow coverage beginning of the shift
13  conference, and you can see, why aren't I up there?
14  So there are times where she would have firsthand
15  knowledge, you know, because she would know I was on
16  the surgery rotation and new people who are not on
17  the surgery rotation are on the board going to
18  surgery and I was not.
19  BY MR. BLOOM:
20      Q. Did Dr. DeMichael ever express to you that
21  she ever had complaints about Dr. Ekbladh?
22      A. I don't recall. I'm getting water.
23          (A brief break was taken.)
24  BY MR. BLOOM:

6 (Pages 245 to 248)

B-0215

Zechman
v.
Christiana Care Health Systems
Ellen Zechman, Volume 2
C.A. # 05-159JJF
August 16, 2006

Page 249

1  Q.  Dr. Zechman, other than what you've just
2  described to me about being pulled from the surgery
3  shifts, is there anything else that you believe that
4  Dr. DeMichael has independent knowledge with respect
5  to your case?
6  **A.  The eating in the triage area.**
7  Q.  What is the basis for you saying that?
8  **A.  Because she had to put up with the same**
9  **stuff.**
10  Q.  Meaning what?
11  **A.  Not being able to take breaks for eating, the**
12  **OSHA violation part of it.**
13  Q.  Was that generally true that people weren't
14  able to take breaks to eat in the triage area?
15  **A.  They did change it after I started fussing**
16  **about it. But earlier on in my stay, yes. When I**
17  **started saying hey, this is an OSHA violation, we**
18  **need to, you know, be able to get out of here to eat,**
19  **then things did start changing somewhat, not all the**
20  **time, but they did make a better effort to relieve**
21  **us. But that was later on, I'd say, in the spring of**
22  **2003.**
23  Q.  Is the change that you're describing for me
24  that people are allowed to leave the area to grab a

Page 250

1  bite to eat?
2  **A.  They would send somebody in to relieve you.**
3  **Whereas before, there was no relief. You had to stay**
4  **there. They would send in one of the chief residents**
5  **to take your place so that you could go to the lunch**
6  **room to get something to eat.**
7  Q.  You told me a minute ago that there were
8  three who you remember complaining to this about to.
9  And they were the nursing supervisor, Dr. Sciscione
10  and Dr. Patruno.
11  **A.  Yes.**
12  Q.  Anybody else?
13  **A.  I was going to say whoever was in earshot,**
14  **you know, when it was going on.**
15  Q.  And I think you told me that you don't
16  remember anything about your conversations on this
17  topic with either the nursing supervisor, Dr. Patruno
18  or Dr. Sciscione; is that true?
19  **A.  I don't remember the specifics.**
20  Q.  What do you remember?
21  **A.  I know that I mentioned it to them.**
22  Q.  Do you remember anything about their response
23  to you? And when I say "their," I mean Patruno
24  Sciscione and the nursing supervisor.

Page 251

1  **A.  We have already gone over this. With**
2  **Patruno, we discussed where we could have lunch**
3  **rooms. I mentioned that. It hasn't changed. And he**
4  **made the comment when I was making suggestions, we**
5  **could turn this room into a break room or add on a**
6  **room out here. He says they will never do that.**
7  **That costs too much.**
8  **With Sciscione, he listened to me. He**
9  **did not make any negative comments, you know. He was**
10  **just supportive in my concern.**
11  Q.  So you referred a while ago being chastised.
12  Who chastised you?
13  **A.  Dr. Patruno.**
14  Q.  Did he chastize you in any way other than
15  what you just described about they'll never do that,
16  that sort of thing?
17  **A.  Just telling me that I shouldn't sneak away**
18  **or disappear. He preferred that I not say that I was**
19  **going to eat that I just do it. But then in turn he**
20  **says but you can't disappear either. So it was like**
21  **a catch 22. I can't announce that I am leaving to**
22  **get a bite to eat, but don't disappear either, which**
23  **basically leaves you either not having a break for 24**
24  **or 36 hours or having an OSHA violation by nibbling**

Page 252

1  **in the corner.**
2  Q.  Is that the conversation that you said before
3  that is reflected in the e-mail?
4  **A.  Yes.**
5  Q.  The e-mail that you're referring to -- well,
6  we will discuss it when we get to it.
7  Dr. Zechman, I am going to shift topics
8  briefly. Because we spent a lot of time during our
9  last session talking about your discrimination claims
10  in this case and the bases of the claims. I don't
11  want to rehash it. But I want to make sure that I've
12  got the boundaries of it correctly and that I fully
13  understand who the people are that are involved. So
14  I just want to recap it briefly and make sure we did
15  not miss anything that you meant to testify about.
16  My understanding, based on the last day
17  we spent together, was that you contend in this case,
18  you've asserted claims of discrimination based upon
19  both your age and your disability, correct?
20  **A.  That's correct.**
21  Q.  You have also asserted claims of harassment
22  based either on your age or your disability. Is that
23  true?
24  **A.  That's correct.**

7 (Pages 249 to 252)

B-0216

Zechman
Ellen Zechman, Volume 2

v.

C.A. # 05-159JJF

Christiana Care Health Systems
August 16, 2006

Page 253

1  Q. And you also asserted claims of retaliation?
2  A. Yes.
3  Q. Is there anything else that I've left out?
4  A. I would say that with the failure to give me
5  the medical leave and increasing my schedule and
6  continuing, you know, to pile stuff on me when I was
7  begging for time off for two months. I put in a
8  verbal request like maybe July 14th. But the first
9  written one was July 23rd. And not getting anything,
10  even e-mails -- what's 9? September, right?
11       I was begging for a day off, because
12  they wouldn't even let me have a day off for me to go
13  to my doctor, and the e-mail said I am exhausted.
14  Every joint in my body hurts. I need time off. Have
15  you heard from my doctor concerning my request for
16  creative scheduling, basically referring to my
17  request for accommodation, sick leave, family medical
18  leave whatever the heck they would give me I needed
19  time off. I was exhausted. I was hurting. I was
20  sick.
21       That goes beyond discrimination. That
22  is abuse.
23  Q. I want to make sure I understand the people
24  who you are accusing of discrimination or retaliation

Page 254

1  or harassment.
2       At least based on your last deposition,
3  the three people that I heard you to be accusing of
4  that sort of conduct were Dr. Ekbladh, Dr. Gray and
5  Dr. Heinle. Is that true?
6  A. Sandy Kardos as well. But Dr. Heinle, she
7  was not really involved in that part of it. She did
8  not really have say so.
9       But the buck stops at Dr. Ekbladh. He
10  could have stepped in at any moment and straightened
11  everything out. He was the boss. He was the
12  director. And he knew firsthand, because I was in
13  his office every week talking to him, asking for the
14  medical leave. Well, if you can't give me medical
15  leave, can I have vacation? Can I have sick leave?
16  Nothing.
17  Q. I just want to make sure I have the players
18  right.
19  A. The players are right. But Ekbladh was
20  number one. He is the boss. The buck stops there.
21  He could have said one word and everybody else would
22  have jumped.
23  Q. Is there anybody else that you are accusing
24  of discrimination, harassment or retaliation in this

Page 255

1  case other than what we have just discussed?
2  A. Going back to the original document, I think
3  there are other things that are just not coming to my
4  mind. You know, whatever is in that original
5  Complaint.
6  Q. As you sit here today -- because your
7  Complaint is not evidence. And this deposition is a
8  process of gathering evidence. Do you have evidence
9  that anybody other than the three people you've just
10  identified discriminated against you?
11  A. There were other instances where Dr. Vakili
12  during surgery did not want me in surgery. And later
13  on I did a case with him and Dr. Vakili -- we talked
14  about this the other day. We are rehashing stuff
15  that we have already talked about.
16       Dr. Vakili -- I think I did an abdominal
17  hysterectomy with him either July or August. And he
18  even said you do so good. Why are they mad at you?
19  Q. Anybody else that you've left out?
20       MS. BREWINGTON: I'm going to object.
21  Asked and answered. We have gone through this at the
22  first deposition. She has gone over this.
23  BY MR. BLOOM:
24  Q. I'm just going to note that we spent a lot --

Page 256

1  go ahead.
2  A. I am sure there are. It's all written down.
3  It's hard. There's a lot of stuff here. It's hard
4  for me to remember every detail. If you want to pull
5  the original Complaint and let's go through it line
6  by line and add to it, let's do that. That will help
7  my memory if you want to do that. We rehashed all
8  this last time, so how much of this do you want me to
9  repeat? Do you want to pull the original Complaint?
10  How much more of this do you need to hear a second or
11  third time?
12  Q. I just want to make sure you haven't left out
13  people. You've made very serious allegations,
14  accusations of discrimination and retaliation and
15  harassment. You're accusing people of doing that. I
16  want to make sure I have the names of the people who
17  you are accusing. We've gone through Dr. Heinle, Dr.
18  Gray, Dr. Ekbladh. Now you've just referred to Dr.
19  Vakili. Is there anybody we've left out?
20  A. I would have to see the original Complaint
21  because there is just so much here.
22  Q. Dr. Vakili, to your understanding, is not a
23  Christiana Care employee; is that true?
24  A. No. And that was very humiliating. And we

8 (Pages 253 to 256)

Zechman                                v.                    Christiana Care Health Systems
Ellen Zechman, Volume 2          C.A. # 05-159JJF                      August 16, 2006

Page 257

1  talked about this last time, an extremely humiliating
2  thing when he wouldn't see me and then later -- it's
3  purely -- they say you're no good, and then later he
4  saw that I was good, that I knew what I was doing.
5       In that abdominal hysterectomy, I did
6  all the surgery and we had less than 25 cc's of blood
7  loss. That is fantastic for abdominal surgery.
8  Q. It is your understanding that Dr. Vakili is
9  an outside physician.
10  A. Oh, yes, but he still is an attending
11  physician that evaluated me, and these evaluations
12  have not shown up. They were not in discovery. And
13  there were others that I know were put in that Dr.
14  McIntosh said I filled out a good evaluation on you.
15  Did you see it?
16  Q. Who is Dr. McIntosh?
17  A. She is a private physician.
18       Dr. Beth Shubert filled out good
19  evaluations on my surgical skills. None of those
20  showed up in discovery. Now what happened to those
21  things?
22  Q. Who is Dr. Shubert?
23  A. She is another private Ob-Gyn that I worked
24  with.

Page 258

1  Q. The incident that you just talked about with
2  Dr. Vakili, this is what we talked about last time
3  where Dr. Sciscione then backed you up?
4  A. Yes. And you do have documents on that.
5       In addition Dr. -- oh, the name just
6  left my head. We have a letter from one of the
7  attendings that he sent a letter in my behalf to Dr.
8  Brian Little saying that my surgical skills in his
9  opinion were appropriate for my level of training.
10  And guess what? That never showed up.
11       All of the good letters mysteriously did
12  not show up in my discovery documents from
13  Christiana. We have copies of them and we had
14  submitted them. But how come these good documents,
15  two letters from --
16       MS. BREWINGTON: If you would like me to
17  say the name. I can help her.
18       THE WITNESS: Dr. Carlson. Two letters
19  from the department commending me for teaching the
20  medical students and having exceptional knowledge and
21  good teaching skills, letters of commendation, two of
22  them from the department, Dr. Shlossman. They
23  weren't in my file with the discovery.
24  BY MR. BLOOM:

Page 259

1  Q. That was from the medical school, right?
2  A. No. That was from the department. And all
3  of these mysteriously, the good stuff, hasn't shown
4  up in our discovery file from Christiana. Why is it
5  not there? How come I have these letters, and they
6  have been plucked and not surfaced in my discovery
7  file from Christiana? A little bit strange, huh?
8  Q. Well, Dr. Zechman, I am not going to address
9  why there are not duplicate copies of things produced
10  in the record.
11  A. We requested the full file. Why are the good
12  letters not there?
13  Q. Dr. Zechman, do you contend that when Dr.
14  Vakili, I guess, asked you not to participate in that
15  surgery, do you contend he was discriminating against
16  you for some reason?
17  A. Yes.
18  Q. What leads you to believe that Dr. Vakili was
19  motivated by discrimination?
20  A. By whatever he heard from his colleagues,
21  because he said specifically, They say you're not
22  good. I don't want you in here.
23  Q. So you're understanding is that he was acting
24  based upon things he heard from other people?

Page 260

1  A. Yes. And that was early in my training.
2  That would have gone back to -- and I might not be
3  absolutely correct on this date. But the dates would
4  be consistent with the letters Dr. Sciscione. It was
5  maybe September, October, November 2002. I was still
6  the newby there. And he had never worked with me
7  before, so he was strictly going off of something he
8  had heard from his colleagues.
9  Q. To your understanding, Dr. Ekbladh is older
10  than you are; is that true?
11  A. I hope so, because -- yes. Not a fair
12  question.
13  Q. But he is a man in his 60s; is that true?
14  A. I don't know whether he is late 50s or late
15  60s, but yes, he is older than me.
16  Q. And I understand you have claims against Dr.
17  Ekbladh. But my question is, do you contend that Dr.
18  Ekbladh discriminated against you because of your
19  age?
20  A. I feel the age factor was more the other
21  residents and the other attendings. With Dr. Ekbladh
22  I think it was more retaliation when I would speak
23  out against things that I knew were wrong.
24       And having helped my husband start his

9 (Pages 257 to 260)

B-0218

Zechman
Ellen Zechman, Volume 2

v.
C.A. # 05-159JJF

Christiana Care Health Systems
August 16, 2006

Page 261

1  own clinic, like the OSHA violations, certain things
2  you know, I knew this stuff. And I would speak out,
3  and he didn't like that, and he was very angry about
4  me going over his head and getting that accommodation
5  request from Dr. Brian Little. That put him through
6  the ceiling. His face turned red when I did that.
7  He was very angry. He even told me I had chutzpa in
8  one of the those languages. He said I hope you make
9  it, because you really have got chutzpa. And it was
10  in reference to me getting those forms.
11  Q. When did that interaction happen?
12  A. That would have happened at our first meeting
13  after I had put in the request. And it would have
14  been that meeting where he was threatening to
15  terminate me immediately where he had that list where
16  it was a bullying technique after I had put in for
17  the request for, you know, the altered schedule on
18  the 23rd. The very next week he gives me this form.
19  And I had just signed the contract weeks before of
20  terminate, bla bla bla, after going over his head and
21  getting the forms for accommodation.
22  Q. I want to make sure that we also have the
23  complete universe of the complaints that you're
24  referring to. You just referred to the complaint

Page 262

1  about the OSHA violation. And there was also, I know
2  a complaint that you sent to the ACGNE; is that
3  correct?
4  A. That's correct.
5  Q. Are there any other complaints that you made
6  in connection to your retaliation claim?
7  A. There is a complaint concerning --
8      MS. BREWINGTON: I want to object and
9  make clear on the record that she has mentioned
10  things previously in the deposition. Do you mean
11  other than what she has already said last time?
12      MR. BLOOM: Yes.
13      MS. BREWINGTON: So anything you had not
14  mentioned last time, if you can remember that, and
15  what you had not mentioned today already.
16      THE WITNESS: Yes; because we are
17  rehashing already a lot of this stuff.
18      I cannot think of anything at this
19  moment. But if it comes to me while we are talking,
20  I will let you know. Okay?
21  BY MR. BLOOM:
22  Q. I appreciate that. But so far as you can
23  remember right now, it's the complaint to the ACGNE
24  and the complaint about the OSHA violations with

Page 263

1  lunch in the triage rooms?
2  A. And the exam beds. That was a big one.
3  We've talked about that already.
4  Q. We talked about that, the mechanical problem
5  with the beds. Was that the issue?
6  A. You've got it, yes.
7  Q. That's the general issue?
8  A. You've got it, yes.
9  Q. I am going to try not to touch on things we
10  went over last time. But you referred the last time
11  to a closing window of opportunity that related to
12  the illness of your father and your mother no longer
13  being available to you to help with your kids and
14  your family; is that right?
15  A. Yes. I feel that personally it's going on
16  three years. This October it will be three years. I
17  should have graduated and been home back in North
18  Carolina practicing as an Ob-Gyn doctor.
19      When I was talking to Barbara McElwaine
20  concerning the labor law violations that Christiana
21  was found in violation of labor laws concerning my
22  leave, she asked me, Do you want your job back? And
23  I told her, I said I would be scared to go back there
24  for retaliation. I said, And my window of

Page 264

1  opportunity has closed to be that far away from home.
2      But the main thing is I'd be scared to
3  walk in there. If Barbara McElwaine with the
4  Department of Labor says, Here, you have got to take
5  her back, I would be so scared. I told Barbara
6  McElwaine this. I said, For God's sake, look at me
7  when I didn't have a labor law violation against
8  them. Just imagine what they would do if I went back
9  to work after the Department of Labor -- putting this
10  labor law violations on them.
11  Q. Let me be more precise with my question. Did
12  I hear you correctly last time that the window of
13  opportunity closing that you just referred to
14  happened in late 2003, early 2004?
15  A. My life changed and my ability to be away
16  from my family did change because of my father dying,
17  my mother going back to work, and the nanny that had
18  been with my children, each one of them, the last
19  three, when I walked in the door with my newborn baby
20  one day old from the hospital, she died.
21      So there's been a change in my life and
22  my ability to leave my children for two, three weeks
23  at a time.
24  Q. I'm just trying to pin down the time when

B-0219

Zechman                                    v.              Christiana Care Health Systems
Ellen Zechman, Volume 2          C.A. # 05-159JJF                    August 16, 2006

Page 265

1  that happened. And I thought you said late 2003,
2  early 2004. I just want to make sure we have the
3  time frame right.
4      **A. My father died last January. So what was**
5  **that? And it was slightly before that when he got**
6  **sick, that my mother could no longer help me with the**
7  **children, because she was having to take care of him.**
8  **He was under hospice care at home. But I can't give**
9  **you the exact date of when all that, you know, went**
10 **down, because she was having to take care of him**
11 **before he went under hospice. I can't give you an**
12 **exact date on that. Sorry.**
13     Q. And I think I have seen a document somewhere
14 in the record in this case that it was an obituary
15 from May 2003?
16     **A. That obituary was my stepfather. The one**
17 **that you had seen was not my father. That was my**
18 **stepfather. And I just went in for that funeral.**
19 **That did not affect my life.**
20     Q. I'm going to switch topics now. And I want
21 to ask you about remediation at Christiana Care.
22 When I say remediation, do you know generally what
23 that refers to?
24     **A. Yes.**

Page 266

1      Q. You were given a remediation program while
2  you were at Christiana Care, right?
3      **A. Yes.**
4      Q. Do you object to the fact that you were given
5  a remediation program?
6      **A. No. I object to the fact that there were**
7  **people who were doing less than me -- they based that**
8  **remediation on my CREOG scores which is the in-house**
9  **exam. And there were people who made worse than me**
10 **that they did not remediate.**
11     Q. Who?
12     **A. Kirfides and Dr. Gray. And here I was, a**
13 **fully licensed physician. I had passed all my**
14 **national Boards. These people had not. They had**
15 **made less than I did on that exam. They were not put**
16 **on remediation.**
17     Q. How do you know that?
18     **A. Your discovery documents say it.**
19     Q. I think we are going to get to those
20 documents. Other than the paper that's in this case,
21 do you have any other personal knowledge that
22 supports your believe that neither Dr. Kirfides or
23 Dr. Gray were given remediation?
24     MS. BREWINGTON: Other than the papers

Page 267

1  in this case?
2  BY MR. BLOOM:
3      Q. I'm asking if you have any independent
4  knowledge of that fact. You just referred to
5  documents you've seen in the discovery record. I'm
6  asking what you know. Do you have any personal
7  knowledge about whether or not Kirfides or Gray were
8  on remediation?
9      **A. They were not.**
10     Q. How do you know that?
11     **A. The residents talked about this stuff in the**
12 **gossip lounge, you know, in the middle of the night**
13 **when we're sitting there with our cups of coffee**
14 **trying to stay awake. It's common knowledge.**
15     Q. Did you object to the content or substance of
16 the remediation program that you were given?
17     **A. I wanted to do whatever it took to finish**
18 **that program and be Board certified. If they would**
19 **have said, you know, do like the Marine Corps and do**
20 **100 pushups in front of me every day, I would have**
21 **done it, because I wanted to finish that program and**
22 **be a Board certified Ob-Gyn.**
23     Q. Dr. Zechman, I'm not asking you whether you
24 would have done it or wouldn't have done it. I am

Page 268

1  asking if you objected to the content or the
2  substance of the remediation program that was
3  developed for you.
4      MS. BREWINGTON: I object. The question
5  is vague, but you could answer him if you can.
6      THE WITNESS: I don't know what you're
7  really trying to get at by "objecting," because I
8  didn't-- I felt I was being singled out because there
9  were people that were doing less than I on the test
10 that they base this on. And they weren't being
11 required to do this. So I felt there was a
12 discrimination. I felt I had been singled out.
13     I did agree that I needed more surgery,
14 you know, that my skills needed more surgery.
15 Because they had had more surgery training than what
16 I had. But then I kept getting bumped out of surgery
17 where I wasn't getting the training. It was another
18 catch 22. Oh, you need to improve your surgery
19 skills, but yet they kept bumping me out of the very
20 training that would have given me those skills to
21 improve.
22     And I actually improved in spite of
23 that. And there were good evaluations given by the
24 doctors that I did surgery there that somehow did not

Page 269

1  make it into the file from the discovery in
2  Christiana. Because they were given directly to
3  Sandy Kardos. We don't have records of those. They
4  are only showing the bad stuff, and they are not
5  bringing -- you know, they have plucked or failed to
6  produce the good stuff out of my files.
7      Q.  You just mentioned Sandy Kardos again?
8      A.  Yes.
9      Q.  She is not somebody we talked about last
10 time?
11     A.  In what way do you believe Sandy Kardos
12 discriminated against you?
13         MS. BREWINGTON: I object. We did talk
14 about her last time.
15         THE WITNESS: We did talk about her ad
16 nauseam. She is a main player in this. We talked
17 about her constantly. And she is in the initial
18 Complaint. You need to review that.
19 BY MR. BLOOM:
20     Q.  Why do you think that Sandy Kardos was
21 motivated by discrimination against you?
22         MS. BREWINGTON: I object to
23 speculation, but you could answer that.
24         THE WITNESS: I don't know what her

Page 270

1  motivations would be. But I know one time I asked
2  her specifically how can you do this? You know this
3  is illegal in reference to the family medical leave,
4  denying that and the ADA. How can you do this? You
5  know this is illegal to do this.
6          And her answer was -- and I quoted this
7  last time too. And this will be in the deposition
8  from last time -- I am just the secretary. I do what
9  I am told to do.
10     Q.  Sandy Kardos is an administrative assistant
11 in the residency program?
12     A.  She is considered the residency coordinator.
13 She is directly under the director. She does
14 whatever he tells her to do.
15     Q.  She is not a doctor?
16     A.  No. I don't even know if she has a college
17 education.
18     Q.  Your remediation program extended to areas
19 other than surgical skills. Do you agree with that?
20     A.  It was at -- no, no. Hold on. I'm
21 stumbling. It primarily was the surgical skills
22 because that was the primary thing they felt that I
23 needed more practice with. But it also included
24 reading the chapters and taking the test as well as

