

**WILCOX & FETZER LTD.**

In the Matter Of:

# Zechman

## v.

# Christiana Care Health Systems

## C.A. # 05-159 JJF

---

### Transcript of:

### Paul F. Kaminski, M.D.

### July 14, 2006

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

B-0262

Zechman
Paul F. Kaminski, M.D.

v.

C.A. # 05-159 JJF

Christiana Care Health Systems
July 14, 2006

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ELLEN ZECHMAN,                          )
                                        )
            Plaintiff,                  )
                                        )
v.                                      ) Civil Action No.
                                        )    05-159 JJF
CHRISTIANA CARE HEALTH SYSTEMS,         )
                                        )
            Defendant.                  )


            Deposition of PAUL F. KAMINSKI, M.D. taken
pursuant to notice at the offices of Margolis
Edelstein, 1509 Gilpin Avenue, Wilmington, Delaware,
beginning at 9:30 a.m. on Friday, July 14, 2006,
before Ann M. Calligan, Registered Merit Reporter and
Notary Public.

APPEARANCES:
            LORI BREWINGTON, Esquire
            MARGOLIS EDELSTEIN
               1509 Gilpin Avenue
               Wilmington, Delaware  19806
               on behalf of the Plaintiffs,
            THOMAS S. BLOOM, Esquire
            MORGAN, LEWIS & BOCKIUS, LLP
               1701 Market Street
               Philadelphia, Pennsylvania  19103-2921
                on behalf of the Defendant.


                WILCOX & FETZER
     1330 King Street - Wilmington, Delaware 19801
                 (302) 655-0477
                 www.wilfet.com            **B-0263**

Page 2

1  ALSO PRESENT:
2      KAREN DeCREASE, Paralegal
3              -----
4          PAUL F. KAMINSKI, M.D.,
5      the witness herein, having first been
6      duly sworn on oath, was examined and
7      testified as follows:
8              EXAMINATION
9  BY MS. BREWINGTON:
10  Q.  Good afternoon, Doctor.
11  **A.  Good afternoon.**
12  Q.  My name is Lori Brewington, and I represent
13  Ellen Zechman in a discrimination action against
14  Christiana Care.
15      Have you ever testified at a deposition
16  before?
17  **A.  A deposition, yes.**
18  Q.  Yes.  Okay.  So I'm sure you know I'm going to
19  ask you a series of questions.  I'll make every effort
20  to ask them one at a time, and I'll ask you to answer
21  those questions.  If you have any questions about the
22  question that's being asked or if you'd like me to
23  rephrase it, just go ahead and let me know, and I'll
24  go ahead and do that for you.

Page 3

1      At times Christiana Care's attorney may
2  object to some of the questions that I ask, and that
3  is entirely proper.  Only thing that I ask is that you
4  go ahead and answer the question anyway unless he
5  specifically advises you not to answer the question.
6  Is that understood?
7  **A.  Yes.**
8  Q.  If at any time you need to take a break, just
9  let me know.  I don't think we're going to go too
10  long, but if you need to take a break, just let me
11  know.
12      Let's start with your full name for the
13  record.
14  **A.  Paul F. Kaminski.**
15  Q.  And what did you do in preparation for your
16  deposition testimony today?
17  **A.  Met with him for about 45 minutes.**
18  Q.  Did you review any documents?
19      MR. BLOOM:  Before you answer that
20  question, you can answer that question to the extent
21  you reviewed documents other than documents that I
22  selected for you to review.
23  **A.  I did not review any documents, no.**
24      MS. BREWINGTON:  Okay.  Thank you.

Page 4

1      MR. BLOOM:  Sure.
2  Q.  I want to ask you about your educational
3  background.
4  **A.  Okay.**
5  Q.  If you could just start with college.
6  **A.  Loyola College in Baltimore, Maryland.**
7  Q.  When did you graduate?
8  **A.  1955 I think.**
9  Q.  Close enough.
10      And then just tell me about the
11  progression up?
12  **A.  University of Maryland School of Medicine.**
13  **College was '59.  Medical was '63.**
14  Q.  Okay.
15  **A.  Did a residency in ob/gyn at St. Agnes Hospital**
16  **in Baltimore, Maryland, from 1963 to 1967.**
17      **You said education now, is that correct?**
18  Q.  Yes.
19  **A.  I did a fellowship in breast and gyn pathology**
20  **from Armed Forces Institute of Pathology from 1981 to**
21  **1983.**
22      **And I got a master's degree in education**
23  **from Penn State in 1993 -- 1995.**
24  Q.  Anything else?

Page 5

1  **A.  That's enough.**
2  Q.  It's quite enough.  I was just checking.
3      Now, let's talk about your employment with
4  Christiana Care?
5  **A.  Yes.**
6  Q.  When did you first become employed with
7  Christiana Care?
8  **A.  July 1st, 1995.**
9  Q.  And what was your position at that time?
10  **A.  I came to Christiana as the residency program**
11  **director and the director of the Division of**
12  **Education.**
13  Q.  And this is the residency program director of
14  obstetrics and gynecology?
15  **A.  Yes.**
16  Q.  And how long were you residency director?
17  **A.  Seven years.**
18  Q.  And what did you do after that?
19  **A.  I stepped down to associate program director.**
20  **That was the beginning of kind of getting out of the**
21  **administrative duties before retiring.**
22  Q.  And when was that?
23  **A.  That would be from 2003.  2004, I think I was**
24  **the associate program director.  I'm not sure exactly**

Zechman                                                     Christiana Care Health Systems
Paul F. Kaminski, M.D.        v.    C.A. # 05-159 JJF                    July 14, 2006

Page 6

1   when I gave up that job specifically. Now I'm just a
2   staff physician.
3   Q.   You're not just anything.
4        So that I have the time frame right, you
5   were residency program director beginning in 1995?
6   A.   Yes.
7   Q.   And that was for about seven years?
8   A.   Through June 30th, 1992 -- 2002. I'm sorry.
9   Q.   Then the assistant program director, 2000 --
10  A.   3, 2004. Probably not 2004, but I may have
11  been.
12  Q.   And after that staff physician?
13  A.   Correct.
14  Q.   And that's what you are currently?
15  A.   Currently right now.
16  Q.   Dr. Zechman was employed with Christiana Care
17  in June of 2002 through September of 2003.
18  A.   Yes.
19  Q.   What was your position at that time?
20  A.   At the time she was hired, I was the program
21  director, and I will say I interviewed her and made a
22  recommendation to hire her.
23  Q.   And when she left the program were you serving
24  as assistant program director?

Page 7

1   A.   I'm not sure whether I was associate program
2   director or whether I had just given up that job. I
3   don't remember. I probably was still the associate
4   program director, but somebody would need to tell me.
5   Q.   Now, you were the residency program director,
6   but as I understand it, at some point, Dr. Sciscione
7   also served?
8   A.   July 1st, 2003, he took over as the program
9   director.
10  Q.   And then when did Dr. Ekbladh take over?
11  A.   When Dr. Sciscione left, and I'm not sure
12  exactly time-wise when.
13  Q.   You know it was you, then Sciscione, then
14  Ekbladh?
15  A.   Yes.
16  Q.   You mentioned that you were the one that
17  recommended Dr. Zechman for the program, is that
18  correct?
19  A.   Yes.
20  Q.   Tell me about the recommendation process or the
21  process that came about.
22       Do you understand the question?
23  A.   She came up for an interview. I interviewed
24  her along with -- there were one or two other

Page 8

1   residents there at that time, who also talked to her.
2   And since it was a weekend and we were kind of running
3   short on time, we made a -- she was the best qualified
4   of the candidates that came, at least in my opinion.
5   Q.   Why is that?
6   A.   Well, you have to make a decision. You
7   interview four people which one is --
8   Q.   Yeah. But why did you feel that she was the
9   best compared to the others?
10  A.   Just after going through the interview process,
11  how you would evaluate people. And I don't have
12  anything formal in front of me --
13  Q.   Right?
14  A.   -- but she was the best of the three or four
15  applicants.
16  Q.   Do you recall -- and I know it was a while ago.
17  Do you recall what were some of the qualities about
18  Dr. Zechman that made her better than the other
19  candidates?
20  A.   She seemed genuine, and she seem to have a
21  genuine desire to want to learn.
22  Q.   Did you have an understanding of Dr. Zechman's
23  background?
24  A.   Only what she told me.

Page 9

1   Q.   And what do you remember about what she told
2   you?
3   A.   I know she had a couple of children. I forget
4   whether it was two or three.
5   Q.   Okay.
6   A.   That she was coming from Virginia. Her husband
7   was in practice in North Carolina, I think. And that
8   her husband flew back and forth to Delaware at times
9   to be with her. And that was their plan, even when
10  she was hired, that they were going to do a lot of
11  flying back and forth. I mean, that was kind of what
12  I remembered.
13  Q.   Now, this previous school that she attended in
14  Virginia, do you or did you have an understanding of
15  whether that school was comparable to Christiana Care
16  standards.
17  A.   It was an approved residency program, so it
18  should have been.
19  Q.   Are you saying that it may not have been or you
20  don't know?
21  A.   From what I remember, it was an approved
22  residency program at that time. So it should have
23  been equal.
24  Q.   Did you have discussions with Dr. Zechman

3 (Pages 6 to 9)

Zechman
Paul F. Kaminski, M.D.

v.

C.A. # 05-159 JJF

Christiana Care Health Systems
July 14, 2006

Page 10

1  before she was hired about her surgical skills or
2  anything like that?
3  A.  I knew she had -- I knew she did very little
4  surgery at her previous program.
5  Q.  That would be the one at Virginia?
6  A.  Yeah.
7  Q.  Did you feel that she would still be able to be
8  successful in the Christiana Care program?
9  A.  Yes.  Yes.
10  Q.  Why is that?
11  A.  Because we've had other people come with lower
12  surgical background, and they've caught up.  So there
13  was no reason to think she was any different.
14  Q.  So is it your understanding that she may not
15  have been at the level as other residents before
16  entering the program?
17  A.  We knew surgical-wise she was not going to be
18  at the level of the other residents in that area.  We
19  anticipated.
20  Q.  But it was your understanding that based on
21  other students being at that same level, that she'd be
22  able to --
23  A.  Catch up.
24  Q.  Okay.

Page 11

1          How would she be able to catch up?  What
2  was the plan?
3  A.  The plan was to put her in as many surgical
4  cases as possible.
5  Q.  So the best way to get that surgical is to do
6  it.
7  A.  Is to operate.
8  Q.  Now, this may be a crazy question, but are you
9  saying actually in there doing the surgery or
10  observing, just being a part of it?
11  A.  Acting first as assistant, and as she developed
12  skills, then giving more and more responsibility to
13  eventually do the surgery.
14  Q.  And do you know whether that happened with
15  Dr. Zechman?  And when I say that happened, I mean, do
16  you know whether or not she received as much surgery
17  as possible?
18  A.  Do I have first-hand knowledge of it?  No,
19  because by the time she was in that position, I was no
20  longer the program director.  So I did not look at her
21  statistical numbers to any extent, nor did I operate
22  with her a lot.
23  Q.  You didn't?
24  A.  No, just because I was at the point in my life

Page 12

1  where I was trying to operate less and less.
2  Q.  So the reason why you didn't operate with her a
3  lot is because you didn't operate a lot?
4  A.  That would be correct.
5  Q.  I know that you recommended her for the
6  program.  Once you made that recommendation, are you
7  making it to the resident review committee?
8  A.  It goes to them and then to the institution.
9  Q.  Do you recall whether there was any difficulty
10  in getting Dr. Zechman voted on or getting her
11  approved?
12  A.  No.
13  Q.  No, you don't recall?
14  A.  No, there was no problem.
15  Q.  And as director of the program you served on
16  the resident review committee, right?
17  A.  Yes.
18  Q.  Tell me when the resident review committee --
19  what is it?
20  A.  That's a -- there are two residency review
21  committees.  One is departmental.  One is
22  institutional.  The departmental deals strictly with
23  the ob/gyn residency program, the 16 residents
24  evaluate -- go through, evaluate each resident at each

Page 13

1  meeting, and also administrative things that come from
2  the residency review committee as far as changes in
3  requirements and et cetera.
4  Q.  Okay.
5  A.  Okay.
6  Q.  Take a look at this document that we are going
7  to have marked.
8          MS. BREWINGTON:  I am actually going to
9  ask you to mark that one.  I think he has the
10  original.
11          (Kaminski Deposition Exhibit 1 was marked
12  for identification.)
13  BY MS. BREWINGTON:
14  Q.  Do you know whether or not these are the
15  members of the resident review committee?
16  A.  That looks correct.
17          MR. BLOOM:  I'm going to interject an
18  objection to the form.  We don't have a time period.
19          MS. BREWINGTON:  I was going to actually
20  ask, but he answered the question before.
21  BY MS. BREWINGTON:
22  Q.  But my question was, do you know whether or not
23  these are the members of the resident review committee
24  that approved Dr. Zechman into the program in 2000?

4 (Pages 10 to 13)

Zechman
Paul F. Kaminski, M.D.

v.
C.A. # 05-159 JJF

Christiana Care Health Systems
July 14, 2006

Page 14

1  A.  I can't answer that question.  I don't have a
2  date on here.
3  Q.  So you can't tell me based on the names of the
4  people?
5  A.  Most of the people are permanent members, but
6  there are some people that rotate in and out.
7  Q.  Well, tell me how that works.  Do you get voted
8  onto the committee?
9  A.  Appointed.
10  Q.  Appointed?
11  A.  By the chairman.
12  Q.  And it's a lifetime appointment?
13  A.  No.  There are certain people.  The chairman is
14  a permanent member.  The program director is a
15  permanent member.  The associate program director is a
16  permanent member.  And the division heads, which would
17  be the -- which would have been at that time
18  Dr. Colmorgen and Dr. Whitney, and then the rest of
19  the people would be -- there's always a resident
20  member, which at that point it says Colleen Bratsch.
21  Dr. Sciscione was not a resident.  That's a misprint?
22  Q.  Okay.
23  A.  There's always a resident member of the
24  committee.  Then there are several members from the

Page 15

1  private community that are appointed for, I believe,
2  two- or three-year terms.
3  Q.  Do you know whether or not the vote for Zechman
4  was a unanimous decision?
5  MR. BLOOM:  Object to the form.  Which
6  vote?
7  MS. BREWINGTON:  I'm sorry.  This vote --
8  right now I'm specifically asking you about
9  Dr. Zechman and her being accepted into the program.
10  BY MS. BREWINGTON:
11  Q.  So the vote that I'm talking about is -- I'm
12  not sure when it occurred, but I know that Zechman
13  began the program in June of 2002.
14  A.  June or July.  I forget which.
15  Q.  June or July.  Okay.
16  So my question is, when the resident
17  review committee approved her into the program, do you
18  have an understanding of whether it was a majority or
19  unanimous?
20  A.  I don't remember.
21  Q.  Are these votes secret ballot or anything like
22  that?
23  A.  If it's close, it might be.  If it's going to
24  be pretty much unanimous, it's anybody -- all in favor

Page 16

1  say, "Aye."
2  MS. BREWINGTON:  Off the record for two
3  seconds.
4  (Discussion off the record.)
5  BY MS. BREWINGTON:
6  Q.  Are residents in the program evaluated,
7  Dr. Kaminski?
8  A.  Yes.  Oh, yes.  Residents in the program are
9  evaluated.
10  Q.  Tell me about the evaluation process.
11  A.  All of the attending physicians get a form
12  which evaluates professionalism, knowledge, surgical
13  skills, et cetera.  I believe it's a one to five
14  scale.  And they are turned into the program
15  coordinator.  They are tabulated by the program
16  coordinator and brought to the residency review
17  committee meeting.
18  Also there's room at the bottom of that
19  form for comments from the evaluators.
20  The evaluation process is different now.
21  Q.  It's different since Dr. Zechman left?
22  A.  Yes.
23  Q.  Then I'm not really concerned about that.
24  Let's confine our discussion to what the

Page 17

1  evaluation process was when Dr. Zechman --
2  A.  Okay.
3  Q.  Now, all the attending physicians are given
4  these forms.  Who are they given these forms by?
5  A.  The program coordinator.
6  Q.  So the program coordinator gives the form to
7  attending physicians?
8  A.  Right.
9  Q.  Now, these attending physicians, are these the
10  physicians that work with the residents in surgery
11  or --
12  A.  In any aspect.
13  MR. BLOOM:  I'm going to remind you,
14  Dr. Kaminski, to allow Ms. Brewington to complete her
15  question before you answer.
16  Q.  Is it mandatory that they complete these
17  evaluations?
18  A.  No.
19  Q.  So, in your opinion, do the doctors complete
20  these evaluations?
21  A.  The full-time physicians all have to complete
22  the evaluation, but the private attending physicians,
23  it's voluntary.
24  Q.  So the full time physicians must complete the

5 (Pages 14 to 17)

B-0267

Zechman
Paul F. Kaminski, M.D.

v.
C.A. # 05-159 JJF

Christiana Care Health Systems
July 14, 2006

Page 18

1  evaluations?
2  A. Yes.
3  Q.  And are there other types of evaluations,
4  meaning nurses evaluating residents and residents
5  evaluating other residents?
6  A. Residents evaluate other residents. Whether
7  nurses were evaluating them at that time -- they do
8  now. I don't remember whether they did then.
9  Q.  Are evaluations supposed to be completed on a
10  monthly or weekly basis or is it --
11  A. It's rotational basis. As the -- residents
12  on the rotation for three months, they may just get
13  evaluated at the end of the third month. If they are
14  on one-month rotation, obviously it's going to be a
15  monthly evaluation.
16  Q.  The oral boards, is that considered an
17  evaluation?
18  A. Yes.
19  Q.  Now, Dr. Zechman took part in the oral boards,
20  and I don't remember the year that she actually took
21  them.
22  A. Okay.
23  Q.  But my question is, is it standard practice to
24  be evaluated by more than one doctor in your oral

Page 19

1  boards?
2  A. Yes.
3          MR. BLOOM: I'm going to interpose an
4  objection. I don't think it's -- are you talking
5  about mock oral boards or actual boards?
6  Q.  Well, I guess it's the mock because Dr. Zechman
7  took it, and that's the one I'm talking about. It was
8  an oral board, and it was considered an oral board. I
9  don't know whether it was --
10  A. It's a knowledge evaluation tool.
11  Q.  But is it mock?
12  A. It's mock. From the standpoint is it board --
13  for board certification, no. It's strictly for
14  departmental use.
15  Q.  Is there a standard in terms of how many people
16  will administer the oral boards?
17  A. When Dr. Sciscione became the program director,
18  I don't have direct knowledge because I didn't
19  participate in it.
20  Q.  Take a look at that for me. Is this an example
21  of the evaluation form that the attending physicians
22  would complete?
23  A. Yes.
24          MR. BLOOM: Objection to the form.

Page 20

1  Q.  Now, based on what I see here, it doesn't look
2  like this was completed. Is that a fair statement?
3  A. It appears to be blank.
4  Q.  Because if it was completed, there would be
5  like some writing or circles with the numbers?
6  A. Yes.
7          MR. BLOOM: I'm going to note for the
8  record that there's no Bates number or other
9  indication on this document.
10          THE WITNESS: There's a date.
11          MR. BLOOM: That it's been produced in
12  this case. I don't know one way or the other whether
13  it has, but...
14  BY MS. BREWINGTON:
15  Q.  Now, is it a fair statement that Dr. Zechman
16  should have several of these in her file?
17  A. You would hope.
18  Q.  You would hope.
19          Well, if the full-time physicians are
20  required to complete these, right?
21  A. Not on every case.
22  Q.  Okay. So in which cases are the physicians
23  required to complete this form, the evaluation form?
24          MR. BLOOM: You're talking about this

Page 21

1  specific kind of form?
2          MS. BREWINGTON: This one. Exhibit 2, or
3  Kaminski 2.
4          (Kaminski Deposition Exhibit 2 was marked
5  for identification.)
6  A. Since I was not the program director, I cannot
7  tell you what the requirements were at that time.
8  BY MS. BREWINGTON:
9  Q.  Was this the form that you are speaking of
10  earlier?
11  A. It is one of several forms.
12  Q.  Tell me about the different forms.
13  A. This was one that was used for -- this is
14  knowledge of -- there's another one used just
15  basically for outpatient clinic, a similar form, with
16  knowledge. You don't have use of assistance at the
17  clinic, so it was different questions but a similar
18  type form.
19  Q.  Did the residents give these forms to the
20  attending physicians on occasion?
21  A. Yes.
22          They would give these to the attending
23  physician on occasions that they wanted to be
24  evaluated on.

B-0268

6 (Pages 18 to 21)

Zechman                                                          Christiana Care Health Systems
Paul F. Kaminski, M.D.                     C.A. # 05-159 JJF                      July 14, 2006

Page 22

1   Q.  Were they supposed to give them to them for all
2   their --
3   A.  **Not necessarily for all their cases.**
4         (Kaminski Deposition Exhibit 3 was marked
5   **for identification.)**
6   BY MS. BREWINGTON:
7   Q.  Take a look at this document.  We are going to
8   have this marked as Kaminski 3.  It's a memo to ob/gyn
9   attendings from Anthony Sciscione regarding Ellen
10  Zechman.  It's dated December 13th, 2002.
11        Did you receive this memo?
12  A.  **I should have because it has ob/gyn attending.**
13  Q.  But you don't recall?
14  A.  **No.**
15  Q.  Well, let me ask you this, part of the memo
16  indicates, "I would ask that the faculty attending
17  would review the history, physical, and counseling
18  with Dr. Zechman, concentrating on critical thinking
19  skills and increasing knowledge."
20  A.  **Mm-hmm.**
21  Q.  Do you know whether you did this, meaning, did
22  you concentrate with Dr. Zechman on critical thinking
23  and --
24  A.  **I had very little contact with Dr. Zechman on a**

Page 23

1   **day-to-day basis.**
2   Q.  Did you have any contact with her?
3   A.  **I'm sure I did.**
4   Q.  Do you recall having any contact?
5   A.  **Before or after this memo, no, I can't tell.**
6   Q.  So as it stands here today, do you recall
7   working with her at any level to develop her skills or
8   anything?
9   A.  **When I did have contact with her, we would work**
10  **on informally trying to develop her skills.**
11  Q.  What do you mean by that?
12  A.  **That I filled out a paper and evaluation every**
13  **time she saw a patient, no, I didn't.  Did I review**
14  **things when she was in triage if I was the in-house**
15  **attending physician, yes, I did.  I would have had to.**
16  Q.  Do you recall whether you filled out any
17  evaluations for Dr. Zechman?
18  A.  **Specifically related to this?**
19  Q.  Oh, no.  Just ever.
20  A.  **Yeah, I did.**
21  Q.  You did?
22  A.  **Yes.**
23  Q.  Dr. Zechman worked in triage, that's fair to
24  say?

Page 24

1   A.  **Yes.**
2   Q.  And some of your patients were in triage,
3   correct?
4   A.  **Yes and no.**
5   Q.  Explain to me why that's a yes and a no?
6   A.  **Patients that would have had my name stamped on**
7   **them as being -- was I physically the person rendering**
8   **care that day, maybe yes, maybe no.  If there are**
9   **eight attending physicians, the chance of that would**
10  **be one in eight.  All of the patients that came from a**
11  **particular site had my name on them whether I was**
12  **there or not.**
13  Q.  Because you were the attending?
14  A.  **Because I was the responsible -- well, I was**
15  **responsible -- I was responsible for those patients in**
16  **the outpatient area.  If they came to triage, my name**
17  **appeared but I didn't necessarily see the patient.  I**
18  **probably didn't.**
19  Q.  Now, tell me how that works.  When you have a
20  resident and you have attending physicians in triage
21  or in the outpatient area -- is outpatient area and
22  triage the same thing?
23  A.  **Two different things.**
24  Q.  What's the outpatient area?

Page 25

1   A.  **Wilmington Hospital.  That's where the**
2   **residency patients -- and there's always an attending**
3   **physician present at Wilmington Hospital to supervise**
4   **whatever residents are there.**
5   Q.  Tell me about triage, then.  How is that
6   different than outpatient?  Is triage the emergency
7   room?
8   A.  **It's kind of like an emergency room.**
9   Q.  Is there always an attending physician there
10  present?
11  A.  **At that time I guess that question would be no.**
12  Q.  At that time meaning when Dr. Zechman --
13  A.  **That's right.**
14  Q.  Why not?
15  A.  **There weren't enough attending physicians.**
16  Q.  So where would the attending physicians be?
17  A.  **Well, these for the most part were private**
18  **patients and their private attending would be called**
19  **about every one of their patients.**
20  Q.  So the attending person would be on call?
21  A.  **Right.**
22  Q.  And so, with Dr. Zechman being in triage, there
23  wouldn't be an attending physician there, but she
24  would --

7 (Pages 22 to 25)

Zechman
Paul F. Kaminski, M.D.

v.
C.A. # 05-159 JJF

Christiana Care Health Systems
July 14, 2006

Page 26

1   A.  Call -- the patient who's attending said
2   Dr. Bell, she would call Dr. Bell and say your
3   patient, Ms. So and So, is here with such and such.
4   Q.  Now, as I understand it -- and I need you to
5   correct me if I'm wrong -- the attending physician
6   with respect to residents treating patients, are they
7   supposed to be within walking distance or within -- on
8   the same grounds as the resident?
9   A.  The RRC mandates that there be an in-house
10  attending physician. So there always is someone in
11  the hospital that's available for consultation from
12  any resident or any -- and also to handle emergencies
13  if the other -- real attending physician is not
14  available.
15  Q.  So this person's not the attending physician,
16  it's someone else.
17  A.  Wait a minute. You --
18  Q.  Let's go back because I guess I'm confused.
19  You said if the real attending physician is not
20  available?
21  A.  Well, Dr. Bell may be at home. If a patient of
22  his has an acute emergency that requires immediate
23  attention, that in-house attending physician will fill
24  in until he got there.

Page 27

1   Q.  So the attending in-house physician fills in?
2   A.  Right.
3   Q.  And that's acceptable under the mandate?
4   A.  The mandate is that there be an in-house
5   attending physician available 24 hours for
6   emergencies.
7   Q.  I may have already asked you this, but I don't
8   remember your answer. Do you recall a time actually
9   working with Dr. Zechman in surgery?
10  A.  I'm sure I did a few C-sections with her, but I
11  don't recall anything else.
12  Q.  How were her surgical skills based on your
13  experience.
14  A.  Below average, but acceptable.
15  Q.  What do you mean by below average? And what I
16  mean by that is, whose average?
17  A.  Based on the fact that I've been in resident
18  education since 1977, it's an idea of what's average
19  for all the residents that I've gone through. Some
20  are better than others, and it stands out.
21  Q.  I guess my question is, was she below average
22  for a second year? Is that what you were --
23  A.  Yes.
24  Q.  And do you know whether or not you worked with

Page 28

1   Dr. Zechman toward the end of her career at
2   Christiana, or before that?
3   A.  Towards the end I had very little contact with
4   her.
5   Q.  So this had to be like probably in the --
6   A.  Early on.
7   Q.  Did you say below average but acceptable?
8   A.  Yes.
9   Q.  When you say acceptable, what do you mean by
10  that? Do you mean that she was still functioning at
11  an acceptable level as a second year?
12      MR. BLOOM:  Object to the form of the
13  question, but you can answer.
14  A.  It needed to get better, but with time I
15  thought it probably would get better.
16      (Kaminski Deposition Exhibit 4 was marked
17  for identification.)
18  BY MS. BREWINGTON:
19  Q.  Take a look at what we are going to mark as
20  Kaminski 4 title on the top is "July 2003 Curriculum
21  for Ellen Zechman"?
22  A.  Yes.
23  Q.  Do you see where it indicates, July 21st, 2003,
24  with Dr. Kaminski?

