Zechman
Anthony C. Sciscione, D.O.

v.

C.A. # 05-159 (JJF)

Christiana Care Heath Systems
September 7, 2006

---

Page 54

1  **self-explanatory.**
2  Q.  With respect to Dr. Zechman, if she's at the
3  expected level, what is the expected level?
4  **A.  PGY2.**
5  Q.  So she was acting at the level that she was
6  supposed to be at at the time?
7  **A.  According to them, yes.  This is only one part**
8  **of her evaluation.**
9  Q.  Just one minute.  I think I'm finished.
10     MS. BREWINGTON:  I don't have anything
11  further.
12     MS. BAISINGER:  I just have one question, a
13  follow-up question.
14  BY MS. BAISINGER:
15  Q.  Back to Exhibit 4, I believe, it's the
16  March 24th, 2003, letter to Dr. Zechman.
17  **A.  Yes.**
18  Q.  I believe that you stated that you convinced
19  the committee to give Dr. Zechman a chance to prove
20  that she could advance to a PGY3 in June 2003.
21  **A.  Right.  I really wanted to give her every**
22  **chance, even if it was to the last minute to prove**
23  **herself before they would say that she couldn't be**
24  **promoted.**

---

Page 55

1  Q.  Did you believe that the committee's concerns
2  about Dr. Zechman at this time were valid concerns?
3  **A.  I thought they were legitimate.**
4     MS. BAISINGER:  That's all I have.
5     MS. BREWINGTON:  I don't have anything
6  further.
7     (The deposition was then concluded at
8  4:15 p.m.)
9         - - - - -
10
11     INDEX TO TESTIMONY
12
13  ANTHONY SCISCIONE, D.O.         PAGE
14
15  Examination by Ms. Brewington        2
16  Examination by Ms. Baisinger        54
17
18         - - - - -
19
20
21
22
23
24

---

Page 56

1     INDEX TO EXHIBITS
2
3  SCISCIONE EXHIBIT NO.:          PAGE
4
5  1  A multipage copy of a Complaint        11
6  2  A one-page copy of a letter dated
      November 21, 2002, to Ghassem Vakili, M.D.,
7     from Anthony C. Sciscione, D.O.        32
8  3  A one-page copy of a letter dated
      December 12, 2002, to Ellen Huffman-Zechman,
9     M.D., from Anthony C. Sciscione, D.O.    37
10 4  A one-page copy of a letter dated March 24,
      2003, to Dr. Ellen H. Zechman from Anthony
11    C. Sciscione, D.O.                40
12 5  A one-page copy of an e-mail dated Tuesday,
      May 13, 2003, from Ellen H. Zechman to
13    Anthony Sciscione, MD             46
14 6  A four-page copy of Mock Oral Boards forms 51
15
16         - - - - -
17
18
19
20
21
22
23
24

---

Page 57

1
2
3
4
5
6
7
8     REPLACE THIS PAGE
9
10    WITH THE ERRATA SHEET
11
12    AFTER IT HAS BEEN
13
14    COMPLETED AND SIGNED
15
16    BY THE DEPONENT.
17
18
19
20
21
22
23    **B-0322**
24

Wilcox & Fetzer, Ltd.    Professional Court Reporters    (302)655-0477

Zechman
Anthony C. Sciscione, D.O.

v.

C.A. # 05-159 (JJF)

Christiana Care Heath Systems
September 7, 2006

Page 58

1   State of Delaware )
2            )
3   New Castle County )
4
5
6            CERTIFICATE OF REPORTER
7
8            I, Kathleen White Palmer, Registered
    Professional Reporter and Notary Public, do hereby
9   certify that there came before me on the 7th day of
    September, 2006, the deponent herein, ANTHONY C.
10  SCISCIONE, D.O., who was duly sworn by me and
    thereafter examined by counsel for the respective
11  parties; that the questions asked of said deponent and
    the answers given were taken down by me in Stenotype
12  notes and thereafter transcribed into typewriting
    under my direction.
13
             I further certify that the foregoing is
14  a true and correct transcript of the testimony given
    at said examination of said witness.
15
             I further certify that I am not counsel,
16  attorney, or relative of either party, or otherwise
    interested in the event of this suit.
17
18
19
20
21           Kathleen White Palmer, RPR, RMR, CLR
             Certification No. 149-RPR
22           (Expires January 31, 2008)
23
    DATED:  September 15, 2006
24

**B-0323**

RECEIVED

SEP 29 2006

BY:

1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2      IN AND FOR THE DISTRICT OF DELAWARE
 3                  -   -   -
 4   ELLEN ZECHMAN        :   CIVIL ACTION
                          :
 5          v.            :
                          :
 6   CHRISTIANA CARE      :
     HEALTH SYSTEMS       :   NO. 05-159
 7
                  -   -   -
 8
               SEPTEMBER 13, 2006
 9
                  -   -   -
10
11              Oral deposition of JOSEPH E.
12   PATRUNO, M.D. taken pursuant to notice,
13   was held at the law offices of MORGAN,
14   LEWIS & BOCKIUS LLP, 1701 Market Street,
15   9th Floor, Philadelphia, Pennsylvania
16   beginning at 2:29 p.m., on the above
17   date, before Dottyann Y. Walsh, a
18   Certified Shorthand Reporter and Notary
19   Public in the Commonwealth of
20   Pennsylvania.
21                  -   -   -
22        ESQUIRE DEPOSITION SERVICES
             1201 North Orange Street
23      One Commerce Center  Suite 760
            Wilmington, Delaware 19801
24             (302) 426-9857
```

B-0324

2

```
1   APPEARANCES:
2
        MARGOLIS EDELSTEIN
3       BY: LORI A. BREWINGTON, ESQUIRE
        1509 Gilpin Avenue
4       Wilmington, Delaware 19806
        (302) 777-4680
5       Representing the Plaintiff
6
        MORGAN, LEWIS & BOCKIUS LLP
7       BY: KENDRA L. BAISINGER, ESQUIRE
        1701 Market Street
8       9th Floor
        Philadelphia, Pennsylvania 19103
9       (215) 963-5624
        Representing the Defendant
10
11      ALSO PRESENT: Ellen Zechman
12            - - -
13
14
15
16
17
18
19
20
21
22
23
24
```

4

```
1            - - -
2       DEPOSITION SUPPORT INDEX
3            - - -
4
5   Direction to Witness Not to Answer
6   Page Line    Page Line    Page Line
7   None
8
9
10  Request for Production of Documents
11  Page Line    Page Line    Page Line
12  None
13
14
15  Stipulations
16  Page Line    Page Line    Page Line
17  None
18
19
20  Question Marked
21  Page Line    Page Line    Page Line
22  None
23
24
```

3

```
1            - - -
2          I N D E X
3            - - -
4   Testimony of: JOSEPH E. PATRUNO, M.D.
5
        By Ms. Brewington         6
6
7            - - -
8          E X H I B I T S
9            - - -
10  NO.    DESCRIPTION       PAGE
11  Patruno-1  Complaint        28
12  Patruno-2  Group of mentor      57
            meeting notes
13
    Patruno-3  E-mail, 7-26-03    72
14
    Patruno-4  E-mail, 5-13-03    74
15
    Patruno-5  Possible remediation  81
16            schedule
17  Patruno-6  Evaluation form,    87
            10-28-03
18
    Patruno-7  Letter, 2-18-03    97
19
    Patruno-8  RRC minutes, 8-18-03  99
20
21
22
23
24
```

5

