IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ELLEN ZECHMAN, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 05-159-JJF |
| | : | |
| CHRISTIANA CARE HEALTH SYSTEMS, | : | |
| | : | |
| Defendant. | : | |

---

**REPLY BRIEF IN FURTHER SUPPORT OF DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

---

David H. Williams (DE 616)
MORRIS JAMES LLP
500 Delaware Ave., Suite 1500
P.O. Box 2306
Wilmington, DE 19899
302.888.6900
dwilliams@morrisjames.com

Michael J. Ossip (admitted pro hac vice)
Thomas S. Bloom (admitted pro hac vice)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
215.963.5543

Attorneys for Defendant Christiana Care Health
Systems

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................... ii

I.      INTRODUCTION ................................................................................................1

II.     PLAINTIFF'S AGE DISCRIMINATION CLAIM FAILS ................................................1

        A. There Is No Evidence That Any Of The Individuals Whom Plaintiff Accuses
           Of Age Discrimination Influenced The Committee's Termination Decision. ..............2

        B. There Is No Evidence That The Committee's Stated Reasons For Its
           Termination Decision Were Pretextual. ..........................................................................5

III.    PLAINTIFF'S DISABILITY CLAIMS FAIL ....................................................................10

        A. Plaintiff Does Not Have A "Disability" Because There Is No Evidence That She Is
           Substantially Limited In A Major Life Activity .......................................................... 10

        B. There Is No Evidence To Support Plaintiff's Failure To Accommodate Claim ........ 13

IV.     THERE IS NO EVIDENCE OF RETALIATION. ..........................................................16

V.      PLAINTIFF'S PROMISSORY ESTOPPEL CLAIM FAILS............................................19

VI.     CONCLUSION .........................................................................................................20

# TABLE OF AUTHORITIES

## CASES

Auguster v. Vermilion Parish Sch. Bd., 249 F.3d 400 (5th Cir. 2001) .......................... 2-3

Austost Anstalt Schaan v. Net Value Holdings, Inc., Civ. No. 00-771-SLR,
    2001 WL 908996 (D. Del. Aug. 10, 2001) .................................................. 19-20

Billet v. CIGNA Corp., 940 F.2d 812 (3d Cir. 1991) ......................................................2

Cannice v. Norwest Bank Iowa, N.A., 189 F.3d 723 (8th Cir. 1999).............................14

Carruth v. Cont'l Gen. Tire, Inc., Civ. No. 98-4233, 2001 WL 1775992
    (S.D. Ill. June 21, 2001) ...................................................................12

Chrin v. Ibrix Inc., No. Civ.A. 20587, 2005 WL 2810599 (Del. Ch. Oct. 19, 2005) ....................19

Cont'l Ins. Co. v. Rutledge & Co., Inc., 750 A.2d 1219 (Del. Ch. 2000) ........................20

Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509 (3d Cir. 1992) ....................2

Fraser v. Goodale, 342 F.3d 1032 (9th Cir. 2003) ................................................. 10-11

Fuentes v. Perskie, 32 F.3d 759 (3d Cir. 1994) ...........................................................6

Gile v. United Airlines, 95 F.3d 492 (7th Cir. 1996) .....................................................16

Hartsfield v. Miami-Dade County, 90 F. Supp. 2d 1363 (S.D. Fla. 2000) ....................16

Kautz v. Met-Pro Corp., 412 F.3d 463 (3d Cir. 2005).............................................. 6-7

Moore v. J.B. Hunt Transp., Inc., 221 F.3d 944 (7th Cir. 2000).......................11, 12, 13

Spruill v. Winner Ford, Ltd., 175 F.R.D. 194 (D. Del. 1997)........................................15

Sutton v. United Air Lines, Inc., 527 U.S. 471 (1999) ..................................................11

Synesiou v. DesignToMarket, Inc., Civ. No. 01-5358, 2002 WL 501494
    (E.D. Pa. Apr. 3, 2002) ......................................................................19

Tice v. Ctr. Area Transp. Auth., 247 F.3d 506 (3d Cir. 2001)........................................11

Toyota Motor Mfg. v. Williams, 534 U.S. 184 (2002) ...................................................10

Vande Zande v. Wisconsin Dep't of Admin., 44 F.3d 538 (7th Cir. 1995) ..............11, 12

Weiss v. Northwest Broad., Inc., 140 F. Supp. 2d 336 (D. Del. 2001)............................19

Whitfield v. Pathmark Stores, Inc., Civ. No. 96-246, 1999 WL 222459 (D. Del. Mar. 30,
    1999)...........................................................................................15

.

**MISCELLANEOUS**

Third Circuit Model Jury Instructions (Civil) § 9.1.3 (2006) ........................................................14

.

## I.     INTRODUCTION

Christiana Care Health Care Services ("Christiana Care") hereby submits its Reply Brief in further support of its motion for summary judgment.  As Christiana Care showed in its initial Memorandum of Law, there is insufficient evidence under Rule 56 standards to create a triable issue of material fact as to any of Plaintiff's claims.  Plaintiff's Opposition Brief relies on speculation, generalities and innumerable assertions of fact that are unsupported by the record citations to which she refers.  Rule 56 requires Plaintiff to come forward with admissible record evidence that is capable of sustaining her claims at trial.  Viewing the record in the light most favorable to Plaintiff, there is no such evidence.  Thus, Christiana Care's motion should be granted.

## II.    PLAINTIFF'S AGE DISCRIMINATION CLAIM FAILS

Plaintiff does not contend in her Opposition Brief that *any* of the relevant decision makers with respect to her termination (*i.e.*, the RRC members) were biased against her because of her age.  In addition, as Christiana Care showed in its initial Memorandum of Law, Plaintiff's claim of age discrimination is further undercut by the fact that most of the decision makers were older than Plaintiff and that she was not meaningfully older at the time of her termination than she was when Christiana Care hired her 16 months earlier with full knowledge of her age.  (Def. Mem. at 21-22).

