## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ELLEN ZECHMAN,                          :
                                        :
            Plaintiff,                  :
                                        :
       v.                               :        C.A. No. 05-159-JJF
                                        :
CHRISTIANA CARE HEALTH SYSTEMS,         :
                                        :
            Defendant.                  :

---

### COMPENDIUM OF UNPUBLISHED OPINIONS CITED
### IN REPLY BRIEF IN FURTHER SUPPORT OF DEFENDANT'S
### MOTION FOR SUMMARY JUDGMENT

---

David H. Williams (DE 616)
MORRIS JAMES LLP
500 Delaware Ave., Suite 1500
P.O. Box 2306
Wilmington, DE 19899
302.888.6900
dwilliams@morrisjames.com

Michael J. Ossip (admitted pro hac vice)
Thomas S. Bloom (admitted pro hac vice)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
215.963.5543

Counsel for Defendant Christiana Care
Health Systems

Dated: December 11, 2006

# TABLE OF CONTENTS

| TAB NO. | DESCRIPTION |
|---|---|
| A | Austost Anstalt Schaan v. Net Value Holdings, No. Civ. A. 00-771-SLR, 2001 WL 908996 (D. Del. Aug. 10, 2001) |
| B | Carruth v. Cont'l Gen. Tire, Inc., No. 98-CV-4233-JPG, 2001 WL 1775992 (S.D. Ill. June 21, 2001) |
| C | Chrin v. Ibrix Inc., No Civ. A. 20587, 2005 WL 2810599 (Del. Ch. Oct. 19, 2005) |
| D | Synesiou v. DesignToMarket, Inc., No. 01-5358, 2002 WL 501494 (E.D. Pa. Apr. 3, 2002) |
| E | Whitfield v. Pathmark Stores, Inc., No. Civ.A. 96-246-MMS, 1999 WL 222459 (D. Del. Mar. 30, 1999) |

# EXHIBIT A

Westlaw.

Not Reported in F.Supp.2d                                           Page 1

Not Reported in F.Supp.2d, 2001 WL 908996 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**C**
Briefs and Other Related Documents
Austost Anstalt Schaan v. Net Value Holdings,
Inc.D.Del.,2001.Only the Westlaw citation is
currently available.
United States District Court, D. Delaware.
AUSTOST ANSTALT SCHAAN, Balmore Funds
S.A. and Amro International, SA, Plaintiffs,
v.
NET VALUE HOLDINGS, INC., Defendant.
**No. Civ.A.00-771-SLR.**

Aug. 10, 2001.

Richard M. Beck, of Klehr, Harrison, Harvey,
Branzburg & Ellers LLP, Wilmington, Delaware,
and Glenn A. Weiner, of Klehr, Harrison, Harvey,
Branzburg & Ellers LLP, Philadelphia,
Pennsylvania, for plaintiffs, of counsel.

MEMORANDUM OPINION
ROBINSON, Chief J.

**I. INTRODUCTION**

*1 Presently before the court is the motion of Net
Value Holdings, Inc. ("defendant"), to dismiss the
complaint of Austost Anstalt Schaan ("Austost"),
Balmore Funds ("Balmore") and Amro
International, S.A. ("Amro") (collectively "plaintiffs
"). Defendant argues that plaintiffs' complaint fails
to state claims upon which relief can be granted
pursuant to Rules 9(b) and 12(b)(6) of the Federal
Rules of Civil Procedure and the Private Securities
Litigation Reform Act, 15 U.S.C. § 78u-4(b). (D.I.7)
On August 22, 2000, plaintiffs filed a complaint
asserting six causes of action against the defendant,
which include: (1) breach of contract; (2) breach of
the covenant of good faith and fair dealing; (3)
fraud; (4) a violation of Section 10(b) of the
Securities and Exchange Act and Rule 10(b)-5; (5)
estoppel; and (6) reformation. (D.I.1) Plaintiffs
assert that as a result of defendant's actions and
inaction, the plaintiffs suffered damages in excess
of $20 million. (Id.) Plaintiffs oppose the motion
arguing that defendant's failure to timely register the
shares underlying the convertible notes, as allegedly
promised by defendant in an oral agreement,
directly caused the damages about which plaintiffs
complain. In addition, plaintiffs argue that all
claims asserted against defendant are well-pleaded
and, as a result, defendant's motion to dismiss
should be denied. (D.I.10)

**II. BACKGROUND**

In or about May 1999, each of the plaintiffs
purchased $500,000 (i.e., $1.5 million collectively)
of defendant's 8% unsecured convertible promissory
notes pursuant to Subscription Agreements ("the
Agreements") between the parties. Under certain
circumstances, these notes were convertible into
shares of defendant's common stock at a rate of
$2.50 per share.[FN1]

> FN1. Defendant characterizes itself as an "
> internet 'incubator" 'that provides capital
> and assistance to early stage e-businesses.
> (D.I. 7 at 3)

According to plaintiffs, they were unwilling to
purchase the notes unless defendant agreed to
register the stock underlying the notes with the
Securities and Exchange Commission ("SEC").
This registration would allow plaintiffs to publicly
resell the stock upon conversion of the notes. (D.I.
10 at 6) Defendant contends that the agreements "
plainly state" that the stock issuable on conversion
of the notes was intended to be exempt from
registration with the SEC and that each plaintiff "
represented and warranted" that it "fully under
[stood] that.. [defendant] does not expect the
securities to be listed on a national stock exchange
in the foreseeable future, if at all." [FN2] (D.I. 7 at 4)
Absent defendant's registration, plaintiffs would not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 908996 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

be able to resell the shares until one year after the notes were purchased pursuant to SEC Rule 144 and, thus, as plaintiffs argue, the return on their investment would be "substantially delayed." [FN3] (D.I. 10 at 6)

> FN2. In addition, defendant asserts that plaintiffs warranted that they were purchasing the notes "for investment purposes only and not with a view to the resale or distribution thereof, in whole or in part." (D.I.7, Exs.A-C, § 7(a)(x))

> FN3. According to plaintiffs, this "substantial delay" is particularly relevant because with an "internet incubator" company, such as defendant, this delay could mean the difference between a substantial gain and a substantial loss on their investment. (D.I. 10 at 6)

Initially, defendant was unwilling to grant registration rights because it had already sold $6 million in notes to other investors to whom it did not grant registration rights. In order to get plaintiffs to purchase the notes, defendant eventually agreed to grant registration rights. (*Id.*) Under the Agreements, defendant allegedly promised to register plaintiffs' shares "as soon as possible but not later than the next registration statement which [defendant] would file." [FN4] (D.I. 10 at 7) Defendant was unwilling to specify the timing of its registration commitment in the Agreements.[FN5] Supposedly, defendant feared that other purchasers would learn of and request the same registration rights as those allegedly granted to plaintiffs; thus, the general registration language. (*Id.*) Ultimately, plaintiffs agreed to more general language and permitted defendant's attorneys to draft language which would allow the parties to retain the alleged oral agreement, while avoiding having to grant similar rights to other note holders.[FN6] (*Id.*)

> FN4. Defendant specifically notes that this language appears nowhere in the Agreements. (D.I. 10 at 5)

> FN5. The Agreement reads in pertinent part:
> 5. Restrictions on Resale.
> (a) The Common Stock has not been registered under the Securities Act or any state securities laws and may not be sold or transferred unless (i) subsequently registered thereunder; (ii) the undersigned shall have delivered to the Company an opinion of counsel (which opinion and counsel shall be reasonably acceptable to the Company) to the effect that the securities to be sold or transferred may be sold or transferred pursuant to Rule 144 promulgated under the Securities Act (or a successor). The company agrees to use reasonable commercial efforts to register the Common Stock under the Securities Act at some future date.
> (D.I.7, Ex. A) (emphasis added).

> FN6. Plaintiffs assert that defendant was allowed to "successfully deprive" other note holders of registration rights through the ambiguous language of the Agreements. (D.I. 7 at 7)

*2 On October 8, 1999, defendant filed a registration statement regarding some of the convertible notes. However, defendant did not include those notes which plaintiffs purchased and held pursuant to the Agreements. As this registration was the "next registration statement that defendant filed," plaintiffs interpreted this inaction (i.e., failure to register) as a breach of the Agreements. (D.I. 10 at 8) Defendant did eventually file a registration statement covering plaintiffs' stock, which became effective June 30, 2000. [FN7]

> FN7. Plaintiffs claim that this does not effectuate their agreement, however, because at the time of registration they could have already sold their shares without registration pursuant to SEC Rule 144. (D.I.10)

For its part, defendant argues that the Agreements were "fully integrated" at the time of ratification

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 3

Not Reported in F.Supp.2d, 2001 WL 908996 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

and, thus, no representations, other than those contained therein, are applicable. In support of this argument, defendant cites language in the Agreements which indicates that "[t]his Subscription Agreement and the Escrow Agreement contain the entire agreement of the parties with respect to the subject matter hereof and there are no representations, covenants or other agreements except as stated or referred to herein." (D.I.7, Exs.A-C, § 14) Defendant argues that plaintiffs are simply seeking to enforce verbal promises that are entirely different from what is contained in the " fully integrated" Agreements. Further, defendant argues that this information is precluded by the parol evidence rule, and that plaintiffs' failure to particularize the details of the alleged oral agreements subjects their complaint to dismissal pursuant to Fed.R.Civ.P. 9(b) and 12(b)(6).

## II. STANDARD OF REVIEW

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint should be dismissed if it fails to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). On a motion to dismiss, the court must accept as true all facts alleged by plaintiff and should not award the motion unless plaintiff cannot prove any set of facts in support of his claim which would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). As the Third Circuit Court of Appeals noted in *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410 (3d Cir.1997), " 'the issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." ' *Id.* at 1420 (citing *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)).

## III. DISCUSSION

The complaint asserts six causes of action against defendant, each of which shall be addressed *seriatim.*

### A. Breach of Contract

Plaintiffs allege that at the time of the Agreements, defendant orally agreed to register the stock no later than the time at which the next registration statement was to be filed. When defendant failed to register the stock upon filing its next registration statement (i.e., October 8, 1999) plaintiffs claim their interests in the stock were damaged. (D.I.1)

Defendant argues that plaintiffs have failed to state a claim for breach of contract because they have admitted the stock was eventually registered by defendant (i.e., consistent with registration at "some future date."). (D.I.7) Further, defendant argues the alleged oral representations are precluded by the parol evidence rule because the representations, even if made, either preceded or were contemporaneous with the ratification of the Agreements which were themselves fully integrated. (*Id.*)

*3 Defendant is correct in asserting that the parol evidence rule would preclude admission of the alleged oral agreements if the Agreements were fully integrated when ratified.[FN8] *James River-Pennington Inc. v. CRSS Capital Inc.,* Civ. A. No. 13870, 1995 WL 106554,*5 (Del. Ch. Mar. 6, 1995). However, at this juncture, the record is insufficiently developed to allow the court to definitively determine whether the Agreements were fully integrated and, thus, determine whether the parol evidence rule applies. Therefore, it does not appear that plaintiffs could not prove any set of facts which would entitle them to relief on this claim. *See Conley,* 355 U.S. at 45-46.

> FN8. The parties to this action have previously agreed that the Agreements are governed by Delaware law. *See* D.I. 10, Exs. A-C, § 17 ("This Subscription Agreement is governed by the laws of the State of Delaware as applied to the residents of that jurisdiction executing contracts wholly to be performed therein.").

### B. Breach of Duty of Good Faith and Fair Dealing

Plaintiffs allege defendant breached its duty of good faith and fair dealing owed to plaintiffs regarding

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 908996 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

their "registration rights"-a duty violated when defendant failed to "timely" register plaintiffs' stock. (D.I.1) Defendant charges plaintiffs' claim is based solely on their reliance upon the alleged oral representations regarding registration. Defendant argues that this claim is also barred under the parol evidence rule because the parties did not include the alleged representation in the fully integrated Agreements. (D.I.7)

At first glance, plaintiffs' claim appears insufficient because it is yet unclear what duty was owed that defendant did not fulfill. Plaintiffs allege the registration was "untimely." However, to the extent the registration was "untimely," the record is insufficiently developed to allow the court to determine whether the Agreements were indeed fully integrated, whether a more specific time component controlled registration and, if so, what additional duty was owed to plaintiffs by defendant.

Thus, it is premature to say plaintiffs can prove no set of facts which will entitle them to relief on this claim.

### C. Fraud in the Inducement

Plaintiffs claim defendant committed fraud by orally representing it would register the stock underlying the convertible notes "as soon as practical, but in any event, not later than the next registration statement" filed. (D.I.1) These r epresentations thereby induced plaintiffs to enter into the transaction (i.e., plaintiffs agreed to purchase the convertible notes) which they allegedly would not have done absent the oral representation. (*Id.*) In addition, plaintiffs allege that in furtherance of defendant's "fraudulent scheme," defendant insisted upon unspecific language in the Agreements regarding registration in an attempt to "deprive the plaintiffs of the benefit of their clear agreement." (*Id.*)

Defendant seeks to have plaintiffs' claim dismissed pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted. In addition, defendant asserts plaintiffs have failed to plead fraud with adequate specificity pursuant to Rule

9(b) of the Federal Rules of Civil Procedure. (D.I.7) In response, plaintiffs argue the claims have been well-pleaded, but that in the event that the court disagrees, they ask for leave to amend their claims.

### 1. Rule 9(b)

*4 Allegations of fraud must be pled with particularity to allow a defendant adequate opportunity to defend the plaintiff's allegations. Fed.R.Civ.P. 9(b). The Court of Appeals for the Third Circuit has specifically noted that the particularity requirement has been rigorously applied in securities fraud cases. *Burlington Coat Factory,* 114 F.3d at 1417. Satisfactory pleading under Rule 9(b) is often evidenced by a complaint which pleads the alleged fraud with "precise allegations of date, time, or place." *Naporano Iron & Metal Co. v. American Crane Corp.,* 79 F.Supp.2d 494 (D.N.J.1999) (citing *Craftmatic Sec. Litig. v. Kraftsow,* 890 F.2d 628, 645 (3d Cir.1989) ). However, this standard is a ceiling rather than a floor. The requirement may also be satisfied by pleading which uses " 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Rolo v. City Investing Co. Liquidating Trust,* 155 F.3d 644, 658 (3d Cir.1998) (citing *Seville Indus. Machinery v. Southmost Machinery,* 742 F.2d 786, 791 (3d Cir.1984)). It is with these parameters in mind that plaintiffs' claim is reviewed.

Plaintiffs have alleged that oral representations were made that induced them to enter into the aforementioned transactions. Further, plaintiffs have specifically pled what financial impact the alleged fraud had.[FN9] Defendant argues plaintiffs cannot reasonably rely upon the alleged representations due to the written language of the Agreements.

> FN9. Plaintiffs claim they suffered approximately $20 million in damages. (D.I.1)

The current language of the Agreements (e.g., " [t]he company agrees to use reasonable commercial efforts to register the Common Stock under the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 5

Not Reported in F.Supp.2d, 2001 WL 908996 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Securities Act at some future date.") (D.I.7, Ex. A) is not necessarily contradicted by or in conflict with the language presented by plaintiffs. In an agreement which is not fully integrated, plaintiffs' interpretation may help to explain what is meant by "some future date." Until the record is sufficiently developed to allow the court to determine whether the parties had fully integrated Agreements, it is premature to dismiss this claim pursuant to Rule 12(b)(6) alone. As defendant notes, however, plaintiffs' have neglected to plead with "precision" or "particularity" approximately when, by whom, and to whom the alleged representations were made which allowed the alleged fraud to take place. Under Rule 9(b), this information or a reasonable facsimile is necessary to give defendant notice of the claims against it. *Burlington Coat Factory*, at 1418. Therefore, plaintiffs' current pleading of fraud is insufficient to satisfy the standards of Rule 9(b).

### 2. Leave to Amend-Rule 15(a)

In pertinent part, Rule 15 states that "leave [to amend] shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). The Third Circuit has recognized the importance of allowing claimants to amend their complaints after a Rule 9(b) dismissal. " [B]ecause we are hesitant to preclude the prosecution of a possibly meritorious claim because of defects in the pleadings, we believe that plaintiffs should be afforded an additional opportunity ... to conform the pleadings to Rule 9(b)." *Burlington Coat Factory*, at 1435 (citing *Ross v. A.H. Robbins Co.*, 607 F.2d 545, 547 (2d Cir.1979).[FN10] Thus, in the event of a Rule 9(b) dismissal, it is customary for claimants to obtain a second opportunity to correct any deficiencies in their complaint. See *Saporito v. Comubstion Engineering, Inc.*, 843 F.2d 666, 675 (3d Cir.1988) (emphasizing that claimants should have an opportunity to amend a complaint to add greater specificity following the award of a motion to dismiss). *Cf. Rolo v. City Investing Co. Liquicating Trust*, 155 F.3d 644 (3d Cir.1998) (denying leave to amend where even the first amended complaint was lacking the requisite particularity).

FN10. In *Burlington Coat Factory*, the Third Circuit awarded leave to amend even though the original complaint had already been amended once and there had been approximately four months between the original filing of the complaint and amendment. 114 F.3d at 1435. The court specifically noted that where leave to amend is denied by the district court solely on Rule 9 particularity grounds, reversal is necessary. Id.

*5 Therefore, although the court has found the aforementioned claim lacking in the requisite particularity of Rule 9, it finds that plaintiffs should have an opportunity to formally move to amend their complaint, to include an amended fraud claim that endeavors to meet the Rule 9 pleading requirements.

### D. Section 10(b) and Rule 10(b)-5

Plaintiffs allege defendant knowingly violated § 10(b) of the Securities and Exchange Act and Rule 10(b)-5. Specifically, plaintiffs allege defendant knowingly and/or recklessly (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the plaintiffs. (D.I. 1 at 7) In addition, plaintiffs allege defendant acted with scienter in that it acted with knowledge of the misrepresentations and omissions of material fact or acted with reckless disregard for the truth. Finally, plaintiffs allege that by falsely representing that it would register the shares, defendant induced plaintiffs to refrain from bringing suit to compel registration. (*Id.*)

Defendant contends plaintiffs' federal securities claims should be dismissed because they fail to meet the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA" ). Citing to 15 U.S.C. § 78u-4(b)(1) and (2) respectively, defendant claims plaintiffs are required to specify each allegedly false statement and "state with particularity facts giving rise to a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 6

Not Reported in F.Supp.2d, 2001 WL 908996 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). In particular, defendant argues that with respect to plaintiffs' Rule 10(b)-5 claims, plaintiffs have failed to plead "the who, what, when, where and how" of the alleged fraud, in addition to facts supporting "a strong inference of" scienter. (D.I.7)

Section 10(b) prohibits the "use or employ, in connection with the purchase or sale of any security . .. [of] any manipulative or deceptive device or contrivance in contravention of such rules as the Commission may prescribe...." *Semerenko v. Cendant Corp.,* 223 F.3d 165, 174 (3d Cir.2000) (quoting 15 U.S.C. § 78j(b)). Rule 10(b)-5 is violated when any person makes "any untrue statement of a material fact or [omits] a material fact necessary to make the statements made in the light of the circumstances under which they were made, not misleading ... in connection with the purchase or sale of any security." *Semerenko,* 223 F.3d at 174 (quoting 17 C.F.R. § 240.10b-5(b)). In addition, the PSLRA, 15 U.S.C. § 78u-4(b)(1) states:

In any private action arising under this chapter in which the plaintiff alleges that the defendant-(A) made an untrue statement of material fact; or (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

**\*6** 15 U.S.C. § 78u-4(b)(1). Further, § 78u-4(b)(2) reads in pertinent part, "[i]n any private action arising under this chapter ... the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).[FN11]

FN11. Failure to satisfy the requirements

of §§ 78u-4(b)(1) & (2) results in the dismissal of the complaint. 15 U.S.C. § 78u-4(b)(3)( A); *In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 531 (3d Cir.1999).

