## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ELLEN ZECHMAN, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 05-159-JJF |
| | : | |
| CHRISTIANA CARE HEALTH SYSTEMS, | : | |
| | : | |
| Defendant. | : | |

---

## APPENDIX OF EXHIBITS TO
## REPLY BRIEF IN FURTHER SUPPORT OF DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

---

David H. Williams (DE 616)
MORRIS, JAMES LLP
500 Delaware Ave., Suite 1500
P.O. Box 2306
Wilmington, DE 19899
302.888.6900
dwilliams@morrisjames.com

Michael J. Ossip (admitted pro hac vice)
Thomas S. Bloom (admitted pro hac vice)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
215.963.5543

Counsel for Defendant Christiana Care
Health Systems

Dated: December 11, 2006

# TABLE OF CONTENTS

| PAGE NO. | DESCRIPTION |
|---|---|
| C-1 | E-mail from Robyn Gray to Sandra Kardos and Lamar Ekbladh, M.D., dated Sept. 23, 2003 |
| C-2 | Deposition of Dean Patton, M.D., dated July 27, 2006 |
| C-11 | Agreement between Ellen Ruth Huffman-Zechman and QTC Medical Group, Inc., dated Feb. 7, 2005 |
| C-25 | Letter to Morgan Lewis from James Zechman, M.D., PhD, dated March 20, 2006 |

**Kardos, Sandra L.**

| | |
|---|---|
| **From:** | Gray, Robyn |
| **Sent:** | Sunday, September 21, 2003 10:31 AM |
| **To:** | Kardos, Sandra L.; Ekbladh, Lamar MD |
| **Subject:** | ellen zechman |

Hi Sandy and Dr Ekbladh

I wanted to let you know that Ellen Zechman called in on Saturday, Sept. 20, 2003 about 6am to let us know that she would not be able to come in, because she was experiencing leg numbness (Joe Patruno called her back for me, so for more details about the conversation please check with him). She told Joe that she did not need to go to the ED because she thought it was most likely "back" - musculoskeletal. She was going home to be evaluated in North Carolina. I don't know what her long term plan is, Joe mentioned something about a "medical leave".

I don't know when she is going to let us know but if I hear from her I will have her contact you.If you hear from her can you let me know what the plan is because I will have to adjust next weeks schedule.

Thanks - Robyn

*[handwritten note:]* Didn't she call the chief surgeon to let them know she wasn't coming in Monday. (call (ME) Sandi to inform me she would not call week

D0144
CONFIDENTIAL

7/27/2006 Dean Patton, M.D.

```
0001
 1                    UNITED STATES DISTRICT COURT
 2                 EASTERN DISTRICT OF NORTH CAROLINA
 3
 4    ELLEN ZECHMAN,
 5              PLAINTIFF,          CIVIL ACTION: 05-159-JJF
 6    V.
 7    CHRISTIANA CARE HEALTH
 8    SYSTEMS,
 9              DEFENDANT.
10
11                       DEPOSITION OF
12                     DEAN PATTON, M.D.
13
14              AT THE BRODY SCHOOL OF MEDICINE
15                 GREENVILLE, NORTH CAROLINA
16
17
18       THURSDAY, JULY 27, 2006, BEGINNING @ 1:41 P.M.
19                        VOLUME 1
20                      PAGES 1 - 33
21
22
23
24
25
```

1

---

7/27/2006 Dean Patton, M.D.

```
 1          1.   SAID DEPOSITION SHALL BE TAKEN FOR THE PURPOSE OF
 2    DISCOVERY OR FOR USE AS EVIDENCE IN THE ABOVE-ENTITLED ACTION
 3    OR FOR BOTH PURPOSES, AS PERMITTED BY THE APPLICABLE RULES OF
 4    CIVIL PROCEDURE;
 5          2.   READING AND SIGNING OF THE TRANSCRIPT OF
 6    TESTIMONY BY THE WITNESS IS NOT WAIVED.  CHANGES TO THE
 7    DEPOSITION MAY BE MADE IN THE WITNESS' OWN HAND, OUT OF THE
 8    PRESENCE OF THE OFFICER, DELINEATED BY PAGE AND LINE NUMBER
 9    ON THE ERRATA SHEET TO THE SIGNATURE PAGE.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3

---

7/27/2006 Dean Patton, M.D.

```
 1    APPEARANCES
 2    LORI A. BREWINGTON, ESQ.
 3    MARGOLIS-EDELSTEIN
 4    DELAWARE OFFICE
 5    1509 GIPPIN AVENUE
 6    WILMINGTON, DELAWARE 19806
 7    (302)777-4680
 8    loriabrewington@margolisedelstien.com
 9
10    FOR THE DEFENDANT:
11    THOMAS S. BLOOM, ESQ.
12    MORGAN, LEWIS & BOCKIUS, LLP
13    1701 MARKET STREET
14    PHILADELPHIA, PENNSYLVANIA 19103-2921
15    (215)-963-5543
16    tbloom@morganlewis.com
17
18    COURT REPORTER:
19    SHEILA B. DARDEN
20             S T I P U L A T I O N S
21          BY NOTICE AND/OR CONSENT, THE DEPOSITION OF
22    DEAN PATTON, M.D., WAS TAKEN ON THE 27TH DAY OF JULY, 2006,
23    BEGINNING AT 1:41 P.M., AT THE BRODY SCHOOL OF MEDICINE, IN
24    GREENVILLE, NORTH CAROLINA, BEFORE SHEILA B. DARDEN, A COURT
25    REPORTER AND NOTARY PUBLIC IN AND FOR THE COUNTY OF GREENE.
```

2

---

7/27/2006 Dean Patton, M.D.