Page 271

1  an altered schedule where they had me -- I was
2  supposed to get more surgery experience, but it
3  wasn't happening. And I was supposed to work with
4  one of the operating room technicians on one of the
5  dummies that I kept getting reassigned, where we
6  would make an appointment and Dr. Gray would reassign
7  me and put me somewhere else where I wouldn't get the
8  training I was supposed to have.
9      Q.  And there was also a schedule developed for
10 you where you would be shadowing doctors on a
11 one-on-one basis; is that true?
12     A.  Yes.
13     Q.  That was not limited to shadowing them in
14 surgery, right?
15     A.  It would be clinical shadowing too. I did
16 that with Dr. Hoffman. I did that with Dr. Kaminski.
17 We had a great time. Dr. Hoffman, I did that with
18 him. And to my knowledge, they gave me very good
19 evaluations from those shadowings. And for some
20 strange reason they are not there.
21     Q.  Did you have any problem with the fact that
22 your remediation extended to areas other than
23 surgical skills?
24     A.  No. I welcomed it. I enjoyed working with

Page 272

1  these people one-on-one. I had a wonderful time when
2  I worked with each one of them in the clinic. I got
3  along well with all of them.
4      Q.  I'm going to shift topics briefly. When you
5  started to repeat your second year of your residency,
6  that meant that the people who had previously been
7  the first year residents were now your classmates?
8      A.  Yes.
9      Q.  Do you remember who those people were?
10     A.  Andrea DeMichael. Una Likhyani. It's kind
11 of an Asian name, Una Likhyani. I can't spell that.
12 If you got the e-mail in one of your discovery
13 documents, any of the e-mails that were to any of us
14 from Sandy Kardos the names would be spelled
15 correctly.
16     Q.  Were there any other names that you remember
17 that were in that class?
18     A.  It will take a minute. There would be four.
19 There was Una. There was Andrea. There was
20 Jennifer. I can't remember Jennifer's last name.
21 And there was somebody else that I am blanking on.
22     Q.  Well, let me know if you remember it.
23     A.  Fair enough.
24     Q.  At that point when you started to repeat the

**B-0221**

12 (Pages 269 to 272)

Page 273

1  second year in July 2003, was Dr. Heinle still in the
2  program at that point?
3  **A. Yes.**
4  Q. She then became a forth year?
5  **A. Third year. She was my equal.**
6  Q. Dr. Heinle was in your class?
7  **A. Until I was given the second year contract.**
8  **And then she was a third year, and I was considered a**
9  **second year. And I was told all along that I had the**
10  **possibility of being put up to third year at any**
11  **time. And Dr. Hoffman said that that was part of the**
12  **agreement when they made that decision. And he was**
13  **in the meeting when they made that decision.**
14  Q. Was there ever a point where Dr. Heinle was
15  in a supervisory position over you?
16  **A. Yes; several times during that summer.**
17  Q. This is after she graduated to the third
18  year?
19  **A. Yes.**
20  Q. At that point, did you in your own mind feel
21  capable of supervising junior Ob-Gyn residents?
22  **A. In certain areas I did. In other areas I did**
23  **not. And I welcomed assistance.**
24      **The main thing is, we are never supposed**

Page 274

1  **to be alone. We are always supposed to have a**
2  **supervising physician, as I spoke last time, within**
3  **hollering distance. That never happened at**
4  **Christiana.**
5      **Even in Dr. Kaminski's deposition he**
6  **said there were not enough attendings. What would**
7  **happen would be you would have one doctor that was**
8  **the attending for the residents for Ob triage for**
9  **surgery for the labor floor. You could have some**
10  **person have to go to the operating room with an**
11  **ectopic pregnancy having a hemorrhage, life**
12  **threatening. And that one attending would have to go**
13  **to OR and be tied up in the OR. And then you would**
14  **have no attending to help you on the labor deck or to**
15  **help you in Ob triage. You would have two areas**
16  **totally uncovered by a supervising physician because**
17  **there was only one in-house. And when they had to go**
18  **to OR, they had to go to the OR. And so that made me**
19  **uncomfortable. They were not following national**
20  **guidelines.**
21  Q. Dr. Zechman, I am going to have to interrupt
22  you or we're never going to get out of here today,
23  because your answer had nothing to do with the
24  question I asked. The question is, I think you just

Page 275

1  said that there were some areas in which you felt you
2  were capable of supervising residents --
3  **A. Yes.**
4  Q. -- and there were other areas in which you
5  were not; is that true?
6  **A. That is true.**
7  Q. Can you tell me the areas in which you felt
8  you were competent as of the summer of 2003 to
9  supervise junior Ob-Gyn residents?
10  **A. Uncomplicated deliveries.**
11  Q. Anything else?
12  **A. And triage.**
13  Q. Anything else?
14  **A. That's it.**
15  Q. What is the areas in which you did not feel
16  capable of supervising junior residents at that time?
17  **A. Is that with or without a supervising**
18  **physician? Because that is a big difference. And**
19  **there were many times when we did not have an**
20  **immediately available supervising physician.**
21  Q. Tell me in that circumstance.
22  **A. With a supervising physician?**
23  Q. No; without.
24  **A. I want to break it up --**

Page 276

1  Q. Give it to me both ways, please.
2  **A. With a supervising physician to bounce any**
3  **questions off of at my call as it should be, I would**
4  **feel comfortable supervising any of them with having**
5  **my attending within hollering distance at any moment**
6  **for any questions that I had, any area.**
7      **But the fact that there were many, many,**
8  **times that that supervising physician was not**
9  **available -- that puts it in a whole different -- you**
10  **know. And technically I should not be required to do**
11  **that until the last 12 months of my training. And I**
12  **was only halfway through my program.**
13      **By the national standards you are only**
14  **required -- it's called the green book. You are only**
15  **required to supervise independently the last 12**
16  **months of your four-year training period. You should**
17  **have that attending at your elbow.**
18  Q. Are you done with your answer?
19  **A. Maybe.**
20  Q. What you described was a lack of direct
21  supervision at Christiana Care. I take it from your
22  testimony that you view that as a widespread problem;
23  is that true?
24  **A. At nights and on holidays and weekends, yes.**

B-0222

13 (Pages 273 to 276)

Zechman
Ellen Zechman, Volume 2

v.

C.A. # 05-159JJF

Christiana Care Health Systems
August 16, 2006

Page 277

1    Q.  That was less of a problem during the week?
2    A.  During regular working hours it was not a
3    problem.  There were plenty of people running around.
4    But that was only a third of the day, and that did
5    not encompass holidays and weekends.
6    Q.  So I take it that during those periods where
7    there was less supervision by senior physicians, that
8    that was a circumstance that existed for all the
9    residents in your class?
10   A.  Yes.
11   Q.  Now, during those periods which you described
12   as not having the amount of supervision you thought
13   was appropriate, what are the areas in which you felt
14   you were not capable of supervising junior residents?
15   A.  Surgery.
16   Q.  Anything else?
17   A.  That's mainly it.  Additional high risk
18   pregnancy.  Where it's the Ob intensive care.  I had
19   not had enough experience in that to feel comfortable
20   within that area.
21   Q.  I'm going to shift topics and talk about your
22   medical condition and the accommodation that you have
23   referred to.  Okay?
24   A.  Okay.

Page 278

1    Q.  Dr. Fraser is the physician who primarily
2    treats you for your connective tissue disorder?
3    A.  That's right.  He's a specialist in that
4    area.
5    Q.  He gave a deposition a couple weeks ago.  And
6    he testified that your condition is called an
7    unspecified diffuse connective tissue disorder and it
8    is not a mixed connective tissue disorder.  Do you
9    agree with that?
10   A.  I will agree with anything he said, because
11   he is the specialist in that area.  And we are
12   splitting hairs in the pathology book by doing this.
13   And whatever he says is the truth.  He is considered
14   a national expert in this area.  And his credentials
15   just blow me away.  So his word is the word of God,
16   as far as I am concerned, when it comes to that.
17   Q.  And I think you mentioned the last time you
18   were here that the symptoms of the condition happen
19   occasionally and are not with you all the time.  Is
20   that true?
21   A.  There are certain symptoms that are with me
22   all the time that I just deal with.  Others come when
23   I have a flare-up and others with a severe flare-up.
24   Q.  What are the symptoms that are always

Page 279

1    present?
2    A.  Various aches and pains of the joints.
3    Q.  On a day-to-day basis, does your connective
4    tissue disorder limit your daily activities?
5    A.  Not unless I have a flare-up.
6    Q.  So apart from when you're having a flare-up,
7    you are not limited in the activities you do on a
8    daily basis?
9    A.  I need my eight hours of sleep.  The fatigue
10   component is with me all the time.  Like if I go a
11   24-hour period without sleeping, I really need 12
12   hours of sleep after that.  I can go through, you
13   know, I would say several days of having a little bit
14   of sleep or no sleep.  But it's almost a cumulative
15   thing that then I crash.
16       But in order to stay optimal, I really,
17   you know, need eight hours of sleep a night.  Or if I
18   go a 24-hour period without sleep like pulling a
19   call, I really need to get 12 hours of sleep the next
20   night.  Because that's when I start the downward
21   slide of going into a flare-up.
22   Q.  Right now you're currently working, right?
23   A.  Yes.
24   Q.  And you also have kids at home?

Page 280

1    A.  I do.
2    Q.  I take it from your testimony the last time
3    that you spend a significant amount of time caring
4    for your kids and bringing them around?
5    A.  Yes; I share with my husband, so yes.
6    Q.  Does your connective tissue disorder limit
7    your ability to do any of the activities that you
8    currently do on a daily basis?
9    A.  It depends on what all is going on.  If I
10   have a rough day at the office.  And there are times
11   when, say, there's a cub scout meeting that evening,
12   I tell my husband, Honey, I'm tired.  I need to lay
13   down on a sofa.  You cook supper tonight.  You take
14   the kids.  I'm tired.  I just need to lay down.  And
15   I do.
16       The main thing to keeping optimal
17   operating is to get to sleep.  And if I have a rough
18   day -- like last night I had a rough night.  I had
19   all of this going in my head.  I had nightmares
20   because I read the deposition.  I woke up with
21   flashbacks of all this again.  I probably only slept
22   two hours straight last night.
23       If I don't sleep well tonight, I will
24   probably be sick by Thursday or Friday.

B-0223

14 (Pages 277 to 280)

Zechman
Ellen Zechman, Volume 2

v.

C.A. # 05-159JJF

Christiana Care Health Systems
August 16, 2006

Page 281

1   Q.  And when you just referred to being sick, is
2  that what you refer to as a flare-up?
3   **A.  Yes.**
4   Q.  When you have a flare-up, are there any
5  activities in your life that you physically can't do?
6   **A.  I physically can keep going. But I'm**
7  **tremendously fatigued. I get sores in my mouth, like**
8  **canker sores in my mouth. My stomach gets upset,**
9  **because these canker sores go all the way through my**
10  **digestive system when they act up. So I'll get**
11  **diarrhea.**
12      **I'll have joint pain. I could keep**
13  **going with that. I can take medicines and go with a**
14  **mouth full of sores. But it is the fatigue component**
15  **where I literally feel like I have the flu, and I**
16  **just want to lay down and go to sleep.**
17   Q.  And what you described is when you are having
18  a flare-up with your connective tissue disorder?
19   **A.  Yes.**
20   Q.  And so I take it that when you are not having
21  a flare-up, you are not limited physically?
22   **A.  No; I can go full blast, and I can get a lot**
23  **done.**
24   Q.  You were hospitalized at Christiana Care in

Page 282

1  February 2003; is that correct?
2   **A.  Yes.**
3   Q.  Other than that instance in February 2003,
4  was there ever another instance in which you were
5  hospitalized at Christiana Care?
6   **A.  I went into Ob triage one time. I was having**
7  **a severe migraine headache. And I was throwing up**
8  **and dehydrated. And I went in for that. Had I not**
9  **nipped that in the bud, I would have laid out of**
10  **work. It would have gotten worse. It would have**
11  **been a spiral. But we nipped that one in the bud by**
12  **rehydrating me, getting the medicine for the headache**
13  **and getting rest, and I was going to go right after**
14  **that.**
15   Q.  Migraines are not related to your connective
16  tissue disorder; is it?
17   **A.  I do get migraines with that too. That is**
18  **one of the symptoms that I have.**
19   Q.  The instance in which you were actually
20  admitted to the hospital at Christiana Care, was that
21  when you had spinal meningitis?
22   **A.  I never got an absolute diagnosis on that.**
23  **But I had a stiff neck. I had photophobia. That**
24  **means light sensitivity. My head hurt every time I**

Page 283

1  **moved it. So I do not know what the final diagnosis**
2  **was. They never told me.**
3   Q.  You're a doctor. Did you ask?
4   **A.  I did.**
5   Q.  Who was treating you, by the way, when you
6  were in the hospital in February 2003?
7   **A.  I went into the emergency room. And one of**
8  **their staff doctors treated me. I did see him in a**
9  **followup visit afterwards. And I can't remember his**
10  **name.**
11   Q.  After being in the emergency room, you were
12  actually admitted, weren't you?
13   **A.  Yes.**
14   Q.  Was there a particular physician who was
15  following after you were admitted?
16   **A.  Yes; that is the one I can't remember his**
17  **name. And I did see him in followup afterwards.**
18   Q.  What did he tell you about the diagnosis?
19   **A.  He felt that there was not a clear diagnosis.**
20   Q.  Did you tell Dr. Fraser about the
21  hospitalization was related to spinal meningitis?
22   **A.  I gave Dr. Fraser the symptoms. And he might**
23  **have made his own diagnosis or read it somewhere. I**
24  **don't know. But I just told him what was going on.**

Page 284

1  **That was part of the differential diagnosis, because**
2  **they did do a spinal tap on me at that time. But I**
3  **don't recall what they finally called it.**
4   Q.  And spinal meningitis, it's your
5  understanding, is an infection?
6   **A.  There are several kinds. Spinal meningitis**
7  **is simply an inflammation of the meninges. It can be**
8  **what they call aseptic. You can have an inflation**
9  **that is just irritation. Or you could have viral or**
10  **you could have bacterial. Bacterial is the one that**
11  **scares everybody. But viral can also happen.**
12      **And with different like lupus and**
13  **multiple sclerosis and these auto immune diseases,**
14  **you can have what is called an aseptic meningitis.**
15  **Aseptic means that it is more of an auto immune**
16  **reaction and not an outward virus or bacteria causing**
17  **the inflammation of the meninges.**
18   Q.  Did the circumstance that lead to you being
19  hospitalized in 2003 eventually resolve?
20   **A.  Yes; and haven't seen anything of it since.**
21   Q.  That was like a one-shot problem?
22   **A.  Yes, it was like a one-shot deal, whatever it**
23  **was.**
24      MS. BREWINGTON: Can we take a break?

15 (Pages 281 to 284)

Zechman                                    v.                    Christiana Care Health Systems
Ellen Zechman, Volume 2              C.A. # 05-159JJF                        August 16, 2006

Page 285

1      (A brief break was taken.)
2  BY MR. BLOOM:
3      Q.   Dr. Zechman, I'm going to hand you an exhibit
4  premarked as Zechman-67. This is a July 29, 1997
5  letter from your doctor, Dr. Fraser to whom it may
6  concern. I take it you have seen this letter before.
7      A.   Yes.
8      Q.   Do you know for what purpose this letter was
9  created?
10     A.   I really cannot remember. I had actually
11  seen him before then, and yeah, for quite some time--
12  yes, because at first he didn't know what was going
13  on with me.
14     Q.   Did you ask him to write you a letter for
15  some reason?
16     A.   I can't remember. If this is correct with
17  the date July 1997, you are going almost on ten
18  years. I can't remember.
19     Q.   Okay. You can put that aside. I'm going to
20  hand you what's been marked as Zechman 68. If you
21  can just confirm for me, this is the July 23rd, 2003
22  letter to Dr. Ekbladh that you've referred to
23  previously?
24     A.   Yes.

Page 286

1      Q.   And this is the letter where you refer to
2  creative schedule?
3      A.   Right.
4      Q.   If you'll turn to the second page, the very
5  last sentence you say, "I am very grateful for all of
6  the efforts that have been made to help me achieve
7  this goal." Am I right that the goal that you're
8  referring to there is to complete the residency
9  program?
10     A.   Absolutely.
11     Q.   Can you tell me what the efforts that have
12  been made are that you are referring to in this
13  letter?
14     A.   Giving me the opportunity, accepting me into
15  the program.
16     Q.   Is there anything else that you were
17  referring to?
18     A.   That was the main thing. My goal was to be
19  an Ob-Gyn.
20         (A brief break was taken.)
21  BY MR. BLOOM:
22     Q.   Dr. Zechman, I put in front of you two
23  exhibits, Zechman-69 and Zechman-71. Zechman-69 is
24  the request for disability accommodation form that

Page 287

1  you filled out?
2      A.   That's correct.
3      Q.   Am I right that the handwriting in the top
4  portion where it's completed by the employee is in
5  your handwriting?
6      A.   That's in my handwriting, and that's me
7  dating it the 24th. Now, the signature down here is
8  Dr. Brian Little's administrative assistant and down
9  there and she dated it and signed it before she gave
10  it to me 7/23/03. She signed it, gave it to me. I
11  signed it and then it gets sent in. And this was
12  sent to Dr. Fraser.
13         And please note at the bottom where his
14  office staff circled the fax number they faxed it to
15  him and faxed it back into that number. And I
16  actually -- because I believe I was in the office
17  when she faxed this one out. I'm not sure, but she
18  faxed it both to the employee health services and to
19  Sandy Kardos, both places. And this is the office
20  personnel's signature of it was faxed 8/11.
21     Q.   That handwriting notation you're talking
22  about, that was written by the person who sent the
23  fax?
24     A.   Yes; by Dr. Fraser's office.

Page 288

1      Q.   So Dr. Little's assistant who signed it, her
2  first name is Joanne?
3      A.   Yes.
4      Q.   Do you know what her last name is?
5      A.   No, I can't figure that out, and I really
6  didn't know her.
7      Q.   And if you look at the second exhibit that is
8  in front of you --
9      A.   Can I say something more about this?
10     Q.   Sure.
11     A.   I want you to turn to the back page and look
12  at that essential job functions from obstetric and
13  gynecology residents. That is the official form that
14  was given me which is very much unlike the one you
15  showed me last time in the first part of this
16  deposition where I had said I had never seen that
17  before.
18         And I thought it was very ironic about
19  the lifting part, how we were on that particular one
20  that you showed me that I had never seen before, that
21  we were expected to lift patients. And I said isn't
22  that funny since the nurses have mechanical devices
23  to lift patients in that form that you showed me.
24  And this is the official one from the director of

16 (Pages 285 to 288)

Page 289

1  education. This is the one I've seen before. This
2  is the official. I do not know what you had in your
3  hand that was part of discovery last time saying that
4  our job description was to lift patients.
5     Q.  Is that why you are directing my attention
6  this last page of --
7     A.  Yes.
8     Q.  Let me finish the question. Because you're
9  saying that the true essential job functions of being
10 an Ob-Gyn resident do not include lifting?
11       MS. BREWINGTON: Objection, because of
12 mischaracterizing. You can answer.
13       THE WITNESS: According to this, this is
14 the description that my physical attributes or
15 qualities or disabilities or whatever are to be
16 evaluated.
17       That sheet that you handed me last time
18 that I commented on the lifting, I have never seen
19 before. I have no idea where that came from.
20 BY MR. BLOOM:
21    Q.  That's fine. Keep looking at this page that
22 you are directing my attention to. So I gather
23 you're telling me that there is something that is not
24 listed in these essential job functions that you

Page 290

1  think is significant. Am I getting that right?
2     A.  No. I'm saying that that paper that you
3  showed me before, I have no idea where that came
4  from. And that does not appear to be accurate
5  wherever that came from. This is the job functions
6  of the Ob-Gyn. This came from the director of
7  graduate education, essential job functions of
8  Ob-Gyn. This is the form that I have seen before
9  (indicating document).
10    Q.  And you just referred -- the other form you
11 referred to last time, you just talked about lifting
12 on that form, right?
13    A.  That's all I can remember right now from that
14 form. I just wanted to point out the fact that you
15 had produced that form. You had asked me if I had
16 ever seen it before, and I said no, I have not. And
17 how I had picked up on that, that is not a form that
18 we are shown or told that that those are our
19 essential functions. So whatever that came from is
20 questionable.
21    Q.  You think somebody made it up?
22       MS. BREWINGTON: Objection.
23 Argumentative.
24 BY MR. BLOOM:

Page 291

1     Q.  Do you?
2     A.  I don't know where it came from.
3     Q.  Look at this last page of Exhibit 69. Is
4  this what you believe is an accurate description of
5  the essential job functions of your residency
6  position?
7     A.  Yes.
8     Q.  Is there anything in this list of essential
9  job functions that you view as a lifting requirement?
10    A.  No.
11    Q.  In your view, is lifting an essential job
12 function of your position as an Ob-Gyn resident?
13    A.  Not in the context that was relayed in that
14 other sheet that I had never seen before until you
15 had produced it.
16    Q.  So in what respect do you think that lifting
17 is an essential job function being a resident?
18    A.  There's a certain amount where you have to
19 readjust a patient's leg or something on the
20 operating table or during delivery. But the nurses
21 have mechanical devices to aid them in lifting,
22 moving patients so that they do not hurt their backs.
23       We, as residents, should have the same
24 devices for safety and OSHA regulations.

Page 292

1     Q.  And that limited amount of lifting that
2  you've just referred to, lifting a patient's leg,
3  does that sort of lifting -- I'm going to rephrase
4  that question. Is there any other kind of lifting
5  that you view as part of your essential job functions
6  as a resident in addition to the moving a patient's
7  leg that you just referred to?
8     A.  The lifting of certain operating room
9  equipment for adjusting the operating table. But in
10 addition, there are supposed to be operating room
11 assistants that come in and do that as well. And it
12 is done for the older physicians and the nurses.
13    Q.  With respect to the lifting that you consider
14 to be part of your essential job functions, was there
15 ever a time where you were physically unable to do
16 those physical lifting tasks that you just described
17 as part of your job?
18    A.  No. I always did what was required of me --
19    Q.  And you were physically capable of doing?
20    A.  -- capably. There were times when I was
21 sick, especially and specifically when I was begging
22 for time off for accommodation, for FMLA that I did
23 it anyway, you know. I was sick. I was hurting. I
24 was begging for time off, but I did it anyway.