Page 29

1   A.  Yes.
2   Q.  And then on the 22nd, "Westside with
3   Dr. Kaminski all day"?
4   A.  Yes.
5   Q.  Would that have been her rotation with you
6   during the week of the 21st through the 25th?
7   A.  That would be correct.
8   Q.  Now, that's later on in her career with
9   Christiana Care, would you agree?
10  A.  She came in July of 2002, is that correct?
11  Q.  Yeah.
12  A.  Then that would be the second year, yes?
13  Q.  Do you know whether she actually worked with
14  you that week?
15  A.  I know she came to Westside. I specifically
16  remember that. I can't tell you about the other ones.
17  Q.  What is Westside?
18  A.  Westside is the federally funded health clinic
19  over on Fourth Street.
20  Q.  What would she have been doing with you during
21  that week, everything that you did?
22  A.  Yeah. Basically whatever I did, she did.
23  Wilmington is clinic and all the residents have clinic
24  one day a week. So I would have been her supervisor

8 (Pages 26 to 29)

Zechman                                                      Christiana Care Health Systems
v.
Paul F. Kaminski, M.D.          C.A. # 05-159 JJF                        July 14, 2006

Page 30

1   in the clinic that day. And I'm sure she did that.
2   Like I say, Westside, I do remember her being there.
3   I do remember her being in the colposcopy clinic which
4   I do on Wednesday mornings. Thursday, I couldn't tell
5   you. There could have been a lot, there may have been
6   none. I couldn't tell you. The same thing with the
7   operating room, whether I did any cases or not.
8       Q. Now, previously before I showed you document, I
9   actually asked you about her surgical skills.
10      A. Mm-hmm.
11      Q. Do you have an understanding of how the other
12  doctors viewed her surgical skills?
13      A. Directly, no.
14      Q. Not directly, but as I understand it, you
15  served on the resident review committee?
16      A. Yes.
17      Q. And correct me if I'm wrong. I'm thinking you
18  had discussions about Dr. Zechman and her skills?
19      A. In context of that committee, yes.
20      Q. Is that the only context in which you had
21  discussions about her surgical skills?
22      A. With me and her surgical skills, yes.
23      Q. So are you saying that, in those resident
24  review meetings, you discussed your contact with

Page 31

1   Dr. Zechman?
2       A. Any comments that I had, I would have shared at
3   that time.
4       Q. Is it fair to say that the other doctors did
5   the same?
6       A. I would hope so.
7       Q. Well, did they?
8       A. Yes.
9       Q. And based on your experience in the resident
10  review committees, what was your understanding of how
11  other doctors viewed her surgical skills?
12      A. Probably -- you're asking me to speculate on
13  how they did. I don't specifically remember.
14      Q. I don't want you to speculate. I guess I want
15  to know, as you attended the resident review
16  committees and Dr. Zechman's name was discussed and
17  her surgical skills were discussed, what did you learn
18  or what did you have an understanding of based on the
19  conversations?
20      A. That her skills would be below average to
21  unacceptable.
22      Q. And do you know whether that was all of the
23  members of committee?
24      A. No, I don't.

Page 32

1       Q. Do you know whether it was more than half of
2   the members of the committee?
3       A. No, I don't.
4       Q. Do you have an understanding of whether it was
5   one or two people that thought that her skills were
6   unacceptable?
7       A. I would say more than one or two, but I
8   wouldn't go further than that.
9       Q. If you turn to the second page of Kaminski 4, I
10  believe, I'm going to ask you to look at the dark
11  portion of this document, and it begins with Zyrtec-D
12  12 hour.
13      A. Okay.
14      Q. If you look at where it says 7/25/06, do you
15  see where it says that?
16      A. Yes.
17      Q. It's difficult to read.
18          It says, "Assigned to OR with Kaminski.
19  Was reassigned to triage. Denied surgical training."
20          Do you see where it says that?
21      A. Yes.
22      Q. Now, I've read that statement to you. Does
23  that refresh your recollection as to whether she was
24  reassigned to triage?

Page 33

1       A. No, it doesn't.
2           MR. BLOOM: Object to the question. Go
3   ahead.
4       A. No, it doesn't.
5           MR. BLOOM: I'm going to note for the
6   record -- I believe I could be wrong -- that this is
7   Dr. Zechman's handwriting. I'm sorry for the
8   interruption.
9   BY MS. BREWINGTON:
10      Q. Now, being assigned to triage -- I guess I'm
11  trying to get an understanding of, when you're
12  assigned for surgery -- and I'm talking about when
13  you're, meaning a resident -- they are obviously
14  supposed to be in surgery to learn. That's a fair
15  statement?
16      A. Correct.
17      Q. Now, what would be the reason reassigning a
18  resident to triage?
19      A. I can't answer that. Those decisions were the
20  discretion of the chief resident.
21      Q. Does the chief resident have to consult anyone
22  when she makes a determination who gets reassigned?
23      A. She's trying to run the entire surgical
24  schedule, the entire triage, labor and delivery, so

9 (Pages 30 to 33)

Zechman
Paul F. Kaminski, M.D.

v.

C.A. # 05-159 JJF

Christiana Care Health Systems
July 14, 2006

Page 34

1   she has -- he or she has to make adjustments
2   periodically as to who needs to do what.
3       Q.  Was Robyn Gray the chief resident while
4   Dr. Zechman was employed?
5       A.  She would have been for part of that time.
6   They rotated that.  Whether she was the one in July, I
7   could not tell you.
8       Q.  What's the rotation like?  Is it quarterly?
9       A.  For each -- it's different.  For some rotations
10  it's quarterly.  For some it's once a month.
11      Q.  Now, the chief resident would be someone in
12  the --
13      A.  Fourth year.
14          (Kaminski Deposition Exhibit 5 was marked
15  for identification.)
16  BY MS. BREWINGTON:
17      Q.  Take a look at this document.  We are going to
18  mark this as Kaminski 5.  It's an e-mail from
19  Dr. Zechman to Dr. Ekbladh.  It was sent on January
20  26, 2003, at 5:10.
21          Based on the exhibit that I showed to you
22  earlier, Kaminski 4, would it be fair to say that this
23  e-mail was sent the same week that she was supposed to
24  be or scheduled to work with you?

Page 35

1       A.  It appears to be.
2       Q.  I want to direct your attention to the line
3   that begins with "on Friday," and I will go ahead and
4   read that out loud.
5           "On Friday I was left relieving in triage
6   rather than being allowed to go to the OR on a
7   possible perforation on a patient that Dr. Kaminski
8   and I had seen in the clinic the day before."
9           My question is, based on your review of
10  this document, does it refresh your recollection as to
11  whether Dr. Zechman was removed from surgery with you
12  or from working with you?
13      A.  No.
14          MS. BREWINGTON:  I'm going to have this
15  marked.
16          (Kaminski Deposition Exhibit 6 was marked
17  for identification.)
18  BY MS. BREWINGTON:
19      Q.  You can go ahead and flip to the next page of
20  that document that I just put in front of you.  We are
21  going to mark that as Kaminski 6.  And what it is is
22  Dr. Zechman's complaint.  And I want to refer you to a
23  specific section of the complaint and then ask you a
24  question about it.

Page 36

1       A.  Okay.
2       Q.  It's paragraph 38, I believe.
3       A.  I've read it.
4       Q.  Did you have discussions or a discussion with
5   Dr. Zechman about being reassigned?
6       A.  On that particular day -- you jogged my memory
7   and I can say, yes, I did, and I did send to
8   Dr. Ekbladh -- I don't remember whether it was an
9   e-mail or a note.
10      Q.  It was an e-mail or a note, but it wasn't an
11  evaluation?
12      A.  Not a formal evaluation.
13      Q.  So you had a discussion with Dr. Zechman that
14  day?
15      A.  I think she came to me, and we had a discussion
16  about that.
17      Q.  I want to ask you about that.  Tell me
18  everything that you remember about that.
19      A.  That's about it.
20      Q.  There's nothing else.
21      A.  I wouldn't have remembered had I not seen this.
22  I do remember seeing this.  I think I showed to it
23  her.  Does it say I showed it to her?
24      Q.  It does.

Page 37

1       A.  Okay.
2       Q.  So that's an accurate statement?
3           MR. BLOOM:  Object to the form.  You can
4   answer it.
5       Q.  I'm sorry.  The portion of paragraph 38 that
6   pertains to you, that's an accurate --
7       A.  Yes.
8       Q.  Okay -- statement?
9           Do you have an understanding of whether or
10  not Dr. Zechman was reassigned more often than other
11  residents?
12      A.  No, I don't.
13      Q.  We talked about her surgical skills and I asked
14  you to tell me what you thought about them and you
15  mentioned, blow average but acceptable.  How about her
16  medical knowledge?
17      A.  Below average.
18      Q.  Acceptable?
19      A.  Barely.
20      Q.  Do you have an understanding of -- okay.  Back
21  to that question.  Let me get a clarification of a
22  time frame.
23          Are we talking about towards the beginning
24  of her --

B-0272

10 (Pages 34 to 37)

Zechman                                                           Christiana Care Health Systems
Paul F. Kaminski, M.D.                    v.    C.A. # 05-159 JJF              July 14, 2006

Page 38

1   A.  Throughout.
2   Q.  Throughout.  Okay.
3        How about Dr. Zechman's ability to relate
4   to patients and treat patients, how would you
5   characterize them?
6   A.  Acceptable.
7   Q.  Why did you feel she was acceptable in that
8   area?
9        MR. BLOOM:  I'm going to object to the
10  form.  I think it's compound, but you can answer.
11  A.  Why did I feel it was acceptable?
12  Q.  Yes.  Why?
13  A.  I mean, patients -- she did not generate a lot
14  of patient complaints.  Patients seemed to be
15  generally happy with her.  Again, no one can please
16  everyone, so -- and her interactions, I thought, were
17  acceptable.
18       (Kaminski Deposition Exhibit 7 was marked
19  for identification.)
20  BY MS. BREWINGTON:
21  Q.  Tell me about the CREOG scores.  What are they?
22  A.  The CREOG exam is an in-training exam given to
23  o-b residents nationwide.  It happens to be the
24  Saturday after Martin Luther King Day.

Page 39

1   Q.  Every year?
2   A.  Every year.
3        They are compared to residents nationwide
4   at their level.  So all residents take it.  I mean,
5   yes, if they are sick or occasionally somebody
6   doesn't, but basically everybody does it, every
7   program nationwide.
8   Q.  Does it count for any type of certification?
9   A.  No.
10  Q.  How does Christiana Care use these scores?
11  A.  Use them in two ways.
12  Q.  Okay.
13  A.  The program gets reported how many residents
14  got every particular question right or wrong.  If
15  there's a particular question that everyone got wrong,
16  then it's basically the program's fault for teaching
17  that particular form and we make sure that we include
18  it in the curriculum the following year.
19       The other thing is to compare the
20  residents knowledge-wise.
21  Q.  When you say compare the residents
22  knowledge-wise, are you comparing Christiana Care
23  residents to residents outside?
24  A.  Mm-hmm.  If somebody gets 50th percentile and

Page 40

1   50th percentile nationwide -- actually, there's no
2   percentile given on the CREOG, but the standard -- the
3   standard score is 200 but the standard deviation --
4   the median is 200 but standard deviation is 20.
5        But using the standard deviation, you can
6   to go a statistic chart and figure out what percentile
7   that is.
8   Q.  These are the CREOG scores as of March 17,
9   2003, is that correct?
10  A.  That's what it says.
11  Q.  If I look at the second years, the PGY2s --
12  A.  Yes.
13  Q.  -- Heinle, Kersh, Kirifides, and Zechman.
14  A.  Mm-hmm.
15  Q.  Now, is it fair to say that Zechman did better
16  than Kirifides?
17  A.  I would consider that pretty much equal.
18  Q.  They are pretty much equal.
19  A.  The test isn't that discriminatory.
20  Q.  And how about Dr. Gray's score, if you look at
21  the PGY3s?
22  A.  Again, it is comparable.
23  Q.  So you would say that Kirifides, Zechman, and
24  Gray were comparable scores on the CREOG?

Page 41

1   A.  All were bad?
2   Q.  Now, I'll take you to the bottom half of the
3   document here.  Is it fair to say that Robyn Gray was
4   given remediation with promotion?
5   A.  Yes.
6   Q.  And Dr. Kirifides was given a mentor, correct?
7   A.  It would appear that way.
8   Q.  And Dr. Zechman was given remediation with
9   possible no promotion, is that correct?
10  A.  That would be correct.
11  Q.  Do you know why she was given the possibility
12  of no promotion when she scored similar to these other
13  residents?
14  A.  No, I don't, not just -- just based on this
15  sheet of paper.
16       (Discussion off the record.)
17       (Pause.)
18       (Kaminski Deposition Exhibit 8 was marked
19  for identification.)
20  BY MS. BREWINGTON:
21  Q.  Take a look at what we are going to have marked
22  as Kaminski 8.  Tell me what this document is.
23  A.  It appears to be a meeting from the residency
24  review committee.

11 (Pages 38 to 41)

Zechman                              v.                    Christiana Care Health Systems
Paul F. Kaminski, M.D.          C.A. # 05-159 JJF                      July 14, 2006

Page 42

1    Q.   The minutes from the meeting, is that what it
2    is?
3    A.   A copy of the minutes.
4    Q.   It's dated August 18, 2003?
5    A.   Yes.
6    Q.   And you were present at this meeting?
7    A.   It says I was.
8    Q.   And it says, "Invited Matthew Hoffman, Joseph
9    Patruno, and Gordon Ostrum."
10        Do you know whether they actually attended
11   the meeting?
12   A.   No, I don't.
13   Q.   And you don't recall?
14   A.   No, I don't.
15   Q.   Take a look at the second page. It indicates
16   sort of there in the middle, "After a long discussion
17   on where to go from here with her course of study, it
18   was suggested by the committee to do the following:
19   Continue probation with the special PGY2 rotation,
20   must get active and continuous counseling for stress
21   and depression, must get learning ability test."
22        Did I read that accurately?
23   A.   Yes.
24   Q.   Is it fair to say that, at the end of this

Page 43

1    meeting which took place in August of 2003, the plan
2    was to continue Dr. Zechman in the program as a PGY2?
3    A.   That would be correct.
4    Q.   And the decision was also to get a learning
5    ability test, is that correct?
6    A.   Yes.
7    Q.   Did the committee have a concern that
8    Dr. Zechman had some sort of the cognitive deficit?
9    A.   Not specifically, but wanted to give her the
10   benefit of the doubt in case there was one. We would
11   have to evaluate her in case there was one. And I
12   think it was very much on our mind because a resident
13   two years before that was diagnosed with a specific
14   learning disability, and when that was addressed, the
15   performance markedly improved.
16   Q.   That happened previously with a different
17   resident?
18   A.   Yes.
19   Q.   Do you remember the name of the resident?
20   A.   Yes, I do.
21   Q.   What was the name of the resident that you
22   addressed his or her disabilities?
23   A.   Her name was Kay. Her married name was Dohr,
24   D-o-h-r.

Page 44

1    Q.   And did the resident review committee have
2    discussions on the type of disability? Like I guess
3    my question is, did you have a sense of what kind of
4    ability or disability she may have?
5    A.   I did not.
6    Q.   Did anyone?
7    A.   I don't -- not that I -- I'd be speculating to
8    answer that question.
9    Q.   When we talk about disabilities, are we talking
10   about like ADHD?
11   A.   That would be one example.
12   Q.   Dyslexia?
13   A.   Another example. Something that we may all
14   have missed.
15   Q.   Still during this committee meeting in August
16   of 2003, there was also some discussion about
17   Dr. Zechman requesting ADA accommodations, is that
18   correct?
19   A.   I don't remember that.
20   Q.   Is it fair to say that based on your review of
21   the minutes that that's accurate? It's actually the
22   paragraph down from what I just read?
23   A.   Okay. That's what it states.
24   Q.   You also had a discussion about an ACGME

Page 45

1    letter, is that correct? It says, 3.4 ACGME letter.
2        MR. BLOOM:  Are you asking the witness if
3    he remembers that discussion or if the document says
4    that?
5    Q.   I am asking both.
6    A.   Not specifically.
7    Q.   Is it accurate that the document indicates that
8    you discussed that?
9    A.   The documents indicates that there was a letter
10   sent and discussed.
11   Q.   What's ACGME? I don't need the acronym.
12   A.   Graduate medical education. It's the
13   organization above the residency review committees.
14   Q.   Did you know that a letter was sent?
15   A.   I did.
16   Q.   Did you know it as a result of this meeting or
17   did you know prior to?
18   A.   As a result of this meeting.
19   Q.   Do you know who sent the letter?
20   A.   The letter was sent anonymously. We can
21   speculate, but I don't know who sent it.
22   Q.   Well, if I ask you to speculate, do you know
23   who sent the letter?
24        MR. BLOOM:  Object to the form.

**B-0274**

12 (Pages 42 to 45)

Zechman                                           Christiana Care Health Systems
Paul F. Kaminski, M.D.          v.                July 14, 2006
                          C.A. # 05-159 JJF

Page 46

1   A.  I would say probably Dr. Zechman, but it could
2   have been anyone, any one of the other residents.
3   Q.  I did ask you to speculate, and you speculated
4   Dr. Zechman.  Why did you speculate Dr. Zechman as
5   opposed to any of the other residents?
6   A.  Because she was having the most difficulty at
7   that time.
8   Q.  And when you say difficulty, do you mean like
9   learning difficulty or difficulty with the residents?
10  A.  I think, if we go back to the -- everything
11  that's stated in -- I think if you look at that,
12  that's quite a laundry list.
13  Q.  So let's look at the laundry list.  The
14  concerns listed, learning ability -- that goes back to
15  perhaps a--
16  A.  Test for what we said earlier, that learning
17  disability.
18  Q.  Adaptability, poor political judgment, very
19  abrupt moods, attitude, behavioral.  Okay.
20      So based on these concerns, you speculated
21  that perhaps Dr. Zechman was the one that sent the
22  complaint?
23  A.  Yes.
24  Q.  Were there discussions in the committee

Page 47

1   meetings about who may have sent the complaint?
2   A.  No.
3   Q.  Did you share your view with anyone else?
4   A.  Outside the committee, no.
5   Q.  But within the committee, did you share your
6   view?
7   A.  No.
8   Q.  So are you saying that you didn't share your
9   view?
10  A.  I didn't share my view.
11  Q.  Let me just ask the question, and then you can
12  answer.
13      Are you saying that you did not share your
14  view that Zechman may have written this letter with
15  anyone?
16  A.  No, I didn't.
17      MS. BREWINGTON:  Let's mark that.  We are
18  going to mark this as Kaminski 9.
19      (Kaminski Deposition Exhibit 9 was marked
20  for identification.)
21  BY MS. BREWINGTON:
22  Q.  This is a document that was dated September
23  30th, 2003.  It's on Christiana Care letterhead.  It's
24  from Dr. Ekbladh who, at the time, was the residency

Page 48

1   program director?
2   A.  Yes.
3   Q.  It's to Dr. Zechman, and it indicates that "at
4   the September 29, 2003, meeting of the resident review
5   committee, it was the unanimous decision of the
6   members of the committee to dismiss you for academic
7   reasons."
8       My question is, in August of 2003 -- and I
9   think it was August 18, which was approximately six
10  weeks prior to September 29 meeting, the decision by
11  the committee was to continue her on the second year
12  path.
13      MR. BLOOM:  Objection to the form.  The
14  testimony on the document was that she was on
15  probation.  Subject to that, you can answer the
16  question.
17  A.  I'd have to see the document because we are
18  getting too many things thrown at me.
19  Q.  Let's go back to it then.
20      This is the August 18, 2003.  The second
21  page of it indicates what the plan would be for
22  Dr. Zechman.
23  A.  Okay.
24  Q.  Okay?

Page 49

1   A.  Yes.
2   Q.  Is it fair to say that that indicates that she
3   would continue as a second year in the program --
4   A.  Yes, it does.
5   Q.  -- as of August 2003.
6       The committee met again on the 29th of
7   September, which was, I guess, I would say, six weeks
8   later?
9   A.  Yes.
10  Q.  What changed in terms of -- why did the
11  committee decide to terminate her six weeks later?
12  A.  I don't specifically recollect.
13  Q.  Were you part of the committee at that time?
14  A.  Yes, I was.
15  Q.  Do you generally recollect why the committee
16  chose to terminate her at that time?
17  A.  No, I don't.  I know they did.
18  Q.  Did you vote to terminate her?
19  A.  Actually, no.
20  Q.  So the statement here that it's a unanimous
21  decision of the members --
22  A.  At the meeting it says two abstentions.
23  Q.  It does, but this letter says, "unanimous
24  decision."  Okay.

13 (Pages 46 to 49)

Zechman
Paul F. Kaminski, M.D.

v.
C.A. # 05-159 JJF

Christiana Care Health Systems
July 14, 2006

Page 50

1  A. Abstention is not a yes or a no, I guess.
2  Q. Right. It's not.
3  A. So the yeses were unanimous.
4  Q. But there were two abstentions?
5  A. Yes.
6  Q. Dr. Kaminski, who else abstained from
7  terminating Dr. Zechman?
8  A. I would believe it would be Dr. Hochman.
9     MR. BLOOM: Objection.
10  Q. Tell me why you decided to abstain from this
11  decision?
12  A. Because I still thought maybe she would be
13  salvageable as a resident in ob/gyn.
14  Q. Did you say that in the resident review
15  committee meeting?
16  A. I'm sure I had my say. I don't remember
17  specifically -- specifics one way or another at this
18  point.
19  Q. Why did you abstain as opposed to voting no?
20  A. You knew you were going to be on the short end
21  of the vote. I don't think it would have made any
22  difference to the ultimate decision.
23  Q. And I think I asked you this and I think you
24  said you don't know specifically, but let me ask you

Page 51

1  again. Do you have an understanding of why the
2  committee chose to terminate her six weeks later?
3  A. No. I just have to go on the basis of what it
4  states here.
5  Q. Let's look at what it states here. The first
6  one is "overall evaluation scores very low."
7  A. Okay.
8  Q. Six weeks prior, is it fair to say that her
9  overall evaluation skills were low at that time?
10  A. Yes.
11  Q. And six weeks prior they still decided to keep
12  her on as a second year, correct?
13  A. Yes.
14  Q. Let's go to the next one. "Surgical skills are
15  that of a PGY1." Is that accurate?
16  A. Yeah.
17  Q. Is it fair to say that six weeks prior to that
18  her stills were at the PGY1 level?
19  A. Yes.
20  Q. And at that time they still decided to keep her
21  on, is that correct?
22  A. Yes.
23  Q. "Failure to meet a special rotation and
24  mainstreaming resulted in performance which is still

Page 52

1  below expected level."
2     Is it fair to say, that her performance
3  was at that level six weeks prior?
4  A. Yeah. But there's a special rotation thrown in
5  there. Doesn't look like she did very well with that.
6  Q. Special rotation?
7  A. I don't know what that is.
8  Q. "No significant improvement with surgical
9  skills." Is six weeks enough time to have a
10  significant improvement in surgical skills?
11  A. For many people, yes.
12  Q. What about someone that may perhaps have a
13  learning disability?
14     MR. BLOOM: Objection to the form.
15  A. I can't answer that question, having been faced
16  specifically with that.
17  Q. "Very poor clinical judgment which lead toss
18  concerns about patient care and safety." Okay.
19     My question is, as I understand it,
20  Dr. Zechman saw an awful lot of patients --
21  A. She did.
22  Q. -- in triage. Was there a concern about
23  patient safety at that time?
24  A. I don't know specifically.

Page 53

1  Q. Do you know why she would be assigned to triage
2  and seeing so many patients if, in fact, there was
3  such a concern about her patient care and safety?
4     MR. BLOOM: Objection to the form.
5  A. I had no -- I had nothing to do with why she
6  was assigned where.
7  Q. I know, but I guess I'm asking you, do you know
8  why she would be assigned to triage to treat so many
9  patients if there was a real concern about patient
10  care and safety?
11  A. With appropriate supervision she can -- she can
12  see a maximum number of patients with the idea that
13  she's going to improve that. So there would be a
14  rationale for doing that, but I don't know that that
15  was the rationale.
16  Q. And the last one, "unreceptive to educational
17  interaction, therefore very hard to work with and
18  teach."
19     Would you agree that six weeks prior she
20  was having concerns that she was very hard to work
21  with and very hard to teach?
22  A. I don't understand.
23  Q. Okay. I guess my question is, is this
24  something new, this unreceptive to educational

B-0276

14 (Pages 50 to 53)

Zechman                                                    v.                          Christiana Care Health Systems
Paul F. Kaminski, M.D.                            C.A. # 05-159 JJF                                     July 14, 2006

Page 54

1  interaction and therefore hard to work with?
2     A.  I don't know.
3     Q.  Okay.  But you were on the committee?
4     A.  I was on the committee.  I don't know whether
5  that was something new --
6     Q.  Okay.
7     A.  -- because I personally did not find that.
8     Q.  With Dr. Zechman?
9     A.  Yes.
10           (Discussion off the record.)
11           (Pause.)
12           (Kaminski Deposition Exhibit 10 was marked
13  for identification.)
14  BY MS. BREWINGTON:
15     Q.  Take a look at this document we are going to
16  mark as Kaminski 10.  It's a letter from Dr. Ellen
17  Zechman to you, and Dr. Brian Littie, October 3rd
18  2003.
19           My question, is, did you contact
20  Dr. Zechman to information her that she was being
21  terminated from the program?
22     A.  No.  She called the -- she called Sandi Kardos,
23  the program coordinator.
24     Q.  Okay.

Page 55

1     A.  And Dr. Ekbladh, Dr. Sciscione were not around.
2  So they found me to deliver the news from -- the
3  letter, I guess, had already been sent.  I was the
4  messenger.
5     Q.  Now, was Dr. Zechman working that day?
6     A.  She was not -- I don't know where she was that
7  day.  She was not in the hospital.
8     Q.  Do you know why she called in?
9     A.  I don't know.
10     Q.  Do you know whether she was on a leave of
11  absence at that time?
12     A.  I don't know.  She may have been, but I don't
13  know.
14     Q.  Did someone instruct you to tell her that she
15  was terminated from the program?
16     A.  I was instructed.  I was the messenger.
17     Q.  From Dr. Ekbladh?
18     A.  From Dr. Ekbladh since he wasn't around.
19     Q.  What did you say to her?
20     A.  It was just -- I'm instructed to tell you that
21  you have -- something.  I'm instructed to tell you
22  that you've been terminated.  She said something, does
23  that mean I don't have to come in tomorrow or
24  whatever?  I would say that would be correct.