```
1            - - -
2       JOSEPH E. PATRUNO, M.D.,
3       after having been duly sworn, was
4       examined and testified as follows:
5            - - -
6       DIRECT EXAMINATION
7            - - -
8   BY MS. BREWINGTON:
9       Q.   Good afternoon, Mr. Patruno.
10      A.   Hello.
11      Q.   My name is Lori Brewington.
12  And I represent Dr. Ellen Zechman in a
13  disability action against Christiana
14  Care. I'm going to ask you a series of
15  questions. I am sure that you have
16  testified in a deposition before.
17      A.   Not exactly like this. But
18  I have.
19      Q.   I'm going to ask you a
20  series of questions. All I ask is that
21  you answer them as truthfully as
22  possible. At times Christiana Care's
23  attorney may object to some of the
24  questions and that is entirely proper.
```

-JOSEPH E. PATRUNO, M.D.

6

1  The only thing that I ask is that you
2  answer the question unless she
3  specifically advises you not to answer
4  the question.
5       At times -- we have a court
6  reporter here and she's going to be
7  taking down everything that we are saying
8  here. I will ask that you let me
9  complete my question fully and then if
10 you could respond. I will try not to
11 talk over you and you will try not to
12 talk over me.
13      Let's start by you telling
14 me your full name for the record.
15   A.  Joseph E. Patruno.
16   Q.  If you could spell Patruno
17 for the court reporter.
18   A.  P-A-T-R-U-N-O.
19   Q.  Where did you go to medical
20 school?
21   A.  Brown University.
22   Q.  And when did you graduate?
23   A.  I graduated in 1995.
24   Q.  Did you attend a residency

7

1  program?
2    A.  I did residency at Penn
3  State Hershey in OB/GYN.
4    Q.  And you graduated when?
5    A.  '99.
6    Q.  Are you board certified?
7    A.  I am.
8    Q.  In what specialty?
9    A.  Obstetrics and gynecology.
10   Q.  Where do you currently work?
11   A.  I work at Lehigh Valley
12 Hospital in Allentown, Pennsylvania.
13   Q.  And what is your role there?
14   A.  I'm chief of gynecology.
15   Q.  How long have you been chief
16 of gynecology at Lehigh Valley Hospital?
17   A.  For about one year.
18   Q.  What did you do prior to
19 working there?
20   A.  I worked at Christiana Care
21 Medical Center.
22   Q.  And what was your role at
23 Christiana Care?
24   A.  I was in the division of

8

1  general OB/GYN, also called the medical
2  education division.
3    Q.  Were you a teaching
4  physician?
5    A.  Yup.
6    Q.  Is that different than an
7  attending physician or is that the same
8  thing?
9    A.  Sort of the same except I
10 was employed by the hospital as a
11 hospitalist.
12   Q.  How long were you at
13 Christiana Care?
14   A.  For three years.
15   Q.  And why did you leave?
16   A.  Because my job up in
17 Allentown was better.
18   Q.  Now, Dr. Zechman was a
19 resident at Christiana Care's obstetrics
20 and gynecology program in June or July
21 of 2002 and ending in September 2003.
22 Most if not all of my questions are going
23 to be concerning that period of time.
24 Were you assigned to be her mentor at any

9

1  period of time?
2    A.  I was.
3    Q.  As I stated, she began
4  working there in 2002 in June. When did
5  you first become her mentor?
6    A.  I started working there I
7  think about the same time. I can't
8  remember exactly when I was first
9  assigned as her mentor.
10   Q.  And that's fair. It has
11 been a while. Would you say it was --
12   A.  Probably -- I'm sorry.
13   Q.  I was going to ask would you
14 say it was toward the beginning of her
15 career there, towards the middle or the
16 end?
17   A.  I'm going to make a guess
18 probably four to six months.
19   Q.  And who assigned you as her
20 mentor?
21   A.  Tony Sciscione.
22   Q.  What was the purpose of
23 that?
24   A.  To help Ellen sort of adjust

-JOSEPH E. PATRUNO, M.D.

10

1  clinically and put together a program to
2  help her.
3      Q.  Are you aware of anyone else
4  in the residency program that was
5  assigned a mentor?
6      A.  At that particular time I
7  can't remember. But at other points
8  during the residency, people are assigned
9  mentors.
10     Q.  Did you feel that it was
11 appropriate for Ellen to have a mentor?
12     A.  Sure.
13     Q.  Did you feel that she needed
14 a mentor?
15     A.  Theoretically, I thought
16 having a mentor certainly was not going
17 to be a bad thing.
18     Q.  Why is that?
19     A.  Because mentors can oversee
20 things, they can be the mentoree's
21 advocate, they can help them adjust and
22 move them along if they are having
23 difficulty in what they are doing.
24     Q.  Was it your understanding

11

1  that Dr. Zechman was having difficulty?
2      A.  I think probably when I was
3  assigned, the reason was because she was
4  having some difficulty.
5      Q.  And what were some of your
6  roles and responsibilities as
7  Dr. Zechman's mentor?
8      A.  Well, as I remember it, our
9  goal was to get together as often as we
10 could, and my goal was to make it maybe
11 two or three times a month. We would
12 spend about an hour if we could and sort
13 of review what was going on in terms of
14 her progress. And often we talked about
15 clinical stuff as well. And I would give
16 her an assignment and we would review
17 something clinically.
18     Q.  Were you her mentor
19 throughout her whole time there or at
20 some point did that end, the mentoring
21 relationship?
22     A.  I'm not sure if it
23 officially ended. Although I can't --
24 sort of near the end, Tony Sciscione left

12

1  and our program was going through some
2  changes and I'm not sure how frequently
3  we got together toward the end.
4      Q.  Is it fair to say that the
5  frequency kind of decreased towards the
6  end?
7      A.  Yeah, perhaps, difficult for
8  me to remember to be honest. I have to
9  be honest.
10     Q.  But you were still
11 officially her mentor, you just didn't
12 meet as much?
13     A.  Right. You keep saying
14 officially, I'm not sure what officially.
15     Q.  Did anyone tell you that you
16 were no longer her mentor?
17     A.  No.
18     Q.  So as of September of 2003
19 when she left, you were still considered
20 to be her mentor?
21     A.  I suppose.
22     Q.  And you say you suppose
23 because why?
24     A.  You are saying like you are

13

1  officially her mentor. As I remember it,
2  I was assigned to help Ellen when she
3  started and sort of help her along. I'm
4  not sure there was an official.
5      Q.  Term mentor?
6      A.  Yeah.
7      Q.  Okay.
8      A.  It wasn't an official role
9  of mentor. Every one of our residents
10 when they started were assigned a mentor.
11 And those people were supposed to be
12 available to them if they needed them is
13 sort of how it worked out. And sometimes
14 people used their mentors and other times
15 they didn't.
16     Q.  So were you the mentor
17 assigned to Zechman, Dr. Zechman?
18     A.  I was.
19     Q.  Did Dr. Zechman ever talk to
20 you about concerns that she was having?
21     A.  Yes.
22     Q.  What do you recall about
23 your conversations with her specifically
24 with respect to the concerns that she was

-JOSEPH E. PATRUNO, M.D.-

14

1  having?
2      A.  I think there were a variety
3  of concerns.  And they depended on when
4  we met.  I think early on there were some
5  concerns in regards to Ellen and what she
6  needed to do to keep up with her cohort,
7  and how she was doing clinically, and
8  what she could do to improve.  She also I
9  think had some concerns about her
10 relationships with her peers which I
11 think were difficult in some cases.  I
12 think she had some concerns about her
13 experience and what she was doing and her
14 spending a lot of time in our triage unit
15 which was sort of the role of the second
16 year residents in our program at the
17 time.
18     Q.  Is there anything else that
19 you can recall about her concerns?
20     A.  That is a very open-ended
21 question.
22     Q.  It is, I would agree.  So
23 your answer is probably yes at this
24 point?

15

1      A.  Well, focus me.  Focus me if
2  you want to go someplace in particular.
3      Q.  We will go there, but let's
4  talk about each one of the things that
5  you have mentioned.
6      A.  I would be happy to.
7      Q.  The first thing and please
8  correct me if I'm wrong, is that I
9  understand Dr. Zechman expressed concerns
10 about keeping up with her cohorts and
11 what she needed to do to improve?
12     A.  Yeah.
13     Q.  Can you elaborate on this?
14 I guess my question is what exactly do
15 you recall about her concerns?
16     A.  Maybe I should rephrase it.
17 I'm not sure necessarily it was Ellen's
18 concern as it was perhaps a perception in
19 the program that she was behind some of
20 her cohort.
21     Q.  And when you say cohort, do
22 you mean --
23     A.  I mean other people in her
24 class.  Because I think it would be fair

16

1  to compare it to the other second year
2  residents at the time.
3      Q.  And when you say behind, are
4  we talking about her surgical skills?
5      A.  No, I'm not talking about
6  her surgical skills because I didn't have
7  a lot of exposure to Ellen's surgical
8  skills to be honest, or technical skills,
9  and I will make that clear.  Sort of the
10 way our program worked, I operated as an
11 hospitalist mostly with our chief
12 residents, whether it was in obstetrics
13 or gynecology, so I did not have a lot of
14 surgical experience along with Ellen, we
15 didn't do a lot of surgeries together.
16 So no, this was mostly -- probably most
17 of our interactions were with her in our
18 triage unit at Christiana.
19     Q.  So do you mean her being
20 behind other residents with respect to
21 triage?
22     A.  Yes.  On some levels.
23     Q.  Can you tell me what you
24 mean by that?

17

1      A.  My memory was -- and our
2  triage unit was a very busy atmosphere,
3  was that Ellen had to adjust to sort of
4  the volume of our triage unit which was
5  sometimes busy.
6      Q.  While Ellen was in triage,
7  was there a sufficient amount of
8  assistance for her?  When I say
9  assistance, I mean I guess the attending
10 physicians on hand?
11     A.  That is a little bit
12 obscure, sufficient.  I can tell you what
13 our staffing protocol was there.
14     Q.  Hold that thought.  And let
15 me ask you this question.  If Dr. Zechman
16 needed to talk with someone about a
17 triage case, and someone meaning I guess
18 the attending physician, is that
19 attending physician or would that
20 attending physician be available to her?
21          MS. BAISINGER:  Objection.
22      Speculation.  You can answer.
23          MS. BREWINGTON:  Based on
24      your experience.

B-0328

-JOSEPH E. PATRUNO, M.D.

18

1    THE WITNESS: Based on my
2    experience, it was somewhat
3    dependent on when during the day
4    she was doing a shift. During the
5    daytime there was an attending
6    there. There was always an
7    attending in-house. Which you got
8    more specialized attention during
9    the daytime hours.
10   BY MS. BREWINGTON:
11   Q.   What happened at night?
12   A.   **Residents would see patients**
13   **and then communicate with either the**
14   **attending in-house or the generals**
15   **attending when the patient -- saw the**
16   **patient normally to discuss plans.**
17   Q.   And the attending in-house,
18   who is that? Not the name of the person,
19   but --
20   A.   **What is their role?**
21   Q.   Yes, and where are they?
22   A.   **The 24-hour attending was**
23   **assigned basically to the labor and**
24   **delivery end of the triage unit.**

19

1    Q.   Did Dr. Zechman ever discuss
2    with you her concern about being left in
3    triage unattended?
4    A.   **She may have. I can't**
5    **recall lake specific details, but she**
6    **certainly may have.**
7    Q.   Did Dr. Zechman discuss with
8    you her concern about fatigue in the work
9    hours?
10   A.   **She may have, but I don't**
11   **recall details. I really do not.**
12   Q.   Going back to the second
13   thing that you mentioned.
14   A.   **Sure.**
15   Q.   You mentioned concerns about
16   relationships with peers which were
17   difficult. The which were difficult, is
18   that according to you or according to
19   Dr. Zechman?
20   A.   **Probably more according to**
21   **Dr. Zechman, but also just being an**
22   **observant overseer of the residents, my**
23   **perception.**
24   Q.   Tell me about your

20

1    perception of Dr. Zechman's relationship
2    with her peers if you could.
3    A.   **Which peer?**
4    Q.   Let's start with Heinle.
5    A.   **Okay. Dr. Heinle was one of**
6    **Dr. Zechman's cohorts, one of the four**
7    **residents in the second year class. And**
8    **I think there was sort of a volatile**
9    **relationship between Dr. Zechman and**
10   **Dr. Heinle. And my perception of their**
11   **interactions was that Dr. Heinle didn't**
12   **think that Dr. Zechman could keep up.**
13   **And I'm not sure that there was any**
14   **animosity from Dr. Zechman towards**
15   **Dr. Heinle.**
16   Q.   Did you observe Dr. Zechman
17   treating Dr. Heinle any way?
18   A.   **I think there was a lot of**
19   **sort of ignoring more than truly**
20   **unprofessional behavior or shouting**
21   **matches or fights.**
22   Q.   And you as overseer of the
23   program, did you --
24   A.   **I wasn't overseer of the**

21

1    **program.**
2    Q.   Oh, I thought you just said
3    that.
4    A.   **No, I said as an attending**
5    **physician overseeing residents.**
6    Q.   You as an overseer of the
7    residents. I'm sorry.
8    A.   **That is okay.**
9    Q.   Did you address this concern
10   about Dr. Heinle ignoring Dr. Zechman
11   with Dr. Heinle?
12   A.   **There may have been**
13   **discussions between myself, Dr. Heinle,**
14   **Stef Kirsh and Alex Kirfides with the**
15   **goal of helping them function together.**
16   Q.   You said there may have
17   been. Is that something you don't
18   recall?
19   A.   **I don't really recall.**
20   Q.   How about Dr. Rachel
21   Heinle -- I'm sorry, Dr. Gray?
22   A.   **I had very little exposure**
23   **to Dr. Zechman and Dr. Gray's**
24   **interactions because Dr. Gray at that**

-JOSEPH E. PATRUNO, M.D.-

22

1  time was probably a chief resident I
2  would imagine.
3      THE WITNESS: Was Dr. Gray a
4  chief resident that year?
5      DR. ZECHMAN: Uh-huh.
6      THE WITNESS: My question is
7  a lot of those interactions didn't
8  happen down in triage where I was
9  doing most of my coverage, and I
10  really don't have any memory
11  between the two of them or can I
12  remember Dr. Gray saying anything
13  to me particularly derogatory
14  about Dr. Zechman.
15  BY MS. BREWINGTON:
16      Q.   Are there any other
17  residents that you can recall saying
18  anything about Dr. Zechman specifically?
19      A.   Not specifically.
20      Q.   Did Dr. Zechman send you
21  e-mails concerning Dr. Gray?
22      A.   I don't recall. I don't
23  recall. I really don't recall.
24      Q.   And you don't recall or do

23

1  you recall having discussions with her
2  about Dr. Gray?
3      A.   I have to say I don't
4  recall. I really don't.
5      MS. BAISINGER: Can we take
6  a break?
7      (Recess at 2:48 p.m.)
8      (Resumed at 2:56 p.m.)
9  BY MS. BREWINGTON:
10      Q.   Did you ever talk with
11  Dr. Zechman or did Dr. Zechman ever talk
12  with you about her concerns about
13  attending physicians treating her
14  differently?
15      A.   There may have been some
16  conversations about that.
17      Q.   Do you recall which
18  attending physicians?
19      A.   Not so much. Maybe -- I
20  don't remember like details. Not so
21  much.
22      Q.   How about Dr. Vakili? Did
23  she ever talk to you about Dr. Vakili
24  treating her any differently?

24

1      A.   She may have.
2      Q.   Is it because it is
3  difficult for you to recall?
4      A.   I have to be honest, I can't
5  recall details. And I apologize, but I
6  have been working with residents for a
7  lot of years. And there have been a lot
8  of complaints and Ellen's situation is
9  unique. But I can't remember the
10  details. Dr. Vakili was one of our older
11  attendings and I'm not sure if he treated
12  her differently. Although I know he was
13  very set in his ways. I can't remember
14  the details, though.
15      Q.   Do you remember details
16  about -- not details because I understand
17  it is hard for you to recall everything,
18  but I guess my question is do you
19  remember anything at all about the
20  conversations that you would have with
21  Dr. Zechman concerning the attending
22  physicians treating her differently?
23      A.   Well, I think at times she
24  felt she wasn't getting opportunities to

25

1  do what she wanted to do.
2      Q.   Which was what?
3      A.   Which was I think she wanted
4  to get more surgical experience.
5      Q.   Is there anything else?
6      A.   No, not really.
7      Q.   And this wanting to get more
8  surgical experience, is this something
9  she had to get, the surgical experience,
10  in order to improve?
11      A.   Ultimately.
12      Q.   How did you respond to her
13  concern about -- you say want, I'm going
14  to say need to have more surgical skills.
15      A.   Right.
16      Q.   My question is how did you
17  respond or do you recall?
18      A.   Probably my response would
19  have been that you are going to get it
20  with the volume that we had at Christiana
21  and continue to try to be aggressive
22  about doing those things and getting
23  those skills that you need.
24      Q.   What do you mean by being

-JOSEPH E. PATRUNO, M.D.

26

1  aggressive? Does she have to request to
2  do these surgeries?
3      A.  It depends. Some
4  opportunities vary depending on what your
5  level of training is, what rotation you
6  are doing.
7      Q.  How would she go about being
8  aggressive? What did you mean by that?
9      A.  I will give you an example,
10  if she was up on labor and delivery and
11  there was a C-section to do, volunteer to
12  do it.
13      Q.  Who makes the final
14  decision?
15      A.  I think it varies.
16      Q.  Is it the chief residents?
17      A.  Probably often.
18      Q.  What happens when the chief
19  resident doesn't like you?
20      MS. BAISINGER: Objection,
21  speculation.
22      THE WITNESS: I don't know.
23  You would hope that the chief
24  resident would be professional and

27

1      continue to provide for those
2      below them.
3  BY MS. BREWINGTON:
4      Q.  Did you feel that
5  Dr. Zechman's concerns about not getting
6  enough surgery were valid or legitimate?
7      A.  Once again, I'm not sure I
8  was in the best position to make that
9  judgment. The reason being I wasn't
10  running the residency, so I wasn't sort
11  of assigning people to rotations. And
12  most of my experience with Ellen was down
13  in triage which wasn't a place we did
14  procedures. I guess we would have spent
15  some time on labor and delivery, and I
16  don't remember doing many cases with
17  Ellen, and I can't remember she wasn't
18  there, she was assigned to other places.
19  Now I forgot the question.
20      Q.  I really don't know what the
21  question was either.
22      A.  Should she have gotten.
23      Q.  I want to know how you felt
24  about it. Did you have an opinion on

28

1  whether her concerns about surgery were
2  legitimate or valid?
3      A.  The judgment I can't make is
4  whether or not Ellen did not have the
5  opportunities to do the surgeries that
6  her peers did.
7      Q.  And --
8      A.  I'm not sure I feel
9  comfortable to make that judgment.
10      Q.  But is it fair to say that
11  she discussed this concern with you?
12      A.  Yeah, I think she did.
13      MS. BREWINGTON: If I could
14  have that marked.
15      (Exhibit Patruno-1 marked
16  for identification.)
17  BY MS. BREWINGTON:
18      Q.  What is in front of you
19  right now is we have previously marked as
20  Patruno-1. That is the complaint that
21  Dr. Zechman filed against Christiana
22  Care. Have you ever seen that document?
23      A.  I did, just today. I
24  believe it is the same document.

29

1      Q.  I would like to turn your
2  attention to paragraph 20. I'm going to
3  read it out loud and then I will ask you
4  a question about it. During this
5  initial meeting, Dr. Patruno told
6  plaintiff that various members of the
7  residency review community disapproved of
8  her. Patruno also told plaintiff that
9  she would have to work exceptionally hard
10  to win the committee's approval, and he
11  also told plaintiff that the upcoming
12  annual CREOG exam would be pivotal for
13  its approval. Patruno told plaintiff,
14  these are not kind and loving people
15  here, and warned plaintiff, "if you do
16  not do well on this exam, those knives in
17  your back will be knives in your head."
18      My first question is do you
19  recall anything about paragraph 11 -- I
20  mean paragraph 20?
21      A.  So this was probably during
22  one of our mentor meetings I assume. I
23  was not part of the RRC. So I'm not sure
24  that I was that involved with any of it.

-JOSEPH E. PATRUNO, M.D.

30

1    So I certainly don't remember saying
2    anything to these specifics. I really
3    don't. And I wouldn't tell her that the
4    residency review committee disapproved of
5    her.
6        Q.   That was my next question.
7    Not necessarily did you tell her that but
8    whether you were aware of whether they
9    approved or disapproved of her?
10       A.   Like I said, I'm not in the
11   RRC. So I wasn't in any meeting where
12   anyone said they disapproved of her. My
13   comments probably would have been
14   probably because of interaction I have
15   with Dr. Sciscione who said these are
16   some of the issues. But I don't remember
17   making any statements that are this
18   detailed or anything to even suggest most
19   of these things.
20       Q.   Let's take it step by step
21   by step. The first sentence, Dr. Patruno
22   told plaintiff that various members of
23   the residency review committee
24   disapproved of her. Is that statement

31

1    false?
2        A.   Yeah. It is.
3        Q.   Did you tell Dr. Zechman
4    anything about the residency review
5    committee?
6        A.   I wasn't part of the
7    residency review committee.
8        Q.   I understand you were not
9    part of it, but you mentioned
10   Dr. Sciscione may have told you some
11   things.
12       A.   Yeah, but he wouldn't have
13   given me these details. That committee
14   was really sort of a closed door
15   committee. To protect the residents.
16       Q.   I understand that your
17   position is that you didn't tell her
18   that, the residency review committee said
19   those things.
20       A.   I don't recall saying
21   anything to that effect.
22       Q.   Do you have an understanding
23   of whether or not the residency review
24   committee disapproved of Dr. Zechman?

32

1        MS. BAISINGER: Objection.
2    Asked and answered.
3        MS. BREWINGTON: You can
4    answer.
5        THE WITNESS: I can answer?
6        MS. BAISINGER: You can
7    answer.
8        THE WITNESS: Once again, I
9    would imagine that they didn't
10   disapprove of her, she chose her
11   to be one of our residents. So
12   disapproval is the wrong word. I
13   never would have used that word.
14   BY MS. BREWINGTON:
15       Q.   The next sentence, Patruno
16   also told plaintiff that she would have
17   to work exceptionally hard to win the
18   committee's approval and he also told
19   plaintiff that the upcoming CREOG exam
20   would be pivotal for its approval. Is
21   any part of that allegation true?
22       A.   I may have told Ellen
23   that -- I mean, I think she had to work
24   hard. And I think the CREOG exam which

33

1    was sort of a more objective measure of
2    her knowledge and -- knowledge, would be
3    favorable for her to do well on it. But
4    I don't remember phrasing it in such a
5    way that it was sort of an ultimatum.
6    She needed that to get their approval.
7        Q.   Do you know whether or not
8    the resident review committee considers
9    the results of the CREOG exams?
10       A.   Yeah.
11       MS. BAISINGER: Objection.
12   Speculation.
13       MS. BREWINGTON: Yeah, you
14   do know whether or not they do?
15       THE WITNESS: I believe they
16   do, yes.
17   BY MS. BREWINGTON:
18       Q.   Next sentence, Patruno told
19   plaintiff these are not kind and loving
20   people here and warned plaintiff if you
21   do not do well on this exam, those knives
22   in your back will be knives in your head.
23   Is there anything about that sentence
24   that is true?

B-0332

-JOSEPH E. PATRUNO, M.D.

34

1    A.    I have no recollection of
2  saying those things. I really do not.
3    Q.    So then my next question was
4  going to be what did that mean and can
5  you tell me?
6    A.    I have no recollection of
7  saying anything to that affect. That
8  makes me seem like I'm really unhappy as
9  well and I don't think I was. I don't
10  think I would work in an environment
11  where people...
12    Q.    Did you review the results
13  of the CREOG exam with Dr. Zechman?
14    A.    I probably did.
15    Q.    Do you have any recollection
16  of how Dr. Zechman did on that CREOG
17  exam?
18    A.    I happen to know just
19  because I looked through my notes earlier
20  today. I think she got 12 percentile for
21  her level of training.
22    Q.    Do you know whether or not
23  there were others in the residency
24  program that did or that had lower scores

35

1  than her?
2    A.    I don't know. I don't know
3  that year. I don't know. I mean, there
4  were other residents that had troubles
5  with CREOG, too.
6    Q.    You indicated that you were
7  aware that others had problems with the
8  CREOG, is that true?
9    A.    When I was at Christiana,
10  yeah, there were residents who had
11  problems with CREOGs, yeah.
12    Q.    Do you know if any of those
13  residents were terminated from the
14  program?
15    A.    Because of their CREOG
16  scores?
17    Q.    At all. Do you know whether
18  they were terminated from the program?
19    A.    So when Dr. Zechman was
20  there. I don't think any other -- I
21  don't think any other residents at the
22  time in 2002 were terminated.
23    Q.    So some of those residents
24  may have had problems with their CREOGs

36

1  but they were not terminated from the
2  program, is that what you are saying?
3    A.    True.
4    Q.    Take a look at paragraph 48.
5  I will read it out loud. In or around
6  August and September 2003, plaintiff was
7  denied the opportunity to attend weekly
8  half-day clinics at Wilmington Hospital.
9  These clinics are a requirement of all
10  OB/GYN training programs. When plaintiff
11  asked Dr. Hoffman why she was excluded
12  from this opportunity, he shrugged his
13  shoulder and told her to ask Dr. Ekbladh.
14  When plaintiff asked her assigned mentor,
15  Dr. Patruno, why she was excluded from
16  this opportunity, Patruno stated, can't
17  you see? They kicked you out of the call
18  room, now they're pushing you out the
19  door. Did I read that accurately?
20    A.    Yes.
21    Q.    Let's start with the
22  beginning part of that. Was Dr. Zechman
23  not allowed to attend the weekly half-day
24  continuity clinics at Wilmington

37

1  Hospital?
2        MS. BAISINGER: Objection.
3  Speculation.
4        MS. BREWINGTON: How is that
5  speculation?
6        MS. BAISINGER: He may not
7  know.
8        MS. BREWINGTON: Let's ask
9  him.
10        THE WITNESS: I don't know.
11        DR. ZECHMAN: Sounds like
12  she's putting words in his mouth.
13        MS. BAISINGER: I would ask
14  that plaintiff not speak during
15  this deposition.
16        THE WITNESS: I don't know.
17  I wasn't in control of schedules.
18  BY MS. BREWINGTON:
19    Q.    Did Dr. Zechman ask you
20  anything about these continuity clinics?
21  Did she talk to you about it?
22    A.    She may have, but I don't
23  recall details.
24    Q.    Do you know what these

-JOSEPH E. PATRUNO, M.D.

38

1 continuity clinics are?
2    A.   Sure.
3    Q.   Can you tell me about them.
4    A.   Basically they are office
5 practice, and at Christiana, the
6 residents saw patients at the Wilmington
7 Hospital. Which was about 10 miles away
8 from the Newark campus where they did
9 most of their stuff.
10    Q.   And are these a requirement
11 of the program?
12    A.   There are residency review
13 requirements that you maintain some sort
14 of a continuity experience for residents.
15    Q.   Just so it is clear and I'm
16 not sure whether I asked you this or not,
17 did Dr. Zechman come to you as her mentor
18 and ask why she was not allowed to attend
19 these clinics?
20    A.   She may have. But I don't
21 recall the details of any conversation.
22    Q.   The last two lines of
23 paragraph 48, can't you see, they kicked
24 you out of the call room, now they are

39

1 pushing you out the door. Do you have
2 any recollection of that statement?
3    A.   I do not.
4    Q.   Do you believe that is
5 something you said?
6    A.   No, I don't believe I said
7 anything like that at all.
8    Q.   Do you have -- I guess my
9 question and concern is we have
10 allegations in this complaint, and we
11 have statements made by you as part of
12 the allegations.
13    A.   I understand.
14    Q.   Do you have -- I will ask it
15 as simple as I can, do you know why
16 Dr. Zechman would say that you said these
17 things?
18    MS. BAISINGER: Speculation.
19    THE WITNESS: No. I don't.
20    We may have had a conversation
21    about the call room and this was
22    her interpretation of the
23    conversation. But I certainly
24    wouldn't have said the line that

40

1 is quoted here.
2 BY MS. BREWINGTON:
3    Q.   So you did have a
4 conversation with Dr. Zechman about the
5 call room?
6    A.   I may have. I understand
7 I'm not being clear to you, but I do not
8 have much of a recollection of the
9 details. I really do not.
10    Q.   Tell me what you can recall
11 about your conversation with Dr. Zechman
12 about the call room.
13    A.   I don't really have a memory
14 of any of that.
15    Q.   You remember discussing it
16 but you don't remember --
17    A.   Well, I don't really
18 remember the details.
19    Q.   I don't need details. I
20 need anything. You don't remember
21 anything?
22    A.   No, you asked me if I said
23 any of these things and I said I did not.
24    Q.   And then we moved on. And

41

1 we mentioned the call room?
2    A.   And I said there may have
3 been some conversation about the call
4 room. And I don't remember what the
5 details of the call room or when this --
6 in September 2003. So this was probably
7 about the time that Ellen didn't get
8 promoted to third year and there was a
9 call room issue. And whose call room she
10 would be in. So I think the issue may
11 have related to that. But I certainly
12 don't remember any details or alluding to
13 the fact that she got kicked out of a
14 call room or that that ultimately meant
15 she was getting pushed out the door.
16    Q.   Do you know whether or not
17 there was a call room for her?
18    A.   That is a good question. I
19 assume there was.
20    Q.   The reason I ask is because
21 you just stated it was a time when she
22 would have been a third year, so there
23 would have been an issue. Is that what
24 you said?

-JOSEPH E. PATRUNO, M.D.

42

1    A.   Right.
2    Q.   And I just wanted to ask you
3  about that. What would have been the