Plaintiff attempts to defeat summary judgment in two ways.  First, Plaintiff claims that various unidentified individuals allegedly "influenced" the Committee members based on their own "inherent age based bias."  (Pl. Opp. at 13).  Alternatively, Plaintiff contends that a factfinder could conclude that the RRC's stated reasons for its termination decision were pretextual.  Neither of these arguments has any merit.

**A.    There Is No Evidence That Any Of The Individuals Whom Plaintiff Accuses Of Age Discrimination Influenced The Committee's Termination Decision.**

Although admittedly none of the RRC members were biased against her because of her age, Plaintiff suspects that they were "influenced by the age based biased opinions of Plaintiff from both attending physicians and other residents." (Pl. Opp. at 12).  This argument fails because, among other reasons, there is not a shred of evidence that any of the individuals who Plaintiff accuses of age-based bias played any role in the RRC's termination decision or "influenced" the Committee members.

Plaintiff's brief is brimming with vague, unsupported assertions of bias by unspecified "various teaching physicians," "other residents," and other unnamed "colleagues." (Pl. Opp. at 12-13).  But the only individuals Plaintiff accuses of age-based bias are Sandi Kardos (an administrative assistant), Robyn Gray (a fourth-year resident), and Rachel Heinle (a second-year resident).  (Id.)  Plaintiff cites no evidence that these individuals participated in the termination decision or that they "influenced" the Committee members in any way, because there is no such evidence.

It is well established that comments or opinions "by non-decision makers or by decision makers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision." Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992) (ordering district court to enter judgment in favor of defendant).  As the Third Circuit has explained, "what matters is the perception of the decision maker," not the comments or perceptions of the plaintiff or other employees. Billet v. CIGNA Corp., 940 F.2d 812, 825 (3d Cir. 1991).  "[F]or comments in the workplace to provide sufficient evidence of discrimination, they must be:  1) related [to the protected class of persons of which the plaintiff is a member]; 2) proximate in time to the terminations;  3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision

at issue." <u>Auguster v. Vermilion Parish Sch. Bd.</u>, 249 F.3d 400, 405 (5th Cir. 2001) (internal quotations omitted) (affirming summary judgment).

Plaintiff alleges that Sandi Kardos told her in June 2002 that "You certainly don't look your age." (Pl. Opp. at 13). Even assuming a factfinder could interpret this compliment as an age-biased comment (which it could not reasonably do), it is a classic stray remark under <u>Ezold</u>. The alleged comment is not competent evidence of discrimination because: (1) there is no evidence that Ms. Kardos, who is not a doctor, played any role in the RRC's termination decision; (2) the alleged remark was substantively unrelated to the termination decision; and (3) the alleged remark was remote in time from the termination decision. Even according to Plaintiff, the remark occurred "[p]rior to beginning her Residency" and thus more than a year before the decision at issue in this case. (Pl. Opp. at 13).

Plaintiff's allegations regarding fourth-year resident Robyn Gray, one of four rotating chief residents, are similarly inapposite. Plaintiff contends that Dr. Gray "required Plaintiff to do rigorous tasks that the other younger residents in the Program were not required to do." (Pl. Opp. at 13-14). The only "rigorous task" to which Plaintiff refers is Dr. Gray's suggestion that Plaintiff attend the morning rounds led by veteran OB/GYN specialists. When Plaintiff complained to Dr. Ekbladh, he responded in an email that "all residents are encouraged to attend any potential learning experience . . . Feel free to attend or not depending on your own feeling. I would encourage you to take advantage when possible." (A-58). Far from evidencing discrimination, this incident corroborates one of the reasons Plaintiff failed as a resident – she refused to acknowledge she had deficiencies other than her poor surgical skills and she was hostile to the program's efforts to help her learn and catch up. (Def. Mem. at 10-12).

Moreover, there is no evidence that Dr. Gray was biased against Plaintiff based on age. The only purported evidence cited in Plaintiff's brief is an unsupported assertion that Dr. Gray once asked "why she wanted to 'do this at this stage in [her] life.'" (Pl. Opp. at 13). Plaintiff cites page 79 of her own deposition, but the cited testimony reveals that Plaintiff could not

remember who allegedly made this remark. In any event, the alleged comment is not suggestive of ageist bias, particularly when viewed in light of the fact that Plaintiff was living hundreds of miles away from her husband and four children and yet, despite her sacrifices, she was failing as an OB/GYN resident.[1]

Even if there were evidence that Dr. Gray was biased against Plaintiff because of her age, Plaintiff's allegations against Dr. Gray are immaterial as a matter of law because she was not involved in the termination decision. Although Dr. Gray and other chief residents were permitted to sit in on portions of RRC meetings as "representatives of the residents," the undisputed evidence is that they were required to leave the meetings during deliberations and votes regarding other residents. (A-97 – A-98). Plaintiff does not and cannot cite any evidence that Dr. Gray was consulted, offered an opinion, or otherwise influenced the RRC's termination decision, because there is no such evidence.

Finally, Plaintiff relies on testimony that she was "isolated" and viewed as an "outsider" by her second-year classmates, including Rachel Heinle. (Pl. Opp. at 13). Even assuming that Plaintiff had difficulty bonding with Dr. Heinle and other peers in part because she was older and chose to spend her free time with her family, that does not support an inference that Plaintiff's classmates were discriminating against her because of her age. Significantly, Dr. Sciscione testified based on his personal observations that the tense relationships between Plaintiff and her co-residents were a function of Plaintiff's poor performance, not her age: "Dr. Zechman's turnover to her patients, that they were incomplete. They weren't – they weren't accurate, that she often left things not done. That was really the crux of their issues with her." (Sciscione Dep. 21:24 – 22:5 at A-282 – A-283). With respect to Dr. Heinle, Dr. Sciscione testified that she

---

[1]     Plaintiff also asserts in her brief that someone told her that OB/GYN is "a young person's specialty." (Pl. Opp. at 13). Plaintiff cites no evidence identifying the person who allegedly made this remark or whether he/she was a Christiana Care employee. Nor does Plaintiff cite any evidence that this unidentified person played any role in the decision to terminate her residency.