To establish a valid claim under 10(b)-5, a plaintiff must demonstrate the defendant "(1) made a misstatement or an omission of a material fact (2) with scienter (3) in connection with the purchase or sale of a security (4) upon which the plaintiff reasonably relied and (5) that the plaintiff's reliance was the proximate cause of his or her injury." *Semerenko,* at 174 (citing *Weiner v. Quaker Oats Co.,* 129 F.3d 310, 315 (3d Cir.1997)).

In support of their Rule 10(b)-5 claim, plaintiffs essentially allege that defendant (1) misrepresented to plaintiffs when its stock would actually be registered, (2) had actual knowledge of the misrepresentation (or omission) or acted with reckless disregard of its truth, (3) as it related to the sale of the convertible notes, (4) upon which plaintiffs reasonably relied as demonstrated by plaintiffs' forbearance from filing an action to compel earlier registration, and (5) that as a direct and proximate result of plaintiffs' reliance, they suffered damages in excess of approximately $20 million. (D.I. 1 at ¶¶ 1-17, 27-35)

In support of their pleading of scienter, plaintiffs cite to the Third Circuit's opinion in *In re Advanta Sec. Litig.,* 180 F.3d 525 (3d Cir.1999). There, the court held "it remains sufficient for plaintiffs to plead scienter by alleging facts 'establishing a motive and an opportunity to commit fraud, or by setting forth facts that constitute circumstantial evidence of either reckless or conscious behavior." '[FN12] *Id.* at 534-35 (quoting *Weiner,* 129 F.3d at 318 n. 8).

FN12. To this end, plaintiffs contend that " motive" is demonstrated by defendant's unwillingness to "extend registration rights generally" to the purchasers of the convertible (promissory) notes. " Opportunity" is presumably demonstrated by the alleged fraudulent pre-ratification statements which induced plaintiffs to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 908996 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 7

enter into the transaction. (D.I.1)

However, in *Advanta,* the court also explained that it believed Congress' intent in enacting the PSLRA was to establish a "pleading standard approximately equal in stringency to that of the Second Circuit." [FN13] *Id.* at 534. *See also Novak v. Kasaks,* 216 F.3d 300, 310 (2d Cir.2000) (agreeing with *Advanta* in that the language of the Reform Act establishes a pleading standard equally stringent to the Second Circuit's). Thus, the court found that "[m]otive and opportunity, like all other allegations of scienter ... must now be supported by facts stated 'with particularity' and must give rise to a 'strong inference' of scienter." *Advanta,* at 535.

> FN13. The foundation of the Second Circuit standard is that "a plaintiff must plead facts supporting a 'strong inference' that the defendant acted with the requisite scienter, by alleging either 'facts establishing a motive to commit fraud and an opportunity to do so' or facts constituting circumstantial evidence of either reckless or conscious behavior." *In re Time Warner Inc. Sec. Litig.,* 9 F.3d 259, 269 (2d Cir.1993)."

Although plaintiffs briefly address each element of the alleged fraud in their pleading, few of the elements are pled with the particularity required by the PSLRA. While plaintiffs ostensibly have pled the "what" portion of the alleged fraud (i.e., defendant's motive as it relates to the sale of the convertible notes), the approximate "who, when, where and how" of the fraud are not pled with a level of particularity that would satisfy § 78u-4(b)(1). In addition, the court finds the pleading lacking in the particularity which would give rise to a "strong inference" of scienter.[FN14] 15 U.S.C. § 78u-4(b)(2). While plaintiffs have generally averred scienter, they have not provided the level of detail that *Advanta* seemingly requires.[FN15]

> FN14. In *Novak v. Kasaks,* 216 F.3d 300 (2d Cir.2000), the Second Circuit instructed that the " 'strong inference'

standard" will be met where a "complaint sufficiently alleges that the defendants: (1) benefitted in a concrete and personal way from the purported fraud ... (2) engaged in deliberately illegal behavior ... (3) knew facts or had access to information suggesting that their public statements were not accurate ... or (4) failed to check information that they had a duty to monitor. ..." Id. at 311. Thus, the court is also not entirely satisfied that plaintiffs' have established the defendant's fraud under this equally meaningful interpretation of the prevailing pleading requirements under the PSLRA.

> FN15. Thus, it is not clear to the court that the pleading set forth in D.I. 1, ¶ 33, is armed with an adequate number of specific facts that would allow the court to discern defendant's "motive and opportunity" to commit fraud. A generalized unwillingness to "extend registration rights" or "register shares" at any given time is insufficient to carry the burden set forth in *Advanta.*

*7 Indeed, plaintiffs arguably admit the deficiencies in their fraud claim as pled. In plaintiffs' reply brief, they assert that their 10(b)-5 claim is well pled, yet follow this assertion with language that "[p]laintiffs allege (or can allege) ...." the necessary specifics of the pleading. (D.I. 10 at 29-30) This language suggests that even plaintiffs recognize (or can recognize) the insufficiency of their present pleading of fraud. Therefore, pursuant to 15 U.S.C. § 78u-4(b)(3), because the pleading requirements of paragraphs (1) and (2) have not been adequately met, plaintiffs' Rule 10(b)-5 claim shall be dismissed.

E. Estoppel

Plaintiffs allege that, in order to get them to agree to the securities transaction, defendant promised to register the stock underlying the notes "as soon as practical but not later than the next registration statement." (D.I.1) Plaintiffs assert that they agreed to the underlying transaction solely in reliance on

Not Reported in F.Supp.2d                                                                              Page 8

Not Reported in F.Supp.2d, 2001 WL 908996 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

the alleged promise. Further, plaintiffs assert defendant was aware of their reliance, and the specific reasons they agreed to allow the Agreements to contain general language regarding registration. Thus, plaintiffs claim that it would be unfair and inequitable to allow defendant to "deny its representation" regarding registration, and that defendant should be estopped from doing so.

Defendant argues that plaintiffs realistically have no grounds for estoppel, because there is an enforceable agreement between the parties. Defendant cites *Fox v. Rodel, Inc.,* C.A. No. 98-531-SLR, 1999 WL 803885 (D.Del. Sept.13, 1999), among other cases, for the proposition that it "is axiomatic that a claim for promissory estoppel is applicable only in the absence of an enforceable contract." *Fox,* 1999 WL 803885, at *9. Further, defendant asserts that plaintiffs must prove they reasonably relied on the alleged promise in order to obtain promissory estoppel. Defendant argues that in light of the "integrated written agreements" between the parties which contain different terms regarding registration, plaintiffs' estoppel claim must be dismissed. Id.

Previously, plaintiffs have, at least for the sake of argument, acquiesced to the argument that there were agreements between the respective parties. (*See* D.I. 1, ¶¶ 9, 14, 17, 19-23, 25, 27-30, 32-35, 43-46) While plaintiffs have argued that the Agreements do not accurately represent the full and complete agreement between the parties, one thing is abundantly clear-agreements did exist. In light of this finding, the court will dismiss plaintiffs' estoppel claim.

### F. Reformation

Plaintiffs assert that during the drafting phase of the Agreements, attorneys for the defendant "verbally assured" plaintiffs that the "future date" language meant the stock would be registered "as soon as practical, but not later than the next registration statement which [defendant] would file." [FN16] (D.I. 1 at 9) Plaintiffs also assert that to the extent that defendant denies its obligation to register the shares pursuant to this "verbal assurance," the terms

of the Agreements are based upon a mistake which was induced by defendant's wrongful conduct. Thus, plaintiffs argue they are entitled to reformation of the contract to reflect the "clear intent and agreement" of the parties. (*Id.*)

> FN16. As alleged, the lack of specificity in the agreements was due to defendant's fear that other stock purchasers would request similar registration rights. (D.I. 1 at 9)

*8 Defendant asserts reformation of a written agreement can occur only when plaintiff can demonstrate by "clear and convincing evidence" that the written agreement does not accurately or actually reflect the understanding of the parties. *Coca-Cola Bottling Co. v. Coca-Cola Co.,* 988 F.2d 386, 404-05 (3d Cir.1993). Defendant also asserts Delaware courts have rejected such claims when they contradict an agreement executed by both parties. *See Hob Tea Room, Inc. v. Miller,* 89 A.2d 851, 857 (Del.1952); *Demetriades v. Kledaras,* 121 A.2d 293, 295-96 (Del.Ch.1956). Defendant argues that because plaintiffs failed, like the plaintiffs in *Hob Tea Room* and *Demetriades,* to obtain the specific language regarding registration during the drafting phase, they cannot now subvert the Agreements and re-write their contracts through the filing of this complaint.

In citing the *Coca-Cola* case, defendant sets forth the proper burden plaintiffs must carry in order to achieve reformation of a contract. However, this burden must be carried during the "prosecution" stage of a case, not the "pleading" stage. In light of the Rule 12(b)(6) standard, it cannot be said that plaintiffs cannot successfully plead any set of facts in support of their reformation claim.[FN17]

> FN17. In fact, plaintiffs' assertion lends itself to an inference that the language regarding registration was sufficiently ambiguous as to make the intent of the parties subject to reasonable debate. *See Shearing v. IOLAB Corp.,* 712 F.Supp. 1446, 1454-55 (1989) (finding license agreement language which purported to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 9

Not Reported in F.Supp.2d, 2001 WL 908996 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

use "best reasonable commercial efforts" to effectuate contract sufficiently ambiguous to justify the use of extrinsic evidence to prove the intent of the parties). Similarly, the language of the Agreements requiring the use of "reasonable commercial efforts" is arguably so ambiguous that the intent of parties as to the meaning of "future date," as it relates to registration of the stock, is subject to interpretation. This "uncertainty" precludes a Rule 12(b)(6) dismissal of this claim at this stage of the proceedings.

### IV. CONCLUSION

For the reasons stated, defendant's motion to dismiss is granted in part and denied in part. Defendant's motion is granted with regard to claim 4 of the complaint (the § 10(b) and Rule 10(b)-5 fraud claim) and claim 5 (the estoppel claim). Defendant's motion shall be denied with regard to claims 1, 2, 3 and 6 of the complaint. For claim 3, the fraud in the inducement claim, plaintiffs are granted the opportunity to formally move for leave to amend, pursuant to Fed.R.Civ.P. 15. Plaintiffs' motion to amend should include a copy of their proposed amended complaint. Plaintiffs shall have 30 days to file their motion and amended complaint.

An appropriate order shall issue.

D.Del.,2001.
Austost Anstalt Schaan v. Net Value Holdings, Inc.
Not Reported in F.Supp.2d, 2001 WL 908996 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:00CV00771 (Docket) (Aug. 22, 2000)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1

Not Reported in F.Supp.2d, 2001 WL 1775992 (S.D.Ill.), 82 Empl. Prac. Dec. P 40,975, 145 Lab.Cas. P 34,466, 7
Wage & Hour Cas.2d (BNA) 1054, 12 A.D. Cases 1244
**(Cite as: Not Reported in F.Supp.2d)**

▷
Carruth v. Continental General TireS.D.Ill.,2001.
United States District Court, S.D. Illinois.
Adrian E. CARRUTH, Plaintiff,
v.
CONTINENTAL GENERAL TIRE, INC.,
Defendant.
No. 98-CV-4233-JPG.

June 21, 2001.

MEMORANDUM OPINION AND ORDER
GILBERT, District J.
*1 Before this Court is a post-trial motion filed by
Defendant Continental General Tire, Inc. (Doc. 76,
77). Plaintiff Adrian Carruth ("Carruth") has
responded (Docs.78, 79), and Continental has
replied (Doc. 80). For the following reasons, this
motion is denied.

I. BACKGROUND

This case involved allegations that Continental,
Carruth's former employer, violated the Americans
with Disabilities Act ("ADA") and the Family and
Medical Leave Act ("FMLA") when it took adverse
employment actions against Carruth because he had
diabetes mellitus and because he asserted his rights
under the FMLA. As to Carruth's ADA claim, a jury
found that Carruth, who suffers from diabetes
mellitus, was substantially limited in a major life
activity and awarded him $175,000 in damages
along with an additional $250,000 in punitive
damages. As to Carruth's FMLA claim, a jury found
that Continental retaliated against Carruth for
exercising his rights under the FMLA and awarded
Carruth $75,000 in damages.

Continental, unhappy with the adverse jury verdict,
moved to reduce all damage awards. Continental
urged arguments similar to the ones currently before

this Court. Without going into the reasoning, it is
enough here to say that this Court capped Carruth's
total recovery on his ADA claim to $300,000
pursuant to 42 U.S.C. § 1981a (Doc. 70, at p. 12),
reduced the jury award's of $75,000 for
compensatory damages to $50,195.27 (Doc 70, at
pp. 12-13; Doc. 73, at pp.2-3), and determined the
proper amount of prejudgment interest and FMLA
liquidated damages.

II. DISCUSSION

Continental has now fired another round of
post-trial motions. Continental now seeks judgment
notwithstanding the verdict as to both claims, a new
trial based on various trial errors, and for additional
remittur of the amount of verdict and judgment.
This Court will address each request in turn.

A. Motion For Judgment As A Matter Of Law

Continental moves for judgment notwithstanding
the verdict on both claims. Continental's motion "
can be granted only when reasonable people,
viewing the facts most favorably to the plaintiff and
disregarding conflicting unfavorable testimony,
could not conclude that the plaintiff has made out a
prima facie case." Thomas v. Stalter, 20 F.3d 298,
301 (7th Cir.1994) (quotations and internal
quotation marks omitted).

1. ADA claim

Continental argues that there was no evidence upon
which a reasonable jury could have found Carruth
substantially limited in a major life activity (Doc.
76, ¶ 2). Specifically, Continental maintains that a
reasonable jury could never have viewed Carruth as
substantially limited in working, arguing that (1)
because Carruth's blood sugar flare-ups were largely

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                   Page 2

Not Reported in F.Supp.2d, 2001 WL 1775992 (S.D.Ill.), 82 Empl. Prac. Dec. P 40,975, 145 Lab.Cas. P 34,466, 7
Wage & Hour Cas.2d (BNA) 1054, 12 A.D. Cases 1244
(Cite as: Not Reported in F.Supp.2d)

controlled through corrective measures, he cannot be considered disabled; and, alternatively, (2) because Carruth's blood sugar flare-ups were so infrequent and had such a minimal adverse impact on his ability to show up to work, the flare-ups could not have "substantially limited" his ability to work generally.

**\*2** First, Continental argues that Carruth cannot be disabled under the ADA because, after taking into account mitigating measures, his diabetic condition is largely controllable. In support, Carruth relies on *Sutton v. United Airlines, Inc.*, 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). There, severely myopic job applicants brought an ADA discrimination action against an airline, challenging the airline's minimum-vision requirement for the position of global pilot. The applicants argued that, without glasses, they could hardly see. They urged the Court to access their visual impairments without reference to any correcting measures they could have employed, even measures that could, with ease, fully correct their impairments forever (*e.g.*, wearing glasses).

The Court rejected that argument, concluding that " [a] 'disability' exists only where an impairment ' substantially limits' a major life activity, not where it 'might,' 'could,' or 'would' be substantially limiting if mitigating measures were not taken." *Id* . at 482. The Court was satisfied that the applicants' myopic vision was not a "disability" under the ADA, inasmuch as the applicants themselves admitted that wearing glasses would *fully* correct their visual impairment forever. *See id.* at 488. *See also id.* at 482-83 (noting three times that an individual is not disabled if his impairment "*is* corrected").

Noteworthy was the Court's avoidance of the issue of whether individuals, who are unable to always fully control their impairment despite taking the prescribed correcting measures, could still be disabled. The Court did note that "one has a disability ... if, *notwithstanding the use of a corrective device*, that individual is substantially limited in a major life activity." *Sutton*, 527 U.S. at 488 (emphasis added). Illustrating this principle, the

Court stated that "individuals *who take medicine* to lessen the symptoms of an impairment so that they can function *but nevertheless remain substantially limited* " are disabled. *Id.* (emphasis added). Therefore, an individual can apparently be "disabled " due to impairments and limitations that persist despite that individual's use of all of the prescribed mitigating measures. *See Murphy v. United Parcel Service, Inc.,* 527 U.S. 516, 521, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999) ("Because the question whether petitioner is disabled when taking medications is not before us, we have no occasion here to consider whether petitioner is 'disabled' due to limitations that persist despite his medication ....").

The Seventh Circuit's recent case of *Lawson v. CSX Transp., Inc. .*, 245 F.3d 916 (7th Cir.2001), supports this conclusion. There, insulin-dependent diabetic John Lawson applied for a train conductor job with CSX, was turned down, and sued CSX for discriminating against him because he had diabetes. Lawson had been diabetic since birth. To manage his disease, Lawson had to "monitor carefully blood sugar levels and minimize fluctuations in his blood sugar." *Id.* at 918. Lawson's monitoring required " ' continued vigilance' and strict adherence to 'a perpetual multifaceted and demanding treatment regime" ' *Id.* In addition to injecting himself with insulin, Lawson had to "follow a diet plan, exercise daily, and test his blood sugar several times a day." *Id.* Throughout his life "Lawson has had great difficulty regulating his blood sugar levels" which has lead to flare-ups during which he experiences " ' wildly fluctuating glucose levels with hyperglycemia " ' and, at times, severe hypoglycemic reactions. *Id.*

**\*3** Lawson wanted to be a train conductor. So he applied to a train conductor trainee program that was offered by CSX through his local community college. *See id.* at 920. After being cleared by his doctor to work despite his diabetes, Lawson began the five-week training and completed it with good grades. Afterward, Lawson interviewed with CSX, informing the interviewers that he had diabetes, that his diabetes substantially prevented him from working for a number of years, and that he had been educating his classmates about the symptoms and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 3

Not Reported in F.Supp.2d, 2001 WL 1775992 (S.D.Ill.), 82 Empl. Prac. Dec. P 40,975, 145 Lab.Cas. P 34,466, 7
Wage & Hour Cas.2d (BNA) 1054, 12 A.D. Cases 1244
**(Cite as: Not Reported in F.Supp.2d)**

treatment of hypoglycemia. CSX denied Lawson a job, and there was evidence that CSX's reason for doing so was phony. After Lawson filed suit against CSX for disability discrimination, CSX reconsidered its earlier decision and hired him.

The district court held that Lawson was not substantially limited in his ability to work or eat for purposes of ADA as result of his treated diabetes. First, the court decided that the evidence Lawson produced that he was substantially limited in working (*i.e.*, Lawson's testimony that he had been unable to work for years) was not credible.[FN1] The court also noted that, since he was rehired, Lawson had been able to work just fine. Second, after noting that Lawson had a fairly extensive dietary treatment regimen, the court held that an individual could only be substantially limited in eating if his "actual physical ability to ingest food is restricted ." *Id.* at 924. Finding no physical food barrier preventing Lawson from ingesting, the court found that Lawson's extensive dietary treatment regimen (and the consequences of failing to follow it) was not a substantial limitation on his ability to eat when he was compared with the rest of the population.