```
 1    INDEX
 2
 3    EXAMINATION
 4    DIRECT
 5    - BY THOMAS S. BLOOM:          PAGES  5 - 29
 6
 7    ADJOURNMENT                    PAGE   30
 8    SIGNATURE PAGE                 PAGES 31 - 32
 9    REPORTER CERTIFICATE           PAGE   33
10
11                                   EXHIBITS
12    NUMBER                         IDENTIFIED
13    DEPOSITION EXHIBIT [1]         LETTER TO JOHN P SCHERER, III
14                                   FROM JO ELLEN REEL
15    DEPOSITION EXHIBIT [2]         SUBPOENA
16
17
18
19
20
21
22
23
24
25
```

4

1    P R O C E E D I N G S

2         Whereupon, Dean Patton, M.D., having been first duly

3    sworn, was examined and testified as follows:

4         MR. BLOOM:  Before we start, Lori, is there

5    anybody present with you on the other end?

6         MS. BREWINGTON:  Nope, it's just me.

7         MR. BLOOM:  Okay.  Anybody on the telephone line

8    other than Lori Brewington?

9         MS. BREWINGTON:  Are you asking me?

10        MR. BLOOM:  Well, I'm just--I think we've gotten

11   no response, so--

12        MS. BREWINGTON:  Oh, okay.

13        MR. BLOOM:  You appear to be the only one on the

14   line.

15        ON DIRECT EXAMINATION CONDUCTED BY COUNSEL FOR THE

16   DEFENDANT:

17        BY:  MR. THOMAS S. BLOOM:

18        Q.  Good afternoon, Dr. Patton, my name is Tom

19   Bloom, and I represent Christiana Care Health Systems in a

20   case that's been brought by Ellen Zechman and--have you ever

21   given a deposition before today?

22        A.  Yes, I have.

23        Q.  Okay.  When was the last time you gave a

24   deposition?

25        A.  Last time I gave a deposition, to the best of my

5

1         Q.  Okay.  And, so, during the course of your

2    testimony today, it may be that some of your answers relate

3    to information that you've gathered from other people as

4    opposed to things that you had personal knowledge of at the

5    time.  If that is true of any of your answers, I'd appreciate

6    it if you'd let me know.  Let me know when you're relaying

7    information that was conveyed to you by other people.  Will

8    you try to do that?

9         A.  I will try to do that, but that should not be a

10   problem because I don't know of any other source of

11   information.

12        Q.  Okay.  Did you talk with anybody here at ECU in

13   order to gather additional facts or to prepare for today's

14   deposition?

15        A.  Yes, I did.

16        Q.  Who did you speak to?

17        A.  I spoke with the residency director in family

18   medicine, who is Dr. Andy Lopez.  And I also spoke with the

19   manager of graduate medical education at Pitt County Memorial

20   Hospital, and the name of that person is Ms. Alison Riddick,

21   R-i-d-d-i-c-k.

22        Q.  Okay.  Can you tell me--describe the substance

23   of your conversation with Dr. Lopez?

24        A.  The conversations with Dr. Lopez date back to

25   when Ms. Zechman initially applied for residency here, and we

7

1    knowledge, must have been at least ten years ago and maybe

2    fifteen years ago.

3         Q.  Okay.  I'm just gonna ask you a series of

4    questions today and ask that you give the most complete and

5    accurate answers that you can.  I don't want you--neither I

6    nor plaintiff's counsel want you to speculate about things.

7    We want to hear what you have actual knowledge of.  And we

8    have a court reporter here taking down everything we say, so

9    it's important that you give verbal responses to my questions

10   rather than nods of the head or even using phrases like Uh-uh

11   or Uh-huh.  Can you try to do that?

12        A.  I will try to do that.

13        Q.  Okay.  And, also, since we have a court reporter

14   taking down everything we say, it'll help all of us if you

15   wait for me to finish a question before you start to answer

16   it, and I will do the same and try to make sure you're done

17   with your answer before I ask my next question.  Will you do

18   that?

19        A.  I will do that.

20        Q.  Dr. Patton, your deposition today is being

21   conducted pursuant to what's called a Rule 30(b)(6) Subpoena

22   of East Carolina University School of Medicine.  And do you

23   understand that you're testifying here today as a

24   representative of ECU School of Medicine?

25        A.  I do understand that.

6

1    had several conversations about her application.  And then

2    I'm going to guess, maybe, six weeks ago or so, when I first

3    had conversation with Mr. Hassler about the fact that you

4    were inquiring, or your firm was inquiring, about information

5    about Ms. Zechman, I had conversation with Dr. Lopez at that

6    time again.

7         Q.  And you referred a moment ago to conversations

8    that you had; is it Dr. Lopez?

9         A.  Yes.

10        Q.  Okay.  You referred to conversations that you

11   had with Dr. Lopez at the time that Ms. Zechman applied for

12   residency.  Are you referring to when she applied to the

13   family practice residency program in 2004?

14        A.  Right.  And I had no--I had no conversations

15   with anybody about any other programs that she had applied to

16   prior to her application into family medicine.

17        Q.  What do you mean by that?

18        A.  I mean--I mean I only knew about her application

19   to family medicine.  When she applied to family medicine, I

20   then became aware that she had applied to other programs at

21   ECU in the past.

22        Q.  Okay.  And can you tell me what you remember

23   from your conversations with Dr. Lopez at that time?

24        A.  I was the--I was functioning as the Chair of the

25   Department of Family Medicine at that time, so in some sense

8

1  I had oversight of the residency programs, with that being
2  delegated primarily to Dr. Lopez and his colleague, Dr. Jan
3  Vesty.  And the conversation that we had had to do with the
4  fact that Ellen Zechman had applied for residency and that
5  there was some concern on the part of the office of graduate
6  medical education about her application with us because of
7  her previous experience with our institution.
8      Q.   Okay.  And what did you learn about
9  Ms. Zechman's previous experiences with the institution?
10     A.   I learned that she had applied in obstetrics and
11  gynecology, that she had not been included on their rank
12  list, and if you want to know more about rank lists, I can
13  talk to you about that.  But she had not been included on
14  their rank list so, in effect, she was not gonna be offered a
15  position here, and that she had filed an EEO claim against
16  the school-against the hospital, I guess, in fact, because
17  she was not employed by the hospital.
18     Q.   Okay.  Am I hearing you right that your
19  understanding was that Ms. Zechman had filed a complaint
20  against ECU or the hospital claiming that her non-selection
21  to the OB-GYN program was discriminatory in some way?
22     A.   I guess I only assumed that it was
23  discriminatory in some way because it was an EEO complaint.
24     Q.   Okay.  Did you--apart from the fact that
25  Ms. Zechman had filed a complaint against ECU in connection

9

1      Q.   Did he tell you why the hospital wouldn't
2  support her application?
3      A.   I don't remember his telling me why.
4      Q.   And after learning that fact from Dr. Lopez, did
5  you have any subsequent conversations with Dr. Lopez about
6  Ms. Zechman's application?
7      A.   I don't think we had any other conversations
8  that I can recall about Ms. Zechman's application until we
9  were informed within the last few months that your law firm
10  wanted more information about her applications here.
11     Q.   Okay.  And after that happened, did you then
12  have any further conversations with Dr. Lopez about
13  Ms. Zechman?
14     A.   Yes.  Dr. Lopez and I sat down together in his
15  office one afternoon and tried to just kind of recreate the
16  conversations that we had had in the past.  And what I have
17  shared with you already is essentially the kinds of things
18  that we talked about at that time.
19     Q.   Was there--do you know one way or the other
20  whether Dr. Lopez had any previous personal interactions with
21  Ms. Zechman?
22     A.   You mean prior to her application, or--
23     Q.   Yeah.  Do you know whether he knew her before?
24     A.   I don't think he knew her.
25     Q.   And what about Alison Riddick, can you tell me

11

1  with her OB-GYN application, did you learn anything else
2  during your conversations with Dr. Lopez that factored into
3  the decision whether to admit her to the family practice
4  program?
5      A.   If my memory serves me right, and to the best of
6  my recollection, we had some conversation about whether she
7  was qualified to be a resident in family medicine or not and
8  whether we anticipated that she would kind of fit in with the
9  rest of the folks that we were trying to recruit to this
10  residency program, and I think those were the subjects of our
11  conversation together.
12     Q.   Do you remember specifically what the issues
13  were with respect to her fitting in with the program?
14     A.   I don't remember exactly what those issues were,
15  but they were--I don't remember.
16     Q.   Anything else about your conversations with
17  Dr. Lopez other than what you've already just described?
18     A.   Well, I don't think that--I think that was the
19  initial conversation and that was not the end of the
20  conversation.  That conversation extended over several days.
21  We came back to it on other occasions.  And, at some point,
22  we learned that the hospital would not support her
23  application for residency to our residency training program.
24     Q.   And who informed you of that?
25     A.   Dr. Lopez informed me of that.

10

1  when you first spoke with Alison Riddick about Ellen
2  Zechman's application to the family medical program?
3      A.   I don't think that I talked to Alison Riddick
4  about this until today.  And one of the reasons that it
5  didn't happen earlier that I would have had conversation
6  about this is that my role has changed at the school and at
7  the hospital, and I now work in the office of graduate
8  medical education and I work very closely with Ms. Riddick,
9  who manages that office now.  And I work there as an
10  assistant dean for graduate medical education.
11     And, kind of on my way over here today, it kind
12  of hit me, Alison, what do you remember about Ellen Zechman?
13  And, well, you know, she didn't remember meeting her, and she
14  remembered that an EEO complaint had been filed against the
15  hospital by Ms. Zechman, and that was the extent of our
16  conversation and it probably only took about 20 seconds.
17     Q.   Now can you tell me briefly what is your current
18  position here at ECU?
19     A.   I really have two positions.  I am a Vice Chair
20  in the Department of Family Medicine, and I oversee fund
21  development in special projects.  In that role I also see a
22  cadre of patients who call me their doctor, and I supervise
23  residents in their care of patients and in their provision of
24  minor procedures on our family practice patients.  And that's
25  pretty much my role in family medicine.

7/27/2006 Dean Patton, M.D.

1       My role as an Assistant Dean in graduate medical
2  education is about equally split now between the department
3  and the office of graduate medical education. Most of my
4  effort in graduate medical education has to do with internal
5  reviews of programs and preparation for reviews by the
6  Residency Review Commission.
7       Q.  Was your position different than that at the