17 (Pages 289 to 292)

Page 293

1    Q. I understand that, Dr. Zechman. But
2 physically, you could move a patient's leg if you
3 needed to? Am I hearing that right?
4    **A. Yes.**
5    Q. I am going to use these two exhibits
6 together, 69 and 71. 71 is an August 25th, 2003
7 letter from you to Dr. Fraser, right?
8    **A. That's correct.**
9    Q. And you're asking him to get the
10 accommodation form which I believe is a reference to
11 69. Is that true?
12    **A. It is. May I speak?**
13    Q. Of course.
14    **A. Dr. Fraser was saying he had already sent the**
15 **stuff in and Sandy Kardos and Dr. Ekbladh were saying**
16 **we don't have this information. And so this was a**
17 **second attempt to get it done, because he was saying,**
18 **I sent it in. I sent it in shortly after you gave it**
19 **to me which would be consistent with this date with**
20 **8/11. And Dr. Ekbladh and Sandy Kardos were saying,**
21 **we don't have anything.**
22 **And they were ignoring my requests for further**
23 **accommodation for vacation leave. They were just**
24 **ignoring and denying my requests.**

Page 294

1    Q. Is any of the other handwriting on Zechman 69
2 other than the top portion your handwriting?
3    **A. This is completed by the physician. That is**
4 **Dr. Fraser's handwriting beyond a doubt. And please**
5 **note the date is 8/9/03 where he signed it, and it**
6 **was sent into them.**
7    Q. You are aware, are you not, that Dr. Ekbladh
8 actually followed up with a telephone call to Dr.
9 Fraser?
10    **A. It was not a followup. He demanded that he**
11 **talk to my physician.**
12    Q. Did you have any problem with that?
13    **A. Yes, I did. I thought that was being**
14 **intrusive. But I knew I couldn't say no, because I**
15 **feared retribution. And I was already getting enough**
16 **retribution that, you know, I was just scare to say**
17 **anything by that point. But he demanded to talk to**
18 **my physician.**
19    Q. And you understood you were asking for
20 special treatment because of a medical condition you
21 had, right?
22    **A. I was not asking for special treatment. I**
23 **was asking for accommodation, family medical leave.**
24 **That is legal rights. That's not special treatment.**

Page 295

1    Q. That's correct, but you were asking for
2 something other than your regular job duties based on
3 your condition. Would you agree with that?
4    **A. I was asking for federally protected**
5 **accommodation or FMLA. And I will not word that any**
6 **other way, because that's the truth. And that's what**
7 **I was asking for.**
8    Q. Did you understand that you needed to
9 medically justify that request in this way?
10    **A. Absolutely; and that's what these forms are**
11 **doing. That's exactly what these forms are doing.**
12    Q. Did you view it as inappropriate that Dr.
13 Ekbladh wanted a followup conversation with your
14 physician?
15    **A. Yes; because he demanded it before he had**
16 **even seen this, before he had even seen this "To be**
17 **completed by physician" he demanded to speak to my**
18 **doctor. And I was scared to say something other than**
19 **"uh-huh."**
20    Q. There is a medical records release portion of
21 Exhibit Zechman 69. Is all of that in your
22 handwriting and your signature there?
23        MS. BREWINGTON: Where?
24        THE WITNESS: I'm not seeing it.

Page 296

1 BY MR. BLOOM:
2    Q. The very first page of Exhibit Zechman 69.
3        MS. BREWINGTON: At the bottom?
4 BY MR. BLOOM:
5    Q. In the middle.
6    **A. That is my handwriting.**
7    Q. That's your signature on the line that says
8 "Employee Signature"?
9    **A. Yes; 7/24/03 is the date that I did it, the**
10 **same morning I did that.**
11    Q. Okay. You can put that aside.
12 Dr. Zechman, I'm handing you what is marked Zechman
13 73. Is this an e-mail from you to Sandy Kardos with
14 a copy to Dr. Ekbladh, the top portion? I'm not
15 asking about the handwritten portion.
16    **A. This handwriting I have no idea what that is.**
17    Q. You do not recognize whose handwriting that
18 is?
19    **A. No. I have no idea what that is. That was**
20 **not on the original one.**
21    Q. That was not part of the e-mail you sent?
22    **A. Yes, sir.**
23    Q. And there in the handwriting there are dates
24 and some of them with the date next to it it says

18 (Pages 293 to 296)

Zechman                                          Christiana Care Health Systems
Ellen Zechman, Volume 2        v.        C.A. # 05-159JJF        August 16, 2006

Page 297

1   "off." And next to it, it says "work." As you sit
2   here today do you know whether these notations
3   reflect days you were working and days you had off?
4       A.  They do not.
5       Q.  Tell me which ones you think are wrong.
6       A.  Going to the very first entry, 8/2 Saturday
7   work. That's a call day. I go in at eight o'clock
8   Saturday morning. I do not get off until eight
9   o'clock Sunday morning. So I have worked from
10  midnight, when it changes from Saturday to Sunday, to
11  eight o'clock Sunday morning.
12      So Sunday is not an off day when you've
13  worked eight to nine hours sometimes. When you are
14  coming off of call, you did not get out of there
15  until nine or ten o'clock after writing the notes.
16  In fact, it could have been more nine hours that I
17  worked Sunday. So I worked from eight o'clock
18  Saturday, if I went in earlier to write notes which
19  often I had to do. I might have gone in 7:00 that
20  morning and worked until midnight.
21      Q.  Let me interrupt you for one second, Dr.
22  Zechman. Are you talking about what happened
23  specifically on August 3, 2003, or are you talking
24  generally about what sometimes happens?

Page 298

1       A.  I am talking about what happened every time
2   you're on a Saturday. They say you are working this
3   day, but you work eight hours into the next time. I
4   am speaking specifically of this time, but I am also
5   speaking of any time you have call on Saturday, you
6   work eight hours Sunday morning.
7       Q.  What about at the bottom there is a notation
8   for August 30th, 2003 where it says you're off from
9   8:00 a.m. to Sunday eight o'clock? Is that accurate
10  or inaccurate?
11      A.  I do not know. But I do specifically, you
12  know, what I said about Saturday and Sunday, you work
13  a 24-hour period and you're working 16 hours Saturday
14  and you're working eight hours Sunday. So it's not
15  an off day.
16      Q.  When do you come back?
17      A.  Monday morning. So you have no day off that
18  whole week. So you will work straight through from
19  Monday through the weekend through the next week, and
20  hopefully you get one day off the next week. So
21  you're working close to, you know, four days.
22      Q.  If I'm hearing you correctly, you're saying
23  on Sundays you're talking about you work until eight
24  o'clock in the morning Sunday. And then you are off

Page 299

1   until 8:00 in the morning the follow Monday?
2       A.  No. You go in six o'clock Mondays doing your
3   rounds. So you don't get a 24-hour period off.
4   Technically, legally you are supposed to, but it was
5   not happening.
6       Q.  So it was 22 hours?
7       A.  Sometimes it would be less than that
8   depending on what time you got out Sunday. But you
9   could not leave until you were done with your work,
10  whether it was nine o'clock, ten o'clock.
11      If you were stuck in the operating room,
12  you were stuck there until noon, get off at noon and
13  have to be back in at six o'clock the next morning.
14      Q.  Did you always attend morning rounds on
15  Mondays?
16      A.  It depends on which rounds. There were
17  several different rounds.
18      Q.  Morning rounds.
19      A.  There were morning rounds for everybody at
20  seven o'clock. There were Ob high risk rounds at
21  6:30. You are only required while all the other
22  residents were only required to be at morning rounds
23  for the early 6:30 ones if they were participating in
24  that service that day, like if they were going to

Page 300

1   take over the shift, or if they were coming off of
2   call and they needed to relay a change of shifts.
3       I was harassed by Dr. Gray demanding
4   that I be at those meetings at 6:30 every morning
5   even when I was not assigned to the service. No one
6   else was. I sent her an e-mail asking her when the
7   rule had changed. I sent Dr. Ekbladh an e-mail
8   saying that Dr. Gray was harassing me about that.
9   And once again, this is after I had put in leave,
10  they are adding to my schedule, making it a longer
11  day for me, harassing me about coming in at 6:30 when
12  I was not on service.
13      Now, the times I was on call, I was
14  supposed to be there. That was not a problem. But
15  Dr. Gray was demanding I be there every morning which
16  none of the other residents that were not assigned to
17  that service had to be there. And I even sent her an
18  e-mail saying, Is there something new? Did the rules
19  change? Am I missing something? Why am I required
20  to come to these when it is not the status quo for
21  anybody else? It was harassment by Dr. Gray.
22      Q.  Did she tell you she thought it was a good
23  learning opportunity for you?
24      A.  No, she didn't. She was just demanding. Now

19 (Pages 297 to 300)

B-0228

Zechman
Ellen Zechman, Volume 2

v.

C.A. # 05-159JJF

Christiana Care Health Systems
August 16, 2006

Page 301

1  Dr. Ekbladh sent back a letter saying, Well, you do
2  not have to go, but it's a good learning experience.
3  If you could be there, it's always a good learning
4  experience. So he basically backed me up in saying
5  that you're not required to be there, but, you know,
6  it's a learning experience. So you can if you want
7  to, but you don't have to.
8      You have those e-mails, both of me
9  complaining to Dr. Ekbladh that she is harassing me
10  as well as his response. You have all of that in
11  your discovery.
12  Q.  You agree with Ekbladh that going in the
13  morning rounds is a good learning opportunity?
14  A.  Not always. There were times it was a good
15  opportunity. Most of the time you are just rehashing
16  what happens over the night and into the change of
17  shift.
18      Your true learning and your true
19  lectures occurred at seven o'clock which were the
20  teaching rounds. Our teaching morning rounds were
21  the seven o'clocks where we had lectures and it was
22  part of our teaching curriculum per ACGME
23  requirements.
24  Q.  And with respect to any given morning round,

Page 302

1  do you know ahead of time whether that day's morning
2  rounds are or are not going to be a good learning
3  experience?
4  A.  No. It all depends how busy doctors are. It
5  is kind of an ad lib thing. If they are in a hurry
6  and have to go to surgery or they've got a C section
7  pending, it's what happened, what do I need to do,
8  out of here.
9  Q.  Are morning rounds when you are sort of
10  walking around with a more senior physician taking
11  stock of cases?
12  A.  That's not how they did it there. We just
13  sat at nurses' station and recited what had happened
14  through the night and what needed their attention.
15  Q.  Okay, you can put that document aside.
16  A.  Can I make a statement in addition to that?
17  Q.  No; there isn't a question pending.
18      MS. BREWINGTON: Is it regarding a
19  previous question that she did not finish her
20  answer--
21  BY MR. BLOOM:
22  Q.  You didn't finish your answer?
23  A.  Yes. Depending upon who the teacher was.
24  Some of the teachers were better of making a point of

Page 303

1  teaching than others.
2      Others just blew through it, you know,
3  what's going on. The learning experience depended
4  really on the teacher that was in charge that
5  morning.
6  Q.  Who were the ones who were good at teaching
7  during rounds?
8  A.  Dr. Sciscione was excellent at teaching the
9  rounds. He was pretty much the best. Dr. Shlossman
10  was excellent.
11  Q.  Dr. Zechman, I'm giving you Zechman 77, which
12  is a September 16, 2003 letter from Dr. Ekbladh to
13  you. Did Ekbladh give you this letter on September
14  16, 2003?
15  A.  Yes. And please make note that this letter
16  is talking about FMLA which I had been requesting
17  since July. And I get this letter in September
18  saying that it has been brought to our attention and
19  that they need the enclosed certificate health care
20  provider. I had been requesting FMLA since the
21  16th -- I mean since July. And this was the first
22  time I am given the formal forms for FMLA, on
23  September 16th.
24  Q.  Fine. You've said that many times today.

Page 304

1  I'm going to ask that when you're done answering the
2  question that's been asked, that you just answer the
3  that's been asked. You are filibustering this
4  deposition. I mean it's taking a lot longer than it
5  needs to.
6      MS. BREWINGTON: I'm going to object to
7  that just simply because you want her to recall
8  things. She is recalling things and other times you
9  don't want her to. I mean, this is her deposition to
10  get it on the record.
11      MR. BLOOM: That's fine. I am getting
12  the same speech packed into a lot of different
13  questions.
14      THE WITNESS: You are asking me the same
15  questions over and over, so yes, you're going to get
16  the answer over and over.
17      MR. BLOOM: I will try not to repeat
18  questions.
19  BY MR. BLOOM:
20  Q.  Dr. Zechman, I'm going to hand you what's
21  been marked Zechman 79. Am I right that this is a
22  September 22nd, 2003 note from your doctor regarding
23  the pinched nerve you got moving deck furniture
24  around?

B-0229

20 (Pages 301 to 304)

Page 305

1    A.  That's correct.
2    Q.  Were you out on leave during this time
3  period?
4    A.  I was out on leave and this also bled into my
5  scheduled vacation.  So there was an overlap.  And
6  this is the note that I sent as soon as I got it into
7  Sandy Kardos.
8    Q.  I'm handing you what's been marked as Zechman
9  80.  Is any of the handwriting on the first page of
10  this exhibit yours?
11    A.  No; that is my husband's handwriting.  This
12  is in relation to this same request, and I was
13  sending in the forms requesting for leave of absence.
14  Please note the date is September 22nd.  And I am
15  requesting leave of absence that I still have not
16  had any ADA, sick leave or FMLA.
17    Q.  Is all of the handwriting, other than the
18  first page which is the fax cover sheet -- is all of
19  the remaining handwriting in this exhibit your
20  handwriting?
21    A.  Yes, it appears to be.
22    Q.  And after sending this form you were on leave
23  of absence?
24    A.  The pinched nerve, yes.

Page 306

1    Q.  I am handing you Zechman 83.  Is that a note
2  October 3, 2003 note from your doctor saying you are
3  able to return to work?
4    A.  That's correct.
5    Q.  Is the handwriting at the top of this exhibit
6  your handwriting?
7    A.  That's my handwriting, yes.
8    Q.  Am I correct that actually you did not send
9  this to Christiana Care because you learned earlier
10  in the day that your residency was terminated?
11    A.  That's incorrect.  I had sent this in because
12  I was ready to come back to work after my vacation.
13  And it was after Sandy received this that she called
14  me.
15    Q.  Well, you say at the top that this was a note
16  that you were going to fax Sandy Kardos.  You wrote
17  that, didn't you?
18    A.  I did.
19    Q.  It doesn't say you sent it to Sandy Kardos,
20  does it?
21    A.  I sent it to her.  I did.  And it was after
22  this that I talked to her on the phone, and she says
23  Dr. Kaminski needs to call you.  And that is when she
24  had Dr. Kaminski call me back and tell me I was

Page 307

1  terminated.
2    Q.  What time do you think you sent this to Sandy
3  Kardos?
4    A.  It was early in the morning.
5    Q.  Are you aware of any document in this case
6  that reflects the fact that this was actually sent?
7    A.  I would have no idea.
8    Q.  As you sit here now, you can think of one
9  that you've seen?
10    A.  I can't remember.
11    Q.  All right.  You could put that away --
12  actually one other question about that exhibit, Dr.
13  Zechman.  When did you write this note at the top of
14  Zechman 83?
15    A.  I wrote that note later when I was submitting
16  this to the EEOC Complaint.  And it was my
17  documentation for the EEOC Complaint explaining it to
18  the investigator.
19    Q.  I'm handing you now what has been marked as
20  Zechman 82.  You recognize this document, right?
21    A.  Yes.
22    Q.  Is there any handwriting on Zechman 82 that
23  is not your handwriting?
24    A.  Dr. Fraser's signature and address.  And I

Page 308

1  was sitting in the exam room, and we did this
2  together.
3    Q.  So other than the lines, the signature line
4  and the address line near the end of this document,
5  the rest of your writing is your handwriting?
6    A.  It was my writing but I was in the exam room
7  with Dr. Fraser when we went over this line to line
8  together.  And I was doing the writing and we were
9  talking about it.  And filling it out together.
10    Q.  Were you physically present with Dr. Fraser
11  when he faxed this to Christiana Care?
12    A.  I was physically present when one of these
13  documents were faxed.  I think it was this one
14  because I was in the office that morning when we also
15  did -- you see this is received October 3rd and that
16  was -- it was received along with this other one that
17  we've just talked about.  Let me pull it, 83.  These
18  went over together.  And I was in the office watching
19  the girls when they sent both of these over.
20        MS. BREWINGTON:  And for the record, she
21  identified 83.
22        THE WITNESS:  That morning I was in
23  there first thing in the morning at that office.  His
24  office was ten minutes from my house at that time.

21 (Pages 305 to 308)

Zechman
Ellen Zechman, Volume 2

v.

C.A. # 05-159JJF

Christiana Care Health Systems
August 16, 2006

Page 309

1  And this one, he filled this out and his office sent
2  them in at the same time. And I saw them go through
3  the fax machine.
4  BY MR. BLOOM:
5      Q.  So you're referring to Zechman 82 and 83
6  faxed together?
7      A.  Yes.
8      Q.  In the fax line on Zechman 82, it says that
9  this was faxed from Dr. Fraser's office at 2/17 in
10  the afternoon of October 3rd, 2003. Do you see that?
11     A.  I do not see that.
12     Q.  On the upper left-hand corner.
13     A.  I see an 8/27 fax at the time. Well, that's
14  a 9:15 one -- 1470 -- I don't know. I might have my
15  times wrong. I think the best thing to do is to get
16  Dr. Fraser's records.
17         MS. BREWINGTON:  But that's the time;
18  isn't it (indicating)?
19         MR. BLOOM:  That's 2004.
20         THE WITNESS:  That's when it was faxed
21  another time. That would go with that. I must have
22  faxed it twice. And that's always a possibility.
23  BY MR. BLOOM:
24     Q.  Well, there are two fax lines at the top of

Page 310

1  this document. One is from September 2004, a year
2  after you left Christiana Care, right?
3      A.  Yes.
4      Q.  The other fax line is October 3rd, 2003; is
5  that correct?
6      A.  Yes.
7      Q.  And that's the date you say Dr. Fraser faxed
8  this to Christiana Care?
9      A.  Yes.
10     Q.  Do you have any basis to dispute that this
11  document was faxed at 2:17 in the afternoon of
12  October 3rd?
13     A.  The number is there. I'm not going to
14  dispute that, but I don't know whether that was the
15  first faxing or the second faxing. I don't know.
16  But I was in the office that day when these things
17  went out.
18     Q.  And you would agree that Zechman 83 does not
19  have a fax line on it at all, right?
20     A.  I'm not seeing it. But this is the copy that
21  I made. This would not have been the copy coming
22  from his office. This is a copy of one of my
23  documents that I sent in to the EEOC. His document
24  that he sent in from his office would look different

Page 311

1  from this.
2      Q.  Have you seen the document that you just said
3  you believe Dr. Fraser has?
4      A.  I don't have a copy of it. This is the one
5  that I have, and I actually have the real one in my
6  documents, the actual prescription pad he wrote on.
7      Q.  Do you remember what time in the morning you
8  first showed up in Dr. Fraser's office October 3rd?
9      A.  No, I have no idea.
10     Q.  Does Dr. Fraser, in your experience, see
11  patients before 8:30?
12     A.  I don't know.
13     Q.  Have you ever seen them before 8:30?
14     A.  I can't remember, but he does start early.
15  But I don't know his first appointment time. I don't
16  know.
17     Q.  Can you think of an instance in which he has
18  seen you before 8:30 in the morning?
19     A.  I've been seeing that doctor since 1995. I
20  can't remember.
21     Q.  I'm handing you what's been marked as Zechman
22  6. The title of the top is ADA Intake Questionnaire.
23  Is this a document that you filled out in connection
24  with your EEOC charge?

Page 312

1      A.  Yes, it is.
2      Q.  And when you were preparing this document,
3  did you try to answer the questions as completely and
4  as accurately as you could?
5      A.  At the time I was still very upset and almost
6  in shock over what had happened to me. So I would
7  say this was done, to the best of my ability, at that
8  time, because I was truly in shock over this
9  happening to me.
10     Q.  What does that mean when you say you were in
11  shock?
12     A.  I could not believe what Christiana Care had
13  done to me. I could not believe it. I was
14  horrified. I was shocked. It was just unbelievable,
15  that all this had happened.
16     Q.  Can you just confirm that all of the
17  handwriting on Zechman 6 is your handwriting?
18     A.  This is not my handwriting on the last page.
19     Q.  Are you referring to the part where it says
20  check off those that are affected by your disability?
21     A.  Yes.
22     Q.  Do you know whose handwriting that is?
23     A.  No. I assume that it was the EEOC agent.
24     Q.  But the rest of the handwriting on that page

**B-0231**

22 (Pages 309 to 312)

Zechman                              v.              Christiana Care Health Systems
Ellen Zechman, Volume 2         C.A. # 05-159JJF              August 16, 2006

Page 313

1  is your writing?
2  A. Yes.
3  Q. And that's your signature at the bottom?
4  A. Yes.
5  Q. Dr. Zechman, I am going to shift topics and
6  talk to you about remediation at Christiana Care.
7  A. Haven't we already talked about this?
8  Q. We have. We will talk about it in more
9  detail. You were --
10  A. Do you remember your comment about me not
11  repeating things? That goes both ways.
12  Q. In 2002 you learned that the committee had
13  voted to appoint you a mentor; is that true?
14  A. I can't remember the exact date. It's in
15  e-mails, but that's not what I've committed to
16  memory.
17  Q. And Dr. Patruno was appointed as your mentor?
18  A. Yes.
19  Q. And you didn't have a mentor when you first
20  started Christiana Care on July 1st, 2003, correct?
21  A. No, I did not.
22  Q. And Dr. Patruno became your mentor
23  approximately the end of October 2002?
24  A. I'm not sure about the time, but he became my

Page 314

1  mentor, yes.
2  Q. In 2002, though, right?
3  A. Yes.
4  Q. Was it your understanding that Dr. Patruno
5  had been appointed as your mentor to help you catch
6  up to your classmates?
7  A. Yes.
8  Q. Were you told -- who told you that you were
9  going to now have a mentor?
10  A. Dr. Sciscione, I believe.
11  Q. Did he tell you why?
12  A. He felt that it would be useful for me to
13  have someone that I could sit down with and discuss
14  topics one on one with and go over certain concerns,
15  because lots of times the teaching physicians were
16  too busy running around because they were
17  understaffed with teaching physicians doing their
18  clinical duties, delivering babies, that that would
19  give me an opportunity to have one-on-one time with a
20  teaching physician.
21  Q. Was Dr. Patruno a good mentor?
22  A. Dr. Patruno is a wonderful, personable, good
23  guy. But he had just come to Christiana himself and
24  was just learning the system and the ropes of that

Page 315

1  institution himself.
2  Q. Did Dr. Sciscione tell you that one of the
3  reasons they decided to appoint you a mentor was
4  because they thought your medical knowledge was
5  behind what they expected it to be?
6  A. I don't remember him saying that he thought
7  that my surgical skills were behind. And we
8  discussed that before I hired on.
9      I find it ironic that they would say
10  that my medical knowledge was behind when I had
11  already passed the national competency test for
12  licensure. It is called the USMLE, United States
13  Medical Licensing Examination. And my colleagues had
14  not even taken the test yet. I had passed the
15  national competency test to be a full
16  licensed physician.
17      I had to have sufficient knowledge to
18  pass the tests that every physician has to. And they
19  even had concerns of my colleagues having not even
20  taken the test.
21  Q. I'm not asking whether you agreed with the
22  criticism. But were you aware in the fall of 2002
23  that there was concern among the faculty about the
24  level of your medical knowledge? Were you aware that

Page 316

1  that concern existed?
2  A. No. I was aware that they were not happy
3  with my surgical skills. I knew that they were
4  constantly giving me oral exams, you know, asking me
5  questions while I was doing something. And it made
6  me very nervous. And I had trouble answering the
7  exams because I was nervous around them because I
8  could feel, you know, some of the animosity.
9      And there was a certain, I would say
10  anxiety, I call it test anxiety, because I realized
11  that they were, you know, trying to test me, and it
12  made me nervous. You know, with certain ones.
13  Others like Dr. Patruno I was uncomfortable with, but
14  a lot of them were almost hostile in their
15  questioning me about different things.
16  Q. Was this also in the fall of 2002?
17  A. Yes. It was from day one. First day I
18  showed up on the scene.
19  Q. Were you also aware -- and again, I'm not
20  asking if you agree with the criticism -- but were
21  you aware that there existed a concern about your
22  medical judgment in the fall of 2002?
23  A. No. But that concern is very unfounded and
24  prejudiced in that I was a fully-licensed physician

23 (Pages 313 to 316)

Zechman
Ellen Zechman, Volume 2

v.