Page 56

1           Or next week.  Whatever she put.
2     Q.  Did she ask you why?
3     A.  Not that I remember.  It was a very -- it was a
4  brief conversation.
5     Q.  Did she know a vote was coming up or something
6  like that?
7     A.  I don't know if she did or not.
8           MS. BREWINGTON:  I don't think I have
9  anything further.
10           MR. BLOOM:  I just have a little bit of
11  Dr. Kaminski.
12           EXAMINATION
13  BY MR. BLOOM:
14     Q.  Did I hear you correctly at the start of
15  today's deposition you said when Dr. Zechman was hired
16  that there were approximately three or four
17  applicants?
18     A.  There were three or four that we chose to
19  interview.  There were probably more than that number
20  of applicants.
21     Q.  And at the time that Dr. Zechman was accepted
22  into the program, I think I heard you say that you
23  were aware that she was had some catching up to do in
24  surgical skills?

Page 57

1     A.  Yes.
2     Q.  At the time you recommended that she be hired,
3  were you aware of any other deficiencies in
4  Dr. Zechman's skills or experience?
5     A.  I was not.
6     Q.  Did you become aware of any after she started?
7     A.  Knowledge deficit, yes.
8     Q.  What about her clinical judgment?
9     A.  Clinical judgment, was difficult.  She -- I was
10  never comfortable with, say, turning her loose because
11  of that.  I was afraid she might do something.  She
12  never got my full confidence.
13     Q.  What do you mean when you say turning her
14  loose?
15     A.  A lot of residents you can say, well, I did
16  this, this, and this, and you say, well, that's going
17  to be fine.  With her you always say, maybe I need to
18  recheck it.
19     Q.  Was it a concern to you that Dr. Zechman would
20  take action with respect to patients without
21  consulting supervising physicians?
22     A.  She was known to do that.
23     Q.  Was that an area of concern with respect to
24  Dr. Zechman?

B-0277

15 (Pages 54 to 57)

Case 1:05-cv-00159-JJF    Document 58-6    Filed 11/22/2006    Page 17 of 60

Zechman
Paul F. Kaminski, M.D.                              v.
                              C.A. # 05-159 JJF

Christiana Care Health Systems
July 14, 2006

Page 58

1  A. To me, it would be an area of concern.
2  Q. When you personally worked with Dr. Zechman,
3  did your interactions with her lead you to conclude
4  that she had a poor medical knowledge base?
5  A. Poor medical knowledge, but I think I got along
6  with well her with as far as working with her on the
7  few occasions that I did.
8  Q. How did Dr. Zechman react to criticism?
9  A. Oftentimes poorly insofar as she would cry,
10 responses like that.
11 Q. And did you ever observe that?
12 A. I observed it. I was never the cause of it.
13 Q. And when Dr. Zechman would cry in response to
14 criticism, any of those instances did the person who
15 was offering the criticism behave in a way that you
16 found inappropriate?
17 A. I did not.
18 Q. So when Dr. Zechman received criticism that
19 prompted her to cry, did you view the criticism as
20 more mean or nasty than would be directed at another
21 resident?
22 A. No. No.
23 Q. When the committee ultimately voted to
24 terminate Dr. Zechman's residency, when it came up at

Page 59

1  that meeting in September 2003, did that come as a
2  surprise to you that the committee was going to
3  consider her termination?
4  A. No.
5  Q. You could see it coming?
6  A. Yes.
7  Q. Was that based on Dr. Zechman's performance
8  over the course of the time she was at the program?
9  A. And previous timeline that was given for her to
10 improve or be -- we can't carry her on probation
11 forever.
12 Q. In your judgment, was the decision to terminate
13 Dr. Zechman's residency in 2003 a reasonable decision?
14 A. I think it was reasonable.
15 Q. Do you think the decision was justified?
16 A. Yes, I do.
17 Q. Earlier there were some questions by
18 Ms. Brewington about Dr. Zechman's treatment of
19 patients, and I think that's where you were talking
20 about how patients didn't complain about a lot about
21 her.
22 A. From a personal interaction with patients, she
23 was fine.
24 Q. And when you gave that testimony earlier, I

Page 60

1  take it you were not describing her medical judgment
2  in dealing with patients?
3  A. Yes.
4  Q. When you say yes, which do you mean?
5  A. I was referring to personal and not medical.
6  Q. You also testified, I think, that, when
7  Dr. Zechman was initially hired, that she had a strong
8  desire to learn, did I hear that right?
9  A. Yes.
10 Q. At during the course of her residency, did you
11 ever come to a view as an opinion as to whether or not
12 Dr. Zechman was resistant to teaching?
13 A. I think she more gave up than be resistant.
14 Q. And how was Dr. Zechman's relationships with
15 other residents?
16 A. Generally not good.
17 Q. Did other residents complain about her?
18 A. Yes. But unofficially they gripe about each
19 other all the time, but they griped about her a lot
20 more than other residents.
21 Q. Did other residents express a desire not to
22 work with Dr. Zechman?
23 A. They preferred not to.
24 Q. Do you know why?

Page 61

1  A. Because of the personal interactions.
2  Q. What personal interactions are you referring
3  to?
4  A. They didn't -- they didn't like working with
5  her. I don't think anyone got to the point where they
6  could trust her.
7  Q. Trust her in what way?
8  A. Her decision making.
9  Q. Do you agree with that, that her decision
10 making is questionable?
11 A. Enough to be dangerous -- I wouldn't say enough
12 to be dangerous, but it was questionable at times.
13      MR. BLOOM: I don't have anything else.
14      MS. BREWINGTON: I don't have anything.
15      (Deposition ended at approximately
16 3:30 p.m.)

B-0278

Zechman
Paul F. Kaminski, M.D.

v.
C.A. # 05-159 JJF

Christiana Care Health Systems
July 14, 2006

Page 62

```
 1        INDEX TO TESTIMONY
 2
 3   PAUL F. KAMINSKI, M.D.          PAGE
 4      Examination by Ms. Brewington    2
 5      Examination by Mr. Bloom        56
 6
          ------
 7
 8        INDEX TO EXHIBITS
 9
     KAMINSKI DEPOSITION EXHIBIT NO.     PAGE
10
 1   Resident Review Committee Members   13
11
 2   Case Specific Operative Skills
12       Evaluation                 21
13   3   Memorandum dated December 13, 2002   22
14   4   July 2003 Curriculum for Ellen
         Zechman                    28
15
 5   E-mail from Ellen H. Zechman to
16       Lamar Ekbladh, M.D., dated July
         26, 2003                   34
17
 6   Civil Cover Sheet and Complaint    35
18
 7   CREOG scores                 38
19
 8   Resident Review Committee minutes,
20       August 18, 2003              41
21   9   Letter dated September 30, 2003   47
22  10   Letter dated October 3, 2003    54
23
24
```

Page 63

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT.

Page 64

State of Delaware )
                  )
New Castle County )

CERTIFICATE OF REPORTER

I, Ann M. Calligan, Registered Merit Reporter and Notary Public, do hereby certify that there came before me on the 14th day of July, 2006, the deponent herein, PAUL F. KAMINSKI, M.D., who was duly sworn by me and thereafter examined by counsel for the respective parties; that the questions asked of said deponent and the answers given were taken down by me in Stenotype notes and thereafter transcribed by use of computer-aided transcription and computer printer under my direction.

I further certify that the foregoing is a true and correct transcript of the testimony given at said examination of said witness.

I further certify that I am not counsel, attorney, or relative of either party, or otherwise interested in the event of this suit.

Ann M. Calligan, RMR
(Certification No. 186-RPR)
(Expires January 31, 2008)

B-0279

17 (Pages 62 to 64)

Wilcox & Fetzer, Ltd.         Professional Court Reporters         (302)655-0477



**WILCOX & FETZER LTD.**

In the Matter Of:

# Zechman

## v.

# Christiana Care Health Systems

### C.A. # 05-159 (JJF)

---

Transcript of:

## Lamar Ekbladh, M.D.

### August 2, 2006

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

B-0280

Zechman
Lamar Ekbladh, M.D.

v.
C.A. # 05-159 (JJF)

Christiana Care Health Systems
August 2, 2006

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

ELLEN ZECHMAN,                          )
                                        )
            Plaintiff,                  )
                                        )  Civil Action
      Vs.                               )  No. 05-159 (JJF)
                                        )
CHRISTIANA CARE HEALTH SYSTEMS,         )
                                        )
            Defendant.                  )

            Deposition of LAMAR EKBLADH, M.D., taken
pursuant to notice at the law offices of Margolis Edelstein,
1509 Gilpin Avenue, Wilmington, Delaware, beginning at 10:03
a.m., on Wednesday, August 2, 2006, before Allen S. Blank,
Registered Merit Reporter and Notary Public.

APPEARANCES:

            LORI A. BREWINGTON, ESQUIRE
            MARGOLIS EDELSTEIN
            1509 Gilpin Avenue
            Wilmington, DE 19806

                  For - Plaintiff

            THOMAS S. BLOOM, ESQUIRE
            MORGAN, LEWIS & BOCHIUS, LLP
            1701 Market Street
            Philadelphia, PA 19103
                  For - Defendant

                  WILCOX & FETZER
      1330 King Street -  Wilmington, Delaware 19801
                  (302) 655-0477
                  www.wilfet.com                    **B-0281**

Zechman                                v.              Christiana Care Health Systems
Lamar Ekbladh, M.D.          C.A. # 05-159 (JJF)              August 2, 2006

Page 2

1
2        LAMAR EKBLADH, M.D.,
3        the deponent herein, having first been
4        duly sworn on oath, was examined and
5        testified as follows:
6                EXAMINATION
7    BY MS. BREWINGTON:
8    Q    Good morning, Dr. Ekbladh.
9    A    Good morning.
10   Q    My name is Lori Brewington and I have the pleasure
11   of taking your deposition today in connection with
12   Dr. Zechman's age and disability discrimination action
13   against Christiana Care.
14       Have you ever testified in a deposition before?
15   A    Yes, I have.
16   Q    I'm going to ask you a series of questions, make
17   every effort to ask them one at a time. If at any time you
18   don't understand anything that I ask, just let me know and
19   I'll go ahead and try to rephrase it or repeat it for you.
20   If you do decide to answer the question, then we'll both
21   assume that you understood the question. Do you understand?
22   A    Yes, I do.
23   Q    Okay. We have a court reporter here. And he will
24   be taking down your answers. Because the court reporter is

Page 3

1    here, we have to make sure that the record is clear. So we
2    want to make sure that we are not talking over each other.
3    So I'll make every effort not to talk while you're talking
4    and I just request that you do the same.
5        Mr. Tom Bloom is here. And he is representing
6    Christiana Care in this matter, as you know. And at times,
7    he will object to some of the questions that I ask. And
8    that is entirely proper.
9        The only thing that I ask is that you go ahead
10   and answer the question unless he specifically directs you
11   not to answer that question. Do you understand?
12   A    Yes.
13   Q    Okay. The last thing is that Delaware, in Delaware,
14   we have a practice where attorneys do not discuss the
15   deposition testimony with the deponent during the deposition
16   and while the deposition is ongoing. And that includes
17   breaks in the deposition of any kind, whether it be five or
18   ten minutes. If you do, however, choose to discuss that
19   testimony with Mr. Bloom, then I will then ask you what was
20   discussed. Because you will have waived that privilege. Do
21   you understand?
22   A    Yes.
23       MR. BLOOM: I'm going to object to that last
24   instruction. But go ahead.

Page 4

1        MS. BREWINGTON: Okay.
2    BY MS. BREWINGTON:
3    Q    Let's start. Please state your name for the record?
4    A    Lamar Ekbladh.
5    Q    Okay. And how do you spell Ekbladh?
6    A    E-k-b-l-a-d-h.
7    Q    And what did you do in preparation for your
8    deposition testimony today?
9    A    I reviewed materials submitted by my attorney.
10   Q    Did you do anything else?
11   A    No.
12   Q    Did you speak with anyone besides your attorney?
13   A    No.
14   Q    I want to start off by asking you about your
15   educational background. And you can begin with college for
16   me, please.
17   A    I went to Boston University, undergraduate school.
18   To Yale University for medical school. To Hartford Hospital
19   for my internship. Hartford Hospital in Hartford,
20   Connecticut. To the University of North Carolina in Chapel
21   Hill for my residency.
22   Q    And I'm assuming your residency was in obstetrics?
23   A    In obstetrics and gynecology, yes.
24   Q    And when did you graduate from medical school?

Page 5

1    A    1968.
2    Q    And is that when you began your residency?
3    A    No. I did an internship at Hartford Hospital.
4    Q    And how long was the internship at Hartford?
5    A    One year.
6    Q    And then after that, you went to Connecticut?
7    A    After the internship?
8    Q    Yes.
9    A    The internship was at Hartford Hospital in Hartford,
10   Connecticut. My residency was at the University of North
11   Carolina at Chapel Hill, North Carolina.
12   Q    And tell me about your work experience?
13   A    After my residency, I spent two years in the United
14   States Navy at the Bethesda Naval Hospital for my service
15   obligation. I then went back to the University of North
16   Carolina in Chapel Hill where I was for eight years. Next
17   was four years in private practice in Williamsburg,
18   Virginia. And then I was at Hershey Medical Center, Penn
19   State University, for eight years. And since 1994, I have
20   been at Christiana Hospital.
21   Q    And when you started at Christiana Hospital in 1994,
22   what was your title at that time?
23   A    Chair of the Department of Obstetrics and
24   Gynecology.

**B-0282**

2 (Pages 2 to 5)

Zechman
Lamar Ekbladh, M.D.

v.

C.A. # 05-159 (JJF)

Christiana Care Health Systems
August 2, 2006

Page 6

1  Q    And did you hold any other titles at Christiana Care
2  besides chair?
3  **A    At that time, no.**
4  Q    At any time?
5  **A    Titles, for the past year plus, I have been**
6  **associate residency program director, interim program**
7  **director.**
8  Q    When did you become interim program director?
9  **A    When Dr. Sciscione took a position at Drexel**
10 **University.**
11 Q    Do you recall when that was? Around what year?
12 **A    That was I believe 2003.**
13 Q    Now, Dr. Zechman was enrolled in the residency
14 program there between I believe June of 2002 through October
15 or September 2003. Were you the residency director towards
16 the end of that in 2003?
17 **A    I was the residency director for the very last part**
18 **of that.**
19 Q    And prior to that time, were you an assistant
20 director or anything like that with respect to the residency
21 program?
22 **A    No, I was not.**
23 Q    How did you end up being the interim director?
24 **A    Well, I took that position when Dr. Sciscione left**

Page 7

1  and was mentoring someone else in the process to take over
2  as program director.
3  Q    And who was that?
4  **A    At that point, we were mentoring Dr. Patruno.**
5  Q    And did he take over the program?
6  **A    He ended up not taking over the program.**
7  Q    Why is that?
8  **A    He took another position as director of**
9  **gynecological services at another hospital.**
10 Q    Are there any plans right now for you to become the
11 director as opposed to the interim director?
12 **A    No. In fact, we have hired a permanent director.**
13 Q    And who is that?
14 **A    Dr. Sciscione.**
15 Q    You hired him back?
16 **A    Yes.**
17 Q    So is he currently working at Christiana Care?
18 **A    No, he is not.**
19 Q    Where is he?
20 **A    He is currently at Crozer.**
21 Q    Now, is he eventually going to be back at Christiana
22 Care?
23 **A    Yes, he will be.**
24 Q    Do you know when?

Page 8

1  **A    I believe the date is August 21st.**
2  Q    As I already represented to you, Dr. Zechman began
3  her residency program in June of 2002; is that accurate?
4  **A    Yes, I believe that's accurate.**
5  Q    Okay. I just want to make sure we are on the same
6  page there.
7  **A    Although I believe it was July.**
8  Q    July. Okay. I wasn't sure. So it was July.
9  **A    Very end of June or July.**
10 Q    Is that when the academic year starts?
11 **A    That's when the academic year starts, is the 1st of**
12 **July.**
13 Q    And is it one rolling year?
14 **A    Yes.**
15 Q    So July 2002.
16      Did you have any part in accepting her into the
17 program?
18 **A    Yes, I did.**
19 Q    Can you tell me about that?
20 **A    I was one of the interviewers.**
21 Q    And who else interviewed Dr. Zechman?
22 **A    I do not remember specifically all of the other**
23 **interviewers.**
24 Q    How many interviewers were there?

Page 9

1  **A    I don't remember exactly.**
2  Q    Were you chosen to be an interviewer?
3  **A    As chair, I usually interviewed all candidates for**
4  **the residency program.**
5  Q    And tell me about the interview process?
6  **A    The interview process would be for a candidate to**
7  **come to interview with a number of the faculty and with some**
8  **of the residents. I spend usually about a half an hour with**
9  **each.**
10 Q    So is it fair to say you spent about a half an hour
11 with Dr. Zechman?
12 **A    Probably, at least.**
13 Q    And is there a standard list of questions that you
14 ask her or does it depend on the resident?
15 **A    A lot of it depends on the circumstance.**
16 **Interviewing for a first year position and second year**
17 **position might be different.**
18 Q    So you were interviewing Dr. Zechman for a second
19 year position, correct?
20 **A    Yes.**
21 Q    What do you recall about your interview with
22 Dr. Zechman?
23 **A    Nothing specific.**
24 Q    How about in general? Do you recall anything about

3 (Pages 6 to 9)

Page 10

1  that interview, that first interview?
2  A   When you use the term in general --
3  Q   What was your impression of Dr. Zechman?
4  A   It was a positive impression.
5  Q   And by positive, do you mean -- I'll ask you. What
6  did you mean by positive?
7  A   It is a person that we would consider offering a
8  position to.
9  Q   And based on what?
10 A   On the interview, on review of her previous
11 information from her previous program.
12 Q   And as you sit here today, is there anything that
13 you can remember about what you considered with respect to
14 Dr. Zechman?
15 A   We would consider the standard application form and
16 our interview process.
17 Q   And of that, you don't really remember?
18 A   I don't remember the details.
19 Q   And is it your testimony you don't remember anything
20 about that interview?
21 A   Other than it was a positive impression, no, I do
22 not.
23 Q   Did you consult with anyone else about hiring
24 Dr. Zechman?

Page 11

1  A   The process would be, after interviewing someone,
2  would be to get together with the other interviewers and
3  make a decision on hiring or on whether or not to hire the
4  individual or to offer the position.
5  Q   Were there any concerns that you can recall about
6  Dr. Zechman at that time?
7  A   I don't remember any specific concerns, no.
8  Q   How about with respect to her surgical skills?
9  A   That was not so much a concern as it was letting any
10 resident coming into the second year of our program be aware
11 that they would not likely have had the same surgical
12 experience as our first year residents.
13 Q   And why is that?
14 A   Simply because our residency program has a lot of
15 surgical experience in the first year for our residents
16 whereas most programs do not.
17 Q   And how do you know that? Do you know that just
18 based on --
19 A   From case logs from other programs and other
20 residents.
21 Q   And in your opinion, would you say that that makes
22 Christiana Care's program like a step above the other
23 residency programs?
24 A   Not necessarily. It just means the experience comes

Page 12

1  from different levels.
2  Q   So some other schools, although they may not get
3  that surgical experience in that first year, they may get
4  that same experience maybe in their second or third year?
5  A   That would be my assumption for purposes of
6  training, yes.
7  Q   At the time of your interview with Dr. Zechman, did
8  you feel that she was capable of completing the program?
9  A   Yes.
10 Q   And what was the reason for that opinion?
11 A   By the evaluation of the materials that we mentioned
12 before.
13 Q   And that would have been her grades, her previous
14 work experience?
15 A   Her previous work experience and information that we
16 received from her previous program.
17 Q   And also the actual interview with her?
18 A   And the actual interview, yes.
19     MS. BREWINGTON:  If I could have this document
20 marked as Ekbladh 1, please.
21     (Ekbladh Deposition Exhibit No. 1 was marked
22 for identification.)
23 BY MS. BREWINGTON:
24 Q   I have just placed in front of you what we have had

Page 13

1  marked as Ekbladh 1. The title of it is Christiana Care
2  Health System EEO Survey Form.
3     Are you familiar with the EEO Survey Form?
4  A   Only indirectly.
5  Q   Tell me what you know about the form?
6     MR. BLOOM:  Objection to the form of the
7  question. You can answer it, if you can.
8     THE WITNESS:  Please repeat the question. I'm
9  sorry.
10    MS. BREWINGTON:  Sure.
11 BY MS. BREWINGTON:
12 Q   You mentioned that you know about the form
13 indirectly; is that accurate?
14 A   I know that a form is filled out. Do I see all of
15 the forms? No.
16 Q   Well, you said you know about the form and you know
17 it's filled out. Who is it filled out by?
18 A   It should be filled out by the employee.
19 Q   So it's all employees of Christiana Care fill out
20 this form?
21 A   That is my impression, yes.
22 Q   In the residency program, who ensures that this form
23 is filled out?
24 A   Within the residency program, information would come

**B-0284**

Zechman
Lamar Ekbladh, M.D.

v.

C.A. # 05-159 (JJF)

Christiana Care Health Systems
August 2, 2006

Page 14

1 from human resources to Sandi Kardos, who is the program
2 director.
3    Q    So is Sandi Kardos the person that handles --
4    A    The program coordinator.  Excuse me.  Coordinator.
5    Q    So as program coordinator, she coordinates filling
6 out these forms?
7    A    She makes sure that forms are appropriately
8 completed.  All of the non clinical term forms, yes.
9    Q    Have you ever seen this form before?
10    A    I have only seen this form as presented in the
11 material that's presented to me.
12    Q    By your attorney?
13    A    Yes.
14    Q    This form indicates -- the printed name is Zechman?
15    A    Yes.
16    Q    And the question -- I guess it's not halfway down
17 the page, but it says, are you disabled.  And she checks
18 yes.  And other.  Do you see where it says that?
19    A    Yes.
20    Q    When did you become aware that Dr. Zechman was
21 disabled?
22          MR. BLOOM:  Objection to the form of the
23 question.  But you can answer it, if you understand it.
24          THE WITNESS:  Late in her first full year.

Page 15

1 BY MS. BREWINGTON:
2    Q    And how did that come about?
3    A    I don't remember specifically, you know, the exact
4 dates or how it came about.
5    Q    That's fine.
6    A    But we got information from Ellen about saying that
7 she had a connective tissue disorder and was being seen for
8 it.
9    Q    And when you say late in the first full year, that's
10 2002, right?
11    A    Well, late in the academic year, which would be into
12 2003.
13    Q    Once these forms are completed by the resident, do
14 you happen to know what happens to them after that?
15    A    Specifically, no.
16    Q    You can actually put that aside.
17          Dr. Ekbladh, can you tell me about the
18 Residency Review Committee?
19    A    The Residency Review Committee is -- consists of
20 physicians within the department whose purpose it is to
21 review the progress of the residents through the program.
22    Q    And how often does the committee meet?
23    A    Quarterly.
24    Q    And you were or are a member of that committee?  Are

Page 16

1 you currently a member?
2    A    Yes.
3    Q    And were you a member of the committee when
4 Dr. Zechman was employed?
5    A    Yes.
6    Q    And was that throughout the whole time that she was
7 employed?
8    A    Yes.
9    Q    Are there certain leadership roles on the Residency
10 Review Committee?
11    A    The Residency Review Committee is convened and run
12 by the program director.
13    Q    So that would have been Dr. Sciscione?
14    A    Sciscione.
15    Q    And then towards the end of Dr. Zechman's career
16 would be you?
17    A    Would have been myself, yes.
18          MS. BREWINGTON:  Off the record.
19          (Discussion held off the record.)
20          MS. BREWINGTON:  Okay.  Back on the record.
21          If I could have that marked as Ekbladh 2.
22          (Ekbladh Deposition Exhibit No. 2 was marked
23 for identification.)
24 BY MS. BREWINGTON:

Page 17

1    Q    Have a look at that document for me.  I have just
2 put in front of you Ekbladh 2.  It's entitled, Christiana
3 Care Health Services, Department of Obstetrics and
4 Gynecology, Resident Review Committee.  And the date is
5 October 28th, 2002.
6          My first question is, are these minutes from
7 the meeting?
8    A    Yes.
9    Q    And would these minute be generated after each
10 quarterly meeting?
11    A    Yes.
12    Q    And at times, are there special meetings?
13    A    Yes.
14    Q    Who decides whether there is going to be like a
15 special meeting of the residency review committee?
16    A    The program director.
17    Q    Is that something that everyone is required to
18 attend, everyone meaning --
19    A    Every one of the membership that can attend is
20 supposed to attend, yes.
21    Q    And what would be some of the circumstances where
22 you would have a special meeting?  Is that considered an
23 emergency meeting?
24    A    It's when there are special circumstances with which

5 (Pages 14 to 17)

Zechman                          v.                    Christiana Care Health Systems
Lamar Ekbladh, M.D.       C.A. # 05-159 (JJF)                    August 2, 2006

Page 18

1  to convene the meeting for either program or individual
2  resident issues.
3  Q   So an example of that would be if there was like a
4  problem with one of the residents or something?
5  A   Yes.
6  Q   At this meeting on October 28th, Dr. Zechman's
7  performance was discussed; is that accurate?
8  A   According to the minutes. I was not present.
9  Q   Do you know whether her performance was discussed
10 prior to this October 28th meeting? And I mean when I say
11 discussed, meaning in previous Resident Review Committee
12 meetings?
13 A   I have no specific knowledge of that.
14 Q   So this may have been the first discussion but
15 you're not sure?
16 A   It may have been.
17 Q   It was in October of 2002 that a motion was made to
18 have Dr. Patruno appointed as a mentor; is that accurate?
19 A   According to the minutes of the meeting.
20 Q   Do you or did you feel that it was appropriate for
21 her to have a mentor?
22 A   I was not at the meeting.
23 Q   I understand you weren't there. I understand. But
24 in retrospect?

Page 19

1  A   For any resident for whom we have concerns, we
2  believe mentors are appropriate.
3  Q   And for what purpose?
4  A   To assist the resident with any of the difficulties
5  that had been discussed and to give the resident a contact
6  person to discuss issues with and to be available for them.
7  Q   Now, in each Residency Review Committee meeting, do
8  you go through each and every resident?
9  A   Yes, we do.
10 Q   So that's the PG1's through the PG4's by name?
11 A   By name.
12 Q   And you can actually put that one aside.
13     (Ekbladh Deposition Exhibit No. 3 was marked
14 for identification.)
15 BY MS. BREWINGTON:
16 Q   I have just put in front of you what was marked as
17 Exhibit 3 or technically Ekbladh 3, and it is a special
18 meeting from March 17th of 2003. And the attendees were
19 Dr. Sciscione, Dr. E. Whitney, Dr. Hochman, yourself,
20 Dr. Demeo, Dr. Shlossman and Dr. Brosch.
21     And is it fair to say that all these
22 individuals are part of the Residency Review Committee.
23 A   Yes.
24 Q   Could you tell me what this document is?