4  issue?
5    A.   Well, question would have
6  been if she gets promoted from second to
7  third year, shouldn't she have set up
8  camp in the second year call room or the
9  third room call room? And I vaguely
10  remember that there was an issue with
11  this, but I can't remember the details or
12  where Ellen was ultimately assigned. I
13  would expect that there would have been a
14  call room for her. I would expect. But
15  I don't remember the details.
16    Q.   Paragraph 49. On or about
17  August 20, 2003, plaintiff met with her
18  mentor, Dr. Patruno, who encouraged
19  plaintiff to quit and go home and be with
20  her family. Patruno told plaintiff, you
21  are not wanted here. They are all but
22  ignoring you. It is not getting better,
23  it is getting worse. Do you recall
24  meeting with Dr. Zechman in August

43

1  of 2003?
2    A.   No, but I believe I did.
3    Q.   And that would have been
4  near the end of her employment, her
5  termination. Did you have a discussion
6  with her as to whether she should remain
7  in the program?
8    A.   I don't remember the exact
9  details, but I do remember having
10  conversations with Ellen about her family
11  and what motivated her.
12    Q.   Can you tell me -- I know
13  you don't remember specifically, but you
14  mentioned her family and what motivated
15  her.
16    A.   Right.
17    Q.   Do you recall anything at
18  all about having conversations with her
19  regarding her family and what motivated
20  her?
21    A.   Yeah. And I always gave
22  Ellen credit for choosing to come up
23  through the residency away from her
24  family. And I said that must be

44

1  difficult. And I tried to get more
2  knowledge or get to know Ellen's sort of
3  motivation in terms of doing her training
4  away from her family, which was literally
5  something she had to do at that point.
6    Q.   Did you encourage her to
7  resign?
8    A.   I did not encourage her to
9  resign, but I said, you know, it was at a
10  point that she was in August, she was
11  having difficulty in terms of where she
12  was with the program. And I said that
13  might not be -- I can't remember saying
14  you ought to resign. I must have said
15  something to the effect I might resign or
16  I might consider things under the
17  circumstances. Certainly wouldn't have
18  pushed her to resign.
19    Q.   Under what circumstances are
20  we talking about?
21    A.   In terms of what, I'm sorry?
22  Rephrase.
23    Q.   Sure. You just mentioned
24  that and I do not want to put words in

45

1  your mouth and we can read back the
2  record if you would like to. But I can't
3  remember everything you said. But I
4  think you were saying that -- I don't
5  want to put words in your mouth. That
6  you may have encouraged her to resign
7  based on the circumstances?
8    A.   No.
9        MS. BAISINGER:
10        Mischaracterization. Read the
11        sentence back.
12        (The record is read back.)
13  BY MS. BREWINGTON:
14    Q.   My next question to you
15  is -- do you want to say something?
16    A.   No.
17    Q.   You may have said to her
18  that you might resign under the
19  circumstances, is that accurate?
20    A.   I think her situation in the
21  program had gotten to the point where it
22  was dire.
23    Q.   Can you tell me about that,
24  the situation with the program becoming

-JOSEPH E. PATRUNO, M.D.

46

1 dire?
2    **A.  I think she was having**
3 **difficulty in terms of the program.**
4 **Going back to our previous conversations.**
5    Q.  Was she stressed out?
6    **A.  Interactions -- certainly**
7 **she was stressed out.**
8    Q.  Was she tired?
9      MS. BAISINGER:  Speculation.
10      THE WITNESS:  Every resident
11    gets tired.
12 BY MS. BREWINGTON:
13    Q.  Did Dr. Zechman express
14 concerns about being tired to you?
15    **A.  I don't remember exact**
16 **details, but I'm sure she did.  That**
17 **wouldn't make her unique.  Lots of**
18 **residents --**
19    Q.  Were you aware that she had
20 a disability?
21      MS. BAISINGER:  Object to
22    the characterization.
23      THE WITNESS:  I knew Ellen
24    had a medical issue, the detail of

47

1    it was an autoimmune disorder, I'm
2    not sure I knew much more in terms
3    of the details of what her medical
4    condition was.
5 BY MS. BREWINGTON:
6    Q.  You talked about the
7 situation with the program being dire?
8    **A.  Right.**
9    Q.  And we mentioned stress, and
10 I mentioned fatigue and you said that
11 wouldn't have been any different than any
12 other resident in your opinion.
13    **A.  Yeah.**
14    Q.  Did she talk with you about
15 family medical leave?
16    **A.  I'm not sure I remember a**
17 **question about family medical leave.  I**
18 **don't remember a question about that.**
19    Q.  Do you think the volume of
20 work was getting to Dr. Zechman?
21    A.  Yes.
22    Q.  How so?
23    A.  I don't think she was
24 keeping up with the work as well as her

48

1    cohort.  And I know that Ellen was
2    hospitalized for a short period of time.
3    I remember that.  Near the end of her
4    tenure, I can't remember exactly when.
5    Q.  Do you know why shy wasn't
6 keeping up?
7    **A.  Do I know why?**
8    Q.  Yes.
9    **A.  Not exactly.  I don't know**
10 **why.  I really don't.**
11    Q.  Did you ask her?
12    **A.  Did I ask her?**
13    Q.  Yes.
14    **A.  We didn't talk alluding to**
15 **her physical disability.  I don't**
16 **remember having a lot of conversations**
17 **about physical disabilities.  But I'm not**
18 **saying she didn't have one.**
19    Q.  Are you done?
20    **A.  I'm done.**
21    Q.  Were you aware that
22 Dr. Zechman completed a request for
23 accommodation form?
24    **A.  A request for what?**

49

1    Q.  Accommodations.
2    **A.  I wasn't privy to any**
3 **details to it.  I may have known that it**
4 **happened.**
5    Q.  You may have known or you
6 did know?
7    **A.  I don't really have a**
8 **recollection.  I got to be honest.  I**
9 **wasn't involved with the administrative**
10 **aspects of the residents, even as her**
11 **mentor.  So I can't recall.  I cannot,**
12 **I'm sorry.**
13    Q.  Did you have any knowledge
14 of what accommodations she was
15 requesting?
16    **A.  No.**
17    Q.  Did you have any discussions
18 with anyone at Christiana Care concerning
19 accommodations for Dr. Zechman?
20    **A.  Accommodations?  I cannot**
21 **remember like any specific**
22 **accommodations.  I remember a**
23 **modification in her curriculum.  But I**
24 **can't remember any specific**

-JOSEPH E. PATRUNO, M.D.

50

1  **accommodations.**
2      Q.  Tell me about the
3  modification in her curriculum.
4      **A.  I can't give you details,**
5  **but I think -- as I remember it was**
6  **designed to focus to deal with some**
7  **deficits.**
8      Q.  Who did you have a
9  conversation with about this modification
10  in her curriculum?
11      **A.  I would guess it was with**
12  **Tony Sciscione perhaps. Although I'm not**
13  **sure.**
14          THE WITNESS: Did Tony leave
15      before you?
16          MS. BAISINGER: You can't
17      have those conversations.
18  BY MS. BREWINGTON:
19      Q.  I just asked you whether you
20  had any conversations with anyone at
21  Christiana Care concerning accommodations
22  for Dr. Zechman.
23      **A.  Yes.**
24      Q.  This question is concerning

51

1  her disability specifically. Did you
2  have any conversations with anyone at
3  Christiana Care concerning Dr. Zechman's
4  disability?
5      **A.  Not that I recall.**
6      Q.  Paragraph 63, please.
7  Plaintiff met with her assigned mentor,
8  Dr. Patruno, for advice and information
9  about defendant's "fair hearing
10  procedure." Patruno questioned plaintiff
11  asking her what she thought she would
12  accomplish by challenging Dr. Ekbladh.
13  Stating, don't you see, they don't want
14  you here. Patruno told plaintiff, if you
15  win by challenging her decision, you
16  will just be ignored. You can't learn if
17  they won't teach you. Did I read that
18  accurately?
19      A.  You did.
20      Q.  Did you meet with
21  Dr. Zechman after her termination?
22      A.  I don't remember a meeting,
23  but we may have had a conversation.
24      Q.  Was it on the phone, over

52

1  the phone?
2      **A.  It may have been.**
3      Q.  Can you tell me what you
4  recall about that conversation? Not
5  necessarily specifically, but generally.
6      **A.  Yes, I think probably we**
7  **discussed the appeal process, that I**
8  **wasn't that familiar with, because I**
9  **wasn't on the RRC. And I think it was a**
10  **good conversation, you know, where Ellen**
11  **should go and what she should do at that**
12  **point.**
13      Q.  Did you think that she
14  should talk with Dr. Ekbladh about being
15  dismissed from the program?
16      **A.  I probably assumed that she**
17  **had. I assumed there had been some**
18  **conversation with him.**
19      Q.  Did you have an opinion of
20  whether she should appeal her
21  termination?
22      **A.  I can't remember if I had a**
23  **specific opinion, but I did probably ask**
24  **her what she wanted out of the process.**

53

1      Q.  And what was her response?
2      **A.  I can't recall. I think the**
3  **conversation sort of went to the point**
4  **that if you do get reinstated, you want**
5  **to stay here or what is the value? And I**
6  **think Ellen's perception was if she got**
7  **reinstated, I can't remember if she**
8  **necessarily wanted to stay at Christiana.**
9  **But it would have perhaps helped her**
10  **situation with other residency programs.**
11  **But I can't remember -- this is just sort**
12  **of vague. But I can't remember more as**
13  **far as details.**
14      Q.  Did you talk to Dr. Ekbladh?
15      **A.  I don't remember having a**
16  **conversation with him.**
17      Q.  And I probably wasn't very
18  specific, did you talk to Ekbladh about
19  Dr. Zechman's termination? Is your
20  answer the same?
21      A.  Yes, it is.
22      Q.  Okay.
23      **A.  Once again I wasn't really**
24  **involved with the RRC or the decision to**

-JOSEPH E. PATRUNO, M.D.

54

1  terminate Ellen or her resignation,
2  whichever happened.
3      Q.  Did you call Dr. Zechman at
4  her home after her termination?
5      A.  I had a conversation with
6  her and her husband. I believe after the
7  termination. And I may have called her.
8  I guess I may have called her. We had a
9  conversation. I remember having a
10 conversation at home.
11     Q.  Did you have more than one?
12     A.  I believe just one.
13     Q.  Is that the conversation
14 where you discussed the fair hearing
15 process?
16     A.  It may have been, it may
17 have been.
18     Q.  During that conversation you
19 talked to her husband and Dr. Zechman?
20     A.  Yeah.
21     Q.  Was it one after the other
22 or were they both on different lines?
23     A.  I think one after another.
24 I think it was one after another. I

55

1  don't think it was a conference call. I
2  think I talked to one and then the other.
3      Q.  Do you remember anything
4  that Mr. -- Dr. Zechman said?
5      A.  Well, he was angry about the
6  situation. And -- he was angry and
7  didn't have very nice things to say about
8  the department or the institution.
9      Q.  Why did you call her?
10     A.  That's a good question. I
11 don't know. That is a good question. I
12 can't remember if I called her or she
13 called me. Or I said finally, let's talk
14 about this situation. I can't remember.
15     Q.  Did you go to Dr. Ekbladh
16 and ask what you could do to help
17 Dr. Zechman?
18     A.  At what point?
19     Q.  At any point.
20     A.  I don't remember many
21 interactions at all with Dr. Ekbladh with
22 regards to Ellen, especially because Tony
23 Sciscione was the residency director and
24 was sort of in charge of things. And I'm

56

1  trying to remember the timing of when
2  Tony Sciscione left which is when
3  Dr. Ekbladh took over.
4      Q.  I will represent to you that
5  when Dr. Zechman was terminated from the
6  program, Dr. Sciscione was no longer
7  there.
8      A.  Yeah, that is what I
9  thought.
10     Q.  And if you could narrow the
11 question down a little more and see if
12 you perhaps know whether you did this.
13 My question is did you talk with
14 Dr. Ekbladh in and around the time of her
15 termination to see what you could do to
16 help Dr. Zechman?
17     A.  Was this before she was
18 terminated or after she was terminated?
19     Q.  Around that time, so that
20 would have been in September of '03 when
21 she was actually terminated from the
22 program. So let's do August, September,
23 October.
24     A.  I really don't have any

57

1  specific memory.
2      Q.  Do you have any memory at
3  all about that?
4      A.  No, I don't. I'm sorry.
5      MS. BREWINGTON:  I would
6  like to have that marked.
7         (Exhibit Patruno-2 marked
8  for identification.)
9  BY MS. BREWINGTON:
10     Q.  What is in front of you now
11 is what has been previously marked as
12 Patruno-2. When you met with
13 Dr. Zechman, did you take notes of your
14 mentor meetings?
15     A.  Yeah, I think after our
16 meetings I would try to put a little
17 synopsis together.
18     Q.  So if you had a meeting on
19 say a Monday, you would take notes Monday
20 after the meeting?
21     A.  I usually would, I think
22 that is sort of how I functioned.
23     Q.  Would you hand write your
24 notes or would you type them?

-JOSEPH E. PATRUNO, M.D.

58

1    A.  I type them.
2    Q.  So would this document be
3  your notes from the meetings?
4    A.  Yes.
5    Q.  Take a look through them and
6  tell me if all the meeting notes are
7  there.
8    A.  I'm not certain if this
9  represents all our meetings. I had no
10  obligation to do notes every time we met.
11  We may have met informally at other times
12  and I didn't document anything.
13    Q.  So every time you met, you
14  didn't necessarily take notes?
15    A.  Yeah, I may not have. I
16  think if we got a decent amount of time
17  together I would have.
18    Q.  The last meeting I have here
19  is April 10, 2003. Do you think you met
20  with her after --
21    MS. BAISINGER:  Excuse me.
22  May 20.
23    MS. BREWINGTON:  Are they
24  not in order? I'm sorry. Yes,

59

1  May 20. Did you meet with her
2  after that date?
3    THE WITNESS:  I can't
4  remember.
5  BY MS. BREWINGTON:
6    Q.  We talked about earlier your
7  experience with Dr. Zechman with respect
8  to the work was mainly in triage, is that
9  fair to say?
10    A.  Yeah.
11    Q.  How often did you work with
12  her?
13    A.  In triage?
14    Q.  Yes.
15    A.  If she were on the triage
16  rotation, probably twice a week or three
17  times a week.
18    Q.  Would you say that is often?
19    A.  Yeah, that is pretty often.
20    Q.  What was your opinion of how
21  she worked in triage?
22    A.  Give me a more specific
23  question.
24    Q.  What were your thoughts as

60

1  an attending physician of her work as a
2  resident in triage?
3    A.  My memory was that Ellen did
4  okay in triage. I think she had
5  difficulty adapting to it early on in the
6  residency and the volume. Certainly
7  compared to her -- the other people in
8  her class who had been part of the
9  program the year before. I thought she
10  had a little bit of difficulty keeping up
11  with the patient numbers in triage. And
12  she needed some assistance. But I think
13  she also showed signs of improvement
14  through the year. I think she learned.
15    Q.  Is it fair to say she got
16  better?
17    A.  I think she got better,
18  yeah.
19    Q.  You mentioned she had
20  difficulty adapting early on and
21  difficulty with the volume compared to
22  the other residents. My question is do
23  you know why she had difficulty? Do you
24  have an understanding of the reason for

61

1  her difficulty?
2    A.  Not exactly. But I would
3  speculate in part was because she was in
4  a program her intern year that didn't
5  have a triage and didn't incorporate the
6  same volume as Christiana.
7    Q.  So as compared to the other
8  residents who were in the program before
9  and had experience with triage?
10    A.  Right, I think that was a
11  part of it.
12    Q.  What is your opinion of
13  Dr. Zechman's -- let me ask you what was
14  your opinion. Because we will talk about
15  the time that Dr. Zechman worked there.
16  But your opinion of her medical knowledge
17  while she was in the residency program.
18    A.  I think her knowledge of
19  obstetrics and gynecology was less than
20  her peers.
21    Q.  Was it acceptable? Do you
22  understand? Was it acceptable -- was she
23  at an acceptable level for a second year
24  resident in the program?

-JOSEPH E. PATRUNO, M.D.

62

1       A.   I think her CREOG exam
2   scores of 12th percentile of her year
3   were indicative. So I'm not sure
4   acceptable, I don't quite understand the
5   question. I think there was room for
6   improvement.
7       Q.   But weren't there members in
8   her own class that did worse than her on
9   the CREOG?
10      A.   Perhaps.
11      Q.   So then her medical
12  knowledge being less than that of her
13  peers isn't necessarily accurate, is it?
14      A.   Well, it depends, if you are
15  basing medical knowledge simply on the
16  CREOG examination, then in book
17  knowledge, that is one issue. The other
18  issue is how you function. And you apply
19  the knowledge.
20      Q.   I asked you about medical
21  knowledge and you brought up the CREOG.
22      A.   I'm trying to objectify it a
23  little bit. So that is why I bring that
24  up. There were other people in the

63

1   program who had issues with the CREOG.
2       Q.   So when we talk about her
3   medical knowledge and we objectify it
4   with -- to the CREOG scores, there were
5   others in her program that had less
6   medical knowledge than her, is that
7   correct?
8       MS. BAISINGER: Speculation.
9       THE WITNESS: Who did poor
10      on CREOG exams, yeah.
11  BY MS. BREWINGTON:
12      Q.   There were in fact some in
13  the residency program that received
14  8 percent?
15      A.   Okay.
16      Q.   You don't have any knowledge
17  of that?
18      A.   Well, I wasn't the residency
19  director, so I wasn't privy to any CREOG
20  scores, probably other than Ellen's that
21  year. Other than what was heard behind
22  the grapevine or through the grapevine.
23      Q.   How would you characterize
24  Dr. Zechman's ability to relate to

64

1   patients?
2       A.   I think Ellen did well with
3   patients for the most part. I think once
4   again going back to the triage
5   experience, I think she had difficulty
6   sort of prioritizing patients, but she
7   improved with that. But I think Ellen
8   did okay with patients. I think she was
9   concerned about them.
10      Q.   Take a look at your
11  mentoring note of April 10, 2003. Is
12  there an April 10, 2003?
13      A.   Yes, it is the last one.
14      Q.   Read it to yourself and let
15  me know when you have finished.
16      A.   Okay.
17      Q.   Did there come a time when
18  Dr. Zechman was diagnosed with a rash
19  that may or may not have been contagious?
20      A.   According to my note, yes.
21      Q.   And you indicate in your
22  record of April 10, 2003 that she was
23  reading and concentrating on quizzes, is
24  that accurate?

65

1       A.   Yeah.
2       Q.   Are you aware of whether or
3   not Dr. Zechman had to remain in the
4   library to read and take those quizzes
5   rather than taking sick leave that day?
6       A.   Had to remain in the
7   library? I don't remember. I'm going to
8   guess yes. But I don't remember.
9       Q.   I don't want you to guess.
10  I don't want you to guess. So you have
11  no knowledge of that?
12      A.   I don't remember, no.
13      Q.   Take a look at November 23,
14  2002. The second paragraph beginning
15  with she works, if you could read that to
16  yourself for me.
17      A.   Okay.
18      Q.   Have you finished reading?
19      A.   Yes.
20      Q.   Dr. Zechman was entitled to
21  a lunch, correct?
22      A.   Sure.
23      Q.   Can residents eat lunch in
24  the area where they are working?

-JOSEPH E. PATRUNO, M.D.

66

1    A.   Yes.  As I remember, they
2  could.  There was an area to eat, and
3  often residents -- but often residents
4  would eat in the work area.
5    Q.   Eat in the work area?
6    A.   Sure.  There was a nursing
7  station.
8    Q.   So is that allowed?  Like in
9  terms of OSHA violations?
10    MS. BAISINGER:  Speculation.
11    THE WITNESS:  I don't know
12    like the OSHA regulation, I don't
13    know like the details.
14  BY MS. BREWINGTON:
15    Q.   In this nursing area, are
16  there specimens of anything around?
17    A.   Not really, there shouldn't
18  be.  It is not like sort of in the
19  specimen area.
20    Q.   There shouldn't be, but are
21  there?
22    A.   No, I didn't think there
23  were.  Often, they are computers and
24  charts.

67

1    Q.   So the residents would eat
2  where the nurses are working?
3    A.   Yeah, it was sort of a
4  station, the nurses stayed on one side
5  and the doctors stayed on the opposite
6  side.
7    Q.   Now, was Ellen allowed to go
8  to eat lunch in the cafeteria?
9    A.   There wasn't any like firm
10  policy that you had this time to go eat
11  lunch.  But people would go eat lunch
12  when they could.
13    Q.   Would you have preferred she
14  eat lunch at the nursing station?
15    A.   Would I have preferred?
16    Q.   Yes.
17    A.   I probably wouldn't have had
18  any preference really.
19    Q.   But you preferred that she
20  not announce that she was going to eat
21  lunch?
22    A.   This may have been just an
23  issue of contention with her peers, and I
24  may have thrown that out.  I personally

68

1  probably have no preference to be honest
2  where she ate lunch.
3    Q.   If she didn't announce that
4  she was going to lunch, would that be
5  disappearing?
6    A.   If she didn't announce that
7  she was going to lunch?
8    Q.   If she didn't tell somebody
9  that she was going to lunch, would that
10  be disappearing?
11    A.   Perhaps.
12    Q.   So what was she supposed to
13  do?
14    A.   What was that?
15    Q.   So what was she supposed to
16  do?
17    A.   Go get lunch and come back.
18  I don't know.
19    Q.   You have several references
20  in your notes and if you would like you
21  can take a look at them.  You have them
22  in front of you.  That indicate that
23  Dr. Zechman will work on communicating
24  with peers and social issues with other

69

1  residents and improve her relationships
2  with peers.
3    A.   Yes.
4    Q.   What was going on with her
5  peers?  When I say with her peers, I mean
6  with Dr. Zechman and her peers.
7    A.   I think her relationship
8  with her peers went in a bad direction.
9  I think she lost the ability to
10  communicate with her peers.  She lost the
11  trust of her peers.  And she had
12  difficulty interacting with her peers.
13  And certainly not focus of any fault of
14  her own.  I think it was difficult.  And
15  my point being that it was important to
16  interact in a positive way with the
17  people you work with.
18    Q.   It wasn't Dr. Zechman's
19  fault?
20    A.   No, I said no fault of her
21  own.  I think there is always two sides
22  to any situation or any story.  And every
23  interaction may have been unique on some
24  level.

-JOSEPH E. PATRUNO, M.D.

70

1    Q.  If it's not Dr. Zechman's
2  fault, what is going on?  I guess -- you
3  were her mentor?
4    **A.  Right.**
5    Q.   And you had conversations
6  with Dr. Zechman about -- I mean you
7  mentioned it several times here,
8  communicating with your peers, social
9  issues with other residents.
10   **A.  Yeah.**
11   Q.   Through no fault of
12  Dr. Zechman's, whose fault is it?
13   **A.  I will rephrase it.  I was**
14  **not saying no fault of Dr. Zechman's, it**
15  **was not Dr. Zechman's issue alone.  My**
16  **perception of the issue was this, I think**
17  **Dr. Zechman came to our residency with**
18  **some deficits and knowing exactly what**
19  **she wanted and needed.  Which didn't**
20  **necessarily fit in with the residency**
21  **program and the system.  I think what**
22  **happened is Dr. Zechman befriended a lot**
23  **of the attendings and instead of**
24  **integrating and becoming part of the**

71

1  **residency, and a part of the resident**
2  **team, was looked at a little bit as an**
3  **outsider.  And my goal was to try and**
4  **keep her in her resident cohort because I**
5  **felt that that would make her job easier**
6  **and give her more opportunities.  And**
7  **make her life easier.  I also recognize**
8  **that a lot of the teaching that residents**
9  **get are from other residents.**
10   Q.   So if they were ignoring
11  her, was she getting the teaching?
12   **A.  If they were ignoring her,**
13  **she may have not been getting the**
14  **teaching.  My goal was to improve her**
15  **relationship with her residents.  You**
16  **know, goal wasn't to pick sides.**
17   Q.   Would it be a fair statement
18  that the other residents didn't like
19  Dr. Zechman?  And when I say the other
20  residents, I'm talking about the second
21  years.
22        MS. BAISINGER:  Speculation.
23        THE WITNESS:  I will be
24  honest with you, I think there was

72

1  an issue with Rachel Heinle.  But
2  I think Stephanie Kirsh and Alex
3  Kirfides fell for Ellen.  They
4  did.  And I think they tried to
5  support her.
6        MS. BREWINGTON:  Mark this,
7  please.
8        (Exhibit Patruno-3 marked
9  for identification.)
10  BY MS. BREWINGTON:
11   Q.   Was Dr. Zechman's age a
12  factor with being friends with the
13  attending physicians rather than the
14  residents?
15        MS. BAISINGER:  Speculation.
16        THE WITNESS:  I don't think,
17  I do not think.
18  BY MS. BREWINGTON:
19   Q.   I wanted to give you this so
20  you have something to refer to.  This is
21  an e-mail that we have had marked as
22  Patruno-3.  It is an e-mail from
23  Dr. Zechman to Dr. Ekbladh.  And it is
24  entitled update with Dr. Gray as chief

73

1  resident.  I don't believe you are CC'd
2  on this e-mail.  My only question to you
3  is did you have discussions with her,
4  Dr. Zechman, on how to work better with
5  Dr. Gray?
6    **A.  I don't remember details to**
7  **any conversation that we had.  That is**
8  **not to say that we didn't have a**
9  **conversation.  I don't remember details.**
10  **I have dealt with lots of**
11  **resident-to-resident issues.**
12   Q.   Were you a mentor to anyone
13  else in Christiana Care's program?
14   **A.  Yes.**
15   Q.   Who is that?
16   **A.  Rita Vinode I worked with**
17  **pretty closely in regards to CREOG scores**
18  **and getting her educational stuff up.**
19   Q.   Did she come in before
20  Dr. Zechman?
21   **A.  No, she was also a chief, I**
22  **think she was -- was Rita with Dr. Gray?**
23  **I think so.  I think she was a chief.**
24        MS. BAISINGER:  No

-JOSEPH E. PATRUNO, M.D.

74

1      communication.
2          THE WITNESS: She may have
3      been the same year as Dr. Zechman
4      or she was a year ahead.
5  BY MS. BREWINGTON:
6      Q.  Dr. Gray?
7      A.  Yeah, she was probably two
8  or three years ahead of Dr. Zechman. And
9  I also worked with Dr. Gray as well in
10 regards to her academic and test taking
11 scores.
12         MS. BREWINGTON: Mark that.
13         (Exhibit Patruno-4 marked
14     for identification.)
15 BY MS. BREWINGTON:
16     Q.  So it is fair to say that
17 Dr. Zechman wasn't the only person that
18 had issues with test taking and CREOG
19 scores?
20     A.  Yes.
21     Q.  Do you have an understanding
22 of why Dr. Zechman was terminated from
23 the program as opposed to I assume Vinode
24 who graduated from the program and

75

1  Dr. Gray?
2          MS. BAISINGER: Speculation.
3          THE WITNESS: CREOG scores
4      are an objective measure of what
5      you know. But no one including
6      Dr. Zechman I don't believe got
7      fired because of her CREOG scores.
8      Our goal with CREOG scores because
9      they correlate with your ability
10     to pass your certification exam.
11     Our goal is to get your knowledge
12     up to the point that you are going
13     to pass your certification exam.
14     And that is how we used it at
15     Christiana. But we never -- you
16     know, if you were not doing well
17     on your CREOG scores, it was an
18     indication that you needed to
19     study because you were at risk of
20     failing your certification exam.
21 BY MS. BREWINGTON:
22     Q.  But Dr. Zechman at the time
23 she took the CREOG scores that we are
24 talking about where she received this

76

1  12 percent, she had two more years, is
2  that correct?
3      A.  Yeah.
4      Q.  So she could have improved
5  in those two years, is that correct?
6      A.  Yeah, absolutely.
7      Q.  What is your understanding
8  of why she was terminated from the
9  program?
10     A.  My understanding was that
11 she wasn't working to the level that she
12 was expected to work to.
13     Q.  Are you aware that --
14         THE WITNESS: I apologize.
15         MS. BREWINGTON: Read that
16     back for me.
17         (The record is read back.)
18 BY MS. BREWINGTON:
19     Q.  So that was your
20 understanding, that she wasn't working at
21 the level she was expected to, is that
22 correct?
23     A.  Right.
24     Q.  Are you aware that

77

1  Dr. Zechman was at the expected level for
2  a second year in her mock oral board
3  results?
4          MS. BAISINGER: Objection to
5      the characterization.
6          THE WITNESS: I know she did
7      the mock orals, but I didn't
8      participate in them and I didn't
9      know the scores.
10 BY MS. BREWINGTON:
11     Q.  You didn't know the results?
12     A.  Yeah, nor did I see the
13 results.
14     Q.  So how would that square
15 with your understanding that she wasn't
16 at the expected level when we have mock
17 oral board exam results that say that
18 she's at the expected level?
19     A.  I mean, it is just one piece
20 of a puzzle. Mock oral boards we brought
21 visiting professors in who basically
22 reviewed things with the residents over a
23 two-hour period. So I'm going to
24 reiterate, I was not part of the RRC nor

-JOSEPH E. PATRUNO, M.D.

78

1  the overall decision to term' -- you
2  know, to terminate Ellen or have her
3  resign.
4      Q.  Okay.
5      A.  So I'm not really privy to
6  all of the details. My understanding was
7  that she was not progressing to the level
8  that we were expecting that she would.
9      Q.  And we talked about the mock
10  oral board being one piece of the puzzle.
11      A.  Right.
12      Q.  And we also talked about the
13  CREOG scores, would you consider them
14  another piece of the puzzle?
15      A.  Sure.
16      Q.  Dr. Zechman is at a meets
17  expectations with the mock oral board
18  results.
19      A.  Okay.
20      Q.  And she's at a 12 percent in
21  her CREOG scores which is higher than
22  others that were allowed to continue in
23  the program, what other pieces of the
24  program are we missing?

79

1      A.  Her evaluations I guess.
2      Q.  Okay.
3      A.  Her faculty and peer and 360
4  evaluations.
5      Q.  Okay.
6      A.  I guess that is probably
7  your other objective information.
8      MS. BAISINGER:  I want to
9      object to the last question
10      assuming facts not in existence.
11  BY MS. BREWINGTON:
12      Q.  Take a look at this e-mail,