"really had difficulty with people who didn't perform up to her level" and that "Dr. Heinle had

that issue, not just with Dr. Zechman, but with other residents that weren't – that weren't, in her

estimation, weren't pulling their weight." (Sciscione Dep. 23:11 – 24:9 at A-283). More

importantly, Plaintiff does not and cannot cite any evidence that any of her classmates, including

Dr. Heinle, were involved in the RRC's termination decision. Indeed, Plaintiff admitted in her

deposition that her classmates, such as Dr. Heinle, "did not really have say so" in decisions

affecting Plaintiff. (Zechman Dep. 254:7 – 8 at A-163). Therefore, the alleged comments,

perceptions, beliefs and attitudes of Plaintiff's co-residents are legally immaterial to the issue of

whether the RRC's termination decision was discriminatory.

     In short, Plaintiff's speculation that the RRC members were influenced by the allegedly

ageist opinions of others is unsupported by the record. Even assuming that such comments

demonstrate any such bias, there simply is no evidence that any of the individuals who Plaintiff

accuses of discriminatory animus participated in or influenced the Committee's decision.

Accordingly, Plaintiff's assertions of age-based bias are insufficient to defeat Christiana Care's

motion for summary judgment.

    **B.**    **There Is No Evidence That The Committee's Stated Reasons For Its Termination Decision Were Pretextual.**

     Plaintiff's attempt to establish pretext fails as a matter of law because she does not

address the Committee's stated reasons for its decision to terminate her residency, let alone show

that those reasons are weak or implausible, which is the standard for proving pretext.

     The RRC's reasons for terminating Plaintiff's residency are expressly stated in its

September 30, 2003 termination letter (and in its September 29 meeting minutes): (1) "overall

evaluation scores very low"; (2) "surgical skills are that of a PGY1"/"no significant improvement

with surgical skills"; (3) "failure to meet a special rotation and mainstreaming resulted in

performance which is still below expected level"; (4) "very poor clinical judgment which leads to

concerns about patient care and safety"; and (5) "unreceptive to educational interaction, therefore very hard to work with and teach." (A-83; A-81).

"[T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons . . . was either a post hoc fabrication or otherwise did not actually motivate the employment action" by presenting admissible evidence of significant "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons." Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994) (internal citations omitted) (emphasis added).

Plaintiff contends that Christiana Care failed to give her sufficient surgical opportunities. For purposes of this motion only, Christiana Care does not dispute that residents, including Plaintiff, are occasionally reassigned from surgical cases by various attending physicians and chief residents. However, Plaintiff has not adduced evidence that she was reassigned more than her classmates or that she was denied surgical cases that were appropriate to her abilities. Nor has Plaintiff identified the physicians who reassigned her (other than Dr. Gray and Dr. Vakili), let alone adduce evidence that these unnamed physicians made their decisions based on age discrimination. These failures of proof are fatal to her claim because many of these decisions were made by attending physicians who, like Dr. Vakili, were not employed by Christiana Care. (Zechman Dep. 254:11 – 12 at A-163, 256:22 – 24 at A-164). Moreover, it is undisputed that surgical assignments were, necessarily, based on a balancing of the residents' educational needs against the complexity of the procedure and the safety of the hospital's patients. (Ekbladh Dep. 34:23 – 36:6 at A-260, 56:19 – 57:1 at A-265). Absent some evidence that Christiana Care employees made manifestly inappropriate decisions with respect to Plaintiff's surgical assignments, a court should not second-guess those decisions, particularly in this case where the decisions relate to performing surgery on pregnant women. Kautz v. Met-Pro Corp., 412 F.3d 463, 468 (3d Cir. 2005) ("The question is not whether the employer made the best or even a

sound business decision; it is whether the real reason is discrimination.") (internal citation omitted).

Plaintiff also argues that her medical knowledge, as determined by the CREOG exam and a practice oral board exam, was comparable to younger residents who were not terminated. (Pl. Opp. at 16). This argument misses the mark entirely because the RRC did not cite Plaintiff's medical knowledge as a reason for its termination decision. (A-83; A-81). Contrary to the assertion in Plaintiff's brief, Dr. Patruno never "opined that Plaintiff was terminated . . . because she received a 12%" on her CREOG exam. (Pl. Opp. at 16) (citing Patruno Dep. 35 at B-0333). Dr. Patruno said no such thing; the deposition page cited by Plaintiff does not even refer to the termination decision. When Plaintiff's counsel asked Dr. Patruno about Plaintiff's termination, he stated: "I'm going to reiterate, I was not part of the RRC nor the overall decision to term' – you know, to terminate Ellen or have her resign. . . . So I'm not really privy to all the details. My understanding was that she was not progressing to the level that we were expecting that she would." (Patruno Dep. 77:23 – 78:8 at B-0343 – B-0344).