> FN1. Normally, judges do not make credibility determinations or weigh evidence on summary judgment motions.

The Seventh Circuit reversed the district court, finding evidence that Lawson was substantially limited in eating.[FN2] The court noted that *Sutton* required courts determining whether a claimed disability is substantially limiting to "examine the plaintiff's condition as it exists after corrective or mitigating measures used to combat the impairment are taken into account." *Id.* Thus, with respect to Lawson, the court found that it had to consider the beneficial effect that Mr. Lawson's diabetes medication had in controlling his condition when determining whether he was substantially limited in his ability to eat. *See id.* Citing evidence that Lawson's restrictions were actually severe, the court distinguished his eating restrictions from other eating restrictions that courts failed to find substantially limiting (*e.g.*, not being able to eat

peanuts). The court noted that, after experiencing a blood sugar drop, Lawson had to stop everything and desperately search out the right types of foods that could bring his blood-sugar levels back to normal so that he did not become dizzy, weak, incoherent, or otherwise incapacitated. *See id.* at 924-25. The court also cited evidence that "*even when taking insulin, Mr. Lawson's 'ability to regulate his blood sugar* and metabolize food *is difficult, erratic, and substantially limiting.*' ' *Id.* at 924 (emphasis added). Ultimately, the court held that "a jury could find that the prescribed treatment Mr. Lawson must take to survive with diabetes causes symptoms that substantially limit the major life activity of eating." *Id.* at 926.

> FN2. The Seventh Circuit did not address whether Lawson was *actually* substantially limited in working. Carruth never submitted a jury instruction that listed eating as a major life function.

*4 The court made one more observation worth noting. It distinguished *Sutton* noting that, unlike the mitigating measures diabetics normally take, the mitigating measures in *Sutton* could easily, fully, and indefinitely correct the impairment at issue:
The wearing of corrective lenses to neutralize the effects of myopia, at issue in *Sutton,* 527 U.S. at 475, involves none of the coordination of multifaceted factors or the constant vigilance that, according to this record, Mr. Lawson must demonstrate on a daily basis.

*Id.* at 925-26. *See also Haschmann v. Time Warner Entertainment Co.,* 151 F.3d 591, 599-600 (7th Cir.1998) (noting that the impairing effects of lupus, which "lie dormant and flare from time to time," could support an inference that she was disabled after the first lupus flare). In making these statements, the court distinguished the type of mitigating measures available to diabetics as opposed to the ones available to the severely-myopic plaintiffs in *Sutton* and reiterated a court's obligation to undertake "an individualized inquiry based on the particular circumstances of each case" to determine whether the actual limiting

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 4

Not Reported in F.Supp.2d, 2001 WL 1775992 (S.D.Ill.), 82 Empl. Prac. Dec. P 40,975, 145 Lab.Cas. P 34,466, 7 Wage & Hour Cas.2d (BNA) 1054, 12 A.D. Cases 1244
**(Cite as: Not Reported in F.Supp.2d)**

effects could reach the level of "substantial." *Id.* at 926.

In this case, while Carruth's diabetic condition is largely controlled by corrective measures, Carruth still suffered blood sugar flare-ups despite taking all of the prescribed mitigating measures (*e.g.,* monitoring diet, exercise, etc.). To start, two things are clear. The first is that Carruth is not substantially limited from working simply because he has diabetes. *See Sutton,* 527 U.S. at 482 (noting that diabetics have to show how they were substantially limited in a major life activity after taking the prescribed mitigating measures). The second is that Carruth is not *in* substantially limited in working simply because the underlying impairment causing his limitation is diabetes. *See Lawson,* 245 F.3d at 926 (rejecting the belief that *Sutton* stands for the proposition "that no diabetic can ever be considered disabled under the ADA's meaning").[FN3] Instead, this Court must assess whether the actual (as opposed to hypothetical) limiting effects of Carruth's condition still " substantially limited" his ability to work generally after taking into account the mitigating measures. [FN4] Here, Carruth had a number of diabetic flare-ups despite taking the prescribed mitigating measures. Therefore, this Court must determine whether a jury was entitled to find that the cumulative effects of the limiting effects Carruth faced after taking the prescribed mitigating measures "substantially limited" his ability to work generally.

FN3. It would be strange if courts started treating the Supreme Court's diabetic dicta as a bases for treating diabetic impairments more unfavorably than other impairments. Indeed, this illness-classification approach is the exact approach that the Supreme Court rejected when it used its diabetic example. The Supreme Court's command was clear: look at the evidence of the actual limitations that the impairment causes; do not focus on the impairment's name.

FN4. The Supreme Court's did not declare diabetes to be a *per se* non-disability in *Sutton.* Rather, it intimated that diabetics who choose not to monitor their blood sugar cannot complain about subsequent blood sugar bouts caused by that failure. *See Sutton,* 527 U.S. at 483. Indeed, a "*per se* non-disability" reading of this dicta in *Sutton* would fly in the face of the Court's own repeated admonitions that courts must undertake an individualized disability inquiry. *See Albertson's, Inc. v. Kirkingburg,* 527 U.S. 555, 566, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999) (noting that "the Court of Appeals did not pay much heed to the statutory obligation to determine the existence of disabilities on a case-by-case basis"). The Court had little sympathy for diabetics "if they failed to monitor their blood sugar levels ...." *Sutton,* 527 U.S. at 483. *Sutton's* "if they failed to monitor" language was geared more to the diabetics that failed to monitor their conditions at all, not the ones who did monitor it but whose monitoring turned out to be not alway successful. *See id.* at 488 (noting that "one has a disability ... if notwithstanding *the use* of a corrective device, that individual is substantially limited in a major life activity").

Having rejected Continental's argument that diabetes is a *per se* non-disability because it can be controlled most of the time, this Court must consider Continental's second argument that Carruth failed to present sufficient evidence at trial for a jury to find that his diabetic condition could have " substantially limited" his ability to work generally. Continental notes that Carruth worked, at the very least, from November 20, 1995, to May 20, 1996, in his diabetic condition (six months). Continental argues that, at best, Carruth's evidence demonstrated that the two blood sugar bouts caused him to be unable to work seven days during the entire six-month period after which doctors diagnosed him with diabetes.[FN5] Though any missed work day admittedly limits an individual's ability to work every day of the year, Continental

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                           Page 5

Not Reported in F.Supp.2d, 2001 WL 1775992 (S.D.Ill.), 82 Empl. Prac. Dec. P 40,975, 145 Lab.Cas. P 34,466, 7
Wage & Hour Cas.2d (BNA) 1054, 12 A.D. Cases 1244
**(Cite as: Not Reported in F.Supp.2d)**

argues any limitation Carruth experienced on his ability to work generally was not substantial. *See Davidson v. Midelfort Clinic, Ltd.,* 133 F.3d 499, 506 (7th Cir.1998) (noting that "not every impairment that affects a major life activity will be considered disabling; only if the resulting limitation is significant will it meet the ADA's test"). Specifically, Continental argues that, inasmuch as Carruth's blood sugar bouts occurred infrequently (twice) over a long period of time (six months) and were not of long duration (averaging three and a half days per bout), the cumulative effect of Carruth's *actual* limitation (an inability to work seven days in a six-month period) did not "substantially limit" his ability to work generally when compared to the rest of the population.

FN5. Continental is referring to two of Carruth's blood sugar bout absences. The first lasted from February 13, 1996, to February 16, 1996 (4 days), and the second lasted from April 22, 1996, to April 23, 1996 (2 days). However, at trial, Carruth presented to the jury plaintiff's exhibit 33 indicating that he was prevented from working until April 24, 1996. This Court will use the seven-day figure, a figure more favorable to Carruth, but this Court notes that it would reach the same conclusion even if the six-day figure was employed.

*5 Carruth responds, arguing that evidence of these two blood sugar bouts was, contrary to Continental's assertions, not the only evidence before the jury as to his actual limitations. In particular, Carruth points to plaintiff's exhibit 33, which is some evidence that Carruth was totally disabled from working from November 28, 1995, through December 11, 1995. This changes things a bit. Instead of being unable to work for seven days, as Continental suggests, Carruth has presented some basis for a jury determination that Carruth was unable to work for 14 additional days (November 28, 1995, through December 11, 1995) in addition to the seven days argued by Continental.FN6 The issue, then, is quite simple: Was a jury allowed to draw the inference that an inability to work (*i.e.,* to

work at all) for 21 days out of a six-month period could constitute a "substantial limitation" on an individual's ability to work generally when compared with the population?

FN6. Carruth's other evidence of being unable to work does not appear to have any relation to his diabetic condition. Carruth went "home early" after his October 9, 1995, report of dizziness. Whether the jury had a basis to conclude this one day where Carruth went home early was because of diabetes will not matter in this Court's determination. Also, the fact that Continental fired Carruth (as it turned out improperly) does not alter the limiting effects that Carruth's diabetic flare-ups caused, namely, Carruth's inability to be able to show up for work those additional 14 days.

A survey of the applicable case law is necessary to adequately address this issue. *Vande Zande v. State of Wis. Dept. of Admin.,* 44 F.3d 538 (7th Cir.1995), sets the stage. There, paraplegic Lori Vande Zande sued her employer, the State of Wisconsin, for disability discrimination. As a result of a spinal cord tumor, Vande Zande was paralyzed from the waist down. Wisconsin accommodated her walking difficulty in numerous ways (*e.g.,* restructuring some facilities in her building, buying special adjustable furniture for her, contributing money toward daily personal care items she needed, and allowing her to rearranging her schedule around medical appointments). Vande Zande's paralysis also made her prone to develop pressure ulcers, the treatment of which often required her to stay at home for several weeks to recover. The ulcer incident at issue required that she stay at home for eight weeks straight. The question was not whether Vande Zande was "disabled" because of her ulcers, inasmuch as her paralysis already caused her to be substantially limited in walking and, thus, "disabled." *See id.* at 541. Rather, the question was whether Wisconsin had a duty to reasonably accommodate those ulcers. Wisconsin argued it had no such duty, because the ulcers themselves did not independently

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 6

Not Reported in F.Supp.2d, 2001 WL 1775992 (S.D.Ill.), 82 Empl. Prac. Dec. P 40,975, 145 Lab.Cas. P 34,466, 7
Wage & Hour Cas.2d (BNA) 1054, 12 A.D. Cases 1244
(Cite as: Not Reported in F.Supp.2d)

meet the statutory definition of "disability" as distinguished from Vande Zande's paralysis which clearly did.

The Seventh Circuit rejected Wisconsin's argument. The Seventh Circuit first noted that employees suffering intermittent, episodic impairments (e.g., a broken leg) would not be "disabled." See id. at 544. However, the court noted, Vande Zande already met the statutory definition of being disabled, because she was "substantially limited" in her ability to walk. The question, as the court framed it, was whether Wisconsin had a duty to reasonably accommodate Vande Zande's ulcers. The court held that Wisconsin had such a duty, reasoning that "an intermittent impairment that is a characteristic manifestation of an admitted disability is, we believe, a part of the underlying disability and hence a condition that the employer must reasonably accommodate." Id. at 544. The court went on to find for Wisconsin because the accommodation Vande Zande sought (i.e., installing a home computer for her so she could avoid wasting some of her sick days) was simply unreasonable. [FN7]

> FN7. In a later decision, the court stressed that Vande Zande was never arguing that her intermittent flare-ups met the statutory definition of a "disability." See Moore v. J.B. Hunt Transport, Inc., 221 F.3d 944 (7th Cir.2000).

*6 The Vande Zande court made one further observation worth noting. First, it closed the door on disabilities like one-time broken legs (i.e., temporary, episodic impairments not caused by chronic conditions). However, Vande Zande left unanswered the question of whether recurring, episodic impairments caused by underlying, chronic conditions caused so significant an adverse impact on the afflicted individual's inability to show up to work that such a limitation on that individual's ability to work might render that individual " substantially limited" in working generally. The court admitted that AIDS (i.e., a chronic condition that destroyed the immune system) would not

intuitively meet the statutory definition of "disability "-presumably because people can work fine without an immune system-unless courts looked at the cumulative effects that having such a disease had on that afflicted individual's ability to work generally ( i.e., the destruction of afflicted individual's immune system allowed a whole host of common, opportunistic diseases to invade that individual who could no longer effectively fight them off because he had no immune system). That set up a distinction between non-recurring impairments caused by one-time injuries (e.g., broken legs) as opposed to recurring, episodic, impairing manifestations of chronic, underlying conditions from which an individuals suffer.

In E.E.O.C. v. Sears, Roebuck & Co., 233 F.3d 432 (7th Cir.2000), the Seventh Circuit concluded that the episodic and intermittent nature of manifestations chronic condition (e.g., diabetes) did not bar an impaired individual's ADA claim. See id. at 440 n. 4. There, Judith Keane's diabetes and neuropathy resulted in a numbness in her right leg after she had to walk long distances. Keane was fine if she stayed in her work area, because only short walks were needed there. But Keane could not tolerate the longer walks (e.g., from parking lot or to the cafeteria). Keane wanted permission to park in the handicapped parking spots closer to the building and to use a short cut to the cafeteria. Sears permitted her to park in the handicapped spots but did not let her use the cafeteria short cut. Keane was therefore forced to take the long way to eat lunch. The district court granted summary judgment in Sears' favor, and Keane appealed.

The Seventh Circuit reversed the district court, finding sufficient evidence whether Keane's condition "substantially limited" her ability to walk when compared with the general population. Sears had argued that the flare-ups occurred the farther she was forced to walk and, thus, could be considered "episodic." Because her flare-ups could be considered "episodic," Sears relied on Vande Zande, 44 F.3d at 544, which held that " [i]ntermittent, episodic impairments are not disabilities...." The Sears court rejected that argument, noting that Vande Zande was making that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 7

Not Reported in F.Supp.2d, 2001 WL 1775992 (S.D.Ill.), 82 Empl. Prac. Dec. P 40,975, 145 Lab.Cas. P 34,466, 7
Wage & Hour Cas.2d (BNA) 1054, 12 A.D. Cases 1244
**(Cite as: Not Reported in F.Supp.2d)**

statement with respect to a temporary, episodic impairment caused by a one-time injury (*e.g.*, a broken leg) as opposed to recurring, episodic, impairing manifestations of or flare-ups caused by some chronic, underlying chronic condition (*e.g.*, Keane's numb-leg impairment caused by her neuropathy). Accordingly, the *Sears* court held that the episodic and intermittent nature of the manifestations of Keane's diabetic/neuropathic condition was "not dispositive in the disability inquiry." *Sears*, 233 F.3d at 440 n. 4.

*7 Summing up thus far, *Vande Zande* determined that an individual suffering one episodic impairment caused by a temporary injury (*e.g.*, a broken leg) was not disabled. *Sears* concluded that episodic, impairing manifestations of or flare-ups (*i.e.*, a numb leg) caused by an underlying, chronic condition (*i.e.*, diabetes/neuropathy) should be treated differently. *Sears* noted that employees suffering from such impairments *could*, under certain circumstances, be disabled. *Sears* left unclear the answer to one question: When do episodic, impairing manifestations or flare-ups (*e.g.*, diabetic flare ups) caused by an underlying chronic condition (*e.g.*, diabetes) recur so infrequently that the cumulative limiting effect of those manifestations or flare-ups cannot objectively reach the level of "substantially limiting" an individual's ability to work generally when compared with the general population?

*Moore v. J.B. Hunt Transport, Inc.*, 221 F.3d 944 (7th Cir.2000), a case that was decided after the jury trial in this case, shed some light on the answer. There, arthritis-stricken Gregory Moore sued his employer for disability discrimination. Aside from difficulties Moore had with his rheumatoid arthritis when he was forced to work in excessively cold, wet, and damp environments, Moore claimed that he had occasional temporarily-incapacitating flare-ups (*i.e.*, one or two per year) caused by rapid barometric pressure changes, during which his joints would swell and he would be unable to move for one or two days per flare. *See id.* at 948. Moore argued that "his 'flare-ups' caused him to be completely debilitated while they last and that, therefore, the flare-ups render his condition a

disability." *Id.* Moore relied on *Vande Zande* for the proposition that "an intermittent impairment that is a characteristic manifestation of an admitted disability is ... a part of the underlying disability and hence a condition that the employer must reasonably accommodate." *Id.* at 952 (quoting *Vande Zande* ).

The Seventh Circuit rejected Moore's argument. The court started by distinguishing the *Vande Zande* case:
We believe Mr. Moore misapprehends the holding of *Vande Zande*. In that case, the plaintiff was paralyzed from the waist down, and her paralysis made her prone to develop pressure ulcers. The question in that case was not whether Vande Zande was disabled, but whether her employer had a duty to reasonably accommodate her when she developed these ulcers. In that situation, we stated that "an intermittent impairment that is a characteristic manifestation of an admitted disability is, we believe, a part of the underlying disability and hence a condition that the employer must reasonably accommodate." *Id.* at 544. Mr. Moore does not seek accommodation for an intermittent impairment resulting from an "admitted disability"; instead, he attempts to use his intermittent flare-ups to establish that his impairment is a disability. *Vande Zande*, therefore, is not controlling.

*8 *Moore*, 221 F.3d at 952. Ultimately, the Seventh Circuit did "not believe that Mr. Moore's infrequent flare-ups, one or two per year, render his condition a disability." *Id. See Haschmann v. Time Warner Entertainment Co.*, 151 F.3d 591, 594 (7th Cir.1998) (affirming a jury verdict in favor an ADA plaintiff who had two flares of her lupus, one of which however lasted around 26 days and the other lasted nine days, noting that lupus "has periods of inactivity and periods of flare").

Other courts apply similar reasoning to find that an individual's inability to show up to work occasionally-while certainly limiting that individual's ability to work-does not limit it *substantially* if the absences are infrequent and short. For example, in *E.E.O.C. v. Sara Lee Corp.*,

Not Reported in F.Supp.2d                                                                                    Page 8

Not Reported in F.Supp.2d, 2001 WL 1775992 (S.D.Ill.), 82 Empl. Prac. Dec. P 40,975, 145 Lab.Cas. P 34,466, 7
Wage & Hour Cas.2d (BNA) 1054, 12 A.D. Cases 1244
**(Cite as: Not Reported in F.Supp.2d)**

237 F.3d 349, 352 (4th Cir.2001), the Fourth Circuit held that an epileptic who suffered a seizure once every year, the duration of which was a couple minutes, was not substantially limited from working generally. In *Todd v. Academy Corp.,* 57 F.Supp.2d 448 (S.D.Tex.1999), a district court held that an epileptic who suffered eight 15-second-long seizures over a five-month period was not substantially limited from working generally. In *Moreno v. American Ingredients Company,* 2000 WL 527808 (D.Kan. April 7, 2000), a district court held that a epileptic who suffered a seizure once every month and a half, the impairing duration of which lasted several hours, was not substantially limited in working generally. And, in *Perkins v. St. Louis County Water Co.,* 160 F.3d 446 (8th Cir.1998), the Eighth Circuit held that an individual who experienced two vertigo/vomiting episodes as a result of his Meniere's disease [FN8] which resulted in a total of two weeks and three days of absences over a period of three years was not substantially limited in working generally. These cases demonstrate that, while some impairments may adversely *affect* an individual's ability to show up to work every day of the year, impairments generally do not *significantly* limit that individual's ability to show up for work if the impairments are infrequent and short. *Cf. Davidson,* 133 F.3d at 506 (noting that "not every impairment that affects a major life activity will be considered disabling; only if the resulting limitation is significant will it meet the ADA's test").