8  time Ms. Zechman applied to the family practice program in
9  2004?
10      A.  Yes, it was. At that time, I was Chair of the
11  Department of Family Medicine.
12      Q.  And can you describe very briefly what your
13  responsibilities were as Chair of the department?
14      A.  Chair of the department is to represent the
15  Dean's office to the department, the department to the Deans'
16  office to oversee all the operations of the department of
17  family medicine. We have several divisions with the
18  department. To oversee the financial management of the
19  department, and to be the boss.
20      Q.  When you were Chair of the family practice
21  department, did you personally have a role to play in
22  selecting who would be admitted to the family practice
23  residency program?
24      A.  As Chair of the Department--excuse me--as Chair
25  of the Department of Family Medicine, I always review the

13

7/27/2006 Dean Patton, M.D.

1  match list before it went in, but I can't remember any time
2  that I insisted on that list being changed in any way. I was
3  involved with the interview of some of the applicants but not
4  all, and I usually participated in what we called the "rank
5  meeting," which is a meeting where all the residents who have
6  view--who have interviewed the incoming applicants or the
7  potential--the applicants for position and faculty who have
8  interviewed get together to discuss these applicants and to
9  develop a rank list. And, so, that was my role as Chair in
10  the--in the choosing of people who would come here for their
11  residency.
12      Q.  Do you remember the rank meeting wherein
13  Ms. Zechman's application may have been discussed?
14      A.  I may have fragments of memory about that
15  specific meeting, but it kind of all blurs together with all
16  those other rank meetings that I went to. I don't remember
17  anything special about that meeting.
18      Q.  Do you have an understanding in your mind of who
19  ECU considers the decision-makers with respect to whether or
20  not Dr. Zechman would have been admitted to the family
21  practice program?
22      A.  Yes. I think in most cases the decision-maker
23  is going to always be the residency program director, but I
24  would think that most Chairs within this school would want to
25  be sure that they maintained veto power over any of those

14

7/27/2006 Dean Patton, M.D.

1  applicants that might appear on the rank list. And then it
2  is not the Department of Family Medicine or even the school
3  of medicine that eventually employs these people. It is Pitt
4  County Memorial Hospital. And, so, the office of graduate
5  medical education, in terms of its--its review of
6  applications and that sort of thing, would also hold veto
7  power.
8       Q.  Is it common for that office to exercise the
9  veto power that you just described?
10      A.  No, it's very uncommon.
11      Q.  Do you have any memory whether that office
12  exercised its veto power with respect to Dr. Zechman?
13      A.  I do.
14      Q.  Okay. Can you tell me what you remember?
15      A.  Yes. And the memory that I have is that
16  Dr. Lopez had received instructions from Dr. Darnell Jones,
17  who was the DIO, the Designated Institutional Officer for
18  graduate medical education, that he should not include her on
19  the rank list.
20      Q.  Do you know why?
21      A.  I can only speculate as to why, so I do not know
22  why.
23      Q.  What is the DIO that you just described?
24      A.  DIO is--every institution that sponsors a
25  graduate medical education program or residency training

15

7/27/2006 Dean Patton, M.D.

1  program or multiple residency training programs must have an
2  institutional officer who represents the institution to the
3  Accreditation Council for Graduate Medical Education and to
4  the various RRC, residency review commissions, for the
5  various specialties. So that's a requirement.
6       If you're gonna have an accredited residency
7  program, you have to have a DIO. And he was functioning--
8  Dr. Darnell Jones was functioning as DIO, and he was the
9  Associate Dean for graduate medical education. That
10  Associate Dean title, is a university title, because even
11  though Pitt County Memorial Hospital is the sponsoring
12  institution, there is a very close working relationship
13  between ECU School of Medicine, Brody School of Medicine, and
14  ECU and Pitt County Memorial Hospital.
15      Q.  Did you ever have a conversation with Dr.
16  Darnell Jones about Ms. Zechman's application to the family
17  practice?
18      A.  I don't recall a specific conversation that I
19  ever had with Dr. Jones about that.
20      Q.  Did you speak to anybody other than Dr. Lopez
21  about--about the input that Darnell Jones had into the
22  decision; did you learn that from anybody other than
23  Dr Lopez?
24      A.  Not that I can remember.
25      Q.  Okay. Did Dr. Lopez suggest in any way to you

16

1   what the reasons were for--for Darnell Jones' decision?

2        A.   He at some point said to me that he assumed it

3   had something to do with the previous EEO complaint, but he

4   did not know that for sure.

5        Q.   When you refer to the "previous EEO complaint,"

6   you're referring to the complaint filed by Ms. Zechman

7   against ECU?

8        A.   Yes.

9        Q.   Okay.  And, I guess, you said before it was--it

10  may have also been filed against the hospital itself?

11       A.   Actually, it was filed against the hospital as

12  far as I--as far as I know.  I don't think it was filed

13  against ECU, but I don't know that for sure.

14            Remembering any--and I'm saying that--to a

15  certain degree, I guess I'm entering into some speculation

16  about that, because I'm thinking about the fact that it is

17  Pitt County Memorial Hospital that is the sponsoring

18  institution for all the residency training programs.

19       Q.   Okay.  And when you just referred to entering

20  into a little speculation, are you talking about speculating

21  about who the defendant was?

22       A.   Yes.  Yes, that's exactly what I'm referring to.

23       Q.   Dr. Patton, did you review any particular

24  documents in preparing for today's deposition?

25       A.   I don't remember reviewing any specific

17

1   documents.  I don't remember reviewing any documents in

2   preparation for today.  And the reason, the reason, I guess,

3   that I'm appearing to kind of stumble about that a little

4   bit, or be hesitant about that a little bit, is that I know

5   that we asked for documents from the department, and I know

6   that the only thing that we came up with was the rank list

7   for that year.  And that's the document that we gave to

8   Mr. Hassler.  I don't recall whether I looked at that before

9   we gave it to Mr Hassler or not.

10       Q.   Okay.  So I take it at some point Mr. Hassler--

11  you learned that there was a process underway to collect

12  documents that relate to Ms. Zechman's application at ECU?

13       A.   Yes.

14       Q.   Okay.  And you forwarded whatever documents you

15  had to ECU's counsel, Mr. Hassler?

16       A.   That is true.

17       Q.   Okay.  Dr. Patton, could you briefly describe

18  your educational background, starting with college?

19       A.   Sure.  After graduation from high school, I

20  attended a year of Bible college at Appalachian Bible

21  Institute in Bradley, West Virginia.  Following that I went

22  to Marshall University in Huntington, West Virginia and went

23  there for three years prior to being accepted at medical

24  school at West Virginia University; at the end of my first

25  year of medical school, transferred credits back to Marshall

18

1   so that I ended up graduating from Marshall with a Bachelors

2   Degree.  At that time, at the end of my first year of

3   medical school, received my MD from West Virginia University

4   in 1972.  At that time, I entered a general surgery residency

5   training program in Akron, Ohio at the Akron General Medical

6   Center.  After nine months of that, I knew I did not want to

7   be a surgeon.  I worked in my hometown emergency department

8   for two years prior to going back to West Virginia University

9   in Morgantown, West Virginia to complete a residency in

10  family medicine.

11            Since that time, I practiced for nine years,

12  I've been here for almost twenty, and at the end of my first

13  year as a faculty member here, I did a fellowship in faculty

14  development at University of North Carolina Chapel Hill.

15       Q.   In what year did you first join the faculty at

16  ECU?

17       A.   1986.

18       Q.   Okay.  And you've been on the faculty

19  continuously since then?

20       A.   Yes.

21       Q.   Can you tell me in what year you became the

22  Chair of the Family Practice Department?

23       A.   1995.

24       Q.   Okay.  And that's the position--you held

25  that position until when?

19

1        A.   Until middle of 2004.

2        Q.   And I'm gonna switch topics briefly to

3   Ms. Zechman's history at ECU.

4            Were you aware that she attended medical school

5   here at ECU?

6        A.   I was.

7        Q.   Did you know her at that time?

8        A.   You know, I have a brief memory of having met

9   her  I've had conversation with her at some point in the

10  past.  I think if she were in a lineup I'd be able to pick

11  her out of the group, but I don't recall the real substance

12  of any of those conversations.

13       Q.   Where--did you have some direct involvement in

14  the medical school program that she was in that would

15  naturally lead you to have interactions with her or was it

16  more casual than that?

17       A.   Are you referring to when she was a student?

18       Q.   Yes.

19       A.   No, I had no direct interactions with her as a

20  student that I can remember.

21       Q.   Okay.  And were you aware that Ms. Zechman

22  participated for two years in the pathology residency program

23  here at ECU?

24       A.   I have heard that, but I don't remember

25  interacting with her during that time.

18

20

1      Q.   Did you ever--when Ms. Zechman applied to the
2  family practice residency program, do you remember whether at
3  that time you reached out to have any conversations with
4  people who knew Ms. Zechman from the pathology department?
5      A.   I think we actually did--or, encouraged
6  Dr. Lopez to have some conversations with Dr. Peter Kragel,
7  who was the Chair of the Department of Pathology at that
8  time.
9      Q.   Do you have any understanding as to what
10 information Dr. Lopez was able to gather about Ms. Zechman's
11 experiences in the pathology program?
12     A.   Not in specifics, but I do remember that the
13 recommendation was--was not a very positive one.  And I don't
14 know why.
15     Q.   At the time that Ms. Zechman applied to the
16 Family Practice Residency program, do you recall whether you
17 had any conversations with anyone in the OB-GYN department
18 about Ms. Zechman?
19     A.   I don't recall.
20     Q.   Do you know who Janet Lentz is?
21     A.   I don't remember ever hearing that name.
22     Q.   What about Dr. Edward Newton, do you know who
23 that is?
24     A.   Yes, I do know Dr. Edward Newton.
25     Q.   Who's Dr. Newton?

1      A.   Dr. Newton--we have a lot of Newman's around
2  here as well--Dr. Edward Newton is the Chair of the
3  Department of OB-GYN.
4      Q.   And did you ever speak with Dr. Newton about
5  Ms. Zechman?
6      A.   I don't recall a conversation with him about
7  Ms. Zechman, but it may have not been--I mean, he's a Chair