C.A. # 05-159JJF

Christiana Care Health Systems
August 16, 2006

Page 317

1  that had been practicing medicine and I have never had
2  an adverse outcome. I have never had a lawsuit. I
3  never had any incidents. I was a fully-licensed
4  physician. And I had passed all of my Boards and had
5  been practicing medicine independently. And my
6  colleagues weren't even licensed yet.
7      Q.  Just so we're clear, what you've been talking
8  about is your licensing and passing exams. None of
9  that is to be an Ob-Gyn physician, correct?
10     A.  No; but it is general physician and general
11  medical knowledge that you have to be competent in in
12  order to pass the test to begin with.
13         I also in my first year in the CREOG
14  exam did very well, which is testimony to my basic
15  knowledge at that time in obstetrics and gynecology
16  as a first year student. My first year test results
17  were good. Everyone that saw them said they were
18  excellent. That was one of the reasons they accepted
19  me at Christiana was because I did good on that first
20  year competency test that demonstrated good medical
21  knowledge.
22     Q.  How do you think you did on the second year
23  of your CREOG test?
24     A.  I did less than optimal, because I had been

Page 318

1  on call twice that week, and I was exhausted. I was
2  even out sick shortly after that.
3      Q.  Am I correct that Dr. Patruno as your mentor
4  met with you basically weekly?
5      A.  You're incorrect. It was not weekly. I
6  forget. At first it was frequently. And then it
7  became less and less frequent just because he did not
8  have time with his busy work schedule. We met as
9  much as we possibly could. But it did decreased I
10  would say in December.
11     Q.  Dr. Patruno told you, did he not that there
12  was a perception within the faculty that your medical
13  knowledge was lacking? Again, I am not asking if you
14  agree that the perception is accurate, but he told
15  you that the perception existed, didn't he?
16     A.  Dr. Patruno told me that there was great
17  animosity. And that these people did not like me
18  because I was different.
19     Q.  My question is -- he may have told you lots
20  of other things, but one of the things he told you
21  was that there was a perception in 2002 that your
22  medical knowledge was lacking. Did he tell you that?
23     A.  I don't recall that statement. I recall him
24  telling me that these people did not like me, that I

Page 319

1  had to do good on this exam or the knives on my back
2  would become knives in my head if I did not do well
3  on that exam, because they did not like me.
4      Q.  Do you remember when he told you that?
5      A.  It was at one of our meetings before
6  Christmas in 2002. And I don't remember the exact
7  meeting.
8      Q.  Did Dr. Patruno also tell you that there was
9  a perception that you didn't respond well to --
10         MS. BREWINGTON:  Objection. Wait. Also
11  tell you she didn't agree when he told her the other
12  statement.
13         MR. BLOOM:  I'll rephrase the question.
14         MS. BREWINGTON:  Thank you.
15  BY MR. BLOOM:
16     Q.  Did Dr. Patruno tell you that in the fall of
17  2002 that there was a concern that you did not
18  respond well to criticism?
19     A.  I don't remember him saying that. I remember
20  him saying that I needed to act more like a whipped
21  puppy. Because I didn't act like I was scared of
22  them, and I didn't act like a whipped puppy. He
23  perceived that I should act more like a "whipped
24  puppy." And that is a direct quote, the

Page 320

1  whipped-puppy part.
2      Q.  And part of what Dr. Patruno was supposed to
3  do was to develop a remedial curriculum; is that
4  true?
5      A.  That was not my understanding. My
6  understanding was that we would go over cases and
7  concerns that I had had the previous week or since
8  the last time I had a meeting and that we would cover
9  certain things that we knew were coming up on the
10  CREOG test as a study session. But that was not
11  relayed as remedial. It was relayed as let's work on
12  these things. Let's have some time where you could
13  have a teaching physician to yourself to go over
14  these things, to study for this CREOG exam. That is
15  how that was relayed to me.
16     Q.  So Dr. Patruno set up a curriculum to help
17  you prepare for the CREOG exam?
18     A.  That's correct.
19     Q.  And that started in the fall of 2002 by Dr.
20  Patruno?
21     A.  It probably started more like late November.
22     Q.  I show you what has been marked as Zechman
23  15. Tell me if you recognize that document.
24     A.  I had seen the document in the discovery

**B-0233**

24 (Pages 317 to 320)

Page 321

1  stuff, but I have not been shown it before that. I
2  have never seen this prior, never.
3      Q. Is this schedule of CREOG study sessions
4  consistent with your recollection of what you
5  actually did with Dr. Patruno?
6      A. No, it's not. We went over surgical
7  instruments. This is not consistent with what we
8  talked about. This was not even given to me. And
9  this was not part of our plan. I have never seen
10  this prior to seeing this for discovery.
11      Q. I am not suggesting that you have. Are you
12  telling me at that you did not review any of these
13  CREOG topics with Dr. Patruno?
14      A. We might have randomly reviewed a few. But
15  we certainly were not following the schedule. And
16  this was not a schedule that was given to me and it
17  was certainly not a schedule that we were abiding by
18  in our discussions. We were concentrating more on
19  surgical skills and surgical instruments and surgical
20  procedures. This is totally different from what we
21  were doing.
22      Q. Prior to discovery in this case, had you seen
23  Dr. Patruno's notes from his meetings with you?
24      A. No. I did not even know that he was making

Page 322

1  notes.
2      Q. Have you seen them since then?
3      A. I have seen a few of them in discovery stuff.
4  But I was not even aware that he was making any
5  notes. And are they signed by him? Are they his
6  notes?
7      Q. Did Dr. Patruno ever tell you that he thought
8  you're focusing too much on surgical skills and not
9  acknowledging other areas that the faculty thought
10  you needed to work on? Did he ever tell you that?
11      A. No. We discussed different things, a lot of
12  things, but we were not going by something like this.
13  I don't know where this came from.
14      Q. You can put that aside.
15      A. Can I say something else? We did a lot of
16  just chatting too during those sessions, person to
17  person chatting.
18      Q. Dr. Zechman I'm going to hand you what has
19  been marked Zechman 22. December 12, 2002 letter
20  from Dr. Sciscione to you.
21      A. Yes.
22      Q. You have seen this letter, correct?
23      A. Yes.
24      Q. I take it from this letter that prior to

Page 323

1  getting this letter you had a sit-down discussion
2  with Dr. Sciscione?
3      A. We probably did. I don't remember the date.
4  But I do remember seeing this letter, because I was
5  surprised that here I was saying in here remove you
6  from remediation, and I had no idea I was on
7  remediation. He's talking about removing me. And I
8  had no clue that I was on remediation. That was news
9  to me.
10      Q. So you didn't know that Christiana Care
11  viewed the work you were doing with Dr. Patruno's
12  remediation?
13      A. No.
14      Q. But you knew that was something that was done
15  for you that wasn't necessarily being done for other
16  residents at that time?
17      A. I knew other residents had mentors and had
18  had meetings with them, but I thought it was more of
19  a teaching tool and not a remediation. I thought it
20  was just a mentoring and not a remediation, and I
21  thought this was a mentoring. I was totally
22  flabbergasted when I saw the word "remediation,"
23  because I thought I was under a mentoring program.
24      Q. You did not know that they considered that

Page 324

1  remediation?
2      A. No. I considered it more positive mentoring.
3      Q. And Dr. Sciscione communicated to you, I take
4  it, that there has been concern over your progress in
5  your first few months at Christiana Care?
6      A. Yes. And that was -- what we had discussed
7  before I had even been hired on, is that I had not
8  had the level of surgery training that first years do
9  at my previous program. It was just a different
10  sequence of teaching in Virginia than the sequence of
11  teaching at Christiana. And there were certain
12  skills that I had that were better. There were
13  others that I didn't. And surgery was a big thing.
14          In Virginia, you really didn't do any of
15  your own surgery until the second year. It was kind
16  of an award to be handed the scalpel.
17      Q. Does working in triage relate to developing
18  your surgical skills?
19      A. Absolutely no. Triage is an emergency room
20  clinic. It's more of the slave labor part of this
21  residency program.
22      Q. Dr. Sciscione tells you in this letter that
23  he going to create a, quote, "more intense education
24  curriculum" for you; is that true?

25 (Pages 321 to 324)

Zechman
Ellen Zechman, Volume 2

v.

C.A. # 05-159JJF

Christiana Care Health Systems
August 16, 2006

Page 325

1   A. I'm not seeing that. Where are you seeing
2   that? Give me a paragraph or a line.
3   Q. In the middle of the first main paragraph I'm
4   going to read a portion to you, and you tell me if I
5   read this right.
6       "We" -- and "we" I take it refers to his
7   discussion with you. "We discussed your approach to
8   diagnosis, and we discussed creating a more intense
9   education curriculum. As you know, I assigned you a
10  mentor, Dr. Patruno two months ago when we recognized
11  your challenges in our program. I would like you to
12  continue to meet with Dr. Patruno"-- I'm going to
13  stop there. Did I read at that much correctly?
14  A. Why do you want to stop there? I think the
15  next line is very important.
16      "I will ask that you run all the
17  patients that you see in the triage area past the
18  attendings." And he is saying that, because I had
19  been complaining about there were not enough
20  attendings, and we were unsupervised in that area.
21  And this is his response in acknowledging that
22  complaint, that we do not have enough attendings.
23      I am left there with nobody. And that
24  should not happen in a training program. Already

Page 326

1   this early I was seeing that problem. And this is
2   his response getting it on paper to acknowledging
3   that complaint that I was being unsupervised in that
4   area with not enough attending physicians.
5       I am sorry, but we are not conveniently
6   stopping where you want to stop.
7   Q. No, no. We're going to get to that part too.
8   He says he wants you to go over every patient in the
9   triage area with an attending physician. And then he
10  goes on to say -- that's the part you just read,
11  right?
12  A. Yes.
13  Q. And then he goes on to say, quote, "This is
14  an effort to teach and review with you the critical
15  thinking process that occurs in a seasoned faculty
16  member." Did I read that right?
17  A. That's correct. Because I had complained to
18  him that we were left alone in triage without
19  supervision.
20  Q. There is no reference to that complaint in
21  this letter?
22  A. That is what that is in reference to. That
23  is what that remark is in reference to.
24  Q. You believe that?

Page 327

1   A. I know that. I was there. I was there when
2   I complained to him about this. And keep in mind,
3   that I had already been practicing medicine as a
4   seasoned, licensed physician for six years prior to
5   this.
6   Q. Do you disagree that the purpose of this
7   letter was to, quote, "create a more intense
8   education curriculum for you"? Do you disagree with
9   that?
10  A. Say that again.
11      MR. BLOOM: Could you read that?
12      (The Court Reporter read the pending
13  question.)
14      MS. BREWINGTON: Before she answers that
15  question I just want to lodge an objection on the
16  grounds of speculation. But you can certainly answer
17  if you have an understanding.
18      THE WITNESS: I feel like Mr. Bloom is
19  trying to impose his opinion upon me with that.
20      MS. BREWINGTON: But I want to instruct
21  you to just answer his questions without comments
22  about what Mr. Bloom is trying to do. Okay?
23      THE WITNESS: He is saying that he wants
24  to create a more intense curriculum for me.

Page 328

1   BY MR. BLOOM:
2   Q. It doesn't say anything in this letter about
3   creating a more intense curriculum for any of the
4   other residents, does it?
5   A. No; but I don't know what was going on with
6   the other residents. I don't know the letters they
7   got. They don't know the letter I got.
8   Q. Fair enough. You can put that away. I hand
9   you Zechman 23. This is a December 13th, 2002 memo
10  from Dr. Sciscione to all Ob-Gyn attendings. And
11  that appears to be the date after the letter you were
12  just looking at. Isn't that true?
13  A. Yes.
14  Q. Have you seen this memo before?
15  A. I had not seen this memo until I looked at
16  the discovery documents.
17  Q. Is this memo from Dr. Sciscione consistent
18  with what he told you he was going to do the day
19  before in terms of getting you more one-on-one
20  attention with the physicians?
21  A. Yes; and it's also consistent with my
22  complaint that I was not getting enough supervision
23  from the attendings and that I wanted a higher
24  profile over there because it needed to be.

**B-0235**

26 (Pages 325 to 328)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Zechman                                    v.              Christiana Care Health Systems
Ellen Zechman, Volume 2          C.A. # 05-159JJF                    August 16, 2006

Page 329

1  Q. And what you are referring to was a lack of
2  supervision. That is something that you believe was
3  the case for all of the residents?
4  A. For all of the residents.
5  Q. But this memo doesn't refer to giving special
6  attention to any resident other than specifically
7  you, does it?
8  A. But I was the one that was complaining that
9  the place was not properly supervised with attending
10 physicians.
11 Q. Did you view this step by Dr. Sciscione of
12 increasing your one-on-one instruction with attending
13 physicians as a positive thing that Dr. Sciscione
14 did?
15 A. Absolutely. I wanted to learn as much as I
16 could. And the more I could squeeze out of those
17 teaching physicians, the more I could put in my
18 brain. And that's the whole reason I was there.
19 Q. All of the residents, in your experience
20 anyway, view more one-on-one attention with attending
21 physicians as a positive thing?
22       MS. BREWINGTON: Objection. It calls
23 for speculation, but you can answer.
24       THE WITNESS: I don't know. But having

Page 330

1  been out in private practice for six years I
2  treasured and appreciated having an attending
3  physician in there discussing, going over with
4  them, because I know what it was like to be out in
5  the world alone. And I just enjoyed having a
6  teaching physician with me. Because that's the way
7  it is supposed to be. That is what residency is all
8  about.
9  BY MR. BLOOM:
10 Q. Did you notice after your meeting with Dr.
11 Sciscione on December 12th, 2002 that you, in fact,
12 started to receive more one-on-one attention from
13 attending physicians?
14 A. From most of them, certain ones in
15 particular.
16 Q. Which ones in particular?
17 A. Dr. Hoffman. Dr. Kaminski when he was in
18 triage. Dr. Hochman. And I appreciated it. I
19 enjoyed it.
20 Q. Is there any person or persons whom you view
21 as physicians who are most supportive of you during
22 your residency?
23 A. Dr. Hochman.
24 Q. That's H-O-C-H-M-A-N?

Page 331

1  A. H-O-C-H. I think that is correct.
2  Q. Anything else?
3  A. Beth -- I'm blanking --Shubert.
4        I would have to see her name. I am
5  blanking on her name -- Dr. McIntosh. I'm trying to
6  think of some of the other ones. I'd have to see my
7  book. There were a lot of them that I worked with,
8  Dr. Carlson, Dr. White, Dr. Mamberg. As I can spit
9  them out, it comes to me. Dr. Jose -- what is Jose's
10 last name, a Spanish guy? Absolutely delightful. I
11 mean just loved to work with him. I would take on
12 extra cases to get in the operating room with him.
13 Q. I'm going to ask you a hypothetical question.
14 If Dr. Hochman were to tell you he doubted whether
15 you could successfully complete the program, would
16 you view that differently than -- would you give that
17 more credence than if it came from somebody else?
18       MS. BREWINGTON: Objection. It calls
19 for speculation.
20       THE WITNESS: I can't read somebody's
21 mind.
22 BY MR. BLOOM:
23 Q. I'm asking what's on your mind. If they were
24 to tell that to you.

Page 332

1  A. I don't think that's a fair thing to ask me,
2  either.
3  Q. Why is it unfair to ask you?
4  A. Because you're asking me to speculate. And I
5  don't know.
6  Q. I'm going to show you Zechman Number 5. This
7  is a March 11th, 2003 letter from Dr. Sciscione to
8  you. You received this letter, right?
9  A. I did.
10 Q. Did you, in fact, have a conversation with
11 Dr. Sciscione about your 2003 CREOG scores?
12 A. I went into the office, and he told me that I
13 was in the 12th percentile. And he led me to believe
14 that I made the lowest score out of the whole bunch.
15 And we found out later through discovery documents it
16 wasn't the lowest score. In fact, the chief resident
17 getting ready to graduate made less than I did
18 percentagewise. And I think that's very ironic that
19 he was making me feel so bad when I had two more
20 years of training when his chief resident did 8
21 percent, did poorer than I did.
22 Q. Two questions on that. One, you don't know
23 what conversations Dr. Sciscione had with other
24 residents about their scores, correct?

27 (Pages 329 to 332)

B-0236

Zechman
Ellen Zechman, Volume 2

v.

C.A. # 05-159JJF

Christiana Care Health Systems
August 16, 2006

Page 333

1    A.    That is true.
2    Q.    Second question. Your scores on the CREOG
3    test are not scored on the same scale as a
4    fourth-year resident; that's also correct, right?
5    A.    I don't know how they score those, because
6    these are not the national scores. This is some sort
7    of calculation they're doing in-house. The national
8    scores that come from, you know, where all of them
9    are graded are different from this. And I don't know
10   where they are coming up with this number.
11        But we find out later that Dr. Kirfides
12   did less than I, and Dr. Gray had a less percentile,
13   and they were not put on remediation. And they were
14   not threaten to not promote. And during that visit,
15   he acted like I was just the lowest score in the
16   whole bunch was what he led me to believe. Which at
17   that time, I said, oh, well. But now I think that
18   was quite unfair of him to come across that way.
19   Q.    I'm going to show you Zechman 66. You've
20   seen this document before, right?
21   A.    Yes. And this is the one that I have been
22   referring to where Dr. Gray is 8 percent. Dr.-- I'm
23   trying to see that name. Dr. Liu, a graduating
24   senior was 13 percent.

Page 334

1    Q.    You don't have any reason to believe that the
2    percentages that apply to people in different classes
3    than you are similar percentages that apply to second
4    years, do you?
5    A.    The percentage is, to my understanding -- and
6    nobody ever explained this to me, but to my
7    understanding, that is the percentage of their class.
8    And so my 12 is based on PGY2s, all second years. So
9    my actual grade was higher than that nationally.
10   Q.    These are percentiles?
11   A.    Only with in-house. My grade was more in
12   line nationally. This is only comparing --
13   Q.    Well, how would that be? If that's the case,
14   they are only comparing you to three other people,
15   right?
16   A.    Or maybe just all PGY2s in the nation, but
17   not all residents in the nation. The number that we
18   get from the national grading thing is a national
19   number comparing us with the national statistics.
20   Q.    I'm going to direct your attention to the
21   lower portion of this. There's a section that says
22   remediation with promotion. And it lists Robyn Gray
23   and Alex Kirfides as two people who are going to be
24   on remediation with promotion, correct?

Page 335

1    A.    I'm not seeing Kirfides. Your Kirfides is
2    at the very bottom of the list, and it just says that
3    he is assigned a mentor. Look at that.
4        Now, Robyn Gray was remediation with
5    promotion. And she was going up to be a graduating
6    senior. But they promoted her to a chief resident
7    with those kind of grades.
8        "Remediation with no promotion," look at
9    me. And for Dr. Likhyani, she was under me, and she
10   is not even enlisted here. So how come she is making
11   less than I am and they're not giving her a mentor?
12   Do you see where I have been singled out here?
13   Q.    You did not prepare this document, right?
14   A.    I did not.
15   Q.    And I take it -- when did you first see this
16   document, Zechman 66?
17   A.    In discovery documents.
18   Q.    So when you say Alex Kirfides is not on
19   remediation, that's just your interpretation of this
20   document?
21   A.    Do you see the words there? Look there,
22   "Remediation with promotion Dr. Robyn Gray." And the
23   next "Dr. Kirfides, Mentor." He was not under
24   remediation.

Page 336

1        "Remediation with possible no promotion,
2    Dr. Zechman."
3        "Mandatory Board preparation -- each one
4    of these is a separate evaluation of their plans.
5    Here Kirfides is just given a mentor.
6    Q.    That's your interpretation of this document?
7    A.    It's saying it right here. It's right in
8    front of you in black and white, sir. Can't you read
9    it?
10   Q.    Dr. Zechman, so as of March 17th, 2003, there
11   is already the possibility that you are not going to
12   be promoted to the next year, correct? You just read
13   it?
14   A.    Yes. It says "possible." The decision was
15   not made.
16   Q.    Right; but it was a possibility as of March
17   17, 2003 that you would not be promoted?
18   A.    Yes.
19   Q.    And at the bottom you will see there is also
20   a possibility that you would be offered no contract
21   at all. Do you see that?
22   A.    I see that.
23   Q.    And if you were not offered a contract, that
24   would be functionally the same as terminating your

28 (Pages 333 to 336)

Zechman
Ellen Zechman, Volume 2

v.