Page 20

1  A   This document is a review of the -- the
2  residents' CREOG examination. That is an in-training
3  examination for obstetrics and gynecology.
4  Q   Is it similar to like a prep for the board exam?
5  A   No. It's more like an exam to look at progress,
6  knowledge, progress, through their residency.
7  Q   So if we look at the list of the PG Y3's, Dr. Gray is
8  at an eight percent as a third year resident. Was that a
9  concern of the Residency Review Committee?
10 A   Yes.
11 Q   And why was the Residency Review Committee concerned
12 about her eight percent?
13 A   That's eighth percentile. Because it's low. We
14 have concern for her being able to pass the boards.
15 Q   And what did the committee decide to do about Gray?
16 A   As noted here, was to assign her a mentor.
17 Q   Was there any concern at that time that she may have
18 to like repeat her third year?
19 A   I don't remember specifically that discussion.
20 Q   But is it fair to say that's not notated on --
21 A   It is not notated on here, yes.
22 Q   And how about Dr. Kirifides? He was a PG Y2 along
23 with Dr. Zechman, is that correct?
24 A   Yes.

Page 21

1  Q   And he was in the 10th percentile?
2  A   Yes.
3  Q   Is it fair to say that the Residency Review
4  Committee was concerned about him, too?
5  A   Yes.
6  Q   And what did the committee decide to do in his
7  instance?
8  A   Assign a mentor.
9  Q   And was there any discussion with respect to
10 Dr. Kirifides about repeating the second year?
11 A   I have no recollection of whether there was or was
12 not.
13 Q   Is it fair to say that that's not notated on this
14 form?
15 A   Yes.
16 Q   Then we have Dr. Zechman. And she is at 12 percent,
17 the 12th percentile, is that correct?
18 A   Yes.
19 Q   And it's fair to say that Kirifides and Gray were
20 both below Dr. Zechman?
21 A   Yes.
22 Q   And what was the determination for Dr. Zechman at
23 this March 17th, 2003 meeting?
24 A   As noted here, remediation with possible no

6 (Pages 18 to 21)

Zechman                                    v.                    Christiana Care Health Systems
Lamar Ekbladh, M.D.                  C.A. # 05-159 (JJF)                        August 2, 2006

Page 22

1  **promotion.**
2  Q    And why was this an option for Dr. Zechman and not
3  an option for Kirifides or Dr. Gray?
4  A    **I do not remember the specific discussions which**
5  **resulted in that recommendation.**
6  Q    Looking back now, do you have any reason to know or
7  understand why Dr. Zechman would need to or may need to be able
8  to go forward to a third year but Kirifides, who was in the
9  same class and had a lower score, would be able to continue?
10 A    **I don't remember any details about that.**
11 Q    What are the mock oral boards?
12 A    **Mock oral boards are an oral exam where individual**
13 **residents are questioned by a faculty person, usually not**
14 **from our institution, and an evaluation of their ability to**
15 **respond to the clinical situations presented is evaluated.**
16 Q    Okay. Is it just one faculty person?
17 A    **No. There are four different faculty persons.**
18 Q    Is it always four?
19 A    **It has been four, yes.**
20 Q    Do you recall whether or not it was four, like
21 specifically whether or not it was four when Dr. Zechman
22 took the oral boards?
23 A    **I believe it was four. I don't remember**
24 **specifically.**

Page 23

1  Q    And are the administers of the oral or the mock oral
2  boards required to submit some type of evaluation?
3  A    **Yes.**
4  Q    Do you happen to recall the names of those
5  individuals that administered the mock oral boards?
6  A    **Specifically, no, I do not.**
7       MS. BREWINGTON: I'm actually not going to mark
8  this document. But what I'll do is just use it to just help
9  refresh recollection.
10      MR. BLOOM: Let me just take a peak at that
11 first.
12      MS. BREWINGTON: I was going to give you a
13 copy.
14      MR. BLOOM: Thank you.
15 BY MS. BREWINGTON:
16 Q    As you look at this document -- I have actually
17 stapled two e-mails together. If this first one is an
18 e-mail. It may be a memo. But the first one is from
19 Patrice Weiss and it's to Susan Knerr cc: Patrice Weiss and
20 it was sent on May 4, 2003. And the subject is, Christiana
21 Care Reviews.
22      And then the second one is from Dr. Hoffman and
23 it's to Anthony Sciscione. And it's dated May 7th, 2003.
24      My question is, after you have had an

Page 24

1  opportunity to review it, does this help to refresh your
2  recollection as to whether Patrice Weiss and Dr. Hoffman
3  participated in the mock oral boards?
4  A    **Apparently they did.**
5       MS. BREWINGTON: Ekbladh 4, please.
6       (Ekbladh Deposition Exhibit No. 4 was marked
7  for identification.)
8  BY MS. BREWINGTON:
9  Q    I have just put in front of you what we have
10 previously marked as Christiana Care Health Services,
11 Department of Obstetrics and Gynecology, Residency Review
12 Committee. And the date is June 16th, 2003.
13      Take a look at the second page. If you could
14 read for me the first block where it says, 6.2, Oral Boards?
15 A    **Yes.**
16 Q    That rectangle box. Could you read that aloud for
17 me?
18 A    **The PGY2's took their mock oral boards on May 2nd.**
19 **Three of the people giving the oral boards were not**
20 **associated with this program, which allowed for an equal**
21 **across the board evaluation for all the residents. Kersh**
22 **and Heinle scored above average. Kirifides at or above**
23 **average. Zechman at or below average.**
24 Q    It indicates in here that three of the four people

Page 25

1  giving the oral board were not associated with this program.
2  Based on that statement, would it be fair to assume that
3  there were at least four people administering the exam?
4  A    **Yes.**
5  Q    And we have already mentioned Patrice Weiss and
6  Dr. Hoffman?
7  A    **Yes.**
8  Q    Dr. Hoffman is associated with the program, right?
9  A    **Yes, he is.**
10 Q    And Weiss is not associated with the program?
11 A    **That is correct.**
12 Q    So is it fair to say that there are at least three
13 others that are not associated with the program?
14      MR. BLOOM: Objection to the form. You can
15 answer it.
16      THE WITNESS: No, at least two others that are
17 not associated.
18      MS. BREWINGTON: You're right. My math.
19 BY MS. BREWINGTON:
20 Q    So Dr. Weiss is not associated with the program?
21 A    **Correct.**
22 Q    And then two others that are not associated?
23 A    **Correct.**
24 Q    And Dr. Hoffman that is?

**B-0287**

7 (Pages 22 to 25)

Zechman
Lamar Ekbladh, M.D.

v.
C.A. # 05-159 (JJF)

Christiana Care Health Systems
August 2, 2006

Page 26

1 **A   Yes.**
2          MS. BREWINGTON:  At this time, I'd like to put
3  on the record a formal document request for the two other
4  oral board evaluations of those that gave the oral boards I
5  believe in May, May 2nd.
6          MR. BLOOM:  Just put the request in writing and
7  we'll respond to it.
8          MS. BREWINGTON:  Sure.  Thank you.
9  BY MS. BREWINGTON:
10  Q   Did you attend this Residency Review Committee
11  meeting?
12  **A   Yes, I did.**
13  Q   And there was some discussion about Dr. Zechman; is
14  that accurate?
15  **A   That is correct.**
16  Q   Tell me what was discussed in this Residency Review
17  Committee meeting with respect to Dr. Zechman?
18  **A   Specifics of the discussion, I certainly don't**
19  **remember all the specifics, but what we would have discussed**
20  **were a composite of her evaluations and performance.**
21  Q   And do you recall how Dr. Zechman was doing as of
22  June of 2003?
23          MR. BLOOM:  You mean other than what's
24  reflected in this document?

Page 27

1          MS. BREWINGTON:  I mean anything.  If it's
2  reflected in this document.
3          THE WITNESS:  I'm sorry.  I don't understand.
4  BY MS. BREWINGTON:
5  Q   You can certainly rely on this document if it helps
6  to refresh your recollection.
7          And my question is, what do you recall about
8  Dr. Zechman's performance at this time in June of 2003?
9  **A   My recollection was that it was in general by most**
10  **people not to be progressing at the rate that we would**
11  **anticipate.**
12  Q   It also indicates here that there are questions or
13  concerns about her ability to complete the program and
14  concerns about her fitting in with the upcoming second
15  years.
16          What was the concern with respect to fitting in
17  with the second years?
18  **A   I don't remember specifically.**
19  Q   Now, in June of 2003, she would have been -- I guess
20  that's when you get ready to go into your third year?
21  **A   It would be going into the third year in July of**
22  **2003, yes.**
23  Q   July of 2003.
24          So at the time in June 2003, there was a

Page 28

1  concern by the Residency Review Committee that she wouldn't
2  fit in with the second years that were coming into the
3  program, coming into the second year?
4  **A   My reading of this is that the upcoming second**
5  **years.**
6  Q   Okay.  And at the end of this meeting, there was a
7  decision to offer her a second year contract with a novel
8  curriculum and to review her at three and six months, is
9  that correct?
10  **A   Yes.**
11  Q   Do you recall what this novel curriculum would
12  entail?
13  **A   I do not remember all the details.  But those that I**
14  **recall is that she was to work more closely with specific**
15  **attendings.**
16  Q   Do you recall anything else?
17  **A   Specifically, no.**
18  Q   Anything generally that you recall?
19  **A   That she would be monitored closely to ensure that**
20  **she was progressing.**
21  Q   Now, monitored closely, would that be by the
22  attendings?
23  **A   It would be by the attendings and by the program**
24  **director.**

Page 29

1  Q   How about the chief residents?
2  **A   And the chief residents.**
3  Q   How about the nurses?
4  **A   Not specifically.**
5  Q   When you say monitored closely, what exactly do you
6  mean?
7  **A   That we would check in with her about her**
8  **performance on a regular basis.**
9  Q   Okay.  And what would be the purpose of re-reviewing
10  her in three months and then at six months?  Do you
11  understand the question?
12  **A   I understand the question.  The purpose would be to**
13  **evaluate her progress.**
14  Q   And after evaluating the progress, then you would
15  what?
16  **A   Make a decision as to whether the progress was**
17  **appropriate or not.**
18  Q   And you would then tailor her program in a different
19  way?
20  **A   The program might be tailored or other decisions**
21  **about her continuing in the program might be made.**
22  Q   Like what?
23  **A   Including dismissal.**
24  Q   And in three months, that would have been September

8 (Pages 26 to 29)

Zechman                                    v.                    Christiana Care Health Systems
Lamar Ekbladh, M.D.              C.A. # 05-159 (JJF)                        August 2, 2006

Page 30

1 and December, is that correct?
2 **A   Yes.**
3 Q   Of 2003?
4 **A   Yes.**
5 Q   Okay.  You can put that aside.
6        Did you have discussions with Dr. Zechman about
7 the call room?
8 **A   I vaguely remember discussions about the call room,**
9 **yes.**
10 Q   Did Dr. Zechman have concerns about the call room?
11 **A   From what I remember, she felt she was being not**
12 **given an appropriate call room.**
13 Q   Do you know why?
14 **A   I believe she felt that she should have the third**
15 **year on call room.**
16 Q   And what was your feeling on that?
17 **A   That she was, indeed, part of the second year class**
18 **and would share the call room with the second year call**
19 **room.**
20 Q   Now, how many residents are in the second year
21 program?
22 **A   I'm sorry?**
23 Q   How many residents are second years?  Is it four?
24 **A   It's usually four, yes.**

Page 31

1 Q   Do you recall how many there were when Dr. Zechman
2 was --
3 **A   When she was repeating her second year, there would**
4 **be five in that year.**
5 Q   Including Dr. Zechman?
6 **A   Including Dr. Zechman, yes.**
7 Q   And what exactly is in a call room?
8 **A   A bed, a desk and some places to keep books.**
9 Q   And that's the area that the residents use whenever
10 they are at the hospital?
11 **A   Whenever they are on call, yes.**
12 Q   And in Dr. Zechman's second year call room, there
13 would be four sets of like four beds?
14 **A   No.  No.  There would be one bed.  Because there**
15 **would only be one -- only necessary for one person to sleep**
16 **there at any given time.**
17 Q   So what would happen when Dr. Zechman would be on
18 call and another second year resident would be on call?
19 **A   At that point, she would be able to use the third**
20 **year on call room.**
21 Q   When did you tell her that she could use the third
22 year?
23 **A   I don't remember specifically.  But it was probably**
24 **around the time of her concern.**

Page 32

1 Q   So she brought a concern to you, like where shall I
2 put my things, and then you said what?
3 **A   My recollection is that the response was that her**
4 **formal place would be in the second year on call room, that**
5 **she could use the other on call room if she were the**
6 **second -- second year on call on any given night.**
7 Q   Okay.  And would that basically always ensure that
8 she had someplace to be?
9 **A   Yes.**
10 Q   And was she okay with using the third year call
11 room?
12 **A   I cannot attest for how she felt about it.**
13 Q   She didn't respond to you in any way?
14 **A   No.**
15        (Ekbladh Deposition Exhibit No. 5 was marked
16 for identification.)
17 BY MS. BREWINGTON:
18 Q   Can you take a look at this document, Ekbladh 5?  On
19 the top, it says note, June 25th, 2003.  And at the bottom,
20 it's typed Dr. Ekbladh.  Is this your statement or a note?
21 **A   It's a note.**
22 Q   Okay.
23 **A   About a discussion.**
24 Q   Do you normally take notes on your discussions with

Page 33

1 residents?
2 **A   Usually, yes.**
3 Q   And would that be each and every time you meet with
4 the resident?
5 **A   Any time I met with the resident, where I felt the**
6 **conversation was of a significant concern, you know, and**
7 **warranted a note.**
8 Q   Okay.  Did you feel that your discussion with her on
9 June 25th was of a significant concern?
10 **A   Yes, it was a concern to her.  Therefore, it was a**
11 **concern.**
12 Q   Okay.  Tell me about your conversation with her on
13 June 25th, 2003?
14 **A   Other than what I have written here, my recollection**
15 **is what I mentioned to you before about our discussion and**
16 **what is noted here.**
17 Q   Okay.  Well, have you had an opportunity to read it?
18 **A   Um-hmm.  Yes.**
19 Q   Did you type this?
20 **A   I probably did not type this myself, no.**
21 Q   So did you write the note?
22 **A   I probably dictated the note.**
23 Q   And then someone else typed it?
24 **A   Yes.**

**B-0289**

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Zechman
Lamar Ekbladh, M.D.

v.
C.A. # 05-159 (JJF)

Christiana Care Health Systems
August 2, 2006

Page 34

1  Q   Is the first part of this note consistent with what
2  you were telling me earlier about the third call room versus
3  the second call room?
4  A   I believe it is.
5  Q   And during this conversation on June 25th, 2003, did
6  you also discuss her repeating her second year?
7  A   Yes.
8  Q   Do you recall what exactly you discussed about that?
9  A   Specifically, no.
10 Q   How about based on your review of your note?
11 A   Other than what that first part of the year would
12 be, we discussed that apparently that she would work hard,
13 that her success or failure was in her hands, that she would
14 be reviewed again.  And at that point, another determination
15 of her progress would be made.  We then discussed the role
16 of the attending on any service in designing, you know, in
17 helping her with her program.
18 Q   At this conversation, did she discuss concerns with
19 you about being pulled from her rotations for other
20 opportunities?
21 A   Yes.
22 Q   What exactly was she talking about there?
23 A   At any given time, obviously in any medical service,
24 and especially in an obstetrical service, the day is very

Page 35

1  difficult to specifically plan.  And there may be times when
2  reallocation of residents may need to be made, where they
3  will help out, where they will be at any given time.  And
4  this reflected that.
5  Q   It reflected --
6  A   The fact that at any given time she or any other
7  resident may need to be somewhere else other than where it
8  was specifically planned for them to be.
9  Q   So would an example of that be where she was
10 assigned to surgery and then had to be in triage?
11 A   That could be a possibility, yes.
12 Q   Is there any other possibility?
13 A   There could be lots of other possibilities.
14 Q   Give me a couple of possibilities?
15 A   Because I'm trying to understand how it works in the
16 hospital.  And I really don't know.  And that's the only
17 thing that came to my head, that being assigned specifically
18 to surgery, then having to be in perhaps triage.  I think
19 the chief resident and/or the attending together, their
20 responsibility for any given day is to be sure that care is
21 given appropriately in all areas in which we give care,
22 which are multiple.
23 Q   Okay.
24 A   I'll probably give -- the simplest example may be

Page 36

1  labor and delivery, where if you all of a sudden have three
2  deliveries going on at the same time and a Cesarean section
3  that needs to be done, you need to look for the people who
4  are available, you know, in something which is not, you
5  know, specifically committed to come and be able to help for
6  those periods of time.
7  Q   And was Dr. Zechman's concern that she was -- was it
8  her concern that she was being pulled from certain things to
9  do other things?
10 A   That appears to be her concern, yes.
11 Q   And did you talk with her about that in this
12 meeting?
13 A   Yes.
14 Q   And how did you respond to her?
15 A   That it would be up to -- you know, ultimately, the
16 attending on service.  I mean usually it is the chief
17 resident but ultimately the attending on service to decide
18 where the most appropriate place for any resident to be at
19 any given time.
20 Q   And Dr. Gray was one of the chief residents, is that
21 correct?
22 A   That is correct.
23 Q   So would she play a role in determining where
24 Dr. Zechman would be at any given time?

Page 37

1  A   She may, yes.
2  Q   Okay.  You also indicate in this note that the first
3  six weeks is an intensive review by specific attendings who
4  will report each week on her progress.
5       Did the attendings submit evaluations?
6  A   They would either submit written evaluations or
7  verbal comments.
8  Q   Now, these written evaluations, who would they
9  submit them to?
10 A   They would be submitted to Sandi Kardos and then to
11 me at this particular time.
12 Q   Because you were the director?
13 A   At that time, yes.
14 Q   How about the verbals?  Who would they discuss this
15 with?
16 A   The verbals would usually be with me.
17 Q   Did you take notes on these verbal evaluations?
18 A   Not always.
19 Q   Sometimes?
20 A   Sometimes.  And they would be noted and dictated.
21 Q   So not always but sometimes?
22 A   Yes.
23 Q   Verbal evaluations.  Okay.
24      And what was the feedback that you were

**B-0290**

10 (Pages 34 to 37)

Zechman
Lamar Ekbladh, M.D.

v.
C.A. # 05-159 (JJF)

Christiana Care Health Systems
August 2, 2006

---

Page 38

1   getting?
2   A   I don't remember specifically.
3   Q   Do you remember --
4   A   No.
5   Q   Do you remember in general?
6   A   In general, it was continued concern about her
7   progress.
8   Q   Were there any positive evaluations?
9   A   I'm sure there were some positives in there.
10  Q   Is it your opinion that the negatives outweighed the
11  positives?
12  A   At this time, we weren't making an evaluation.  But
13  there seems to be more negatives than positives.
14  Q   What do you mean by we weren't making an evaluation?
15  A   Until we come back to the Residency Review Committee
16  where everything can be reviewed altogether.
17  Q   I see.  Okay.
18          So in June, you weren't really making an
19  evaluation?
20  A   I was not specifically evaluating her.
21  Q   So the next Residency Review Committee --
22  A   Would be the formal.
23  Q   Okay.  You can put that aside.
24          MS. BREWINGTON:  Let's have that marked.

---

Page 39

1          (Ekbladh Deposition Exhibit No. 6 was marked
2   for identification.)
3   BY MS. BREWINGTON:
4   Q   This document is titled, Request for Disability
5   Accommodation.  And the date at the top is July 24th, 2003.
6          Have you ever seen this document before?
7   A   Yes.
8   Q   Can you tell me when?
9   A   As submitted by my attorney for review.
10  Q   Is that the first time you saw it?
11  A   Yes.
12  Q   The accommodation requested in July of 2003 was
13  additional days off for long rest breaks with scheduled time
14  off.
15          Is that accurate what I have read?
16  A   Additional days off for longer rest breaks with
17  scheduled -- yeah, that looks like that's what it says.
18  Q   And the second page, at the bottom, it says, request
19  for accommodation forms should be returned to Employee
20  Health Services.  And then it provides a fax number,
21  733-1890.  Do you see that?
22  A   Yes.
23  Q   Is that your fax number?
24  A   No, it is not.

---

Page 40

1   Q   Is that the fax number to Employee Health Services?
2   A   I cannot specifically state whether it is or is not.
3   Q   But what you do know is that it's not your fax
4   number?
5   A   Yes.
6   Q   Did you receive any information from anyone at
7   Employee Health that this form was completed?
8   A   I don't remember receiving any specific information
9   to that effect.
10  Q   And when you say specific information, do you mean
11  no information at all?
12  A   I don't remember anybody -- I do not remember
13  anybody telling me that this form had been completed.
14  Q   Do you know whether this request for disability
15  accommodation was ever considered?
16  A   I'm sorry?
17  Q   Do you know whether this request for disability
18  accommodation was ever considered by Christiana Care?
19  A   My assumption is it was considered because it was
20  submitted.  So it was considered, yes.
21  Q   It was considered.
22          And when you say it was considered, do you mean
23  it was considered by Employee Health?
24  A   Yes.

---

Page 41

1   Q   I may have asked you this.  And I think what I asked
2   you is, did anyone contact you from Employee Health
3   Services.  Did you receive any conversation from anybody
4   from Employee Health Services regarding this request for
5   disability accommodation?
6   A   No.
7          MS. BREWINGTON:  Mark this as Ekbladh 7.
8          (Ekbladh Deposition Exhibit No. 7 was marked
9   for identification.)
10  BY MS. BREWINGTON:
11  Q   This is a letter from Dr. Zechman to you and it's
12  dated July 23rd, 20003.
13          Did you ever receive this letter?
14  A   Yes.
15  Q   Do you know when you received it?
16  A   I don't remember exactly when.
17  Q   The date of it is July 23rd, 2003.  Do you know
18  whether you received it near that date?
19  A   I don't remember the specific date that I received
20  it.
21  Q   Did you receive it from Dr. Zechman?
22  A   Yes.
23  Q   So this is not something that you received and
24  reviewed later on, like with your attorney or something like

**B-0291**

---

Zechman
Lamar Ekbladh, M.D.

v.
C.A. # 05-159 (JJF)

Christiana Care Health Systems
August 2, 2006

Page 42

1  that?
2          MR. BLOOM: I'm going to object to the question
3  to the extent it seeks to probe communications with counsel.
4          MS. BREWINGTON: I apologize. Let me clarify
5  it.
6  BY MS. BREWINGTON:
7  Q   I guess what I'm trying to understand is, I have
8  given you previous documents and you said you reviewed them
9  with your attorney. I guess I just want to clarify whether
10 this document you received contemporaneously with the date
11 of July 23rd, 2003?
12 A   I received this document somewhere in the vicinity
13 of that time frame.
14 Q   Okay. Thank you.
15         In this letter to you, is it fair to say that
16 she is requesting additional time off for her disability?
17 A   Yes.
18 Q   And specifically, she requested two periods of 72
19 hour breaks in a four week cycle.
20         And I guess my question is, the normal four
21 week schedule, do you get one weekend off?
22 A   I don't remember the schedules exactly.
23 Q   Okay. But is it fair to say --
24 A   It's fair to say that that is like --

Page 43

1  Q   Go ahead.
2  A   That is likely.
3  Q   And as I read this, as I understood it to be, she
4  was requesting an additional day off besides that one
5  weekend. So she would have Saturday and Sunday off and then
6  she requested either a Monday or a Friday; is that accurate?
7          MR. BLOOM: Objection to the form of the
8  question.
9          THE WITNESS: That could be the inference from
10 the request.
11 BY MS. BREWINGTON:
12 Q   What is your understanding of Dr. Zechman's letter?
13 A   My understanding is, is literally exactly the way
14 she wrote it, looking for a three day break, you know,
15 around a weekend twice in four weeks.
16 Q   Did you respond to this request?
17 A   It is my recollection that we discussed it.
18 Q   So you discussed it at a meeting with her?
19 A   I believe so.
20 Q   But you don't recall writing anything to her?
21 A   That is correct.
22 Q   Did you discuss this request with anyone?
23 A   I don't remember specifically.
24         MR. BLOOM: I'm just going to interpose an

Page 44

1  objection. The last question, do you mean did he discuss it
2  with anyone else at Christiana Care?
3          MS. BREWINGTON: Yes. We can phrase it that
4  way. But anyone is the question.
5  BY MS. BREWINGTON:
6  Q   Did you discuss it with anyone?
7  A   It is likely. I don't remember with whom.
8  Q   What were your thoughts about her request for a
9  change in her schedule?
10 A   I thought these were some things which we could look
11 at and consider, you know, at that time.
12 Q   Did you feel as if her request was something that
13 could be arranged?
14 A   It would be a challenge but it could be arranged.
15 Q   And who would take part in trying to rearrange the
16 schedule? Would this be something that you would do as the
17 director or would there be --
18 A   We would look to the chief residents because it
19 would involve everybody's schedule.
20 Q   And the chief residents were in charge of making
21 everyone's schedule?
22 A   Of creating their own schedule, yes.
23         MS. BREWINGTON: Eight.
24         (Ekbladh Deposition Exhibit No. 8 was marked

Page 45

1  for identification.)
2  BY MS. BREWINGTON:
3  Q   Please review that document that I have placed in
4  front of you labeled Ekbladh 8.
5          The first one is dated July 28, 2003. The
6  first document. And then the second one is dated August 6,
7  2003.
8          What is the document that I put in front of
9  you?
10 A   The first is a document from the ACGME about a
11 complaint against the program. And the second is a response
12 to the complaint.
13 Q   And the response to the complaint was written by
14 you, is that correct?
15 A   It was written over my signature, yes.
16 Q   Who wrote it?
17 A   Well, we usually get together with the people
18 involved with the program so that we know everything that's
19 going on. But basically I wrote the response. But we have
20 input from the coordinator from people who take calls.
21 Q   Did you have input from the committee?
22 A   The committee would be involved, yes.
23 Q   And what was your understanding of the complaint
24 that was filed with the ACGME?