13  we have marked this Patruno-4. It is
14  from Dr. Zechman to Dr. Sciscione and it
15  was dated May 13, 2003. And you are CC'd
16  on this message along with Dr. Ekbladh
17  and Dr. Zechman CC'd herself. And the
18  subject is repeatedly pulled
19  from -- it says form, from GYN rotation.
20  Take a look at it and let me know when
21  you have had a chance to review it.
22      A.  I have reviewed it before.
23      Q.  Do you recall receiving this
24  e-mail?

80

1      A.  I don't recall receiving it.
2      Q.  Do you know whether you
3  responded to her by e-mail or anything?
4      A.  No, I don't know if I did
5  respond. Did I respond? Did I?
6      MS. BAISINGER:  She's asking
7      questions.
8  BY MS. BREWINGTON:
9      Q.  As her mentor, did you have
10  any knowledge of Dr. Zechman being
11  regularly reassigned to triage for labor
12  and delivery?
13      A.  I don't have any knowledge,
14  but certainly this note is very specific
15  to details. So I wouldn't question that
16  this was true.
17      Q.  She indicates in the e-mail,
18  quote, how can I improve my skills if I'm
19  left in triage and denied the opportunity
20  to improve? Is that a fair question?
21      A.  Sure.
22      Q.  So is it fair to say that in
23  order for her to improve her skills, she
24  needs to be in surgery?

81

1      A.  Yeah, I mean if we are
2  talking about surgical skills, yeah. I
3  think obviously doing surgery is going to
4  help the situation out.
5      Q.  Did you ever have any
6  discussions with Dr. Ekbladh or
7  Dr. Sciscione about Dr. Zechman's
8  concerns that she was being regularly
9  reassigned?
10      A.  I can't remember any
11  details. I can't remember details.
12      Q.  Is that your answer?
13      A.  Yeah, that is my answer.
14      Q.  When you say you can't
15  remember details, does that mean you
16  can't remember anything?
17      A.  I can't remember ever having
18  a specific conversation.
19      Q.  Can you remember anything
20  about that?
21      A.  No.
22      MS. BREWINGTON:  If I could
23      have that marked, Patruno-5.
24      (Exhibit Patruno-5 marked

-JOSEPH E. PATRUNO, M.D.

82

1      for identification.)
2   BY MS. BREWINGTON:
3      Q.   Take a look at this document
4   and let me know when you have had an
5   opportunity to briefly review it. I will
6   not go into specifics about it.
7      A.   Okay.
8      Q.   Do you know what this
9   document is?
10     A.   It looks like it is the
11  remediation scheduled for Dr. Zechman or
12  a modified curriculum for her.
13     Q.   And at the top it indicates
14  possible remediation schedule for
15  Dr. Zechman, correct?
16     A.   Yeah.
17     Q.   Who created this schedule?
18     A.   I don't know. Maybe Tony
19  Sciscione I would imagine.
20     Q.   Do you know who creates the
21  schedules? But I guess not everyone
22  would have received this, is that
23  correct?
24     A.   Yeah. I don't know. I

83

1   don't know who it went to. I don't know.
2      Q.   Would this have been for
3   2003?
4      A.   I would guess.
5      Q.   And we would guess that
6   because she came in in 2002?
7      A.   Right.
8      Q.   And that would have been
9   June.
10     A.   Right.
11     Q.   The remediation schedule
12  didn't start at that time, correct?
13     A.   Right.
14     Q.   So it probably would have
15  been the following year, 2003.
16     A.   Right.
17     Q.   And it begins in July
18  of 2003 and ends in December. Let me
19  correct that, because we don't know it
20  doesn't say 2003. And it begins in July
21  and ends in December.
22     A.   Okay.
23     Q.   But Dr. Zechman was only
24  there for two years, and this possible

84

1   remediation schedule didn't occur during
2   that first 2002 year, is that correct?
3      A.   Yeah, I don't think so.
4      Q.   Dr. Zechman was terminated
5   in September of 2003. Would it be a fair
6   statement that the possible remediation
7   schedule for Dr. Zechman had her
8   scheduled for certain things through
9   December?
10     A.   According to this document,
11  yeah.
12     Q.   Do you know whether or not
13  she was reassigned at any time from July
14  through December, do you have any
15  specific knowledge of that?
16     A.   I can't remember details to
17  Ellen's schedule in 2003.
18     Q.   Did you ever have surgery
19  with Dr. Zechman?
20     A.   Did I ever do surgery with
21  Dr. Zechman?
22     Q.   Yes, do surgery. I'm sorry.
23     A.   We probably did some D&C's
24  together. I'm not sure, maybe a few

85

1   C-sections together. Probably.
2      Q.   How would you rate her
3   surgical skills?
4      A.   Nothing sticks out to me as
5   being either questionable or concerning
6   or particularly good. Not enough
7   experience.
8      Q.   You not having enough
9   experience with her?
10     A.   Me not having enough
11  experience with her.
12        THE WITNESS: Can I have a
13     five-minute break?
14        MS. BREWINGTON: Sure.
15        (Recess at 4:09 p.m.)
16        (Resumed at 4:20 p.m.)
17  BY MS. BREWINGTON:
18     Q.   I know we mentioned this a
19  while back, but I wanted to go back and
20  ask you about the autoimmune deficiency
21  that Dr. Zechman had. Do you know
22  whether or not this autoimmune deficiency
23  could have contributed to her fatigue?
24     A.   I suppose it could have.

-JOSEPH E. PATRUNO, M.D.

86

1    Q.   Do you know whether or not
2  the autoimmune deficiency could have
3  contributed to her difficulty keeping up
4  with the volume of work?
5        MS. BAISINGER: Speculation.
6        THE WITNESS: Ellen and I
7     talked a little about her
8     autoimmune disorder. But I wasn't
9     familiar with the details. I
10    wasn't exactly sure what
11    medications she was taking if any.
12    So I didn't know the severity of
13    her situation.
14 BY MS. BREWINGTON:
15    Q.   Can an autoimmune deficiency
16 contribute to fatigue, just in general,
17 not necessarily with respect to
18 Dr. Zechman?
19    A.   I'm sure it can.
20    Q.   And your position is you are
21 not sure whether it did in Dr. Zechman's
22 case?
23    A.   Yeah, I'm not her physician.
24 I was never her personal physician,

87

1  rheumatologist, her internist, I don't
2  know.
3        MS. BREWINGTON: I would
4     like to get that marked.
5        (Exhibit Patruno-6 marked
6     for identification.)
7  BY MS. BREWINGTON:
8     Q.   Take a look at Patruno-6.
9  The date at the top is October 28, 2003.
10    A.   Okay.
11    Q.   It indicates Dr. Ellen
12 Zechman, triage, anonymous evaluation.
13 Have you ever completed evaluation forms
14 like this?
15    A.   Yeah, I have.
16    Q.   Do you know whether or not
17 the date at the top indicates the date
18 the evaluation was submitted or
19 completed?
20    A.   I don't know. I don't know,
21 I can't remember how the database worked.
22    Q.   Is that what it is, do you
23 complete the evaluation in a database?
24    A.   Yeah, it is a computer

88

1  database and it gets sent to you.
2     Q.   It gets sent to you --
3  database? Can you look at other
4  evaluations in the database?
5     A.   No. You can do your own.
6  You can do your own evaluations, and when
7  you are finished them, you can submit
8  them and then they are gone.
9     Q.   Who sends it to you?
10    A.   The residency coordinator
11 I'm guessing.
12    Q.   And when does she send it?
13    A.   Probably some time after the
14 rotation is done.
15    Q.   And do most doctors complete
16 those evaluations?
17    A.   Most doctors probably do not
18 complete these evaluations.
19    Q.   And they don't have to?
20    A.   You do your best. Trying to
21 get people to fill them out, but often
22 they don't. You are asked to, everyone
23 is asked to.
24    Q.   And based on your review of

89

1  this document, would it be fair to say
2  that this evaluation is an anonymous
3  evaluation of Dr. Zechman in triage?
4     A.   Who has access to this, I
5  assume the residency director has access
6  to this and the residency coordinator has
7  access to it and the chairman of the
8  department would have access to it. And
9  those are the only people I would assume
10 has access to it.
11    Q.   But --
12    A.   What did you ask me?
13    Q.   I want to know if this
14 document here, based on your
15 understanding, is this an evaluation of
16 Dr. Zechman by an anonymous doctor in
17 triage? It is not a trick question. I'm
18 asking it based on the topic up here.
19    A.   It says anonymous
20 evaluation. Yeah, I suppose.
21    Q.   Tell me when you fill them
22 out --
23    A.   Well, what happens is you
24 know who you are getting the evaluations

-JOSEPH E. PATRUNO, M.D.

90

1  from. This is normally how it works.
2  The residency coordinator knows because
3  that is how you know you are getting
4  evaluations back. And most people will
5  designate that they evaluated the
6  resident. So --
7      Q.  I don't understand.
8      A.  I don't understand either.
9  Because this is the residency process.
10  My experience with this is that they come
11  back and actually tell you who does the
12  evaluation.
13      Q.  They actually come back --
14      A.  Like you send the evaluation
15  to a physician, they do the evaluation
16  and it comes back to the residency
17  coordinator completed, but it tells you
18  who the evaluation is from.
19      Q.  So your question or concern
20  is why is this anonymous?
21      A.  Yeah. I didn't know there
22  was anonymous evaluations. But maybe you
23  can somehow submit an anonymous
24  evaluation. Perhaps.

91

1      Q.  Aside from the fact that it
2  is anonymous, does this look like it is
3  an evaluation of Dr. Zechman's
4  performance in triage?
5      A.  I would imagine, it says
6  triage rotation, yeah.
7      Q.  I want to direct your
8  attention to the last page of the
9  evaluation. The sentence that begins
10  with there?
11      A.  Okay.
12      Q.  I will read it aloud. To
13  the best I can -- best ability I can
14  because it looks like it is cut off here.
15  It says, there exists an inherent bias
16  against her by both residents and
17  attendings. You can't learn surgery by
18  watching and then it says F-O. I'm not
19  sure what that is. She needs assignments
20  to residents that will allow her to be
21  the primary surgeon and to attendings
22  that will allow -- I'm thinking that is
23  her, and maybe a to there, I don't know.
24      A.  Okay.

92

1      Q.  To do at least her half of
2  major cases and minor cases if not the
3  entire case. Surgery labs will help, but
4  surgery labs -- I'm going to think that
5  is do not, but I don't know -- have the
6  pressure of live patients. Did I read
7  that as accurately as I could?
8      A.  Yeah.
9      Q.  I know it is cut off there.
10  My first question is did you write this
11  evaluation?
12      A.  I don't know. I may have.
13  But I don't know. I can't be sure. I
14  will be honest with you, the top part I
15  could have written. But the last part --
16      Q.  The top part of the page
17  or --
18      A.  The first part. Under
19  comments. That sort of sounds a little
20  bit like me.
21      Q.  This first sentence?
22      A.  Yeah, and I don't know if
23  this is the --
24      MS. BAISINGER:  On the first

93

1  page?
2      THE WITNESS:  Yes, on the
3  first page.
4      MS. BREWINGTON:  The first
5  page comments.
6      THE WITNESS:  Yes.
7      MS. BREWINGTON:  These two
8  paragraphs look like something you
9  may have written or could have
10  written?
11      THE WITNESS:  I could have.
12  But I can't be sure. I think I
13  know who wrote it and I don't
14  think it was me.
15  BY MS. BREWINGTON:
16      Q.  Who do you think wrote it?
17      MS. BAISINGER:  Speculation.
18      THE WITNESS:  I think Paul
19  Kaminski wrote it is my guess.
20  BY MS. BREWINGTON:
21      Q.  Why do you think Paul
22  Kaminski wrote it?
23      A.  Because it is written the
24  way he talks.

B-0347

-JOSEPH E. PATRUNO, M.D.

94

1    Q.   What do you mean?
2    A.   It is just written the way
3  he talks.
4    Q.   The words that he uses?
5    A.   Yeah. But it is
6  speculation. I will put in speculation
7  as well.
8    Q.   You will object.
9    A.   I object.
10    Q.   Seriously, the words that
11  are used that makes you think that?
12    A.   Yeah.
13    Q.   Because it is the way that
14  Dr. Kaminski talks?
15    A.   Talks, yeah.
16    Q.   How about this statement,
17  there exists an inherent bias against her
18  by both residents and attendings, would
19  you agree with that statement?
20    A.   Difficult to say. I think
21  Ellen -- I agree that Ellen needed
22  surgical experience and I think perhaps
23  she wasn't getting it. But I'm not sure
24  I could say there was an inherent bias.

95

1    Q.   Do you know why she wasn't
2  getting the surgery?
3    A.   Not exactly.
4    Q.   Was it that there wasn't
5  surgery to be had?
6    A.   No, I think there was
7  surgery, we were doing surgery.
8    Q.   Dr. Zechman needed surgery,
9  there was surgery there, but she didn't
10  get it?
11       MS. BAISINGER: Is there a
12  question?
13  BY MS. BREWINGTON:
14    Q.   Why?
15    A.   Maybe it related to the fact
16  that -- you know, she had a very
17  organized e-mail about how she was
18  relocated that particular day. Maybe it
19  was her rotations.
20    Q.   Could it have been the
21  inherent bias?
22       MS. BAISINGER: Same, facts
23  not in evidence.
24       THE WITNESS: You are

96

1       looking at the organization. I
2  don't know if there was an
3  inherent bias. There may have
4  been bias for particular
5  individuals.
6  BY MS. BREWINGTON:
7    Q.   Like Dr. Zechman?
8    A.   No, no. I think the bias
9  relates to, you know, people working with
10  Dr. Zechman. And them giving her the
11  opportunity to work with them.
12    Q.   They may have been biased
13  against Dr. Zechman?
14    A.   Yeah. So inherent bias
15  means the entire organization.
16    Q.   I see what you are saying.
17  Are you saying that certain individuals
18  but not an inherent bias meaning the
19  program?
20    A.   Right.
21    Q.   Certain individuals, is
22  there anyone?
23    A.   In particular?
24    Q.   Yes. Anyone.

97

1    A.   Not that I can remember in
2  particular. No one ever came to me and
3  said -- I can't remember anyone coming to
4  me and specifically saying, I don't want
5  to work with Ellen. But I was also not
6  in -- like I said, my position with Ellen
7  was working with her mostly in triage and
8  not in the operating room setting.
9    Q.   Were you aware that
10  Dr. Vakili did just that with
11  Dr. Sciscione -- I'm sorry, Dr. Vakili
12  did that with Dr. Zechman?
13       MS. BAISINGER:
14  Characterization. Objection.
15       THE WITNESS: I don't think
16  I'm aware of it.
17       MS. BAISINGER: No prior
18  testimony.
19       THE WITNESS: I don't think
20  I'm aware of it. But it certainly
21  could have happened.
22       MS. BREWINGTON: If I can
23  have that marked.
24       (Exhibit Patruno-7 marked

-JOSEPH E. PATRUNO, M.D.

98

1       for identification.)
2   BY MS. BREWINGTON:
3       Q.   I will ask you to read this
4   letter out loud, it is a letter dated
5   February 18, 2003. And it is from a
6   Dr. Philip Shlossman. If you could go
7   ahead and read after the Dear Ellen.
8       A.   **When the previous medical**
9   **students rotated through our department,**
10  **they had many positive comments about our**
11  **program and the individuals within our**
12  **group. You were specifically named as**
13  **being extremely helpful, knowledgeable**
14  **and instructive. It is with help like**
15  **yours that our medical student training**
16  **is so well received and enjoyed. On**
17  **behalf of both the medical students and**
18  **the department, I want you to know how**
19  **appreciative we are of your efforts.**
20  **Please keep up the enthusiasm.**
21      Q.   Who is Dr. Shlossman?
22      A.   **Dr. Shlossman was the**
23  **medical student coordinator. So we had**
24  **students that came from Jefferson, and he**

99

1   **sort of organized them. He is also**
2   **maternal fetal medicine specialist at**
3   **Christiana.**
4       Q.   Would you agree with
5   Dr. Shlossman's statements that
6   Dr. Zechman is extremely helpful,
7   knowledgeable and instructive?
8       A.   **Yeah, I think Ellen did well**
9   **with the students. She was always very**
10  **personable with them.**
11      Q.   With the students?
12      A.   **Yeah.**
13          MS. BREWINGTON: Mark that,
14      please.
15          (Exhibit Patruno-8 marked
16      for identification.)
17  BY MS. BREWINGTON:
18      Q.   Have you ever seen this
19  document, Patruno-8?
20      A.   Earlier today.
21      Q.   The top part of it says
22  Christiana Care Health Services,
23  Department of Obstetrics and Gynecology,
24  Resident Review Committee, August 18,

100

1   2003. I will represent to you that we
2   have taken depositions of Dr. Kaminski,
3   Dr. Ekbladh and Dr. Sciscione. One of
4   them testified that these were minutes
5   from the meeting of August 18, 2003. I
6   can't remember which one. That is why I
7   say one of them. And I wanted to let you
8   know what they were just in case you were
9   not aware of that. Did you attend this
10  meeting on August 18, 2003?
11      A.   I can't recall. I cannot
12  recall if I attended. I saw that I was
13  invited and I wasn't on the RRC. Maybe
14  as Ellen's mentor I was invited but I
15  cannot remember going to.
16      Q.   Do you go to resident
17  committee meetings?
18      A.   At this time I wasn't
19  routinely going to RRC meetings. After
20  that, I did. I wasn't on the RRC at this
21  time.
22      Q.   At some point did you become
23  a member of the RRC?
24      A.   Yeah.

101

1       Q.   So you don't know whether
2   you attended?
3       A.   I really cannot recall.
4       Q.   So I guess you don't know
5   whether or not Dr. Hoffman attended this
6   meeting?
7       A.   No.
8       Q.   Or Dr. Ostrum?
9       A.   No.
10      Q.   Do you know approximately
11  how many residency review -- resident
12  review committee meetings you attended
13  while Dr. Zechman was at Christiana Care
14  and you were not on the committee?
15      A.   The RRC?
16      Q.   Yes.
17      A.   I may have gone to one.
18      Q.   Could it have been this one?
19      A.   I was going to say it could
20  have been this one. And if something in
21  the minutes say that I contributed I
22  would have believed I was there. But I
23  can't remember the details or, you know,
24  I can't remember the details of being at

- JOSEPH E. PATRUNO, M.D.

102

1  this particular meeting.
2      Q.   You were her mentor at this
3  time, were you not?
4      A.   Right.
5      Q.   Would you have felt
6  obligated to attend a meeting where you
7  had been invited to discuss her
8  performance?
9      A.   If I were available I
10  probably would have gone.  If I were
11  available.  Like I said, if there was
12  something in here that said I made a
13  comment.  It says I gave invitations, but
14  it doesn't say I was there.  I can't
15  remember the details of the meeting.  I
16  really can't.  If I was there.
17      Q.   Based on your review of this
18  document, is it fair to say that
19  Dr. Zechman's request for disability
20  leave was discussed during this meeting?
21          MS. BAISINGER:  Objection.
22      He hasn't testified that he was
23      there.
24          MS. BREWINGTON:  Based on

103

1      your review of the document.
2          THE WITNESS:  According to
3      this document and I will read it
4      for you.
5  BY MS. BREWINGTON:
6      Q.   I don't need you to read it.
7  You can read it to yourself.  Based on
8  your review, was Dr. Zechman's disability
9  leave discussed during the August 18,
10  2003 residency review committee meeting?
11      A.   That is documented.
12      Q.   And did the committee also
13  discuss the ACGME complaint?
14      A.   It looks like it was
15  reviewed.
16      Q.   If you take a look at this
17  August 18, 2003 RRC minutes from the
18  meeting, they indicate that the plan for
19  Dr. Zechman was to continue probation
20  with the special PGY-2 rotation, is that
21  right?
22      A.   Yes.
23      Q.   I will represent to you that
24  the RRC voted to end Dr. Zechman's

104

1  program on September 29, 2003 which
2  ultimately led to her resignation from
3  the program.
4      A.   Okay.
5      Q.   Approximately six weeks
6  later.
7      A.   Okay.
8      Q.   So August 18 she was to
9  continue in a PGY-2 status.  Six weeks
10  later, September 29, she was terminated
11  from the program.  As her mentor, can you
12  tell me what occurred within that
13  six-week period from allowing her to
14  continue her second year and then
15  deciding to end her contract?
16      A.   I don't remember.  I really
17  don't.
18      Q.   Do you know whether or not
19  Dr. Zechman went out on a leave of
20  absence during that time for a pinched
21  nerve?
22      A.   I remember Dr. Zechman being
23  hospitalized for a short period of time.
24      Q.   At Christiana Care?

105

1      A.   At Christiana.  I don't
2  remember the details regarding a pinched
3  nerve.  I don't remember the details of
4  her hospitalization.
5          MS. BREWINGTON:  If we could
6      go off the record for a short
7      break.
8          (Recess at 4:38 p.m.)
9          (Resumed at 4:41 p.m.)
10          MS. BREWINGTON:  I have no
11      further questions.  Thank you.
12          (Witness excused.)
13          (Deposition concluded at
14      approximately 4:41 p.m.)
15
16
17
18
19
20
21
22
23                  B-0350
24

106

1
2  CERTIFICATE
3
4
5      I HEREBY CERTIFY that the
   witness was duly sworn by me and that the
6  deposition is a true record of the
   testimony given by the witness.
7
       It was requested before
8  completion of the deposition that the
   witness, JOSEPH E. PATRUNO, M.D., have
9  the opportunity to read and sign the
   deposition transcript.
10
11
   _____
12 DOTTYANN Y. WALSH, a
   Certified Shorthand Reporter and
13 Notary Public of the
   State of Delaware
14 CSR License Number: 251-RPR
   Notary Number: 20051147009
15 Notary expiration: April 14, 2007
   Dated: September 27, 2006
16
17
18     (The foregoing certification
   of this transcript does not apply to any
19 reproduction of the same by any means,
   unless under the direct control and/or
20 supervision of the certifying reporter.)
21
22
23
24

108

1      - - - - - -
       E R R A T A
2      - - - - - -
3  PAGE LINE CHANGE
4  ___ ___ _____
5  ___ ___ _____
6  ___ ___ _____
7  ___ ___ _____
8  ___ ___ _____
9  ___ ___ _____
10 ___ ___ _____
11 ___ ___ _____
12 ___ ___ _____
13 ___ ___ _____
14 ___ ___ _____
15 ___ ___ _____
16 ___ ___ _____
17 ___ ___ _____
18 ___ ___ _____
19 ___ ___ _____
20 ___ ___ _____
21 ___ ___ _____
22 ___ ___ _____
23 ___ ___ _____
24 ___ ___ _____

107

1   INSTRUCTIONS TO WITNESS
2
3       Please read your deposition
4  over carefully and make any necessary
5  corrections. You should state the reason
6  in the appropriate space on the errata
7  sheet for any corrections that are made.
8       After doing so, please sign
9  the errata sheet and date it.
10      You are signing same subject
11 to the changes you have noted on the
12 errata sheet, which will be attached to
13 your deposition.
14      It is imperative that you
15 return the original errata sheet to the
16 deposing attorney within thirty (30) days
17 of receipt of the deposition transcript
18 by you. If you fail to do so, the
19 deposition transcript may be deemed to be
20 accurate and may be used in court.
21
22
23
24

109

1
2   ACKNOWLEDGMENT OF DEPONENT
3
4       I, JOSEPH E. PATRUNO, do
5  hereby certify that I have read the
6  foregoing pages, 1 - 105, and that the
7  same is a correct transcription of the
8  answers given by me to the questions
9  therein propounded, except for the
10 corrections or changes in form or
11 substance, if any, noted in the attached
12 Errata Sheet.
13
14
15 _____
16 JOSEPH E. PATRUNO, M.D.      DATE
17
18
19
20 Subscribed and sworn
   to before me this
21 ____ day of _____, 20____.
22 My commission expires:_____
23
   _____
24 Notary Public

**B-0351**

110

| | LAWYER'S NOTES |
|---|---|

1
2 PAGE LINE
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**B-0352**

1          UNITED STATES DISTRICT COURT

2        EASTERN DISTRICT OF NORTH CAROLINA

3

4   ELLEN ZECHMAN,

5          PLAINTIFF,                    CIVIL ACTION: 05-159-JJF

6   V.

7   CHRISTIANA CARE HEALTH

8   SYSTEMS,

9          DEFENDANT.

10

11              DEPOSITION OF

12           DAVID D. FRASER, M.D.

13

14      AT THE HOME OF DAVID D FRASER, M.D.

15          NEW BERN, NORTH CAROLINA

16

17    FRIDAY, JULY 28, 2006, BEGINNING @ 1:05 P.M.

18              VOLUME 1

19            PAGES 1 - 101

20

21

22

23

24

25

RECEIVED
AUG 2 2 2006
BY:

B-0353

**2**

1  APPEARANCES
2  FOR THE PLAINTIFF:
3  LORI A. BREWINGTON, ESQ.
4  MARGOLIS-EDELSTEIN
5  DELAWARE OFFICE
6  1509 GIFFIN AVENUE
7  WILMINGTON, DELAWARE 19806
8  (302)777-4680
9  loriabrewington@margolisedelstien.com
10
11 FOR THE DEFENDANT:
12 THOMAS S. BLOOM, ESQ.
13 MORGAN, LEWIS & BOCKIUS, LLP
14 1701 MARKET STREET
15 PHILADELPHIA, PENNSYLVANIA 19103-2921
16 215-963-5543
17 tbloom@morganlewis.com
18
19
20 COURT REPORTER:
21 SHEILA B. DARDEN
22     S T I P U L A T I O N S
23        BY NOTICE AND/OR CONSENT, THE DEPOSITION OF
24 DAVID D. FRASER, M.D., WAS TAKEN ON THE 28TH DAY OF JULY,
25 2006, BEGINNING AT 1:05 P.M., AT THE HOME OF DAVID D. FRASER,

**4**

1  INDEX
2
3  EXAMINATION
4  DIRECT
5  - BY THOMAS S. BLOOM          PAGES 5 - 1
6  CROSS
7  - BY LORI A. BREWINGTON       PAGES 92 - 8
8  REDIRECT
9  - BY MR. BLOOM                PAGES 98 - 100
10
11 ADJOURNMENT            PAGE 100
12 REPORTER CERTIFICATE         PAGE 101
13
14        EXHIBITS
15 NUMBER          IDENTIFIED
16 FRASER EXHIBIT [1]  MEDICAL RECORDS
17 FRASER EXHIBIT [2]  REQUEST FOR DISABILITY ACCOMMODATION
18 FRASER EXHIBIT [3]  CERTIFICATION OF HEALTH CARE PROVIDER
19 FRASER EXHIBIT [4]  LETTER TO MS. BREWINGTON FROM DR. FRASER
20        DATED 5/7/06
21
22
23
24
25

**3**

1  M.D., IN NEW BERN, NORTH CAROLINA, BEFORE SHEILA B. DARDEN, A
2  COURT REPORTER AND NOTARY PUBLIC IN AND FOR THE COUNTY OF
3  GREENE.
4     1. SAID DEPOSITION SHALL BE TAKEN FOR THE PURPOSE OF
5  DISCOVERY OR FOR USE AS EVIDENCE IN THE ABOVE-ENTITLED ACTION
6  OR FOR BOTH PURPOSES, AS PERMITTED BY THE APPLICABLE RULES OF
7  CIVIL PROCEDURE;
8     2. READING AND SIGNING OF THE TRANSCRIPT OF
9  TESTIMONY BY THE WITNESS IS WAIVED.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**5**

1        P R O C E E D I N G S
2     Whereupon, DAVID D. FRASER, M.D., having been first
3  duly sworn, was examined and testified as follows:
4     ON DIRECT EXAMINATION CONDUCTED BY COUNSEL FOR THE
5  DEFENDANT:
6     BY: MR. THOMAS S. BLOOM:
7     Q.  Good afternoon, Dr. Fraser.  My name is Tom
8  Bloom, and I'm a lawyer from Morgan, Lewis, and we represent
9  Christiana Care in a lawsuit filed by Elaine--I mean; excuse
10 me--Ellen Zechman.
11    A.  Uh-huh; hi.
12    Q.  Hello.  Have you ever given a deposition before?
13    A.  Last one was probably about, maybe, about four
14 years ago.
15    Q.  Okay.  Do you remember what the circumstances
16 were of the deposition?
17    A.  A patient of mine was involved in a motor
18 vehicle accident, and it went to court.
19    Q.  Okay.  Well, the way this is gonna proceed is
20 I'm just gonna ask you questions and ask that you give as
21 complete and candid answers as you can.  We have a court
22 reporter who's sitting there with you, and she's gonna be
23 transcribing everything we say, so it's important that--it's
24 important, A., that you give verbal and audible responses--
25    A.  All right.

**B-0354**

6

1    Q. --especially since I'm on the telephone and not
2    there with you. And it's also important that you permit me
3    to finish a question before you start answering, and I will
4    do the same thing and try not to cut off your answers. Will
5    you try to do that?
6    A. Yes.
7    Q. I understand that you--Dr. Zechman is currently
8    a patient of yours; is that right?
9    A. Yes, sir.
10    Q. Okay. And are you her primary care physician or
11    do you just treat her for a particular condition or
12    conditions?
13    **A. I am a specialist. I just treat her for her**
14    **arthritis-related diseases.**
15    Q. Okay. Can you tell me what specific conditions
16    you treat Ms. Zechman for?
17    **A. She originally saw me in the mid-1990s, and she**
18    **has an unspecified diffuse connective tissue disorder. She**
19    **also has various chronic pain disorders, such as myofascial**
20    **pain, low back pain. In addition, I have seen her for**
21    **degenerative arthritis of her back, of various other joints,**
22    **for recurrent sciatica, and most recently as a couple of**
23    **years ago, she did have a pinched nerve in her back and**
24    **spinal stenosis.**
25    Q. And the first condition you referred to, I think

7

1    you said it was an unspecified mixed connective tissue
2    disorder. Did I hear that right?
3    **A. It was an unspecified diffuse connective tissue**
4    **disease, or disorder.**
5    Q. Okay. Can you tell me what that is?
6    **A. That basically is, for lack of other words, it's**
7    **a hodgepodge of a little bit of this and a little bit of**
8    **that, some symptoms of lupus, some symptoms of rheumatoid**
9    **arthritis, some symptoms of scleroderma, all sort of rolled**
10    **into one person, however, not meeting criteria for any**
11    **specific disorder.**
12    Q. Is there a specific way in which you were able
13    to diagnose Dr. Zechman with that particular disorder you
14    just described?
15    **A. Well, with her clerical symptoms, with some**
16    **blood work in terms of a positive ANA test she had years ago,**
17    **some--an abnormally elevated sedimentation rate, but,**
18    **basically, that was about it. She has no other auto-antibody**
19    **findings or other tests objectively which are positive.**
20    Q. Am I hearing you correctly that your diagnosis
21    was based upon eliminating the possibility of other
22    objectively determinable conditions and that the connective
23    tissue disorder was sort of the explanation that was left?
24    **A. No, not quite. In some ways, that is true, but**
25    **she does certainly have symptoms and some criteria for**

8

1    **various connective tissue diseases, but she does not meet**
2    **criteria for any specific disease. For example, she does not**
3    **meet the American College of Rheumatology criteria for**
4    **rheumatoid arthritis. She does not meet the American College**
5    **of Rheumatology criteria for lupus. However, she has a few**
6    **criteria of lupus, she has a few criteria for rheumatoid**
7    **arthritis. So she certainly has symptoms, she certainly has**
8    **objective physical findings.**
9    **In addition, she did have a positive ANA years**
10    **ago, and she has had at some times a low white count, anemia,**
11    **which, obviously, can occur for other reasons, and she has**
12    **had a slightly elevated sedimentation rate for her age. So**
13    **all this taken in combination, yes, led me to the diagnosis**
14    **of an unspecified diffuse connective tissue disease.**
15    Q. What you just referred to, a positive ANA,
16    **A. Yes.**
17    Q. Can you tell me what that means?
18    **A. An ANA is an anti-nuclear antibody. It is**
19    **basically a screen for autoantibodies in a patient's**