Finally, Plaintiff asserts that "many of the evaluations referenced an inherent bias against Plaintiff." (Pl. Opp. at 16). However, Plaintiff's brief does not refer to a single evaluating physician whom she believes was biased against her because of age. Plaintiff merely relies on two supportive evaluations from Dr. Hochman and Dr. Kaminski, who Plaintiff does not accuse of age discrimination (they are both older than Plaintiff). (Pl. Opp. at 15, citing B-0103 – B-0104) (A-94). Although Dr. Hochman expressed concern that some unidentified "attendings hold a bias against her," he did not attribute this to Plaintiff's age or any other unlawful reason. (B-0103). Moreover, Dr. Hochman, who Plaintiff testified was one of the "most supportive of [her] during [her] residency" (Zechman Dep. 330:20 – 23 at A-182), ultimately concluded that Plaintiff would probably never catch up because she refused to acknowledge her deficiencies. Dr. Hochman's final evaluation of Plaintiff, which he submitted to the RRC just four days before it voted to terminate her residency, is supportive of the termination decision:

7

I'm probably Ellen's biggest supporter but I can't say I've seen very much improvement. [A-74] Ellen needs to realize she has a problem. [A-76] [She] still needs a special curriculum. I'm doubting if she will ever catch up. [A-77].[2]

Dr. Kaminski, who Plaintiff also views as an ally and sympathetic witness, testified in his deposition that the RRC's reasons for terminating Plaintiff's residency were consistent with his own observations of Plaintiff and that, in his view, the termination decision was both "justified" and "reasonable." (Kaminski Dep. 59:12 – 16 at A-223). For example, the RRC based its decision in part on the fact that Plaintiff had "Very poor clinical judgment which leads to concerns about patient care and safety." (A-81; A-83). Dr. Kaminski testified that he shared that concern:

> Q:   What [was your opinion of] her clinical judgment?
>
> A:   Clinical judgment, was difficult. She – I was never comfortable with, say, turning her loose because of that. I was afraid she might do something. She never got my full confidence.
>
> Q:   What do you mean when you say turning her loose?
>
> A:   A lot of residents you can say, well, I did this, this, and this, and you say, well, that's going to be fine. With her you always say, maybe I need to recheck it.
>
> Q:   Was it a concern to you that Dr. Zechman would take action with respect to patients without consulting supervising physicians?
>
> A:   She was known to do that.
>
> Q:   Was that an area of concern with respect to Dr. Zechman?
>
> A:   To me, it would be an area of concern.

(Kaminski Dep. 57:8 – 58:1 at A-222 – A-223).

The RRC also based its termination decision in part on the fact that Plaintiff was "very hard to work with and teach" (A-81; A-83), which was supported by numerous evaluations stating that she "can't take criticism," "display[s] inappropriate emotionalism," and "shift[s] blame onto others." (A-68; A-70; A-78). Dr. Kaminski testified that he observed these problems as well:

> Q:   How did Dr. Zechman react to criticism?

---

[2]      Dr. Hochman was not present during the September 29, 2003 termination vote. (A-80).

A:    Oftentimes poorly insofar as she would cry, responses like that.

Q:    And did you ever observe that?

A:    I observed it. I was never the cause of it.

Q:    And when Dr. Zechman would cry in response to criticism, [in] any of those instances did the person who was offering the criticism behave in a way that you found inappropriate?

A:    I did not.

Q:    So when Dr. Zechman received criticism that prompted her to cry, did you view the criticism as more mean or nasty than would be directed at another resident?

A:    No. No.

(Kaminski Dep. 58:8 – 22 at A-223).

Q:    Did other residents express a desire not to work with Dr. Zechman?

A:    They preferred not to.

Q:    Do you know why?

A:    Because of the personal interactions.

Q:    What personal interactions are you referring to?

A:    They didn't – they didn't like working with her. I don't think anyone got to the point where they could trust her.

Q:    Trust her in what way?

A:    Her decision making.

(Kaminski Dep. 60:21 – 61:8 at A-223).[3]

       In short, Plaintiff has failed to adduce evidence from which a factfinder could reasonably

conclude that the RRC's reasons for its decision were a pretext for age discrimination. Plaintiff's

brief ignores four of the RRC's five stated reasons and instead focuses only on her alleged lack of

surgical opportunities. Even if this Court were to permit Plaintiff to second-guess doctors'

decisions as to who should perform particular surgeries on pregnant women (which it should not

_____

[3]    Significantly, Dr. Dean Patton, who gave a 30(b)(6) deposition in this case on behalf of East Carolina University ("ECU"), testified that ECU refused to hire Plaintiff as a resident because the physicians who had previously worked with Plaintiff for two years in ECU's pathology department reported that she "had attitude problems," was "difficult to work with," and "she was not easy to work with." (Patton Dep. 24:20 – 25:19 at C-7 – C-8) (The appendix, referred to as "C-__," is being filed with this brief). After being rejected by ECU's residency program, Plaintiff filed a lawsuit alleging that ECU's decision was based on age and disability discrimination. (A-26 – A-32).

permit her to do), Plaintiff has utterly failed to address the other four reasons for her termination or show why those reasons are pretextual. Nor has Plaintiff identified another resident who had *any* of the deficiencies set forth in her termination letter, much less a resident who was similarly situated to her. Finally, Plaintiff has not only failed to identify the name of a single evaluating physician who was influenced by ageist bias, Plaintiff's two biggest supporters (Dr. Hochman and Dr. Kaminski) agree with the RRC's stated reasons for its decision. The Court should therefore grant summary judgment.

## III.    PLAINTIFF'S DISABILITY CLAIMS FAIL

### A.    Plaintiff Does Not Have A "Disability" Because There Is No Evidence That She Is Substantially Limited In A Major Life Activity

As Christiana Care showed in its initial Memorandum of Law, the testimony of Plaintiff and her own doctor establish that Plaintiff's intermittent flare-ups do not substantially limit any of her major life activities and, therefore, she is not disabled under the ADA. (Def. Mem. at 23-26). Plaintiff's response – that she is disabled because her intermittent flare-ups are the result of an underlying chronic medical condition – misses the mark because it fails to address Plaintiff's admissions that her flare-ups do not significantly limit her activities. Plaintiff's response is also based on a mischaracterization of the cases she cites in her brief.