FN8. Meniere's disease is a disease of the inner ear characterized by deafness, vertigo, and tinnitus (*i.e.,* a ringing, roaring, or hissing sound in one or both ears). *Stedman's Medical Dictionary,* 518 (27th ed.2000).

Read together, *Vande Zande, Sears* and *Moore,* impart three guiding principles to courts faced with individuals who suffer episodic impairments that (1) are temporary and (2) do not stem from an already-admitted disability (*e.g.,* like Vande Zande's pressure ulcers that stemmed from her paralysis, which was an admitted disability). First, a temporary, episodic impairment that is singular (*i.e.,* does not recur because of some underlying condition) is not a "disability" (*e.g.,* a broken leg). [FN9] Second, a temporary, episodic impairment that recurs periodically as a result of some underlying, chronic condition from which the individual suffers (*i.e.,* a manifestation of or a flare-up caused by the underlying condition) *may* constitute a disability if, after considering taking into account the prescribed mitigating measures, the cumulative impact of the flare-ups still *substantially* limits that individual's ability to work generally. Third, at some point, temporary, episodic flare-ups caused by underlying, chronic conditions-even totally incapacitating flare-ups-may recur so infrequently over a long period of time (*e.g.,* one or two times a year) and have so minimal an adverse impact on that individual's ability to show up to work (*e.g.,* being unable to work two to four days per year) that the cumulative adverse impact of those flare-ups cannot objectively be said to "substantially limit" that individual's ability to work generally. *Moore,* 221 F.3d at 952.[FN10]

FN9. *See Plant v. Morton Intern., Inc.,* 212 F.3d 929, 938 (6th Cir.2000) (holding that temporary physical conditions do not generally constitute substantial impairments and the mere possibility of recurrence is not sufficient to establish substantial impairment).

FN10. This Court notes that impairments causing no *significantly* greater absenteeism in the general population would not objectively substantially limit that individual's ability to work generally when that individual is compared with the rest of the population. *See Ryan v. Grae & Rybicki,* 1996 WL 680256, *4 (E.D.N.Y. Nov.13, 1996) ("To the extent that [plaintiff] must stay near a bathroom when her condition becomes aggravated, she is not unlike many others who suffer from periodic diarrhea or other stomach problems, yet are fully capable of tending to their everyday life requirements, even

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                        Page 9

Not Reported in F.Supp.2d, 2001 WL 1775992 (S.D.Ill.), 82 Empl. Prac. Dec. P 40,975, 145 Lab.Cas. P 34,466, 7
Wage & Hour Cas.2d (BNA) 1054, 12 A.D. Cases 1244
**(Cite as: Not Reported in F.Supp.2d)**

during spells of discomfort."), *aff'd,* 135 F.3d 867 (2nd Cir.1998).

*\*9* Here, this Court ordered the parties to cite to the evidence that was before the jury as to Carruth's actual limitations. When viewed most favorably to Carruth (the prevailing party), the evidence at trial indicated that Carruth's diabetic condition made him unable to work about 21 days in a period of about six months. Being unable to show up for work prevents an employee from not only working one job, but any job. Being unable to work at all for 21 days in six months is much more frequent and lengthy of an inability to show up for work than the *Moore* plaintiff's inability to show up for work two to four days per year. Indeed, Carruth's inability to work dwarfs that of the average person's inability to work due to occasional, brief bouts of random illnesses. Admittedly, six or seven days in a period of six months might have yielded a different conclusion. But, given the cumulative adverse impact that Carruth's diabetic condition had on his ability to be able to show up for work, this Court believes that a reasonable jury could find that Carruth's inability to work 21 days out of a period of six months provides an adequate basis for jury determination that that limitation on Carruth's ability to work generally was substantial. *See Sutton,* 527 U.S. at 491 (defining "substantially limits" as meaning "considerable or specified to a large degree ") (citation and internal quotation marks omitted). FN11

FN11. Continental has been making a big deal about a post-adverse-employment-action job Carruth took. In general, this Court is unclear how an individual's ability or inability to work at some point after the adverse employment action has any significant bearing on the issue at hand, which requires an individualized assessment of whether, *at the time Continental took the adverse employment action,* Carruth was disabled. Admittedly, evidence that he took a job after the adverse employment action might bear on

the jury's determination whether or not to believe Carruth, but it does not mean that, at the time Continental took the adverse employment action, Carruth was not disabled. This Court focuses on whether Carruth met the statutory definition of being "disabled" at the time of the adverse employment action, and this focus is entirely consistent with Seventh Circuit case law, *E.E.O.C. v. Sears, Roebuck & Co.,* 233 F.3d 432, 438 (7th Cir.2000); *Duda v. Board of Educ. of Franklin Park Public School Dist. No. 84,* 133 F.3d 1054, 1059 (7th Cir.1998); *Harrington v. Rice Lake Weighing Systems, Inc.,* 122 F.3d 456, 461 (7th Cir.1997); *Ray v. Cassens Transport Co.,* 212 F.3d 969, 974 (7th Cir.2000) (and citations thereto); *cf. Feldman v. American Memorial Life Ins. Co.,* 196 F.3d 783, 790 (7th Cir.1999); as well as the case law in other circuits, *Kocsis v. MultiCare Management, Inc.,* 97 F.3d 876, 884 (6th Cir.1996); *Browning v. Liberty Mut. Ins. Co.,* 178 F.3d 1043, 1047 (8th Cir.), *cert. denied* 528 U.S. 1050, 120 S.Ct. 588, 145 L.Ed.2d 489 (1999); *Cash v. Smith,* 231 F.3d 1301, 1306 n. 5 (11th Cir.2000); *Monroe v. Cortland County, N.Y.,* 37 F.Supp.2d 546, 553 (N.D.N.Y.1999).

Finally, this Court notes that the arguments related to whether there was enough evidence to establish that Continental " perceived" Carruth as disabled are misplaced, inasmuch as Carruth did not submit any jury instructions in support of his perception-based disability theory.

For these reasons, this Court rejects Continental's argument that it is entitled to judgment notwithstanding the verdict on the ADA claim.

### 2. FMLA claim

Continental argues that there was no evidence upon which a jury could have found (1) that Continental discriminated against Carruth by retaliating against

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 10

Not Reported in F.Supp.2d, 2001 WL 1775992 (S.D.Ill.), 82 Empl. Prac. Dec. P 40,975, 145 Lab.Cas. P 34,466, 7
Wage & Hour Cas.2d (BNA) 1054, 12 A.D. Cases 1244
**(Cite as: Not Reported in F.Supp.2d)**

him for his exercise of rights under the FMLA
(Doc. 76, ¶ 3) or (2) that Carruth suffered an
adverse employment action in relation to
Continental's FMLA discrimination (Doc. 76, ¶ 3).

This Court has already addressed this issue, in part,
in another order rejecting Continental's attempts to
argue that Carruth should not be entitled to FMLA
liquidated damages (Doc. 70, at pp. 21-22). First,
this Court found that the jury in this case had more
than enough evidence before it to conclude that the
actual firing was in retaliation for Carruth's
numerous assertions of FMLA leave and his
frequent complaints to the Department of Labor.
Second, this Court found that it was entirely
reasonable for a jury to conclude that the reasons
proffered by Continental (*i.e.,* insubordination and
leaving early without permission) were a pretext to
intentional FMLA retaliation. Finally, contrary to
Continental's steadfast arguments, a jury was not
required to believe that the only adverse
employment action that was the subject of FMLA
retaliation was the one absentee point. Given the
timing and history of Carruth's previous problems at
Continental in connection with his numerous FMLA
leave requests, it would have been entirely
reasonable for the jury to have found that Carruth's
*discharge* was based on these events.

**\*10** For these reasons, this Court rejects
Continental's argument that it is entitled to judgment
notwithstanding the verdict on the FMLA claim.

### B. *Motion For A New Trial*

Continental moves for a new trial on both Carruth's
ADA and FMLA claims, arguing that (1) the verdict
was against the manifest weight of the evidence,
because the jury was confused, too passionate,
prejudiced, and/or too sympathetic; (2) this Court
erroneously admitted evidence which requires a
new trial; and (3) this Court erred in refusing certain
jury instructions proffered by Continental. This
Court will address each argument in turn.

### 1. *Manifest Weight Of The Evidence*

The jury found in favor of Carruth on both his
claims, but Continental believes that the verdict
cannot be reconciled with the evidence and that this
Court should therefore grant its motion for a new
trial pursuant to Federal Rule of Civil Procedure 59.
The Seventh Circuit has held:
Only when a verdict is contrary to the manifest
weight of the evidence should a motion for a new
trial challenging the jury's assessment of the facts
carry the day. Moreover, the district court, having
seen the presentation of the evidence and observed
the course of the trial, is in a unique position to rule
on a new trial motion.... As long as there is a
reasonable basis in the record to support it, we will
not overturn a jury's verdict.

*Cefalu v. Village of Elk Grove,* 211 F.3d 416, 424
(7th Cir.2000) (internal citations, quotations, and
quotation marks omitted).

Continental offers little in the way of argument on
this point. This Court rejects Continental's general
and conclusory assertion as a substitute for
argument. In addition, this Court has seen the
presentation of the evidence and observed the
course of the trial. Based on the evidence presented
at trial, there is more than a reasonable basis in the
record to support the jury's verdict as to both
claims. This Court does not find that Continental
has shown that the jury's verdict is contrary to the
manifest weight of the evidence. Therefore, this
Court rejects Continental's conclusory assertions
and will not overturn the jury's verdict on this basis.

### 2. *Evidentiary Rulings*

To have any chance at succeeding on a motion for a
new trial based on improper evidentiary rulings, the
losing party must show that (1) the record contains
no evidence on which the district court rationally
could have based its decision or where the supposed
facts found are clearly erroneous, (2) such an error
had a "substantial influence over the jury," and (3)
the result reached was "inconsistent with substantial
justice." *Agushi v. Duerr,* 196 F.3d 754, 759 (7th
Cir.1999) (noting that parties challenging "
evidentiary rulings of the district court are like rich

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 11

Not Reported in F.Supp.2d, 2001 WL 1775992 (S.D.Ill.), 82 Empl. Prac. Dec. P 40,975, 145 Lab.Cas. P 34,466, 7
Wage & Hour Cas.2d (BNA) 1054, 12 A.D. Cases 1244
(Cite as: Not Reported in F.Supp.2d)

men who wish to enter the Kingdom: their prospects compare with those of camels who wish to pass through the eye of the needle"). The Seventh Circuit has also commented:

*11 No error in either the admission or the exclusion of evidence ... is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

*Wheeler v. Sims,* 951 F.2d 796, 802 (7th Cir.1992) (quotation omitted).

First, Continental challenges this Court's admission of the testimony of Fred Wrightam. He was an investigator for the U.S. Department of Labor who took the position that the blood sugar rule Continental imposed upon Carruth was not in accord with the FMLA. Continental believed that Mr. Wrightam's opinion amounted to a legal opinion that Continental, by imposing the blood sugar rule, violated the FMLA. Continental argues that this Court erred in allowing Mr. Wrightam to testify because (1) his testimony as to his position was irrelevant under Rule 402; and (2) his testimony as to his position was too prejudicial under Rule 403. The crux of the argument is that evidence of prior administrative findings/positions are irrelevant.

In this case, this Court correctly refused to exclude statements made by Mr. Wrightam to Continental in April 1996 based on irrelevancy. The statements were relevant to the issue of whether Continental was motivated to fire Carruth because of the constant involvement and antagonization of the U.S. Department of Labor, which was directly precipitated by Carruth's constant complaints. This Court has already dealt at length with this issue and is convinced that its original ruling on the issue was correct (Doc. 50). This Court also notes that it gave a limiting instruction to the jury as to this testimony.

Second, Continental challenges this Court's admission of evidence related to Carruth's November 1995 firing. This Court has already dealt with this issue at length and will not do so again. For the same reasons this Court previously gave for allowing this evidence (Doc. 50, at p. 7), this Court rejects Continental's argument that its admission was erroneous.

Third, Continental challenges this Court's admission of evidence related to the disciplinary treatment of Eric Rodotz. Continental asserted that Carruth's termination based in part on "leaving the plant without permission" which was mandated by the discipline policy. However, Eric Rodotz testified that he left the plant without permission, that his supervisor knew that he left the plant without permission, but that Continental decided, contrary to its disciplinary policy, to not fire him for that offense and only sanction him for some lesser offense of leaving the work area (Trans. at p. 330-31). This Court's ruling allowing this evidence was proper, especially where it was Continental that asserted that, when an employee leaves the plant without permission, he is fired.

*12 In any event, even if this Court did err in some respect-which it did not-Continental has not shown that any such error had a "substantial influence over the jury" and that the result reached was "inconsistent with substantial justice." Continental has not met its burden of showing that there are proper grounds to upset the jury's verdict and order a new trial in this case based on allegedly erroneous evidentiary rulings.

### 3. *Jury Instructions*

Continental argues that this Court erred when it failed to submit to the jury two jury instructions it proffered. On a motion for a new trial based on a district court's rulings on jury instructions, a new trial is not awarded unless, "considering all the instructions, the evidence and the arguments, it appears that the jury was misled and its understanding of the issues was seriously affected to the prejudice of the complaining party." *E.E.O.C. v.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 12

Not Reported in F.Supp.2d, 2001 WL 1775992 (S.D.Ill.), 82 Empl. Prac. Dec. P 40,975, 145 Lab.Cas. P 34,466, 7
Wage & Hour Cas.2d (BNA) 1054, 12 A.D. Cases 1244
(Cite as: Not Reported in F.Supp.2d)

*AIC Sec. Investigations, Ltd.,* 55 F.3d 1276, 1283 (7th Cir.1995). This Court will address each jury instruction in turn.

### a. *Pretext/Honest Belief Jury Instruction*

Continental first claims that this Court committed error by refusing its pretext/honest belief jury instruction. That instruction read:
If you conclude that the individuals who made the decision to terminate the plaintiff's employment with the defendant honestly believed that their stated reasons for terminating the plaintiff's employment, then you must find in favor of the defendant and against the plaintiff, even if you do not agree with those reasons, and even if you believe that the defendant should not have discharged the plaintiff for those reasons.

Def.'s Proposed Jury Instruction No. 3. *See McCoy v. WGN Continental Broadcasting Co.,* 957 F.2d 368, 373 (7th Cir.1992) (noting that "the issue of pretext ... addresses the issue of whether the employer honestly believes in the reasons it offers" ); *Richter v. Hook-SupeRx, Inc.,* 142 F.3d 1024, 1029 (7th Cir.1998).

Continental's pretext instruction is simply a legal principle employed by courts during the pretrial stage of an employment discrimination case, and judges "need not deliver instructions describing all valid legal principles." *Gehring v. Case Corp.,* 43 F.3d 340, 343 (7th Cir.1994). They "may and usually should leave the subject to the argument of counsel." *Id. See Hasham v. California State Bd. of Equalization,* 200 F.3d 1035, 1051 (7th Cir.2000). The *Gehring* case is particularly illustrative in this respect:
[Plaintiff's] other arguments concern the jury instructions. He wanted the judge to walk the jury through the paradigm established by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The judge declined, for the very good reason that the Supreme Court has held that this burden-shifting model applies to pretrial proceedings, not to the jury's evaluation of evidence at trial. Once the judge finds that the

plaintiff has made the minimum necessary demonstration (the "prima facie case") and that the defendant has produced a [non-discriminatory] explanation, the burden-shifting apparatus has served its purpose, and the only remaining question-the only question the jury need answer-is whether the plaintiff is a victim of intentional discrimination.

**\*13** *Gehring,* 43 F.3d at 343. *See Hennessy v. Penril Datacomm Networks, Inc.,* 69 F.3d 1344, 1350 (7th Cir.1995).

In this case, this Court instructed the jury, on both claims, that, to find in favor of Carruth, they needed to conclude that, when Continental took the adverse employment action, it did so intentionally attempting to discriminate against Carruth. Rather than describing each possible inference of the evidence, this Court left the subject of the interpretation of the evidence to the argument of counsel. This Court is convinced that it issued a balanced and fair set of instructions that accurately stated the law. Indeed, despite declining to instruct the jury on all possible legal principles, this Court " graciously allowed Defendant's lawyer to ask the jury to draw the inference expressed in his proposed instruction." *Hasham,* 200 F.3d at 1051. *See Trial Trans.* at pp. 484-85 ("[P]retext will be mentioned nowhere in the instructions. You can argue it."). Finally, this Court believes that a "jury is well-equipped to evaluate the evidence and use its good 'common sense' to come to a reasoned decision," *Sheehan v. Donlen Corp.,* 173 F.3d 1039, 1046 (7th Cir.1999), rendering Continental's apparent worry that the jury disregarded other jury instructions and found liability based on reasons unrelated to ADA or FMLA discrimination simply unconvincing.

### b. *Sutton Mitigating Measures Jury Instruction*

Continental next claims that this Court committed error by refusing its mitigating measures jury instruction based on *Sutton v. United Airlines, Inc.,* 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). Continental's instruction read:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 13

Not Reported in F.Supp.2d, 2001 WL 1775992 (S.D.Ill.), 82 Empl. Prac. Dec. P 40,975, 145 Lab.Cas. P 34,466, 7
Wage & Hour Cas.2d (BNA) 1054, 12 A.D. Cases 1244
**(Cite as: Not Reported in F.Supp.2d)**

An individual with an impairment that is largely corrected by medication or other measures does not have a "disability" within the meaning of the Americans With Disabilities Act. To be considered " disabled" under the Americans With Disabilities Act, a person whose impairment is being largely corrected by medication or other measures must still be "substantially limited" in a "major life activity," as defined elsewhere in these instructions.

Def.'s Proposed Jury Instruction No. 4. However, after Carruth objected to Continental's instruction, this Court proposed an alternative instruction to both parties:If a person is taking measures to correct for, or mitigate, a physical impairment, the effects of those measures must be taken into account when judging whether that person is "substantially limited " in a major life activity.

Def.'s Modified Proposed Jury Instruction No. 4. [FN12] Carruth's attorney agreed to the instruction, stating: "I have no problem with the one the Court has proposed" (Trial Trans. at p. 488, ¶¶ 3-4). Likewise, Continental's attorney agreed to the instruction and actually *withdrew* his Proposed Jury Instruction No. 4, stating: "If the Court is going to give instruction No. 4 [Def.'s Modified Proposed Jury Instruction No. 4], I, contingent on that, I'll waive and withdraw Defendant's No. 4" (Trial Trans. at p. 488, ¶¶ 13-15).

> FN12. This Court drafted this instruction and labeled it as Defendant's Modified Proposed Jury Instruction No. 4. Also, this Court notes that, when the transcript states "to correct a metaphysical impairment," this Court actually said "to correct for, or mitigate, a physical impairment" which is consistent with the language of Defendant's Modified Proposed Jury Instruction No. 4 and this Court's own recollection (Trial Trans. at p. 487, 488). *See* 28 U.S.C. § 753(b) (transcript is only *prima facie* evidence of what was said in court).