8  colleague, so we frequently ran into each other.  It's hard
9  for me to imagine that we would not have talked about it, but
10 right now I don't remember any conversations.
11     Q.   What about Dr. Raymond Dombroski, do you know
12 who that is?
13     A.   I know Dr. Raymond Dombroski.
14     Q.   Who is he?
15     A.   He is the--he, at that time, was the--the
16 program director of the residency training program in OB-GYN,
17 and he's a maternal fetal medicine specialist in that
18 department.
19     Q.   Do you recall whether you've had any
20 conversations with Dr. Dombroski regarding Ms. Zechman's
21 application to the family practice program?
22     A.   I'm pretty sure I did not have any conversations
23 with him about that.
24     Q.   Okay.  Dr. Patton, I'm gonna put in front of you
25 what's previously been marked as ECU Exhibit No. [1].  And

1  what this is is it's a two-page document, and the second page
2  is a list of faculty within the OB-GYN department here at ECU
3  roughly during the time frame between November 2000 and
4  February 2002.  And I would just ask that you take a look at
5  the list of names and tell me if this document refreshes your
6  memory as to whether there might be any other people who you
7  remember speaking to about Ms. Zechman.
8           MS. BREWINGTON:  Can we go off the record for
9  one second, Tom?
10          MS. BLOOM:  Yes.
11          COURT REPORTER'S NOTE:  AN OFF-THE-RECORD BREAK
12 WAS TAKEN FROM 2:11 P.M. TO 2:11 P.M.
13          MR. BLOOM:  And I'm just--this is Tom Bloom.
14 I'm just gonna indicate for the record that Exhibit ECU [1],
15 which has just been handed to Dr. Patton, also bears the
16 Bates numbers ECU0045 to 0046.
17          Okay.  Dr. Patton, does looking at that list
18 remind you of any other physicians in the OB-GYN department
19 who you spoke to about Ms. Zechman?
20     A.   This list doesn't remind me of anybody that I
21 spoke to.
22     Q.   Okay.  You can put that aside.  Thank you.
23          Other than what you've already described today,
24 were there any other individuals or conversations that you
25 can remember internal to ECU that you had at the time the

1  decision was made not to select Ms. Zechman to the family
2  practice program?
3      A.   I don't remember talking with anybody else other
4  than the people that we've talked about today.
5      Q.   Did--during the course of considering Ms.
6  Zechman's application to the family practice program, did
7  anybody express to you concerns about whether Ms. Zechman was
8  difficult to work with or whether she had attitude problems;
9  did anybody say anything like that to you?
10     A.   I think I had that information third-handed
11 through Dr. Lopez, that that is some of the feedback she
12 received as he talked with Drs. Kragel from the Department of
13 Pathology and--and I don't know whether that came from the
14 OB-GYN department or not.  I don't know whether it did or
15 not.
16     Q.   And Dr. Lopez is somebody who you spoke to also
17 recently in preparation for this deposition.  Did I hear that
18 right from before?
19     A.   You did.
20     Q.   Okay.  And am I hearing you correctly that
21 Dr. Lopez expressed to you that he had received some
22 feedback, possibly from the pathology department, that
23 Ms. Zechman had attitude problems or was difficult to work
24 with.  Did I hear that correctly from you?
25     A.   You heard that correctly, yes.

1    Q.   Okay.  As you sit here today, do you know

2 whether anybody outside of ECU was consulted with respect to

3 the decision not to select Ms. Zechman to the family practice

4 program?

5    A.   I do not know if anybody else was contacted.

6    Q.   Okay.  So does that also mean that you don't

7 know whether anyone at Christiana Care was contacted?

8    A.   I don't know that for sure.

9    Q.   Could you please summarize for me your

10 understanding of the reasons why Ms. Zechman was not selected

11 for the family practice program here at ECU?

12    A.   I think there were a constellation of factors

13 that led to her not being selected for the Family Practice

14 Program here at ECU.

15    I think that No. 1 in that list would be her

16 academic qualifications were considered to be borderline, not

17 stellar.

18    No. 2 was the concern expressed by the

19 Department of Pathology that she was not easy to work with.

20    And No. 3, which is--probably trumps the other

21 two, is that the office of graduate medical education

22 communicated with us that we should not put her on our rank

23 list.

24    Q.   Apart from learning of that instruction from the

25 DIO not to put Ms. Zechman on the rank list, did you have an

1 understanding as to whether Ms. Zechman was otherwise sort of

2 in line to be accepted?  Let me rephrase the question.

3    Did hearing that instruction from the DIO change

4 the decision that was being made with respect to Ms. Zechman?

5    A.   Hearing that from the DIO made all the other

6 deliberations irrelevant.  Had we not received that

7 information from the DIO, at the very best, she would have

8 been very low on our rank list, if there at all.

9    Q.   And the DIO was Darnell Jones at the time?

10    A.   Yes, that is true.

11    Q.   And do you have any understanding as to what

12 kinds of information the DIO would ordinarily have with

13 respect to individual resident selection decisions?

14    A.   The applications for residency training in all

15 departments are screened by the office of graduate medical

16 education before anyone can be put on a rank list, and the

17 office of graduate medical education has to approve all

18 applicants who are put on a rank list.

19    So you would have had the application, you would

20 have known, that office would have known, that she was

21 applying, and that office would have known her previous

22 history here, whereas we may not have been fully aware of it

23 as a program.

24    Q.   Do you remember, apart from Ms. Zechman, can you

25 remember the last time before that you had received an

1 instruction like that from the DIO not to put somebody on the

2 Rank List?

3    A.   There was a--many years ago when I was residency

4 program director, before I became Chair, there was a student

5 who applied who had had some problems with drug use in the

6 past, and I was, as residency director, inclined to believe

7 that the rehabilitation process had been completed and that

8 we should take this person into our program, and the DIO

9 said, "We'll not hire this person."  So that's the only other

10 time that I can remember in the Department of Family Medicine

11 since I came here in 1986, that we were told by the DIO that

12 we should not rank somebody.  That's the only one I can

13 remember.

14    Q.   Do you recall roughly a year when that other

15 incident happened?

16    A.   Not a clue.  I mean, I can give you a range.  It

17 was somewhere between 1988 and 1994, and, more likely, in the

18 second half of that than the first half.

19    Q.   And you referred a moment ago, I think, to one

20 of the reasons among the constellation of reasons that

21 affected the decision with respect to Ms. Zechman was her

22 academic qualifications being borderline.  I think I heard

23 you say that word.  Am I capturing what you said accurately?

24    A.   I think you're capturing it accurately.

25    Q.   Can you tell me when you refer to academic

1 qualifications in that context, can you tell me specifically

2 what you're referring to?

3    A.   When I talk about academic qualifications, I can

4 be specific about that, though I can't relate it specifically

5 back to what her Board scores were and that sort of thing.

6 But things we look at include whether they had to repeat any

7 rotations during their medical school time.  We look at the

8 Dean's letter, which is kind of the final summation of a

9 medical student's experience, and the Dean's letter always

10 goes to potential program directors.

11    We look at Board scores.  And not only do we

12 look at scores, but we look at how many attempts the resident

13 had to make--or the resident-applicant had to make in order

14 to reach a passing grade on the National Board of Medical

15 Examiners' test.

16    Those are the kinds of things we're looking for

17 as minimal criteria.  If we see things like they belong to

18 Alpha Omega Alpha, which is the honorary society for

19 exceptional medical students, that's obviously a very

20 positive thing.  But those are kind of the minimums, that

21 previous list.

22    Q.   And I think you testified before that you became

23 aware that Ms. Zechman had filed a complaint against ECU in

24 connection with her previous non-selection into a residency

25 program, correct?

7/27/2006 Dean Patton, M.D.

1    A   Yes.

2    Q   Okay.  Did your knowledge of that fact play any

3  role in the decision not to select her at the family practice

4  program?

5    A.   I think that fact certainly caused us some

6  anxiety.  And we have presumed that it is that fact that was

7  at least a big influence in the instruction we received from

8  the office of graduate medical education not to put her on

9  our rank list.

10   Q.   And that's the DIO who you referred to?

11   A.   Yes.

12      MR. BLOOM:  Okay.  Let's go off the record.  I

13  think we may be done.

14      COURT REPORTER'S NOTE:  AN OFF-THE-RECORD BREAK

15  WAS TAKEN FROM 2 22 TO 2:24 P.M.

16      MR. BLOOM:  All right.  Actually, I'm just gonna

17  mark and introduce the last exhibit, which is ECU Exhibit

18  [2], which is the Subpoena pursuant to which this deposition

19  today is happening.

20      Dr. Patton, I'm not gonna ask you any questions

21  about the Subpoena other than what we've already discussed.

22  I have no further questions today.  Thank you for your time.

23

24

25

7/27/2006 Dean Patton, M.D.

1      DR. PATTON:  Thank you.

2      MS. BREWINGTON:  I don't have any questions.

3      MR. BLOOM:  Okay.  Then we're off the record.

4

5  * * * * * * * * * * * * * * * * * * * * * * * * * *

6

7      DEPOSITION CONCLUDED AT 2:25 P.M.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

7/27/2006 Dean Patton, M.D.

1      ERRATA SHEET

2      Pursuant to Rule 30(e) of the Federal Rules of Civil

3  Procedure any changes in form or substance which you desire

4  to make to your deposition testimony shall be entered upon

5  the deposition with a statement of the reason given for

6  making them.

7      To assist you in making any such corrections, please

8  use the form below.  If supplemental or additional pages are

9  necessary, please furnish same and attach them to this errata

10  sheet.

11      I, the undersigned, DEAN PATTON, M.D., do hereby

12  certify that I have read the foregoing deposition and that to

13  the best of my knowledge said deposition is true and accurate

14  (with the exception of the following corrections listed

15  below).

16

17  Page ___ Line ___ should read: _____

18  Reason for change: _____

19

20  Page ___ Line ___ should read: _____

21  Reason for change: _____

22

23  Page ___ Line ___ should read: _____

24  Reason for change: _____

25

7/27/2006 Dean Patton, M.D.

1

2

3  Page ___ Line ___ should read: _____

4  Reason for change: _____

5

6  Page ___ Line ___ should read: _____

7  Reason for change: _____

8

9  Page ___ Line ___ should read: _____

10  Reason for change: _____

11

12  Page ___ Line ___ should read: _____

13  Reason for change: _____

14

15  Page ___ Line ___ should read: _____

16  Reason for change: _____

17

18  Page ___ Line ___ should read: _____

19  Reason for change: _____

20

21

22

23

24

25

**C-9**

7/27/2006 Dean Patton, M.D.