C.A. # 05-159JJF

Christiana Care Health Systems
August 16, 2006

Page 337

1    residency?
2    **A. I had not thought about that. I had not seen**
3    **that.**
4    Q. Is that true, though?
5    **A. I don't know. I had never put up with this**
6    **before.**
7    Q. If you are not offered a contract at the end
8    of your second year, does your residency end?
9    **A. I don't know. I had not faced that problem**
10   **before.**
11   Q. Dr. Zechman, I'm handing you what has been
12   marked as Zechman 25. It's a March 24th, 2003 letter
13   from Dr. Sciscione to you; is that correct?
14   **A. That's right.**
15   Q. And you received this letter?
16   **A. Yes.**
17   Q. There's handwriting at the bottom. It
18   continues onto the second page. That's your
19   handwriting?
20   **A. That's my handwriting.**
21   Q. And in this letter, specifically the second
22   sentence of the second paragraph, Dr. Sciscione
23   notifies you, at least as of March 24th, 2003, the
24   recommendation of the committee is that you repeat

Page 338

1    your second year?
2    **A. Yes.**
3    Q. And then he tells you that he is going to
4    extend your remediation plan, correct?
5    **A. Hold on and let me read this a minute.**
6    Q. Sure. Let me know when you're ready.
7    **A. Yes; okay, go ahead. I read some of that.**
8    Q. You agree that Dr. Sciscione is telling you
9    that he is going to extend your remediation program?
10   **A. Yes.**
11   Q. And he also told that you this time was going
12   to be carved out of your resident schedule. Is that
13   true?
14   **A. I don't know. Do you want to give me a line**
15   **that you are seeing that? Are you extrapolating or**
16   **are you actually seeing that?**
17   Q. No. I will read you the quote, eighth line
18   down.
19   **A. I see it. All right.**
20   Q. I am going to read you in the middle of the
21   paragraph starting with the word "during." I'm going
22   to read a couple sentences.
23   **A. Okay.**
24   Q. "During this time and as part of your

Page 339

1    extended remediation plan, you are expected to create
2    a schedule to meet with your mentor or coach, Dr.
3    Joseph Patruno. This time is to be carved out of
4    your resident schedule. It is your responsibility to
5    contact Dr. Patruno, set this up, and convey this
6    information to Sandy Kardos so that she can make the
7    proper arrangements in the schedule," close quote.
8        Did I read that portion correctly?
9    **A. That's correct.**
10   Q. And so it was your understanding that your
11   schedule was actually going to be modified so that it
12   could incorporate the extended remediation?
13   **A. This meant that in my opinion and how it**
14   **actually happened is that Dr. Patruno and I would get**
15   **together and come up with a schedule according to**
16   **what he had to do, because his schedule was priority**
17   **over my schedule, and that if arrangements had to be**
18   **made for me to have relief so that I could go meet**
19   **him, then that would be done.**
20       **Now, what we did most of the time is**
21   **waited until the end of the day when I was done with**
22   **my schedule. And then we would go meet in his office**
23   **before I left for the day.**
24       **But where we were having problems was**

Page 340

1    **meeting with his schedule. His schedule was so busy,**
2    **that we were having trouble getting together**
3    **sometimes. But they are saying we would meet**
4    **together and she would get relief when it was okay**
5    **for him to meet with me. And if I was assigned to**
6    **something, she would send me relief so that I could**
7    **meet with him. But the problem with meeting was more**
8    **with his schedule and how busy he was that interfered**
9    **with us getting together.**
10   Q. Did you have any problem with the fact that
11   Dr. Sciscione was extending remediation?
12   **A. No. I wanted to do whatever it took to**
13   **finish the program. If it took five years to finish**
14   **the program, then I was willing to give it that time.**
15   **I wanted to finish the program. I wanted to be a**
16   **Board certified Ob-Gyn.**
17   Q. Let me ask you a little differently. Im not
18   asking what you are going to do. I want to know if
19   you thought that Dr. Sciscione's or the committee's
20   decision to extend your remediation plan seems
21   unjustified to you.
22   **A. I felt that they needed to focus on allowing**
23   **me to advance my surgical skills, because I was not**
24   **getting into surgery. I was being reassigned even on**

29 (Pages 337 to 340)

B-0238

Page 341

1  my Ob-Gyn rotations, I would get sent to triage. And
2  I felt I was not getting the base in order to get
3  that knowledge base.
4          The test taking comes with reading, and
5  taking the test and being well-rested when you take
6  the test so that you can get through the test. But I
7  felt that they were being a little unfair in
8  criticizing. Because most of the criticism that I
9  was getting was the surgical skills. And I had
10  already proven myself with the knowledge and would
11  continue to do that with the next test that was
12  coming up. That test only came up once a year.
13     Q.  You just said that most of the criticism
14  related to the surgical skills. What did the rest of
15  the criticism relate to you?
16     A.  Why are you doing this? You have got four
17  children at home. Why do you even want to do this?
18  Why are you here? That's where a lot of the
19  criticism came. You have got four children, and your
20  husband is a doctor. Why are you here? You are a
21  licensed physician. Why do you want to do this? Why
22  don't you go home to your children? That was the
23  rest of the criticism.
24     Q.  Did Dr. Sciscione tell you that there was a

Page 342

1  perception among the faculty that you were defensive
2  and resistant to constructive criticism about your
3  actual medical performance there?
4          Did he tell you that?
5     A.  I don't recall him telling me that. I do
6  recall Dr. Patruno saying that I needed to act more
7  like a whipped puppy.
8     Q.  Were you aware that that was a concern among
9  the faculty, that you were defensive and resistant to
10  constructive criticism?
11     A.  I don't know. I welcomed criticism. I
12  welcomed teaching. That's the whole reason I was
13  there.
14     Q.  Were you aware, though, that that perception
15  existed?
16     A.  I don't think I was. You've certainly driven
17  that point several times today about criticism.
18     Q.  Well, you have now seen the resident review
19  committee meeting notes in this case now, right?
20     A.  I've seen some of them. I can't remember
21  what they said other than the initial one where they
22  were so concerned over people not even having taken
23  their Boards.
24     Q.  I'm going to show you Zechman 54. This is an

Page 343

1  April 21st, 2003 e-mail exchange between you and Dr.
2  Sciscione. Is that true?
3     A.  Yes.
4     Q.  And you cc's somebody on your initial e-mail.
5  Who did you cc?
6     A.  That was so that I would have a copy of this
7  for my records. And what I was doing is, on my own
8  time, this was without instruction, I was following
9  around the chief resident so that I could -- like I
10  say, I was hungry for teaching. And I was following
11  around on my own going in when I was not required to
12  go in to gain the benefit of, number one, bonding
13  with these people that I knew were not liking me.
14          I felt like well, maybe if I come help
15  them out, if I work with them, they'll like me and
16  they will realize how sincere I am about this and how
17  badly I want to do this. And so I was e-mailing Dr.
18  Sciscione, letting him know that I was taking these
19  extra steps to try to, you know, be more, I would say
20  eager to learn, be more willing to help, you know,
21  being more subjective and servantile so that I
22  would -- I wanted to stay there. I wanted to learn.
23          I was going in trying to help these
24  girls out so that they would consider me part of the

Page 344

1  team, because they were not considering me part of
2  the team. I was, quote, different. And I wanted to
3  be part of the team.
4     Q.  In the very middle there is a sentence where
5  you write -- it's a half a line, "Additionally I
6  continue to meet with Dr. Patruno weekly."
7          Do you see that?
8     A.  I see that.
9     Q.  Is that true that you basically met with Dr.
10  Patruno on a weekly basis?
11     A.  I can't remember. I know for a while it was
12  weekly. I don't know at what point it started not
13  being weekly. But at some point it was.
14     Q.  And then near the end of this e-mail, you say
15  to Dr. Sciscione that you think he will see an
16  academic difference now that we are on reduced hours.
17  Do you see that?
18     A.  Yes.
19     Q.  What does that refer to?
20     A.  My fatigue. Do you see already this is April
21  21st. He was aware of my disability, and I was
22  having problems with fatigue because we were on
23  longer work weeks. And this is in reference to, I
24  think things are going to get better, and I will have

30 (Pages 341 to 344)

Zechman                                                        Christiana Care Health Systems
Ellen Zechman, Volume 2          C.A. # 05-159JJF                      August 16, 2006

Page 345

1  more emergency and be more alert, because it says --
2  the previous call schedule required 30 to 36-hour
3  shifts that were killing me.
4        And so this was -- I had not asked for
5  ADA yet I had not asked for family medical leave.
6  But notice I am saying I am fatigued. I am tired.
7  The 36-hour work shifts are killing me.
8     Q.  What are the reduced work hours that you are
9  referring to?
10    A.  It was illegal or -- not illegal but it was
11  not the norm. At the time this was written prior to,
12  I think it was July of 2003, a national law went into
13  place that they had to pull us off of the floors
14  after 24 hours. They could not make us work 36
15  hours. Because we were on our feet without resting,
16  for 36 hours. So we would work a night shift and
17  then the next shift with no sleep. And they made
18  that illegal in July of this year, and they
19  started in March. I forget when that law went into
20  effect. And this was in response to the new rules
21  where we could only go 24 hours without resting or on
22  call rather than the previous 36. And I was really
23  having fatigue problems with the 36 hours. And
24  that's, you know, when -- with the CREOG I had pulled

Page 346

1  two of those 36-hour shifts prior to the weekend of
2  taking that test. I was extremely fatigued.
3        Before I crashed and was hospitalized, I
4  had pulled one or two of these 36-hour shifts, and
5  they were killing me.
6     Q.  Which shift are you talking about?
7     A.  They were 24-hour stints.
8     Q.  Were the shifts reduced just for you or for
9  everybody?
10    A.  Nationwide. It was a Nationwide rule because
11  this was killing everybody.
12    Q.  The week before you started your second year
13  as a second year resident, this would be the last
14  week of June, do you recall having a meeting with Dr.
15  Ekbladh to discuss how things were going to progress
16  on the floor?
17    A.  I can't remember.
18    Q.  Do you remember him telling you that your
19  progress going forward and that your status would be
20  reviewed every six weeks?
21    A.  I can't remember. I would meet with him
22  frequently. I forget how frequently now. But I
23  can't remember --
24    Q.  Well, let me clarify. I don't mean that he

Page 347

1  could meet with you every six weeks. My question is
2  did Dr. Ekbladh tell you that once you started your
3  second, second year, that the committee would need to
4  review your status every six weeks?
5     A.  No, I don't remember that being said at all,
6  absolutely not. I would have frequent evaluations by
7  the mentors that I was assigned to, but not what you
8  just said. I never heard of that.
9     Q.  Dr. Zechman, I'm going to hand you two
10  exhibits at a time Zechman 17 and 18.
11    A.  Okay, go ahead.
12    Q.  Did you receive either of these two documents
13  while you were at Christiana Care?
14    A.  I received this top one. And the page behind
15  it. I did receive this one and this one. Let me
16  see. I received all of these.
17        MS. BREWINGTON:  Can you identify them?
18        THE WITNESS:  Zechman 17?
19  BY MR. BLOOM:
20    Q.  And 18; did you receive 18 too?
21    A.  They may not be different. I received one of
22  these. I don't know which one I received, but one of
23  the two. But I don't remember which one it is.
24    Q.  Just so the record is clear, unless you tell

Page 348

1  me that there is a difference, I'm not sure there is
2  actually a difference between these two documents.
3  If you think there is a difference, point it out to
4  me.
5     A.  I don't know, you know, do you want to walk
6  through it line by line right and find out? That's
7  not a fair assessment right now unless you want to
8  walk through it together.
9     Q.  Well, let's turn to -- well, first of all,
10  let's take the first page of Zechman 17. This is
11  part of your remediation plan, right?
12    A.  Yes.
13    Q.  Who gave you this document?
14    A.  This top document was given to me by Dr.
15  Hoffman.
16    Q.  Did he say anything to you when he handed you
17  the document?
18    A.  I'm sure he did, but I don't recall it. He
19  said lots.
20    Q.  Did you think any portion of this remediation
21  plan as it is described in Zechman 17 was unjustified
22  remediation?
23    A.  No; I welcomed this, and I enjoyed doing it.
24  I enjoyed practicing this stuff. He never tested me

31 (Pages 345 to 348)

Zechman
Ellen Zechman, Volume 2

v.

C.A. # 05-159JJF

Christiana Care Health Systems
August 16, 2006

Page 349

1  on it, though. All of this was given to me, and I
2  would go and practice it. I would even stay late and
3  practice, and I was never tested on it.
4      And then Dr. Ekbladh, when this first
5  came into being, Dr. Hoffman was going to now be my
6  mentor. Dr. Patruno was no longer my mentor. And
7  then for some reason Dr. Ekbladh basically took me
8  away from Dr. Hoffman, and Dr. Hoffman no longer
9  my mentor. I was never tested on this.
10     Q.  When you say tested on this, what was the
11  "this" you are referring to?
12     A.  These little instructions here.
13         Now, each quiz where we would have the
14  chapters, that's where I was talking about the test
15  where I would have to get up at 4:00 in the morning
16  to study. And yes, that was unfair, because not only
17  were they adding to my work day, this had me having
18  to get up four o'clock in the morning to do this
19  reading before I went in at six o'clock in the
20  morning. I don't remember when this was first given
21  to me. I don't remember whether it was right after I
22  was requesting leave and time off or, you know,
23  after. I'm not sure.
24         But what was happening was, they gave me

Page 350

1  the schedule and they themselves did not allow me to
2  follow it. They would reassign me.
3     Q.  Who is "they"?
4     A.  Dr. Gray. And when I would complain to Dr.
5  Ekbladh, nothing would be done.
6         I even told Dr. Gray, This is what I am
7  supposed to be doing. And I would show her the
8  schedule, go call Dr. Ekbladh if you don't believe
9  me. And I don't know whether she did or not, but
10  there was no reinforcement on the floor, and I had to
11  go wherever Dr. Gray said to go. I was supposed to
12  have practice sessions. And she would assign me
13  labor or delivery to some urgent thing or C section
14  where I would not be able to get these training
15  sessions that I needed.
16         For Friday, the 25th, the operating
17  room, I was supposed to be there with Dr. Kaminski.
18  I was sent to triage. We have documentation of this.
19  And other people went into the operating room.
20     Q.  What would be the documentation of that?
21     A.  The surgical things where I'm stuck at that
22  time in triage and where I document I am supposed to
23  be in the operating room, and so-and-so goes. We
24  have got documentation of that.

Page 351

1     Q.  These are documents that you wrote?
2     A.  These are documents as well as the case,
3  things from the OR or from triage. When I was in
4  triage, I documented my presence in triage by keeping
5  the stickers that had the medical record numbers on
6  them. That was my proof that I was there seeing
7  those patients and not in the OR where I was supposed
8  to be.
9     Q.  I'm going to show you Zechman 112. This is I
10  believe the same schedule, but it has handwriting on
11  it. Is that your handwriting?
12     A.  That looks like my handwriting. And right
13  there, the February 25th, no OR. You see, I was not
14  put in the OR.
15     Q.  Did you go through the schedule to mark off
16  the times were you were pulled from assignments that
17  were on the schedule?
18     A.  I did. I would mark where I was. And these
19  are my workday hours, 6:30 in the morning to 6:30 in
20  the p.m. I notice, you know --
21     Q.  There is not a question pending yet. When
22  would you mark off like you did on July 25th when you
23  were pulled from an assignment, did you make those
24  notations as the events were occurring, or was that

Page 352

1  something you did more recently?
2     A.  I either did it the weekend after it
3  occurred, like when I would review the week, because
4  I knew this was happening. And I was so frustrated
5  about being reassigned when this was so critical to
6  me to prove myself.
7         So like at the end of the week I would
8  fill in these schedules.
9     Q.  You just referred to the one that's July
10  25th, and you indicated you were pulled from the
11  assignment with Dr. Kaminski by writing "no OR" and
12  circling it; is that true?
13     A.  Right. That means I was not sent to the OR.
14  I was reassigned. I was supposed to be in there with
15  Dr. Kaminski, and they would not let me go.
16         And it was Dr. Gray, and I forget sure
17  who exactly went in on that case, but it was Dr. Gray
18  that reassigned me. And Dr. Kaminski even sent a
19  letter to Dr. Lamar that they were not letting me
20  have the surgical cases. How can I improve if you
21  don't give me the training?
22     Q.  Are there any other assignments on this
23  schedule where you note here that you were pulled
24  from the assignment?

B-0241

32 (Pages 349 to 352)

Zechman
Ellen Zechman, Volume 2

v.

C.A. # 05-159JJF

Christiana Care Health Systems
August 16, 2006

Page 353

1    A. I did not do my full documentation on these.
2    I did it more in some of my notebooks.
3    Q. It's a "yes" or "no" question, really. Are
4    there any other notations here that reflect you were
5    pulled from the assignment?
6    A. Not on this page, but they are elsewhere.
7    Q. Elsewhere where? You mean elsewhere in
8    different kinds of documents?
9    A. In my patient logs.
10    Q. As you sit here today -- and let's just look
11    at the front page. This is the July 2003 curriculum
12    for Ellen Zechman. As you sit here now, can you
13    think of any other assignments during the month of
14    July other than July 25th where you were pulled from
15    your special schedule?
16    A. I have made a list. And my attorney has that
17    list where I went through my documents with that. I
18    can't from memory say that. I have to have my
19    diaries. And I kept daily diaries, and there is
20    documentation of other pullings. And we do have that
21    documentation. My attorney has that, because we
22    broke it down and specifically, you know, gave days
23    and case numbers and that sort of thing.
24    Q. How recently did you provide that to your

Page 354

1    lawyer?
2    A. I don't know. We've got so much
3    documentation that it's --
4        MS. BREWINGTON: Can I answer?
5        MR. BLOOM: Sure.
6        MS. BREWINGTON: It's months ago it's
7    been produced.
8        THE WITNESS: That was prior to our
9    first deadline of having discovery. So whenever that
10    was, because that's when I sat down and you, know,
11    went through the diaries and made those lists.
12    BY MR. BLOOM:
13    Q. Dr. Zechman, I'm going to show you Zechman
14    30. This is a July 30th, 2003 memo that Dr. Ekbladh
15    gave to you. Is that true?
16    A. This was at a private meeting in his
17    office --
18    Q. Doctor, I am just going to ask you a "yes" or
19    "no" question.
20    A. I am not going to answer "yes" or "no."
21    There is more than that.
22    Q. Did you receive this document Zechman 30 from
23    Dr. Ekbladh?
24    A. Yes, I did.

Page 355

1    Q. Is that your signature on the signature line
2    above the words "Ellen Zechman, M.D."?
3    A. Yes, it is. This was exactly seven days
4    after I requested leave or ADA.
5    Q. Why is that significant to you?
6    A. Because I had just signed a contract for the
7    whole year the very last days of June. And it was
8    effective July 1st. And the only thing that had
9    happened between now and then was that fact that I
10    was asking for leave or accommodation.
11    Q. You were aware, weren't you, that the
12    committee was going to continue to review your status
13    as a resident?
14    A. That was not up for a while. That was not
15    due for at least --
16    Q. Six weeks?
17    A. No; it was going to be longer than six weeks.
18    It was more like two months, three months. It was
19    not six weeks.
20    Q. Were you aware that there had already been a
21    vote by the committee to consider terminating your
22    residency. Are you aware of that?
23    A. I heard one or two people did that, and the
24    vote was brought down. And the vote that went

Page 356

1    through was that I be given the PGY2 contract with
2    the possibility of being promoted to PGY3 once I got
3    more surgical skills. It was not a unanimous
4    decision.
5    Q. Some people wanted to terminate you before
6    that?
7    A. No. Some people wanted to just help me get
8    my surgical skills and send me forward.
9    Q. What's the basis of your knowledge of the
10    committee meeting events that you were just
11    testifying about? Where did you learn that?
12        MS. BREWINGTON: I am going to object to
13    vague. But you could go ahead and answer.
14        THE WITNESS: The attendings on the
15    floor, the different attendings that I worked with,
16    the physicians told me that.
17    BY MR. BLOOM:                    **B-0242**
18    Q. Who?
19    A. I can't remember. But it was common
20    knowledge that there were one or two that did not
21    like me and did not want me there. There were others
22    that, you know, liked me and thought it was
23    ridiculous.
24    Q. Thought what was ridiculous?

33 (Pages 353 to 356)

Zechman                                        v.                    Christiana Care Health Systems
Ellen Zechman, Volume 2              C.A. # 05-159JJF                      August 16, 2006

Page 357

1   A.  What they were doing, like Dr. Vakili, Why
2   are they mad at you?  Why are they doing this to you?
3      Q.  Do you have any reason to believe Dr. Vakili
4   has ever seen any of the evaluative materials that
5   relate to you?  Do you have any reason to believe
6   that?
7      A.  I think he has, and I think he probably
8   talked to the other attendings while they were
9   sitting in lounges waiting for babies to be born.
10  They discussed things.
11     Q.  You don't have any personal knowledge of what
12  documents he has seen or who he's talked to; is that
13  true?
14     A.  No; that's speculation.
15        MS. BREWINGTON:  Off the record.
16        (A brief break was taken.)
17  BY MR. BLOOM:
18     Q.  I just heard from you that there were a
19  couple of physicians on the committee that had wanted
20  to terminate your residency earlier in the spring of
21  2003.  Did I hear that right?  I don't want to put
22  words in your mouth, but I thought that's what you
23  were telling me.
24     A.  That is what I heard from the vote when they

Page 358

1   decided to not promote me, that there was, from what
2   I've heard, only one physician that said that.
3      Q.  Who told you that?
4      A.  I can't remember, but it was lounge talk.
5      Q.  Was that person who told you that a member of
6   the committee?
7      A.  Yes, they were.
8      Q.  Did that person tell you who wanted to
9   terminate your residency?
10     A.  No, they did not, but I heard through the
11  grapevine from some of the residents a name.
12     Q.  What residents told you the name?
13     A.  I'm trying to think.  I can't remember,
14  because like I said, this was lounge conversation
15  again and I can't remember.  I can't remember.
16     Q.  What was the name that they told you?
17     A.  Faith Brosch, B-R-O-S-C-H.
18     Q.  From your conversations with these other
19  residents whose names you don't now remember, but do
20  you remember from those conversations how they came
21  to learn that Faith Brosch wanted to terminate your
22  residency?
23     A.  I think there -- and I'm not sure, I think
24  there was a resident representative at these

Page 359

1   meetings, and it came through the grapevine through
2   the resident that was attending those meetings, but I
3   don't know which one was attending and, you know, how
4   it came through the grapevine.
5      Q.  I'm going to hand you what's been marked as
6   Zechman 31.  And this is an August 19th, 2003 e-mail
7   exchange between you and Sandy Kardos?
8      A.  Yes.
9      Q.  I take it that you initiated this e-mail
10  exchange with a question asking what was discussed at
11  yesterday's meeting?
12     A.  I cannot remember.  It was in question, but I
13  don't know whether I was in turn, you know, sending
14  an e-mail over something that was asked me in person,
15  you know, and I was just responding later.  I don't
16  remember.  I honestly don't remember the surrounding
17  circumstances of this or the discussion that was
18  concerning it.
19     Q.  So you don't know whether this relates to the
20  committee vote that was held the day before?
21     A.  I don't know.  I don't know whether, you
22  know, it was relating to my requests from, you know,
23  my, to this point denied request for leave and
24  accommodation.  I cannot remember.  I really can't.

Page 360

1      Q.  Okay.
2      A.  All I know is I was still trying to get FMLA.
3   I was still trying to get leave, sick leave,
4   whatever, and I was being ignored.
5      Q.  Incidentally, Dr. Zechman, a few questions
6   ago actually just before we took the break you made
7   reference to your surgical skills and that being the
8   area where you needed improvement; is that true?
9      A.  Initially I felt that the improvement had
10  been greatly improved by August, and I was getting
11  good evaluations which, for some reason, they had not
12  appeared in the discovery stuff.  And that was --
13  once I got the chance to get in the operating room,
14  you know, and got experience, those skills were
15  coming up, because that's what I needed.  I needed,
16  you know, a chance to get in there and do it, you
17  know, needed practice.
18     Q.  Do you acknowledge that faculty members
19  expressed to you concerns about your progress in
20  areas other than surgical skills?
21     A.  Other than those letters, no, they didn't.
22  They did not discuss it with me personally.
23     Q.  I'm going to hand you Zechman 32.  This is an
24  August 20th, 2003 letter from Dr. Ekbladh to you,

**B-0243**

34 (Pages 357 to 360)

Zechman
Ellen Zechman, Volume 2

v.
C.A. # 05-159JJF

Christiana Care Health Systems
August 16, 2006

Page 361

1  correct?
2  **A. Yes.**
3  Q. And you received a copy of this letter?
4  **A. I did.**
5  Q. Let me know when you're ready.
6  **A. Go ahead. I'm ready. I'll have you stop if**
7  **it's something I have not seen.**
8  Q. Did Dr. Ekbladh express to you verbally,
9  apart from within this letter, that he thought you
10  should be tested for a learning disability?
11  **A. No, he did not. He never said anything about**
12  **being tested for a learning disability. This was the**
13  **first I had ever seen anything about that underlying**
14  **learning disability, "but that these could not be**
15  **clearly separated." I have no idea what he was**
16  **talking about there.**
17      **I was exhausted. I was sick. I needed**
18  **time off. And I don't know why, you know, here it is**
19  **a month later they are talking about all this kind of**
20  **stuff and yet they are not giving me the one thing**
21  **that I needed, and that was time off to rest and**
22  **recuperate.**
23  Q. That's the one thing you thought you needed
24  was rest?