B-0292

12 (Pages 42 to 45)

Zechman
Lamar Ekbladh, M.D.

v.
C.A. # 05-159 (JJF)

Christiana Care Health Systems
August 2, 2006

Page 46

1    A   Specifically, you know, as they say here. Would you
2    like me to read each of the complaints? Because my
3    understanding is only that of what was communicated by the
4    ACGME.
5    Q   Okay. Well, you can either tell me what you recall
6    or, if you have to rely solely on the document, you
7    certainly can.
8        MR. BLOOM: I think the witness has indicated
9    that his knowledge and understanding of the complaint is
10   what the document says.
11       MS. BREWINGTON: Then we can certainly read it
12   into the record.
13       MR. BLOOM: All right. The document is in the
14   record. Do you want him to read the entire document?
15       MS. BREWINGTON: Certainly. Maybe it will
16   refresh his recollection.
17       MR. BLOOM: Okay.
18       MS. BREWINGTON: I mean if we have to go
19   document by document, we certainly will.
20       THE WITNESS: It is alleged that for evenings,
21   weekends and holidays, a junior resident is the only
22   physician in-house. There is no direct supervision by an
23   attending. The majority are private patients, and residents
24   see these patients alone. They evaluate and treat the

Page 47

1    patients with only telephone guidance from the attending who
2    never sees the patient.
3    BY MS. BREWINGTON:
4    Q   Okay. The next one?
5    A   It is alleged that residents are used for service
6    and that the program has failed to provide the training
7    needed to advance their surgical skills. Allegedly, junior
8    residents spend much of the year in OB/GYN triage. The
9    triage is a high volume area and residents treat 30 to 40
10   private patients within a 12 hour shift. Residents are
11   pulled from the GYN rotation to fill in at OB/triage or L&D.
12       Residents view themselves as unsupervised slave
13   laborers for the private physicians. It is alleged that the
14   residents write daily notes on the private patients who are
15   not seen by their physician. If they do not complete the
16   notes, they stay beyond normal duty hours to complete the
17   task or else suffer harassment by the private doctors.
18   Q   Okay. Now, as to this first allegation. How did
19   you respond?
20   A   My response is as written under the response to
21   allegation number one.
22   Q   Do you recall, without reading this, anything that
23   you responded?
24   A   I responded that we do have a 24 hour attending in

Page 48

1    the house at all times and is always available for
2    consultation by the residents who are on call. There are
3    private patients that are seen by the residents, that when
4    they are seen, they call the private attending; and, if it
5    is a complicated problem or if the patient needs to be
6    admitted, the attending would come in and see the patient.
7    If it is something that they felt that they have dealt with
8    appropriately over the phone, the patient might be let go
9    home.
10   Q   How about the second allegation, that residents are
11   used for service and that the program has failed to provide
12   the training needed to advance their surgical skills?
13   A   I just reviewed, I believe, in the response and I
14   would, you know, refer to the response in allegation number
15   two. If you would like me to read it, I will.
16   Q   Well, I guess my question is to you, and you can
17   certainly rely on the writing, but there was an allegation
18   made that residents are used for services and that the
19   program has failed to provide the training needed to advance
20   these skills.
21       How do you respond to that as the director?
22   A   I disagree.
23   Q   Okay. And in what way do you disagree?
24   A   By reviewing the fact that, as in paragraph one,

Page 49

1    that the program has been very careful to be sure that there
2    is an educational component to the service that is provided.
3    The majority of the residents who come to this program, come
4    to this program because of the reputation it has for
5    teaching surgical skills. We have an excellent surgical
6    teaching faculty and the volume ensures a comprehensive
7    education for all operative procedures and surgical skills
8    that graduating residents will need.
9    Q   And it was also alleged, the third allegation was
10   that residents view themselves as unsupervised slave
11   laborers.
12       As the director of the program, how did you or
13   how would you respond to that?
14   A   I will read my response. Residents are asked to do
15   post-operative or post-delivery notes only on patients upon
16   which they have operated or done the delivery. Residents
17   have no care responsibility for the bulk of private
18   obstetrical patients with whom they have had no contact.
19   Their attending physician sees all of the patients admitted
20   to the hospital at least daily and this has been not been a
21   problem or a concern for any of our attending physicians. I
22   am not aware of any harassment by our private physicians of
23   residents to get them to write progress or discharge notes
24   on patients the residents have not cared for.

13 (Pages 46 to 49)

Zechman        v.        Christiana Care Health Systems
Lamar Ekbladh, M.D.     C.A. # 05-159 (JJF)     August 2, 2006

Page 50

1   Q   Now, did you receive a response from the ACGME?
2   A   **No, we did not.**
3   Q   Were you going to say something else?
4   A   **No.**
5   Q   Okay. Did you receive a document or anything from
6   any source concerning these allegations?
7   A   **Other than this document, that's the only one I**
8   **have.**
9   Q   And when did you first become aware that someone had
10  filed a complaint with the ACGME?
11  A   **When I got this document.**
12  Q   So that date is --
13  A   **Received August 4th, 2003.**
14  Q   And is it fair to say that you were aware that the
15  complaint was made by a resident?
16  A   **All we become aware of is that a complaint was made.**
17  **I can see exactly what was written in the complaint. It is**
18  **just that a complaint was made. Whether it was made by a**
19  **resident or an attending.**
20  Q   So you were not aware that it was made by a
21  resident?
22  A   **We were not made aware specifically by whom it was**
23  **made, no.**
24  Q   Did you know that it was Dr. Zechman?

Page 51

1         MR. BLOOM: I'm going to object to the form.
2   Do you mean at the time or now?
3         MS. BREWINGTON: I'm going to ask him now.
4   See, what I want to ask him is, did he know that it was
5   Dr. Zechman.
6   BY MS. BREWINGTON:
7   Q   And what's your answer?
8         MR. BLOOM: Same objection. You can answer.
9         THE WITNESS: No. At the time I received this
10  document, I was not aware that it was Dr. Zechman.
11  BY MS. BREWINGTON:
12  Q   At any time, did you become aware that it was
13  Dr. Zechman?
14  A   **Only in some of the papers that I have had a chance**
15  **to review where Dr. Zechman specifically states that she**
16  **made a complaint to the ACGME.**
17        MR. BLOOM: Just to clarify for the record.
18  When you say you reviewed documents that you just referred
19  to, do you mean documents that you reviewed within the last
20  few months of 2006?
21        THE WITNESS: Yes.
22        MR. BLOOM: Okay.
23        MS. BREWINGTON: And I'm going to put a
24  statement on the record that you'll certainly have your

Page 52

1   chance to ask him questions.
2   BY MS. BREWINGTON:
3   Q   Do you know that ACGME issued a decision or a
4   finding on the allegations?
5   A   **I have had no direct communication from ACGME on**
6   **their findings.**
7   Q   Do you have any indirect communication, any
8   knowledge of anything?
9   A   **Indirect knowledge would be that our program was**
10  **totally reviewed in 2004 and there were no references to any**
11  **concerns about the program as raised in this complaint.**
12  Q   Were there other concerns about the program?
13  A   **Yes.**
14  Q   Like what?
15  A   **Numbers of procedures within specific areas and the**
16  **recording of those numbers.**
17  Q   Numbers of procedures in certain areas; is that what
18  you're saying?
19  A   **Yes.**
20  Q   What do you mean by that?
21  A   **The total number reported by the residents within**
22  **areas -- within areas that they are supposed to report**
23  **numbers of. Of which they are supposed to report numbers.**
24  Q   I don't understand.

Page 53

1   A   **I would have to look at the report of that review to**
2   **tell you specifically.**
3   Q   Well, are you saying that the numbers, that the
4   residents' numbers were too high or something? Is that what
5   you're saying?
6   A   **The numbers can either reflect too high, too low or**
7   **differential reporting by residents of their numbers.**
8   Q   And basically the numbers should be at a certain
9   standard?
10  A   **There is no standard set for the numbers.**
11  Q   But there was a concern by the ACGME about that?
12  A   **Pardon?**
13  Q   Was there a concern by the ACGME about that, the
14  numbers?
15  A   **About some numbers as reported, yes.**
16        **(Ekbladh Deposition Exhibit No. 9 was marked**
17  **for identification.)**
18  BY MS. BREWINGTON:
19  Q   I have just put in front of you what's previously
20  been marked as Ekbladh 9. It is an e-mail from Dr. Zechman
21  to you. It's dated July 26th, 2003. And the subject is,
22  Update with Dr. Gray as chief resident.
23        If you could please review that document and
24  let me know when you're finished.

14 (Pages 50 to 53)

Zechman
Lamar Ekbladh, M.D.

v.

C.A. # 05-159 (JJF)

Christiana Care Health Systems
August 2, 2006

Page 54

1    Do you recall receiving this e-mail?
2  A  Yes.
3  Q  Did Dr. Zechman have concerns about Dr. Gray as the
4  chief resident?
5  A  She expresses some of them here, yes.
6  Q  And what was your understanding of her concerns?
7  A  As expressed here, that Dr. Gray was not allowing
8  her to make independent decisions.
9  Q  And did you respond to Dr. Zechman about her concern
10  that she wasn't allowing her to make independent decisions?
11  A  I do not remember specifically.
12  Q  Do you know whether you talked with Dr. Gray about
13  Dr. Zechman's concerns?
14  A  Specifically related to this?  I do not remember.
15  Q  Well, how about related to anything with respect to
16  Dr. Zechman?
17  A  Yes.  Dr. Gray.  I had conversations with Dr. Gray.
18  Q  Specifically with respect to Dr. Zechman?
19  A  Yes.
20  Q  And what were some of the topics of discussion?
21  A  Dr. Gray's concerns were her concern about
22  Dr. Zechman being able to make decisions and her progress
23  through the program.
24  Q  How often did you talk with Dr. Gray about this?

Page 55

1  A  I don't remember.
2  Q  Would you consider it like several times?
3  A  Over the course of a few months, it was probably
4  several times.
5  Q  Several times?  I didn't hear you.
6  A  Several times, yes.
7  Q  In this e-mail, Dr. Zechman alleges that Dr. Gray
8  has asked a nurse, Lisa Dempsey, to call her whenever there
9  are any patient care issues.  Do you see where it says that?
10  Is that something that Dr. Gray should be doing?
11  A  If Dr. Gray has concerns about any resident and
12  their patient care, it is something that she might ask.
13  Q  And that's entirely proper?
14  A  It's entirely proper.
15  Q  And did you tell Dr. Zechman that?
16  A  I don't remember specifically.
17  Q  Dr. Zechman also indicates in this e-mail that she
18  was left relieving triage rather than being allowed to go to
19  the OR on a possible perforation on a patient that
20  Dr. Kaminski and she saw in clinic the day before.
21    Is that a concern to you?
22    MR. BLOOM:  Objection to the form.  You can
23  answer it, if you can.
24    THE WITNESS:  No.

Page 56

1  BY MS. BREWINGTON:
2  Q  Tell me why not?
3  A  Because it is up to the team involved in the care at
4  any given time to decide who is the most appropriate to
5  assist or to cover what areas.
6  Q  And the team would be the chief resident and the
7  attending?
8  A  And the attending, yes.
9  Q  Do you think that it was determined by the chief and
10  the attending physicians that Dr. Zechman wasn't the most
11  qualified to do the surgery?
12    MR. BLOOM:  Objection to the form.  You can
13  answer it.
14    THE WITNESS:  I cannot specifically state what
15  they used to make that decision.  Could that be one of the
16  items used in making the -- it could be one of the things
17  used in making a decision.
18  BY MS. BREWINGTON:
19  Q  What are some of the other things that would be used
20  in making the decision to remove her from OR?
21  A  If they expected this to be a very complicated case
22  where they needed a more experienced resident for
23  assistance, if they felt that the -- another resident needed
24  experience doing that as much as -- another resident needed

Page 57

1  the experience as much as Dr. Zechman did.
2  Q  Do you know whether or not Dr. Zechman was pulled
3  away from surgery more than other residents?
4  A  I cannot specifically say whether she was or was
5  not.
6  Q  Was that a concern that she brought to your
7  attention?
8  A  Yes.
9  Q  Did you look into that?
10  A  We could not identify that she was being changed any
11  more than anybody else was in the daily changing of the
12  schedule.
13  Q  Okay.  So you looked into it and determined that she
14  wasn't being changed more than others?
15  A  We did not feel she was being changed more than
16  anybody else was.
17  Q  And when you say we, is that yourself and someone
18  else?
19  A  It might be myself, Dr. Patruno, other people
20  involved with deciding schedules, the chief residents.
21  Q  Did Dr. Kaminski ever send you an e-mail or somehow
22  express his concern to you that Dr. Zechman was being
23  transferred from surgery into another area?
24  A  I don't recall.

B-0295

15 (Pages 54 to 57)

Zechman
Lamar Ekbladh, M.D.

v.

C.A. # 05-159 (JJF)

Christiana Care Health Systems
August 2, 2006

Page 58

1    (Ekbladh Deposition Exhibit No. 10 was marked
2 for identification.)
3 BY MS. BREWINGTON:
4    Q    Please review the document that I put in front of
5 you, Ekbladh 10. It's an e-mail. It's to you. And I'm not
6 sure who it's from. But it's cc'd to Sandi Kardos. And the
7 subject is, requested this in writing. And the first
8 sentence is, as per our conversation and my conversation
9 with Dr. Ekbladh, you are no longer required to take quizzes
10 that pertain to the chapters that are assigned to you each
11 week.
12    Is it fair to assume, based on this e-mail from
13 Sandi Kardos, that you had a conversation with her with
14 respect to quizzes?
15    A    Yes.
16    Q    What were these quizzes?
17    A    These were prepared quizzes on chapters that were
18 prepared by the attending physicians.
19    Q    Okay. Was this something that only Dr. Zechman had
20 to do?
21    A    That Dr. Zechman did. I do not remember if there
22 were any other residents who were being asked to do that at
23 that time.
24    Q    Who asked her to do that?

Page 59

1    A    That would be as part of the special attention given
2 to her during this period of time to help her improve.
3    Q    And why was she no longer required to do it at this
4 time?
5    A    I do not remember specifically. It may have been
6 that her performance was satisfactory on these. Although
7 she could still do it, it wasn't required.
8    (Ekbladh Deposition Exhibit No. 11 was marked
9 for identification.)
10 BY MS. BREWINGTON:
11    Q    Did you meet with Dr. Zechman on July 30th, 2003?
12    A    Apparently I did.
13    Q    And you say that because this document is dated July
14 30th, 2003?
15    A    Yes.
16    Q    And for the record, this document is labeled Ekbladh
17 11. Why don't you tell me what it is?
18    A    It's a document to Dr. Zechman telling her when we
19 were going to review her progress and to make her aware of
20 what the considerations would be at the time of that review.
21    Q    And specifically, is it fair to say it occurred on
22 July 30th, 2003, this meeting with her?
23    A    It would be fair to say.
24    Q    At this meeting with her, you advised her that there

Page 60

1 would be a mid quarter residency review meeting on August
2 18th, 2003, and the department was going to consider four
3 options. And the first one was proceed with mediation,
4 special PGY2 rotation. And is that what she was doing
5 currently?
6    A    That's what she was doing.
7    Q    The second option was mainstream into PGY2 position?
8    A    Correct.
9    Q    And that would be with the PGY2's but without doing
10 this special rotation?
11    A    That is correct.
12    Q    And the third one was termination from the program.
13 And then the fourth one was progress into PGY3 position?
14    A    Yes.
15    Q    The progression into the PGY3 position, would she
16 have been with the other PGY3's?
17    A    If that had been the decision at that time, yes.
18    Q    Is there a certain number of PGY3's that the school
19 can have?
20    A    We are approved for four per year.
21    Q    Okay.
22    A    We can't increase that number if the increase is due
23 to remediation, special programs and so forth.
24    Q    So you could have four plus Zechman, Dr. Zechman; is

Page 61

1 that what you're saying?
2    A    Yes.
3    Q    Is that based on like a rule?
4    A    The Residency Review Committee keeps us to four
5 unless the reason for the increase is for specific
6 education, remediation, of residents. That is why we were
7 able to have five in the second year.
8    Q    I see. Okay.
9    So is the same thing true that you could place
10 her with the threes?
11    A    If she had progressed through this, we would have
12 asked permission of the RRC, the main RRC, which would
13 usually give permission to bring her back into the year.
14    Q    You said the main RRC. Is there a different one
15 than the one --
16    A    There is our Residency Review Committee and then
17 there is the National Residency Review Committee.
18    Q    So you need to get permission from the National
19 Residency Review Committee to do that?
20    A    Yes.
21    Q    Did anyone look into getting this permission from
22 the Residency Review Committee, the National Residency
23 Review Committee?
24    A    You cannot ask for this permission in anticipation.

B-0296

16 (Pages 58 to 61)

Zechman
Lamar Ekbladh, M.D.

v.
C.A. # 05-159 (JJF)

Christiana Care Health Systems
August 2, 2006

Page 62

1  You can only ask if it is specifically requested.
2  Q   Do you recall anything else about the conversation
3  with Dr. Zechman other than what we have talked about?
4  A   No, ma'am.
5  Q   Do you have any recollection of any statements made
6  to you by Dr. Zechman at this meeting?
7  A   Specific statements, no. I believe her goal was to
8  progress into a PGY3 position. But other than that, any
9  specific parts of the discussion, I don't recall.
10      (Ekbladh Deposition Exhibit No. 12 was marked
11  for identification.)
12  BY MS. BREWINGTON:
13  Q   This is Ekbladh 12. This is an e-mail from
14  Dr. Zechman to you. It was sent out on August 1st, 2003.
15  The subject is regarding rounds and the importance is high.
16      Let me know when you have had an opportunity to
17  review it.
18  A   Okay.
19  Q   The bottom of the page is an e-mail from you to
20  Dr. Zechman. And it's dated Wednesday, July 23rd, 2003.
21  And the first part says, Ellen, I understand there are some
22  issues as to whether or not you should attend morning and/or
23  evening rounds.
24      What is your understanding of the issues with

Page 63

1  respect to the morning and evening rounds?
2  A   As I remember, the issue was at that time that Ellen
3  didn't want to necessarily attend those rounds but was being
4  asked to attend those rounds.
5  Q   Who was she being asked to attend the rounds by?
6  A   I don't remember specifically. It may be the chief
7  residents.
8  Q   It would either be the chief residents or the
9  attending?
10  A   Or the attending, yes.
11  Q   And did Dr. Zechman tell you why she didn't want to
12  attend?
13  A   Only as she progressed here. And I'm not sure there
14  is even a real reason, you know, listed here.
15  Q   Well, based on your review of the e-mail, what is
16  your understanding, if you have one, of why she didn't want
17  she should have to attend the morning and evening rounds?
18  A   The impression that I got was that it is not
19  required of all other residents who are not on the service.
20  So why should it be required of her.
21  Q   Is that a fair statement, that it wasn't required of
22  others?
23  A   That is a fair statement.
24  Q   And was it required of Dr. Zechman?

Page 64

1  A   Dr. Zechman was apparently asked to attend.
2  Q   Okay. And your basic response was that you're not
3  required to attend; is that fair to say?
4  A   That is correct.
5  Q   Then we have the e-mail at the top. And I guess the
6  e-mail at the top is her response to your e-mail at the
7  bottom?
8  A   It appears that that is such.
9  Q   What are these morning and evening rounds? Are they
10  like really early in the morning or really late at night?
11  A   They are usually at 6:00 o'clock in the morning and
12  at 6:00 o'clock at night. And the 6:00 o'clock in the
13  morning especially are teaching rounds. The evening rounds
14  are a combination of teaching and work rounds. Work rounds
15  basically for handoff so that the people that are on the day
16  let the people coming on at night know and teaching points
17  may be brought up about any specific patient.
18  Q   In this e-mail to you, Dr. Zechman expressed a
19  concern that she was being singled out. Do you see where it
20  says that?
21  A   I remember reading it. I don't see exactly where it
22  is. Yes, about the 6th or 7th line down.
23  Q   Yes.
24      What were your thoughts or what are your

Page 65

1  thoughts about her feelings of being singled out?
2      MR. BLOOM: Objection to the form. You can
3  answer it, if you can.
4      THE WITNESS: There were a lot of people trying
5  to get her extra educational opportunities, which we felt
6  she needed. And this would be an extra educational
7  opportunity that she had the ability to participate in,
8  although not required.
9      Why she felt singled out, I could only surmise
10  to say. I don't know why she felt singled out.
11  Q   Did you feel it was a valid concern of hers?
12  A   I could understand how she felt that way. I did not
13  feel it was a valid concern.
14  Q   And why did you understand how she felt?
15  A   Because she said she felt that way.
16  Q   And so you just automatically understood it?
17  A   Understand, when somebody is asked to do something,
18  which everybody else isn't asked, that you might feel like
19  you're singled out.
20  Q   Do you have any knowledge of whether or not it was
21  difficult for Dr. Zechman to attend the morning rounds?
22  A   I don't have any specific knowledge on that.
23  Q   She goes on in this e-mail to ask you to review the
24  call schedule because what was said to be the plan on paper

17 (Pages 62 to 65)

Page 66

1   was not enforced.
2        Do you see where it says that?  It's kind of
3   towards the bottom.  It's actually in the middle.
4   A  I do not believe that that is referring to the call
5   schedule but rather to her daily schedule.
6   Q  Okay.  Did you review her daily schedule?
7   A  Her schedule, I believe I did at that time.  And as
8   we discussed before, the attempt always was to adhere to the
9   schedule as much as possible.  But the daily changes might
10  require changes in that.
11  Q  Where it says, also, please review the August call
12  schedule, are we talking about her personal schedule?
13  A  You know, I don't remember specifically.
14  Q  Well, if we keep reading, it says, there are two
15  PGY2's, an off service intern and PGY3 and PGY4 on call.
16       If you kept reading that, would it be fair to
17  assume that it's not her personal schedule that we are
18  talking about?
19  A  Correct.  The assumption that I have from that, and
20  purely an assumption, is that she is saying there are too
21  many people on call.
22  Q  And did you say that you did review the call
23  schedule?
24  A  I usually, if asked to review the call schedule.

Page 67

1   And that would not be an unusual call schedule to have other
2   residents besides our own on it.
3        (Ekblaldh Deposition Exhibit No. 13 was marked
4   for identification.)
5   BY MS. BREWINGTON:
6   Q  What you have in front of you is Ekbladh 13.  What
7   is this document?
8   A  This is a document consisting of two notes of
9   apparent meetings with myself and Dr. Zechman on August 7th
10  and August 13th, 2003.
11  Q  So the August 7, 2003 note, the last sentence of
12  that says, I advised her that when we get the medical report
13  from her physician, we will take the next steps to look at
14  how we can potentially accommodate any medical handicaps?
15  A  Yes.
16  Q  Okay.  Do you know what medical report you're
17  referencing here?
18  A  It would be a medical report from her physician
19  relative to her disability condition.
20  Q  Would it be a form that Christiana Care has provided
21  or would it just be a report from a doctor?
22  A  It could be a separate report, it could be a form.
23  At that point, I'm not sure I was aware exactly how the
24  report would get there.

Page 68

1   Q  Was this report supposed to come to you?
2   A  I would want information from that physician, yes.
3   Q  Okay.  And it says when we get the medical report.
4   Do you mean Christiana Care or do you mean like the
5   residency program?
6   A  Both.
7   Q  Then the next note, August 13th, 2003.  Do you
8   recall whether or not at this point you had spoken with
9   Dr. Frazier, Dr. Zechman's doctor?
10  A  I don't specifically remember the timing.
11  Q  I'm going to jump out of order.
12       (Ekbladh Deposition Exhibit No. 14 was marked
13  for identification.)
14  BY MS. BREWINGTON:
15  Q  Take a look at these two documents that we are going
16  to have labeled together as Ekbladh 14.  Is that your
17  handwriting on that first page?
18  A  It appears to be.
19  Q  And it says Dr. David Frazier, 8-11-03, 1:45?
20  A  Yes.
21  Q  Is that the date that you talked to Dr. Frazier?
22  A  Apparently it was.
23  Q  And what exactly is the second document?
24  A  It is a dictated and formal note relating to the

Page 69

1   initial.
2   Q  So going back to Ekbladh 13.  Okay.  Is it fair to
3   say that, as of August 13th, 2003, you had talked to
4   Dr. Frazier about Dr. Zechman's disability?
5   A  Yes, it is.
6   Q  Tell me about this conversation with Dr. Frazier?
7   A  It was a conversation to inquire of what he felt her
8   problems were and confirmed that it was an unspecified
9   connective tissue disorder with intermittent flares.  And we
10  discussed what would be the best way for her to work within
11  the program given her connective tissue disorder.
12  Q  And in terms of the best way to handle this
13  connective tissue disorder, did Dr. Frazier give an opinion?
14  A  He expressed that, since it was intermittent and
15  unpredictable as to when it would flare, we should be
16  prepared to give her time off when these flares occurred.
17  Q  Okay.  How did you get in contact with Dr. Frazier?
18  A  By telephone.
19  Q  Let me be more specific.
20       Did Dr. Zechman ask you to call her doctor?
21  A  I do not remember when she specifically asked me to
22  call.  She knew we were going to be speaking to her
23  physician.  But I do not remember whether she specifically
24  asked me to call or not.

B-0298

18 (Pages 66 to 69)

Zechman
Lamar Ekbladh, M.D.

v.
C.A. # 05-159 (JJF)

Christiana Care Health Systems
August 2, 2006

Page 70

1  Q   Do you know whether she provided you with a
2  telephone number?
3  A   I know she provided us with a name and address. But
4  I do not recall whether she provided the telephone number or
5  not.
6  Q   Do you know whether she gave you permission to talk
7  to Dr. Frazier?
8  A   I do not remember.
9  Q   Do you know whether you told her you were going to
10  call Dr. Frazier?
11  A   I don't remember specifically.
12  Q   Do you know what prompted you to call Dr. Frazier?
13  A   Wanting to get information about the best way to
14  work with Helen with her medical issues.
15  Q   And is that based on the letter that she sent to you
16  about her medical disability or is that based on -- what is
17  it based on?
18  A   It was based on our interest in being able to
19  respond to her medical needs in an appropriate way given her
20  medical needs.
21  Q   Okay. I understand that. I guess my question is,
22  how did this come about, though? Like when I ask what
23  prompted you to call her doctor. We discussed the letter,
24  the July 23rd, 2003 letter, that she sent to you, or was it

Page 71

1  that she discussed her disability in a meeting with you.
2            MR. BLOOM: Objection. Asked and answered.
3  You can answer it again.
4            THE WITNESS: I don't remember the specific
5  thing. I'm sure the letter had some impact on wanting to
6  get that information. We did have discussions about her
7  medical issues. So they both probably impacted.
8  BY MS. BREWINGTON:
9  Q   You and Dr. Zechman had discussions?
10  A   Yes.
11  Q   We took Dr. Frazier's deposition last week. And
12  I'll represent to you that he testified that he spoke with
13  you and that he faxed the request for accommodation form to
14  Christiana Care on August 11th of 2003. Do you have any
15  knowledge of whether or not Christiana Care received that
16  document?
17  A   Only in the fact of the document that I previously
18  saw.
19  Q   Do you have any understanding whether or not, as of
20  August 13th, 2003, whether Christiana Care had received the
21  accommodation form?
22  A   On August 13th, I do not believe that I knew whether
23  they had or had not.
24  Q   Did you contact Employee Health to find out whether

Page 72

1  they had the form, had received the form?
2  A   I do not remember.
3  Q   When you talked with Dr. Frazier, did he tell you he
4  was going to fax the form?
5  A   I don't remember.
6  Q   Take a look at the second page of Ekbladh 14. That
7  one right there. In the last sentence, you write, at the
8  end of the conversation, he stated that his written report
9  would be faxed to us.
10  A   Apparently he did tell me.
11  Q   So he told you that after August 11th that he would
12  fax the form to you, or fax the form to us?
13  A   To the number, yes.
14  Q   Is it fair to say that the request for accommodation
15  form may have been faxed to Employee Health in or around
16  August 11th?
17  A   I believe so.
18  Q   Back to this one. It's 13. At the bottom of the
19  second note, the note dated August 13th, 2003. It says, I
20  expressed to her that she first needs to totally accept the
21  fact that she is repeating the second year and that, until
22  she does so, with or without help, the amount of stress she
23  feels will not disappear.
24            Okay. As of August 13, 2003, she was going to

Page 73

1  be repeating her second year, is that correct?
2  A   She was repeating her second year.
3  Q   She was in her second year?
4  A   Yes.
5  Q   And that's because it starts in July?
6  A   That is correct.
7            MS. BREWINGTON: This we're going to have
8  marked as 15.
9            (Ekbladh Deposition Exhibit No. 15 was marked
10  for identification.)
11  BY MS. BREWINGTON:
12  Q   I have just placed in front of you what has
13  previously been marked as Ekbladh 15. It's another e-mail.
14  It's from Dr. Zechman to Sandi Kardos. And you're cc'd on
15  it. And it's dated 8/11/2003. And the subject is gyn
16  rotation.
17            Do you recall receiving this e-mail?
18  A   I believe I do.
19  Q   Do you know whether or not you responded to this
20  e-mail?
21  A   I do not recall whether I responded or not.
22  Q   Do you know whether Sandy responded to this e-mail?
23  A   I don't know.
24  Q   Did you have any discussion with anyone concerning

19 (Pages 70 to 73)

Zechman                                  v.                    Christiana Care Health Systems
Lamar Ekbladh, M.D.             C.A. # 05-159 (JJF)                      August 2, 2006

Page 74

1   what Dr. Zechman brought to your attention?
2   A   I do not recall.
3   Q   Now, was it a concern to you that she wasn't listed
4   on the board for cases?
5        MR. BLOOM: Objection to the form of the
6   question. It assumes a fact to be true, which may not be
7   true. But subject to that, you can answer the question.
8        THE WITNESS: On any given day, the number of
9   cases that are available upon which the residents may
10  participate varies. On any given day, not every resident
11  gets a case to do. So on any given day, if a resident is
12  not assigned to a case, that would not be a major concern.
13  BY MS. BREWINGTON:
14  Q   And the assignment board, does that just give the
15  cases for that day?
16  A   That is correct.
17  Q   So this would have been the date of August 11th,
18  2003?
19  A   If the date on the e-mail is the same as the date
20  she is talking about looking at the board, yes.
21  Q   Dr. Zechman's last sentence on here is actually a
22  question. How am I supposed to improve my skills without
23  any cases.
24       Is it a fair statement that these surgical

Page 75

1   cases are necessary to improve the skills?
2   A   Repetition for technical skills is important.
3   Q   And this would include being assigned cases?
4   A   Yes.
5        (Ekbladh Deposition Exhibit No. 16 was marked
6   for identification.)
7   BY MS. BREWINGTON:
8   Q   I have just placed in front of you Ekbladh 16. It's
9   another Residency Review Committee meeting minutes, I
10  believe. It's dated August 18, 2003.
11       I just want you to take a look at it and let me
12  know when you're finished. Okay?
13  A   Um-hmm.
14  Q   At this meeting on August 18, 2003, a special
15  meeting or a special invitation was given to faculty members
16  involved in training Dr. Zechman.
17       Do you know whether or not these doctors
18  attended?
19  A   They apparently did.
20  Q   You said apparently. Is that because they were
21  invited?
22  A   They were invited and they were not excused.
23  Q   Okay. So Dr. Hoffman, Dr. Patruno and Dr. Ostrum
24  attended this August 18th, 2003 meeting?