20    **bloodstream, and it is a very, very rough measure of antibody**
21    **production. It is commonly thought to be a test for lupus.**
22    **However, that really gets us into a great deal of problems,**
23    **because, for example, it's estimated that upwards of 10**
24    **percent of women in the United States will have a positive**
25    **test for lupus. However, less than 1 percent of people in**

9

1    **the United States actually have lupus. So you can see it's a**
2    **really bad test for that disorder.**
3    **Now a lot of other diseases can have associated**
4    **with it a positive test or a positive ANA test or a positive**
5    **test for lupus. For example, autoimmune thyroid disease,**
6    **insulin-dependent diabetes, autoimmune liver disease, even**
7    **rheumatoid arthritis, 20 percent of patients with rheumatoid**
8    **arthritis can have a positive ANA as well. So, in general,**
9    **it is just a rough measure of autoimmune disease, and only**
10    **with certain other criteria that the patient exhibits can we**
11    **actually diagnose lupus.**
12    Q. You referred also to an elevated sedimentation
13    rate. Can you tell me what that means?
14    **A. That is a very rough measure of inflammation in**
15    **the body, and we rheumatologists, doctors routinely use it to**
16    **see if there's any inflammation, infection, other things**
17    **going on. It's a very common and a very inexpensive test to**
18    **do as a general screen. However, it can be influenced by a**
19    **number of things, such as a low blood count, whether someone**
20    **has a cold, even the time of day, and various other**
21    **conditions such as that.**
22    **It also is affected by the age, for example.**
23    **And generally it's felt to--if someone is being seen and has**
24    **an elevated sedimentation rate or a sedimentation rate**
25    **greater than their age, that is thought to be clinically**

10

1  significant.
2      Q. Okay. And how is the sedimentation rate
3  affected by somebody's age?
4      A. Well, generally, as we all, you know,
5  unfortunately, as we're all growing older at the same rate,
6  there are certain physiologic changes which happen, one of
7  which is that the plasma proteins in the bloodstream tend to
8  change, and the sedimentation rate is actually performed by
9  actually watching or monitoring or timing the red cells
10  settling in a tube of blood. And the plasma proteins, by
11  coating the red cells, can either inhibit or actually hasten
12  the red cells actually settling to the bottom of the test
13  tube. So when the plasma proteins change as we get older,
14  for example, the red cells tend to settle out faster. So
15  that's why as we get older the sedimentation rate tends to
16  increase slightly with age.
17      Q. Okay. Does that mean that it's--the red blood
18  cells are settling quicker in the Petri dish, is that
19  indicative of a higher level of inflammation within the body;
20  is that what you were saying?
21      A. Well, yes, somewhat. I mean, you know, with
22  other things taken into account, if you can rule out other
23  facts, like someone having an active infection, someone
24  having a severe anemia, you know, other things like that, all
25  other things being taken into consideration, if someone had a

11

1  high sedimentation rate and the right clinical symptoms,
2  then, yes, we do believe that a high sedimentation rate does
3  equal active inflammation in the body.
4      Q. And do you remember in what year you first
5  diagnosed Dr. Zechman with the unspecified diffuse mixed
6  connective tissue disease?
7      A. The unspecified diffuse connective tissue
8  disease, and I know I'm saying that over and over again
9  because I do not want to have you all refer to it as a mixed
10  connective tissue disease. It is not a mixed connective
11  tissue disease. That is a totally different diagnose with
12  other autoantibodies being present. She does not have that.
13      Q. Let me stop you there, then. Can you explain to
14  me what the difference is between the mixed connective tissue
15  disease and the unspecified diffuse connective tissue disease
16  that Dr. Zechman has?
17      A. Well, a diffuse connective tissue disease is
18  basically what I have already said. It is a few criteria of
19  this, a few criteria of that, with some abnormal laboratory
20  findings in the right individual, and we can't diagnose a
21  specific disorder, a specific disease, so, well, for lack of
22  a better word, we put them under this umbrella of an
23  unspecified diffuse connective tissue disease. And the mixed
24  connective tissue disease was actually--is a very, very
25  specialized disease that was actually first recognized,

12

1  actually, at Duke University back in the late '60s and early
2  '70s and it is, basically, a combination of rheumatoid
3  arthritis, polymyositis, systemic lupus and scleroderma, all
4  rolled together into the same individual with very high
5  levels of a very specific antibody called ribonucleoprotein,
6  or RNP, very high levels of this auto-antibody. And
7  Ms. Zechman--or, Dr. Zechman, does not have positive
8  antibodies to RNP.
9      Q. Do those two conditions, and when I refer to the
10  "two conditions," I'm referring to the mixed connective
11  tissue disease as opposed to the unspecified diffuse
12  connective tissue disease--
13      A. Yes.
14      Q. --does those two conditions manifest themselves
15  differently in terms of symptoms?
16      A. No, not necessarily. Sometimes--let me give you
17  a for example using two other conditions, if I may.
18  Sometimes--in fact, Ms.--Dr. Zechman; I'm sorry--Dr. Zechman
19  has this as well, too. But sometimes a patient will have a
20  condition called sicca, or dryness to their mouth and eyes,
21  and it's very common in autoimmune diseases or disorders,
22  very common in rheumatoid arthritis, very common in lupus and
23  in scleroderma.
24      It is not necessarily a disease on its own, but
25  it can be. If someone has sicca, or dry mouth and dry eyes,

13

1  by itself and they have positive antibodies, that is a
2  positive SSA and a positive SSB antibody in high titers, that
3  is called Sjŧgren's syndrome. Now there is really no
4  clinical difference in terms of sicca syndrome versus
5  Sjŧgren's syndrome. The only difference is that one person
6  has positive antibodies, the other one does not have positive
7  antibodies.
8      However, there is a difference in terms of
9  prognosis. Patients who have Sjŧgren's syndrome, or the
10  positive antibodies, they tend to have more complications,
11  more vasculitis, more pulmonary disease, and a higher
12  incidence of lymphoma associated with their disorder. And
13  unspecified diffuse connective tissue disease versus a mixed
14  connective tissues disease is somewhere--you can think of it
15  somewhat in the same way.
16      Q. Okay. And is there a difference in the
17  prognosis between those two diseases?
18      A. Yes. Generally, patients who have mixed
19  connective tissue disease, they have more of a
20  sclerodermatous disorder, more scleroderma, worse--more
21  problems with arthritis, and they can also have end-organ
22  manifestations of lupus such as nephritis, cerebritis, you
23  know, vasculitis, things of that sort.
24      Q. And Dr. Zechman told me that the primary
25  symptoms of her connective tissue disease are fatigue and

14

1  joint pain. Do you agree with that?
2      A. Yes, somewhat. She also has aphthous ulcers.
3  She has intermittent rashes, as well. Those will rear its
4  ugly head from time to time.
5      Q. Okay. And do you have any understanding as to
6  when Dr. Zechman first began to experience ulcers in terms of
7  just a year?
8      A. Oh, yes. When I first saw her back in '95 or
9  '96, she was having some aphthous ulcers back at that time.
10  However, back, I believe, when she was in her fellowship, she
11  really had a great exacerbation of her aphthous ulcers.
12      Q. And do you know what the condition of her ulcers
13  is today?
14      A. She gets occasional crops of what--we call them
15  "crops"--occasional flares or crops of the aphthous ulcers
16  from time to time. In fact, I have given her some Dukes--a
17  mouthwash called Dukes Magic Mouthwash. It was actually a
18  combination of medicines that were originally formulated at
19  Duke University, and I originally gave this to her back in, I
20  believe, 2003, and she has an open prescription for this that
21  she uses as needed.
22      Q. And you also referred to rashes. Is that a
23  symptom that Dr. Zechman exhibited when you first started
24  seeing her in '95 or '96?
25      A. Yes.

15

1      Q. And has that persisted till today?
2      A. Yes.
3      Q. And in terms of the rashes, is this something
4  that is constant or episodic?
5      A. It is episodic, or intermittent.
6      Q. Okay. And what about Dr. Zechman's arthritis,
7  is that something that she had when you first started
8  treating her in 1995 or '96?
9      A. Yes, sir.
10      Q. Okay. Have the symptoms of her arthritis
11  worsened over time?
12      A. Her arthritis is more--how could I say it--it is
13  not a deforming--it is not a destructive arthritis. It is--
14  it can have joint swelling and tenderness, but it is a
15  nuisance more than anything else.
16      Q. And is that still true today, that it's
17  basically just a nuisance?
18      A. Yes.
19      Q. Okay. And you referred to sciatica. Is that a
20  condition that Dr. Zechman had when you first met her in 1995
21  or '96?
22      A. She had some low back symptoms, but, no, she did
23  not have that at that time.
24      Q. Do you recall when in time Dr. Zechman was
25  diagnosed with sciatica?

16

1      A. Yes. Actually, it was after the birth of one of
2  her children, and by carrying the child around frequently,
3  she started having hip and leg pain.
4      Q. Do you remember a year; could you put a year to
5  that?
6      A. If I can open up my charts, I will take a look.
7  Oh, I saw her on 12/20/2002, and, actually, she was a second-
8  year resident at that time. I had not seen her prior for
9  almost--let me see here. I'm just looking through the pages.
10  I'd not seen her in about two-and-a-half years--no, I'm
11  sorry--18 months. And she said--I'm reading from the
12  records--"have not seen her in quite a while. Her family is
13  doing well, and her baby is now two-and-a-half years. She is
14  having difficulty lifting him up and carrying him; has
15  recurrent sciatica." So that was on 12/20/2002.
16      Q. And are you saying that that's the first time
17  there was mention of Dr. Zechman having sciatica?
18      A. Yes. Prior to that, I do have documented low
19  back pain, but that is the first instance I have documented
20  sciatica.
21      Q. Okay. And I'm just gonna pause for a second,
22  Dr. Fraser, because I think that--you produced documents to
23  us pursuant to a Subpoena for Dr. Zechman's medical records,
24  and the earliest note that I have is from December 20, 2002,
25  but I take it from your last few answers that you actually

17

1  have records that are earlier than that.
2      A. Oh, yes. I've been seeing her for--well, in my
3  own practice, since I left and I was on my own--let's see
4  here. I can tell you the exact date. The first time I saw
5  her in my own practice was on 5/1/1997.
6      Q. Okay. And what I'm gonna ask you to do,
7  Dr. Fraser, is when we get all done today is for you to
8  produce the remainder of her records, and we'll reimburse you
9  for any copying costs that there may that may be entailed in
10  that.
11      A. That'll be fine.
12      Q. Okay. And you also referred earlier that
13  Dr. Zechman suffered a pinched nerve.
14      A. Yes.
15      Q. Was that from the injuries she suffered moving
16  deck furniture around during a hurricane?
17      A. Yes, sir.
18      Q. Okay. And Dr. Zechman told me during her
19  deposition that the symptoms of her connective tissue disease
20  are--manifest themselves in intermittent flares, but that
21  they're not--in other words, that they're not always present,
22  but they flare up from time to time.
23      A. Yes.
24      Q. Do you agree with that characterization?
25      A. Yes, sir.

**B-0357**

5 (Pages 14 to 17)

18

1    Q.  Okay.  And, so, the flare-up of the connective
2    tissue disorder are not predictable; is that true?
3    A.  Yes, sir.
4    Q.  Is there anything in particular or any
5    combination of things that tend to trigger a flare-up in the
6    symptoms of Dr. Zechman's connective tissue disorder?
7    A.  Infectious complications.  For example, if
8    someone has a cold that can throw them into a flare-up of
9    their connective tissue disease.  If someone has suffered a
10   trauma, if someone is under some sort of a stress, if, say,
11   someone goes outside and works all day in the sun gardening,
12   for example, they can get a photosensitive rash, that can
13   throw them into a flare of their disease.  You know, various
14   things like that.
15   Q.  What about--apart from working outside in the
16   sun, what about just working unusually long hours, would that
17   precipitate a flare-up?
18   A.  It possibly could.  Oftentimes patients with
19   connective tissue diseases we do recommend that they do get
20   enough rest so that they don't overstress themselves and run
21   into any flares.
22   Q.  And does--if somebody is working long hours,
23   does it make a difference in terms of triggering a flare-up,
24   whether those hours are spent at a desk versus on your feet
25   all day?

19

1    A.  Generally, you know, the more physically
2    exhausting the labor is, then the higher the incidence of a
3    flare could be.  However, I do have to tell you that there
4    have been reports in the literature of, for example, a
5    hairdresser with lupus getting a flare from being under
6    fluorescent lights.  So there are really no hard and fast
7    rules in terms of this.
8    Q.  Did you have any conversations with Dr. Zechman
9    about the fact that she going to be doing an OB-GYN residency
10   before she actually started doing that residency?
11   A.  No, sir.
12   Q.  Do you remember when you first learned that she
13   was pursuing an OB-GYN residency?
14   A.  Yes, sir.  It was that date I mentioned, 12/20
15   of--what was it, 2002, I believe.  That was the first time I
16   had seen her.  In fact, let me go ahead and read from that
17   note, in the third paragraph.  "She is working hard as a
18   second-year resident at Delaware in OB-G."  That's the first
19   I had known of that.
20   Q.  And you've completed a residency, Dr. Fraser,
21   did you not?
22   A.  Oh, please do not remind me.
23   Q.  Why do you say that?
24   A.  That was hard, hard, hard.  In fact--
25   Q.  Your residency was in internal medicine?

20

1    A.  Yes; yes.
2    Q.  Okay.  And I take it from your answer to the
3    last question that that was a fairly grueling experience?
4    A.  Well, maybe I overstated that.  I thoroughly
5    enjoyed those years, but thank God I will never have to go
6    back and repeat them.
7    Q.  And why do you say that; what was either
8    difficult or not so fun about that experience?
9    A.  Well, the time away from family, the long hours
10   at the hospital.  You know, this was back in the late '80s
11   when they didn't have the work-hour changes they have now.
12   My daughter is an OB-GYN resident currently, and, well, she
13   has, honestly, a whole lot more time off than I did.  But I
14   can remember my first month as an intern, I had one day off,
15   and, actually, I still had to go in and do rounds.  So it was
16   pretty tough.  And when they say 24 hours on/24 hours off,
17   you know, 24 hours on, but you still had to do your rounds,
18   and you were lucky if you got home by 2:00, 3:00 in the
19   afternoon.
20   Q.  Okay.  And you just mentioned that your daughter
21   is currently an OB-GYN resident?
22   A.  Yes, sir.
23   Q.  Okay.  And is it your understanding that a
24   residency in OB-GYN today is still a very demanding and time-
25   consuming endeavor?

21

1    A.  Oh, yes, I get a blow-by-blow description of it.
2    Q.  Okay.  And is it fair to say that that sort of
3    residency, in OB-GYN, demands more hours, more working hours,
4    than is typically required when you're done with your
5    residency and you're just practicing medicine?
6    A.  Well, I think a lot of different residencies
7    will demand more hours, all in different ways.  For example,
8    an internal medicine residency, I mean, you're not up waiting
9    for babies to be delivered, you know, each night when you're
10   on call, but you're up taking care of, you know, sick
11   patients, you know, each night.  But, for example, my
12   daughter, so far she's been on call, I think, five nights
13   this month, and three of them she got no sleep.
14   Q.  Now I thank you for that clarification.  So I'm
15   gonna back and break my question down.  The first part is I
16   take it you would agree with me that, in general, being a
17   resident is a more demanding, more time-consuming endeavor
18   than when you're done with your residency and then just
19   practicing?
20   A.  Yes.
21   Q.  Okay.  And from among the group of residency
22   programs that exist, do you have any understanding as to
23   whether or not an OB-GYN residency program typically is more
24   or less time-consuming and demanding than other types of
25   residencies?

22

1    A. More demanding and time-consuming than others.
2    I mean, it is a four-year residency. Generally, the first
3    two years are very, very tough and time-consuming, obviously,
4    between surgery and labor and delivery. However, there are
5    other residency programs that may even be more grueling. For
6    example, cardio-thoracic surgery, for example.
7    Q. And given what you know about residency programs
8    in general and your daughter's OB-GYN residency program, have
9    you ever formed a judgment as to whether or not Dr. Zechman's
10    physical condition is compatible with completing a program
11    like that?
12    A. Oh, honestly, I don't know whether I could
13    comment on that. I would think that physically she could
14    complete a program, a residency program. But, you know,
15    honestly, I--that's all I can say about that.
16    Q. Other than what you just referred to, physically
17    possibly being able to complete a residency program, do you
18    have doubts for other reasons about whether Dr. Zechman could
19    complete a residency program?
20        MS. BREWINGTON: I'm gonna object; asked and
21    answered. But you can go ahead and answer, Doctor.
22    A. I don't know whether I'm really qualified,
23    honestly. You know, I am a specialist, and I deal only with
24    arthritis and arthritis-related diseases. I don't know,
25    honestly, whether I would be able to render any sort of

23

1    logical opinion at all.
2    Q. Well, I understand that, Dr. Fraser. And with
3    the caveat that your answer is not a medical expert opinion
4    or anything like it, but you are her--one of her treating
5    physicians who's known her for a long time, and so, just as
6    an observer of her, I'm gonna ask that you answer that
7    question to the extent that you have opinions in your mind
8    about it.
9    A. If she did not have significant stress during
10    that time period, I think that she would be able to function
11    appropriately as a resident.
12    Q. From your observation of Dr. Zechman, does she
13    have difficulty coping with stress?
14    A. I've seen her only in a medical situation. I've
15    seen her personally--you know, she's another physician in the
16    area, and I know her husband. I've seen them socially,
17    maybe, a handful of times. I have not noticed anything
18    inappropriate about her behavior, about her functioning out
19    in the general community.
20    Q. Okay. And you would agree with me, I take it,
21    Dr. Fraser, that an OB-GYN residency program, indeed, maybe
22    most residency programs, is a stressful experience?
23    A. Yes.
24    Q. Okay. All right. I'm gonna ask that the
25    reporter take out Fraser Exhibit [1] and present it to the

24

1    witness, please. Dr. Fraser, do you have Exhibit [1] in
2    front of you now?
3    A. Yes, sir, I do.
4    Q. Okay. Exhibit [1] is a multi-page document
5    which contains all of the records that you produced to us in
6    response to our Subpoena, and if you would, just take a
7    moment and flip through and let me know if that is an
8    accurate description of what Fraser [1] is.
9    A. Yes, sir.
10    Q. Okay. And what I'm gonna do, Dr. Fraser, is I
11    think a lot of your records appear in this exhibit in reverse
12    chronological order, so I'm gonna direct your attention to
13    near the back of Fraser one, and I ask that you look for a
14    document that has a number in the lower right-hand corner
15    called DF0038.
16    A. Okay. DF--
17    Q. This has your December 20, 2002 note.
18    A. 38, DF0038?
19    Q. Yes.
20    A. All right. I have it right here.
21    Q. Okay. And I'm gonna direct your--this is your
22    medical notes from a visit with Dr. Zechman on December 20,
23    2002?
24    A. Yes.
25    Q. Okay. And there's a section that says History

25

1    of Present Illness, and then it says Chief Complaint colon
2    doing about the same close quote.
3    A. Yes.
4    Q. Do you see that?
5    A. Yes.
6    Q. What does that mean, when you write "Doing about
7    the same"?
8    A. Actually, I have to explain. I don't write
9    that. The nurse writes that. The nurse goes in when she is
10    bringing the patient to the room. She says Well, how're you
11    doing today? And, unfortunately, someone will say Oh, I'm
12    doing about the same, or I'm doing okay, or You know, I'm
13    doing fine. And, so, that's what they write down. Whereas
14    when I get in the room, guess what happens? They start
15    complaining. So--
16    Q. Okay. And--all right. So are you telling me
17    that I shouldn't--from the comment that she's doing about the
18    same, I should not infer that she had been at your office at
19    any relatively recent time?
20    A. Right, 'cause she hadn't, because the other
21    time, the last time she was there was in June of 2000.
22    Q. All right. And the next section of this page
23    has a heading HPI.
24    A. Yes.
25    Q. It's HPI all capitalized.    **B-0359**

26

1    A. Yes.
2    Q. Do you know what that stands for?
3    A. History of present illness.
4    Q. Okay. And who completes that section?
5    A. I do. I type, so any mistakes in the typing is
6    totally my fault.
7    Q. Understood. And this first paragraph under HPI,
8    this was the paragraph that you read from earlier; is that
9    true?
10   A. Yes; yes, sir.
11   Q. Okay. And in the last sentence of this first
12   paragraph, it says quote Elevated emergency room previously
13   as well close quote. Can you tell me what that refers to?
14   A. That--this program--and this has to go back with
15   my proofreading skills; I apologize. But my proofreading
16   skills are pretty lacking, and once I sign off on a note,
17   obviously, for medical/legal reasons, I can't go back and
18   change it. But it should say "Elevated ESR previously as
19   well," and when I was typing the "ER" came out and the "S"
20   didn't get added in. And, so, when I hit the spacebar, this
21   program takes "ER spacebar" and explodes it into emergency
22   room.
23   Q. Okay. And, so, what--is it supposed to say
24   "ESR"?
25   A. Yes.

27

1    Q. Can you tell me what that means?
2    A. Sedimentation rate.
3    Q. Okay.
4    A. Sometimes it can be rather embarrassing because,
5    for example, sometimes I would see, like, a black male, and
6    imagine what a "BM spacebar" expands into.
7    Q. Got it. Would you please read the second
8    paragraph of this HPI section?
9    A. Let's see. "Dif," of difficulty "with aphthous
10   ulcers and even has developed these in her gastrointestinal
11   tract, cervix, et cetera. suggestive of Behtet's. Her
12   family is from Eastern Europe. Also has neuropsychiatric
13   difficulties from time to time, no synovitis, fevers, rash,
14   pleurisy, no weight loss, denies sicca, diffuse back pain as
15   above, denies prodromal illnesses, insect bites, trauma, et
16   cetera, denies declytis, SI pain or sacroiliac pain, eye
17   complaints, no headaches, photophobia, et cetera."
18   Q. Thank you. And in the first portion of the
19   paragraph where it refers to ulcers, and then there's a
20   phrase that says "suggestive of Becket's," B-e-c-h-e-t-'-s.
21   A. Yes, Behtet's syndrome.
22   Q. Is Behtet's a condition that is frequently
23   linked up with ulcers?
24   A. Yes; yes, sir.
25   Q. Okay. Have you ever come to a conclusion

28

1    whether Dr. Zechman has Behtet's?
2    A. She does not strictly meet criteria. Here again
3    I go talking about criteria. But she does not strictly meet
4    the criteria for Behtet's, but she does--in fact, only on a
5    few isolated occurrences has she told me about gastro--lower
6    gastrointestinal and cervical ulcers. But usually her
7    aphthous ulcers are in her upper gastrointestinal tract, her
8    mouth, for example.
9    Q. And I take it from this note that Behtet's is
10   more commonly found in people of Eastern European decent?
11   A. Yes. It is a genetic disorder, yes. It is also
12   an autoimmune disorder.
13   Q. And later in this paragraph there's a reference
14   to--it says, I think as you read, quote Also has
15   neuropsychiatric difficulties from time to time close quote.
16   A. Yes.
17   Q. Can you tell me what that means?
18   A. Oh, trouble concentrating, possibly some
19   depression, headache, some blurred vision, things of that
20   sort.
21   Q. Do you know whether this visit with Dr. Zechman
22   in December of 2002, was that the first time you were aware
23   of that or had you previously been aware of those symptoms?
24   A. No, I'd previously been aware that she, from
25   time to time, will have--and we call this neuropsychiatric

29

1    difficulties a grab-bag term. Patients with autoimmune
2    disease will have this. For example, it's estimated that 80
3    percent of patients with lupus will have neuropsychiatric
4    problems. And this can range anywhere from a dull headache
5    from time to time all the way to a seizure disorder.
6    Q. So is it accurate to say that from the time when
7    you first started treating her in the mid-1990s that Dr.
8    Zechman also had these other symptoms of occasional inability
9    to concentrate and depression?
10   A. Yes.
11   Q. And in the next sentence it says "No synovitis,"
12   s-y-n-o-v-i-t-i-s. Can you tell me what that means?
13   A. That is documented swelling, tenderness of the
14   synovial tissue around joints.
15   Q. Okay. So when you say "no synovitis," it means
16   that she doesn't have that swelling, at least at that time?
17   A. Yes.
18   Q. And what does pleurisy mean?
19   A. Pleurisy is a very sharp penetrating chest pain,
20   and it is commonly seen in autoimmune diseases, for example,
21   lupus-type diseases, and is somewhat like someone taking a
22   knife and sticking it between your ribs.
23   Q. And then in the next sentence you say "she
24   denies prodromal illness," p-r-o-d-r-o-m-a-l.
25   A. Yes.

B-0360

30

1    Q.  Can you tell me what that is?

2    A.  Well, like, for example, as I was mentioning

3  before, some things that can cause a flare, one thing can be,

4  like, an infection, like an upper respiratory tract

5  infection, a sinus infection, something such as that.

6    Q.  And, Dr. Fraser, would you please read the third

7  paragraph of this HPI section?

8    A.  Yes.  "She is working hard as a second-year

9  resident at Delaware in OB-G; has to travel back and forth on

10  the weekend, et cetera.  This is taking a toll on her.

11  Diffuse fatigue and myalgia is noted; no dysphagia or

12  hoarseness."

13    Q.  Can you tell me in what way the traveling back

14  and forth to Delaware was taking a toll on Dr. Zechman?

15    A.  Basically, just running her down, the fatigue,

16  the tiredness.

17    Q.  And what does myalgia refer?

18    A.  Muscle pain, muscle aches, like, you know, for

19  example, if you and I had been out working all day in the

20  yard, later that night we probably would have some muscle

21  aches or muscle pains.

22    Q.  So was it your understanding, Dr. Fraser, that

23  in addition to the ordinary rigorous job of being a resident,

24  that the traveling back and forth between Delaware and North

25  Carolina was exacerbating Dr. Zechman's condition?

31

1    A.  Well, I think it was a combination of things.  I

2  don't think it was any one thing.  I think everything taken

3  in total was contributing to her difficulties.

4    Q.  And when you refer to "everything taken in

5  total," can you tell me what you're referring to?

6    A.  Her work as a resident, the traveling back and

7  forth, her family, the stress, you know, those sort of

8  things.

9    Q.  Okay.  And if you'll turn to the very next page,

10  which is labeled DF39, and I turn your attention to the

11  section where it lists the medications that Dr. Zechman was

12  taking.  One of them Zyrtec, Z-y-r-t-e-c.

13    A.  Yes.

14    Q.  Can you tell me what that is and what it was

15  prescribed for?

16    A.  Yes.  That is a medicine for allergies, for

17  seasonal allergies.

18    Q.  And what about Atenolol, A-t-e-n-o-l-o-l.

19    A.  Yes, Atenolol.  That is a medicine that can be

20  used either for headaches or for hypertension.  In this low

21  dose, however, it was for her headaches.

22    Q.  And as we go through your records, when we have

23  a session like this which lists medications, is that limited

24  to medications that you're prescribing or all the medications

25  that she's taking?

32

1    A.  Hopefully, that is all the medications that she

2  is taking and because there's nothing beyond that giving you

3  the number prescribed and the number of refills, I did not

4  prescribe any of these?

5    Q.  I see.  So you were just noting the medicines

6  that Dr. Zechman told you that she was taking?

7    A.  Yes; yes, sir.

8    Q.  Okay.  All right.  If you will please,

9  Dr. Fraser, flip backwards in Exhibit Fraser [1] to the page

10  marked DF36, and this should be your notes from a visit on

11  May 23, 2003.

12    A.  Yes.

13    Q.  Okay.  And would you please read the section

14  that you wrote under History of Present Illness.

15    A.  Yes.  "Doing much, much better and in better

16  spirits as well; no synovitis, aphthous ulcers, fevers, rash,

17  pleurisy.  No headaches, photophobia, et cetera.  Denies

18  numbness, tingling in extremities or changes in bowels or

19  bladder; will be starting her third year soon.  Wants oral

20  steroids to take intermittently, and we discussed this.

21  Fatigue improved on Provigil as well."

22    Q.  All right.  Focusing on the first paragraph, do

23  you see that Dr. Zechman denied that she was having numbness;

24  is numbness something that she had experienced in the past?

25    A.  I think in terms of her fingers from her

33

1  Raynaud's, yes, but at this point, she had not had any in her

2  legs, if that's what you're pertaining to.

3    Q.  Okay.  Does Dr. Zechman's connective tissue

4  disease affect one part of the body more than others?

5    A.  From time to time it can, but it can hop, skip

6  and jump around.  For example, the arthritis can be in the