It is well established that a medical condition or impairment does not constitute a disability under the ADA unless it causes a substantial limitation in one or more of the person's major life activities. Toyota Motor Mfg. v. Williams, 534 U.S. 184, 198 (2002). Plaintiff appears to contend that her flare-ups limit her in the major life activity of thinking: "the cumulative impact of [her] flare-ups inhibited Plaintiff's ability to think and function as a resident in the program." (Pl. Opp. at 20). However, the only cited evidence regarding Plaintiff's ability to think is that she has "an occasional inability to concentrate and depression," (Pl. Opp. at 6) which falls far short of what is required to establish a substantial limitation in the major life activity of thinking. Fraser v. Goodale, 342 F.3d 1032, 1044 (9th Cir. 2003) ("Being unable to think and

communicate three times in a five month period is not a substantial limitation.") In any event, the testimony of Plaintiff and her doctor – that Plaintiff's flare-ups are extremely rare and do not significantly limit any of her daily activities – establishes that Plaintiff is not substantially limited in *any* major life activity within the meaning of the ADA.[4]

Plaintiff relies upon Vande Zande v. Wisconsin Dep't of Admin., 44 F.3d 538 (7th Cir. 1995), in support of her assertion that her intermittent flare-ups can satisfy the ADA's definition of a "disability" because they are caused by an underlying chronic medical condition (Pl. Opp. at 19). However, Plaintiff fails to disclose in her brief that the plaintiff in Vande Zande was "paralyzed from the waist down" and that the employer "admitted" that she was disabled under the ADA. Id. at 543-44. The issue in Vande Zande was not whether the plaintiff was disabled, but rather whether the employer failed to provide a reasonable accommodation for an intermittent symptom that was a "manifestation of an admitted disability." Id. at 544-45 (affirming summary judgment because the plaintiff's requested accommodation was not reasonable).

In a subsequent case decided by the same court of appeals, the Seventh Circuit explicitly rejected precisely the same argument that Plaintiff asserts here. In Moore v. J.B. Hunt Transp., Inc., 221 F.3d 944 (7th Cir. 2000), the plaintiff suffered from rheumatoid arthritis, which caused intermittent "flare-ups" during which "he is not able to move." Id. at 948. The district court granted summary judgment in the employer's favor because, among other reasons, there was

---

[4]     Notwithstanding Plaintiff's belief that she was limited in her "ability to think and function as a resident in the program," (Pl. Opp. at 20) Plaintiff cannot contend that she is substantially limited in the major life activity of "working" because there is no evidence that she is "unable to work in a broad class of jobs." Sutton v. United Air Lines, Inc., 527 U.S. 471, 491-92 (1999) ("When the major life activity under consideration is that of working, the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs. . . . To be substantially limited in the major life activity of working, then, one must be precluded from more than one type of job, a specialized job, or a particular job choice. If jobs using an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs."); Tice v. Ctr. Area Transp. Auth., 247 F.3d 506, 512-13 (3d Cir. 2001) (affirming summary judgment). There is no evidence that Plaintiff's medical condition prevents her from working in a "broad class of jobs." Indeed, Plaintiff is currently working as a general practice physician and has been working as a physician since she left Christiana Care. (C-11 – C-24, C-25).

insufficient evidence to support a finding that the plaintiff was disabled under the ADA. Id. at

949-50. Affirming the district court's grant of summary judgment, the court of appeals explained

that the intermittent flare-ups could not establish the existence of a disability:

> Mr. Moore argues that his "flare-ups" cause him to be
> completely debilitated while they last and that, therefore, the
> flare-ups render his condition a disability. Mr. Moore cites
> Vande Zande[] in support of his argument. We believe Mr.
> Moore misapprehends the holding of Vande Zande. In that case,
> the plaintiff was paralyzed from the waist down, and her
> paralysis made her prone to develop pressure ulcers. The
> question in that case was not whether Vande Zande was disabled,
> but whether her employer had a duty to reasonably accommodate
> her when she developed these ulcers. In that situation, we stated
> that "an intermittent impairment that is a characteristic
> manifestation of an admitted disability is, we believe, a part of
> the underlying disability and hence a condition that the employer
> must reasonably accommodate." [44 F.3d] at 544. Mr. Moore
> does not seek accommodation for an intermittent impairment
> resulting from an "admitted disability"; instead, he attempts to
> use his intermittent flare-ups to establish that his impairment is a
> disability. Vande Zande, therefore, is not controlling.
> Furthermore, we do not believe that Mr. Moore's infrequent
> flare-ups, one or two per year, render his condition a disability.

Moore, 221 F.3d at 952. See also Carruth v. Cont'l Gen. Tire, Inc., Civ. No. 98-4233, 2001 WL

1775992, at *5 & n.7 (S.D. Ill. June 21, 2001)[5] (noting that the Moore decision "stressed that

Vande Zande was never arguing that her intermittent flare-ups met the statutory definition of a

'disability'" because Vande Zande had "already met the statutory definition of being disabled,

because she was 'substantially limited' in her ability to walk" because she was paralyzed from the

waist down) (emphasis in original).

The facts of the Moore case truly underscore why Plaintiff is unable to establish that she

is disabled under the ADA. Moore suffered from rheumatoid arthritis, which Plaintiff concedes is

similar to her connective tissue disorder. (Pl. Opp. at 18; Zechman Dep. at 142:6 – 7 at A-135;

Fraser Dep. at 6:25 – 8:14 at A-227). Their symptoms are also similar: both Moore and Plaintiff

suffer from intermittent flare-ups of joint pain and fatigue. However, Moore's flare-ups – which

---

[5] All unpublished court opinions are in the Compendium being filed with this brief.

the court held were legally insufficient to establish a disability – were both more frequent and more severe than Plaintiff's flare-ups. With respect to frequency, Moore had one or two flare-ups per year. Moore, 221 F.3d at 948, 952. In this case, Plaintiff's doctor testified that Plaintiff "can go for months or years and not be bothered" by her condition, and that "[s]he can go many years without any problems." (Fraser Dep. 74:5 – 23 at A-244; 82:8 – 25 at A-246). Plaintiff herself testified that she "can go years and weeks, you know, and be asymptomatic." (Zechman Dep. 142:12 – 19 at A-135).