*14 In this case, this Court holds Continental to its attorney's word and finds that Continental withdrew

the instruction that it now claims this Court should have given. *See Miller v. Willow Creek Homes, Inc.,* 249 F.3d 629, 631 (7th Cir.2001) ("The [appellants] would have us ignore the clear statements of their intent announced by their attorney in open court."). Also, Defendant's Modified Proposed Jury Instruction No. 4 accurately and sufficiently reflects the state of the law as enunciated by the Supreme Court in *Sutton. See E.E.O.C. v. Sears,* 233 F.3d at 439 (7th Cir.2000) ("*Sutton* merely dictates that the analysis of whether a person is substantially limited in a major life activity must be conducted with reference to the mitigating device.").

### C. Motion For Remittur Of The Amount Of Verdict And Judgment

Continental rehashes its old arguments that the amount of the verdict and judgment should be reduced. This Court already dealt with these arguments in its previous orders and will not restate its entire reasoning here (Docs.70, 73). Therefore, for the same reasons this Court previously rejected Continental's previous arguments, this Court rejects them again.

### III. CONCLUSION

For the foregoing reasons, Continental's motion for judgment not withstanding the verdict, for a new trial, and for an order for remittitur of the amount of verdict and judgment (Doc. 76) is DENIED.

IT IS SO ORDERED.

S.D.Ill.,2001.
Carruth v. Continental General Tire
Not Reported in F.Supp.2d, 2001 WL 1775992 (S.D.Ill.), 82 Empl. Prac. Dec. P 40,975, 145 Lab.Cas. P 34,466, 7 Wage & Hour Cas.2d (BNA) 1054, 12 A.D. Cases 1244

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C



Not Reported in A.2d                                    Page 1

Not Reported in A.2d, 2005 WL 2810599 (Del.Ch.)
(Cite as: Not Reported in A.2d)

**H**
Chrin v. Ibrix Inc.Del.Ch.,2005.Only the Westlaw
citation is currently available.
UNPUBLISHED   OPINION.   CHECK   COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
David CHRIN, Plaintiff,
v.
IBRIX INCORPORATED and Steven Orszag,
Defendants.
No. Civ.A. 20587.

Submitted Oct. 4, 2005.
Decided Oct. 19, 2005.

David Chrin, pro se.
Peter B. Ladig, The Bayard Firm, Wilmington,
Delaware, for the Defendants.

*MEMORANDUM OPINION AND ORDER*
LAMB, Vice Chancellor.
*1 The plaintiff executed a contract to purchase 1.5
million newly-issued shares of common stock of the
defendant corporation for a total purchase price of
$1,500. The opportunity to purchase shares at these
bargain terms was offered to him since he was a
founding employee of the corporation. Eighteen
months later, the board of directors terminated the
plaintiff's employment and asserted the right, under
the stock ·purchase agreement, to repurchase a
portion of his shares at a similarly discounted price.
Under that contract, the company's right to
repurchase those shares depended upon the board
having made a good faith determination to
terminate his employment for "good cause" as
narrowly defined in that agreement.

The plaintiff brings this suit against the corporation
and others alleging a wide variety of causes of
action relating to both the execution of the stock
purchase agreement and the events surrounding his
termination and the purported share repurchase.
First, the plaintiff alleges that the defendants duped
him into signing the stock purchase agreement for a
smaller percentage equity interest than he was
entitled to receive. Second, the plaintiff claims that
he was not terminated for "good cause." From this
he argues both that none of his shares were validly
repurchased and that his employment continued
until the end of the three-year vesting period found
in the stock purchase agreement.

The defendants now move to dismiss the complaint.
The court finds that the well pleaded allegations of
fact found in the complaint, if true, cannot support
any claim for relief relating to the plaintiff's initial
share purchase. Thus, the counts relating to those
matters will be dismissed. Nevertheless, the court
concludes that the complaint adequately alleges a
claim that the board of directors did not make a
good faith determination to terminate the plaintiff's
employment for "good cause" within the meaning
of the contract and, thus, the company was not
entitled to repurchase his shares. The motion to
dismiss as to those counts will be denied.

I.FN1

FN1. The facts recited herein are taken
from the well pleaded allegations of the
second amended complaint, filed June 7,
2005.

A. *The Parties*

The plaintiff, David Chrin, is a resident of New
Jersey. The defendant, Ibrix, Inc., is a Delaware
corporation organized for the purpose of developing
software for computer storage devices. Chrin is a
stockholder and former. employee of Ibrix. The
defendant, Steven Orszag, a renowned university
professor of mathematics, was a co-founder and
chairman of the board of directors of Ibrix. At the
time in question, Orszag was a senior faculty
member at Princeton University in the Department

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                      Page 2

Not Reported in A.2d, 2005 WL 2810599 (Del.Ch.)
(Cite as: Not Reported in A.2d)

of Applied Mathematics and director of that university's Computational Fluids Lab.

### B. The Stock Purchase Agreement

In the fall of 1999, while working at Cambridge Hydrodynamics, Inc., a small consulting firm near Princeton, New Jersey owned by Orszag's wife, Chrin and Eric Jackson approached Orszag about forming a company to develop and sell a network storage device. The three are co-inventors in a patent (No. 7,782,389) (eventually assigned to Ibrix) that covered the original product idea. The parties reached an oral agreement in which Chrin and Jackson would develop the product while Orszag would incorporate the company, provide all the initial funding, and find outside investors. Orszag agreed to fund the company until outside investors could be found.

*2 Initially, the parties decided that they would be equal partners in major decisions affecting the company and would each be given a one-third equity interest in the company. However, they agreed that "Mr. Orszag's equity in the Company would increase over time as the pair's [Chrin and Jackson] stock decreased equally by half of Mr. Orszag's increase." [FN2] Allegedly, the part of the agreement relating to the equity split was put in writing, although the plaintiff does not possess a copy. The complaint further alleges that the three parties orally agreed that "they would be equal partners in major decisions affecting the Company and about creating the Company." [FN3]

> FN2. Pl.'s Second Am. Compl. ("Compl.") ¶ 7.

> FN3. Id.

By early 2000, "it became apparent it would take longer than anticipated to attract outside funding." [FN4] Due to Orszag's funding of expenses up to that point, Chrin's and Jackson's equity share was rapidly approaching zero. Orszag said that he would "make a fair adjustment, because it was never his intent to have all the equity of the Company after

[Chrin's and Jackson's] intellectual" efforts on behalf of the enterprise. [FN5]

> FN4. Id. at ¶ 9.

> FN5. Id.

By late summer 2000, outside funding prospects were more promising. Thus, Orszag proceeded to have the necessary documents prepared to incorporate Ibrix. On August 7, 2000, the parties initialed a founders' equity distribution agreement ("FED"), providing that Chrin and Jackson were each to receive 18.8% of the common stock, Orszag was to receive 47.7% of the common stock, and the remaining common stock was to be distributed to outside investors. [FN6]

> FN6. Compl. ¶ 9. The parties also discussed that Chrin and Jackson would have to buy the stock at a sufficiently high enough price so that there would not be a windfall capital gains tax due on the difference in the true value and the price actually paid. Jackson and Chrin agreed to pay a maximum of $2,000 for the shares.

At about this time, Orszag also explained to Chrin and Jackson the dilutive effect on their percentage interest that would occur as a result of additional issuances of stock to outside investors. The complaint alleges that Chrin was aware that the number of shares to be issued increased from one million to two million, and then to four or five million, and finally to eight to ten million. [FN7]

> FN7. Id. "Orszag had said the number of shares in the company would be one million; then later increased it to two million; then about the time the distribution agreement was initialed, four or five million.... The last word in September, 2000 was that the initial number of shares would be 8 to 10 million."

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                      Page 3

Not Reported in A.2d, 2005 WL 2810599 (Del.Ch.)
(Cite as: Not Reported in A.2d)

In or around September 2000, "Steven Orszag told David Chrin that his equity interest in the Company was being reduced and given to Eric Jackson because Orszag felt Mr. Chrin was not putting in sufficient effort into the project." [FN8] According to the complaint, Orszag told Chrin to "take it or leave it." [FN9] Chrin believed the amount of the reduction was about 2% of the total equity of the company. Chrin alleges he felt coerced and compelled to acquiesce to Orszag, who at the time was his supervisor at Cambridge, so he agreed to this reduction without discussing the matter with Jackson.[FN10]

> FN8. Compl. ¶ 10.

> FN9. *Id.*

> FN10. *Id.*

The company was incorporated on October 3, 2000. The following day, Orszag gave Chrin a Founders Stock Purchase Agreement ("SPA") for 1.5 million shares of common stock at a price of $.001 per share. According to the complaint, "Orszag gave Chrin the agreement without making any statements other than suggesting it be reviewed before signing it." [FN11] Chrin read the agreement, signed it, and gave it back to Orszag. Chrin alleges that he thought the 1.5 million shares in the SPA amounted to 18.8% of the company's issued stock, as stated in the FED, minus the 2% reduction given to Jackson . [FN12] Despite the fact that Chrin knew that the issuance of additional shares to outside investors would dilute his percentage equity interest, Chrin did not ask Orszag or anyone else what percentage interest was represented by the 1.5 million shares. [FN13] According to the complaint, the 1.5 million shares purchased by Chrin were approximately 7.6% of the company's issued common stock.[FN14] Chrin claims that he was duped into buying a smaller percentage of Ibrix equity than he had a right to acquire.

> FN11. Compl. ¶ 16.

> FN12. *Id.*

> FN13. At oral argument, the plaintiff stated that, during the period from October 2000 until his termination in May 2002, he never inquired into what percentage of the company he owned.

> FN14. *Id.* It is disputed how many shares the company issued on the date of the SPA. Chrin asserts that 19,710,000 shares were issued on the date of the SPA, which would give him approximately 7.6% of the company's issued stock. The defendants assert that 11.2 million shares were issued on the date of the SPA, which gave Chrin approximately 13.4% of the company's issued stock. The Ibrix certificate of incorporation authorized the issuance of up to 25 million shares.

## B. *The Termination Of Chrin's Employment*

*3 In 2001, Chrin was employed as a Product Manager at Ibrix, providing systems support, researching competition, and managing equipment purchases. [FN15] In the fall of that year, Orszag asked Chrin to report directly to Mark Dennis, the director of Testing and Quality Assurance, and to assist him in testing the product. Chrin understood this to be a temporary extension of his job responsibilities. In early 2002, Dennis conducted an employee review of Chrin and told Chrin that his work was satisfactory. The review was not put in writing. According to the complaint:

> FN15. Compl. ¶ 29. Beginning in May 2001, Chrin worked at Cambridge, but " was compensated at a two-thirds time rate by Ibrix." Chrin became a full-time employee of Ibrix on June 1, 2001.

Subsequently, at no time did Mr. Dennis indicate to Mr. Chrin that his work was less than satisfactory, or that Mr. Chrin was negligent in his duties, or had committed any misconduct. Likewise, at no point did Mr. Orszag, Mr. John, or any other board member indicate to Mr. Chrin that there was any dissatisfaction with Mr. Chrin's work, or that he was negligent with his duties or was acting in a manner

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 4

Not Reported in A.2d, 2005 WL 2810599 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

to constitute misconduct.[FN16]

> FN16. Compl. ¶ 36.

On May 3, 2002, Dennis told Chrin he was terminated. Chrin alleges that when he asked Dennis why he was terminated, Dennis replied that his work was unsatisfactory.[FN17] Chrin repeatedly asked Dennis for specific examples of his unsatisfactory work but "Dennis refused to cite specific examples, stating he did not have to."[FN18] Chrin then approached Orszag and asked him for specific reasons why he was fired. Orszag allegedly stated that the board had accepted Dennis's recommendation to terminate Chrin.[FN19] Shortly thereafter, Chrin and his counsel met with Orszag to discuss Chrin's termination and severance package. [FN20] "At this meeting Mr. Orszag described the reason for termination only as unsatisfactory or insufficient quality of work, and refused to state more." [FN21]

> FN17. Compl. ¶ 37.

> FN18. *Id.*

> FN19. *Id.* Chrin sent Orszag an e-mail asking him to confirm that the reason for his termination was insufficient quality of work. Orszag replied to the e-mail merely saying that he had set up a meeting with the company's attorney.

> FN20. Compl. ¶ 38. Bruce Lubitz, attorney for Chrin, and Tom Lewis, attorney for Ibrix, attended this meeting.

> FN21. *Id.*

Thereafter, the company sent notices to Chrin of its intention to exercise its option to repurchase a portion of his shares pursuant to the SPA. The SPA permitted the company to repurchase a portion of Chrin's shares in the event he was terminated for cause. According to Section 6 of the SPA:
In the event of the termination by the Company of Purchaser's employment relationship with the

Company for cause (as defined below), the Company shall upon the date of such termination (the "Termination Date") have an irrevocable, assignable option (the "Repurchase Option") for a period of sixty (60) days from such date to repurchase all or any portion of the stock held by Purchaser as of the Termination Date which has not yet been released from the Company's Repurchase Option in accordance with the terms of this Section 6 at the purchase price per share of stock specified in section 1 (adjusted for any stock splits, stock dividends and the like).

The SPA defines cause to mean:(i) Purchaser's commission of any dishonest or fraudulent act relating to his employment; (ii) misappropriation of funds or embezzlement by Purchaser of the Company funds; (iii) commission of any felony or crime involving moral turpitude; or (iv) repeated misconduct or negligence in the performance of Purchaser's duties relating to his employment as determined in good faith by the Board of Directors of the Company.

*4 On May 8, 2002, Orszag sent Chrin a check in the amount of $477.22 for the share repurchase. Then, on May 28, 2002, Orszag sent Chrin a letter and enclosed a second check for $27.58, explaining that he had incorrectly calculated the number of shares held by Chrin, and that Ibrix was entitled to repurchase additional shares. Chrin refused the payments, alleging that the company did not have the right to repurchase his shares under the SPA since he was not fired for cause. According to the complaint, prior to Chrin's termination, no Ibrix board member sought expert legal advice as to whether Chrin's unsatisfactory work fell within the SPA's definition of termination for cause.[FN22]

> FN22. Compl. ¶ 38.

On October 3, 2003, Chrin filed this *pro se* action against Ibrix, Orszag, and others.[FN23] The defendants twice moved to dismiss. On both occasions, the plaintiff filed an amended complaint that both dropped parties and added factual allegations in an effort to meet the thrust of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 5

Not Reported in A.2d, 2005 WL 2810599 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

motions to dismiss. On July 1, 2005, the defendants filed a motion to dismiss the second amended complaint. This is the court's decision on that motion.

> FN23. The plaintiff's original complaint also contained defendants Reba Orszag, Shaji John, and Thomas Thekkethala, but the claims against these defendants were dismissed by the plaintiff in the amended complaint.

### II.

The standard for dismissal pursuant to Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted is well established. A motion to dismiss will be granted if it appears with reasonable certainty that the plaintiff could not prevail on any set of facts that can be inferred from the pleading.[FN24] That determination is generally limited to the factual allegations contained in the complaint. In considering this motion, the court is required to assume the truthfulness of all well-pleaded allegations of fact in the complaint.[FN25] All facts of the pleadings and inferences that can reasonably be drawn therefrom are accepted as true.[FN26] However, with that said, a trial court need not blindly accept as true all allegations, nor must it draw all inferences from them in the plaintiff's favor unless they are reasonable inferences.[FN27]

> FN24. *Kohls v. Kenetech Corp.,* 791 A.2d 763, 767 (Del. Ch.2000).

> FN25. *Grobow v. Perot,* 539 A.2d 180, 188 n. 6 (Del.1988).

> FN26. *Id.*

> FN27. *In re Lukens Inc. S'holders Litig.,* 757 A.2d 720, 727 (Del. Ch.1999).

### III.

*A. Claims Arising Out Of The October 4, 2000 SPA*

The plaintiff alleges in the second amended complaint that: (1) Ibrix breached the SPA, or, in the alternative, the FED; (2) Orszag breached the FED and committed fraud; (3) Orszag breached his duties in regard to an agency relationship he had with Chrin in matters relating to the incorporation of the company; (4) Orszag breached the implied covenant of good faith and fair dealing; and (5) Chrin relied to his detriment on promises made by Orszag in the FED and is entitled to relief based on promissory estoppel.

*1. Breach Of The SPA, Or, In The Alternative, The FED*

The plaintiff alleges that Ibrix breached the SPA by not tendering to him an 18.8% equity interest in the company. In effect, the plaintiff contends that the SPA should be read to incorporate the FED into its terms. The plaintiff alleges that, while the SPA made no specific reference to what percentage of the company the 1.5 million shares represented, he was entitled to rely on the FED to fill in this blank. The defendants argue that the SPA contained an integration clause, which prohibits the plaintiff from claiming the FED was part of the SPA. Section 8(f) of the SPA states:
**\*5** This Agreement, *including the Exhibits hereto,* contains all of the understandings and agreements arrived at between the parties with respect to the subject matter hereof. This Agreement cannot be changed, altered or amended except in an instrument in writing signed by the party against whom enforcement is sought.[FN28]

> FN28. Compl. Ex. F § 8(f) (emphasis added).

The plaintiff contends that "including the Exhibits hereto" means that the SPA "includes any agreements and understandings in any exhibit."[FN29] Additionally, the plaintiff claims that the SPA was a short agreement and could not possibly comprise all the understandings and negotiations between the parties.[FN30] Therefore, the plaintiff argues, the SPA should be read to incorporate

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                            Page 6

Not Reported in A.2d, 2005 WL 2810599 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

information external to the four corners of the contract, such as the FED.

> FN29. Pl. Br. in Supp. of Opp'n. to Defs. Mot. to Dismiss 8.

> FN30. *Id.* at 10.

Moreover, the plaintiff claims that the buyer warranty section, Section 4 of the SPA, also makes references to external documents which permit the plaintiff to rely on information outside of the SPA. Section 4 states:
I represent and warrant that I am familiar with the Company's plans, operations and financial condition and that I have heretofore received all such information as I deem necessary and appropriate to enable me to evaluate the financial risk inherent in making an investment in the Stock of the Company. [FN31]

> FN31. Compl. Ex. F § 4.

The plaintiff reasons that this section states that he has received information from the company that is outside of the SPA and has used this information in making his decision as to whether or not to purchase the stock. Accordingly, he argues that the SPA permits him to rely on information outside of the contract, such as the FED. [FN32]

> FN32. Pl. Br. in Supp. of Opp'n. to Defs. Mot. to Dismiss 12. The plaintiff argues that if Ibrix wanted to limit his reliance on external information, the warranty statement should have stated: "I warrant I have relied only on the information contained within this agreement concerning the Company's plans, operations, and financial information in making my decision to purchase the Company's stock."

The court cannot reasonably infer from the plain language of the SPA that the SPA incorporated the

FED into its terms. "Where the [contract] language is clear and unambiguous, this court will accord the language its ordinary meaning." [FN33] First, the court cannot reasonably construe the phrase " including the Exhibits hereto" to impliedly include the FED because the FED was not an exhibit to the SPA. Based on the unambiguous terms of the clause, the court cannot reasonably agree with the plaintiff's interpretation that the language includes all agreements or understandings in "any" exhibit. Second, it would be unreasonable for the court to read the buyer warranty clause to impliedly incorporate the FED into the SPA. The plaintiff is using a warranty he gave to the defendants assuring that he was familiar with the financial risks in making an investment in the company to try to circumvent the integration clause. Allowing the plaintiff to do this would undermine the SPA's integration clause.

> FN33. *Council of the Dorset Condo. Apts. v. Gordon,* 801 A.2d 1, 5 (Del.2002).