```
1
2                                    _____
3                                         Signature
4
5    Sworn to and Subscribed before me
6
7    _____, Notary Public.
8
9    This ____ day of _____, _____.
10
11   My Commission Expires:
12                                              SBD
13
14
15
16
17
18
19
20
21
22
23
24
25
```

33

7/27/2006 Dean Patton, M.D.

```
1    STATE OF NORTH CAROLINA
2    COUNTY OF GREENE
3
4    C-E-R-T-I-F-I-C-A-T-I-O-N
5
6              I, SHEILA B. DARDEN, A COURT REPORTER AND NOTARY
7    PUBLIC IN AND FOR THE AFORESAID COUNTY AND STATE, HEREBY
8    CERTIFY THAT THE FOREGOING IS AN ACCURATE TRANSCRIPT OF THE
9    DEPOSITION OF DEAN PATTON, M.D., WHICH WAS TAKEN BY ME BY
10   STENOMASK, AND TRANSCRIBED BY ME.
11             I FURTHER CERTIFY THAT THE DEPONENT WAS FIRST
12   DULY SWORN BY ME, AND THAT THE DEPONENT AND PARTIES DID NOT
13   WAIVE THE SIGNING OF THE DEPOSITION BY THE DEPONENT.
14             I FURTHER CERTIFY THAT I AM NOT FINANCIALLY
15   INTERESTED IN THE OUTCOME OF THIS ACTION, A RELATIVE,
16   EMPLOYEE, ATTORNEY OR COUNSEL OF ANY OF THE PARTIES, NOR A
17   RELATIVE OR EMPLOYEE OF SUCH ATTORNEY OR COUNSEL.
18
19             WITNESS, MY HAND AND SEAL, THIS DATE:  AUGUST 7,
20   2006.
21             MY COMMISSION EXPIRES:  FEBRUARY 27, 2010.
22
23
24                   SHEILA B. DARDEN
25                   COURT REPORTER AND NOTARY PUBLIC
```

34

**C-10**

ORIGINAL

## AGREEMENT BETWEEN
## INDEPENDENT CONTRACTOR AND QTC MEDICAL GROUP, INC.

WHEREAS, QTC MEDICAL GROUP, INC. ("Medical Group") and its subsidiary Bay Brook Medical Group, Inc. intends to enter into an Agreement with Ellen Ruth Huffman-Zechman, M.D. as an Independent Contractor, ("IC") for the performance of certain tasks;

WHEREAS, IC declares that IC is engaged in an independent business and has complied with all federal, state or local laws regarding business and professional permits and licenses that may be required to carry out said business and the tasks performed under this Agreement. IC is an independent licensed professional authorized to practice medicine or related health field in the State of NC. IC's license must be clear and unrestricted during the course of the Agreement. IC must notify the Medical Group of any change in license status within forty-eight hours.

**THEREFORE, IN RELIANCE ON THE FOREGOING REPRESENTATIONS, MEDICAL GROUP AND IC AGREE TO THE FOLLOWING TERMS AND CONDITIONS:**

**1.0    Professional Obligations and Service Standards:**

1.1    Medical Group engages IC to perform the services described on the Attachment(s) hereto, which calls for evaluations or services. No treatment shall be rendered under the terms of this Agreement. Further, if IC is the "treating physician" of the evaluation candidate, a conflict exists, and IC will notify Medical Group within 48 hours of setting appointment.

1.2    IC agrees and acknowledges that IC is solely responsible for evaluations, conclusions and narrative material set forth in any medical report created pursuant to this Agreement and that IC functions as an independent medical provider making all determinations and assessments in accordance with IC's own medical judgment and expertise. Medical Group will supply administrative support to IC as necessary to facilitate the clarity, consistency and completeness with specific program or contractual requirements by reviewing the report and the supporting documentation. IC agrees and acknowledges that any clarifications requested by Medical Group personnel are not directives, and that IC has the ultimate authority and responsibility in making all substantive determinations regarding medical evaluations performed under this Agreement.

1.3    IC will promptly, and within the timelines described on the Attachment, complete and forward to the Medical Group all required reports.

1.4    IC acknowledges and agrees all reports, records and other documents generated in connection with this Agreement and the services performed thereunder (subject to laws relating to medical records, as applicable) belong to the Medical Group's client, and any information shared with the IC will not be used by the IC for any purpose other than as set forth in this Agreement or disclosed to any other person except as permitted in this Agreement.

1.5    Medical Group is the sole financially responsible party for the services IC renders under this Agreement. IC shall submit invoices to Medical Group for services agreed upon in the Attachment(s) hereto. Medical Group shall pay IC according to terms outlined in such Attachment(s). IC must not, under any circumstance, bill and/or collect any payment either from the Medical Group's client or claimant.

1.6    (i) In the event IC performs the service(s) in IC's facility, IC is and shall be responsible for all cost of IC's performance hereunder. Without limiting the foregoing, IC shall furnish, without cost to Medical Group, usage of IC's own designated office space, medical equipment, office supplies, clerical and medical staff in support of IC's obligations and performance under this Agreement. (ii) Unless specifically agreed to by the Medical Group in writing, IC shall, throughout the duration of this Agreement, maintain and provide proof of malpractice insurance of not less than $100,000 per occurrence and $300,000 annual aggregate or the minimum malpractice limits required by the state in which IC is licensed to practice, whichever is greater. (iii) IC shall notify Medical Group

C-11

QTC001
CONFIDENTIAL

exam and report. (v) Medical Group retains the right, and IC acknowledges that M...

Ver_090103
Page 2 of 3

within 10 days of any lapse or cancellation of malpractice insurance, material modification, expiration of the policy and any claims made against IC's policy.

(iv) For the services performed by IC at the facilities provided by Medical Group, Medical Group shall provide, without cost to IC, office space, clerical and medical staff support considered reasonable/necessary for IC to fulfill this Agreement. Unless otherwise specified, IC is responsible for any expenses incurred including traveling to and from facilities to accomplish the services designated under this Agreement.

1.7    The parties are independent professionals or professional corporations and shall conduct themselves, at all times, in accordance with the highest standards of professional conduct and responsibility.

IC shall indemnify and hold harmless Medical Group and its officers, directors, shareholders, members, employees, agents and representatives from any and all liabilities, losses, damages, claims and expenses of any kind, including costs and attorneys' fees, which result from or relate to IC's performance or failure to perform under this Agreement. In the event that a claim is made against both parties, it is the intent of both parties to cooperate in the defense of said claim and to cause the insurers to do likewise. Both parties shall have the right to take any and all actions they believe necessary to protect their interest.

1.8    IC warrants that IC has not been convicted of any criminal charges. Additionally, IC will notify Medical Group immediately of any criminal charges or convictions during the Agreement period.

1.9    IC agrees to keep in confidence all confidential or proprietary information pertaining to this Agreement, including but not limited to personal information of individuals examined under this Agreement, all price and payment information, and/or all information concerning performance under this Agreement the release of which could be harmful to Medical Group (the "Confidential Information"). IC agrees not to disclose Confidential Information to any person except those of its officers, employees, agents, contractors and advisors who have a reasonable need to know such information to assist or advice IC in connection with the performance of its obligations or enforcement of its rights hereunder. If IC is requested or required (by informal request or by subpoena or similar process) to disclose any Confidential Information, IC agrees to provide Medical Group of prompt notice of such request(s) so that Medical Group may seek an appropriate protective order and/or waive IC's compliance with the provisions of this paragraph.

**2.0    Agreement Governance:**

2.1    IC understands that Medical Group makes no representation or guarantee concerning the amount of work that IC may be called upon to perform.

2.2    IC is an independent contractor. Both IC and Medical Group recognize and acknowledge that there is no employer/employee relationship between IC and Medical Group. Except as may be required by taxing authorities for backup withholding tax, Medical Group will not withhold from payments due IC hereunder any of the following: FICA (Social Security), federal unemployment insurance, state or federal income taxes, state disability insurance, state unemployment insurance, or workers' compensation insurance. IC and Medical Group shall be solely and independently responsible for its own employment obligations, and the acts and omissions of its own employees.

2.3    (i) IC and Medical Group recognize that IC may be comprised of a Professional Corporation, Association, or university affiliated medical practice in which a number of licensed physicians in such group are able to perform the tasks outlined in this Agreement. (ii) Each individual provider performing services under this Agreement shall be individually qualified and paneled; each provider must hold a clear and unrestricted professional license to practice in the state in which services are performed. (iii) IC must notify Medical Group within 24 hours of any change or adverse actions against the professional license of providers performing work under this Agreement. (iv) Each individually licensed physician shall be responsible for his/her medical exam and report. (v) Medical Group retains the right, and IC acknowledges that Medical Group retains such right, to exclude from performance herein, physicians from IC's group who do not meet

IC Initials

QTC002
CONFIDENTIAL

the requirements of this Agreement or who fail to satisfactorily perform such services as outlined in this Agreement.

2.4   In the event of a dispute between Medical Group and IC concerning any of the covenants, terms or conditions of this Agreement, the matter shall be submitted to arbitration in lieu of judicial process. Arbitration shall be conducted in Diamond Bar, California in accordance with the Commercial Rules of the American Arbitration Association ("AAA"), using a mutually-selected arbitrator who is knowledgeable and experienced in the area of providing health care services. The parties agree that the decision of the arbitrator shall be final, conclusive and binding as to each of them.   The parties agree that the arbitrator's award may be enforced in any court having jurisdiction thereof by the filing of a petition to enforce said award.  Costs of filing may be recovered by the party, which initiates such action to have an award enforced.  In the event any party brings any action or proceeding to enforce any provision of this Agreement or to recover any amount due hereunder, the prevailing party shall be entitled to costs and reasonable attorneys' fees incurred in any such action or proceeding.

Subject to the provisions above, each party hereby irrevocably (i) submits to the jurisdiction of any California State or federal court sitting in the County of Los Angeles, California, with respect to matters arising out of or relating hereto; (ii) agrees that all claims with respect to such action or proceeding may be heard and determined in such State or federal court; (iii) waives the defense of an inconvenient forum; and (iv) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