Page 362

1  **A. I think I needed my rest and my recuperation**
2  **and then discuss anything else that needed to be**
3  **discussed. But already we were close to over a month**
4  **for me asking for sick leave, FMLA, ADA, whatever I**
5  **could get. I still had not had it. My schedule was**
6  **being increased and, you know, they are talking here**
7  **about me -- that I seemed stressed and have many**
8  **signs of depression. Yes, I was stressed. I was**
9  **sick and they were not giving me time off.**
10  Q. And Dr. Ekbladh asked you to see a
11  psychiatrist, didn't he?
12  **A. You're right. And do you know what I told**
13  **that psychiatrist? I said, I need sleep, I need**
14  **rest. I'm sick. I need to have leave. I said, talk**
15  **to me after I have rest and leave.**
16  Q. This is Dr. Marcus?
17  **A. Yes. And she suggested, well, do you think**
18  **you're depressed? I said, no, I'm exhausted. I'm**
19  **not depressed, I am exhausted and sick.**
20  Q. Dr. Marcus did tell you that she thought you
21  should pursue ongoing counseling, correct?
22  **A. I forget what she said, but I told her that,**
23  **you know, she needed to help me get some time off**
24  **because I had put in for this ADA. I had put in for**

Page 363

1  **the FMLA and, I said they're not giving it to me.**
2  **You know, don't talk to me about, you know,**
3  **counseling when they are not even giving me the time**
4  **to recuperate from a physical illness that I need**
5  **time to recuperate from.**
6  Q. Did you tell her that?
7  **A. I did. I said, you know, help me get time**
8  **off.**
9  Q. Did you tell her, don't talk to me about
10  counseling?
11  **A. I didn't say it that way. I didn't say don't**
12  **talk to me about counseling. I said, what I need is**
13  **rest. I said, you know, that's what I need. That**
14  **should come first the fact that we take care of the**
15  **physical illness that I have been trying to get time**
16  **off for, then if there is psychological counseling**
17  **needed after that, you know, let's discuss that after**
18  **we take care of the physical problem. That's just**
19  **good medicine.**
20  Q. Did you pursue counseling at any time since
21  your meeting with Dr. Marcus?
22  **A. No, because I was still trying to get my**
23  **leave and my --**
24  Q. Just to clarify, I mean at any time after

Page 364

1  your meeting with Dr. Marcus until today.
2  **A. I had used my preachers as my counselors. I**
3  **have used my family and my friends. All of this has**
4  **been tremendously emotionally traumatic for me. And**
5  **I have used my personal support system as my**
6  **counseling to get me through it as well as my pastors**
7  **at church. That's the counseling I've had.**
8  Q. Now, Dr. Fraser testified that he also
9  suggested to you that you speak to somebody
10  professionally for counseling.
11      MS. BREWINGTON: I'm going to object.
12  That mischaracterizes the testimony.
13      THE WITNESS: I speak to him. He's part
14  of my counseling network. And I speak to my Ob-Gyn.
15  BY MR. BLOOM:
16  Q. What was your reaction when you saw this
17  reference to a potential underlying learning
18  disability? Did you respond in any way to Dr.
19  Ekbladh about that?
20  **A. No, I had no idea what he was talking about.**
21  **He is not one you get to talk to things about. He**
22  **just, you know, gives orders and you do it. No, I**
23  **kind of blew it off because, you know, it was like**
24  **what's he talking about, you know? The only problem**

35 (Pages 361 to 364)

Zechman                              v.                    Christiana Care Health Systems
Ellen Zechman, Volume 2        C.A. # 05-159JJF                         August 16, 2006

Page 365

1  I had was I was sick and I needed time off. I needed
2  rest.
3     Q.  All right, you can put that document aside.
4  I'm going to hand you Zechman 34, which is a
5  September 4, 2003 letter from Dr. Ekbladh to you.
6     A.  Uh-huh.
7     Q.  Is that what this document is?
8     A.  Yes, that was my schedule for the rest of the
9  year.  And please note that there's nothing about
10 leave, sick leave, FMLA and ADA on here.
11    Q.  Dr. Zechman, I'm sorry.  You're going on to
12 give speeches that do not respond to the questions
13 I'm asking.
14    A.  I'm sorry, but that point needs to be made.
15    Q.  Let me finish.  I'm going to ask you
16 questions and ask you if you could just -- I just
17 asked you if the document is what it says it is.  If
18 at the end of the deposition your lawyer wants to ask
19 you other questions, this case is going to go on,
20 you'll have every opportunity to say whatever you
21 want to say, but if we're going to finish this, I'll
22 ask you to just answer the question and then wait for
23 the next question.
24        Did you receive this document, Zechman

Page 366

1  34?
2     A.  Yes, I did.
3     Q.  And so you're aware that you were going to
4  have another evaluation on September 29th, 2003 by
5  the review committee?
6     A.  When this was down here, yes.
7     Q.  You can put that away.
8        Did Dr. Marcus suggest that you consider
9  taking medication?
10    A.  She suggested that, and I told her that if
11 that was needed, I would be open to that, but I
12 needed to get rest and time off before doing that.
13       You don't throw medication on somebody
14 that, you know, just for the sake of it when you have
15 got an ongoing medical condition that has not been
16 taken care of and not addressed.  But I was open to
17 that, but first things first.  Let's get me
18 recuperated and then let's, you know, address those
19 issues.
20    Q.  Did you express any concern to Dr. Marcus
21 that medication might hinder your ability to function
22 as a resident?
23    A.  You never know.  Any medication can have side
24 effects.  I did not want to take medications and show

Page 367

1  up to work the next day.
2     Q.  So is that a yes, that you did express that
3  concern to her?
4     A.  Yes, I said, I need time off.  I need time
5  off to recuperate and see what's going on here.  And
6  they still didn't give me time off.
7     Q.  I'm giving you Zechman 35.  This is a
8  September 30th, 2003 letter from Dr. Ekbladh to you,
9  correct?
10    A.  That's correct.
11    Q.  And you received this letter?
12    A.  I did not receive it until sometime late in
13 October in the mail.
14    Q.  So you heard over the telephone the
15 decision --
16    A.  Dr. Kaminski, yes, sir.
17    Q.  He told you on October 3rd?
18    A.  Yes, sir.  When I called in to tell them that
19 I was coming back, I had been released by my doctor,
20 he said, don't come back.  Dr. Ekbladh says you're
21 terminated.
22    Q.  Did that seem like an odd thing to you that
23 he would say Dr. Ekbladh terminated you?
24    A.  That's what he said.  And you're right, I

Page 368

1  thought it was very odd.  He said Dr. Ekbladh had
2  terminated me.
3     Q.  Is that typical in your experience that
4  members of the resident review committee would
5  disclose to a resident the internal communications of
6  the committee meetings?
7        MS. BREWINGTON:  Objection.
8        THE WITNESS:  I don't have any prior
9  experience in things like this, so I have no idea.
10 BY MR. BLOOM:
11    Q.  Had anybody else who was a member of the
12 resident review committee ever divulged to you
13 discussions that were held in that meeting?
14    A.  Which meeting are we talking about?
15    Q.  Any resident review committee meeting.
16    A.  There were always rumors of, you know, lounge
17 talk and, you know, of what went on any time there
18 was a meeting.
19    Q.  But this is serious.  I mean, you're saying
20 that Dr. Kaminski, who was a member of the resident
21 review committee, divulged to you internal
22 communications of a meeting of that committee; is
23 that what you're saying?
24    A.  I don't know whether that was a meeting of

B-0245

36 (Pages 365 to 368)

Page 369

1  the committee. All I know was he called me back and
2  said not to come back to work, that Dr. Ekbladh had
3  terminated me. He didn't say anything about the
4  committee meeting.
5      Q.  I'm handing you Zechman 37. Did you type
6  this document?
7      A.  That very day, shortly after I got off the
8  phone with Dr. Kaminski.
9      Q.  And you say right here in this letter that
10  you learned of the decision at 8:30 in the morning on
11  October 3rd; is that correct?
12      A.  I would assume that this is correct because
13  this is -- you know, I typed it that day.
14      Q.  Whose idea was it to permit you to resign as
15  opposed to proceeding through the fair hearing process?
16      A.  It was Dr. Ekbladh's as well as I had -- I
17  was going to proceed with the fair hearing process,
18  and I talked to Dr. Brian Little and, you know, told
19  him what was going on. And I also had contacted
20  Dr. -- I'm blanking -- Charles Whitney concerning
21  being my advocate because he was a previous residency
22  director. And both Dr. Little and Dr. Whitney said
23  that you, you know, can't fight this. He'll get you
24  later. And when I talked to Dr. Ekbladh about

Page 370

1  fighting it, he basically threatened me and he says,
2  well, if you fight it and you win, I'll just get you
3  later. And he threatened to report me to the
4  National Data Practitioner's Bank and basically
5  didn't give me a choice. And it was like, well, why
6  fight me, because I will just get you later. If you
7  win, I'm still your supervisor; I'll still get you.
8      And then when I talked to Dr. Whitney,
9  Charles Whitney, about this, he says, you know, he's
10  right, he'll just get you later. And he told me
11  about what Ekbladh had done to him about -- just
12  about putting him out of business by cutting out his
13  operating room time and being a surgeon.
14      Dr. Charles Whitney is a GYN oncologist,
15  which is a cancer surgeon for the GYN. He stood up
16  against Dr. Ekbladh and Dr. Ekbladh basically gave
17  away all his operating room time and just about put
18  Charles Whitney out of business. Because a surgeon
19  makes his living by operating, and if are you not
20  given any OR time, you're in bad shape. And he says,
21  he'll get you later and, you know, he is still going
22  to be there. And he says, you have got to resign.
23  You have got to get out of there because he will ruin
24  you. He is out to ruin you.

Page 371

1      Q.  Do you have any knowledge of the
2  circumstances that you just described that relate to
3  Dr. Whitney's privileges other than what Dr. Whitney
4  told you?
5      A.  There was talk with the attendings when I
6  would be operating. Let me see if I can remember one
7  of the surgeon's name. She's not there anymore and
8  the name is not coming to me. But she and I
9  discussed it. And this was before I ever had this
10  incident, about how Dr. Whitney was coming to all the
11  other GYN surgeons asking them if he could have their
12  operating room time if they didn't need it because
13  Dr. Ekbladh had cut him out of the schedule and he
14  needed more operating room time in order to take care
15  of his patients.
16      So it was common knowledge among the
17  other GYN surgeons because Dr. Whitney had gone
18  through, you know, asking for more operating room
19  time. And this was the discussion among the
20  surgeons, could they give him any time.
21      But Dr. Ekbladh basically said, you
22  know, if you try to fight me, I'm still going to be
23  your supervisor; I am still the department chair and
24  I will get you later. So I was forced to resign.

Page 372

1      Q.  In your mind, was resigning preferable or
2  worse than if the termination decision just stood as
3  an involuntary termination?
4      They are equally as bad because I still
5  have to justify them for the rest of my life. Any
6  application I put on, both of them are permanent
7  damage to my career, permanent damage, because any
8  time I fill out any application, if I -- I probably
9  could not even get another residency position if I
10  wanted one in Ob-Gyn, because in the minute they
11  said, well, what happened to the last, the
12  resignation is just as bad as this. I didn't
13  complete the program and people are going to count
14  that against me.
15      I would have rather stayed in a horrible
16  program and been abused for six years rather than
17  this happen, because at least I would have finished
18  and been Board certified at the end.
19      Q.  So just the fact that you left the program
20  prematurely you view as something that will be held
21  against you?
22      A.  It is held against you, it is. When you
23  interview at other places, anywhere, it is held
24  against you.

37 (Pages 369 to 372)

Page 373

1    Q.  Just the fact that you didn't finish?
2    **A.  Yes.  My career is permanently ruined because**
3    **of this.  And had I had time to get some rest and**
4    **accommodation, I could have finished this.  It might**
5    **have taken an extra six months, but I could have done**
6    **it.  And that's something I'm never going to get**
7    **over.**
8    Q.  Dr. Zechman, you have seen a lot of documents
9    during this case that you didn't see at the time,
10   true?
11   **A.  I have.**
12   Q.  Has it occurred to you now, now that you have
13   seen a lot more documents, that you and the faculty
14   had different perceptions at the time as to what were
15   the areas in which you needed to improve?
16          Has it occurred to you now that there
17   might have been a disparity between what you thought
18   were the areas that you needed to improve and the
19   areas that the faculty thought you needed to improve?
20   **A.  I was open to all areas of improvement.  What**
21   **was being told to me was, you know, it was my**
22   **surgical skills.  It was primarily my surgical**
23   **skills.  That was repeatedly told to me, you know,**
24   **but I was open.  I mean, I was reading, you know.  I**

Page 374

1    **just wanted to do it.  You know, whatever it took,**
2    **however long it took, I just wanted to finish.**
3          **And I wanted the opportunity to finish**
4    **and -- but I was having problems because of the work**
5    **schedule and because of my physical problems, but it**
6    **was not something that couldn't be overcome had they**
7    **just worked with me and given me the opportunities.**
8    Q.  I'm going to hand you what has been marked as
9    Zechman 46.  This is an e-mail that you wrote to a
10   Dr. O'Connor; is that true?
11   **A.  That's correct.**
12   Q.  Is it true that you sent this e-mail on June
13   18th, 2003 and then you resent it to him the next
14   day?
15   **A.  That's correct.**
16   Q.  Who is Dr. O'Connor?
17   **A.  He is basically the head of Ob-Gyn training**
18   **programs nationally.**
19   Q.  This is an e-mail in which you communicated
20   to Dr. O'Connor that you have certain complaints
21   about the residency program at Christiana Care?
22   **A.  Yes; and we have gone over quite a few of**
23   **these already.**
24   Q.  And you say in the first paragraph that you

Page 375

1    are asking Dr. O'Connor to keep your name
2    confidential?
3    **A.  At that time, yes.**
4    Q.  Why did you want him to keep your name
5    confidential?
6    **A.  Because I knew that this would be the kiss of**
7    **death for me if they found out I did it.  Read the**
8    **last line.**
9    Q.  That's exactly where I was going to turn.
10   This is the part where you -- once again, is that the
11   sentence you were about to point to?
12   **A.  Huh-uh, the I am scared, but I cannot keep my**
13   **mouth shut and see this abuse continue.**
14   Q.  And in the previous sentence, this is the
15   second to the last sentence of the e-mail, you write,
16   quote, "Once again, I am begging you not to reveal me
17   as a source.  I am sure they would seek out any
18   reason possible to get rid of me," close quote.
19   **A.  Absolutely.  Yes.**
20   Q.  So it was important to you that Dr. O'Connor
21   maintain your anonymity?
22   **A.  Yes.**
23   Q.  And so I take it that you did not, given your
24   concerns about being retaliated against, I take it

Page 376

1    that you did not disclose to anybody at Christiana
2    Care that you had filed this complaint?
3    **A.  No, not at that time.  I might have mentioned**
4    **it, you know, later after all was said and done, you**
5    **know, like after October.**
6    Q.  Oh, after you were terminated?
7    **A.  Yes.  But not at this time, because I really**
8    **felt and I very strongly feel this was contributory**
9    **to especially the turn of events in August, because I**
10   **am probably the only one that would have enough, as**
11   **Dr. Ekbladh would say, chutzpa to do this, to**
12   **complain and to try to get things corrected on a**
13   **higher level when nothing was happening locally.**
14   Q.  But you were careful not to disclose the fact
15   that you had sent this complaint to anybody at
16   Christiana Care while you were still employed by
17   Christiana Care?
18   **A.  Yes.  But I'm sure that by reasonable**
19   **deduction that they knew it was me, because like I**
20   **said, I am the only outspoken one that had, you know,**
21   **the guts to say, hey, this is wrong, because I wasn't**
22   **that whipped puppy.**
23   Q.  You sent this e-mail after you had learned
24   that you were not going to progress to the third

B-0247

Zechman                                 v.                Christiana Care Health Systems
Ellen Zechman, Volume 2           C.A. # 05-159JJF                   August 16, 2006

Page 377

1  year, true?
2      A.  I don't think it was engraved in stone. It
3  had not transpired yet.
4      Q.  But you had been told in March by Dr.
5  Sciscione that that --
6      A.  That it was a consideration. It was still a
7  consideration at that point. It was not a done deal.
8      Q.  He actually told you that was the
9  recommendation as of that point, right?
10      A.  But it also said that there was wiggle room
11  there. Let me see if I can dig it up where we can
12  read that. Because it said if I did this, that and
13  the other, I would be offered PGY3, a third year
14  contract. And actually I was told that if I did
15  all -- that if my surgical skills improved and
16  everything went fine through the summer, that I would
17  be offered a PGY3 contract in the fall. And Dr.
18  Hochman can testify to that when you get him in here,
19  because, you know, that was still what they were
20  saying.
21          Okay. This is March 24th. If you meet
22  these criteria and prove that you are capable of
23  performing the PGY 3 responsibilities, you will be
24  offered a contract as a PGY 3 for the 2004 academic

Page 378

1  year. So they were still, you know, saying that I
2  was -- you know, they were considering giving me the
3  second year, but it was not a done deal yet when this
4  went out. But I was already, you know, continually
5  being reassigned away from surgery where, you know, I
6  wasn't getting those opportunities.
7          Do you see down here at the bottom of
8  the page where I just read that?
9      Q.  You're reading a document that was written by
10  Dr. Sciscione, right?
11      A.  Yes.
12      Q.  I'm going to hand you what was marked as
13  Zechman 47. This is a follow-up e-mail from you to
14  Dr. O'Connor regarding the complaint you had sent him
15  in June?
16      A.  Uh-huh.
17      Q.  Okay.
18      A.  That's yes, excuse me.
19      Q.  This is now approximately almost four months
20  since you left Christiana Care that you sent this?
21      A.  This copy was printed. I don't know where
22  this copy came from, whether it's my copy. This was
23  actually sent in October shortly after, but this was
24  printed off the computer for my EEOC Complaint on

Page 379

1  January 29th, 2004. Do you see that number right
2  there? That's the date I printed it off and, you
3  know, added it to my stuff that was being sent. The
4  actual e-mail was sent in October after I had been
5  forced to resign.
6      Q.  Okay, you can put that away.
7      A.  Okay.
8      Q.  I'm going to give you Zechman 48. What is
9  Zechman 48?
10      A.  This is a follow-up to this one that we just
11  read. Notice the date is October 28th? And that's
12  the actual date it was sent. So this one was sent
13  prior to that because this one came next.
14      Q.  Just so we clear, you're saying that --
15      A.  Zechman 47. And this Zechman 48 was a
16  follow-up to Zechman 47. And the actual date this
17  was sent is October 28th.
18      Q.  Hang on one second. So Zechman 47 is
19  something that you sent before you sent Zechman 48?
20      A.  Yes.
21      Q.  Zechman 47 occurred earlier in time, earlier
22  in October than Zechman 48?
23      A.  I think so, yes.
24      Q.  Who is Ms. Miller?

Page 380

1      A.  She is the complaints officer for Dr.
2  O'Connor, his assistant. And I had been told not to
3  send the stuff to him but to send it to her instead.
4  And so that's why I was forwarding it to her, because
5  that's what I was told to do and I was trying to
6  follow the proper chain of command procedure.
7          (Brief recess taken.)
8      BY MR. BLOOM:
9      Q.  Dr. Zechman, I'm going to hand you Zechman
10  49, which is a January 6, 2004 letter to you from
11  Robert Laskowski. Who is Robert Laskowski?
12      A.  Well, it says right there at the bottom of
13  the page, president and chief executive officer for
14  Christiana Care.
15      Q.  And this January 6th, 2004 letter from him,
16  did you receive this letter?
17      A.  I did.
18      Q.  And he refers in this letter to a letter that
19  you sent to Dr. Laskowski on December 13th, 2004
20  regarding Dr. Ekbladh; is that true?
21      A.  That's true.
22      Q.  Do you still have a copy of the letter that
23  you sent to Dr. Laskowski?
24      A.  No, I sure don't. I wish I did. This was

39 (Pages 377 to 380)

B-0248

Zechman                                    v.                Christiana Care Health Systems
Ellen Zechman, Volume 2          C.A. # 05-159JJF                      August 16, 2006

Page 381

1  kind of a last ditch effort to get things corrected
2  concerning all this mess before I filed an EEOC
3  Complaint or sought legal action. I wanted to get
4  things corrected. I knew that this was all wrong and
5  shouldn't be happening and, you know, I was trying to
6  get help before I had to go outside and, you know,
7  bring in outside agencies. You know, I just wanted
8  to finish my residency. You know, I wanted it
9  corrected. I wanted to finish my residency.
10       I even asked Dr. Ekbladh that, you know,
11  if he really didn't want me there to please get on
12  the phone and find another program that I could
13  transfer in, you know, because I knew that there was
14  this bad blood by July. And I begged him, I said,
15  you know, if you don't want me here, get me in
16  another program. Call your buddies. Get on the
17  system. You know, help me get in another program
18  because I want to do this, I want to finish this
19  training. And, you know, he wouldn't lift a finger
20  to try to get me even in another program. And there
21  is a big difference in the business and the intensity
22  of different programs.
23    Q.  Why is that significant to you?
24    A.  Just -- this was a very high volume program,

Page 382

1  and once my disability started kicking in, you know,
2  in another program, you know, that was less intense,
3  if he was not going to accommodate my disability and
4  adjust my schedule so I could finish, possibly
5  another program, you know, that was less intense,
6  less fast-paced, I could have handled it without
7  accommodation. And we discussed that, and I begged
8  him to help me. I said, well, if you don't want to
9  accommodate this, then help me find another program
10  that will. Get on the phone. You know, there are
11  supposed to be mechanisms within the system to handle
12  this, because these programs get money from health
13  and human services. This is Medicaid and Medicare
14  funding and it is their responsibility to train the
15  trainees because we are needed by the public.
16    Q.  The accommodation that you just referred to,
17  is that the modified schedule that you had set out --
18    A.  Yes.
19    Q.  Wait, let me just finish the question. Was
20  that the modified schedule that you referred to in
21  that July 23rd letter to Dr. Ekbladh?
22    A.  Yes. I was asking for accommodation with
23  that, quote, modified schedule. That was my
24  suggestion of accommodate that would have been least

Page 383

1  destructive to my colleagues.
2    Q.  I'm going to hand you Zechman 50. Can you
3  tell me what Zechman 50 is?
4    A.  This is a complaint I filed with JCAHO and
5  this was after I had already left and it's concerning
6  what I have said many times about not enough
7  supervised physicians in that hospital. They were
8  cutting costs and not hiring enough physicians to
9  handle us on weekends and holidays and nights.
10    Q.  This is an October 18th, 2004 e-mail, right?
11    A.  Evidently so by that date up there, yes.
12    Q.  And the from line says James Zechman. Is
13  that your husband?
14    A.  That's my husband, yes.
15    Q.  So did you send this e-mail from his e-mail
16  account?
17    A.  Yes.
18    Q.  But you wrote this?
19    A.  I wrote it, yes.
20    Q.  And it's addressed to an e-mail address,
21  which is complaint@jcaho.org.
22    A.  Yes.
23    Q.  Can you tell me what JCAHO stands for?
24    A.  It's called the Joint Commission. It is

Page 384

1  basically the organization that credentials hospitals
2  for Medicaid/Medicare payment. And when there is a
3  problem, and this is an official public complaint
4  thing, they go in and investigate the problem. And
5  if they find violations, they correct them. It's
6  kind of a regulatory thing for the institution.
7       Just like the ACGME was the regulatory
8  institution for the residents, this is for like
9  emergency rooms, that they follow the rules that they
10  are supposed to follow.
11    Q.  All right. So this e-mail that's reflected
12  in Zechman 50 was sent to a different regulatory
13  agency than ACGME?
14    A.  Yes.
15    Q.  What about the prior e-mail that we saw that
16  was from you to Ms. Miller? What organization is she
17  from?
18    A.  Same, with ACGME with Dr. O'Connor. Let's
19  say that was Dr. O'Connor's kind of sidekick or
20  assistant, whatever, you know. But that's the same
21  organization.
22    Q.  And then at the bottom of Zechman 50 there is
23  handwriting that says, "A letter similar to this was
24  also e-mailed to Delaware insurance commissioner and

**B-0249**

40 (Pages 381 to 384)

Zechman                                v.                Christiana Care Health Systems
Ellen Zechman, Volume 2        C.A. # 05-159JJF                  August 16, 2006

Page 385

1  Medicare/Medicaid."
2  **A.  Yes.**
3  Q.  Is that your handwriting?
4  **A.  That's my handwriting.**
5  Q.  Did you, in fact, send similar letters to the
6  Delaware Insurance Commissioner?
7  **A.  I did.**
8  Q.  And you sent a similar complaint to Medicare
9  and medicaid?
10  **A.  No, not to them I didn't, but I did send it**
11  **to Delaware Insurance Commissioner.**
12  Q.  So why is it that you write here at the
13  bottom that you also sent it to Medicare and
14  Medicaid?
15  **A.  Maybe I did.  I can't remember.  I don't**
16  **know.  But this is concerning, you know, the 64**
17  **patients, you know, that were -- you know, they were**
18  **not properly staffing this organization.**
19  Q.  Is there something in particular that
20  prompted you to send this Complaint more than a year
21  after you had left Christiana Care?
22  **A.  Just the fact that I was hearing through the**
23  **grapevine that nothing had changed, that they were**
24  **still not having enough staff.**

Page 386

1          **And since that time -- I don't know**
2  **which one of these precipitated the change, but now**
3  **they are standing and they keep a paid doctor on staff**
4  **in these departments to help out so that if the**
5  **attending physician for the residents has to go**
6  **upstairs to do a delivery or to the operating room,**
7  **that there is a doctor down in this area.**
8          **So evidently one of these complaints**
9  **finally got recognized and Christiana was forced to**
10  **make changes, which that was -- you know, they were**
11  **cutting costs.  They had to hire a doctor in order to**
12  **properly staff the thing.  That's why they didn't**
13  **want to do it, because it was costing money.**
14  Q.  That's what you heard through the grapevine?
15  **A.  Yes, sir.**
16  Q.  I take it you don't have any personal
17  knowledge of whether things have changed at
18  Christiana Care since you --
19  **A.  I haven't been in there.  No, I would be**
20  **scared somebody would shoot me if I went in there.**
21  Q.  I am going to hand you Zechman 118.  This is
22  a December 17th, 2004 letter to you from the
23  executive director of the Board of Medical Practice
24  in Delaware.  Is that what this is?