Page 76

1   A   Yes.
2   Q   At the bottom of the first page, not all the way to
3   the bottom, but it lists some concerns about Dr. Zechman.
4   And the first one is learning ability. Do you see where it
5   says that?
6   A   Yes.
7   Q   Can you tell me what is meant by that?
8   A   That would most likely apply to her ability to
9   acquire and process knowledge.
10  Q   So were members of the committee concerned that she
11  may have some sort of cognitive deficit?
12  A   I don't remember if that was specifically discussed.
13  Q   Why did the committee feel that she may have a
14  learning ability problem?
15  A   I don't know specifically.
16  Q   Do you know anything?
17  A   I'm sorry?
18  Q   Do you know anything as to why the Residency Review
19  Committee would feel that way?
20  A   Since there is a composite of many people's input, I
21  don't remember specifically what prompted that concern.
22  Q   What was the plan of action with respect to the
23  committee's concern that she may have some concern with
24  learning?

Page 77

1   A   I don't remember. There is none specifically noted.
2   Q   Well, based on my review of this document, it is
3   actually the second page, almost towards the middle, it
4   says, must get learning ability test.
5   A   I'm sorry. I skipped over that part.
6   Q   Okay. So is it fair to say that the committee, as
7   of August 2003, wanted Dr. Zechman to take a learning
8   ability test?
9   A   It would be offered to her.
10  Q   Okay. Do you know whether it was ever offered to
11  her?
12  A   I believe it was.
13  Q   Who would have offered it to her?
14  A   It would have been myself.
15  Q   So you offered her a learning ability test?
16  A   I believe we did.
17  Q   Do you recall when you offered her a learning
18  ability test?
19  A   I do not recall.
20  Q   Did she accept your offer?
21  A   No.
22  Q   Why?
23  A   I do not recall.
24  Q   Do you recall her responding in any way to your --

**B-0300**

20 (Pages 74 to 77)

Zechman
Lamar Ekbladh, M.D.

v.
C.A. # 05-159 (JJF)

Christiana Care Health Systems
August 2, 2006

Page 78

1  A  I don't recall.
2  Q  As of this August 18th, 2003 meeting, would it be
3  fair to say that the committee decided to continue her
4  probation with the special PGY2 rotation?
5  A  Yes.
6  Q  So as of the August 18th, 2003 meeting, would it
7  also be fair to say that there wasn't a decision to
8  terminate her at that point?
9  A  That is correct.
10  Q  When we go back to the learning ability test and you
11  indicated that you offered that to her, what type of testing
12  were you offering?
13  A  Specifically, we have people within the medical
14  center that if people accept this will talk to them about
15  what their needs are and arrange testing as appropriate.
16  Q  So is it fair to say there were no specifics on what
17  she was going to be tested on?
18  A  That is correct.
19  Q  It was also discussed in this meeting of August 2003
20  that Dr. Zechman had started the process of ADA; is that
21  accurate?
22  A  That is accurate.
23  Q  Her specific illness was also discussed in this
24  meeting as it indicates connective tissue disease?

Page 79

1  A  Um-hmm.
2  Q  Why was there a discussion about her particular
3  illness?
4  A  Why was there a discussion?
5  Q  Um-hmm.
6  A  Because a response to special rotations and so forth
7  may be forthcoming to the RRC so they are aware because our
8  internal Residency Review Committee would keep them aware of
9  modifications in residents' schedules and how call is set up
10  and so forth.
11  Q  Take a look at where it says -- it's in the last
12  paragraph before the ACGME letter paragraph.
13  A  Um-hmm.
14  Q  And it's the second sentence there and it says, she
15  went on 8/8/03 to her doctor in North Carolina to have him
16  fill out the paperwork. To date, nothing has been received.
17  Is that an accurate statement?
18  A  Apparently at that time, we, me as a department, had
19  not received anything as far as paperwork.
20  Q  But as far as Christiana Care, is that an accurate
21  statement?
22  A  They may have. We had not at that time.
23  MS. BREWINGTON: Off the record.
24  (Discussion held off the record.)

Page 80

1  (A brief recess was taken.)
2  MS. BREWINGTON: Back on the record.
3  (Ekbladh Deposition Exhibit No. 17 was marked
4  for identification.)
5  BY MS. BREWINGTON:
6  Q  Take a look at the document that's in front of you.
7  It's been previously marked as Ekbladh 17. It's dated
8  August 20th, 2003. And it's a letter from you to
9  Dr. Zechman.
10  I want to call your attention to the second
11  paragraph of this e-mail. Okay. It indicates the committee
12  has recommended that you currently remain on the GYN service
13  in the same status as a second year resident with your
14  future rotations to be decided once it is clear what
15  accommodations must be made for your disability.
16  Is it fair to say that, as of August 20th,
17  2003, Dr. Zechman was in her second year rotation and she
18  was like currently repeating it?
19  A  Yes.
20  Q  And the intent at that time was for her to continue
21  repeating her second year rotation?
22  A  Yes.
23  Q  It also says that we are currently awaiting the
24  final report from Dr. Frazier.

Page 81

1  Would it be fair to say that, as of August
2  20th, 2003, Dr. Zechman's schedule had not been altered in
3  any way?
4  MR. BLOOM: Objection to the form.
5  THE WITNESS: Her formal on call schedule had
6  not been changed in any way.
7  BY MS. BREWINGTON:
8  Q  So is it fair to say that she was working the same
9  schedule or similar schedule to the other residents in the
10  program?
11  A  Yes.
12  Q  And that her disability had not altered her schedule
13  in any way?
14  A  At this point, it had not, no.
15  (Ekbladh Deposition Exhibit No. 18 was marked
16  for identification.)
17  BY MS. BREWINGTON:
18  Q  This is a letter from you to Dr. Zechman and it's
19  dated September 4th, 2003. And we have had this marked as
20  Ekbladh 18.
21  This letter provided Dr. Zechman with her
22  upcoming schedule, is that correct?
23  A  Yes.
24  Q  And it provides a schedule beginning the week of

21 (Pages 78 to 81)

Zechman
Lamar Ekbladh, M.D.

v.
C.A. # 05-159 (JJF)

Christiana Care Health Systems
August 2, 2006

Page 82

1 9/8/03 and continuing through November 17th of 2003, is that
2 correct?
3  **A  That's correct.**
4  Q   Is it fair to say that, as of September 4th, 2003,
5 the plan for Dr. Zechman was to continue as a PGY2 in the
6 same rotation?
7  **A  I'm sorry. When you say in the same rotation. The**
8  **rotations as described here?**
9  Q   Let me reask the question. I understand what you're
10 saying.
11      Was it the plan as of September 4th, 2003, to
12 continue Dr. Zechman as a PGY2 with a special program?
13      MR. BLOOM: Objection to the form. You can
14 answer it.
15      THE WITNESS: Yes. Since this is special as
16 compared to the other residents' rotations, yes.
17 BY MS. BREWINGTON:
18  Q   Okay. Thank you.
19      You also indicate in the last paragraph, we
20 have still not received a written reply from Dr. Frazier in
21 spite of numerous requests.
22      Who made numerous requests?
23  **A  I suspect that we did probably through Sandy,**
24  **although I don't remember who made the requests.**

Page 83

1  Q   Did you?
2  **A  I don't remember specifically.**
3  Q   And do you know to whom the requests were made?
4  **A  I do not know specifically. I would suspect to the**
5  **office of Dr. Frazier.**
6  Q   And at this point, September 4th, 2003, you yourself
7 had already spoken to Dr. Ekbladh who indicated that she
8 needed time off for her disability?
9  **A  I spoke to Dr. Frazier, yes.**
10  Q   I'm sorry. You spoke with Dr. Frazier. Okay.
11  **A  Yes.**
12      (Ekbladh Deposition Exhibit No. 19 was marked
13  for identification.)
14 BY MS. BREWINGTON:
15  Q   I have just placed in front of you Ekbladh 19. And
16 it is a document entitled, Christiana Care Health Services,
17 Department of Obstetrics and Gynecology, Resident Review
18 Committee, September 29th, 2003.
19      And these are the minutes from the September
20 29th, 2003 Residency Review Committee meeting, correct?
21  **A  Yes.**
22  Q   And you were in attendance at this meeting?
23  **A  Yes.**
24  Q   And it was determined at the September 29th meeting

Page 84

1 that Dr. Zechman would be dismissed from the program. Is
2 that accurate?
3  **A  That is correct.**
4  Q   And why is that?
5  **A  For the reasons listed in the minutes here.**
6  Q   Do you have any recollection of why Dr. Zechman was
7 terminated from the program?
8  **A  Because we felt at this time that she was not**
9  **progressing. We felt that an appropriate fashion that would**
10  **allow her to complete the program overall in a satisfactory**
11  **fashion.**
12  Q   Okay. Well, let me take you back to what we have
13 previously marked as Ekbladh 18. And in Ekbladh 18,
14 Dr. Zechman was to continue as a PGY2.
15      What changed between September 4th, and
16 September 29th, 2003?
17  **A  What changed? The change did not occur just between**
18  **September 4th and September 29th. This was a reorganization**
19  **of her schedule because her initial special schedule ended**
20  **at this time. So we had to, you know, continue a schedule**
21  **for her. The reason for dismissal was an accumulation of**
22  **all the data.**
23  Q   Okay. But at the previous Resident Review Committee
24 meeting of August 18th, the plan was for her to continue as

Page 85

1 a PGY2?
2  **A  Yes.**
3  Q   So my question is, what changed between August 18th
4 and September 29th for you to decide to end her program?
5  **A  In that period of time -- in the August meeting, it**
6  **was felt that there was concern about her not progressing**
7  **appropriately. But our original plan had been to reevaluate**
8  **in three months. And that was an interim evaluation to see**
9  **progress. And little, if any, progress had been made. That**
10  **was confirmed at the next meeting and it was felt that there**
11  **hadn't been anything at all between those two meetings and**
12  **that termination should follow.**
13  Q   Do you know whether or not Dr. Zechman was tested
14 for any learning disabilities prior to September 29th?
15  **A  I do not believe that she was.**
16  Q   And is it fair to say that Dr. Zechman was dismissed
17 from the program for, quote, academic reasons?
18  **A  Yes.**
19  Q   And it also indicates in the September 29th
20 Residency Review Committee meeting that it was majority
21 approval with two abstained. Who were the two that
22 abstained?
23  **A  I do not recall. We don't keep specific vote**
24  **records.**

B-0302

22 (Pages 82 to 85)

Zechman                                    v.              Christiana Care Health Systems
Lamar Ekbladh, M.D.              C.A. # 05-159 (JJF)                    August 2, 2006

Page 86

1    Q   Dr. Kaminski, we deposed him a few weeks back and he
2    testified that he was one of the ones that abstained. Does
3    that refresh your recollection at all?
4    A   I would not have known that.
5        (Ekbladh Deposition Exhibit No. 20 was marked
6    for identification.)
7    BY MS. BREWINGTON:
8    Q   Take a look at this document we have previously
9    marked as Ekbladh 20. It's an e-mail to Dr. Zechman.
10   Actually, it's a memo. I'm sorry. To Dr. Zechman from you
11   dated September 16th, 2003. And it's regarding request for
12   family/medical leave.
13       The first sentence indicates, it has been
14   brought to our attention that you may need to take periods
15   of intermittent leave.
16       Is it fair to say that it was brought to your
17   attention that she may need to take intermittent leave as
18   early as July 2003?
19   A   Yes.
20   Q   Why did you then wait to send the e-mail until
21   September 16th, 2003?
22   A   Because I became aware that, if it was going to
23   become a formal process of intermittent leave, we needed to
24   have FMLA -- I don't know what it's called -- approvable

Page 87

1    eligibility and so forth documented.
2    Q   When did you become aware of that?
3    A   Apparently around this time.
4    Q   And who made you aware of that?
5    A   I believe it was our personnel, human resources.
6    Q   Did you talk to them about Dr. Zechman?
7    A   I believe I did.
8    Q   Okay. Did you talk with Dr. Zechman about her leave
9    around this time?
10   A   I'm going to say I will make an assumption that I
11   did. I have no specific recollection.
12   Q   Okay. And is that because, when you send memos, you
13   usually talk with the resident?
14   A   Most of the time, I do, yes.
15   Q   Do you recall Dr. Zechman saying to you that she had
16   already submitted medical documentation?
17   A   I don't recall.
18   Q   And at the time that you sent this memo on September
19   16, 2003, were you aware of whether or not she had already
20   sent documentation to Christiana Care?
21   A   I don't recall.
22   Q   When I say documentation, I mean a request for an
23   accommodation?
24   A   Yes. I don't recall.

Page 88

1        (Ekbladh Deposition Exhibit No. 21 was marked
2    for identification.)
3    BY MS. BREWINGTON:
4    Q   I just placed in front of you Ekbladh 21. It's
5    dated September 30th, 2003, and it's a letter from you to
6    Dr. Zechman.
7    A   Yes.
8    Q   Why don't you tell me what this document is?
9    A   This is the document informing Dr. Zechman of the
10   decision of the Residency Review Committee.
11   Q   That she was terminated from the program for
12   academic reasons?
13   A   Yes.
14   Q   Who notified Dr. Zechman that she would be
15   terminated from the program?
16   A   I did.
17   Q   And how did you notify her? Did you call her on the
18   phone or did you meet with her?
19   A   I don't remember.
20   Q   Do you recall any response that Dr. Zechman may have
21   given to you?
22   A   Specifically, no.
23   Q   In general, anything?
24   A   I would suspect that she, since a fair hearing

Page 89

1    process was set up, that she requested a fair hearing
2    process.
3        (Ekbladh Deposition Exhibit No. 22 was marked
4    for identification.)
5    BY MS. BREWINGTON:
6    Q   I just placed in front of you what's been previously
7    marked as Ekbladh 22. And it's dated October 6, 2003. Is
8    this the day that you met with her to discuss her
9    termination?
10   A   Apparently it is, yes.
11   Q   And this is also the day that you discussed the fair
12   hearing process?
13   A   Yes.
14   Q   Did you discourage her in any way from pursuing a
15   fair hearing process?
16   A   Not to my knowledge, no.
17   Q   I understand that you met with her on October 6,
18   2003, to discuss the termination. Was she already aware
19   that she was terminated at this point?
20   A   I believe she was.
21   Q   Okay. Do you recall how she became aware of the
22   termination?
23   A   I'm not totally aware. That was probably by letter.
24   Q   That's fine.

23 (Pages 86 to 89)

Zechman
Lamar Ekbladh, M.D.

v.
C.A. # 05-159 (JJF)

Christiana Care Health Systems
August 2, 2006

Page 90

1    (Ekbladh Deposition Exhibit No. 23 was
2    marked for identification.)
3    BY MS. BREWINGTON:
4    Q    I believe that's Ekbladh 23. Okay. Have you ever
5    seen this document before?
6    A    As supplied to me recently, yes.
7    Q    Do you know whether or not this form was faxed to
8    your office?
9    A    I do not recall it being faxed.
10   Q    These fax numbers at the bottom, are either of them
11   your fax number?
12   A    They are not.
13   Q    Do you know whose fax number they are?
14   A    I do not.
15       (Ekbladh Deposition Exhibit No. 24 was marked
16   for identification.)
17   BY MS. BREWINGTON:
18   Q    I have just placed in front of you what's previously
19   been marked as Ekbladh 24. It's a document from Employee
20   Health Services. And it indicates regarding FMLA
21   approval/denial. And it indicates on 10/3/03, we were
22   provided with a certification of health care provider form
23   for Ellen Hoffman Zechman. Following is a result of our
24   review. Approved for intermittent time including reduced

Page 91

1    work schedule and it was reviewed by Chris Collins and the
2    date is 10/6/03.
3        It's fair to say that the date of her approval
4    is after her termination; is that accurate?
5    A    Yes.
6    Q    Okay. And, actually, the date of the receipt of the
7    FMLA certification of health care provider is after her
8    termination; is that accurate?
9    A    Yes. I remember that date. This occurred after
10   that, yes.
11   Q    And for the record, he is pointing to the Employee
12   Health Services form that was sent and approved after she
13   was terminated; is that accurate?
14   A    Yes.
15   Q    Let me just make sure I don't have any other
16   questions.
17       Have you ever seen this document before?
18   A    This particular document? Only recently.
19   Q    Were you aware that Christiana Care approved her
20   intermittent time off?
21   A    Not until I saw this document.
22       MS. BREWINGTON: I don't have anything further.
23   Thank you for your time.
24       MR. BLOOM: Okay. I may or may not have a

Page 92

1    couple of quick follow-ups. Can we take a five minute
2    break?
3        MS. BREWINGTON: Okay.
4        MR. BLOOM: Okay. Back on the record.
5        EXAMINATION
6    BY MR. BLOOM:
7    Q    Dr. Ekbladh, I'm just going to put back in front of
8    you what was previously marked as Ekbladh 4. And I'll just
9    direct your attention to the entry regarding Dr. Zechman and
10   the decision to have her repeat her second year of residency
11   program.
12       Do you see that entry?
13   A    Yes, I do. 6.3?
14   Q    Yes.
15       And there is a note in that box that
16   Dr. Zechman would be re-reviewed at three and six months.
17   Do you see that?
18   A    Yes.
19   Q    Was there any guarantee that Dr. Zechman would
20   remain in the program for that next six months?
21   A    No.
22   Q    And I take it you were aware that, even prior to
23   this meeting, there had already been a vote on the committee
24   as to whether or not to terminate Dr. Zechman's residency?

Page 93

1    A    Yes.
2    Q    Did there ever come a time at which the option of
3    terminating Dr. Zechman's residency was an option that was
4    taken off the table?
5    A    No, there was not.
6    Q    Okay. You can put that aside. Thank you.
7        And I'm just going to direct your attention to
8    what was previously marked as Exhibits Ekbladh 23 and 24.
9    And these are a health care certification and also a form
10   from Employee Health Services at Christiana Care
11   respectively.
12       Did you receive or see either of these two
13   documents at the time they were generated in 2003?
14   A    No, I did not.
15   Q    As we sit here today on August 2nd, 2006, can you
16   approximate the period of time during which you first saw
17   these two documents?
18   A    It was within the past month or two.
19       MR. BLOOM: I have nothing else.
20       MS. BREWINGTON: Okay.
21       EXAMINATION
22   BY MS. BREWINGTON:
23   Q    Dr. Ekbladh, we just went off the record for five
24   minutes. And my question to you is, did you have any

B-0304

24 (Pages 90 to 93)

Zechman
Lamar Ekbladh, M.D.

v.

C.A. # 05-159 (JJF)

Christiana Care Health Systems
August 2, 2006

Page 94

1  discussions with Mr. Bloom at that time?
2      MR. BLOOM: You can answer that with a yes or
3  no answer.
4      THE WITNESS: Yes.
5  BY MS. BREWINGTON:
6   Q   What was the content of your conversation with
7  Mr. Bloom?
8      MR. BLOOM: I'm going to object and instruct
9  the witness not to answer. He was off the stand. Your
10  examination was complete. I'm entitled to have privileged
11  communications with the client.
12      MS. BREWINGTON: For the record, I am objecting
13  to your client not answering the question. I said I had no
14  further questions and then you indicated that you may ask
15  some questions. And that's on the record.
16      MR. BLOOM: That's fine.
17      MS. BREWINGTON: Okay.
18  BY MS. BREWINGTON:
19   Q   Did you review any documents during that time?
20      MR. BLOOM: If you reviewed any documents other
21  than documents that I showed you, you can answer that
22  question.
23      THE WITNESS: Only documents that I was shown
24  here.

Page 95

1  BY MS. BREWINGTON:
2   Q   And did you have discussions with Mr. Bloom
3  concerning the content of your deposition testimony during
4  that five minute break?
5      MR. BLOOM: Hang on one second.
6      Can you read back that last question?
7      (The previous question was read back by the
8  court reporter.)
9      MR. BLOOM: You can answer that. You can
10  answer that with a yes or no.
11      THE WITNESS: Yes.
12  BY MS. BREWINGTON:
13   Q   And what was the content of that conversation?
14      MR. BLOOM: All right. I'm going to object and
15  instruct the witness not to answer that.
16      MS. BREWINGTON: I have no further questions.
17      MR. BLOOM: Okay.
18      (Deposition concluded at 1:00 p.m.)
19
20
21
22
23
24

Page 96

1          I N D E X
2  DEPONENT: LAMAR EKBLADH, M.D.          PAGE
3      Examination by Ms. Brewington      2
4      Examination by Mr. Blood           92
       Examination by Ms. Brewington      93
5
6        E X H I B I T S
7
     EKBLADH DEPOSITION
8
   NUMBER      DESCRIPTION          MARKED
9
   1   EEO Survey Form              12
10
   2   Christiana Care Health Services   16
11      Department of Obstetrics and
        Gynecology Resident Review
12      Committee, October 28, 2002
13  3   Special Meeting, March 17, 2003   19
14  4   Christiana Care Health Services   24
        Department of Obstetrics and
15      Gynecology Resident Review
        Committee, June 16, 2003
16
   5   Note: June 25, 2003            32
17
   6   Request for Disability Accomodation  39
18
   7   Letter dated July 23, 2003, to   41
19      Dr. Ekbladh from Ellen Zechman, M.D.
20  8   Letter dated July 28, 2003, to   45
        Lamar Ekbladh, M.D, from Marsha
21      A. Miller
22  9   E-mail from Ellen H. Zechman sent  53
        July 26, 2003, to Lamar Ekbladh, M.D.
23
24  10  E-mail to Lamar Ekbladh, M.D. from  58
        Sandra J. Kardos

Page 97

1
2          E X H I B I T S
3
     EKBLADH DEPOSITION
4  NUMBER      DESCRIPTION          MARKED
5  11  Memo dated July 30, 2003, RE:    59
       Ellen Zechman, M.D.
6
   12  E-mail from Ellen H. Zechman     62
7      sent August 1, 2003, to Lamar
       Ekbladh
8
   13  File Note - August 7, 2003       67
9
   14  Handwritten notes from telephone  68
10     call with Dr. David Frazier -
       August 11, 2003 (1:45 p.m.)
11
   15  Memo from Ellen H. Zechman to    73
12     Sandra L. Kardos dated 8/11/2003
13  16  Christiana Care Health Services  75
       Department of Obstetrics and
14     Gynecology, Resident Review
       Committee, August 18, 2003
15
   17  Letter dated August 20, 2003, to  80
16     Ellen Zechman, M.D., from Lamar
       Ekbladh, M.D.
17
   18  Letter dated September 4, 2003,  81
18     to Ellen Zechman, M.D., from
       Lamar Ekbladh, M.D.
19
   19  Christiana Care Health Services  83
20     Department of Obstetrics and
       Gynecology, Resident Review
21     Committee, September 29, 2003
22  20  Memo to Ellen Zechman, M.D., from  86
       Lamar Ekbladh, M.D., dated September
23     16, 2003
24

**B-0305**

25 (Pages 94 to 97)

Zechman
Lamar Ekbladh, M.D.

v.
C.A. # 05-159 (JJF)

Christiana Care Health Systems
August 2, 2006

Page 98

1
2
3

EXHIBITS

EKBLADH DEPOSITION

NUMBER        DESCRIPTION        MARKED

4

5

6

7

8

9

10

11

21    Letter dated September 30, 2003,      88
       to Ellen Zechman, M.D., from
       Lamar Ekbladh, M.D.

22    Handwritten noted dated October       89
       6, 2003, To Whom It May Concern
       from Lamar Ekbladh

23    Certificate of Health Care            90
       Provider with Confidential Fax
       Cover Sheet

24    Memo from Employee Health Services    90
       to Academic Affairs

12
13
14
15
16
17
18
19
20
21
22
23
24

Page 100

1    State of Delaware )
                          )
2    New Castle County )
3
4          CERTIFICATE OF REPORTER
5
6        I, Allen S. Blank, Registered Merit Reporter and
     Notary Public, do hereby certify that there came before me
     on the 2nd day of August, 2006, the deponent herein, LAMAR
7    EKBLADH, M.D., who was duly sworn by me and thereafter
     examined by counsel for the respective parties; that the
8    questions asked of said deponent and the answers given were
     taken down by me in Stenotype notes and thereafter
9    transcribed by use of computer-aided transcription and
     computer printer under my direction.
10
         I further certify that the foregoing is a true and
11   correct transcript of the testimony given at said
     examination of said witness.
12
         I further certify that I am not counsel, attorney,
13   or relative of either party, or otherwise interested in the
     event of this suit.
14
15
16
17          Allen S. Blank, RMR
            Certification No. 103-RPR
18          (Expires January 31, 2008)
19
     DATED:  August 4, 2006
20
21
22
23
24

Page 99

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

REPLACE THIS PAGE
WITH THE ERRATA SHEET
AFTER IT HAS BEEN
COMPLETED AND SIGNED
BY THE DEPONENT.