7  hands, can be in the hip, can be in the shoulder, can be in

8  the feet, you know, something like that.

9    Q.  Do you have any understanding as to when

10  Dr. Zechman was first diagnosed with this condition?

11    A.  As I recall—in fact, if you will allow me, let

12  me get my notes from when I first saw her at my previous

13  office.  Can I do that?

14    Q.  Sure.  Just let me know when you're ready.

15    A.  All right.  All right.  I first saw her,

16  actually, in October of 1996.  At that time, she was having

17  severe back pain.  I saw her twice when I was at another

18  office.  I went on to practice on my own in February of 1997.

19  I first saw her in my own office in May 1, 1997, and the

20  first mention of an unspecified diffuse connective disease,

21  with Raynaud's disease or Raynaud's phenomenon, was made on

22  my note of May 1, 1997.  However, although I did not diagnose

23  her with this, when I saw her at the previous office in 1996

24  I did make note of the fact that she had been seeing,

25  actually, some allergists up at ECU who had suggested that

34

1    she had some sort of a diffuse autoimmune disease.
2        Q.  Okay.  And do you--apart from the date on which
3    she may have received the diagnosis, do you have any
4    understanding as to how long Dr. Zechman has actually
5    suffered from this particular condition?
6        A.  When I saw her back in October of '96, she said
7    that she had been ill on and off for eleven-and-a-half years.
8        Q.  Okay.  All right.  So since the mid '80s?
9        A.  Yes.
10       Q.  Did Dr. Zechman ever mention to you that she
11   felt the demands of her residency program in OB-GYN were too
12   stressful or demanding?
13       A.  She told me that at her current stressful
14   situation she was hopeful that she could complete her
15   residency and she was going to try her utmost.
16       Q.  So am I understanding you correctly that
17   although Dr. Zechman expressed her hope to complete it, that
18   she also expressed some doubts as to whether she could?
19       A.  She expressed some trepidation.
20       Q.  Okay.  Can you explain to me what you mean by
21   that, that "she expressed some trepidation"?
22       A.  She thought that perhaps she was being forced
23   out.
24       Q.  Okay.  Did she tell you why?
25       A.  She thought that the people up there did not

35

1    like her because she was sick and she had to have time off.
2        Q.  Okay.  Do you remember when in time Dr. Zechman
3    told you that?
4        A.  Let me see here.  It was approximately the same
5    time--I did not include this in any of my notes--it was
6    approximately the same time that I filled out the paperwork
7    and I talked to the Chairman of the department.
8        Q.  Okay.  That was Dr. Lamar Eckblood?
9        A.  Yes.
10       Q.  Okay.  Just focusing your attention back to page
11   DF36, which is your May 23, 2003 note, there's a reference
12   here that Dr. Zechman quote wants oral steroids to take
13   intermittently, and we discussed this close quote.  Can you
14   tell me what that means?
15       A.  Well, Dr. Zechman--well, obviously, she's a
16   physician.  And--well, it's sort of like a lawyer
17   representing themselves, if you know what I mean.
18       Q.  I think I do.  So Dr. Zechman had an opinion in
19   her own mind that oral steroids would be beneficial for her?
20       A.  Yes, to take intermittently.
21       Q.  Okay.
22       A.  And I--honestly, I don't like that, and I tried
23   to dissuade her.  But Ellen, Dr. Zechman, she's an
24   intelligent woman, and she knows how to take them, and I
25   reviewed with her at length ad nauseam about taking them

36

1    intermittently, and she assured me that she would only take
2    them in the prescribed manner.
3        Q.  And what did Dr. Zechman say to you about the
4    reasons why she thought she would benefit from taking oral
5    steroids?
6        A.  It would give her more energy and also take care
7    of her rashes, her intermittent fevers, and her joint pain
8    and swelling, and, of course, her occasional pleurisy.
9        Q.  Incidentally, when--do you have an understanding
10   as to what the medical cause is of the fatigue that Dr.
11   Zechman experiences?
12       A.  It really is multifactorial.  There are a lot of
13   theories, everything from elevated anti-tumor necrosis factor
14   in the bloodstream to the anemia to other cytokine mediators,
15   but then you also have to consider that there's more than
16   just the autoimmune disease going on here.  There's also the
17   chronic pain component of this as well.
18       Q.  And you referred a moment ago--I take it you
19   were reluctant to prescribe the oral steroids to Dr. Zechman.
20       A.  Yes.
21       Q.  Okay.  Can you tell me what your concerns were
22   about prescribing oral steroids.
23       A.  Steroids are the world's greatest medicine if
24   taken for less than two weeks.  They're the world's worst
25   medicine if taken for longer than two weeks.  There's just

37

1    too many side effects and risks associated with long-term
2    steroids.  And, unfortunately, once you get someone on
3    steroids, they feel so wonderful--in fact, almost a euphoric
4    type effect--that oftentimes people want to take more and
5    more and more continuously.  Dr. Zechman, however, has taken
6    them very judiciously, and I know this because of the refills
7    that she has gotten.
8        Q.  And how do the refills that she's gotten lead
9    you to that conclusion?
10       A.  Well, she's only called for refills very, very
11   infrequently.  So she's, obviously, not taking them every
12   day.  In fact, far from it.
13       Q.  Is Dr. Zechman able to write her own
14   prescription for oral steroids?
15       A.  That--well, to answer your question, yes.
16   However, that would be an ethical conflict, so I very much
17   doubt that Ellen would do it.  And I also sincerely doubt
18   that her husband would write her any prescriptions.
19       Q.  And if you will turn to the next page of your
20   May 23, 2003 note, in the medication section there's a
21   reference to Prednisone.  Do you see that?
22       A.  Yes.
23       Q.  Is that--is Prednisone a medication that you
24   prescribed for Dr. Zechman?
25       A.  That is the steroid that I gave her that we just

38

1  were talking about.
2      Q. Oh, Prednisone is the oral steroid?
3      A. Yes, sir.
4      Q. Okay. Does taking that oral steroid have any
5  side effects; I should say taking it intermittently, does
6  that have any side effects?
7      A. Not necessarily. It depends on the frequency,
8  and it depends on the dose. However, I'm a firm believer the
9  only good steroid is no steroid. But long-term and
10 continuously, steroids can cause weight gain, fluid
11 retention, stomach upset, diabetes, high blood pressure,
12 osteoporosis, cataracts, thinning of the skin, infections
13 and, unfortunately, the list goes on and on and on.
14     Q. And are you aware of any side effects that
15 Dr. Zechman suffered from taking the steroids?
16     A. No, none at all.
17     Q. And when--what is--can you interrupt for me what
18 the dosage and the frequency that you're prescribing in terms
19 of the Prednisone?
20     A. Prednisone 5 milligrams is a very, very small
21 dose. In fact, 5 milligrams a day is the only long-term--
22 it's the only--or, the highest long-term dose that I would
23 prescribe to a patient who absolutely, positively needs
24 steroids and nothing else works. I try my very, very best to
25 get patients off of any steroid more than 5 milligrams a day.

39

1  In fact, I try to get my patients off steroids completely.
2      Q. And, so, you're prescribing 5 milligrams once a
3  day?
4      A. Well, as directed. And she knew to take this
5  intermittently, basically in small tapers, like, you know, 5
6  milligrams a day for a couple of days until she felt better.
7  And that's the way she took it.
8      Q. And what is the--there's a reference that has a
9  number sign 120. What does that refer to?
10     A. I gave her 120 pills, and I gave her three
11 refills.
12     Q. Okay. So does that mean a total of four
13 prescriptions for 120 pills?
14     A. Yes, sir.
15     Q. Was there any concern on your part about giving
16 Dr. Zechman a prescription of about 480 of these pills,
17 which, I mean, this is potentially a prescription that if
18 she's using it intermittently, you know, could go on for a
19 couple of years without coming back to you for another
20 prescription. Did that present any concern to you?
21     A. Well, if she had come back to me relatively
22 soon, I would have had to sit down and read her the riot act
23 and tell her she taking too many. And then we would have had
24 to talk about other medications, perhaps these modifying
25 agents, in lieu of the steroids.

40

1      Q. Okay. And am I correct, given that you were
2  instructing her to take it for a few days when she needed it
3  and then stop taking it--
4      A. Yes.
5      Q. --am I correct that this prescription should
6  last well over a year, probably two years?
7      A. It should last well over a year, and most of the
8  time people--pharmacies will not refill prescriptions,
9  obviously, if they are so many years out of date.
10     Q. Okay. And if you will flip to the two previous
11 pages in Exhibit Fraser [1], there looks to be a duplicate of
12 your May 23, 2003, note, but I notice at the very bottom of
13 page DF35 there's a print time, and it looks like it's 9:38
14 a.m., and then on the next two pages that we were just
15 talking about it has a print time of 9:31. Do you know why
16 this list printed twice at two different times?
17     A. No. I--okay. You're talking about 34 and 35?
18     Q. Yeah.
19     A. Huh. Well, no, I have no idea. The only thing
20 I can think of is I didn't think the note had printed out,
21 and so I just printed it out again, and just signed it and
22 left it at that. So--but the note, once I signed it, it's a
23 done deal, so I can't change it.
24     Q. All right. And if you would please turn to the
25 page that's marked DF31, which is your notes from August 8,

41

1  2003, and let me know when you're there.
2      A. Okay. I'm there.
3      Q. And would you please read your description of
4  History of Present Illness?
5      A. "HPI. Has had several disease flares; severe
6  knee pain as well, causing difficulty walking. No synovitis
7  or rash; occasional aphthous ulcers and fevers; intermittent
8  chest pain and palpitations; no dizziness or shortness of
9  breath or cough; on Atenolol; fatigue the worst part of her
10 illness. No diffuse musculoskeletal pain, but a.m. stiffness
11 and diffuse achiness. Was taking unknown muscle relaxer that
12 helped her at night. Not sure of the name of it, though.
13     Q. Okay. And when you--when the reference says
14 "not sure of the name of it," the muscle relaxer, that means
15 Dr. Zechman wasn't sure of the name of it when she was
16 talking to you?
17     A. Yes, she was not sure of the name of it.
18     Q. Okay. There's also a reference here that
19 there's quote no diffuse musculoskeletal pain close quote.
20     A. Yes.
21     Q. What is that kind of pain?
22     A. Well, that's like a total body pain, like I hurt
23 all over.
24     Q. Okay. So am I correct that Dr. Zechman's
25 complaints of pain during this visit were localized?

42

1    A. Yes.
2    Q. Okay. And they were localized in her knees?
3    A. Her knees, but she also complained of diffuse
4 achiness, and those were in her joins.
5    Q. Okay. Any particular joints or all joints?
6    A. Basically, all joints. You know, when you--it's
7 sort of like getting up--you know, as you get older, you get
8 up in the morning, and, you know, it takes you several steps
9 to limber up. You know, your joints just can't get going.
10 That's the achiness I'm referring to.
11    Q. And at the bottom of this page there's a
12 reference to a medication called Zanaflex?
13    A. Yes.
14    Q. Is that something that you prescribed or
15 provided to her?
16    A. Yes. I gave her some samples of that. That is
17 a muscle relaxant. I told her to stop taking that other
18 unknown muscle relaxant, and I gave her some samples of
19 something that I knew and gave her some samples of the
20 Zanaflex.
21    Q. All right. And if you will flip to page DF28,
22 which is your note from September 22, 2003.
23    A. Okay.
24    Q. And is this when she came to see you after she
25 hurt herself moving furniture around on her patio?

43

1    A. Yes, it is.
2    Q. Okay. Is there anything in this note that
3 refers to any changes in Dr. Zechman's pre-existing medical
4 condition?
5    A. I'm sorry; I'm just reading the note to make
6 sure. No; no. I think the remainder of her medical
7 conditions at that time I do not mention anything being out
8 of the ordinary. However, you know, this note, obviously,
9 was done in the urgency of her back and leg pain.
10    Q. What is the medication Sterapred,
11 S-t-e-r-a-p-r-e-d?
12    A. That is a term for a steroid dose pak, sort of
13 like a Medrol dose pak. It's a very high dose of steroids
14 the first day, tapering on down, all the way to nothing over
15 twelve days.
16    Q. And was your prescription of this steroid pak in
17 addition to the Prednisone that she was taking?
18    A. No. She would stop the Prednisone 5 milligram
19 intermittent pills I gave her and take the dose pak.
20    Q. And what's the medication Soma, S-o-m-a?
21    A. That was the muscle relaxer that she had told me
22 that she was on previously and she couldn't remember the
23 name. It's a very potent muscle relaxer.
24    Q. Does that require a prescription?
25    A. Yes, it does.

44

1    Q. Do you know who prescribed that for her?
2    A. No, I do not.
3    Q. Do you know whether Dr. Zechman received the
4 prescription for Soma from somebody other than herself or her
5 husband?
6    A. I cannot--I don't think she did, but I cannot
7 say with absolute certainty. I believe she got it from
8 someone she was working with in Delaware.
9    Q. And what is the medication Bextra, B-e-x-t-r-a?
10    A. That's no longer on the market. That is a COX-2
11 inhibitor, and it is an Aspirin-type medicine; it's an anti-
12 inflammatory.
13    Q. And, so, am I correct that Soma is the muscle
14 relaxer that Dr. Zechman had previously taken which had not
15 been prescribed by you, and you sought to replace that muscle
16 relaxant with a different one that you were more comfortable
17 with?
18    A. Yes.
19    Q. Okay. And was Dr. Zechman agreeable to that
20 substitution?
21    A. At the time, yes, she was.
22    Q. Could there come a time when that change?
23    A. I assume so, because, evidently, she got some
24 more Soma, and she was taking it for her back pain at the
25 time.

45

1    Q. At which time?
2    A. At this 9/22/2003 time.
3    Q. Okay. All right. And if you will turn to page
4 DF26, which is your note from October 3, 2003.
5    A. Okay.
6    Q. And would you please read the narrative
7 paragraph at the top?
8    A. "HPI. Not any better at all. Also discussed
9 personal matter pertaining to her work. Will have to give
10 her a note so she can go back on Monday. MRI will be
11 scheduled but no idea when this will be. Steroids did not
12 help. Patient taking two Soma's at night for sleep. Worried
13 about this," that is me, I'm worried about this. "Denies
14 numbness, tingling in extremities or changes in bowel or
15 bladder. Pain in her right hip now, but this could be from
16 her impalgic gait."
17    Q. What is impalgic gait?
18    A. Means you walk funny.
19    Q. Do you have any understanding is that something
20 that Dr. Zechman has on a regular basis or just from time to
21 time?
22    A. Oh, no, not at all. This was from her back,
23 sciatica slash radiculopathy from her injury.
24    Q. Oh, I see. All right. So am I right, then, she
25 suffered an injury moving furniture around on the deck--

12 (Pages 42 to 45)

46

1    A. Yes.
2    Q. --and that sort of to compensate for the injury
3  or pain, she started to walk differently?
4    A. Yes.
5    Q. Okay. And you said that when--this paragraph
6  refers to quote unquote worried about this, referring to
7  Dr. Zechman taking two Soma's at night, that the person who
8  was worried about this was you, Dr. Fraser, right?
9    A. Yes.
10    Q. Okay. Can you tell me why you were worried
11 about that?
12    A. Well Soma is a very potent muscle relaxer, and
13 it is one, honestly, that I just don't like prescribing. It
14 has a lot of side effects. In fact, it has an active
15 metabolite that has a longer half-life than the actual drug
16 itself. So if you take a lot of it, the active metabolite
17 actually accumulates in your system and you can actually
18 become addicted to it. I don't think--I'm not insinuating
19 anything here at all. That was not the case here, because
20 you have to take, like, one or two three times a day
21 regularly, you know, for, like, weeks and months. But I just
22 do not like prescribing it. It's like a happy pill. You
23 know, one is okay, but two is, I just think, a little
24 excessive.
25    Q. And what are the side effects from taking Soma?

47

1    A. Oh, drowsiness, dizziness, increased somnolence,
2  grogginess the next day, trouble functioning, basically just
3  wipes you out. It does help your back, though.
4    Q. Would taking Soma exacerbate the fatigue that
5  Dr. Zechman feels?
6    A. Well, that's an interesting question. It
7  actually helps people sleep, but it may make them excessively
8  groggy the next day. So it may not actually allow them to
9  function as well the next day.
10    Q. And the grogginess that you just referred to,
11 would that result from taking one Soma at night?
12    A. It could; it could. I have patients who can't
13 even take, like, a half or quarter of a muscle relaxer at
14 night because they wake up feeling terrible.
15    Q. Did you have any understanding as to what side
16 effects Dr. Zechman actually experienced when she was taking
17 two Soma's per night?
18    A. She told me she really wasn't having any
19 problems getting up in the morning, that it was helping her
20 back.
21    Q. All right. If you will flip to the entry--this
22 is your October 15, 2003, notes, which is part of Exhibit
23 Fraser [1] at DF24.
24    A. Okay.
25    Q. And would you please read the narrative at the

48

1  top?
2    A. "HPI. Continues with her numbness in her lower
3  leg and thigh complaints. Reviewed MRI and, indeed, patient
4  has degenerative joint disease and degenerative disk disease
5  at several levels. This combined with disk protrusions at
6  three levels is accounting for her complaints. Discussed and
7  will proceed with trial of epidurals. Also discussed
8  possible EMG nerve conduction, but will wait the epidurals.
9  As last resort, will send to neurosurgery. Patient
10 agreeable."
11    Q. Was--a "trial of epidurals," what does that
12 mean?
13    A. Epidural steroid injection is a selected steroid
14 injection at a disk space in a person's back. Basically,
15 you're injecting steroids into the epidural space around
16 where the nerve root is pinched, coming out of the back, and
17 the steroid, with the numbing medicine, decreases the pain
18 and reduces the swelling around the nerve root, thereby
19 relieving the symptoms.
20    Q. Do you recall whether Dr. Zechman actually
21 received her epidural injection?
22    A. No, she did not go.
23    Q. Okay. Do you know why?
24    A. She did not feel she could take the time off of
25 work.

49

1    Q. And why would--well, let me ask it this way.
2       Would receiving an epidural injection cause her
3  to miss time from work?
4    A. Well, there was the time in terms of driving
5  down to New Bern, the day getting it, then she--you know, you
6  really shouldn't be doing anything in terms of exerting
7  yourself for the next 24 to 48 hours, and then, of course,
8  driving back.
9    Q. Did you ever discuss with Dr. Zechman whether it
10 might have been advisable for her to see a physician that was
11 located close to her residency program in Delaware?
12    A. Yes, we did talk about that.
13    Q. Okay. Who raised that possibility, was it you
14 or her?
15    A. I did.
16    Q. Okay. And why did you raise that possibility
17 with her?
18    A. Well, I thought it would just be more convenient
19 for her. You know, I hate to have people drive all the way
20 down here to see little ol' me. But, you know, she had been
21 seeing me for several years, she felt comfortable with me.
22 Her husband also had seen me twice. And she was coming down
23 in any event at least twice a month to see her family. The
24 only issue, obviously, is having the studies down.
25 Obviously, you know, I don't have a license to practice

50

1    medicine in Delaware, so I can't order any tests up there.
2        Q. Oh, I see. All right. So she couldn't have
3    just had the epidural injections done in Delaware?
4        A. Unfortunately, not.
5        Q. Am I hearing you right that she would need a
6    Delaware physician to prescribe that?
7        A. Yes.
8        Q. Okay. And does this visit on 10/15 in the
9    narrative description that you just read, does this all
10   relate to the specific injury that she suffered moving the
11   furniture around?
12       A. Yes.
13       Q. Okay. Was there any interaction so far as you
14   could tell between the injury she suffered moving furniture
15   and whether that interacted with or affected the other
16   medical conditions that she already had, or was it a separate
17   discreet thing?
18       A. Well, in terms of her autoimmune syndrome,
19   obviously, this had nothing to do with that. All right.
20   Unless you want to make the case that the stress of her
21   having a pinched nerve and the problem with her back may have
22   cause for the disease flares, I think is a valid
23   consideration. However, going back to the MRI she had, she
24   had known degenerative arthritis and degenerative disk
25   changes in her back. And looking at her age, that makes

51

1    sense. That, obviously, did not happen from lifting deck
2    furniture, you know, because of the hurricane. Those were
3    long-term degenerative changes that had been coming on over
4    years. Lifting the deck furniture was just basically the
5    straw that broke the camel's back, pardon the pun.
6        Q. And if you will turn to your notes from November
7    12, 2003, which is the page marked DF22, and will you please
8    read the narrative at the top?
9        A. "Doing much better, and never had an injection.
10   99.8 percent better. No other complaint. Discussed several
11   other issues today."
12       Q. Do you remember what else you discussed that
13   day?
14       A. The only thing I can remember is that she was
15   hopeful that she was going to--since her back was doing so
16   much better, that she was going to be able to continue on in
17   her residency program as if nothing had happened, but she had
18   had to take so much time off, evidently, that she thought
19   that maybe something was going to be made of that.
20       Q. Okay. And this may help refresh your
21   recollection. I think I can represent to you that
22   Dr. Zechman had already left the residency program as of the
23   first week of October 2003. Does that change your
24   recollection of what was discussed at this visit in November?
25       A. Maybe. I'm not--I know she told me. I don't

52

1    know whether she told me then--she may have. She may have
2    told me then. But I can't--I'm not--I know she told me. I
3    know we sat down and talked about it. I could be mistaken,
4    and this is one of the reasons why I don't put personal
5    things in notes, but now it's coming back to haunt me, I
6    guess, because I cannot be absolutely certain.
7            I thought at one point she was actually very
8    hopeful about continuing on in her residency, and I think
9    initially she did not tell me. I don't think she told me,
10   honestly, until later. And--but I can't--I don't have any
11   evidence to that. But as I recall, she did not tell me. I
12   mean, she did not call me up on the phone, and she did not
13   tell me the first time she saw me, saying Guess what I just
14   did. I think it wasn't until later, she said, "I've left the
15   program."
16       Q. Okay. And if I'm understanding you right, are
17   you saying that you were under the impression that she was
18   still in the program for some period of time after she, in
19   fact, had already left?
20       A. Yes.
21       Q. Okay.
22       A. But I can't swear to that, and I do not know
23   exactly when the date was when she told me that she had left.
24       Q. Do you remember what she told you when she first
25   told you she had left the program?

53

1        A. Actually, I'm looking through my notes here. I
2    want to say it wasn't until the next year she told me she had
3    left. But, honestly, I cannot be certain. So--I honestly
4    cannot be certain.
5        Q. I understand that. Putting aside the "when" she
6    told you--
7        A. Right.
8        Q. --do you remember what she told you about her
9    leaving the program?
10       A. I want to say that she told me something to the
11   effect that she was forced out.
12       Q. And--all right. And if you will flip to the
13   previous note, which is your note of February 16, 2004, page
14   DF19 of Fraser Exhibit [1], could you please read the
15   narrative from this note?
16       A. Yes. "Depressed and concerned. Lot back pain
17   noted but not radicular as before. No other complaints.
18   Wants to lose weight, impatient, id"--it should be "is"--my
19   wonderful spelling--"trying to do everything"--that should be
20   everything she "possibly can, including an Atkins-type diet,
21   et cetera. Taking steroids about twice a week," and that was
22   her. And, of course, I have question marks about that.
23   "Long discussion concerning this, obviously. Will stop and
24   see how she does.
25           Alternates between Bextra and Motrin. Here,

54

1  again, this is what she wanted to do. Also, patient out of
2  Soma and we"--of course, only one "e"--"will not refill
3  this." We've already talked about why. "Patient wants
4  Wellbutrin, and this could be worth a try"--it could also
5  help her lose weight, that's why--oh, well, I already say
6  that--"her weight gain and her depression."
7      Q. And going back to the beginning of this entry,
8  do you have any understanding as to why Dr. Zechman was quoted
9  unquote depressed and concerned?
10     A. Honestly--and here, again, I can't swear to
11  this--but I think at this visit, this is when she told me
12  that she had stopped the program.
13     Q. Okay. Did she--now this is February 16, 2004.
14     A. Yes.
15     Q. During this meeting, do you think she told you
16  that she had just then left the program or is it that she was
17  telling you then that she had left the program four-and-a-
18  half months earlier?
19     A. I think she had told me now that she had left
20  the program, you know, some time before, that it just didn't
21  work out and she had been forced out because of all the time
22  she had to take off because of her back.
23     Q. And I take it from this note that Dr. Zechman
24  was taking steroids about twice a week, and that you, Dr.
25  Fraser, was concerned about that?

55

1      A. Yes.
2      Q. Okay. Can you tell me when you expressed that
3  concern to Dr. Zechman?
4      A. I basically told her that that was not a good
5  thing to do because of the risks or side effects, and we
6  discussed that, and she concurred.
7      Q. Are these steroids that you're referring to
8  different than the 5 milligrams of Prednisone she had been
9  taking?
10     A. No, sir. They're one and the same.
11     Q. So taking it twice a week is too much?
12     A. Well, unfortunately, twice a week may turn into
13  three weeks, which may turn into five times a week, which may
14  turn into every day, which may turn into two every day, and
15  you can see the problem.
16     Q. Did you ever believe that Dr. Zechman had, you
17  know, had taken a step or two down that path?
18     A. I could not--I cannot answer that. I hope not.
19     Q. And when it says quote The patient out of Soma,
20  and will not refill this close quote, was she asking you
21  for a prescription for Soma?
22     A. I believe she may have been hinting around about
23  it. She may not have come out to say Oh, by the way, I need
24  a refill of Soma; it may have been one of those situations
25  where Well, I just used my last Soma, hint, hint. And I just

56

1  basically, you know, cut her off and said, Well, that's good,
2  because, you know, I don't like that medicine, that's lousy
3  medicine, and I'm glad you're out of that now.
4      Q. Just bear with me one minute, Doctor. If you
5  will flip to the page marked DF13--
6      A. Okay.
7      Q. --this is actually--looks to be a note of yours
8  from April 11, 2003, so this one may be a little out of order
9  in the exhibit. And just let me know when you're there.
10     A. Yeah, I noticed when I was reviewing my chart
11  that some of them got out of order. Okay.
12     Q. And am I correct that the chief complaint at the
13  to--again, this is something that your assistant typed?
14     A. Yes.
15     Q. Okay. Would you read the narrative below that?
16     A. "HPI. Not doing well at all. Crops of aphthous
17  ulcers noted. Had spinal meningitis several months ago and
18  eventually hospitalized in Delaware. Patient given
19  Rocephin," which is an IV antibiotic, "for four days. Has
20  never quote fully recovered end quote from this. Always
21  tired but living the life of a resident. Rash noted over the
22  past several days on her trunk and extremities. Not
23  photosensitive at all. Seen by emergency room at work and
24  told this was perhaps a coxsackievirus. Patient limited from
25  patient contact. Intermittent fevers as well. No headache

57

1  or photophobia now, though. Joints painful but no swelling
2  noted. Denies chest pain or shortness of breath or cough.
3  No weight loss, sicca, weakness, dysphagia, et cetera.
4  Reviewed labs from last time. All normal. Patient tells me
5  she is taking several vitamins and other supplements in order
6  to have enough energy to work as a resident."
7      Q. Was this a recurring theme for Dr. Zechman, that
8  she was sort of constantly struggling to have sufficient
9  energy to deal with the demands of being a resident?
10     A. Well, fatigue was always a major component of
11  her visits.
12     Q. Okay. And is that something that, I take it,
13  did exist before she was a resident?
14     A. Yes.
15     Q. Okay. And it exists to this day?
16     A. Yes.
17     Q. Okay. And when I'm referring to "it," you
18  understand I'm referring to her fatigue?
19     A. Yes.
20     Q. Okay. And what is spinal meningitis?
21     A. Spinal meningitis is a infectious disease of the
22  spinal fluid, brain and, basically, a spinal infection of the
23  meninges, or the covering of the spinal cord and the brain.
24     Q. Do you have any understanding as to how
25  Dr. Zechman contracted spinal meningitis?

58

1    A. Well, it can be either viral or bacterial. It
2 can be from a variety of different causes. For example, it's
3 very common in young people, for example, military recruits
4 when they first, you know, go into the military. And there
5 are usually several cases of spinal meningitis in the
6 barracks.
7    Q. And what are the symptoms of spinal meningitis?