Moore's flare-ups were also more severe than Plaintiff's flare-ups. When Moore had a flare-up, he was "completely debilitated" and "not able to move." Moore, 221 F.3d at 948, 952. In this case, Plaintiff testified that her flare-ups are not nearly that severe. Far from being debilitated or unable to move, Plaintiff testified that she "physically can keep going" during a flare-up. (Zechman Dep. at 281:4 – 11 at A-170). Indeed, Plaintiff testified that the only limitation on her daily activities during flare-ups are that "there are times when, say, there's a cub scout meeting that evening, I tell my husband, Honey, I'm tired. I need to lay down on a sofa. You cook supper tonight. You take the kids. I'm tired. I just need to lay down. And I do." (Id. at 280:6 – 15 at A-170). Thus, according to Plaintiff and her doctor, Plaintiff's flare-ups are less frequent and far less severe than those experienced by Moore, which the court of appeals determined were legally insufficient to create a triable issue of disability under the ADA.

Thus, there is no evidence from which a factfinder could reasonably conclude that Plaintiff is substantially limited in a major life activity. Accordingly, the Court should grant summary judgment as to all of her disability-based claims.

### B. There Is No Evidence To Support Plaintiff's Failure To Accommodate Claim

Christiana Care established in its initial Memorandum of Law that Plaintiff's accommodation claim fails because: (1) Plaintiff did not need an accommodation to perform the essential functions of her job; and (2) even if Plaintiff were entitled to an accommodation,

Christiana Care permitted Plaintiff to take days off on an as-needed basis, which is an alternative accommodation that her own doctor described as "optimal." (Def. Mem. at 26-28). Plaintiff does not respond to either of these arguments in her brief, because there is no meritorious response. Instead, Plaintiff devotes five pages of her brief to arguing that she can establish the "four elements" of a failure to engage in the interactive process. (Pl. Opp. at 23-27). This argument is without merit.

First, an employer's failure to engage in the interactive process, even if proven at trial, is not a cause of action and cannot support a claim for relief. Cannice v. Norwest Bank Iowa, N.A., 189 F.3d 723, 727 (8th Cir. 1999) ("[T]here is not per se liability under the ADA if an employer fails to engage in an interactive process. . . ."). Indeed, the Third Circuit Model Jury Instructions for accommodation claims under the ADA specifically state: "Neither party can win this case simply because the other did not cooperate in an interactive process." Third Circuit Model Jury Instructions (Civil) § 9.1.3 (2006).

Moreover, there is no evidence from which a factfinder could reasonably conclude that Christiana Care failed to engage in the interactive process. As Plaintiff concedes in both her Complaint and in her Opposition Brief, Plaintiff first requested an accommodation on July 23, 2003, when she "began to suffer from increasing fatigue." (Pl. Opp. at 7; Compl. ¶¶ 39-40). Plaintiff also concedes that Christiana Care provided her with the appropriate Request for Accommodation Form on July 23, 2003. (Id.). Plaintiff admits that her physician, Dr. Fraser, did not complete the accommodation form and fax it to Christiana Care until August 11, 2003. (Pl. Opp. at 7). Although Dr. Ekbladh did not receive the fax on August 11 (it was not faxed to Dr. Ekbladh), it is undisputed that Dr. Ekbladh spoke with Dr. Fraser by telephone that same day and discussed Plaintiff's request for an accommodation. (A-61; Fraser Dep. 81:21 – 82:25 at A-245 – A-246).

Dr. Fraser told Dr. Ekbladh that Plaintiff's flare-ups are extremely intermittent and unpredictable and that the most appropriate response was to allow her to take days off on an as-

needed basis, "because there's not a set schedule for these sort of flares." (Fraser Dep. 85:16 – 19 at A-246; A-69). That is precisely the accommodation that Christiana Care provided. Although Dr. Ekbladh later provided Plaintiff with FMLA forms in order to apply for intermittent FMLA leave, that process never interfered with Plaintiff's ability to take days off when she needed them.[6] Plaintiff's brief does not identify a single instance in which Christiana Care denied a request to take a day off because of her medical condition. Indeed, Plaintiff appears to concede that her specific requests for days off were granted when she needed them and that she merely objects to the fact that she was sometimes required to use her vacation days. (Pl. Opp. at 26).[7] The record also shows that Plaintiff was able to unilaterally take days off for her condition without advance notice or approval. (C-1) (Email regarding Plaintiff's unilateral decision to stay home on September 20, 2003).

Notwithstanding the undisputed fact that Christiana Care granted Plaintiff's individual requests to take days off on an as-needed basis, Plaintiff apparently believes that Christiana Care was required to grant her request for an "adjusted schedule." (Pl. Opp. at 26). Plaintiff is wrong for two reasons. First, the only "adjusted schedule" Plaintiff has identified in this case is the schedule described in her July 2003 request for two 3-day vacations every month. (A-51 – A-52). That accommodation is not reasonable because her own doctor testified that her flare-ups are extremely intermittent, unpredictable, and that she therefore only needed "more time off *from*

---

[6]      Plaintiff has not asserted any claims under the FMLA in this case. Nevertheless, Christiana Care feels compelled to respond to Plaintiff's counsel's inadmissible assertion that a Department of Labor employee "informed Plaintiff's counsel that she determined that Defendant violated Plaintiff's rights under the FMLA." (Pl. Opp. at 24). Agency determinations are irrelevant and thus inadmissible in a federal court discrimination case particularly where, as here, the DOL has not made any factual findings or legal conclusions or issued a written determination setting forth a basis for any violation of the FMLA. Whitfield v. Pathmark Stores, Inc., Civ. No. 96-246, 1999 WL 222459, at *3-4 (D. Del. Mar. 30, 1999) ("Neither the factual findings nor the legal findings in the [DOL] Determination are admissible under the Federal Rules of Evidence"); Spruill v. Winner Ford, Ltd., 175 F.R.D. 194, 196-98 (D. Del. 1997) (same). It also appears that the DOL has not interviewed a single witness in this case other than Plaintiff.