Stated briefly, after entering into an agreement that contained an unambiguous integration clause, the plaintiff cannot now rely on external documents to allege a breach of an undertaking not contained in the integrated agreement. [FN34] As a final point, " parol evidence cannot be used to interpret a contract that facially is unambiguous." [FN35] Thus, the court cannot reasonably allow the FED, an antecedent preliminary understanding, to vary or contradict the facially unambiguous SPA. [FN36]

> FN34. *See H-M Wexford LLC v. Encorp, Inc.,* 832 A.2d 129, 141 (Del. Ch.2003).

> FN35. *Highlands Insurance Group, Inc. v. Halliburton Co.,* 2001 Del. Ch. LEXIS 32 at *26 (Del. Ch. Mar. 21, 2001).

> FN36. *See Burgess v. Manufactured Housing Concepts, L.L.C.,* 1997 Del.Super. LEXIS 162 at * 2 (Del.Super. Ct. June 17, 1997) ("where two parties have executed a written contract to which they both have assented as the complete

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 7

Not Reported in A.2d, 2005 WL 2810599 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

integration of the agreement, all other evidence of antecedent understanding and negotiation will be inadmissible for the purpose of varying or contradicting the writing").

*6 Alternatively, the plaintiff alleges that the FED was a legally enforceable contract which Ibrix implicitly assumed when the company was formed. The plaintiff claims that Ibrix breached this contract by not giving him an 18.8% equity interest in the company and not forming the company so that Jackson, Orszag, and Chrin "shared equally in the process on major decisions affecting the company." FN37

> FN37. Compl. ¶ 25; See Am. Legacy Found. v. Lorillard Tobacco Co ., 831 A.2d 335, 350-51 (Del. Ch.2003) (stating that, generally, "if the subsequently formed corporation expressly adopts a pre-incorporation agreement or implicitly adopts it by accepting its benefits with knowledge of its terms, the corporation is bound by it ." Id. at 350).

Taking the plaintiff's allegations as true, the court cannot reasonably infer that the plaintiff had a rational basis to conclude that the FED entitled him to 18.8% of the equity in the company as it was ultimately incorporated. Indeed, the plaintiff himself alleges in the complaint that he did not reasonably expect to receive the 18.8% equity interest stated in the FED. The plaintiff alleges that under the original equity distribution agreement, his equity stake was rapidly approaching zero by mid-2000. Several months later, Orszag decided to adjust the equity distribution so that he did not have all the equity in the company. Chrin acknowledges that Orszag presented the FED to him with the understanding that Chrin's equity interest would be diluted by outside investors. It is reasonable to assume, and the complaint does not allege to the contrary, that there were outside investors who diluted the plaintiff's equity stake. In addition, Orszag told the plaintiff that his equity interest would be further reduced and given to Jackson because Orszag felt that the plaintiff was not putting

in sufficient effort. The plaintiff assented to this reduction, which he believed amounted to a decrease of approximately 2% of his equity interest.

For these reasons, the plaintiff could not have reasonably relied on the FED as a promise to allot to him 18.8% of the company's equity when the facts alleged by him conclusively demonstrate that he knew his 18.8% equity interest would be diluted. Moreover, because the plaintiff's claims are based on prior representations that are not memorialized within the text of the SPA, the court cannot reasonably infer that the plaintiff justifiably relied on those representations. At best, the plaintiff's factual allegations suggest that the FED was a preliminary agreement about the potential equity interest in Ibrix that was subject to change.

Finally, the FED does not mention that the plaintiff is entitled to an equal controlling interest in the company. Allegedly, in the fall of 1999, there was an oral understanding between the plaintiff, Jackson, and Orszag in which they were to participate equally in managing the affairs of the company. However, this agreement came about when the parties were to have equal shares in the company. The plaintiff could not have reasonably expected, and the court could not reasonably infer, that this original agreement implicitly carried over after the plaintiff's equity interest was greatly reduced. Moreover, the facts alleged in the complaint clearly show that Chrin never " participated equally" in managing the affairs of Ibrix and never objected to his exclusion. FN38

> FN38. For example, paragraphs 13 and 14 allege that Orszag and Ted Tussing, Orszag's daughter-in-law's brother, were appointed as the two directors of Ibrix and that they appointed Orszag's wife as president. Chrin played no role in either action. Nor does he allege that he played any role in management once Ibrix was incorporated.

*2. Breach Of The FED By Orszag*

*7 The plaintiff claims that Orszag was bound by

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2005 WL 2810599 (Del.Ch.)
(Cite as: Not Reported in A.2d)

agency or contract principles to form Ibrix in a manner specified by the FED and that Orszag breached either or both of these duties when he did not give the plaintiff an 18.8% equity interest in the company or an equal vote on important corporate decisions. As to the breach of contract claim, the court has already concluded that the plaintiff does not allege sufficient facts to suggest either that the plaintiff was entitled to an equal vote on important corporate decisions or that Orszag was in any way bound to incorporate Ibrix in a particular manner. The conclusory allegation in paragraph 7 of the complaint that changes in stock interest "would not affect their ability to have an equal vote in important matters affecting the Company or its creation" notwithstanding, the course of dealing alleged in the complaint is entirely inconsistent with Chrin having any contractually enforceable right to participate equally with Orszag in the creation or management of Ibrix. Similarly, even if there was an interim understanding that Chrin would be entitled to an 18.8% equity stake in Ibrix, that understanding was obviously subject to modification or dilution. Indeed, the complaint alleges Chrin's understanding to that effect.

Next, the court addresses the allegation that "an agency relationship existed between Mr. Chrin and Mr. Orszag whereby Mr. Orszag acted as Mr. Chrin's agent in matters relating to the incorporation of the Company." [FN39] Agency is a fiduciary relationship that results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.[FN40] "The burden rests upon the party asserting the existence of an agency relationship to prove it." [FN41] Here, the plaintiff does not allege that the parties had a mutual understanding that Orszag would act on his behalf or that Orszag was subject to his control. [FN42] Indeed, the allegations of the complaint clearly show that Chrin both lacked any control over Orszag and was aware of that fact. Therefore, the court cannot reasonably infer that Orszag ever agreed to act as Chrin's agent for any purpose.

FN39. Compl. ¶ 28.

FN40. Restatement (Second) of Agency, § 1 ("The agency relation results if, but only if, there is an understanding between the parties which, as interpreted by the court, creates a fiduciary relation in which the fiduciary is subject to the directions of the one on whose account he acts.").

FN41. *Abex Inc. v. Koll Real Estate Group,* 1994 Del. Ch. LEXIS 213 at *40 (Del. Ch. Dec. 22, 1994).

FN42. *Id.* ("Critical to an agency relationship is the power of the principal to direct and control the agent.").

### 3. *The Duty Of Good Faith And Fair Dealing*

The plaintiff claims that Orszag breached the implied covenant of good faith and fair dealing by coercing Chrin to modify the FED and accept a lower percentage of equity in Ibrix. According to *Dunlap v. State Farm Fire & Cas. Co.:*
Stated in its most general terms, the implied covenant of good faith and fair dealing requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain. Thus, parties are liable for breaching the covenant when their conduct frustrates the "overarching purpose" of the contract by taking advantage of their position to control implementation of the agreement's terms.
[FN43]

FN43. 878 A.2d 434, 442 (Del.2005); *see also Aspen Advisors LLC v. UA Theatre Co.,* 861 A.2d 1251, 1260 (Del.2004) (" The implied covenant is only breached when the defendant [has] engaged in arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the contract.").

*8 Chrin claims that Orszag, who at the time was his supervisor at Cambridge, told him that his

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                    Page 9

Not Reported in A.2d, 2005 WL 2810599 (Del.Ch.)
(Cite as: Not Reported in A.2d)

equity interest in Ibrix would be reduced by about
2% and given to Jackson because he felt Chrin was
not putting sufficient effort into the project.
Allegedly, "Orszag told Mr. Chrin to take it or
leave it." [FN44] Chrin claims that he felt compelled
to acquiesce because Orszag was his supervisor
who exercised significant control over his activities
at Cambridge.

FN44. Compl. ¶ 10.

It is perplexing that the plaintiff alleges that Orszag
was his agent and was subject to his control on
matters affecting the incorporation of Ibrix, while
concurrently alleging that Orszag controlled him
and coerced the plaintiff to take a lower equity
percentage of the company. Furthermore, the
plaintiff does not allege any facts to suggest that
Orszag threatened to take retaliatory action against
him at Cambridge if he did not agree to a reduction
in his equity interest in Ibrix.[FN45] Nor does the
complaint allege that Orszag said or did anything to
imply that he would improperly use his supervisory
powers at Cambridge if Chrin did not agree to a
modification of the FED. In fact, the plaintiff
acknowledges that he agreed to this reduction when
he signed the SPA .[FN46] Thus, the plaintiff does
not allege sufficient facts for the court to infer that
Orszag acted in bad faith and coerced him into
agreeing to a lower equity percentage in Ibrix.

FN45. Restatement (Second) of Contracts,
§ 175; *Singh v. Batta Envtl. Assocs.*, 2003
Del. Ch. LEXIS 59 at *17 (Del. Ch. May
21, 2003) (holding that the party claiming
duress must show a wrongful act that
overcame the will of the aggrieved party
who was without adequate means to
protect himself); *Cianci v. JEM Enter.*,
2000 Del. Ch. LEXIS 125 at * 31 (Del.
Ch.2000) (holding that there are three
basic elements of a claim that coercion or
duress taints the enforceability of a
contract: (1) a wrongful act, (2) which
overcomes the will of the aggrieved party,
(3) who has no adequate legal remedy to
protect himself).

FN46. Compl. ¶ 16. *See Cianci,* 2000
Del. Ch. LEXIS 125 at * 42 ("Ratification
results if the party who executed the
contract under duress accepts the benefits
flowing from it or remains silent or
acquiesces in the contract for any
considerable length of time after
opportunity is afforded to annul or void it."
).

### 4. *Promissory Estoppel*

The plaintiff pleads in the alternative that, assuming
the FED was not an enforceable contract, Orszag
promised to give Chrin an 18 .8% equity interest
when Orszag incorporated the company. Chrin
alleges that he relied on this promise and reasonably
believed he was receiving 18.8% of the company's
equity when he signed the SPA.

Promissory estoppel involves "informal promises
for which there was no bargained-for exchange but
which may be enforceable because of antecedent
factors that caused them to be made or because of
subsequent action that they caused to be taken in
reliance." [FN47] To succeed on a claim for
promissory estoppel, the plaintiff must plead
sufficient facts to suggest that the defendant made a
promise with the intent to induce action or
forbearance, that the plaintiff actually relied on the
promise, and that the plaintiff suffered an injury as a
result.[FN48]

FN47. 3 Eric Holmes Mills, et al., Corbin
on Contracts, § 8.1, at 5 (Rev. ed.1996).

FN48. *VonFeldt v. Stifel Fin. Corp.*, 714
A.2d 79, 87 (Del.1998).

Here, whether or not the FED was an enforceable
contract subject to modification or a mere promise,
Chrin does not allege facts to suggest that he had a
reasonable expectation that he would receive 18.8%
of the equity interest in Ibrix. Orszag's promise was
not that the plaintiff would receive 18.8% of the
equity interest in Ibrix, but, as the plaintiff
acknowledges in his complaint, that he *might*
receive 18.8% of the company's equity, subject to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2005 WL 2810599 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 10

dilution by outside investors. Knowing that there had to be outside investors, Chrin could not have reasonably anticipated to get the full 18.8% of the company's equity. Moreover, since Chrin signed the SPA and agreed to its integration clause, Chrin cannot now claim reliance on a prior promise that varies its terms.

### 5. Fraud

*9 The plaintiff alleges that Orszag committed fraud both in his capacity as a director of the company and as an agent on behalf of the plaintiff. It is alleged that Orszag misrepresented to Chrin that the SPA gave Chrin an 18.8% equity interest in the company when in fact Chrin only purchased approximately 7.6% of the equity. In addition, Chrin alleges that Orszag acted as his agent when he incorporated the company, and thus owed Chrin a duty to disclose what percentage of the company Chrin was buying under the SPA.

The elements of a fraud claim are well settled. The plaintiff must plead with sufficient particularity: (1) a material false representation made by the defendant; (2) the defendant's knowledge or belief that the representation was false, or his reckless indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's actions or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance.[FN49] "But fraud does not consist merely of an overt misrepresentation. It may also occur ... by silence in the face of a duty to speak."[FN50]

FN49. *Stephenson v. Capano Development, Inc.,* 462 A.2d 1069, 1074 (Del.Super.1983).

FN50. *Id.; BAE Sys. N. Am. Inc. v. Lockheed Martin Corp.,* 2004 Del. Ch. LEXIS 119 at * 31 (Del .Ch.2004) ("There are three types of common law fraud: 1) representing false statements as true; 2) actively concealing facts which prevents the plaintiff from discovering them; or 3)

remaining silent in the face of a duty to speak.").

The plaintiff does not sufficiently allege that Orszag committed fraud by misrepresentation or, in the alternative, fraud based on nondisclosure. First, the plaintiff does not allege that Orszag made a material misrepresentation. Chrin does not allege that Orszag, or anyone else, misrepresented to him that the 1.5 million shares in the SPA equated to 18.8% of the company. Indeed, just the opposite is alleged. According to the complaint:

Mr. Orszag gave Mr. Chrin the agreement without making any statements other than suggesting it be reviewed before signing it.... David Chrin was not provided with a written or verbal disclosure statement by Mr. Orszag indicating the distribution of shares under Paragraph 15, was not as had been stated in the distribution agreement ..., nor subsequently did Mr. Orszag or the Company disclose this information to Mr. Chrin.[FN51]

FN51. Compl. ¶¶ 16, 17.

Second, when the plaintiff signed the SPA, he could not have justifiably operated under the assumption that he was purchasing an 18.8% equity stake in the company. As discussed *supra,* the plaintiff knew his equity interest would be diluted and was uncertain as to the equity interest he was getting in the company. Therefore, the plaintiff could not have reasonably relied on the FED. Indeed, neither before nor after signing the SPA, did the plaintiff ever even inquire into what percentage equity interest he owned in the company. This conduct is entirely inconsistent with the claim that he had a contractual right to receive a set percentage of the equity.

Lastly, the plaintiff does not allege any basis for imposing on Orszag a duty to disclose. "Generally, there is no duty to disclose a material fact or opinion, unless the defendant had a duty to speak"[FN52] stemming from a relationship of trust and confidence.[FN53] Here, the plaintiff alleges that Orszag was Chrin's agent when he formed the corporation. As discussed above, the complaint

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2005 WL 2810599 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

does not support an inference that an agency relationship existed between Chrin and Orszag. Accordingly, Orszag had no duty to inform Chrin of his equity percentage in the company. Based on the foregoing analysis, the complaint does not properly allege fraud.

> FN52. *Matthews Office Designs v. Taub Invs.*, 1994 Del. LEXIS 182 at *4 (Del.1994)

> FN53. Restatement (Second) of Torts, § 551.

### B. *Claims Arising Out Of Chrin's Employment Termination*

*10 On May 3, 2001, Chrin was terminated from his position as a product manager at Ibrix. Chrin alleges that (1) Ibrix breached the SPA by repurchasing a portion of his Ibrix shares when he was not terminated for cause, (2) Ibrix breached the implied covenant of fair dealing by not disclosing to him why he was terminated for cause, and (3) Ibrix breached an implied three-year employment contract.

### 1. *The Share Repurchase*

Section 6 of the SPA gives the company the right to repurchase a portion of an employee's shares of stock in Ibrix if the employee is terminated for cause. The SPA defines cause as:
(i) Purchaser's commission of any dishonest or fraudulent act relating to his employment; (ii) misappropriation of funds or embezzlement by Purchaser of the Company funds; (iii) commission of any felony or crime involving moral turpitude; or (iv) repeated misconduct or negligence in the performance of Purchaser's duties relating to his employment as determined in good faith by the Board of Directors of the Company.

The plaintiff claims that the company had no right to repurchase his shares because the board did not make a good faith determination that "cause"

existed to terminate his employment. Chrin alleges that he received positive reviews from his supervisor, and "at no point did Mr. Orszag, Mr. John, or any other board member indicate to Mr. Chrin there was any dissatisfaction with Mr. Chrin's work." [FN54] According to the complaint, when Chrin asked why he was terminated, his supervisor replied that his work was unsatisfactory.

> FN54. Compl. ¶ 36.

The plaintiff's allegations, if true, support a reasonable inference that he was not fired "for cause " within the meaning of the SPA. Mere unsatisfactory or insufficient quality of work may not rise to the level of repeated misconduct or negligence. Additionally, the allegation that the defendants refused to disclose the grounds for his termination supports the claimed absence of cause. [FN55] If the plaintiff can show, at trial, that the board of directors did not make the necessary good faith determination, he will be entitled to a judgment invalidating Ibrix's attempted repurchase of his shares.

> FN55. The plaintiff also claims that the defendants are barred by equitable estoppel from asserting a defense that the plaintiff was terminated for cause under the SPA. The plaintiff argues that because the company refused to provide details of his termination they should be estopped from now claiming he was fired for cause. *See Dep't of Natural Res. & Envtl. Control v. Front St. Props.*, 808 A.2d 1204 (Del.2002). The doctrine of equitable estoppel may be invoked "when a party by his conduct intentionally or unintentionally leads another, in reliance upon that conduct, to change position to his detriment." The plaintiff does not plead sufficient facts to establish equitable estoppel. The fact that the defendants failed to disclose the reasons for Chrin's termination does not estop the defendants from later proving that they terminated him for cause.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                            Page 12

**Not Reported in A.2d, 2005 WL 2810599 (Del.Ch.)**
**(Cite as: Not Reported in A.2d)**

### 2. *The Implied Covenant Of Fair Dealing*

The plaintiff alleges that the company breached an implied covenant of fair dealing in the SPA by refusing to disclose to him why he was terminated for cause. This claim is intertwined with the previous one relating to the validity of the share repurchase. It will be sustained for similar reasons.

### 3. *Is The SPA An Implied Employment Contract?*

Finally, Chrin claims that the SPA's vesting schedule of the repurchase option gives rise to an implied three-year employment contract that was breached when he was terminated. He bases this claim on paragraph 6 of the SPA, which states:
One-third of the shares subject to vesting shall be released from the repurchase option on the first anniversary of the date of this agreement and 1/36 of the shares subject to vesting shall be released from the repurchase option on the last day of each month thereafter, until all such shares subject to vesting are released from the repurchase option (provided in each case that purchaser's employment relationship with the company has not been terminated prior to the date of any such release).

*11 Based on the unambiguous contract language, the court cannot reasonably infer a three-year employment contract. "If the contract is clear on its face, the court will rely solely on the clear, literal meaning of those words." [FN56] The paragraph on which the plaintiff relies is merely a vesting schedule releasing Chrin's shares from the company's right to repurchase them upon certain events enumerated in the SPA. It is a mechanism to calculate how many shares the company can repurchase if Chrin leaves voluntarily or is terminated for cause. It is not an employment contract.

> FN56. *Interactivecorp v. Vivendi Universal,* 2004 Del. Ch. LEXIS 90 at *30 (Del. Ch. June 30, 2004).

IV.

For the foregoing reasons, the defendants' motion to dismiss pursuant to Rule 12(b)(6) is GRANTED as to Counts I through VII, and XI, and DENIED as to Counts IX and X. IT IS SO ORDERED.