2.5   This Agreement commences on the Effective Date upon execution of this Agreement and may be terminated at any time upon not fewer than 60 days written notice by either party.  In the unlikely event this Agreement is terminated, IC agrees to honor all terms and conditions of the Agreement pertaining to any cases already scheduled and in process prior to notice of termination.

Cause for immediate termination by Medical Group shall include willful violation of any state law, willful breach of any law of the United States, or public conduct which offends decency, compromises Medical Group's integrity, or causes Medical Group or Contractor public ridicule or public scandal.  Cause for immediate termination by IC shall include the same things as the aforementioned.

Executed on the  7  day of  February  20 05, (the "Effective Date"), in the city of Diamond Bar, California.

| | |
|---|---|
| **QTC MEDICAL GROUP INC.** | **INDEPENDENT CONTRACTOR** |
| BY: | BY: _Ellen Ruth Huffman-Zechman_ |
| | IC Signature |
| Lay Kay, M.D., Chief Medical Director | NAME: _Ellen Ruth Huffman-Zechman_ |
| QTC Medical Group, Inc. | Print Name |
| 1350 S. Valley Vista Drive | TITLE: _Medical Doctor -MD_ |
| Diamond Bar, CA  91765 | Print Title |
| | FOR: |
| | Ellen Ruth Huffman-Zechman, M.D. |
| | 2417 Neuse Blvd |
| | New Bern, NC  28562 |
| Date: _3/2/0_ | Date: _Feb 7, 2005_ |

QTC003
CONFIDENTIAL

ATTACHMENT – VA EXAMINATIONS

*GEN_MB_080104*

# GENERAL MEDICAL

This Attachment is fully incorporated into the "AGREEMENT BETWEEN INDEPENDENT CONTRACTOR AND QTC MEDICAL GROUP, INC." entered into by **Ellen Ruth Huffman-Zechman M.D.** ("IC"), and QTC Medical Group, Inc. ("Medical Group"), and is subject to all terms and conditions herein.

**1.    STANDARDS TO BE MAINTAINED**
*IC understands and agrees that IC is responsible for the performance of medical examinations and delivery of a complete medical report, including diagnostic study results, according to the services requested by Medical Group as defined below: [See also APPENDIX 1: RESPONSIBILITY DIAGRAM for further reference]*

1.1    **VA Compensation & Pension (C&P) Examination:**
IC shall perform a medical examination including the review of medical records (when applicable) prior to the examination.

1.2    **Complete VA Compensation & Pension (C&P) Medical Exam Report Package:**
IC understands that timeliness is of the essence and that a *complete* report package shall include the following:

1.2.1   A narrative medical report duly signed by the examining physician. The narrative medical exam report shall include, at a minimum, corroborating histories, physical findings, results of all diagnostic tests performed and diagnoses.

1.2.2   Each question or field in the Claimant Medical History and the Physician Exam Protocol of the KMEP* worksheet is answered.

1.2.3   The C&P exam report will be generated and transmitted to Medical Group in the following method: IC will use Medical Group's proprietary software as they are implemented, including but not limited to KMEP and KPED*, to generate an electronic examination report in lieu of dictation and transcription. IC will lock or finalize the browser version of Medical Group's KMEP and KPED and transmit the resulting medical report to Medical Group. IC will ensure that Medical Group receives a FAX copy of the signed narrative report upon completion, within the designated timeframe.

1.2.4   IC will expedite and collect all on- and off-site diagnostic test results pertinent to the examination in a timely manner and incorporate relevant results into the final C&P exam report. Additionally, all diagnostic reports and tracings will be FAXED to Medical Group. The signed 201 service bill shall be FAXED to Medical Group to complete the delivery of the C&P exam report package.

1.3    **Clarification:**
In the event clarification(s) are required, the final signed report or addendum shall be received by Medical Group within 48 hours after request is communicated to IC.

1.4    **Independent Medical Opinion (IMO):**
When IC is asked to perform an Independent Medical Opinion (IMO) based on the review of medical records, IC will list in the report, the medical records reviewed. The opinion rendered should include sound rationale citing the records as evidence to substantiate the opinion.

1.5    **Authorization for Additional Diagnostic Testing:**
IC must contact Medical Group for authorization of any additional diagnostic tests not listed or pre-authorized on the 201 Service Bill.

1.6    **Examination Attendant:**
IC should have an attendant of the same sex as the claimant, when conducting a physical examination on a claimant of the opposite sex.

1.7    **Customer Service Standards:**
- IC will be courteous and demonstrate professionalism towards the veteran claimant and sensitivity to his/her unique circumstances.
- Claimant's waiting time should not be more than 30 minutes from the scheduled appointment time.

\* *KMEP and KPED are QTC's proprietary application software.*


Provider Initials

QTC004
CONFIDENTIAL

*ATTACHMENT – VA EXAMINATIONS*

GEN_MB_080104

*Page 2 of 3*

## 2.    FEES AND INCENTIVES

### 2.1    VA Compensation and Pension (C&P) Examination Report Package:

2.1.1    IC shall sign and return the 201 Service Bill to Medical Group upon completion of service or on the day of a no show appointment. The 201 Service Bill is IC's invoice to Medical Group.

2.1.2    IC agrees to comply with the requirements set forth in "Standards To Be Maintained" and shall be paid the following fee schedule:

| | REGULAR FEE | TIMELINESS INCENTIVE⊕ | BROWSER INCENTIVE⊕ |
|---|---|---|---|
| Description | The "complete" report package delivered within fourteen (14) business days from the date of the consultative exam OR ten (10) business days from the date of the off-site diagnostic test*, whichever date is later. "Complete" is defined in "Standards to be Maintained", Paragraph 1.2 | The "complete" report package WITHOUT ANY CLARIFICATION delivered within four (4) business days from the date of the consultative exam, OR four (4) business days from the date of the last "off-site" diagnostic test*, whichever date is later. "Complete" is defined in "Standards to be Maintained", Paragraph 1.2 | For medical reports generated and delivered to QTC using QTC's software: KMEP and KPED |
| C&P Exam Report Package | $40.00 | $20.00 | $15 |
| Predischarge & DOD Exam Report Package | $55.00 | $20.00 | $15 |

⊕ Incentive fees are in addition to the Regular Fee.

2.1.3    Medical Group reserves the sole right to reschedule the examination with another provider if report and all related diagnostic test results are not received within fourteen (14) business days from the day of the exam or ten (10) business days from the day of the off-site diagnostic test, whichever date is later. If Medical Group exercises such right to reschedule, no payment of any fees or incentives shall be made to IC.

2.1.4    IC shall be paid an additional $60 when IC is asked to provide an Independent Medical Opinion (IMO) about a case based on the review of medical records and IC's report includes the required information as set forth in Standards To Be Maintained (Paragraph 1.4).

2.1.5    No additional fee will be paid when a supplementary report is requested for clarification by the Department of Veterans Affairs.

### 2.2    No Show:
IC understands that there is a $20 fee if the following conditions are met:
a) claimant fails to show for or cancels an appointment less than 24 hours from the time and date of the scheduled appointment, and
b) Medical Group receives the FAXED 201 Service Bill within 24 hours of the scheduled appointment.

---

* Off-site diagnostic tests are tests paid " directly" by Medical Group.

*Provider Initials*

C-15

ATTACHMENT – VA EXAMINATIONS

2.3    On-site Diagnostic Testing:

IC shall be paid for the interpretation of diagnostic tests as follows:

| TYPE OF TESTING | REIMBURSEMENT ($/Interpretation) |
|---|---|
| 1. Stress Test (includes EKG fee) | 25.00 |
| 2. EKG | 3.00 |
| 3. PFT | 5.00 |
| 4. Doppler (resting) | 5.00 |
| 5. Doppler (exercise – includes resting fee) | 20.00 |

2.4    Payment Terms:

Payment process will be initiated when Medical Group receives a signed 201 Service Bill, either for No Show or included with a "complete" signed medical report (as defined in paragraph 1.2). Payment due dates are on the average 60 days from the day of payment initiation. Checks are issued on the 8th and 22nd of each month.

Any dispute(s), disagreement(s) or question(s) ("dispute") regarding amounts payable and/or paid pursuant to this Agreement shall be submitted to QTC Medical Group, Inc. in writing, in reasonable detail, within ninety (90) days after the subject payment is received. If no such dispute is submitted to QTC within said ninety (90) day period, the amount and the method of calculation thereof shall be final and conclusive on all parties.

I, as the Independent Contractor, have read and agree with the requirements, compensation and terms and conditions included in this Attachment.

IC NAME (PRINT):    *Ellen Huffman-Zechman*

TITLE:    *Medical Doctor*

IC SIGNATURE:    *Ellen H Zechman*

DATE:    *Feb 2, 2005*

PVD#:

QTC006
CONFIDENTIAL

## RRB - DISABILITY EXAMINATION

### (All Specialties excluding Psychological Testing)

This Attachment is fully incorporated into the "AGREEMENT BETWEEN INDEPENDENT CONTRACTOR AND QTC MEDICAL GROUP, INC.," entered into by Ellen Ruth Huffman-Zechman M.D. ("IC") and QTC Medical Group, Inc. ("Medical Group"), and is subject to all terms and conditions therein.

1. **STANDARDS TO BE MAINTAINED**

    1.1 Services to be performed: IC understands and agrees that IC is responsible for the performance of medical examinations and timely delivery of a complete medical report, including diagnostic study results, according to the services requested by Medical Group as defined below.

    1.2 Disability Examination: IC performs a medical examination, which could include review of medical records when applicable, according to the clients' guidelines using KMEP WORKSHEETS in their entirety, with each question or field answered or completed in the Claimant Medical History and the Physician Exam Protocol of the KMEP worksheet.

    1.3 Report Preparation: IC understands that timeliness is of the essence in meeting The Railroad Retirement Board's timeliness requirements and that a *complete* report package shall include the following:

        1.3.1 On-site Report Preparation: IC dictates, OR uses Browser KMEP[1] with the KMEP worksheets, to generate a medical report on the day of the examination. [Upon its availability, Medical Group will introduce IC to Medical Group's proprietary Browser software, to generate an electronic examination report in lieu of dictation and transcription.]

        1.3.2 Forms: IC completes all required forms, including the RFC (Residual Functional Capacity) Form, which pertain to the evaluation, when applicable.

        1.3.3 Diagnostic Test Results: When applicable, IC will expedite and collect all on- and off-site diagnostic test results pertinent to the examination in a timely manner and incorporate relevant results into the final exam report. Additionally, all diagnostic reports and tracings will be FAXED to Medical Group.

        1.3.4 Quality of Report: Upon receipt of the medical report, IC must proofread the narrative report and corroborate the history, examination findings and results of all diagnostic tests performed with the diagnostic conclusion.