Page 387

1  **A.  That's what that is.**
2  Q.  Okay.  And I take it from this that you had
3  sent another complaint to the Delaware Department of
4  Administrative Services; is that true?
5  **A.  Yes.**
6  Q.  Do you still have a copy of what you sent to
7  that organization?
8  **A.  No, I do not.  And once again, this was a**
9  **last ditch effort to try to get things straightened**
10  **out before turning it over to the EEOC and seeking**
11  **legal counsel.  You know, I tried on multiple levels**
12  **to get it handled internally first and then statewide**
13  **first before taking it on to the EEOC and seeking**
14  **legal counsel.**
15  Q.  Did you seek legal counsel prior to filing
16  your EEOC charge?
17  **A.  No, I made sure that -- you know, I wanted**
18  **the investigation to go through, and I had my**
19  **certificate of right to sue when I went and called**
20  **looking for a lawyer.  At each level I was hoping to**
21  **get things resolved before taking it to the next**
22  **level.**
23  Q.  What did you think the Insurance Commissioner
24  of Delaware could do to help you with your residency

Page 388

1  position?
2  **A.  How does Christiana get their money?  Through**
3  **insurances.  By putting pressure, you know, and**
4  **bringing this to the Insurance Commissioner, that's a**
5  **controlling factor, how they get paid.  So it's a**
6  **very powerful controlling factor.**
7  Q.  Did you think that the EEOC was not up to the
8  task to dealing with your complaints?
9  **A.  Absolutely.  They were overwhelmed.  I don't**
10  **think they did a good investigation at all.  I even**
11  **complained that they did not even call in the**
12  **witnesses that I had given them to verify some of**
13  **this information.  But this is a pretty detailed,**
14  **overwhelming case.  And for people that don't know**
15  **medicine, it's overwhelming.**
16  Q.  In what way did you complain about the EEOC's
17  investigation?
18  **A.  After it was all said and done and I had seen**
19  **a letter of their remarks, I sent a letter asking,**
20  **well, why didn't you interview so and so?  I had sent**
21  **them a whole sheet of people, of possible contacts,**
22  **and even those contacts had called me and said, they**
23  **didn't call me.  Why didn't they call me?  So I knew**
24  **they had not done a thorough investigation.**

41 (Pages 385 to 388)

Zechman                              v.              Christiana Care Health Systems
Ellen Zechman, Volume 2        C.A. # 05-159JJF              August 16, 2006

Page 389

1    Q.  I am going to hand you Zechman 117. Could
2    you just confirm for me that this is the
3    Administrative Charge -- it's actually an addendum
4    that you filed with the EEOC?
5    A.  Yes.
6    Q.  Is all the handwriting on Zechman 117 your
7    handwriting?
8    A.  Yes.
9    Q.  And that's your signature on the second and
10   the third page of this document?
11   **A.  Yes, and the first two.  This was the**
12   **beginning of the EEOC Complaint.**
13   Q.  And you signed your first EEOC Complaint on
14   June 9th, 2004?
15   **A.  That's right.**
16   Q.  I'm going to give you what's been marked as
17   Zechman 109.  You don't need to describe to me the
18   contents of this, but can you tell me what this
19   document is?
20   **A.  My personal diaries concerning being bumped**
21   **out of cases as I referenced earlier when you gave me**
22   **that schedule.  Please note that in the middle it**
23   **says Friday, 7/25/03, and I give more of a detailed**
24   **description of how I had been bumped out of Dr.**

Page 390

1    **Kaminski's case.  And it says -- I couldn't remember**
2    **the person's name.  Well, it was Dr. Naqui, one of**
3    **the senior residents that got to go in on that case.**
4          **So this is where I would, you know,**
5    **document that sort of thing.**
6    Q.  Are these the diary notes that you were
7    referring to earlier when you said that you also kept
8    a diary of surgical assignments you were pulled from?
9    **A.  Yes.**
10   Q.  Can you tell me when in time you made these
11   diary notes.  And when I say when in time, I mean how
12   long after the events occurred did you make these
13   notes?
14   **A.  Either that day or within a day or two, like**
15   **if I was on call, the diary notation wouldn't be made**
16   **until I was well-rested.  So if I was on call one**
17   **night, let's say it happened -- let me just give an**
18   **example, if it happened on Monday, and I was on call**
19   **Monday night, and then I would work most of Tuesday,**
20   **then I was exhausted so I'd sleep.  So it might not**
21   **get documented until Wednesday night after I was**
22   **well-rested and could think clearly.  But it would be**
23   **within two or three days, if not the very day of the**
24   **actual event.**

Page 391

1    Q.  Did you carry around your diary with you as
2    you're working in the hospital, or is it something
3    you went to and filled out at the end of the day?
4    **A.  I did both.  I had an overnight bag that I**
5    **kept with me, and it was my work stuff.  And I kept**
6    **it in my work stuff.**
7          **So if I was there on call, it would be**
8    **there with me or you know, it was not left like in a**
9    **room.  It was usually with me in my stuff bag.**
10   Q.  I guess what I was really asking, and I
11   didn't ask it well is, did you whip out your diary
12   during your shift to make entries, or did you wait
13   until the end of your shift to make entries in the
14   diary?
15   **A.  The end of my shift.  I did this in private.**
16   Q.  Is all of the handwriting in Zechman 109 your
17   handwriting?
18   **A.  It looks like it is all of mine, because it**
19   **was a private diary, yes.**
20   Q.  Does this look to be a complete collection of
21   the diary notes that you kept?
22   **A.  I would also keep little blurt notes in my**
23   **daily logs.  So this was not like my total.  My daily**
24   **logs is where I would have a surgery case, and I**

Page 392

1    **would put the patient's sticker so that I could --**
2    **you have to prove that you've done so many surgeries**
3    **in order to get certified.  There would be little**
4    **notations in stuff like that that would not be in**
5    **here.  But this was my formal diary.  And actually**
6    **one of the attendings, Dr. -- my brain just went**
7    **blank -- suggested I keep a diary, because she was**
8    **seeing what was happening to me.**
9          **It will come to me.  I wish I had some**
10   **of my logs.  When I see these names, they jump out at**
11   **me.  Tilton-Burton.**
12         **Actually, this is not the diary that she**
13   **gave me.  But when I was kicked out of the call rooms**
14   **and having to keep my stuff in the locker rooms and**
15   **sneak around and find a place to sleep, she was upset**
16   **by that.  And she even gave me a diary to start**
17   **logging my stuff.**
18   Q.  Start logging -- what do you mean your stuff?
19   **A.  My experiences of what was happening to me.**
20   Q.  So is Dr. Tilton-Burton somebody who was
21   helping you?
22   **A.  I felt that she was a positive influence,**
23   **yes.**
24   Q.  Did you view her as supportive of you?

**B-0251**

42 (Pages 389 to 392)

Zechman                                    v.              Christiana Care Health Systems
Ellen Zechman, Volume 2          C.A. # 05-159JJF                      August 16, 2006

Page 393

1   A. Yes, I did.
2   Q. Dr. Zechman, I'm handing you Zechman 7 and am
3   I correct that Zechman 7 is a form you filled out in
4   connection with your EEOC charge?
5   A. That's correct.
6   Q. Would you just flip through this and confirm
7   for me that all of the handwriting -- and I
8   understand it's not all handwritten, but that the
9   handwriting is all yours?
10  A. Yes.
11  Q. Dr. Zechman, in addition to the handwritten
12  pages of Zechman 7 there are also some typewritten
13  pages. Did you type all of the typewritten pages
14  that are in this exhibit?
15  A. Yes. And it pretty well rehashes what we
16  have been discussing the whole time.
17  Q. And if you'll just turn to the last page
18  which is a typewritten page Discipline Questionnaire,
19  question number one, and then there is a statement.
20  Do you see that?
21  A. Yes.
22  Q. Did you write this statement?
23  A. Yes.
24  Q. Take a minute to review it, and I want to

Page 394

1   know if there is anything that you think is incorrect
2   or that needs to be changed in this?
3   A. No; this reiterates a lot of what we talked
4   about.
5   Q. That's accurate?
6   A. Yes. I'm not seeing anything jump out at me
7   that appears to be inaccurate at this moment.
8   Q. I'm going to show you Zechman 110. Is
9   Zechman 110 a document that you created?
10  A. Yes. This is recapping some of my diary
11  things, and I think this was done for my lawyer.
12  Q. You think these notes come from the
13  handwritten diary we were looking at a few minutes
14  ago?
15  A. As well as the patient log diaries. It is a
16  combination of both.
17  Q. So is this an attempt to compile the surgical
18  cases that you were pulled from?
19  A. Yes. I think there were others.
20  Q. I'm going to hand you Zechman 119. Is
21  Zechman 119 a document you created?
22  A. This is from my lawyer, yes.
23  Q. Do you know when in time you created this
24  document?

Page 395

1   A. This was when we had our first discovery
2   deadline to get documents in.
3   Q. But you personally prepared this document?
4   A. Yes.
5   Q. I'm handing you what is Zechman 3. Can you
6   tell me what Zechman 3 is?
7   A. This is just a letter from our local
8   community college just saying that they have
9   appointed me as an advisory committee to one of their
10  nursing programs. This is a voluntary, nonpaid
11  position.
12  Q. This position occurred in November 2005?
13  A. Yes.
14  Q. Do you still serve on that committee?
15  A. Yes. It is something that I only get called
16  for a meeting once a year when they are working on
17  their curriculum just to have a physician's input,
18  and it's voluntary.
19  Q. All right you can put that aside.
20  I'm handing you Zechman 104. Could you tell me what
21  Zechman 104 is?
22  A. This is a letter of reference from one of the
23  physicians I work with in New Bern and I had worked
24  with him at the clinic that I work at. And this is

Page 396

1   just his letter of recommendation for me.
2   Q. Did you ask Dr. Weathers to prepare this
3   letter for you?
4   A. No. He had asked me to prepare one for him,
5   and I did. And then he just on his own sent this to
6   me for my files.
7   Q. I'm going to ask it a different way. Did you
8   approach Dr. Weathers about whether he would be
9   willing to either write or sign a letter of
10  recommendation for you?
11  A. No, I didn't. He had approached me saying
12  that he needed one, because we were working together.
13  And I said yes, I would be glad to do it. And he
14  just on his own sent this, you know, because he
15  figured eventually I'd need it.
16  Q. Do I understand you wrote a letter of
17  reference for him as well?
18  A. I wrote a letter of reference for him. We
19  worked together. We had a close working
20  relationship. He would ask me questions and consult
21  me. I would ask him questions. He is an older guy.
22  He is probably late 60s. And you know, he was taking
23  a job closer to his home and ask me to do a letter
24  since I was one of the main doctors he was working

43 (Pages 393 to 396)

Zechman
Ellen Zechman, Volume 2

v.
C.A. # 05-159JJF

Christiana Care Health Systems
August 16, 2006

Page 397

1  with at that time.
2      I said I'll do it now. I said
3  eventually I will probably need one from you, so
4  don't forget me, you know, since he was moving on.
5  And he sent this to me.
6    Q.  When in time did you receive this from Dr.
7  Weathers?
8    A.  Gosh, I'm not sure, because it came into my
9  office and ended up in my file before I paid a whole
10  lot of attention, you know, the girl that gets these
11  things, she has got her Dr. Ellen important stuff and
12  she will, you know, stuff this stuff in my file.
13    Q.  Do you think it was in 2006 or earlier?
14    A.  It's been recently. I would say within the
15  past year, because I worked with him, you know, this
16  past year.
17    Q.  And I think I understand you. I just want to
18  make sure the record is clear that you and Dr.
19  Weathers essentially wrote letters of reference for
20  each other?
21    A.  Well, we were a team at this office, and he
22  was leaving and needed me to write a letter for him,
23  which I did, because he was taking another job. And
24  the last time I saw him, I said, well, don't forget

Page 398

1  me, because I will probably eventually need you to
2  write a letter for me. And it just appeared. I
3  guess he did it before he forgot me.
4    Q.  I'm going to show you what's been marked as
5  Zechman 102. It's a printout from a Web page of the
6  American Academy of General Physicians.
7      MS. BREWINGTON: I don't see a Bates
8  stamp on this.
9      MR. BLOOM: No. It's being produced
10  right now. It was just printed off the Web recently.
11      MS. BREWINGTON: Can we just go off the
12  record for a moment so that I can read this.
13      (Discussion off the record)
14  BY MR. BLOOM:
15    Q.  Dr. Zechman, what is the American Academy of
16  General Physicians?
17    A.  It is basically the professional organization
18  for GPs. These are different from family physicians.
19  This is a separate organization. It is "ye old GPs."
20  And they are not considered family physicians. We do
21  not get the pay scale or the reimbursement, because
22  family physicians say they are specialists and get
23  special pay. We are GPs, and I'm a member of the
24  organization. I was elected president for my charm

Page 399

1  and good looks and that's all there is to it. It is
2  not a paid position. This is a voluntary position.
3    Q.  How many members are there approximately of
4  the AAGP?
5    A.  I would say at least a thousand.
6    Q.  Is this a Nationwide organization?
7    A.  Yes, it is.
8    Q.  And you have been president of that
9  organization since when?
10    A.  I was just reelected. And I served the
11  previous term. So that would have been 2005. And
12  then now I'm currently the president. And that term
13  will end in the spring.
14    Q.  What are your functions and responsibilities
15  as president of the AAGP?
16    A.  Mainly to be the voice of the members
17  whenever you know, we've got like a motion coming up
18  to be their representative. If it's not an
19  everybody-vote thing to meet with them in committees
20  and say, well, we've got so many members that feel
21  this.
22      It's more of a figurehead and then I
23  basically help MC the yearly meetings. My biggest
24  task is going to the yearly meetings and being over

Page 400

1  them. It's more of a figurehead representing the
2  people, and you are elected by the membership.
3      There is a CEO that does the work.
4    Q.  Can you estimate on a week-to-week basis how
5  much time you spend on AAGP responsibilities?
6    A.  Oh, Gosh, I'd estimate one a month. I'd say
7  two or three hours a month.
8    Q.  I'm handing you Zechman 100. Zechman 100 is
9  a federal court Complaint filed by you against, among
10  other defendants, East Carolina University; is that
11  true?
12    A.  That's correct.
13    Q.  And this is the Complaint that you filed
14  against ECU after they rejected you from the Ob-Gyn
15  program?
16    A.  That's correct. I had interviewed for the
17  Ob-Gyn program. The assistant director was very
18  supportive. And all the residents could only ask me
19  why was I doing this, and what was I going to do with
20  my children.
21    Q.  And so part of your claim against ECU is that
22  they were discriminating against you because of your
23  age and your disability?
24    A.  That as well, and they knew of my disability

B-0253

Page 401

1  because I had had all my children there. And that
2  was a big factor in monitoring me during my
3  pregnancies. Because this took place in 2003 and my
4  last baby was born in 2000. In fact, it might have
5  even been before 2003, because that's when it was
6  filed.
7       Okay, the actual interview was 2001 so
8  this was just a year after I had had my baby, so that
9  a lot of these people were in the hospital looking at
10  my records when I was delivering my last baby.
11  Q.  And this Complaint was filed in January 2003?
12  A.  Was that when it was filed? I was going to
13  say I reference -- yes.
14  Q.  If you'll turn to the very last page of
15  Zechman 100 --
16  A.  Yes.
17  Q.  -- do you recognize that as the signature of
18  your lawyer at the time?
19  A.  That is.
20  Q.  And the date of the signature is January 30th
21  2003; is that right?
22  A.  Yes, right.
23  Q.  So you were well into your residency at
24  Christiana Care by the time you filed this Complaint;

Page 402

1  is that true?
2  A.  I forget exactly. If that's the filing date,
3  yeah -- well, no. January was the beginning of 2003.
4  So I was six months into it, yeah.
5  Q.  All right. You can put that away. I am
6  going to hand you Zechman 101. Zechman 101 is a
7  Notice of Voluntary Dismissal in the same Complaint
8  that we were just referring to.
9  A.  Yes.
10  Q.  Is that your signature on the lower left-hand
11  corner?
12  A.  That is.
13  Q.  Did you receive anything from ECU in exchange
14  for your agreement to drop your lawsuit?
15  A.  Absolutely nothing. I was doing my
16  residency. All I wanted was my residency. And there
17  was just no need to pursue this, because although,
18  you know, they did discriminate against me, and I
19  feel that they did even in the interview. I had a
20  residency. All I wanted to do was become an Ob-Gyn.
21  Q.  Wasn't that also true at the time you filed
22  the initial complaint in 2003?
23  A.  The works were already in process prior to
24  that. That was lawyer stuff of, you know, when it

Page 403

1  actually got filed and all that.
2  Q.  I'm going to hand you two documents to look
3  at at the same time, and they are Zechman 56 and
4  Zechman 122.
5  A.  These are basically the same thing.
6  Q.  I thought they might be. Are these two
7  exhibits in exchange of e-mails between you and Dr.
8  Sciscione?
9  A.  Yes.
10  Q.  Do those appear to be accurate reproductions
11  of the e-mail exchanges that actually occurred
12  between you and Dr. Sciscione?
13  A.  Yes.
14  Q.  Okay, you can put them aside.
15  A.  You don't want to talk about the contents of
16  them?
17  Q.  You could talk about them. Is there
18  something in these e-mails that you view as
19  significant in this case?
20  A.  Yes. Because this is where we, the residents
21  were supposed to go to Philadelphia, downtown
22  Philadelphia to the Obstetrical Society of
23  Philadelphia. And I had never driven in Philadelphia
24  at that time, was terrified of driving in the middle

Page 404

1  of the city. And I begged someone to either give me
2  a ride in or let me follow them in, and nobody would.
3  And then at the last moment I was still begging to
4  either let me ride with them or just let me follow,
5  because I'm from the boonies. I have never driven in
6  a big city. And they all left without me, which
7  really hurts my feelings even to this day.
8       So I said, well, just let me stay here.
9  Let me just fill in for everybody else while
10  everybody else goes to the meeting because I'm scared
11  to drive by myself. And Dr. Patruno just wanted me
12  to just stay.
13       And then somebody else -- I don't know
14  whether it was Dr. Sciscione or somebody else --
15  would not let me just stay and work and told me just
16  to drive to Philadelphia. And I didn't know my way
17  around, and I got lost and called Dr. Kaminski on my
18  cell phone and told them I was lost. And then when I
19  did find the place, I couldn't find a parking lot,
20  because it was in the middle of the city. And I just
21  turned around and went home.
22       And Dr. Sciscione was all upset with me.
23  He didn't know the full story, but he said because I
24  didn't make it to the meeting, unfortunately this

45 (Pages 401 to 404)

Page 405

1  puts me in the position of having to credit you with
2  a half day of vacation. So he penalized me by taking
3  my vacation time away from me for not being at the
4  meeting. And here I even called Dr. Kaminski on the
5  telephone. Well, how do I get there? Where do I
6  park?
7        In the past they had provided
8  transportation for the residents to get them to the
9  meeting and back. Why didn't they do it this way?
10  Q.  What was the meeting?
11  A.  It was the Obstetrical Society of
12  Philadelphia residents' activity. So it was some
13  Philadelphia medical society, you know, residents'
14  activity things.
15        But the thing that is so hurtful is that
16  for two weeks I begged everybody, please let
17  somebody, let me ride with you and/or just let me
18  follow you. And you know, they would not let me.
19  And I know some of them were going to go out that
20  night and party. It was a Friday, and it was
21  Philadelphia. And they did not want an old woman
22  hanging out with them.
23  Q.  Did somebody say that to you?
24  A.  I heard that in the grapevine later.

Page 406

1  Q.  When did you hear that?
2  A.  Maybe two weeks later. They were planning an
3  outing, partying after that on the town in
4  Philadelphia.
5  Q.  Who is the "they" that you keep referring to?
6  A.  The other residents.
7  Q.  All the Christiana Care residents?
8  A.  No; just the Ob-Gyn ones, my colleagues.
9  Q.  All classes?
10  A.  Yes, all four years.
11  Q.  I'm going to show you Zechman 57.
12        Actually before we get to Zechman 57, do
13  you remember who told you or how you learned through
14  the grapevine that the other residents didn't want
15  you out partying with them?
16  A.  It came from one of the chief residents, Dr.
17  Liu who graduated after that. And in fact, I think
18  Dr. Patruno specifically asked her to give me a ride,
19  and she got very upset about it, that she had other
20  plans and didn't, you know, want to. And then later,
21  you know, it was, you know, they didn't want me
22  hanging out with them, because they had a party
23  planned.
24  Q.  Who told you that?