**B-0306**

26 (Pages 98 to 100)



**WILCOX & FETZER LTD.**

## In the Matter Of:

# Zechman

## v.

# Christiana Care Heath Systems

### C.A. # 05-159 (JJF)

----

### Transcript of:

### Anthony C. Sciscione, D.O.

### September 7, 2006

----

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

B-0307

Zechman
Anthony C. Sciscione, D.O.

v.
C.A. # 05-159 (JJF)

Christiana Care Heath Systems
September 7, 2006

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ELLEN ZECHMAN,                          )
                                        )
                        Plaintiff,      )
                                        )   Civil Action
          v.                            )   No. 05-159
                                        )     (JJF)
CHRISTIANA CARE HEALTH SYSTEMS,         )
                                        )
                        Defendant.      )


          Deposition of ANTHONY C. SCISCIONE, D.O.,
taken pursuant to notice at the law offices of
Margolis Edelstein, 1509 Gilpin Avenue, Wilmington,
Delaware, beginning at 3:00 p.m. on Thursday,
September 7, 2006, before Kathleen White Palmer,
Registered Merit Reporter and Notary Public.

APPEARANCES:

          LORI BREWINGTON, ESQUIRE
          MARGOLIS EDELSTEIN
            1509 Gilpin Avenue
            Wilmington, Delaware   19899
            for the Plaintiff

          KENDRA L. BAISINGER, ESQUIRE
          MORGAN LEWIS & BOCKIUS LLP
            1701 Market Street
            Philadelphia, Pennsylvania 19103
            for the Defendant

------------------------------------------------------
          WILCOX & FETZER, LTD.
1330 King Street - Wilmington, Delaware 19801
            (302) 655-0477
            www.wilfet.com

**B-0308**

Zechman
Anthony C. Sciscione, D.O.

v.

C.A. # 05-159 (JJF)

Christiana Care Heath Systems
September 7, 2006

Page 2

1    ANTHONY C. SCISCIONE, D.O.,
2    the witness herein, having first been
3    duly sworn on oath, was examined and
4    testified as follows:
5  BY MS. BREWINGTON:
6    Q.  Good afternoon, Dr. Sciscione.
7    A.  Hi.
8    Q.  My name is Lori Brewington and I'm here to take
9  your deposition today.
10   A.  What's your last name?
11   Q.  Brewington.
12   A.  Okay.  I'll remember that.  Thanks.
13   Q.  Great.  I'm sure you have testified at a
14  deposition before?
15   A.  Yes, ma'am.
16   Q.  I'm just going to ask you a series of
17  questions.  The one rule that we need to have is that
18  you don't answer the question while I'm speaking and I
19  won't ask you a question if you're not finished saying
20  your answer.  Okay?  We have a court reporter here who
21  will be taking down your responses to the questions.
22  At times Christiana Care's attorney may object and
23  that's entirely proper.  The only thing that I ask is
24  that you go ahead and answer the question unless she

Page 3

1  specifically advises you not to answer the question.
2       Do you understand?
3    A.  Fair enough.
4    Q.  Why don't we begin by you stating your full
5  name for me.
6    A.  Anthony Sciscione.
7    Q.  If you could spell your last name...
8    A.  S-c-i-s-c-i-o-n-e.
9    Q.  Did you do anything in preparation for your
10  deposition testimony today?
11   A.  I read briefly through some of the -- I guess
12  some of the papers and communications that went back
13  and forth between Dr. Zechman and myself.
14   Q.  Before you continue, did you review them with
15  your attorney?
16       MS. BAISINGER:  Yes.
17   A.  Yes.
18   Q.  That's fine.
19       Let's begin by telling me a little bit
20  about your educational background.  Okay?
21  Specifically, where did you attend medical school?
22   A.  I went to medical school at the University of
23  New England.
24   Q.  Is that where you did your residency program,

Page 4

1  as well?
2    A.  No.  I did my residency program at the Medical
3  Center of Delaware.
4    Q.  What did you do after your residency program?
5    A.  I did a fellowship in maternal-fetal medicine.
6    Q.  When was that?
7    A.  '92 to '94.
8    Q.  Are you board certified?
9    A.  Yes, ma'am.
10   Q.  In what specialty?
11   A.  Obstetrics and gynecology and maternal-fetal
12  medicine.
13   Q.  When did you begin working at Christiana Care?
14   A.  1994.
15   Q.  As I understand it, you are working there again
16  now?
17   A.  Correct.
18   Q.  Take me through your work experience at
19  Christiana Care with respect to like when you started,
20  what you did while you were there, when you left and
21  when you came back.
22   A.  How exhaustive -- I mean, you don't want me to
23  tell you every time I walked in and out of the
24  building.

Page 5

1    Q.  No.
2    A.  You want me to --
3    Q.  At some point, as I understand it, your
4  employment ended with Christiana Care; is that
5  correct?
6    A.  Correct.  In 2002, I believe.
7    Q.  So you started --
8    A.  Or 2003.  I can't remember.  One or the other.
9    Q.  2002 or 2003?
10   A.  Yes.
11   Q.  So you started in 1994?
12   A.  Correct.
13   Q.  What was your job title at that time?
14   A.  Faculty maternal-fetal medicine and director of
15  research.
16   Q.  Did your title change any time between 1994 and
17  2002-2003?
18   A.  It must have been 2003, to be more clear.  It
19  had to be 2003 when I left, July of 2003.
20   Q.  Okay.
21   A.  At any rate, I became associate residency
22  director.
23   Q.  When was that?
24   A.  I don't remember.

**B-0309**

2 (Pages 2 to 5)

Zechman
Anthony C. Sciscione, D.O.

v.

C.A. # 05-159 (JJF)

Christiana Care Heath Systems
September 7, 2006

Page 6

1    Q.  Okay.
2    A.  And then I became residency director in 2002.
3    Q.  Why did you leave Christiana Care?
4    A.  I had another position as director of
5    maternal-fetal medicine at Drexel University.
6    Q.  Why did you decide to return to
7    Christiana Care?
8    A.  To be residency director and director of
9    maternal-fetal medicine.
10   Q.  Was there a reason why you wanted to leave
11   Drexel and go back to Christiana Care?
12   A.  I thought this was a neat opportunity, plus my
13   chair left at Drexel.
14   Q.  Now, as I understand it, Dr. Ekbladh was acting
15   director of the program, or no?
16   A.  I do not know the answer to that question.
17   Q.  Do you have an understanding of what his role
18   was at all?
19   A.  Not specifically.
20   Q.  Do you know generally?
21   A.  Generally.
22   Q.  Do you know who he is?
23   A.  I know who he is.
24   Q.  Have you ever worked with him?

Page 8

1    interviewed with you?
2    A.  I don't remember those specifics.  I
3    interviewed with her, correct.  Whether it was my
4    office or not, I'm not sure.
5    Q.  Was there more than one person that interviewed
6    Dr. Zechman that day?
7    A.  I'm sure there's more than one.
8    Q.  Because that's the procedure; is that correct?
9    A.  Yes.
10   Q.  You said that she was chosen among other
11   candidates for that position?
12   A.  I believe we had other candidates.
13   Q.  Do you know why you chose Dr. Zechman over the
14   other candidates?
15   A.  I can't say specifically.
16   Q.  Can you say anything?
17   A.  I think generally --
18        (Interruption.)
19   A.  Sorry about that.
20   BY MS. BREWINGTON:
21   Q.  That's fine.
22   A.  I think generally we thought she came from a
23   very good medical school.  She was very affable on her
24   interview.  She seemed eager.  That's what I remember.

Page 7

1    A.  Sure.  He was my chair.  But when it comes to
2    the residency, after I left, I really don't know what
3    he did.
4    Q.  Okay.
5    A.  I mean what his title was.
6    Q.  But is he there now?
7    A.  Yes.
8    Q.  Does he have a title now?
9    A.  He's chair of the department.
10   Q.  Oh, he is chair of the department.
11        Dr. Zechman was a resident in the
12   Christiana Care program, I believe, from June of 2002
13   through September of 2003.  Am I correct that you were
14   the director of the residency program in the beginning
15   of a residency through at least July of 2003?
16   A.  Correct.
17   Q.  Do you recall when you first met Dr. Zechman?
18   A.  I believe I first met her on her interview.
19   Q.  Tell me about that interview.
20   A.  I can't remember specifics.  I just remember
21   generalities about meeting her.  There was other
22   candidates for a position that was open in our program
23   and we decided on taking Dr. Zechman.
24   Q.  So she came to your office and met with you and

Page 9

1    Q.  You talked about her previous medical school.
2    What was your understanding of her medical background
3    at that time that you were interviewing her?
4    A.  I can't recall exactly what -- what -- what I
5    was told or what I knew.
6    Q.  As you sit here today, do you have an
7    understanding of Dr. Zechman's medical background
8    prior to coming into Christiana Care's program?
9    A.  A general understanding, but not the specifics.
10   I probably had a much better understanding at the
11   time.
12   Q.  That's understandable.  Tell me what you can
13   remember now.
14   A.  I remember that she was in another program, and
15   I want to say it was a family practice, OB -- it
16   was -- I don't remember the specifics, so I shouldn't
17   say.  And I remember at some point she trained in
18   pathology.  That's what I remember.
19   Q.  Do you have an understanding of the surgical
20   experience that she had at her previous program?
21   A.  You mean as I sit here today or back when I met
22   her?
23   Q.  As you sit here today.
24   A.  No.  I probably had a very good handle on it

3 (Pages 6 to 9)

Zechman
v.
Christiana Care Heath Systems
Anthony C. Sciscione, D.O.
C.A. # 05-159 (JJF)
September 7, 2006

Page 10

1  when I met her.
2    Q.  When you met her.  But as you sit here today,
3  you don't recall?
4    A.  I don't recall specifics of her surgical
5  background, no.
6    Q.  Do you recall anything about her surgical
7  background as you sit here today?
8    A.  No.
9    Q.  Do you know whether you inquired as to her
10  surgical background when you hired her in 2002?
11    A.  Either I probably did or Dr. Kaminski did.
12  Dr. Kaminski was probably the residency director when
13  she interviewed would be my bet.
14    Q.  Is discussing someone's surgical skills or
15  medical knowledge something that you would do during
16  the interview process?
17    A.  Customarily, no.  Customarily, no, about
18  medical knowledge or surgical skills.
19    Q.  Where do you get that information?  Would that
20  be something like in terms of on their transcripts?
21    A.  Oh, her letters of recommendation.  I assume
22  she had letters of recommendation when she applied
23  from her previous program director.
24    Q.  How about the name of the school?  Would that

Page 11

1  tell you something about how much surgical experience
2  the individual had?
3    A.  It depends on the school.  Some I know very
4  well and some I don't know very well, so I depend -- I
5  always depend on the program director and the letters
6  of recommendation.
7    Q.  Did you talk with Dr. Zechman about her
8  surgical skills during the interview process?
9    A.  I don't recall.
10    Q.  What do you recall specifically or in general
11  about your interview with Dr. Zechman?
12    A.  Again, specifically, I don't -- I mean, it was
13  many years ago and I don't remember specifics.
14        Generally, I just remember that she was an
15  affable person who seemed eager to get started and
16  that was -- I thought those were two very good reasons
17  to hire her.
18        MS. BREWINGTON:  If I could have that
19  marked.
20        (Sciscione Exhibit 1 was marked for
21  identification.)
22  BY MS. BREWINGTON:
23    Q.  What I've just placed in front of you is what
24  we just had labeled Sciscione 1.  Okay?  I'll

Page 12

1  represent to you that it is a copy of a complaint in
2  this case.  I want you to take a look at specifically
3  paragraph 15 of the complaint.  Once you've had an
4  opportunity to read paragraph 15, let me know.
5    A.  (The witness reviews the document.)  Okay.
6    Q.  My first question about paragraph 15 of the
7  complaint is:  Do you recall after reading this
8  paragraph whether or not you had a conversation with
9  Dr. Zechman about how she was different than the other
10  residents?
11    A.  I don't believe that we ever -- I ever used the
12  word that she was different.
13    Q.  Do you know that for sure?
14    A.  To the best of my recollection, the first line
15  of this paragraph is not true.
16    Q.  The first line is:  "In or around August of
17  2002, Dr. Sciscione informed Plaintiff that various
18  teaching physicians 'did not like' Plaintiff because
19  she was 'different'."
20    A.  Correct.
21    Q.  Now, my question to you is, and I want to break
22  this down in two parts:  That you did not inform her
23  that these physicians did not like her, and are you
24  also saying that the physicians never said that?

Page 13

1    A.  I don't --
2    Q.  Do you see my question?
3    A.  Yes.  Let me be really clear about this,
4  Miss Brewington.
5    Q.  Okay.
6    A.  I don't believe I ever told Dr. Zechman that
7  someone didn't like her.
8    Q.  Now, did you have any knowledge of treating
9  physicians not liking Dr. Zechman?
10    A.  No, I wouldn't say that's true at all.
11    Q.  Dr. Zechman is alleging that this conversation
12  actually took place between you and herself.
13    A.  I see that.
14    Q.  My question is to you:  Do you have any
15  understanding of why she may consider this to have
16  taken place?  When I say "this," this conversation
17  between the two of you.
18        MS. BAISINGER:  Objection.  Speculation.
19        You can answer.
20    A.  I think that she is using the term "did not
21  like" -- I think she's confusing -- Miss Brewington,
22  when I spoke with her about did not like, which
23  really, I believe, is personal.  So if I say I don't
24  like Lori Brewington, that's personal, versus -- and

4 (Pages 10 to 13)

Zechman
Anthony C. Sciscione, D.O.

v.

C.A. # 05-159 (JJF)

Christiana Care Heath Systems
September 7, 2006

Page 14

1  I'm not saying this by any chance. You seem like an
2  excellent attorney. But me saying I don't think
3  you're a good attorney, that's not personal. That's
4  professional. I'm saying, geez, I don't think you're
5  a good attorney and you can interpret that as, well,
6  Tony Sciscione doesn't like me.
7      Q.  Okay.
8      A.  And I think that is what happened with
9  Dr. Zechman.
10     Q.  So is it fair to say that you did have a
11 conversation with her concerning the other treating
12 physicians, the teaching physicians?
13     A.  I think the most fair thing to say is that I
14 had multiple conversations about concerns over her
15 skills and her competency of as an
16 obstetrician/gynecologist.
17     Q.  How about this Rita Vinod?
18     A.  Vinod.
19     Q.  Vinod. Do you recall discussing Dr. Rita Vinod
20 with Dr. Zechman?
21     A.  No.
22     Q.  Was there any concern or difficulty with hiring
23 Dr. Vinod?
24     A.  No, not that I recall, no.

Page 15

1      Q.  Did the Residency Review Committee have any
2  concern about hiring Dr. Zechman?
3      A.  The residency review committee wasn't consulted
4  about hiring Dr. Zechman.
5      Q.  Who was consulted? What committee?
6      A.  It's no committee. It's based on interviews,
7  Miss Brewington. So what would happen is you would
8  meet -- just like in a law firm, you would meet all
9  the partners and they would decide whether you were a
10 good fit or you weren't a good fit. It's based on
11 four, maybe six hours' worth of information, letters
12 of recommendation, medical school transcripts.
13     Q.  Am I understanding that it's the interviewees
14 that make the decision?
15     A.  It's the interviewees that make the decision,
16 consensus decision. Ultimately the decision is left
17 up to the residency director, who probably at that
18 time was Dr. Kaminski.
19     Q.  So this decision to hire or fire does not go to
20 the committee? Is that what you are saying?
21     A.  I think we are getting confused.
22     Q.  Not hire or fire. I just mean to higher.
23     A.  Because fire is different.
24         Hire, no. This is very typical. And so we

Page 16

1  are totally clear on the subject, Miss Brewington --
2      Q.  Yes.
3      A.  -- this is the way we handle all of our medical
4  students who come in. This isn't just for Dr. Zechman
5  who came in for a postgraduate year 2 position.
6      Q.  Okay.
7      A.  They all come in for an interview. We review
8  their medical transcripts. They all have interviews
9  with the committee. We review their letters of
10 recommendation. We review a personal statement with
11 them. And it's very similar for every year.
12     Q.  You indicated they all have interviews with the
13 committee. Which committee?
14     A.  It's not a committee. It's a group of
15 interviewees, usually faculty. Interviewers, I'm
16 sorry, instead of interviewees.
17     Q.  So it's a group of faculty?
18     A.  Correct.
19     Q.  Not called a committee?
20     A.  No.
21     Q.  How many?
22     A.  I don't remember how many people Dr. Zechman
23 interviewed with.
24     Q.  How many generally in the process of --

Page 17

1      A.  It varies from situation to situation. On
2  average, it's, I would guess, somewhere between six
3  and eight faculty members.
4      Q.  What happens when there's a dispute, meaning
5  three people want to hire, three people don't? How is
6  that handled? Is it by vote? Is it majority?
7      A.  First of all, I should point out that it's a
8  rare event, surprisingly. Even as I say it, I think
9  it's surprising. But thinking about -- and I've been
10 in medical education for a long time, but it is a rare
11 event that people aren't on the same page. It's not
12 because we communicate with each other ahead of time.
13 It's more independently.
14         Actually, what more likely happens is
15 people are more neutral, and then there are other
16 folks who feel very strongly one way or the other. So
17 if there is -- in the unlikely occurrence that there
18 would be a split, ultimately it would be up to the
19 residency director.
20     Q.  At this time you were the residency director?
21     A.  No. I believe it was Dr. Kaminski when she was
22 interviewed. I was residency director when she
23 started working.
24     Q.  When was the interview? If she was hired in

5 (Pages 14 to 17)

Zechman                                    v.                 Christiana Care Heath Systems
Anthony C. Sciscione, D.O.          C.A. # 05-159 (JJF)                September 7, 2006

Page 18

1  June, would the interview be like a month or two
2  before that?
3  A. I don't recall.
4  Q. Do you recall Dr. Zechman asking you if the
5  teaching physicians didn't like her because of the way
6  she talked or anything like that?
7  A. She may have said that. But again, I think
8  we're mixing up professional versus personal and I
9  think Dr. Zechman may have done that in this. Do not
10  like, I think, is strong. I think we are all here --
11  all of us are committed to graduating a competent
12  obstetrician/gynecologist, and it's our charge to do
13  that. And if that happens that someone doesn't
14  believe they are going to be a competent
15  obstetrician/gynecologist, that's a professional
16  decision, not a personal decision.
17      And to be perfectly clear, we've had
18  multiple residents from all over the country, really
19  all over the world, so the way someone speaks -- of
20  course, what I mean by that is the inflections in
21  their voice or accents. I have, never come up
22  in my experience. Saying things that are
23  inappropriate, that's a different story.
24  Q. How about her age, did you have a discussion

Page 19

1  with Dr. Zechman about her age?
2  A. I don't think once did we discuss her age.
3  Q. Take a look at allegation number 22 for me.
4  A. (The witness reviews the document.) Okay.
5  Q. Do you recall a conversation with Dr. Zechman
6  regarding a Dr. Rachel Heinle?
7  A. We did have a discussion about this and I do
8  have an independent recollection of it.
9  Q. Let me start, though, by asking you who Rachel
10  Heinle is.
11  A. She would have been in her year, so she would
12  have been her colleague.
13  Q. Dr. Zechman's?
14  A. Yes.
15      And looking at the statement, if I can sort
16  of see where I think this is going, the first part or
17  the first sentence is correct, which is: "Also, in or
18  around October 2002" -- again, not remembering exactly
19  October 2002. That we can debate all day long. I
20  don't remember that, specifically.
21  Q. Okay.
22  A. -- "Plaintiff mentioned to Dr. Sciscione that
23  she was experiencing increasingly rude behavior toward
24  her from Dr. Rachel Heinle." I do remember having

Page 20

1  that conversation.
2      The last part I disagree with. I don't
3  believe I ever said that "'if anyone ever had it out
4  for you, it's Rachel Heinle.'"
5  MS. BAISINGER: Could you just read that
6  sentence into the record showing that it's from --
7  MS. BREWINGTON: Paragraph 22.
8  MS. BAISINGER: Yes, that he was referring
9  to the words in paragraph 22.
10  MS. BREWINGTON: Paragraph 22 indicates,
11  for the record: "Also, in or around October 2002,
12  Plaintiff mentioned to Dr. Sciscione that she was
13  experiencing increasingly rude behavior toward her
14  from Dr. Rachel Heinle."
15      And it's your position that you do recall
16  that part of paragraph 22?
17  A. Correct.
18  Q. That the conversation took place?
19  A. We had that conversation.
20  Q. Then it indicates in the complaint, paragraph
21  22: "Dr. Sciscione agreed with Plaintiff and told
22  her, 'if anyone ever had it out for you, it's Rachel
23  Heinle.'"
24      That part of section 22 did not occur?

Page 21

1  A. I disagree with that, what Dr. Zechman is
2  alleging that she said.
3  Q. Did the other residents have issues with
4  Dr. Zechman?
5  A. The other residents or Rachel Heinle?
6  Q. Well, my first question is the other residents.
7  A. Okay.
8  Q. Then we can go specifically as to who, if there
9  is anyone.
10  MS. BAISINGER: Objection. Speculation.
11      You can answer.
12  A. I think most of the issues surrounding
13  Dr. Zechman came from probably the chief class which
14  interact with second year residents and her own class.
15  Q. Is Robyn Gray one of the members of the chief
16  class?
17  A. She would have been the chief resident.
18  Q. The other members of Dr. Zechman's class would
19  have been Kirifides?
20  A. Kirifides, Kirsh, who is now Marshall, and
21  Heinle.
22  Q. Why did you have that sense that there were
23  some issues there?
24  A. We should be clear. It wasn't a sense. They

6 (Pages 18 to 21)

Page 22

1  came to me and actually brought up issues about
2  Dr. Zechman's turnover to her of patients, that they
3  were incomplete. They weren't -- they weren't
4  accurate, that she often left things not done. That
5  was really the crux of their issues with her.
6        Dr. Heinle had little bit different issues
7  with her. I'll talk about that when you're ready.
8     Q.  Tell me about the different issues that
9  Dr. Heinle had with Dr. Zechman.
10    A.  Yeah. I'd be happy to. This was a real
11  interpersonal issue between the two of them. You
12  never really been a residency director, but you may
13  have led groups in the past I'm sure. You seem like a
14  very accomplished attorney.
15        You have to realize in a group that there's
16  always interpersonal issues. Just always. If you
17  have a big enough group, that's going to happen. And
18  with 16 residents, it's going to happen. Look, I have
19  issues with my brother and I love him. I mean, we
20  live together. It's just the way it goes.
21        Dr. Heinle, and let me give you some real
22  background into this because I think this is where
23  this came from. And it should be also clear that I
24  spoke to Dr. Heinle about this issue, too.

Page 23

1        Dr. Heinle was -- came from Temple Medical
2  School, top of her medical school class. Was our
3  absolute top recruit. Was probably the top recruit in
4  the area. She was what I would call a very high
5  performer. In other words --
6        MS. BREWINGTON:  Off the record for one
7  minute.
8        (Discussion off the record.)
9  BY MS. BREWINGTON:
10    Q.  I'm sorry.
11    A.  Rachel Heinle is -- I can tell you in Rachel's
12  life I would be willing to bet everything came pretty
13  easily to her. She probably performed well in school
14  her whole life. There is just some people that, and
15  I'm sure you've met them, information just goes very
16  easily into their brain for whatever reason and they
17  retain information very well. That's Rachel Heinle.
18  Rachel Heinle does well on tests. Rachel Heinle does
19  well on everything academic. She's just a neat, neat
20  person.
21        With that positive come some challenges,
22  and one of the challenges for Dr. Heinle that, you
23  know, I coached her through was she really had
24  difficulty with people who didn't perform up to her

Page 24

1  level. Like she expected everybody to do like her,
2  like to be like her. Like Lance Armstrong would
3  expect everybody to pedal a bike as fast as he can.
4  It just isn't going to happen.
5        And I think that was their issue. And I
6  think Dr. Heinle had that issue, not just with
7  Dr. Zechman, but with other residents that weren't --
8  that weren't, in her estimation, weren't pulling their
9  weight. They weren't moving as quick as her. They
10  weren't synthesizing data and coming to rapid, quick,
11  accurate decisions like she did.
12        My explanation always to her is that, you
13  know, everything is a bell curve. She's on this side
14  of the bell curve, so some folks are just in the
15  average or below average and she needs to understand
16  that she's not always going to interact with people
17  like her in her life, and that's really a
18  professionalism issue. And that was something I
19  needed to deal with as residency director.
20    Q.  So did she treat Dr. Zechman poorly?
21    A.  I wouldn't say poorly. What I would say is
22  that at times she was more short with Dr. Zechman.
23  And I think that if you asked Dr. Zechman, she would
24  say, yes, she was short with her.

Page 25

1        Now, Dr. Zechman is a very sensitive
2  person, and when someone is short with you, that can
3  make you not feel good. There's some folks who have,
4  I'm sure you've heard the term, have very thick skin.
5  That was not Dr. Zechman.
6        But on the other hand, it should be clear I
7  spoke to Dr. Heinle about that behavior, as well,
8  because I didn't think it was proper.
9    Q.  You talked about the other residents in her
10  class and the chief residents coming to you with some
11  concerns about Dr. Zechman.
12    A.  Correct.
13    Q.  You mentioned one of them is patient turnover?
14    A.  Correct.
15    Q.  What is that?
16    A.  Especially with the new -- I'm sure you are
17  well aware of the new 80-hour workweek, the new real
18  compartmentalization of medical education. What
19  happens is patients don't just come in nine to five,
20  Miss Brewington. You know that. They come in
21  24 hours a day and the acuity of their care can be
22  very different.
23        When we have different folks taking care of
24  them, they need to communicate when they are not

7 (Pages 22 to 25)

Zechman                                v.              Christiana Care Heath Systems
Anthony C. Sciscione, D.O.         C.A. # 05-159 (JJF)              September 7, 2006

Page 26

1  taking care of them anymore to the new physician
2  taking over what are the issues, what's the
3  background, what needs to be done. And that's a very,
4  very important part of what we do.
5     Q.  So with respect to Dr. Zechman, was there an
6  issue with the way she handled the patients?
7     A.  I think the issue was mostly that her
8  documentation was not very good and that her -- what
9  we would call turnover, explanation of the patients
10  were not very complete.
11        I think Dr. Zechman, because she became
12  sensitive to this, would often just stay and stay a
13  little bit longer to try to synthesize it because she
14  moved a little bit slower than the rest of the folks,
15  which is fine. I have no problem with that. And I
16  think I made that clear to her. She has to do what
17  she has to do to get the turnover to be correct. But
18  she wasn't always very detail oriented on that and I
19  think that sometimes was an issue.
20     Q.  I guess what I'm trying to understand is:  How
21  does that reflect upon the other residents?  Is it
22  that they rely on what she writes in treating the
23  patient?
24     A.  Correct. So supposed we turned over and I'll

Page 27

1  just give you an example. I say, Listen. There's a
2  guy here and he's got right leg pain and he has -- he
3  has something that needs to be attended to tonight in
4  surgery in his right leg.
5        But suppose I made a mistake and it was
6  really the left leg. That's a huge issue because they
7  could do surgery on the left leg by accident if they
8  weren't paying close enough attention.
9        So they have to be very careful when they
10  turn over and it needs to be very detail oriented and
11  it needs to be very complete. Otherwise, things get
12  missed and patients are treated poorly.
13     Q.  Was Dr. Zechman ever disciplined or talked to
14  about her patient turnover?
15     A.  Yeah. I don't like to use the word
16  "disciplined" as a residency director. I like to use
17  the term "coached."
18     Q.  Okay.
19     A.  I coached her about these issues. I coached
20  her about sort of the way to approach patients the way
21  that she learns is really important and the way that
22  she's perceived is important. And there may have been
23  a disassociation between that.
24     Q.  Did you notice whether or not the coaching that

Page 28

1  you provided improved her -- let me finish.
2     A.  Go ahead.
3     Q.  -- improved her skills?
4     A.  I think there was some improvement in her
5  skills. I think that the one thing that Dr. Zechman
6  did is that she was at least on the surface
7  self-effacing. She would acknowledge that maybe this
8  was happening or wasn't happening. In all fairness,
9  though, so was Dr. Heinle when I mentioned it to her.
10  I said this is just the way it is. You really have to
11  learn to deal with this. And they both tried to make
12  some changes.
13        MS. BAISINGER:  Just a clarification. The
14  last question did you mean the patient turnover skills
15  or skills, in general?
16        MS. BREWINGTON:  I meant skills, in
17  general.
18        THE WITNESS:  And I was speaking as skills,
19  in general.
20        MS. BAISINGER:  Okay.
21        MS. BREWINGTON:  Okay.
22  BY MS. BREWINGTON:
23     Q.  Were you aware that Dr. Zechman had mixed
24  connective tissue disease?