8    A. Headache, trouble focusing, painful eyes, fever,
9 trouble concentrating, things of that sort.
10    Q. And I take it that Dr. Zechman's contracting
11 spinal meningitis is unrelated to her pre-existing medical
12 conditions?
13    A. Yes, although patients with autoimmune diseases
14 do tend to have abnormal immune systems, and that may put
15 them--may, I stress--at a slightly increased risk of
16 infectious diseases.
17    Q. Okay. But if Dr. Zechman were hospitalized due
18 to spinal meningitis, would you agree with me that that is
19 not the same thing as being hospitalized for diffuse
20 connective tissue disorder, for example?
21    A. Oh, no, they're not the same thing at all.
22    Q. Right. And spinal meningitis is a discreet
23 infection that she contracted?
24    A. Yes.
25    MR. BLOOM: OFF THE RECORD.

59

1    COURT REPORTER'S NOTE: AN OFF-THE-RECORD BREAK
2 WAS TAKEN.
3    MR. BLOOM: Okay, Lori, are you there?
4    MS. BREWINGTON: Yeah, I am, but if we could
5 just read the last question back. I want to be sure that
6 he's finished his response. If we could ask him whether he
7 was finished. I didn't get if the court reporter
8 interrupting or if that was it.
9    MR. BLOOM: Sure. Do you mind reading back the
10 last question and answer.
11    COURT REPORTER: Wait just a second, please.
12 Right. And spinal meningitis is a discreet infection that she
13 contracted? Yes.
14    MR. BLOOM: That was the last question and
15 answer?
16    COURT REPORTER: That was the very last
17 question and his answer.
18    Q. Okay. Okay, back on. All right, Dr. Fraser,
19 we're still looking at your April 11, 2003, note, which is a
20 part of Fraser Exhibit [1] at page DF 13. And is Dr. Zechman
21 the person who told you that she had contracted spinal
22 meningitis?
23    A. Yes.
24    Q. Okay. And when it refers in your notes to her
25 being hospitalized in Delaware, did you have any

60

1 understanding as to whether she was hospitalized actually at
2 the hospital where she was a resident?
3    A. She told me she had been.
4    Q. She told you that she had been hospitalized in
5 the hospital where she was working?
6    A. At the same complex.
7    Q. Okay. And did she mention to you that she--her
8 hospitalization began with a visit to the emergency room?
9    A. Yes, she did.
10    Q. Okay. And the note that we're looking at from
11 your record is April 11, 2003, and your reference to the
12 spinal meningitis is that she was--that it happened several
13 months ago.
14    Is it consistent with your memory that this
15 hospitalization for spinal meningitis occurred in or around
16 February of 2003?
17    A. I had no idea as to the exact date.
18    Q. Okay. All right. And if you would flip to the
19 page of your medical records which is marked F0008, and if
20 you would read the narrative from that visit?
21    A. "HPI. A lot of stress recently. Her lawsuit
22 continues, and then her father was diagnosed with esophageal
23 carcinoma just before Christmas. Patient was on her way to
24 Wilmington last week after hearing her father was quote
25 throwing up blood end quote. Developed left chest pain

61

1 associated with radiation to her left arm up into her neck,
2 felt sick. This resolved, and patient did find someplace to
3 stop and took Aspirin. No reoccurrence at all. Father did
4 pass away the next day. Patient distraught and feels quote
5 it was all stress end quote. Still, patient has hypertension
6 and is of the age which should take her pain with caution.
7 Will make arrangements. No synovitis, aphthous ulcers,
8 fevers, rash, pleurisy, no headache, photophobia, et cetera.
9 Denies numbness, tingling in extremities or change in bowels
10 or bladder. Patient does take intermittent steroids as
11 needed for her symptoms, including joint pain and fatigue.
12 Urged caution concerning this."
13    Q. And when urged caution regarding the
14 intermittent use of steroids, was this--was there anything
15 particular that you were cautioning about apart from the
16 general cautions you had previously issued to her?
17    A. Well, previously, you know, I thought we had
18 been able to successfully take her off of this, but,
19 evidently, she still had some, I guess, hanging around, for
20 lack of a better term. And, I guess, under the stress of her
21 symptoms increasing, she restarted taking the steroids, and,
22 so, I just asked her to be careful because of the side
23 effects and just a general precaution from the fact that I
24 didn't like people taking intermittent steroids.
25    Q. And when there's a reference to--I suppose

62

1   you're quoting her when you say "quote it was all stress
2   close quote"; is that right?
3       A. Yes.
4       Q. What's the "it" that she's referring to?
5       A. The chest pain.
6       Q. What is "all stress"?
7       A. The chest pain. The chest pain she was
8   experiencing at that time.
9       Q. Okay. And when you refer to "making
10  arrangements" at the end of the first paragraph, can you tell
11  me what that refers to?
12      A. We referred her to a cardiologist in town for
13  evaluation. We also get an EKG on her as well.
14      Q. Okay. And if you will flip to page DF0005,
15  which is your note from August 5, 2005, will you please read
16  the narrative at the top of that note?
17      A. "HPI. Taking medications intermittently in
18  disgust. Out"--it should be out "of several of these.
19  Several other issues discussed. Spent 20 minutes with
20  patient. No synovitis, aphthous ulcers, fevers, rash,
21  pleurisy, no headache, photophobia, et cetera. Denies
22  numbness, tingling in extremities or changes in bowels or
23  bladder. No weakness noted. Denies sicca. Occasional low
24  back pain noted. Reviewed X rays and MRIs from several years
25  ago. Talked about her job and new house. Normal cardiac

63

1   evaluation noted. No stress test done. Patient has had
2   normal colonoscopy, but endoscopy with ulcer. This improved,
3   she tells me; stress-induced."
4       Q. What is it that was stress-induced?
5       A. The ulcer.
6       Q. Okay. And did you have an understanding of what
7   was the cause of Dr. Zechman's stress at that time?
8       A. No. Just, I would assume, just life stressors.
9       Q. Okay. In your experience treating Dr. Zechman,
10  is she somebody who feels the effects of stressors more so
11  than the average person?
12      A. Yes.
13      Q. And do you recall--the reference that you had
14  talked to Dr. Zechman about her job and the new house, do you
15  remember what job she was working at at that time?
16      A. She has a medical practice in her husband's
17  office in our town called The Ladies' Clinic, and she does
18  primary care with a gynecologic--I'm sorry; that's my cell
19  phone. Let's go off the record.
20          COURT REPORTER: We're gonna go off the record a
21  moment.
22          MR. BLOOM: Okay.
23          COURT REPORTER'S NOTE: AN OFF-THE-RECORD BREAK
24  WAS TAKEN.
25          DR. FRASER: That--her job, basically, is to do

64

1   primary care for women, and she does a lot of GYN-type
2   things, obviously. And we talked about that and how that was
3   going, and then she and her husband were building a new house
4   in a subdivision in our area, and we talked about how that
5   was going as well.
6       Q. And you referred a moment ago, I thought, to the
7   fact that Dr. Zechman--that stress, or stressors, affect
8   Dr. Zechman more than the average person. Did I hear that
9   right?
10      A. Yes.
11      Q. Okay. Can you elaborate on that and tell me in
12  what way stress tends to more affect Dr. Zechman?
13      A. All I--you know, I'm not--I'm a medical
14  physician, so all I can do is tell you how I see how she, you
15  know, interacts and how certain things cause her to react.
16  And when things don't go well, or when things upset her, or
17  when she feels bad, or when she's sick or when, for example,
18  her father or other stress-type situations, for example,
19  there were some doctors that were trying to squeeze her out
20  of the women's clinic here a couple of years ago, she tends
21  to, I guess, internalize that. And it tends to cause her
22  undue anxiety and depression and problems.
23      Q. Does it in your experience also cause her to
24  verbally react to people who she believes are causing her
25  stress?

65

1       A. Oh, honestly, I never experienced that. I have
2   had limited experience--I mean, I've known them for years,
3   you know, since 1995. I've had limited experience with them.
4   However, Hi, how're you doing, in the mall; several offices
5   as you can tell from my notes; been at maybe six to eight
6   different social functions in the past six years where I've
7   seen them. And, basically, you know, that's it. Talked
8   about her kids, you know, talked about, you know, how life
9   was going, and that sort of thing.
10      Q. Did Dr. Zechman tell you why she thought people
11  were trying to force her out of The Ladies Clinic?
12      A. The OB-GYN group here in town, they all merged
13  together, and they did not want--as she put it to me--this is
14  all the way she put it to me, obviously. They did not want
15  any quote unquote competition, and, so, they were, from what
16  she was telling me, badmouthing her and telling people they
17  shouldn't go to see her, and things of that sort.
18      Q. Do you have any understanding as to whether or
19  how that circumstance resolved itself?
20      A. As far as I know, she's still doing the job, and
21  she still has some patients. Admittedly, she says not enough
22  to pay her bills. I mean, you know, she works--she has her
23  clinic in the same office that her husband works in. You
24  know, they own the office building. They share a physician
25  assistant. And I think she only works about three days a

17 (Pages 62 to 65)

B-0369

66

1   week because of her disease. But I think that's okay with
2   her.
3       Q. So your understanding is that Dr. Zechman is
4   currently working three days a week because of her connective
5   tissue disease?
6       A. You know, I cannot swear to that, but I don't
7   think she's working full time. And it could be because she
8   doesn't have enough business. It also could be because she
9   has an active family and she has a big house to take care of.
10      Q. Do you have any--as her treating physician, do
11  you have any judgment as to whether or not Dr. Zechman is
12  capable of working full time?
13      A. I don't honestly know whether she would be
14  capable of working full time. I think that she would want to
15  try to work full time, but I honestly, given her history,
16  and, you know, the amount of time I've seen her, you know,
17  ten-plus years, I honestly don't know.
18      Q. And I take it you would agree that working as a
19  resident is more demanding than merely working a full-time
20  job; would you agree with that?
21      A. Yes.
22      Q. Okay. Based upon your experience treating
23  Dr. Zechman, do you believe she's able to handle the rigors
24  of being a resident?
25      A. Here again, I think that she honestly--as she

67

1   communicated directly to me, she honestly wanted this. And
2   she pursued it, and I can remember when she came to me after
3   she had been at Delaware for a year and a half and she told
4   me--because it was all news to me--that she had looked into
5   several, several different programs, and this was something
6   she actively pursued. And she wanted it very dearly. So I
7   would have thought that she would have tried her utmost to
8   finish her residency. And the fact is, I mean, she did,
9   what, two-plus years. And, I mean, she was halfway through.
10  She had done the worst two years. And if--I can't think of
11  any reason why anyone in their right mind would have just
12  walked away from that.
13      Q. Did her--any of the medical conditions for which
14  you were treating Dr. Zechman inhibit her ability to handle
15  the hours and the demands of her residency?
16      A. Well, aside from the fatigue, she had no
17  disabling disorders.
18      Q. Okay. And, so, what about the fatigue, did that
19  inhibit her ability to handle the demands or hours of her
20  residency program?
21      A. Well, honestly, if handled in the right way, no.
22      Q. What would be handling it in the right way?
23      A. If she had been able to structure her life in
24  the correct manner, even setting her priorities, and I'm not
25  in any way, shape or form trying to put myself into her

68

1   shoes, and I'm not trying to preach or anything. But, also,
2   if she had had, obviously, some help in terms of the
3   residency program as well. Basically, I think it would have
4   taken two to tango. It would have taken both parties to come
5   together for some common ground here in order to make this
6   work.
7       Q. Okay. So let's break it down to those two
8   components. The first was you referred to Dr. Zechman's
9   priorities. Taking that part first, what do you think needed
10  to change on Dr. Zechman's end in order for her to be able to
11  complete her residency?
12      A. You know, I'm saying this all retrospectively,
13  and this is all conjecture. Perhaps--I mean, she went
14  through medical school. That's saying a whole lot, okay;
15  medical school is extremely, extremely demanding in terms of
16  time. So she knew how to manage time. Residency, likewise,
17  is very important in terms of managing time. But it's also
18  physically demanding as well, because especially in a program
19  like OB-GYN, I mean, you're on your feet, doing surgeries,
20  delivering babies, checking on people maybe every 15 minutes,
21  things of that sort, and, you know, OB-GYN, it's, like, when
22  you're delivering babies, 99 percent sheer boredom, 1 percent
23  sheer terror. And that terror, it can really get to you, can
24  cause you a lot of stress.
25          Maybe, you know, she could have managed her time

69

1   better. Maybe, you know, going to Delaware was not in her
2   best interests. Maybe it was too far away. But, you know,
3   if you do what you have to do in order to get through a
4   program and get a degree or get through a residency program
5   and be Board-certified. You know, I don't know what else to
6   say, you know. I'm certainly not an expert in terms of
7   dealing with stress or dealing with, you know, time
8   management myself.
9       Q. What is the time management issue that you're
10  referring to with Dr. Zechman; how could she have better
11  managed her time, as you understand it?
12      A. Well, in my limited evaluation of her, you know,
13  just limited to the medical visits, you know, as physicians,
14  we tend to, at least when we're dealing with patients, we
15  like to get straight to the point. We like to deal with the
16  most important issues first, and we tend to want to
17  prioritize things.
18          Like, for example, I mean, you know, I'm rather
19  forebode at times. I guess you can tell that right now. But
20  in some of these notes we've gone through, like when she came
21  in and had her back pain and her leg was hurting her, you
22  know, I didn't really spend a whole lot of time about the
23  rest of her disease, because it really wasn't at that time a
24  big deal. Her back pain and probable radiculopathy was a big
25  deal. So that was Goal No. 1.

70

1    And some people, I guess, maybe just can't see
2    the forest through the trees, so to speak, and they tend to
3    get lost, and they just can't prioritize. And when you're a
4    resident, you certainly need to know what's important and
5    what's not.
6        Q.    Okay. And, so, if I'm hearing you right, when
7    you referred earlier, you know, it takes two to sort of make
8    this work from Dr. Zechman's end, what she could have done or
9    perhaps what was limiting on her end of the deal was not
10   being able to prioritize?
11       A.    Yeah. I mean, it's a, sort of an unwritten law
12   as a resident that you don't quote sweat the small stuff end
13   quote, you know, and you basically take care of the big
14   problems, you know, because if you're trying to sweat the
15   small stuff, you're gonna be there all day, you're gonna be
16   there all night, you're not gonna get anything done.
17       Q.    And I take it you're impression was that Dr.
18   Zechman sweats the small stuff?
19       A.    Well, maybe she was just wrapped up in a lot of
20   different things.
21       Q.    And what is it in you view that could have or
22   should have been done on Christiana Care's end that might
23   have enabled Dr. Zechman to complete her residency?
24       A.    Well, that's probably an unfair question. I'll
25   answer it, absolutely, but it's probably an unfair question,

71

1    because all the information I have received, aside from a
2    somewhat, you know, brief conversation but very pleasant
3    conversation I had with the Chairman of the OB department,
4    was from Dr. Zechman. And from what I was led to understand
5    was that the department was unyielding, unbending in terms of
6    giving her time off, did not understand about her disease.
7    The other residents were very upset because she was having to
8    take so many sick days and use vacation days, and that there
9    was a virtual backlash against her, not only from her fellow
10   residents, but also from the attending. And, quite honestly,
11   when you're in a residency program, that's sort of like being
12   in a military unit. You know, who's watching your back?
13       Q.    And what you just described, Dr. Fraser, is that
14   truly what Dr. Zechman told you?
15       A.    Yes.
16       Q.    Okay. But in terms of--what I'm trying to
17   figure out is whether Dr. Zechman's medical condition
18   presented any barrier to her successfully performing with the
19   hours and demands of her residency program.
20           Did her medical condition inhibit her ability to
21   do that?
22       A.    If her medical condition was controlled, no.
23       Q.    Okay. And what does that mean, if her medical
24   condition was controlled?
25       A.    If she was able to successfully take care of

72

1    herself and manage herself and not be under any condition
2    that might precipitate a flare of her disease, then, yes, she
3    could do a residency and complete a residency.
4        Q.    Is there anything special that Christiana Care
5    needed to do to enable her to do that? I mean, does--well,
6    let me rephrase that question, Dr. Fraser.
7            What medically needs to happen for Dr. Zechman
8    when she has a flare-up of her medical condition?
9        A.    Well, it depends how the flare is manifested.
10   If she has fevers, joint swelling, pleurisy, then, obviously,
11   you know, medications. If it's pain and fatigue, you know,
12   rest, pain medicines. If it's her back pain, obviously, you
13   know, muscle relaxants. So it really depends on what type of
14   flare, I guess, we're talking about.
15       Q.    Okay. Dr. Fraser, have you been asked to render
16   any expert opinions in this case?
17       A.    No.
18       Q.    Okay. And, so, I take it you are not rendering
19   or offering any expert opinions?
20       A.    No.
21       Q.    And I'll ask the court reporter to hand
22   Dr. Fraser Exhibit Fraser [2]. Dr. Fraser, do you have
23   Exhibit [2] in front of you?
24       A.    Not yet.
25       Q.    Just let me know when you do.

73

1        A.    All right. All right, I do now.
2        Q.    All right. And Exhibit [2] is a Request for
3    Disability Accommodation Form, and the date at the top if
4    July 24, 2003. Dr. Fraser, I take it you have seen this
5    document before?
6        A.    Yes. I have a copy of it in my records.
7        Q.    Okay. And the handwriting on the first page, is
8    any of that handwriting yours?
9        A.    No, it is not.
10       Q.    And if you turn to the second page, is the
11   handwriting on the second page your handwriting?
12       A.    Yes, it is.
13       Q.    Okay. I'm gonna direct your attention to
14   Question 2A, which is to be completed by physician, and the
15   first question or instruction says "Please identify physical
16   slash mental limitations caused by employee's disability."
17   And then you have a handwritten response after that, right?
18       A.    Yes.
19       Q.    Could you read that, please?
20       A.    All right. "Disease characterized by
21   intermittent episodes of fatigue, joint pain, rash, fever,
22   pleurisy. Occasional problems walking, working,
23   concentrating."
24       Q.    And the next question, which is Question 2B, is
25   "What essential job responsibilities are affected by

74

1    employee's disability, and to what degree is employee's
2    performance and essential function limited?" And can you
3    tell me what your handwritten response it?
4        A. "As above."
5        Q. Okay. And then in response to Question C, it
6    asks the duration of the disability. Can you tell me what
7    your handwritten response is?
8        A. "Intermittent."
9        Q. And then Question C1 asks "Is employee's
10   limitation permanent?" And you have a question mark there.
11       A. Yes.
12       Q. Is that your question mark?
13       A. Yes, I have a question mark.
14       Q. Okay. And can you tell me what your question
15   mark indicates?
16       A. Well, I didn't want to--there's a fine line
17   here. She has a disease, but you can go for months or years
18   and not be bothered by it, for example. But then you can
19   have a severe flare and have to go to the doctor and be on
20   multiple medications for six months, for example. So I had a
21   question in my mind about whether I should really, truly put
22   down whether this was a permanent limitation or not. So
23   that's why I put down "intermittent."
24       Q. And then question C2 says "If limitations are
25   not permanent, how long will they persist?" Can you tell me

75

1    what your handwritten response is?
2        A. "As above; intermittent."
3        Q. It says "Please suggest any accommodations
4    parenthesis Please be specific close parens that will allow
5    employee to fully perform each essential job function
6    affected by employee's disability." Could you please read
7    your handwritten response?
8        A. "Allowing employee to have periods of rest
9    during working hours and use her vacation liberally would
10   help prevent major disease flares. During major flares,
11   patient will not be able to further" something "at work."
12   And I can't read that. I guess somebody has very bad
13   handwriting.
14       Q. And apart from--well, let me rephrase that.
15       Is one of the things that you're suggesting that
16   Dr. Zechman be allowed to use vacation time when she's having
17   a flare-up?
18       A. Yes.
19       Q. All right. And apart from taking rest time or
20   vacation time when Dr. Zechman is actually experiencing a
21   flare-up, did you have any specific recommendation as to any
22   specific change to her schedule that should be made to
23   prevent flare-ups?
24       A. I did not have any specific time requirements.
25   I did have a couple of conversations with her in which I

76

1    thought she needed to go to the Chairman of the department if
2    she felt she was having problems in this area and sit down
3    with him and have a heart to heart talk with him to see what
4    could be arranged.
5        Q. And how was that--was that conversation that you
6    were suggesting that Dr. Zechman have with the Chair of the
7    department, was that for a different purpose than the
8    conversation that you actually had with the Chair of the
9    department?
10       A. Actually, what I'm pertaining to was actually
11   some time before, and--because she had been telling me that
12   she had been having--this was not a--although the problem
13   with her back might have been the last straw. But she had
14   been having this very, very slowly evolving problem from what
15   I was led to understand with the other residents and
16   attending in terms of her work and schedule, and sometimes it
17   was being straightened out, sometimes it was not being
18   straightened out, and it was causing her a lot of stress.
19   And, so, I had mentioned to her about Well, just go, be up
20   front, talk to them, see what can be worked out. You know,
21   you need to be reasonable, they need to be reasonable, sit
22   down, straighten things out.
23       You know, you want to finish the program, you
24   know, you've done two years, almost two years, just see what
25   can be worked out. You know, certainly things can be worked

77

1    out here. You're almost halfway through.
2        Q. Was it your understanding that what Dr. Zechman
3    was telling you was that her absences from work were creating
4    resentment among the co-residents?
5        A. Yes.
6        Q. Okay. And was it your understanding that that
7    resentment related to the fact there's a fixed number of
8    residents, and that if Dr. Zechman's not there, they needed
9    to pick up the slack for her?
10       A. Yes.
11       Q. Now you mentioned that you did have a
12   conversation with Dr. Eckblood, who was the Chair of the OB-
13   GYN department at Christiana Care. Did I hear you right?
14       A. Yes.
15       Q. Do you remember that conversation with him?
16       A. Briefly. It was after I had filled out and we
17   had faxed this form to the department.
18       MR. BLOOM: Okay. And--all right. I actually
19   have--I don't have it as an exhibit for you, but Dr. Eckblood
20   prepared a note after he spoke to you, and, so--Lori, for
21   your reference, this is Document D182--and, Dr. Fraser, I'm
22   just gonna read you portions of this, and I want to ask if
23   this sort of corresponds with your recollection of the
24   conversation with him.
25       MS. BREWINGTON: I'm just gonna object to this,

78

1  that I don't have the document in front of me and it wasn't
2  identified as an exhibit, so I won't be in a position to--
3       MR. BLOOM: Well, it's not being used an
4  exhibit. Do you want to pull it, though? You do have it in
5  your office.
6       MS. BREWINGTON: It might take a minute to pull
7  it, if that's all right.
8       MR. BLOOM: Yeah, sure. I'll wait.
9       MS. BREWINGTON: All right. Thanks. What's the
10 number again?
11      MR. BLOOM: D182.
12      MS. BREWINGTON: Okay. I have it.
13      Q. Okay. And, Dr. Fraser, did I hear you correctly
14 that you did not have a specific recommendation for how
15 Christiana Care might alter Dr. Zechman's schedule to
16 accommodate her medical condition. Did I hear you correctly?
17      MS. BREWINGTON: Object; mis-characterization.;
18 but go ahead and answer.
19      DR. FRASER: Should I answer.
20      MS. BREWINGTON: Yes.
21      A. Oh. No, I did not have a specific
22 recommendation. Dr. Zechman and I just talked about time
23 management, maybe some periods of taking time off. But it
24 wasn't my job, and I certainly wouldn't be presumptive to
25 tell the residency department how to treat their residents,

79

1  so we talked in generalities.
2       So Dr. Zechman had, obviously, had read the
3  employee residency manual, and had various ideas on her own,
4  and, at least I thought, had already talked to the chairman
5  of the department about how they could perhaps work with her
6  to better suit her requirements.
7       Q. Okay. And was your knowledge of that based
8  solely on what Dr. Zechman told you?
9       A. Yes.
10      Q. Can you tell me what you remember of your
11 conversation with Dr. Eckblood?
12      A. He was very nice, very polite, listened, and
13 basically said they would try to do whatever they possibly
14 could.
15      Q. And did you make any specific recommendations to
16 Dr. Eckblood?
17      A. Ellen--or, Dr. Zechman had mentioned about the
18 use of vacation times and interspersing these with her other
19 days off, and we might have talked about that because she had
20 mentioned that to me on a previous visit. So I might have
21 brought that up. I didn't make any notes or anything like
22 this about my conversation. And that's where this Exhibit
23 [2], that's where all that stuff came from, as well.
24      Q. And it came from when Dr. Zechman suggested to
25 you?

80

1       A. Yeah, about vacation days?
2       Q. Uh-huh.
3       A. Yes, that's what she said, that she had
4  researched, and she had talked to the people up at Christiana
5  about this, and that they thought that maybe they could work
6  things out. And I know that we had talked about that she
7  would have to fill out a Family Medical Act, and this was
8  another piece of paper that she would have to fill out.
9  Basically, as I understood, this was just another part of the
10 paper trail that they were gonna have to do in order to
11 document things so they could work things out.
12      The rest of the conversation, I have to tell
13 you, I mean, there was nothing specific. I mean, there was
14 nothing earth-shaking. I left the conversation thinking
15 that, you know, nice guy, and I really, really hoped that he
16 and Ellen could work things out, and I honestly believe I
17 recall him saying that they would do their utmost to try to
18 accommodate Dr. Zechman.
19      Q. Do you know what intermittent FMLA leave is?
20      A. Well, I have the Family Medical Leave Act
21 paperwork here in my chart. Do you want me to get that?
22      Q. You mean the paperwork for Dr. Zechman?
23      A. Yes.
24      Q. No. We're gonna get to that.
25      A. Oh, okay.

81

1       Q. I just wanted to know if you have a general
2  understanding of what it means for an employee to be able to
3  take intermittent FMLA leave?
4       A. Yeah, because most of my patients have chronic
5  medical conditions characterized by intermittent disease
6  flares, so at the drop of a hat, obviously, you know, they
7  might need to take time off, yes.
8       Q. Okay.
9       A. Okay. I'm certainly not an expert, but I've
10 filled out the paperwork several times.
11      Q. I'm sorry; I didn't mean to interrupt you. Were
12 you finished with your answer.
13      A. All I said is that I'm certainly not an expert
14 in terms of the legal ramifications, but I have filled out
15 the paperwork numerous times for my patients.
16      Q. Okay. And based on your treatment of Dr.
17 Zechman, would approving her to take intermittent FMLA leave
18 on an as-needed basis from your perspective be a medically
19 acceptable response from the residency program?
20      A. Yes.
21      Q. All right. Dr. Fraser, I'm going to read to
22 you, and I apologize I don't have the document as part of
23 your exhibits, but Dr. Zechman's counsel now has it in front
24 of her. And this is Document D182, and these are--it's a
25 note prepared by Dr. Eckblood after his conversation with

21 (Pages 78 to 81)

B-0373

82

1   you. And the title at the top is "Telephone call with
2   Dr. David Fraser, August 11, 2003, 1:45 p.m." And I'm gonna
3   read you the first paragraph. There are three paragraphs.
4   I'm gonna read them one at a time and ask if there's anything
5   you disagree with about Dr. Eckblood's recollection of the
6   conversation, okay?
7       **A. All right.**
8       Q. Okay. The first paragraph says quote Today I
9   had a telephone conversation with Dr. Fraser concerning Ellen
10  Zechman. He states that Dr. Zechman has been under his care
11  for approximately ten years and that she has an unspecified
12  connective tissue disorder of which she has intermittent
13  flares. She can go many years without any problems and then