[7]      Requiring Plaintiff to use her vacation days does not give rise to a cause of action under the ADA or any other law at issue in this case.

*time to time* . . . because there's not a set schedule for these sort of flares." (Fraser Dep. 85:16 –

19 at A-246) (emphasis added).  Second, it is settled law that the "ADA requires only a

reasonable accommodation, not necessarily the preferred accommodation, or the maximum

accommodation or every accommodation." Hartsfield v. Miami-Dade County, 90 F. Supp. 2d

1363, 1372 (S.D. Fla. 2000); Gile v. United Airlines, 95 F.3d 492, 499 (7th Cir. 1996) ("employer

is not obligated to provide an employee the accommodation he requests or prefers").  In this case,

Christiana Care provided a reasonable accommodation by permitting Plaintiff to take days off on

an as-needed basis "when she had a flare-up," which her own doctor described as an "optimal"

accommodation because Plaintiff's flare-ups are intermittent and unpredictable.  (Fraser Dep.

88:4 – 17 at A-247).

    For the reasons set forth above and in Christiana Care's initial Memorandum, the Court

should grant summary judgment on Plaintiff's accommodation claim

## IV.    THERE IS NO EVIDENCE OF RETALIATION. [8]

    As Christiana Care demonstrated in its initial Memorandum, Plaintiff cannot make out a

*prima facie* case of retaliation because there is no evidence of a "causal link" between the

termination decision and her request for an accommodation or her complaint to the ACGME.

(Def. Mem. at 31-34).  Even if Plaintiff could establish a *prima facie* case, she has failed to

adduce evidence from which a factfinder could conclude that each of the RRC's reasons for its

decisions were pretextual.  (Def. Mem. at 18-22, 35-36).

    With respect to the *prima facie* case, Plaintiff's brief does not contend that any of the

RRC members ever made negative comments about her request for accommodation or the

anonymous ACGME complaint, or that they ever retaliated against another resident who made

---

[8]    To the extent Plaintiff purports to assert a claim based purely on anti-disability animus,
    Plaintiff's theory of liability is identical to her retaliation claim – that the RRC terminated
    her residency in response to her request for an accommodation under the ADA.
    (Compare Pl. Opp. at 28 with Pl. Opp. at 30-31).

similar requests or complaints.[9]  Instead, Plaintiff attempts to establish a *prima facie* case based

solely on the timing of her termination and her belief that she was only provided with six weeks

to improve her performance.  Even putting aside that temporal proximity is rarely sufficient to

establish a *prima facie* case (Def. Mem. at 34), Plaintiff's argument completely ignores the first

12 months of her residency and the chronology of events that led to her termination:

- In October 2002, the RRC determined that Plaintiff's competence was deficient in several areas and it therefore appointed a mentor (A-22);

- In December 2002, Dr. Sciscione (then-Chair of the RRC) told Plaintiff that, due to her lack of improvement, he was going to intensify her remedial education and provide her with extra one-on-one instruction from the faculty (A-24);

- In March 2003 – four months *before* Plaintiff requested an accommodation or sent her email to the ACGME in July 2003 – the RRC discussed the possibility of terminating her residency because she was still not improving in several areas and, making matters worse, Plaintiff was resistant to the program's efforts to teach her.  (A-34).

- In June 2003 – one month *before* Plaintiff's accommodation request and email to the ACGME – the RRC held a formal vote regarding Plaintiff's termination but decided to permit her to stay on as a probationary second-year resident subject to "rereview." (A-40).

- In July 2003, the RRC informed Plaintiff that the Committee would consider terminating her residency at its next meeting on August 18, 2003.  (A-57).

- At the August 18, 2003 RRC meeting – *after* Plaintiff's ADA request and ACGME complaint – the RRC again considered termination and again decided to permit Plaintiff to continue as a probationary resident subject to being "re-reviewed at the next RRC meeting."  (A-64 – 65).

---

[9]    Plaintiff alleges that Ms. Kardos told her that the residency program "cannot support residents going out on FMLA." (Pl. Opp. at 31).  This allegation has no conceivable relevance to Plaintiff's claims in this case.  Ms. Kardos was not a decision maker with respect to Plaintiff's termination; a request for FMLA leave is not protected activity under the ADA; and Plaintiff's Complaint does not assert any claims under the FMLA.  Moreover, it is undisputed that Dr. Ekbladh personally provided Plaintiff with FMLA forms and that the Employee Health Services department subsequently approved Plaintiff for intermittent FMLA leave.  (A-69; A-90).

- At the next RRC meeting on September 29, 2003, the Committee members voted to terminate Plaintiff's residency for the reasons set forth in the meeting minutes. (A-81).

The foregoing chronology of events, which is undisputed, is not remotely suggestive that the RRC's termination decision was causally linked to her accommodation request or the ACGME complaint. To the contrary, the fact that the RRC voted *not* to terminate Plaintiff at the August 18 meeting – even though by that time all the RRC members were well aware of Plaintiff's July request for accommodation and the ACGME complaint – is affirmative evidence that its September 29 vote was not retaliatory. Moreover, the RRC had repeatedly warned Plaintiff that it might terminate her residency if she failed to significantly improve her deficiencies in several areas. After she failed to show significant improvement over a period of at least 11 months, despite intensive remediation, the Committee eventually voted to terminate her residency. As Dr. Kaminski testified, "we can't carry her on probation forever." (Kaminski Dep. 59:10 – 11 at A-223).

In short, Plaintiff has failed to adduce sufficient evidence to establish a *prima facie* case of retaliation.[10] Even if she could establish a *prima facie* case, a factfinder could not reasonably conclude that the RRC's stated reasons for its decision were pretextual, as shown above in section II.B. of this Reply Brief.