Del.Ch.,2005.
Chrin v. Ibrix Inc.
Not Reported in A.2d, 2005 WL 2810599 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT D

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1

Not Reported in F.Supp.2d, 2002 WL 501494 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

**C**
Briefs and Other Related Documents
Synesiou v. Designtomarket, Inc.E.D.Pa.,2002.Only
the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
John SYNESIOU, Plaintiff,
v.
DESIGNTOMARKET, INC., Mardi Harrison, Don
Brown, and Tom Lawrence, Defendants.
No. 01-5358.

April 3, 2002.

*MEMORANDUM and ORDER*
YOHN, J.
*1 Plaintiff, John Synesiou ("Synesiou"), brings
this action against defendants, DesignToMarket ("
DTM"), Mardi Harrison ("Harrison"), Don Brown (
"Brown") and Tom Lawrence ("Lawrence")
(collectively, "defendants"), alleging a violation of
the Pennsylvania Wage Payment and Collection
Law ("WPCL"), 43 P.S. § 260.1 *et. seq.* (Count I),
breach of contract against DTM only (Count II),
promissory estoppel (Count III), and unjust
enrichment (Count IV).

Presently before the court is defendants' motion to
dismiss Counts I, III and IV of plaintiff's complaint.
For the reasons set forth below, I will deny
defendants' motion to dismiss Count I, and I will
grant defendants' motion to dismiss Counts III and
IV.

**BACKGROUND**

In his complaint, Synesiou alleges the following
relevant facts. On April, 1, 2001, Synesiou entered
an employment agreement with DTM, a corporation
with its principal place of business in Warminster,
Pennsylvania, and members of DTM's board of
directors whereby he was to serve as president and
CEO for a one year term, to be automatically

extended at the expiration of each term. Compl. ¶
¶ 9, 10. As part of his employment, Synesiou was
required to relocate from Minneapolis to a city with
a larger concentration of venture capital firms.
Compl. ¶ 23. As a result, Synesiou sold his house
in Minneapolis and moved to San Diego. Compl. ¶
24. The employment agreement, which was to be
governed by Pennsylvania law, provided that DTM
would cover Synesiou's relocation costs. Compl. ¶
¶ 14, 21. The employment agreement also set forth
the amount of Synesiou's compensation and a
schedule for when this compensation would be paid.
Compl. ¶¶ 11-13.

On August 7, 2001, less than 5 months into his
employment, Synesiou was terminated without
cause. Compl. ¶ 26. Synesiou did not receive
advance notice of his termination, nor did he
receive the severance or relocation costs to which
he was entitled under the employment agreement.
Compl. ¶¶ 31-33. As a result, on October 22,
2001, Synesiou filed the instant action.

**STANDARD of REVIEW**

In ruling on a motion to dismiss for failure to state a
claim upon which relief may be granted, the court
must accept as true all well-pleaded allegations of
fact, and any reasonable inferences that may be
drawn therefrom, in the plaintiff's complaint and
must determine whether "under any reasonable
reading of the pleadings, the plaintiff may be
entitled to relief." *Nami v. Fauver,* 82 F.3d 63, 65
(3d Cir.1996) (citations omitted); *Colburn v. Upper
Darby Township,* 838 F.2d 663, 665-66 (3d
Cir.1988), *cert. denied,* 489 U.S. 1065, 109 S.Ct.
1338, 103 L.Ed.2d 808 (1989) (citations omitted).
Although the court must construe the complaint in
the light most favorable to the plaintiff, it need not
accept as true legal conclusions or unwarranted
factual inferences. *Conley v. Gibson,* 355 U.S. 41,
45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Claims
should be dismissed under Rule 12(b)(6) only if "it

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 2

Not Reported in F.Supp.2d, 2002 WL 501494 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Id.*

## DISCUSSION

### 1. Count I: Violation of Wage Payment and Collection Law

**\*2** In Count I of his complaint, Synesiou alleges that defendants violated Pennsylvania's Wage Payment and Collection Law ("WPCL"), 43 P.S. § 260.1 *et. seq.,* by failing to pay Synesiou the compensation due to him under the employment agreement. Defendants maintain that Synesiou's WPCL claim fails as a matter of law because (1) DTM is not an "employer" within the meaning of the WPCL, and (2) Synesiou, as a resident of California, is not an employee entitled to WPCL protection.

### A. *DTM is an "employer" as defined by the WPCL*

The WPCL defines "employer" as "every person, firm, partnership, association, corporation, receiver or other officer of a court of this Commonwealth and any agent or officer of the above-mentioned classes employing *any person* in this Commonwealth." 43 P.S. § 260.2a (emphasis added). Defendants' contend that DTM is not such an employer, as Synesiou did not and cannot allege that DTM employs any person in Pennsylvania. This is not so.

First, Synesiou alleges that DTM was an "employer" as defined by the WPCL. Compl. ¶ 41. In ruling on this motion to dismiss, this court must accept Synesiou's allegation as true unless defendants can definitively show that it is a false statement or an unwarranted factual inference. However, defendants have not provided any reason as to why this court should not believe Synesiou's contention that DTM is an "employer" as defined by the WPCL.

Second, although the term "employee" is not defined in the WPCL, the Pennsylvania Superior

Court has determined that in applying the WPCL, the definitions of employee provided in the Pennsylvania Unemployment Compensation Act (" UCA"), 43 P.S. § 751 *et. seq.,* and the Pennsylvania Worker's Compensation Act ("WCA"), 77 P.S. § 1 *et. seq.,* are "persuasive." *Frank Burns, Inc. v. Interdigital Communications Corp.,* 704 A.2d 678, 680 (Pa.Super.1998). Both the UCA and WCA define employee to include the officers of a corporation. 43 P.S. § 753(l)(1) (The definition of employee includes one employed to perform " service as an officer of a corporation."); 77 P.S. § 22 (The term employee includes "every executive officer of a corporation elected or appointed in accordance with the charter and by-laws of the corporation.").[FN1] In his complaint, Synesiou also alleges that Harrison and Brown, two of DTM's officers and executives, are residents of Pennsylvania. Compl. ¶¶ 3,4. Given the fact that DTM's officers and executives may be considered employees of DTM, and two of DTM's officers reside in Pennsylvania, Synesiou's complaint has alleged sufficient facts for this court to find that DTM employs people within this state and is, therefore, an "employer" as defined by WPCL.

> FN1. Further support that the officers of DTM are employees under the WPCL is found in the Third Circuit case of *Scully v. U.S. Watts, Inc.,* 238 F.3d 497 (3d Cir.2001). In *Scully,* the Third Circuit allowed a corporation's president and chief operating officer to bring a claim under the WPCL against his former corporate employer. Because only employees may assert the protections of the WPCL, *Scully* indicates that the Third Circuit considers corporate officers to be employees.

### B. *Synesiou is an "employee" entitled to the protections of the WPCL*

Defendants argue that even if DTM is an "employer " under the WPCL, Synesiou's WPCL claim must be dismissed, as Synesiou, a nonresident, was not an employee entitled to the protections of the WPCL. Defendants maintain that it is "settled" that a nonresident may not recover for violations of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                Page 3

Not Reported in F.Supp.2d, 2002 WL 501494 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

WPCL. In support of this contention, defendants rely upon *Killian v. McCulloch,* 873 F.Supp. 938 (E.D.Pa.1995). In *Killian,* the district court held that the WPCL's protections did not extend to employees who were never based in Pennsylvania and who were not residents of Pennsylvania. 873 F.Supp. at 942. In arriving at this conclusion, the court found that "while the [WPCL] assuredly has the effect of deterring wrongful behavior on the part of employers, its primary aim is to ensure that those who are employed in Pennsylvania receive compensation for their work." *Id.* Thus, the court found that the legislature's interest in enacting the WPCL was to protect those who work within Pennsylvania, and not those who work outside the state. *Id.*

At the time *Killian* was decided, no Pennsylvania state court had ruled on the issue of whether a nonresident employee may bring suit in Pennsylvania pursuant to the WPCL, and therefore the *Killian* court was forced to predict what Pennsylvania courts would do when faced with this issue. Such predictions are no longer required without the guidance of any Pennsylvania court whatsoever. In January 2000, a Pennsylvania court rejected *Killian's* holding and allowed a nonresident employee to maintain a WPCL claim when his employment agreement required the use of Pennsylvania law and made Pennsylvania the exclusive forum for employer-employee disputes. *Crites v. Hoogovens Tech. Services, Inc.,* 43 Pa.D. & C. 4th 449 (Pa.Com.Pl.2000). In *Crites,* the Pennsylvania court considered whether an Ohio resident, whose employment obligation was in Mexico, was able to bring a WPCL claim against his Pennsylvania employer. 43 Pa.D. & C. 4th at 451. The *Crites* court found that applying the *Killian* holding when an employment agreement specified that it was to be governed by Pennsylvania law would bring about "absurd" results. *Id.* at 456-57. If *Killian* applied, the court found that the nonresident employee would be effectively out of court, as he would be unable to bring suit under the WPCL because of his nonresident status and unable to bring the action under another state's equivalent of the WPCL because of the employment agreement's choice of Pennsylvania law. *Id.* at 456. This result was inconsistent with the purposes of the WPCL,

which the court found to be *both* protection of Pennsylvania employee wages *and* punishment of "wayward employers" who failed to pay its employees' wages. *Id.* at 455. Accordingly, the Pennsylvania court rejected *Killian* and allowed the nonresident employee to maintain his WPCL claim.

*3 Applying the Pennsylvania precedent of *Crites* to the present action, this court will allow Synesiou's WPCL claim.[FN2] Synesiou is a California resident who was employed by DTM, a Pennsylvania corporation, pursuant to an employment agreement that specified that it was governed by Pennsylvania law.[FN3] Compl. ¶ 21. As a result of the choice of law provision, no matter where Synesiou chose to pursue this action against defendants, he was required to bring his statutory claim for wages under the WPCL.[FN4] Because the protections of another state's equivalent of the WPCL are unavailable to Synesiou, if he is not afforded the protections of the WPCL, Synesiou will effectively be out of court and DTM will be immune from any statutory liability for its failure to pay the compensation due to him.[FN5] This result offends the second purpose behind the enactment of the WPCL as enunciated by the *Crites* court, to punish recalcitrant employers for failing to pay employee wages. Accordingly, defendants' motion to dismiss Count 1 of Synesiou's complaint will be denied.

> FN2. Defendants argue that the *Crites* precedent is distinguishable from the present action because *Crites* involved an employment agreement with both a choice of law and choice of forum clause. Doc. 10 at 1-2. Defendants maintain that since the employment agreement here does not contain a choice of forum clause, the holding in *Crites* is inapplicable. Contrary to defendants' belief, the existence of a choice of forum provision was merely incidental to the *Crites* court's holding. Even if there had not been a choice of forum clause in *Crites* and the nonresident employee was able to sue his employer in a forum other than Pennsylvania, the choice of law clause would have prevented the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 501494 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

nonresident employee from suing under another state's equivalent of the WPCL. The court reasoned that if nonresidents were absolutely barred from bringing WPCL claims, an employer would effectively be able to protect itself against WPCL liability simply by hiring nonresidents and including a Pennsylvania choice of law clause in its employment agreements. *Crites,* 43 Pa.D. & C. 4th at 456. It was because of this employers' liability shield created by the Pennsylvania choice of law provision that the *Crites* court allowed the nonresident employee to maintain his WPCL claim.

FN3. This court has diversity jurisdiction over the present action, and therefore Pennsylvania choice of law rules will apply. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 196 (1941) Because " Pennsylvania courts generally honor the intent of the contracting parties and enforce choice of law provisions in contracts executed by them," this court will honor the choice of law provision and apply Pennsylvania law to the employment agreement at issue. *Kruzits v. Okuma Machine Tool, Inc.,* 40 F.3d 52, 55 (3d Cir.1994).

FN4. Defendants also argue that the choice of Pennsylvania law provision in the employment agreement does not necessarily mean that the agreement is governed by the WPCL. Doc. 10 at 2. Defendants suggest that the choice of law clause allows them to selectively choose which Pennsylvania employment laws apply to Synesiou's employment agreement. This is a novel interpretation of contractual choice of law provisions for which defendants have not provided any support. Defendants have not explained why the choice of Pennsylvania law provision in the employment agreement means anything other than what it says, namely that the "employment agreement shall be governed by the laws of the Commonwealth of Pennsylvania." Such laws necessarily include the Pennsylvania WCPL.

FN5. The other district court cases cited by defendants to support their position that Synesiou is not entitled to the protections of the WPCL do not involve choice of law provisions. As such, these cases are not analogous to the present action where a choice of law provision governed the employment agreement and required Synesiou's statutory cause of action for wages to be brought under the Pennsylvania WPCL.

II. Counts III & IV-Promissory Estoppel and Unjust Enrichment

*4 In Counts III and IV of his complaint, Synesiou brings claims of promissory estoppel and unjust enrichment, respectively. Synesiou's promissory estoppel claim is that he was told by defendants that DTM would pay his relocation costs and that he relied on this promise when he sold his home in Minnesota and relocated to San Diego. Compl. ¶¶ 58-61. Synesiou's unjust enrichment claim is that as a result of defendants' wrongful actions, he was damaged and defendants obtained a benefit to which they were not entitled. Compl. ¶¶ 62-65. Defendants argue that because there is a valid and enforceable written employment agreement that governs these matters, Synesiou's claims for promissory estoppel and unjust enrichment must be dismissed.

A cause of action for promissory estoppel arises when a party relies to his detriment on the representations of another party. *Carlson v. Arnot-Ogden Memorial Hospital,* 918 F.2d 411, 416 (3d Cir.1990); *Thomas v. E.B. Jermyn Lodge No. 2,* 693 A.2d 974, 977 (Pa.Super.1997). Promissory estoppel applies to enforce a promise that is not supported by consideration, in other words, when there is no binding contract. *Carlson,* 918 F.2d at 416; *Constar, Inc. v. National Distribution Centers, Inc.,* 101 F.Supp.2d 319, 323 (E.D.Pa.2000). Thus, promissory estoppel has no application when parties have entered into an

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                        Page 5

Not Reported in F.Supp.2d, 2002 WL 501494 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

enforceable agreement. *Carlson*, 918 F.2d at 416. Similarly, a claim of unjust enrichment is defeated by the existence of an enforceable and binding contract. *Schott v. Westinghouse Electric Corp.,* 436 Pa. 279, 259 A.2d 443, 448 (Pa.1969); *see also Matter of Penn Center Transp. Co.,* 831 F.2d 1221, 1230 (3d Cir.1987) (plaintiff cannot maintain a claim of unjust enrichment when an express contract existed on the same subject). "Under Pennsylvania law, 'the quasi-contractual doctrine of unjust enrichment is inapplicable when the relationship between the parties is founded on a written agreement or express contract.' " *Hershey Foods Corp. v. Ralph Chapek, Inc.,* 828 F.2d 989, 999 (3d Cir.1987) (quoting *Schott v. Westinghouse Electric Corp.,* 436 Pa. 279, 259 A.2d 443, 448 (Pa.1969)). This is because the essence of an unjust enrichment claim is that there is no direct relationship between the parties under which the plaintiff may recover. *Rade, v.Transition Software Corp.,* 1998 WL 767455 at * 9 (E.D.Pa. Oct. 30, 1998).

Here, neither party disputes the existence of a valid and enforceable employment agreement nor does either party dispute the fact that the existence of this agreement precludes Synesiou from obtaining relief under a promissory estoppel or unjust enrichment theory.[FN6] As a result, Synesiou argues (1) that he is entitled to plead promissory estoppel and unjust enrichment claims in the alternative and (2) that because his promissory estoppel and unjust enrichment claims are based on matters outside the scope of the employment agreement, these claims are not precluded by the existence of this agreement.

> FN6. Should defendants later attempt to change their position with reference to the validity of the employment contract, the court will reconsider this issue.

Under Fed.R.Civ.P. 8(a), plaintiffs are free to plead alternative theories of relief. However, the fact that the federal rules permit alternative pleading does not mean that alternatively plead claims may not be dismissed if they fail to state a claim. As stated above, the finding of an enforceable contract defeats the validity of promissory estoppel and unjust enrichment claims. *Carlson,* 918 F.2d at 416 (promissory estoppel claim must fail when a valid contract exists); *Halstead v. Motorcycle Safety Foundation Inc.,* 101 F.Supp.2d 455, 459 (E.D.Pa.1999) (unjust enrichment claim must fail when a valid contract exists); *Schott,* 259 A.2d at 448 (unjust enrichment claim inapplicable when a contractual relationship exists between parties); *see also Matter of Penn Center Transp. Co.,* 831 F.2d 1221, 1230 (3d Cir.1987) (plaintiff cannot maintain a claim of unjust enrichment when an express contract existed on the same subject). Thus, because the parties agree that a valid employment agreement exists here, Synesiou cannot maintain a claim for either promissory estoppel or unjust enrichment, as neither theory is available to provide Synesiou with relief.[FN7]

> FN7. Synesiou's reliance on *Eastland v. Du Pont,* 1996 WL 421940 (E.D.Pa. July 23, 1996), and *Gonzalez v. Old Kent Mortgage Co.,* 2000 WL 1469313 (E.D.Pa. Sept. 21, 2000), is misplaced here. These cases are readily distinguishable from the present action. In both *Eastland* and *Gonzalez,* the validity and existence of the underlying contractual agreement was in dispute. *Eastland,* 1996 WL 421940 at *2; *Gonzalez,* 2000 WL 1469313 at *4. As such, these courts allowed claims of unjust enrichment to be plead in the alternative in case it was found that no valid contract existed between the parties. By contrast, in the present action, the validity and enforceability of the employment agreement are not at issue. Because of this key difference, the *Eastland* and *Gonzalez* precedents do not instruct this court.

*5 In apparent recognition of the obstacle that the valid employment agreement presents to his promissory estoppel and unjust enrichment claims, Synesiou argues that these claims are based on representations that were made to him *after* the execution of the employment agreement and that these claims are beyond the scope of the agreement. As such, Synesiou maintains that his promissory

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 501494 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

Page 6

estoppel and unjust enrichment claims are not barred by the existence of the employment agreement.

Synesiou's promissory estoppel and unjust enrichment claims [FN8] are premised on the allegation that Synesiou relied on defendants' representations that as part of his employment he was required to relocate and that DTM would cover his relocation costs. Compl. ¶ 59. As a result, Synesiou seeks to recover for damages incurred in connection with his relocation. Compl. ¶ 61. An examination of the allegations contained in Synesiou's complaint leads this court to conclude that these matters are within the scope of the employment agreement. In his complaint, Synesiou alleges that the employment agreement provides that DTM would pay plaintiff $60,000 for his relocation costs. Compl. ¶¶ 14, 23. Additionally, as part of his breach of contract claim, Synesiou alleges that DTM failed to pay the relocation costs that were provided for and due to him under his employment agreement. Compl. ¶¶ 51, 54. Given that Synesiou seeks to recover the same damages under his promissory estoppel and unjust enrichment claims as his breach of contract claim, namely reimbursement for his costs of relocating to San Diego, it is evident that Synesiou's promissory estoppel and unjust enrichment claims concern matters within the four corners of the employment agreement. Thus, Synesiou's promissory estoppel and unjust enrichment claims are defeated by the existence of the employment agreement. Accordingly, these claims will be dismissed.[FN9]

FN8. Synesiou's complaint does not specifically indicate that his unjust enrichment claim is premised on defendants' representations regarding relocation. Rather, Synesiou's claim of unjust enrichment is based on all of defendants' actions described in his complaint to the extent that defendants accepted a benefit to which they were not entitled and have not paid. Compl. ¶ 63. However, in his memorandum in opposition to defendants' motion to dismiss, Synesiou states that his unjust

enrichment claim pertains to his relocation. Doc. 9 at 15.