        1.3.5 Signed Report: IC must submit a duly signed medical report and the RFC form to Medical Group within 48 hours of receipt of the transcribed report. IC will ensure that Medical Group receives an electronic text file, in a standard word processor format, of the final medical report, when applicable.

    1.4 Clarification(s): In the event clarification(s) are required, Medical Group must receive the final signed report or addendum within 48 hours after request is communicated to IC.

    1.5 Authorization for Additional Diagnostic Testing: IC must notify Medical Group for authorization of any additional diagnostic tests not listed or pre-authorized on the 201 Service Bill.

    1.6 201 Service Bill: As applicable, IC shall sign and return the 201 Service Bill to Medical Group with the signed medical report or on the day of a no show appointment. The 201 Service Bill is IC's invoice to Medical Group.

    1.7 Customer Service Standards: IC will be courteous and demonstrate professionalism towards the claimant and sensitivity to his/her unique circumstance. Claimant's waiting time should not be more than 30 minutes from the scheduled appointment time.

2. **FEES AND INCENTIVES**

    2.1 IC shall be paid by Medical Group for completion of services and requirements set forth in Section 1, Standards to be Maintained, according to Fee Schedules A & B below. Timeliness days for the receipt of a complete, signed report by Medical Group for determining Premium or Standard Fees are counted from the day of the examination (See Fee Schedule A on page 2).

    2.2 Medical Group reserves the sole right to reschedule the examination with another provider if the report and all related diagnostic test results are not received within fourteen (14) calendar days from the day of the exam or five (5) calendar days from the day of the off-site diagnostic test, whichever date is later. If Medical Group exercises such right to reschedule, no payment of any fees or incentives shall be made to IC.

---

1. Browser KMEP is QTC's proprietary application software.

QTC007
CONFIDENTIAL

ATTACHMENT – QTC Medical Evaluation Facilities (RRB)

Ver. Spec_060104
Page 2 of 2

A.    Medical Examination Fee Schedule by Type of Services:

| TYPE OF EXAMINATION SERVICES | | Report Dictated by Utilizing KMEP Worksheets | | Report Prepared Utilizing BROWSER KMEP Software Tool (WHEN AVAILABLE) | | |
|---|---|---|---|---|---|---|
| | | Premium Fee Reports received WITHIN 7 calendar days | Standard Fee Reports received AFTER 7 calendar days | Premium Fee Reports received WITHIN 4 calendar days | Standard Fee Reports received AFTER 4 calendar days | Browser KMEP Incentive (1) |
| RRB | Complete Examination, including completion of all required forms. | 52.00 | 32.00 | 52.00 | 32.00 | $15 |
| | Supplemental Report for Report Clarification (2) | $0 | $0 | $0 | $0 | $ 0 |
| | No Show (Client Does Not Pay additional fee when a claimant fails to show, or the scheduled appointment is cancelled by the Claimant or the Client) | $0 | $0 | $0 | $0 | $ 0 |

(1)  Upon Browser KMEP availability to IC, Browser KMEP Incentive is paid to IC when Medical Group receives a complete medical report from IC using the Browser KMEP related Software.

(2)  IC understands that client will not pay additional fee when a supplemental report or clarification is requested by the client on existing examinations.

B.    Diagnostic Testing Interpretation – Fee Schedule for Interpretation of the following tests, if applicable:

| TYPE OF TESTING | STANDARD FEE |
|---|---|
| 1. Stress Test (including Resting EKG) | $25 |
| 2. EKG | $3 |
| 3. PFT | $5 |
| 4. Doppler (resting) | $5 |
| 5. Doppler (exercise – includes resting fee) | $20 |
| 6. EEG (if applicable) | $10 |

3.    **PAYMENT TERMS**

Payment process will be initiated when Medical group receives a signed 201 Service Bill included with a complete signed medical report (as defined in paragraph 1.3). Payment due dates are on the average 60 days from the day of payment initiation. Checks are issued on the 8th and the 22nd of each month. Any dispute(s), disagreement(s) or question(s) ("dispute") regarding amounts payable and/or paid pursuant to this Agreement shall be submitted to QTC Medical Group, Inc. in writing, in reasonable detail, within ninety (90) days after the subject payment is received. If no such dispute is submitted to QTC within said ninety (90) day period, the amount and the method of calculation thereof shall be final and conclusive on all parties.

*I, as the independent Contractor, have read and agree with the requirements and compensation set forth in this Attachment to Independent Contractor Agreement.*

BY: _Ellen Huffman - Zechman_
Print Name

SIGNATURE: _Ellen Huffman Zechman_    DATE _Feb 8, 2005_

C-18

QTC008
CONFIDENTIAL

Version_QMO_080104

# ATTACHMENT – QTC OFFICE
## [PHYSICAL]

This Attachment is fully incorporated into the "AGREEMENT BETWEEN INDEPENDENT CONTRACTOR AND QTC MEDICAL GROUP, INC.," entered into by Ellen Ruth Huffman-Zachman M.D. ("IC") and QTC Group, Inc. ("Medical Group"), and is subject to all terms and conditions therein.

## SERVICE REQUIREMENTS

1. **Disability Evaluation** – IC understands that the following requirements must be met for the disability evaluation to be considered complete:

   A. IC performs the evaluation and reviews the available medical records.
   B. IC dictates the medical report on the day of the examination.
   C. IC completes all required forms, if applicable.
   D. Upon receipt of the transcribed medical report, IC must proofread report and corroborate the history, examination findings and diagnostic tests with the conclusion.
   E. IC must submit final, signed medical report to Medical Group within 48 hours of receipt of the transcribed report.

2. **Contact with IC** – IC agrees that the following telephone and/or pager number may be used by Medical Group staff to contact IC regarding evaluations performed.

   Telephone (home/work): _858-636-8685_         Pager: _____

## COMPENSATION

1. Initial Independent Medical Examination

   A. Fee Schedule – Payment for services is according to the receipt date of the final, signed medical report by Medical Group according to the Service Requirements, Paragraph 1. The payment structure is outlined below, based on the date of the appointment:

| TYPE OF EXAMINATION | | PREMIUM FEE (Reports received within 7 calendar days) | STANDARD FEE (Reports received after 7 calendar days) |
|---|---|---|---|
| DAPD | Complete Examination | 42.00 | 22.00 |
| | Follow-up Examination | 20.00 | 20.00 |
| | General Medical Examination | 20.00 | 20.00 |

   B. Diagnostic Testing - IC shall be compensated for interpretation of the following tests:

| TYPE | TEST NAME | REIMBURSEMENT |
|---|---|---|
| 10 | Stress Test (includes EKG fee) | $25 |
| 11 | EKG | $3 |
| 12 | PFT | $8 |
| 13 | Doppler (resting) | $5 |
| 14 | Doppler (exercise – includes resting fee) | $20 |
| 19 | EEG (if applicable) | $10 |


Provider Initials

C-19

QTC009
CONFIDENTIAL

Version_QMO_080104

## PAYMENT TERMS

Payment is due averaged 60 days from the date the reports are signed. Checks will be issued on the eighth (8th) of each month. Any dispute(s), disagreement(s) or question(s) ("dispute") regarding amounts payable and/or paid pursuant to this Agreement shall be submitted to QTC Medical Group, Inc. in writing, in reasonable detail, within ninety (90) days after the subject payment is received. If no such dispute is submitted to QTC within said ninety (90) day period, the amount and the method of calculation thereof shall be final and conclusive on all parties.

---

*I, as the Independent Contractor, have and agree with the requirements and compensation included on this Attachment.*

BY: *Ellen Ruth Huffman - Zechman*
Print Name

SIGNATURE: *Ellen Ruth Huffman-Zechman*   DATE: *February 7, 2005*
IC Signature

---

Attachment – QTC MEF
Physical

QTC010
CONFIDENTIAL

Ver_0411103
Page 1 of 2

# CONFIDENTIALITY, PRIVACY AND SECURITY AGREEMENT

This agreement is attached to and is fully incorporated into the "AGREEMENT BETWEEN INDEPENDENT CONTRACTOR AND QTC MEDICAL GROUP, INC." entered into by **Ellen Ruth Huffman-Zechman, M.D.** ("IC"), and QTC Medical Group, Inc. ("Medical Group"), and is subject to all terms and conditions herein. This Attachment is effective as of May 12, 2003.

**1.    PROTECTION OF CLAIMANT INFORMATION**

1.1    Definition of Claimant Information:
Claimant Information includes claimant personal information (e.g. Social Security Number, Address, Date of Birth), and claimant medical information including but not limited to medical records, diagnostic results, X-rays and transcription records. For the purposes of this agreement all electronic and paper forms, printed examination sheets and related information provided by the Medical Group are also considered part of Claimant Information.

1.2    Privacy Laws:
IC shall comply with the Privacy Act of 1974, Public Law 93-579 and all applicable state laws regarding privacy and protection of Claimant Information. IC and Medical Group recognize that claimants referred to IC by the Medical Group for medical examinations are different from patients who request treatment. IC understands that Claimant Information as it pertains to medical examinations is not governed under HIPAA regulations.

1.3    Information Disclosure:

1.3.1    IC understands and agrees that IC is responsible for the protection of Claimant Information, including the uses and disclosure of such information by persons directly employed or subcontracted by IC or, if IC performs the services in Medical Group's facility, employees of Medical Group who assist in the performance of medical examination services.

1.3.2    IC understands and agrees that Claimant Information pertaining to claimants referred to IC by the Medical Group will only be disclosed to the Medical Group.

1.3.3    IC understands and agrees not to disclose Claimant Information to the Claimant or anyone not involved in the performance of medical examination services unless specifically authorized by the Medical Group *or under emergency conditions* where disclosure of Claimant Information is imperative to protecting the claimant's health.

1.4    Notification of Disclosure:
IC agrees to notify the Medical Group in writing when any disclosure of Claimant Information is made due to emergency conditions. IC further agrees to notify the Medical Group in writing when any disclosure is made due to actual or suspected misuse or misappropriation that may come to IC's attention.

1.5    Information Disposal:
Upon completion of the examination and acceptance of the examination report by the Medical Group, IC shall duly dispose of Claimant Information in a confidential manner by shredding or pulping.

**2.    PROPRIETARY RIGHTS:**

2.1    Intellectual Property:

2.1.1    IC agrees that nothing in this Agreement shall be construed as granting any rights under any patent, copyright or other intellectual property right of the Medical Group. The browser interface, printed worksheets and other written, printed, graphic, or electronically recorded data furnished by the Medical Group for use by IC are the proprietary property of the Medical Group.

2.1.2    IC will maintain in confidence and will not, directly or indirectly, disclose or use, either during or after the term of this agreement, any proprietary or confidential information or know-how belonging to the Medical Group whether or not it is in written format or electronic format, except to the extent necessary to perform medical examination services on behalf of the Medical Group.


Initials IC _____

QTC011
CONFIDENTIAL

Ver_0411103
Page2 of 2