Page 407

1  A.  Dr. Liu said that they all had a party, and
2  they didn't want me.
3  Q.  Was Dr. Liu telling you something
4  communicating her own opinion to you, or was she
5  relaying something to you that someone told her?
6  A.  I'm not sure how that was. I do not know.
7  Q.  You made a reference a few moments ago to
8  your age and being older and that being related to
9  the partying. Did anybody say that to you or was
10  that sort of what you assumed from the circumstances?
11  A.  That had been alluded to that I did not fit
12  in. And I was a good 15 to 20 years older than a lot
13  of them.
14  Q.  How was it alluded to? And we are talking
15  specifically about the series of events --
16  A.  I don't know. You would have had to have
17  been there. The conversation was over four years
18  ago. I might not be remembering all of the
19  conversation. I don't know, but that was the gist of
20  it.
21        MS. BREWINGTON:  Could we go off the
22  record for one second?
23        (Discussion off the record)
24  BY MR. BLOOM:

Page 408

1  Q.  Dr. Zechman, do you have in front of you
2  Exhibit 57?
3  A.  Yes, I do.
4  Q.  Number 57 is an e-mail from you to Dr.
5  Ekbladh, July 26, 2003?
6  A.  Yes.
7  Q.  Is this the e-mail that you referred to in
8  the past where you complained to Dr. Ekbladh about
9  Dr. Gray?
10  A.  Yes. And this is one of them. There were
11  more. But this is one of them. I also note that I
12  am also referring to that case I got bumped out of
13  what Dr. Kaminski says was on Friday which was a
14  Saturday, which would reference back to July 25th.
15  So this is further documentation of that particular
16  day when I did not get sent to the OR and I should
17  have been. But yes, this was letting him know,
18  basically how she was harassing me.
19  Q.  The second sentence here refers to Dr. Gray
20  not allowing you to make patient care decisions. Can
21  you tell me why you think it was inappropriate for
22  Dr. Gray to involve herself in patient decisions made
23  by you?
24  A.  She should be involved, but she was going

46 (Pages 405 to 408)

Zechman                              v.              Christiana Care Health Systems
Ellen Zechman, Volume 2         C.A. # 05-159JJF              August 16, 2006

Page 409

1  ahead of me and doing the work without me go, you
2  know, do the chart and discuss it with her. She is
3  my chief resident. So I am going to make a decision.
4  And you know, before I make any changes in patient
5  care, I'm going to run it by her.
6         And then for the private doctors,
7  because we were taking care of private patients as
8  well, I would not use her. These were for only our
9  service, what she was responsible for, but I would
10  run it by the private physician. And she was just
11  running ahead and leaving me out of the loop. And
12  that's not allowing me to learn and not allowing me
13  to prove myself. And I was very upset with this,
14  because this was in July when I was needing to prove
15  myself and I was needing to, you know, be assertive
16  in, you know, taking the lead in care. And she was
17  undermining me, not allowing me to do that.
18         Now, I was not going to do anything
19  without her permission, but she was not even letting
20  me make the decisions to present them to her for her
21  approval or not.
22     Q.  And the complaint that you are expressing in
23  this e-mail to Dr. Ekbladh, did you express that to
24  Dr. Gray also?

Page 410

1     A.  Yes, I did. And I expressed this again in
2  person to Dr. Ekbladh, because he completely ignored
3  this e-mail. And so the next time I was in the
4  meeting with him personally in his office, I went
5  over this again and he would just sit there and, you
6  know, make no comments about it.
7     Q.  What did Dr. Gray say to you when you raised
8  this issue to her?
9     A.  She would just run off and not even address
10  the issue.
11     Q.  Is she somebody who you viewed as more
12  impatient than the other chief residents?
13     A.  No. She did not like me. She and Rachel
14  just did not like me for whatever reason. She and
15  Rachel were best friends, and they for some reason
16  did not like me.
17         And I think Dr. Kaminski enforced that
18  in his depositions as well, because it was Robyn Gray
19  that was doing a lot of the scheduling where I got
20  bumped out and Dr. Rachel Heinle got put in the OR.
21  And I got bumped out of cases. They were best
22  friends.
23     Q.  I am going to hand you what's been marked as
24  Zechman 121. The lower portion of this document is

Page 411

1  an e-mail from you to Dr. Gray; is at that true?
2     A.  I was forwarding this to my husband. Yes,
3  the bottom one is where we discussed this. But this
4  top part is me forwarding this to my husband, what
5  was going on and the stuff I was putting up with.
6     Q.  And so the lower portion, the e-mail that is
7  being forwarded is your e-mail to Dr. Gray in which
8  you complained about her asking you to attend morning
9  rounds?
10     A.  Yes. This was the harassment that we talked
11  about earlier about going to their rounds and when I
12  asked has the rule changed? Why are you requiring me
13  to do this when other people are not being requiring
14  me to do this? And she was very harassing about you
15  need to be at these rounds even when it was not my
16  turn to be there. And this was just harassment.
17         This was not about Ellen, I think you
18  need to -- you could gain from this or bla-bla-bla.
19  It was, You need to be there. You are not coming
20  early enough. It was harassment.
21     Q.  So it was the way that the suggestion was
22  presented to you that you found objectionable? Is it
23  the way she presented the idea of going to morning
24  rounds to you?

Page 412

1     A.  It was the way she was fussing at me every
2  day for not being at rounds even when I was not on
3  assignment and I was not on call and technically did
4  not need to be there. You know, she was demanding
5  that I come anyway, adding another half hour to my
6  workday when I was already asking for some relief and
7  time off.
8         You see, this is July 29th. This was
9  right after I had asked for the accommodation. She
10  never responded to this either, not to me anyway.
11     Q.  Did you ever publicly threaten to sue Robyn
12  Gray?
13     A.  I didn't threaten to sue her. I told her
14  when she kept bumping me out of the OR when I should
15  be going, I said you are bumping me out of cases that
16  I need and that I have been assign to. This is
17  discrimination, and I will report you.
18         I did not threaten to sue her. I
19  threatened to report her for not properly assigning
20  me to the cases as she should have.
21     Q.  Did you ever tell Alex Kirfides that you were
22  thinking of suing Robyn Gray?
23     A.  No; I never said anything about suing. I
24  said that I would report her for discrimination. And

47 (Pages 409 to 412)

Zechman                                  v.              Christiana Care Health Systems
Ellen Zechman, Volume 2          C.A. # 05-159JJF                    August 16, 2006

Page 413

1  that would be within the chain of command within
2  Christiana Care. But no, I never said sue, reporting
3  her for not giving me the cases I was assigned to is
4  what I would have reported. And that's what I was
5  doing here when I sent the one to Ekbladh. I was
6  reporting her. And that was what I meant.
7     Q.  Did you express that also to Alex Kirfides?
8     A.  I was feeling him out to see if he was being
9  treated the same way. And I said if she is doing
10 this to me and singling me out, I am going to report
11 her. But that's my words, I will report her, you
12 know, within our chain of command. And this was my
13 method of reporting her, reporting her to the boss.
14    Q.  Are you saying that Dr. Gray's pulling you
15 from surgical experiences started in July 2003?
16    A.  No. It started before then, but I was under
17 more of a microscope in July. And you know, I became
18 more sensitive to it, because I wanted these
19 surgeries in order to prove myself.
20    Q.  When in time do you think that started to
21 happen that you were being pulled from surgeries by
22 Dr. Gray or anyone?
23    A.  It started early on. My very first GYN
24 rotation I started noticing it, but I was new then.

Page 414

1  I said, Hey, they are just making me earn my stripes
2  here. And I didn't pay any attention.
3        I did not formally start complaining
4  until May. And we've got the first e-mails here
5  where I say to Dr. Sciscione at that time. And I
6  think it was May where I was distressed that I am
7  repeatedly pulled from my GYN, you know, task and yet
8  I am being criticized for not having surgical skills.
9  And I think that was May of 2003 when I first
10 formally started complaining about it.
11       It was happening a lot more, but I
12 thought, hey, I am the newby, they are making me earn
13 my stripes. I will just suck it up. But then when I
14 started being criticized for not having the surgical
15 skills, I said, okay, they want me to have these
16 skills, but they are bumping me out of surgery where
17 I can't get them.
18    Q.  Who was criticizing your surgical skills?
19    A.  The other attendings were criticizing my
20 surgical skills. And Dr. Sciscione was relating that
21 to me. And that's when I started keeping track of
22 how many times I was getting bumped. But it was
23 happening, I would say, from the first time I was
24 assigned to that service. I sucked it up, because I

Page 415

1  figured I am the new person. They are going to pick
2  on me a little bit. You are going to expect that
3  being the new kid on the block.
4     Q.  I think you said this before, Dr. Ekbladh
5  resolved the issue regarding going to morning rounds
6  in a way that was satisfactory to you?
7     A.  Yes.
8     Q.  I'm going to hand you what's been marked as
9  Zechman 107. This appears to be an August 1, 2003
10 e-mail from you. Is that true?
11    A.  That's correct. This is to my husband.
12    Q.  So this is an e-mail you sent to your husband
13 on August 1st?
14    A.  Yes.
15    Q.  What is the website that you referred to?
16 The www.anion.com?
17    A.  That was the formal schedule of a call
18 schedule that was listed on the website. They would
19 put that in, and that was the website you would go
20 to. That was the password in order to pull your
21 schedule up. And everybody would pull their own
22 schedule up and be able to access it. So if you were
23 on vacation, you would be able to access this website
24 and see when you would be on call when you came back.

Page 416

1        But this is basically me telling my
2  husband that look what they are doing to me. How
3  does this facilitate my learning when they are not
4  giving me the assignments, and just basically
5  ventilating to him about the discrimination I was
6  enduring.
7     Q.  I'm going to hand you Zechman 61. Is Zechman
8  61 an exchange of e-mails between you and Sandy
9  Kardos on August 11, 2003?
10    A.  Yes. And the bottom one was the first one
11 about I was supposed to be on the gynecology surgery
12 cases, and I wasn't even listed on the board. I was
13 being reassigned at the last minute that morning.
14 And I was ventilating to Sandy, you know, how am I
15 supposed to improve my skills when I am not being
16 assigned any cases.
17    Q.  You just referred a second ago to being
18 reassigned, and I don't see any reference to that in
19 your e-mail. Is there a difference in your mind
20 between showing up and not being on the board as
21 opposed to being reassigned from the assignment that
22 you had?
23    A.  There is a difference. The chief resident,
24 which was Robyn Gray at that time. When she had the

48 (Pages 413 to 416)

Zechman
Ellen Zechman, Volume 2

v.
C.A. # 05-159JJF

Christiana Care Health Systems
August 16, 2006

Page 417

1 day's OR schedule which would have been posted at
2 five in the morning, she would put it on the
3 blackboard in our assignment room. And she would
4 assign the cases. And here I was supposed to be
5 assigned cases, and this time she was not reassigning
6 me.
7      I will define it. I was not getting the
8 initial assignments. And this is where she was
9 plugging somebody else in on cases when it was my
10 turn to go to the operating room.
11      Q. Wait a second, because I think in your own
12 e-mail at the top of this you say that you had been
13 assign a case, it just wasn't up on the board yet?
14      A. She had not put it on the board yet. And I
15 didn't know whether she was leaving me out and
16 putting somebody else's name on there. Because it
17 was where I was supposed to be going to this, and she
18 had not formally assigned me to that. So I didn't
19 know whether she was just not going to put somebody
20 else's name up there. Everybody else's number was up
21 there and mine was not.
22      Q. Did you end up doing this case with Dr.
23 Whitney?
24      A. I can't remember. Now being reassigned is

Page 418

1 when you were up on the board in the morning, you're
2 planned to go to that case, and at the last minute
3 you get a call saying you are at that case,
4 you go to labor and deliver a baby. And they push
5 somebody else in your place at the last minute. So
6 all the paperwork would say that you went to that
7 case, but the actual operating room record would have
8 that somebody else actually showed up for the case
9 where you had been bumped at the last minute, and
10 somebody else had been stuck in there in your place.
11 And that happened frequently thanks to Dr. Gray.
12      Q. You referred earlier in the day to you
13 complaining to Dr. Ekbladh about the fact that you
14 kept having to take more quizzes and that after you
15 complained to him, he said you didn't have to do that
16 anymore. Did I hear you right?
17      A. Yes. When I told him that that was
18 discrimination for me to be taking these tests and
19 nobody else had to take the tests --
20      Q. Let me ask you. If people on the committee
21 or Dr. Ekbladh believed you were behind your
22 classmates academically, is it still discrimination
23 for him to give you additional academic work to catch
24 up?

Page 419

1      A. Additional academic work, yes, but additional
2 testing constantly, no. You could have the
3 additional academic work without the formal testing.
4 And then when the year's test comes around, you take
5 the test like everybody else does.
6      Q. Well, let me make sure we have this straight
7 though, because these quizzes -- I think you've said
8 this before -- that it was combined with reading
9 assignments in a textbook and then a quiz based on
10 reading the assignment you did. Would that be true?
11      A. Sometimes. Sometimes they would be quizzes
12 that the attending just made up out of their head.
13 And that was really unfair, because they could pull
14 things to try to trip you up.
15      And even in one of the internal memos
16 where it says, but we should not try to trip her up,
17 like it was discussed like how to trip me up to make
18 me look bad. And we have that in our discovery
19 documents where it's very blatantly we should not try
20 to trip her up.
21      Q. Do you have any reason to doubt that
22 attending physicians, in fact, asked trick questions
23 of the other residents but did not of you?
24      A. I have no idea. But I know I was being

Page 420

1 treated differently at this time.
2      Q. And after Dr. Ekbladh told you that you
3 didn't need to keep taking the quizzes, did you tell
4 him that you actually wanted to keep taking them
5 voluntarily?
6      A. Voluntarily, but at a different schedule so
7 that I could continue proving myself but not at such
8 a rapid pace that was stressing me since I was, you
9 know, asking for time off and needing a reduced
10 schedule. But to do it, you know, in a more relaxed
11 method. I didn't mind doing the reading. I enjoyed
12 that, but he was killing me when I was asking for
13 time off, just adding more work to my schedule.
14      Q. I think we already covered the substance of
15 this, but I am going to put in front of you Zechman
16 62, and this is an e-mail from Sandy Kardos addressed
17 to both you and Dr. Ekbladh.
18      Did you receive this?        **B-0258**
19      A. Yes, I did.
20      Q. And I have haven't seen in the record a
21 response to this e-mail by you. Are you aware of any
22 response by you?
23      A. I think it was a verbal response where I ran
24 through her office and gave her a verbal response

49 (Pages 417 to 420)

Zechman
Ellen Zechman, Volume 2

v.
C.A. # 05-159JJF

Christiana Care Health Systems
August 16, 2006

Page 421

1 rather than an e-mail.
2    Q.  So did you continue to take reading
3 assignments and quizzes voluntarily?
4    A.  I took a few. But once Dr. Ekbladh did not
5 require it of her, she did not have the time to work
6 with -- it was not her job anymore. And so, you
7 know, she did not put the effort into it anymore and,
8 you know, she did not have time to give me the
9 quizzes.
10    Q.  Was that something that you complained about?
11    A.  No; I was trying to keep a low profile and
12 just be the whipped puppy at this stage.
13    Q.  I'm going to hand you Zechman 115. Actually
14 we may have come across another version of this.
15    A.  Yes. This goes with -- we just went through
16 this. This is just a different copy of that.
17    Q.  My only question is, when you forwarded an
18 e-mail you sent to Robyn Gray about morning rounds
19 and you forwarded it to your husband, right?
20    A.  Yes.
21    Q.  My only question of this document is, when
22 you forwarded the e-mail to your husband and you say,
23 quote, "This is the e-mail I sent her asking,
24 quote/unquote diplomatically, why--"   My question

Page 422

1 is, you put the word "diplomatically" in quotes. And
2 my question is why.
3    A.  Because I was trying to be nice. Why are you
4 requiring me? She didn't like me to begin with, so I
5 was treading on, you know, thin ice. And you know, I
6 was trying to be diplomatic. Well, why are you
7 insisting on this? So diplomatically I'm asking why,
8 because I was treading on thin ice with her and I
9 knew that. But yet I wanted to know why she was
10 harassing me like this.
11    Q.  And so is it your view that your e-mail to
12 Robyn, that the tone of that e-mail was diplomatic?
13    A.  I tried to be, yes. Have you changed the
14 rules? Did I miss something. If something went out
15 and I missed it, I need to know about it.
16    Q.  Dr. Zechman, I've just handed you Zechman 92
17 this is a September 20th, 2002 letter from you to Dr.
18 Sciscione and then there is an attachment? Is that
19 yes?
20    A.  That's yes.
21    Q.  In your letter you tell Dr. Sciscione that
22 you need to testify in a domestic abuse case and so
23 you will be out of the area for that; is at that
24 true?

Page 423

1    A.  I just needed time off, and I was just giving
2 them proof that, yes.
3    Q.  What is this underlying case that you needed
4 to go down and testify about?
5    A.  It was a domestic abuse case.
6    Q.  Is this person who is listed on the subpoena,
7 your ex-husband?
8    A.  Yes. This is the problems I was having
9 ex-husband at an earlier while, but it was just
10 coming through to the courts.
11    Q.  Is this there a reason? Do you know why your
12 husband's is listed in the plaintiff as in this
13 document or is listed as the top party?
14    A.  No, I can't remember exactly, because we had
15 a lot going on at that time and I can't remember what
16 this was about.
17    Q.  Was there at this time, July 2002, was there
18 still ongoing divorce proceedings or had the divorce
19 happened in the past?
20    A.  It was more about the child. You know, my
21 oldest child is from this marriage. So it was to do
22 with that.
23    Q.  Relating to child support?
24        Visitation, interactions with the child,

Page 424

1 the raising of the child, that sort of thing.
2        MS. BREWINGTON:  Off the record.
3        MR. BLOOM:  I have no further questions.
4 Thank you for your time coming up here, Dr. Zechman.
5        (At 5:10 p.m. the deposition was
6 concluded.)
7            - - -
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**B-0259**

50 (Pages 421 to 424)

Zechman
Ellen Zechman, Volume 2

v.

C.A. # 05-159JJF

Christiana Care Health Systems
August 16, 2006

Page 425

1          I N D E X
2
3    Testimony of: ELLEN ZECHMAN
4    By Mr. Bloom ......................229
5
     Certificate of Reporter...........429
6
7          E X H I B I T S
8
     NUMBER                      MARKED
9
     67   July 29, 1997 letter from Dr. Fraser      285
10
     68   July 23, 2003 letter to Dr. Ekbladh       285
11
     69   Request for Disability Accommodation Form  286
12
     71   August 25th, 2003 letter to Dr. Fraser    293
13
     73   E-mail to Sandy Kardos                    296
14
     77   September 16, 2003 letter from Dr. Ekbladh 303
15
     79   Letter September 22, 2003                 304
16   80   Form                                      305
17   83   October 3, 2003 note from Dr. Fraser      306
18   82   Form                                      307
19   6    ADA Intake Questionnaire                  313
20   15   Schedule of CREOG study sessions          322
21   22   December 12, 2002 letter from Dr.         322
          Sciscione
22
     23   December 13, 2002 memo from               328
23        Dr. Sciscione to all Ob-Gyn attendings
24

Page 427

1    EXHIBITS  (Continued)              MARKED
2    109  Personal diaries                    389
3    110  recap of diary                      393
4    119  Document created by Dr. Zechman      394
5    3    Letter from local community college  395
6    104  Letter of reference                  395
7    102  printout from Web page of the American  398
          Academy of General Physicians
8
     100  Complaint against East Carolina University 400
9
     101  Notice of Voluntary Dismissal        403
10
     56   Exchange of e-mail between Dr. Zechman   403
11        and Dr. Sciscione
     122  Exchange of e-mail between Dr. Zechman   403
12        and Dr. Sciscione
13   57   E-mail to Dr. Ekbladh, July 26, 2003    408
14   121  E-mail from Dr. Zechman to Dr. Gray      411
15   107  August 1, 2003 e-mail from Dr. Zechman   415
16   61   Exchange of e-mail between Dr. Zechman    416
          and Sandy Kardos August 11, 2003
17
     62   e-mail from Sandy Kardos                420
18
     115  E-mai to husband and Dr. Gray           421
19
     92   September 20th, 2002 letter              422
20        to Dr. Sciscione
21
22
23
24

Page 426

1    EXHIBITS  (Continued)             MARKED
2    5    March 11, 2003 letter from Dr. Sciscione  332
3    66   In-house residents' grades           333
4    25   March 24, 2003 letter from Dr. Sciscione  337
5    54   April 21, 2003 e-mail between         343
          Dr. Zechman and Dr. Sciscione
6
     17   Remediation plan                     347
7
     18   Remediation plan                     347
8
     112  Schedule                             354
9
     30   July 30, 2003 memo from Dr. Ekbladh   354
10
     31   August 19, 2003 e-mail exchange between  359
11        Dr. Zechman and Sandy Kardos
12   32   August 20, 2003 letter from Dr. Ekbladh  134
13   34   September 4, 2003 letter from Dr. Ekbladh  365
14   35   September 30, 2003 letter from Dr. Ekbladh  367
15   37   Letter to Drs. Kaminski and Little    369
16   46   E-mail that you wrote to Dr. O'Connor  374
          June 18, 2003
17
     47   Follow-up e-mail to Dr. O'Connor      378
18
     48   Follow-up letter to Exhibit 47        379
19
     49   January 6, 2004 letter Mr. Laskowski  380
20
     50   October 18th, 2004 e-mail from Dr. Zechman  383
21
     118  December 17th, 2004 letter from the   386
22        executive director of the Board of
          Medical Practice
23
     117  Administrative Charge                 389
24

Page 428

1
2
3
4
5
6    REPLACE THIS PAGE
7    WITH THE ERRATA SHEET
8    AFTER IT HAS BEEN
9    COMPLETED AND SIGNED
10   BY THE DEPONENT.
11
12
13
14
15
16
17
18
19
20
21
22                              **B-0260**
23
24

51 (Pages 425 to 428)



Page 429

1    State of Delaware      )
                            )
2    New Castle County      )
3

          CERTIFICATE OF REPORTER
4
5          I, Elise Alvarado, Registered Professional
     and Certified Court Reporter and Notary Public, do
6    hereby certify that there came before me on August
     16, 2006, the deponent herein, ELLEN ZECHMAN, who was
7    duly sworn by me and thereafter examined by counsel
     for the respective parties; that the questions asked
8    of said deponent and the answers given were taken
     down by me in stenotype notes and thereafter
9    transcribed by use of computer-aided transcription
     and computer printer under my direction.
10
           I further certify that the foregoing is a
11   true and correct transcript of the testimony given at
     said examination of said witness.
12
           I further certify that I am not counsel,
13   attorney, or relative of either party, or otherwise
     interested in the event of this suit.
14
15
              _____
16          Elise Alvarado, RPR, CSR
17          Certification No. 256
18          (Expires January 31, 2008)
19
     DATED: _____
20
21
22
23
24

**B-0261**