Page 29

1     A.  No.
2     Q.  Were you aware of any illness that she had
3  through her residency program?
4     A.  No. The only illness I was aware of is one
5  time she wasn't feeling well, so I escorted her down
6  to the emergency room.
7     Q.  Is that the time when she had a rash?
8     A.  I don't recall.
9     Q.  Take a look at paragraph 25. Okay?
10     A.  (The witness reviews the document.)
11     Q.  It indicates: "On or about February 24th,
12  2003, Plaintiff reported to Defendant's emergency room
13  with a severe headache, stiff neck, and photophobia.
14  Plaintiff informed Dr. Sciscione, Defendant's
15  Residency Director, that she suffered from Mixed
16  Connective Tissue Disease."
17        Do you know whether this February 24, 2003,
18  incident is the same time that you took her down to
19  the emergency room?
20     A.  I don't.
21     Q.  Do you know whether Dr. Zechman was admitted to
22  the emergency room on more than one occasion?
23     A.  I don't remember.
24     Q.  You don't recall her telling you that she had

B-0315

Wilcox & Fetzer, Ltd.         Professional Court Reporters         (302)655-0477

Zechman
Anthony C. Sciscione, D.O.

v.

C.A. # 05-159 (JJF)

Christiana Care Heath Systems
September 7, 2006

Page 30

1  mixed connective tissue disease?
2  **A. No.**
3       MS. BAISINGER: Objection. Asked and
4  answered.
5       You can answer.
6       MS. BREWINGTON: Okay.
7  BY MS. BREWINGTON:
8  Q.  Take a look at paragraph 27 of the complaint.
9  **A.  (The witness reviews the document.) Okay.**
10  Q.  My question is:  Do you recall asking
11  Dr. Zechman to sit in the library when she had this
12  rash or spotted rash or when she was ill?
13  **A.  I don't have an independent recollection of**
14  **this, no.**
15  Q.  When an individual is sick --
16  **A.  Can I actually address this as I read this a**
17  **second time?**
18  Q.  Sure.
19  **A.  Because the way this reads, I mean, if I was**
20  **reading this and I was independent, I would say, wow,**
21  **this Sciscione guy is a real ogre. But the truth of**
22  **the matter is, I can tell you absolutely 100 percent**
23  **if I thought she was really ill, I would have sent her**
24  **home.**

Page 31

1       **And the fact -- and I think the truth of**
2  **the matter, and I'm actually surprised that**
3  **Dr. Zechman said this because as a residency director,**
4  **I went with her, I took her down to the emergency room**
5  **when she was sick and I sat with her and held her**
6  **hand.**
7       **And I just think it's unfair of her to**
8  **portray me like this. I think I was her advocate her**
9  **whole time there and personally it makes me not feel**
10  **very good when she says stuff like this or alleges**
11  **stuff like this.**
12       **And I want that to be on the record because**
13  **I really just thought if she was contagious to**
14  **pregnant folks and she still felt well, she could go**
15  **and read. I didn't think that was unreasonable. I**
16  **don't think that is unreasonable as I read this today.**
17  Q.  So you don't have any recollection of this, but
18  you are saying that if you did, it would have been
19  reasonable for you to have her be in the library?
20  **A.  Or to read. I don't know if I would have said**
21  **the library. I may have even said go home and read or**
22  **whatever. But, yeah, absolutely.**
23  Q.  Would that have still been reasonable even if
24  she had a work release from employee health?

Page 32

1  **A.  No. If she had a work release, and maybe I**
2  **didn't read this close enough, Miss Brewington, but I**
3  **didn't see that she did have a work release. But if**
4  **she did have a work release, we would have let her go**
5  **home. Actually, I would have let her go home if she**
6  **told me she didn't feel well. And if I remember**
7  **right, it said in here she was only slightly sick.**
8  **Yeah. Slightly sick means to me she wasn't very ill.**
9  Q.  It says "initially."
10  **A.  Yes, and initially it sounds like from what she**
11  **alleges that I asked her to read. So if you are**
12  **slightly sick, ask you to read, no different than I**
13  **ask my kids when they feel sick.**
14  Q.  You can put that to the side.
15       MS. BREWINGTON:  If I can have that marked
16  as Sciscione 2.
17       (Sciscione Exhibit 2 was marked for
18  identification.)
19  BY MS. BREWINGTON:
20  Q.  Take a look at what we just placed in front of
21  you. That is Sciscione 2.  Let me know when you've
22  had an opportunity to review it.
23  **A.  Yes, I've already read this, so I'm familiar**
24  **with it. Thank you.**

Page 33

1  Q.  Tell me who Dr. Vakili is.
2  **A.  He's one of the volunteer faculty**
3  **obstetrician/gynecologists.**
4  Q.  When you say "volunteer faculty," is that
5  different than teaching physician?
6  **A.  No. It means he's not paid.**
7  Q.  There are different levels of physicians with
8  respect to the residency program; is that correct?
9  **A.  No.**
10  Q.  My question is, and maybe I'm not being clear.
11  There's some teaching physicians that are employed by
12  Christiana Care; correct?
13  **A.  I would put it a different way.**
14  Q.  Okay.
15  **A.  I would say everybody who is an**
16  **obstetrician/gynecologist at Christiana, it's an**
17  **expectation they will be an educator. Some people are**
18  **paid specifically for that.**
19  Q.  So he's an educator, but he's just not paid for
20  it?
21  **A.  Correct.**
22  Q.  Is he obligated to teach?
23  **A.  In my opinion.**
24  Q.  But that's just your opinion?

**B-0316**

9 (Pages 30 to 33)

Zechman
Anthony C. Sciscione, D.O.

v.
C.A. # 05-159 (JJF)

Christiana Care Heath Systems
September 7, 2006

Page 34

1  A. I don't know that there's a dictum from the
2  department. That would come from the chair,
3  Dr. Ekbladh. But in my opinion, and maybe I'm just
4  too idealistic, Miss Brewington, but we were all
5  learning at one point and everybody has the obligation
6  to train people.
7  Q. Is that the general custom at Christiana Care?
8  A. Yes, it is.
9  Q. Tell me why you wrote this letter to
10  Dr. Vakili.
11  A. Because Dr. Zechman came to me and told me that
12  he asked her not to scrub with him in a case.
13  Q. So it was Dr. Zechman that brought this to your
14  attention?
15  A. Yes.
16  Q. Did anyone else say anything to you about this?
17  A. No.
18  Q. Was Dr. Zechman upset?
19  A. Yes.
20  Q. Was she crying?
21  A. Don't remember.
22  Q. This letter is dated November 21st, 2002. Is
23  it fair to say that you wrote this on or about the
24  same day that Dr. Zechman came to you?

Page 35

1  A. Yes.
2  Q. In this letter you indicate that Dr. Vakili
3  gave reasons for not wanting to scrub with Dr. Zechman
4  and --
5  A. As told to me by Dr. Zechman.
6  Q. The first one is "I have an office full of
7  patients." "I need to hurry" is the second one. "She
8  is not teachable" is the third one. "I'm not in the
9  mood to teach someone today."
10  What were your thoughts when you heard
11  those comments?
12  A. Outraged.
13  Q. Did you have any reason to disbelieve
14  Dr. Zechman?
15  A. No. I took it at the face value.
16  Q. Did you ever have a conversation with
17  Dr. Vakili about his comments?
18  A. No. I believe I did it all through a letter
19  and he responded in a letter.
20  Q. What do you recall about his response?
21  A. I believe he was penitent.
22  Q. Did he give a reason?
23  A. I don't recall.
24  Q. The second sentence of the second paragraph

Page 36

1  says: "She came from a program, which we had
2  recognized was not as academically or clinically
3  rigorous as our program. I had recognized that she
4  would be significantly behind when she started this
5  program."
6  Based on what you wrote here, is it fair to
7  say that when you hired Dr. Zechman, you recognized
8  that she would be significantly behind when she
9  started the program?
10  A. Yeah. This probably is more generally correct,
11  and I may have said it was right when she came we knew
12  it. And what I meant is within a month or so we knew,
13  we recognized that her skills were behind.
14  Really, the best way to judge whether
15  someone -- what their skills or what they were taught
16  was is to see them performing. And if their
17  performance is below what we would expect is
18  competency, well, then, obviously they didn't get what
19  they should have gotten in another program.
20  Q. How about that second sentence of the first
21  paragraph where it says that "she came from a program,
22  which we had recognized was not as academically or
23  clinically rigorous as our program."
24  When you hired Dr. Zechman, did you

Page 37

1  recognize that the program that she was previously in
2  was not as academically or clinically rigorous as the
3  Christiana Care program?
4  A. I have to be honest with you. I think every
5  program is not as good as ours.
6  Q. And not as academically or clinically rigorous?
7  A. No. I think we have the best program in the
8  country.
9  Q. So you recognized that and accepted
10  Dr. Zechman, anyway?
11  A. Because any resident that is going to come from
12  another program with few exceptions is going to have
13  their challenges because we really want the best of
14  the best.
15  MS. BREWINGTON: Let's have this marked as
16  Sciscione 3.
17  (Sciscione Exhibit 3 was marked for
18  identification.)
19  BY MS. BREWINGTON:
20  Q. Take a look at the second sentence of this
21  letter. It's a letter dated December 12, 2002, from
22  you to Dr. Zechman. The second sentence begins with:
23  "Unfortunately, this is the most likely secondary to
24  the poor educational base that you received in your

**B-0317**

10 (Pages 34 to 37)

Zechman
Anthony C. Sciscione, D.O.

v.

C.A. # 05-159 (JJF)

Christiana Care Heath Systems
September 7, 2006

Page 38

1  previous program."
2       Now, I know that you stated that
3  Christiana Care, you feel as though that's the best
4  program; is that correct?
5  **A.  Correct.**
6  Q.  The program that she was previously in, is it
7  your opinion that that was a poor program?
8  **A.  I can say this:  I think they poorly prepared**
9  **Dr. Zechman.  I don't know if they are a poor program,**
10 **but that's what they did.**
11 Q.  You felt as though she had a poor educational
12 base?
13 **A.  I felt that it wasn't as strong as it should**
14 **be.**
15 Q.  Towards the bottom of the first paragraph you
16 write: "I will ask that you run all the patients that
17 you see in the triage area past the attending in the
18 triage area that day or on call."
19      Is there always an attending there?
20 **A.  I don't remember.**
21 Q.  You don't remember?
22 **A.  I don't remember.  Now there is an attending**
23 **there at least during the day till 8:00, but not at**
24 **night.**

Page 39

1  Q.  What would she do or what was she supposed to
2  do if there wasn't an attending?
3  **A.  There's always an attending covering.**
4  Q.  So it would be the one on call?
5  **A.  Yes, yes.**
6  Q.  Now, is that a realistic expectation of
7  Dr. Zechman and the attendings?
8  **A.  Yes.**
9  Q.  Do you know whether this happened?  And when I
10 say "this," do you know whether Dr. Zechman was able
11 to run each and every patient -- when I say "run," I
12 mean run all the patients to the attendings, like ask
13 them about them?
14 **A.  It was my expectation that was going to happen**
15 **and I think it did.**
16 Q.  What would be the purpose of doing that?
17 **A.  Really, there was two reasons to do that.  One**
18 **is, and the more important one in my mind, was so that**
19 **she could role model her thinking after seasoned**
20 **doctors or faculty.  And two is for patient safety.**
21 Q.  Do you know whether this was something that the
22 other attending physicians were willing to do?  Do you
23 know whether you faced any resistance, I guess, is my
24 question.

Page 40

1  **A.  I think it was enthusiastically accepted in**
2  **this instance.  And I have to tell you, this is the**
3  **first time I think we ever asked anybody to do that.**
4       MS. BREWINGTON:  If I can have that marked
5  as Sciscione 4.
6       (Sciscione Exhibit 4 was marked for
7  identification.)
8  **A.  (The witness reviews the document.)  Okay.**
9  BY MS. BREWINGTON:
10 Q.  This is a letter from you to Dr. Zechman and
11 it's dated March 24th, 2003.  The first sentence says:
12 "The Departmental Education Committee met Monday,
13 March 17, 2003 to discuss the progress of each
14 resident and the results of their CREOG In-Service
15 Training Examination."
16      My first question to you:  The Departmental
17 Education Committee, is that the Residency Review
18 Committee?
19 **A.  Yes.**
20 Q.  That's just like another name for it?
21 **A.  Yes.**
22 Q.  As of March 24, 2003, as I'm reading this, the
23 Residency Review Committee met on March 17 of 2003 to
24 discuss Dr. Zechman and her progress along with the

Page 41

1  other residents.
2  **A.  We probably discussed lots of things, but**
3  **that's one of the things we discussed.**
4  Q.  Based on your review of this letter, you had an
5  opportunity to review it; is that correct?
6  **A.  Yes.**
7  Q.  Can you tell me in your own words what the plan
8  was for Dr. Zechman?
9  **A.  The plan was to continue her mentorship, and**
10 **some of it is written here:  to continue her**
11 **mentorship, continue her remediation, continue what I**
12 **call an immersion program, continue following her.**
13 **And then there was some hurdles or some goals for her**
14 **to meet.**
15 Q.  What were some of her goals that she had to
16 meet?
17 **A.  I think it's described in here, but it says**
18 **there was an oral examination in May.  In order to**
19 **progress to the PGY3, you must meet or exceed the**
20 **expectation of PGY2 resident just prior to entering**
21 **PGY3 year.  Surgical evaluation cards, faculty**
22 **performance evaluations on her performance, 80 percent**
23 **of the evaluations were meet or exceed an average**
24 **rating for a PGY2 resident.**

11 (Pages 38 to 41)

Page 42

1    Q.  One part I want to focus on is: "There will be
2    an oral examination in May.  In order to progress to
3    the PGY3 year you must meet or exceed the expectations
4    of a PGY2 resident just prior to entering their PGY3
5    year."
6         Would that be, this meets expectation or
7    exceeds expectations, would that be based on the oral
8    examination that takes place in May?
9    A.  I think -- actually, I think that's exactly
10   what this says, but I think when you read the whole
11   letter in context, I think it was very clear to
12   Dr. Zechman on all fronts she really needed to
13   demonstrate that she was ready to progress to the
14   PGY3.
15   Q.  Okay.
16   A.  Not just oral examinations, but her -- I mean
17   their surgical evaluation, her faculty evaluations and
18   so forth and so on.
19   Q.  As of March 24th, 2003, was the plan to
20   continue Dr. Zechman as a PGY2?  Was that the plan?
21   A.  No.  The plan was to assess her and see if she
22   could move into the PGY3 year.
23   Q.  Let me read you the second paragraph, and it
24   says, and let me start with the beginning:  "The

Page 43

1    committee felt after reviewing all the information
2    above that you are performing more in accord with a
3    PGY1, rather than a PGY2 resident and the committee
4    felt that you should continue in our program, but in
5    the PGY2 position starting July 1, 2003."
6    A.  Okay.
7    Q.  So my question is:  As of March 24th, 2003, was
8    the plan for Dr. Zechman to repeat the second year in
9    July of 2003?
10   A.  No.
11   Q.  Okay.
12   A.  You have to read this really closely --
13   Q.  Okay.
14   A.  -- Miss Brewington, and what it says here is
15   the committee wanted to do something, and if you
16   really look at this, is that I trumped them as a
17   residency director.  They wanted to not progress her
18   and I wanted to give her every opportunity to prove to
19   the committee that she could be progressed.  And
20   that's what this is saying here.
21   Q.  Okay.
22   A.  And I convinced the committee to set some goals
23   in a last-ditch effort to have Dr. Zechman progress.
24        So again, and this is why I was still so

Page 44

1    disappointed in what she said, I'm trying to give
2    Dr. Zechman the fairest possible evaluation to the
3    point where I'm actually going around the committee to
4    try to progress her.
5    Q.  So it's almost like I have to read between the
6    lines almost with this?
7    A.  Well, no.  I think if you read it, "The"
8    committee felt," and then it says "the PGY2 position
9    starting July 1, 2003.  Therefore I am notifying you
10   that at this point in time, the recommendation of the
11   committee is to offer you a PGY2 position at the
12   conclusion of this academic year.  However, the
13   committee agreed" -- in other words, I convinced
14   them -- "to extend your remediation plan."
15        Okay?  Do you read that.
16   Q.  Yes.
17   A.  Now you see the change?
18   Q.  Yes.
19   A.  Now you see how I was her advocate?
20   Q.  Yes.
21   A.  How I was trying to defend her, how I was
22   trying to be an idealist, trying to give her every
23   chance.
24   Q.  But at some point you left.

Page 45

1    A.  I left, but that's -- I can't talk about after
2    I left because I wasn't there.
3    Q.  Exactly.
4    A.  But the point is the committee felt one way, I
5    was trying to make sure she had every opportunity to
6    prove herself because that's my job as a residency
7    director, is to be her advocate.
8    Q.  In fact, nowhere in this letter to her is the
9    mention of termination; is that correct?
10   A.  I don't believe there is, no.
11   Q.  As I understand it, there were two
12   alternatives, and please correct me if I'm wrong,
13   because you wrote this letter, but as I understand it,
14   if she met these goals and met the criteria, she would
15   then progress to a PGY3?
16   A.  Correct.
17   Q.  However, if she did not meet these goals, she
18   would remain a PGY2?
19   A.  Correct.
20   Q.  I guess then my next question to you is:  Why
21   was she terminated from the program?
22        MS. BAISINGER:  Objection.  Speculation.
23   A.  I can't comment.  I wasn't there.  I was at
24   Drexel University at the time.  But again, you can see

12 (Pages 42 to 45)

Zechman
Anthony C. Sciscione, D.O.

v.

C.A. # 05-159 (JJF)

Christiana Care Heath Systems
September 7, 2006

Page 46

1    she's struggling in the program.
2            (Sciscione Exhibit 5 was marked for
3    identification.)
4    A. (The witness reviews the document.)
5    BY MS. BREWINGTON:
6    Q. Have you had an opportunity to read this?
7    A. Yes.
8    Q. You're looking at Sciscione 5. Do you recall
9    receiving this e-mail?
10   A. I didn't, but now that I read it --
11   Q. You didn't recall --
12   A. No, I didn't, but now it sparks some memory.
13   Q. Did you talk with Dr. Zechman about her concern
14   that she was being reassigned to triage and labor and
15   delivery and not doing the surgeries?
16   A. No. I talked to her superior.
17   Q. Is that Dr. Ekbladh?
18   A. No, no. I talked to whoever her GYN chief
19   resident was. That's who assigns cases.
20   Q. Okay.
21   A. And asked them to assign her, to continue
22   assigning her to surgical cases, to encourage her to
23   be on surgical cases.
24   Q. Do you know who that would have been around

Page 47

1    this time?
2    A. I do not. I think it was probably Dr. DeLuca,
3    but I'm not sure.
4    Q. After you talked to them, what happens after
5    that? Do you follow up? Did you look at the schedule
6    to make sure she was on it? Did anything happen?
7    A. Yes. I follow up. I asked them. Did you do
8    it? I don't remember exactly, but I'm sure they said,
9    yeah, we're assigning her to more cases.
10   Q. Okay.
11   A. Remember, she is talking about two days. You
12   know, she let me know early and I took care of it.
13   Q. Was it a concern of yours that Dr. Zechman did
14   not receive surgical training as much as the other
15   residents?
16   A. Well, let me be clear about this. I was
17   concerned about Dr. Zechman on many levels.
18   Q. Okay.
19   A. I mean, not just surgically. I mean, the way
20   she processed information, the way she came to
21   conclusions, the conclusions she came to, and if I
22   remember right, she had a spotty interaction with some
23   patients.
24           In fact, I remember one letter of complaint

Page 48

1    about the way she treated a patient and I had to call
2    the patient. I always call the patients on letters of
3    complaints and they were very upset about the way they
4    were treated by Dr. Zechman.
5            So there was lots of different things I was
6    concerned about, not just her surgical skills.
7    Q. I hear what you are saying, but my question is
8    more: Was it a concern to you that Dr. Zechman may or
9    may not have been getting the surgery and the surgical
10   training that she needed?
11   A. No. I think she was afforded the
12   opportunities. What did concern me is what happened
13   with Dr. Vakili, which is -- and you can see this
14   happening, and I mention in the letter, which is the
15   folks that aren't as skilled people don't want to work
16   with because they are not as skilled, but they can't
17   ever get more skilled until they work.
18           There are some folks that are just not
19   good -- they don't have good dexterity, for whatever
20   reason. The way they're wired. I don't understand
21   it, but they just don't. Some people are excellent
22   surgeons. Some people are mediocre surgeons. Some
23   people are poor surgeons. Unfortunately, I can't
24   change that. All I can do is give them the

Page 49

1    opportunity to operate, and she was given the
2    opportunity to operate.
3            And after my experience at other programs,
4    compared to other programs, even with her thinking she
5    was limited compared to other residents in our
6    program, probably operated maybe twice as much as
7    residents in other programs. Certainly residents in
8    Drexel, at the university.
9    Q. How about operated as much as other residents
10   in the program?
11   A. I assumed she was given the exact same
12   opportunities as everyone else, and I do believe that
13   occurred as any other second year in the program.
14   Q. Did Dr. Zechman send you an e-mail concerning
15   the beds in triage being a hazard?
16   A. Now that you say it, it sounds familiar, but I
17   can't recall.
18   Q. So I guess then you wouldn't recall whether you
19   followed up and sent an e-mail to anyone else
20   concerning the beds?
21   A. I can tell you this, and anybody who knows me,
22   I'm not a person who doesn't follow up on stuff. If I
23   get an e-mail, you'll get an e-mail back from me or
24   something. I don't let things just go.

13 (Pages 46 to 49)

B-0320

Zechman
Anthony C. Sciscione, D.O.

v.
C.A. # 05-159 (JJF)

Christiana Care Heath Systems
September 7, 2006

Page 50

1  Q.  Was there a problem with the beds?
2  A.  I don't recall.
3  Q.  If there had been a problem with the beds,
4  would you consider that a safety hazard?
5  A.  I would have asked for somebody who understands
6  the beds to look into it, which would have been either
7  the head nurse of labor and delivery, Donna Smith, or
8  it would have been somebody from bioengineering.
9  Q.  Okay.
10  A.  Was someone injured on one of the beds?  I
11  don't recall that.
12  Q.  I'm asking questions.
13  A.  Oh, I'm sorry.
14  Q.  Were you aware that Dr. Zechman sent a
15  complaint to the ACGME?
16  A.  No.  Do you mean during -- when I was residency
17  director?
18  Q.  I mean, and I should have said were you aware.
19      Are you aware that she sent a complaint?
20  A.  No.
21  Q.  Okay.
22  A.  And I think the ACGME would have contacted me
23  as residency director, so I assume it didn't occur
24  during my time there.

Page 51

1  Q.  But you weren't aware of it even if it did
2  occur?
3  A.  No.  But I assume since you are the one asking
4  the questions that it must have occurred.
5  Q.  Maybe it did; maybe it didn't.  It did occur
6  and it was while Dr. Ekbladh was the director.
7      I guess my question was simply:  Did you
8  know that?  Were you aware of that?
9  A.  No.  I want to make it clear, when I left
10  Delaware, I left Delaware.
11  Q.  But you could have become aware of it when you
12  came back.  How long have you been back?
13  A.  Nine days.
14  Q.  Okay.
15  A.  At least I didn't have a deposition.
16  Q.  Welcome back.
17  A.  Thanks.
18      MS. BAISINGER:  Off the record.
19      (Discussion off the record.)
20      (Sciscione Exhibit 6 was marked for
21  identification.)
22  BY MS. BREWINGTON:
23  Q.  We've just placed in front of you Sciscione 6.
24  Take a look at it.  Then I just want to ask you what

Page 52

1  exactly it is.
2  A.  (The witness reviews the document.)  These were
3  the assessments for the oral boards that we gave all
4  the second year residents.
5  Q.  So would each resident have four assessments,
6  individual assessments?
7  A.  When you say "four" --
8  Q.  I guess I mean there's four different
9  evaluators, so would each second year resident have
10  four different evaluations similar to Dr. Zechman?
11  A.  Oh, I see.  I'm sorry.
12      They would have had not only the same
13  evaluation, but would have had the exact same
14  questions.  And there was anticipated answers to the
15  questions, right answers.  So the folks who did it
16  were sitting there just saying did they get this
17  right, did they get to this, did they get to that.
18  Q.  So everybody has the same questions?
19  A.  Yeah, yes.
20  Q.  The same people ask the questions, the same
21  evaluators?
22  A.  Yes, correct.
23  Q.  Now, am I correct that Dr. Zechman was at the
24  expected level in the opinion of each evaluator?

Page 53

1  A.  You know, I don't want to speak for each of
2  them.
3  Q.  Okay.
4  A.  What I mean specifically is Patrice, it's not
5  an accident.  I know Patrice.  It's not an accident
6  that X is not on that line that says "At Expected
7  Level," but I'll let you talk to her yourself.  Her
8  quote is "I had difficulty working" -- she had
9  difficulty working through the cases with Ellen and
10  keeping her focused on the point at hand.  So
11  obviously she had some concerns.
12  Q.  But she didn't mark "Below Expected Level," did
13  she?
14  A.  No.
15  Q.  Okay.
16  A.  I don't think she marked "At," either.
17  Q.  Michael Beldin, did he mark "Below Expected
18  Level"?
19  A.  No.  He marked "At."
20  Q.  How about Craig Sobolewski?
21  A.  To save you some time, both Craig Sobolewski
22  and Matt Hoffman both marked "At Expected Level."
23  Q.  Tell me what "At Expected Level" means.
24  A.  Can you be more specific?  I mean, I think it's

B-0321

14 (Pages 50 to 53)