14  for a while may see him on a regular basis.
15      He also stated that she had a chronic pain
16  syndrome, a diagnosis that she refuses to accept, with her
17  having recurrent ulcers and pleurisy. He also states that
18  she will complain diffuse fatigue close quote. Is there
19  anything that I just read from Dr. Eckblood's note that you
20  can think is inaccurate?
21      **A. There's only one thing. The ulcers and pleurisy**
22  **component, those would be unspecified diffuse connective**
23  **tissue disease, do not go with the chronic pain disorder.**
24      Q. Okay. Other than that?
25      **A. Other than that, no. That sounds very fine.**

83

1       Q. Okay. Can you tell me what it means when--that
2   you believe that Dr. Zechman has a chronic pain syndrome, but
3   that she doesn't accept that diagnosis?
4       **A. Well, chronic pain syndromes are--well, it's**
5   **sort of like saying you have arthritis. There are a variety**
6   **of different chronic pain disorders. And I'll just take one**
7   **for example. One is called fibromyalgia. Now Ellen--or,**
8   **Dr. Zechman does not have fibromyalgia, per se. But at times**
9   **she, you know, may have some criteria of that disease. But**
10  **fibromyalgia is a chronic pain disorder where you have**
11  **widespread musculoskeletal pain, diffuse fatigue, and you**
12  **have to meet certain select criteria.**
13      **Basically, it is a diagnosis of exclusion, that**
14  **is you have to exclude everything else under the sun it could**
15  **possibly be. A lot of people don't like the stigma of having**
16  **a chronic pain disorder. One of the reasons is that you can**
17  **be walking down the street, people look at you, you look**
18  **fine, no problems at all, but you're hurting. And, so, when**
19  **you complain, people look at you and say But you look fine;**
20  **how can you have arthritis? You must be crazy.**
21      **And, so, there is a stigma that goes along with**
22  **having a chronic pain disorder. And, certainly, for a**
23  **physician to have a chronic pain disorder for which there's,**
24  **obviously, no cure, sometimes you just want to push it out of**
25  **your mind, Oh, I don't have that.**

84

1       Q. And are you done with your last answer, Dr.
2   Fraser?
3       **A. Yes.**
4       Q. Okay. I'm gonna read the next paragraph of
5   Document D182. And the second paragraph of Dr. Eckblood's
6   contemporaneous note says quote, We discussed what might help
7   her handle the stresses and fatigue of a residency program.
8   He stated that extra time off might help the fatigue, but he
9   had no specific recommendations of how that time could be
10  arranged. He stated that he suspected that no matter what
11  time we gave her off, she might request more close quote. Is
12  there anything in that description of the conversation that
13  you think is inaccurate?
14      **A. I don't remember saying something--and I'm**
15  **pretty sure I would have remembered saying something as**
16  **specific as that about Ellen that, you know, whatever time**
17  **they gave her, she would just ask for more time off. I don't**
18  **remember saying that. Maybe we talked about something, and**
19  **he may have read into that.**
20      **But in terms of the first part, I can't recall**
21  **our conversation specifically, and I don't know whether I--as**
22  **I told you before, I don't know whether we specifically**
23  **talked about anything. I mean, I included it here in the**
24  **paper, and I thought maybe I had said something about Well,**
25  **you know, like, Ellen said that maybe you all could give her**

85

1   some time off, vacation days, something like that. I can't
2   swear to it. I honestly do not remember.
3       **But on the other hand, I would not be so bold as**
4   **to tell the chairman of the department how to manage his own**
5   **people. So I, obviously--you know, I wouldn't be so strong**
6   **as to say Hey, you need to give her some more time off, and**
7   **why don't you use some vacation days? We probably talked in**
8   **generalities, okay. So that first part of the statement I**
9   **can sort of understand, although I think I may have said**
10  **something about Well, Dr. Zechman, you know, said something**
11  **about you all had talked about using vacation days, and she**
12  **had talked to me about it, you know; what do you think about**
13  **it?**
14      **But as for the second statement, I honestly do**
15  **not recall ever making that statement. I just--I don't know**
16  **where that came from. I mean, perhaps we talked about the**
17  **fact that this was an episodic, intermittent disease, and she**
18  **might require more time off from time to time, you know,**
19  **because there's not a set schedule for these sort of flares.**
20  **But I certainly would not cast any aspersions on her needing**
21  **more and more and more and more time off.**
22      Q. Okay. Is there anything else that you want to
23  say about that paragraph I just read?
24      **A. No.**
25      Q. Right. And just for the sake of completeness, I

86

1 would read the third and final paragraph, and it says quote
2 At the end of the conversation he stated that his written
3 report would be faxed to us close quote. And at some point
4 you did fax him the report that we had just been looking at--
5     A. Yes--
6     Q. --as Fraser [2], correct?
7     A. Yes.
8     Q. Okay. All right. Could you please hand the
9 witness Fraser [3]?
10    A. Okay.
11    Q. And Fraser [3] is a document with the heading at
12 the top "Certification of Health Care Provider parentheses
13 Family and Medical Leave Act of 1993 close parentheses.
14    A. Yes.
15    Q. You've seen this document before?
16    A. Oh, yes, I have it in my records.
17    Q. Okay. And the handwriting--actually, can you
18 tell me other than the signature at the end, is any of the
19 handwriting in this exhibit your handwriting?
20    **A. The signature, type of practice, address,**
21 **telephone number are all mine. Everything else is not mine.**
22    Q. Okay. Do you know if the rest of it is Dr.
23 Zechman's handwriting?
24    A. I would assume so.
25    Q. Okay. And take a moment to review this document

87

1 because I only want to confirm that when you sign at the end
2 of this document that your signature indicates that you agree
3 with the handwritten responses that Dr. Zechman had filled
4 in.
5     **A. Yes. I, actually--and I can guarantee you I**
6 **went through it with a fine-tooth comb before I put my name**
7 **to it the first time--or, the only time.**
8     Q. Okay. So you agree with what Dr. Zechman says
9 in her responses to these questions?
10    A. Yes.
11    Q. Okay. And would you agree with me that--I mean,
12 what I see repeated in most, if not all, of these responses
13 is that the symptoms of Dr. Zechman's condition are
14 unpredictable; am I right?
15    A. Yes, that's true.
16    Q. Okay. An is it your view that the optimal
17 approach to trying to permit Dr. Zechman to complete the
18 residency program consistent with her medical condition was
19 to approve her for intermittent Family Medical Leave so she
20 could take leave when she had a flare-up?
21    **A. I'm trying to formulate my answer. Can I answer**
22 **and then give an explanation?**
23    Q. Of course.
24    **A. Yes. However, this was not a carte blanche to**
25 **take any time off at all. And I made specific requests of**

88

1 **Dr. Zechman to work with her chairman and to settle any**
2 **differences that she had with anybody at her residency**
3 **program.**
4     Q. Okay. Am I understanding you correctly that you
5 didn't want Dr. Zechman to use her intermittent FMLA leave as
6 a way to avoid interactions with other residents that were
7 causing her stress?
8     **A. I didn't want her to use this as Oh, I don't**
9 **feel good, I think I'll just call in sick.**
10    Q. Okay. And that's something that you emphasized
11 to Dr. Zechman?
12    **A. Yes.**
13    Q. So with that, and with that caveat, that this
14 was not carte blanche, you agree that the optimal approach
15 here was for her to pursue intermittent family medical leave
16 so she could take it when she had a flare-up?
17    **A. Yes. Under those conditions, yes, sir.**
18    Q. Okay. Would you please hand Dr. Fraser Exhibit
19 Fraser [4]?
20    **A. Okay.**
21    Q. And am I correct, Dr. Fraser, that Fraser [4] is
22 a letter that you wrote to Dr. Zechman's lawyer, Lori
23 Brewington?
24    **A. Yes, it is.**
25    Q. Okay. And is that your signature on the second

89

1 page of Fraser [4]?
2     **A. Yes, it is.**
3     Q. Okay. And if I can direct your attention to the
4 second page of your letter, there's a reference in the top
5 paragraph that you quote unquote believed Dr. Zechman's work
6 load was detrimental for her health at that time quote
7 unquote. Can you tell me in what way Dr. Zechman's work load
8 was detrimental to her health?
9     **A. Well, the duties she was experiencing--well,**
10 **let's step back in a minute. I can't take this in a vacuum.**
11    Q. Okay.
12    **A. And I can't give you a simple answer because the**
13 **situation is that one thing caused another which caused**
14 **another, and sort of like a snowball rolling downhill,**
15 **getting bigger and bigger and bigger and bigger. And by the**
16 **time all this came to fruition, she couldn't function at work**
17 **because of the stress and because she was in almost a, from**
18 **what she was telling me, almost a perpetual state of flare,**
19 **okay. And part of my reasoning for having her to go talk**
20 **things out, straighten things out is, Get things taken care**
21 **of, get the stress off, work things out, rearrange things,**
22 **get things straightened out so that you can get back to the**
23 **task at hand of being a resident, okay.**
24    Q. What were the things that needed to be
25 straightened out so that she could get back to the task of

90

1  being a resident?
2      A.  Well, basically, the stress she felt that she
3  was under because of the way the residents were feeling about
4  her, the attending.  Evidently, she had told me that they had
5  changed her schedule so that she didn't have--she had to work
6  so many days in a row.  And, you know, everything was sort of
7  snowballing, okay.  And, so, I was not trying to get her out
8  of work.  I was not trying to lessen the load.  What I was
9  trying to do was trying to basically just even the playing
10  field and having her and the department basically just, you
11  know, settle things, settle their differences, however you
12  want to put it, so that they could work together.  You know,
13  'cause honestly, I mean, I'm, you know, I'm getting on my
14  soapbox.  I don't think either one of them were working
15  together, and I think that's the whole reason we're here
16  right now.
17      Q.  I think you said before your understanding of
18  these interactions, other than a short conversation with
19  Dr. Eckblood, is based entirely on what Dr. Zechman told you,
20  correct?
21      A.  Absolutely true; absolutely true.
22      Q.  All right.  So you would agree you only have one
23  side of the story?
24      A.  Absolutely true.
25      Q.  Okay.  In the next paragraph on the second page,

91

1  there's a reference to Dr. Zechman being treated with various
2  NSAIDs?
3      A.  Yes.
4      Q.  Tell me what that is.
5      A.  Non-steroidal anti-inflammatory drugs, such as
6  the Bextra we talked about before, Motrin, various things
7  like that.
8      Q.  What is Provigil?
9      A.  Provigil is a rather interesting medicine.  It's
10  somewhat akin to an antidepressant, but it is used, actually,
11  for fatigue.  It has very, very specific indications.  One of
12  them is for shift work sleep deprivation, and it works very,
13  very well for people who have fatigue from either multiple
14  sclerosis or sleep apnea or sleep deprivation due to shift
15  work.
16      Q.  Dr. Fraser, did Dr. Zechman ever tell you that
17  she was required to repeat her second year OB-GYN residency
18  for academic reasons?
19      A.  No.  She did tell me, now that you mention it,
20  that it--something about her surgical skills.  But she told
21  me this in the same vein as some of the attendings didn't
22  pick her to assist on surgeries.  They picked the other
23  residents, and this was part and parcel of the, I guess, the
24  freeze-out she thought she was experiencing during that time.
25  So she did not get the experience, the surgical experience,

92

1  the other residents got.  But, no, she did not specifically
2  tell me that she had to repeat a year.
3      Q.  Okay.  And what you just referred to in terms of
4  relative experiences that people got, that's based on what
5  Dr. Zechman told you?
6      A.  Yes.
7          MR. BLOOM:  Dr. Fraser, just stay with me one
8  minute.  I'm just gonna look over my notes.  I think we may
9  be done.  I have no further questions.
10          I'm just gonna remind you, Dr. Fraser, to please
11  send me a copy of the remainder of your file regarding Dr.
12  Zechman.
13          DR. FRASER:  Yes.  I have them right here, and
14  I'll certainly send them to you.
15          DR. BLOOM:  Okay.  And for that reason, I'm
16  gonna hold the deposition open.  I don't necessarily expect
17  that we'll need to continue this, but I'm gonna hold it open
18  just in case.
19          MS. BREWINGTON:  Okay.  And I just have just a
20  few questions for Dr. Fraser, if I may.
21          MR. FRASER:  Okay.
22          CROSS-EXAMINATION BY MS. LORI BREWINGTON:
23      Q.  Good afternoon, Dr. Fraser.  I will try not to
24  keep you much longer.  I just have a few questions.  Just for
25  the record, again, my name is Lori Brewington, and I

93

1  represent the plaintiff, Dr. Zechman, in this matter.
2          I want to ask you about a few things.  You
3  mentioned earlier that Dr. Zechman did not see a physician in
4  Delaware for her injections; is that correct?
5      A.  That's true.
6      Q.  Okay.  Do you know whether she treated with any
7  Delaware physicians?
8      A.  Not that I know of; not that I know.
9      Q.  Okay.  And what was your understanding of why
10  she did not treat with a Delaware physician?
11      A.  I think that she did not want people up there to
12  know her business.  She did not want people to know about her
13  illness, except as far as, obviously, they needed to know
14  that she had this condition.  But I don't think--you know how
15  people in hospitals talk and that sort of thing.  She did not
16  want people to, basically, be gossiping about her medical
17  condition.
18      Q.  Do you think it was reasonable for her to
19  continue treating with you as opposed to beginning treatment
20  with a new doctor in Delaware?
21      A.  Well, yes.  I mean, it's really a personal
22  choice.  For example, I mean, I've been a rheumatologist in
23  eastern North Carolina since 1991, and I've been taking care
24  of patients, the same patients, since 1991.  I've had
25  patients that have seen me years ago, and, like, some have

94

1  moved up to the Norfolk area. I have one that more recently,
2  just two years ago, he moved up to Raleigh. I referred him
3  to a rheumatologist, a friend of mine, up in Raleigh. He,
4  unfortunately, just didn't hit it off with her, so he drives
5  down every three months to see me down here.
6         So, you know, your physician is a personal
7  choice, and especially when you deal with chronic diseases
8  and you see somebody, you know, like, for example, rheumatoid
9  arthritis, I generally see people every three months, and
10  oftentimes I see them much more often than their primary care
11  doctor, you know, do blood work and that sort of thing. Some
12  people just don't like changing.
13       Q. Is it fair to say that that has a lot to do with
14  the patient's comfort level with the physician?
15       A. Oh, absolutely.
16       Q. In your opinion, is Dr. Zechman able to handle
17  the rigors of being in a residency program?
18       A. Under the right circumstances, yes.
19       Q. Okay. And by that, you mean with certain
20  accommodations for her disability?
21       MR. BLOOM: Object to the form. You can answer.
22       MS. BREWINGTON: You can go ahead and answer
23  that.
24       A. Oh, I can answer that. Yes, but, as I mentioned
25  before, it takes two to tango. Dr. Zechman has to do her

95

1  part, and the residency program has to do their part.
2       Q. Okay. And by the residency program doing their
3  part, what do you mean by that?
4       A. Well, they have to be understanding and
5  accommodating in terms of the person's illness--or, a
6  patient's illness, respect the Family Medical Leave Act, try
7  to make reasonable accommodations in terms of time off for
8  disease flares, all right, that sort of thing.
9       Q. Okay. And with respect to your testimony today,
10  is it fair to say that you are providing your professional
11  opinion as to Dr. Zechman's medical condition?
12       A. Yes.
13       MR. BLOOM: Object to the form. You can answer
14  that.
15       DR. FRASER: Yes.
16       Q. I'm sorry; I didn't year.
17       A. Yes.
18       Q. Okay; thank you. You mentioned earlier that you
19  did not provide a specific requirement or time requirement or
20  time frame to alleviate the flare-ups. I guess my question
21  is--hold on one second. Someone opened my door. Where was
22  I? Oh, okay. You mentioned that you didn't identify a
23  specific time frame for these flare-ups. Would it be fair to
24  say that there isn't necessarily a specific time frame for
25  each individual flare-up?

96

1       A. That's absolutely true. There is no specific
2  time frame. Someone might have a flare, but go home, rest,
3  you know, take some, you know, NSAIDs, muscle relaxants, be
4  good to go by the next morning. Someone may have to take a
5  couple of days off for a disease flare. Someone may have to
6  go to visit their doctor and have a dose pak of steroids. It
7  just depends on the situation and any possible complications.
8       Q. Okay. And as I understand you, Doctor, and
9  please correct me if I'm wrong, your recommendation at
10  Christiana Care was that Dr. Zechman receive some time off,
11  but you were leaving it to the department, namely Dr.
12  Eckblood, to arrange the time off?
13       A. Yes, because I would not presume to tell a
14  chairman of the department how to treat his residents. I was
15  talking in generalities, and I would never make a specific
16  recommendation. I mean, it's like someone coming into my
17  house that I've never seen before and telling me that I need
18  to beat my kids. I beat my kids regularly anyway, so why
19  does he need to tell me?
20       Q. Okay. Take a look at Exhibit [2], Fraser [2].
21       A. Okay.
22       Q. Okay. The title of this document is "Request
23  for Disability Accommodation." And the title of Exhibit [3]
24  is "Certification of Health Care Provider Family Medical
25  Leave Act."

97

1       A. Yes.
2       Q. My question is Is there a reason why you
3  completed both forms; do you have any understanding of why
4  you were required to complete the Disability Accommodation
5  and then the Certification of Health Care Provider?
6       A. Well, I am used to doing the FMLA. I mean, that
7  is very common to me. And Dr. Zechman, even though she is a
8  resident and she is training, she is an employee of the
9  hospital. Now the Request for Disability Accommodation, as I
10  far as I was concerned--as far as I knew, and this was from
11  Dr. Zechman--it was just another form I would have to do for
12  the residency program for the hospital.
13       Q. Okay. And you completed the Request for
14  Disability Accommodation on--or, actually, it's dated July
15  24, 2003. Do you know when you completed this document?
16       A. Yes. I signed it on 8/9/03.
17       Q. 8/9/03. And do you recall the date when you
18  sent it to Christiana Care?
19       A. Yes, on 8/11.
20       Q. Do you know who you sent it to?
21       A. We sent it to the same--I sent it to Dr.--what
22  was--I have the phone numbers in my chart here, but we
23  actually sent it to two different phone numbers.
24       Q. Okay.
25       A. Let me get that. I just put all that stuff--

25 (Pages 94 to 97)

98

1  here we go. We faxed it to both phone numbers. I can give
2  them to you.
3       Q. Go ahead and give them to me, if you have them.
4       A. Yes. Area Code--they're both Area Code 302.
5  Then the first phone number is 733-1890.
6       Q. Okay.
7       A. Second number is 733-2990.
8       Q. Okay. Now that first number that you mentioned,
9  that number is actually listed at the bottom of the second
10 page of the Request for Disability Accommodations.
11      A. Oh, okay; okay.
12      Q. Do you see it?
13      A. Yes.
14      Q. Well, you said you sent it to that. And then
15 you also sent it to a second number. Do you know why you
16 sent it to the second number?
17      A. Probably because Ellen told me to.
18      Q. Okay.
19      A. Yes. I have a letter from her, and she said Fax
20 it to both phone numbers.
21      Q. Okay. Do you recall whether you spoke with
22 Dr. Eckblood after you faxed this Request for Disability
23 Accommodation to Christiana Care?
24      A. I believe it was before. I told him that I had
25 completed it, I went over it with him, and I told him that I

99

1  would be faxing it to his attention--or, faxing it to his
2  office.
3       Q. What did you say; what was the last part?
4       A. I would be faxing it to his office momentarily.
5       Q. Okay. Hold on. I'm gonna make sure I don't
6  have anything else. Okay. I don't have anything further.
7  That you, Doctor.
8       A. All right. Thank you.
9  ON REDIRECT BY MR. THOMAS S. BLOOM:
10      Q. Dr. Fraser, I apologize; one last question.
11      A. Okay.
12      Q. Tom Bloom again. Did you ever suggest or
13 discuss with Dr. Zechman that she see a psychiatrist or
14 psychologist?
15      A. I believe I did mention to her that maybe there
16 --that she might consider talking to someone about things,
17 but I'll put this in the same vein of her not wanting to
18 truly recognize that she has a chronic pain ailment.
19      Q. You mean that she did not want to acknowledge
20 that she might have a need for psychiatric help?
21      A. True; yes.
22      Q. But it appeared to you, as her treating
23 physician, that maybe she did need some kind of help like
24 that?
      A. Well, at times, maybe we all can use some help
25 like that. But, for example, in one of my notes we went
   over, I did talk to her, and I believe I put her on an
   antidepressant called Wellbutrin. Not only to help her lose

100

1  some weight, but I thought perhaps it would also help with
2  her depression. So I had mentioned to her possibly seeing
3  someone to help her with some issues. But I don't--I would
4  not, knowing Dr. Zechman, I would not have put it as strongly
5  as saying I think you need to see a psychiatrist.
6       Q. Do you know--as you sit there today, do you know
   whether Dr. Zechman has, in fact, seen a psychiatrist or
7  psychologist?
8       A. No.
        Q. The answer is she didn't or you don't know?
9       A. I do not know.
10      MR. BLOOM: Okay. Thank you very much, Dr.
11 Zechman. I have nothing else.
12      DR. FRASER: Okay.
13      MR BLOOM: Are we all done, Lori?
14      MS. BREWINGTON: Yes; thank you.
15      MR. BLOOM: Okay. We're off the record.
   Thanks, everybody.
16      DR. FRASER: Thank you.
17 * * * * * * * * * * * * * * * * * * * * * * * * * *
18      DEPOSITION CONCLUDED AT 4:47 P.M.
19
20
21
22
23
24
25

101

1  STATE OF NORTH CAROLINA
2  COUNTY OF GREENE
3          C-E-R-T-I-F-I-C-A-T-I-O-N
4
5       I, SHEILA B. DARDEN, A COURT REPORTER AND NOTARY
   PUBLIC IN AND FOR THE AFORESAID COUNTY AND STATE, HEREBY
6
   CERTIFY THAT THE FOREGOING IS AN ACCURATE TRANSCRIPT OF THE
7
   DEPOSITION OF DAVID D. FRASER, M.D., WHICH WAS TAKEN BY ME BY
8
   STENOMASK, AND TRANSCRIBED BY ME.
9
      I FURTHER CERTIFY THAT THE DEPONENT WAS FIRST
10
   DULY SWORN BY ME, AND THAT THE DEPONENT AND PARTIES WAIVED
11
   THE SIGNING OF THE DEPOSITION BY THE DEPONENT.
12
      I FURTHER CERTIFY THAT I AM NOT FINANCIALLY
13
   INTERESTED IN THE OUTCOME OF THIS ACTION, A RELATIVE,
14
   EMPLOYEE, ATTORNEY OR COUNSEL OF ANY OF THE PARTIES, NOR A
15
   RELATIVE OR EMPLOYEE OF SUCH ATTORNEY OR COUNSEL.
16
17
      WITNESS, MY HAND AND SEAL, THIS DATE: AUGUST 2, 2006.
18
      MY COMMISSION EXPIRES: FEBRUARY 27, 2010.
19
20
21
22
23          SHEILA B. DARDEN
24          COURT REPORTER AND NOTARY PUBLIC
25          GREENVILLE, NORTH CAROLINA

26 (Pages 98 to 101)

Return

| CCHS.-Obstetrics and Gynecology | Date: 10/28/2003 |
| **House Officer Evaluation Form** | |

Dr. Ellen Zechman
Triage
*Anonymous Evaluation*

Image
Not
Available



EXHIBIT
*Petrano—6*
9-13-06
Dottyann Y. Walsh, CSR

**The most valuable part of this form is the evaluator's comments. You are strongly encouraged to record your specific comments concerning this house officer's performance. In particular, note individual strengths and weaknesses and suggest ways in which individual performance could be improved.**

## COMMENTS

Ellen is improving and has become more comfortable multitasking and keeping up. Her knowledge base is better a she is working hard to read and continue to expand her knowledge. Relationships with peers continues to be an is (although not necessarily Ellen's fault) and she has not been dependable in her attendance which is adding more s in regards to her relationship with classmates and other residents. I still am apprehensive about Dr Zechman's abil lead as a senior resident and I do not feel her subordinate residents will do well with her in aleadership position. I'n sure I have easy recommendations for this problem. Needs close surveillance and customized training curriculum catch up with peers. All in all working hard and improving.

In evaluating the resident's performance, use as your standard the level of knowledge, skills and attitudes expected from the clearly satisfactory resident at this state of training. For any component that needs attention or is rated a 4 or less, please provide specific comments and recommendations in the comment section above. Be as specific as possible, including reports of critical incidents and/or outstanding performance. Global adjectives or remarks, such as "good resident," do not provide meaningful feedback to the resident.

## 1. PATIENT CARE:

| | Unsatisfactory | Satisfactory | Superior | |
|---|---|---|---|---|
| Incomplete, inaccurate medical interviews, physical examinations, and review of other data; incomplete performance of essential procedures; fails to analyze clinical data and consider patient preferences when making medical decisions | 1 2 3 | 4 5 6 | 7 8 9 | Superb, accurate, comprehensive medical interviews, physical examinations, review of other data, and procedural skills; always makes diagnostic and therapeutic decisions based on available evidence sound judgment, and patient preferences |

*0 = Insufficient Contact to Judge*

Performance needs attention?                                              Y

Specify:
Some negative feedback from patients in triage. Difficult to isolate personailty issues from actu

B-0379

## 2. MEDICAL KNOWLEDGE

| | Unsatisfactory | Satisfactory | Superior |
|---|---|---|---|

Margolis Edelstein
Zechman, E. v. Christiana Care
0142

| mechanisms of disease | | | | relationships, mechanisms of disease |

**0 = Insufficient Contact to Judge**

Performance needs attention?                                                    Ye

Specify:
I feel the mandatory reading assignments will help Ellen. I don't think we should try to trick her on the test question ask questions which test her understanding of classic OB/GYN conditions.

## 3. PRACTICE-BASED LEARNING/IMPROVEMENT

| | Unsatisfactory | Satisfactory | Superior | |
|---|---|---|---|---|
| - · Fails to perform self-evaluation; lacks insight, initiative; resists or ignores feedback; fails to use information technology to enhance patient care or pursue self-improvement | 1 2 3 | 4 5 6 | 7 8 9 | - · Constantly evaluates own performance; actively uses practice-based data to improve care; incorporates feedback into improvement activities; effectively uses technology to manage information for patient care and self-improvement |

**0 = Insufficient Contact to Judge**

Performance needs attention?                                                    A

Specify:

## 4. INTERPERSONAL AND COMMUNICATION SKILLS

| | Unsatisfactory | Satisfactory | Superior | |
|---|---|---|---|---|
| - · Does not establish even minimally effective therapeutic relationships with patients and families; does not demonstrate ability to build relationships through listening, narrative or nonverbal skills; does not provide education or counseling to patients, families, or colleagues | 1 2 3 | 4 5 6 | 7 8 9 | - · Establishes a highly effective therapeutic relationship with patients and families; demonstrates excellent relationship building through listening, narrative, and nonverbal skills; excellent education and counseling of patients, families, and colleagues; always "interpersonally" engaged |

**0 = Insufficient Contact to Judge**

Performance needs attention?                                                    A

Specify:

B-0380

## 5. PROFESSIONALISM

| | Unsatisfactory | Satisfactory | Superior | |
|---|---|---|---|---|
| - · Lacks respect, compassion, | | | | - · Always demonstrates respect, compassion, integrity, honesty; |

Margolis Edelstein
Zechman, E. v. Christiana Care
0143

| | | | | |
|---|---|---|---|---|
| integrity, honesty; disregards need for self-assessment; fails to acknowledge errors; does not consider needs of patients, families, colleagues; does not display responsible behavior | 1 2 3 | 4 5 6 | 7 8 9 | teaches/role models responsible behavior; total commitment to self-assessment; willingly acknowledges errors; always considers needs of patients, families, colleagues |

*0 = Insufficient Contact to Judge*

Performance needs attention?                                    Ν

Specify:

## 6. SYSTEM-BASED LEARNING

| | Unsatisfactory | Satisfactory | Superior | |
|---|---|---|---|---|
| · · Unable to access/mobilize outside resources; actively resists efforts to improve systems of care; does not use systematic approaches to reduce error and improve patient care | 1 2 3 | 4 5 6 | 7 8 9 | · · Effectively accesses/utilizes outside resources; effectively uses systematic approaches to reduce errors and improve patient care; enthusiastically assists in developing systems' improvement |

*0 = Insufficient Contact to Judge*

Performance needs attention?                                    Ν

Specify:

| Resident's Overall Clinical Competence | 1 2 3 | 4 5 6 | 7 8 9 |
|---|---|---|---|

Performcance needs attention?                                    Yε

Specify:
Ellen needs more experience with technical aspects of the specialty. This will be the most difficult for her to improv There exists an inherent bias against her by both residents and attendings. You can't learn surgery by watching fo She needs assignments to residents that will allow her to be the primary surgeon and to attendings that will allow h do at least her half of major cases and minor cases if not the entire case. Surgery labs will help but surgery labs dc have the pressure of live patients.

Total Contact Hours with Resident per Block

                                                                          >ε

Form Publication : Ver.11 07/25/2002

B-0381

Margolis Edelstein
Zechman, E. v. Christiana Care
0144