---

[10] With respect to the ACGME complaint, Plaintiff's *prima facie* case fails for an additional reason: the ACGME never informed the RRC that Plaintiff's anonymous complaint contained an allegation to discrimination. Although Plaintiff's lengthy email to the ACGME contained a reference to discrimination (A-48 – A-49), the ACGME did not forward her email to the RRC. Rather, the ACGME prepared its own letter (A-54 – A-56) asking the RRC to address certain questions regarding compliance with residency regulatory guidelines. The ACGME's letter to the RRC does not refer to any allegation of discrimination and therefore, it cannot be the basis of a retaliation claim. (Def. Mem. at 31-33).

V.    **PLAINTIFF'S PROMISSORY ESTOPPEL CLAIM FAILS.**[11]

Plaintiff's purported promissory estoppel claim fails for at least two reasons. First,

Plaintiff's Complaint does not assert a claim of promissory estoppel. Second, it is well

established in Delaware that a party cannot assert a promissory estoppel claim that seeks to

contradict or modify the terms of a valid written contract.

Plaintiff does not address the fact that there is no promissory estoppel claim in her

Complaint. With respect to Delaware's legal prohibition against contradicting or modifying a

written contract, Plaintiff asserts that she "is not asserting a claim based on promises that

contradict the terms of the employment contract between the parties" but that she is merely

seeking to enforce an alleged oral "representation that Plaintiff would be afforded the opportunity

to improve her surgical skills." (Pl. Opp. at 34). Plaintiff is wrong. The parties' written contract

contains the following integration clause:

> **Entire Agreement:** This Agreement constitutes the entire
> Agreement between the parties and supercedes all previous
> agreements. Any amendments to the Agreement must be in
> writing and executed by the parties hereto. (A-17; A-45).

By asserting a claim based on an alleged prior oral promise that is not specified in the written

contract, Plaintiff is indisputably seeking to contradict the contract's integration provision. Such

claims are precluded as a matter of Delaware law. Weiss v. Northwest Broad., Inc., 140 F. Supp.

2d 336, 344 (D. Del. 2001) ("Because the court has determined that the Financing Agreement is a

valid contract, [plaintiff] cannot recover under a theory of promissory estoppel"); Chrin v. Ibrix

Inc., No. Civ.A. 20587, 2005 WL 2810599, at *8 (Del. Ch. Oct. 19, 2005) ("since [plaintiff]

signed the [agreement] and agreed to its integration clause, [plaintiff] cannot now claim reliance

on a prior promise that varies its terms"); Synesiou v. DesignToMarket, Inc., Civ. No. 01-5358,

2002 WL 501494, at *4 (E.D. Pa. Apr. 3, 2002) ("promissory estoppel has no application when

---

[11]    Plaintiff's brief represents that "Plaintiff has agreed to voluntarily dismiss her claim of a
breach of the covenant of good faith and fair dealing." (Pl. Opp. at 1).

parties have entered into an enforceable agreement"); Austost Anstalt Schaan v. Net Value Holdings, Inc., Civ. No. 00-771-SLR, 2001 WL 908996, at *7 (D. Del. Aug. 10, 2001) ("it is axiomatic that a claim for promissory estoppel is applicable only in the absence of an enforceable contract") (internal citation and quotations omitted).

Finally, in light of the fact that Plaintiff **did** receive surgical training and perform surgery (albeit less than she desired), an alleged promise that she "would be afforded the opportunity to improve her surgical skills" is too vague and indefinite to be relied upon or enforced. (See, e.g., A-50) ("Good Day. Surgical training skills for all residents in AM."). See Cont'l Ins. Co. v. Rutledge & Co., Inc., 750 A.2d 1219, 1233-34 & n.27 (Del. Ch. 2000) (granting summary judgment on promissory estoppel claim because alleged promise lacked "the necessary definiteness and certainty"; noting that "[a]n essential element of promissory estoppel is that the promisor's representation must be reasonably definite and certain so that the intentions of the parties can be ascertained").

## VI.    CONCLUSION

For the reasons set forth above and in Christiana Care's initial Memorandum of Law, there are no genuine issues of material fact and the Court should therefore grant summary judgment to Christiana Care with respect to Plaintiff's Complaint in its entirety.

David H. Williams (#616)  (dwilliams@
MORRIS JAMES LLP         morrisjames.com)
500 Delaware Ave., Suite 1500
P.O. Box 2306
Wilmington, DE  19899
302.888.6900

Michael J. Ossip (admitted pro hac vice)
Thomas S. Bloom (admitted pro hac vice)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA  19103
215.963.5543
Attorneys for Defendant Christiana Care
Dated:  December 11, 2006        Health Services

1494432/1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ELLEN ZECHMAN,                          :
                                        :        C.A. No. 05-159 (JJF)
                    Plaintiff,          :
                                        :
          v.                            :
                                        :
CHRISTIANA CARE HEALTH SYSTEMS,         :
                                        :
                    Defendant.          :

CERTIFICATE OF ELECTRONIC SERVICE

I hereby certify that on December 11, 2006, I electronically filed the attached

**REPLY BRIEF IN FURTHER SUPPORT OF DEFENDANT'S MOTION FOR**

**SUMMARY JUDGMENT** with the Clerk of Court using CM/ECF which will send notification

of such filing(s) to the following:

> Jeffrey K. Martin, Esquire
> Margolis Edelstein
> 1509 Gilpin Avenue
> Wilmington, DE 19806

> David H. Williams (#616) (dwilliams@morrisjames.com)
> MORRIS JAMES LLP
> 500 Delaware Avenue, Suite 1500
> P.O. Box 2306
> Wilmington, DE 19899
> (302) 888-6900

> Michael J. Ossip (mossip@morganlewis.com)
> Thomas S. Bloom (tbloom@morganlewis.com)
> MORGAN, LEWIS & BOCKIUS LLP
> 1701 Market Street
> Philadelphia, PA 19103
> (215) 963-5543

> Attorneys for Defendant
Dated: December 11, 2006         Christiana Care Health Services, Inc.

1473986/1