FN9. Because the existence of the employment agreement bars Synesiou's promissory estoppel and unjust enrichment claims, it is unnecessary for this court to consider defendants' argument that the parol evidence rule also bars these claims. Additionally, by dismissing Synesiou's promissory estoppel and unjust enrichment claims, this court need not consider defendants' argument that Synesiou has not plead a factual basis to maintain these claims against the individual defendants.

CONCLUSION

*6 Defendants' motion to dismiss will be granted in part and denied in part. This court will not dismiss Synesiou's WPCL claim (Count I). Synesiou has alleged sufficient facts for this court to find that DTM is an "employer" as defined by the WPCL, and recent Pennsylvania caselaw instructs this court that plaintiff, although not a Pennsylvania resident, is an employee entitled to the protections of this act. This court will, however, dismiss Synesiou's promissory estoppel (Count III) and unjust enrichment (Count IV) claims. Because the validity of the employment agreement is uncontested and the factual basis for Synesiou' s promissory estoppel and unjust enrichment claims is encompassed by this agreement, Synesiou is not entitled to relief under either a promissory estoppel or an unjust enrichment theory.

An appropriate order follows.

ORDER

And now this _____ day of April, 2002, upon consideration of plaintiff's complaint (Doc. No. 1); defendants' motion to dismiss Counts I, III, and IV of plaintiff's complaint (Doc. No. 3); plaintiff's opposition thereto (Doc. No. 9); defendants' reply (Doc. No. 10); and plaintiff's letter brief dated March 15, 2002; it is hereby ORDERED that defendants' motion to dismiss Count I of plaintiff's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 7

Not Reported in F.Supp.2d, 2002 WL 501494 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**


complaint is DENIED. It is further ORDERED that
defendants' motion to dismiss Counts III and IV is
GRANTED and Counts III and IV are dismissed.

E.D.Pa.,2002.
Synesiou v. DesignToMarket, Inc.
Not Reported in F.Supp.2d, 2002 WL 501494
(E.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2:01CV05358 (Docket) (Oct. 22, 2001)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT E



Not Reported in F.Supp.2d                                      Page 1

Not Reported in F.Supp.2d, 1999 WL 222459 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

▷
Briefs and Other Related Documents
Whitfield v. Pathmark Stores, Inc.D.Del.,1999.Only
the Westlaw citation is currently available.
United States District Court, D. Delaware.
Sharon WHITFIELD, Plaintiff,
v.
PATHMARK STORES, INC., Defendant.
**No. CIV.A. 96-246-MMS.**

March 30, 1999.

Teresa C. Fariss, Esq., of Young, Conaway, Stargatt
& Taylor, Wilmington, Delaware; attorney for
plaintiff.
Susan G. Harron, Esq., of White and Williams LLP,
Wilmington, Delaware; Of Counsel: Michael F.
Kraemer, Esq., of White and Williams LLP,
Philadelphia, Pennsylvania; attorneys for defendant.

MEMORANDUM OPINION
SCHWARTZ, Senior District J.
**\*1** Sharon Whitfield ("Whitfield") filed this
complaint against Pathmark Stores, Inc. ("Pathmark
") alleging violation of the Americans with
Disabilities Act ("ADA"). 42 U.S.C. § 12111 *et seq.*
She alleges she was a qualified individual with a
disability and Pathmark discriminated against her
because of her disability. She further alleges
Pathmark retaliated against her for engaging in
protected activity under the ADA. A jury trial of the
matter has been scheduled beginning May 10, 1999.
Before the Court are three [FN1] pre-trial motions in
limine from Defendant.

I. FACTS

The relevant facts are simple.[FN2] Whitfield had
been employed by Pathmark since 1981, when in
1992 and 1993 she was in two successive
automobile accidents injuring her back. After some
time away from Pathmark, she returned to work in

October 1993 with several doctor's restrictions.
When she informed Pathmark her injuries were
permanent, she was taken off the work schedule on
February 11, 1994

Whitfield filed a disability discrimination charge
against Pathmark with the Delaware Department of
Labor ("DDOL") on April 27, 1994.[FN3] On May
7, 1994, she returned to work at Pathmark with a
note reiterating her medical limitations. When she
returned, she was placed on an assignment which
included activities she believed were not within her
limitations. She asked to be returned to the job she
had held immediately after returning from her
accident. After Whitfield performed the new job
and experienced an aggravation of her symptoms,
she provided Pathmark with a doctor's note. She
was again taken off the work schedule May 21,
1994.

A series of negotiations regarding a possible return
to work in keeping with her medical restrictions
followed. These meetings, however, were to no
avail, and Whitfield remained off the schedule at
Pathmark.

On April 28, 1995, the Delaware Department of
Labor issued a decision finding probable cause to
believe Pathmark had discriminated against
Whitfield. The EEOC issued Whitfield a "Notice of
a Right to Sue" on April 19, 1996. On May 1, 1996,
Pathmark terminated Whitfield. She instituted this
suit on May 13, 1996.

II. DISCUSSION

"The Third Circuit Court of Appeals has approved
of pre-trial motions in limine as a method of '
narrow[ing] the evidentiary issues for trial and ...
eliminat[ing] unnecessary trial interruptions." '
*Spruill v. Winner Ford of Dover, Ltd.,* 175 F.R .D.
194, 196 (D.Del.1997) (quoting *Bradley v.
Pittsburgh Bd. of Educ.,* 913 F.2d 1064, 1069 (3d

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                  Page 2

Not Reported in F.Supp.2d, 1999 WL 222459 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Cir.1990)). Pathmark moves to prevent Whitfield from introducing at trial three different types of evidence: (1) evidence of future wage loss, D.I. 106; (2) evidence "concerning or pertaining to the Delaware Department of Labor investigation of plaintiff's disability discrimination charge and subsequent determination," D.I. 107; and (3) evidence of wage loss after June 16, 1994, D.I. 108. A separate discussion of each motion follows.

### A. Evidence of Future Wage Loss

**\*2** Pathmark seeks to exclude evidence of future wage loss. It argues that because Whitfield has asked for reinstatement, the legally preferred remedy, she is not entitled to the alternative remedy of future wages. The Court will deny the motion.

The Third Circuit Court of Appeals has made plain that absent circumstances in which reinstatement is not feasible, back pay with reinstatement is the preferred remedy in a case such as this. *E.g., Starceski v. Westinghouse Electric Corp.*, 54 F.3d 1089, 1103 (3d Cir.1995); *Feldman v. Philadelphia Housing Authority*, 43 F.3d 823, 831-32 (3d Cir.1995). Here, Whitfield not only includes reinstatement in her prayer for damages [FN4] but she also testified in her deposition that she was seeking reinstatement to active employment at Pathmark, D.I. 106, Exh. B ("I want my job back." ). It is clear, therefore, that Whitfield is seeking reinstatement.

Whitfield argues, however, that after trial the Court may decide reinstatement is inappropriate in this case because 1) no comparable employment would be available; and 2) a history of hostility exists in the workplace. *See, e.g., Starceski*, 54 F.3d at 1103 (3d Cir.1995) (listing grounds for granting front pay rather than reinstatement); *Maxfield v. Sinclair International*, 766 F.2d 788, 796 (3d Cir.1985) (" There may be no position available at the time of judgment or the relationship between the parties may have been so damaged by animosity that reinstatement is impracticable."). Pathmark notes that it "does not argue that it cannot reinstate plaintiff, if ordered to do so by this Court." [FN5] D.I. 106, ¶ 10.

The Third Circuit Court of Appeals has explicitly explained that "[s]ince reinstatement is an equitable remedy, it is the district court that should decide whether reinstatement is feasible[,] .... [but] the amount of damages available as front pay is a jury question." *Maxfield*, 766 F.2d at 796 (3d Cir.1985). It has further noted,

[T]he preferable course for a plaintiff seeking the equitable remedy of reinstatement is for such a plaintiff to ask for a jury interrogatory concerning the amount of damages attributable to front-pay in order to avoid a double recovery. In the future, we may require such a practice in order to preserve a claim for reinstatement.

*Squires v. Bonser*, 54 F.3d 168, 176 n. 16 (3d Cir.1995) (outlining the preferred practice when dealing with the alternative remedies of reinstatement and front pay). Other cases have also ratified this approach. *Starceski*, 54 F.3d at 1103 (discussing presence of jury instructions on front pay); *Anastasio v. Schering Corp.*, 838 F.2d 701, 708-710 (analyzing jury calculation of front pay for reasonableness). Thus, the Court, if Pathmark is found to have unlawfully discriminated or retaliated against Whitfield, will be asked to determine if reinstatement is appropriate. The Court declines, without a full presentation on the reinstatement issue, to preclude the possibility that front pay damages may be warranted. *See Feldman*, 43 F.3d at 832 (describing approvingly trial court's practice of deferring issue of availability of front pay until after presentation of evidence and then determining whether issue of front pay damages should be put to the jury). The Court therefore denies Pathmark's motion to exclude evidence of front pay damages.

### B. DDOL Investigation and Determination

**\*3** Pathmark requests the Court exclude both the factual and legal findings of the DDOL's Determination, all testimony regarding the determination and all evidence concerning the DDOL investigation of Whitfield's charges. The Court will grant Pathmark's motion as to the Determination itself and any testimony regarding the Determination, but will reserve decision as to any evidence concerning the DDOL investigation,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 3

Not Reported in F.Supp.2d, 1999 WL 222459 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

including the contents of the DDOL file, until Whitfield seeks to introduce them at trial.

Pathmark argues the Determination must be excluded as hearsay evidence because it is an out of court statement being "offered for the truth of the matter asserted." Fed.R.Evid. 801(c). It further argues that the exception to the hearsay rule embodied in Federal Rule of Evidence 803(8)(C) which permits admission of

[r]ecords, reports, statemetns, or data comilations, in any form, of pulic offices or agencies, setting forth ... (C) in civil actions ... factual findings resulting from an investigation made pursuant to authoirty granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

In determining the admissibility of documents under this exception, this Court has previously held that the trustworthiness of the information is the primary factor to be considered. *Spruill v. Winner Ford of Dover, Ltd.,* 175 F.R.D. 194, 196 (D.Del.1997). However, as this Court noted, "With the record silent as to trustworthiness, the Court is loathe to hold the findings of the DDOL are inadmissible based on lack of trustworthiness, despite gereral recognition that the quality of these findings may vary." [FN6] *Id.* at 197. However, because the Court finds that the Determination is inadmissible on other grounds, it need not further consider this issue.

Neither the factual findings nor the legal findings in the Determination are admissible under the Federal Rules of Evidence. The facutal findings are inadmissible because they are unnecessarily cumulative. Under the Federal Rules of Evidence, " all relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules presribed by the Supreme Court ...." Fed.R.Evid. 402; *see also Beech Aircraft v. Rainey,* 488 U.S. 153, 168 (1988) (noting that relevance requirements of the Federal Rules of Evidence further limit the admissibility official reports). Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the aciton more

probably or less probably than it would be without the evidence." Fed.R.Evid. 401.

The factual findings of the determination clearly echo the facts for which this Court has, in previous opinions, found supporting evidence. After Whitfield's return from work after a back injury, when her doctor provided Pathmark a note indicating her limitations were permanent, she was taken off the work schedule in February 1994. She returned to work on May 7, 1994, but experienced problems with her back doing the work assigned to her. She was taken off the work schedule again on May 21, 1994. Because the facts oulined in the DDOL report are duplicative of undisputed facts, they are cumulative and therefore have little relevance.[FN7] *Spruill,* 175 F.R.D. at 197. Therefore, the factual findings of the DDOL Determination will not be admitted at trial.

*4 The legal findings of the Determination are likewise inadmissible because they could have a highly prejudicial effect. Federal Rule of Evidence 403 permits exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." As this Court has previously noted, several courts have excluded such opinions or conclusions by the EEOC because of the prejudice it might have toward one of the parties. *Id.* at 198. Indeed, in *Brom v. Bozell, Jacobs, Kenyon & Eckhardt,* 867 F.Supp. 686 (N.D.Ill.1994), the Court noted noted that admitting such administrative conclusions were "tantamount to saying 'this has already been decided and her is the decision[.]' " *Id.* at 692 (quotation omitted). *Id.* at 692.

In this case, the DDOL Determination makes several conclusions of law. For example, the Determination states "Respondent failed to provide a valid reason for taking Charging party off the schedule," "Respondent discriminated against Charging party," and "failed to accomodate." Furthermore, the Determination assumes Whitfield has a disability, a conclusion this Court has declined to make as a matter of law. By drawing this

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 1999 WL 222459 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

conclusion, the Determination has the potential to confuse the jurors and would be highly prejudicial against Pathmark since it draws many of the same conslusions the jury will be asked to draw. Therefore, the Conclusion of the Determination is also inadmissible. Similarly, any testimony regarding the DDOL Determination will likewise be excluded.

Pathmark also seeks to exclude all evidence concerning the DDOL investigation, including all materials submitted by Pathmark to the DDOL as part of the investigation. However, neither party has apprised the Court of the contents of the investigative file. That file could contain relevant evidence or impeachment evidence, which, if otherwise admissible, should not be excluded. Without further knowledge of the contents of the investigative file, the Court cannot rule upon the admissibility of any one item in the investigative file. However, counsel are advised not to mention before the jury any evidence in the investigative file without first requesting a bench conference and obtaining a ruling and not to mention the contents of the DDOL investigative file during opening argument.

### C. Wage Loss After June 16, 1994

This particular motion in limine borders on the frivolous. Pathmark requests this Court to exclude all evidence of wage loss after June 16, 1994, on the ground that Whitfield failed to accept an unconditional offer of reinstatement by Pathmark on that date. D.I. 108. While it is true that under the Supreme Court's holding in *Ford Motor Co. v. EEOC,* 458 U.S. 219 (1982), failure to accept an unconditional offer of reinstatement tolls accrual of back pay from the date of the offer, Pathmark has not come anywhere close to showing uncontroverted evidence of an unconditional offer of reinstatement.

*5 Pathmark relies on a letter dated June 16, 1994, memorializing a meeting on June 8, 1994, where, according to the letter, Pathmark agreed to all the terms set forth by Whitfield and offered to return her to work immediately. D.I. 108, Exh. A.

However, Whitfield argues the offer at this meeting, far from being unconditional, was conditioned upon her withdrawing the charges she had filed with the EEOC and DDOL. Indeed, Richard McGinley, the Director of Associate Relations at Pathmark, testified the terms of Whitfield's reinstatement were included on a sheet of paper given to her at the June 8, 1994, meeting and marked as an exhibit in his deposition. D.I. 114, Exh. A at 90, 92. Indeed, that exhibit states, in handwriting at the bottom, " EEOC/Del DOL disability charges to be withdrawn. " D.I. 114, Exh. B. The Court cannot, therefore, conclude Pathmark gave Whitfield an unconditional offer of employment precluding her from seeking back pay after that date. *See also Whitfield v. Pathmark,* No. Civ. A. 96-246, 1998 WL 372313, at *3 (D. Del. June 22, 1998) (reciting as a fact in a summary judgment opinion that "Pathmark's proposal required that Whitfield drop her disability discrimination charge."). The Court therefore will deny Pathmark's motion to exclude evidence of wage loss after June 16, 1994.

### III. CONCLUSION

Therefore, the Court will deny Pathmark's motion to exclude evidence of future wage loss. Pathmark's motion to exclue evidence of the DDOL investigation will be granted with respect to the DDOL Determination in its entirety, but judgment is reserved as it relates to evidence of the DDOL investigation. Finally, Pathmark's motion to exclude evidence of wage loss after June 16, 1994, will be denied.

FN1. Pathmark has informed the Court by letter that it no longer intends to pursue a fourth motion in limine, D.I. 109, in light of this Court's March 12, 1999, decision in this case reinstating Whitfield's discrimination claim, ___ F.Supp.2d ___ (D.Del. March 12, 1999).

FN2. The Court has twice outlined more fully the facts underlying this matter in two summary judgment opinions. *Whitfield v. Pathmark Stores, Inc.,* No. Civ. A. 96-246

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 1999 WL 222459 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 5

MMS, 1998 WL 372313 (D. Del. June 22, 1998); *Whitfield v. Pathmark Stores, Inc.,* 971 F.Supp. 851 (D.Del.1997), *vacated in part by,* ____ F.Supp.2d ____ (D.Del. March 12, 1999).

FN3. Whitfield's attorney, Richard Zappa ( "Zappa") later gave Pathmark notice of the complaint.

FN4. This alone is not conclusive since the the Third Circuit Court of Appeals has held that a plaintiff who does not request reinstatement cannot claim damages in the form of frontpay, since front pay is in lieu of reinstatement. *Wehr v. Burroughs Corp.,* 619 F.2d 276 (1980); *but see Maxfield v. Sinclair International,* 766 F.2d 788, 796 (3d Cir.1984) (where plaintiff specifically prayed for front pay and did not specifically disavow desire for reinstatement, front pay not waived).

FN5. The Court notes that the principal of judicial estoppel will bind Pathmark from later asserting a different position in bad faith. *E.g. Stairmaster Sports/Medical Products, Inc. v. Groupe Procycle, Inc.,* 25 F.Supp.2d 270, 280 (D.Del.1998) (holding party to patent litigation was judicially estopped from asserting position inconsistent with position taken at *Markman* proceedings).

FN6. While Pathmark suggests that the Determination is untrustworthy because it assumes Whitfield is disabled. However, this alone, does not render the report untrustworthy, particularly since the Court has recently held that whether Whitfield is disabled is an issue for the jury. ____ F.Supp.2d ____ (D.Del. March 12, 1999).

FN7. This discussion of the facts is not exhaustive with respect to every fact detailed by the DDOL or undisputed in this matter. For purposes of deciding this motion in limine, the Court has focused on the "meat" of the Determination.

D.Del.,1999.
Whitfield v. Pathmark Stores, Inc.
Not Reported in F.Supp.2d, 1999 WL 222459 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:96cv00246 (Docket) (May. 13, 1996)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

ELLEN ZECHMAN,                        :
                                      :        C.A. No. 05-159 (JJF)
                 Plaintiff,           :
                                      :
        v.                            :
                                      :
CHRISTIANA CARE HEALTH SYSTEMS,       :
                                      :
                 Defendant.           :

## CERTIFICATE OF ELECTRONIC SERVICE

I hereby certify that on December 11, 2006, I electronically filed the attached

**COMPENDIUM OF UNPUBLISHED OPINIONS CITED IN REPLY BRIEF IN**

**FURTHER SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the

following:

> Jeffrey K. Martin, Esquire
> Margolis Edelstein
> 1509 Gilpin Avenue
> Wilmington, DE 19806

David H. Williams (#616)
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
P.O. Box 2306
Wilmington, DE 19899
(302) 888-6900
dwilliams@morrisjames.com

1473990/1

Michael J. Ossip (mossip@morganlewis.com)
Thomas S. Bloom (tbloom@morganlewis.com)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA  19103
(215) 963-5543

Attorneys for Defendant
Christiana Care Health Services, Inc.

Dated:  December 11, 2006