**2.2    Worksheets:**
IC agrees that any forms, printed examination sheets and related information provided by the Medical Group in electronic or printed forms are provided for the purposes of conducting the medical examination and shall solely belong to the Medical Group. IC further agrees that these materials will not be duplicated or distributed except as required to complete the medical examination on behalf of Medical Group.

**2.3    Transfer of Claimant Information:**
IC agrees that IC is not the custodian of claimant data. For all claimants referred to IC by the Medical Group, IC agrees to assign and hereby assigns to Medical Group its entire right, title and interest in all Claimant Information and related data, including but not limited to, paper reports, handwritten notes, data entered electronically in Medical Group Software, electronic notes and documents submitted to the Medical Group via FAX, electronic FAX, web browser, mail and e-mail.

**3.    ACCEPTABLE USE**

**3.1    Limited License to Use Medical Group Software:**
Medical Group grants IC the license to use the software for the sole purpose of performing medical examination (s) and generating the corresponding medical report (s) on behalf of Medical Group.

**3.2    Terms and Conditions of Use of Medical Group Software:**

　　3.1 1    IC agrees to use this software responsibly and will ensure that IC and other persons directly employed or subcontracted by the IC who use this software will only use it for the purpose for which the Limited License is granted (see paragraph 3.1).

　　3.1.2    IC understands and agrees that the use of Medical Group Software is subject to the terms and conditions included as part of the Medical Group Software and are subject to change without prior notice. IC further understands that notice of such changes will be given electronically at the time of login to the Medical Group Software and using the software will constitute acceptance of the terms and conditions posted.

**3.3    Use of Medical Group's Facility:**
*In the event IC performs the service(s) in Medical Group's facility*, IC understands and agrees to responsibly use Medical Group provided information technology including but not limited to PCs, associated networks, internet access, email, data storage, computer accounts, software (both commercial off-the-shelf and proprietary Medical Group Software) and telephony services (collectively labeled "Medical Group IT"). IC further agrees that any use of Medical Group IT made available to IC or persons directly employed or subcontracted by IC, willfully or otherwise, for other than medical examination (s) and generating the corresponding medical report (s) on behalf of Medical Group shall constitute a breach of contract. Under such circumstances, IC understands that the Medical Group has the right to take appropriate action including but not limited to immediate cessation of access to Medical Group IT and contract termination.

**Provider (IC)**

Provider Signature:    *Ellen Huffman-Zechman*

Print Name:    *Ellen Huffman-Zechma*

Date:    *Feb 2, 2005*

QTC012
CONFIDENTIAL

### Attachment to Agreement between

### Independent Contractor (IC) and QTC Medical Group, Inc.

During the term of this Agreement, IC may provide services to other persons or organizations for compensation or otherwise outside the scope of IC Agreement with QTC, provided that such services do not interfere with diligent performance of the tasks and services under this Agreement.

1.  Upon termination of the Agreement, and for a period of one (1) year thereafter, IC agrees not to compete with Medical Group, either directly or indirectly. This clause will not be enforced where such clauses are not enforceable.

2.  IC acknowledges that office staff are employees of QTC Management Inc. and not independent contractors and that any interference by IC with such employment relationship may constitute tortious interference with an existing economic relationship. Accordingly, during the term of this Agreement and for a period of 12 months thereafter, IC on behalf of himself or herself or any other entity will not solicit for hiring any person who is an employee of QTC to terminate such employment.

3.  Furthermore, IC acknowledges the Medical Group's relationship with its patient referral sources is based on goodwill established by Medical Group. IC further acknowledges that QTC introduced IC to those patient referral sources and, but for QTC's introduction, IC would not have had a relationship with those patient referral sources. Thus, IC expressly agrees that IC shall not, on behalf of himself or herself, or on behalf of any other person or entity, for a period of one (1) year after termination of this agreement, either (i) directly or indirectly solicit clients through any of Medical Group's patient referral sources to which IC was introduced by QTC, or (ii) provide medical examinations or disability evaluation services for any of Medical Group's referral sources, to which IC was introduced by QTC.

Independent Contractor (IC):

By: _Ellen Huffman-Zechman_  Date: _Feb 27, 2005_
     (IC Signature)

Name: _Ellen Huffman-Zechman_
        (Print name)

Title: _Medical Doctor_
        (Print title)

NC_Ver_011003

C-23

QTC013
CONFIDENTIAL

Version 010102

## Notification of Privacy Act of 1974

*Please read and file a copy of this Notification with your QTC contractual paperwork.*
*Thank you.*

**PRIVACY ACT NOTIFICATION (APR 1984)** The Contractor will be required to design, develop, or operate a system of records on individuals, to accomplish an agency function subject to the Privacy Act of 1974, Public Law 93-579, December 31, 1974 (5 U.S.C. 552a) and applicable agency regulations. Violation of the Act may involve the imposition of criminal penalties.

**PRIVACY ACT (APR 1984)**

(a) The Contractor agrees to-
   (1) Comply with the Privacy Act of 1974 (the Act) and the agency rules and regulations issued under the Act in the design, development, or operation of any system of records on individuals to accomplish an agency function when the contract specifically identifies-
      (i)    The systems of records; and
      (ii)   The design, development, or operation work that the contractor is to perform;
   (2) Include the Privacy Act notification contained in this contract in every solicitation and resulting subcontract and in every subcontract awarded without a solicitation, when the work statement in the proposed subcontract requires the redesign, development, or operation of a system of records on individuals that is subject to the Act; and
   (3) Include this clause, including this subparagraph (3), in all subcontracts awarded under this contract which requires the design, development, or operation of such a system of records.

(b) In the event of violations of the Act, a civil action may be brought against the agency involved when the violation concerns the design, development, or operation of a system of records on individuals to accomplish an agency function, and criminal penalties may be imposed upon the officers or employees of the agency when the violation concerns the operation of a system of records on individuals to accomplish an agency function. For purposes of the Act, when the contract is for the operation of a system of records on individuals to accomplish an agency function, the Contractor is considered to be an employee of the agency.
   (1) "Operation of a system of records," as used in this clause, means performance of any of the activities associated with maintaining the system of records, including the collection, use, and dissemination of records.
   (2) "Record," as used in this clause, means any item, collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to, education, financial transaction, medical history, and criminal or employment history and that contains the person's name, or the identifying number, symbol, or other identifying particular assigned to the individual, such as a fingerprint or voiceprint or a photograph.
   (3) "System of records on individuals," as used in this clause, means a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual.

(c) (1) "Operation of a system of records," as used in this clause, means performance of any of the activities associated with maintaining the system of records, including the collection, use, and dissemination of records.
     (2)    "Record," as used in this clause, means any item, collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to, education, financial transaction, medical history, and criminal or employment history and that contains the person's name, or the identifying number, symbol, or other identifying particular assigned to the individual, such as a fingerprint or voiceprint or a photograph.
   (4) "System of records on individuals," as used in this clause, means a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual.

I have read and understand the above Privacy Act:

Provider Name: *Ellen Ruth Huffman-Zechman*
           (Print Name)

Signature: *Ellen R Huffman-Zechman*    Date: *Feb 7, 2005*

QTC014
CONFIDENTIAL



*Allergy & Asthma Clinic*

*of New Bern*

James M. Zechman, MD, PHD

Board Certified
Allergy & Immunology

Morgan Lewis
1701 Market Street
Philadelphia, PA 19103-2921

March 20, 2006

Re: Ellen Zechman v Christiana Care Health Systems: No. 05-159 JJF

To Whom It May Concern:

Dr. Ellen Huffman Zechman has acted as Corporate Secretary for The Allergy & Asthma Clinic of New Bern since 1994. She has additionally worker voluntarily on an as needed basis for the Allergy Clinic as a General Practice physician. As of May 2004 she has been compensated with a salary after returning from Christiana Care Hospital in Delaware. She works as an assistant to the Allergy Specialist since she is licensed as a General Physician. She does not hold any equity interest, stock ownership or partnership in this corporation. There are currently no contracts or agreements concerning her employment. There have been no bonuses.

Earnings for 2004: $22,500.
Earnings for 2005: $36,000.

Dr. Ellen Zechman is an excellent and capable physician. She is personable and enjoys excellent rapport with staff and patients.

Sincerely,

James M Zechman, MD, PhD
President, Allergy & Asthma Clinic of New Bern

Margolis Edelstein
Zechman, E v. Christiana Care
0814

C-25

AAC0001
CONFIDENTIAL

2417 Neuse Blvd. • New Bern, NC 28562 • (252) 636-2625 • (252) 635-1530 (fax)
3601 Bridges Street, Suite G • Morehead City, NC 28557 • (252) 726-9909 • (252) 726-1181 (fax)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ELLEN ZECHMAN,                           :
                                         :        C.A. No. 05-159 (JJF)
                    Plaintiff,           :
                                         :
          v.                             :
                                         :
CHRISTIANA CARE HEALTH SYSTEMS,          :
                                         :
                    Defendant.           :

### CERTIFICATE OF ELECTRONIC SERVICE

I hereby certify that on December 11, 2006, I electronically filed the attached

**APPENDIX OF EXHIBITS TO REPLY BRIEF IN FURTHER SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using

CM/ECF which will send notification of such filing(s) to the following:

> Jeffrey K. Martin, Esquire
> Margolis Edelstein
> 1509 Gilpin Avenue
> Wilmington, DE 19806

> *David H. Williams*
> David H. Williams (#616) (dwilliams@morrisjames.com)
> MORRIS JAMES LLP
> 500 Delaware Avenue, Suite 1500
> P.O. Box 2306
> Wilmington, DE 19899
> (302) 888-6900

> Michael J. Ossip (mossip@morganlewis.com)
> Thomas S. Bloom (tbloom@morganlewis.com)
> MORGAN, LEWIS & BOCKIUS LLP
> 1701 Market Street
> Philadelphia, PA 19103
> (215) 963-5543
> Attorneys for Defendant
Dated: December 11, 2006        Christiana Care Health Services, Inc.